1 SEAN K. KENNEDY, Bar no. 145632
Federal Public Defender
2 CRAIG A. HARBAUGH, Bar No. 194309
eMail:  craig_harbaugh@fd.org
3 LINDA L. GRIFFIS, Bar No. 100827
eMail: linda_griffis@fd.org
4 Deputy Federal Public Defenders
321 East 2nd Street
5 Los Angeles, Californ   90012-4202
Telephone (213) 894-2854
6 Facsimile (213) 894-7566

7 Attorneys for Petitioner
MARIA DEL ROSIO ALFARO
8

9 **UNITED STATES DISTRICT COURT**

10 **CENTRAL DISTRICT OF CALIFORNIA**

11

| 12 MARIA DEL ROSIO ALFARO, | ) | Case No. CV 07-7072-CJC |
| 13     Petitioner, | ) | **DEATH PENALTY CASE** |
| 14     v. | ) | **PETITION FOR WRIT OF HABEAS CORPUS** |
| 15 DEBORAH PATRICK, Warden of Central California Women's Facility, | ) | |
| 16     Respondent. | ) | **EXHIBITS 1 - 92 FILED CONCURRENTLY** |
| 17 | ) | |

18

19       Petitioner, Maria Del Rosio Alfaro, by and through her counsel, hereby

20 petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 *et seq.*,

21 and Rule 83-17.3 of the Local Rules for the United States District Court for the

22 Central District of California.  This is a "protective petition" which is being filed in

23 the event that the expedited-review procedures of Chapter 154 of the federal habeas

24 statute (28 U.S.C. § 2261, *et seq.*) and, in particular, the 180-day statute of limitations

25 contained in 28 U.S.C. § 2263(a), are held to apply to Petitioner's case retroactively.

26 / / /

27 / / /

28

1

## **<u>TABLE OF CONTENTS</u>**

2
**<u>Page</u>**

3

Exhibit Index. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvi

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     JURISDICTIONAL ALLEGATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . .  5

III.    INCORPORATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

IV.     PROCEDURAL HISTORY AND BACKGROUND. . . . . . . . . . . . . . . .  10

V.      STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

VI.     CLAIM 1:  PETITIONER WAS DEPRIVED OF HER RIGHT TO
        THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR
        AND RELIABLE DETERMINATION OF GUILT AND PENALTY
        BY TRIAL COUNSEL'S DEFICIENT PERFORMANCE.  . . . . . . . . . . .  32

        A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

        B.    COUNSEL'S REFUSAL TO PERMIT MS. ALFARO TO PLEAD
              GUILTY DESPITE HER DESIRE TO DO SO.. . . . . . . . . . . . . . . . . .  35

        C.    COUNSEL'S FAILURE TO MOVE TO WITHDRAW OR TO
              ADVISE CLIENT TO MOVE FOR SUBSTITUTE COUNSEL
              DESPITE COMPLETE BREAKDOWN OF ATTORNEY-CLIENT
              RELATIONSHIP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

        D.    COUNSEL'S FAILURE TO REQUEST CO-COUNSEL. . . . . . . . . . . .  52

        E.    COUNSEL'S FAILURE TO ADMIT MS. ALFARO'S OFFER TO
              ENTER A GUILTY PLEA IN THE PENALTY PHASE.. . . . . . . . . . . .  54

        F.    COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND
              DISCOVER THE IDENTITY OF THE MAN PRESENT AT THE
              CRIME SCENE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

        G.    COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND
              ACCURATELY IDENTIFY THE DRIVER AND ATTENDANT
              FAILURE TO DEVELOP AND PRESENT SUBSTANTIAL
              DOMINATION/EXTREME DURESS MITIGATION EVIDENCE.. . . .  67

        H.    COUNSEL'S FAILURE TO ADEQUATELY ARGUE THE FACTS
              THAT SUPPORTED A PENALTY PHASE DEFENSE OF
              SUBSTANTIAL DOMINATION AND EXTREME DURESS. . . . . . . .  71

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Table of Contents (cont')</u>**                                                 **<u>Page</u>**

I.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE
     AND DEVELOP MITIGATION EVIDENCE, TO UTILIZE
     RETAINED EXPERTS, TO RETAIN NECESSARY EXPERTS
     AND TO PRESENT AVAILABLE MITIGATION EVIDENCE........ 74

     1. COUNSEL'S FAILURE TO CONDUCT AN ADEQUATE
        PENALTY PHASE INVESTIGATION......................... 75

     2. COUNSEL'S FAILURE TO EFFECTIVELY UTILIZE THE
        EXPERTS HE RETAINED. ................................ 78

        a. Martha Rogers, Ph.D................................. 77

        b. Consuelo Edwards, M.D................................. 79

        c.  Armando Morales...................................... 82

     3. COUNSEL'S FAILURE TO RETAIN AND PRESENT THE
        TESTIMONY OF APPROPRIATE EXPERTS AND LAY
        WITNESSES.............................................. 82

        a. Failure to Retain and Present Testimony of a Neuro-psychologist
           and Appropriate Lay Witnesses............................. 82

        b. Failure to Retain and Present Testimony of a Qualified
           Psychiatrist and Appropriate Lay Witnesses................... 87

        c. Failure to Retain and Present Testimony of a School Testing
           Expert and Present Appropriate Lay Witness Testimony.......... 95

        d. Failure to Retain and Present Testimony of a Qualified
           Psychologist and Appropriate Law Witnesses. ............... 104

        e. Failure to Retain and Present Testimony of an Expert on Brain
           Development and Appropriate Lay Witness Testimony......... 106

        f. Failure to Retain and Present Testimony of an Expert
           on Environmental Toxicity and Appropriate Lay Witness
           Testimony.............................................. 107

        g. Conclusion............................................. 107

J.   COUNSEL'S FAILURE TO MOVE FOR A CHANGE OF VENUE. . . 107

K.   COUNSEL'S FAILURE TO FILE A TIMELY MOTION
     TO SUPPRESS MS. ALFARO'S CONFESSION. ................ 109

L.   COUNSEL'S FAILURE TO ADEQUATELY ADVISE MS. ALFARO
     REGARDING HER FIFTH AMENDMENT RIGHT................ 111

M.   COUNSEL'S FAILURE TO SEEK AN  EVALUATION OF
     PETITIONER'S COMPETENCY............................... 114

iii

1    **Table of Contents (cont')**                                                **Page**

2    N.   COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF THE
          PSYCHOTROPIC DRUGS MS. ALFARO WAS PRESCRIBED
3         WHILE IN JAIL AS MITIGATING EVIDENCE AND TO EXPLAIN
          HER APPARENT INATTENTIVENESS DURING TRIAL . . . . . . . . . 118
4
     O.   COUNSEL'S FAILURE TO PRESENT EVIDENCE AVAILABLE
5         AND NECESSARY TO ADDRESS THE AGGRAVATORS . . . . . . . . 118

6    P.   ADDITIONAL INSTANCES OF COUNSEL'S FAILURE
          TO PROVIDE EFFECTIVE ASSISTANCE. . . . . . . . . . . . . . . . . . . . . . 122
7
     Q.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
8

9    VII.  CLAIM 2:  MR. MONROE PROVIDED INEFFECTIVE
           ASSISTANCE OF COUNSEL BY FAILING TO PROVIDE
10         AUTHORITY TO THE TRIAL COURT FOR THE ADMISSION OF
           MS. ALFARO'S UNCONDITIONAL OFFER TO PLEAD GUILTY
11         AS MITIGATION EVIDENCE IN THE PENALTY PHASE OF THE
           TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
12
     A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
13
     B.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
14
     C.   MR. MONROE PROVIDED INEFFECTIVE ASSISTANCE OF
15        COUNSEL BY FAILING TO PROVIDE AUTHORITY FOR THE
          ADMISSIBILITY OF MS. ALFARO'S WILLINGNESS TO PLEAD
16        GUILTY AS MITIGATING EVIDENCE IN EITHER PENALTY
          PHASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
17
     D.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
18
     VIII.  CLAIM 3:  ASSUMING PETITIONER WAS COMPETENT TO
19          STAND TRIAL, PETITIONER WAS DENIED HER RIGHT TO BE
            PRESENT   FOR ALL PROCEEDINGS IN HER CAPITAL TRIAL. . . 136
20
     A.   PETITIONER WAS ABSENT FROM CRITICAL STAGES OF HIS
21        CAPITAL TRIAL PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . 137

22   B.   PETITIONER'S ABSENCE FROM HER CAPITAL TRIAL
          REQUIRES HABEAS RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
23
     IX.   CLAIM 4:  APPELLATE COUNSEL PROVIDED INEFFECTIVE
24         ASSISTANCE BY FAILING TO ASSERT A VIABLE *BATSON*
           CLAIM ON APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
25
     X.   CLAIM 5:  TRIAL COUNSEL PROVIDED INEFFECTIVE
26        ASSISTANCE BY FAILING TO OBJECT AFTER THE
          PROSECUTOR STRUCK THE SECOND AND THIRD LATINO
27        JURORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
28

                                        iv

1

**Table of Contents (cont')**                                                   **Page**

2   XI.   CLAIM 6:  HE PROSECUTION'S FAILURE TO PRODUCE
         EXCULPATORY EVIDENCE AND THE PRESENTATION OF
3        FALSE TESTIMONY VIOLATED PETITIONER'S
         CONSTITUTIONAL RIGHTS. ................................ 144

4
         A.   INTRODUCTION. ......................................... 144
5
         B.   LAW IN SUPPORT OF CLAIM. ............................. 144
6
         C.   FACTS IN SUPPORT OF CLAIM. ........................... 147
7
              1.  The Prosecutor Failed to Disclose Exculpatory Evidence and
8                 Presented False Testimony Regarding Third-Party Culpability. .... 147

9             2.  The Prosecutor Failed to Disclose and Presented False Testimony
                  Regarding Regarding Impeachment Evidence of Reynoso. ........ 152
10
    XII.  CLAIM 7:  THE DISTRICT ATTORNEY ENGAGED IN
11        EGREGIOUS AND PERVASIVE MISCONDUCT THAT
          RENDERED MS. ALFARO'S PENALTY PHASE RETRIAL
12        FUNDAMENTALLY UNFAIR. ............................... 154

13        A.   INTRODUCTION. ......................................... 155

14        B.   LEGAL STANDARDS. ..................................... 156

15        C.   THE PROSECUTOR ELICITED IMPROPER AGGRAVATING
               EVIDENCE AT THE SECOND PENALTY TRIAL. ............... 158
16
               1.  Ms. Alfaro's Non-felonious, Non-violent Criminal Record
17                 Was Improperly Introduced. ................................ 158

18             2.  Mr. Middleton Improperly Introduced Other Inadmissible
                   "Bad Acts" Evidence. ..................................... 162
19
               3.  Mr. Middleton Improperly Argued Lack Of Remorse. ........... 162
20
               4.  Mr. Middleton Improperly Attempted to Introduce Evidence
21                 Of Intent to Kill.. ....................................... 163

22             5.  Mr. Middleton Improperly Suggested that Ms. Alfaro Had Been
                   "Coaxed" to Tell the Jury About Being Raped as a Child and
23                 Improperly Denigrated the Defense Experts. ................... 163

24        D.   THE PROSECUTOR MISCHARACTERIZED THE LAW.. .......... 164

25        E.   THE PROSECUTOR INFLAMED THE JURY'S PASSIONS. ....... 166

26        F.   THE CUMULATIVE PREJUDICE OF THE PROSECUTOR'S
               MISCONDUCT REQUIRES REVERSAL OF MS. ALFARO'S
27             SENTENCE. ............................................. 167

28

**Table of Contents (cont')**                                                    **Page**

XIII.   CLAIM 8:  THE PROSECUTION ENGAGED IN REPEATED
        MISCONDUCT THROUGHOUT ALL PHASES OF
        PETITIONER'S TRIAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

XIV.    CLAIM 9:  THE PROSECUTOR VIOLATED THE EQUAL
        PROTECTION CLAUSE BY EXERCISING PEREMPTORY
        CHALLENGES BASED UPON A RACIALLY
        DISCRIMINATORY MOTIVE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

        A.   FACTS IN SUPPORT OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . 173

             1.  Richard Sanchez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

             2.  Susan Mayor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

             3.  Jaime Soto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

        B.   LAW IN SUPPORT OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . . 185

             1.  The Defendant is Latina and the Victim Was White in a Case
                 With Strong Racial Undertones. . . . . . . . . . . . . . . . . . . . . . . . . 188

             2.  At the Time of the Prosecutor's Strike of Sanchez, No Latinos
                 Were on the Panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

             3.  The Prosecutor Struck Three Latino Jurors Eligible for Causal
                 or Peremptory Challenges for Both Jury Selections.. . . . . . . . . . . . 190

             4.  There was no Plausible Justification for the Prosecutor to Strike
                 Sanchez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

             5.  There Was No Difference Between Juror Sanchez and the
                 Remaining White Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

             6.  The Prosecutor Refused to Explain His Reasons for Striking
                 Juror Sanchez Despite Being Given an Opportunity to Do So
                 By the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

XV.     CLAIM 10:  MS. ALFARO WAS DENIED A FAIR-CROSS
        SECTION OF VENIRE PERSONS BASED UPON A FLAWED
        PROCESS USED TO SELECT AND IMPANEL HIS JURIES. . . . . . . . 192

        A.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

        B.   APPLICABLE LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

XVI.    CLAIM 11:  PETITIONER'S CONSTITUTIONAL RIGHTS
        WERE VIOLATED BY THE IMPANELMENT OF JURORS
        WHO WERE BIASED IN FAVOR OF THE DEATH PENALTY. . . . . 197

XVII.   CLAIM 12:  PETITIONER'S CONSTITUTIONAL RIGHTS
        WERE VIOLATED BY THE CONCEALMENT OF MATERIAL
        INFORMATION ON VOIR DIRE. . . . . . . . . . . . . . . . . . . . . . . . . . . 200

**Table of Contents (cont')**                                          **Page**

XVIII.   CLAIM 13:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE EXCUSAL OF JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT EXCUSAL. . . . . 204

XIX.   CLAIM 14:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN JURORS WERE NOT REMOVED FOR CAUSE OR BIAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

XX.   CLAIM 15:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT'S BIAS. . . . . . . . . . . . . . 209

A.   LAW IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

B.   FACTS IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . 213

1.  The Trial Judge Was Biased Based Upon His Emotional Entanglement With a Custody Proceeding Against His Stepson Who Was a Drug Addict Identical to Petitioner. . . . . . . . . . . 213

2.  Trial Judge's Conduct Throughout Trial Evidenced His Strong Bias Against Petitioner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

3.  The Trial Judge Had a Personal Interest in the Case Based Upon His Work Relationship With the Victim's Mother. . . . . . . . . . 221

XXI.   CLAIM 16: THE CONFLICT BETWEEN PETITIONER AND TRIALCOUNSEL VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

B.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

C.   LEGAL BASIS OF THE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

1.  The Trial Court's Refusal to Substitute Counsel Violated Ms. Alfaro's Sixth Amendment Right to Conflict-Free Counsel . . . . 232

2.  Mr. Monroe's Decision to Prevent Ms. Alfaro from Pleading Guilty Adversely Affected His Performance. . . . . . . . . . . . . . . . . . . 234

D.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

XXII.   CLAIM 17:  THE TRIAL COURT ERRED BY PRECLUDING EVIDENCE OF PETITIONER'S OFFER TO PLEAD GUILTY. . . . . . 238

A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

B.   LAW IN SUPPORT OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . . . . 239

C.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

1

**Table of Contents (cont')**                                                                              **Page**

2
3
   D.    THE TRIAL COURT ERRED IN EXCLUDING THE
         EVIDENCE OF MS. ALFARO'S WILLINGNESS TO
         PLEAD GUILTY DURING THE PENALTY PHASES OF
         HER TRIAL........................................................ 242
4
5
   E.    CONCLUSION. ................................................... 244

XXIII.   CLAIM 18:  THE TRIAL COURT COMMITTED MULTIPLE
6        ERRORS CONDUCTING VOIR DIRE FOR EACH OF MS.
         ALFARO'S TRIALS ........................................... 245
7
8
   A.    INTRODUCTION. ................................................ 246
9
   B.    THE TRIAL COURT ERRED IN DENYING THE DEFENSE
         REQUEST FOR ADDITIONAL VOIR DIRE ABOUT THE
10       CHILD VICTIM.................................................. 247

         1. Introduction............................................... 247
11
         2. Where A Particular Factor In A Case Would Cause A Juror
12          To Invariably Vote For Death, That Juror Is Not Fair And
            Impartial. ................................................. 248
13
         3. In this Case, the Defense Urged That the Fact the Victim
14          Was a Child Could Cause Certain Jurors to Invariably
            Vote for Death.............................................. 252
15
            a.  First Trial........................................... 252
16
            b.  Second Trial.......................................... 254
17
         4. The Court Improperly Restricted Inquiry Into Jurors' Views
18          Regarding a Child Victim.................................... 255
19
         5. Conclusion. ............................................... 260
20
   C.    THE TRIAL COURT ERRED IN REFUSING TO EXCUSE
         JUROR PATTON FOR CAUSE AND IN FAILING TO GRANT
21       THE DEFENSE ADDITIONAL PEREMPTORY CHALLENGES..... 260

22       1. Introduction............................................... 260

23       2. Statement of Facts......................................... 261

24       3. The Defense Was Forced To Exhaust All Of Its Peremptory
            Challenges As A Result of the Trial Court's Failure to Strike
25          For Cause Jurors Who Had Strong Feelings That Would
            Render Them Biased Against Ms. Alfaro....................... 265
26
         4. The Trial Court Erred In Failing To Remove Mr. Patton
27          For Cause. ................................................ 266

28       5. Conclusion. ............................................... 268

**Table of Contents (cont')**                                            **Page**

D.   THE TRIAL COURT ERRED BY DENYING THE DEFENSE
     REQUEST FOR SEQUESTERED VOIR DIRE DURING THE
     DEATH QUALIFICATION PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . 269

     1.  Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

         a.  First Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

         b.  Second Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

     2.  The Trial Court Failed To Exercise Its Discretion To Hold
         Sequestered Voir Dire, Resulting In A Capital Jury That Was
         Conditioned To Impose The Death Sentence. . . . . . . . . . . . . . . . . . 275

         a.  In Capital Cases Courts Must Be Especially Vigilant To
             Guard Against Biased Jurors. . . . . . . . . . . . . . . . . . . . . . . . . 275

         b.  *Hovey* v. *Superior Court*. . . . . . . . . . . . . . . . . . . . . . . . . . . 277

         c.  Death Qualification After Code of Civil Procedure § 223's
             Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

     3.  The Trial Court Failed to Exercise Its Discretion. . . . . . . . . . . . . 281

     4.  If This Court Finds That The Trial Court Exercised Discretion,
         It Must Find That The Trial Court Abused its Discretion. . . . . . . . . 283

     5.  The Court's Failure to Conduct Individual or Group Voir Dire
         Resulted in a Miscarriage of Justice. . . . . . . . . . . . . . . . . . . . . . . 287

E.   THE TRIAL COURT'S MULTIPLE ERRORS IN CONDUCTING
     VOIR DIRE DEPRIVED MS. ALFARO OF HER RIGHT TO A
     FAIR AND IMPARTIAL JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

     1.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

     2.  Statement Of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

         a.  The First Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

         b.  The Second Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

     3.  The Magnitude Of The Capital Jury's Responsibility Requires
         That The Trial Court Be Scrupulous In Maintaining Both the
         Appearance And The Fact Of Impartiality. . . . . . . . . . . . . . . . . . . 295

     4.  The Trial Court's Decisions Regarding The Conduct of Voir
         Dire Deprived Ms. Alfaro Her Right To An Impartial Jury. . . . . . . . 296

         a.  The Court's Decision To Deny Sequestered Voir Dire
             Was Erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

1    **Table of Contents (cont')**                                                        **Page**

2

3            b.  The Court's Decision To Deny A Jury Questionnaire
                Was Erroneous................................................ 297

4            c.  The Court's Refusal To Ask Questions About The
                Child Victim Was Erroneous................................. 298

5

6            d.  The Court Compounded Each Of The Above Errors
                Through Its  Fashioning Of The Death Qualification
                Questions, Resulting In A Jury Predisposed To Find

7               Ms. Alfaro Guilty And To Sentence Her To Death. ........... 299

8        5. Conclusion. ................................................... 300

9    XXIV.    CLAIM 19:  THE TRIAL COURT'S FAILURE TO CLOSE
             MS. ALFARO'S TRIAL SO THAT SHE COULD TESTIFY
10           WITHOUT FEAR OF RETALIATION VIOLATED HER
             CONSTITUTIONAL RIGHTS    ............................. 302
11
         A.  PROCEDURAL HISTORY................................... 303
12
         B.  LEGAL STANDARD. ...................................... 305
13
         C.  THE TRIAL COURT'S REFUSAL TO CLOSE THE
14           COURTROOM DURING MS. ALFARO'S TESTIMONY
             VIOLATED HER CONSTITUTIONAL RIGHTS................. 308
15
         D.  CONCLUSION. ........................................... 311
16
     XXV.    CLAIM 20:  THE TRIAL COURT'S FAILURE TO SUBSTITUTE
17           PETITIONER'S COUNSEL VIOLATED HER CONSTITUTIONAL
             RIGHTS................................................... 312
18
         A.  INTRODUCTION. ......................................... 313
19
         B.  STATEMENT OF FACTS.................................... 316
20
         1.  September 1991......................................... 317
21
         2.  November 1991.......................................... 318
22
         3.  February 20-21, 1992. .................................. 320
23
         4.  March 5, 1992........................................... 322
24
         5.  March 9-18, 1992:  The Guilt Phase Trial. ................ 323
25
         6.  March 30-April 1, 1992:  The First Penalty Phase Trial. .......... 324
26
         7.  April 9, 1992:  The *Marsden* Hearing. ..................... 326
27
         8.  May 19-June 3, 1992:  The Second Penalty Trial. ............... 335
28

1

**Table of Contents (cont')**                                               **Page**

2

   9. July 14, 1992: Hearing On Defendant's Motion For
      Reduction Of Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  337

3

   C.   MS. ALFARO HAD THE RIGHT TO THE EFFECTIVE
4       ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  338

5  D.   THE TRIAL COURT'S DENIAL OF MS. ALFARO'S
        MOTION FOR APPOINTMENT OF SUBSTITUTE COUNSEL
6       VIOLATED HER CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . .  338

7       1. MS. ALFARO SHOWED THAT SHE AND MR. MONROE
           HAD BECOME EMBROILED IN SUCH AN IRRECONCILABLE
8          CONFLICT THAT INEFFECTIVE REPRESENTATION WAS
           LIKELY TO RESULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  339
9
        2. MS. ALFARO SHOWED THAT MR. MONROE HAD
10         PROVIDED HER WITH INADEQUATE REPRESENTATION. . . .  342

11              a.  Mr. Monroe Provided Inadequate Representation By
                    Denying Ms. Alfaro The Right To Make Critical
12                  Decisions About Her Defense. . . . . . . . . . . . . . . . . . . . . . . .  342

13              b.  Mr. Monroe Provided Inadequate Representation When
                    He Refused To Consent To A Guilty Plea     . . . . . . . . . . . . .  343
14
                c.  Mr. Monroe Provided Inadequate Representation When
15                  He Advised Ms. Alfaro Concerning Her Testimony. . . . . . . .  344

16      3. MS. ALFARO'S REQUEST FOR SUBSTITUTE COUNSEL
           WAS TIMELY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  346
17
        4. THE COURT'S INQUIRY WAS INADEQUATE. . . . . . . . . . . . . .  347
18
   E.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  348
19
XXVI.  CLAIM 21: THE TRIAL COURT DENIED MS. ALFARO
20      HER SIXTH AND FOURTEENTH AMENDMENT RIGHTS
        IN DENYING THE DEFENSE CHANGE OF VENUE
21      MOTION BEFORE THE RETRIAL OF THE PENALTY
        PHASE BECAUSE OF JURORS' EXPOSURE TO
22      INFLAMMATORY PUBLICITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  350

23   A.  INTRODUCTION AND DESCRIPTION OF THE PUBLICITY. . . . .  351

24   B.  A CHANGE OF VENUE MUST BE GRANTED WHERE,
         AS HERE, A REASONABLE LIKELIHOOD EXISTS THAT
25       A FAIR AND IMPARTIAL TRIAL CANNOT OTHERWISE
         BE HAD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  353
26
         1. The Nature And Gravity Of The Offense. . . . . . . . . . . . . . . . . . . .  354
27
         2. The Standing Of The Victim And Accused In The Community  . . . .  354
28

1

**Table of Contents (cont')**                                              **Page**

2    3.  The Sensational, Inflammatory Publicity. . . . . . . . . . . . . . . . . . . . . . 355

3    4.  The Impact On The Community. . . . . . . . . . . . . . . . . . . . . . . . . . . . 356

4    C.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357

5    XXVII.  CLAIM 22:  THE TRIAL COURT VIOLATED PETITIONER'S
         DUE PROCESS RIGHTS BY COMMITTING NUMEROUS
6        EVIDENTIARY ERRORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357

7    A.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

8    B.  STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360

9    1.  Dr. Morales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 361

10   2.  Dr. Edwards.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 364

11   3.  Dr. Rogers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365

12   4.  The District Attorney's Closing Argument.  . . . . . . . . . . . . . . . . . 367

13   C.  LEGAL ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368

14   1.  The Trial Court Erred In Permitting Extensive Cross-
         Examination Of Drs. Morales and Edwards Based On
15       Raw Data And Rough Notes They Were Not Qualified To
         Interpret And Had Not Relied Upon.. . . . . . . . . . . . . . . . . . . . . . . 369
16
     2.  The Trial Court Erred In Allowing The District Attorney
17       To Call Dr. Rogers As A Rebuttal Witness. . . . . . . . . . . . . . . . . . 373

18   D.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377

19   XXVIII.  CLAIM 23:  THE TRIAL COURT ERRED IN ADMITTING
         EVIDENCE OVER DEFENSE COUNSEL'S OBJECTION
20       CONCERNING  MS. ALFARO'S NON-FELONIOUS, NON-
         VIOLENT CRIMINAL CONDUCT AND HER "INTENT TO KILL".. 378
21
     A.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379
22
     B.  STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 380
23
24   C.  THE COURT ERRED IN NOT EXCLUDING EVIDENCE OF
         MS. ALFARO'S NON-FELONIOUS, NON-VIOLENT CRIMINAL
25       RECORD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

     D.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 384
26
27   XXIX.  CLAIM 24:  THE TRIAL COURT'S DETERMINATION THAT
         THE AGGRAVATING CIRCUMSTANCE OUTWEIGHED THE
28       MITIGATING CIRCUMSTANCES VIOLATED PETITIONER'S
         CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385

1

**Table of Contents (cont')**             **Page**

2

    A.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 386

3

    B.     DESCRIPTION OF THE TRIAL COURT'S RULING. . . . . . . . . . . . . 387

4

    C.     THE TRIAL COURT FAILED TO CONSIDER ALL OF
            THE MITIGATING EVIDENCE PRESENT IN THIS CASE. . . . . . . . . 398

5

6

        1. The Trial Court Ignored the Mitigating  Evidence That
           Ms. Alfaro Had No Felony Record or Record of Criminal
           Activity Involving the Use or Attempted Use of Violence. . . . . . . . 400

7

8

        2. The Trial Court Ignored Mitigating Evidence  of the Affects
           of intoxication, Mental Defects, and Duress Which Impaired
           Ms. Alfaro's Ability to Conform Her Conduct to the

9

           Requirements of the Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

10

        3. The Trial Court Ignored the Mitigating Evidence of
           Ms. Alfaro's Youth, Disadvantaged Background, and

11

           Her Remorse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

12

        4. The Trial Court's Determination That Ms. Alfaro Was Entitled
           to No Sympathy Based on "Choices" She Had Made Was

13

           Fundamentally Flawed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

14

    C.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

15

XXX.    CLAIM 25:  THE DENIAL OF PETITIONER'S MOTION
        FOR NEW TRIAL VIOLATED PETITIONER'S

16

        CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 408

17

    A.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409

18

    B.     THE TRIAL COURT'S RULING. . . . . . . . . . . . . . . . . . . . . . . . . . . 409

19

    C.     THE COURT HAD A DUTY TO LOOK AT ANY EVIDENCE
            THAT RENDERED THE DEATH VERDICT INAPPROPRIATE . . . . 416

20

    D.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

21

XXXI.    CLAIM 26:  THE TRIAL COURT'S ERRONEOUS AND
        PREJUDICIAL DENIAL OF PETITIONER'S MOTIONS

22

        VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS. . . . . . . . 418

23

    A.     DEFENSE MOTIONS DENIED BY THE TRIAL COURT. . . . . . . . . 418

24

    B.     HABEAS RELIEF IS WARRANTED. . . . . . . . . . . . . . . . . . . . . . . . 422

25

XXXII. CLAIM 27:  THE TRIAL COURT VIOLATED
        PETITIONER'S RIGHTS BY FAILING TO PROVIDE

26

        PETITIONER WITH THE NECESSARY ASSISTANCE

27

        OF COMPETENT AND INDEPENDENT EXPERTS. . . . . . . . . . . . . 423

28

1

<u>**Table of Contents (cont')**</u>                                                                                **Page**

2

3
XXXIII. CLAIM 28:  THE EXECUTION OF PETITIONER WOULD
          CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AS
          PETITIONER IS MENTALLY RETARDED.....................  425

4
    A.    INTRODUCTION. ..........................................  425

5

6
    B.    PETITIONER IS MENTALLY RETARDED.....................  426

7
        1. PETITIONER HAS WELL-DOCUMENTED SIGNIFICANT
          LIMITATIONS IN INTELLECTUAL FUNCTIONING. .........  427

8

9
        2. PETITIONER HAS SIGNIFICANT LIMITATIONS IN
          ADAPTIVE BEHAVIOR AS EXPRESSED IN CONCEPTUAL,
          SOCIAL, AND PRACTICAL ADAPTIVE SKILLS..............  429

10
          a. Conceptual Skills.......................................  429

11
              (i)    Functional Academics..............................  430

12
              (ii)    Communication..................................  430

13
              (iii)    Self-direction...................................  431

14
          b. Practical Skills........................................  431

15
               (i)    Self-Care. .......................................  431

16
              (ii)    Home Living. ...................................  431

17
               (iii)    Community Use...................................  432

18
               (iv)    Occupational Skills/Work.........................  432

19
          c. Social Skills..........................................  432

20
               (i)    Interpersonal Relationships And Responsibility. ........  432

21

22
              (ii)    Self-esteem, Gullibility, Naiveté, Capability to
                    Obey Laws, and Avoidance of Victimization............  432

23
        3. PETITIONER'S MENTAL RETARDATION MANIFESTED
          BEFORE THE AGE OF 18. ...............................  433

24
    C. CONCLUSION. ..........................................  433

25

26
XXXIV. CLAIM 29:  THE EIGHTH AMENDMENT PROHIBITS
          EXECUTION OF PETITIONER DUE TO HIS MENTAL
          DISABILITIES.........................................  434

27

28
XXXV.  CLAIM 30:  CALIFORNIA'S DEATH PENALTY SENTENCING
          SCHEME VIOLATES CONSTITUTIONAL GUARANTEES........  436

1

**Table of Contents (cont')**                                                    **Page**

2    A.   PENAL CODE § 190.2 FAILS TO ADEQUATELY NARROW
THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH
3        PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  437

4    B.   PENAL CODE § 190.2 GIVES PROSECUTING AUTHORITIES
UNGUIDED DISCRETION IN DECIDING WHETHER TO
5        CHARGE STATUTORILY DEATH-ELIGIBLE DEFENDANTS
WITH SPECIAL CIRCUMSTANCES AND TO SEEK THE
6        DEATH PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  439

7    C.   PENAL CODE § 190.3(A) as APPLIED IS UNCONSTITUTIONAL. .  441

8    D.   THE TRIAL COURT ERRED IN FAILING TO INSTRUCT
THE JURY ON WHICH FACTORS SHOULD COULD BE
9        CONSIDERED IN AGGRAVATION AND WHICH FACTORS
COULD BE CONSIDERED IN MITIGATION. . . . . . . . . . . . . . . . . .  446
10

11    E.   THE JURY WAS PRECLUDED FROM GIVING ANY
MITIGATING EFFECT TO EVIDENCE OF MS. ALFARO'S
MENTAL OR EMOTIONAL DISTURBANCE THAT WAS
12        DEEMED TO BE LESS THAN "EXTREME". . . . . . . . . . . . . . . . . . .  448

13    F.   THE TRIAL COURT FAILED TO INSTRUCT ON BURDEN
AND STANDARDS OF PROOF AT CRUCIAL STEPS IN THE
14        SENTENCING DETERMINATION.. . . . . . . . . . . . . . . . . . . . . . . . . . .  451

15    G.   THE TRIAL COURT ERRED IN FAILING TO DELETE
16        INAPPLICABLE FACTORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  452

17    H.   THE TRIAL COURT ERRED IN FAILING TO INFORM THE
JURY THAT IT HAD THE DISCRETION TO DECLINE TO
IMPOSE THE DEATH PENALTY AND RETURN A VERDICT
18        OF LIFE WITHOUT PAROLE EVEN IF IT FOUND NO
19        EVIDENCE IN MITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  453

20    I.   THE TRIAL COURT ERRED IN FAILING TO REQUIRE A
WRITTEN STATEMENT OF FINDINGS.. . . . . . . . . . . . . . . . . . . . . .  454

21    J.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  456

22  XXXVI. CLAIM 31: PETITIONER'S CONSTITUTIONAL RIGHTS
WERE VIOLATED AS A RESULT OF THE
23        DISCRIMINATORY MEANS OF SELECTING THE ORANGE
24        COUNTY VENIRE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  456

XXXVII.    CLAIM 32: THE VIOLATIONS OF FEDERAL LAW
25        ARTICULATED IN THIS PETITION ALSO
CONSTITUTE VIOLATIONS OF INTERNATIONAL
26        LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  459

27        A. INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  460
28

1

**Table of Contents (cont')**                                                    **Page**

2
3
4

    B. THE UNITED STATES, BY COMMITTING ITSELF TO VARIOUS MULTINATIONAL ORGANIZATIONS AND TREATIES, HAS COMMITTED ITSELF TO FOLLOWING INTERNATIONAL HUMAN RIGHTS LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460

5
6

    C. MS. ALFARO'S CONVICTION AND DEATH SENTENCE VIOLATE THE DUE PROCESS GUARANTEES OF INTERNATIONAL LAW. . . . . . . . . . . . . . . . . 463

7
8

        1. THE ARBITRARY IMPOSITION OF THE DEATH PENALTY AGAINST MS. ALFARO VIOLATES INTERNATIONAL LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 464

9
10
11

        2. THE CAPITAL PROSECUTION AND DEATH SENTENCE OF MS. ALFARO VIOLATE INTERNATIONAL LAW PROHIBITIONS AGAINST DISCRIMINATION ON THE BASIS OF RACE AND NATIONAL OR SOCIAL ORIGIN. . . . . . . . . . . . 465

12
13
14

        3. TOGETHER THE TRIAL COURT'S MULTIPLE ERRORS AND CALIFORNIA'S DEATH PENALTY SCHEME FAILED TO GUARANTEE MS. ALFARO EFFECTIVE PROTECTION AGAINST DISCRIMINATION IN VIOLATION INTERNATIONAL LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 466

15

    D. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 467

16
17
18

XXXVIII.   CLAIM 33:  PETITIONER WAS DENIED HIS CONSTITUTIONAL AND INTERNATIONAL LAW RIGHTS BECAUSE OF THE CUMULATIVE IMPACT OF ERRORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 468

19

XXXIX.   PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470

20

VERIFICATION OF PETITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | | **EXHIBITS IN SUPPORT OF PETITION** |
| 2 | **EXHIBIT** | **DESCRIPTION** |
| 3 | 1 | Declaration of Raymond McGrath, 07/30/2001 |
| 4 | 2. | Declaration of Martha Lee Rogers, Ph.D., 09/13/2000 |
| 5 | 3. | Declaration of Silvia Melendez Alonso, 05/21/2001 |
| 6 | 4. | Declaration of Maria Del Rosio Alfaro, 07/27/2001 |
| 7 | 5. | Declaration of Charles A. Sanislow, Ph.D., 07/03/2001 |
| 8 | 6. | Declaration of Sabrina Duran, 09/20/2000 |
| 9 | 7. | Declaration of Natasha Khazanov, Ph.D., 07/14/2001 |
| 10 | 8. | Declaration of Pablo Stewart, M.D., 07/23/2001 |
| 11 | 9. | Declaration of Silvia Alfaro, 05/22/2001 |
| 12 | 10. | Declaration of Cynthia Asprodites, Ph.D., 05/28/2001 |
| 13 | 11. | Declaration of Marcy Arcueta, 05/21/2001 |
| 14 | 12. | Declaration of Betty Cleary-Soto, 09/18/2000 |
| 15 | 13. | Declaration of Rosa Melendez Sanchez, 05/21/2001 |
| 16 | 14. | Memorandum from Stephen Shepard to William Monroe, 11/22/1991 |
| 17 | 15. | Note from Laura Lawhon's file (Monroe's Investigator), 08/20/1991 |
| 18 | 16. | Transcript of Dr. Danto's Sodium Pentothal Interview with Ms. Alfaro 09/27/1991 |
| 19 20 | 17. | Orange County Register Article "Final Analysis: Investigation Service Combines Psychiatry and Sleuthing to Examine Violent Deaths", 11/26/1991 |
| 21 22 | 18. | O.C.S.D. Deputy Allen's Interview Notes, 06/16/1990 |
| 23 | 19. | Flyer of Composite Drawing |
| 24 | 20. | Discovery page 2185 (Clue #584) |
| 25 | 21. | Discovery Page 2185 (Clue #642) |
| 26 | 22. | Police Interview with Antonio "Shorty" Reynoso / Raul Rodriguez, 07/02/1990 |
| 27 | 23. | Sandberg Interview of Torrres-Graciano in Mexico, 01/26/1992 |
| 28 | 24. | Autopsy Report of Autumn Wallace, 06/16/1990 |

1

**Exhibits in Support of Petition (cont'd)**

2

25.     O.C.S.D. Criminal Investigation Report re Telephone Interview with
        Ryan Joseph Finan, 06/25/1990

3

4

26.     Interview of Lien Nguyen by Inspector Giffin, 06/17/1990

5

27.     Psychiatric Evaluation by Consuelo Edwards, M.D., 03/23/1992

6

28.     Criminal Record of Antonio "Shorty" Reynoso / Raul Rodriguez

7

29.     Report by Armando T. Morales, DSW, 03/29/1992

8

30.     Anatomical Type Chart, by Consuelo Edwards, M.D.

9

31.     Clinical Articles re Sodium Pentathol

10

32.     Interview of Joyce Wallace and Roy Chester Wallace, 06/15/1990

11

33.     Orange County Sheriff-Coroner Department forensic Services, Report
        of Toxicological Examination, 06/28/1990

12

34.     Sheriff-Coroner Department Teletype Messages, 07/06/1990

13

35.     Interview of Vicky Darr, 12/1990

14

36.     Criminal History of Manuel Torres-Graciano

15

37.     O.C.S.D. Investigator Giffin's Investigative Overview, 11/02/1990

16

38.     Memo from Laura Lawhon to William M. Monroe Regarding
        Toxicologist, 01/13/2001

17

18

39.     News Article About Hon. Theodore Millard, 01/01/2001

19

40.     Jury Interview Notes (L. Lawhon email to W. Monroe) 04/28/1992

20

41.     Pretrial News Articles Regarding Murder of Autumn Wallace

21

42.     O.C.S.D. Interview of Juan Jiminez, 07/02/1990

22

43.     Defense Investigator Interview of Juan Jiminez, 10/11/1990

23

44.     O.C.S.D. Investigator Tom Giffin's Notes

24

45.     Laura Lawhon Notes re Interview of Ms. Alfaro, 03/25/1991

25

46.     Laura Lawhon Notes re Linda Wallace, 11/11/1991

26

47.     Notation re William Monroe's Request to District Attorney for Life
        Without Possibility of Parole

27

48.     O.C.S.D. Interview of Sabrina Duran, 07/05/1990

28

49.     Excerpt from O.C.S.D. Investigator Gary Bale's Notebook

xviii

**Exhibits in Support of Petition (cont'd)**

50.     Investigative Email from Detective Bale to Investigator Raymond McGrath, 06/21/2001

51.     David Sandberg Witness List Exchange, 05/02/1992

52.     O.C.S.D. Coroner's report of Evidence Examination, 07/19/1990

53.     Statement of Probable Cause and Arrest Affidavit for Ms. Alfaro

54.     Sandberg's Case Book Index notes on Manuel Torres-Graciano's Criminal History

55.     Advertisement in 1992 Clerk's Union Newsletter

56.     Multi-Generational Family Alcohol History Chart

57.     WAIS-R Records, 11/06/1990

58.     WMS-R Records, 11/08/1990

59.     MMPI-Z Records, 02/03/1992

60.     Interpretive Report and Profile of Maria Del Rosio Alfaro, Alcohol Use Inventory, 10/24/1990

61.     Juvenile Records of Ms. Alfaro

62.     Pre-Sentence Report by Bruce M. Carel, Deputy Probation Officer, Orange County Probation Department, 07/14/1992

63.     Interview Notes of Dr. Consuelo Edwards, 01/31/1992

64.     190.4(e) Hearing Order, 07/14/1992

65.     Order Appointing Dr. Martha Rogers as Expert Witness, 10/11/1990

66.     Jose Alfaro Medical Records

67.     Jose Alfaro's Pre-Sentence Report, 01/29/1999

68.     Birth Certificate of Manuel Cueva, Jr.

69.     Birth Certificate of Ehdie Berto Cueva-Alfaro

70.     Birth Certificate of Ernesto Cueva-Alfaro

71.     Birth Certificate of Daniel Alfaro

72.     CIGNA Healthplans, 10/20/1985 through 12/04/1985

73.     Lakewood Hospital and New Beginnings, 01/ 8-16/1987

74.     Phoenix House, 01/16-18/1987

xix

**Exhibits in Support of Petition (cont'd)**

75.    Family Health Plan - Fountain Valley, 08/14/1987

76.    Medical Records from Western Medical Center, 12/31/1989

77.    Medical Records from University of California Irvine Medical Center, July 4-15, 1989

78.    Medical Records from Western Medical Center, 12/31/1989

79.    Orange County Jail Records

80.    Medical Records from Western Medical Center, 02/05/1981

81.    California Correctional Women's Facility Records

82.    Anaheim County School District Records

83.    Declaration of Karen Snell, 07/30/2001

84.    Lawhon Notes, 1990

85.    Email re Toby Silver, 9/1991

86.    U.S. Census Bureau Data for Orange, CA., 1990

87.    Voir Dire Chart

88.    Declaration of Silvia Alfaro, 7/16/2008

89.    Declaration of Tamara Benedict, 7/18/2008

90.    Declaration of Jeff Hasner, 7/29/2008

91.    Declaration of Glass, 7/29/08

92.    Declaration of Ian MacNeil, 7/30/08

xx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## **INTRODUCTION**

1.   Petitioner is filing this protective petition after the effective date of the

Antiterrorism and Effective Death Penalty Act ("AEDPA"), and therefore the

AEDPA governs his Protective Petition.  *Woodford v. Garceau*, 538 U.S. 202,

123 S. Ct. 1398, 155 L. Ed. 2d 363 (2003).

> Under AEDPA, a habeas petition challenging a state court judgment
> shall not be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of the
> claim -- (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of clearly established Federal law, as
> determined by the Supreme Court of the United States; or (2) resulted
> in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  28 U.S.C. § 2254(e)(1) states that "a determination of a factual

issue made by a State court shall be presumed to be correct" and that the habeas

petitioner "shall have the burden of rebutting the presumption of correctness by clear

and convincing evidence."

2.   Ninth Circuit cases consistently hold that less deference to state court

decisions are warranted where, with regard to the majority of Petitioner's claims, the

state court summarily denied the claim without an opinion or an evidentiary hearing.

First, because "there is no reasoned state court decision to assess," the federal court

"must conduct an independent review of the record" to determine if the state court

decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1119

(9th Cir. 2006); *Brown v. Palmateer*, 379 F.3d 1089, 1092 (9th Cir. 2004) ("Because

the Oregon courts have provided no *ratio decidendi* to review, or to which we can

give deference, we employ the 'objectively reasonable' test.  In this situation, federal

habeas courts accord the state court decisions less deference than in standard habeas

cases"); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (similar).  A leading

treatise describes this Ninth Circuit rule as "an intermediate approach" in which the

court "review[s] the record 'independently' in a manner that is somewhat more

1    deferential to the state courts than the pre-AEDPA standard of *de novo* review."

2    Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure*,

3    Vol. 2 § 32.2 at 1576 & n.10 (5th ed. 2005).

4         3.  Second, because the state courts made no findings of fact or held a hearing

5    on the claims, there are no factual determinations for this Court to defer to, or for

6    § 2254(e)(1)'s presumption of correctness to apply to.  *Taylor v. Maddox*, 366 F.3d

7    992, 1014 (9th Cir. 2004) ("It is well-established that when the state courts do not

8    make findings at all, no presumption of correctness attaches, and we must make our

9    own findings.") (*citing Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2540, 156 L.

10   Ed. 2d 471 (2003)); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) ("with the

11   state court having refused Nunes an evidentiary hearing, we need not of course defer

12   to the state court's factual findings -- if that is indeed how those stated findings

13   should be characterized – when they were made without such a hearing"); *Killian v.

14   Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (similar).

15        4.  Further, in *Holland v. Jackson*, 524 U.S. 649, 653, 124 S. Ct. 2736, 159 L.

16   Ed. 2d 683 (2004) (per curiam), the Supreme Court recognized that "[w]here new

17   evidence is admitted [in the federal habeas court], some Courts of Appeals have

18   conducted *de novo* review [rather than apply the § 2254(d)(1) and (2) standards] on

19   the theory that there is no relevant state-court determination to which one could

20   defer."  *See, e.g.*, *Monroe v. Angelone*, 323 F.3d 286, 297-99 & n.19 (4th Cir. 2003);

21   *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003); *Williams v. Coyle*, 260 F.3d 684,

22   706 (6th Cir. 2001); *but see Matheny v. Anderson*, 377 F.3d 740, 747 (7th Cir. 2004);

23   *Valdez v. Cockrell*, 274 F.3d 941, 946-47, 951-52 (5th Cir. 2001); *see also LeCroy v.

24   Secretary, Florida Dep't of Corrections*, 421 F.3d 1237, 1262-63 & n.30 (11th Cir.

25   2005) (collecting cases).  This rule makes sense:  "the new, relevant evidence was

26   never before the state court so it never considered the impact of the evidence when

27   denying relief, and there is arguably nothing to defer to."  *LeCroy*, 421 F.3d at 1263

28   n.30.

1      5.  Petitioner is unaware of published Ninth Circuit opinions discussing this

2   line of cases on the issue of *de novo* review, but in *Killian v. Poole*, 282 F.3d at 1207,

3   the court concluded that "[f]or claims for which no adjudication on the merits in state

4   court was possible . . . AEDPA's standard of review does not apply."  The court

5   explained:  "AEPDA deference does not apply to Killian's perjury claim in this case

6   because the state courts could not have made a proper determination on the merits.

7   Evidence of the perjury, after all, was adduced only at the hearing before the

8   magistrate judge."

9      6.  The terms "contrary to" and "unreasonable application" have independent

10  meanings.  *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914

11  (2002); *Sarausad v. Porter*, 479 F.3d 671 (9th Cir. 2007).  A state court decision is

12  "contrary to" clearly established federal law if it arrives at a conclusion opposite to

13  that of the Supreme Court on a question of law, or decides the case differently than

14  the Supreme Court on a set of materially indistinguishable facts.  *Williams v. Taylor*,

15  529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *accord Carey v.*

16  *Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006).  To be an

17  "unreasonable application of" clearly established federal law, the state court decision

18  must have identified the correct legal rule but unreasonably applied it to the facts at

19  hand.  *Id.* at 406.

20     7.  "Supreme Court holdings at the time of the state court's last reasoned

21  decision are the source of clearly established Federal law for the purposes of

22  AEDPA," *citing Williams*, 529 U.S. at 412; *Abdul-Kabir v. Quarterman*, 127 S. Ct.

23  1654, 167 L. Ed. 2d 585 (2007) (granting habeas relief under AEDPA because state

24  court decision ignored "fundamental principles established by [the Supreme Court's]

25  most relevant precedents"); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005);

26  *accord Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Ninth Circuit

27  precedent remains persuasive authority in determining what is clearly established

28  federal law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000);

3

*Arnold v. Runnels*, 421 F.3d 859, 865 n.6 (9th Cir. 2005).  As the Supreme Court has stated, "in the context of federal habeas"  "[d]eference does not imply abandonment or abdication of judicial review."  *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).  To that end, while the standard as articulated in section 2254 is demanding, it is "not insatiable; as we said the last time this case was here, "'[d]eference does not by definition preclude relief.'"  *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162  L. Ed. 2d 196 (2005) (*Miller-El II*) (granting habeas relief under AEDPA), *citing Miller-El I*, 537 U.S. at 340; *see Panetti v. Quarterman*, ___ U.S. ___, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) ("AEDPA does not "'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"), *citing Carey*, 127 S. Ct. at 656 (Kennedy, J., concurring in judgment).

8.  When state courts fail to render a reasoned decision on the merits of a claim, the AEDPA rules are fundamentally altered.  Ninth Circuit cases consistently hold that less deference to state court decisions is warranted when the state court summarily denies a claim without an opinion or an evidentiary hearing.  First, because "there is no reasoned state court decision to assess," the federal habeas court "must conduct an independent review of the record" to determine if the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1119 (9th Cir. 2006); *Brown v. Palmateer*, 379 F.3d 1089, 1092-93 (9th Cir. 2004) ("Because the Oregon courts have provided no ratio decidendi to review, or to which we can give deference, we employ the 'objectively reasonable' test.  In this situation, federal habeas courts accord the state court decisions less deference than in standard habeas cases."); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (similar).  A leading treatise describes this Ninth Circuit rule as "an intermediate approach" in which the court "review[s] the record 'independently' in a manner that is somewhat more deferential to the state courts than the pre-AEDPA standard of de novo review."

4

Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (5th ed. 2005), Vol. 2, § 32.2 at 1576 & n.10.

9.  Second, because here, the state courts made no findings of fact (as to most claims), or held a hearing (as to all claims), there are no factual determinations for the federal habeas court to defer to, or for § 2254(e)(1)'s presumption of correctness to apply to.  *Taylor v. Maddox*, 366 F.3d 992, 1014 (9th Cir. 2004) ("It is well-established that when the state courts do not make findings at all, no presumption of correctness attaches, and we must make our own findings.") (*citing Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2540, 156 L. Ed. 2d 471 (2003)); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) ("with the state court having refused Nunes an evidentiary hearing, we need not of course defer to the state court's factual findings – if that is indeed how those stated findings should be characterized – when they were made without such a hearing"); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (similar).

# II.

## JURISDICTIONAL ALLEGATIONS

1.  Place of detention:  Central California Women's Facility, Chowchilla, California.

2.  Conviction on which Petition is based:

a.  Nature of offenses involved:  first-degree murder with special circumstance.

b.  California Penal Code sections:  Information of November 30, 1990: (1) Count 1, Penal Code § 187 (first-degree murder); (2) Count 2, Penal Code § 459/460.1 (residential burglary); (3) Penal Code § 211/212.5(a) (first degree robbery).  It was alleged as to all counts that Petitioner personally used a deadly and dangerous weapon, a knife, in violation of Penal Code § 12022(b).  The following special circumstances were alleged:  Petitioner was engaged in the commission

5

1   of a robbery (Penal Code § 190.2(a)(17)(i)), and a burglary in the first degree (Penal

2   Code § 190.2(a)(17)(vii)).

3             c.  Name and location of sentencing court:  Orange County Superior

4   Court, California.

5             d.  Case number:  C-82541.

6             e.  Date of conviction:  March 23, 1992.

7             f.  Date of sentence:  June 9, 1992.

8             g.  Sentence on each count: (1) Count 1, death; (2) Count 2, seven years,

9   (3) Count 3, seven years.

10            h.  Plea:  Not guilty.

11            i.  Kind of trial:  jury.

12            j.  Did you testify at trial?:  Petitioner testified only at the first penalty

13  phase, which resulted in a mistrial.

14        3.  Automatic appeal:

15            a.  Name of Court:  Supreme Court of the State of California, Crim. No.

16  S027730.

17            b.  Affirmed.

18            c.  Date of result:  August 6, 2007.

19            d.  Citation or number of opinion:  *People v. Alfaro*, 41 Cal. 4th 1277, 63

20  Cal. Rptr. 3d 433 (2007).

21            e.  In summary, the grounds raised in Petitioner's automatic appeal

22  included, but were not limited to:

23                (1)  Claim I - The Trial Court Erred in Failing to Adequately

24  Address the Conflict That Arose Between Ms. Alfaro and Her Counsel Regarding

25  Her Desire to Plead Guilty and His Refusal to Consent (And Trial Counsel Was

26  Ineffective);

27                (2)  Claim II - The Trial Court Erred by Precluding Evidence

28  of Ms. Alfaro's Offer to Plead Guilty;

6

1           (3)  Claim III - Trial Counsel Provided Ineffective Assistance

2   of Counsel by Failing to Provide Authority to the Trial Court for the Admission

3   of  Ms. Alfaro's Unconditional Offer to Plead Guilty as Mitigation Evidence in the

4   Penalty Phase of the Trial;

5           (4)  Claim IV - The Trial Court Committed Multiple Errors

6   Conducting Voir Dire for Each of Ms. Alfaro's Trials;

7           (5)  Claim V -  The Trial Court Erred in Failing to Close

8   Ms. Alfaro's Trial So That She Could Testify Without Fear of Retaliation;

9           (6)  Claim VI - The Trial Court Denied Ms. Alfaro Her Sixth

10  Amendment Right to Counsel by Failing to Substitute Counsel;

11          (7)  Claim VII - In Denying the Defense Change of Venue Motion

12  Before the Retrial of the Penalty Phase Because of Jurors' Exposure to Inflammatory

13  Publicity, the Trial Court Denied Ms. Alfaro Her Sixth and Fourteenth Amendment

14  Rights;

15          (8)  Claim VIII - The Trial Court Erred in Allowing Extensive

16  Cross-examination of Defense Experts Based on Inflammatory Rough Notes and Raw

17  Data That They Were Not Qualified to Interpret and Had Not Relied Upon, and in

18  Allowing the Prosecutor to Call the Defense Consulting Psychologist as a "Rebuttal"

19  Witness;

20          (9)  Claim IX - The Trial Court Erred in Admitting Evidence over

21  Defense Counsel's Objection Concerning Ms. Alfaro's Non-felonious, Non-violent

22  Criminal Conduct and Her "Intent to Kill";

23          (10)  Claim X - The District Attorney Engaged in Egregious and

24  Pervasive Misconduct That Rendered Ms. Alfaro's Penalty Phase Retrial

25  Fundamentally Unfair;

26          (11)  Claim XI - Many Features of California's Death Penalty

27  Sentencing Scheme, as Interpreted and Applied by this Court, Violate the Federal

28  Constitution;

(12)  Claim XII - The Violations of State and Federal Law Articulated above Likewise Constitute Violations of International Law and Require That Ms. Alfaro's Conviction and Penalty Be Set Aside;

(13)  Claim XIII - The Trial Court's Determination That the Aggravating Circumstance Outweighed the Mitigating Circumstances Was Contrary to Law and the Evidence Presented;

(14)  Claim XIV - Based on Mitigating Evidence Known to the Trial Judge That Was Not Brought Before the Jury, the Trial Court Had a Duty to Exercise its Authority to Modify the Verdict Pursuant to Penal Code § 1181(7);

(15)  Claim XV - Based on the Errors in Ms. Alfaro's Case That Mandate Reversal, Ms. Alfaro Urges this Court to Exercise its Authority to Modify the Verdict.

f.  The facts supporting these grounds are included in the claims below.

4.  Petition for Writ of Habeas Corpus:

a.  Name of Court: Supreme Court of the State of California, Crim. No. S099569.

b.  Result:  Denied.

c.  Date of result:  November 28, 2007.

d.  Citation or number of opinion:  2007 Cal. Lexis 13400.

e.  In summary, the grounds include, but are not limited to:

(1)  Claim 1 - Petitioner Was Deprived of Her Right to the Effective Assistance of Counsel and to a Fair and Reliable Determination of Guilt and Penalty by Trial Counsel's Deficient Performance;

(2)  Claim 2 - Petitioner's Conviction and Sentence Were Obtained by means of False Evidence and In Violation of *Brady v. Maryland* and *Giglio v. United States*;

(3)  Claim 3 - Petitioner's Constitutional Rights were Violated by the Trial Court's Bias;

8

1          (4)  Claim 4 - Petitioner's Constitutional Rights were Violated as a

2   Result of the Discriminatory Means of Selecting the Orange County Venire.

3          f.  The facts supporting these grounds are included in the claims below.

4          g.  No evidentiary hearing was held.

5     5.  Petition for Writ of Certiorari:

6          a.  Name of court: United States Supreme Court, case number 07-8483.

7          b.  Result:  Denied.

8          c.  Date of denial:  March 3, 2008.

9          d.  Citation or number of opinion: *Alfaro v. California*, ___ U.S. ___,

10  128 S. Ct. 1476, 170 L. Ed. 2d 300 (2008).

11         e.  In summary, the questions presented included:

12             (1)  Does California Penal Code Section 1018, which prohibits a

13  defendant from pleading guilty to a capital crime without his or her counsel's

14  consent, violate the defendant's Sixth Amendment right to make this fundamental

15  decision in his or her case ?

16    6.  Petitioner presently has no appeal pending before the state court.

17    7.  The following attorneys have represented Petitioner:

18         a.  At the trial:  William Monroe, Esq.

19         b.  On appeal and state habeas level:  Karen L. Snell, Esq.; Nanci L.

20  Clarence, Esq.

21

22                              **III.**

23                          **INCORPORATION**

24     1.  While Petitioner has endeavored to specifically state all facts and law

25  supporting each claim herein, additional supporting facts and law may have been

26  stated in separate claims.  For this reason, Petitioner incorporates by reference each

27  and every paragraph of this petition into each and every claim presented as if fully set

28

9

1  forth therein.  Petitioner additionally incorporates all exhibits appended to this
2  petition.  All references to exhibits are to those exhibits unless otherwise specified.

3      2.  Petitioner requests that this Court take judicial notice of the certified record
4  on appeal and all pleadings, briefs, orders and exhibits filed with the California
5  Supreme Court in connection with Petitioner's appeal (*People v. Alfaro*, Supreme
6  Court of the State of California, Crim. No. S027730) and in connection with
7  Petitioner's state habeas petition (*In re Maria Del Rosio Alfaro on Habeas Corpus*,
8  Supreme Court of the State of California, No. S099569).

9

10                                  **IV.**
11              **PROCEDURAL HISTORY AND BACKGROUND**

12     1.  The crimes at issue in this case were committed on June 15, 1990.  A
13  warrant for Ms. Alfaro's arrest was issued on June 26, 1997.  Ms. Alfaro was arrested
14  on June 27, 1990.  Immediately after her arrest, Ms. Alfaro confessed to the crimes
15  during a four hour videotaped interrogation by Orange County Sheriff's Investigators.

16     2.  On July 16, 1990, William Monroe, a member of the Alternate Defense
17  Panel of the Orange County Superior Court, was appointed to represent Ms. Alfaro
18  as the Public Defender's Office had a conflict of interest in that it had previously
19  represented Antonio "Shorty" Reynoso, aka Raul Rodriguez (hereinafter "Reynoso"),
20  one of two men who were present with Ms. Alfaro at 10462 Hedlund Avenue,
21  Anaheim, California, at the time of the crimes.

22     3.  On November 30, 1990, a three-count Information was filed in the Superior
23  Court charging Ms. Alfaro with:  (1)  having murdered Autumn Wallace, a violation
24  of Penal Code § 187(a); (2)  residential burglary of the dwelling occupied by Autumn
25  Wallace, a violation of Penal Code §§ 459/460.1; and (3)  first degree robbery
26  of Autumn Wallace, a violation of Penal Code §§ 211/212.5(a).  CT 63-64.[1]  It was

27  _____

28      [1]   "CT" hereinafter refers to the Clerk's Transcript in this matter.

1    alleged as to all counts that Petitioner personally used a deadly and dangerous

2    weapon, a knife, in violation of Penal Code § 12022(b).  The following special

3    circumstances were alleged: Petitioner was engaged in the commission of a robbery

4    (P.C. § 190.2(a)(17)(i)) and a burglary in the first degree (P.C. § 190.2(a)(17)(vii))

5    at the time Autumn Wallace was killed.  CT 63-64.

6          4.  On November 30, 1990, Ms. Alfaro entered a plea of not guilty to each

7    count and denied the special circumstances.  CT 62.

8          5.  On September 19, 1991, the defense filed a motion for specific jury

9    selection procedures which included a request for attorney conducted voir dire, a

10   written jury questionnaire, and/or individual questioning of jurors outside the

11   presence of other prospective jurors.  CT 118.  The motion was heard and denied on

12   November 1, 1991.  CT 230.

13         6.  On February 20, 1992, defense counsel William Monroe filed, ex parte, a

14   "Request For Special Instructions And For An Order To Obtain Specific Jail

15   Records."  CT 361.  On February 21, 1992, an in camera hearing was held during

16   which Mr. Monroe asked the court whether he had a duty to withdraw due to "an out

17   and out conflict" that had arisen between himself and Ms. Alfaro because she wanted

18   to plead guilty unconditionally and proceed to the penalty phase of the trial and he

19   refused to consent.  RT 106-23 (February 21, 1992 proceedings[2]).  The court refused

20   to advise Monroe, citing California Penal Code § 1018 and stating, "I don't know

21   why you talk about pleading guilty.  There is no way she'll plead guilty without the

22   consent of her attorney of record, period.  You have indicated very clearly you don't

23   consent to that.  So there isn't going to be a plea of guilty, period."  *Id*.  At no time

24   did Monroe move to withdraw.

25         7.  On February 26, 1992, the court heard the district attorney's oral in limine

26   motion to exclude any reference at trial to Petitioner's counsel's offer to have his

27   _____

28         [2]   "RT" hereinafter refers to the Reporter's Transcript in this matter.

1   client plead guilty in exchange for a sentence of life without the possibility of parole.

2   CT 400.  Though the district attorney conceded that an offer to plead guilty

3   unconditionally would constitute mitigating evidence, neither the court nor

4   Mr. Monroe informed the district attorney that Ms. Alfaro had made such an offer.

5   The court instead "direct[ed] counsel not to bring up that issue, or the defendant

6   herself if she were to testify not to bring up that issue, without leave of court. . . .

7   In all phases of the trial . . . ."  RT 187.

8        8.  On February 26, 1992, defense counsel filed a motion to exclude

9   Ms. Alfaro's videotaped confession and all statements made to investigating officers

10  based on a blood test indicating that Ms. Alfaro was under the influence of cocaine,

11  benzoylecconine and morphine at the time she made the statements.  CT 380.  After

12  a hearing held March 2, 1992, the motion was denied.  CT 436.

13       9.  After a number of continuances, jury selection began on March 3, 1992 (CT

14  444) and concluded on March 5, 1992.  CT 463.  A defense motion concerning the

15  prosecution's use of peremptory challenges in a discriminatory manner was made and

16  denied on March 4, 1993.  CT 456.  On March 5, 1992, the court denied the defense

17  motion for additional peremptory challenges, which argued that the defense had been

18  required to use peremptory challenges to excuse prospective jurors who should have

19  been excused for cause and further, that the court did not allow additional voir dire

20  questions -- in particular, questions aimed at bias based on the fact that the victim was

21  a child -- as requested by defendant.  CT 462.

22       10.  On March 9, 1992, the court granted a request for media coverage of trial

23  proceedings over defendant's objection and the guilt phase of the trial commenced.

24  CT 468.  The prosecution's case-in-chief concluded March 18, 1992.  CT 500.  Also

25  on March 18, 1992, defense counsel moved to exclude the press and public from the

26  courtroom during Ms. Alfaro's testimony only.  CT 489  The motion was supported

27  by a declaration signed by Ms. Alfaro, in which she stated:

28

12

> On the day of the murder of Autumn Wallace, June 15, 1990, I was in the company of two male hispanics [sic]. The name of one of them is Shorty, the name of the other person I am afraid to disclose because I fear for my personal safety and the safety of my family. On the day of the murder, this other male hispanic [sic] was in the house of Autumn Wallace with me. . . .
> If I testify in public so the newspapers get the information and I identify this male hispanic [sic], I believe my family will be harmed because the man is still out in the community.
> I cannot and will not testify unless my testimony is taken in a closed courtroom with my testimony sealed.

CT 497a-497c. The motion was denied. CT 499. Thereafter, Ms. Alfaro waived her right to testify at the guilt phase (CT 500-01) and the defense rested without calling any witnesses. CT 500.

11. On March 23, 1992, jury deliberations began. CT 966. On the same day, the jury delivered its verdict, finding Ms. Alfaro guilty on all counts and further finding the weapon allegation and the special circumstances to be true. CT 1086-90. One week later, on March 30, 1992, the penalty phase began. CT 1096-97. Ms. Alfaro took the stand in her own defense. RT 1592-1816. On direct she described her background and expressed her remorse. On cross-examination, she was questioned extensively about the circumstances of the crime. Both sides rested on April 1, 1992, after the prosecution was permitted to present rebuttal witnesses over defense counsel's objection. CT 1113. Closing arguments and instructions were given on April 2, 1992. CT 1119. After requests by the jury for further instructions and re-reading of testimony, the jury declared that it had reached an impasse on April 8, 1992. CT 1141. After determining pursuant to California Penal Code § 1140 that there was no possibility the jurors could reach a decision, the court declared a mistrial. CT 1147.

12. The day after the mistrial was declared, April 9, 1992, Ms. Alfaro requested that substitute counsel be appointed for her retrial due to an irreconcilable conflict with Mr. Monroe. RT 2119-49 (April 9, 1992 proceedings). The court denied the motion. CT 1195. Thereafter, the court scheduled the penalty phase retrial for May 11, 1992. CT 1440-a.

13

13.   Due to the excessive television and newspaper publicity surrounding the first trial and the verdict, on April 24, 1992, defense counsel filed a motion for change of venue or, in the alternative, a continuance of the retrial to allow the publicity to die down.  CT 1220.  On April 29, 1992, the trial court denied the motion.  CT 1292.  On May 6, 1992, the trial court denied defendant's motion to quash the district attorney's subpoena of non-testifying defense expert Dr. Martha Rogers as well as defense counsel's renewed motion to exclude Ms. Alfaro's videotaped confession.  CT 1440.

14.  On May 7, 1992, the trial court denied defense counsel's renewed motion for sequestered voir dire.  CT 1440A.  Jury selection in the penalty re-trial commenced on May 11, 1992 (CT 1441), and concluded on May 18, 1992.  CT 1519. The trial court denied the defense request to exclude witnesses on May 19, 1992, and the taking of evidence at the penalty re-trial commenced that same day.  CT 1528. The re-trial proceeded May 19, 20, 21, 26, 27, 28 and June 1, 2 and 3, 1992.

15.  On May 23, 1992, the Orange County Women's Jail classified Ms. Alfaro for a housing change due to the need for "acute mental health care."  CT 1745-46. On May 30, 1992, an entry was placed in her "jacket" indicating that she no longer needed "mental health care of that nature."  *Id.* at 1746.  On June 2, 1992, Ms. Alfaro waived her right to testify at the second penalty trial.  CT 1556.

16.  On June 2, 1992, the district attorney was permitted to call defense expert Dr. Martha Rogers.  CT 1557.  That same day, closing arguments and instructions were given and jury deliberations began.  CT 1572.  Jury deliberations continued June 8, 1992 (CT 1576), and June 9, 1992, on which date the jury determined that Ms. Alfaro should be sentenced to death.  CT 1586.

17.  On June 30, 1992, defense counsel filed a motion for a new trial.  CT 1699. On July 14, 1992, the motion was heard and denied, as was Petitioner's motion to modify the verdict.  CT 1815.  On that same date, the trial court pronounced the

14

judgment of death as to count 1 and stayed execution of sentence on the remaining

counts pursuant to California Penal Code § 654.  CT 1818-19.

18.  Petitioner's notice of appeal was filed on July 16, 1992.  CT 1820.

Petitioner's direct appeal is currently pending before this Court.

# V.

## STATEMENT OF FACTS

1.  Petitioner Maria del Rosio Alfaro was eighteen years old on June 15, 1990,

the date of the crimes of which she stands convicted.

2.  Ms. Alfaro was under the influence of heroin and cocaine at the time of the

crimes.  She became addicted to heroin at approximately age twelve.  According to

medical records, school records, and witnesses, Ms. Alfaro had well below average

intellectual functioning (her IQ tested at 78 at the time of trial, but may in fact be

much lower), organic brain damage, a violently abusive childhood resulting in post

traumatic stress disorder, major depressive disorder and borderline mental retardation,

all of which are documented to have preceded her drug addiction.

3.  The morning of June 15, 1990, Ms. Alfaro got up and fed her eighteen

month old son, Manny.  She then headed for "Little Tijuana," an area of Anaheim

known for its drug trade, to obtain heroin.  Once there, Ms. Alfaro obtained a mixture

of black tar heroin and cocaine from a drug dealer named Manuel Torres Graciano,

who provided her with drugs on "credit."  By mid-afternoon, she had injected herself

with the black tar heroin/cocaine mixture at least twice.

4.  Manuel Torres Graciano, then thirty years old, was a drinking buddy

of Ms. Alfaro's father.  Torres Graciano distributed drugs for Enrique "Kiko"

Hernandez, who had gone to high school with Ms. Alfaro's aunt.  As of June 15,

1990, Ms. Alfaro owed Hernandez several hundred dollars for drugs, and Torres

Graciano informed her it was time for her to pay up.  Torres Graciano agreed to give

Ms. Alfaro a ride to a house she told him about where there was property that could

15

1   be sold to pay her debt.  They were accompanied by "Shorty" Reynoso, a convicted

2   drug dealer who had been paroled the week before after serving three years in prison

3   for selling narcotics.  Torres Graciano himself was on probation at the time.  Reynoso

4   held Ms. Alfaro's baby in the back seat of the car, a brown Monte Carlo, while she

5   rode up front with Torres Graciano.  Reynoso hoped to buy a VCR from Ms. Alfaro

6   that he understood she was going to pick up at the house.

7        5.  The group arrived at the home of Joyce Wallace and her daughters April and

8   Autumn at approximately 3:45 p.m.  Ms. Alfaro got out of the car and went inside.

9   Torres Graciano also got out of the car.  Reynoso later testified that at first he

10   believed Ms. Alfaro was retrieving her own property, but quickly came to realize that

11   she was in fact burglarizing the home.

12        6.  Ms. Alfaro had previously stayed at the house with her friend, April

13   Wallace.  That afternoon, nine year old Autumn Wallace, who was home alone, let

14   Ms. Alfaro into the house.  Sending Autumn to do an errand for her in the back of the

15   house, Ms. Alfaro began gathering items and placing them by the front door.  Torres

16   Graciano entered the house to collect the items Ms. Alfaro placed by the front door

17   and take them to the car.  At some point, Torres Graciano saw Autumn Wallace, and

18   realized there was a witness to their crime.  He began screaming at Ms. Alfaro,

19   calling her a stupid whore and ordering her to do something, as he was on probation

20   and did not want to be caught.  Still yelling and threatening Ms. Alfaro, Torres

21   Graciano grabbed a knife from the kitchen drawer, and pulled Autumn through the

22   house into the back bathroom.  Torres Graciano handed Ms. Alfaro the knife,

23   shouting, "do it, do it, do it" in Spanish.  Scared and intoxicated, Ms. Alfaro stabbed

24   Autumn then fled past Torres Graciano, who remained in the doorway of the

25   bathroom where Autumn had fallen, taking the knife that she had used with her after

26   wiping it off on a towel which she left at the scene.

27        7.  After loading the stolen property into the car, Torres Graciano drove

28   Ms. Alfaro, Manny, and Reynoso back to Little Tijuana, screaming obscenities

16

1    at Ms. Alfaro along the way.  Once they reached "Little TJ," Ms. Alfaro sold some

2    of the Wallace's property.  Most of the stolen items remained with Torres Graciano,

3    payment for Ms. Alfaro's drug debt.

4          8.  At approximately 6:15 p.m., Ms. Alfaro called Manuel Cuevas, the father

5    of Manny, from a phone booth near a Carl's Junior restaurant and asked for a ride.

6    While at the Carl's Junior, she dropped the knife she had used to stab Autumn

7    Wallace in a dumpster.

8          9.  Autumn Wallace's body was discovered by her mother and her aunt at

9    approximately 5:40 p.m.  Later that evening, while the Orange County Sheriff's

10    Investigators were still present, Ms. Alfaro walked by the Wallace's home, with

11    Manuel Cuevas and Manny.  Having interviewed Susan Mata, a witness who had

12    driven by the Wallace home at approximately 4:05 p.m. and described seeing a

13    Hispanic man with a baby in front of the Wallace home at the time of the crimes, and

14    having heard from April Wallace about her friend Rosie Alfaro, who was a "hype,"

15    Investigator Giffin approached them.  Ms. Alfaro identified herself and asked if she

16    could speak to April Wallace.  She admitted to Investigator Giffin that she had been

17    at the Wallace house earlier in the day, but denied involvement in the crime.

18          10.  The following day, the investigators went to Ms. Alfaro's home and asked

19    her to accompany them to the Sheriff's Department to provide "elimination prints."

20    Ms. Alfaro did so.  In response to the investigators' questions, Ms. Alfaro again

21    denied involvement in the crime.  Later that day, Torres Graciano picked Ms. Alfaro

22    up, and over the course of the next two weeks, stayed with her in several different

23    motels.

24          11.  Based on the description of the Hispanic man with a baby provided by

25    Susan Mata, a composite drawing of this suspect was prepared and distributed.

26          12.  On June 24, 1990, the investigators received information that a fingerprint

27    found at the crime scene matched that of Ms. Alfaro.  On June 26, 1990, they

28    obtained a warrant for her arrest.  Ms. Alfaro was arrested on June 27, 1990.

13.   The evening of her arrest, Ms. Alfaro was interrogated by Sheriff's Investigators Giffin and Bale for four hours.  Before questioning her, the investigators had a nurse draw blood.  The blood test established that Ms. Alfaro was under the influence of cocaine, benzoylecconine and morphine.  The investigators observed numerous hypodermic needle marks on Ms. Alfaro's arms and neck.  In response to their questions, Ms. Alfaro admitted that she was addicted to both heroin and cocaine.  CT 507.

14.   Almost immediately after the interrogation began, Ms. Alfaro admitted entering the Wallace home to "take something" and to stabbing Autumn Wallace. CT 509-510.  She told them she arrived in Little TJ at approximately 11:00 a.m. or 12:00 p.m., where she obtained "speedballs" consisting of heroin and cocaine, which she and a woman named Sabrina injected.  She told them that shortly thereafter, she headed out for more drugs, and ran into a man named "Shorty" who agreed to give her drugs if she let him use her "rig."  She told the Investigators that Shorty later accompanied her to the Wallace house.  She told them that he was the one in the composite drawing that they were looking for and that he had been nearby when they arrested her.  She said they got a ride to the Wallace house from a Mexican guy, about 30 years old, who she claimed she had never seen before.  She described his car as being like a blue Camaro, which the investigators knew was untrue as Susan Mata had seen a brown Monte Carlo in the Wallace's driveway at the time of the crimes. Investigator Giffin concluded that Ms. Alfaro knew who the driver was, but would not reveal his identity.  RT 1156.

15. Ms. Alfaro stated that she knocked on the Wallace's door and when Autumn answered, asked if she could use the bathroom.  Meanwhile, she said, "Shorty had my baby."  CT 525.  Ms. Alfaro repeated several times that at the time she entered the house she was "really wired, really coked out and stuff."  CT 526. The following exchange then occurred:

18

| | | |
|---|---|---|
| 1 | Giffin: | Autumn knew who you were and the only way you could rip off and get away with it was kill Autumn, is that right? |
| 2 | | |
| 3 | Alfaro: | Yes. |
| | Giffin: | Now those words came out of my mouth cause that's why I think you did it.  I don't know, did I just put that idea in your head?  Did you think about that before? |
| 4 | | |
| 5 | | |
| 6 | Alfaro: | Before what? |
| | | * * * |
| 7 | | |
| 8 | Giffin: | So when did you really first think about killing Autumn? |
| 9 | Alfaro: | What do you mean? |
| | Giffin: | Well, you could . . . |
| 10 | | |
| 11 | Alfaro: | . . . when I was at Juan's apartment? |
| | Giffin: | When you were at Juan's apartment? |
| 12 | | |
| 13 | Alfaro: | Yeah. |
| | Giffin: | That's when you really thought about it the first time? |
| 14 | | |
| 15 | Alfaro: | Uh-hum.  Well, I didn't think of killing her, I just thought of just going over there and I was just gonna get something and put it in my purse or something and walk out. |
| 16 | | |
| 17 | Giffin: | Okay.  But in the back of your mind over at Juan's apartment, I mean, this had to be half hour, maybe an hour before you went over there, wasn't it? |
| 18 | | |
| 19 | Alfaro: | When? |
| 20 | Giffin: | When you were at Juan's apartment and you were thinking about going over to Autumn's house . . . |
| 21 | Alfaro: | . . . uh-huh. |
| 22 | Giffin: | . . . to rip them off. |
| 23 | Alfaro: | I didn't plan on killing her. |
| 24 | Giffin: | But you thought about it? |
| 25 | Alfaro: | No.  I thought of going there and taking things. |
| 26 | | * * * |
| 27 | Giffin: | Now, you're inside the house.  Now, are you sure you didn't think about it before you got over there?  Truthfully? |
| 28 | | |

19

| | | |
|---|---|---|
| 1 | Alfaro: | What do you mean, before? |
| 2 | Giffin: | Before you got over to Autumn's house?  Truthfully now?  Let's be honest with each other. |
| 3 | | |
| 4 | Alfaro: | I know, I don't know. |
| 5 | Giffin: | You didn't think about killing Autumn before you got inside the house? |
| 6 | Alfaro: | No. |
| 7 | Giffin: | Once you got inside the house, when did you first think about it? |
| 8 | | |
| 9 | Alfaro: | When, when I got there.  Just thought about it. |
| | Giffin: | When you got there, where? |
| 10 | Alfaro: | In the bathroom.  And I was going towards, when I was like there. |
| 11 | | |
| 12 | * * * | |
| 13 | Giffin: | So that's why you opened the drawer because you knew that's where the knives were and you needed something to kill her with, is that right?  Don't let me put words in your mouth.  I wanna hear it from you. |
| 14 | | |
| 15 | | |
| 16 | Alfaro: | Yes. |
| | Giffin: | After you got the knife, tell me some more. |
| 17 | Alfaro: | Tell some more what? |
| 18 | Giffin: | Where did you go? |
| 19 | Alfaro: | After I got the knife?  I'm in the bathroom. |
| 20 | * * * | |
| 21 | Giffin: | . . . Rosie, I haven't heard it from you.  I told you why I thought you stabbed her.  You tell me why. |
| 22 | | |
| 23 | Alfaro: | Cause she knew who I was? |
| 24 | Giffin: | Sounds like a question.  It sounds like you're asking me a question. |
| 25 | | |
| 26 | Alfaro: | Cause she knew who I was. |
| | Giffin: | You got some things you wanna ask her Gary? |
| 27 | | |
| 28 | CT 569-571. | |

16.  From other questions posed to Ms. Alfaro during the interrogation, it is clear that the investigators believed that another person and not just Ms. Alfaro was involved in the murder of Autumn Wallace.  *See, e.g.*, CT 600 (Bale: "Well we know the guys were involved in stealing the property and we know that they knew that that's what they were doing.  Right?  Come on.  They knew exactly what was going on.").  Giffin and Bale repeatedly asked her whether there was someone she was afraid of or was protecting.  *See, e.g.* CT 534, 543, 554, 582.  Although Investigator Giffin testified at the preliminary examination that during the interrogation he gave Ms. Alfaro every opportunity to tell him who else was involved, and that she insisted that she had acted alone, a close reading of her statement does not support this testimony.  *See, e.g.*, CT 543 (Giffin: "Well, there's some areas that you didn't tell me everything.  I'm sure my partner can review his notes and tell you about it, but you know what, I'd rather they come from you without us prompting you do to it."  Alfaro: "About the, the microwave?"  Giffin: "We kind of skipped over that, didn't we?  Pretty heavy microwave, isn't it?  Tell me about that."  Alfaro: "Well, we didn't take it.  But then, that's when the guy said that, that things didn't fit in the car.  I don't really . . . I thought all the time he had it and then he told me when we were in the car, when we already on the way, he told me he didn't and that he left it there."  Giffin: "So he was really inside the house, wasn't he?").  *See also* CT 534; RT 1640-45 (Ms. Alfaro testified that someone else came in the house).  While Ms. Alfaro clearly accepted responsibility for Autumn Wallace's murder and did not state that anyone else had stabbed Autumn, she stated that the driver had entered the house.  As will be shown below, though Ms. Alfaro clearly confessed to first degree murder with a special circumstance, nothing she said rules out the driver's knowing participation in the crimes.  The physical evidence is consistent with the theory that Ms. Alfaro was under the substantial domination of another when she stabbed Autumn Wallace and that she acted while under extreme duress.

21

17.   Meanwhile, Orange County investigators worked around the clock on the case, canvassing the neighborhood where Ms. Alfaro had met up with Reynoso and Torres Graciano.  On July 2, 1990, hearing that investigators had been asking questions about him, Reynoso contacted the Anaheim Police to turn himself in. Also on July 2, 1990, the Investigators learned from Torres Graciano's sister, Isabel Torres, that Torres Graciano had left for Mexico earlier that day.  *See* Exhibit 1 (Declaration of Ms. Alfaro's Habeas Investigator Raymond McGrath and exhibits cited therein).

18.   On July 3, 1990, the investigators obtained a Department of Motor Vehicles picture of Manuel Torres Graciano.  Investigator Bales proceeded to paste a copy of Torres Graciano's picture in his crime book.  On July 5, the investigators showed pictures of Torres Graciano to Sabrina Duran, who confirmed that the man in the picture, Torres Graciano, had been present at Juan's apartment with Ms. Alfaro on June 15, 1990; that he was Ms. Alfaro's "boyfriend", and that he drove a brown Monte Carlo.

19.   Curiously, Investigator Giffin's "Investigative Overview," dated November 7, 1990, contains no mention of Torres Graciano.  Nor does it disclose any efforts made to identify the man who had driven Ms. Alfaro and Mr. Reynoso to the Wallace home on June 15, 1990, efforts that are referenced elsewhere, though they appear to have come to an abrupt halt after the investigators learned that Torres Graciano had left the country.

20.   Throughout the trial court proceedings, both Ms. Alfaro and Mr. Reynoso maintained their silence as to Torres Graciano's identity as the man who drove them to the Wallace home.

21.   Shortly after her arrest, Ms. Alfaro told her mother that she wanted to plead guilty.  She also told her attorney, repeatedly, that she wished to plead guilty to the crimes.  She did not wish to commit state assisted suicide.  Rather, she sought to proceed to the penalty phase of the trial, where her acceptance of responsibility

22

could serve as concrete evidence of her remorse.  However, her attorney, William Monroe, would not consent to a guilty plea.  Instead, he insisted, over Ms. Alfaro's strenuous objection, on arguing that the driver of the Monte Carlo, who he erroneously identified as Roberto "Beto" Frias Gonzalez ("Frias Gonzalez"), and not Ms. Alfaro, was responsible for Autumn Wallace's death.

22.  Ms. Alfaro's trial jurors were sworn on March 3, 1992.  Jury deliberations began on March 23rd.  The jury reached a guilt phase verdict within four hours.  The jury found Ms. Alfaro guilty of the charges and found the allegation that she had used a knife and had committed the murder in the course of a first degree burglary and a robbery to be true.

23.  The penalty phase began on March 30, 1992.  The prosecution rested after introducing a photograph of Autumn when alive.  RT 1441.  The defense called a number of witnesses, who testified in cursory fashion as follows:

a.  Manuel Cuevas, Ms. Alfaro's common law husband, testified that she was the loving and caring mother of four children, two of them twins born after her arrest in this case.  RT 1445-50.  After her arrest, Ms. Alfaro continued to express concern for the children and to write and talk to them.  RT 1448.

b.  Janell Laird, a friend who had known Ms. Alfaro since pre-school, testified that Ms. Alfaro's father was an alcoholic who often vomited in front of them (RT 1458, 1464), and that he hit his wife and Ms. Alfaro.  RT 1465.  Ms. Laird was afraid of Ms. Alfaro's father, who eventually abandoned the family.  Ms. Laird testified that Ms. Alfaro was in the sixth grade when she started to use drugs.  RT 1457.  Despite her own problems, Ms. Alfaro wrote Ms. Laird from jail and told her the importance of staying away from drugs and living a law-abiding life.  RT 1460.  During one telephone call from jail, Ms. Alfaro told Ms. Laird that Autumn Wallace did not deserve to die and that she never planned on hurting her.  RT 1468, 1472.

c.  Tamara Benedict, Ms. Alfaro's childhood neighbor, remembered Ms. Alfaro's father as a violent alcoholic.  RT 1488.  She testified that Ms. Alfaro

23

1   dropped out of school in seventh grade, at which time she started running away and

2   shooting up "speed balls," a mixture of heroin and cocaine, up to 50 times a day.

3   RT 1483-84.  Ms. Alfaro often told Ms. Benedict that she wanted to quit drugs,

4   but was unable to overcome the addiction she had developed to them.  RT 1486.

5   Sometimes, Ms. Alfaro slept with her drug dealers in order to get her drugs.

6   RT 1499.  She tried to clean up many times and was able to get temporary jobs.

7   RT 1487.  Since being incarcerated, Ms. Alfaro had written several letters to

8   Ms. Benedict expressing sorrow for what she had done.  RT 1490.

9           d.  Sylvia Alfaro, Ms. Alfaro's's mother, testified that she worked 10

10  to 14 hours per day and sometimes seven days a week.  RT 1506.  She testified

11  that her husband, Ms. Alfaro's father, was an alcoholic, often hit her in front of the

12  children, and threw the family out of the house during drunken rages.  RT 1506-07,

13  1509.  She testified that Ms. Alfaro started skipping school at age eleven.

14  RT 1511-12.  Mrs. Alfaro realized that her daughter had a drug problem at age twelve

15  and began counseling with her three to four times a week.  RT 1515.  When

16  Ms. Alfaro was thirteen, she became a prostitute as a means of supporting her drug

17  habit.  RT 1516-17.  Mrs. Alfaro sent her to live in Mexico with her grandmother,

18  but the grandmother sent her back to Anaheim five months later.  RT 1518.  After her

19  return, her mother often found Ms. Alfaro on the streets dirty, hungry, and shoeless.

20  RT 1519.  Ms. Alfaro's father refused his wife's pleas for help with their daughter

21  and finally abandoned the family when Ms. Alfaro was fourteen; the same year

22  Ms. Alfaro became pregnant with her first son, Danny.  RT 1511, 1520.

23          e.  Mrs. Alfaro testified that at one point she was able to put her daughter

24  into a drug rehabilitation/detoxification program, but Ms. Alfaro was unable to stay

25  more than ten days because her insurance coverage expired.  RT 1521.  Three months

26  after her first son Danny was born, Ms. Alfaro returned to the use of drugs.  RT 1523.

27  Her mother saw the needle marks on her arms, but did not kick her out of the house

28  because she loved her.  RT 1525.  On one occasion, Mrs. Alfaro chased her daughter

1  down the street and threw her to the ground in an effort to talk to her, but a 38 year

2  old woman named "Betsy" threatened to call the police unless she left Ms. Alfaro

3  alone.  RT 1527, 1528.  Mrs. Alfaro testified that on that occasion, her daughter cried

4  and asked her for help.  RT 1527.

5           f.  Mrs. Alfaro testified that she often took Ms. Alfaro's children to visit

6  her at the jail and would continue to do so if Ms. Alfaro received a sentence of life

7  imprisonment without the possibility of parole, and that she did not want to see her

8  little girl die.  RT 1530.

9           g.  Dolores Onofre, who had known Ms. Alfaro since she was a small

10  child, recalled Ms. Alfaro's father as a drunk who was violent in front of the children

11  and threatened to kill his wife.  RT 1552-53.

12          h.  Betty Cleary, a manager at a McDonald's restaurant where Ms. Alfaro

13  had worked, recalled her as dependable, congenial, and a good employee.  RT 1540.

14          i.  Sylvia Archuleta, who worked for a Christian program called "Teen

15  Challenge," testified that she met Ms. Alfaro at the Orange County Jail.  RT 1558.

16  She testified that Ms. Alfaro often broke down crying and expressed sorrow for the

17  grief she had caused Autumn Wallace's family.  RT 1560.

18          j.  Norman Morein, a sentencing consultant, testified that Ms. Alfaro had

19  adjusted satisfactorily at the county jail and that her confrontation with an inmate

20  there was natural and expected behavior.  RT 1920.  Mr. Morein further testified that

21  Ms. Alfaro expressed genuine remorse and sorrow for the crime (RT 1922), and that

22  she had become religious since being incarcerated.  RT 1923.  Mr. Morein opined that

23  Ms. Alfaro could have a positive influence on people if allowed to live.  RT 1927.

24          k.  Dr. Armando Morales, a sociologist, testified that Ms. Alfaro had

25  a relatively stable childhood to age five.  RT 1823.  Thereafter, she was abused by her

26  violent and alcoholic father (RT 1826); was raped at age nine by her father's friend

27  (RT 1867); experienced racism at school (RT 1823); and suffered the ravages of drug

28  abuse.  RT 1825.  According to Dr. Morales, Ms. Alfaro developed emotional

1    problems, including depression associated with trauma, which contributed to her self-
2    medication in the form of substance abuse.  RT 1826-27.  He testified that because
3    of her very early childhood, she was able to develop close attachments and be a
4    positive influence on others.  RT 1828-34.  Dr. Morales testified that Ms. Alfaro felt
5    remorse and empathy for the victim and her family.  RT 1828.

6            l.  Finally, after receiving assurances from her trial counsel that she
7    would not be questioned about the circumstances of the crime but would only be
8    questioned about her background, Ms. Alfaro testified.  She provided the jury with a
9    general account of her unhappy home life (RT 1594), her violent and alcoholic father
10   (RT 1595-99), the racial prejudice she suffered at school, (RT 1599-00), and her
11   problems with substance abuse.  She testified that she began to use hard drugs in the
12   sixth grade.  She was introduced to them by a woman named Betsy who, after
13   Ms. Alfaro became addicted, forced her to prostitute herself to get drugs.  RT 1602-
14   27, 1653-62, 1666-73.  She testified she had also stolen property to get money to pay
15   for drugs.  Ms. Alfaro described the depth of her drug addiction and her mother's
16   efforts to get her into a drug rehabilitation program.  RT 1620.  She also expressed
17   her sorrow and remorse for the death of Autumn Wallace, to whom she read a letter in
18   which she had written, "I'm sorry we took your innocent life."  RT 1629-31, 1651.

19   24.  Although Ms. Alfaro's attorney had planned to avoid cross-examination
20   about the crime by limiting his direct examination of Ms. Alfaro to her background
21   and remorse,  the court ruled that the door had been opened when Ms. Alfaro read the
22   letter she had written to Autumn Wallace (which defense counsel had reviewed
23   before asking her to read it on the stand), and permitted extensive cross-examination
24   about the circumstances of the crime.  During this cross-examination, for which she
25   was wholly unprepared, Ms. Alfaro admitted that she had murdered Autumn Wallace.
26   When asked whether it was true that she had told the defense psychiatrist that the man
27   there with her was "Beto", she stated that this was true, but later stated that "Beto"
28   had in fact done "nothing."  RT 1633-35.  When asked later whether the "third party

26

that was in the house" had forced her to stab Autumn Wallace, she answered, "Yes, he did . . . He was threatening me." RT 1636.  She said she believed he would harm her." RT 1735.  She testified that she had used cocaine and heroin shortly before going to the house and was "out of her head" when she got there.  RT 1725-29.  She stated that when she came down from her drug high, she could not believe that Autumn was dead.  RT 1740.

25.  Following arguments and instructions, the issue of the penalty was submitted to the jury.  RT 2113.  They could not, however, arrive at a unanimous verdict.  The trial court declared a mistrial on April 8, 1992.

26.  On April 9, 1992, one day after the mistrial was declared and outside the presence of the prosecution, Ms. Alfaro made a motion for substitute counsel. RT 2119-2149.  Ms. Alfaro explained to the trial judge that her lawyer had insisted on blaming "Beto" over her objection, and that she no longer trusted her lawyer because he had lied to her about the scope of her cross-examination.  She stated that Mr. Monroe  "misrepresented to me, he lied to me, about going on the stand. I thought there was never going to be any cross-examination from what he had told me and there was ... He's been wanting me to do things I never wanted to do.  He still goes ahead and does them."  RT  2119-20 (April 9, 1992 proceedings).  Mr. Monroe confirmed, "Miss Alfaro feels that basically I betrayed her." *Id.* 2120.  Ms. Alfaro described other conflicts that had arisen between them, and her own sense of helplessness as a result.  The court denied the motion.  *Id.* 2149.

27.  The case received substantial print and television coverage during the trial. Particularly during and after the jury hung in the penalty phase, both the Orange County Register and the Los Angeles Times printed highly inflammatory articles. *See, e.g.*, Exhibit 42.  As a result, the defense filed a motion for a change of venue for the penalty retrial, which the court denied.

28.  A second jury was empaneled on May 11, 1992.

27

29.  At the penalty re-trial, the prosecution presented the majority of the witnesses it had presented during the guilt phase of the first trial, which provided the newly empaneled jury with evidence of the circumstances of the crime.  RT 3196.  The prosecutor also had an employee of the district attorney's office read portions of Ms. Alfaro's cross-examination from the first penalty trial.  RT 3630-31.  Although offered the opportunity by the trial judge, defense counsel declined to introduce other portions of Ms. Alfaro's testimony at the first penalty trial, in which she had expressed her remorse and provided factual information about her violently abusive childhood as well as other mitigating evidence.

30.  In the defense case, Mr. Monroe attempted to convince the jury that the Hispanic man who had driven Ms. Alfaro to the Wallace home, and not Ms. Alfaro, had killed Autumn Wallace.  He called Marc Taylor, a criminalist retained as an expert by the defense, to testify that he had examined various items of evidence, including pieces of clothing, bloodstained flooring, shoe prints, blood spattered furniture, a bloodstained towel, plastic casts of shoe prints found outside the Wallace house, men's and women's LA Gear tennis shoes, boots and sandals.  RT 3762.  He testified that some of the shoe prints found inside and outside the house did not match defendant's LA Gear shoes.  RT 3766.  Mr. Taylor testified that he had conducted experiments with a red lotion liquid and knives in order to analyze the patterned bloodstains on the towels.  RT 3770.  He concluded that the blood stains on one of the towels were caused by wiping a knife other than Exhibit 61, the paring knife found at the scene.  RT 3774-75, 3815-17.  Mr. Taylor conceded, however, that examining blood swipes was not an exact science and that the patterns could have been caused by wiping a belt or shoe.  RT 3803-10.

31.  Kenneth Harer, a deputy sheriff at the Orange County Jail, testified that he identified a man named "Beto" who resembled the suspect depicted in a flier posted after Autumn Wallace's death.  RT 3842.  The same man was seen by Harer entering a blue Camaro.  RT 3843.  Monroe had argued to the jury in the first trial,

28

1   and continued to argue in the second penalty phase, based on this evidence alone, that
2   this was the man who was responsible for killing Autumn Wallace.

3        32.  Mr. Monroe also presented most of the witnesses who had testified on
4   behalf of Ms. Alfaro at the first penalty trial, as well as the following witnesses:

5             a.  Toby Silver, a registered nurse on the mental health team of the
6   Orange County Jail during Ms. Alfaro's incarceration there, testified that during
7   clinical sessions, Ms. Alfaro manifested signs of depression and low self-esteem,
8   expressed remorse for her crimes and stated that she missed her children.
9   RT 3825-31.

10            b.  Gerardo Rangel, a bilingual paraprofessional who knew Ms. Alfaro
11  at Ball Junior High School, testified that he met with her mother regarding her
12  absenteeism and performance problems at school.  RT 3886.  Mr. Rangel was
13  unsuccessful in helping Mrs. Alfaro enroll her daughter in drug rehabilitation
14  programs because Mrs. Alfaro was not capable of paying the required fee.
15  RT 3887-88.

16            c.  Albert Lopez, a minister with "Gleaners," testified that he visited
17  with Ms. Alfaro approximately 20 to 25 times at the Orange County Jail and that
18  he believed she was sorry for the crime.  RT 3915.  On one occasion, Ms. Alfaro
19  broke down and cried, and Lopez believed her sorrow to be genuine.  RT 3916-17.

20            d.  Finally, the defense presented Dr. Consuelo Edwards, a medical
21  doctor from Spain, as a mental health expert witness.  RT 4032.  Dr. Edwards
22  described Ms. Alfaro's childhood and life to the point of her incarceration at age
23  eighteen, including her abusive father; her drug use (RT 4061); her multiple
24  pregnancies (RT 4062); her limited but acceptable work as an employee at
25  McDonald's (RT 4063); and her relationship with the father of three of her four
26  children.  RT 4063.  Dr. Edwards described Ms. Alfaro's borderline intellectual
27  functioning, her low IQ of 78, give or take five points, and her learning disabilities
28  which were exacerbated by her traumatic experiences as a child.  RT 4068-73.

1   Dr. Edwards described testing she had done which suggested the possibility

2   of organic brain damage on the right side of Ms. Alfaro's brain, although she

3   admitted that the test she had relied upon did not establish such damage.  RT 4079.

4   According to Dr. Edwards, Ms. Alfaro's low impulse control was further

5   compromised under the influence of drugs.  RT 4074.  She testified that Ms. Alfaro

6   was a passive and dependant person who considered herself unimportant and

7   followed others.  RT 4084-85.

8                e.  For the most part, Monroe used Dr. Edwards to tell the story of the

9   crime that she had extracted from Ms. Alfaro at Monroe's request.  Dr. Edwards

10  testified that Ms. Alfaro had confessed to her that she killed Autumn Wallace, and

11  had recounted the sequence of events preceding the murder (RT  4040-46), but had

12  refused to answer Dr. Edwards' questions regarding the unidentified Hispanic man,

13  other than to say that he was a friend of her father's named "Miguel."  RT 4046.  She

14  testified that Ms. Alfaro told her that the man threatened to harm both her and her

15  baby unless she killed Autumn.  RT 4052-54.  She testified that Ms. Alfaro told her

16  she remembered stabbing Autumn four or five times before running from the room.

17  RT 4054-55.  She testified that Ms. Alfaro told her she did not plan to kill Autumn.

18  RT 4058.  Dr. Edwards described how in a later interview she confronted Ms. Alfaro

19  with the fact that she -- Dr. Edwards -- had been shown a picture of a man named

20  "Beto," not Miguel, who had been identified by the defense lawyer and investigator

21  as the man seen outside the Wallace house, and that Ms. Alfaro then agreed that the

22  man was named "Beto."  RT 4060.  She testified that Ms. Alfaro expressed great

23  sorrow for the crime.  RT 4075.

24               f.  Dr. Edwards opined that at the time of the crime, Ms. Alfaro was

25  legally sane but was suffering from an ongoing organic mental disorder, namely

26  under the influence of drugs -- either intoxication or withdrawal.  RT 4091, 4103.

27  Additional diagnoses included Attention Deficit Disorder, Learning Disabilities,

28  a Conduct Disorder characterized by childhood anti-social behavior, Adjustment

Disorder characterized by anxiety and depression, and a Dependent Personality
Disorder.  RT 4092-97.  Dr. Edwards further opined that Ms. Alfaro was not
malingering (RT 4095, 4211, 4126-38), and that she possessed the potential for
change and improvement.  RT 4194.

33.  From May 23, 1992, the Orange County Women's Jail classified
Ms. Alfaro for a housing change due to the need for "acute mental health care."
CT 1745-46.  On May 30, 1992, an entry was placed in her "jacket" indicating that
she no longer needed "mental health care of that nature."  *Id.* 1746.  On June 2, 1992,
Ms. Alfaro waived her right to testify at the second penalty trial.  CT 1556.  At no
time did Monroe ask the court to have Ms. Alfaro's competency to proceed with trial
evaluated.

34.  The following witnesses testified during the prosecution's rebuttal case:

a.  One Orange County Jail employee testified that he had seen
Ms. Alfaro strike another inmate.  RT 4250.  Other jail employees testified to hearing
her comment "I'm a frustrated person who takes things out on people, and have to
learn to live with that," (RT 4249), and "I'm not going to be able to do this again.
I'm no actor.  I'm going to be cold this time.  I just want to get this over with."
RT 4253.

b.  Sheriff's Department Investigators Harper and Giffin also provided
rebuttal testimony in order to refute the defense claim that Robert Frias Gonzalez was
the "Beto" identified outside the Wallace home, based on a specific tattoo he had on
his neck (RT 4259), and to establish that defense witness Lopez had stated he was
going to marry Ms. Alfaro when her trial was over.  RT 4260.

c.  Finally, in an attempt to establish that Ms. Alfaro was "malingering,"
the prosecution called defense consulting psychologist Martha Rogers, who was
questioned by the district attorney about the meaning of the phrase "probable fake
bad," which she had purportedly noted during her examination of Ms. Alfaro's MMPI
raw test data.  RT 4267.  Dr. Rogers told the district attorney that "malingering was

31

1  one possible interpretation."  Inexplicably, defense counsel failed to ask her about the

2  others.  *See* Exhibit 2 (Declaration of Martha Rogers).

3      35.  After argument and instructions, the issue of penalty was submitted to the

4  jury.  On June 9, 1992, after deliberating for five days, the jury returned a verdict

5  of death.  CT 1584.

6      36.  On June 14, 1992, the trial court denied Ms. Alfaro's automatic motion for

7  a reduction of the sentence from death to life without the possibility of parole

8  pursuant to Penal Code § 190.4(e) and her motion for a new trial pursuant to Penal

9  Code § 1181(7) and sentenced her to death.

10

11  **CLAIMS FOR RELIEF**

12  **VI.**

13  **CLAIM 1:  PETITIONER WAS DEPRIVED OF HER RIGHT TO THE**

14  **EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR AND**

15  **RELIABLE DETERMINATION OF GUILT AND PENALTY BY**

16  **TRIAL COUNSEL'S DEFICIENT PERFORMANCE**

17      The convictions and sentence of death were rendered in violation of

18  Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and

19  non-capricious determination of guilt and penalty, to the effective assistance of

20  counsel, to present a defense, and to due process of law as guaranteed by the Fifth,

21  Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because

22  Petitioner's trial counsel rendered constitutionally deficient representation at all

23  critical stages of the criminal proceedings.

24      1.  Exhaustion of the claim:  This claim was fairly presented as Claim 1 in the

25  habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no.

26  S099569.

27      2.  AEDPA:  The claim was rejected by an Order of the California Supreme

28  Court dated November 18, 2007.  Because the state court's denial of this claim is both

32

"contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858. The state court denied this claim without an opinion, and without affording Petitioner an evidentiary hearing, discovery, or any other means to further develop his claim. When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial was objectively unreasonable.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of each claim of ineffective assistance of counsel below, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

## A.   <u>INTRODUCTION</u>

6.  Trial counsel unreasonably failed to conduct a timely or adequate investigation of the potential guilt and penalty phase issues, did not develop or

1   present a coherent trial strategy, and was unable to make informed and rational

2   decisions regarding potentially meritorious defenses and tactics.  Ms. Alfaro's

3   counsel's errors and omissions were such that a reasonably competent attorney acting

4   as a diligent and conscientious advocate would not have performed in such a fashion.

5        7.  Reasonably competent counsel handling a capital case at the time

6   of Ms. Alfaro's trial knew that a thorough investigation of the prosecution theories

7   of guilt, independent analysis of the physical evidence supporting those theories, and

8   possible objections to the introduction of such evidence was essential to the

9   development and presentation of a defense at trial.  Reasonably competent counsel

10  handling a capital case at the time of Petitioner's trial knew that where the defendant

11  has fully confessed to the crime, a timely and thoroughly prepared suppression

12  motion must be filed, and that in the event that the motion is unsuccessful, this must

13  be taken into account in determining trial strategy.  Reasonably competent counsel

14  handling a capital case at the time of Petitioner's trial knew that a thorough

15  investigation of the defense theories, including any legal bar to such theories, the

16  physical evidence that may or may not support those theories, and possible obstacles

17  to the introduction of evidence to support those theories was essential to the

18  development and presentation of a defense at trial.

19       8. Reasonably competent counsel handling a capital case at the time

20  of Petitioner's knew that defense experts require referral questions that enable them

21  to perform within the scope of their expertise.  Reasonably competent counsel

22  handling a capital case at the time of Petitioner's trial knew that a change of venue

23  motion should be filed when the victim's family members work for the court where

24  the matter would otherwise be heard and there had been extensive inflammatory

25  pretrial publicity concerning the matter in that locality.  Reasonably competent

26  counsel knew that a defendant has a constitutional right to make the fundamental

27  decision as to how to plead and that absent evidence that the defendant is

28  incompetent -- in which case an evaluation of competency to stand trial should be

performed -- or evidence that the defendant merely wishes to commit state-assisted suicide, the client's desire to be permitted to plead guilty should be honored. Reasonably competent counsel know that when a client will not communicate with counsel or assist in her own defense, her competency should be questioned and/or counsel should advise the client to seek substitute counsel and move to withdraw.

9.  Reasonably competent counsel handling a capital case at the time of Ms. Alfaro's trial knew that a thorough investigation of the role his client played in the crime, her background and family history, including her academic, social, medical, and institutional history, was essential to the adequate preparation of both guilt and penalty phase defenses.  Reasonably competent counsel knew that a plea of guilty can serve as mitigating evidence and that a client will not automatically suffer the death penalty if she enters such a plea.

10.  Counsel's failures to investigate adequately and present defenses and protect Petitioner's statutory and constitutional rights prejudiced the defense.  But for counsel's unprofessional errors, the result of the proceeding would have been different.

**B.   COUNSEL'S FAILURE TO PERMIT MS. ALFARO TO PLEAD GUILTY DESPITE HER DESIRE TO DO SO**[3]

11.  Trial counsel acted unreasonably in withholding his consent to Ms. Alfaro's entry of an unconditional guilty plea despite her desire to enter such a plea and proceed to the penalty phase, where her guilty plea would have constituted concrete evidence of her acceptance of responsibility and remorse.  In so doing, he deprived Ms. Alfaro of her right to make decisions involving her fundamental right to decide how to plead and what defense to present, and all other rights included in the

_____

[3]  As set forth in Claim 16, infra, pp. 219-34, counsel's withholding of his consent to plead guilty consituted an actual conflict of interest that adversely affected his performance, which requires no proof of prejudice.  To the extent the Court finds the absence of a conflict, his actions constitute ineffective assistance of counsel.

1    Sixth Amendment right to self-representation and right to effective representation,

2    Fifth Amendment right to due process, Eighth Amendment right to reliable

3    sentencing, and Fourteenth Amendment right to due process.  Ms. Alfaro did not

4    want to commit state-assisted suicide.  She wanted to plead guilty in order to advance

5    her penalty phase defense.  Because she was denied this universally recognized

6    mitigating evidence of her remorse for her crimes, habeas relief is warranted.

7         12.  On June 27, 1991, the day of her arrest, Ms. Alfaro agreed to be

8    interviewed by law enforcement officers without counsel present.  Less than five

9    minutes after having been read her *Miranda* rights, Ms. Alfaro admitted that she

10   stabbed Autumn Wallace.  CT 509-10.  During the nearly four hours of questioning

11   that followed, Ms. Alfaro repeatedly confessed to stabbing Autumn Wallace and

12   described in detail the circumstances of the crime, including her intention to steal

13   property when she went into the Wallace home.  CT 504-603.  She admitted knowing

14   that the wounds she inflicted could cause death.  CT 577.

15        13.  Ms. Alfaro told her mother shortly after her arrest that she wanted to plead

16   guilty and consistently maintained throughout her pretrial incarceration and trial that

17   she wanted to plead guilty.  Exhibit 3 (Declaration of Silvia Melendez Alonso).  She

18   further told her mother that she wanted to present a penalty phase defense.  *Id*.

19        14.  Ms. Alfaro also told her attorney William Monroe that she wanted to plead

20   guilty unconditionally and did not want him to argue that someone else was

21   responsible for Autumn Wallace's death.  *See, e.g.*, RT 106-23 (February 21, 1992

22   proceedings).  She did not want to die; she wanted to present a strong penalty phase

23   defense.  Exhibit 4 (Declaration of Maria del Rosio Alfaro).

24        15.  On February 20, 1992, eleven days before jury selection was to begin,

25   Mr. Monroe sought guidance from the court concerning the conflict that had arisen

26   between himself and Ms. Alfaro regarding her desire to plead guilty and his refusal to

27   consent.  In a "request for special instructions" filed *in camera*, he informed the court,

28   "[m]y client . . . refuses to follow my instructions and take the stand and implicate

36

'Beto'. . . .  If my client insists on pleading guilty to the special circumstances, it is against my most rigorous advice.  I am requesting instructions from the court as to whether or not the court believes it is necessary for me to withdraw from the case at this late stage or whether or not I should remain on the case."  CT 355.

16.  The following day, February 21, 1992, the court met with defense counsel and Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992 proceedings).  During the discussion that ensued, defense counsel described an "out and out conflict" between himself and Ms. Alfaro regarding her desire to plead guilty and his "wish to proceed to trial on the guilt phase":

> The Court:  You've asked the court for some instructions here and I'm not really in a position to give any instructions concerning your relationship vis-a-vis your client.  No one has made a motion to be relieved.  No one has made a motion to have substitute counsel.  So there is really nothing — there is really nothing before, properly before the court, to consider that.
>
> So you have expressed some concerns here and I don't know if the purpose of this in-camera hearing is to allow you to put on the record what your concerns are and make sure your client understands certain rights she has or what we are doing.
>
> Mr. Monroe:  . . . Your Honor, I believe I'm asking the court to give me a lead or advice as to whether or not the court believes I should declare a conflict because I believe that a conflict may exist.  I wish to proceed to trial on the guilt phase.  I wish to call Shorty, one of the witnesses, and that Beto who we believe is the other killer.
>
> My client has adamantly, adamantly refused to allow me to call Beto or to cross examine Shorty regarding his relationship with Beto . . . because my client has told me she is in absolute fear of her safety and she's in absolute fear of the safety of her family should it become known to Beto that we in some way, shape, or form, for lack of a better term, have given him up. . . .  I'm concerned, Your Honor, if I proceed the way I want I'm placing my client's life and her family's lives in jeopardy according to my client.  If I proceed the way my client wants to proceed, it's against my vigorous, vigorous advice because she wants to plead guilty to a special circumstance homicide where there is no evidence of a 211 circumstance --
>
> The Court:  She can't plead guilty without the consent of counsel.  That's Penal Code section 1018.  In a capital case the court doesn't have the authority to accept a guilty plea from a defendant without the consent of the attorney.
>
> Mr. Monroe:  I, in good conscience could not consent.

37

1    The Court:  There could not be a guilty plea.

2    Mr. Monroe:  That's right.  However, my client insists on pleading guilty.

3    The Court:  She might insist on it.  The court is not going to accept any
     guilty plea on a capital case without the consent of the attorney.

4

5    Mr. Monroe:  Then my client turns around and tells me she does not
     want certain witnesses called or me to conduct the trial the way I think it
     should be conducted.  I have an out and out conflict.

6

7    The Court:  I'm not sure you do have an out and out conflict that would
     justify your being taken off the case.  I think what you should do is
     basically what you are doing.  You should indicate where you disagree,

8    make sure she understands that she's going against your advice, going
     against your desires, and that she consents to it and specifically has

9    directed you to proceed in a certain fashion.

10        I'm not sure a lawyer is entirely quote "independent" from the best
     interests and desires of the client.  Basically, lawyers are really here to

11   serve the client.

12   Mr. Monroe:  That's exactly the point.  But I can't turn around and say
     I consent to allow my client to plead guilty when I know she's pleading

13   guilty for all intents and purposes to a death sentence.

14   The Court:  There is no problem with that.  If you don't want to consent
     to it, you don't have to consent to it.  But that doesn't cause any

15   automatic conflict that would relieve you and put some other attorney in,
     not unless we are going to call up all of the attorneys in Orange County

16   and see who would consent to somebody pleading guilty to a capital
     offense.  And I don't plan to do that.  And I am not sure you would find

17   any, if any, that would do it if they were competent legal counsel.

18   Mr. Monroe:  . . . In effect she and I are at loggerheads.

19   The Court:  Well, you might be at loggerheads but that doesn't mean that
     you have a conflict of interest between the two of you that is of such

20   magnitude that she is denied the right to effective assistance of counsel.
     She has instructed counsel what she wants to do.

21

22   Mr. Monroe:  And I cannot effectively represent her if I follow her
     instructions.

23   The Court:  Well, you cannot represent her the way you want to
     represent her.

24

25   Mr. Monroe:  So I'm suppose[d] to represent her incompetently then
     by not presenting a vigorous defense.

26   The Court:  No.

27   Mr. Monroe:  I cannot present the defense I need because she won't
     allow me to.

28

                                    38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Court: You can't force her to testify. . . . That doesn't cause any conflict of interest. . . .

Mr. Monroe: I cannot effectively represent my client at this stage in light of the instructions she has given me.

The Court: You cannot represent her the way you want to represent her, but that doesn't mean you can't effectively represent her to the best of your abilities within the guidelines or parameters she has outlined for you.

Mr. Monroe: Which is to put on a shallow bare-bones sham defense.

The Court: . . . I don't know what you want to call it. But she has an absolute right not to testify.
        And your whole defense, from what I read in this in-camera document, your whole defense is based on her getting on the stand and pointing the finger at somebody else. And she is not going to do that, according to this, not unless she changes her mind. And if she doesn't do it, it definitely handicaps your efforts to defend her.

***

The Court: Bottom line. Bottom line is clients have a lot of control over how a case is presented. And the mere fact that you and her disagree over her getting on the stand might be a conflict in fact between you. But it is not the kind of a — kind of conflict that is a legal conflict that would justify the court in appointing new counsel to represent her especially on the eve of trial.

        And this thing has been going on for a long time and apparently . . . you have been at loggerheads with her for some time. I don't think this is the first time that you mentioned to me she didn't want to testify.

Mr. Monroe: This is the first time I mentioned to you that she does not want to testify. . . . [T]his is the first time last week or on the 12th when she told me she wanted to plead guilty and did not want to testify.

The Court: Well, the court cannot accept and will not accept a guilty plea from her without your consent under Penal Code section 1018.

Mr. Monroe: I think as a minimum, Your Honor, we ought to have counsel appointed to advise her about the consequences of her act.

The Court: I'm sure you have advised her of what the consequences of her not testifying are.

Mr. Monroe: I certainly have. However, maybe because of this conflict that she and I have, maybe an independent person should be talking to her.

The Court: Well, you haven't raised anything in this paperwork that would indicate you are having a communication problem or that she is not understanding what you're saying or that somebody else would be

1    in a better position to do it. . . . You just basically have a basic
2    disagreement over the tactics in defending her.

3    Mr. Monroe:  Its more profound than that.  It's a basic disagreement
     what she wants to do with her life.

4    The Court:  But it is her life.  It's not your life.

5    Mr. Monroe:  It's my obligation to look after her life.

6    The Court:  That's right.  But it is your obligation to serve her to the best
     you can within the ethical framework of being her attorney.  But we
7    should never lose sight of the fact that it's her case.  She is a party to the
     case.  She is the one that has the constitutional rights.  You don't have
8    any constitutional rights in this case.

9    Mr. Monroe:  She's a 20-year-old girl.

10   The Court:  She is the one that has the constitutional rights.

11   Mr. Monroe:  A 20-year-old child is going to plead guilty to a death
     penalty?
12
     The Court:  I don't know why you talk about pleading guilty.  There is
13   no way she'll plead guilty without the consent of her attorney of record,
     period.  You have indicated very clearly you don't consent to that.  So
14   there isn't going to be a plea of guilty, period.

15   Mr. Monroe:  You understand that Rosie--Miss Alfaro?

16   The Defendant:  Then what am I going to do?  I told you what I wanted to do.

17   Mr. Monroe:  What do you want to do?

18   The Defendant:  Plead guilty.

19   Mr. Monroe:  You put me in an absolute[ly] untenable position, Judge
     Millard.
20
     The Court:  That is what you think.  I don't think so.  You are no
21   different than other lawyers that have a disagreement over tactics.
     Cases are legion in the California courts that a mere disagreement
22   over tactics does not justify -- is not a legal conflict from the standpoint
     of such magnitude that will effectively deny the person their right to
23   counsel.  There are all kinds of tactical conflicts that occur in cases
     of criminal and civil cases.  That doesn't mean on the eve of trial all of a
24   sudden we change attorneys and start the case all over again.  It just
     doesn't happen that way.
25
     ***
26
     Mr. Monroe:  Pleading guilty is more than tactics.
27

28

                                    40

1    The Court:  As  I indicated, unless she can convince you to consent to
     her pleading guilty, there won't be any plea of guilty in the case.  So
2    I don't know what else to tell you.

3    RT 110-20 (February 21, 1992 proceedings).

4        17.  As  this transcript and the evidence filed herewith plainly demonstrate, it

5    was Ms. Alfaro's desire to enter an unconditional guilty plea.  She wanted to accept

6    responsibility for the crimes with which she was charged and proceed to the penalty

7    phase of her case, where she hoped that her guilty plea would demonstrate to the jury

8    that she accepted responsibility for the crimes and felt remorse for what she had done.

9    She did not want her lawyer to attempt to absolve her of responsibility by blaming

10   someone else for the crimes or to contest her guilt.  She did not want to commit state-

11   assisted suicide.  She wanted to present a strong penalty phase defense and hoped that

12   the jury would find that the mitigating circumstances outweighed the aggravating

13   circumstances and impose a sentence of life in prison without the possibility

14   of parole.

15       18.  If Mr. Monroe withheld his consent to Ms. Alfaro's entry of a guilty plea

16   because he believed she was incompetent to make the fundamental decision of how to

17   plead and defend against the death penalty in her capital case, then he unreasonably

18   and ineffectively failed to raise this issue before trial, and Ms. Alfaro so claims

19   herein.  At no time did Mr. Monroe ask the court for or obtain an evaluation of his

20   client's competency to enter a guilty plea or proceed to trial.

21       19.  There was no tactical reason for Mr. Monroe to withhold consent to a

22   guilty plea.  Ms. Alfaro had confessed to the crimes and Monroe's expert,

23   Dr. Consuelo Edwards, testified at the suppression hearing that she did so knowingly

24   and intelligently.  RT 261-262.  Ms. Alfaro was unwilling to testify at the guilt phase

25   trial and to implicate the Hispanic male in the murder.  RT 111 (February 21, 1992

26   proceedings).  There was no physical evidence that the man entered the bathroom and

27   there was no witness other than Ms. Alfaro to support an argument that someone

28   other than Ms. Alfaro had killed Autumn Wallace.  Duress is not a defense to a

41

capital crime. *See* Penal Code § 26. And aiding and abetting is not a defense where, as here, the defendant admits the intent to kill. CT 570. Tactically, it would have been to Ms. Alfaro's advantage to plead guilty and thereby obtain concrete proof of her acceptance of responsibility and remorse which would help mitigate the crime, the sole aggravating circumstance cited by the prosecution. Instead, because Monroe refused to consent, she was forced to proceed to trial with an unsupported guilt phase defense which, predictably, resulted in an argument by the prosecution that she had not accepted responsibility and felt no remorse during the penalty phase of the trial. *See, e.g.*, RT 4367-68.

20. The Information charged two theories of murder: first degree felony murder and first degree premeditated murder. *See* RT 1203. Assistant District Charles Middleton: "Basically, my theory is going to be they don't even have to get past felony murder but they also have premeditation and deliberation in the case."]. During the videotaped interrogation, Ms. Alfaro stated that she entered the Wallace house in order to commit burglary, that she took the knife "to kill Autumn" (CT 570), and that she stabbed Autumn Wallace. This constituted a confession to first degree murder with special circumstances.

21. Monroe did not file a motion to suppress Ms. Alfaro's confession until February 26, 1992, five days before trial. CT 380. At the hearing, Monroe called Dr. Edwards to testify, but had not prepared her beforehand. On cross-examination, she readily admitted that Ms. Alfaro's confession was knowing and voluntary, having neither the competence to describe the toxicological effect of the drugs on Ms. Alfaro nor appreciation for the nuances of the term "knowing and voluntary." RT 261-62. Yet even after he knew the confession would be admitted, Monroe unreasonably persisted in refusing to allow Ms. Alfaro to plead guilty.

22. In order to have any hope of presenting a defense based on the participation of another person in the murder of Autumn Wallace, Monroe needed some evidence -- either physical proof or Ms. Alfaro's testimony to this effect. In

42

papers filed February 20, 1992, Mr. Monroe informed the court that "my client, Maria del Rosio Alfaro, refuses to follow my instructions and take the stand and implicate 'Beto' and refuses to allow to me [sic] to call and cross-examine 'Beto' on her behalf." *Id.* at 9-10; *see, e.g.*, RT 111( February 21, 1992 proceedings).  Mr. Monroe claimed that her reluctance was due to a fear of reprisal from the second Hispanic man, and prepared and filed a declaration signed by Ms. Alfaro that described the man's participation in the crime and her refusal to testify while he remained "out in the community," moving to close the courtroom for her testimony.  *See* CT 497a-497c.  Yet he unreasonably failed to do so until March 18, 1992, more than a week into the trial.  And when his motion was denied, he again unreasonably failed to re-consider his decision to prevent Ms. Alfaro from pleading guilty.

23.  That Monroe was unable to come up with forensic evidence linking the driver to the crime is clear from the record.  During a hearing held November 8, 1991, a year and a half into his representation of Ms. Alfaro and only days from the then current trial date, Monroe reported that he had been "aggressively developing that theory [that the driver had come into the house and committed the crime]," but that he needed more discovery and more time.  *Id.* at 28.  Before ruling, the trial court called Mr. Monroe and Ms. Alfaro into chambers and asked Mr. Monroe for an offer of proof as to what he hoped to glean from the materials he had requested.  *Id*. at 34. Monroe responded, "the problem we have right now is that we have yet to find any independent evidence to support the premise that this guy was in the house."  RT 35 (Nov. 8, 1991 proceedings).  Thereafter, the judge announced in open court that it was "this court's opinion that good cause has not been shown for a continuance."  *Id.* at 40.  Again, Monroe failed to reconsider and allow Ms. Alfaro to plead guilty.  By the time trial began, the situation had not improved.  Monroe told the jury in his opening statement, "[t]he evidence will disclose that though there is no independent evidence to support the proposition that a third party was in the house . . . ."  RT 625-26.

43

24.  Not only did Monroe unreasonably insist on mounting a guilt phase defense, given Ms. Alfaro's confession, the lack of any forensic evidence that anyone else stabbed Autumn Wallace and Ms. Alfaro's refusal to testify that someone else had, he unreasonably pursued a defense that was unavailable as a matter of law. Penal Code § 26 provides: "All persons are capable of committing crimes except those belonging to the following classes:  Six -- Persons (*unless the crime be punishable with death*) who committed the act or made the omission charged under threats or menaces to show that they had reasonable cause to and did believe their lives would be endangered if they refused."  Pen. Code § 26 (emphasis added).

25.  That Mr. Monroe spent well over a year of the pretrial period pursuing a defense that was unavailable as a matter of law is beyond dispute.  On November 14, 1991, Monroe filed a Declaration Under Seal in which he stated:  "The position of the defense is that the defendant MARIA DEL ROSIO ALFARO, did not act alone but acted in concert with another party and under the direction and duress of that person." Supplemental Record Re: Corrections at 272-d.  In an ex parte hearing held November 15, 1991, in arguing for discovery related to a variety of individuals, who, Monroe conjectured, could have been the unidentified Hispanic male present at the scene, Monroe asserted:  "Perhaps we can develop it.  That's the whole point.  And the balance of what we are talking about is the prospect of a death penalty sentence versus a possibility of a second degree under the duress theory.  Unless we have a chance to chase that guy down, we can't even determine that . . . ."  RT 48 (Nov. 15, 1991 proceedings).

26.  According to Monroe's former law clerk, Stephen Shepard, on November 22, 1991, a year and a half after being appointed to represent Ms. Alfaro, barely three months before the trial actually began, and after six continuances of the trial date (at the request of the defense), Mr. Shepard prepared a memorandum in response to a request from Monroe regarding jury instructions to support a duress defense.  Upon completing his research, Shepard informed Monroe that Penal Code § 26 makes

44

1   duress unavailable as a defense as a matter of law.  Shepard's memorandum states:

2   "Mr. Monroe, in view of the discovery that duress is not available as a defense, I have

3   submitted the following motion for your approval . . . . I admit discovering PC 26

4   came as a surprise and the following was all I could think of at the last moment . . . ."

5   Exhibit 14.

6         27.  Even after he learned that duress was unavailable as a matter of law,

7   Monroe continued to pursue what was effectively a duress defense, as evidenced by

8   the following exchange during the hearing on the defense motion to close the trial for

9   Ms. Alfaro's testimony, held March 17, 1992:

10        Assistant District Attorney Middleton:  I don't know where it's leading, but
          from my reading of the defense motion, there appears to be the potential of a
11        duress defense in this case.  And I wanted to draw the court's and defense
          counsel's attention to CALJIC 4.41 that says duress is not a defense to a capital
12        case.

13        Mr. Monroe:  Penal Code section 26.

14        Mr. Middleton:  And also Penal Code section 26.  I just wanted to make sure
          everybody's aware of that.
15
          The Court:  . . . If you reviewed the defendant's special jury instructions, it
16        would have given you some clue about that.

17        Mr. Middleton:  I have.

18   CT 1128.

19   The court then stated to Monroe,

20        Let me ask you a question you might care to address.  First of all, as the district
          attorney pointed out, the defense of duress may not be available in a capital
21        offense.  What impact does that have on whether or not she's able to present a
          defense?
22
          Mr. Monroe:  I think the --
23
          The Court:  I guess what I'm saying is if somebody wants to get -- wants to
24        present a defense that somebody made me do it by way of duress and that
          defense is not available by law, then it's not a defense.
25
          Mr. Monroe:  I'm suggesting to the court that a different standard would be
26        applied to an aider and abettor as opposed to a primary perpetrator.  And that
          we suggest that the evidence would support that.
27
          The Court:  Well, you lost me there.  If somebody does something under the
28        compulsion of duress, they're a direct actor.  They're not a -- they would not be

45

1    an aider and abettor within the sense of being an aider and abettor.  They're a
     direct actor in the homicide.

2

3    Mr. Monroe:  Not necessarily, as the facts would come out as expressed in that
     declaration.  (Referring to a declaration signed by Ms. Alfaro.)

4    The Court:  Well, let's assume hypothetically that you and I go somewhere and
     we're going to rip off Mr. Middleton's house, okay?  And you and I get
5    together and we plan to go over there, and we both arm ourselves with guns,
     okay?  And we don't think Mr. Middleton is going to be home.  And let's
6    assume that we go over there and we're in the process of -- we have broken in,
     we're in the process of taking Mr. Middleton's large-screen television in the
7    back of our van and Mr. Middleton shows up, and you tell me that, "Ted,
     you're going to have to blow his ass away or I'm going to kill you."  And I
8    blow his ass away.  Penal Code section 26 says that's not a defense.  I'm still
     culpable.  I'm still responsible for that conduct.

9

10   Mr. Monroe:  What If I didn't blow his ass away, I simply threw my gun at him
     and ran out and you blew his ass away?

11   The Court:  Well, that's a hypothetical upon which there's no evidence.

12   Mr. Monroe:  I can't comment any further, your honor, other than what we
     have in our declaration.

13

14   The Court:  Okay.  See, that's a hypothetical that's not -- there's just no
     evidence to support that.

15   RT 1134-36.

16        28.  Monroe also acted unreasonably to the extent that he pursued an aider and

17   abettor defense.  An aider and abettor in a felony murder case will escape liability

18   for first degree murder only if she can establish that she is not the actual killer and

19   that she did not intend the death of the victim.  Having failed to suppress Ms. Alfaro's

20   confession, in which she admitted (among other things) that she took the knife "to kill

21   Autumn" (CT 570), it was unreasonable for Monroe to pursue an aider and abettor

22   defense.  It was also unreasonable because Monroe knew that Ms. Alfaro would not

23   testify that another person had killed Autumn and that she had not intended to kill.

24   *See* February 21, 1992 proceedings at 111.

25        29.  After forcing his client to trial, Monroe acted unreasonably when he

26   conceded during his opening statement that, "[t]here is some question as to whether

27   or not anybody else went into the house."  RT 624.  He acted unreasonably when the

28   most he could say for the defense case was,

46

1

The evidence will disclose that although there is no independent
evidence to support the proposition that a third party was in the house,
there will be testimony disclosing that other items of evidence had not
been tested or analyzed to confirm or eliminate the possibility that a third
person might have been in the house and was the real perpetrator.

2

3

4 RT 625-26.

5      30.  Things got no better during the remainder of the guilt phase of the trial.

6 Though she could not prevent her attorney from arguing that someone else killed

7 Autumn Wallace, Ms. Alfaro could and did refuse to take the stand to support her

8 counsel's theory.  RT 1179.  And despite Monroe's assurances to the court that he

9 would present other defense witnesses (RT 1179), Monroe called no witnesses.  RT

10 1179.  In his closing remarks, seemingly oblivious to the fact that Ms. Alfaro had

11 been charged with felony murder, Monroe conceded to the jury that Ms. Alfaro

12 stabbed Autumn Wallace after entering the house to steal.  He asked the jury to "find

13 that, yes, Rosie Alfaro did stab little Autumn.  Rosie Alfaro did not kill that little

14 girl."  RT 1294.  Further conceding guilt, as well as demonizing his client in the eyes

15 of the jury, he stated, "At one time [Ms. Alfaro] says, 'I stabbed her three or four

16 times.'  That might be consistent with the likes of Rosie Alfaro."  RT 1303.

17      31.  In light of the above, it is not surprising that Monroe withdrew his request

18 for an aider and abettor instruction, thereby effectively conceding that there was no

19 legal defense to the crimes with which Ms. Alfaro was charged.  *See* Special

20 Instruction # 7 (CT 988), and agreement to withdraw (RT 1226) ("The court:

21 Number 7, . . . are you withdrawing that one, too?  Monroe:  We have 8.83.1 in now,

22 so I can withdraw that one.  The court:  Okay.")  Monroe agreed to withdraw 8.83.1.

23 RT 1215.  Monroe's other proposed instructions regarding first degree murder sought

24 only to allow the jury to find no malice, which would not have prevented a verdict

25 of first degree felony murder.  *See* CT 967-96.  As  it turned out, the jury found

26 Ms. Alfaro guilty of all charges, including first degree murder with special

27 circumstances, in less than four hours.  RT 1399-1411; CT 1086.  There was no

28 tactical reason for Monroe to withhold consent to a guilty plea and deprive his client

47

1    of critical evidence that would have mitigated the sole aggravating factor in this case,

2    the circumstances of the crime.

3        32.   The prejudice that arose from Mr. Monroe's insistence on proceeding to

4    trial on the issue of guilt is glaring.  In his opening statement during the penalty

5    phase, the district attorney told the jury, "You're going to find, ladies and gentlemen,

6    from the evidence that Rosie Alfaro has not accepted the responsibility for the killing

7    of Autumn Wallace."  RT 1436.  After the first penalty jury hung, and the second jury

8    was impaneled, the district attorney again told the jurors that: "Miss Alfaro has not

9    accepted any responsibility.  That's what the evidence will show."  RT 3179.  During

10   his closing in the second penalty trial, the District Attorney returned to this theme.

11          Remorse, Ladies and Gentlemen? . . . Ladies and Gentlemen, th[e]
            remorse [Ms. Alfaro exhibits in the video-taped confession] was not for
12          her, that little girl.  That remorse was for the plight of Rosie Alfaro only.
            You can say a whole lot of things.  You can mouth the words. . . .
13          Especially once you get into the system and you know what's expected,
            you can mouth the words, "I have sympathy" or "I have remorse" or "I
14          feel sorry."  *But actions speak louder than words.*  The only remorse she
            has is for sitting in jail for what she's done.
15
16   RT 4367-68 (emphasis added).  Had Mr. Monroe consented to Ms. Alfaro's guilty

17   plea, these powerful arguments in favor of a verdict of death could not have been

     made.  The jury would have known that Ms. Alfaro was willing to accept full
18
     responsibility for her crimes, knowing that she faced life in prison without the
19
     possibility of parole, if not death, in so doing.
20
21       33.   The prejudice to Ms. Alfaro that flowed from Monroe's unreasonable

22   decision to present the third man defense is also obvious from the trial court's

     comments, at sentencing:
23
24          If we adopt the argument of the defense, that is to say that Miss Alfaro
            stabbed Autumn Wallace several times, three or four or five times, and
25          then this other unknown person finished off the job stabbing young
            Autumn Wallace the other 47, 49 times, it's absolutely amazing that
26          Miss Alfaro left bloody footprints on the floor.  And this other person
            who obviously was there, according to their argument, after the pool
27          of blood is even larger than it would have been when Miss Alfaro left the
            room, somehow this person didn't leave a trace, not a single trace of any
28          footprint in the blood. . . .  It is the Court's belief that the jury rejected
            the defense's contention that a third person was present, did any of the

                                            48

1   stabbing in this case.  The evidence is grossly insufficient to even raise
    that as a strong inference in the case . . . .  It appears to this court . . . it's
2   a figment of someone's imagination to say that another third person was
    present and that Miss Alfaro acted under substantial domination of this
3   person. . . .  [T]he circumstances of the crime itself standing alone far
    outweigh any mitigating circumstances, if there are any, that are
4   presented in this case.

5   CT 1810-15.

6       34.  In unreasonably withholding his consent to Ms. Alfaro's guilty plea, trial

7   counsel deprived her of universally recognized mitigating evidence of remorse and

8   acceptance of responsibility.  Studies show that juries are much more likely to impose

9   a sentence of life without possibility of parole rather than a death sentence if they

10  believe the defendant has taken responsibility for the crime.  *See* Scott Sundby*, The*

11  *Capital Jury and Absolution:  The Intersection of Trial Strategy, Remorse, and the*

12  *Death Penalty*, 83 Cornell L. Rev. 1557 (1998).  There was no tactical reason for

13  Monroe's refusal to permit his client to plead guilty.  But for Mr. Monroe's

14  ineffective assistance as counsel in refusing to consent to Ms. Alfaro's entry of a

15  guilty plea, it is probable that the result at the penalty phase of the trial would have

16  been different.

17  **C.**    **COUNSEL'S FAILURE TO MOVE TO WITHDRAW OR TO ADVISE**

18      **CLIENT TO MOVE FOR SUBSTITUTE COUNSEL DESPITE**

19      **COMPLETE BREAKDOWN OF ATTORNEY-CLIENT**

20      **RELATIONSHIP**

21      35.  Ms. Alfaro was denied her right to counsel, to due process and to a fair

22  trial as a result of Monroe's failure to move to withdraw despite the complete

23  breakdown of their attorney-client relationship.  It is clear from the record that

24  Monroe's relationship with Ms. Alfaro deteriorated to such an extent that in failing to

25  make a motion to withdraw and for substitute counsel, he deprived Ms. Alfaro

26  of effective representation of counsel.  Mr. Monroe failed to move to withdraw

27  despite his admitted knowledge that he and Ms. Alfaro had arrived at an

28  insurmountable conflict over the most fundamental aspects of the case.  This conflict

49

1   involved her desire to plead guilty and Mr. Monroe's unwillingness to consent to
2   such a plea and the question of whether Ms. Alfaro would disclose the identity of the
3   driver or testify on her own behalf, as well as other issues.  It is probable that had
4   Ms. Alfaro been afforded counsel with whom she could communicate and participate
5   in her own defense, the outcome would have been different.  Ms. Alfaro's defense
6   was prejudiced by Monroe's failure to move the court to allow him to withdraw and
7   his failure to advise Ms. Alfaro of her right to move for substitute counsel.

8       36.  In a pleading filed ex parte on February 20, 1992, entitled "Request for
9   Special Instructions," Monroe wrote: "[m]y client . . . refuses to follow my
10  instructions and take the stand and implicate 'Beto' . . . .  If my client insists on
11  pleading guilty to the special circumstances, it is against my most rigorous advice.
12  I am requesting instructions from the court as to whether or not the court believes
13  it is necessary for me to withdraw from the case at this late stage or whether or not
14  I should remain on the case."  CT 355.

15      37.  On February 21, 1992, at a hearing held on Monroe's "Request for Special
16  Instructions," the court told Monroe, "I'm not really in a position to give any
17  instructions concerning your relationship vis-a-vis your client.  No one has made a
18  motion to be relieved.  No one has made a motion to have substitute counsel.  So
19  there is really nothing -- there is really nothing before, properly before the court."
20  RT 110 (February 21, 1992 proceedings).  Despite the Court's invitation, Monroe's
21  response was not to make a motion or to advise Ms. Alfaro of her right to make a
22  motion for substitute counsel.  Instead, he asked the Court for a "lead":  "Your Honor,
23  I believe I'm asking the court to give me a lead or advice as to whether or not the
24  court believes I should declare a conflict because I believe that a conflict may exist."
25  *Id.* at 110.  Later, Monroe declared, "I have an out and out conflict."  *Id.* at 112.  He
26  said, "In effect, she and I are at loggerheads."  *Id.* at 113-14.  He told the court the
27  conflict was "profound;" that it was "a basic disagreement what she wants to do with
28  her life."  *Id.* at 118.  He said, "I cannot effectively represent my client at this stage in

50

1   light of the instructions she has given me." *Id.* at 115.  He told the court, "I think

2   as [sic] a minimum, Your Honor, we ought to have counsel appointed to advise her

3   about the consequences of her act." *Id.* at 117.  But when the court declined to take

4   action, Monroe did nothing but declare "You put me in an absolutely untenable

5   position, Judge Millard." *Id.* at 119.  Monroe filed no motion to withdraw nor did he

6   advise his client of her right to do so.  The transcript of the February 21, 1992,

7   hearing contains no such advisement and on April 9, 1992, when Ms. Alfaro did

8   make a *Marsden* motion, she explained that the reason she had not made one earlier

9   was, "Well, I didn't know what I was supposed to do to bring it up.  I had to ask one

10  of the girls in the jail. . . .".  RT 2130 (April 9, 1992 proceedings).

11      38.  During the April 9th hearing, on Ms. Alfaro's *Marsden* motion, it again

12  emerged that Ms. Alfaro's relationship with Monroe rendered him ineffective as her

13  counsel.  Monroe informed the Court, "Miss Alfaro told me she would not talk to me

14  any more, she would not cooperate with me any more, she would not do anything that

15  I asked that I wanted her to do."  At first he admitted that her lack of trust arose out

16  of the fact that he had given her inaccurate advice about the scope of cross-

17  examination, should she take the stand.  But when he realized that the Court viewed

18  his advice as incompetent, he denied that he had given it.  RT 2124-29 (April 9, 1992

19  proceedings).  Instead of joining Ms. Alfaro in requesting substitute counsel, Monroe

20  back-pedaled about the nature of his advice, placing his own concerns about his

21  performance above his client's right to an attorney with whom she could

22  communicate and would cooperate in her death penalty proceeding.

23      39.  Ms. Alfaro had ample reason in addition to Monroe's incompetent advice

24  about cross to stop cooperating with Monroe.  She was not upset over a mere tactical

25  error.  Nor was she being unreasonably obstinate.  The record establishes a long-

26  running conflict, full of quarrels and disagreements, between herself and Mr. Monroe

27  over numerous situations over the course of the proceedings.  He had a duty, as an

28  officer of the Court sworn to uphold her constitutional rights, to move to withdraw.

1    Had he done so, it is probable that the result of the penalty trial would have been
2    different.

3    **D.      COUNSEL'S FAILURE TO REQUEST CO-COUNSEL**

4         40.  In capital cases, an attorney may request that the court appoint an
5    additional attorney as co-counsel.  Pen. Code § 987(d); *Keenan v. Superior Court*,
6    31 Cal. 3d 424, 430, 640 P.2d 108 (1982).  A request for appointment of co-counsel
7    is made by the defendant's first attorney by filing a confidential affidavit with the
8    court outlining the reasons why co-counsel is required.  Pen. Code § 987(d).  The
9    court weighs several factors in deciding to appoint additional counsel, including, but
10   not limited to, the factual and legal complexity of the case and evidentiary differences
11   between the guilt phase and the penalty phase of trial.  *Keenan* 31 Cal. 3d at 432.
12   Mr. Monroe's failure to request co-counsel in a case where it was objectively
13   unreasonable not to do so, amounted to deficient performance - representation below
14   common professional norms.  This error prejudiced Ms. Alfaro's defense, seriously
15   undermining confidence in the outcome, that is, the death penalty verdict.  But for
16   Mr. Monroe's error, there is a reasonable probability that the result of the proceedings
17   would have been different.

18        41.  Ms. Alfaro's case involved a particularly heinous crime and a video taped
19   confession by the defendant.  The case required the analysis of over 4,000 pages
20   of discovery and extended scientific testimony of experts.  CT 536 (March 5, 1992,
21   987.9 records).  Discovery filled twenty-one three-inch binders.  *Id*. There were facts
22   from which a reasonably competent attorney would realize that it was necessary to
23   conduct a thorough investigation, hire forensic experts, and hire mental health experts
24   to study the defendant's personal history, psychological and neurological
25   development, drug use and mental state at the time of the crimes.  In evaluating the
26   need for a second attorney, the court also focuses on the complexity of the legal
27   issues involved.  It is probable that had Monroe requested appointment of second
28   counsel, his request would have been granted.

42.  Instead, Monroe used a rookie investigator (*see* Exhibit 1 (McGrath Declaration) at ¶ 10) to perform legal work properly performed only by lawyers. *See* CT 536 (March 5, 1992, 987.9 records) (Monroe: "I did not ask the court to provide co-counsel to this case and so a good many of the quasi-legal issues which co-counsel might have done were completed by the investigator.").  While it is true that defense counsel in capital cases may ease the burden of preparing for trial by employing an investigator, because many of the tasks involved in preparation for trial cannot be delegated to non-attorneys, the court cannot assume that authorization of funds for an investigator makes appointment of a second attorney unnecessary. Regardless of work done by an investigator, the ultimate responsibility for coordinating the investigation and assimilating the results must remain with an attorney sensitive to the potential legal issues involved.

43.  In this case, the investigator's role was plainly not limited to quasi-legal tasks but extended far into the domain of an additional counsel.  The investigator inappropriately developed defense theories, as evidenced in several different declarations to the court.  *See, e.g.*, CT 67, 101, 108 (Monroe declared: "I and the investigator under my direction have been diligently examining appropriate areas of defense and/or mitigation.  We have yet to formulate a clearly delineated avenue of defense and mitigation . . . "); CT 538 (March 5, 1992, 987.9 records) ("Had it not been for the extraordinary efforts by the investigator, who assumed almost a position of quasi co-counsel in analyzing the evidence, examining some of the legal issues, obtaining and performing the extensive investigation and then obtaining the appropriate experts to support the theory of this defense, we would have had no defense at all to mount and the trial would have been reduced to a sham.")  Having "legal issues" examined by the investigator was patently unreasonable under prevailing professional norms.  Trial preparation for a capital case involves especially complicated factual and legal issues that cannot necessarily be resolved through the use of an investigator, but require the employment of a second attorney.

44.  Ms. Alfaro suffered the consequences of a flawed legal defense co-devised by a non-attorney.  She was denied the benefits of defense and mitigation theories developed by a qualified legal co-counsel that would have averted a sentence of death.  Mr. Monroe's decision severely prejudiced Ms. Alfaro's case.  That these acts affected the outcome of the case is made apparent by the fact that the duress defense theory developed in collaboration with the investigator did not exist as a matter of law and Monroe rested the guilt phase defense he had insisted on without presenting any affirmative evidence.  CT 500.  The fact that Mr. Monroe admitted the almost "quasi-counsel" status of his investigator, "without whom there would have been no defense at all," confirms the objective necessity of co-counsel.

45.  Mr. Monroe's faulty reliance on his investigator and resulting failure to request co-counsel from the court undermined the reliability of the verdict.  There is a reasonable probability that, had Mr. Monroe not relied on his investigator for legal theory but requested a second counsel instead, a feasible defense would have been promoted and a jury would have concluded that the balance of aggravating and mitigating circumstances in Ms. Alfaro's situation did not warrant the death penalty.

**E.**   **COUNSEL'S FAILURE TO ADMIT MS. ALFARO'S OFFER TO ENTER A GUILTY PLEA IN THE PENALTY PHASE**

46.  Mr. Monroe acted unreasonably not only in refusing to consent to Ms. Alfaro's entry of an unconditional guilty plea, but in failing to introduce evidence that she had wanted to plead guilty in the penalty phases of her trial. Neither jury was informed that Ms. Alfaro had sought to plead guilty to the charges, let alone to plead guilty without any guarantee of leniency, despite both the court's and defense counsel's knowledge that this was, in fact, the case.  This was mitigating evidence of which Ms. Alfaro was deprived as a result of her counsel's ineffective representation of her.  But for Monroe's incompetence as counsel in this regard, there is a reasonable probability that the result of the penalty phase of Ms. Alfaro's trial would have been different.

54

47.   On February 21, 1992, the trial court met with defense counsel and Ms. Alfaro ex parte. RT 106-23 (February 21, 1992). During the discussion that ensued, defense counsel made it clear, as did Ms. Alfaro herself, that Ms. Alfaro desired to enter an unconditional guilty plea and proceed to the penalty phase of her trial. *Id.*

48.   The District Attorney was not present for the February 21, 1992 *ex parte* in camera hearing. And, based on a motion he made five days later, it can be inferred that he was unaware of Ms. Alfaro's desire to enter an unconditional guilty plea and proceed to the penalty phase. It can also be inferred that at some point, Mr. Monroe approached the District Attorney and asked if he would be willing to plea bargain: a sentence of life without the possibility of parole in exchange for Ms. Alfaro's plea of guilty. *See* CT 400-01; RT 169-87; Exhibit 15 (note to Lawhon from Monroe re District Attorney's Death Penalty Committee's rejection of his offer to have Ms. Alfaro plead guilty). In an oral motion made February 26, 1992, district attorney Middleton argued that evidence of an offer to plead to life without parole should be precluded because it is only an unconditional offer to plead guilty that constitutes a mitigating circumstance:

> Mr. Middleton:  [I]f the defendant wanted to plead guilty, she can plead guilty right up front, right now. *Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation.* Not the fact that she extended or her attorney extended some kind of offer, because the attorney extending some kind of an offer isn't anything.
>
> I could say yes and then they could say, you know, fly their fingers right in front of my face and say we just wanted to see if you would do it: *to me it doesn't really mean anything unless there is an actual acceptance with the offer to really give some validity to the fact that the person is offering to plead guilty.*
>
> Mr. Monroe:  If that's Mr. Middleton's concern, Your Honor, I can have Miss Alfaro on the record represent to the Court to show the extent of her remorse -- she really does -- that she is willing now to plead guilty in return for life without possibility of parole.
>
> Mr. Middleton:  That's not the concern of the People that it's valid. I'm saying without -- I mean *she could make it valid to the jury, this remorse or whatever else the defense is saying she has, by actually pleading guilty and going to the penalty phase.*

55

RT 185-86 (February 26, 1992 proceedings) (emphasis added).  Despite the court's
and Monroe's actual knowledge that Ms. Alfaro was willing to plead guilty
unconditionally — a fact that the district attorney conceded amounted to a mitigating
circumstance — neither of them informed the district attorney of this fact.  Instead,
Monroe stood mute as the court ruled as follows:

> The Court: Well, it's definitely not relevant to anything in the guilt phase
> of the trial.  And it would appear to me -- unless you can submit some
> authority to the court, it would appear to me a mere offer to plead guilty,
> if the District Attorney strikes the -- or does not seek the death penalty,
> appears to me from a logic and common sense standpoint not to be the
> proper subject matter of mitigating testimony in a penalty phase, if we
> ever get to a penalty phase, in the trial.
>
> And it's. . . a motion in limine.  So, *in effect, the court would --
> what it does, it directs counsel not to bring up that issue, or the
> defendant herself if she were to testify not to bring up that issue, without
> leave of court.*
>
> And whenever you feel you have some authority or some analogy
> by some cases or something of that nature you want me to look at, I will
> be more than happy to review the motion in limine.
>
>       * * *
>
> Mr. Monroe: Certainly in guilt but also in penalty?
>
> The Court: In all phases of the trial unless you have leave of the court
> otherwise.

*Id.* at 186-87.

49.  Despite the court's invitation to Monroe to present "some authority or
some analogy by some cases or something of that nature" that would support the
admissibility of evidence of a defendant's willingness to plead guilty in the penalty
phase of a capital trial, Monroe failed to do so.  Had Monroe stated on the record
at the February 26, 1992 hearing that Ms. Alfaro had, in fact, wanted to enter an
unconditional guilty plea, the district attorney would have been hard-pressed to object
to the admissibility of the evidence, given his concession that an unconditional plea
offer would be admissible.  Instead, Monroe failed to argue, in light of the district

1 attorney's concession, that an offer to enter an *un*conditional plea of guilty would be

2 admissible in any event.  RT 183-87 (February 26, 1992 proceedings).

3     50.  Monroe's unreasonable failure to offer evidence of Ms. Alfaro's desire

4 to enter a guilty plea was highly prejudicial.  Even if he had a valid tactical reason for

5 withholding consent to her entry of a guilty plea, there could have been no tactical

6 reason for failing to present the court with authority for introducing her desire to

7 plead guilty in the penalty phase or for failing to argue that her offer had been

8 unconditional, and that the district attorney had conceded that such an offer qualified

9 as admissible evidence.  As  a result of his failure to argue that Ms. Alfaro's offer

10 to plead guilty was undisputably admissible, Monroe allowed the jury to be misled.

11 Stated the district attorney, in his closing to the penalty jury, "Who operates the

12 defense?  It's at the operation of Ms. Alfaro.  She's the defendant.  She chooses

13 to fabricate, fake, embellish and create."  RT 4366.  "Remorse, Ladies and

14 Gentlemen?"  RT 4367.  There was no tactical reason for Mr. Monroe to have failed

15 to offer this obviously mitigating evidence that would have supported a finding that

16 Ms. Alfaro accepted responsibility for the crimes and felt remorse.  Had he done so, it

17 is probable that the result of the penalty trial would have been different.

18 **F.**　**COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND**

19 　**DISCOVER THE IDENTITY OF THE MAN PRESENT AT THE CRIME**

20 　**SCENE**

21     51.  While duress was not available as a defense at the guilt phase of the trial,

22 evidence that Ms. Alfaro was under extreme duress or the substantial domination

23 of another person would have constituted admissible mitigating evidence during the

24 penalty phase.  *See* Penal Code § 190.3(g).  Trial counsel unreasonably failed to

25 conduct an adequate investigation to ensure a fair and reliable determination of guilt

26 and penalty.  In particular, he unreasonably failed to interview or to instruct the

27 defense investigator to interview key witnesses and unreasonably failed to use the

28 information available to him to draw the correct conclusion regarding the identity

of the man who drove Ms. Alfaro, her baby, and Reynoso to the Wallace home.  Had
he done so, he would have been able to present powerful mitigating evidence about
this man's substantial domination over Ms. Alfaro and her extreme duress.

52.  Instead, trial counsel unreasonably blamed the wrong man, and
unreasonably argued, absent any evidence, that this man, and not Ms. Alfaro, had
been responsible for killing Autumn Wallace.  He made this argument first at the guilt
phase of the trial, and after the jury rejected it, he made it again at both penalty trials.
Mr. Monroe's unreasonable approach squandered the mitigating evidence that
Ms. Alfaro had been dominated and threatened by the driver at the time she
committed the crimes, succeeding only in convincing the jurors that she did not
accept responsibility for her conduct.  But for her counsel's incompetence in this
regard, Ms. Alfaro's sentence probably would have been different.

53.  This was Mr. Monroe's first capital case.  He had previously represented
only one client charged with murder.  Although he hired Sandberg Investigation to
assist him with the case (*see* CT, 987.9 material), the primary investigator assigned to
work the case, Laura Lawhon, had no prior experience investigating a capital case or
even a murder case.  *See* Exhibit 1 (Declaration of Raymond McGrath) at ¶ 10.

54.  While Monroe devoted the vast majority of the defense team's time and
resources to finding out the identity of the Hispanic man who drove Ms. Alfaro to the
Wallace home, he did so in a wholly incompetent manner.

55.  To begin with, he failed to explain to Ms. Alfaro the value of the man's
role in the crimes as mitigating evidence, regardless of her own confession to the
crimes.  *See* Exhibit 4 (Alfaro Declaration).  Instead, he told Ms. Alfaro that he
wanted to defend her by arguing that this man, and not she, had killed Autumn
Wallace, a strategy to which she strongly objected.  *See, e.g.*, RT 111 (February 21,
1992 proceedings).  As  a result, Ms. Alfaro refused to cooperate with Monroe by
disclosing the man's identity.

56.  Having failed to extract this information from his client himself, Monroe unreasonably moved the court for funds to hire "experts" for the purpose of extracting this information from her, voluntarily or involuntarily, despite his admitted knowledge that her reasons for withholding the information included fear for her safety and that of her family members if she told.  In the process of obtaining funds for these experts, Monroe betrayed his duty as defense counsel for Ms. Alfaro by making prejudicial statements about her to the judge.

57.  On September 9, 1991, for example, Monroe filed a declaration under seal in which he requested funds to hire an expert by the name of Dr. Bruce Danto of "Death Investigation International," Fullerton, California, to administer Sodium Pentothal to Ms. Alfaro.  CT 274-76 (Sept. 9, 1991, 987.9 records).  Stated Monroe:

> [T]he information provided by my client tends to be inconsistent at times
> . . . .
> It is imperative that we obtain information from the defendant which is not colored by some subconscious fear, ulterior motive or hidden bias.
> My interviews with other experts who have examined MARIA DEL ROSIO ALFARO, have suggested there is a substantial likelihood that I may be able to obtain the information I need by employing certain chemical devices including but not limited to the use of sodium pentothal [sic].

CT 274-75 (Sept. 9, 1991, 987.9 records).  That Monroe felt the need to administer Sodium Pentothal to his client speaks volumes about their relationship, as well as his level of desperation in his quest for a defense.  *See* Exhibit 15 (note from Monroe's investigator's file:  "Danto scares me but we have nothing to loose [sic].").  That he told the judge Ms. Alfaro had been "inconsistent" and that he needed to give her drugs to obtain information not colored by "ulterior motive[s]" served to bias the court against her.  That Monroe sent Ms. Alfaro to Dr. Danto in the custody of Sheriff's Deputies who were present during the administration of the "truth serum" and subsequent interrogation of Ms. Alfaro about the crime is truly mind-boggling.  *See* CT 277-78 (Sept. 9, 1991, 987.9 records); *see also* Exhibit 16 (Transcript of Dr. Danto's Sept. 27, 1991 Sodium Pentothal inverview with Ms. Alfaro in

1  presence of Sheriff's Deputies).  During the interview, Dr. Danto elicited a number

2  of inculpatory statements from Ms. Alfaro, including, Ms. Alfaro: "I didn't know

3  what I was doing."  Dr. Danto:  "Well, how can that be since you planned on getting a

4  VCR that you were going to sell to Miguel?  You knew what you were doing there,

5  didn't you, dear?"  Ms. Alfaro:  "Yeah."  *Id.* at p. 28.

6      58.  Predictably, the district attorney became aware of Dr. Danto's

7  administration of "truth serum" to Ms. Alfaro.  Not only were Sheriff's deputies

8  present throughout the interrogation, but Dr. Danto gave an interview about his

9  session with Ms. Alfaro to the Orange County Register.  It appeared on November 26,

10 1991, shortly before trial.  Exhibit 17 (Orange County Register article).  The article,

11 which does not mention Ms. Alfaro by name, but recites facts which clearly identify

12 her, erroneously states that she has been convicted of murder, and that Dr. Danto gave

13 her Sodium Pentothal to "enhance her memory which she contends was affected by

14 drugs she was taking at the time of the slaying."  *Id*.  Yet, despite the district

15 attorney's reference to this article on the record in Monroe's presence, Monroe

16 unreasonably failed to take any action -- be it motion for change of venue,

17 continuance, or targeted voir dire -- to blunt the prejudicial impact of this information

18 on his client.

19     59.  In the end, Monroe did not get what he wanted from his client or Dr. Danto

20 and was left to analyze the evidence.  Had he done so in a competent manner, he

21 would have learned the identity of the driver.  Instead, Monroe unreasonably fixated

22 on one Roberto "Beto" Frias Gonzalez, stubbornly insisting that he was the man who

23 had driven Ms. Alfaro to the Wallace home, despite the absence of any evidence

24 connecting Frias Gonzalez to Ms. Alfaro or the crimes.

25     60.  On the day of the crimes, a witness named Susan Mata told an Orange

26 County Sheriff's Deputy that at approximately 4:00 to 4:15 p.m. on June 15, 1990,

27 she saw a medium brown Monte Carlo backed in the driveway of the Wallace home

28 with its trunk open.  She also stated that she saw a male Hispanic, about 27-32 years

old, with hair straight back and a big mustache near the sidewalk with a Hispanic child about 1-1/2 to 2 years old.  She said she got a good look at both the man and the child.  She said she saw a second man behind the trunk, but was not able to see him very well.  *See* Exhibit 18 (Deputy Allen's Susan Mata interview notes).  In an interview the following day, Ms. Mata told investigators that she could not be certain that the man leaning into the trunk of the Monte Carlo was Hispanic (*id.* at 7); that she saw only a part of his arm (*id.*); and that she couldn't see his face.  *Id*.  Based on Ms. Mata's description of the first Hispanic man, a composite drawing was prepared and flyers asking the public for information about the man in the drawing were distributed.  Exhibit 19 (copy of flyer).

61.  On June 22, 1990, Roberto Frias Gonzalez was identified by Sheriff's Deputy Kenneth Harper as a possible suspect because he looked like the drawing based on the observations of Susan Mata.  *See* Exhibit 20 (Clue # 584; Discovery page 1793l).  On June 29, 1990, Mr. Gonzalez was booked into the Orange County Jail for a probation violation and was questioned about the crime.  See Exhibit 21 (Clue # 642, Discovery page 2185).  He denied knowing Petitioner and indicated that he had an alibi for June 15.  *Id.* at 2186. On July 2, 1990, deputies interviewed Mr. Gonzalez's sister, and she confirmed his alibi.  *Id.* at 2188.  In addition, Sheriff's Deputies showed a picture of Mr. Gonzalez to members of Petitioner's family and none recognized him.  *Id*.

62.  The man in the composite drawing turned out to be Antonio "Shorty" Reynoso, who surrendered to the police on July 2, 1990.  RT 3489.  During questioning, Reynoso admitted that he had been outside the Wallace home with Ms. Alfaro's baby on June 15th, and thus, clearly he was the man Ms. Mata had described.  Exhibit 22 (transcript of Reynoso's interview with Sheriff's investigators). During a hearing held February 26, 1992, the district attorney explained that the prosecution had considered and eliminated Roberto Frias Gonzalez as a suspect for this and other reasons: "Robert Frias Gonzalez is not a suspect in this case as far

1    as the prosecution goes, and was only a suspect as far as he appeared to be similar to

2    the drawing of the person that had a child outside the victim's home which turned out

3    to be Antonio Reynoso."  RT 135-36 (February 26, 1992).

4         63.  Yet despite Ms. Mata's statement that she did not get a good look at the

5    second man in front of the Wallace home, the fact that the drawing looked just like

6    Reynoso, the fact that Reynoso admitted that he had been outside the Wallace home

7    with the baby, and the fact that there was no other evidence even remotely suggesting

8    that Frias Gonzalez was involved in the crimes, Monroe persisted in believing that the

9    composite drawing supported the conclusion that Roberto Frias Gonzalez was the

10   third man.  During a hearing held November 15, 1991 on Monroe's request for

11   subpoenas, he explained his theory that the composite was not simply a picture

12   of "Shorty" Reynoso, but also of the third man:  The court: "And this [referring to a

13   subpoena] apparently does not relate to your third party duress defense for Raul

14   Roger Rodriguez?"  Mr. Monroe:

15          Yes, because if the court remembers when I mentioned the possibility
            of the existence of that person in our last hearing, who goes under the
16          name of Robert Frias Gonzales, also, the eye witness identification
            of Shorty and a composite of Shorty which is a composite of this third
17          person, Shorty and this third person look almost alike.  It's our
            contention or suggestion really that there may be a relative relationship
18          between those two because it is inconceivable to us, Your Honor, that
            Shorty, who got out of state prison the day before this homicide, goes
19          down to the place of this homicide with this third person and never
            knows -- is never aware of the fact that a homicide goes down after he's
20          seen outside with Miss Alfaro's two-year-old child.  We believe there's a
            connection between Shorty and that third person and we are trying to
21          trace that connection down.

22   RT 52-53 (Nov. 15, 1991 proceedings).  Days before the trial began, Monroe repeated

23   his belief that Frias Gonzalez was the driver, based on nothing more than his

24   resemblance to the composite drawing of the man Susan Mata had seen -- and

25   Ms. Alfaro's insistence that he *not* blame Roberto "Beto" Frias Gonzalez for the

26   crime:

27          Monroe:  My client has adamantly, adamantly refused to allow me to call Beto
28          or to cross examine Shorty regarding his relationship with Beto or to show

62

1   photographs of Mrs. Mata who I.D.ed a person outside of the house.  We
2   believe she [referring to Susan Mata] I.D.ed Beto because my client has told
    me she is in absolute fear of her safety and she's in absolute fear of the safety
3   of her family should it become known to Beto that we in some way, shape, or
    form, for lack of a better term, have given him up.

4   RT 111 (February 21, 1992 proceedings).

5       64.  There is no evidence that Monroe ever interviewed Rosalinda Gonzalez,

6   Roberto's sister, to question her about his alibi.  There is no evidence that Monroe

7   ever found anything other than Frias Gonzalez's resemblance to the composite

8   drawing to link him to Ms. Alfaro or the crimes.  Nevertheless, Monroe continued to

9   argue, through the guilt trial, penalty trial, and penalty re-trial, that Frias Gonzalez,

10  and not Ms. Alfaro, killed Autumn Wallace.

11      65.  That Monroe and not Ms. Alfaro was responsible for identifying and

12  seeking to blame "Beto" for the crimes is evidenced by Monroe's statements to the

13  court,

14      The defense of this case has been based on the proposition that the crime
        was so heinous that it could have only been committed by a person under the
15      extreme influence of PCP or some similar drug or the person had an absolutely
        abandoned, malignant, and vicious heart.
16
        The preliminary inquiry disclosed that the client was not under a
17      hallucinogenic which would have left her out of control.  However, the
        initial investigation also strongly suggested that she was not capable
18      of committing this crime alone.

19      Although the police had initially investigated this area, they
        discounted it and it fell to the defense to begin to develop that particular
20      theory.

21              * * *

22      The client . . . was less than candid during the initial stages of our
        investigation.
23              * * *

24      The client's statements to defense counsel and his investigators
25      changed as frequently as her decision as to whether or not to she would
        cooperate in her own defense.
26              * * *

27      It was because [the investigator went to Mexico] that we were able
28  to develop independent evidence to *breakdown the client's changing*

63

*facade and have her finally admit to what we believe is the true theory of the defense* which we are now in a position to present to the jury.

CT 535-39 (March 5, 1992, 987.9 records).

66.  The unreasonableness of Monroe's approach — "to break down the client's changing facade and have her finally admit to what we believe is the true theory", i.e. that "Beto" drove her to the Wallace home  — is highlighted by his own declaration, filed April 17, 1992, in which he acknowledges that his client suffers from a personality disorder which makes her unnaturally susceptible to suggestion. CT 1196-1207.  Monroe states that Dr. Consuelo Edward would testify that Ms. Alfaro is "a follower" who "suffers from a Dependent Personality Disorder which makes her subordinate herself to others and agree with them, even if she believes they are wrong, for fear of being rejected."  CT 1202-03; RT 4087.

67.  Knowing that Ms. Alfaro would "agree," "for fear of being rejected," Monroe used Dr. Edwards to get Ms. Alfaro to agree that "Beto" was the man who drove her to the Wallace home.  When she testified at Ms. Alfaro's penalty re-trial, Dr. Edwards confirmed that the notion that "Beto" was the driver came from Monroe or his investigator, and not Ms. Alfaro.  She testified that Monroe or his investigator informed her that Roberto "Beto" Frias Gonzalez was the second Hispanic man seen at the Wallace house, and used her to pressure Petitioner to agree:

> D.A. Middleton:  In relationship to when the defense showed you these three exhibits, when was it that Maria Alfaro said Beto did it?
>
> Dr. Edwards:  It was after I confronted her with the fact that the defense has shown me a composite picture of one of the men that was in front of the house and that this man was called Beto and that Miguel was not to be found anywhere, and yet a Beto was there.  And then she said that but became very angry.  She said she didn't want any of this and was going to dismiss her attorney.
>
> D.A. Middleton:  You used this information that you got from the defense in questioning -- in asking questions to Maria Alfaro, didn't you?
>
> Dr. Edwards:  Yes.
>
> D.A. Middleton:  Well, did the defense tell you that Exhibit 90 was the person holding the child out in front?

64

1     Dr. Edwards:  No, they didn't say that. . . .

2     D.A. Middleton:  Did they tell you that the person in exhibit 90 was in
fact one of the persons that was in the front yard?

3

4     Dr. Edwards:  Yes.

    D.A. Middleton:  And did they tell you that the person in exhibit 89 was
5     the other person that was in the front yard?

6     Dr. Edwards:  Yes sir. . . .

7     D.A. Middleton:  Did they tell you that both of those individuals were in
the front yard?

8

9     Dr. Edwards:  They told me that this individual was in the front yard,
that that individual was the picture seen as being there, and that that
person had been identified as Beto.

10

11   *See* RT 4204-06; *see also*  Supp. CT 355 (February 20, 1992 pleading entitled

12 "Request for Special Instructions").

13     68.  Monroe's erroneous identification of Roberto Frias Gonzalez as the second

14 male present at the Wallace house at the time of the crimes severely prejudiced

15 Ms. Alfaro at trial.

16     69.  During the first penalty trial, Ms. Alfaro was cross-examined by the

17 assistant district attorney based on Dr. Edwards's report in which Dr. Edwards states

18 that Ms. Alfaro first told her that the driver's name was "Miguel," then later agreed

19 that it was "Beto."  RT 1633-34.  The fact that it was Dr. Edwards who pressured

20 Ms. Alfaro to give a name, then told Ms. Alfaro that the man's name was "Beto," did

21 not emerge until the second penalty trial, as Monroe chose not to call Dr. Edwards to

22 testify at the first penalty trial.  RT 1978-80 (April 2, 1992 proceedings).  This

23 rendered the production of Dr. Edwards's report to the prosecution unnecessary and

24 unreasonable.

25     70.  In response to Monroe's argument that "Beto" did it, the district attorney

26 subpoenaed Mr. Frias Gonzalez to court to allow him to establish his alibi, thereby

27 making it look like Ms. Alfaro had lied about his involvement.  RT 1944.  Though

28 insisting on usurping his client's right to decide how to plead, Mr. Monroe acceded to

1   her request that he not cross-examine Mr. Frias Gonzalez (RT 1949), further

2   convincing the jury that Ms. Alfaro had presented a trumped up defense.

3        71.  Monroe's erroneous identification of Beto as the third man also gave rise

4   to the district attorney's devastating cross-examination of Ms. Alfaro and

5   Dr. Edwards about Ms. Alfaro's inconsistency.  The district attorney used the fact that

6   Ms. Alfaro had first told Dr. Edwards the driver was "Miguel" and then told

7   Dr. Edwards that the driver was "Beto" as evidence that Ms. Alfaro was malingering;

8   that she was lying about everything, including her remorse.  It was his knowledge that

9   the district attorney would use Dr. Edwards to highlight Ms. Alfaro's inconsistency

10  about the identity of the driver that caused him not to call her at the first penalty trial

11  (*see* RT 1978-80 (April 2, 1992 proceedings)), thereby leaving him with no

12  psychiatric expert to testify on Ms. Alfaro's behalf at the penalty trial.

13       72.  In addition, Monroe's erroneous identification of "Beto" as the driver

14  undermined his cross-examination of Reynoso, whose testimony that Ms. Alfaro did

15  not appear to be under the influence of drugs and that the second Hispanic man did

16  not enter the house was highly prejudicial.  Had he identified the proper subject,

17  rather than focusing erroneously on Roberto Frias Gonzalez, Monroe could have

18  proved Reynoso a liar, based on his false testimony that he did not know the driver,

19  and the fact that the driver, with whom Reynoso spent the day while on parole for

20  drug trafficking, was a well known drug dealer.  Instead, Monroe managed to bolster

21  Reynoso's credibility by showing him a photograph of Frias Gonzalez and not the

22  person who was present at the scene and asking him whether this was the man driving

23  the car, to which Mr. Reynoso credibly answered, in agreement with what the jury

24  had been told by the police, "That's not him."  RT 3491.

25       73.  In sum, because Frias Gonzalez was obviously not involved, Monroe's

26  unsupported conclusion that he was, his continuing insistence that he was, and the

27  evidence he created to make it look like Ms. Alfaro had admitted that he was, made

28  her look like a liar who was trying to escape responsibility by blaming the crime on

66

an innocent third party.  It caused her to lose the jury's sympathy.  In fact, a number of the jurors believed that trial counsel's claim that a man present at the scene was responsible for forcing Ms. Alfaro to commit the crime was just a defense ploy and that the man in fact never existed.  *See,* Exhibit 91 (Declaration of Ralph Glass) at ¶¶ 2-3; Exhibit 92 (Declaration of Ian MacNeil) at ¶ 2. It resulted in ineffective cross-examinations of key witnesses.  And it squandered the mitigating evidence that Ms. Alfaro was under extreme duress and the substantial domination of another person at the time of the crimes.  It resulted in Monroe's failure to develop other mitigating evidence arising out of the true identity of the driver as a drinking buddy of Ms. Alfaro's father and to whom she owed money for drugs he had provided to her within the preceding hours and days.  But for Monroe's conduct, it is probable that the outcome of the penalty phase would have been different.

**G.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND ACCURATELY IDENTIFY THE DRIVER AND ATTENDANT FAILURE TO DEVELOP AND PRESENT SUBSTANTIAL DOMINATION/EXTREME DURESS MITIGATION EVIDENCE**

74.  Had Monroe adequately investigated the case, he would not have made the mistake he did concerning the identity of the driver.  All of the information necessary to accurately determine the identity of this individual was available to him.  But for his ineffective assistance as counsel, Ms. Alfaro could have presented a strong mitigation case based on Manuel Torres Graciano's substantial domination of her at the time of the crimes and the extreme duress she was under as a result of his threats to harm her and her family.  But for Monroe's ineffective assistance in this regard, it is probable that the result of the penalty phase would have been different.

75.  There were substantial clues from which a reasonably competent attorney would have been able to accurately identify the driver of the brown Monte Carlo seen at the Wallace home at the time of the crimes as Manuel Torres Graciano.  *See* Exhibit 1 (McGrath Declaration) at ¶¶ 2-65.  Among them were the following:

67

76.  Through refusing to say who drove her to the Wallace home, Ms. Alfaro told the detectives during her confession that in the days after the crimes, she stayed in various motels with a man named "Manuel Flores ... something ... it's a long name."  CT 585-87.

77.  Juan Jiminez, who lived in the apartment where Ms. Alfaro stated she used drugs before going to the Wallace home, told police that on the day of the crimes, he had directed Ms. Alfaro to a local drug dealer named "Manuel."  Exhibit 43 (Jiminez interview).

78.  Juan Jiminez had two relatives living nearby in Little TJ:  Isabel Torres Hernandez, and Manuel Torres Graciano.  Exhibit 51 (Sandberg notes).  Manuel Torres Graciano was booked in Orange County for being in possession of and being under the influence of narcotics on August 8, 1989.  On November 26, 1989, he was charged with violating Penal Code § 597, cruelty to animals.  On January 19, 1990, he was charged with the same offense.  On June 15, 1990, Torres Graciano was on probation.  Exhibit 36 (Torres Graciano criminal record).

79.  McDonald's manager Betty Cleary Soto told investigators that Ms. Alfaro had a boyfriend who picked her up at work in a brown Monte Carlo.  Exhibit 1 (McGrath Declaration) at ¶ 19.

80.  When Sheriff's investigators interviewed Isabel Torres on July 2, 1992, she told them that her brother Manuel Torres Graciano had "just" left for Mexico.  She also told them that her brother knew Antonio Reynoso.  Exhibit 44 (Tom Giffin's investigative notes) at 865-66 .

81.  When defense investigator Sandberg interviewed Manuel Torres Graciano in Mexico, Torres Graciano told Sandberg that he was present when Rosie was arrested (Exhibit 23 at 5); that she was doing drugs that day (*id.* at 6); that Rosie was "messed up" on drugs -- cocaine and black tar heroin -- when they arrested her (*id.* at 7); that the "narcs" stopped and showed him a picture of Rosie and questioned him about his relationship to her and he identified her as a friend (*id.* at 8); that he sold

68

drugs for a guy named "Kiko" (*id.* at 10); and that he left the U.S. shortly after Rosie's arrest. *Id.* at 12. Unreasonably, Sandberg failed to ask Torres Graciano if he was the one who had driven Ms. Alfaro to the Wallace home and whether he knew Reynoso, among other things.

82. Monroe did appreciate that Torres Graciano could have been involved, in that he sought fingerprint evidence for him, along with various other players, including Frias Gonzales. *See* Supp. CT 344-d (January 13, 1992). Yet he failed to draw the obvious conclusions that a reasonable attorney would have made; to wit: Torres Graciano was the man who drove Ms. Alfaro to the Wallace home on June 15, 1990.

83. Ms. Alfaro's defense was prejudiced as a result of Monroe's failure to accurately identify the driver.

84. Because he failed to find the right man, Monroe failed to develop and credibly present evidence during the penalty phases of her trial to support the fact that Ms. Alfaro was under extreme duress and the substantial domination of another person at the time of the crime. Ms. Alfaro herself could have provided this evidence if Torres Graciano had been identified and rendered incapable of harming her and her family. *Cf.* CT 497a-497c (Ms. Alfaro attests that she is afraid to testify and will not testify in open court so long as the driver is at large). Facts about Torres Graciano -- such as his relationship with Ms. Alfaro's father, the fact that he had raped Ms. Alfaro as a child (*see* Exhibit 1 (McGrath Declaration) at ¶¶ 28-30) and Exhibit 16 (Danto transcript) at 45), his role as Ms. Alfaro's drug dealer, his criminal history, and his decision to flee to Mexico on July 2, 1990 -- would have provided a solid foundation for an extreme duress/substantial domination defense. It may also have led to discoveries of forensic evidence further linking him to the crime scene.

85. In addition, Monroe's erroneous conclusion about the identity of the driver undermined Ms. Alfaro's defense in that it prevented Monroe from effectively cross-examining key prosecution witnesses against Ms. Alfaro. For example, Reynoso's

69

testimony that Ms. Alfaro had not used drugs on the day of the crime and that the driver had not gone into the house was harmful to Ms. Alfaro's case.  Instead of impeaching Reynoso for falsely denying knowledge of the driver's identity (as noted above, Torres Graciano's sister Isabel had told Sheriff's investigators that Torres Graciano knew Reynoso), Monroe ended up bolstering Reynoso's credibility by showing him a photograph of Beto and eliciting Reynoso's truthful testimony that the man in the picture was not the driver of the Monte Carlo.  RT 965.  Likewise, Investigator Giffin's testimony that he had concluded that Ms. Alfaro acted on her own could have been impeached by the records indicating that the investigator knew Torres Graciano was the driver, but failed to pursue him even though the facts supported the conclusion that he bore criminal responsibility for burglary, robbery, and murder.

86.  Had Monroe correctly identified the driver, and provided the substantial evidence that supported his role in the offense to the district attorney, he would have substantially advanced Ms. Alfaro's penalty phase defense by undermining the prosecution's theory of the case -- that Ms. Alfaro acted alone and thus was solely responsible for the crimes.  As  noted above, the available evidence established probable cause to believe that Manuel Torres Graciano aided and abetted the burglary of the Wallace home, and arguably the robbery and murder of Autumn Wallace.  This, as well as the fact that Torres Graciano had left the country while on probation, would have supported a request by the prosecution for Torres Graciano's extradition as well as other efforts to obtain custody of Torres Graciano.  Had he been returned to Orange County and charged with crimes arising out of the burglary, robbery and/or murder of Autumn Wallace, the defense goal of spreading the responsibility for the crimes would have been achieved.  Had the prosecution chosen not to take the necessary steps to obtain Torres Graciano's presence, then Monroe would have been entitled to argue that the prosecution knew of his role in the offenses and was intentionally preventing the jury from hearing from him and that the jury should infer

that, had he been available, he would have supported Ms. Alfaro's statement that she entered the home with the intent to burglarize it only, and that Torres Graciano, on probation at the time, was furious that Autumn Wallace had seen him and pressured Ms. Alfaro to kill her. But for Monroe's conduct, it is probable that the outcome of the penalty phase would have been different.

87. A death sentence was not a foregone conclusion in this case. It is reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different result would have been obtained at trial. *See* Exhibit 91 (Declaration of Ralph Glass) at ¶ 4.

## H.   COUNSEL'S FAILURE TO ADEQUATELY ARGUE THE FACTS THAT SUPPORTED A PENALTY PHASE DEFENSE OF SUBSTANTIAL DOMINATION AND EXTREME DURESS

88. During both the guilt and penalty phases of Ms. Alfaro's trial, Monroe acted unreasonably in arguing that the second Hispanic man present at the Wallace home, and not Ms. Alfaro, was responsible for Autumn Wallace's death. In trying to prove too much -- that Petitioner was not the killer and had not intended to kill Autumn Wallace -- Monroe undermined Petitioner's mitigation case by failing to effectively present the evidence that would have supported the mitigating factor set forth in Penal Code § 190.3(g), whether or not defendant acted under extreme duress or under the substantial domination of another person. In truth, Ms. Alfaro was under extreme duress and the substantial domination of another person at the time she committed the crimes. *See, e.g.*, CT 497a-497c; Exhibit 16 (Danto interview) at 43-54. Monroe's failure to make the mitigation argument consistent with the evidence and his insistence on making an argument that was not supported by the evidence rendered his representation ineffective.

89. There was no evidence to support the argument that the driver of the Monte Carlo, and not Ms. Alfaro, delivered the fatal stab wound to Autumn Wallace.

71

90.   There was evidence that the Hispanic man entered the home, and thus, that he could have seen Autumn Wallace and pressured Ms. Alfaro to "do something" about this eyewitness to their burglary:

a.   Ms. Alfaro said the third man came inside the house during her videotaped confession.  CT 534, 543; *see also* RT 625-26.

b.   A blood stained paring knife was found on the floor outside the bathroom where Autumn Wallace was killed.  During her confession and thereafter, Ms. Alfaro insisted that the paring knife was not the knife she had used to stab Autumn.  She described the knife she used as bigger than the paring knife, and consistently reported that she had placed it in her purse and had taken it with her after wiping it off on a pink towel that she did not take with her.  CT 527-28, 546, 579-80, 597; RT 919, 1152, 1704-08, 1728, 3559, 3572, 4261, 4265.  She stated that later that afternoon, she discarded the knife she used in a dumpster behind a Carl's Junior restaurant.  CT 537-38, 543, 578.  Criminalist Kenny Wong reported finding blood smears on the exterior front and back of a shoulder bag and bloodstains on the inside of the bag belonging to Ms. Alfaro.  Exhibit 52 (Wong report re blood in handbag).  He testified that Ms. Alfaro's vinyl handbag tested positive for blood, but that he did not test the blood for age or type.  The investigators testified that Mrs. Wallace had reported a knife larger than the paring knife missing from her kitchen drawer.  RT 4263 (Wong); RT 735, 737 (Linda Wallace testifies a knife was missing).

c.   A pink towel with a blood smear that looked significantly like a knife swipe was found by Orange County Sheriff's Office investigators inside the house in April Wallace's bedroom on the day after the crime.  Defense forensic expert, Mark Taylor, testified that the mark on the pink towel could not have been produced by the paring knife left at the scene.  RT 3806.

d.   Coroner David Masamichi Katsuyama testified at Ms. Alfaro's guilt phase trial that Autumn Wallace's wounds were consistent with the paring knife found at the scene.  RT 759, 768-69.  He noted, however, that some of the wounds

72

could have been caused by a larger knife blade.  RT 769-773, 805.  At the second

penalty trial, Dr. Katsuyama stated that a "large number of wounds [were] probed,"

and that a twelve inch blade could not have caused the wounds because it would have

penetrated to the depth of the blade.  RT 3247-54.  On cross-examination,

Dr. Katsuyama admitted that he probed "most of [the wounds]" (RT 3277), but only

measured six of the more than fifty wounds.  RT 3278.  He admitted that he earlier

testified that he probed only six wounds.  RT 3279. He further admitted that some

of the wounds had openings that were about one and one fourth inch in maximum

dimension.  RT 3288.  Moreover, he testified that nothing specifically indicated that

the knife was inserted up to hilt.  RT 3293.  Notably, the autopsy report indicates that

only two wounds were measured for depth of penetration.  *See* Exhibit 24 (autopsy

report).

   e.  A footprint, approximately size 12, was found outside the Wallace's

front door in the dirt that could not be identified as that of anyone known to be

present at the scene.  RT 1042.

   f.  Two witnesses contradicted the prosecution's story that only

Ms. Alfaro went inside the Wallace home because all the witnesses who saw the car

outside the house at the time of the crime also saw two men outside the house.  Ryan

Joseph Finan, who was on Monroe's February 25, 1992 potential witness list, but was

never called, told Orange County Sheriff's investigators that he saw the car, but saw

no people.  *See* Exhibit 25.  Lien Nguyen told the investigators that she saw two

people in the back of the car, presumably referring to Antonio "Shorty" Reynoso and

Ms. Alfaro's child, Manny, and not Manuel Torres Graciano.  *See* Exhibit 26; CT 551

(Shorty and Manny were seated in the back of the car).  Thus, these witnesses would

have supported the defense argument that Manuel Torres Graciano entered the house

with Ms. Alfaro, thereby supporting Ms. Alfaro's testimony that she was under

extreme duress and the substantial domination of another person at the time of the

crime.  *See, e.g.*, CT 497a-497c; RT 1636, 1735.

91.  Nevertheless, Monroe unreasonably stated during his opening statement in the guilt phase that there was no evidence that anyone other than Ms. Alfaro had entered the house.  *See* RT 625-26.

92.  Not only did Monroe fail to make the argument he could have made regarding Ms. Alfaro's substantial domination by the other person, he persisted in presenting the argument that the third man, and not Ms. Alfaro, had killed Autumn Wallace after the jury rejected it in the guilt phase.  Moreover, he persisted in presenting it to the second penalty jury even though he knew that it had been rejected by eleven of the twelve jurors in the first guilt phase.  *See* Exhibit 40 (Laura Lawhon's notes dated April 28, 1992 of interviews with first penalty phase jurors).

93.  In sum, while the argument that the driver of the Monte Carlo and not Ms. Alfaro had killed Autumn Wallace was inconsistent with Ms. Alfaro's confession, and there was no evidence to support it, the evidence was consistent with the defense that Ms. Alfaro acted under the substantial domination of another person and under extreme duress.  Monroe provided ineffective assistance of counsel to Ms. Alfaro in failing to present this argument and in presenting the same argument to the second penalty jury that had been rejected by the jury in the guilt phase and by first penalty phase jury.  A death sentence was not a foregone conclusion in this case. It is reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different result would have been obtained at trial.  *See* Exhibit 91 (Declaration of Ralph Glass) at ¶¶ 2-4.

## I.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND DEVELOP MITIGATION EVIDENCE, TO UTILIZE RETAINED EXPERTS, TO RETAIN NECESSARY EXPERTS AND TO PRESENT AVAILABLE MITIGATION EVIDENCE

94.  Mr. Monroe unreasonably failed to conduct an adequate penalty phase investigation and develop mitigation evidence that was available to him at the time of trial; unreasonably utilized the experts that he retained, thereby wholly

74

1    undermining their value as credible mitigation experts.  Trial counsel furthermore

2    failed to consult appropriate and necessary experts to explore and explain matters

3    raised by the investigation that was conducted, and by the investigation that should

4    have been conducted.  There was no tactical reason for counsel's failures in this

5    regard.

6    **1.    COUNSEL'S FAILURE TO CONDUCT AN ADEQUATE**

7    **PENALTY PHASE INVESTIGATION**

8         95.  All penalty phase investigations in capital cases must be thorough.

9    *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S. Ct. 2527, 2538, 156 L. Ed. 2d 471

10   (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) ("[T]rial counsel did not fulfill

11   their obligation to conduct a thorough investigation of the defendant's background"),

12   *citing*, ABA Standards for Criminal Justice 4-4.1 cmt. at p. 4-55 (2d ed. 1980); *also*

13   *see* 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1982)

14   ("The lawyer also has a substantial and important role to perform in raising mitigating

15   factors both to the prosecutor initially and to the court at sentencing . . . .

16   Investigation is essential to fulfillment of these functions.").  "When it comes to the

17   penalty phase of a capital trial, '[i]t is imperative that all relevant mitigation

18   information be unearthed for consideration.'" *Stankewitz v. Woodford*, 365 F.3d 706,

19   719 (9th Cir. 2004), *citing Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir.

20   2003), *quoting Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).  Counsel's

21   duty is not discharged merely by presenting some limited evidence.  *Id.* at 716.

22        96.  Trial counsel failed to conduct reasonably necessary investigation to

23   determine and document Ms. Alfaro's family background and social, medical and

24   psychiatric history.  Had he done so, he would have discovered many aspects

25   of Ms. Alfaro's life that her jury should have known before they were charged with

26   the responsibility of determining her fate.  For example, the jury was totally unaware

27   that when Ms. Alfaro was six or seven years old, her mother placed her in front of her

28   husband's car to prevent him from leaving home.  Instead of staying home, however,

1    Ms. Alfaro's father proceeded to hit his daughter with the passenger side of the car
2    and push her along the concrete wall, leaving her scraped and bloody.  Exhibit 3
3    (Declaration of Silvia Melendez Alonso) at ¶ 32.

4         97.  Unpredictable familial violence peppered with verbal intimidation and
5    insults was rampant, committed against Ms. Alfaro by her mother, father and
6    grandfathers.  *Id.* at 11-14, 17; Exhibit 7 (Khazanov Declaration) at ¶¶ 37-41.  This
7    treatment had a direct and extremely negative impact on Ms. Alfaro's self-esteem.  *Id.*

8         98.  Ms. Alfaro's father used her as a pawn in his own criminal behavior.
9    Exhibit 8 (Stewart Declaration) at 19.  He took her to supermarkets, where he held
10   her in his arms as he stole large pieces of meat, which he hid in his jacket, behind her
11   body.  *Id.*  This process is known clinically as "corruption," one of many tactics
12   which thwarts the child's perceptions of appropriate behavior and interpersonal
13   relationships.  It also makes the child a participant in the adult's wrong-doing,
14   instilling a sense of guilt and confusion.  *Id.*

15        99.  Counsel also failed to pursue lines of investigation concerning Petitioner's
16   family history of mental illness, her cognitive deficits, and Petitioner's behavior and
17   functioning near and during the time of the alleged offenses.  Ms. Alfaro has a genetic
18   predisposition to addiction.  Not only was her father an alcoholic, her grandfathers on
19   both sides were alcoholics.  Aberrant behavior by numerous relatives on both sides,
20   likely reflecting significant psycho-pathology, is also reported.  Exhibit 8
21   (Declaration of Pablo Stewart, M.D.) at 7, 9.  Ms. Alfaro's cognitive deficits and her
22   learning disabilities are shared by her brother and at least one of her sons.  *Id.* at 15-
23   17.  School records that appear not to have been provided to Dr. Morales include
24   concrete evidence of severe cognitive disabilities from a very early age.  Exhibit 10
25   (Declaration of Cynthia Asprodites, Ph.D.).  At approximately age 16, Ms. Alfaro
26   suffered a concussion in a car accident resulting from her boyfriend driving drunk.
27   She hit the windshield and suffered multiple facial abrasions, a cervical spine sprain

28

and a possible spine fraction, in addition to the concussion.  Exhibit 8 (Stewart Declaration) at 21.

100.  The scattershot penalty phase case Monroe presented failed to effectively emphasize the mitigating factors present in Ms. Alfaro's case, including but not limited to, her lack of a criminal felony record or record of crimes of violence, her violently abusive childhood, physically and mentally, her mental disabilities, the fact that she became a mother at fourteen, her youth, and her genuine remorse.  Although trial counsel presented a smattering of disabilities suffered by Ms. Alfaro, Monroe failed to have an expert discuss the cumulative impact of her mental disabilities, use of drugs, and other relevant information.

101.  Among his other failings, Mr. Monroe asked the experts he did retain the wrong referral question -- focusing on the guilt phase of the trial, and not the penalty phase.  He failed to provide the experts with records and witness statements necessary for them to draw appropriate conclusions.  And he failed to retain other experts, including but not limited to a neuro-psychologist, despite clear indications from the experts he did hire that testing for organic brain damage was called for.  Counsel have an obligation to conduct an investigation that will allow a determination of what sort of experts to consult.  Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert.  The instances of Monroe's ineffective assistance with respect to the experts he did hire and the resulting prejudice to Petitioner, resulted in Petitioner receiving ineffective assistance of counsel.

102.  Had trial counsel conducted the investigation reasonably required and consulted appropriate experts, they would have been able to present abundant, compelling evidence that Ms. Alfaro suffers organic brain damage, and the effects of those deficits upon her development, behavior, and functioning; that Ms. Alfaro has a family history of psychiatric illness and substance abuse, and the effects of that history; that Ms. Alfaro suffered much more extensive effects of abuse, trauma, and

1    neglect than was demonstrated at trial; and the nature and effects of Ms. Alfaro's

2    psychiatric illness and substance abuse disorders.  But for counsel's failure to develop

3    and present this evidence, it is reasonably likely a more favorable outcome would

4    have been obtained.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,

5    80 L. Ed. 2d 674 (1984).

6        **2.    COUNSEL'S FAILURE TO EFFECTIVELY UTILIZE THE**

7             **EXPERTS HE RETAINED**

8             **a.    Martha Rogers, Ph.D.**

9        103.  At Mr. Monroe's request, psychologist Martha Rogers, Ph.D., was

10   appointed as a defense expert by order dated September 25, 1990.  The order

11   provides:  "The purpose of the appointment will include, but is not limited to, the

12   evaluation and explanation of the personality and the behavior of MARIA DEL

13   ROSIO ALFARO and to assist the attorney in cross-examining the expert testimony

14   of the conclusions reached by the opposition.  It may also assist the attorney in

15   discovering a possible defense based on mental defect."  Exhibit 2 (Declaration

16   of Martha Rogers) at 4; CT 987.9 materials.  Monroe unreasonably restricted his

17   preparation of Ms. Alfaro's defense to the guilt phase of the trial, thereby

18   unreasonably failing to use Dr. Rogers to develop and present penalty phase

19   mitigation evidence which could have been developed and presented had Monroe

20   provided effective assistance of counsel.  *Id*.

21       104.  In addition, Monroe acted unreasonably in having Dr. Rogers administer

22   an MMPI test to Ms. Alfaro, instructing her not to complete her analysis or write a

23   final report, and then providing her raw data and rough notes to other defense experts

24   who were unqualified to interpret them.  *See* Claim 22.  During his cross-

25   examinations of defense experts Morales and Edwards about Dr. Rogers's rough note

26   "probable fake bad," the district attorney succeeded in making Ms. Alfaro look like a

27   liar who was faking remorse for the crimes she had committed.  Had Monroe

28   instructed Dr. Rogers to prepare a final report, it would have emerged that the

notation "probable fake bad" was an incorrect conclusion.  *See* Exhibit 2 (Rogers Declaration) and Exhibit 5 (Declaration of Charles Stanislaw, Ph.D.).  Instead, the district attorney was able to make much of the phrase, calling Dr. Rogers himself to have her explain that it meant that "there may have been some exaggeration or overstatement of whatever this person's current psychiatric condition is," and that it could mean the person was malingering.  RT 4268.  Had Monroe taken the opportunity to cross-examine Dr. Rogers after she was called to testify by the prosecutor, which, unreasonably, he did not (*id.*), he could have brought out the many alternative explanations for the results, which Dr. Rogers had specifically told him about, such as that the test subject was admitting personal and emotional problems to get help sooner.  *See* Exhibit 2 (Rogers Declaration) at 7-8.

105.  In addition, Monroe ignored Dr. Rogers' conclusion that Ms. Alfaro "should have Neuro work up."  *Id.* at 5.

## b.   Consuelo Edwards, M.D.

106.  At Monroe's request, psychiatrist Consuelo Edwards was appointed as a defense expert by order dated August 13, 1991.  CT 987.9 materials.  Her sole referral question was, "What was the state of mind of Miss Alfaro at the time of the alleged crime?"  *See* Exhibit 27 (Edwards' psychiatric evaluation); RT 4102.  Once again, Monroe unreasonably focused his preparation of Ms. Alfaro's defense on the guilt phase of the trial, failing to use Dr. Edwards to develop and present available penalty phase mitigation evidence.

107.  In addition, Monroe unreasonably used Dr. Edwards to force Ms. Alfaro to identify Roberto Frias Gonzalez as the third man.  *See* Claim I.F, *supra*.  At the time Monroe set up Dr. Edwards to have the discussion with Ms. Alfaro in which she pressured Ms. Alfaro to admit that "Beto" was the second Hispanic man present at the Wallace house, Monroe knew that Ms. Alfaro was unwilling to identify this individual or to implicate anyone else in killing Autumn Wallace.  If he sought to use Dr. Edwards' testimony to provide the jury with his version of the facts, the effort

was wasted.  As  Monroe told the trial judge when he rested at Ms. Alfaro's first trial, he was unable to call Dr. Edwards to testify because, as a result of the fact that he had used her to elicit inconsistent information from Ms. Alfaro, her testimony would have been harmful to Ms. Alfaro's case.  RT 1978-81 (April 2, 1992 proceedings).  This did not, however, prevent him from calling her at Ms. Alfaro's second penalty trial, which was in and of itself unreasonable and ineffectual.  Inasmuch as the jury was instructed at the second penalty trial not to consider Ms. Alfaro's statements relayed through Dr. Edwards (*see, e.g.*, RT 4038-50) for the truth, but only to consider them for the impact they had on Dr. Edwards' opinion (RT 4039), his effort was again in vain.  Furthermore, revisiting the facts of the crime through Dr. Edwards served to diminish the impact of Dr. Edwards' testimony about Ms. Alfaro's impairments that, if viewed alone and independently, would have been powerful mitigation testimony.

108.  Additionally, Monroe unreasonably presented evidence developed by Dr. Edwards regarding Ms. Alfaro's Post Traumatic Stress Disorder and depression to defend against guilt, thereby undermining its value as mitigation evidence.

109.  Finally, Monroe failed to explain to Ms. Alfaro that her statements to psychiatrist Edwards were not confidential.  *See* Exhibit 4 (Maria del Rosio Alfaro Declaration).  When Ms. Alfaro learned that this was not the case, that Dr. Edwards' report had been provided to the prosecutor, who used it to cross-examine her, the attorney-client relationship was further eroded.

110.  Monroe had available to him substantial evidence that Ms. Alfaro was intoxicated at the time of the offense.  Monroe's unreasonable failure to present evidence that Ms. Alfaro could not conform her conduct to the requirements of law because of intoxication at the time of the offense (Penal Code § 190.3(h)) resulted in ineffective assistance of counsel.

111.  During Ms. Alfaro's interrogation on June 27, 1990, Ms. Alfaro informed Investigator Giffin that she had started using daily the week or so before the crime (CT 510); that she obtained two dimes of coke and two dimes of black tar heroin on

the day of the crimes before she committed the crimes; that Sabrina injected her in the

neck and she injected Sabrina in the neck around 2:00 p.m.; that Shorty asked to use

her needle after this and she used a second time with Shorty (CT 515-18); and that

she was coked out at the time of the crimes.  CT 526.

112.  Sabrina Duran has attested that she and Ms. Alfaro used drugs together

the morning of the crime.  Exhibits 6, 48.  There is no evidence that Monroe

interviewed Ms. Duran about her use of drugs with Ms. Alfaro, despite Ms. Alfaro's

statement to the Sheriff's investigator that she used drugs with Sabrina on the day

of the crime.

113.  Though Antonio Reynoso denied at trial that he had used drugs with

Ms. Alfaro on the day of the crime, his statement to law enforcement on July 2, 1990,

indicates that he believed Ms. Alfaro was under the influence.  Exhibit 22 (Transcript

of Reynoso's statement to sheriff's investigators).  Yet Monroe neither questioned

Reynoso about this nor attempted to interview him or other witnesses to Ms. Alfaro's

drug use on June 15th, such as Juan Jimenez.  Exhibit 1 (McGrath Declaration) at

¶ 54.  Moreover, Reynoso had been out of prison, for selling drugs, only one week at

the time of the crime and was jailed for a parole violation on July 2, 1990, the day he

surrendered to police.  *Id.* at ¶¶ 58-82.  He was sent to prison for violating his parole

on October 12, 1990, as a result of being under the influence of drugs.  Exhibit 28

(Reynoso's criminal record).  Monroe failed to question him about any of this  to

impeach his testimony that he was not using drugs on the day of the crime and that he

did not believe Ms. Alfaro had done so.

114.  The evidence of Ms. Alfaro's intoxication on the day of the offenses is so

compelling that in Respondent's Brief, the Attorney General admits that Ms. Alfaro

was addicted to heroin and cocaine at the time (RT 4); and that she injected these

drugs shortly before committing the crimes.  *Id.* at 4-5.  Specifically, the Attorney

General admits that Ms. Alfaro bought two dime bags that afternoon and that she shot

up at least twice, including once with Shorty.  *Id.; see also* CT 515 (during

81

1    interrogation, Investigator Giffin asks Ms. Alfaro, "how much did you pick up?"

2    A: "Um, I think it was two (2) and two (2). Like two (2) dimes of coke and two (2)

3    dimes black.").

4          115. From her testimony at the suppression hearing, it is clear that

5    Dr. Edwards was qualified to make at least a preliminary assessment regarding

6    Ms. Alfaro's intoxication at the time of offenses and that Monroe unreasonably

7    failed to ask her to do so. *See* RT 196-277. Additionally, although Monroe had

8    references to toxicologists who could develop this evidence, he declined to retain

9    them. Exhibit 38.

10                    **c.      Armando Morales**

11          116. Monroe unreasonably retained Dr. Armando Morales as the sole

12   mitigation expert at the first penalty trial and unreasonably failed to retain him until

13   March 18, 1992, the day both the prosecution and defense rested in the guilt phase

14   of the trial. *See* Exhibit 29 (Morales' report). Monroe's failure to begin preparing a

15   penalty phase defense in an adequate amount of time violated Ms. Alfaro's right to

16   receive the effective assistance of counsel during the penalty phase. Had Morales

17   been able to spend more time with the family, he would have been able to learn key

18   facts, known to family members, that supported the mitigation case. *See* Exhibits 3,

19   7, 8, 9.

20   **3.      COUNSEL'S FAILURE TO RETAIN AND PRESENT THE**

21   **        TESTIMONY OF APPROPRIATE EXPERTS AND LAY**

22   **        WITNESSES**

23          117. Monroe unreasonably failed to develop and present mitigation evidence,

24   including, but not limited to, mental health evidence, that was available at the time

25   of trial, had he collected all relevant information, interviewed necessary lay

26   witnesses, followed the suggestions of the experts he did hire, and hired qualified

27   experts. Counsel's failure in this regard rendered his representation of Ms. Alfaro

28   ineffective.

a.  **Failure to Retain and Present Testimony of a Neuro-**
**psychologist and Appropriate Lay Witnesses**

118.  The facts of which Monroe was aware triggered the need for him to hire a neuropsychologist to determine whether Ms. Alfaro suffered from organic brain damage at the time of the crime and sentencing.  *See, e.g.*, Exhibit 2 (Rogers Declaration) at 5.  His failure to retain a neuropsychologist and present that expert's testimony, as well as the testimony of lay witnesses who would lend support to a finding of brain damage, was ineffective assistance of counsel.

119.  Natasha Khazanov, Ph.D., the neuropsychologist retained by state habeas counsel, has concluded after testing that Ms. Alfaro suffers from serious organic brain damage and did so at the time of the offenses.  Exhibit 7 (Khazanov Declaration).  Dr. Khazanov identified "both localized dysfunction -- primarily in the frontal lobes -- and diffuse damage in both the left and right hemispheres, affecting her overall cognitive and neurological functioning."  *Id.* at ¶ 151.  As  a result of these impairments, Ms. Alfaro's abilities to plan or carry out a specific course of action, to act independently or make informed decisions, to interpret social or interpersonal cues (whether verbal or nonverbal), to assess her environment or specific situations and respond rationally or thoughtfully, are severely and chronically impaired.  These impairments, debilitating in themselves, are likely to be exacerbated both by the presence of drugs and her ongoing dependency, and by the residual, long-term effects of chronic substance abuse, which is essentially a form of repeated exposure to highly damaging neurotoxins.  *Id.*

120.  Moreover, Ms. Alfaro's ability to retain information and relay that information accurately (even as accurately as it was originally perceived) is seriously impaired.  These impairments, individually and cumulatively, have left Ms. Alfaro an unreliable reporter of details, highly vulnerable to the influence and suggestions of those around her.  They have also resulted in inconsistent reports by Ms. Alfaro which have raised the specter of manipulation and intentional dishonesty.  Given her

83

extensive impairments, such characterizations are highly suspect and likely
ill-informed.  Any characterizations or assumptions which overlook or fail to consider
the effects of her multiple, severe impairments do her an extreme disservice and lack
clinical credibility.  *Id*.

121.  The signs and symptoms of this damage have been documented since
elementary school and the findings and observations of numerous clinicians confirm
that both the existence and the severity of her impairments are longstanding and
irreversible.  Moreover, the effects of her organic impairments are compounded by
several co-existing conditions, including chronic underlying mental illness, seriously
compromised intellectual functioning, and chronic substance abuse and dependency.
At critical points in her life, the effects of her organic impairments have also been
exacerbated by her history of chronic physical and psychological trauma.  While it is
impossible to determine the causes of these conditions, it is clear that their symptoms
and effects are inter-related and cumulative.  *Id*.

122.  It is Dr. Khazanov's professional opinion that findings consistent with the
foregoing would have been reached at the time of Ms. Alfaro's arrest and trial, had
she been evaluated by a qualified neuropsychologist.  It is also her opinion that the
need for a thorough neurological assessment was abundantly clear at all points
relevant to Ms. Alfaro's trial, and for many years prior to that time.  That assessment
was never conducted.  Until Dr. Khazanov's assessment, the nature and extent
of Ms. Alfaro's brain damage was never investigated or understood.  Because this
critical information was never obtained, all assessments of Ms. Alfaro's mental state
rendered prior to her 1992 trial were incomplete and unreliable.  *Id*.

123.  The many indicators of organic brain damage and the records
documenting them (detailed in section II.A. of Exhibit 7 (Declaration
of Dr. Khazanov)), coupled with the observations and impressions of the experts who
examined Ms. Alfaro pre-trial, were sufficiently powerful and consistent to warrant
further investigation of her mental state.  This should have included interviews aimed

84

at obtaining data and observations from a broader range of family members, other lay witnesses, and prior examining professionals.  This additional investigation, including critical witness interviews, was essential to an accurate assessment of any issues pertaining to Rosie Alfaro's mental state and personal history.

124.  Given Ms. Alfaro's long history of mental illness and substance abuse, any statements made while she was under the influence of drugs or experiencing symptoms of drug withdrawal were very likely inaccurate, incomplete, or otherwise unreliable.  The same is true of any statements made by Ms. Alfaro regarding events, perceptions, memories, or her own mental state which took place when she was using or withdrawing from drugs or alcohol.  Exhibit 7.

125.  Ms. Alfaro's combined disabilities suggest that she may well have been unable to assist in the preparation of her defense.  Her profound deficits in memory and comprehension make it very likely that she was unable to comprehend the issues involved in her case or to accurately relate to counsel relevant information concerning the offense, including but not limited to the extent of her participation and the roles played by others in that offense, and her personal history and experience, especially regarding the extent and consequences of her own impairments.  These obstacles were almost certainly compounded by her age (18 years old at the time of arrest, 20 when convicted and sentenced to death) and the unique circumstances of her pre-trial detention, including giving birth to twins while in custody and the prolonged separation from her four sons.  Given her history of victimization and betrayal, the combined stress of protracted legal proceedings (including two hearings to determine whether she would live or die), the courtroom setting itself, and her perception of hostility from both the judge and her own attorney very likely produced further mental decompensation.  *Id*.

126.  Mental illness is not static.  Especially in individuals like Ms. Alfaro, who suffer multiple disabilities, mental state can quickly deteriorate, especially in response to changes in environment, physical illness or medical conditions, external

85

1   stressors, changes in psychiatric or other medications, or even the passage of time.

2   Ms. Alfaro's history includes episodes of severe depression, a range of physically and

3   emotionally self-destructive behaviors, and numerous suicide attempts.  Given this

4   history and the severity of her impairments, Ms. Alfaro's in-custody suicide attempt

5   in October of 1991, should have triggered a re-investigation of her mental state.

6   Similarly, her transfer to the mental health unit during her second penalty phase trial

7   should have caused all parties to re-assess her mental state and competency to

8   proceed.  *Id*.

9       127.  Dr. Khazanov's clinical findings and observations, confirming the

10   presence of significant organic brain damage, including profound frontal lobe

11   deficits, are extremely relevant to several specific factors, set forth in Penal Code

12   § 190.3, to be considered in determining Ms. Alfaro's penalty.  It is her opinion that

13   at the time of this offense, Ms. Alfaro was serious mentally impaired.  She suffered

14   the cumulative effects of longstanding brain damage, low intelligence, and a serious

15   psychiatric disorder characterized by chronic depression and dissociative features, all

16   while under the influence of heroin and cocaine in significant quantities.  As  a result,

17   her ability to conform her conduct to the requirements of the law, control her

18   behavior, or comprehend the consequences of that behavior was severely impaired.

19   At the time of the offense, Ms. Alfaro was only 18 years old and extremely immature.

20   She had minimal education, profoundly impaired judgment, a mental age far below

21   her chronological age of 18, and a long history of neglect, abandonment, sexual

22   victimization, and physical abuse.  It appears that her participation in the homicide

23   was prompted, at least in part, by threats to herself and her 1-year-old son, who was at

24   that moment in the physical custody of an older, domineering male co-defendant, a

25   recently-released ex-convict with a known propensity for violence who had driven

26   Ms. Alfaro to the crime scene.  *Id*.

27   / / /

28

1                    **b.**      **Failure to Retain and Present Testimony of a Qualified**

2                              **Psychiatrist and Appropriate Lay Witnesses**

3        128.  Monroe recognized that he had undermined Dr. Edwards value as a

4 psychiatric expert by using her to extract contradictory information from Ms. Alfaro

5 regarding the identity of the man who drove Ms. Alfaro and Reynoso to the Wallace

6 home.  *See* RT 1978-81 (April 2, 1992 proceedings).  But instead of hiring a

7 psychiatrist who could testify about Ms. Alfaro's mental disabilities without

8 significant impeachment, and focusing that expert on the *penalty* phase of the case, he

9 persisted in using Dr. Edwards.  Had Mr. Monroe retained a qualified psychiatric

10 expert to focus on the penalty phase of the trial, and presented the testimony of lay

11 witnesses who could have provided support to the psychiatrist's findings, he would

12 have developed evidence that would have had a probability of changing the outcome

13 of the case.  Exhibits 8 (Stewart Declaration) and 7 (Khazanov Declaration).  In

14 particular, the following findings, among others noted in the declarations referenced

15 above, would have contributed to a finding of mitigating circumstances warranting a

16 sentence less than death:

17        129.  At the time of the crimes, Ms. Alfaro suffered from serious organic brain

18 damage, chronic depressive disorder, Posttraumatic Stress Syndrome, and substance

19 abuse/dependence.

20        130.  The effects of Rosie Alfaro's cognitive impairments were consistently

21 documented throughout elementary school.  Early signs and symptoms of her

22 underlying psychiatric illness were observed during the same years.  Depressive and

23 dissociative symptoms have been acknowledged and documented since the time

24 of her arrest at the age of 18, yet rarely have they been treated in any consistent or

25 meaningful way.  Those symptoms, as well as a range of symptoms and behaviors

26 associated with PTSD, persist today.  The severity of her drug addiction, and its

27 devastating effects on her mental and physical health, are beyond dispute.

28

131.  Ms. Alfaro's psychiatric conditions must be considered in the context of her early experiences.  Ms. Alfaro suffered early and chronic physical and emotional abuse which was sufficiently severe to exacerbate pre-existing brain damage and underlying psychiatric illness.  Her ongoing abuse also induced the post-traumatic symptomatology which profoundly impaired her perceptions, insight and behavior on the day of Autumn Wallace's death.  Rosie Alfaro struggled through her childhood and adolescence in an environment characterized by chaos, unpredictable violence, and a pervasive lack of safety.  In addition to the chronic abuse and neglect within her own home, Ms. Alfaro suffered acute traumas in the form of molestation and rape.

132.  All of Ms. Alfaro's impairments were present during her pre-trial detention and her trial.  They were almost certainly exacerbated by the circumstances of her confinement (not the least of which was her pregnancy, delivery of twins, and separation from her babies while incarcerated at the Orange County Jail), by her young age and immaturity, by the prolonged separation from her four young sons, by her confusion regarding the legal process and the court proceedings themselves, and by her belief that her own attorney had first sabotaged her most fundamental desire -- to assume responsibility for this tragic crime -- and subsequently misled and humiliated her as she took the stand wholly unprepared.

133.  Beyond the limitations associated with low intelligence and learning disabilities, Ms. Alfaro's cognitive impairments left her more vulnerable to physical and psychological abuse.

134.  Ms. Alfaro exhibits a wide range of symptoms consistent with trauma-based conditions.  In addition to the unpredictable violence suffered regularly in her home, Ms. Alfaro has consistently reported being raped by a "drinking buddy" of her father as a young child.  Her mother's description of her obsessive compulsive house cleaning, which began at the age of nine, supports Ms. Alfaro's report of a rape.  In addition, substance abuse (using massive quantities of any drug available) and

88

1  chronic addiction, beginning at a very young age, are frequently related to untreated
2  childhood victimization.  The circumstances of the offense might well have triggered
3  memories of her assault and abuse.  More importantly, they very likely triggered
4  memories of the emotions associated with it: terror, confusion, guilt, helplessness.
5  These factors make it extremely unlikely that Ms. Alfaro would come away from that
6  experience with her memory intact, thereby explaining inconsistencies in her report
7  of the crime.  Exhibit 8.

8      135.  Any assessment of Ms. Alfaro's reports of the offense must look not only
9  to their inconsistencies, but also to those aspects which have remained consistent over
10 time.  The most striking aspect of her reports of the offense, since her arrest, is her
11 clear desire to accept responsibility for this tragic killing.  *Id*.

12     136.  Ms. Alfaro's drug history is remarkable in several respects.  It began
13 when she was a very young girl (sniffing organic solvents at 8 or 9; alcohol at 10;
14 PCP, heroin and cocaine at 12).  Before her 15th birthday, Ms. Alfaro had been
15 diagnosed with Cocaine Abuse and Withdrawal, Polydrug Abuse and Withdrawal,
16 and Chemical Dependency and Heroin Withdrawal.  Her responses and her drug use
17 history reveal a young girl who turned to drugs to deaden her emotional pain.  The
18 quantities she consumed, her young age, the fact that she became addicted almost
19 immediately, her choice of drugs (heroin, preferably in combination with cocaine),
20 and her willingness to take almost any substance to alter her consciousness are further
21 evidence of self-medication.  Adolescent heroin addicts often have histories
22 of chronic childhood trauma.  Comorbidity of depression and substance abuse is
23 documented in the clinical literature, as is that of PTSD and substance abuse.  *Id*.

24     137.  An unusual number of known risk factors -- biological and environmental
25 -- left Ms. Alfaro predisposed to suffer, in addition to her other disabilities, a severe
26 depressive illness.  Evidence of that depression was observed early in her childhood.
27 Ms. Alfaro attempted suicide twice prior to trial.  Since her conviction, California
28

89

1  Department of Corrections personnel have consistently diagnosed her and prescribed

2  medication for serious, sometimes debilitating, chronic psychiatric disorders.  *Id*.

3       138.  Many of Ms. Alfaro's impairments were recognized at trial.  Drs.

4  Edwards and Morales did, in fact, diagnose some of Ms. Alfaro's disabling

5  conditions, any one of which might be debilitating in and of itself.  However, those

6  diagnoses, individually or in combination, do not accurately describe Ms. Alfaro's

7  mental state.  Her conditions are such that an accurate assessment must recognize and

8  examine the complex interplay between and among these disabilities.  That analysis

9  was not conducted.  A fundamental factor affecting every aspect of Ms. Alfaro's

10 mental state -- i.e., assessment of organic brain damage and neuro-cognitive

11 impairments -- was never undertaken.  Moreover, Ms. Alfaro herself was examined

12 and judged by standards which failed to properly consider her unique limitations and

13 the unique range of factors which impaired her perceptions and memory.  The pre-

14 trial evaluations and expert testimony given at trial were, for these and other reasons,

15 inherently flawed.  They were incomplete and unfocused, in large part because they

16 were conducted by evaluators whose primary role was neither clinical nor therapeutic.

17 The experts who assisted trial counsel were charged with discovering the identity

18 of the third accomplice at the Wallace homicide.  This role necessarily interfered with

19 a competent professional's ability to conduct an accurate clinical assessment.  (*Id*.

20      139.  While it is true that most of the trial experts were also charged with

21 conducting forensic evaluations, even that aspect of their examinations was distorted

22 and misdirected by defective, inappropriate, and/or meaningless referral questions.

23 Counsel failed to provide his mental health experts with the direction, clarity, and

24 context necessary for a meaningful and truly relevant examination.  (*Id*.

25      140.  Although Dr. Edwards was retained for the stated purpose of evaluating

26 Ms. Alfaro's mental state at the time of the offense, "she recalls that much of her

27 evaluation was aimed at discovering the identity of the third party (the second,

28 unidentified male) who was present at the crime scene."  Exhibit 7 (Khazanov

90

1   Declaration) at ¶ 101.  Dr. Khazanov provides several examples of Dr. Edwards' role
2   as an interrogator, rather than evaluator, of Ms. Alfaro.

3        141.  In addition, included in trial counsel's file is a two-page, detailed chart
4   comparing the physical features and characteristics of "SHORTY," "BETO," and
5   "COMPOSITE."  Exhibit 30 (Anatomical type chart by Consuelo Edwards).  Under
6   "ANATOMICAL TYPE," Shorty is described as "ENDOMORPHIC," Beto
7   as "MESOMORPHIC," and the composite drawing as "ATHLETIC
8   MESOMORPHIC."  A handwritten note on the first page states that "this is from
9   Dr. Edwards."  (Id.  This chart is further evidence that Dr. Edwards devoted a
10  significant amount of her time (and her medical training) to the identification of the
11  second accomplice, an investigative task which conflicted with her duty to thoroughly
12  assess Ms. Alfaro's mental state.

13       142.  Trial counsel engaged Bruce Danto, M.D. to inject Ms. Alfaro with
14  Sodium Pentathol and thereby induce her to identify the third individual who was
15  present at the crime scene.  Court documents and Dr. Danto's statements to the press
16  confirm that, despite his training and qualifications as a psychiatrist, Dr. Danto's role
17  was essentially that of counsel's investigator or interrogator.  *See* Exhibit 16
18  (transcript of interview); Exhibit 7 (Khazanov Declaration) at  ¶¶ 103-105, notes 86-
19  91; and, Exhibit 17.  A series of clinical articles found in trial counsel's files and
20  appended to his request for expert funds confirms that Dr. Danto was indeed acting in
21  a non-clinical (and non-therapeutic) capacity.  Exhibit 31; *see also* Exhibit 17.  They
22  also raise questions about the appropriateness of this technique (the Sodium Pentathol
23  interview), even as an investigative tool.

24       143.  The articles shed light on the use of so-called "truth serums" and the role
25  played by Dr. Danto in conducting a Sodium Pentathol interview of Ms. Alfaro.
26  Three of these articles are from highly respected professional journals.  These articles
27  discuss the use of Sodium Amytal and "Amytal interviews" in the context of clinical
28  assessment and diagnosis.  Although they reach different conclusions, these articles

91

1  discuss the possible role of Sodium Amytal interviews in distinguishing between
2  specific symptoms of psychotic and depressive disorders, and in the treatment
3  of catatonia and severe organic stuporous states.  At not point in his examination
4  of Rosie Alfaro was Dr. Danto's interview focused on diagnostic or treatment issues.

5      144.  A fourth article in counsel's files discussed the use of hypnosis and
6  Sodium Amytal interviews "in attempts to gain access to memories that do not seem
7  to be readily accessible to usual conscious efforts of recall."  That article, presenting
8  these issues in the context of one case history, found that "neither of these procedures
9  turned out to be the hoped-for 'truth-serum...'"

10     145.  Only one of the articles in counsel's files is specifically addressed to the
11 use of "various truth serum drugs" as employed by Dr. Danto in his examination
12 of Rosie Alfaro.  That article -- "The Use of Brevital Sodium in Police Investigation"
13 -- was authored by Dr. Danto himself and appeared not in a clinical journal, but in a
14 law enforcement magazine, *The Police Chief*.  In that article, the interviewee is
15 referred to as "suspect, witness, or defendant."  Perhaps more important, however, is
16 Danto's description of himself as "a psychiatrist and police officer."

17     146.  The presence of these articles in counsel's files is significant for several
18 reasons.  They indicate that, although this technique has potential clinical/diagnostic
19 uses, those uses were neither explored nor considered as part of Dr. Danto's
20 examination.  They confirm that Dr. Danto, although trained as a mental health
21 professional, was in fact acting as a criminal investigator/interrogator when he
22 examined Ms. Alfaro.  Finally, the presence of these articles in counsel's files
23 suggests that both Dr. Danto and Ms. Alfaro's attorney were aware that the
24 techniques used in Danto's examination were clinically questionable.  Their apparent
25 indifference to the standard of care is also reflected in an e-mail from counsel's lead
26 investigator, David Sandberg, which states: "DANTO SCARES ME BUT WE HAVE
27 NOTHING TO LOOSE [sic]."

28

147.  In sum, Rosie Alfaro suffered from severe psychiatric, neurological, cognitive and emotional disorders which are longstanding and debilitating.  These disabilities existed at the time of the offense, and they have persisted at all times since.  Indeed, Ms. Alfaro's brain damage, her chronic depressive disorder, and Posttraumatic Stress Disorder were present and observed throughout most of her childhood and adolescence.  As  Ms. Alfaro reached adolescence, they were compounded by chronic self-destrucitve drug abuse and addiction.  It is Dr. Stewart's professional opinion that these conditions are related and intertwined; their effects are cumulative, disabling and overwhelming.

148.  For more than a year prior to her capital trial, Ms. Alfaro sought to plead guilty to the charges stemming from Autumn Wallace's death.  It is Dr. Stewart's professional opinion that this was the product of sincere remorse and a desire to accept responsibility for her actions -- to do "the right thing."  However, her desire to plead guilty was in no way an attempt to achieve what some have called "state-assisted suicide."  Despite her chronic psychiatric impairments, Ms. Alfaro did not want to be sentenced to death; to the contrary, she was terrified by that prospect.

149.  It is very possible that Ms. Alfaro's multiple disabilities rendered her unable to assist counsel in preparing and presenting a legal defense.  Her ability to recall and relate relevant information to her attorney were severely hampered by her longstanding cognitive impairments and memory deficits.  Her confusion with respect to legal issues is documented in pre-trial jail records, and descriptions of her affect and demeanor in the courtroom suggest that she was unable to comprehend or participate in the trial proceedings.  Her impairments in perception, attention, memory and comprehension may well have been exacerbated by the psychotropic medications prescribed and administered by clinical staff throughout her detention and trial.

150.  It is Dr. Stewart's professional opinion that these factors, in addition to her documented history of severe impairments, should have prompted a full investigation into Ms. Alfaro's competency to stand trial.  As  part of that

93

1    investigation, competent mental health evaluators should have considered the

2    possible effects of all psychiatric medications administered to Ms. Alfaro in the

3    weeks and months prior to trial and during the trial itself, including changes in her

4    medication regimen and any corresponding changes in her behavior or presentation.

5        151.  It is also Dr. Stewart's opinion that a full and comprehensive evaluation

6    of Ms. Alfaro's competency should have been conducted at the time of her second

7    penalty phase hearing.  Her perceptions of sabotage and humiliation by her own

8    attorney during the first penalty hearing were so powerful that Ms. Alfaro formally

9    requested new counsel, an action quite out of character for this malleable young

10   woman.  This in itself indicates that the damage she sustained during the first trial

11   was indeed severe.  Furthermore, in the time between her first trial and the

12   commencement of her second penalty hearing, her medication dosage was doubled.

13   During that same period, her classification within the Orange County Women's Jail

14   was changed due to her need for "acute mental health care."  These changes, in

15   addition to the cumulative effects of ongoing incarceration and the prospect of a

16   second hearing to determine (literally) whether she would live or die, constitute

17   circumstances sufficient to warrant a full evaluation (or re-evaluation)

18   of Ms. Alfaro's competency to proceed.  Given her history of betrayal and

19   victimization, and her perception of betrayal by counsel during her first penalty

20   hearing, any competency evaluation at that time should have specifically addressed

21   Ms. Alfaro's ability to assist Mr. Monroe, in particular, int eh preparation and

22   presentation of her case for mitigation.

23       152.  The sentencing court in Ms. Alfaro's case was required to consider

24   specific factors in mitigation pursuant to California Penal Code § 190.3, including:

25   subsections (d) that the offense was committed while Ms. Alfaro was under the

26   influence of "extreme mental or emotional disturbance"; (g) that she acted under

27   extreme duress or under the "substantial domination" of another; (h) the fact that, at

28   the time of the offense, Ms. Alfaro's capacity to conform her conduct to requirements

94

1  of the law was impaired "as a result of mental disease or defect, or the affects

2  of intoxication"; and (i) Ms. Alfaro's youth at the time of the crime.  It is

3  Dr. Stewart's professional belief that, as a result of genetic, developmental,

4  environmental, neurological and psychiatric factors beyond Ms. Alfaro's control, she

5  suffered substantial cognitive and psychiatric impairments relevant to subsections (d),

6  (g), and (h).  With respect to subsections (d) and (h) in particular, Ms. Alfaro's mental

7  capacity was severely impaired by multiple psychiatric disabilities *and* the affects

8  of intoxication (both heroin and cocaine).  It is Dr. Stewart's further belief that the

9  same cognitive and psychiatric impairments render the mitigation of subsection (i) --

10  Ms. Alfaro's age (18 at the time of the offense) -- especially salient and compelling.

11            **c.    Failure to Retain and Present Testimony of a School Testing**

12                 **Expert and Present Appropriate Lay Witness Testimony**

13       153.  Ms. Alfaro was eighteen years old at the time of the offenses.  CT 1737.

14  Her age should have been a significant factor in mitigation.  *See* Penal Code

15  § 190.3(i).  Instead, however, the trial judge discounted her age as mitigating

16  evidence, stating,

> it does appear that the defendant was eighteen years old at the time of the
> crime.  If mere age by itself without any other factor is involved, it
> would appear perhaps that the age of eighteen might be a mitigating
> factor in the case.  The Court feels that you have to put the age in context
> of what her background shows that she had dropped out of school at an
> early age, been out on the streets for a substantial period of time, been
> involved in the drug culture for a substantial period of time, things
> of that nature.  So it would appear that in a streetwise sense she was
> much more mature than her age would indicate.  So it doesn't appear that
> the age of the defendant at the time of the crime is really a substantial
> mitigating factor in the case.

23  CT 1812.  Had Monroe hired the appropriate experts, and introduced the testimony

24  of both an expert and appropriate lay witnesses, this conclusion would have been

25  impossible for the trial court to reach and Ms. Alfaro would have been given credit

26  for the substantial mitigating factor her youth represented.  Exhibit 10 (Declaration

27  of Cynthia Asprodites, Ph.D.).  As  habeas expert Dr. Cynthia Asprodites has

28  concluded:

154.  Rosie Alfaro's records reflect that she was identified and referred for a special needs assessment in the fall of second grade, just a few months after first enrolling at Madison School in the Anaheim City School District ["ACSD"].  Her second grade teacher observed that while her math skills were notably below grade level, her reading and language skills were even more delayed.  A handwritten note on Ms. Alfaro's "Pupil Planning Form" states: "Reading - Beg. K level."  She was 8 years old.  Several months later, despite some improvement following provision of supplemental support services, a formal assessment was recommended to determine eligibility for special education services.  As  a result, it was determined that Rosie Alfaro "is functioning 2 grade levels below expectancy in reading and spelling."  *Id*.

155.  Despite apparent efforts to provide a range of services -- including speech therapy, language acquisition and therapy, and reading labs -- her academic performance remained significantly behind what was expected, especially given her chronological age.  At the end of the second grade, about one full year older than her classmates, Ms. Alfaro could recognize only 22 letters of the alphabet and could name only 19 of them.  The records do not suggest that Rosie ever completely mastered the basic alphabet.  It is quite unusual for a child at that grade level not to have mastered the alphabet.  This fact might suggest that Ms. Alfaro suffered cognitive impairments in addition to her specific learning disabilities.  *Id*.

156.  During the fourth grade, Ms. Alfaro took the "Written Expression - Proficiency Standards" Test designed to assess students of her grade level.  The highest possible score was 18; minimum proficiency required at least 12 points.  Ms. Alfaro scored only 10.  Other standardized tests given that year, including the Test of Language Development and Illinois Test of Psycholinguistic Abilities, "showed Rosio's receptive vocabulary to be at the 5-6 (5 years and 6 months) level."  Ms. Alfaro was 10 years old.  Ms. Alfaro took the same tests one year later, in the

fifth grade, at 11-1/2 years old, but she was never able to succeed on items beyond a 9-year-old level. *Id.*

157.  Ms. Alfaro's progress in school was consistently extremely poor.  During the seventh grade and again in the ninth grade, after briefly enrolling in an alternative high school, Rosie Alfaro left school while failing (literally) every class she was enrolled in.  At the time of Ms. Alfaro's trial, an evaluating psychiatrist noted:

> Education: Rosie Alfaro did not finish 7th grade.  She always had
> difficulty reading, spelling ... other subjects also bad.  She had poor
> attention, felt rejected by peers but had no problems with teachers.  She
> did not finish special courses in continuation school.

*Id.*

158.  Rosie Alfaro suffered significant learning difficulties which were consistently recognized, and which significantly impaired her ability to function not only academically, but emotionally, socially and cognitively as well.  In second grade, her learning difficulties (referred to in some of her records as "handicapping conditions") were documented, diagnosed, and the subject of Individualized Education Plans [I.E.P.'s] intended to address her unique needs and impairments.  In early 1980, her disorder was identified as "a specific learning disability in the understanding and use of oral and written language" -- i.e., a language-based disability.  Shortly thereafter, the school psychologist identified "a specific learning disability in the establishment of the sound-symbol relationship basic to the understanding and use of written language."  When first tested in second grade, and throughout elementary school, it was agreed that Rosie Alfaro's learning difficulties were not attributable to language acquisition -- i.e., they could not be explained by her limited exposure to English:

> Her basic learning skills fall far below the normal range of functioning
> and do not appear to be related to lack of exposure to English.

She was subsequently placed in a Resource Special Program to address academic deficiencies. *Id*.

159.  In the fourth grade, Ms. Alfaro was diagnosed with a "disorder in language acquisition and language comprehension"; her IEP identified a "language disorder involving understanding and associating word meanings."  Her condition in the fifth grade was similarly labeled a "disorder in language comprehension and language expression"; her "Handicapping Condition" was "Language disorder involving understanding and associating word concepts."  Language therapy was provide to address deficits associated with a language disorder.  Assessment in sixth grade, as a part of annual review, again confirmed a "disorder in language comprehension and expression."  *Id*.

160.  These are serious and potentially disabling disorders.  They are recognized and set forth as part of the standard *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM*"), published by the American Psychiatric Association.  The *DSM* sets forth the basic criteria for currently recognized mental diseases and disorders, including childhood developmental disorders.  It was first published in 1952 and has subsequently been revised five times, most recently in 2000.  *Id*.

161.  During Rosie Alfaro's childhood and adolescence, the *DSM-III* was in use.  That version, as well as the *DSM-III-R* (updated in 1987), included "Specific Developmental Disabilities" as class of disorders.  Despite variances in nomenclature, the criteria for those disorders and our understanding of them have remained fairly consistent for more than two decades.  Relevant to any assessment of Ms. Alfaro are the consistent, documented findings, throughout her childhood, of the two most common developmental language disorders: "Expressive Type" (disorders of vocal expression or "encoding"); and "Receptive Type" (disorders of language comprehension).  It should be understood that the presence of both disorders often has a cumulative impact on an individual child's academic and cognitive functioning, with the functional deficits of each being exacerbated by the other.  *Id*.

98

162.  Clinical evaluations conducted pre-trial indicate that Rosie very likely suffered undiagnosed AD/HD in childhood; emotional problems and social difficulties from an early age are also part of her academic record. *Id.*

163.  Ms. Alfaro's full brother, Jose Luis Alfaro, has suffered a serious seizure disorder since infancy.  Other documents suggest that both Luis and Silvia Alfaro (Ms. Alfaro's full-sister) also suffered specific developmental disorders. *Id.*

164.  The severity of an individual's impairments is likely to be exacerbated by the co-existence of neurological deficits, other mental or emotional disturbances, or multiple learning disabilities.  This is a critical consideration in a thorough evaluation of Ms. Alfaro, not only during the critical developmental years of childhood and adolescence, but also in young adulthood.  The records Dr. Asprodites reviewed suggested that several (if not all) of these potentially exacerbating factors were present during Rosie Alfaro's development.  Notes of Dr. Rogers, written during psychological and intelligence testing, suggested that "[s]he should have Neuro workup..." and considered the possibility of "organic sequelae from drugs or syphilis or solvents."  Several evaluators have either diagnosed, or noted significant symptoms of, a range of psychiatric and/or emotional disorders, including the following: Organic Brain Syndrome, Anxiety Disorders, Depressive Disorders (including Major Depressive Disorder and Dysthymia), Post-Traumatic Stress Disorder, Adjustment Disorders, Dependent Personality Disorders, and numerous chronic substance-related conditions.  Records also consistently place her cognitive abilities int eh range of "Borderline intellectual functioning." *Id.*

165.  The records indicate that Rosie Alfaro, despite her chronological age (a full year older than her classmates), was significantly less mature -- academically and socially -- than the younger children in the classroom.  In second grade, her "Normal Grade Placement" was consistently identified as "third."  Nonetheless, she consistently performed academically at least two to three years below her already-adjusted grade placement. *Id.*

166.  At 8 years old, Rosie Alfaro took the Peabody Picture Vocabulary Test, a well-established measure of receptive vocabulary, which reveals that Rosie had a Mental Age of only 3-5 (3 years and 5 months).  Four months later, her Mental Age on the same test had risen, but only to 4-4 (4 years and 4 months).  Despite evident improvements within a short period, her performance on this test was unusually deficient.  Scores like this in a young child suggest serious impairments.  In the case of the Peabody Tests, Dr. Asprodites points to two factors: (1) the gap between her chronological age and her measured mental age (8-1 vs. 3-5 on the first test; 8-4 vs. 4-4 on the second); and (2) the fact that on both tests, despite interventions aimed at improving her skills, Ms. Alfaro's Mental Age was measured at approximately one-half her chronological age.  This suggests that Ms. Alfaro was very possibly struggling with a more disabling cognitive or neurological impairment.  *Id*.

167.  On other tests of achievement taken during the same period, her Age Equivalency continued to trail about two years behind what was expected of someone at her grade placement.  At approximately 8-1/2 years old, her Age Equivalency was measured at 6-8 and 6-10.  At 9, her Performance Age still lagged two years behind her chronological age: several tests measured her Age Equivalency as two years behind, while other tests placed her mental age between three and four years below her chronological age.  When Ms. Alfaro left school in her early teens, she was performing academically and cognitively at roughly the level expected of a 9-year-old child.  *Id*.

168.  An accurate assessment of Ms. Alfaro's maturity and her level of functioning requires full consideration of the context of her abilities and life circumstances.  The Court's order (Exhibit 62 (190.4(e) hearing order dated 7/14/92)) identified several factors which provide critical information and insights regarding her emotional and intellectual development and her level of functioning, including: (1) her extremely limited academic progress and the brevity of her education; (2) the unstable and chaotic childhood adolescence which left her homeless and vulnerable

100

for extended periods of time; and (3) early and prolonged exposure to toxic substances, including alcohol, heroin and cocaine, known to compromise intellectual and behavioral functioning, especially among those, like Rosie Alfaro, already suffering with compromised intellectual functioning. *Id*.

169.   This last factor is especially salient, as Ms. Alfaro's records confirm that she became dependent on street drugs at a very young age and used chronically and habitually for many years, including substances (such as organic solvent) known to cause physical injury to the brain itself.  She was admitted into detoxification and rehabilitation programs at least twice as an adolescent.  The extent of her addiction, including the poor judgment and emotional turmoil which so often accompany (or lead to) dependence and abuse, is reflected in her inpatient records from Doctors' Hospital of Lakewood:

> This is 13-year-old girl admitted here with a four year history of using drugs... [T]he patient has been using heroin and cocaine especially in the last few months... [S]he is using intravenous drugs about three times per day.  She has also been sniffing paint thinners. ...  She required medications to help with the withdrawal symptoms....

Another entry notes:

> ...She would either use heroin or cocaine and occasionally make speed balls and use them conjointly...[S]he is unable to give me an idea of how much....In addition to that, she was using alcohol...

Her diagnoses upon discharge were: (1) Polydrug Abuse, (2) Heroin Withdrawal, and (3) Cocaine Withdrawal.  *Id*.

170.   Other evaluations also report heavy I.V. drug use (mostly heroin and cocaine) by 13, chronic PCP use beginning at 14, and paint thinners while she was only 11 years old.  these are toxins that almost certainly exacerbated whatever pre-existing cognitive and intellectual impairments she suffered.  While awaiting trial,

1  Rosie Alfaro was given the Alcohol Use Inventory, the results of which "very

2  strongly suggest[ed] a diagnosis of Alcohol Dependence," closely related to

3  "considerable anxiety and depression" and "mental health problems of a significant, if

4  not serious, nature."  Another evaluator described her use of drugs and alcohol

5  as "self-medication beginning about age 10."  *Id.*

6        171.  Other documents and data point to several additional factors and

7  circumstances which might have a profound impact on a young woman's

8  development in all areas, including the following:

9      *Chronic violence within the home, with Rosie Alfaro as a frequent
   witness to brutal beatings of her mother at the hands of her father;

10

11     *Sexual victimization (apparently including rape) in her own home by a family
   friend (or perhaps even a relative), when she was approximately 9 years old,
   undoubtedly exacerbated by the secrecy, shame, terror, distrust, and betrayal

12 commonly associated with early childhood exploitation;

13     *A striking lack of emotional support or even physical protection within her
   parents' home, which was quite unstable, and usually consisted of an alcoholic

14 (and frequently violent and periodically absent) father and an overworked
   mother whose work responsibilities rendered her effectively absent for most

15 of Rosie Alfaro's childhood and adolescence;

16     *Sporadic school attendance, including extended absences from the academic
   programs made available to her, often triggered by unperfected (or

17 unannounced) returns (sometimes for several months) to her grandparents'
   village in rural Mexico, during which Ms. Alfaro apparently received no

18 schooling of any kind;

19     *What appears to be a range of co-existing psychiatric and/or emotional
   disorders which went unidentified and untreated, including several conditions

20 known to be associated with Rosie's diagnosed developmental language
   disorders -- *e.g.*, social difficulties (including extremely poor self-esteem),

21 anxiety symptoms, depressive episodes, chronic concentration and attentional
   deficits, trauma-related symptoms and behaviors, adjustment disorders,

22 borderline intellectual functioning, and possible organic deficits; and

23     *A home life characterized by a severe lack of boundaries (emotional, sexual,
   and even generational), unrelenting intrusive criticism by her parents, and

24 several other needy (disabled) household members whose needs distracted
   from her own, including (for many years) an infirm and alcoholic father, a

25 brother with a chronic seizure disorder from infancy, and a half-brother with
   Down's Syndrome, born very close in time to the birth of Rosie's own first

26 child.

27 *Id.*

28

172.  These are salient factors which would presumably be expected to influence the emotional, intellectual, physical and social development of any adolescent.  Any one of these factors places the child at greatly increased risk of developing or exacerbating emotional, social, behavioral and/or cognitive impairments which can severely thwart that individual's ability to function in society.  In Ms. Alfaro's case, these included significant deficits in her ability to reason and her ability to accurately comprehend and interpret verbal information.  She had a mental age of 9 when she left school for the last time at the age of 14.  The obstacles to her academic achievement are well documented.  She made very little progress, despite what appear to have been good faith efforts by appropriate professionals to address her unique needs.  Lack of educational continuity, coupled with social difficulties and low self-esteem, a chaotic (and frequently terrifying) home life, the emotional upheaval of several moves between Anaheim and Mexico, as well as complicating co-existing co-existing conditions (physical, cognitive and emotional), diminished any possibility of progress beyond the very basic elementary education she attended.  Her severe and chronic substance problem at an early age intensified these risks.  It is possible that her academic and social failure and her early addictions were, to some degree, related.  *Id.*

173.  These and other factor undoubtedly influenced her development, but not in the manner suggested by Judge Millard.  None of the circumstances or events he identified could be expected to render a severely compromised young woman "more mature than her age would indicate."  They might result in a lifestyle, an environment, and/or early experiences that most young women would hope to avoid.  Those circumstances would neither encourage nor result in maturity, insight, good judgment, or even basic personal safety.  Rather, the experiences, deprivations and afflictions suffered by Rosie Alfaro -- individually and cumulatively -- would almost inevitably result in extremely impaired social functioning, emotional and psychiatric

1  disturbances, chronic vulnerability, self-destructive behaviors, and (ultimately)
2  tragedy for herself and others. *Id*.

3      174. It is Dr. Asprodites professional opinion, based on the records,
4  documents, and court transcripts she was reviewed, that at the time of the offense for
5  which she has been convicted, Ms. Alfaro was in no sense, clinical or otherwise,
6  "more mature than her age would indicate." Rather, the materials strongly suggest
7  that she was functioning at the other end of the spectrum, significantly *less* mature
8  than many young women of her age. She lacked the insight, stability, confidence,
9  judgment, emotional support and intellectual resources necessary to function as a
10  healthy 18-year-old young woman; instead, Rosie Alfaro labored under multiple
11  impairments which further hindered her already-compromised ability to function and
12  survive as a young adult.

13      **d.   Failure to Retain and Present Testimony of a Qualified**
14      **Psychologist and Appropriate Law Witnesses**

15      175. The prosecution was able to substantially advance its case in favor of the
16  death penalty by introducing and repeatedly referring to Dr. Martha Rogers'
17  preliminary notation on the raw MMPI test data "probable fake bad." *See* Claim 22.
18  Had Monroe hired a qualified psychologist to review the MMPI data once he knew
19  Dr. Rogers' preliminary notation would be admitted, which he did after it was
20  admitted in the first penalty trial and that trial ended in a mistrial, he would have
21  developed substantial mitigating evidence. Exhibit 5 (Declaration of Charles A.
22  Sanislow, Ph.D.). As habeas expert, Dr. Charles Sanislow, Ph.D., has concluded:

23      176. There are several possible reasons why a pattern indicating an invalid test
24  administration such as that obtained on the validity scales by Ms. Alfaro might be
25  produced. One reason is that the person taking the MMPI was unable to understand
26  or otherwise fully comprehend the items. This might be the case in an individual with
27  deficits in reading skills or comprehension. A second reason is that the individual
28  may have not been able to fully attend to the test stimuli. This might be the case for a

104

1    person who has attentional difficulties, or in the case where there are disruptions in

2    the testing environment.  Another reason that such a profile can be produced is if the

3    person has organic brain deficits to lead to confused states, attentional or other

4    cognitive deficits similar to those found in the examples noted above.  *Id*.

5         177.  It may also be the case that the person is grossly confused or disoriented.

6    This can happen when an individual has undergone an extreme stressor (e.g., an acute

7    institutionalization in a hospital or forensic setting).  It can also happen if the person

8    is undergoing an acute psychotic break where they have lost touch with reality

9    because of the rapid onset of a severe mental illness.  In this instance, the validity

10   profile might colloquially be referred to as a "cry for help."  Another reason that such

11   a profile might be produced is that person intentionally attempts to present his or

12   herself in the worst possible light by endorsing all items with an apparent negative

13   valence to ostensibly communicate to the examiner the worst state of distress

14   possible.  This is colloquially referred to as a "fake-bad" profile.  An invalid profile

15   similar to that produced by Ms. Alfaro may also be obtained from a person who

16   randomly answers the test's questions.  *Id*.

17        178.  A closer examination of the validity scales, including several important

18   subscales, can assist in determining likely possible reasons for why invalid profile

19   might have been produced.  These procedures involve examining if the respondent

20   was less attentive to latter portions of the test compared to the first half (F(B)), or if

21   there are patterns of inconsistent responses (VRIN).  The appropriate procedure is to

22   consider these possibilities systematically, and then to look for independent evidence

23   that might corroborate or disconfirm these possibilities.  Depending on conclusions,

24   the MMPI-2 might be re-administered.  In all cases of an invalid profile, however, it

25   is inappropriate to interpret the clinical profile.  *Id*.

26        179.  From the information provided to Dr. Sanislow, including the computer-

27   generated report and the handwritten notes of Dr. Rogers, Dr. Sanislow cannot

28   conclusively determine the reason that an invalid profile was obtained.  Elevations on

105

both the F and the F(B) scales indicate that Ms. Alfaro's pattern of responding to test items (or lack thereof) did not vary from the first half to the second half of the test. Thus, it does not appear that the invalid profile was obtained because she fatigued during the administration of the test. The elevated VRIN (variable response inconsistency) suggests that Ms. Alfaro answered questions with slight semantic variation inconsistently. And elevated VRIN score is consistent with an individual who is confused or unable to fully comprehend the test times. Given this pattern on the validity scales, it appears likely to Dr. Sanislow that the most straightforward explanation for an invalid test administration would pertain to Ms. Alfaro's reading and comprehension level. *Id*.

e.   **Failure to Retain and Present Testimony of an Expert on Brain Development and Appropriate Lay Witness Testimony**

180. Ms. Alfaro's turbulent and abusive childhood, compromised intellectual functioning and history of chronic substance abuse and dependency, which started at a very early age, also put trial counsel on notice that he should have retained an expert to explain the impact of those events on brain development. Heredity may determine the basic number of brain nerve cells children are born with, and their initial arrangement, but this is just a framework. A child's environment has enormous impact on how these cells get connected or "wired" to each other. A child's experiences, good or bad, influence the wiring of her brain and the connection in her nervous system. Loving interactions with caring adults strongly stimulate a child's brain, causing synapses to grow and existing connections to get stronger. Connections that are used become permanent. If a child receives little stimulation early on, the synapses will not develop, and the brain will make fewer connections.

181. Stressful experiences also shape a child's developing brain. When children are faced with physical or emotional stress or trauma, the hormone cortisol is released. High levels of cortisol can cause brain cells to die and reduces the connections between the cells in certain areas of the brain. Too much cortisol in the

106

1  brain can make it hard for children to learn and to think. And they may have trouble
2  acting appropriately in stressful situations.  Deprived of a positive, stimulating
3  environment, a child's brain suffers.

4         182.  A tremendous amount of structural and functional brain development
5  takes place during the teenage years.  As such, high levels of drinking and substance
6  abuse, particularly the use of heroine and cocaine, result in particularly devastating
7  impairments to the brain.  Alcohol and drugs impact both behavior and brain function
8  differently in adolescents than in and adults.  For instance, adolescents are more
9  vulnerable than adults to the effects of alcohol on both memory and memory-related
10 brain function.

11              **f.**     **Failure to Retain and Present Testimony of an Expert on**
12                     **Environmental Toxicity and Appropriate Lay Witness**
13                     **Testimony**

14        183.  Finally, trial counsel should have conducted an investigation and retained
15 an expert to determine if Ms. Alfaro's childhood environment, particularly toxic
16 factors, caused her many disabilities and impairments.

17              **g.**     **Conclusion**

18        184.  A death sentence was not a foregone conclusion in this case.  It is
19 reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different
20 result would have been obtained at trial.  *See* Exhibit 91 (Declaration of Ralph Glass)
21 at ¶ 4.  Trial counsel's failure to retain and present the testimony of the above-named
22 experts, as well as the testimony of lay witnesses who would lend support to a finding
23 of brain damage, was ineffective assistance of counsel. Had trial counsel retained the
24 appropriate experts, provided those experts with necessary materials, it is probably
25 that the verdicts in this case would have been different.

26 **J.     COUNSEL'S FAILURE TO MOVE FOR A CHANGE OF VENUE**

27        185.  Monroe unreasonably failed to move for a change of venue due to the fact
28 that the victim's mother and aunt worked for the Orange County Superior Court in

which Petitioner's trial was held.  Based on the victim's family's relationship to court personnel, including the fact that one member of the court, the trial judge, would later decide if Ms. Alfaro should live or die, and others, and including the prosecution team, which had the discretion to seek or not to seek the death penalty and exercised it to seek the death penalty, Monroe's failure to move for a change of venue was unreasonable.

186.  As  she testified at trial, Linda Wallace, Autumn Wallace's mother, who found her daughter's body in the bathroom of her home when she returned from work, worked as a clerk for the Orange County Superior Court, where Petitioner's trial was held.  RT 731, 3345.  Mrs. Wallace had worked there for approximately fifteen years.  Exhibit 83 (Snell Declaration) at 6-7.

187.  Joyce Wallace, Autumn Wallace's aunt, also worked for the Orange County Superior Court.  Exhibit 32 (Joyce Wallace Interview).  Joyce Wallace worked in the financial division of the court (Exhibit 83 (Snell Declaration) at 6-7)), where it is likely that she knew many of the court personnel involved in the trial.

188.  Monroe's investigator took notes on November 11, 1991, which indicate that "lots of deputies" inquired of Ms. Alfaro why her attorney did not move for a change of venue.  One deputy said she had lunch with Mrs. Wallace every day, according to Ms. Lawhon's notes.  Exhibit 46.

189.  Trial judge Theodore Millard's wife, Sondra, a travel agent, advertised in the Clerk's Union newsletter every month in 1992 in an advertisement that features a photograph of Sondra.  Exhibit 55; and Exhibit 1 at ¶ 71.  It is likely, as a result, that she knew many of the court personnel involved in the trial.  This also gives rise to a potential financial connection between the Millard's and clerks of the court.

190.  During the trial, employees of the Orange County Superior Court regularly attended the trial and held a bake sale on the courthouse grounds to raise money for the Wallace family.  *See* Exhibit 1 (McGrath Declaration) at ¶ 71.  This

1  and other incidents evidenced a partiality on behalf of the justice system against

2  Ms. Alfaro.

3      191.  State habeas counsel's investigator attempted to interview employees

4  of the Court who were involved in and/or attended the trial, but they were unwilling

5  to be interviewed absent court process.  *See* Exhibit 1 (McGrath Declaration) at ¶ 72.

6  State habeas counsel's investigator also attempted to contact Judge and Mrs. Millard,

7  but was unable to do so.  *Id*. at ¶ 70.  If afforded discovery, additional facts

8  supporting this claim and other claims would be established.  But for Monroe's

9  incompetence in failing to move for a change of venue, there is a probability that the

10  result of Ms. Alfaro's penalty trial would have been different.

11  **K.**   **COUNSEL'S FAILURE TO FILE A TIMELY MOTION TO SUPPRESS**

12       **MS. ALFARO'S CONFESSION**

13      192.  Monroe's failure to raise the issue of the voluntariness of Ms. Alfaro's

14  confession before the first day of trial, and his failure to adequately prepare for the

15  hearing on the motion, resulted in Petitioner receiving the ineffective assistance

16  of counsel.  In connection with this claim, Ms. Alfaro also alleges a violation of her

17  Fourth Amendment rights.

18      193.  Monroe failed to raise the issue of the involuntariness of Ms. Alfaro's

19  confession until Dr. Edwards raised it immediately before trial.  He did not file the

20  motion until February 26, 1992.  CT 380.  Indeed, the court commented on Monroe's

21  untimely filing as follows:  The court: "My clerk also explained to me when I was

22  getting ready to come out on the bench this morning you had some other motion you

23  wanted to file that you forgot about it.  I told her to give it back to you and you could

24  attempt to file it in open court.  I don't know what it is.  I didn't look at it at all."

25  Monroe:  "It's a motion to exclude the defendant's videotape and statements, your

26  honor, and the statements made to the investigating officers.  I can proffer that to the

27  clerk of the court now."  The court: "Can I ask why that motion wasn't filed earlier?"

28  Monroe: "Because it only became evidence to me when I was discussing with

109

1   Dr. Edwards testimony, possible testimony, with respect to the penalty phase.  And

2   she was going over certain material and she was the one who observed that she

3   believed that Miss Alfaro was under the influence at the time she had submitted to the

4   videotape and had signed the Miranda warning." *See* RT 133 (February 26, 1992

5   proceedings).

6       194.  It was unreasonable for Monroe to have failed to investigate fully the

7   issue raised by his client's documented narcotics intoxication at the time she was

8   questioned by the police.  An Orange County Sheriff-Coroner Department Forensic

9   Services Report, Report of Toxicological Examination, produced to the defense,

10  reports in bold print, "DRUGS DETECTED: COCAINE & BENZOYLICCONINE

11  MORPHINE."  Exhibit 33.  Although Monroe's investigator appears to have

12  identified a toxicologist who could perform the necessary investigation and provide

13  expert testimony, Monroe did not pursue the matter.  Exhibit 38.  A reasonable

14  attorney would have sought expert advice regarding the impact of the narcotics in

15  Ms. Alfaro's system on her ability to make a knowing and intelligent waiver.

16      195.  It was particularly ineffective for Monroe to fail to bring a motion to

17  suppress the confession until immediately before trial, given his theory of the case,

18  which was in direct conflict with Ms. Alfaro's video-taped confession.  Had he

19  brought the motion earlier, he would have appreciated that the confession would be

20  admitted and thus the impossibility of successfully defending Ms. Alfaro at a guilt

21  phase trial.

22      196.  Monroe's ignorance of the legal issues and his failure to prepare

23  Dr. Edwards to testify at the hearing are apparent from the hearing transcript.

24  *See* RT 196-278 (February 26 and 27, 1992 proceedings).  Dr. Edwards clearly

25  had no idea what the legal issues were or the meaning of the term "knowing and

26  voluntary."  Monroe, too, apparently had no idea what the legal issues were,

27  as he failed to draw or assist Dr. Edwards in drawing crucial distinctions, resulting

28  in Dr. Edwards giving a blanket endorsement to Ms. Alfaro's waiver of her right

110

1  to remain silent.  She responded to the prosecutor's question, "Did she understand

2  the Miranda rights?"  "She understood the Miranda rights."  RT 262.  Had Monroe

3  appreciated the legal issue and had he properly prepared the witness, she would have

4  clarified that while Ms. Alfaro may have understood her rights, she did not knowingly

5  and voluntarily waive them.

6      197.  Had Monroe retained a qualified expert, he would have been able to

7  establish that the influence of drugs on Petitioner rendered her confession involuntary

8  and the results of the guilt and penalty phases probably would have been different.

9  **L.    COUNSEL'S FAILURE TO ADEQUATELY ADVISE MS. ALFARO**

10     **REGARDING HER FIFTH AMENDMENT RIGHT**

11     198.  Monroe's advice to Ms. Alfaro concerning her Fifth Amendment right

12  to testify or not to testify was unreasonable, inadequate, and ineffective.  Monroe

13  misled Ms. Alfaro into taking the stand at her first penalty trial by telling her she

14  would not be cross-examined about the circumstances of the crime.  His advice was

15  unreasonable in that he had reviewed a letter she had written to Autumn Wallace

16  prior to her taking the stand, which he asked her to read to the jury while on the stand,

17  in which she wrote, "I'm sorry *we* took your innocent life."  A reasonably competent

18  attorney would have known this passage would open the door to cross-examination

19  about the circumstances of the crime, which in fact occurred.  Monroe unreasonably

20  failed to prepare Ms. Alfaro to testify about the circumstances of the crime given this

21  fact, and the fact that he had produced Dr. Edwards' report to the prosecutor (which

22  was in itself unreasonable, given that he did not call her at the first guilt or penalty

23  trial, and Petitioner so alleges), then opened the door for district attorney Middleton

24  to cross-examine Ms. Alfaro about the circumstances of the crime, in particular her

25  purported identification of "Beto" as the man who had pressured her to kill Autumn,

26  which he extracted from Dr. Edwards' report, making Ms. Alfaro look like a liar.

27  This was clearly prejudicial and, but for Monroe's incompetence, there is a

28  reasonable probability that the sentence would have been different.

1    199.  On direct examination, Monroe had Ms. Alfaro read a letter he had

2  previously reviewed (see RT 2130 (April 9, 1992 proceedings)) in which she had

3  written to Autumn Wallace, "I'm sorry we took your innocent life."  RT 1630-31.

4    200.  The following passage from the hearing outside the presence of the jury

5  requested by Monroe after the district attorney began to cross-examine Ms. Alfaro

6  about the circumstances of the crime establishes his unreasonable misunderstanding

7  of the scope of cross-examination, should Ms. Alfaro take the stand:

8     Monroe:  We didn't raise anything in our direct examination to suggest
      any lingering doubt, your honor.  We strictly limited it to the background
9     of the defendant as she was growing up and then the nature and extent
      of her genuine remorse for the family.
10
      Middleton:  However, that genuine remorse has to go to something, has
11    to be to some crime that she must have committed.  Because the way
      she's telling it it's self defense ---
12
      Monroe:  That was not anything that came out in her examination.
13
      Middleton:  Or defense of her child.
14
      Monroe:  Once again, your honor, none of that came out in the direct
15    examination, and that was issues that the district attorney raised in the --
      what I consider the improper cross-examination.
16
      The court:  Well, you asked her specifically about how she felt about
17    the killing of Autumn Wallace, okay.  And I think that definitely puts
      in issue what she claims happened to Autumn Wallace and what her
18    culpability is in that.  Is she the primary actor?  Is she the only actor?
      Was there somebody else there?  We know that the idea of duress is not
19    a legal defense in California to a capital offense, there's a code section
      right on point.
20
      Monroe:  PC 26.
21
      The court:  And but that doesn't mean that that type of evidence in --
22    it doesn't exclude that kind of evidence in the penalty phase of a trial.
23    Monroe:  We didn't raise it.  etc....
24    The court:  I mean those are -- those are -- those circumstances could
      weigh very heavily in a trier of fact's mind to determine the real extent
25    of the culpability of the person in weighing the circumstances of the
      offense.
26
      Monroe:  But they already had the opportunity to see that and weigh that,
27    your honor, in the guilt phase.
28

112

1    The court:  Well, that doesn't mean they can't weigh further circumstances of the offense in a penalty phase.

2

3    Monroe:  I don't deny that.  And they would be able to consider those factors from the guilt phase in the penalty phase.  I'm simply saying that this is not issues that were raised by the defense in the penalty phase, and it is improper cross-examination because it goes beyond the scope . . .

4

5    RT 1648-1651.

6    201.  As  a result of his erroneous and unreasonable belief that Ms. Alfaro

7    would not be cross-examined about the circumstances of the crime after he asked her

8    to read the letter, Monroe failed to prepare her for such cross-examination.  Exhibit 4

9    (Alfaro Declaration).

10    202.  In addition to his unreasonable advice concerning the scope of her cross-

11    examination, Monroe unreasonably misled Ms. Alfaro to believe that her discussions

12    with Dr. Consuelo Edwards were confidential and failed to prepare her for cross-

13    examination based on Dr. Edwards' report, which was produced to the prosecution.

14    Exhibit 4 (Alfaro Declaration).  Thus, when the district attorney began to cross-

15    examine Ms. Alfaro based on Dr. Edwards' report, Ms. Alfaro was wholly

16    unprepared.

17    203.  Ms. Alfaro's unprepared testimony at the first trial was prejudicial to her

18    and, but for Monroe's ineffective assistance, it is probable the outcome of her penalty

19    trials would have been different.

20    204.  The fact that the prosecution introduced Ms. Alfaro's testimony during

21    her first penalty phase in its case in chief at her second penalty trial evidences its

22    prejudicial nature.  An employee of the District Attorney's office was permitted to

23    read selected portions of Ms. Alfaro's earlier testimony to the jury.  RT 3629-3731.

24    The portion in which Ms. Alfaro expressed remorse for her crimes was not among

25    them.  Monroe unreasonably failed to admit this portion of Ms. Alfaro's testimony,

26    although he had the opportunity to do so, further evidencing his incompetence

27    as counsel.

28

113

1    205.  As  a result of Ms. Alfaro's experience testifying unprepared by her

2    counsel for cross-examination at the first trial, she refused to testify at her second

3    penalty trial.  That her failure to testify at the second penalty trial was prejudicial is

4    beyond dispute, as evidenced by the trial court's comments during the *Marsden*

5    hearing on April 9, 1992, after the first jury had hung on penalty and before the

6    second jury was impaneled:

7        Mr. Monroe:  I talked to Rosie about the importance of her getting on the stand
         and the jury seeing her or hearing her.

8
         The Court:  Well, if you wanted a chance to spare her life after listening to the
9        videotape, from a practical standpoint she had to testify.

10       Mr. Monroe:  That was my feeling.

11       The Court:  If she didn't testify, she didn't have much of a chance to save her
         life.

12
     RT 2129 (April 9, 1992 proceedings).
13
         206.  Because Ms. Alfaro did not testify, her attorney's ability to introduce
14
     mitigating evidence through defense experts was dramatically curtailed.  (*See*, *e.g.*,
15
     RT 3973-4199.  None of her hearsay statements to these experts, including her
16
     expressions of remorse, came in for the truth of the matter asserted.  Because this
17
     prejudice flowed from Monroe's ineffective assistance to his client regarding her
18
     Fifth Amendment right, and but for his ineffectiveness, the result of the proceeding
19
     probably would have been different, her sentence must be reversed.
20
     **M.    COUNSEL'S FAILURE TO SEEK AN  EVALUATION**
21
     **        OF PETITIONER'S COMPETENCY**
22
         207.  According to the psychiatric expert retained by Petitioner's counsel,
23
     a number of factors in addition to Ms. Alfaro's documented history of severe
24
     impairments, should have prompted a full investigation into Ms. Alfaro's competency
25
     to stand trial.  Exhibit 8 (Stewart Declaration) at 53.  Monroe's failure to request such
26
     an evaluation was unreasonable and rendered his assistance as counsel ineffective.
27

28

208.  At no time did Monroe seek to have Ms. Alfaro evaluated to determine whether she was competent to stand trial, despite the evidence available to him (from the experts he hired and other facts of which reasonable counsel would have been aware and he was or should have been aware) that indicated such an evaluation should be undertaken.

209.  Monroe apparently believed that Ms. Alfaro's request to plead guilty was unreasonable.  *See* RT 118 (February 21, 1992 proceedings).  Reasonably effective counsel would have had her competency evaluated under these circumstances.

210.  Monroe knew that Ms. Alfaro had no intention of participating in her own defense (see RT 110-11 ( February 21, 1992 proceedings); RT 2129 (April 9, 1992 proceedings)) and apparently believed that Ms. Alfaro's refusal to cooperate in her own defense was unreasonable.  Reasonably effective counsel would have had her competency evaluated under these circumstances.

211.  As  established by the Orange County Jail's medical records and the notes of experts hired by the defense, throughout the pretrial period and during all phases of her trial, Ms. Alfaro had symptoms of mental illness and was heavily medicated. *See e.g.*, Exhibits 79 and 85 (Orange County Jail nurse Toby Silver's psych notes, which indicate as follows: 11/8/90 - Note of atty concern b/c patient may be suicidal; 11/8/90 psych note - GAF 50; borderline personality disorder;  per DSM-IV, GAF 50= Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job); 3/17/91 - high risk of depression; 3/21/91 - depressed, suicidal thoughts, disturbing dreams; 3/26/91 - she has difficulty making decisions, she doesn't want to disagree with anyone, because she wants everyone to like her; 4/2/91 - she appears to be of low intelligence; 4/30/91 - depressed, feelings of hopelessness and helplessness and having difficulty concentrating; 5/7/91 - mood is depressed, complains of having poor concentration; 5/30/91 - mood is depressed; 6/13/91 - mood is depressed, complains of not sleeping well, she is scared, confused,

irritable and hopeless; 6/17/91 - still is feeling depressed and still wants to try an antidepressant; 8/1/91 - Maria is very depressed today . . . she said she has given up, T. Silver calls L. Lawhon to express concern re: Petitioner's depression and that she has given up and doesn't care anymore; 8/6/91 - psychiatry notes, symptoms of depression started after delivery; 8/6/91 - adjustment disorder w/mixed features; 8/8/91 - inmate is very depressed, hopeless, helpless,  start Sinequan 50 mg qHS PO x5d, then increase 100 mg qHS PO x30d; 8/15/91 - affect is flat, mood is depressed, continues to feel hopeless and helpless; 8/27/91 - mood is depressed; 10/17/91 - she continues to feel hopeless about the outcome of her case and she has not helped her lawyer to defend her, she chooses not to think about her situation, which is her way of coping; 10/21/91 - suicide attempt, slashed wrist with razor, reports being very depressed and suicidal, moved for special observation; 10/22/91 - depressed; 10/24/91 - she is depressed, very depressed; 10/29/91 - stops taking Sinequan, prescribed Desyrel; 11/2/91 - went to court and admits to not knowing what happened, she claims she doesn't know, nor does she care, apathetic, depressed, has no interest in her case; 11/12/91 - she is unhappy with her attorney and wants to fire him & get a new attorney; 11/14/91 - continues to feel hopeless and depressed; 11/27/91 - taking Elvaril; 12/12/91 - mood is depressed, however, she doesn't want to realize her depression, stopped taking Desyrel; 12/17/91 - mood is depressed, affect is flat; 12/19/91 - mood is depressed; 1/2/92 - anxious and depressed; 1/18/92 - affect is flat, mood is depressed; 1/30/92 - mood is depressed; 2/14/92 - feels hopeless and helpless; 2/29/92 - anxious and depressed; 3/7/92 - very depressed; 3/11/92 - mood is depressed, hopeless, helpless; 3/14/92 - depressed; 3/25/92 - affect is flat, mood is depressed; 3/28/92 - depressed; 4/4/92 - mood is depressed; 4/23/92 - depressed; 4/24/92 - prescribed imipramine); Exhibit 82 (Martha Rogers' notes, which indicate: 11/6/90 interview notes relate suicidal ideation - reported to jail psych team; Exhibit 84 8/26/90 notes from interview w/Laura Lawhon: "She is 3 mo pg c twins, v excited abt this, her mother said it is strange, she has no comprehension of the

trouble she is in, has image she will live happily ever after with these 2 babies.
Dn realize she is in death penalty case, MMPI (?) possible diagnoses: Axis I: R/O
Organic Disorders, R/O Schizophrenic Disorders, Schizophrenia, Paranoid, R/O
Paranoid Disorders; Axis II: R/O Schizoid PD, R/O Schizotypal PD).  Records reflect
that around the time of her trial, her Imipramine was increased from 50 mg./day
to 150 mg./day, a fairly high dosage.  *See* Exhibit 8 (Stewart Declaration) at 44-45.
Monroe's investigator's notes of his September 25, 1991, interview with Nurse Silver
establish that he was aware, or should have been aware, of the above.  Exhibit 85.
Reasonably effective counsel would have had her competency evaluated under these
circumstances.

212.  During trial, Ms. Alfaro "seemed very lost.  She looked like she did not
understand what was going on. . . .[S]he seemed very out of it."  Exhibit 9 (Silvia
Alfaro Declaration) at ¶ 33.  Reasonably effective counsel would have had her
competency evaluated under these circumstances.

213.  As  noted above, from May 23 through May 30, 1992, during
Ms. Alfaro's second penalty trial, Ms. Alfaro was determined by the Orange County
Jail authorities to require "acute mental health care."  CT 1745-46.  Monroe
unreasonably failed to seek an evaluation of Ms. Alfaro's competency to assist in her
own defense based on this concrete evidence that she might well be incompetent to
stand trial

214.  On June 2, 1992, two days after Ms. Alfaro left the "acute mental health
care" ward, but while she was still receiving mental health care at the jail, Ms. Alfaro
waived her right to testify (CT 1556), which Monroe knew meant she was likely to be
sentenced to death, but still failed to request a competency evaluation.  His failure to
have his client's competency evaluated at this point was unreasonable.
/ / /

N.    **<u>COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF THE
PSYCHOTROPIC DRUGS MS. ALFARO WAS PRESCRIBED WHILE
IN JAIL AS MITIGATING EVIDENCE AND TO EXPLAIN HER
APPARENT INATTENTIVENESS DURING TRIAL</u>**

215.  From shortly after she was arrested through sentencing, Ms. Alfaro was heavily medicated with psychotropic drugs by Orange County Jail doctors.  *See* Exhibit 77.  The drugs, especially combined with her pre-existing mental health disabilities, rendered Ms. Alfaro unable to concentrate on the trial, and she appeared inattentive and occasionally fell asleep during trial.  *See* Exhibit 9.  Yet Monroe unreasonably failed to seek an expert opinion on the impact of the drugs on Ms. Alfaro's ability to assist in her own defense, unreasonably failed to introduce the fact that she was being prescribed these drugs by jail doctors and unreasonably failed to inform the jury of the fact she was taking prescribed drugs during trial, which accounted for her apparent inattentiveness to the trial proceedings.  Monroe's failure was prejudicial to Ms. Alfaro in that it denied Ms. Alfaro mitigating evidence and left the jury to draw erroneous, prejudicial conclusions about the sincerity of Ms. Alfaro's expression of remorse for her crimes.  But for his failures in this regard, it is probable that the results of the penalty phase would have been different.

O.    **<u>COUNSEL'S FAILURE TO PRESENT EVIDENCE AVAILABLE AND
NECESSARY TO ADDRESS THE AGGRAVATORS</u>**

216.  Monroe failed to present an effective defense to the prosecution's evidence regarding aggravating circumstances.

217.  As  set forth above, Monroe unreasonably failed to present evidence to rebut the prosecution's theory of the circumstances of crime.  *See* Penal Code § 190.3(a).  The prosecution argued that Ms. Alfaro alone was responsible for what occurred.  Monroe failed to identify and develop the available evidence that Manuel Torres Graciano, a convicted felon and drug dealer who was on probation when he drove Ms. Alfaro to the Wallace home on June 15, 1990, and fled to Mexico as the

118

1  police were closing in on him (*see* Exhibit 1 (McGrath Declaration)), had Ms. Alfaro
2  under his substantial domination and caused her extreme duress.

3      218.  Monroe also unreasonably failed to provide rebuttal evidence to the
4  prosecution's evidence concerning Ms. Alfaro's violent relationship with Manuel
5  Cuevas.  *See, e.g.*, RT 4218 (Middleton uses violence in relationship with Manuel
6  Cuevas to rebut Edwards' conclusion that Petitioner was a caring person).  In fact,
7  there was substantial evidence available which Monroe failed to develop and present
8  that Petitioner was not violent to Manuel Cuevas but only acted in self defense.

9      219.  As noted above, Monroe failed to effectively cross-examine key
10 prosecution witnesses, including Reynoso, the Sheriff's investigators, and jailhouse
11 informant Vicki Darr despite substantial facts from which effective cross-
12 examinations could have been crafted.

13     220.  For example, Monroe unreasonably failed to cross-examine Orange
14 County Sheriff's Investigator Tom Giffin regarding his belief that Ms. Alfaro acted
15 alone.  He failed to point out that while Ms. Alfaro may have stabbed Autumn
16 Wallace, the evidence is consistent with a finding that she was under extreme duress
17 and the substantial domination of another person at the time.  He failed to point out
18 that Ms. Alfaro told Giffin that the Hispanic man who had driven her to the Wallace
19 home entered the home and, indeed, went as far as the area where the micro-wave
20 oven was located.  Instead, during the first trial, Monroe merely asked Giffin whether
21 he suspected Ms. Alfaro was trying to protect someone else (RT 1156), to which he
22 responded, "Did I ever suspect that?  No, I didn't."  Monroe then asked: "You did not
23 suspect that she was trying to protect somebody else?"

24     Giffin:  No.

25     Monroe: To cover for somebody else?

26     Giffin: I believed that there were other people involved that were
27     with her at the house, the two male Hispanics outside, and I still

28

119

1
2

believe she knows who the driver is and she won't tell me.  But after her confession, we were looking at them as witnesses.

RT 1156.

3

4

221.  A reasonable attorney, properly focused on the penalty phase of the trial, would have pointed out that the evidence did not compel the conclusion Giffin claimed he had reached.  It did not compel the conclusion that the driver was merely a witness and bore no criminal responsibility.  To the contrary, the evidence suggested -- to the investigators themselves --that the driver knew the items he removed from the Wallace home did not belong to Ms. Alfaro.  Exhibit 1 (McGrath Declaration), ¶¶ 2-57.  During his interview of Ms. Alfaro, Giffin challenged her when she said that the two men didn't know what she had done or that she was stealing the items.  CT 541.  Bale accused her of "bullshitting" them.  CT 542.

5
6
7
8
9
10
11
12

222.  Moreover, contrary to the impression left by Giffin's testimony, as late as July 6, 1990, the police were identifying the third man as a suspect, not a mere witness, in inter-office teletypes.  *See* Exhibit 34 (July 6, 1990 teletypes).  Reasonably effective cross-examination would have supported Ms. Alfaro's testimony that she was under extreme duress and the substantial domination of another person who was involved in the criminal conduct at the time she stabbed Autumn Wallace.

13
14
15
16
17
18

223.  At the second penalty trial, Monroe again failed to effectively cross-examine Giffin on this point.  Once again, he focused on guilt and squandered the opportunity to develop mitigating evidence.  Indeed, he asked only the following (of Giffin) on the issue of whether the driver could have been involved: "Did you have reason to believe during the course of your interview that you thought Rosie Alfaro was covering up for someone?"

19
20
21
22
23
24

Giffin:  Yes.

25

Monroe:  You believe she was trying to protect somebody?

26

Giffin:  Initially, yes.

27

Monroe:  Why did you feel that way, Detective Giffin?

28

120

1   Giffin:  Initially it was my opinion that so brutal a murder was not
2   likely to have been committed by a female.  As the interview
    continued, Rosie's minute details and her knowledge and her
3   recollection of the crime scene, of the details of the murder, of her
    participation in it, led me to believe that it was someone with
4   firsthand knowledge of the murder, and she did in fact commit the
    murder by herself.

5   Monroe:  By firsthand knowledge of the murder, could it have
    been a person who had witnessed it as well as participated in it; is
6   that not so?

7   Giffin:  That is not my opinion at all.

8   Monroe:  But is that not a possibility?

9   Giffin:  Well, certainly that's subject to possibility.

10  Monroe:  I have no further questions.

11  RT 3563.

12      224.  Monroe's cross-examination of Reynoso was also ineffective.  He failed

13  to rebut Reynoso's patently false assertion that he had not used drugs on the day

14  of the offenses and that he did not believe Ms. Alfaro had used drugs, despite

15  considerable evidence to the contrary.  In particular, he failed to point out that

16  Reynoso had indicated to the police that Ms. Alfaro was under the influence (*see*

17  Exhibit 22); that Mr. Reynoso was a drug addict; that he had spent three years in

18  prison for selling drugs and had only been out a week at the time of the offenses; that

19  he was placed in custody for violating his parole when he contacted the police after

20  hearing that they were looking for him on July 2, 1990; and that his parole was again

21  revoked in October, 1990, for drug use.  Exhibit 22, Exhibit 28.

22      225.  Monroe also failed to effectively cross-examine Vicki Darr, a jailhouse

23  informant who testified that Ms. Alfaro told her that she "got off on" killing Autumn

24  Wallace.  RT 916.  Among other things, Monroe failed to point out that Ms. Darr had

25  told the police in December 1990, that Rosie told her she was protecting somebody

26  and never mentioned "getting off on it."  Exhibit 35 at 7-8 (12/90 interview with

27  Vicki Darr).  But for Monroe's incompetence in these regards, it is probable that the

28  results of the trial would have been different.

121

1   **P.    ADDITIONAL INSTANCES OF COUNSEL'S FAILURE TO PROVIDE**
2   **EFFECTIVE ASSISTANCE**

3   226.  Petitioner's trial counsel and/or appellate counsel rendered ineffective
4   assistance to Petitioner and denied Petitioner her constitutional rights through
5   countless other derelictions of his professional responsibility to zealously and
6   effectively defend Petitioner.  There could be no rational tactical justification for
7   counsel's failures in this regard.  Counsel's actions and omissions, which fell below
8   an objective standard of reasonableness under prevailing professional norms, include,
9   but are not limited to the following:.

10         a.  Trial counsel failed adequately to investigate the facts of the case, the
11  crime, and all other bad acts and uncharged offenses, which were presented by the
12  prosecution to the jury.

13         b.  Trial counsel failed adequately to investigate Petitioner's background,
14  history, involvement in the offense in chief, and her mental, physical and medical
15  condition at the time of all offenses noted by the prosecution during this case, both
16  charged and un-charged, which were presented to the jury at trial.  Had counsel
17  performed sufficient investigations, he would have learned of substantial exculpatory
18  and/or mitigating evidence and he would have investigated, developed and presented
19  such evidence to the jury during one/or both phases of trial, either through lay
20  witnesses, and/or through expert witnesses.

21         c.  Trial counsel failed adequately to investigate all aspects of the
22  prosecution's case and/or interview all witnesses presented at trial.

23         d.  Trial counsel failed to seek and conduct adequate testing of all of the
24  evidence upon which the prosecution relied at trial.

25         e.  Trial counsel failed adequately to investigate all avenues and lines of
26  defense, and failed to present critical evidence at trial which would have proven that
27  Petitioner was less than fully culpable of malice murder, and not eligible or otherwise
28  not suitable for a death sentence during the sentencing phase.  Rather, trial counsel

122

1   left all aspects of the investigation up to non-lawyers without sufficient expertise,
2   time, or resources adequately to conduct a proper and thorough investigation of
3   Petitioner's background, social history, education, and medical and mental health
4   history, record and status.  As a result, substantial avenues of critical mitigating
5   factual information were left completely overlooked and undiscovered despite its
6   availability to anyone who merely asked the questions on Petitioner's behalf.

7        f.  Trial counsel failed adequately to investigate, develop and present
8   evidence of Petitioner's mental health, mental retardation, and other mental and
9   physical disabilities, all of which would have rendered her ineligible for the death
10  penalty, incompetent to stand trial, and otherwise not deserving of a sentence of
11  death.

12       g.  Trial counsel failed adequately to investigate, interview, consult with,
13  and prepare those defense witnesses, lay and expert, which counsel did call to testify
14  at both phases of trial.

15       h.  Trial counsel failed to seek funds for numerous expert witnesses who
16  could have assisted the defense in proving all of this information to the trial court and
17  to the jury.

18       i.  Trial counsel affirmatively presented to the jury evidence that was
19  damaging and prejudicial to Petitioner during the trial.

20       j.  Trial counsel failed to seek funds for experts and/or to make an
21  adequate showing of his need for defense expert services to assist him in preparing
22  for all of the pre-trial and trial proceedings, the direct examination of the defense's
23  own witnesses, and the cross-examination of prosecution witnesses, the rebuttal of
24  the prosecution's case at the sentencing phase of trial, and the presentation of the
25  defense case at all phases of Petitioner's trial.

26       k.  Trial counsel was not sufficiently experienced nor qualified to
27  represent Petitioner in her capital trial.

28

123

l.  Trial counsel failed to file numerous pre-trial motions to preserve and protect the rights of Petitioner, and/or failed to investigate, research, and/or present available evidence regarding those motions he did file before, during and after trial.

m.  Trial counsel failed properly to preserve and file and argue those motions he did file before, during and after trial.

n.  Trial counsel improperly sought, developed and utilized at trial, and/or failed to seek and obtain altogether, critical and important evidence that was in the possession of the prosecution, its agents or assigns, and/or other agencies and/or entities, and/or was otherwise readily available to the defense from these and/or other sources, which would have been exculpatory and which, if discovered, investigated, developed and presented at trial proceedings, would have materially altered the outcome at all phases of the trial.

o.  Trial counsel failed to move properly, or at all, for a mistrial during repeated instances in the trial when a mistrial was warranted and should/would have been granted had such motions been made.

p.  Trial counsel conducted an inadequate voir dire, thereby failing to learn of the factual information that would have provided the basis to for-cause challenges of numerous potential jurors and actual jurors, and thereby also failing to learn of biases and prejudices of all potential and actual jurors in the case, knowledge of which was essential to the proper exercise of for-cause and peremptory challenges, as well as to address and rebut the prosecution's for-cause challenges and its unlawful and/or unconstitutional use of peremptory challenges.

q.  Trial counsel failed to assert, argue and preserve numerous challenges to the prosecution's conduct during voir dire, including, but not limited to, engaging in improper and/or erroneous factual assertions and/or legal assertions or arguments before the venire either in general or individually, tainting some members of the venire by engaging in misconduct in the presence of such members, exercising

124

peremptory challenges in an unlawful and/or unconstitutional manner, and numerous other instances of misconduct in which the prosecution engaged during voir dire.

r. Trial counsel failed properly to object and preserve numerous issues that arose or occurred during voir dire, including, but not limited to, the restrictive manner in which the trial judge conducted the voir dire, the trial court's refusal to allow questioning of certain members of the venire and/or to allow certain questions of some and/or all members of the venire, the prosecution's unlawful use of peremptory challenges, the trial court's dismissal of members of the venire without adequate legal justification, and/or the trial court's unlawful reliance upon *in camera*, *ex parte* proceedings to conduct portions of the voir dire.

s. Trial counsel failed to object to the testimony in whole or in part of numerous witnesses throughout all stages of the pre-trial and trial proceedings, and such failure resulted in an unfair trial and/or in the jury erroneously hearing substantial prejudicial testimony which would not have been heard had counsel performed adequately.

t. Trial counsel repeatedly failed properly to object to, argue, and preserve numerous legal issues that arose and/or occurred throughout the pre-trial, trial and post-trial.

u. Trial counsel failed properly and/or effectively to cross-examine and/or impeach each of the State's witnesses who testified throughout the pre-trial, trial and post-trial.

v. Trial counsel failed properly and effectively to examine and present evidence through each of the defense witnesses who testified throughout the pre-trial, trial and post-trial.

w. Trial counsel also was ineffective for failing to advise Petitioner concerning whether or not to testify and concerning the investigative leads and/or other potential witnesses that may or should have been interviewed and/or called at all phases of the trial.

125

1    x.  Trial counsel failed to raise and preserve numerous meritorious issues
2  for appeal and/or for litigation in post-conviction proceedings.

3    y.  Trial counsel was insufficiently familiar with the State's case, its
4  witnesses, the relevant documents, the crime scene, the possible defenses and defense
5  witnesses.

6    z.  Trial counsel improperly failed to object to numerous erroneous and
7  unlawful jury instructions, and improperly failed to request necessary instructions, at
8  both phases of the trial.

9    aa.  Trial and appellate counsel failed adequately to research and/or
10 understand the relevant law and legal principles governing all aspects of all phases of
11 the pre-trial, trial, and post-trial proceedings.

12    bb.  Trial counsel failed to develop a coherent and/or consistent theory of
13 the case for use at trial, and failed to investigate, develop and present a theory or
14 theories of the case that were available and should have been presented at either or
15 both phases of trial.  The theory of the defense that was chosen by the defense was
16 clearly not mitigating and thus completely undermined Petitioner's ability to receive a
17 fair trial.

18    cc.  Trial counsel failed adequately to investigate and present evidence
19 on the theory of the defense counsel did choose at either or both phases of the trial.

20    dd.  Trial and appellate counsel failed to argue the appropriate state and
21 federal law, constitutional, statutory, or otherwise, in support of the issues counsel
22 did assert and raise at all stages of the pre-trial, trial, and post-trial proceedings.

23    ee.  After trial, counsel failed adequately to continue investigating and
24 developing new evidence that would have been related to a variety of claims to be
25 presented at the motion for new trial, including all claims raised (and incorporated by
26 express reference herein) in this amended petition, and specifically including juror
27 misconduct, prosecutorial misconduct, a miscarriage of justice due to Petitioner's
28 mental retardation, and ineffective assistance of trial counsel.

126

1
2
3

ff.  Trial counsel erroneously opened the door to substantial highly prejudicial testimony from both prosecution and defense witnesses at all phases of the trial.

4
5
6

gg.  Trial counsel failed properly to preserve objections to evidence, arguments, instructions, court rulings, and other prejudicial occurrences throughout all phases of the pre-trial, trial and post-trial proceedings.

7
8
9

hh.  Trial counsel was aware of, but failed adequately to investigate, develop and present, numerous affirmative and factual defenses at both phases of trial.

10
11
12
13
14
15

ii.  Trial counsel failed to make proper opening and closing statements at both phases of the trial, by failing to respond to prejudicial and/or unlawful arguments by the prosecution, by failing to address material misstatements of fact or law relied upon by the prosecution, and/or by failing affirmatively to raise helpful facts or arguments for the defense, and/or by failing to provide proper and helpful advocacy in any and all respects.

16
17
18
19
20
21
22
23
24

jj.  Trial and appellate counsel were rendered ineffective by virtue of the prosecution's misconduct at all phases of the pre-trial, trial, and post-trial proceedings in this case, including, but not limited to: the affirmative failure to disclose evidence that was exculpatory at either or both phases of trial with respect to the factual and legal issues, the witnesses who did testify, or those who did not but had relevant information which was concealed from the defense by the prosecution; the knowing use of perjured testimony at both phases of trial; and the improper and/or illegal arguments made in the prosecution's opening and closing statements at both phases of trial.

25
26
27

kk.  Trial and appellate counsel were rendered ineffective by virtue of the rampant jury misconduct that occurred throughout all phases of the pre-trial, trial, and post-trial proceedings.

28

127

ll.  Trial and appellate counsel were rendered ineffective by virtue of any and/or all of the judge's erroneous rulings in this case, including, but not limited to, all such rulings cited by counsel for appellant in all appellate briefing filed by appellant on direct appeal and any such ruling identified herein or to be identified hereafter in these habeas corpus proceedings.

mm.  Trial and appellate counsel were rendered ineffective by virtue of the trial judge's bias against the defense in this case.

nn.  Trial and appellate counsel were rendered ineffective by the acts of misconduct of the trial judge and/or the court's officials, employees, and assigns that occurred before, during and after the trial in this case.

oo.  Trial and appellate counsel were rendered ineffective by virtue of the trial judge's refusal to allow the defense to obtain, investigate, develop and/or present relevant exculpatory and/or mitigating evidence which was otherwise unobtainable by the defense absent court order or authorization to do so.

pp.  Trial and/or appellate counsel failed adequately to investigate facts and issues about which they were or should have been on notice -- including trial and/or appellate counsel's ineffectiveness for failing to present information related to all aspects of Petitioner's ineffective assistance of counsel claims -- at the motion for new trial, the failure of which may have waived or did waive Petitioner's right to present and litigate those issues on appeal or in habeas corpus proceedings.

qq.  Appellate counsel failed to enumerate, assert, and argue numerous state and federal constitutional and/or legal issues that were readily apparent on the face of the record in the appellate proceedings.

rr.  Trial and/or appellate counsel failed properly to preserve any facts, claims or issues asserted here by Petitioner (or to be asserted later) which this Court or some future court may deem to have been waived by virtue of trial or appellate counsel's failure to have properly preserved such facts, claims or issues.

1    ss.  Trial counsel failed to properly rehabilitate jurors who expressed

2    opposition to the death penalty.

3    **Q.    CONCLUSION**

4    227.  Any single instance, or sub-set of instances, of ineffective assistance of

5    counsel set forth herein was and is sufficient to undermine confidence in the verdict

6    at both phases of trial, and but for such instance, the outcome would have been

7    different at all phases of Petitioner's trial.  All instances of ineffectiveness of counsel

8    set forth anywhere in this petition, when viewed in combination, were and are

9    sufficient to undermine confidence in the verdict at both phases of trial, and but for

10   such instances, the outcome of both the guilt and penalty phases of Petitioner's trial

11   would have been different.

12   228.  A death sentence was not a foregone conclusion in this case.  It is

13   reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different

14   result would have been obtained at trial.  *See* Exhibit 91 (Declaration of Ralph Glass)

15   at ¶ 4.  Trial counsel's unreasonable acts and omissions alleged herein were below the

16   standard of care for capital defense lawyers practicing at the time of Ms. Alfaro's

17   trial, were without reasonable tactical justification and prejudiced Ms. Alfaro.  But for

18   counsel's failures in these regards, it is reasonably probable that the outcome of the

19   proceeding would have been different.  *Strickland*, 466 U.S. at 669.

20

21   **VII**.

22   **CLAIM 2:  MR. MONROE PROVIDED INEFFECTIVE ASSISTANCE OF**

23   **COUNSEL BY FAILING TO PROVIDE AUTHORITY TO THE TRIAL**

24   **COURT FOR THE ADMISSION OF  MS. ALFARO'S UNCONDITIONAL**

25   **OFFER TO PLEAD GUILTY AS MITIGATION EVIDENCE IN**

26   **THE PENALTY PHASE OF THE TRIAL**

27   Petitioner's conviction and sentence of death were rendered in violation of her

28   rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-

1  capricious determination of guilt and penalty, to the effective assistance of counsel,

2  to present a defense, and to due process of law as guaranteed by the Fifth, Sixth,

3  Eighth and Fourteenth Amendments to the United States Constitution because trial

4  counsel failed to provide legal authority to present critical mitigation evidence during

5  the penalty phase resulting in the trial court's exclusion.

6      1. Exhaustion of the claim:  This claim was fairly presented to the California

7  Supreme Court in the direct appeal.  It was presented in Claim 3 in the Opening Brief.

8      2. AEDPA:  The California Supreme Court denied this claim.  *People v.*

9  *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

10  denial of this claim is both "contrary to" and an "unreasonable application" of clearly

11  established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the

12  claim *de novo*.  Moreover, because the state court's adjudication of this claim was

13  dependent on an antecedent unreasonable application of federal law, this Court

14  "must then resolve the claim without the deference that AEDPA otherwise requires."

15  *Panetti*, 127 S. Ct. at 2858.

16      3. If Respondent disputes any of the facts alleged below, Petitioner requests

17  an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

18  has been afforded discovery and the disclosure of material evidence by the State, the

19  use of this court's subpoena power, and the opportunity to investigate fully, counsel

20  requests an opportunity to supplement or amend this petition.

21      4. The declarations and other exhibits filed with this petition, as well as the

22  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

23  reference into this claim as though set forth in full.

24      5. In support of this claim, Petitioner alleges the following facts, among others

25  to be presented after full discovery, investigation, adequate funding, access to this

26  Court's subpoena power, and an evidentiary hearing.

27

28

A. **INTRODUCTION**

Although the trial court granted the District Attorney's motion to exclude evidence that Ms. Alfaro had offered to plead guilty as mitigation at the penalty phase, he expressed a willingness to revisit the issue by stating to defense counsel, "whenever you feel you have some authority or some analogy by some cases or something of that nature you want me to look at, I will be more than happy to review the motion in limine." RT 187 (February 26, 1992 proceedings).

6. Four years earlier, the California Supreme Court in *People v. Williams*, 45 Cal. 3d 1268, 756 P.2d 221 (1988) expressly stated that California's death penalty law does not prevent "a defendant from offering in mitigation his expressed willingness to plead guilty — when that expressed willingness does in fact tend to show remorse, etc." *People v. Williams*, 45 Cal. 3d at 1332, fn. 9. Yet, despite the trial court's invitation, Mr. Monroe never presented the *Williams* case to the court or sought leave of court to introduce evidence of Ms. Alfaro's desire to plead guilty. His failure constituted ineffective assistance of counsel in that he deprived his client of concrete evidence in mitigation that would have resulted in a sentence of life in prison without the possibility of parole and not death had it been before the jury.

B. **STATEMENT OF FACTS**[4]

7. On February 20, 1992, Mr. Monroe filed a "request for special instructions" *in camera* in which he informed the court that Ms. Alfaro "insists on pleading guilty to the special circumstances," "against my most rigorous advice." He told the court he was "requesting instructions . . . as to whether or not the court believes it is necessary for me to withdraw from the case . . . " CT 355. The following day, February 21, 1992, the court met with Mr. Monroe and Ms. Alfaro ex parte. RT 106-3 (February 21, 1992 proceedings). During the discussion that ensued,

---

[4] For a more detailed statement of the facts pertinent to this argument, please see the Statement of Facts set forth in Section V, supra, which is incorporated by reference herein.

Mr. Monroe described an "out and out conflict" between himself and Ms. Alfaro regarding her desire to plead guilty and his "wish to proceed to trial on the guilt phase." *Id.* at 110-11, 112.  He stated, "my client insists on pleading guilty;" "I can't turn around and say I consent to allow my client to plead guilty when I know she's pleading guilty for all intents and purposes to a death sentence;" "she told me she wanted to plead guilty and did not want to testify;" "A 20-year-old child is going to plead guilty to a death penalty?" *Id.* at 113-18.  Though Mr. Monroe's statements cast doubt on his understanding of the possibility of mounting a penalty phase defense in his client's case, there is no question that he understood that his client was desirous of entering an unconditional guilty plea.

8.  From comments made by the District Attorney five days later, we can infer that at some point Mr. Monroe went to Mr. Middleton and offered to have Ms. Alfaro plead guilty in exchange for an agreed upon sentence of life in prison without the possibility of parole.  In an oral motion made February 26, 1992, the District Attorney argued that evidence of an offer to plead guilty in exchange for a sentence of life in prison without parole should not come in because it is only an unconditional plea of guilty that constitutes a mitigating circumstance.  Mr. Middleton stated, "[I]f the defendant wanted to plead guilty, she can plead guilty right up front, right now. Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation."  RT 185 (February 26, 1992 proceedings).

9.  Although Mr. Monroe knew that Ms. Alfaro was, in fact, willing to "plead guilty right up front, right now," and "[g]o right into the penalty phase," he failed to argue that this mitigation was present in this case, even under the District Attorney's analysis.  The court, which was also aware of Ms. Alfaro's willingness to plead guilty unconditionally, granted the District Attorney's motion nevertheless, stating:

> Well, it's definitely not relevant to anything in the guilt phase of the trial.  And it would appear to me -- unless you can submit some authority to the court, it would appear to me a mere offer to plead guilty, if the District Attorney strikes the -- or does not seek the death penalty, appears to me from a logic and common sense standpoint not to be the

132

1  proper subject matter of mitigating testimony in a penalty phase, if we
2  ever get to a penalty phase, in the trial.

   And it'. . . a motion in limine. So, *in effect, the court would --*
3  *what it does, it directs counsel not to bring up that issue, or the*
   *defendant herself if she were to testify not to bring up that issue,*
4  *without leave of court.*

5      And whenever you feel you have some authority or some analogy
   by some cases or something of that nature you want me to look at, I will
6  be more than happy to review the motion in limine.

7          * * *

8  Mr. Monroe: Certainly in guilt but also in penalty?

9  The Court: In all phases of the trial unless you have leave of the court
   otherwise.
10

11  RT 187 (February 26, 1992 proceedings).

12      10.  Seemingly unaware of the easily accessible authority from this Court

13  supporting the admissibility of Ms. Alfaro's desire to plead guilty, Mr. Monroe never

14  sought leave of court to introduce this evidence.  This is true despite the fact that the

15  District Attorney proceeded to make Ms. Alfaro's *lack of acceptance of responsibility*

16  the linchpin of both his penalty phase opening statements.  In his opening during the

17  first penalty trial he stated:  "You're going to find, ladies and gentlemen from the

18  evidence that Rosie Alfaro has not accepted the responsibility for the killing of

19  Autumn Wallace.  That will be borne out by the evidence."  RT 1436.  In his opening

20  in the second penalty trial he stated: "Miss Alfaro has not accepted any responsibility.

21  That's what the evidence will show."  RT 3179.  Having presented no evidence, the

22  only argument Mr. Monroe offered in closing that even touched upon Ms. Alfaro's

23  acceptance of responsibility--that Mr. Alfaro "was remorseful a month after her arrest

24  when she was talking to Janell.  Before she had Monroe as a lawyer, by the way"--

25  was successfully objected to as "outside the scope of the evidence."  RT 2024-25.

26  / / /

27

28

133

1   **C.    MR. MONROE PROVIDED INEFFECTIVE ASSISTANCE OF**
2   **COUNSEL BY FAILING TO PROVIDE AUTHORITY FOR THE**
3   **ADMISSIBILITY OF MS. ALFARO'S WILLINGNESS TO PLEAD**
4   **GUILTY AS MITIGATING EVIDENCE IN EITHER PENALTY PHASE**

5       11.  While no formula exists by which to measure counsel's performance,

6   "[r]epresentation of a criminal defendant entails certain basic duties." *Strickland*,

7   466 U.S. at 688.  At a minimum, "counsel's function is to assist the defendant, and

8   hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."

9   *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 64 L. Ed. 2d 333 (1980).

10  Mr. Monroe's performance was below accepted norms of practice and as such, denied

11  Ms. Alfaro her right to counsel guaranteed by the Sixth Amendment.  *Strickland,* 466

12  U.S. at 687.

13      12.  While it is a truism that courts will begin assessing an ineffective

14  assistance of counsel claim with the presumption that counsel's challenged action

15  might simply have been sound trial strategy, if the record affirmatively discloses "the

16  lack of a rational tactical purpose for the challenged act or omission," a defendant

17  shows that her counsel behaved unreasonably.  *People v. Ray*, 13 Cal. 4th 313, 349

18  (1996); *People v. Majors*, 18 Cal. 4th 385, 403, 956 P.2d 1137 (1998).  Mr. Monroe

19  had no rational tactical purpose for his failure to present authority for or to attempt to

20  offer evidence that Ms. Alfaro told him repeatedly before trial that she wanted to take

21  full responsibility for the death of Autumn Wallace and plead guilty to the charges.

22  To the contrary, his remarks to the trial judge after hearing his ruling precluding such

23  evidence on February 26, 1992, "Certainly in guilt but also in penalty?," indicate that

24  had he understood he was able, he would have offered this evidence.

25      13.  Because the state court had decided in *People v. Williams*, 45 Cal. 3d

26  1268, four years earlier, that "[n]othing in the death penalty law even purports to bar

27  such evidence," at 1332, Mr. Monroe's failure to call this case to the court's attention

28  constituted ineffective assistance of counsel.

14. Indeed, it is not possible to imagine a tactical reason for declining to introduce at the penalty trials the concrete evidence of the universally recognized mitigating circumstance of remorse in the form of Ms. Alfaro's willingness to plead guilty to the charges. She had already been convicted; thus, an admission of culpability could not hurt her case. Moreover, she had not testified in the guilt phase, and thus, would not be seen as a manipulative liar for offering to plead guilty, then testifying in her own defense, then after being convicted, introducing her willingness to plead pre-trial. It was only Mr. Monroe who might have lost credibility with the jury by introducing evidence that Ms. Alfaro had been willing to plead guilty all along and that he had prevented her from doing so. But he was not on trial. She was. He had a duty to put his own sensibilities aside. Because Mr. Monroe failed to introduce evidence of Ms. Alfaro's offer to plead guilty, evidence which would have concretely assisted her in her penalty phase defense, Ms. Alfaro's constitutional right to the effective assistance of counsel was violated and her death penalty must be reversed.

**D.     CONCLUSION**

15. When the trial judge granted the District Attorney's motion to exclude evidence of Ms. Alfaro's willingness to plead guilty on February 26, 1992, he suggested that he would be willing to reconsider his ruling if Mr. Monroe presented authority for the admissibility of this evidence. Four years earlier, this Court had ruled that the death penalty law does not preclude evidence of an offer to plead guilty in the penalty phase of a capital case when it tends to show remorse. Yet Mr. Monroe made no attempt to provide the court with either the facts or the law, both of which would have supported a ruling admitting the evidence. His failure deprived his client of concrete evidence of her remorse, a universally recognized mitigating circumstance. There is no imaginable tactical reason for Mr. Monroe's failure to introduce this evidence. His failure to inform the jury that Ms. Alfaro had been willing to accept responsibility for her crimes during the penalty phase fell below

135

1   accepted standards of practice.  Ms. Alfaro was not afforded effective assistance of

2   counsel.  Her Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated,

3   and as a result, her sentence must be reversed.

4        16.  The foregoing violations of Ms. Alfaro's constitutional rights are

5   prejudicial and warrant the granting of this Petition without any determination of

6   whether the violations substantially affected or influenced the jury's verdict.  *Kyles v.*

7   *Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (noting that

8   *Brady* violation, which has the same "reasonable probability" prejudice showing as

9   *Strickland*, is not subject to harmless error analysis under *Brecht v. Abrahamson*,

10  507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

11       17.  The constitutional violations set forth in this claim alone mandate relief

12  from the convictions and sentence.  However, even if these violations do not mandate

13  relief standing on their own, relief is required when this claim is considered together

14  with the additional constitutional errors outlined in the remainder of this Petition.

15  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

16  sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

17  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

18  Cir. 1978).

19

20                                  **VIII.**

21  **CLAIM 3:  ASSUMING PETITIONER WAS COMPETENT TO STAND**

22  **TRIAL, PETITIONER WAS DENIED HER RIGHT TO BE PRESENT**

23  **FOR ALL PROCEEDINGS IN HER CAPITAL TRIAL**

24       Petitioner's convictions and sentences were rendered in violation of her rights

25  to due process, a fair trial, equal protection, effective assistance of counsel,

26  confrontation and cross-examination, to present a defense, a reliable determination of

27  guilt, and to a reliable, individualized, and non-arbitrary death-penalty determination,

28  because she was denied the right to be present at all critical stages of the criminal

proceedings against her, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1. This claim has not been presented to the California Supreme Court.

2. Petitioner's right to be present at all proceedings in his capital trial was nonwaivable, and in any event, her purported waivers were not constitutionally valid. Petitioner's trial counsel performed below the standard of care, and to Petitioner's prejudice, because he permitted Petitioner to purport to waive her presence during the trial proceedings. To the extent that the rights violated were state-created, Petitioner had a substantial and legitimate expectation in that interest, and was arbitrarily deprived of that liberty interest. *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

4. The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner incorporates the above facts and alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

**A.     PETITIONER WAS ABSENT FROM CRITICAL STAGES OF HIS CAPITAL TRIAL PROCEEDINGS**

6. Petitioner was absent from critical stages of his capital proceedings, including, but not limited to, the following: An in-chambers proceeding held on March 3, 1992 (CT 444) and an in-chambers conference held on March 9, 1992 (CT 468).

137

1    **B.**     **PETITIONER'S ABSENCE FROM HER CAPITAL TRIAL REQUIRES**

2              **HABEAS RELIEF**

3         7.  Petitioner's absence from significant portions of the proceedings against her

4    violated her federal constitutional rights to be present at all stages of his criminal

5    trial.  *Illinois v. Allen*, 397 U.S. 337, 338 (1970).  Petitioner's personal presence at

6    critical stages of her capital case was nonwaivable and any such waiver by Petitioner

7    or her counsel violated Petitioner's constitutional rights.  *Bustamante v. Eyman*,

8    456 F.2d 269, 273-74 (9th Cir. 1972).  Even if Petitioner could waive her right to be

9    personally present at all critical stages of the proceedings, the record fails to establish

10   a constitutionally valid waiver to allow her to be absent.

11        8.  Further, Petitioner was incompetent to waive her rights and counsel could

12   not waive or stipulate away Petitioner's substantial and constitutional right to be

13   present during her capital trial.  On the face of the record, there was no specific and

14   clear explanation of the rights Petitioner would give up by her absence.  It cannot be

15   inferred that Petitioner's rights were adequately explained and understood with

16   respect to the proceedings at which she was not present.  Petitioner's waivers of her

17   presence were not knowingly and intelligently made, as Petitioner could not make a

18   valid and informed choice without an understanding of the rights being abandoned.

19        9.  Petitioner was prejudiced by her absence from critical stages of her capital

20   trial.  This error, when considered individually or cumulatively, cannot be said to be

21   harmless beyond a reasonable doubt, the State will be unable to meet its burden in

22   showing this error harmless and the error so infected the integrity of the proceedings

23   that it cannot be deemed harmless.   In any event, the violation of Petitioner's rights

24   had a substantial and injurious effect or influence on the guilt and penalty judgments,

25   rendering them fundamentally unfair and resulting in a miscarriage of justice.

26

27

28

## IX.

## CLAIM 4:  APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO ASSERT A VIABLE *BATSON* CLAIM ON APPEAL

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because appellate counsel failed to raise a viable *Batson* claim on appeal.

1.  Petitioner's appellate counsel did not raise a claim of her own ineffectiveness either on appeal or in state habeas (appellate counsel handled both proceedings).

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  Under the Sixth and Fourteenth Amendments to the United States Constitution, a state criminal defendant is guaranteed the right to counsel on a first appeal as of right. *Penson v. Ohio*, 488 U.S. 75, 79, 109 S. Ct. 346, 102 L. Ed. 2d 300 (1988); *Douglas v. California*, 372 U.S. 353, 83 S. Ct. 814, 9 L. Ed. 2d 811

eleven

(1963).[5]  The right to appellate representation necessarily entails the concomitant right to effective assistance of counsel.  *Evitts v. Lucey,* 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985).  Claims of ineffective assistance of appellate counsel are analyzed on the same basis as trial counsel.  *Smith v. Robbins,* 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).  To prevail on a claim of ineffective assistance of counsel, the petitioner must satisfy a two-pronged test:  (1) competency and (2) prejudice.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  The proper inquiry under the first prong is whether counsel's conduct fell below an objective standard of reasonableness, or was it outside the "wide range of professionally competent assistance."  *Strickland,* 466 U.S. at 694.  The second prong is satisfied by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.*

        6.  The responsibilities of appellate counsel "includ[e] the duty to prepare a legal brief containing citations to the transcript and appropriate authority[ ] and setting forth all arguable issues. . ."  *People v. Lang*, 11 Cal. 3d 134, 139, 520 P.2d 393, 396, 113 Cal. Rptr. 9, 12 (1974)  (citations omitted); *see People v. Scobie*, 36 Cal. App. 3d 97, 99, 111 Cal. Rptr. 600, 601 (1973); *People v. Feggans*, 67 Cal. 2d 444, 432 P.2d 21, 62 Cal. Rptr. 419 (1967).  This is consistent with American Bar Association Guidelines, which requires appellate counsel "to present to the appropriate court or courts all arguably meritorious issues . . ."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.9.3 (C), p. 126 (1989); *see Wiggins v. Smith*, 539 U.S. 510, 522, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (endorsing ABA standards as a benchmark for evaluating

---

[5]  A criminal appellant is not merely entitled to appellate counsel, he can actually be compelled to proceed on appeal with legal representation despite his protestations. *Martinez v. Court of Appeal*, 528 U.S. 152, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (concluding that there is no constitutional right to self-representation on appeal).

1   trial counsel's performance);  *Strickland,* 466 U.S. at 688-89 ("Prevailing norms

2   of practice as reflected in American Bar Association standards and the like . . . are

3   guides to determining what is reasonable").  At base, appellate counsel has an

4   obligation to raise all " crucial assignments of error, which arguably might have

5   resulted in reversal."  *People v. Rhoden*, 6 Cal. 3d 519, 524, 492 P.2d 1143,

6   99 Cal. Rptr. 751 (1972); *In re Smith*, 3 Cal. 3d 192, 202, 474 P.2d 969, 90 Cal. Rptr.

7   1, 7 (1970) (inexcusable failure of appellate counsel to raise crucial assignments of

8   error that arguably could have resulted in reversal deprived defendant of effective

9   assistance of appellate counsel).

10          7.  As set forth in Claim 4, appellate counsel provided ineffective assistance

11   by failing to allege the *Batson* claim.  First, appellate counsel's failure to include the

12   *Batson* claim constituted deficient performance.  There is no question that appellate

13   counsel was aware of the *Batson* issue, given that trial counsel had made a *Wheeler*

14   objection on the record.  Second, there is a reasonable probability that Alfaro would

15   have prevailed on the *Batson* claim had appellate counsel appealed.  Alfaro had met

16   her burden to establish a *prima facie* showing to raise an inference of racial animus.

17   Thus, had her claim been presented on appeal, there is a reasonable likelihood that the

18   California Supreme Court would have remanded the case for a full *Batson*/*Wheeler*

19   hearing.

20          8.  That the California Supreme Court had been applying an unduly onerous

21   *prima facie* showing at the time Alfaro's case was pending on appeal is irrelevant.

22   For purposes of evaluating prejudice, courts may not consider "idiosyncrasies of the

23   particular decisionmaker" but instead must "proceed under assumption that the

24   decisionmaker is reasonably, conscientiously, and impartially applying the standards

25   that govern the decision."  *Strickland*, 466 U.S. at 695.  Thus, the court must assume

26   the state court would have applied the constitutionally minimal standard under

27   *Batson*, which Alfaro clearly met.

28

141

9.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (noting that *Brady* violation, which has the same "reasonable probability" prejudice showing as *Strickland*, is not subject to harmless error analysis under *Brecht*, 507 U.S. at 638.

## X.

## CLAIM 5:  TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT AFTER THE PROSECUTOR STRUCK THE SECOND AND THIRD LATINO JURORS

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because trial counsel failed to object to the prosecutor's second and third strike of Latino jurors.

1.  Petitioner did not raise this claim on appeal or in her first state habeas petition.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

142

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  To establish ineffective assistance of counsel, a petitioner must establish the familiar two-pronged test:  (a) trial counsel's representation was deficient, falling "below an objective standard of reasonableness," and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688.

6.  It is beyond cavil that trial counsel's failure to object to the prosecutor's subsequent strikes of the Latino jurors was objectively unreasonable.  The failure to raise and adequately preserve a viable *Batson* motion constitutes ineffective assistance of counsel.  *See Davis v. Sec'y for the Dep' of Corr.*, 341 F.3d 1310, 1314 (11th Cir. 2003); *Gov't of Virgin Islands v. Forte*, 865 F.2d 59 (3rd Cir. 1989); *Hollis v. Davis*, 941 F.2d 1471 (11th Cir. 1991); *State v. Robertson*, 630 N.E.2d 422 (Ohio Ct. App. 1993).  Trial counsel's omission was particular egregious in this case.  First, trial counsel was well aware of his obligation to challenge potentially discriminatory strikes by the prosecutor, as evidence by his first *Wheeler* objection.  Second, trial counsel should have been alert to the prosecutor's discriminatory strikes, given the trial judge's expressed willingness to revisit the *Wheeler* motion in the event the prosecutor struck another Latino juror.

7.  Not only did the failure to raise the *Batson* issue constitute deficient performance, but had trial counsel asserted there is a reasonable probability that a motion would have been successful.  Because the strike of Sanchez ran counter "to accepted trial strategy," *Miller-El*, 123 S. Ct. at 1040, the prosecutor would have had a difficult time explaining his decision.  Even assuming *arguendo* that a subsequent *Batson* motion would have fallen on deaf ears and the motion ultimately denied, this is not fatal.  Just as a defendant has "no entitlement to the luck of a lawless decisionmaker," *Strickland*, 466 U.S. at 695, neither must she endure a lawless

143

1 decisionmaker who refuses to apply clearly established federal constitutional law.  At

2 a minimum, the issue would have been preserved for appeal.  Therefore, because

3 there is a reasonable probability of a different result had trial counsel objected to the

4 prosecutor's strike of two Latino jurors, the trial court would have granted the *Batson*

5 motion, Petitioner was denied effective assistance of counsel.

6      8.  The foregoing violations of Ms. Alfaro's constitutional rights constitute

7 structural error and warrants the granting of this Petition without any determination of

8 whether the violations substantially affected or influenced the jury's verdict.  *Kyles v.*

9 *Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (noting that

10 *Brady* violation, which has the same "reasonable probability" prejudice showing as

11 *Strickland*, is not subject to harmless error analysis under *Brecht*, 507 U.S. at 638.

12

13 **XI.**

14 **CLAIM 6:  THE PROSECUTION'S FAILURE TO PRODUCE**

15 **EXCULPATORY EVIDENCE AND THE PRESENTATION OF FALSE**

16 **TESTIMONY VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**

17      Petitioner's conviction and sentence of death were rendered in violation of her

18 rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

19 determination of guilt and penalty, to the effective assistance of counsel, to present

20 a defense, and to due process of law as guaranteed by the Fourth, Fifth, Sixth, Eighth

21 and Fourteenth Amendments to the United States Constitution because the

22 prosecution violated its duty to disclose exculpatory information, including, but

23 not limited to evidence harmful to the credibility of prosecution witnesses, and in

24 knowingly presenting perjured testimony (knowingly false or misleading testimony

25 by a law enforcement officer is imputed to the prosecution), allowing a witness

26 to give a false impression of the evidence to the jury and allowing false evidence

27 to go uncorrected.  The prosecution also violated its duty not to present false or

28

misleading testimony by offering opinion evidence that Petitioner acted alone in committing the murder.

1.  Exhaustion of the claim:  This claim was fairly presented as Claim 2 in the habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no. S099569.

2.  AEDPA:  The claim was rejected by an Order of the California Supreme Court dated November 18, 2007.  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858. The state court denied this claim without an opinion, and without affording Petitioner an evidentiary hearing, discovery, or any other means to further develop his claim. When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial was objectively unreasonable.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

145

1    5.  In support of this claim, Petitioner alleges the following facts, among others
2    to be presented after full discovery, investigation, adequate funding, access to this
3    Court's subpoena power, and an evidentiary hearing:

4    **A.    INTRODUCTION**

5    6.  Habeas relief is compelled because the state created false impressions
6    that were material in that the false testimony could, in reasonable likelihood, have
7    affected the judgment of the jury.  The record establishes a reasonable likelihood that
8    during deliberations the jurors considered false evidence and argument related to the
9    identity of the man who drove Ms. Alfaro to the Wallace home and his role in the
10   offenses as a result of the prosecution's misconduct, and that this had a prejudicial
11   impact on Ms. Alfaro.  Additionally, there is substantial evidence that key
12   prosecution witness Reynoso received a benefit from the prosecution in that his
13   parole was not revoked, despite evidence that he had violated its conditions, at the
14   request of Inspector Giffin, and that this was not disclosed to the defense.

15   7.  If Respondent disputes any of the facts alleged below, Petitioner requests
16   an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner
17   has been afforded discovery and the disclosure of material evidence by the State, the
18   use of this court's subpoena power, and the opportunity to investigate fully, counsel
19   requests an opportunity to supplement or amend this petition.

20   8.  The declarations and other exhibits filed with this petition, as well as the
21   allegations and facts set forth elsewhere in this petition, are hereby incorporated by
22   reference into this claim as though set forth in full.

23   **B.    LAW IN SUPPORT OF CLAIM**

24   9.  "[T]he suppression by the prosecution of evidence favorable to an accused
25   upon request violates due process where the evidence is material either to guilt or
26   to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.*
27   *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  In order to
28   prevail on a Brady claim, a petitioner must demonstrate that:  (1) "The evidence

at issue must be favorable to the accused, either because it is exculpatory, or because

it is impeaching," (2) "that evidence must have been suppressed by the State," and

(3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82,

119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *accord Jackson v. Brown*, 513 F.3d 1057,

1070-71 (9th Cir. 2008).

10.   A conviction obtained using knowingly perjured testimony violates due

process. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935).

The prohibition against the use of false testimony applies even when the testimony

in question was relevant only to the witness's credibility. *Napue v. Illinois*, 360 U.S.

264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  To prevail on a claim based on

*Mooney-Napue*, the petitioner must show "(1) the testimony (or evidence) was

actually false, (2) the prosecution knew or should have known that the testimony was

actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d

972, 984 (9th Cir. 2005) (en banc).

## C.   FACTS IN SUPPORT OF CLAIM

### 1.   The Prosecutor Failed to Disclose Exculpatory Evidence and Presented False Testimony Regarding Third-Party Culpability

11.   The prosecution fashioned its case entirely on the theory that Petitioner

was in the house alone and acted alone.  Consequently, any evidence raising a doubt

about whether someone else entered the house and was involved in the murder in

any way, including substantially dominating Ms. Alfaro or placing her under extreme

emotional duress, would have materially weakened the prosecution's penalty case and

materially strengthened the defense mitigation case. *See, e.g., Holmes v. South

Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (upholding

defendant's right to present evidence of third-party culpability).

12.   A review of the evidence leads to the conclusion that the investigators

knew the identity of the man who drove Ms. Alfaro to the Wallace home, but failed

to reveal his identity to the defense and, instead, took steps to mislead the jury about

147

this individual's role in the offense.  *See* Exhibit 1 (McGrath Declaration) at ¶¶ 2-65.
Because one of the State's investigators refused to submit to an interview with
Petitioner's state habeas investigator absent a court order, and the other told
Petitioner's state habeas investigator a story that was not credible, discovery is
warranted on this issue.  *Id.* at ¶¶ 64-65; Exhibit 50 (Email from Bale to McGrath).
However, while discovery will clearly strengthen Petitioner's claim, the conclusion
that the prosecution knew Torres-Graciano's identity as the driver can be drawn from
the following.

13.  During her videotaped statement, Ms. Alfaro told Giffin and Bale about
Manuel Torres-Graciano.  Giffin asked Ms. Alfaro who she stayed with at the
Princess Motel during the time period between the crime and her arrest, and she
responded,

> Ms. Alfaro:  The guy that sells.
>
> Giffin:  What's his name?
>
> Ms. Alfaro:  Manuel.
>
> Giffin:  Manuel what?
>
> Ms. Alfaro:  I don't know his last name. . . .  Manuel Flores
> something . . . it's a long name.

CT  585-87.  She told the investigators that she stayed with Manuel, the father of her
children, the first night, but then began staying with Manuel "Flores something . . .
It's a long name."  CT 586-87.  *See also* CT 565.  This interchange occurred after
Bale had stated to Ms. Alfaro:  "You know, we showed, we showed people your
picture around there they know you. . . . They know Manuel."  CT 582-83.

14.  In his notebook, Giffin indicated that on July 2, 1990, Juan Jimenez Garcia
told Giffin that Ms. Alfaro hung out at the next apartment house with a Mexican male
with a mole on his right nostril named Manuel.  Exhibit 44.  He said that on June 15,
1990, he saw Ms. Alfaro around noon with Reynoso, and that Manuel, "the dealer"
(*id.*), was in the area, standing in front of the apartments.  *Id.*

15.  The notebook indicates that Giffin also interviewed Isabelle Torres, Manuel Torres-Graciano's sister, living at 1536 S. Jeffrey # 3, on July 2, 1990.  She described Manuel Torres-Graciano as 5'5", and 170 pounds, and stated that he had recently been released from Los Angeles County jail (4-5 months prior).  She said that Manual "the dealer" knew Shorty.  Exhibit 44.  Without being asked, she stated that he had just left for the Nayarit area of Mexico.  *Id.*

16.  That afternoon, officers took two Polaroid photos from Ms. Torres and obtained the address of their mother in Nayarit, Mexico from her.  Exhibit 44.  Crucially, and in violation of the due process clause and Ms. Alfaro's right to a fair trial, these Polaroid photographs were not produced as discovery to the defense.  Nor were any photos of Torres Graciano shown to Reynoso when he was interviewed later that night (or at any time thereafter), despite the fact that Reynoso told investigators that he would recognize the driver if he saw him.  Exhibit 22 (transcript of investigator's interview with Reynoso); Exhibit 1 (McGrath Declaration) at ¶¶ 46-47.

17.  Also on July 2, 1990, detective Bale pasted a picture of Torres-Graciano in his investigative notebook.  Exhibit 49.

18.  During an interview on July 5, 1990, Sabrina Duran (who Juan Jimenez had told the investigators "shot-up" with Ms. Alfaro on June 15th (Exhibit 44)) identified Torres-Graciano as "Rosie's boyfriend" from the booking photograph pasted in Bale's book.  She told Bale that Ms. Alfaro stayed with him the week after the murder at various motels.  *Id.*  When asked if she had ever seen a Monte Carlo, she asked if it was a brown Monte Carlo.  Exhibit 48.

19.  Torres-Graciano had an August 1989 Orange County felony conviction for the possession or purchase for sale of a controlled substance.  He was given 36 months probation, served 45 days jail time, and was still on probation at the time of the offense.  Warrants were issued in Santa Ana for the possession of a controlled

149

1   substance for sale and a bench warrant was issued November 26, 1989 for training

2   animals for fighting.  Exhibit 36.

3       20.  Given all of the evidence the investigators had amassed concerning Torres-

4   Graciano's participation in the offenses, it is noteworthy that they failed to record any

5   information concerning Torres-Graciano in their November 7, 1990 "Investigative

6   Overview."  Exhibit 37.  The fact that they failed to pursue this line of investigation

7   while arguing to the jury, without cause, that the driver of the Monte Carlo played

8   no role in the offense, violated Ms. Alfaro's constitutional rights.

9       21.  Moreover, from what they did know about Torres Graciano -- that he was

10  nearly twice Ms. Alfaro's age; that he was a drinking buddy of her father; that he had

11  a criminal record and was on probation on June 15, 1990; that he was not only a drug

12  dealer, but *her* drug dealer; that he had been described as her "boyfriend;" and that

13  he fled to Mexico within days of her arrest -- they knew that he could provide

14  exculpatory evidence, at least with respect to the penalty phase.

15      22.  The prosecution further perverted the course of justice by calling Roberto

16  Frias Gonzalez as a witness at trial, knowing that the defense had erroneously

17  identified him as the driver (*see* RT 1944-49; 4256 (Middleton calls D.A. Investigator

18  Robert Harper to testify at penalty retrial as Robert Frias Gonzalez is not available)),

19  succeeding in prejudicing Ms. Alfaro in the eyes of the jury and creating the false

20  impression that there was no one with Ms. Alfaro inside the house on the day of the

21  crimes, when they clearly believed that this was not true.  *See* CT 534, 543, 554,

22  582, 600.

23      23.  The prosecution failed to show a photograph of Torres-Graciano

24  to Reynoso, leading to the inference that they did not want him to confirm Torres-

25  Graciano's identity as the driver, and thereby complicate their case, knowing that

26  Torres Graciano had fled to Mexico, and even if they could get him back, might

27  provide evidence that would assist Ms. Alfaro in the penalty phase.  Exhibit 1

28  (McGrath Declaration) at ¶ 47.  Additionally, because the prosecution knew that

Torres-Graciano and Reynoso knew one another, they knowingly presented perjured

testimony from Reynoso that he did not know the driver of the Monte Carlo. *Cf.*

Exhibit 44 (Isabel Torres tells Giffin that Torres Graciano knows Reynoso); *with*

RT 944-45, 3371 (Reynoso testifies he does not know the driver).

24. Investigator Giffin himself provided false testimony. Though he knew that

Manuel Torres-Graciano drove a brown Monte Carlo, he testified at the first trial as

follows: "Q: Did you ever locate the car that you believed was the one that was in

front of the house? A: Not that we know of. I don't believe so." RT 1145.

Regarding whether he believed another person had been involved, his testimony at

the two trials was not only false, it was inconsistent. At the guilt phase trial, he

testified: "Quite personally, I had a very difficult time believing that Rosie Alfaro

acting alone could have committed such an atrocious murder. But all the physical

evidence, all the witness statements, absolutely everything we found in the

investigation, including her confession, indicated to me that she did act alone.

Monroe: But you did suspect that she was trying to protect somebody else?"

A: "No." Q: "To cover for somebody else?" A: " . . . But after her confession, we

were looking at them as witnesses." RT 1156. In contrast, he testified at the second

penalty trial as follows: Q: "Did you have reason to believe during the course of

your interview that you thought Rosie Alfaro was covering up for someone?"

A: "Yes." Q: "You believe she was trying to protect somebody? A: Initially, yes."

Q: "Why did you feel that way, Detective Giffin?" A: "Initially it was my opinion

that so brutal a murder was not likely to have been committed by a female. As the

interview continued, Rosie's minute details and her knowledge and her recollection

of the crime scene, of the details of the murder, of her participation in it, led me to

believe that it was someone with firsthand knowledge of the murder, and she did in

fact commit the murder by herself." RT 3563. Notably, Ms. Alfaro's interrogation

took place on June 27, 1990. Bulletins issued by the Orange County Sheriff's

Department ("OCSD") on July 6, 1990, indicate that as of that date, the OCSD still considered the missing third person as a suspect.  *See* Exhibit 34.

25.  Moreover, Giffin's testimony that "all the physical evidence, all the witness statements, absolutely everything we found in the investigation, including her confession, indicated to me that she did act alone" was false.  During the interrogation on June 27, 1990, Giffin asked Ms. Alfaro whether she was sure nobody came into house, at which point she admitted that the man came inside, "right there by the door."  CT 534.  Later, she admitted that the man came all the way into the house, when she told the investigators that she believed he had taken the Wallace's microwave oven, located in their laundry room near the kitchen, to the car.  CT 543-44.  Giffin was also aware of Ms. Alfaro's testimony that she took the knife she used with her after wiping it with a towel, and knew that such a towel had in fact been found at the scene, as had a second knife.  *See* CT 546.  And finally, he was aware of at least one footprint found at the scene which could not be identified.  RT 3422.

## 2.   The Prosecutor Failed to Disclose and Presented False Testimony Regarding Regarding Impeachment Evidence of Reynoso

26.  In addition to the above, the prosecution failed to disclose to the defense that Reynoso had been granted a substantial benefit by the prosecution in exchange for his testimony.  Despite the fact that he had been out of custody only one week, after serving three years for drug trafficking at the time of the offenses, and despite the fact that he admitted being in the presence of drug users and drug sellers on the day of the offenses, his parole was not violated.  He was held in custody for approximately a week, and his home was subjected to a parole search, but he escaped what would otherwise have been a return to custody for several months at the request of the prosecution.  Exhibit 1 (McGrath Declaration) at ¶¶ 61-64.  Giffin admitted to Petitioner's investigator that it was possible that he or one of his colleagues asked Reynoso's parole officer not to violate him.  *Id.* at ¶ 63.  In fact, Giffin's notes, which

1   he had not looked at at the time he spoke to Mr. McGrath, indicate that on July 9,

2   1990, he did in fact contact Reynoso's parole agent, Mike Lewis.  Exhibit 44.

3   Mr. Lewis informed state habeas counsel's investigator that, although he had no

4   specific recollection of Ms. Alfaro's case, it was common for law enforcement

5   officers to contact parole agents and ask them not to revoke the parole of a valuable

6   witness, and that such requests would have been considered and granted in a high

7   profile case such as Ms. Alfaro's.  Exhibit 1 (McGrath Declaratiion) at ¶ 62.

8       27.  Based on the available evidence, it appears highly likely that Giffen

9   arranged for Reynoso's parole not to be revoked, and thereby gave a significant

10  benefit to Reynoso in exchange for his "cooperation."  Yet this fact appears not to

11  have been disclosed to the defense.  It does not appear in the discovery.  And it was

12  not brought out on cross-examination of Reynoso at trial, as it would have been by

13  any competent attorney, had it been known.  Should it emerge that this information

14  was disclosed to the defense pretrial, then Petitioner alleges that the failure to use this

15  highly potent impeachment material constitutes another instance of trial counsel's

16  incompetence as counsel.

17      28.  Despite Reynoso's admission during his July 2, 1990 interview with the

18  investigators that Ms. Alfaro had used drugs on June 15, 1990, and police interviews

19  with numerous other witnesses, including Juan Jimenez (*see, e.g.*, Exhibit 44), district

20  attorney Middleton elicited testimony from Reynoso at trial that Ms. Alfaro had not

21  used drugs, thereby perverting the course of justice.

22      29.  The constitutional violations set forth in this claim alone mandate relief

23  from the convictions and sentence.  However, even if these violations do not mandate

24  relief standing on their own, relief is required when this claim is considered together

25  with the additional constitutional errors outlined in the remainder of this Petition.

26  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

27  sentence.  *Jackson v. Brown,* 513 F.3d 1057, 1071-72 (9th Cir. 2008) (requiring the

28  prejudice from *Napue* and *Brady* violations to be analyzed cumulatively); *accord*

*Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (requiring the consideration of multiple constitutional violations collectively to determine whether harmless).

## XII.

## CLAIM 7:  THE DISTRICT ATTORNEY ENGAGED IN EGREGIOUS AND PERVASIVE MISCONDUCT THAT RENDERED MS. ALFARO'S PENALTY PHASE RETRIAL FUNDAMENTALLY UNFAIR

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecutor engaged in misconduct.

1.  Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 10 in the Opening Brief.

2.  AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use

154

1  of this court's subpoena power, and the opportunity to investigate fully, counsel

2  requests an opportunity to supplement or amend this petition.

3          4.  The declarations and other exhibits accompanying this petition, as well as

4  the allegations and facts set forth elsewhere in this petition, are hereby incorporated

5  by reference into this claim as though set forth in full.

6          5.  In support of this claim, Petitioner alleges the following facts, among others

7  to be presented after full discovery, investigation, adequate funding, access to this

8  Court's subpoena power, and an evidentiary hearing.

9  **A.    <u>INTRODUCTION</u>**

10         6.  After the first jury failed to unanimously agree on the death penalty, the

11  People opted to retry the penalty phase.  During the second penalty trial, Deputy

12  District Attorney Charles Middleton's determination to secure a death verdict caused

13  him to step out of the bounds of acceptable prosecutorial conduct.  His unethical and

14  deceptive behavior was so pervasive that it poisoned the proceeding, in violation of

15  Ms. Alfaro's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

16         7.  During voir dire, the district attorney misled the jury regarding its duty

17  to consider evidence in mitigation, telling the jurors that there was only "one side"

18  to the evidence they would be hearing.  During the evidentiary phase of the trial,

19  he intentionally elicited inadmissible evidence from witnesses about Ms. Alfaro's

20  prior non-felonious, non-violent criminal conduct and other "bad acts."  He

21  mischaracterized the evidence to suggest that Ms. Alfaro's description of being raped

22  as a child was coached and to paint her as a bad mother.  And he improperly asked

23  the coroner to comment on whether he thought Ms. Alfaro had possessed "intent

24  to kill."  During his closing argument, Mr. Middleton mischaracterized the law as

25  well as the evidence to confuse  jurors about their responsibility to weigh all of the

26  evidence and to encourage jurors to view mitigating circumstances as non-statutory

27  aggravating factors.  Some of his comments were clearly calculated to arouse the

28  passion and prejudice of the jury, and it is likely that they did so.   The cumulative

1  prejudice flowing from all of these instances of misconduct rendered Ms. Alfaro's

2  penalty hearing fundamentally unfair.[6]

3  **B.    LEGAL STANDARDS**

4       8.  It is well established that misconduct by a prosecuting attorney during

5  closing argument may be grounds for reversal.  *Berger v. United States*, 295 U.S. 78,

6  55 S. Ct. 629, 79 L. Ed. 1314 (1935).  A defendant's due process rights are violated

7  if prosecutorial misconduct renders a trial "fundamentally unfair." *Darden v.*

8  *Wainwright,* 477 U.S. 168, 183, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).  Courts

9  in federal habeas cases review claims of prosecutorial misconduct "to determine

10  whether the prosecutor's remarks 'so infected the trial with unfairness as to make the

11  resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U.S.

12  637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  In capital cases, the Eighth

13  Amendment is also violated where the prosecutors urges the jury to reach the

14  sentence determination based upon factors other than those it is instructed to

15  consider.  *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231

16  (1985); *Sandoval v. Calderon,* 241 F.3d 765 (9th Cir. 2000).  In evaluating habeas

17  challenges to comments by the prosecution, federal courts consider "(1) whether the

18  prosecutor's comments manipulated or misstated the evidence; (2) whether the trial

19  court gave a curative instruction; and (3) the weight of the evidence against the

20  accused." *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) .

21       9.  A prosecutor has the duty to guard against statements by his witnesses

22  containing inadmissible evidence.  *People v. Earp*, 20 Cal. 4th 826, 978 P.2d 154,

23  85 Cal. Rptr. 2d 857, 882 (1999) (quoting *People v. Warren*, 45 Cal. 3rd 471, 481-82,

24  754 P.2d 218 (1988)).  The well-settled principle is that evidence admitted in

25  aggravation in a death penalty case must be relevant to those factors set out in Penal

26  Code § 190.3.  *See People v. Welch*, 20 Cal. 4th 701, 976 P.2d 754, 85 Cal. Rptr. 2d

27  ──────────────

28       [6]  Where a proper objection was lodged and overruled we submit that the trial court erred as well, and address the trial court's errors in Section XIII, *supra.*

203, 241 (1999) (citing *People v. Boyd*, 38 Cal. 3d 762, 774 (1985)); *see also Ortiz v. Stewart*, 149 F. 3d 923, 94 (9th Cir. 1998) (a state court's arbitrary and capricious application of state law constitutes an independent due process or Eighth Amendment violation).  The prosecution may not introduce evidence of the defendant's alleged "bad character" in its case-in-chief unless the evidence bears on one of the enumerated aggravating factors.  *People v. Ramirez*, 50 Cal. 3d 1158, 1192  (1990) (explaining the *Boyd* decision); *see also People v. Millwee*, 18 Cal. 4th 96, 151-52, 954 P.2d 990 (1998) (negative references to defendant's character/personality are permissible only when based on evidence introduced in prosecutor's case-in-chief under sect. 190.3(a), (b), and (c)).  Evidence of nonviolent criminal activity that did not result in a felony conviction is inadmissible as an aggravating factor.  *People v. Visciotti*, 2 Cal. 4th 1, 72 (1992). And it is highly improper for a prosecutor to argue that defendant's clear record might only mean he did not get caught.  *People v. Ochoa*, 19 Cal. 4th 353, 466, 966 P.2d 442 (1998).  A prosecutor commits misconduct by intentionally eliciting inadmissible, irrelevant and improper testimony.  *See United States v. Chu*, 5 F. 3d 1244, 1250 (9th Cir. 1993);  *People v. Scott*, 15 Cal. 4th 1188, 1218 (1997).

10.  "When [a misconduct] claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the . . . remarks in an objectionable fashion." *People v. Smithey*, 20 Cal. 4th 936, 960 (1999) (quoting *People v. Samayoa*, 15 Cal. 4th 795, 841 (1997).  The cumulative effect of Mr. Middleton's misstatements, mischaracterizations and inflammatory comments prejudiced the jury and denied Ms. Alfaro her right to a fair trial.

/ / /

/ / /

**C.**     **THE PROSECUTOR ELICITED IMPROPER AGGRAVATING**
         **EVIDENCE AT THE SECOND PENALTY TRIAL**

**1.**     **Ms. Alfaro's Non-felonious, Non-violent Criminal Record Was**
           **Improperly Introduced**

11.   Penal Code § 190.3 provides that "[i]n determining the penalty, the trier of fact *shall* take into account any of the following factors if relevant."  (Pen. Code, §190.3.  Factors 190.3 (b) and (c) read as follows:

(b)     The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c)     The presence or absence of any prior felony conviction.

*Id.*

12.   Until her arrest in connection with this case, Ms. Alfaro had no felony record and no record of any criminal activity which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. CT 1756-58.

13.   The absence of qualifying past misconduct was potent, statutory, mitigating evidence.   But during the penalty retrial, Mr. Middleton unfairly deprived Ms. Alfaro of the weight of these mitigating factors by eliciting evidence of her non-felonious and non-violent criminal record.   He then converted this inadmissible evidence into a factor in aggravation that bolstered his case for death.   Both his introduction of prejudicial, inadmissible evidence at trial and his use of this evidence as a factor in aggravation were improper and highly prejudicial.

14.   Mr. Middleton did not just bring up Ms. Alfaro's inadmissible "criminal record" once.   He brought it up several times.   On most occasions he asked questions that appeared innocuous, but that he had to have known would elicit damaging, inadmissible evidence.   For example, during Investigator Giffin's testimony, Mr. Middleton asked the investigator about his first contact with Ms. Alfaro; notably,

a question having little to no relevance to the case. "[I] received information from Doug Lucas, who's previously testified, that he had obtained a Cal. I.D. hit," the investigator said. Obviously aware of what the investigator was referring to, Mr. Middleton charged on: "Was that -- a hit, what do you mean?," he asked. RT 3537. Mr. Giffin's response: "It's a computerized fingerprint system in the state of California that has in its data base *people that have been arrested in the state of California*. And when an unknown fingerprint is entered into the base, it compares the points of identification with the known fingerprints in the data base, and it puts out a list of potential matches." RT 3537 (emphasis added). Investigator Giffin went on to explain that after learning of the match between a fingerprint contained in the data base and a print lifted from the victim's bathroom, he contacted Ms. Alfaro. RT 3538. The unavoidable inference of his testimony was that Ms. Alfaro had an arrest record.

15. Mr. Middleton was able to further impress the jury with Ms. Alfaro's criminal record during his cross-examination of defense "psychosocial" expert Dr. Armando Morales. Again, Mr. Middleton's question *appeared* innocuous. He asked: "What did you review in this case before talking to any of the family members or Rosie Alfaro?" RT 3980. But Mr. Middleton, who had been provided with the documents Dr. Morales had reviewed before trial, knew that his question was far from harmless. Dr. Morales' response:

> I saw some reports from places where she had been hospitalized for her drug problems when she was thirteen or fourteen years of age or fifteen years of age. *I saw a juvenile court report, probation report. . . .*

RT 3980.

16. Later in Dr. Morales' testimony, Mr. Middleton deviously elicited additional evidence of Ms. Alfaro's criminal past. Although Dr. Morales had not testified on direct that he believed or did not believe that Ms. Alfaro was suffering from antisocial personality disorder, and the defense objected to the questions for this reason, the court permitted Mr. Middleton to proceed. RT 3999. Reading from his

own copy of the DSM-III-R, Mr. Middleton asked Dr. Morales to apply the standard diagnostic criteria for this disorder to Ms. Alfaro.  RT 3994-4001. When he reached the criterion "often initiating physical fights," and the doctor stated that this did not apply to Ms. Alfaro, Mr. Middleton prodded, "do you know for sure you have got that or not?"  RT 4001.  In order to respond, the doctor was required once again to describe the criminal records he had reviewed; this time providing even more damaging evidence:  "Based on the police reports, police records I have seen, she had an arrest for I believe theft.  Other than the present offense."  RT 4001.  The prosecutor now brought before the jury evidence of an inadmissible criminal record. Not yet satisfied that he brought the full effect of this evidence to the jury's attention, Mr. Middleton hammered the point, responding:

> Is that all you looked for, *you just look at police reports of people caught doing something* before you determine if there was physical fights in somebody's background?

*Id*.  At this point defense counsel renewed his objection, but again, it was overruled. *Id.*  Mr. Middleton took this as a cue he should press on, and he did, asking: "Did you ask the family if she had any physical fights during that period of time?"  *Id*. Dr. Morales' response: "[Ms. Alfaro] had been in a couple of fights.  But when you are poor inner city and poor minority communities, at times one has to become involved in physical fights."  *Id*.  Again, Mr. Monroe's objection was overruled. RT 4002.  And again, this caused Mr. Middleton to go further still, eliciting evidence that improperly (and completely incorrectly) suggested that Ms. Alfaro had something to do with *gangs*:

> Q: We're talking about Anaheim, Orange County, now.  Now is the Anaheim, Orange County, the epitome of inner city dwelling like you know it up in L.A.?

> A: There are little pockets of barrios where you have a certain amount of criminal activity, drug activity, and gang activity.  You have about eighteen gangs in this particular area.  And I'm sure some of these gangs are involved in conflict and fighting and so forth.  So what I'm saying is in certain areas fighting is not uncommon in some of the poor minority areas.

1  RT 4002.

2     17.   When Mr. Middleton got to the "anti-social personality disorder" criterion

3  "fire-setting," he was able to reinforce his point, this time leading Dr. Morales to

4  reference not just Ms. Alfaro's arrest record, but to suggest that she had a record of

5  criminal convictions as well:  "I did not find that in any of the police reports . . . *or*

6  *probation evaluations*."  RT 4004.  Mr. Middleton was again able to reinforce his

7  case in aggravation when he questioned Dr. Morales about the criterion:  "Is reckless

8  regarding his or her own or others' personal safety, as indicated by driving while

9  intoxicated, or recurrent speeding."  RT 4010.  When Dr. Morales testified that Ms.

10  Alfaro did not meet this criterion, Mr. Middleton responded, "No?  Did you see on

11  that survey Dr. Rogers did where she indicates that she often drove while

12  intoxicated?"  *Id*.  Once again, the defense attorney's objection was overruled

13  (RT 4011) and Mr. Middleton continued; this time turning Ms. Alfaro's *lack*

14  of a more extensive criminal record into a factor in aggravation.  In response to

15  Dr. Morales' statement that he had concluded Ms. Alfaro did not fit the diagnostic

16  criterion because he "did not come across any history of traffic violations or citations

17  or drunk driving offenses or things of that nature," Mr. Middleton exploded,  "But

18  that's where the police catch her, right?"  RT 4011.

19     18.   During his closing argument, Mr. Middleton told the jury that statutory

20  aggravating factors relating to prior felony convictions and prior violent conduct are

21  not applicable here.  But he said nothing about juvenile and uncharged crimes.  RT

22  4317-18.  And he certainly did not clarify or concede that these factors should be

23  weighed in mitigation.  There is a likelihood that the jurors were misled to consider

24  this evidence in aggravation.  If the prosecutor did not think there was, he would not

25  have worked so hard to get it before them.

26  / / /

27  / / /

28

1

### 2.   Mr. Middleton Improperly Introduced Other Inadmissible

2

### "Bad Acts" Evidence

3

19.  Not satisfied with the evidence described above, Mr. Middleton inflamed

4

the jury with inadmissible evidence that Ms. Alfaro had been a bad mother.  He asked

5

Dr. Morales:

6

> Were you aware of the fact that she had -- she would have Danny be -- or
> Manny.  Let's go to Manny.  Have Manny be babysat by ex-cons, drug

7

> addicts and --

8

RT 4008.  This time even Judge Millard thought Mr. Middleton had gone too far, and

9

sustained defense counsel's objection.  *Id*.  But the damage was done.

10

### 3.   Mr. Middleton Improperly Argued Lack of Remorse

11

20.  In his opening statement at the penalty retrial, Mr. Middleton argued,

12

"Miss Alfaro has not accepted any responsibility.  That's what the evidence will

13

show."  RT 3179.  In his closing argument, Mr. Middleton's comments about remorse

14

went further, amounting to an invitation to the jury to consider absence of remorse a

15

factor in aggravation of the offense, in clear violation of the law.

16

21.  First, Mr. Middleton listed "no remorse" as one of the facts and

17

circumstances of the crime that required a death sentence.  RT 4331.  Later, he

18

expanded on this theme:

19

> Remorse, Ladies and Gentlemen?  (¶)The video shows it, but look at this
> for a moment.  Don't look at the inconsistencies, but look at the

20

> consistencies. (¶) The night of the crime she's there, not shedding a tear,
> acting inquisitive and just -- just fine. (¶)  The audio tape, "I don't know
> anything about it," acting just fine.  She's not buckling under the heavy

21

> weight of knowledge of what she did to that little child.  Not one tear,
> not one tear. (¶) Until you're under arrest for murder.  Now all of the

22

> sudden the well springs.  It just goes. (¶)  Ladies and Gentlemen, that
> remorse was not for her, that little girl.  That remorse was for the plight

23

> of Rosie Alfaro only. . . . (¶) But actions speak louder than words.  The
> only remorse she has is for sitting in jail for what she's done. . . . (¶) She

24

> chose her bed; let her lie in it.

25

RT 4367-68.  These statements were not made during Mr. Middleton's attack on the

26

"weak" evidence presented in mitigation.  They were made while he was in the

27

process of describing whether the death penalty was appropriate for this murder given

28

the facts in aggravation.  RT 4359.  In this context, his argument was grossly

162

1  improper.  *See People v. Williams,* 16 Cal. 4th 153, 254, 940 P.2d 710 (1997) (lack
2  of remorse may not be considered by jury as a factor in aggravation).

3  **4.    Mr. Middleton Improperly Attempted to Introduce Evidence**
4  **of Intent To Kill**

5  22.  A prosecutor's question seeking to elicit an expert's conclusion on the
6  defendant's intent is misconduct.  *See People* v. *Smithey,* 20 Cal. 4th 936, 960 (1999).
7  Mr. Middleton elicited precisely such an impermissible legal conclusion from his
8  own expert in this case on the crucial issue of Ms. Alfaro's intent *to kill*.  On redirect
9  of the coroner, Mr. Middleton asked the coroner: "I think you would agree with me
10 that if somebody were to stab somebody else just in the heart area a multiplicity of
11 times, it would go toward their state of mind as far as whether they intended to kill?"
12 RT 3285.  Over defense counsel's objection, the coroner was permitted to respond:
13 "If the intent is to cause major damage, one would probably attempt to direct attention
14 to the more vulnerable area."  *Id*.

15 23.  Although Mr. Middleton asked his question about "intent to kill" during
16 the penalty and not the guilt phase of the trial, the question was nevertheless
17 improper.  The only aggravating factor offered by the prosecution in support of a
18 death sentence was the nature and circumstances of the crime itself.  As defense
19 counsel's objection to this question noted, there was no supporting factual foundation
20 justifying an intent to kill here.  Soliciting the coroner's opinion of intent from the
21 crime itself was simply an impermissible attempt to bolster, without evidentiary
22 support, the jury's sense that the only aggravating factor present in this case
23 warranted the death penalty.

24 **5.    Mr. Middleton Improperly Suggested that Ms. Alfaro Had Been**
25 **"Coaxed" To Tell the Jury About Being Raped as a Child and**
26 **Improperly Denigrated the Defense Experts**

27 24.  During his cross-examination of Dr. Morales, Mr. Middleton improperly
28 indicated that Ms. Alfaro had been "coaxed," or coached, to give a false story that she

163

had been raped as a child by one of her father's friends.  RT 4021.  Mr. Middleton

could point to no evidence that suggested Ms. Alfaro was lying about being raped as

a child, and the trial court sustained the defense attorney's objection.  *Id.*

Nevertheless, Mr. Middleton continued in his closing argument, without evidentiary

support, to insinuate that the defense experts were deceitful.  Stated Mr. Middleton:

"It's a big game, these [defense] experts."  RT 4333.  Even though the court sustained

defense counsel's objection to this comment, Mr. Middleton continued to denigrate

the defense's experts merely because they did not rely on evidence Mr. Middleton

wanted them to in forming their conclusions:

> Ladies and Gentlemen, I couldn't think of anything to call this kind of --
> the testimony that you heard other than a fact that there -- it appeared
> that there was some kind of deceit going on.  (¶) What's going on here,
> Ladies and Gentlemen?  A little sleight of hand?

RT 4333-34, 4341.  He later implied that Ms. Alfaro's accomplice defense only arose

once "she ha[d] a defense team."  RT 4362.  These comments were highly improper.

*See United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999) (prosecutor

commits misconduct in denigrating defense as a sham); *People* v. *Earp*, 85 Cal. Rptr.

2d 857, 880 (1999) (a prosecutor's suggestion that defense counsel fabricated the

defense is misconduct when there is no evidence to support that claim); *People v.

Hill,* 17 Cal. 4th 800, 823, 952 P.2d 673 (1998) (although prosecutors have latitude to

draw inferences from the evidence, mischaracterizing the evidence is misconduct).

## D.    THE PROSECUTOR MISCHARACTERIZED THE LAW

25.  During voir dire, Mr. Middleton misstated the law of mitigation in an

apparent effort to confuse jurors.  One juror opined that a justification defense would

change her mind about imposing a death sentence for a premeditated murder.  Instead

of clarifying what "mitigation" means, Mr. Middleton provided this erroneous

response: "But just you're coming out with if they had a reason, that's mitigation.

You see, you're already looking -- not knowing it, but you're already looking at the

other side of the equation, you're looking at the mitigation side.  If there was a reason

for doing it, that would be mitigation." RT 2618. As if he had not already confused the potential jurors enough, Mr. Middleton went on to say that he was just presuming that another "side to the equation" existed. There really is not another side at all.[7]

26. Mr. Middleton did not stop there, however. He also built his closing argument on an improper analogy designed to confuse and mislead the jury as to its responsibility to *weigh* all the evidence in reaching its decision on an appropriate punishment. The analogy was that of a "steel-reinforced, double-thick block wall with cement poured into the open areas." RT 4333. That wall, Mr. Middleton told the jury, represented the circumstances of the crime itself, the only aggravating factor. He told the jury that it was the defense's responsibility to "penetrate" that block wall with persuasive mitigating evidence. *Id*. As to the mitigating circumstance of age, he said, "Sure the defense could use that to try to penetrate that block wall." RT 4338. Dr. Morales' theory, in failing to consider the MMPI test results, "runs up to a block wall." RT 4342. Nor did Ms. Alfaro's drug use or her four children penetrate the wall. RT 4357-58, 4370. "In fact," Mr. Middleton concluded, "take it all together, everything the defense throws at you, and see how much of a deflection, see how much of even maybe a chipping away of that block wall might occur." RT 4371.

27. This analogy was designed to mislead the jurors into failing to properly weigh the aggravating and mitigating circumstances against each other, and to conclude that the aggravating circumstance must *substantially outweigh* the mitigating ones. Although Mr. Middleton said he was not claiming that the defense had the burden of proof, that is precisely what his analogy had done. Mr. Middleton

---

[7]    JUROR: I think there are two sides to every situation and I rarely make a decision -- I can't remember making a decision without hearing two sides.

MR. MIDDLETON: What if there isn't another side to the story?

RT 2670. The trial court overruled defense counsel's objection that Mr. Middleton's remarks were intended to prejudge the evidence. *Id*.

1   implied that one aggravating circumstance of this crime (which was all he had to

2   work with) already justified a death sentence, and that the defense had to convince

3   the jury that the mitigating evidence was sufficient to chip away at that *fait accompli*.

4   This suggestion misrepresented the law and the jury's responsibility in this

5   proceeding.  *See Hill*, 17 Cal. 4th at 829 (it is misconduct for the prosecutor to

6   misstate the law, including absolving itself of its evidentiary burdens).

7   **E.      THE PROSECUTOR INFLAMED THE JURY'S PASSIONS**

8          28.  Mr. Middleton committed misconduct at the end of his closing argument

9   in making comments calculated to arouse the passion or prejudice of the jury.  *See*

10  *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999).  Mr. Middleton urged

11  jurors to view the defendant, not as an individual accused of a crime, but as an

12  embodiment of all their fears for their children's safety:

> You saw every parent's nightmare, Ladies and Gentlemen.  Think of the times that you call home to your child, "I'm coming home from work" or whatever, and maybe that fleeting thought "will this be the last time I see my child, are you doing things okay," and then hang up.  (¶) Think of the things you see about the child molesters, the different things that occur in our society, and you can think of every parent's nightmare. (¶) That's what you have in this case.  (¶) Now, the very — one segment of our society that we cherish the most is our children.  That's the one segment of our society.  They're going to grow.  They have minds like little sponges.
>
> Ladies and Gentleman, this is what Maria Alfaro saw when she knocked on the front door that day.  That's what she saw (holding up photograph of Autumn Wallace).  (¶) This is what she saw when she left (holding up crime scene photograph).

21  RT 4371-72.  The inflammatory remarks clearly were improper appeals to the jurors'

22  emotions and to the community's fears that by rejecting a death sentence they reject

23  their children's future.  As the Ninth Circuit has explained:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values. . . .  The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence.  Jurors may be persuaded by such appeals that, by convicting a defendant, they will assist in the solution of some pressing social problem.

*Leon-Reyes*, 177 F.3d at 822 (citations omitted).

166

1      29.  Likewise, display of the photograph of Autumn in life did not depict the

2  circumstances of the crime and was "wholly irrelevant" to the sentencing

3  determination.  The prosecutor simply utilized the photograph to support an improper

4  emotional appeal.

5  **F.    THE CUMULATIVE PREJUDICE OF THE PROSECUTOR'S**

6  **MISCONDUCT REQUIRES REVERSAL OF MS. ALFARO'S**

7  **SENTENCE**

8      30.  The district attorney engaged in a pervasive pattern of misconduct that

9  rendered Ms. Alfaro's penalty hearing fundamentally unfair.  *See Donnelly v.*

10  *DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)

11  (prosecutorial misconduct may so infect trial with unfairness as to make the resulting

12  conviction a denial of due process; *see also United States v. Bagley*, 473 U.S. 667,

13  676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (due process violation if the

14  prosecutorial misconduct of sufficient significance to result in denial of defendant's

15  right to fair trial).  He committed misconduct numerous times by eliciting improper

16  evidence of Ms. Alfaro's prior non-felonious, non-violent conduct for no other

17  apparent purpose than to prejudice her case for life imprisonment.  He committed

18  misconduct by turning her evidence of remorse into an aggravating factor.  He

19  committed misconduct by attempting to elicit an opinion from the coroner about Ms.

20  Alfaro's state of mind.  He committed misconduct by insinuating several times that

21  Ms. Alfaro and the experts who testified on her behalf had fabricated their evidence

22  and conclusions.  He committed misconduct by mischaracterizing the law of

23  mitigation during voir dire and his closing argument so as to confuse the jury about

24  its responsibility to weigh the evidence.  He committed misconduct by urging jurors

25  to sentence Ms. Alfaro to death to protect their children and by showing photographs

26  designed to arouse the jury's passions.

27  / / /

28

31.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

32.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XIII.

## CLAIM 8:  THE PROSECUTION ENGAGED IN REPEATED MISCONDUCT THROUGHOUT ALL PHASES OF PETITIONER'S TRIAL

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, to present a defense, equal protection, a fair and impartial jury, to the effective assistance of counsel, and to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

because the prosecution committed gross and repeated misconduct throughout all stages of Petitioner's trial.

1.  This claim has not been brought before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

5.  The prosecution and/or its agents, officials, assigns, employees, including but not limited to all personnel, both current and those personnel employed at the time of Petitioner's trial, and at any intervening time period, in the Office of Orange County District Attorney and the Orange County Sheriff's Department ("State attorneys and law enforcement"), all other police departments and/or sheriffs departments in the Anaheim area:

a.  Failed to disclose relevant, material exculpatory files, materials, information, documents, and/or evidence, during all phases of the pre-trial, trial, and appellate proceedings, and continues at this time to fail to disclose all such files, materials, information, documents, and/or evidence.

b.  Engaged in repeated acts of misconduct throughout all phases of the pre-trial, trial, and appellate proceedings, and continue at this time to engage in such misconduct, both by failing to disclose relevant, material exculpatory files, documents, information, materials, and/or evidence, and by relying upon and/or

presenting information, statements, arguments, assertions, etc., to the defense, the court, and/or the jury, that the prosecution knew and/or should have known was false.

c.  Engaged in repeated acts of misconduct throughout all phases of the pre-trial, trial, and appellate proceedings, and continues at this time to engage in such misconduct, by failing to disclose relevant, material exculpatory files, documents, information, materials, and/or evidence, regarding acts of misconduct by members of the jury venire, the actual jurors, and/or the alternate jurors.

d. Engaged in repeated acts of misconduct throughout all phases of the pre-trial, trial, and appellate proceedings, and continues at this time to engage in such misconduct, by failing to disclose relevant, material exculpatory files, documents, information, materials, and/or evidence, regarding acts of misconduct by the trial court and/or its officials, employees, agents and/or assigns.

e.  Knowingly relied upon perjured testimony, both during pre-trial proceedings in presenting evidence in defense against defense motions, as well as during all phases of the trial, and during the hearing on the motion for new trial, which testimony was false and said prosecution knew and/or had reason to believe and/or should have known that such testimony was false.

f.  Knowingly presented and relied upon testimony, both during pre-trial proceedings in presenting evidence in defense against defense motions, as well as during all phases of the trial, and during the hearing on the motion for new trial, in which witnesses falsely testified about any possible deals, benefits, proceeds, or other inducements they had received, expected to receive, and/or did in fact receive in exchange for such testimony.

g.  Engaged in misconduct that denied Petitioner her right to a fair trial, including eliciting improper or false testimony and making improper arguments to the jury.  This misconduct also included reliance upon impermissible factors such as race and socio-economic class in selecting this case for prosecution as a capital case.

h.  Allowed its witnesses -- either knowingly or negligently -- to convey a false impression to the jury, and there is a reasonable likelihood that the false impression could have affected the jury.  *Giglio v. United States*, 405 U.S. 150 (1972).  Regardless of whether the prosecution knew or should have known that it was presenting false evidence, the mere presentation of such evidence and the jury's reliance upon such evidence deprived Petitioner of due process.  *Sanders v. Sullivan*, 863 F.2d 218, 244 (2d Cir. 1988).

6.  In closing argument, the prosecution made a series of improper, misleading, unlawful, inaccurate and inadmissible comments and arguments.  For example,  it was constitutionally improper for the prosecution to comment on the Petitioner's failure to waive her privilege against self-incrimination during trial.  *Griffin v. Cal.*, 380 U.S. 609 (1965).  There can be no such "penalty imposed … for exercising constitutional privileges…."  *Griffin*, 380 U.S. at 614.  Furthermore, the prosecution's closing argument also contained comments that denigrated the jurors' right to exercise mercy in violation of *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837 (1987).  During argument the prosecutor also argued facts not in evidence and improperly offered his own personal opinion about the evidence and the proper outcome.

7.  It has long been held that a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict.  *United States v. Bagley*, 473 U.S. 667, 679, n. 9, (1985); *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), *Napue v. Ill.*, 360 U.S. 264, (1959).  This standard is equivalent to the "harmless beyond a reasonable doubt" standard.  *Chapman*, 386 U.S. at 24.

8.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition.

1    Cumulatively, these errors mandate relief from Petitioner's convictions and sentence.

2    *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d

3    614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

4          9.  The foregoing violations of Petitioner's constitutional rights constitute

5    structural error and warrants the granting of this petition without any determination

6    of whether the violations substantially affected or influenced the jury's verdict.

7    *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies

8    to this claim, the foregoing constitutional violations so infected the integrity of the

9    proceedings that the error cannot be deemed harmless. The foregoing violation

10   of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's

11   convictions and sentence, rendering them fundamentally unfair and resulting in a

12   miscarriage of justice. These errors, both singularly and collectively, so infected the

13   integrity of the proceedings that it cannot be deemed harmless and the State will be

14   unable to meet its burden in showing this error harmless.  In any event, the violation

15   of Petitioner's rights in this regard had a substantial and injurious effect or influence

16   on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally

17   unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner

18   respectfully requests that his petition be granted.

19

20                                     **XIV.**

21   **CLAIM 9:  THE PROSECUTOR VIOLATED THE EQUAL PROTECTION**

22        **CLAUSE BY EXERCISING PEREMPTORY CHALLENGES BASED**

23            **UPON A RACIALLY DISCRIMINATORY MOTIVE**

24          Petitioner's conviction, confinement and sentence of death are illegal

25   and unconstitutional under the Fifth, Sixth, Eighth and Fourteenth Amendments

26   to the United States Constitution due to the prosecutor exercising peremptory strikes

27   against jurors based upon a racially discriminatory purpose.

28

                                        172

1.  Petitioner presented this claim at trial, but her appellate counsel did not raise the issue on appeal.  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

## A.      FACTS IN SUPPORT OF THIS CLAIM

5.  On March 3, 1992, jury selection began. On March 3, 1992, jury selection began as selected prospective jurors assembled in Judge Millard's courtroom.[8]  After

_____

[8]  Apparently, the entire venire first assembled in a jury assembly room and assigned panel and juror numbers, and randomly selected veniremen were then called by panel and juror number from the assembly room to Judge Millard's courtroom, where they sat throughout the courtroom in both the jury box and the spectator section.  However, the record does not show as to whether prospective jurors were required to sit in assigned areas or whether prospective jurors were free to sit where they chose.  Petitioner attempted to acquire a list of the entire assembly room venire and a list of those selected for Judge Millard's courtroom, along any instructions or documents regarding the general procedures regarding jury selection, but was told by the Orange County Court Commissioner that any lists or documents regarding the venire were destroyed years ago.

all these prospective jurors were sworn *en masse*, Judge Millard began the hardship portion of voir dire by explaining how long the trial was expected to last and what generally constituted good cause to be excused from serving as a juror due to undue hardship.  RT 3-9.  Then, beginning with the prospective jurors sitting in the jury box, Judge Millard requested that any juror who believed they could not serve to approach the podium and state his or her reasons. RT 9.  This process then repeated on a row by row basis for the prospective jurors sitting in the spectator section. RT 18.  Excused jurors were asked to report back to the jury assembly room.  RT 12.  Hardship voir dire was essentially voluntary, those prospective jurors who felt they could not serve were encouraged to come forward, but not everyone felt as thought they had good cause to be excused due to undue hardship, so not everyone participated.[9]

6.  After prospective jurors were screened regarding hardship, the Clerk then called the names of the first 12 prospective jurors to be questioned by the Court and requested that they sit in the jury box.[10]  RT 56.  The Court asked more substantive questions and whenever one of the 12 prospective jury-box jurors was excused either by the Court for cause, challenged by counsel and excused for cause, or excused after a peremptory challenge, another from the spectator section was called as a replacement and sat in the jury box.  *See*, *e.g.*, RT 83-84.  This process repeated until 12 jurors and four alternates were seated and accepted by counsel.  In total, and excluding those prospective jurors excused due to hardship, 64 prospective jurors were seated in the jury box and questioned by the Court for the first trial. Only four

---

[9]  A typical exchange occurred as follows:

THE COURT: All right. You would be excused, sir.  If you would report back to -- pick up your card and report back to jury assembly room.  Anyone else in the jury box? Yes, ma'am, what panel are you on?  RT 12.

[10]  It is assumed, but record does not conclusively show that those prospective jurors remaining in the jury box at the end of the hardship voir dire were asked to leave the jury box and sit in the spectator area.  It is assumed they were either asked or not allowed to return to the jury  after the 15 minute recess, the jury box was empty when the first 12 prospective jurors were called and substantive voir dire began. RT 54-56.

were Latino or had Spanish surnames.  Another 67 prospective jurors were questioned for the penalty phase retrial, and only five prospective jurors were Latino or had Spanish surnames.  Of a total of nine jurors, the Court excused two jurors for cause (one juror in the first trial had an out-of-court conversation with another juror, and one in the retrial was excused for bias because his wife worked for the Anaheim Police) and two were excused for hardship (one each in the first and second trials).  One Latino sat as a primary juror in the first trial, and another sat as an alternate on the penalty phase retrial.  The prosecutor struck a total of three Latino jurors.

### 1.    **Richard Sanchez**

7.  Richard Sanchez was Juror No. 20 on Panel No. 116.  RT 56.  Other than his common ethnicity with Ms. Alfaro, there was nothing about Mr. Sanchez that would have concerned the prosecutor.

8.  Consistent with the judge's treatment of other jurors, Mr. Sanchez was subject to court-directed voir dire in a group setting.  As set forth in the chart below, the vast majority of questions prompted only a "Yes" or "No" response, all of which Mr. Sanchez answered to the satisfaction of the People:

| Judge's Question | Sanchez's answer |
| --- | --- |
| So you would be able, in so far as the first phase of the trial, in determining whether or not the defendant was guilty of first degree murder or not guilty, for example – you wouldn't allow your feelings about the death penalty to have any bearing on that? RT 80-81 | No.  RT 81. |
| Do you, to your knowledge, have any co-workers, friends, or any relatives that have expressed to you strong feelings about the death penalty either for or against it at all? RT 91. | No. RT 91. |

175

| | |
|---|---|
| The second question is assuming you were convinced it was first degree murder and assuming the special circumstances were true, one or both of them were true, would you in effect have any hesitation in making that finding, knowing that if you do, you're going to go into the penalty phase of the trial merely because of your beliefs about capital punishment.  RT 108-09 | No. RT 110. |
| And the question is, assume we're in that penalty phase of trial, would you, because of any views you have concerning the death penalty or capital punishment, automatically refuse to vote in favor of the death penalty regardless of the evidence that might be developed during the penalty phase of the trial?  RT 116-17 | No.  RT 117. |
| Would you, because of any views that you may have concerning the death penalty or capital punishment, automatically vote in favor of the death penalty and automatically refuse to vote in favor of life imprisonment without possibility of parole regardless of what the evidence in the case may show?  RT 121. | No. RT 121. |
| Anybody feel that there has to be -- you would require multiple victims in a case before you would consider the death penalty? Any of you have any moral, religious, or  philosophical views that might affect your jury deliberations on the death penalty? RT 124. | No. RT 125. |
| Do you have any particular age in mind under which you would never -- you would think somebody should never receive the death penalty?  RT 128 | No. RT 128. |
| The question is would you require somebody to have a past history of violence before you would consider the death penalty. RT 129-30. | No. RT 130. |

| | |
|---|---|
| Do any of you believe that the state should never execute a woman no matter how vicious or cruel the crime is that she may have committed?  RT 131. | No. RT 131. |
| Do any of you feel in all honesty that you would find it more difficult to vote to impose a death penalty in a case where the defendant is a Mexican-<br>American other than where the defendant was white or Caucasian?  RT 133 | No. RT 133. |
| Do any of you feel that you would find it less  difficult to vote to impose the death penalty in a case were the defendant is a Mexican-American as opposed to a case where the defendant is white?  RT 135. | No. RT 136. |
| Would you in your own mind feel that they should have to prove that the death penalty is not appropriate?  RT 142. | No. RT 142. |
| Do you feel that because of your sympathetic or compassionate nature, if you should have one,  that you would always vote against imposing the death penalty no matter what the evidence in the case shows? RT 143-44. | No. RT 144. |
| Your family, close friends to your knowledge have any contact with drugs or special knowledge of drugs, is there anyone else in the jury box who would answer that yes?  RT 146. | No. RT 146. |
| Would any of you be more inclined to vote for the death penalty, in favor of the death penalty, rather than life without possibility of parole, assuming the jury gets through the first phase and finds the defendant guilty of first degree murder and the special circumstances, because you believe the cost of maintaining a person for the rest of their life in state prison is too costly or an unfair burden on the  taxpayer? RT 149. | No. RT 149. |

| | |
|---|---|
| Have any of you or any member of your family or any close friends to your knowledge had any experience with any mental health professional -- and that would include psychologists, psychiatrists, or anyone else in the mental health field -- that would make it extremely difficult for you to fairly assess the credibility of a mental health professional? RT 166. | No. RT 166. |
| The evidence in our case may show that the defendant is a Mexican-American and the victim was a Caucasian. And it may show that the victim was a Caucasian minor, a female. Do any of you believe that the racial differences between the defendant and the victim would have any effect on your ability to be a fair and impartial juror in our case? RT 176-77. | No. RT 177. |
| Are there any of you that feel if you were required as a juror to examine that kind of evidence that would have such an emotional impact that you couldn't be fair and impartial to both sides of the case? RT 179. | No. RT 179. |
| So far is there anyone who does not agree that the mere fact that the defendant's been arrested, accused of these offenses, brought to trial, may appear to be in custody, that those are zero factors that have nothing to do with guilt or innocence of the defendant? Those are mere procedural matters that the court is in charge of, legal matters, if you want to call it that, falls within the court's division of labor, not your division of labor. Do you have any problem with that . . .? RT 186. | No. RT 186. |
| Do you agree with [the proposition that the only verdict is not guilty] if there no evidence presented in this case? RT 189. | Yes. RT 190. |

| | |
|---|---|
| In the event that there are two reasonable interpretations, you have got to follow that presumption of innocence.  Anyone have any problem with that?  RT 207. | No.  RT 207. |
| I do want you to understand that time gap between June of '90 and now, insofar as the trial is concerned, those legal proceedings that you aren't concerned about is part of my job and not part of your job.  Anybody have any problem with that? RT 216. | No. RT 216. |

9.  The only time the judge permitted Sanchez to elaborate was regarding his views on the death penalty.  When asked to "describe your general feelings about the death penalty," Mr. Sanchez replied, "depends on the crime," specifically, "how bad the crime was."  RT 90-91.  Mr. Sanchez assured the court that, in addition to the facts of the crime, he would be willing to consider both aggravating and mitigating circumstances.  RT 91.  At no time did Mr. Sanchez indicate that he harbored any reservations about voting for death.

10.  The prosecution passed Sanchez for cause.  RT 216.

11.  Later, the prosecutor made a peremptory strike against Sanchez.  RT 263. Monroe immediately moved for a *Wheeler*[11] hearing.  *Id*.  Monroe explained the reason for his challenge:

> Mr. Middleton just excused the -- Mr. Sanchez, the only identifiable Hispanic on the jury box.  And I want to inquire as to whether or not we are beginning to eliminate people with an identifiable class.  Since Miss Alfaro is Hispanic.

RT 263.  The trial judge noted that "unless the district attorney voluntarily wants to respond to it, it would seem to me the burden is on you to make some *prima facie* showing that there has been some intentional exclusion."  RT 264.  Mr. Monroe again

---

[11]  This type of challenge derives from *People v. Wheeler*, 22 Cal. 3d 258, 280, 583 P.2d 748, 148 Cal. Rptr. 890 (1978), where the California Supreme Court concluded that the exclusion of a cognizable group on the basis of race violated the state and federal constitutions.

1  emphasized that the prosecutor struck the "only one Hispanic in the jury box" and

2  asked the trial judge to "inquire as to whether or not there was a racial basis for it."

3  *Id.*  Rejecting the trial judge's offer to explain the basis of his strike of Juror Sanchez,

4  Middelton gave this curious response:

5      Sounds to me like [Monroe] doesn't know, so sounds to me like he
       hasn't met the *prima facie* showing that the prosecution has exercised a
6      peremptory challenge on the basis of race.

7  RT 264.  The trial judge believed that Monroe had failed to "point[ ] to anything at all

8  other than the fact [Sanchez is] the only Hispanic that's presently seated in the jury

9  box."  *Id.*  The trial judge relied upon the fact that "other Hispanics were seated in the

10  jury box earlier that were excused by stipulation of counsel."  *Id.*  Monroe reminded

11  the court that the prior excusal was based upon "language problems" but the trial

12  judge was undeterred.  *Id.*  According to the trial judge, "without anything more,

13  I don't think you've made a *prima facie* showing to require the district attorney to

14  respond to it."  RT 264-65.  The trial judge left the door open for Monroe to renew

15  his motion "[i]n the event that there is . . . another Hispanic seated in the jury and

16  excused by the prosecution, that obviously might change."  RT 265.

17      **2.   Susan Mayor**

18      12.  Susan Mayor, another juror with a Spanish surname,[12] was summoned as

19  part of the first jury with Sanchez.  The prosecutor struck her too.

20      13.  Susan Mayor was a mother and wife.  RT 438.  She was a United States

21  citizen and had never been convicted of a felony.  RT 439.  At the time of Alfaro's

22  trial, Mayor lived in Placentia, California for twelve years.  Mayor had a part-time at

23  California school book fairs while husband worked as a programmer at Team

24  Industry.  RT 438.  She had an eleven-year old son.  RT 439.

25

26

27      [12]  Petitioner is not certain about the ethnicity of Mayor.  Based upon her
    Spanish surname and her difficulty with English, Petitioner believes Mayor may be
28  Latino or Spanish decent.

14.   Prior to any questioning, Mayor expressed concern about sitting as a juror because of her English.  RT 44.  Mayor had previously indicated on her jury summons that she did not understand English well enough.  RT 45.  When asked to explain, Mayor felt that sometimes her "pronunciation like that is not good."  RT 45.  Mayor further mentioned that she spoke English for her job, that she had been speaking English for twelve years, and had taken courses in English.  RT 45-46.  The judge emphasized that he was mainly concerned about Mayor's ability to understand what was happening in the trial.  RT 47.  When Mayor assured the judge that such was the case, the judge denied her request to be relieved from jury duty.  *Id.*

15.   Similar to Sanchez, Mayor was asked a series of questions about the case. She had not heard about the case before being called as a juror, had not spoken to anyone about it since arriving at court, and was not familiar with any witnesses, the attorneys or the accused.  RT 417.  Mayor "agreed with the death penalty" but believed the imposition "depends on the crime committed."  RT 420.  Willing to accept the judge's characterization that "you don't think it should be applied in ever first degree murder case, but you would be willing to look at all of the circumstances down at the bottom end there."  RT 420.  No friends or relatives who have strong feelings about the death penalty nor any "moral, religious or philosophical views that might affect [her] decision in the death penalty.  RT 422, 423.  No requirement for a past history of violence to vote for death, RT 423, would not require multiple victims, RT 424, no minimum adult age for the defendant, RT 424, no objection to executing a woman or a Mexican-American, RT 424, 427.  Would not be affected by the "racial differences" between the defendant and victim, RT 425.  Mayor denied possessing any specialized knowledge about the effects of cocaine or heroin on the body nor would she find that merely because defendant took such drugs she would not be responsible for her conduct, RT 428, 429.  No experience with mental health professional that would cause her to automatically accept or reject their opinion or the testimony of such witnesses. RT 429.  Would not consider cost of maintaining person

181

1  in prison for LWOP in deciding whether to impose sentence.  RT 430.  Would not

2  refuse to find defendant guilty, find special circumstances true, or vote for death

3  based upon any opposition to the capital punishment.  RT 431, 432.  Mayor would

4  not automatically vote for death either.  RT 432.

5      16.  Following questions, Mayor brought the Court's attention to her concern

6  about "the evidence" because Mayor had previously gotten "so upset" about an

7  accident she had witnessed.  RT 435-36.  She saw her co-worker's hand get cut off.

8  When asked whether she thought she would have an emotional reaction to the

9  autopsy photographs and videos, Mayor said she was "not sure right now."  RT 435.

10  Mayor did not know whether her reaction would be different if she did not know the

11  victim.  RT 436-37.

12      17.  Not long after Mayor's voir dire, the prosecutor exercised a peremptory

13  challenge against Mayor.  This was the prosecutor second strike against a Latino

14  juror.  Despite the trial judge's invitation to renew his *Wheeler* objection indicated

15  that another strike of a Latino juror by the prosecutor "might change" the

16  circumstances of whether a *prima facie* case had been made, Monroe sat silent.

17      **3.    Jaime Soto**

18      18.  Jaime Soto was a Latino juror called during the penalty phase retrial.

19  He was the third Latino victim of the prosecutor's peremptory strike.

20      19.  Jaime Soto worked with the Disability Insurance Office for the State of

21  California for 20 years.  RT 2819.  Mr. Soto was divorced and had two teenage sons

22  who lived with him in Anaheim.  RT 2819-20.  He had never been convicted of a

23  felony.  CT 2820

24      20.  Soto was asked a number of questions during voir dire and he answered

25  them all in significant detail.  Soto had never heard about the case before coming into

26  the courtroom nor was he familiar with the area known as "Little Tijuana."  RT 2807.

27  Soto volunteered that three years earlier, one of his son's had "spent a few days in the

28

1  Orange County juvenile hall." RT 2808.[13]  At the time of his son's arrest by officers

2  with the Anaheim police department, Soto had asked the officers for identification.

3  RT 2809.[14]  During the course of his inquiry, Soto explained, "the detective exceeded

4  his authority . . . lost his temper, got me in a choke hold, and shortly afterwards three

5  other police officers came and jumped on me and assisted me to the ground." *Id.*[15]

6  Soto filed a formal complaint with the Anaheim police department against the

7  particular sergeant.  RT 2811.  Later, Soto received a letter from the Chief of Police

8  indicating that his complaint had been reviewed and then was contacted by an

9  investigator.  RT 2811.  When Soto was interviewed about his experience, he was

10  told that the officer had been accused of other incidents of excessive firce.  Soto did

11  not choose to pursue the matter further but offered to testify if necessary.  RT 2810.

12  Soto assured the court that his experience would not affect his ability to assess

13  credibility of law enforcement witnesses:

14      Well, I believe it's like any other field.  You know, degrees of integrity
        vary with each individual.  So it would be unfair to me to say that all
15      policemen were like this particular individual.

16

17  _____

18  [13]  The charges against his son did not involve violence or drugs.  Soto assured
    the court that the experience would have no impact on his ability to remain impartial.
19  *Id.*

20  [14]  Middleton confirmed that none of the prosecution's witnesses were from the
    Anaheim police department.  RT 2811.
21

22  [15]  Soto provided the court with full details of the experience:

23      And I found the experience very interesting because I had one police
        officer that would be pulling my right arm in one direction and another
        police officer would be pulling my left arm in the other direction. And
24      one of them would say "would you please cooperate and get down on the
        ground, okay," and I would -- so the only thing I could do, because I
25      could see that this was a no-win situation for me, I just relaxed my body
        and let my body weight, you know, ease me down because I could see if
26      I didn't do that, we weren't going to get anywhere. My arms were going
        to get longer.
27

28  RT 2809.

183

1  RT 2810.  Despite this experience, Soto knew several individuals who were members

2  of law enforcement, including a retired Long Beach policeman and a cousin who was

3  a motorcycle officer with the City of Irvine.  RT 2812.

4      21.  Regarding special knowledge or experience, Soto disclosed that he had

5  "a little medical background" as part of his employment.  RT 2813.  Although there

6  was some confusion with the judge's questioning, Soto clearly did not believe that

7  psychological opinion was infallible.  RT 2814.  Soto suggested that testing could be

8  manipulated because "if the individual taking the test pays attention to what they're

9  doing and they'll see, for example, that the same question keeps occurring but is

10  worded differently, they may  go ahead and give the answer that they believe the

11  exam is looking for."  *Id.*  Not only was Soto unwilling to believe that testing was

12  "100 percent" accurate, he would not automatically accept the opinion of a mental

13  health professional.  According to Soto, "I think I would have to hear, you know, the

14  merits of everything that's being presented before I could even, you know, arrive at a

15  conclusion."  *Id.*

16      22.  Mr. Soto was completely candid about other aspects of his life.  For

17  example, he admitted that he had "experimented a little" with controlled substances

18  in high school.  RT 2815.  Soto also admitted that he had attended Alcoholic

19  Anonymous meetings for ten years and had spent a few hours in the San Pedro

20  substation for drunk driving in 1979 (thirteen years before trial).  RT 2809.

21      23.  When prompted, Soto described his feelings about the death penalty.

22  Soto has never been opposed to the death penalty and was willing to consider it as a

23  reasonable sentence.  RT 2816.  Soto "believe[d] that there are some circumstances

24  that would warrant serious consideration.  I don't believe that it should be an

25  automatic thing. It would depend on the merits of the case -- or circumstances."  *Id.*

26  Soto insisted on no minimum requirements or had no disqualifying grounds for

27  imposing the death penalty.  RT 2817.  For Soto, the defendant did not have commit

28  multiple murders or even have a history of violence to receive the death penalty.

1    Nor did it matter to Soto that the defendant was a woman or a Mexican-American.

2    RT 2817-18.

3          24.  The prosecutor passed Soto for cause.  However, when the parties were

4    permitted to exercise peremptory challenges, the prosecutor struck Soto.  The defense

5    did not lodge any objection to the prosecutor's third strike of a Latino juror.  The

6    second penalty-phase jury was entirely white.

7    **B.**     **LAW IN SUPPORT OF THIS CLAIM**

8          25.  Under clearly established federal law, courts must apply a three-step

9    approach to determine whether a prosecutor's peremptory challenge violated the

10   Equal Protection Clause.  First, the defendant must make out a *prima facie* case

11   "by showing that the totality of the relevant facts gives rise to an inference of

12   discriminatory purpose."  *Batson v. Kentucky*, 476 U.S. 79, 93-94, 106 S. Ct. 1712,

13   90 L. Ed. 2d 69 (1986) (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 96 S. Ct.

14   2040, 48 L. Ed. 2d 597 (1976)).  Second, once the defendant has made out a *prima*

15   *facie* case, the "burden shifts to the State to explain adequately the racial exclusion"

16   by offering permissible race-neutral justifications for the strikes.  *Batson*, 476 U.S.,

17   at 94; *see also Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S. Ct. 1221,

18   31 L. Ed. 2d 536 (1972).  Third, "[i]f a race-neutral explanation is tendered, the trial

19   court must then decide . . . whether the opponent of the strike has proved purposeful

20   racial discrimination."  *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769,

21   131 L. Ed. 2d 834 (1995) (per curiam).

22         26.  Trial judge's finding that no *prima facie* case had been made was contrary

23   to clearly established federal law.  Habeas relief cannot be granted unless the state

24   court decision was "contrary to, or involved an unreasonable application of, clearly

25   established Federal law" or (2) "resulted in a decision that was based on an

26   unreasonable determination of the facts in light of the evidence presented in the State

27   court proceeding." 28 U.S.C. § 2254(d).  But "[w]hen a state court's adjudication

28   of a claim is dependent on an antecedent unreasonable application of federal law,"

1  the federal courts "must then resolve the claim without the deference that AEDPA

2  otherwise requires." *Panetti*, 127 S. Ct. at 2858.  This limitation applies to

3  procedural as well as substantive determinations.  Thus, where "the state fail[s]

4  to provide the procedures mandated by . . . clearly established law," "no deference is

5  due." *Panetti*, 127 S. Ct. at 2858.

6       27.  In *People v. Wheeler*, 22 Cal. 3d 258, 280, 583 P.2d 748 (1978), the

7  California Supreme Court held that, to show a *prima facie* case, the party challenging

8  the strike must show a "strong likelihood" that the party exercising the strike did

9  so on account of the juror's race.  The United States Supreme Court subsequently

10  rejected the "strong likelihood" standard, finding it impermissibly places on the

11  defendant a more onerous burden of proof than is permitted under federal law.

12  *Johnson v. California*, 545 U.S. 162, 168, 170-73, 125 S. Ct. 2410, 162 L. Ed. 2d 129

13  (2005).  Therefore, where the state court applies the *Wheeler* threshold for

14  establishing a *prima facie* case, the state court's findings are not entitled to deference

15  and the claim is reviewed *de novo*.  *Williams v. Runnels*, 432 F.3d 1102, 1105 (9th

16  Cir. 2006); *Paulino v. Castro,* 371 F.3d 1083, 1090 (9th Cir. 2004); *Wade v. Terhune*,

17  202 F.3d 1190, 1195 (9th Cir. 2000).

18       28.  As an initial matter, Alfaro adequately preserved her *Batson* claim because

19  trial counsel asserted a *Wheeler* motion, the procedural equivalent to a challenge

20  made under *Batson*.  *Paulino v. Castro*, 371 F.3d 1083, 1088 n.4 (9th Cir. 2004);

21  *McClain v. Prunty*, 217 F.3d 1209, 1216 n.2 (9th Cir. 2000); *see also Fernandez v.*

22  *Roe*, 286 F.3d 1073, 1075 (9th Cir. 2002).[16]  Nevertheless, because the trial court

23  evaluated the defendant's *prima facie* showing under *Wheeler* rather than *Batson*'s

24  less onerous standard, the state court decision was based upon an unreasonable

25

26  _____

27  [16]  The California Supreme Court also recognizes that "an objection under Wheeler suffices to preserve a *Batson* claim on appeal." *People v. Lenix*,

28  No. S148029 (Cal. S. Ct. Jul. 24, 2008); *People v. Lancaster,* 41 Cal. 4th 50, 73, 158 P.3d 157 (2007).

1  application of clearly established federal law.  Consequently, the federal court must
2  review Alfaro's *Batson* claim *de novo.*

3      29.  Under *de novo* review*,* Alfaro adequately met the *prima facie* standard.
4  "[T]he threshold for making a prima facie *Batson* claim is quite low."  *Boyd v.*
5  *Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006).   "A defendant satisfies the
6  requirements of *Batson*'s first step by producing evidence sufficient to permit the trial
7  judge to draw an inference that discrimination has occurred."  *Johnson*, 545 U.S. at
8  170.  In establishing her burden, a defendant may rely on "any other relevant
9  circumstances" to raise an inference of discriminatory purpose.  *Johnson*, 545 U.S.
10  at 170; *Batson*, 476 U.S. at 96-97 (noting that in "deciding whether the defendant has
11  made the requisite showing, the trial court should consider all relevant
12  circumstances").  When assessing the existence of a *prima face* case, trial courts must
13  consider all relevant factors, including:

14      (a) the number of members of the cognizable group in the panel,  *United States*
15  *v. Chinchilla,* 874 F.2d 695, 698 & n.4 (9th Cir. 1989);

16      (b)  the race of the defendant and the victim, *United States v. Clemons,* 843
17  F.2d 741, 748 (3rd Cir. 1988);

18      (c) statistical disparity in the prosecutor's use of peremptory challenges

19      (d) "prosecutor's questions and statements during *voir dire* examination and in
20  exercising his challenges,"  *Batson*, 476 U.S. at 96-97;

21      (e) comparative analysis between the struck minority juror and the remaining
22  panel members.  *Boyd v. Newland,* 467 F.3d 1139, 1144-45 (9th Cir. 2006); *Bush v.*
23  *Pliler*, No. 04-56348, 2008 U.S. App. LEXIS 4548, *4-5 (9th Cir. Feb. 29, 2008).

24      (f) the absence of plausible reasons for the strike;

25      (g) "the prosecutor's refusal to justify his strike in light of the court's request,"
26  *Johnson*, 125 S. Ct. at 2418;

27      30.  There is no minimum number of strikes that is necessary to satisfy a *prima*
28  *facie* threshold.  A defendant can make out a *prima facie* case merely by showing the

187

prosecution struck a single juror because of race. *See Snyder v. Louisiana*, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008) ("'[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.'") (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)); *Cousin v. Bennett*, 511 F.3d 334, 339 (2d Cir. 2008) ("a 'pattern' of discriminatory exclusions is not required for a *prima facie* showing, and the exclusion of a single juror could, in circumstances tending to show racial motivation, be sufficient."); *Clemons*, 843 F.2d at 747 ("[s]triking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks"); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987); *United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987) (*prima facie* case established "even though we are here concerned with only a single juror"). While the fact that "juror was the one [minority] member of the venire does not, in itself, raise an inference of discrimination," *Vasquez-Lopez*, 22 F.3d at 902, an inference may be drawn when considered in light of the "relevant circumstances surrounding a peremptory challenge." *Fernandez v. Roe*, 286 F.3d 1073 (9th Cir. 2002); *Bush*, 2008 U.S. App. LEXIS 4548, 4-5 (9th Cir. Feb. 29, 2008) (concluding *prima facie* showing had been made based upon the prosecution's single strike of a Black juror where the defendant was African American and the victim was white, the strike resulted in an all-white jury, and a comparative analysis between the struck Black juror and remaining jurors did not reveal "significant" differences).

       1.     **The Defendant is Latina and the Victim Was White in a Case With Strong Racial Undertones**

     31. It is difficult to imagine a more racially charged case. Extensive pretrial publicity reported that Ms. Alfaro was a drug-addicted prostitute from Anaheim's Hispanic "barrio" who "wasn't a mother to her [four] kids." CT 1251, 1253-54. In contrast, the victim, Autumn Wallace, was a "popular" white nine-year-old A-student who was at home in a pink polka-dot dress cutting out paper dolls when she was

slashed 57 times.  CT 1247, 1251, 1253, 1254, 1258.  Nearly all of this publicity noted a death sentence as a likely punishment for Ms. Alfaro, as well as recounted evidence against Ms. Alfaro that would be relevant to establishing aggravating circumstances.  For example, several stories noted that Ms. Alfaro had confessed to killing the victim to "keep from being caught" for her planned theft of items from the house.  Others described her confession that she had been "wired" on drugs at the time of the crime.  CT 1238, 1241, 1245, 1247.

> **2.**    **At the Time of the Prosecutor's Strike of Sanchez, No Latinos Were on the Panel**

32.  Sanchez was the first Latino juror to survive excusal for hardship.  Four other jurors with Spanish surnames had been excused by the court.[17]  At the time Sanchez was struck, no other Latino jurors were on the panel.[18]

---

[17]  Fustino Rios was the first Latino juror excused.  Because jury service would make it difficult for him to make his house payment, he was excused for financial hardship.  RT 10-11.  Juror Martinez was the next Latino juror excused because her absence would cause an undue hardship for her employer (she was only one of seven tellers working at an active bank).  RT 23-24.  The prosecutor stipulated to both excusals.  RT 11, 24.

Prior to voir dire, Juan Magana asked to be excused because of his "problem" with "poor English."  RT 48.  Although Magana had lived in the United States for twenty years, he spoke Spanish at work and he was the only person at home that spoke English.  RT 51. Magana was mainly concerned that he would not be able to express his views to the other jurors.  RT 50. The judge sua sponte excused Magana and neither side objected.  RT 51.

During voir dire, Dorothy Laguna disclosed that Juror Baptie had spoken to her about Alfaro's case while waiting to be called.  RT 314.  Baptie told Laguna that the crime happened in her neighborhood and that the victim was a child.  RT 346.  Laguna assured the court that the information was "very vague" and that it would not affect her ability to impartial.  RT 316, 218, 347-48.  Baptie testified that she had spoken to Laguna as well as a third juror, Lynne.  RT 352.  Although finding that good cause had not been shown, the court proposed to excuse all three jurors, including Laguna; the prosecutor concurred.  RT 354.

[18]  Although it appears that the prosecutor subsequently allowed one Latino juror, Alice Costa, to remain on the panel, this occurred after he struck Sanchez and after the trial judge warned that  "[i]n the event that there is . . . another Hispanic seated in the jury and excused by the prosecution, that obviously might change."  RT 265.

1    **3.    The Prosecutor Struck Three Latino Jurors Eligible for Causal or**
2           **Peremptory Challenges for Both Jury Selections**

3    33.  In addition to striking Sanchez, the prosecutor also struck Mayor during
4    the first jury selection.  Only after the Wheeler motion was raised did the prosecutor
5    allow one Latino juror to sit.  Later, the prosecutor struck Soto, one of only a handful
6    Latino jurors eligible for the second jury.  No Latinos sat on the second jury resulting
7    in an all-white jury for the penalty phase retrial.

8    **4.    There was no Plausible Justification for the Prosecutor to Strike**
9           **Sanchez**

10   34.  There was no valid reason from the record for the prosecutor to have
11   wanted to strike Sanchez.  As Sanchez's voir dire answers make abundantly clear,
12   Sanchez supported the death penalty.  Sanchez would not require the defendant
13   to have a violent background or commit multiple murders before imposing death.
14   Neither would Sanchez have refrained from imposing death based upon any
15   immutable characteristic of the defendant, such as young age, gender or race.  From
16   the prosecution's perspective, there was absolutely nothing objectionable about
17   Sanchez - except, perhaps, his shared ethnicity with Alfaro.

18   **5.    There Was No Difference Between Juror Sanchez and the**
19          **Remaining White Jurors**

20   35.  A comparative analysis between Sanchez and the jurors that were
21   ultimately seated shows no discernable difference.  Sanchez was asked approximately
22   twenty questions regarding his views on the death penalty.  Exhibit 87, Comparative
23   Juror Analysis.  His answers were all favorable to the prosecution and mirrored those
24   given by the seated jurors.  Even when Sanchez was given an opportunity to provide
25   a more detailed explanation of his views regarding the death penalty, he stated a
26   position virtually identical to ones held by three of the seated (nonLatino) jurors.
27   Juror Sanchez explained that the death penalty "depends on the crime," specifically,
28   "how bad the crime was."  RT 90-91.  Both Jurors Armstrong and Saltz indicated that

1   the death penalty "depends" on the crime.  RT 105 ("depends on crime"); RT 93

2   ("depends on the violence of the crime").  Similarly, Juror Goebel indicated that he

3   "would probably support" the death penalty if the "crime was violent enough."

4   RT 90.  Indeed, some of the jurors the prosecutor permitted to sit appeared reticent to

5   impose the death penalty while Sanchez had exhibited no reservation whatsoever.

6   For example, Juror Abouchar indicated that despite his support for the death penalty,

7   he found it "is not a preferred way of going."  RT 522.  Juror O'Dell used to be

8   opposed to the death penalty under all circumstances but had "tempered" this view

9   and was now "somewhere smack dab in the middle."  RT 478-79.  Nevertheless, the

10  prosecutor allowed these white jurors to sit while striking Sanchez.

11          **6.      The Prosecutor Refused to Explain His Reasons for Striking Juror**

12                   **Sanchez Despite Being Given an Opportunity to Do So By the Court**

13          36.  Even though the prosecutor was technically not required to offer his

14  reason, Middelton's odd rebuttal to the defense request for a *Wheeler* inquiry was

15  certainly suggestive of a discriminatory intent.  The judge informed the parties that

16  although he would not compel the prosecutor to explain his strike of Sanchez, the

17  prosecutor was entitled to volunteer his reason.  RT 264.  But Middelton did not even

18  offer an affirmative denial, much less his specific reasons for striking Sanchez.

19  Instead, Middelton made the unremarkable observation that trial counsel "doesn't

20  know" why he (the prosecutor) struck Sanchez.  Then, Middelton parroted the

21  Court's conclusion that the defense had failed to meet "the *prima facie* showing that

22  the prosecution has exercised a peremptory challenge on the basis of race." *Id.*

23          37.  Middelton's response betrayed racial animus.  First, it is reasonable to

24  assume that an attorney confronted with an allegation of impropriety would have at

25  least offered an emphatic denial.  At the time of Alfaro's trial in 1992, *Wheeler* had

26  been the law for over a decade.  Given that Middelton was a seasoned prosecutor

27  (indeed since *Wheeler* was announced in 1979), he was undoubtedly aware of the

28  need to avoid even the appearance of racial bias in jury selection.  Second, because

191

1   there was nothing about Sanchez's voir dire answers that objectively supported the

2   prosecutor's strike, Middelton should have felt more compelled to explain his

3   reasoning not less.  It is likely that prosecutor was simply unable to proffer a facially

4   neutral reason because he had none.  *Miller-El II*, 545 U.S. at 247 (noting that one of

5   the struck African American jurors "should have been an ideal juror in the eyes of a

6   prosecutor seeking a death sentence, and the prosecutors' explanations for the strike

7   cannot reasonably be accepted").  Middelton's silence speaks volumes.

8       38.  In sum, a review of all relevant circumstances establishes that Alfaro had

9   met the *prima facie* burden under *Batson.*  Therefore, because the "state has never

10  been required to present evidence of the prosecutor's actual, non-discriminatory

11  reasons for striking [the juror]," the Court must hold a hearing to give the prosecutor

12  a chance to offer a race-neutral explanation so that the Court may determine whether

13  the prosecutor violated *Batson*.  *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir.

14  2004); *Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006) (remanding to district

15  court for evidentiary hearing where state trial court did not find *prima facie* showing

16  under incorrect *Wheeler* standard).

17      39.  The foregoing violation of Ms. Alfaro's constitutional right constitutes

18  structural error and warrants the granting of this Petition without any determination of

19  whether the violations substantially affected or influenced the jury's verdict.  *United*

20  *States v. McFerron*, 163 F.3d 952, 955-56 (6th Cir. 1998).

21

22                                         **XV.**

23  **CLAIM 10:  MS. ALFARO WAS DENIED A FAIR-CROSS SECTION OF**

24  **VENIRE PERSONS BASED UPON A FLAWED PROCESS USED**

25  **TO SELECT AND IMPANEL HIS JURIES**

26      Petitioner's conviction and sentence of death were rendered in violation of her

27  rights to due process, a fair trial by an impartial jury drawn from a fair cross-section

28  of the community, fundamental fairness, an impartial tribunal, effective assistance

of counsel, confrontation, presentation of evidence, equal protection, right to compulsory process, self-incrimination, and a fair, reliable, and non-arbitrary determination of guilt and penalty as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a result of the systematic underrepresentation of Hispanics in the venire.

1. This claim was not previously raised in state court.

2. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

3. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

## A.      FACTUAL BACKGROUND

4. After prospective jurors were screened regarding hardship, the Clerk then called the names of the first 12 prospective jurors to be questioned by the Court and requested that they sit in the jury box.[19]  RT 56.  The Court asked more substantive questions and whenever one of the 12 prospective jury-box jurors was excused either by the Court for cause, challenged by counsel and excused for cause, or excused after a peremptory challenge, another from the spectator section was called as a replacement and sat in the jury box.  *See*, *e.g*., RT 83-84.  This process repeated until 12 jurors and four alternates were seated and accepted by counsel.  In total, and excluding those prospective jurors excused due to hardship, 64 prospective jurors were seated in the jury box and questioned by the Court for the first trial. At most six were Latino or had Spanish surnames.  Another 67 prospective jurors were

---

[19]  It is assumed, but record does not conclusively show that those prospective jurors remaining in the jury box at the end of the hardship voir dire were asked to leave the jury box and sit in the spectator area.  It is assumed they were either asked or not allowed to return to the jury  after the 15 minute recess, the jury box was empty when the first 12 prospective jurors were called and substantive voir dire began. RT 54-56.

1  questioned for the penalty phase retrial, and only five prospective jurors were Latino
2  or had Spanish surnames.  Of a total of nine jurors, the Court excused two jurors for
3  cause (one juror in the first trial had an out-of-court conversation with another juror,
4  and one in the retrial was excused for bias because his wife worked for the Anaheim
5  Police) and two were excused for hardship (one each in the first and second trials).
6  One Latino sat as a primary juror in the first trial, and another sat as an alternate on
7  the penalty phase retrial.

8  **B.**     **APPLICABLE LAW**

9       5.  A defendant has a constitutional right to a jury drawn from a fair cross
10 section of the community.  *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664,
11 58 L. Ed. 2d 579 (1979).  To establish a prima facie fair cross-section claim, the
12 defendant needed to identify "a recognizable, distinct class," show substantial
13 underrepresentation of that class of persons in jury pools over a "significant period of
14 time,"and prove that the jury selection process is "susceptible of abuse or is not
15 racially neutral."  *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S. Ct. 1272,
16 51 L. Ed. 2d 498 (1977).

17       a.  Hispanics are a distinctive group for purposes of this constitutional
18 analysis.  *Castenada*, 430 U.S. at 495; *People v. Ramos*, 15 Cal. 4th 1133, 1154
19 (1997).

20       b.  At the time of Ms. Alfaro's trial, Hispanics constituted at least 28.1
21 percent of the population of Orange County.  The number of Hispanics who were at
22 least eighteen years old comprised at least 25.3 percent of individuals eighteen and
23 over in Orange County.

24       c.  Hispanics were under represented in the jury pool in Orange County
25 at the time of Ms. Alfaro's trials in 1992.

26       d.  At Ms. Alfaro's first trial, Hispanics constituted only 9.3 percent
27 of the trial jury panel.

28

194

1          e.  At Ms. Alfaro's second trial, Hispanics made up only 7.4 percent

2    of the trial jury panel.  This under representation is not fair and reasonable in relation

3    to the number of Hispanics in the community

4          f.  Trial counsel rendered ineffective assistance of counsel by failing

5    to investigate the jury selection process, seek discovery, and prepare and present

6    arguments by way of objection and/or motion during Ms. Alfaro's trial.  Such failings

7    further limit Ms. Alfaro's analysis herein.

8          g.  The under representation of Hispanics is due to the systematic

9    exclusion of Hispanics in the jury selection process.  The mechanisms affecting the

10   creation of this disparity include, but are not limited to the following:

11          (1)  The knowing and intentional failure to use random selection

12   procedures throughout the jury selection process.

13          (2)  The knowing and intentional failure to use more than the list

14   of registered voters and the Department of Motor Vehicles list as the source lists for

15   the selection of jurors.

16          (3)  The knowing and intentional failure to properly merge and

17   purge the source lists of duplicate names before creating the master list of prospective

18   jurors.

19          (4)  The knowing and intentional failure to update the source lists

20   and the master jury list.

21          (5)  The knowing and intentional failure to follow up on

22   prospective jurors who do not complete and return juror questionnaires or who fail to

23   appear when summoned for jury service.

24          (6)  The knowing and intentional failure to properly apply juror

25   qualification and exemption criteria.

26          (7)  The knowing and intentional failure to properly review and

27   excuse prospective jurors for undue hardship.

28

195

1    (8)    The knowing and intentional failure to make adequate

2    transportation available to prospective jurors.

3    (9)   The knowing and intentional failure to comply with the

4    statutory mandates for the selection of jurors set forth in the Penal Code and the Code

5    of Civil Procedure.

6    h.   The under representation of Hispanics in Ms. Alfaro's jury pools

7    was part of a pattern of under representation in Orange County that continued after

8    Ms. Alfaro's trial, at least through 1995.

9    (1)   At the 1993 capital trial of Cristhian Monterroso, there were

10   276 presently identifiable members of the potential jury pool.  Twenty-three of these

11   individuals were Hispanic.  Thus, Hispanics made up 8.33 percent of the jury panel,

12   for an absolute disparity of 16.97 percentage points and a comparative disparity of

13   67.1 percent.

14   (2)   In 1995 for the capital trial of Ignacio Tafoya, 17 of the

15   prospective jurors out of a panel of 168 prospective jurors were Hispanic.  This

16   translates into an absolute disparity of 15.2 percentage points and a comparative

17   disparity of 60.1 percent.

18   6.  The exclusion of Hispanics from the jury selection process in Orange

19   County violated the equal protection guarantee of the state and federal constitutions.

20   *Castenada*, 430 U.S. 482.  The absolute disparities and comparative disparities of

21   Hispanics in Ms. Alfaro's trial jury panels are constitutionally substantial under

22   representation.  The jury selection process in Orange County is subject to abuse and

23   is not class neutral.  The selection system is filled with discretionary and ad hoc

24   decision-making by the jury commissioner and his/her staff, and the trial court.  The

25   jury  commissioner and the trial court did not comply with the statutory mandates

26   governing the selection of jurors.

27   7.  Trial counsel rendered ineffective assistance of counsel in violation of the

28   Sixth Amendment by failing to investigate the jury selection process, seek discovery,

196

1    and prepare and present arguments by way of objection and/or motion during Ms.

2    Alfaro's trial, and such failings further limit Ms. Alfaro's analysis herein.

3         8.  The process used to select Ms. Alfaro's jury, including but not limited

4    to the policy of the Orange County Jury Services Department to destroy each old jury

5    source list as soon as a new source list is created, materially violated California

6    mandatory statutory and decisional laws concerning jury selection.  (Code Civ. Proc.,

7    §§ 191, 197, 198, 203, 204, 207, 209, 218, 219, 222, 228.)  These material departures

8    from state mandates resulted in a selection process that was so inherently defective

9    that habeas corpus relief is mandated.

10        9.  The foregoing violations of Ms. Alfaro's constitutional rights constitute

11   structural error and warrant the granting of this Petition without any determination

12   of whether the violations substantially affected or influenced the jury's verdict.

13   *Brecht,* 507 U.S. at 638.

14        10.  The constitutional violations set forth in this claim alone mandate relief

15   from the convictions and sentence.  However, even if these violations do not mandate

16   relief standing on their own, relief is required when this claim is considered together

17   with the additional constitutional errors outlined in the remainder of this Petition.

18   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

19   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

20   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

21   (9th Cir. 1978).

22

23                                    **XVI.**

24   **CLAIM 11:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE**

25   **VIOLATED BY THE IMPANELMENT OF JURORS WHO WERE**

26   **BIASED IN FAVOR OF THE DEATH PENALTY**

27        Petitioner's death sentence was rendered in violation of her rights to due

28   process and equal protection, to a fair trial, to an impartial jury, and to fair and

                                        197

1   accurate guilt determination and to a reliable, individualized, and non-arbitrary death-

2   penalty determination, as a result of juror bias in favor of the death penalty, all in

3   violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth,

4   Eighth, and Fourteenth Amendments to the United States Constitution.

5           1.  This claim has not been raised before the California Supreme Court.

6           2.  If Respondent disputes any of the facts alleged below, Petitioner requests an

7   evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

8   been afforded discovery and the disclosure of material evidence by the State, the use

9   of this Court's subpoena power, and the opportunity to investigate fully, counsel

10  requests an opportunity to supplement or amend this petition.

11          3.  The declarations and other exhibits filed with this petition, as well as the

12  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

13  reference into this claim as though set forth in full.

14          4.  In support of this claim, Petitioner alleges the following facts, among others

15  to be presented after full discovery, investigation, adequate funding, access to this

16  Court's subpoena power, and an evidentiary hearing.

17          5.  A number of the jurors on Petitioner's second penalty phase trial were

18  ready, willing and prejudicially predisposed to impose a sentence of death.

19          6.  Petitioner had a constitutional right to an impartial jury and to a jury aware

20  of its undivided responsibility to determine the appropriateness of a death sentence.

21  *Caldwell v. Mississippi*, 472 U.S. 320 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).

22  One of the most fundamental Eighth Amendment principles is that a capital defendant

23  will not be sentenced to death unless and until a sentencer has adequately considered

24  whether the death penalty is appropriate.  To satisfy this principle, it is essential that

25  the sentencer understand that it has the "*undivided responsibility* for deciding whether

26  a defendant's punishment should be increased from life to death."  Gillers, *The*

27  *Quality of Mercy:  Constitutional Accuracy at the Selection Stage of Capital*

28  *Sentencing*, 18 U.C. Davis L. Rev. 1037, 1046 (1985) (emphasis in original).

7.  Those jurors who were predisposed to impose a sentence of death were without a principled basis upon which to distinguish between the appropriateness of a life without the possibility of parole sentence and a sentence of death.  Their strong inclination towards handing down a death sentence precluded the jury from giving a reasoned moral response to the mitigating evidence presented on Petitioner's behalf at the penalty phase of her trial and created the risk that death was imposed despite evidence which might otherwise have been seen to call for a life sentence.  This violated Petitioner's rights to due process and equal protection of the law, to reasonably effective assistance of counsel, and to a reliable, non-arbitrary, and individualized determination that death was the appropriate penalty in this case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  See *Caldwell v. Mississippi*, 427 U.S. 320, 329, 335-337, 105 S. Ct. 2633, 2639, 2643-2644, 86 L. Ed. 2d 231 (1985); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Gardner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977); *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).

8.  The presence of pro-death jurors on Petitioner's jury prejudiced Petitioner because their predisposition in favor of the death penalty precluded them from fairly considering the evidence favorable to Petitioner during the guilt phase and inclined them toward imposition of a death sentence without regard to mitigation evidence presented by Petitioner.  This jurors' bias in favor of the death penalty was per se prejudicial and relief is warranted without any showing that the error was harmless.  Assuming, arguendo, that the error is not per se prejudicial, the error so infected the integrity of the proceedings that it cannot be deemed harmless and the state will be unable to meet its burden in showing this error harmless.  In any event, the violation of Petitioner's rights had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and

resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XVII.

## CLAIM 12:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE CONCEALMENT OF MATERIAL INFORMATION ON VOIR DIRE

Petitioner's convictions and sentences were rendered in violation of his rights to due process and equal protection, to a fair trial, to an impartial jury, the effective assistance of counsel, and to fair, accurate, reliable and non-arbitrary guilt and penalty determinations as a result of the misconduct of jurors concealing material information prior to their impanelment, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The United States Constitution guarantees Petitioner's right to a fair trial before an impartial jury.  One touchstone of a fair trial is an impartial trier of fact -- a jury capable and willing to decide the case solely on the evidence before it.  Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury.

1. This claim has not been raised before the California Supreme Court.

2. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

200

1   4.  In support of this claim, Petitioner alleges the following facts, among others

2   to be presented after full discovery, investigation, adequate funding, access to this

3   Court's subpoena power, and an evidentiary hearing.

4   5.  Prior to impanelment of each jury, the prospective jurors were asked to

5   respond truthfully to questions designed to elicit information with respect to the

6   prospective juror's qualifications to sit as a juror in the pending case.  Some of the

7   responses provided by prospective jurors were dishonest.  Petitioner was prejudiced

8   by this misconduct.  The concealment of critical information indicates that these

9   jurors were not impartial, violated Petitioner's unquestioned right to challenge the

10  jurors for cause and violated Petitioner's right to exercise peremptory challenges.

11  6.  The Sixth Amendment to the United States Constitution guarantees a

12  defendant's right to a fair trial before a panel of impartial, "indifferent" jurors.  U.S.

13  Const., 6th and 14th Amends; *Tinsley v. Borg*, 895 F.2d 520, 523 (9th Cir. 1990)

14  (citations omitted).  The United States Supreme Court has defined "an impartial trier

15  of fact" as "a jury capable and willing to decide the case solely on the evidence before

16  it."  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct.

17  845, 78 L. Ed. 2d 663 (1984), *citing Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct.

18  940, 71 L. Ed. 2d 78 (1982).  Even if "only one juror is unduly biased or prejudiced,

19  the defendant is denied his constitutional right to an impartial jury," *Tinsley*, 895 F.2d

20  at 523-24 (citations omitted), and "doubts regarding bias must be resolved against the

21  juror."  *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991).

22  7.  The importance of a truthful voir dire examination in assuring a

23  constitutionally unbiased jury is explained in the *McDonough* case:

24  Voir dire examination serves to protect that right [an impartial trier of
    fact] by exposing possible biases, both known and unknown, on the part

25  of potential jurors.  Demonstrated bias in the responses to questions on
    voir dire may result in a juror's being excused for cause; hints of bias not

26  sufficient to warrant challenge for cause may assist parties in exercising
    their peremptory challenges.  The necessity of truthful answers by

27  prospective jurors if this process is to serve its purpose is obvious.

28  464 U.S. at 554.

201

8.  False answers or concealment on voir dire render nugatory the unquestioned right to challenge a prospective juror for cause and also eviscerate a party's right to exercise a peremptory challenge.  The denial of the right to reasonably exercise a peremptory challenge, be it by either the trial court or a juror through concealing material facts, is not a mere matter of procedure, but the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of an defendant against an unlawful conviction.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981).

9.  Concealment or false answers by a juror during voir dire, whether inadvertent or intentional, interferes with the right of a criminal defendant to conduct voir dire for the purpose of discovering bias or impartiality, and constitutes serious misconduct.  The prosecution, the defense and the trial court rely on the voir dire responses in making their respective decisions, and if potential jurors do not respond candidly the jury selection process is rendered meaningless.  Falsehood, or deliberate concealment or nondisclosure of facts and attitudes deprives both sides of the right to select an unbiased jury and erodes the basic integrity of the jury trial process.

10.  When a prospective juror fails to disclose material information on voir dire, the ultimate issue for the court to consider is whether the juror nevertheless was impartial.  As the Supreme Court stated, "only those reasons [for concealing information] that affect a juror's impartiality can truly be said to affect the fairness of a trial."  *McDonough*, 464 U.S. at 556.  Dishonesty by a prospective juror during voir dire supports an inference of bias.  *Dyer v. Calderon*, 151 F.3d 970, 981-983 (9th Cir. 1998); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984) (a juror's dishonesty "is a strong indication that [the juror] was not impartial"); *see also McDonough*, 464 U.S. at 556 (Blackmun, J. concurring) ("in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial"); *id.* at 558 (Brennan, J., concurring) (dishonesty is a factor to be considered in the determination of bias).

1    11.  Although the opinion of the Court in *McDonough* suggests that juror

2    dishonesty is a prerequisite to obtaining a new trial, the five concurring justices make

3    clear that such a showing of dishonesty on voir dire is not required.  *See* 464 U.S. at

4    556-557 (Blackmun, J., joined by Stevens, J. and O'Connor, J., concurring)

5    ["regardless of whether a juror's answer is honest or dishonest, it remains within a

6    trial court's option . . . to order a post-trial hearing at which the movant has the

7    opportunity to demonstrate actual bias, or, in exceptional circumstances, that the facts

8    are such that bias is to be inferred"]; and *id.* at 558 (Brennan, J., joined by Marshall,

9    J., concurring) ("[w]hether the juror answered a particular question on *voir dire*

10   honestly or dishonestly, or whether an inaccurate answer was inadvertent or

11   intentional, are simply factors to be considered in [the] determination of actual bias".)

12   12.  Petitioner was prejudiced by the concealment of critical material

13   information.  Such deliberate concealment indicates that these jurors, or any of them,

14   were not impartial during their participation in this case.  As a result of the jurors'

15   concealment, Petitioner was also deprived of his right to the effective assistance of

16   counsel.  *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d

17   491 (1968); *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961);

18   *Bayramoglu v. Estelle*, 806 F.2d 880, 888 (9th Cir. 1986).  In addition, Petitioner was

19   deprived of his constitutional right to a reliable death sentencing determination, free

20   from constitutionally irrelevant factors.  *See Zant v. Stephens*, 462 U.S. 862, 879,

21   103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Gardner v. Florida*, 430 U.S. 349, 358,

22   97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

23   13.  The concealment of this information prior to impanelment violated

24   Petitioner's unquestioned right to challenge the jurors for cause and also violated

25   Petitioner's right to exercise peremptory challenges.  Prejudice is presumed; such

26   error amounts to a structural defect in the proceedings that is not subject to harmless

27   error analysis.  *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  Assuming,

28   arguendo, that the error is not per se prejudicial, these constitutional violations so

infected the integrity of the proceedings that the error cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless.  In any event, the violations of Petitioner's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, rendering them fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XVIII.

### CLAIM 13:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE EXCUSAL OF JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT EXCUSAL

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, a fair and impartial jury, the effective assistance of counsel, equal protection, and to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a result of the excusal of prospective jurors whose views on the death penalty were not extreme enough to warrant excusal.

1.  This claim has not been presented to the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

204

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  The trial court violated Petitioner's constitutional rights by excusing for cause potential jurors whose views on the death penalty were not extreme enough to warrant exclusion. A capital defendant's right to an impartial jury prohibits the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). To permit the exclusion for cause of prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members.  It "stack[s] the deck against the [defendant]."  *Gray v. Mississippi*, 481 U.S. 648, 658 (1987) (quoting *Witherspoon*, 391 U.S. at 523).

6.  The exclusion of venire members based on their views concerning the death penalty must be limited to those who are "irrevocably committed … to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings," and to those whose "attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." *Witherspoon*, 391 U.S. at 523 n.21; *see also Burns v. Estelle*, 626 F.2d 396, 397 (5th Cir. 1980).  "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

7.  When a trial court misapplies *Witherspoon* and excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence cannot stand. *Davis v. Georgia*, 429 U.S. 122 (1976) (*per curiam*).  Because the trial court improperly excused for cause venire members who were qualified to be seated as jurors under *Witherspoon*, Petitioner has been denied her right to a fair trial and

205

1  impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to
2  the United States Constitution.

3      8.  The constitutional violations set forth in this claim alone mandate relief
4  from the convictions and sentence.  However, even if these violations do not mandate
5  relief standing on their own, relief is required when this claim is considered together
6  with the additional constitutional errors outlined in the remainder of this petition.
7  Cumulatively, these errors mandate relief from Petitioner's convictions and sentence.
8  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d
9  614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

10     9.  The foregoing violations of Petitioner's constitutional rights constitute
11  structural error and warrants the granting of this petition without any determination
12  of whether the violations substantially affected or influenced the jury's verdict.
13  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies
14  to this claim, the foregoing constitutional violations so infected the integrity of the
15  proceedings that the error cannot be deemed harmless. The foregoing violation
16  of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's
17  convictions and sentence, rendering them fundamentally unfair and resulting in a
18  miscarriage of justice. These errors, both singularly and collectively, so infected the
19  integrity of the proceedings that it cannot be deemed harmless and the State will be
20  unable to meet its burden in showing this error harmless.  In any event, the violation
21  of Petitioner's rights in this regard had a substantial and injurious effect or influence
22  on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally
23  unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner
24  respectfully requests that his petition be granted.

25  / / /
26  / / /
27
28

206

**XIX.**

## CLAIM 14:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN JURORS WERE NOT REMOVED FOR CAUSE OR BIAS

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, to present a defense, equal protection, a fair and impartial jury, to the effective assistance of counsel, and to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a result of the trial court's refusal to excuse for cause numerous potential jurors who were biased against Petitioner and/or whose views regarding the death penalty would have substantially impaired their ability fairly to consider a sentence less than death and fairly to consider and give weight and meaning to all proffered mitigating evidence.

1.  This claim has not been presented to the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

5. The trial court's refusal to excuse for cause numerous potential jurors who were biased against Petitioner and/or whose views regarding the death penalty would

207

have substantially impaired their ability fairly to consider a sentence less than death and fairly to consider and give weight and meaning to all proffered mitigating evidence, violated Petitioner's guaranteed constitutional rights.  But for these errors, the outcome would have been different at all stages of the pre-trial, trial, post-trial and appellate proceedings.

6.  A criminal defendant has a fundamental right to an impartial jury that will perform its legal duty.  A cornerstone of this constitutional right is the court's duty and power to remove biased and improper venire members from the jury pool for cause.  *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 , 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).  A defendant's constitutional rights are violated if a court does not dismiss a biased venire member for cause because the defendant is then required to use his valuable peremptory strikes on the constitutionally improper jurors.  *Bradham v. State*, 243 Ga. 638, 639, 256 S.E.2d 331, 332 (1979).  In a capital case, the trial court is constitutionally required to strike for cause any potential jurors whose views in support of the death penalty are sufficiently in favor that their ability to consider a sentence other than death is substantially impaired.  *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).  This includes jurors who, for any reason, are incapable of or unwilling to consider and give weight to mitigating circumstances as that concept is broadly defined by the United States Supreme Court.  *See Lockett v. Ohio*, 438 U.S. 586 (1978).

7.  In this case, the trial court refused to strike for cause many jurors who were clearly biased against Petitioner, and/or were incapable of giving proper consideration to mitigating evidence and/or to a sentence less than death.  Petitioner's rights were violated when several venire members were not dismissed for cause or bias even though they showed a clear bias against Petitioner.  Each of these venire persons should have been removed because each expressed evident bias against Petitioner during questioning on voir dire.

208

8.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Petitioner's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

9.  The foregoing violations of Petitioner's constitutional rights constitute structural error and warrants the granting of this petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless.  In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XX.

## CLAIM 15:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT'S BIAS

The convictions and sentence of death were rendered in violation of Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and

non-capricious determination of guilt and penalty, to a neutral and impartial decision-maker, and to due process of law as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial judge was biased.

1.  Exhaustion of the claim:  This claim was fairly presented as Claim 3 in the habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no. S099569.

2.  AEDPA:  The claim was rejected by an Order of the California Supreme Court dated November 18, 2007.  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858. The state court denied this claim without an opinion, and without affording Petitioner an evidentiary hearing, discovery, or any other means to further develop his claim. When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial was objectively unreasonable.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

210

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

A.   **LAW IN SUPPORT OF CLAIM**

6.  "A neutral judge is one of the most basic due process protections." *Sanchez-Cruz v. INS*, 255 F.3d 775, 779 (9th Cir. 2004); *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975); *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955).  A judge violates a defendant's due process rights if he is biased against the defendant or has an interest in the outcome of the case. *Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997).  The likelihood or even appearance of bias can also disqualify a judge. *Taylor v. Hayes*, 418 U.S. 488, 501, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974).  "A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."  *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997) (citations omitted).

7.  Actual bias occurs when the judge harbors personal animosity toward the defendant or has a personal interest in the outcome of the particular case.  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 823, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986) (calling for recusal where state supreme court justice's interest was "direct, personal, substantial, [and] pecuniary"); *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749 (1927); *Murchison*, 349 U.S. at 138 (finding bias where judge acting as one-man grand jury in secret hearings charged two witnesses with contempt and then presided over witnesses' contempt hearings); *Taylor*, 418 U.S. at 501-03 (finding bias where judge was subject to litigant's direct personal insults).

211

1       8.  The standard for determining implied or presumptive bias is "'whether

2   a reasonable person with knowledge of all the facts would conclude that the judge's

3   impartiality might reasonably be questioned.'"  *United States v. Hernandez*, 109 F.3d

4   1450, 1453 (9th Cir. 1997) (quoting *United States v. Studley*, 783 F.2d 934, 939 (9th

5   Cir. 1986); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d

6   182 (1980).  While judicial bias is ordinarily derived from an extrajudicial source,

7   this is not the only basis.  *Liteky v. United States*, 510 U.S. 540, 551, 554-55,

8   114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).  "Bias exists where a court has prejudged,

9   or reasonably appears to have prejudged, an issue."  *Kenneally v. Lungren*, 967 F.2d

10  329, 333 (9th Cir. 1992).  Judicial bias may also be inferred from misconduct

11  occurring during trial if the judge "display[s] a deep-seated favoritism or antagonism

12  that would make fair judgment impossible."  *Liteky*, Id. at 555. (internal quotation

13  marks omitted).  Finally, judicial bias is well-established when the trial judge

14  "assume[s] the posture of an advocate."  *Anderson v. Sheppard*, 856 F.2d 741, 747

15  (6th Cir. 1988); *Owens v. United States*, 483 F.3d 48, 66 (1st Cir. 2007) ("a 'judge's

16  participation in a trial must be balanced; he cannot become an advocate or otherwise

17  use his judicial powers to advantage or disadvantage a party unfairly'");

18  *Abdulrahman v. Ashcroft,* 330 F.3d 587, 596 (3d Cir. 2003) (noting judges "must

19  assiduously refrain from becoming advocates for either party"); *Reserve Mining Co.*

20  *v. Lord*, 529 F.2d 181, 185-6 (8th Cir. 1976) (en banc) ("Judge Lord seems to have

21  shed the robe of the judge and to have assumed the mantle of the advocate.").

22  *Jorgensen v. Cassiday*, 320 F.3d 906, 911 (9th Cir. 2003).

23  / / /

24  / / /

25

26

27

28

1   **B.      FACTS IN SUPPORT OF CLAIM**

2      **1.      The Trial Judge Was Biased Based Upon His Emotional**

3               **Entanglement With a Custody Proceeding Against His Stepson Who**

4               **Was a Drug Addict Identical to Petitioner**

5          9.  Judge Millard was biased against Petitioner as a drug user because his own

6   stepson had a serious drug problem.  An article entitled "Grandfather Knows Best,"

7   published in the *Orange County Lawyer* in July 1996, describes how the judge, who

8   was normally expressionless and therefore hard for attorneys to read, had tears in his

9   eyes and his voice cracked with emotion when he talked about his own court battle to

10  gain custody of his then eight-year-old granddaughter.  Exhibit 39.  The article states

11  that her father, Judge Millard's stepson, had been using hard drugs since he was a

12  teenager and that when he became a parent, he could hardly take care of himself.

13  Judge Millard described how his granddaughter once found her father passed out on

14  the floor and she could not wake him up.  The article indicates that before the girl

15  started kindergarten -- presumably, in 1992 -- her parents split up.  "Soon after," her

16  mother was killed in an accident.  With only Judge Millard's stepson to care for her,

17  the circumstances deteriorated to the point that neighbors and other family members

18  asked Judge Millard to intervene.  They feared for the girl's safety.  After finding a

19  lawyer, Judge Millard fought for custody of his granddaughter and eventually won,

20  based on evidence of drug abuse and neglect.  *Id*.

21         10.  The article indicates that at the same time Judge Millard was serving as the

22  trial and sentencing judge in Ms. Alfaro's case, he was going through an emotional

23  legal battle as a result of his stepson's drug addiction and its harmful effects on his

24  granddaughter.  His feelings were so strong that he could not talk about his case for

25  guardianship of his granddaughter -- which he won -- without displaying strong

26  emotions several years after the fact.  Crucially, it appears that Ms. Alfaro's case took

27  place during the time period when Judge Millard's concerns for his granddaughter as

28  a result of his stepson's drug addiction were at a high point.

1

2.    **Trial Judge's Conduct Throughout Trial Evidenced His Strong Bias**

2        **Against Petitioner**

3        11.  Judge Millard's conduct throughout the trial evidences his bias against

4    Ms. Alfaro.  As the trial judge, Judge Millard was charged with ensuring that

5    Ms. Alfaro was tried by a fair and impartial jury of her peers.  His questions of the

6    potential jurors indicate that his personal bias against Ms. Alfaro impeded his ability

7    to carry out this crucial function.  The questions that the Judge Millard asked

8    potential jurors during voir dire[20] neutralized the mitigating evidence and guaranteed

9    a jury prepared to sentence Ms. Alfaro to death.  The court's bias against Ms. Alfaro

10    is further evidenced in his refusal to voir dire the jurors on the aggravating factor --

11    whether they could be fair and impartial in light of the fact that the victim was a nine-

12    year-old child -- contending that such questions would cause the jurors to "prejudge"

13    the evidence.  *See* AOB, pp. 118-182.

14        12.  The trial court's acknowledgment that Ms. Alfaro's counsel's strategy

15    had no hope of success unless she testified, and refusal to close the courtroom

16    to allow her to testify freely about the circumstances of the crime, despite her

17    declaration indicating her fear to do so otherwise, while the third man remained "out

18    in the community," also evidence his bias against her.  *See* CT at 497a-497c.  His

19    reasoning for refusing to close the courtroom for her testimony only -- that doing so

20    would cause the jury to believe her concerns that her family was at risk had some

21    validity and would thereby prejudice the prosecution (see RT 1171) -- was dubious.

22

23    _____

[20]  The questions asked include:  Whether they "believe[d] in any particular
24    adult age at which a person should never receive the death penalty, no matter how
vicious or cruel the crime might be committed?"; whether they would "require that
25    the defendant have a past history of violence before you would ever consider voting
for the death penalty?"; whether any of the jurors "believe[d] that the state should
26    never execute a woman no matter how vicious or cruel the crime is that she may have
committed?"; whether they "would find it more difficult to vote to impose the death
27    penalty in a case where the defendant was a Mexican-American than you would if the
defendant were white?"; and whether the jurors felt "that the death penalty should
28    only be reserved for multiple-victim cases?"

214

13.  After the guilt and the first penalty trial, the judge had a very clear idea of the evidence -- or rather the lack thereof -- that someone other than Ms. Alfaro could be blamed for the crime.  By defense counsel's own admission, the trial judge knew that Ms. Alfaro had received incorrect advice about the scope of her cross-examination, should she take the stand in the penalty phase, and that she felt he had betrayed her as a result.  The trial judge knew that there were numerous other conflicts between them focused on defense counsel's decision to blame "Beto" for the crime.  Notwithstanding, the trial judge dismissed Ms. Alfrao's request for substitute counsel, consigning her to a penalty phase retrial with a lawyer she did not trust and who would not honor her decisions.  Judge Millard's statements at the sentencing hearing were in direct conflict with his earlier ruling.  While on April 9, 1992, he told Ms. Alfaro that "anyone" would try to blame the crime on someone else, at sentencing he referred to that defense as a "figment of someone's imagination." While denying a change of venue based on inflammatory pretrial publicity because he believed there was nothing special about her case, the judge now said, "I can't imagine a more vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case."  Before sentencing Ms. Alfaro to death, Judge Millard never once mentioned Ms. Alfaro's desire to plead guilty unconditionally and gave no weight whatsoever to the mitigating factors.

14.  Other examples of Millard's bias are to be found in the transcript of the sentencing proceedings.

15.  Regarding the applicability of Penal Code § 190.3(h), "whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of [her] conduct or to conform [her] conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication," he stated:

> We did have some evidence on the videotape only, really, in our case here.  And there may have been some evidence in the transcript that was read to the jury of the prior testimony of the defendant.  But it —

215

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and the defendant in the video indicates that she had shot up with some heroin or speed balls or whatever the case might be.  And once again, Mr. Giffin very carefully examined her in that area and she really did not indicate and the evidence does not support that any intoxication had any substantial effect on her conduct in our case.

So while there is evidence of intoxication, it would not appear that it's of the quality that *interfered with* the defendant's capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law.  So it does not appear to this court that the factor (h) is present.

RT 4504-05 (emphasis added).  In fact, there was substantial evidence of both Ms. Alfaro's mental defects and her intoxication at the time of the crime that should have weighted the scales toward mitigation.  Investigator Giffin did not "carefully examine[ ] her in that area," and she did not "indicate . . . that any intoxication had [had no] substantial effect on her conduct."  Again, the trial judge based his ruling on a misrepresentation of the facts.

16.  Investigator Giffin began the video taped interview by asking Ms. Alfaro whether she was addicted to cocaine or heroin or both.  CT 507.  Her response was "both."  *Id.*  The investigator then asked her to tell him what happened the day of Autumn's murder.  She began, "I went over there on that day, I was already like, like coked out and stuff, I don't know what I what I was doing . . . ."  CT 509.  She continued, "I was really wired and I was gonna just take something . . . ."  *Id.*

17.  After Ms. Alfaro admitted that she had stabbed Autumn, the investigator took her back over the events of the day in more detail.  The second time through, she told the investigator that she went to "Little TJ" around 12:00 p.m. that day (CT 516) to "pick up" drugs.  CT 515.  After she "picked up" "two dimes of coke and two dimes black [tar]," she went to her friend Juan's apartment and "did it there."  *Id.*  She "cook[ed] it up," and injected herself in the neck.  CT 515-16.  This was at approximately two o'clock in the afternoon.  CT 516.  She stated that shortly after she injected these drugs, "I came back down [to the apartment where she had purchased the drugs] cause I wanted more but I didn't have no money.  So some guy named

216

Shorty came up . . . and he gave me some . . . ." CT 517.  She stated, "I got like kind

of greedy, you know, I wanted to do more and more and more and more."  CT 518.

18.  Ms. Alfaro described to Investigator Giffin how, when they got to the

Wallace house, "I went and knocked and I asked [Autumn] if I could use the

bathroom and she said, 'yeah.'  And I just went in the bathroom and I was like really,

I don't know, I was like really wired, really coked out and stuff."  CT 526.  When the

investigator asked her why she went to the bathroom, she responded, "I don't know,

I just went in there.  I don't know, I was like really, I was really wired, I was real

coked out."  *Id*.  After Ms. Alfaro admitted stabbing Autumn Wallace multiple times,

the investigator asked her why she kept stabbing her.  CT 531.  Ms. Alfaro responded,

"I don't know, I was scared, I don't know what I was doing, I just . . ."  CT 532.  The

investigator asked Ms. Alfaro what she did after she left the house and again she

stated, "I was just like really wired . . . ."  CT 542.  Later, she described waiting

at a bus stop with some of the property she had taken from the Wallace's in a bag.

She says, "I dropped the bag and the mirror broke. . . . And there was a lady right

there and since I was really high and loaded and stuff, I told the lady if she wanted it

and I gave it to her."  CT 561.

19.  The investigators then took Ms. Alfaro through the sequence of events

yet again:

> Investigator Giffin:  When you got over to Juan's, you hooked up with Sabrina, you went down and got a two and two, you came back up and you fixed, you and Sabrina and you still wanted to fix some more.

> Ms. Alfaro:  Uh-huh.

> * * *

> Mr. Giffin:  . . . you let Shorty use your rig.

> Ms. Alfaro:  Yeah.

> Mr. Giffin:  Then he gives you some more?  Then you decided you want some more?

> Ms. Alfaro:  Yeah.

217

1          * * *

2      Mr. Giffin:  Did you tell them you were going to get that stuff and sell it
       so you can buy some more dope?
3      Ms. Alfaro:  Yeah, I told Shorty.

4  CT 548-49.  The investigator then asked Ms. Alfaro about a statement she had made

5  that Shorty had just gotten out of jail.  CT 573.  He asked her how she found out he

6  had just gotten out of jail, and she responded, "I didn't ask him, I . . .I was just really

7  high, I don't know."  CT 574.

8          20.   Towards the end of the interview, the investigators attempted to eliminate

9  any sort of intent defense with the following line of questioning, which clearly

10 established that Ms. Alfaro was not unconscious, but just as clearly left open the

11 possibility that her ability to conform her conduct to the requirements of the law had

12 been impaired:

13     Mr. Bale:  . . . don't try to convince me that you were out of your head.

14     Ms. Alfaro:  No, I wasn't out of my head.

15     Mr. Bale:  I know.

16     Ms. Alfaro:  And I'm not trying to do that.

17     Mr. Bale:  You know what was, you know what . . .

18     Ms. Alfaro:  . . . yes, I know.

19     Mr. Bale:  You know exactly what was going on.

20     Ms. Alfaro:  Yeah, I know.

21     Mr. Bale:  What did you think would happened to, to Autumn when you
       started stabbing her, what do you think was gonna happen?  What
22     happens when you take a knife and poke holes in somebody?  What,
       what can happen to them?  What did you think was gonna happen?
23
       Ms. Alfaro:  She was gonna die.
24
       Mr. Bale:  Okay.  So you were, you were fully aware of that when you
25     started stabbing her, that she could die from that.

26     Ms. Alfaro:  Yeah.

27 CT 577.  This comprises the entirety of Mr. Giffin's questioning of Ms. Alfaro

28 concerning the level of her intoxication.  Far from stating that the drugs had not

                                    218

1 impaired her ability to conform her conduct to the requirements of the law, she

2 repeatedly confirmed that she was heavily under the influence.

3       21.   During her cross-examination at the first penalty trial, which was read to

4 the jury at the second penalty trial, Ms. Alfaro provided additional information about

5 the level of her intoxication and the effects it had on her mental ability including the

6 fact that after shooting up a "twenty and ten" she was high for approximately two

7 hours.  RT 1667.  On redirect, she stated that she had shot up with heroin and coke an

8 hour to an hour and a half before she went to the Wallace house.  RT 1727.  She

9 explained that when she used the word "wired" she meant "when you're out of

10 control, you're -- if you've done too much coke, you panic and you get wired.  Just

11 can't control your -- I don't know how to explain it, but just like in panic.  You

12 panic."  RT 1727-28.  She stated that this was the state she was in when she was in

13 the house with Autumn.  RT 1728.  She clarified that while she had told the

14 investigators she was not out of her head that day, she was in fact wired at the time

15 she killed Autumn Wallace.  RT 1729.  There was clearly substantial evidence that

16 Ms. Alfaro's capacity to conform her conduct to the requirements of the law was

17 impaired by heroin and cocaine, and the trial court made a factual and legal error in

18 disregarding it.  His errors evidence his bias.

19       22.   Charged with deciding whether Ms. Alfaro should live or die, Judge

20 Millard was also required to address whether her youth constituted mitigating

21 evidence.  Penal Code § 190.3(i).  His ruling clearly indicates his bias.  After noting

22 that Ms. Alfaro was eighteen at the time of the crime, the court stated:

23       If mere age by itself without any other factor is involved, it would appear
        perhaps that the age of eighteen might be a mitigating factor in the case.
24       I think you have to put the age in context of what her background shows
        about she had dropped out of school at an early age, been out on the
25       streets for a substantial period of time, been involved in the drug culture
        for a substantial period of time, things of that nature.  So would appear
26       that in a streetwise sense she was much more mature than her age would
        indicate.
27       So it doesn't appear that the age of the defendant at the time of the crime
        is really a substantial mitigating factor in the case.
28

1   RT 4505.   As set forth in Claim I, school records, medical records, and the testimony

2   of experts belie this conclusion.  The fact that it is so completely wrong evidences the

3   trial court's bias.

4        23.  Judge Millard was also required to address whether any other evidence

5   gave rise to sympathy and thereby constituted mitigating evidence.  Penal Code

6   § 190.3(k).  The court stated:

> I guess this is where counsel brings in the disadvantaged background
> of the defendant, her early involvement with drugs, her prostitution,
> things of that nature.  The problems she had with her father, allegedly,
> the problems she had with the father of her second child and third and
> fourth child.  I guess that's where all of these factors fit in.  The fact that
> she is a mother of four children.  Obviously at the time this offense
> occurred she was only the mother of two children.  But she is now as she
> sits there at counsel table the mother of four children.  And I guess that's
> where counsel tries to fit in all of those factors in item (k).  And *those
> factors have kind of a two-edged sword in a way*.  It appears that the
> defendant did get involved in drug activity, came from a separated home,
> and had a disadvantaged youth.
>
> It also appears to the court that people are really the sum total of
> the choices we make in our life.  She chose to leave school.  She chose to
> use drugs.  She chose to engage in acts of prostitution on the streets.  She
> chose to hang out in the area on Jeffery Street over there where there is a
> -- the drug culture is involved.  She made all of those choices.  Those are
> all choices.  There was no evidence presented to the court that those
> were involuntary choices, anybody forced her into doing that, things of
> that nature.
>
> So on the one hand you can say well, she is the mother of four
> children and she is young.  On the other hand, you can say that she made
> those choices, she ought to be responsible for making those choices.
>
> And it was a little shocking to the court, I'm sure it was shocking
> to the jury, that one of her children was taken to the crime scene and was
> cared for in the hands of a relative stranger, a person who just got out of
> prison a couple of days earlier, left to take care of her young boy of
> about eighteen months on the front lawn while she went into the house
> and stabbed Autumn Wallace over fifty times. *So that all cuts a couple
> of ways.*  And it would not appear to the court that the (k) factor has any
> substantial weight in our case.

25   RT 4506-07.  In essence, the court weighed potentially mitigating evidence relevant

26   to the sympathy factor, such as Ms. Alfaro's abusive childhood and mental

27   disabilities which led her to self-medicate with drugs and to motherhood four times

28   over by the time she was eighteen, as "a two edged sword" which he then used

1 against her in finding that she should be put to death.  This clearly indicates the trial

2 court's bias.

3       24.  When the trial court addressed the factor codified in §190.3(a), the

4 circumstances of the crime, Judge Millard made it clear that he was biased against

5 Ms. Alfaro -- in part because of her attorney's conduct -- but also because of the

6 particulars of this case:

> It appears to the court that the -- I've been involved in the legal profession since January 1965.  I was involved with -- I first started in Orange County on a great day of April Fools Day of 1966, and I have been involved in the legal community in Orange County since that time.
>
> In my past I've prosecuted people accused of offenses like Miss Alfaro, I have defended people accused of noncapital homicide offenses when I was a defense attorney, and I have been a member of the Superior Court for over thirteen years.
>
> This case is one of the most senseless, brutal, vicious, callous killings that this court has ever seen.  The description that a picture is worth a thousand words, the circumstances of this offense shown by the photographs show a very vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case.
>
> So it does appear to this court that the circumstances of the offense in item (a) of Penal Code section 190.3, that the circumstances of the crime itself standing alone far outweigh *any mitigating circumstances, if there are any, that are presented in this case.*
>
> In conclusion on that I am satisfied that the jury's verdict imposing the death penalty and reviewing all of those factors is consistent with the evidence and the law that the factors in aggravation, as I have described, beyond all reasonable doubt outweigh any factors in mitigation, and therefore the motion to modify the penalty is denied.

21 RT 4508-09 (emphasis added).  There is no question that this was a brutal crime, but

22 for Judge Millard to say that he could not "imagine that anyone could ever dream one

23 up that would match this case," evidences his bias.

24       **3.**     **The Trial Judge Had a Personal Interest in the Case Based Upon His**

25            **Work Relationship With the Victim's Mother**

26       25.  Because the victim's family included two long time Orange County court

27 employees, the trial court also had a connection to the family.  Deputies assigned

28 to escort Ms. Alfaro to court asked why her attorney had not moved for a change

of venue.  Judge Millard's status as a colleague of the victim's mother and aunt
compelled a knowing and intelligent waiver by Ms. Alfaro.  The Judge's wife
advertised in the Clerk's Union newsletter every month of 1992.  A bakesale was held
on the courthouse grounds at or around the time of trial, and Orange County clerks
attended the trial whenever possible to show their support for the Wallace family.
Exhibit 1 (McGrath Declaration) at ¶¶ 63-71; Exhibit 83 (Snell Declaration) at 6-7.[21]

26.  The foregoing violations of Ms. Alfaro's constitutional rights
constitute structural error and warrants the granting of this Petition without any
determination of whether the violations substantially affected or influenced the jury's
verdict.  *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906
(1997) ("A criminal defendant tried by a partial judge is entitled to have his
conviction set aside, no matter how strong the evidence against him.")

**XXI.**

**CLAIM 16:  THE CONFLICT BETWEEN PETITIONER AND TRIAL
COUNSEL VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**

The convictions and sentence of death were rendered in violation
of Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and
non-capricious determination of guilt and penalty, to a neutral and impartial decision-
maker, and to due process of law as guaranteed by the Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution because trial counsel had
an actual conflict of interest that adversely affected his performance.

1. Exhaustion of the claim:  This claim was fairly presented to the California
Supreme Court in the direct appeal.  It was presented as Claim 1 in the Opening Brief.

---

[21]   Discovery of evidence of the relationship between the trial court and the
victim's family members is warranted.  State habeas counsel's investigator attempted
to interview court personnel and the Millards, to no avail.  Exhibit 1 (McGrath
Declaration) at ¶¶ 68-70.  State habeas counsel did not believe it was appropriate to
approach the Wallace family without this Court's authorization.  Exhibit 83 (Snell
Declaration) at 6-7.

1      2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

2  *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

3  denial of this claim is both "contrary to" and an "unreasonable application" of clearly

4  established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim

5  *de novo*.  Moreover, because the state court's adjudication of this claim was

6  dependent on an antecedent unreasonable application of federal law, this Court "must

7  then resolve the claim without the deference that AEDPA otherwise requires."

8  *Panetti*, 127 S. Ct. at 2858.

9      3.  If Respondent disputes any of the facts alleged below, Petitioner requests an

10  evidentiary hearing so that the factual disputes may be resolved. After Petitioner has

11  been afforded discovery and the disclosure of material evidence by the State, the use

12  of this Court's subpoena power, and the opportunity to investigate fully, counsel

13  requests an opportunity to supplement or amend this petition.

14      4.  The declarations and other exhibits filed with this petition, as well as the

15  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

16  reference into this claim as though set forth in full.

17      5.  In support of this claim, Petitioner alleges the following facts, among others

18  to be presented after full discovery, investigation, adequate funding, access to this

19  Court's subpoena power, and an evidentiary hearing:

20  **A.    INTRODUCTION**

21      6.  Maria del Rosio Alfaro gave a four-hour videotaped confession immediately

22  after her arrest in which she took full responsibility for the death of Autumn Wallace.

23  She told her attorney William Monroe repeatedly before trial that she wanted to plead

24  guilty to the charges.  She told him that she did not want to implicate anyone else.

25  Mr. Monroe refused, however, to allow her to enter a guilty plea.  Over her objection,

26  and in the absence of any evidence to support his theory, he chose to pursue a defense

27  that the unidentified man who had driven Ms. Alfaro to the scene was responsible for

28  Autumn Wallace's murder.

223

7.  When a capital defendant seeks to plead guilty and counsel withholds consent, there is an actual, irreconcilable conflict that adversely affects trial counsel's performance.  The trial court's refusal to appoint alternate counsel requires reversal.

8.  Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a result of the trial court's failure to resolve the conflict between Petitioner and her trial counsel.

9.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

10.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

11.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

**B.    STATEMENT OF FACTS**

12.  On June 27, 1991, the day of her arrest, Ms. Alfaro agreed to be interviewed by law enforcement officers without counsel present.  Less than five minutes after having been read her *Miranda* rights, Ms. Alfaro admitted that she stabbed Autumn Wallace.  CT 509-10.  During the nearly four hours of questioning that followed, Ms. Alfaro repeatedly confessed to killing Autumn Wallace and described in detail the circumstances of the crime, including her intention to steal

property when she went into the Wallace home.  She described taking a knife from the kitchen drawer shortly after entering the house.  CT 570.  She admitted inflicting all of Autumn's wounds:

> Q:   So if anyone besides you did the stabbing or if anyone besides you, in other words, if, if you didn't stab her but somebody else did or if all three (3) of you stabbed her, took turns, then now is the time to tell us.
>
> A:   I did.
>
> Q:   You did it all.  Nobody did any stabbing except you?  Was she injured in any way when you got there?
>
> A:   No.

CT 572.  She admitted stabbing Autumn both in the back and the front (CT 531-32); she admitted knowing that the wounds she inflicted could cause death (CT 577); and she admitted deliberating, although perhaps at the detective's urging and not because she actually understood the concept.  CT 529.  Consistently, throughout the course of the interview, Ms. Alfaro took sole responsibility for Autumn's death.

13.  On February 20, 1992, eleven days before jury selection was to begin, Ms. Alfaro's counsel sought guidance from the court.  In a "request for special instructions" filed *in camera*, he informed the court, "[m]y client . . . refuses to follow my instructions and take the stand and implicate 'Beto'. . . .  If my client insists on pleading guilty to the special circumstances, it is against my most rigorous advice. I am requesting instructions from the court as to whether or not the court believes it is necessary for me to withdraw from the case at this late stage or whether or not I should remain on the case."  CT 355.

14.  The following day, February 21, 1992, the court met with defense counsel and Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992 proceedings).  During the discussion that ensued, defense counsel described an "out and out conflict" between himself and Ms. Alfaro regarding her desire to plead guilty and his "wish to proceed to trial on the guilt phase":

1
2
3
4

The Court:  You've asked the court for some instructions here and I'm not really in a position to give any instructions concerning your relationship vis-a-vis your client.  No one has made a motion to be relieved.  No one has made a motion to have substitute counsel.  So there is really nothing -- there is really nothing before, properly before the court, to consider that.

5
6

So you have expressed some concerns here and I don't know if the purpose of this in-camera hearing is to allow you to put on the record what your concerns are and make sure your client understands certain rights she has or what we are doing.

7
8
9

Mr. Monroe:  . . . Your Honor, I believe I'm asking the court to give me a lead or advice as to whether or not the court believes I should declare a conflict because I believe that a conflict may exist.  I wish to proceed to trial on the guilt phase.  I wish to call Shorty, one of the witnesses, and that Beto who we believe is the other killer.

10
11
12
13
14
15

My client has adamantly, adamantly refused to allow me to call Beto or to cross examine Shorty regarding his relationship with Beto . . . because my client has told me she is in absolute fear of her safety and she's in absolute fear of the safety of her family should it become known to Beto that we in some way, shape, or form, for lack of a better term, have given him up. . . .  I'm concerned, Your Honor, if I proceed the way I want I'm placing my client's life and her family's lives in jeopardy according to my client.  If I proceed the way my client wants to proceed, it's against my vigorous, vigorous advice because she wants to plead guilty to a special circumstance homicide where there is no evidence of a 211 circumstance --

16
17
18

The Court:  She can't plead guilty without the consent of counsel.  That's Penal Code section 1018.  In a capital case the court doesn't have the authority to accept a guilty plea from a defendant without the consent of the attorney.

19

Mr. Monroe:  I, in good conscience could not consent.

20

The Court:  There could not be a guilty plea.

21

Mr. Monroe:  That's right.  However, my client insists on pleading guilty.

22

The Court:  She might insist on it.  The court is not going to accept any guilty plea on a capital case without the consent of the attorney.

23
24

Mr. Monroe:  Then my client turns around and tells me she does not want certain witnesses called or me to conduct the trial the way I think it should be conducted.  I have an out and out conflict.

25
26
27
28

The Court:  I'm not sure you do have an out and out conflict that would justify your being taken off the case.  I think what you should do is basically what you are doing.  You should indicate where you disagree, make sure she understands that she's going against your advice, going against your desires, and that she consents to it and specifically has directed you to proceed in a certain fashion.

1    I'm not sure a lawyer is entirely quote "independent" from the best
2    interests and desires of the client.  Basically, lawyers are really here to
     serve the client.

3    Mr. Monroe:  That's exactly the point.  But I can't turn around and say
     I consent to allow my client to plead guilty when I know she's pleading
4    guilty for all intents and purposes to a death sentence.

5    The Court:  There is no problem with that.  If you don't want to consent
     to it, you don't have to consent to it.  But that doesn't cause any
6    automatic conflict that would relieve you and put some other attorney in,
     not unless we are going to call up all of the attorneys in Orange County
7    and see who would consent to somebody pleading guilty to a capital
     offense.  And I don't plan to do that.  And I am not sure you would find
8    any, if any, that would do it if they were competent legal counsel.

9    Mr. Monroe:  . . . In effect she and I are at loggerheads.

10   The Court:  Well, you might be at loggerheads but that doesn't mean that
     you have a conflict of interest between the two of you that is of such
11   magnitude that she is denied the right to effective assistance of counsel.
     She has instructed counsel what she wants to do.
12
     Mr. Monroe:  And I cannot effectively represent her if I follow her
13   instructions.

14   The Court:  Well, you cannot represent her the way you want to
     represent her.
15
     Mr. Monroe:  So I'm suppose[d] to represent her incompetently then by
16   not presenting a vigorous defense.

17   The Court:  No.

18   Mr. Monroe:  I cannot present the defense I need because she won't
     allow me to.
19
     The Court:  You can't force her to testify. . . . That doesn't cause any
20   conflict of interest. . . .

21   Mr. Monroe:  I cannot effectively represent my client at this stage in
     light of the instructions she has given me.
22
     The Court:  You cannot represent her the way you want to represent her,
23   but that doesn't mean you can't effectively represent her to the best of
     your abilities within the guidelines or parameters she has outlined for
24   you.

25   Mr. Monroe:  Which is to put on a shallow bare-bones sham defense.

26   The Court:  . . . I don't know what you want to call it.  But she has an
     absolute right not to testify.
27
     And your whole defense, from what I read in this in-camera
28   document, your whole defense is based on her getting on the stand and

227

1
2

pointing the finger at somebody else. And she is not going to do that, according to this, not unless she changes her mind. And if she doesn't do it, it definitely handicaps your efforts to defend her.

3

***

4
5
6
7

The Court: Bottom line. Bottom line is clients have a lot of control over how a case is presented. And the mere fact that you and her disagree over her getting on the stand might be a conflict in fact between you. But it is not the kind of a -- kind of conflict that is a legal conflict that would justify the court in appointing new counsel to represent her especially on the eve of trial.

8
9

And this thing has been going on for a long time and apparently . . . you have been at loggerheads with her for some time. I don't think this is the first time that you mentioned to me she didn't want to testify.

10
11

Mr. Monroe: This is the first time I mentioned to you that she does not want to testify. . . . [T]his is the first time last week or on the 12th when she told me she wanted to plead guilty and did not want to testify.

12

The Court: Well, the court cannot accept and will not accept a guilty plea from her without your consent under Penal Code section 1018.

13
14

Mr. Monroe: I think as a minimum, Your Honor, we ought to have counsel appointed to advise her about the consequences of her act.

15

The Court: I'm sure you have advised her of what the consequences of her not testifying are.

16
17

Mr. Monroe: I certainly have. However, maybe because of this conflict that she and I have, maybe an independent person should be talking to her.

18
19
20

The Court: Well, you haven't raised anything in this paperwork that would indicate you are having a communication problem or that she is not understanding what you're saying or that somebody else would be in a better position to do it. . . . You just basically have a basic disagreement over the tactics in defending her.

21
22

Mr. Monroe: It's more profound than that. It's a basic disagreement what she wants to do with her life.

23

The Court: But it is her life. It's not your life.

24

Mr. Monroe: It's my obligation to look after her life.

25
26
27

The Court: That's right. But it is your obligation to serve her to the best you can within the ethical framework of being her attorney. But we should never lose sight of the fact that it's her case. She is a party to the case. She is the one that has the constitutional rights. You don't have any constitutional rights in this case.

28

Mr. Monroe: She's a 20-year-old girl.

The Court:  She is the one that has the constitutional rights.

Mr. Monroe:  A 20-year-old child is going to plead guilty to a death penalty?

The Court:  I don't know why you talk about pleading guilty.  There is no way she'll plead guilty without the consent of her attorney of record, period.  You have indicated very clearly you don't consent to that.  So there isn't going to be a plea of guilty, period.

Mr. Monroe:  You understand that Rosie -- Miss Alfaro?

The Defendant:  Then what am I going to do?  I told you what I wanted to do.

Mr. Monroe:  What do you want to do?

The Defendant:  Plead guilty.

Mr. Monroe:  You put me in an absolute[ly] untenable position, Judge Millard.

The Court:  That is what you think.  I don't think so.  You are no different than other lawyers that have a disagreement over tactics.  Cases are legion in the California courts that a mere disagreement over tactics does not justify -- is not a legal conflict from the standpoint of such magnitude that will effectively deny the person their right to counsel.  There are all kinds of tactical conflicts that occur in cases of criminal and civil cases.  That doesn't mean on the eve of trial all of a sudden we change attorneys and start the case all over again.  It just doesn't happen that way.

***

Mr. Monroe:  Pleading guilty is more than tactics.

The Court:  As I indicated, unless she can convince you to consent to her pleading guilty, there won't be any plea of guilty in the case.  So I don't know what else to tell you.

RT 106-23 (February 21, 1992 proceedings).

15.  On February 26, 1992, defense counsel filed a motion to suppress Ms. Alfaro's confession.  CT 380.  Mr. Monroe argued that drugs affected Ms. Alfaro's judgment and rationality at the time her statement was made to the police.  CT 383.  Claiming that she was incompetent at the time, Mr. Monroe argued that introduction of the confession would violate her right to counsel, right against compulsory self-incrimination, and right to due process.  CT 383.  The motion was heard on February 26, 1992.  RT 133-87 (February 26, 1992 proceedings).  The court

1   found that the statements made were voluntary products of her own free will, and

2   that the degree of drugs in her system did not appreciably affect her ability

3   to knowingly and voluntarily waive her rights.  RT 306-07.  As well, on cross

4   examination, defense psychiatric expert Dr. Consuelo Edwards admitted that

5   Ms. Alfaro knew what she was being told and was not irrational or incoherent.

6   RT 253-55.  Despite defense counsel's knowledge as of March 2, 1992, that

7   Ms. Alfaro's confession would be admitted, there is no evidence that defense counsel

8   reconsidered his decision to prevent her from entering a guilty plea.  RT 307.

9       16.  The record further reflects that although defense counsel continued to

10  search for evidence that the mysterious third man had entered the Wallace home until

11  the eve of trial, his efforts were unsuccessful.  But again, there is no evidence that his

12  fruitless efforts caused him to reconsider his decision to prevent Ms. Alfaro from

13  entering a guilty plea.

14      17.  On March 3, 1992, jury selection began.  The people rested on March 18,

15  1992.  As anticipated, Ms. Alfaro waived her right to testify, and the defense rested

16  the same day.  RT 1179; CT 498-501.  On March 23, 1992, the jury found Ms. Alfaro

17  guilty of all charges, including first degree murder with special circumstances.

18  RT 1398-1411; CT 1086-90.

19      18.  On March 30, 1992, the penalty phase began.  In his opening statement,

20  the District Attorney told the jury, "You're going to find, ladies and gentlemen, from

21  the evidence that Rosie Alfaro has not accepted the responsibility for the killing

22  of Autumn Wallace."  RT 1436.  After the first penalty jury hung, and the second jury

23  was impaneled, the District Attorney again told the jurors that:  "Miss Alfaro has not

24  accepted any responsibility.  That's what the evidence will show."  RT 3179.  During

25  his closing in the second penalty trial, the District Attorney returned to this theme.

26      Remorse, Ladies and Gentlemen? . . . Ladies and Gentlemen, th[e]
        remorse [Ms. Alfaro exhibits in the video-taped confession] was not for
27      her, that little girl.  That remorse was for the plight of Rosie Alfaro only.
        You can say a whole lot of things.  You can mouth the words. . . .
28      Especially once you get into the system and you know what's expected,

1
2

> you can mouth the words, "I have sympathy" or "I have remorse" or "I feel sorry." *But actions speak louder than words.* The only remorse she has is for sitting in jail for what she's done.

3
4

RT 4367-68 (emphasis added).

5
6
7
8
9
10
11
12

19.   Neither jury was informed that Ms. Alfaro had sought to plead guilty to the charges without any guarantee of leniency, but had been prevented from doing so by her counsel, despite both the court's and defense counsel's knowledge that this was, in fact, the case.[22]  Instead, both Ms. Alfaro's attorney and the judge sat silent as the District Attorney argued during the second penalty phase, "Who operates the defense?  It's at the operation of Ms. Alfaro.  She's the defendant.  She chooses to fabricate, fake, embellish and create."  RT 4366.  "Remorse, Ladies and Gentlemen?"  RT 4368.

13
14

20.   On June 9, 1992, after deliberating for three days, the second penalty phase jury sentenced Ms. Alfaro to death.  CT 1584.

**C.    LEGAL BASIS OF THE CLAIM**

15
16
17
18
19
20
21
22
23
24
25

21.   Upon notification that an actual or potential conflict of interest exists, a trial court has the obligation "either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); *see also Wood v. Georgia*, 450 U.S. 261, 272, & n.18, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981).  If the trial court fails to undertake either of these duties, the defendant's Sixth Amendment rights are violated.  *See Holloway*, 435 U.S. at 484.   Complete reversal is required where the attorney's performance was "adversely affected" by the conflict of interest.  *Mickens v. Taylor*, 535 U.S. 162, 174, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

26
27
28

---

[22]  Mr. Monroe's failure to introduce Ms. Alfaro's unconditional offer to plead guilty as mitigating evidence during the penalty phase of her trial, see *People v. Williams*, 45 Cal. 3d 1268, 1232 (1988), is addressed in Claim I.E..

1      **1.     The Trial Court's Refusal to Substitute Counsel Violated**

2                  **Ms. Alfaro's Sixth Amendment Right to Conflict-Free Counsel**

3      22.  That there was an actual conflict between Ms. Alfaro and her counsel

4  on February 21, 1992, is obvious.  Although Mr. Monroe initially sought the court's

5  advice on whether he had a conflict, he later Mr. Monroe made clear that he had

6  "an out and out conflict."  He knew that his client wanted to plead guilty, an intention

7  she unequivocally reaffirmed before the judge.  Nevertheless, Mr. Monroe refused

8  to give his consent.  ("I can't turn around and say I consent to allow my client

9  to plead guilty when I know she's pleading guilty for all intents and purposes

10  to a death sentence.").  Instead, Mr. Monroe wanted to present at the guilt phase

11  "the defense [he] need[ed]," which was that a third person committed the murder.

12  Given the clear contradiction between his client's express wishes and his desire

13  to present a complete guilt phase presentation, Mr. Monroe was, in his view, in

14  an "absolute[ly] untenable position."

15      23.  Mr. Monroe's recognition of the conflict should have been the end

16  of the matter.  Criminal defense counsel are "in the best position professionally and

17  ethically to determine when a conflict of interest exists or will probably develop

18  in the course of a trial." *Holloway*, 435 U.S. at 485.  Due to trial counsel's unique

19  perspective, the courts "necessarily rely in large measure upon the good faith and

20  good judgment of defense counsel." *Cuyler* , 446 U.S. at 347, *Mickens*, 535 U.S.

21  at 167-68 (recognizing how the *Holloway* Court "deferred to the judgment of counsel

22  regarding the existence of a disabling conflict, recognizing that a defense attorney

23  is in the best position to determine when a conflict exists, that he has an ethical

24  obligation to advise the court of any problem, and that his declarations to the court

25  are 'virtually made under oath'").

26      24.  The trial counsel's attempts to recharacterize the conflict as a strategic

27  disagreement constituted an unreasonable determination of the facts.  During the *in*

28  *camera* hearing, the trial judge disagreed with trial counsel's representation that a

conflict had arisen: "I'm not sure you do have an out and out conflict that would justify your being taken off the case. I think what you should do is basically what you are doing. You should indicate where you disagree, make sure she understands that she's going against your advice, going against your desires, and that she consents to it and specifically has directed you to proceed in a certain fashion." RT 112-13 (February 21, 1992 proceedings). Then, seconds later, the court contradicts itself, telling counsel, "If you don't want to consent to [a guilty plea] you don't have to consent to it." RT 113 (February 21, 1992 proceedings). At another point, the court stated, "[y]ou might be at loggerheads but that doesn't mean that you have a conflict of interest between the two of you that is of such magnitude that she is denied the right to effective assistance of counsel. She has instructed counsel what she wants to do." But then, when counsel responds, "[a]nd I cannot effectively represent her if I follow her instructions," the court must concede that this is true:

> The Court: . . . I don't know what you want to call it. But she has an absolute right not to testify. And your whole defense, from what I read in this in-camera document, your whole defense is based on her getting on the stand and pointing the finger at somebody else. And she is not going to do that, according to this, not unless she changes her mind. And if she doesn't do it, it definitely handicaps your efforts to defend her.

RT 116 (February 21, 1992 proceedings).

25. The trial judge even admitted that he had been aware "for some time" that Ms. Alfaro and her counsel "have been at loggerheads." RT 117 (February 21, 1992 proceedings). He acknowledged that they have "a basic disagreement over the tactics in defending her." RT 118 (February 21, 1992 proceedings).

26. Finally, the trial judge recognized that Ms. Alfaro could not pursue her desired course without trial counsel's consent. The judge hid behind § 1018, telling defense counsel, "I don't know why you talk about pleading guilty. There is no way she'll plead guilty without the consent of her attorney of record, period. You have indicated very clearly you don't consent to that. So there isn't going to be a plea of guilty, period." RT 118-19 (February 21, 1992 proceedings).

233

27.  But in the end, the trial judge denied that this created a conflict, telling defense counsel that he is "no different than other lawyers that have a disagreement over tactics."  RT 119 (February 21, 1992 proceedings).

28.  In this respect -- that a disagreement over whether a defendant should plead guilty is simply a tactical disagreement -- the trial judge was clearly wrong and defense counsel, who portrayed the dispute as "more profound than that," was clearly right.

**2.** **Mr. Monroe's Decision to Prevent Ms. Alfaro from Pleading Guilty Adversely Affected His Performance**

29.  "[C]ertain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Florida v. Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551; 160 L. Ed. 2d 565 (2004). Chief among these basic trial rights is the decision to determine whether to plead guilty. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (Burger, C. J., concurring) (stating "such basic decisions as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the accused to make."). Thus, before deciding whether to exercise or waive the right to plead not guilty, "an attorney must both consult with the defendant and obtain [the defendant's] consent to the recommended course of action." *Nixon*, 543 U.S. at 187.

30.  The American Bar Association's standards for the administration of criminal justice also provide that certain decisions must be left to the defendant. Standard 4-5.2 provides:

> Certain decisions relating to the conduct of the case are ultimately for the accused . . .  The decisions which are to be made by the accused after full consultation with counsel are . . . [¶] what plea to enter.

/ / /

234

31.  ABA Standards for Criminal Justice, 4-5.2 (1982) (emphasis added).
While "counsel is free to engage in fair persuasion and to urge the client to follow the
proffered professional advice," "the accused must make the decision[ ]."  4-5.2 cmt.

32.  A defendant's fundamental right to decide how to plead to a criminal
charge is beyond question.  California cannot abrogate this right through legislation.
Section 1018 of California Penal Code provides, in pertinent part:

> No plea of guilty of a felony for which the maximum punishment is
> death, or life imprisonment without possibility of parole, shall be
> received from a defendant who does not appear with counsel, nor shall
> that plea be received without the consent of the defendant's counsel.

33.  This section of the Penal Code prevents a capital defendant from pleading
guilty without the consent of his or her counsel.  Where, as here, trial counsel refuses
to consent to a guilty plea, notwithstanding the client's wishes, the statute creates an
intractable conflict.  State law cannot absolve trial counsel of his obligations under
the Sixth Amendment.

34.  As an initial matter, it is unclear whether Petitioner need even demonstrate
that pleading guilty is a "plausible alternative defense strategy."  *Hovey*, 458 F.3d
at 908, because the decision whether to plead guilty rests solely with the client.
*Jones*, 463 U.S. at 751.  In withholding consent from a client who desires to plead
guilty, Mr. Monroe's conflict undoubtedly had an adverse affect on his performance.
*Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006).

35.  Assuming *arguendo* Petitioner must demonstrate her decision to plead
guilty was a plausible strategy, this showing is easily met.  Given the overwhelming
evidence, including Alfaro's confession, her conviction was a foregone conclusion.
Even with strong evidence of third party culpability (which trial counsel failed to
develop and the prosecution withheld), Alfaro was faced with no chance to succeed at
trial because duress is never a defense to murder.  Accordingly, Alfaro's only hope
was to convince the jury to spare her life.  There is no better way to do so than
through a guilty plea.  "A guilty plea demonstrates remorse, and, since the same jury

235

sits during the guilt and penalty phases of a capital trial, it also lessens the exposure of jurors to the often dramatic evidence of the crime." *Meyer v. Branker*, 506 F.3d 358, 370 (4th Cir. 2007). There is no question that expressions of remorse by the defendant clearly qualify as relevant mitigation evidence at the penalty phase. *Brown v. Payton*, 544 U.S. 133, 143, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005) ("[R]emorse . . . is something commonly thought to lessen or excuse a defendant's culpability."); *Williams (Terry) v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (noting that expressions of remorse, along with other mitigating evidence, "might well have influenced the jury's appraisal of his moral culpability"); *People v. Smith*, 30 Cal. 4th 581, 627, 68 P.3d 302, 134 Cal. Rptr. 2d 1 (2003) ("the presence of remorse is relevant at the penalty phase"). Indeed, few factors have a greater ability to tip the scales in favor of life than the exhibition of remorse by the defendant. *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992) ("In a capital sentencing proceeding, assessments of character and *remorse* may carry great weight and, perhaps, be determinative of whether the offender lives or dies.") (emphasis added); Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty,* 83 Cornell L.Rev. 1557 (1998) (noting death jurors frequently comment that if the defendant had shown some sign that he was sorry they never could have voted for death); *Meyer*, 506 F.3d at 373 ("there is broad consensus on the fact that evidence of remorse is extremely important to capital sentencing juries").

## D.    **CONCLUSION**

36. Ms. Alfaro chose to accept responsibility for her crimes by pleading guilty unconditionally. When Ms. Alfaro's defense attorney refused to consent to her guilty plea, a conflict erupted between them that was serious enough for defense counsel to seek guidance from the court, informing the court that defense counsel believed he had an "out and out conflict" with his client that might warrant his withdrawal. Yet the court refused to become involved; citing California Penal Code § 1018, and

236

1   apparently interpreting that section to relieve the court of its duties to inquire into and

2   seek to resolve conflicts between defense attorneys and their clients, and thereby

3   protect the clients' Fifth, Sixth, Eighth and Fourteenth Amendment rights.  Had the

4   trial court performed its duty to inquire and resolve the conflict, the court should have

5   appointed substitute counsel.  The court's failure to do so violated Ms. Alfaro's Sixth

6   Amendment right to counsel.

7       37.  There is no question that the actual conflict adversely affected

8   Mr. Monroe's performance.  As a result of Mr. Monroe's view that Ms. Alfaro should

9   not plead guilty, he affirmatively prevented her from doing so.  As such, Mr. Monroe

10  divided his loyalties between what he viewed as the 'right' course of action and the

11  course of action sought by his client.  Mr. Monroe's conflict did not merely affect

12  a narrow aspect of the trial but permeated the trial itself but precluding Ms. Alfaro

13  from making a fundamental decision in her case.  Therefore, because Mr. Monroe

14  labored under an actual conflict that adversely affected his performance, automatic

15  reversal is required.

16      38.  The foregoing violation of Ms. Alfaro's constitutional right to conflict-free

17  counsel constitutes structural error and warrants the granting of this Petition without

18  any determination of whether the violations substantially affected or influenced the

19  jury's verdict.  *Brecht,* 507 U.S. at 638.

20      39.  The constitutional violations set forth in this claim alone mandate relief

21  from the convictions and sentence.  However, even if these violations do not mandate

22  relief standing on their own, relief is required when this claim is considered together

23  with the additional constitutional errors outlined in the remainder of this Petition.

24  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

25  sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

26  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

27  Cir. 1978).

28

## XXII.

### CLAIM 17:  THE TRIAL COURT ERRED BY PRECLUDING EVIDENCE OF PETITIONER'S OFFER TO PLEAD GUILTY

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court excluded critical mitigation evidence during the penalty phase.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court as Claim 2 in the direct appeal.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

238

1      5.  In support of this claim, Petitioner alleges the following facts, among others

2  to be presented after full discovery, investigation, adequate funding, access to this

3  Court's subpoena power, and an evidentiary hearing.

4  **A.      INTRODUCTION**

5      6.  Ms. Alfaro sought to enter an unconditional plea of guilty to the charges

6  and proceed to the penalty phase, but her attorney prevented her from doing so.

7  The District Attorney, seemingly unaware that Ms. Alfaro had sought to enter

8  an unconditional plea, moved before trial to exclude evidence that her attorney

9  had offered to have her plead guilty in exchange for a sentence of life without the

10  possibility of parole.  He argued that while an actual guilty plea would be mitigating

11  evidence, Ms. Alfaro's attorney's offer to have her enter a conditional plea was not.

12  Despite its knowledge that Ms. Alfaro had wanted to plead guilty unconditionally, the

13  court granted the District Attorney's motion and ordered Ms. Alfaro and her attorney

14  not to bring up the "issue" during either the guilt or the penalty phase of trial.

15  **B.      LAW IN SUPPORT OF THIS CLAIM**

16      7.  Under clearly established federal law, the sentencer cannot be precluded

17  from considering any relevant mitigating evidence offered by the defendant.[23]

18  *Payne v. Tennessee*, 501 U.S. 808, 822, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)

19  ("a State cannot preclude the sentencer from considering 'any relevant mitigating

20  evidence' that the defendant proffers in support of a sentence less than death");

21  *Hitchcock v. Dugger*, 481 U.S. 393, 394, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987);

22  *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).  The

23  _____

24      [23]  Following the Supreme Court lifting the moratorium on the death penalty imposed in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346
25  (1972), the Supreme Court imposed a number of requirements to ensure fairness in the capital sentencing process.  Chief among them was limitation on the State's
26  ability to narrow a sentencer's discretion to consider mitigation evidence. *McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) ("States cannot
27  limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the
28  sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.")

Supreme Court has spoken of relevant mitigating evidence "in the most expansive terms." *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 2570, 159 L. Ed. 2d 384 (2004). "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (internal quotations omitted). "Thus, a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'" *Tennard*, 542 U.S. at 284; *see McKoy*, 494 U.S. at 441. ("Once this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence."). "[T]he jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer v. Quarterman*, ___ U.S. ___, 127 S. Ct. 1706, 1714, 167 L. Ed. 2d 622 (2007).

8.   While relevant mitigation logically entails aspects of a defendant's conduct as it pertains to circumstances of the offense, *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (plurality opinion) (Berger, C.J.), it also includes conduct and characteristics without regard for the defendant's demeanor at the time of the crimes. *Skipper v. South Carolina*, 476 U.S. 1, 7, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) ("a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination"); *Tennard*, 542 U.S. at 281-82 (dispensing with any "nexus" requirement between the defendant's mental retardation and low intelligent quotient and the circumstances of the crime before that evidence is admissible in mitigation). By the same token, the prosecution may introduce a broad scope of evidence in aggravation to include evidence wholly unrelated to the particular defendant. *Barefoot v. Estelle*, 463 U.S. 880, 896, 103 S. Ct. 3383,

77 L. Ed. 2d 1090 (1983) ("the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty") (relying on *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Payne*, 501 U.S. at 825 (establishing the State's authority to introduce evidence of the specific harm caused by the defendant to include victim impact evidence).

**C.      STATEMENT OF FACTS**

9.   On February 21, 1992, the trial court met with defense counsel and Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992 proceedings).  During the discussion that ensued, defense counsel made it clear, as did Ms. Alfaro herself, that Ms. Alfaro desired to enter an unconditional guilty plea and proceed to the penalty phase of her trial.  *See* RT 106-23 (February 21, 1992 proceedings).

10.   The District Attorney was not present for the February 21, 1992 in camera hearing.  However, based on a motion he made five days later, it can reasonably be inferred that was unaware of Ms. Alfaro's desire to enter an unconditional guilty plea and proceed to the penalty phase.  Rather, it is apparent that at some point, Mr. Monroe approached the District Attorney and asked if he would be willing to plea bargain:  a sentence of life without the possibility of parole in exchange for Ms. Alfaro's plea of guilty.  *See* CT 400-01; RT 183-87 (February 26, 1992 proceedings).  In an oral motion made February 26, 1992, the District Attorney argued that evidence of an offer to plead to life without parole should be precluded because only an unconditional offer to plead guilty constituted a mitigating circumstance:

> Mr. Middleton:  [I]f the defendant wanted to plead guilty, she can plead guilty right up front, right now. *Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation.*  Not the fact that she extended or her attorney extended some kind of offer, because the attorney extending some kind of an offer isn't anything.
>
> I could say yes and then they could say, you know, fly their fingers right in front of my face and say we just wanted to see if you would do it: *to me it doesn't really mean anything unless there is an actual acceptance with the offer to really give some validity to the fact that the person is offering to plead guilty.*

241

1

2
      Mr. Monroe:  If that's Mr. Middleton's concern, Your Honor, I can have Miss Alfaro on the record represent to the Court to show the extent of her remorse -- she really does -- that she is willing now to plead guilty in return for life without possibility of parole.

3

4
      Mr. Middleton:  That's not the concern of the People that it's valid.  I'm saying without -- I mean *she could make it valid to the jury, this remorse or whatever else the defense is saying she has, by actually pleading guilty and going to the penalty phase.*

5

6

7
RT 185-86 (emphasis added) (February 21, 1992 proceedings).  Despite the court's

8
actual knowledge that Ms. Alfaro was willing to plead guilty unconditionally -- a fact

9
that the District Attorney conceded amounted to a mitigating circumstance -- the

10
court ruled as follows:

11
      The Court:  Well, it's definitely not relevant to anything in the guilt phase of the trial.  And it would appear to me -- unless you can submit some authority to the court, it would appear to me a mere offer to plead guilty, if the District Attorney strikes the -- or does not seek the death penalty, appears to me from a logic and common sense standpoint not to be the proper subject matter of mitigating testimony in a penalty phase, if we ever get to a penalty phase, in the trial.

12

13

14
          And it's. . . a motion in limine.  So, *in effect, the court would -- what it does, it directs counsel not to bring up that issue, or the defendant herself if she were to testify not to bring up that issue, without leave of court.*

15

16

17
          And whenever you feel you have some authority or some analogy by some cases or something of that nature you want me to look at, I will be more than happy to review the motion in limine.

18

19
         * * *

20
      Mr. Monroe:  Certainly in guilt but also in penalty?

21
      The Court:  In all phases of the trial unless you have leave of the court otherwise.

22

23
*Id.* at 187.

24
**D.    THE TRIAL COURT ERRED IN EXCLUDING THE EVIDENCE OF**

25
        **MS. ALFARO'S WILLINGNESS TO PLEAD GUILTY DURING THE**

26
        **PENALTY PHASES OF HER TRIAL**

27
      11.  The trial court knew that Ms. Alfaro wanted to enter an unconditional

28
guilty plea and did not want to implicate anyone else in Autumn Wallace's murder.

1    The court knew that Ms. Alfaro was ready and willing but unable to take full

2    responsibility for Autumn's death by pleading guilty to the charges, as her attorney

3    had refused to allow her to enter a guilty plea and insisted instead on putting on

4    a "sham" defense.  RT 115 (February 21, 1992 proceedings).  The court had heard the

5    district attorney admit that, even in his view, an unconditional guilty plea qualified

6    as mitigating evidence.  And it knew that the District Attorney was unaware of the

7    unconditional offer Ms. Alfaro had in fact been prepared to make.  Yet it "direct[ed]

8    counsel not to bring up that issue, or the defendant herself if she were to testify not

9    to bring up that issue, without leave of court."  RT 186-87.

10         12.  By refusing to admit evidence of Ms. Alfaro's willingness to plead guilty,

11    the trial court's error rises to the level of a constitutional violation.  Expressions of

12    remorse by the defendant clearly qualify as relevant mitigation evidence.  *Brown v.*

13    *Payton*, 544 U.S. 133, 143, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005) ("[R]emorse

14    . . . is something commonly thought to lessen or excuse a defendant's culpability.");

15    *Williams (Terry) v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389

16    (2000) (noting that expressions of remorse, along with other mitigating evidence,

17    "might well have influenced the jury's appraisal of his moral culpability");  *People v.*

18    *Smith*, 30 Cal. 4th 581, 627, 68 P.3d 302,134 Cal. Rptr. 2d 1 (2003) ("the presence of

19    remorse is relevant at the penalty phase").  Indeed, few factors have a greater ability

20    to tip the scales in favor of life than the exhibition of remorse by the defendant.

21    *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)

22    ("In a capital sentencing proceeding, assessments of character and *remorse* may carry

23    great weight and, perhaps, be determinative of whether the offender lives or dies.")

24    (emphasis added); Sundby, *The Capital Jury and Absolution:  The Intersection*

25    *of Trial Strategy, Remorse, and the Death Penalty,* 83 Cornell L.Rev. 1557 (1998)

26    (noting death jurors frequently comment that if the defendant had shown some sign

27    that he was sorry they never could have voted for death); *Meyer v. Branker*, 506 F.3d

28

243

358, 373 (4th Cir. 2007) ("there is broad consensus on the fact that evidence of remorse is extremely important to capital sentencing juries").

13. Ms. Alfaro clearly demonstrated contrition for her crimes. She he attempted to plead guilty before trial. The fact that Ms. Alfaro did not actually plead guilty should not have kept the jury from considering all evidence related to her offer to enter a guilty plea.

**E.    CONCLUSION**

14. Neither jury was informed that Ms. Alfaro had sought to plead guilty to the charges without any guarantee of leniency, but had been prevented from doing so by her counsel, despite the fact that even the District Attorney recognized that this was mitigating evidence. The failure to permit the mitigating evidence of Ms. Alfaro's willingness to accept responsibility, violated her Fifth, Sixth, Eighth and Fourteenth Amendment rights. As a result, her death penalty must be reversed.

15. The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

16. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XXIII.

### CLAIM 18:  THE TRIAL COURT COMMITTED MULTIPLE ERRORS CONDUCTING VOIR DIRE FOR EACH OF MS. ALFARO'S TRIALS

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because trial court committed numerous errors during voir dire.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 4 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

245

1    4.  The declarations and other exhibits accompanying this petition, as well as
2 the allegations and facts set forth elsewhere in this petition, are hereby incorporated
3 by reference into this claim as though set forth in full.

4    5.  In support of this claim, Petitioner alleges the following facts, among others
5 to be presented after full discovery, investigation, adequate funding, access to this
6 Court's subpoena power, and an evidentiary hearing.

7 **A.    INTRODUCTION**

8    6.  The capital trial of Maria del Rosio Alfaro involved a number of highly
9 inflammatory facts which, even with the extremes usually associated with death
10 penalty cases, made hers remarkable.  She was only 18 at the time of the crime, a
11 young woman and mother, the victim was a nine-year-old girl who died of multiple
12 stab wounds.  Ms. Alfaro was Hispanic, Autumn Wallace a Caucasian.  Ms. Alfaro
13 had used drugs from an early age, she was poor, she never finished high school.  The
14 trial court itself recognized that Ms. Alfaro's case was anything but ordinary, even in
15 the realm of capital trials.  Because her case could be expected to present jurors with
16 many difficult issues likely to engender strong emotions, the trial court was obligated
17 to employ voir dire methods that would neither overlook jurors whose biases or
18 prejudices made them unfit nor inject prejudice through the court's conduct directing
19 the process.  The trial court failed in each of its obligations.

20    7.  The United States and the California Constitution guarantee that each
21 defendant brought before a court of law to answer to criminal charges and face a
22 possible sentence of death if found guilty shall have a fair and impartial jury decide
23 her fate.  This principle is a fundamental tenet of the American faith in the jury
24 system.  In committing multiple errors while presiding over the voir dire for each of
25 Ms. Alfaro's trials, the trial court did violence to this covenant between the defendant
26 and our constitutions that she is entitled to be judged without bias or prejudice.
27 / / /
28

**B.**     **THE TRIAL COURT ERRED IN DENYING THE DEFENSE REQUEST FOR ADDITIONAL VOIR DIRE ABOUT THE CHILD VICTIM**

**1.**     **Introduction**

8.  During the course of jury voir dire in both Ms. Alfaro's first and second trials, Mr. Monroe sought to have prospective jurors questioned on whether they could remain fair and impartial once they learned that the victim in the case was a nine-year-old girl who had been stabbed to death.  The murder of a child provokes people's strongest emotions.  Mr. Monroe sought to determine if certain jurors would find that the only appropriate punishment could be death.  Such deeply human views may be perfectly understandable.  They nonetheless preclude the person who holds them from sitting on a jury in which the defendant could be found guilty of a first degree murder involving a child and in which special circumstances could be found true, and a life or death verdict must then be decided.  Monroe proposed a jury questionnaire which included the questions:

> It is expected that you will hear testimony regarding the multiple stabbing death of a 8-year-old [*sic*] girl.  Do you expect that such testimony would so upset you that you could not <u>honestly</u> be fair and impartial?
> If such evidence is introduced and proved to your individual satisfaction beyond a reasonable doubt, do you believe that would prompt you to automatically urge the death penalty regardless of any potential mitigating factors?

CT 137.  But the trial court refused to allow Mr. Monroe to explore this area of the prospective jurors' biases, claiming that such questions would be asking the individual juror to prejudge the evidence.

9.  The trial court's characterization of Mr. Monroe's proposed questioning was erroneous.  The jurors would not have been asked to prejudge the case.  Rather, Monroe sought to discover those prospective jurors who had in fact prejudged the case in that they had already decided the punishment and would thus improperly disregard any and all mitigating evidence.

10.  In denying the defense request for evidence that would identify jurors who should be stricken for cause, the trial court abused its discretion, and, as a result, deprived Ms. Alfaro of her Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial sentencing jury at each of her trials.

## 2.   Where A Particular Factor In A Case Would Cause A Juror To Invariably Vote For Death, That Juror Is Not Fair And Impartial

11.  "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." *People v. Earp,* __ Cal. 4th __, 85 Cal. Rptr. 2d 857, 873-74 (1999) (citation omitted). Moreover, when a state provides for jury sentencing, as California does, the right to a fair and impartial jury is as unassailable at the penalty phase as it is at the guilt phase of a capital trial; that right is secured by both the Fourteenth Amendment of the federal Constitution and by the California Constitution. *See* Cal. Const., art. I,  §§ 1, 7(a), 15, 16; *see also People v. Williams*, 16 Cal. 4th 635, 666 (1997) (citing *Morgan*, 504 U.S. at 726-728; *People v. Johnson*, 3 Cal. 4th 1183, 1210-1211 (1992); *see also People v. Gordon*, 50 Cal. 3d 1223, 1248, fn. 4. (1990)).  Thus, when a prospective juror's views about the death penalty would "prevent or substantially impair the performance of his [or her] duties as a juror," *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), that juror is not impartial and may be challenged "for cause."  *See People v. Danielson*, 3 Cal. 4th 691, 712, 838 P.2d 729 (1992); *see also People v. Coleman*, 46 Cal. 3d 749, 764-65, 759 P.2d 1260 (1988).

12.  "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Morgan,* 504 U.S. at 729-734 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  Therefore, "to preserve the right to a fair and impartial jury on the question of penalty, the death qualification process must probe

1   'prospective jurors' death penalty views as applied to the general facts of the case,

2   whether or not those facts [have] been expressly charged." *People v. Earp*,

3   85 Cal. Rptr. 2d at 874 (quoting *People v. Kirkpatrick*, 7 Cal. 4th 988, 1004-05,

4   874 P.2d 248, 30 Cal. Rptr. 2d 818 (1994)).

5       13.  "A prospective juror who would invariably vote either for or against the

6   death penalty *because of one or more circumstances likely to be present in the case*

7   *being tried*, without regard to the strength of aggravating and mitigating

8   circumstances, is therefore subject to challenge for cause, whether or not the

9   circumstance that would be determinative for that juror has been alleged in the

10  charging document." *People v. Kirkpatrick*, 7 Cal. 4th at 1005 (emphasis added).

11  As the United States Supreme Court stated, "Any juror who states that he or she will

12  automatically vote for the death penalty without regard to the mitigating evidence is

13  announcing an intention not to follow the instructions to consider the mitigating

14  evidence and to decide if it is sufficient to preclude imposition of the death penalty."

15  *Morgan*, 504 U.S. at 738.

16      14.  As a result, although a trial court has "considerable discretion . . .

17  to contain voir dire within reasonable limits," the court may not so restrict voir dire as

18  to preclude inquiry into jurors' views "on one or more circumstances likely to be

19  present in the case" that would cause the juror to invariably vote for the death

20  penalty.  *See People v. Kirkpatrick*, 7 Cal. 4th at 1005.  Limitations on voir dire

21  examination that create unreasonable risks of biases or prejudice violate a defendant's

22  right to an impartial jury.  *See Turner v. Murray*, 476 U.S. 28, 35-37, 106 S. Ct. 1683,

23  90 L. Ed. 2d 27 (1986).

24      15.  The Sixth Amendment guarantees criminal defendants trial by an impartial

25  jury.  A juror who is not "life-qualified" -- that is, one who would automatically vote

26  for the death penalty after conviction in every capital case -- is not considered

27  impartial.  *Morgan*, 504 U.S. at 729.  "[P]art of the guarantee of a defendant's right

28  to an impartial jury is an adequate *voir dire* to identify unqualified jurors."  *Id.*

249

1    "*Voir dire* plays a critical function in assuring the criminal defendant that his
2    [constitutional] right to an impartial jury will be honored.  Without an adequate voir
3    dire the trial judge's responsibility to remove prospective jurors who will not be able
4    impartially to follow the court's instructions and evaluate the evidence cannot be
5    fulfilled."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L.
6    Ed. 2d 22 (1981) (plurality opinion).

7        16.  "Were *voir dire* not available to lay bare the foundation of petitioner's
8    challenge for cause against those prospective jurors who would *always* impose death
9    following conviction, his right not to be tried by such jurors would be rendered as
10   nugatory and meaningless as the State's right, in the absence of questioning, to strike
11   those who would *never* do so."  *Morgan*, 504 U.S. at 733-34.  "Inadequacy of *voir*
12   *dire*" itself -- completely apart from whether any of the seated jurors was actually
13   biased -- requires the reversal of a death sentence.  Indeed, this was the result in
14   *Morgan* itself.  *Id.* at 739.

15       17.  As for the substance of voir dire, general questions about prospective
16   jurors' fairness and impartiality are not sufficient to satisfy the Constitution.  *Morgan*,
17   504 U.S. at 735.  The defendant must be permitted to inquire about the jurors' ability
18   to discharge their sentencing obligations in the case at hand.  *Uttecht v. Brown*,
19   127 S. Ct. 2218, 2226, 167 L. Ed. 1014 (2007) (upholding a trial court finding that
20   a prospective juror was disqualified under *Witherspoon v. Illinois*, 391 U.S. 510,
21   88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), because his voir dire questioning revealed
22   that "he had both serious misunderstandings about his responsibility as a juror and
23   an attitude toward capital punishment that could have prevented him from returning
24   a death sentence *under the facts of this case*" (emphasis added)).

25       18.  It is both permissible and necessary to explore juror bias with respect
26   to particular aggravating and mitigating factors likely to be presented to the jurors
27   in the case before them.  *See generally United States v. Johnson*, 366 F. Supp. 2d 822
28   (N.D. IA 2005).  For example, a prospective juror who states, in response to abstract

questions, that he could vote for life without parole, while in actuality, he could never

so vote in a case of murder of a child, would not be qualified to serve in a child-

murder case.  Such a juror would certainly vote for death following conviction in that

case, rendering the penalty phase a meaningless exercise.  If the defendant were

forbidden from inquiring about the prospective juror's views on the death penalty in

cases of murder for hire, the juror's bias could never be uncovered.  *See State v.*

*Williams*, 550 A.2d 1172, 1184 (N.J. 1988) (reversing conviction and death sentence

largely because defendant was prevented from inquiring about prospective jurors'

ability to vote for life in the case at hand, which involved murder and rape); *see also*

*State v. Maxie*, 653 So. 2d 526, 538, No. 93-2158 (La. 1995) ("A potential juror who

indicates that she will not consider a life sentence and will automatically vote for the

death penalty under the factual circumstances of the case before her is subject to a

challenge for cause."); *People v. Kirkpatrick*, 7 Cal. 4th 988, 1005, 874 P.2d 248, 30

Cal. Rptr. 2d 818 (1994) (as modified) ("A prospective juror who would invariably

vote . . . for . . . the death penalty because of one or more circumstances likely to be

present in the case being tried, without regard to the strength of aggravating or

mitigating circumstances, is therefore subject to challenge for cause . . . .").

19.  The same principle applies to types of mitigating evidence.  A juror who

would never consider evidence of an abusive childhood to be mitigating, for example,

is not qualified to sit on a case in which the defendant relies wholly or primarily on

such evidence, even if the juror could, in theory, find some other type of evidence

to have a mitigating effect.  Such a juror could not, in the case at hand, follow the

constitutional imperative to "consider[ ] any constitutionally relevant mitigating

evidence."  *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d

702 (1998); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d

1 (1982) ("Just as the State may not by statute preclude the sentencer from

considering any mitigating factor, neither may the sentencer refuse to consider, as

a matter of law, any relevant mitigating evidence. . . . [Sentencers] determine the

weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration.").

20.  Petitioner's voir dire did not live up to the demands of the Constitution -- it was not a serious, meaningful inquiry into the qualifications and biases of the prospective jurors.  In denying the defense's multiple requests for specific inquiries into prospective jurors' views on how the murder of a child would affect their ability to be fair and impartial in determining the appropriate sentence for Ms. Alfaro, the trial court denied Ms. Alfaro a fair and impartial jury.

**3.**   **In this Case, the Defense Urged That the Fact the Victim Was a Child Could Cause Certain Jurors to Invariably Vote for Death**

  **a.**   **First Trial**

21.  Prior to the commencement of Ms. Alfaro's first trial, both Mr. Monroe and the prosecution asked the court to use jury questionnaires prepared by counsel. As noted above, Mr. Monroe proposed two questions designed to elicit jurors' feelings about a child victim.  In a second questionnaire submitted by Mr. Monroe, he proposed the following, similar question:  "Please explain if the fact that the victim in this case is an eight year old little girl would prohibit you from being a fair and impartial juror in this case?"  CT 264.

22.  The court denied each party's request for a juror questionnaire, although it did indicate that it would incorporate some of the questions proposed into the court-conducted voir dire, and invited counsel to submit any additional topics they wished the court to explore.  RT 24 (November 1, 1991 proceedings); RT 125 (February 24, 1992 proceedings).  Mr. Monroe subsequently filed a motion objecting to the court's assuming complete control of the entire voir dire process and asked for time in which to pose additional follow-up questions and to personally voir dire the jury.  The court denied Monroe's request for direct voir dire, as well as his renewed request, made March 2, 1992, to conduct personally some follow up voir dire with jurors once the voir dire process started.  RT 353 (March 2, 1992 proceedings).  Although the court

1   had indicated previously that it was "inclined in these kind of cases to allow counsel

2   supplemental voir dire of a limited nature," once voir dire commenced, the court

3   refused to permit counsel to ask any questions of the jurors directly.

4       23.  Jury selection started March 3, 1992.  In addition to its own questions, the

5   court asked nearly verbatim all the questions that the prosecution had previously

6   proposed, including questions addressing jurors' views on specific circumstances that

7   were expected to be presented to the jury as mitigators.  CT 394.  The court refused,

8   however, to ask any of the questions suggested by Mr. Monroe regarding jurors'

9   feelings on the child victim.  Because the court denied the attorneys the opportunity

10  to ask voir dire questions, the only way for Mr. Monroe to probe further into specific

11  jurors' possible biases was to submit follow-up questions to the court.  CT 448.

12  Among the follow-up questions proposed by Mr. Monroe was one asking the jurors

13  what effect the fact that the victim was nine years old would have on the ability of the

14  jurors to be fair and impartial.  CT 452-53.

15      24.  During a meeting between the court and counsel, Mr. Monroe urged the

16  court to ask his question about the child victim, referencing two prospective jurors

17  who had already expressed a possible pro death penalty bias:

18      Mr. Monroe:  We're not trying to prejudge the evidence, but it's
         something to ask the questions academically.  But then if they are faced
19       with that prospect of having to decide, when they hear that about a little
         eight-year-old girl that had been brutally stabbed, like Mr. Lewis, the eye
20       for an eye routine, or Mr. Swanson discounting mitigating factors, they
         might be subject to a challenge for cause under *Witherspoon*.
21

22  The prosecution, however, argued that Monroe was asking the jurors to prejudge the

23  evidence, and the trial court agreed:

24      The prosecution:  But bringing up the facts of the case is not what is
         proper in this case and that's what the defense is doing.  The defense,
25       in my estimation, is afraid because of the violence involved in this case
         that a jury might find that this is violent.  And to tell them the facts of
26       this case to see if they are going to prejudge and say yes, that's violent
         in my mind, I think that's improper.
27
         The court:  I think it's clearly asking them if you do that, I think is
28       clearly asking them to prejudge the evidence.  The example with

Mrs. Salta, juror number 7, on page 3 of your supplemental request you say without asking her to prejudge the evidence, would the court explore how she would feel if the child were killed as a result of multiple stab wounds on somebody analogous thereto [*sic*]. I don't know how you would do that without asking her to prejudge.

Mr. Monroe:  What if there are certain kinds of cases wherein some of these jurors, like Mr. Swanson, would say under no circumstances could I vote but for the death penalty.

The court:  But that's not the issue here in this case.  Let's assume that the juror has a mindset that Adolf Hitler should have died under all circumstances.  Adolf Hitler or Charles Manson should have died.  What does that have to do with what we are dealing with?  That could not be a challenge for cause.

* * *

The court:  I don't know what that shows them other than to ask them to prejudge the evidence.  You are trying to get the facts before them it's a little girl and how many times she was stabbed and all of that stuff in voir dire and I don't think that's appropriate.  Anyway, I have made the record on this issue and it is filed.

RT 210-13.

25.  After ruling, the court indicated that it would, when they returned to the courtroom, ask whether either counsel had challenges for cause.  RT 214.  When the court asked Mr. Monroe, he stated: "No, I will not pass for cause.  But if the court is not going to let me explore the questions that I have already posed as part of my follow-up, I don't have any other questions I can ask the jurors right now."  RT 214.

### b.    Second Trial

26.  Prior to voir dire in the penalty phase retrial, Mr. Monroe repeated his request for additional voir dire, again asking the court to inquire of jurors whether the fact that the victim was a child would prevent them from being fair and impartial.  CT 1328.  As Mr. Monroe explained to the court once again, his questions were designed to expose jurors who had a predisposition to giving the death penalty regardless of the evidence in any case involving the murder of a child.  RT 2227-33.

27.  Although the court agreed with the defense "that jurors' views might be a lot different if it's an infant, a baby, a nine year old, a teenager, and adult,

254

1    whatever the case may be, jurors' views might be different on it," RT 2235, the court

2    again refused to ask prospective jurors whether the victim's age would affect their

3    ability to be fair and impartial.

4        28.  The court did permit both counsel to conduct limited direct voir dire

5    during this second trial.  Based on the views previously expressed by the court,

6    however, Monroe was only able to follow up with questions regarding the appropriate

7    punishment when the victim is a child where the juror had previously volunteered that

8    he or she simply could not be fair because of the age of the victim.  RT 2629-31;

9    3000-03.

10   **4.**     **The Court Improperly Restricted Inquiry Into Jurors' Views**

11            **Regarding a Child Victim**

12       29.  There can be no question that "a case involving a child victim can

13   implicate personal bias . . . ."  *See e.g.*, *State v. Clark,* 981 S.W.2d 143, 147 (1998)

14   (trial court abused discretion in restricting voir dire on critical fact that victim was

15   three years old); *see also Maddux v. State*, 862 S.W.2d 590 (Tex. Crim. App. 1993)

16   (trial court abused discretion by preventing defense counsel from questioning jurors

17   about potential bias because victim was child).  Studies have shown that capital juries

18   are more likely to give the death sentence when the victim is a child.  *See* McCord,

19   *Judging the Effectiveness of the Supreme Court's Death Penalty Jurisprudence*

20   *According to the Court's Own Goals: Mild Success or Mild Disaster?* (1997)

21   24 Fla. St. U.L.Rev. 545, 589 (stating that "death sentences are not imposed in

22   domestic killings unless there are multiple homicides . . ., overkill . . ., or a child

23   victim. . . .").  In Ms. Alfaro's case, the trial court's failure to ask the jurors

24   specifically about their views and feelings about a case involving a child victim, and

25   the court's limiting Mr. Monroe's ability to probe specifically into this area of

26   potential juror bias during the second trial, was clearly erroneous.

27       30.  Indeed, this Court has recently affirmed the right of a defendant and the

28   obligation of a trial court to probe into jurors views' on specific circumstances

of a case -- especially when the case involves a crime against a child -- as essential to the protection of the defendant's right to a fair and impartial jury.  In *People v. Earp*, *supra*, this Court found that the trial court's use of a jury questionnaire which stated that "the charges against defendant pertained to 'sexual misconduct involving the death of a child,'" and that specifically asked each prospective juror whether those charges would have any effect on the juror's ability to be fair and impartial satisfied the demands of the federal and state constitutions.  *People v. Earp*, 85 Cal. Rptr. 2d at 874.  The Court found that the trial court's questions served to protect the defendant's right to a fair and impartial jury because "[a]nswers to these questions provided an adequate basis for the trial court and counsel to determine whether a prospective juror's views or attitudes about child molestation would prevent the juror from impartially deciding defendant's guilt." *Id.* at 874 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 430, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991); *see also e.g., People v. Sanchez*, 208 Cal. App. 3d 721, 739, 256 Cal. Rptr. 446 (1989) (appropriate to ask jurors about experience with and attitudes about case when prosecution expected to introduce evidence about child victim).  Here, in contrast, by failing to ask prospective jurors specifically whether the fact that the victim was a child would impair their ability to be fair and impartial, the trial court deprived Ms. Alfaro of the right to learn "prospective jurors' death penalty views as applied to the general facts of the case." *People v. Kirkpatrick*, 7 Cal. 4th at 1004.

31.  The fact that some jurors were forthright enough to volunteer information regarding their views on a child victim only confirms that the issue of a child victim is particularly sensitive and that the court should have specifically inquired into this area of possible bias with each individual juror.  *See Dyer v. Calderon*, 151 F.3d 970, 975-76 (1998) (holding that a trial court has a duty to examine a juror further or take other affirmative steps to uncover potential juror bias).  And surely, the court's failure "to probe into particular jurors viewpoints" cannot be deemed harmless simply because some jurors *volunteered* their feelings.  Jurors may be shy; others reluctant

1   to state publicly their biases or prejudices.  Only when questioned *directly, with*
2   *specificity, and under oath*, can both the court and counsel trust that a prospective
3   juror will be obligated to reveal a bias that would cause him or her invariably to vote
4   for the death penalty.  *Cf. Cabe v. Superior Court*, 63 Cal. App. 4th 732, 742 (1998)
5   (juror not subject to perjury prosecution when question poorly crafted and invites
6   misleading and/or incomplete answer); *see also Earl v. Times-Mirror Co.*, 185 Cal.
7   165, 181, 196 P. 57 (1921).

8      32.  For example, during voir dire for the first trial, prospective juror Woodruff
9   stated that she remembered the nature of a case on which she previously sat as a juror
10  "because it involved a child -- more than one child I should say."  RT 70.
11  Prospective juror Eales stated that the age of the victim would be a difficult factor for
12  him.  RT 251.  When asked to elaborate, Mr. Eales stated that "[i]f we see this picture
13  and it turns out that it's a child, that it would be very -- very -- it would make me feel
14  very bad."  RT 251.  The court informed Mr. Eales that the alleged victim in the case
15  is "hypothetically" in the ten-year-old category, and Mr. Eales responded that that
16  might have a real influence on him.  RT 252.  Only after continual prodding from the
17  court did Mr. Eales respond "I think so" to the question of whether he could evaluate
18  the evidence fairly.  RT 252-53.

19     33.  Other evidence that specific questioning about the child victim would have
20  been likely to reveal bias in this case includes the fact that during the first trial, three
21  prospective jurors had to be excused because they had talked about the facts of the
22  case and they each remembered the case because it involved a child victim.  RT 346,
23  352.  In another instance, prospective juror Becker stated that "I have two small
24  children living at home.  And I'm wondering about my ability to be impartial in a
25  case like this."  RT 371.  The court then asked if "hypothetically, the victim in our
26  case is a ten-year-old girl, approximately ten years old, do you think that fact alone
27  would cause you to become impartial when you consider your situation?"  RT 372.
28  Becker responded "I don't know for sure that it could but it might."  RT 372.  The

1  court did not strike Mr. Becker for cause and Mr. Monroe was forced to use a

2  peremptory to remove Mr. Becker from the jury.  RT 372-73.  In another instance,

3  prospective juror Patton volunteered that he had three granddaughters who were

4  witnesses in a trial involving the rape and murder of a ten- or twelve-year-old girl and

5  that he felt strongly about the experience.  RT 463. Mr. Monroe moved to strike Mr.

6  Patton for cause.  RT 465.  The court denied the request and Mr. Monroe again was

7  forced to use a peremptory.  RT 549.

8      34.  Evidence that bias was likely also emerged during voir dire in the second

9  penalty trial.  In response to the court's question of prospective juror DeYoung,

10  "[d]o you think what you heard about the case and what you recall about it would

11  affect your ability to be a completely fair and impartial juror in the case," (RT 2289),

12  Mr. DeYoung responded, "possibly, because a young child died ... with a child dying,

13  I think it should be a death penalty."  RT 2290.  The court then asked if the death

14  penalty should automatically be imposed in any child murder case and Mr. DeYoung

15  replied, "[u]nless it's accidentally, yes."  RT 2290.  While the court excused

16  Mr. DeYoung for cause, it did not see from his answers the need to more specifically

17  question the other prospective jurors.

18      35.  Yet again, prospective juror Jans' statement that he was "against murder"

19  and "for the death penalty" evidenced the presence of bias, "especially when I heard

20  children are involved that got killed."  RT 2308.  Mr. Jans told the court that in a case

21  involving the murder of a nine year old during a burglary, his opinion was set that the

22  only appropriate penalty was death.  RT 2308-09.  The court excused Mr. Jans for

23  cause, but despite these repeated examples of bias, the court saw no reason to

24  specifically question the other prospective jurors.  And other examples abound.

25  Prospective juror Rouse told the court that she had read only one article about the

26  case in the Los Angeles Times, but that when she finished reading the article, she

27  made a decision on what she thought the penalty should be, and was excused for

28  cause.  RT 2303.  The same was true for prospective juror Orr.  RT 2311.  Prospective

juror Dale, a school teacher, had the insight to recognize that she might be prejudiced because the victim was a child (RT 2337), and prospective juror Anaya admitted that he had a preconceived notion that death was the appropriate punishment, "especially when there is a nine-year-old involved."  RT 2364.  Prospective juror Fields told the court that "the fact that there is a child involved" weighed heavily on the case and that the nature of the crime was very overbearing (RT 2514), and admitted that she would have a very difficult time keeping an open mind when listening to the evidence after seeing a "picture of a dead nine-year-old girl."  RT 2630-31.[24]

36.  In striking at least some jurors for cause after they volunteered that they would invariably vote for death once they learned that the victim in the case had been a child, the court recognized that jurors holding such views could not be fair and impartial.  But relying on jurors to *voluntarily* reveal their biases cannot satisfy the trial court's *duty* to conduct adequate voir dire in order to discover and remove biased jurors.

37.  This Court cannot be sanguine that because some jurors revealed their biases against a defendant accused of a crime against a child, all biased jurors were

---

[24]   Prospective juror Fields:  I don't like to think of myself as being a close-minded person.  But I think involuntarily it might be closed.

Mr. Monroe:  So that you would sit there and listen to what William Monroe said about mitigating factors, but you would really not consider them?

Prospective juror Fields:  I would be sitting there listening to what you were saying with the picture of a dead nine year old in my mind.

Mr. Monroe:  And would that prevent you, then, from considering those mitigating factors?

Prospective juror Fields:  Possibly. Possibly.

Mr. Monroe:  You feel, than, that you would not be able to be a fair and impartial juror?

Prospective juror Fields:  Under the circumstances, I really can't --
I would try to be fair, but it's very difficult under these circumstances.

RT 2630-2631.  The court eventually excused Ms. Field for cause.  RT 2634.

1  exposed.  Jurors cannot be expected to reveal information they have never explicitly
2  or specifically been asked to reveal.  Thus, it is the law that while jurors are "required
3  to be cooperative, and should volunteer information about any matter which could be
4  construed as rendering them biased . . . *the judge has a corresponding duty.  He or*
5  *she is required first to ask direct and specific questions*."  *Cabe v. Superior Court*,
6  63 Cal. App. 4th 732, 741-42, 74 Cal. Rptr. 2d 331 (1998) (emphasis added).

7        **5.    Conclusion**

8        38.  It is certainly true that the court has considerable discretion in structuring
9  voir dire.  But that discretion is limited by the court's obligation to ensure that the
10 defendant's right to a fair and impartial jury is jealously guarded and to remove
11 "prospective jurors who will not be able impartially to follow the court's instructions
12 and evaluate the evidence . . . ."  *People v. Earp*, 85 Cal. Rptr. at 874.  Because the
13 trial court refused to permit inquiry into prospective jurors' views on a highly
14 charged, deeply sensitive, emotional circumstance that would be present in Ms.
15 Alfaro's case -- the murder of a child -- it is likely that biased jurors sat on the jury.
16 As a result, her death sentence must be overturned as her fundamental Fifth, Sixth,
17 Eighth and Fourteenth Amendment rights were violated.  *See Morgan*, 504 U.S.
18 at 739.

19 **C.    THE TRIAL COURT ERRED IN REFUSING TO EXCUSE JUROR**
20 **PATTON FOR CAUSE AND IN FAILING TO GRANT THE DEFENSE**
21 **ADDITIONAL PEREMPTORY CHALLENGES**

22        **1.    Introduction**

23        39.  As discussed in Section A.4 above, prospective juror Patton expressed
24 feelings to the court suggesting that he would have difficulty being a fair and
25 impartial juror on a trial involving the murder of a young girl.  Mr. Patton made his
26 strong feelings known to the court during voir dire in the first when he asked to speak
27 to the court and counsel outside the presence of the other jurors.  In a conference in
28 chambers, Mr. Patton tearfully disclosed that a ten to twelve year old friend of his

1  young granddaughters had been murdered and raped:  "the girl was at their home and
2  they took her from their home and sometime in the next few hours she was murdered
3  and raped.  And these girls have been subject to going to trial for the last couple of
4  years."  Mr. Patton explained that this -- by which he apparently meant the nature of
5  Ms. Alfaro's case -- was "emotional to me."  Nevertheless, in response to the court's
6  question, "How do you feel your emotional feelings would impact your fairness in
7  this case here?," Mr. Patton answered, "I don't think it would have any impact on the
8  case.  I think I could act fair in this trial."  After asking but one follow-up question,
9  the court asked Mr. Patton to return to the courtroom and denied Mr. Monroe's
10  request for additional questioning and his motion to strike for cause.  As a result,
11  Mr. Monroe was forced to use his last peremptory challenge to strike Mr. Patton.
12  When Mr. Monroe requested additional peremptory challenges, the court denied his
13  request.

14      40.  Based on the personal experience Mr. Patton emotionally described --
15  the death of a child near Autumn Wallace's age who had been a friend of his
16  granddaughters and was with them immediately before she was taken from their home
17  and raped and murdered -- the court erred by failing to strike him for cause or, at the
18  very least, take more care to insure that he could put his emotions aside.  A number
19  of other jurors expressed concern about the fact that the victim was a child, and most
20  of them remained in the venire.  The court's error deprived Ms. Alfaro of her right
21  to a fair, impartial, and unbiased jury in violation of her Fifth, Sixth, Eighth and
22  Fourteenth Amendment rights.

23      **2.  Statement of Facts**

24      41.  On the third day of voir dire for Ms. Alfaro's first trial, Albert Patton was
25  called to the jury box for questioning as a prospective juror.  RT 442.  Other than
26  informing the court that his granddaughters have informed him that their father
27  (his deceased daughter's former husband) does dope, Mr. Patton answered the court's
28  general questions unremarkably, but then asked to speak with the court in chambers

261

outside the presence of the other jurors.  RT 461.  During the next break, the court

and counsel met in chambers with Mr. Patton.  The court asked Mr. Patton what he

wished to talk about:

> Mr. Patton:  Well, it's just I'm emotional.  Like I said before, I have three granddaughters.  And my daughter is deceased.  And they were -- had to go to court because of a girl being murdered and raped.  A little girl, ten or twelve.  And the girl was at their home and they took her from their home and sometime in the next few hours she was murdered and raped.  And these girls have been subject to going to trial for the last couple of years.  And that's all.  But it's just emotional to me.

> The Court:  Okay.  How do you feel your emotional feelings would impact your fairness in this case here?

> Mr. Patton:  I don't think it would have any impact on the case.  I think I could act fair in this trial.

> The Court:  All right.  There may be evidence in the case that the victim in our case is a young girl, ten to twelve years old.  Is that going to have any --

> Mr. Patton:  I don't think that would weigh my factor. [*Sic*.]

> Mr. Monroe:  Your honor, if the court would approve, perhaps --

RT 463.  Before Mr. Monroe could continue, the court had Mr. Patton leave the room.

The court and counsel remained in chambers, and the following discussion ensued:

> Mr. Monroe: Would the court touch on the photograph issues with some of the newer jurors, the fact that they may be viewing grisly photographs?

> The Court:  I haven't done it recently but it's a topic that several jurors have brought up on their own.  They are aware that we talked about it, so when I asked about these topics, I haven't talked about it.  Seems like the jurors that have a concern about it, bring it up.

> Mr. Monroe:        My concern with Mr. Patton
>                    would be --

> The Court:  I can ask Mr. Patton some more questions along those lines.

> Mr. Monroe:  I think you would have to share those terrible experiences either by body language or speaking about it in jury deliberations, if he was in the jury.  It's a terrible thing for the man to go through with his grandchildren.

> The Court:  That's true.  I don't have any problem with that. That doesn't mean they think everybody accused of a crime is guilty.

> Mr. Monroe:  It would have an effect on the jury.

262

1

2

The Court:  It may or may not have.  If you're making a challenge for cause -- I don't know if you are.

Mr. Monroe:  I would challenge for cause right now.

3

The Court:  You want to state the basis of it?

4

5

6

7

8

Mr. Monroe:  That his feelings that he expressed here, both in his emotion and the fact that he was crying, is something that is going to impact him despite his disclaimer.  If it happened here when we are talking about things in the abstract, when those photographs come in, if he were a juror, it is almost impossible for him to be able to separate his personal tragedy from the tragedy of this trial.  And I think that would taint the other members of the jury.  I don't believe that he could truly be fair and impartial under these circumstances.

9

The Court:  Does the District Attorney care to respond?

10

11

12

13

Mr. Middleton:  I don't have a degree in psychology, so I can't really read the man as far as what he's going to do in the future.  It looks like he said it wouldn't affect him, he would try to keep it out.  It was mainly talking about his granddaughter and that's something close and dear to him.  That is altogether different.  I think if he did truly feel that he couldn't do it, he would tell us.

14

15

The Court:  That's the impression I got.  I asked him and robed into that area *a little bit* to try to make sure that -- and I have no reasons to suspect that he's being anything other than candid with the court.  And for those reasons, the court is going to deny the challenge for cause to excuse Mr. Patton.

16

RT 464-66 (emphasis added).

17

18

19

20

21

22

23

24

25

26

27

        42.  After voir dire resumed, the court indicated to Mr. Patton that there might be some evidence such as "a videotape that might show part of the alleged crime scene, and there may be some photographs of the decedent."  RT 470.  The trial judge then asked him:  "Do you believe you would be able to examine that kind of evidence and not have a strong -- a strong emotional reaction to it?"  RT 470.  Mr. Patton responded, in full, "I think I could."  RT 470.  The court then said, "All right.  All right.  The topic we touched on just before lunch when everyone else left, have you thought more about it over the lunch hour?"  Mr. Patton responded, "Well, yes, I think about it whenever."  He went on to say that he would not change the answers he had given previously; "I don't think it would have any effect on the way I would think in a different case."  RT 470-71.  The district attorney then passed Mr. Patton

28

263

1  for cause; Mr. Monroe "rest[ed] on his remarks in chambers," and Mr. Patton
2  remained in the venire.  Thereafter, Mr. Monroe was forced to use his final
3  peremptory strike to remove Mr. Patton from the jury.  RT 549.

4      43.  A number of other jurors volunteered that the age of the victim might
5  affect their ability to be fair and impartial as well.  For example, Mr. Monroe was
6  required to use a peremptory strike to remove Mr. Eales after Mr. Eales stated that the
7  age of the victim would be difficult for him (RT 251), and that "[i]f we see this
8  picture and it turns out that it's a child, that it would be very -- very -- it would make
9  me feel very bad."  RT 251.  Mr. Monroe used a peremptory to strike Mr. Becker,
10  although Mr. Becker had revealed that he had two small children living at home and
11  wondered about his ability to be impartial.  RT 371.  The court's inadequate voir dire
12  makes it impossible to know how many other jurors should have been stricken for
13  cause.  Mr. Swanson, for example, who extolled an "eye for an eye" ethic and
14  essentially admitted that he would have a difficult time finding mitigating
15  circumstances, (*see* RT 94-102), would undoubtedly have been subject to removal
16  for cause if the court had questioned him sufficiently.  Instead, Mr. Monroe was
17  forced to use a peremptory.  RT 218.  The same inadequate voir dire of prospective
18  juror Lewis, whose pro-death penalty views revealed a "substantial impairment"
19  in his ability to consider mitigating evidence, forced Mr. Monroe to use a peremptory
20  strike to remove him from the jury.  RT 217.

21      44.  After exhausting all of his peremptory challenges, Mr. Monroe requested
22  an in-camera hearing in order to move for more.  RT 557.  In chambers, Mr. Monroe
23  told the court:

24      Move for additional perempts.  I feel that I have had to use my perempts
      for people who should have otherwise been challenged for cause,
25      specifically the last one I exercised my perempt on, juror number nine,
      who was Mr. Patton.
26
27          In addition, the fact that the court would not use all of my follow-
      up questions before to determine whether or not we had people who
28      should have been further explored for challenge for cause.

1    The Court:  All right.  District Attorney have any position in the matter?

2    Mr. Middleton:  Yes, my position is the court's made all the proper
3    rulings up to this point and there's no more challenges for cause, period.

4    The Court:  Well, the -- I'm not going to argue with you about whether
     the court asked all your appropriate follow-up questions that I felt were
5    appropriate, and I think the jury's been thoroughly voir dired.  And I
     never got any additional supplemental questions from counsel, nor has
6    counsel ever attempted to make a showing of any kind of cause for any
     direct voir dire in the case.  So for those reasons, the request for
7    additional peremptory challenges is denied.

8    RT 557-558.  Mr. Monroe objected to the jury as constituted, the court overruled his

9    objection, and the jurors were sworn.  RT 559.

10       **3.**     **The Defense Was Forced To Exhaust All Of Its Peremptory**

11              **Challenges As A Result Of The Trial Court's Failure To Strike For**

12              **Cause Jurors Who Had Strong Feelings That Would Render Them**

13              **Biased Against Ms. Alfaro**

14       45.  The Sixth Amendment guarantees criminal defendants a verdict by

15   impartial, indifferent jurors.  "It cannot be gainsaid that a fair system for the

16   administration of justice must include the guarantee of 'an impartial jury' for the

17   criminally accused."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977);

18   *see generally Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600

19   (1966); *Irvin*, 366 U.S. at 722.  If only one juror is unduly biased or prejudiced or

20   improperly influenced, the criminal defendant is denied her right to an impartial jury.

21   *See U.S. v. Hendrix*, 549 F.2d at 1227; *see also Dyer v. Calderon*, 151 F.3d 970, 973

22   (1998) ("The bias or prejudice of even a single juror would violate [the defendant's]

23   right to a fair trial.").

24       46.  This Court has held, "[t]o complain on appeal of the composition of the

25   jury, the defendant must have exhausted [all of her peremptory] challenges."

26   *Coleman*, 46 Cal. 3d at 770; *see also People v. Kirkpatrick*, 7 Cal. 4th 988, 1005

27   (1994).  "[E]xhaustion of peremptory challenges is a 'condition precedent' to an

28   appeal based on the composition of the jury."  *Coleman*, 46 Cal. 3d at 770; *People v.*

265

*Ramos*, 15 Cal. 4th 1133, 1158-1159, 938 P.2d 950 (1997).  Because the trial court's error forced the defense to consume all peremptory challenges, and because Mr. Monroe complained of the jury as constituted, Ms. Alfaro's claim that the first jury responsible for determining her guilt and proper sentence was neither fair nor impartial is properly before this Court.

**4.     The Trial Court Erred In Failing To Remove Mr. Patton For Cause**

47.  The court should have removed Mr. Patton for cause.  Mr. Patton had strong enough concerns that the painful emotions surrounding his granddaughters' participation in a trial involving the murder and rape of their young friend might somehow affect his role as a juror in a trial involving the murder of a young girl that he felt compelled to bring this information to the court's attention.  Mr. Patton was obviously disturbed enough about the situation to seek a private meeting with the court in chambers and distressed enough to cry in the presence of strangers.  Although Mr. Patton gamely responded to the court's completely inadequate inquiry about his ability to remain fair, the court needed either to inquire further into the extent of his concerns or simply dismiss Mr. Patton for cause based on his obvious agitation.

48.  The trial court acknowledged that it had probed into the depths of Mr. Patton's feelings only "a little bit."  RT 464-66.  The court's cursory examination did nothing to explore the extent of Mr. Patton's emotions and how those emotions would impact his ability to fairly and impartially assess the evidence.  Simply asking Mr. Patton whether he could be fair put Mr. Patton in the uncomfortable and unrealistic situation of having both to recognize that, in fact, he did have biases and to then admit as much in a public setting.

49.  The United States Supreme Court acknowledges, particulary in the context of the death qualification process, that asking jurors general questions about their ability to be fair does little to illuminate whether they can, in fact, be fair.  The Court has stated that "[a]s to general questions of fairness and impartiality, [biased] jurors

could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed." *Morgan*, 504 U.S. at 733. As discussed above in Section A.4, only when a juror has been questioned *directly, with specificity, and under oath*, can both the court and counsel trust that a prospective juror will be obligated to reveal a bias that would cause him or her invariably to vote for the death penalty. *Cf. Cabe v. Superior Court*, 63 Cal. App. 4th 732, 742 (1998) (juror not subject to perjury prosecution when question poorly crafted and invites misleading and/or incomplete answer); *see also Earl v. Times-Mirror Co.*, 185 Cal.165, 181 (1921).

50. "[B]ias is seldom overt and admitted. More often, it lies hidden and beneath the surface." *People v. Taylor*, 5 Cal. App. 4th 1299, 1312, 7 Cal. Rptr. 676 (1992). An individual juror may have an interest in concealing his or her own bias, or a juror may very well be unaware of his or her biases. *See Smith v. Phillips*, 455 U.S. 209, 221, 222 (1982) (O'Connor, J. concurring). "'[B]ecause . . . bias is a thief which steals reason and makes unavailing intelligence -- and sometimes even good faith efforts to be objective -- trial judges [must, where appropriate, be willing to ask] prospective jurors relevant questions which are substantially likely to reveal such juror bias or prejudice, whether consciously or unconsciously held.'" *People v. Taylor*, 5 Cal. App. 4th at 1312-1313 (quoting *People v. Wells*, 149 Cal. App. 3d 721, 727, 197 Cal. Rptr. 163 (1983)).

51. His daughter having died, Mr. Patton had custody of his granddaughters and cared for them deeply. A young friend of theirs had been murdered only a few hours after having been in their company. Mr. Patton's anguish stemmed no doubt in part because he would naturally think that his granddaughters could have been victims as well; that, "but for the grace of God," they, too, might have been murdered. The conspicuousness of Mr. Patton's struggle with the impact of his granddaughters' experience as it related to the facts of this case demanded that the court either inquire more deeply into its effect on him or simply dismiss him for cause. For the court only

1  to have asked Mr. Patton "a little bit" about his feelings, when he stood before the
2  court and counsel in tears, and when the issue of a child victim as a general matter is
3  already a highly emotional issue, was inexcusable.

4          52.  That Mr. Patton himself stated that he could be fair should have done
5  nothing, by itself, to reassure the court that Mr. Patton would be able to put aside his
6  obviously very intense feelings regarding the murder of a child when evaluating the
7  accusation that Ms. Alfaro had murdered a child.  That Mr. Patton wanted to believe
8  that he could be fair is entirely understandable; that Mr. Patton himself may not have
9  been fully aware of how this deeply disturbing experience would affect him during
10 jury deliberations is highly probable.  *See Dyer v. Calderon*, 151 F.3d at 973-74.  The
11 evidence of Mr. Patton's biases was too clear and the danger arising from a failure to
12 strike a biased juror too great for the court to have been confident that its inquiry was
13 sufficient and for refusing to strike Mr. Patton for cause.  And he is but the most
14 egregious example of the trial court's failure to strike for cause.

15         **5.**     **Conclusion**

16         53.  Mr. Monroe was forced, at a minimum, to use five peremptory strikes
17 to remove jurors who should have been removed for cause.  As a consequence, the
18 court's errors denied Ms. Alfaro her fully statutory allotment of twenty peremptory
19 challenges and resulted in a jury neither fair nor impartial. The trial court's failure
20 to permit adequate voir dire and to strike Mr. Patton for cause resulted in a denial
21 of Ms. Alfaro's Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and
22 impartial jury.

23 / / /
24 / / /
25
26
27
28

268

1  **D.     THE TRIAL COURT ERRED BY DENYING THE DEFENSE REQUEST**
2          **FOR SEQUESTERED VOIR DIRE DURING THE DEATH**
3          **QUALIFICATION PROCESS**

4      **1.     Statement of Facts**

5          54.  Prior to the commencement of both the guilt phase and the second penalty

6  phase trials, Mr. Monroe asked the court to interview jurors individually during the

7  death qualification process pursuant to its authority under the California Code of

8  Civil Procedure § 223.   Ms. Alfaro's case involved a number of potentially

9  inflammatory factors, including the fact that the victim was a nine-year-old child, the

10 victim was Caucasian and the defendant was Hispanic, the defendant was a grade

11 school "dropout," at a time when drug related crime was at its height, the defendant's

12 own lawyer described her as a "hyped out kid," and finally, the fact that Ms. Alfaro,

13 at 18, was an unwed mother and her eleven-month-old child had been with her on the

14 day of the crime. Mr. Monroe argued, as recognized by this Court in *Hovey v.*

15 *Superior Court*, 28 Cal. 3d 1, 70-71, 616 P.2d 1301 (1980), that individual

16 questioning of jurors would facilitate truthfulness and full disclosure during voir dire,

17 and insulate each individual juror from the potentially prejudicial effect of repeated

18 exposure to the death qualification process.  The prosecution opposed the request for

19 sequestered voir dire, although it had joined the defense in requesting questioning by

20 counsel and the use of juror questionnaires.  But the court denied both the defense

21 request for sequestered voir dire and the parties' requests for attorney conducted voir

22 dire and a questionnaire.

23          **a.     First Jury**

24          55.  On November 1, 1991, the court denied without prejudice the defense

25 pre-trial request for sequestered voir dire.  Concluding that Proposition 115 had

26 "overruled the requirements of the *Hovey* case," RT 17 (Nov. 1, 1991 proceedings),

27 the court stated:

28

269

Let me address the easiest one first. *People* versus *Hovey*. My understanding was one of the principal reasons Proposition 115 passed was to eliminate -- the court overruled the requirements of the *Hovey* case. I recognize the court would have discretion to have individual voir dire, but counsel hasn't pointed out on the *Witherspoon* type of voir dire any unique aspect of the case, to my knowledge, that would separate this case from any other special circumstances case insofar as individual voir dire on death penalty qualifications. If you want to address that issue -- I didn't see it in your papers. It just appears that you are urging the court because the charge is a capital case we are entitled to *Hovey* voir dire period. In your response you indicate that even though Prop. 115 might have overruled *Hovey*, the court still has discretion to do it. I agree with that and I would exercise my discretion to allow it if there was some unique fact of this case that would separate it just from the ordinary, if there is such a thing, capital case. I didn't see that in here and that might be an issue you want to address.

My tentative ruling on the issues are number one, I think there is a pretty strong public policy and legal policy behind Proposition 115. I'm not inclined, unless there is some unusual circumstances, to allow *Hovey* voir dire.

*Id.* at 18.

56. On February 24, 1992, in the week preceding jury selection, the court and both counsel met to address outstanding issues related to voir dire. Mr. Monroe inquired again into whether the court would permit sequestered voir dire. Mr. Monroe asked: "The court is also rejecting the *Hovey* voir dire; is that correct?" RT 126 (February 24, 1992 proceedings). The court repeated that the right to individualized voir dire had been intentionally eliminated by the Legislature since *Hovey*.

The Court: I'm not rejecting the *Hovey* voir dire. It's not permissible under Proposition 115.

Mr. Monroe: Would the court consider cluster voir dire, say a group of twelve --

The Court: You can make whatever proposal you want. You should consider Proposition 115. It has been affirmed by the California Supreme Court and you can make whatever suggestions you want to make. But it's my impression that Proposition 115 was specifically designed to basically do away with *Hovey* voir dire and I don't know why this court wouldn't follow the mandates of Prop. 115.

RT 126 (February 24, 1992 proceedings)

270

57.  Jury selection for Ms. Alfaro's first trial began on March 3, 1992.  Each prospective juror seated in the jury box was questioned in the presence of the entire venire.  Following each strike either for cause or peremptory, new jurors were called from the venire and the death qualification process began anew.  RT 56.

58.  The vast majority of the court's voir dire questions were death qualification questions.  Some were designed to elicit the jurors' views on the death penalty generally.  Others asked how the presence of certain characteristics, specific to Ms. Alfaro or to the crime, might affect their willingness to impose a death sentence.  *See, e.g.*, RT 73-180.  The court took the specific questions it asked verbatim from those proposed by the prosecution.  *See, e.g.*, CT 394-95.

59.  The court began by asking each juror whether his or her views on the death penalty would cause him or her to "refuse to find the defendant guilty of first degree murder even though you personally believe the defendant to be guilty . . . just to prevent the penalty phase" or to automatically refuse to vote for death.  *See, e.g.*, RT 77-78.  In the presence of the entire venire, each juror was also asked whether any members of the juror's family, friends or co-workers had strong views on the death penalty (RT 89); whether the juror had any moral, philosophical or religious views that "might affect your jury deliberations on the death penalty" (RT 124); and whether their "sympathetic or compassionate nature" would prevent them from voting for death.  RT 144.  The court phrased approximately ten out of twelve of its questions in a way calculated to screen for jurors who would be inclined to vote against the death penalty; the court asked only one question to screen for jurors who would be inclined to vote for the death penalty.  *See, e.g.*,  RT 120-121.

60.  The court also asked each jurors questions addressing specific characteristics of the crime and Ms. Alfaro.  As noted above, most of these questions were taken verbatim from the questions proposed by the prosecution.  *See, e.g.*, CT 394-95.  The phrasing of these questions was clearly geared towards spotlighting jurors who would be reluctant to vote for the death penalty if any of the identified

271

factors or characteristics were present.  At the same time, the court molded the potential jurors approach to the case.  The court asked whether the jurors felt "that the death penalty should only be reserved for multiple-victim cases?" (*see, e.g.*, RT 124); whether they "believe[d] in any particular adult age at which a person should never receive the death penalty, no matter how vicious or cruel the crime might be committed?" (*see, e.g.*, RT 128); whether they would "require that the defendant have a past history of violence before you would ever consider voting for the death penalty?" (*see, e.g.*, RT 129); whether any of the jurors "believe[d] that the state should never execute a woman no matter how vicious or cruel the crime is that she may have committed?" (*see, e.g.*, RT 131), and whether they "would find it more difficult to vote to impose the death penalty in a case where the defendant is a Mexican-American than you would if the defendant were white?"  *See, e.g.*, RT 132.  The court asked the jurors a single, non-specific question devised to explore their willingness to consider mitigating evidence.  *See e.g.*, RT 121.

61.  The court repeated this series of questions sixteen times.  *See* RT 222-581.

## b.  <u>Second Jury</u>

62.  The first jury found Ms. Alfaro guilty of first degree murder and found true the special circumstances but could not decide on the appropriate penalty.  After three days of deliberation, the court declared a mistrial on April 8, 1992.  Jury selection for the second penalty phase trial began five weeks later.

63.  Prior to the commencement of the second voir dire, Mr. Monroe asked the court to consider either sequestered voir dire during the death qualification process or voir dire in small groups, thereby limiting the potential jurors' exposure to the questions intended to insure willingness to impose the death penalty.  RT 2222.  In addition to the case-specific factors that weighed in favor of sequestered voir dire in the first trial, Mr. Monroe learned from a letter to the court from the first jury's foreman, J.W. Abouchar, that voir dire in the first trial had failed to identify four or five jurors as "implacable deaths."  CT 83-84 (April 21, 1992 proceedings).  The

foreman had written to the court to express his views about the case and to inform

the court that one of the jurors had been, in Mr. Abouchar's opinion, "against

the death penalty," a "bleeding heart," and a "liberal of the seventies." The tone

of Mr. Abouchar's letter was decidedly hostile to the defense.  Supp. CT 83-84.

Mr. Monroe clearly hoped, by conducting sequestered voir dire, to uncover others

who were biased against Ms. Alfaro and the defense.  RT 2222-23.

64.  This second time around, the court again denied the request for either

sequestered or cluster voir dire:

> [T]hat's extremely time consuming and I'm not sure the beneficial
> effects of it are that great.  So I'm going to deny your request for *Hovey*
> or cluster voir dire for right now without prejudice in the event it looks
> like that would be required.

RT 2224-25.

65.  Jury selection began on May 11, 1992.  As in the first jury selection

process, most of the court's questioning focused on the jurors' views about the death

penalty.   And, as with the first jury, the court's formulation of questions primarily

targeted jurors who expressed disapproval of the death penalty.  Focused on the

foreman's characterization of one juror as "against the death penalty," the court

aggressively screened jurors who expressed any hint of disapproval for the death

penalty.  "I was going to add a few topics primarily to cover topics suggested by

Mr. Abouchar in his letter to the court."  RT 2220.

66.  During selection of the second jury, Mr. Monroe repeated his request

for sequestered questioning when one of the prospective jurors revealed to the court

and counsel that she had "fibbed" the previous day about having undergone

counseling and treatment for depression.  RT 2564.  Mr. Monroe again suggested

that individual questioning would provide jurors with an environment in which they

would feel more comfortable revealing relevant, sensitive information about

themselves, as well as revealing their biases and prejudices.  RT 2565.  The court

again denied the request.

67.  Voir dire took five days.  During this second selection process, the court permitted both counsel to conduct limited voir dire themselves.  Because counsel were restricted to following up in areas covered by the court, this only increased the jurors exposure to questions regarding their willingness to impose the death penalty.

68.  The court's questions were particularly prejudicial.  They were clearly constructed to ferret out those jurors who had any qualms against the death penalty generally or who might hesitate in applying it to Ms. Alfaro.  In addition to asking jurors whether they had strong feelings against the death penalty at the time of trial, the court asked whether they had *ever* "in [their] past been against the death penalty?" *See, e.g.*, RT 2521, 2525, 2583.  The court also again asked jurors whether they felt "the death penalty should only be applied in murder cases where there is more than one victim?" (*see e.g.*, RT 2527, 3042); where they would "require a defendant to have a past history of violence before [they] would even consider voting for the death penalty as a reasonable probability?" (*see, e.g.*, RT 2528, 3042), whether any of them "believe[d] there is any particular adult age, it might be a young age or an old age, at which a person should -- at which a person should never receive the death penalty no matter how vicious or cruel the crime is that may have been committed?" (*see, e.g.*, RT 2528), and whether they "believe[d] that the state should never execute a woman, no matter how vicious or cruel the crime is that she may have committed?"  *See, e.g.*, RT 2528.

69.  When one juror expressed some discomfort with the death penalty but indicated a willingness to consider it in certain circumstances, rather than accepting the juror's statement that he would follow the law and consider the penalty, the court asked the juror to describe specifically under what circumstances he would find the penalty appropriate.  RT 2584.  Responding to the court's request that he explain how he would describe his feelings about the death penalty to his friends, the juror responded, "As I sort of indicated before, I feel it is appropriate under certain circumstances."  RT 2584.  Dissatisfied with this adequate and proper response, the

1   court pressed: "All right.  Do you want to give me an example in your mind of the

2   circumstances under which you think it might be appropriate."  RT 2585.

3       70.  Both indirectly and directly, the court revealed its personal approval of the

4   death penalty to the entire venire.  When explaining that the law requires "special

5   circumstances" to distinguish capital from non-capital offenses, the court expressed

6   satisfaction that "killing a judge" qualified as a special circumstance in California.

7   RT 2765.  Later, when a juror expressed frustration that the legal process had taken so

8   long in the Robert Alton Harris case, the court responded:

9           I couldn't agree with you more wholeheartedly, okay?  And I don't mean
            to pass the buck, because people think a judge is a judge just like they
10          think lawyers are lawyers are lawyers.  But those last-minutes stays that
            were issued in that case were all done by the federal court, primarily the
11          Ninth Circuit Court of Appeal.  Unfortunately, state court judges don't
            have any control over them.  So whatever frustration you have about
12          that, please don't blame us for that, okay?

13  RT 2837.  Rather than fulfilling its duty to ensure an impartial jury, the court in Ms.

14  Alfaro's case sought out a jury predisposed to return a sentence of death.  In failing to

15  insulate the jurors from the effects of its questioning by conducting individual voir

16  dire, the court unfairly infected the entire venire.

17      **2.**   **The Trial Court Failed To Exercise Its Discretion To Hold**

18           **Sequestered Voir Dire, Resulting In A Capital Jury That Was**

19           **Conditioned To Impose The Death Sentence**

20      **a.**   **In Capital Cases Courts Must Be Especially Vigilant To**

21           **Guard Against Biased Jurors**

22      71.  In denying the defense request for sequestered voir dire of jurors during

23  the death qualification process, the trial court denied Ms. Alfaro a reasonable

24  procedure designed to intelligently and meaningfully determine the bias or prejudices

25  of jurors.  *See Irvin*, 366 U.S. at 722; *see also People v. Wheeler*, 22 Cal. 3d 258, 272

26  (1978); *People v. Balderas*, 41 Cal. 3d 144, 187-190, 711 P.2d 480 (1985).  As

27  a result, her conviction must be reversed.

28

275

72.   A criminal defendant is guaranteed the right to a fair trial by an impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States and under the California Constitution.  *See* Cal. Const., art I, §§ 1, 7, 13, 15, 16, 17.  The United States Supreme Court recognizes that in capital trials, "the jury is called upon to make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves.'"  *Turner v. Murray*,  476 U.S. 28, 33 (1986) (citations omitted).  Because of the range of discretion entrusted to such a jury, and because of the "qualitative difference of death from all other punishments," (*id.* at 35), the court must be especially vigilant to guard against allowing jurors whose biases or prejudices would prevent them from being impartial and following the dictates of the law from remaining in a capital defendant's venire.

73.   The standard a court applies when determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *see also Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (death sentence illegal when imposed by jury from which veniremen were excluded simply because they voiced general objections to the death penalty).  This standard applies to exclude prospective jurors whose opposition to the death penalty would substantially impair their ability to follow the law as well as to exclude prospective jurors biased in favor of death.  *See Morgan*, 504 U.S. at 729; *see also Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); *Coleman*, 46 Cal. 3d at 763-765.

74.   The principle animating the so-called *Witherspoon/Witt* "death qualification process" -- the questioning of prospective jurors in a capital case on their views about the death penalty -- is that "where an *adversary* wishes to exclude a juror because of bias," the adversary seeking exclusion should be permitted to demonstrate, through questioning, that a potential juror lacks impartiality.  *Witt*,

276

1  469 U.S. at 423 (emphasis added).  The trial court's duty is to determine whether the

2  challenge is proper.  *Id*.  Further, the standard "does not require that a juror's bias

3  be proved with 'unmistakable clarity.'"  *Id.* at 424.  The Court in *Witt* recognized that

4  "'veniremen' may not know how they will react when faced with imposing the death

5  sentence, or may be unable to articulate, or may wish to hide their true feelings."  *Id.*

6  at 425.  Thus, the purpose of the *Witherspoon/Witt* questioning is to elicit, as

7  thoroughly as possible, jurors pro or anti-death penalty biases.  The trial court is then

8  called upon to assess whether a juror's viewpoint -- *regardless of whether it is an anti*

9  *death penalty viewpoint or a pro death penalty viewpoint* -- will substantially impair

10  that juror's ability to be fair and impartial.

11        **b.    *Hovey* v. *Superior Court***

12        75.  In California, prior to 1990 and the passage of Proposition 115, this Court

13  found, in *Hovey v. Superior Court*, 28 Cal. 3d 1 (1980), that individual, sequestered

14  questioning of prospective jurors during the death qualification process provided the

15  best environment to uncover jurors' biases and prejudices and insulate jurors from

16  the deleterious effects of repeated exposure to the death qualification process itself.

17  *See e.g.*, *People v. Freeman*, 8 Cal. 4th 450, 482, 882 P.2d 249 (1994) ("while 'death-

18  qualifying the jury,' the Court and parties questioned the prospective jurors

19  individually, as mandated in *Hovey*"); *People v. DeSantis*, 2 Cal. 4th 1198, 1217

20  (1992) ("*Hovey* . . .requires, in a capital case, a sequestered examination of

21  prospective jurors."); *People v. Visciotti*, 2 Cal. 4th 1, 50-1, 825 P.2d 388 (1992)

22  ("the right to a sequestered voir dire was recognized in response to concerns of

23  capital defendants over the potentially prejudicial effects of an open voir dire on

24  jurors' views and willingness to reveal their views about capital punishment").  In

25  *People v. Avena*, 13 Cal. 4th 394, 412 (1996), the trial court "asked each prospective

26  juror in camera his or her views on the death penalty . . . ."  This was because *Hovey*,

27  "requir[es] sequestered jury voir dire due to the potential bias that may result from the

28  process of death qualifying prospective jurors."

277

76. The Court's insight in *Hovey*, which was supported by research, was that repeatedly exposing all jurors to the death qualification questions "create[d] in the minds of the jurors certain expectations unfavorable to the accused and predispose[d] the jurors to receive and interpret evidence in ways unfavorable to the defense." *Hovey*, 28 Cal. 3d at 69. The Court noted that "[t]hese repeated displays of concern about the death penalty before any evidence of guilt has been presented may prompt the jurors to infer that the court and counsel assumes the penalty trial will occur." *Id.* at 71-72.

77. The Court also recognized that people naturally look to authority figures when they find themselves in novel or unfamiliar circumstances and that, in the courtroom, the judge is the foremost figure of authority. The Court realized that when confronted with the peculiar process of voir dire in a capital trial, "[j]urors undergoing death-qualification would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion. Only such an inference could serve to explain to the jurors why so much time and energy are devoted to an extensive discussion of penalty before trial." *Id.* at 71. Thus, the Court noted, "[a] capital jury, which has been predisposed by virtue of the very process by which it has been selected to think the accused guilty in advance of trial, is unlikely to function properly or maintain its neutrality." *Id.* at 72.

78. The Court further acknowledged that group death qualification not only may make a jury more prone to convict, but may also "alter the states of mind of the jurors exposed to it in ways which make them more likely to impose a death sentence." *Id.* at 73. Thus, the Court found that "a process which systematically reduces whatever 'doubts about the wisdom of capital punishment' or 'reluctan(ce) to pronounce the extreme penalty' is as constitutionally infirm as a jury from which individuals who hold such views are systematically 'culled.' Neither jury can 'speak for the community.' Both juries are 'less than neutral' with respect to the

278

1  choice of penalty."  *Id.* at 74 (quoting *Witherspoon,* 391 U.S. at 520) (citations

2  omitted).

3      79.  The Court concluded that, to avoid the insidious consequences of group

4  voir dire, individual questioning of jurors provided the most reasonable safeguard.

5  The Court thus held that:

6      The most practical and effective procedure available to minimize the
       untoward effect of death qualification is individualized sequestered voir
7      dire. Because jurors would then witness only a single death-qualifying
       voir dire -- their own -- each individual juror would be exposed to
8      considerably less discussion and questioning about the various aspects of
       the penalty phase before hearing any evidence of guilt.
9

10  *Hovey v. Superior Court*, 28 Cal. 3d at 80.

11          c.    **Death Qualification After Code of Civil Procedure § 223's**

12                **Amendment**

13      80.  As part of Proposition 115, the Crime Victims Justice Reform Initiative,

14  § 223 of the Code of Civil Procedure was amended to effect substantial changes to

15  jury selection procedures.  Prior to 1990, for example, both counsel routinely asked

16  questions of the jurors during voir dire; after 1990, the court is required to conduct

17  the examination (*see* Code Civ. Pro. § 223 (["[T]he court *shall* conduct the

18  examination of prospective jurors"]), and only upon a showing of good cause are

19  counsel permitted to examine the jurors directly.  (*Id*. The amended version of § 223

20  further provides that "[v]oir dire of any prospective jurors shall, *where practicable*,

21  occur in the presence of the other jurors in all criminal cases, including death penalty

22  cases."  (Code Civ. Pro. § 223 (emphasis added); *see Covarrubias v. Superior Court*,

23  60 Cal. App. 4th 1168, 1175, 71 Cal. Rptr. 2d 91 (1998).

24      81.  The question following the 1990 amendment to § 223 is the extent to

25  which that amendment abrogates the requirement established in *Hovey v. Superior*

26  *Court* that jurors be questioned individually during the death qualification process.

27  Section 223 states that "any prospective juror" shall be questioned, "where

28  practicable," in the presence of the other jurors in all criminal cases, including in

1   death penalty cases.  The California Supreme Court has yet to address the question

2   of the impact of the amendment to § 223 on the *Hovey* requirements, but the Sixth

3   District Court of Appeal (on a writ of mandate the Court declined to review), held

4   that although § 223 overrules *Hovey*'s mandate that jurors be questioned individually,

5   a trial court must exercise its discretion to determine whether it is "practicable"

6   to conduct group voir dire or whether individual questioning is warranted.  *See*

7   *Covarrubias v. Superior Court*, 60 Cal. App. 4th 1168.

8         82.  In *Covarrubias*, a capital defendant sought a writ of mandate from the

9   court of appeals after the trial court denied his request for sequestered voir dire on the

10   ground that Proposition 115 had overruled *Hovey*.  *Covarrubias*, 60 Cal. App. 4th

11   at 1171.  The Sixth District issued the writ after finding that the trial court had failed

12   to exercise its discretion by simply ruling that individual sequestered voir dire was

13   "not only not required, but that the lawful process and the best process is to conduct

14   voir dire whenever possible in the presence of other jurors."  *Covarrubias, supra,*

15   at 1183.   The *Covarrubias* court found that such a statement "demonstrate[d] the trial

16   court's misunderstanding of section 223."  *Id.*  The trial court's error, according to the

17   Sixth District, was "that it seemed to be focused upon the fact that individual

18   sequestered voir dire was no longer required, *rather than engaging in a careful*

19   *consideration of the practicability of large group voir dire as applied to petitioner's*

20   *case.*"  *Id.* (emphasis added).   The court of appeals went on:

21       This seems especially evident given the trial court's repeated emphasis
        upon its review of "the authorities."  Those authorities may have
22       supported the trial court's interpretation of section 223 with respect to
        *Hovey*, but the trial court's emphasis upon them indicates that the court
23       did not thoroughly examine the application of section 223 to the specific
        circumstances before it.

24

25   *Id.*

26         83.  *Covarrubias* thus stands for the proposition that a trial court must

27   exercise its discretion to "engage in a careful consideration of the practicability

28   of large group voir dire as applied to petitioner's case."  *Id.*  Although declining

1  to define "practicable," the *Covarrubias* court found that the trial court erred in

2  concluding that "practicable" should be understood as utilizing group voir dire

3  "whenever possible."  *Id*.  The court of appeals stated:

4      [S]ection 223 vests the trial court with discretion to determine the
       advisability of practicability of conducting voir dire in the presence
5      of the other jurors.  Accordingly, a finding that large group voir dire
       should be utilized "whenever possible" does not comport with section
6      223's description of the trial court's duty to decide whether such voir
       dire was in fact practicable.

7

8  *Id.* at 1184.

9          **3.    The Trial Court Failed to Exercise Its Discretion**

10         84.  As with the trial court in *Covarrubias*, the trial court in Ms. Alfaro's case

11  failed to exercise its discretion to determine whether, under the specific

12  circumstances of her case, group voir dire was "practicable."  Although the trial court

13  initially appeared to recognize that it had discretion to conduct individual voir dire

14  under § 223, it failed to "thoroughly examine the application of § 223 to the specific

15  circumstances before it."  *Covarrubias*, 60 Cal. App. 4th at 1184.  Rather, the court

16  simply stated in response to Mr. Monroe's first request for sequestered questioning

17  that Monroe had failed to point out "any unique aspect of the case, to my knowledge,

18  that would separate this case from any other special circumstance case."  RT 17 (Nov.

19  1, 1991 proceedings).  The trial court went on, finding that the "pretty strong public

20  policy and legal policy behind Proposition 115"  placed a burden on Mr. Monroe to

21  establish something "unique" or "unusual" about the case before the court would

22  permit sequestered voir dire or voir dire in small groups.  *Id.* at 18.

23         85.  The trial court later disclosed the full extent of its misunderstanding

24  regarding its obligation to "engag[e] in a careful consideration of the practicability of

25  large group voir dire."  After Mr. Monroe renewed his inquiry into the court's

26  willingness to consider *Hovey* voir dire, the court responded:

27      You can make whatever proposal you want.  You should consider
       Proposition 115.  It has been affirmed by the California Supreme Court
28      and you can make whatever suggestions you want to make.  But it's my

                                            281

1    impression that Proposition 115 was specifically designed to basically do
2    away with *Hovey* voir dire and I don't know why this court wouldn't
     follow the mandates of Prop. 115.

3    *Id.* at 19.

4        86.  In basing its rejection of Mr. Monroe's request for sequestered voir dire on

5    the purported policies and mandates of Proposition 115, rather than assessing whether

6    group voir dire was practicable in the specific circumstances of the case -- which

7    involved a drug related murder of a young Caucasian child and a defendant who was

8    Hispanic --  the trial court failed to exercise discretion and fulfill its duty under § 223.

9        87.  The trial court also failed to exercise its discretion when Mr. Monroe

10   repeated his request for sequestered voir dire prior to the commencement of the

11   second penalty phase trial.  When Mr. Monroe reiterated his request for sequestered

12   voir dire prior to jury selection for the second penalty phase trial, the court

13   responded:  "[T]hat's extremely time consuming and I'm not sure the beneficial

14   effects of it are that great."  RT 2224-25.  The denial of sequestered voir dire based

15   on a general complaint that such a procedure may be time consuming cannot be

16   understood as an exercise of discretion.  The court again failed to assess whether,

17   under the specific circumstances of Ms. Alfaro's case, such a process was warranted.

18   In failing to evaluate Mr. Monroe's request in the context of Ms. Alfaro's case

19   specifically, the court failed to comply with its duty to exercise discretion when

20   assessing the practicability of sequestered voir dire.  *See Covarrubias*,

21   60 Cal. App. 4th at 1183.

22       88.  The trial court's abdication of its duty to exercise discretion means that

23   Ms. Alfaro's conviction must be reversed.  *See Covarrubias*, 60 Cal. App. 4th

24   at 1184.  The trial court has an affirmative duty to ensure that a defendant is tried

25   before an impartial jury.  In the death penalty context, this means that the court must

26   ensure that no juror whose "views would 'prevent or substantially impair the

27   performance of his duties as a juror in accordance with his instructions and his

28   oaths,'" *Witt*, 469 U.S. at 424 (citations omitted) be permitted to remain as a juror.

282

The trial court's duty to exercise its discretion to assess the practicability of sequestered voir dire is inextricable from the trial court's duty to ensure that no jurors whose views would prevent *or* substantially impair their performance of their duties remain seated to judge the defendant.  Ms. Alfaro's case presented jurors with the difficult and emotionally demanding task of assessing a young Latina's guilt of the first degree murder of a nine-year-old girl, and whether, if they found her guilty, she deserved to die or instead to spend the remainder of her life in prison.  The trial court's failure to exercise its discretion to evaluate the practicability of sequestered voir dire in order to insulate jurors from the "untoward effects" of group voir dire and more accurately screen jurors for bias and prejudice is reversible error.

## 4.   If This Court Finds That The Trial Court Exercised Discretion, It Must Find That The Trial Court Abused its Discretion

89.  Should this Court conclude that the trial court did, in fact, exercise its discretion, Ms. Alfaro respectfully submits that in denying Mr. Monroe's request for sequestered voir dire, the trial court abused its discretion.

90.  The *Hovey* Court recognized that when people find themselves in unfamiliar circumstances, they tend to look to the behavior of authority figures for guidance.  *Hovey v. Superior Court*, 28 Cal. 3d at 70.  Being called as a juror in a capital trial is an enormous responsibility that is thrust upon many citizens who have no prior experience applying the law.  The *Hovey* Court realized that in the anxiety of finding themselves in such a novel situation, and when repeatedly exposed to questions by court and counsel about their views on the death penalty and how those views would affect their ability to impose a sentence of death on the accused, jurors "would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion."  *Hovey*, 28 Cal. 3d at 71.

91.  Recognizing that jurors will see the judge as the foremost figure of authority, this inference is especially dangerous when it is only the court, and not

283

counsel, conducting the voir dire.  Jurors expect that each counsel is the advocate for a particular position, and as a consequence, may understand that a counsel's questions regarding the jurors' views on the death penalty are designed to seek out a particular perspective.  When, on the other hand, the judge conducts all or most of the voir dire, including all of the death qualification questions, jurors may be persuaded that if the judge, who is ostensibly meant to be a neutral arbiter, is so concerned about the penalty phase, it is likely that a penalty phase will take place. *See Hovey*, 28 Cal. 3d at 70-71.

92.  Furthermore, when it is the judge spending a substantial amount of time screening jurors for a particular viewpoint, the jurors will perceive that the judge -- again, the presumably neutral arbiter -- disapproves of that view.  That is precisely the prejudice that resulted from the way this judge conducted the death qualification process.  By denying the motion for sequestered voir dire the trial court abused its discretion, and by asking numerous questions designed to screen for those opposed to the death penalty while asking markedly fewer questions designed to screen for those who favored the death penalty, over and over in the presence of all jurors, the trial court grossly prejudiced Ms. Alfaro.  Had the trial court permitted counsel to conduct most of the death qualification questions, sequestering may not have been necessary.  But because the court insisted, in the guilt phase, on asking *all* of the questions, and in the penalty phase, asking most of the questions, and moreover, insisted on aggressively screening for jurors who held views against the death penalty, the court's failure to conduct sequestered voir dire resulted in an unbalanced jury biased against Ms. Alfaro.

93.  Section 223 directs a trial court to conduct group voir dire "when practicable."  The *Covarrabius* court declined to evaluate application of the term "practicable" in the context of the case before it.  *See Covarrubias*, 60 Cal.App.4th at 1183 (whether large group voir dire is practicable in petitioner's case is not for us to decide).  The statute itself provides no guidance on what factors a trial court should

284

look to when assessing the "practicability" of conducting group voir dire.  While the statute's drafters could have meant "practicable" as either physically practicable or practicable in terms of the length of time group versus individual voir dire might take, these narrow definitions of "practicability" do not work to promote the interests of fairness and impartiality that court conducted voir dire is designed to ensure.

94.  "Practicable" must refer to specific factors in the case other than the physical limitations of a courtroom or the time it might take to conduct sequestered voir dire -- "practicable" must refer to the substantive factors of the case.  Section 223's specific reference to group voir dire, "including death penalty cases," is a recognition that while the specific requirements of *Hovey* are no longer mandated, § 223 did not eliminate sequestered voir dire entirely.  Consequently, trial courts must continue to recognize that in certain cases, the repeated exposure to death qualification questions that necessarily takes place in group voir dire could result in a biased jury.  Trial courts must assess how, within the context of specific facts of the case before it, the particular death qualification process it intends to utilize may affect the venire, and assess whether group voir dire is practicable or whether individual or small group voir dire would be the better choice.

95.  The trial court in Ms. Alfaro's case denied sequestered voir dire because it believed Proposition 115 mandated against such a process and that Mr. Monroe had failed to establish anything "unique" about Ms. Alfaro's case.  As shown by *Covarrubias*, the court erred in concluding that Proposition 115 mandated against individual voir dire.   Furthermore, the court's position that Mr. Monroe failed to identify anything unusual in Ms. Alfaro's case that warranted individual voir dire is simply wrong.  In his motion requesting sequestered voir dire, Mr. Monroe identified the very factors that made this case particularly sensitive, such as a child victim, drug addiction, and a woman defendant. CT 120-28.  Nor is the court's insinuation that there is nothing unique about this case that would warrant individual voir dire consistent with its later pronouncement that the case is "one of the most senseless,

brutal, vicious, callous killings that this Court has ever seen. . . . I can't imagine a more vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case." RT 4508.  All the facts that caused the court to view the case in that way were known to the court at the time voir dire began.

96.  As the trial court well knew, this case was not routine -- even in the capital context.  A number of jurors in both the first and second trials remarked that a child victim made this case different.  That the defendant and the victim were of different ethnicities -- Ms. Alfaro Hispanic, the victim Caucasian -- made this case particularly sensitive.  Indeed, this factor has been recognized as capable of triggering jurors' deepest prejudices.  *See Tuilaepa v. California*, 512 U.S. 967, 982, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994); *see also McCleskey v. Kemp*, 481 U.S. 279, 312 (1987); *Turner v. Murray*, 476 U.S. 28 (1986).  The court's later acknowledgment of the remarkable nature of the case reflected the nature of the case from its inception.

97.  Also evidencing that this case was different is the fact that the court, both sua sponte and at the urging of the prosecution, asked many more specific questions than would be asked in a "routine" capital case.  *Compare People v. Balderas*, 41 Cal. 3d 144, 187-190 (1985) (The trial court asked each panel member, out of the presence of the other members, five questions designed to learn the member's views on the death penalty).  The trial court here repeatedly asked the jurors whether they would be unwilling to impose the death penalty if the defendant were young; if the defendant were a woman; if the defendant were Mexican-American; if the defendant had no past history of violence.  These are all factors that could be considered mitigators.  By asking the jurors in the presence of other jurors whether the existence of any of those factors would make it more difficult for them to impose the death penalty, the court effectively conveyed the message that it expected Ms. Alfaro's case to proceed to the penalty phase and that they should be immunized from finding those

286

1  factors to be mitigators.  The court's own conduct made group voir dire impracticable

2  and resulted in a jury biased against Ms. Alfaro.

3       **5.    The Court's Failure to Conduct Individual or Group Voir Dire**

4            **Resulted in a Miscarriage of Justice**

5       98.  Section 223 of the Code of Civil Procedure provides, in relevant part, that:

6       The trial court's exercise of its discretion in the manner in which voir
        dire is conducted shall not cause any conviction to be reversed unless the
7       exercise of that discretion has resulted in a miscarriage of justice, as
        specified in Section 13 of Article VI of the California Constitution.
8

9  Code Civ. Pro. § 223.  It cannot be disputed that the trial of a defendant before a

10 biased and partial jury is a miscarriage of justice.  *Irvin*, 366 U.S. at 722.  "The failure

11 to accord an accused a fair hearing violates even the minimal standards of due

12 process."  *Id.*  In failing to grant the defense request for sequestered voir dire, the trial

13 court abused its discretion and caused Ms. Alfaro to be tried and then sentenced

14 before a biased jury.  As a consequence, the trial court violated her Fifth and

15 Fourteenth Amendment rights to due process, her Sixth Amendment right to a fair

16 and impartial jury, and her Eighth Amendment right to a reliable, non-arbitrary,

17 individualized determination that death is the appropriate penalty.  Ms. Alfaro's

18 sentence must be reversed.

19 **E.    THE TRIAL COURT'S MULTIPLE ERRORS IN CONDUCTING VOIR**

20      **DIRE DEPRIVED MS. ALFARO OF HER RIGHT TO A FAIR AND**

21      **IMPARTIAL JURY**

22      **1.    Introduction**

23      99.  As each of the above arguments makes clear, the voir dire methods

24 employed by the trial court in this case created a grave risk that a biased jury would

25 be empaneled.  The court refused to permit a written questionnaire and refused to

26 conduct individual voir dire, instead exposing jurors not just to repeated questions

27 that presupposed guilt, but to questions that had been crafted by the district attorney

28 and adopted wholesale by the trial court which conditioned the jury against the

287

1    specific mitigating circumstances it was obvious Ms. Alfaro would argue -- her age,

2    the fact that she had no prior felony convictions, the fact that she was Hispanic,

3    a mother, and poor.  At the same time, the court refused to adequately question the

4    prospective jurors as to whether they could overcome the emotions that might bias

5    them against the defendant in a case involving the murder of a nine year old child,

6    calling this question too "case specific."  Taken both alone and together, the trial

7    court's voir dire procedures created an unacceptable likelihood that Ms. Alfaro

8    would be tried by a jury predisposed to find her guilty and too willing to sentence her

9    to death.

10    100.  The Sixth and Fourteenth Amendments "prohibit the State from

11    'entrust[ing] the determination of whether a [woman] should live or die to a tribunal

12    organized to return a verdict of death,' and from 'stack[ing] the deck against the

13    [defendant].' . . . [T]he decision whether a [woman] deserves to live or die must be

14    made on scales that are not deliberately tipped toward death."  *Gray v. Mississippi*,

15    481 U.S. 648, 666 (1987) (citations omitted).  The California Constitution provides

16    the same guarantees.  *See People v. Wheeler*, 22 Cal. 3d 258, 266 (fn. omitted) (1978)

17    .  The jury selection procedures employed by the court did violence to the protections

18    afforded Ms. Alfaro by both the United States and California constitutions.

19    101.  Every action taken by the court during voir dire further diminished Ms.

20    Alfaro's fundamental right to have a fair and impartial jury determine her fate.

21    Together, they denied her the rights guaranteed by the Fifth, Sixth, Eighth and

22    Fourteenth Amendments.

23    **2.    Statement Of Facts**

24    **a.    The First Jury**

25    102.  During voir dire for Ms. Alfaro's first trial, all but one of the court's

26    general death qualification questions were crafted to ferret out jurors who were

27    opposed to the death penalty.  The court asked whether jurors would refuse to find

28    defendant guilty to avoid a death sentence (RT 108); whether they would refuse to

find special circumstances true to avoid a penalty phase (RT 109, 114, 227); and whether they would refuse to vote in favor of death because of views regarding capital punishment.  RT 116, 228, 279.  The court repeatedly sought from each prospective juror a commitment that he or she would be willing to impose the death penalty, while failing to convey in a balanced fashion that the jury was also free to choose a sentence of life without the possibility of parole.  The court's questions conveyed the impression that the court viewed with displeasure *any* opposition to the death penalty, no matter to what degree.

103.  The court also asked prospective jurors whether they had any moral, religious, or philosophical views that *might affect* their deliberations on the death penalty.  *See e.g.*, RT 124, 231, 281, 301.  The United States Supreme Court has held that a prospective juror may not be excused for cause on the basis of moral or ethical opposition to the death penalty *unless* that juror's views would prevent the juror from judging guilt or innocence or would cause the juror to reject the death penalty regardless of the evidence.  "Excusal is permissible only if the juror makes this position 'unmistakably clear.'"  *People v. Holt*, 15 Cal. 4th 619, 650 (1998) (citing *Witherspoon*, 391 U.S. at 522, fn. 21).  While the court could ask jurors whether their moral, religious or philosophical views would "prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath," the court's question regarding a general *effect* religious or moral views might have on their decision to vote for death cast too broad a net.

104.  After refusing to ask the prospective jurors whether the fact that the victim was a child would make it difficult for them to be fair (RT 2263), the trial judge proceeded to question jurors about specific evidence that the defense could be expected to present in mitigation.  The court asked whether the jurors believed there was an age at which a person should not receive the death penalty, "no matter how vicious or cruel the crime might be committed?" (*see, e.g.*, RT 128, 232, 283), aware that Ms. Alfaro was only eighteen at the time of the crime.  The court asked whether

289

the jurors would require a defendant to have a past history of violence before imposing death, knowing that Ms. Alfaro had no prior history of violence. *See, e.g.*, RT 129, 231, 282.

105.   The court screened for jurors who might find other issues in the case made it difficult to impose the death penalty as well.  The court asked whether the jurors thought that the death penalty should only be applied in murder cases involving more than one victim, knowing that that was not the case here.  RT 124, 231, 281.  It asked whether the jurors would be reluctant to sentence a woman to death, repeating again and again, "any of you believe that the state should never execute a woman *no matter how vicious or cruel the crime is that she may have committed*?"  RT 131, 232, 284 (emphasis added).

106.   Turning the history of racial prejudice in the imposition of the death penalty on its head, the court asked prospective jurors whether "in all honesty," they would find it more difficult to vote to impose the death penalty in a case where the defendant is a Mexican-American than they would if the defendant were white.  RT 132, 233, 284.  In fact, significant evidence exists that a juror is *more likely* to impose the death penalty when the victim is Caucasian and the defendant is a minority.  *See McCleskey v. Kemp*, 481 U.S. 279 (1987).  Though the court followed this question with the converse, the order of its questions squandered any chance there was of identifying jurors who were, in fact, racially biased against Ms. Alfaro.

107.   The prejudice that flowed from the court's imbalanced questioning was made starkly evident by the district attorney's closing argument.  After the court adopted verbatim the district attorney's questions that had been constructed to discourage jurors from considering characteristics applicable to Ms. Alfaro and/or the crime as mitigating factors, the district attorney was able to take advantage of the court's imprimatur of approval at closing:

I just want to read a couple things and have you recall some of the questions that were read -- that were asked of you:

One, "Do any of you have any religious views that might affect your deliberations on the death penalty?" All of you said no.

"Do you feel the death penalty should only be applied in murder cases where there are multiple victims." All of you said no.

"Would you require that a defendant have a past history of violence before you would even consider voting for the death penalty?" All of you said no again.

"Do any of you believe there's any particular adult age at which a person should never receive the death penalty no matter how vicious or cruel the crime committed?" All of you said no.

Regarding gender bias, "Do any of you believe the state should never execute a woman no matter how vicious or cruel the crime is that she's committed?" All of you said no.

Then we got into racial bias. And nobody was racially biased on the jury.

Those are important considerations in a case like this, *and I think by now you can see why*.

RT 1983-84. The district attorney turned immediately to the jurors' responsibility to weigh aggravating and mitigating factors. RT 1984. Having reminded jurors that they swore not to take into account their religious or moral views, the age of the defendant, the gender of the defendant, the social background of the defendant, and the absence of a prior history of violence when deciding whether Ms. Alfaro should live or die, the district attorney effectively discouraged the jurors from considering the real evidence of mitigation present in Ms. Alfaro's case, and was able to do so with the court's conspicuous assistance.

### b.    The Second Jury

108.  The court's imbalanced approach became even more pronounced during voir dire for Ms. Alfaro's retrial. As discussed in herein, despite its best efforts in the first jury selection process, the court learned from the first jury's foreman, J. W. Abouchar, that jurors had not been adequately screened to remove those who had *any* sentiments against the death penalty. RT 2220.  In his letter to the court, dated April

21, 1992, Mr. Abouchar blamed one of the other jurors who had refused to vote for

the death penalty for Ms. Alfaro of lying during voir dire about her willingness to

impose the death penalty.  Wrote Mr. Abouchar:

> The third [educational] event was discovering that one of the jurors was against the death penalty.  This was Ms. Paulette O'Dell, who is probably an only child who "had a good childhood" and "it was her adulthood she screwed up."  She "did" designer drugs, has joined AA in the past four months, is a controlling person, divorced, smokes like a fiend, and is twenty years older and forty pounds heavier than she thinks she is (the last two are my observations).  She is a liberal of the seventies and admires Cranston, Jerry Brown, etc. . . . She still wouldn't stop being an emotionally involved sympathetic person who blamed Alfaro's upbringing rather than the person, despite other jurors who bared their souls about the bad childhood to discourage the essentially "bleeding heart" position she took.
>
> One of the investigators for the defense, Laura Lawhon, stopped by my home, talked to my wife, and name dropped that she knew one of our neighbors (which she does, it turns out).  I have not talked to her yet, but courtesy requires that I do so this week . . . I will tell her the same profile information about how to hang a jury by finding another high school teacher such as Ms. O'Dell.  However, please educate the prosecuting attorney that when the judge asks jurors your standard question about the death penalty, she never really answered it.  Her first answer was she had been opposed to it; in later life she "had nothing against it."  This is not an answer. This cost all of us in excess of one hundred thousand dollars. You may wish to pass this on to Mr. Littleton. [*Sic*].  Too many vague answers are given today, such as "I don't see why not," "I have nothing against it," etc.  These very often turn out to not be answers.  I have been burned before.

CT 83-84 (April 21, 1992 proceedings).

109.  Rather than treating this letter as simply the expression of an unhappy

man and accepting that reasonable people who believe in the appropriateness of the

death penalty might have found it inappropriate in Ms. Alfaro's case (the jury hung at

ten to *two*), the court accepted Mr. Abouchar's unsupported conclusion that this juror

had lied about her ability to weigh the evidence.[25]  Before jury selection began on

---

[25]  In the afternoon on April 6, 1992, Mr. Abouchar informed the court that the jury had reached an impasse.  RT 2077.  Attempting to determine how far apart the jurors were, the court asked what the split had been on the most recent ballots.  Mr. Abouchar indicated that the jury was split "two, four and six.  The six were zeros." RT 2080.  The court asked whether "six equal zeros" meant that those jurors could go either way.  Mr. Abouchar responded "yes."  RT 2080.  After being given instructed on the meaning of life without the possibility of parole, the jury deliberated another

May 11, 1992, Mr. Monroe asked the court to inform the jury that the first trial ended in a hung jury.  RT 2416-17.  Mr. Monroe argued that the court's refusal to inform the second jury that the first jury could not reach a verdict, "is not totally in response to the question of the jurors, why are we here on the second penalty phase.  It begs the question."  RT 2420.  The court responded: "What do you propose we tell them?  You propose we tell them the absolute truth?"  Mr. Monroe said: "Which is?"  The court replied, "Which is a juror lied on jury selection, failed to answer the questions honestly, and that's why we're here?"  RT 2420.  The questions asked by the court for Ms. Alfaro's retrial, based on the unsupported allegations of a disgruntled ex-juror, further influenced the jurors toward death.

110.  Jury selection for the retrial began on May 11, 1992.  The court asked the same questions that it asked at the first trial.  The court also asked, prompted by Mr. Abouchar's suggestion but in contravention of the dictates of the United States Supreme Court, whether jurors *would hesitate* before imposing death:

> Do you think if you were satisfied in your mind from the evidence you received from the witness stand here, not from anything you see in the newspaper, that the aggravating circumstances in this case substantially outweigh any mitigating circumstances, would you have *any hesitation* in rendering the imposition of the death penalty?

RT 2685.  Such a question directly violates the United States Supreme Court's holding that "a court seeking to eliminate jurors who "might hesitate" to return a verdict imposing death violates a defendant's Sixth and Fourteenth Amendment rights to an impartial jury."  *Witherspoon*, 391 U.S. at 518; *see also Morgan,* 504 U.S. at 731.

111.  As before, the court went on to ask jurors not only whether they opposed the death penalty *now*, but also asked them whether they had *ever* been against the death penalty.   RT 2682-83.  The court said to one prospective juror:  "I'm not sure I really got an answer when you mentioned that you -- I got the impression that you

---

day and a half, but was unable to reach a verdict.  The court declared a mistrial on April 8, 1992.  RT 2113.

said you didn't know if you have ever been against the death penalty and I'm puzzled

how you could have that opinion." RT 2522.  The court asked whether the juror

could recall having gotten "into one of those high school debates" about the death

penalty (RT 2523), and whether she recalled "whether you have ever, I'm not saying

had a strong feeling, but if you ever had feelings that you expressed to others against

the death penalty?" RT 2523.  The court's prying into this juror's *high school*

opinions about the death penalty served no legitimate voir dire purpose.

112.  In response to the court's question of another prospective juror

as to whether she had ever been against the death penalty, the juror,  Ms. Densham,

responded:

> Against it, no.  Questioned, yes.  My first husband was vehemently
> opposed to it so we could get into debates on it."  RT 2525.  The court
> continued:  "Okay.  And how long ago, if you can just give me a handle
> on it, has it been more than ten years ago that you had your last debate
> on that with your ex-husband?"  Ms. Densham:  "Much more than that."
> The court:  "Okay.  And I gather you have always taken the position that
> in appropriate cases the death penalty is an appropriate penalty?"

RT 2525.

113.  Another prospective juror was subjected to the same scrutiny when he

suggested he might, in the past, have been opposed to the death penalty.  When

Mr. MacNeil responded to the question, "Have you ever been against the death

penalty before?", "When I was younger, a teenager," the court responded, "All right.

There's various degrees of being against it.  Did you ever participate in any debates

with your friends about the appropriateness of the death penalty?"  RT 2583.  The

court went on to ask him when he changed his mind and what changed his mind about

it, and to describe the circumstances under which he might find the penalty

appropriate.  RT 2584.

114.  Such invasive inquiries went far beyond the inquiry necessary to

illuminate the jurors who should be struck for cause.  It communicated the court's

disapproval of anyone who had *ever* expressed any criticism of the death penalty.

The court's  questioning clearly gave the district attorney an advantage -- albeit

1    unconstitutional -- by providing him with significant information to guide his

2    decisions on how to best use his peremptory strikes.

3        115.  The court also asked its questions about whether jurors believed that the

4    state should never execute a woman, "no matter how vicious or cruel the crime is that

5    she may have committed," (*see, e.g.*, RT 2528), whether they would find it more

6    difficult to vote to impose the death penalty in a case where the defendant is

7    Mexican-American than they would if the defendant were white (*see, e.g.*, RT 2530),

8    whether they would find it difficult to vote for death if the defendant were young

9    (*see, e.g.*, RT 2639, 2686), and whether they would find it difficult to vote for death

10   if the defendant had no prior history of violence.  *See, e.g.*, RT 2528, 2638, 2686.

11       116.  Finally, in abrogation of its responsibility to be scrupulously impartial,

12   the court revealed its personal approval of the death penalty to the venire.  *See also*

13   Claim 18.  The court expressed satisfaction that "killing a judge" qualified as a

14   special circumstance in California (RT 2765), and later, when a juror expressed

15   frustration that the legal process had taken so long in the Robert Alton Harris case,

16   the court agreed wholeheartedly and blamed federal judges for the alleged "delays."

17   RT 2837.

18       **3.    The Magnitude Of The Capital Jury's Responsibility Requires**

19       **That the Trial Court Be Scrupulous In Maintaining Both the**

20       **Appearance And the Fact Of Impartiality**

21       117.  Capital juries are entrusted to render a "highly subjective, 'unique

22   individualized judgment regarding the punishment that a particular person deserves.'"

23   *Caldwell v. Mississippi*, 473 U.S. 320, 340-41, fn. 7 (1985) (quoting *Zant v. Stephens*,

24   462 U.S. 862, 900 (1983) (Rehnquist, J. concurring).  Because of the irrevocable

25   nature of the punishment a capital jury may impose, the court must be especially

26   vigilant to ensure that biased jurors be excluded.  (*See Morgan*, 504 U.S. at 730

27   ("The adequacy of voir dire is not easily the subject of appellate review, but we have

28   not hesitated, *particulary in capital cases*, to find that certain inquiries must be made

1   to effectuate constitutional protections.") (emphasis added).  A capital defendant

2   possesses the constitutional right not to be sentenced by a "'tribunal organized to

3   return a verdict of death.'"  *Gray*, 481 U.S. at 668 (quoting *Fay v. New York*,

4   332 U.S. 261, 294) (1947).

5       118.  By their very nature, capital cases often involve facts and events which

6   are more repugnant than those of non-capital cases.  As a consequence, a far greater

7   likelihood exists that biases and prejudices may operate undetected in capital cases.

8   *Turner v. Murray*, 476 U.S. 28, 35 (1986).  To help ensure impartial juries in capital

9   cases, the judicial system has developed and encouraged the use of jury

10  questionnaires, sequestered voir dire, and the right of counsel to question potential

11  jurors directly.  When the trial court denied Ms. Alfaro the opportunity to utilize *any*

12  *of these tools*, it frustrated the purpose behind voir dire of revealing biased and

13  incompetent jurors, and it prevented Ms. Alfaro's counsel from making the necessary

14  record from which to challenge jurors for cause.  It paved a direct path to her

15  conviction and death sentence.

16      **4.    The Trial Court's Decisions Regarding The Conduct of Voir Dire**

17          **Deprived Ms. Alfaro Her Right To An Impartial Jury**

18          **a.    The Court's Decision To Deny Sequestered Voir Dire Was**

19              **Erroneous**

20      119.  The court denied Mr. Monroe's request for sequestered voir dire and did

21  so without analyzing whether, in the context of Ms. Alfaro's case, such voir dire was

22  practicable.  As discussed herein, in a case involving such highly charged factors as

23  different ethnicities -- a Caucasian child murder victim stabbed multiple times and a

24  Hispanic teenager defendant -- and drug addiction, sequestered voir dire, at least for

25  the purpose of evaluating prospective jurors' views on the death penalty, was

26  particularly appropriate.  Such repeated exposure to the death qualification process

27  risks that the jurors will conclude that the court expects them to find the defendant

28

1  guilty and then sentence her to death.  *See Hovey v. Superior Court*, 28 Cal. 3d 1
2  (1980).

3          **b.    The Court's Decision To Deny A Jury Questionnaire Was**
4                  **Erroneous**

5          120.  In addition to denying sequestered voir dire, the court denied the requests
6  of both Mr. Monroe and the District Attorney that juror questionnaires be used.
7  RT 125-26 (February 24, 1992 proceedings).  The court could have minimized the
8  dangers inherent in collective voir dire by use of a questionnaire, yet failed, without
9  reason, to do so.

10          121.  The use of juror questionnaires is not uncommon.  Rather, it is *routine*
11  in death penalty cases.  *See e.g.*, *People v. Earp*, 85 Cal. Rptr. 857, 874 (1999);
12  *see also People v. Welch*, 85 Cal. Rptr. 2d 203 (1999); *Zamuido v. Superior Court*,
13  64 Cal. App. 4th 24, 74 Cal. Rptr. 2d 765 (1998); *People v. Millwee*, 18 Cal. 4th 96
14  (1998); *People v. Dennis*, 17 Cal. 4th 468, 950 P.2d 1035 (1998); *People v. Bradford*,
15  15 Cal. 4th 1229 (1997); *People v. Holt*, 15 Cal. 4th 619 (1997); *People v. Carpenter*,
16  15 Cal. 4th 312, 935 P.2d 708 (1997); *People v. Mayfield*, 14 Cal. 4th 668, 928 P.2d
17  485 (1997); *People v. Jackson*, 13 Cal. 4th 1164, 282 P.2d 898 (1996); *People v.
18  Osband*, 13 Cal. 4th 622 (1996); *People v. Arias*, 13 Cal. 4th 92, 913 P.2d 980
19  (1996); *People v. Lucas*, 12 Cal. 4th 415, 907 P.2d 373 (1995); *People v. Cudjo*,
20  6 Cal. 4th 585, 863 P.2d 635 (1993); *People v. Johnson*, 6 Cal. 4th 1 (1993); *People
21  v. Cummings*, 4 Cal. 4th 1233 (1993).  Indeed, the use of questionnaires since the
22  advent of Proposition 115 has been deemed "extremely important:"

23          Jury selection questionnaires are *commonly* used in death cases.  *In light
24          of the elimination of sequestered, individual voir dire, the use of such
              questionnaires, answered by jurors before judge or attorney
25          questioning, has become extremely important.  This device at least
              partially preserves the former benefits of individual questioning with the
26          concomitant expenditure of court time.*

27  (Cal. Criminal Law Procedure and Practice (Cont. Ed. Bar 1998) p. 1472.  As the
28  California Supreme Court recognized in *People v. Cudjo,* 6 Cal. 4th at 629,

1   "[b]ecause the prospective jurors answered the questionnaires individually and in

2   isolation from each other, defendant received the primary advantage of *Hovey* voir

3   dire -- minimizing each prospective juror's exposure to the death qualification voir

4   dire of others."  At the same time, the procedure avoids the length of time required for

5   sequestered voir dire.  *Id*.

6        122.  The trial court's explanation for refusing juror questionnaires was that

7   counsel had framed their questions too broadly, seeking information not only relevant

8   to strikes for cause, but also clearly to inform their peremptory challenges, and that

9   questionnaires do not remain confidential.  At a minimum, if the court believed the

10  questions too broad, it should have afforded counsel the opportunity to narrow their

11  proposed questions or narrowed them itself.  RT 24 (Nov. 1, 1991 proceedings);

12  RT 125 (February 24, 1992 proceedings).  Given the substantial risks collective voir

13  dire posed in Ms. Alfaro's case and the ease with which those risks could have been

14  minimized through the use of juror questionnaires, the court's failure to employ them

15  cannot be found harmless.

16          **c.**    **The Court's Refusal To Ask Questions About The Child**

17                   **Victim Was Erroneous**

18       123.  The risk of picking a biased jury grew as a result of the court's refusal

19  to question jurors individually about the fact that the victim was a child.  The district

20  attorney claimed that in proposing questions such as, "Please explain if the fact that

21  the victim in this case is, say, a nine-year-old-little girl who knew and had been

22  befriended by the defendant would prohibit you from being a fair and impartial juror

23  in this case," the defense was seeking to have jurors "prejudge the evidence."

24  RT 2263.  This ruling misstated the law.  The court's failure to either inquire itself or

25  to permit defense counsel to inquire into such a sensitive and potentially prejudicial

26  area cannot be excused.

27

28

d.     **The Court Compounded Each Of The Above Errors Through Its  Fashioning Of The Death Qualification Questions, Resulting In A Jury Predisposed To Find Ms. Alfaro Guilty And To Sentence Her To Death**

124.  The court's method of conducting the voir dire fatally compounded the errors described above.  All jurors were subjected to repeated questions and discussion of each prospective juror's views on the penalty before Ms. Alfaro had been found guilty of the crimes.  But the inevitable dangers of group voir dire identified by this Court in *Hovey* were exponentially amplified in this case by the manner in which the court fashioned the death qualification questions, and the way in which it injected its own pro-death penalty views into the process.  The court went overboard in ensuring that jurors would be willing to impose the death penalty.  It empaneled a jury predisposed to vote for death.

125.  "The State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would 'frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.'"  *Gray,* 481 U.S. at 658 (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).  A court seeking to eliminate jurors who "might hesitate" to return a verdict imposing death violates a defendant's Sixth and Fourteenth Amendment rights to an impartial jury.  *Witherspoon*, 391 U.S. at 518; *see also Morgan,* 504 U.S. at 731 (citing *Witherspoon,* 391 U.S. at 512-513).

126.  The court's sole obligation is to screen for jurors whose views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Wainwright v. Witt*, 469 U.S. at 424.  The United States Supreme Court has held that a juror who would automatically vote for the death penalty is as incompetent to sit as a juror as one who would vote against the death penalty.  *See Morgan*, 504 U.S. at 729 ("A juror who will automatically vote for

299

1  the death penalty in every case will fail in good faith to consider the evidence of

2  aggravating and mitigating circumstances as the instructions require him to do.").

3      127.  In using the prosecution's proposed voir dire questions nearly verbatim

4  and in shaping its own questions to screen for prospective jurors who were opposed

5  *or had ever been opposed* to the death penalty, the court blatantly disregarded the

6  general principle that a judge must "sedulously avoid all appearances of advocacy as

7  to those questions which are ultimately to be submitted to the jury," (*United States v.*

8  *Hickman*, 592 F.2d 931, 933 (6th Cir. 1979)), and inexcusably ignored the recognized

9  fact that repeated exposure to questioning by a judge about a juror's willingness to

10  impose the death penalty prompts the jurors "to infer that the court . . . assumes the

11  penalty trial will occur." *Hovey v. Superior Court,* 28 Cal. 3d at 70-71.  The

12  imbalanced nature of the court's questioning cannot be deemed harmless.

13      **5.    Conclusion**

14      128.  "'[S]ome constitutional rights [are] so basic to a fair trial that their

15  infraction can never be treated as harmless error.' . . . The right to an impartial

16  adjudicator, be it judge or jury, is such a right." *Gray,* 481 U.S. at 668 (quoting

17  *Chapman v. California*, 386 U.S. 18, 23 (1967)).  The trial court failed in its duty

18  to ensure that an impartial jury was chosen to assess Ms. Alfaro's guilt and determine

19  her sentence.  Instead, it managed to convey as early as voir dire the feelings it later

20  voiced during the hearing on Ms. Alfaro's motion to modify the verdict.  Stated the

21  court:

22      In my past I've prosecuted people accused of offenses like Miss Alfaro,
        I have defended people accused of noncapital homicide offenses when
23      I was a defense attorney, and I have been a member of the superior court
        for over thirteen years.

24
        This case is one of the most senseless, brutal, vicious, callous killings
25      that this court has ever seen.  The description that a picture is worth
        a thousand words, the circumstances of this offense shown by the
26      photographs show a very vicious, senseless killing.  I can't imagine
        a more vicious, senseless, killing.  I have never seen one that compares

27

28

300

1   with this case, nor could I image that anyone could ever dream one
2   up that would match this case.

3   RT 4508.

4          129.  A trial court may be -- and should be -- moved by the cases that come
5   before it.  The court must not, however, permit those private opinions to subvert its
6   obligation to dispassionately apply the law.  The court here sought out and empaneled
7   a jury designed to impose the death sentence that the court clearly thought
8   appropriate.  In so doing, the court violated Ms. Alfaro's Fifth and Fourteenth
9   Amendment rights to due process, her Sixth Amendment right to a fair and impartial
10  jury, and her Eighth Amendment right to a reliable, non-arbitrary, individualized
11  determination of whether death is the appropriate penalty.

12         130.  The trial court's errors, singularly and together, violated Ms. Alfaro's
13  rights to a fair and impartial jury.  At a minimum, Ms. Alfaro's death sentence must
14  be reversed.

15         131.  The foregoing violations of Ms. Alfaro's constitutional rights are
16  structural error and warrant the granting of this Petition without any determination of
17  whether the violations substantially affected or influenced the jury's verdict.  *Brecht*,
18  507 U.S. at 638.

19         132.  The constitutional violations set forth in this claim alone mandate relief
20  from the convictions and sentence.  However, even if these violations do not mandate
21  relief standing on their own, relief is required when this claim is considered together
22  with the additional constitutional errors outlined in the remainder of this Petition.
23  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and
24  sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,
25  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th
26  Cir. 1978).

27
28

301

1

**XXIV.**

2  **CLAIM 19:  THE TRIAL COURT'S FAILURE TO CLOSE MS. ALFARO'S**

3  **TRIAL SO THAT SHE COULD TESTIFY WITHOUT FEAR OF**

4  **RETALIATION VIOLATED HER CONSTITUTIONAL RIGHTS**

5        Petitioner's conviction and sentence of death were rendered in violation of her

6  rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-

7  capricious determination of guilt and penalty, to the effective assistance of counsel,

8  to present a defense, and to due process of law as guaranteed by the Fifth, Sixth,

9  Eighth and Fourteenth Amendments to the United States Constitution because of the

10 trial court's failure to close Petitioner's trial so that she could testify without fear

11 of retaliation.  As  a result, habeas relief is warranted.

12       1.  Exhaustion of the claim:  This claim was fairly presented to the California

13 Supreme Court in the direct appeal.  It was presented as Claim 5 in the Opening Brief.

14       2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

15 *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

16 denial of this claim is both "contrary to" and an "unreasonable application" of clearly

17 established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim

18 *de novo*.  Moreover, because the state court's adjudication of this claim was

19 dependent on an antecedent unreasonable application of federal law, this Court "must

20 then resolve the claim without the deference that AEDPA otherwise requires."

21 *Panetti*, 127 S. Ct. at 2858.

22       3.  If Respondent disputes any of the facts alleged below, Petitioner requests an

23 evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

24 been afforded discovery and the disclosure of material evidence by the State, the use

25 of this court's subpoena power, and the opportunity to investigate fully, counsel

26 requests an opportunity to supplement or amend this petition.

27

28

302

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

A.   **PROCEDURAL HISTORY**

6.  On March 18, 1992, after the prosecution had rested its case in chief, Mr. Monroe moved to exclude the press and public from the courtroom during Ms. Alfaro's testimony on the ground that "the presence of the press and public during her testimony will be so prejudicial to the defendant that she will be deprived of a fair trial." CT 489-95.  In support of this motion, Mr. Monroe filed a declaration signed by Ms. Alfaro, which summarizes the testimony Ms. Alfaro would give in her own defense and states that Ms. Alfaro fears retaliation from the "other male hispanic" [sic] if she testifies in open court.  CT 497-a-c (March 18, 1992 proceedings).  Ms. Alfaro's declaration concludes:

> If I testify in public so the newspapers get the information and I identify this male hispanic [sic], I believe my family will be harmed because the man is still out in the community.
>
> I cannot and will not testify unless my testimony is taken in a closed courtroom with my testimony sealed.

CT 497 (March 18, 1992 proceedings).

7.  Although Ms. Alfaro admits in this declaration that she stabbed Autumn Wallace,[26] and does not directly implicate the "other hispanic [sic] man" in Autumn's

---

[26] This declaration provides that Ms. Alfaro stabbed Autumn Wallace "3 or 4 times." CT 497-b (March 18, 1992 proceedings).  During her video-taped confession on June 27, 1990, Ms. Alfaro responded "I don't know, a couple of times" when asked how many times she had stabbed Autumn Wallace.  CT 531.  She then went on to describe stabbing Autumn an indeterminate number of times. *Id.* at 531-32.  The declaration does not challenge the accuracy of Ms. Alfaro's confession in this regard,

1    murder, she does attest that he encouraged her to commit the murder by threatening

2    to harm her and her family if she did not "do something about Autumn." CT 497-a-c

3    (March 18, 1992 proceedings). Given that duress is not a defense to a capital crime,

4    *see* Cal. Penal Code § 26, this testimony, even if believed, would not have provided

5    a complete defense to the crimes charged. It might, however, have given rise to

6    a defense at the penalty phase of the trial. *See* California Penal Code § 190.3(g).

7        8.   The trial court agreed with Mr. Monroe that it had the authority to exclude

8    the public and media during Ms. Alfaro's testimony. RT 1163-64. Nevertheless, it

9    refused to do so, finding that while what Ms. Alfaro would testify to "might be

10   somewhat revolting and shocking," it had already been disclosed on the videotape"

11   (RT 1167-68); Ms. Alfaro's case "[didn't] involve any alleged abnormal practices, be

12   it sexual, ritual, satanic, or anything else" (RT 1168); and, and that there was "no

13   evidence that our accused is in the condition of extreme emotional disturbance and

14   bewilderment at the prospect of testifying." RT 1168. The court concluded that

15   Ms. Alfaro's sole concern was a "desire to avoid an alleged threat to herself or her

16   family, because that's the bottom line of it." RT 1170.

17       9.   The court also found that the "deterrence of an open hearing to the

18   commission of perjury," and "the possibility that the publicity attendant on an open

19   hearing will lead to the discovery of important witnesses," weighed against closing

20   the courtroom. RT 1169-70. Looking at the "the quality of the threat," the court

21   noted that the last threats had been made a year and half previously and that no

22   evidence existed that "this person is even in the area or counsel would have been able

23   to locate the person." RT 1170-71. The court also expressed concern that excluding

24   the public would cause "the jury to infer that the court assessed some credibility or,

25   in fact, believed that there was a valid threat to exclude the public during her

26

27   ─────────────────

28   and may be read to convey that Ms. Alfaro only *remembered* stabbing Autumn three
     or four times.

304

1   testimony. . . .  And I don't believe any instruction to the contrary would alleviate

2   the possible danger of that interpretation."  RT 1171.

3        10.  Without once mentioning Ms. Alfaro's right to testify and her assertion

4   that her fear was such that absent a closed courtroom, she would not testify, the court

5   concluded that Ms. Alfaro had not made the showing necessary to justify the court

6   exercising its discretion to close the courtroom.  The court appears to have based its

7   decision on its belief that closing the courtroom "could very well prejudice the other

8   side's case; that is, the prosecution's case, and may very well lead to us never finding

9   out who this alleged driver is."  RT 1172.  The court reasoned:

10       Maybe if we didn't have the four-hour video confession that we have
         already watched it might be a different story.  But we have already had
11       that.  And this court also questions the credibility of the defendant's
         story, especially in view of the numerous times on the tape that the
12       police allowed her an opportunity to tell them if anyone else was
         involved in the stabbings [*sic*]. . . .  She was given many opportunities
13       to tell the police. . . .But I'm not making my decision on that basis.
         I'm making my decision on weighing all of the factors involved in the
14       *Kirstowsky* case, the public policy reasons and the common law reasons
         for open hearings, and the lack of a showing of the quality that was
15       shown in the *Kirstowsky* case.

16  RT 1173.

17       11.  After the court denied the defense motion to close the courtroom during

18  Ms. Alfaro's testimony, Ms. Alfaro waived her right to testify, and Mr. Monroe

19  indicated that he had no affirmative defense to present and rested his case.  RT 1179.

20  Five days later, the jury found Ms. Alfaro guilty of all charges, and found the alleged

21  special circumstances to be true.  CT 1086-90.

22  **B.    LEGAL STANDARD**

23       12.  A criminal defendant's right to take the stand to testify on her own behalf

24  is a fundamental right "essential to due process of law in a fair adversary process."

25  *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (quoting

26  *Faretta v. California*, 422 U.S. 806, 819, fn.15, 95 S. Ct. 2525, 47 L. Ed 2d 562

27  (1975)).  The right to testify in one's own defense has its source in several

28  Constitutional provisions, including the Fifth Amendment's due process guarantee,

305

the Sixth Amendment's right to call witnesses in one's defense, and the right of a defendant to control her own defense. *See Rock*, 483 U.S. at 52 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982)). In addition, the Fourteenth Amendment's guarantee "that no one shall be deprived of liberty without due process of law include[s] a right to be heard and offer testimony." *Rock*, 483 U.S. at 51 (quoting *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L. Ed. 682 (1948). Thus, "[e]very criminal defendant is privileged to testify in [her] own defense, or to refuse to do so." *Harris v. New York*, 401 U.S. 222, 225. 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971).

    13.  At the same time, criminal defendants are guaranteed the right to a speedy and public trial by the United States.  U.S. Const., amend. VI.  The public trial guarantee is a right created for the benefit of the defendant.  *See Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 379, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979).  Public trials give the defendant the assurance that the proceedings will be conducted fairly, and are designed to discourage perjury, the misconduct of the participants, and decisions based on secret bias or partiality.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (citing 3 W. Blackstone Commentaries 372-73).

    14.  The United States Supreme Court has recognized that "[t]he right of 'public trial' is not one belonging to the public, but one belonging to the accused." *Estes v. Texas*, 381 U.S. 532, 588-89, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965).  It is this principle -- that the defendant has a right to a public trial --  upon which the presumption that trials will be open is based.  The public's right of access to a criminal trial, in contrast, is a qualified one, which must yield to a defendant's right to a fair trial.  *See Waller v. Georgia*,467 U.S. 39, 45, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) ("the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial"); *see also Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 581, fn. 18 (1980) (in the interests of the fair

306

1   administration of justice, a trial judge may impose reasonable limitations on access to

2   a trial); *Press-Enterprise Co. v. Superior Court (of California)*, 464 U.S. 501, 508,

3   104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) ("[n]o right ranks higher than the right of the

4   accused to a fair trial").

5       15. The United States Supreme Court has also recognized that "the most

6   important witness for the defense in many criminal cases is the defendant [her]self."

7   *Rock,* 483 U.S. at 52.  When the right of public access would interfere with a

8   defendant's right to testify, the trial court has an obligation to close the trial during

9   the defendant's testimony.

10      16. Contrary to the trial court's ruling in this case, Ms. Alfaro did not have to

11  show that her testimony will be "revolting and shocking" to establish that in order to

12  preserve her right to a fair trial, the courtroom should be closed, at least temporarily.

13  Many courts have recognized that justice may require that a courtroom be closed

14  when a witness fears harassment or retaliation by a third party.  *See e.g.*, *United

15  States v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir. 1992) (citing *Waller*, 467 U.S.

16  at 45) (a trial court properly closes the courtroom for a non-defendant witness's

17  testimony after finding that without closure, that witness would experience either

18  harassment or discomfort or fear); *see also United States v. Hernandez*, 608 F.2d 741,

19  747-48 (9th Cir. 1979); *United States v. Eisner*, 533 F.2d 987, 993-94 (6th Cir. 1976)

20  (citing cases upholding closure based on the testifying witness's fear).  The

21  justification for closing the courtroom because a witness fears a third party only

22  grows when the witness is the defendant, who has a fundamental, constitutional right

23  to testify.

24      17. Given the fundamental nature of the defendant's right to testify, if full

25  closure is not an option, the trial court has a duty to find an alternative.  *See Waller*,

26  467 U.S. at 48 (failure to consider alternatives to complete closure of suppression

27  hearing violated defendant's right to a public trial).  The United States Supreme Court

28  has stated that "courts must take such steps by rule and regulation that will protect

307

1  their processes from prejudicial outside interferences." *Sheppard v. Maxwell*,

2  384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966).[27]  A trial court may, for

3  example, prohibit news reporters from attending or publishing information about the

4  trial, "if such restrictions are necessary to assure a defendant a fair trial before an

5  impartial tribunal." *Branzburg v. Hayes*, 408 U.S. 665, 684-685, 92 S. Ct. 2646,

6  33 L. Ed. 2d 626 (1972).  Conversely, the trial judge could exclude the public and

7  order the press to refrain from broadcasting or printing specific information.  *See*

8  *Geise v. United States*, 262 F.2d 151 (9th Cir. 1958) (order of trial court excluding all

9  spectators except members of the press, members of the bar or relatives of the victim

10  and the defendant was not an abuse of the trial court's discretion).

11  **C.  THE TRIAL COURT'S REFUSAL TO CLOSE THE COURTROOM**

12  **DURING MS. ALFARO'S TESTIMONY VIOLATED HER**

13  **CONSTITUTIONAL RIGHTS**

14  18.  According to the declaration apparently signed by Ms. Alfaro on May 18,

15  1992, the third man threatened to harm her son if she did not "do something" about

16  Autumn.  CT 497-b (March 18, 1992 proceedings).  He also threatened Ms. Alfaro

17  herself at the scene and two days later, he sought her out and told her that he would

18  "get [her] and her kids and [her] mom if [she] talked."  CT 497-c (March 18, 1992

19  proceedings).

20  19.  The trial judge understood that Ms. Alfaro's testimony was critical to the

21  defense to which he had consigned her when, on February 21, 1992, he refused to do

22  anything to resolve the conflict that had erupted between Ms. Alfaro and her attorney

23  over her desire to plead guilty and her counsel's insistence on mounting a defense.

24  At the hearing, the court had stated (addressing Mr. Monroe):

25

26  _____

27  [27]  The trial court in *Sheppard* failed to adopt stricter rules governing the use
of the courtroom by newsmen, neglected to insulate witnesses from the press, and
made no "effort to control the release of leads, information, and gossip to the press by

28  police officers, witnesses, and the counsel for both sides."  *Id.* at 359.

1    The Court: [Y]our whole defense is based upon her getting on the stand
2    and pointing the finger at somebody else.  And she is not going to do
     that, . . . not unless she changes her mind.  *And if she doesn't do it, it*
3    *definitely handicaps your efforts to defend her.*

4    RT  116 (emphasis added).  (February 21, 1992 Hearing).  Less than a month later,

5    informed what it would take to get Ms. Alfaro to "change[ ] her mind," the trial judge

6    denied the defense motion to close the courtroom.  In so doing, the judge virtually

7    insured that the defense strategy he had forced on Ms. Alfaro against her will would

8    fail.

9         20.  Some of the reasons articulated by the court for refusing to close the

10   courtroom were proper while others were not.  But even the proper considerations did

11   not outweigh Ms. Alfaro's right to a fair trial, which includes both honoring her right

12   to testify and her right to present a defense.  Moreover, Ms. Alfaro requested only

13   a partial closure of the trial -- just enough to allow her to testify free of fear.  Given

14   the constitutional weight of her interests and the limited nature of the request,

15   Ms. Alfaro's motion for a temporary and partial closure of the proceedings in order

16   to protect her constitutional rights to testify in her own defense, to present a defense,

17   and to a fair trial, should never have been denied.  *See United States v. Hernandez*,

18   608 F.2d at 747 (noting that "the right to a public trial does not preclude a limited

19   exclusion of spectators when there is a demonstrated need to protect the witness from

20   threatened harassment or physical harm.").

21        21.  The trial court based its decision to deny the motion to close the

22   courtroom, in part, on the dubious ground that *the trial court* had doubts about

23   Ms. Alfaro's credibility.  RT 1173 (court "questions the credibility of the defendant's

24   story, especially in view of the numerous times on the tape that the police allowed her

25   an opportunity to tell them if anyone else was involved in the stabbings").  While one

26   may question whether Ms. Alfaro's testimony would have amounted to a guilt phase

27   defense, testimony concerning the threats to her own child that preceded the murder

28   of Autumn Wallace would have supported a penalty phase defense.  Moreover, while

309

Ms. Alfaro's testimony may not have provided a sufficient showing to justify an aiding and abetting instruction, it might have supported a lingering doubt mitigating circumstance at the penalty phase.

22.  First, Ms. Alfaro was not required to testify that "anyone else was involved in the stabbings" in order to assert her constitutional right to take the stand. Moreover, as Wigmore observed, "'if the evidence is really of no appreciable value, no harm is done in admitting it:  but if the evidence is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt.'"  Wigmore, *Evidence* (Tillers rev. ed. 1980) § 139, p. 1724.

23.  But perhaps even more importantly, Ms. Alfaro's right to testify did not depend on her ability to convince the judge of the truth of her story.  Whether her testimony was credible or not was a question for the jury.  "A fundamental premise of our criminal trial system is that 'the jury is the lie detector.'"  *United States v. Sheffer*, 523 U.S. 303, 313, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1997) (quoting *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973).  "Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men [and women].'"  *U.S. v. Sheffer*, *523* U.S. at 313 (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 11 S. Ct. 720, 35 L. Ed. 371 (1891).

24.  The trial court also based its decision to deny Ms. Alfaro's motion on its perception that closing the courtroom would be giving credibility to Ms. Alfaro's fears, and as a result, would amount to the court taking sides.  RT 1171-72 ("In fact, it would appear to this court that so doing could very well prejudice the other side's case, that is, the prosecution's case, and may very well lead to us never finding out who this alleged driver is.").  No one who reads the transcript of this trial will be concerned that the trial judge gave the appearance at any time of taking sides with

310

1  Ms. Alfaro.  But even if it had, the court gave too much weight to the influence
2  of appearances on the jury.  A well placed curative instruction could have avoided
3  any risk of the jury assuming Ms. Alfaro was telling the truth based solely on the fact
4  that the doors of the courtroom were closed during her testimony.  The court usurped
5  the jury's function and denied Ms. Alfaro her right to testify in rendering its decision
6  not to close the courtroom on this basis.

7  **D.    <u>CONCLUSION</u>**

8      25.  Having forced Ms. Alfaro to endure a guilt phase trial, the court proceeded
9  to deprive her of any conceivable advantage from her counsel's ill-formed strategy.
10  Fearful to implicate the third man in any way, Ms. Alfaro was unwilling to tell her
11  story absent some protection from retaliation.  That there was a third man present at
12  the scene was not in doubt.  Ms. Alfaro's fears were not unbelievable.  The effect
13  of the trial court's refusal to close the trial was to deprive Ms. Alfaro of her most
14  fundamental constitutional rights.  The court's error is compounded by its failure to
15  even consider an alternate remedy.  As  a result of the trial court's failure to give due
16  weight to Ms. Alfaro's right to a fair trial, her Fifth, Sixth, Eighth and Fourteenth
17  Amendment rights were violated and habeas relief is required.

18      26.  The foregoing violations of Ms. Alfaro's constitutional rights
19  constitute structural error and warrants the granting of this Petition without any
20  determination of whether the violations substantially affected or influenced the jury's
21  verdict.  *Brecht,* 507 U.S. at 637-38.  However, even assuming the harmless error
22  doctrine applies to this claim, the foregoing constitutional violations so infected the
23  integrity of the proceedings that the error cannot be deemed harmless. The foregoing
24  violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on
25  Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and
26  resulting in a miscarriage of justice.

27

28

1    27.  The constitutional violations set forth in this claim alone mandate relief

2    from the convictions and sentence.  However, even if these violations do not mandate

3    relief standing on their own, relief is required when this claim is considered together

4    with the additional constitutional errors outlined in the remainder of this Petition.

5    Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

6    sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

7    970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

8    Cir. 1978).

9

10                                          **XXV.**

11       **CLAIM 20:  THE TRIAL COURT'S FAILURE TO SUBSTITUTE**

12   **PETITIONER'S COUNSEL VIOLATED HER CONSTITUTIONAL RIGHTS**

13       Petitioner's conviction and sentence of death were rendered in violation of her

14   rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-

15   capricious determination of guilt and penalty, to the effective assistance of counsel, to

16   present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth

17   and Fourteenth Amendments to the United States Constitution because the trial court

18   failed to substitute her trial counsel.  As  a result, habeas relief is warranted.

19       1.  Exhaustion of the claim:  This claim was fairly presented to the California

20   Supreme Court in the direct appeal.  It was presented as Claim 6 in the Opening Brief.

21       2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

22   *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

23   denial of this claim is both "contrary to" and an "unreasonable application" of clearly

24   established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve

25   the claim *de novo*.  Moreover, because the state court's adjudication of this claim

26   was dependent on an antecedent unreasonable application of federal law, this Court

27   "must then resolve the claim without the deference that AEDPA otherwise requires."

28   *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

A.   **INTRODUCTION**

6. This case involved an irreconcilable conflict between client and counsel which resulted in a complete breakdown of their relationship. The conflict arose when Ms. Alfaro expressed her desire to plead guilty to the charges and Mr. Monroe refused to give his consent. It grew when Mr. Monroe sought to blame an unidentified person who was observed outside the Wallace home for Autumn's murder, and Ms. Alfaro refused to assist him in identifying or implicating this individual. Its impact became obvious when Ms. Alfaro refused to testify at the guilt phase of her trial and, bereft of physical evidence or witnesses to support his hypothesis, Mr. Monroe was forced to abandon all semblance of a defense, conceding Ms. Alfaro's guilt to first degree murder in his closing argument, and withdrawing his request for an aiding and abetting instruction.

7. During the first penalty phase, all vestiges of Ms. Alfaro's trust in Mr. Monroe were destroyed. Having refused to testify at the guilt phase, Ms. Alfaro agreed to take the stand during the penalty phase only after her counsel assured her that she would not be required to respond to questions about the crime. But when, on direct, Mr. Monroe had Ms. Alfaro read a letter she had written to Autumn

Wallace -- one he had previously reviewed -- in which she stated, "Autumn, if you could hear me, please don't turn away cause I want you to know that I'm sorry we took your innocent life," the trial court ruled that the door had been opened to cross-examination about the details of the crime.  The district attorney proceeded to interrogate Ms. Alfaro using statements attributed to her by the defense psychiatrist that Ms. Alfaro understood to have been made in confidence.  Wholly unprepared for such an examination, Ms. Alfaro felt utterly and completely betrayed by her counsel.

8.  That the jury, having heard Ms. Alfaro express her remorse, could not reach a verdict, meant that the case would go on.  Having made a sustained, good faith effort to work with Mr. Monroe, Ms. Alfaro was unwilling to endure a retrial represented by the attorney who had lied to and misled her.  When brought to court for the setting of her retrial, Ms. Alfaro sought substitute counsel.  The colloquy between Ms. Alfaro, Mr. Monroe, and the court during the ex parte hearing that followed her motion leaves no doubt as to the depth of the division between client and counsel.  Nevertheless, finding the motion untimely and that Mr. Monroe had not performed incompetently, and informing Ms. Alfaro that she would refuse to cooperate with Mr. Monroe "at her own peril," the court denied Ms. Alfaro's motion for substitute counsel.

9.  Six weeks later, the second penalty trial began.  In his opening statement, Mr. Monroe continued to peddle his story that a mystery man was responsible for Autumn Wallace's fatal wounds.  The damage done to his relationship with Ms. Alfaro by his insistence on this insupportable defense, as well as his inadequate advice concerning her testimony in the previous trial, took a serious toll. Ms. Alfaro's mental condition deteriorated to the point that she needed "acute mental health care" during the second penalty trial.  And there is no evidence that

/ / /

/ / /

314

Mr. Monroe brought this fact to the attention of the court.[28]  Ms. Alfaro refused to take the stand.  Her failure to testify meant that much of the mitigating evidence admitted at the first penalty trial was excluded at the second.  And, as her counsel and the trial court had agreed during the *Marsden*[29] hearing, without her testimony "she didn't have much of a chance to save her life."  After deliberating three days, the jury sentenced her to death.

10.  Confronted with a second penalty trial, believing that her counsel had inadequately represented her at her first trial, and finding herself and her counsel "embroiled in an irreconcilable conflict,"  Ms. Alfaro asked the trial court to replace Mr. Monroe.  At the *Marsden* hearing held April 9, 1992, she presented evidence of both inadequate representation and of an irreconcilable conflict likely to prevent her from receiving effective representation at her penalty retrial.

11.  Ms. Alfaro's request could not have been more timely.  Believing the case to be nearing its end, and uncertain as to how to go about bringing the issue to the court's attention, she did not request a hearing during the week the first jury was deliberating.  But the day it became clear that a second trial would be held, she asked to be heard.  Her request came one week after her testimony; immediately after the first jury had been discharged; before the retrial had been scheduled; and six weeks before the second penalty trial actually commenced.

12.  A bedrock principle of our criminal justice system, embodied in the Sixth Amendment, is that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for [her] defense."  U.S. Const., 6th Amend. Because "fair trials before impartial tribunals" require that each defendant, poor as well as rich, stands equal before the law, the Constitution further requires that

---

[28]  This information appears in the Probation Officer's Presentence Report, in the section devoted to "Adjustment In Orange County Jail."  CT 1745-46.

[29]  *People v. Marsden*, 2 Cal. 3d 118, 123, 465 P.2d 44, 84 Cal. Rptr. 156 (1970).

1  states provide counsel to assist indigent defendants if they are unable to retain

2  counsel.  *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799

3  (1963).  For this right to have meaning, publicly paid and privately retained counsel

4  alike must provide adequate representation.  *See Douglas v. California*, 372 U.S. 353,

5  354-57, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963).

6       13.  When a defendant seeks to discharge his appointed counsel and substitute

7  another attorney, and asserts inadequate representation, the trial court must permit the

8  defendant to explain the basis of his contention and to relate specific instances of the

9  attorney's inadequate performance.  A defendant is entitled to relief if the record

10  shows that the first appointed attorney is not providing adequate representation or

11  that defendant and counsel have become embroiled in such an irreconcilable conflict

12  that ineffective representation is likely to result.

13       14.  The conflict between Ms. Alfaro and Mr. Monroe regarding the course

14  of her defense cannot be described as a disagreement over tactics.  Their

15  disagreements encompassed the most fundamental decisions a defendant must make,

16  including the plea to the criminal charges, the substance of the defense, and whether

17  or not she would testify in her own defense.  When the trial court denied Ms. Alfaro's

18  request to replace Mr. Monroe with another attorney, he consigned her to counsel

19  with whom she could not communicate.  As  a consequence, she did not receive

20  adequate representation at her second penalty phase trial, in violation of her Fifth, and

21  Fourteenth Amendment rights to due process, a fair trial, her Sixth Amendment right

22  to effective counsel, and her Eighth Amendment right to a reliable, rational and

23  accurate determination of death eligibility and death worthiness.

24  **B.**     **STATEMENT OF FACTS**

25       15.  The record is replete with examples of the conflict that existed between

26  Ms. Alfaro and her counsel, William Monroe, concerning the fundamental issues

27  of how she would plead to the charges, the substance of her defense, and whether or

28  not she would testify in her own defense.  April 9, 1992, was not the first time the

attorney-client conflict was brought to the trial court's attention. But on each

occasion when the issue was raised, the trial judge downplayed the nature

of Ms. Alfaro's and her counsel's disagreement and steadfastly refused to take any

action to insure that Ms. Alfaro received adequate representation at her capital trial.

16. To fully understand the desperation experienced by Ms. Alfaro as a result

of her conflict with Mr. Monroe, it is important to keep in mind the core of their

dispute. While a plea of guilty to the charges would have exposed Ms. Alfaro to a

penalty trial, it would also have provided a mitigating factor universally deemed

relevant to the jury's penalty determination. On the other hand, the defense chosen

by Mr. Monroe, that someone other than Ms. Alfaro committed the crime, was

doomed to failure. Ms. Alfaro's four-hour videotaped confession, the physical

evidence tying her to the crime scene and Ms. Alfaro's unwillingness to implicate

anyone else in the murder, ensured that the defense would be rejected. Even if the

jury had overlooked all of these problems, Mr. Monroe's defense strategy addressed

only one of the state's alternative theories of Ms. Alfaro's liability for first degree

murder. The Information charged that Ms. Alfaro acted "willfully and unlawfully and

with malice aforethought," but it also alleged that the murder was committed "while

the defendant was engaged in the commission of" robbery and burglary in the first

degree. CT 63-64. Thus, even if successful, Monroe's theory of the defense would

not have prevented a conviction for first degree felony-murder. As Mr. Monroe

made no attempt to defend Ms. Alfaro against the charged special circumstances,

Mr. Monroe's strategy had no chance of avoiding a penalty trial.

**1.   September 1991**

17. On September 9, 1991, Mr. Monroe filed a declaration under seal in which

he requested funds to hire an expert by the name of "Dr. Danto" to administer Sodium

Pentothal to his client. CT 274-76 (Sept. 9, 1991, 987.9 records). In the course of his

declaration, Mr. Monroe not only disparaged his client, he did so to the judge who

would later weigh the aggravating and mitigating factors to decide whether

317

1    Ms. Alfaro would live or die.  Crucially, this was not a situation in which Ms. Alfaro

2    had waived her attorney-client privilege.  Stated Monroe:

3
        [T]he information provided by my client tends to be inconsistent at times
4        . . . .

5            It is imperative that we obtain information from the defendant
        which is not colored by some subconscious fear, ulterior motive or
6        hidden bias.

7            My interviews with other experts who have examined MARIA
        DEL ROSIO ALFARO, have suggested there is a substantial likelihood
8        that I may be able to obtain the information I need by employing certain
        chemical devices including but not limited to the use of sodium
9        pentothal [sic].

10   CT 274-75 (September 9, 1991, 987.9 records).

11           18.  That Monroe felt the need to administer "truth serum" to his client speaks

12   volumes about their relationship.  That he told the judge Ms. Alfaro had been

13   "inconsistent" and that he needed to give her drugs to obtain information not colored

14   by "ulterior motive[s]" not only served to bias the court against her, it put the court on

15   notice that theirs was a relationship in serious trouble.  That Monroe sent Ms. Alfaro

16   to Dr. Danto in the custody of Sheriff's Deputies who were required to be present

17   during the doctor's administration of Sodium Pentothal and subsequent interrogation

18   of Ms. Alfaro about the crime is beyond comprehension.[30]  CT  277-78 (Sept. 9, 1991,

19   987.9 records).

20           **2.    November 1991**

21           19.  On November 1, 1991, Mr. Monroe filed a motion to continue the trial on

22   the ground that more time was required to obtain and analyze evidence.  CT 231-39.

23   _____

24       [30]  Although the Sheriff's Deputies who transported Ms. Alfaro and attended
     her session were instructed to keep the matter confidential (CT 278 (Sept. 9, 1991,
25   987.9 records)), the District Attorney did become aware of Ms. Alfaro's interview by
     Dr. Danto while under the influence of Sodium Pentothal, as a result of an article in
26   the Orange County Register on November 26, 1991.  RT 82 (Dec. 2 1991
     proceedings).  The article, which appeared *pretrial*, erroneously reported that
27   Ms. Alfaro had been *convicted* of murder and that Dr. Danto had been hired to give
     her Sodium Pentothal and thereby "enhance her memory which she contends was
28   affected by drugs she was taking at the time of the slaying."  RT 82 (Dec. 2 1991
     proceedings).

                                             318

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In his declaration in support of the motion, Monroe confirmed that the story that

someone other than his client was responsible for the murder was *his*:

> *Defendant's counsel* has contended that a third person perpetrated this
> heinous act and that defendant confessed in fear for the safety of her
> family. Evidence of a third person in the home will support the theory.
> *Defendant's attorney* also contends that blood which is neither that
> of the defendant nor the victim may be on the clothing yet to be
> examined.

CT 236 (emphasis added).

20.  At the hearing on this motion, Monroe explained the genesis of his theory

of defense:  "[T]his terrible crime was so heinous, so awful, that it had to be

committed by a person either under some terrible state of drugs or with an absolutely

malignant heart," and that although the defendant "admitted to being wired," "the

background which has been developed with respect to the defendant does not

disclose, quote, that malignant heart that could have perpetrated this kind of crime to

which she apparently has admitted to this to the police department." RT 27-28 (Nov.

8, 1991 proceedings).  Monroe reported that he had been "aggressively developing

that theory," but that he needed more time.  *Id.* at 28.

21.  In response, the district attorney pointed out that during her interview with

the arresting officers, Ms. Alfaro had "admitted not once, not twice, not four, not

seven times, probably in excess of ten times how she did it.  She was alone in the

house when she did it." RT 30-31 (Nov. 8, 1991 proceedings).  The district attorney

opined that the defense request for additional discovery was "just a fishing

expedition."  *Id.* at 31.

22.  Before ruling, the trial court called Mr. Monroe and Ms. Alfaro into

chambers.  RT 33-39 (Nov. 8, 1991 proceedings).  During this ex parte conference,

the court asked Mr. Monroe for an offer of proof as to what he hoped to glean from

the materials he had requested.  *Id*. at 34.  Monroe proceeded to tell the court his

theory of the case, concluding with the statement, "the problem we have right now is

that we have yet to find any independent evidence to support the premise that this guy

319

1   was in the house." *Id*. at 35.  Thereafter, the judge announced in open court that it

2   was "this court's opinion that good cause has not been shown for a continuance." *Id.*

3   at 40.

4   ### 3.    February 20-21, 1992

5       23.  On February 20, 1992, approximately two weeks before trial, Mr. Monroe

6   filed an ex parte request for "special instructions from the court as to whether

7   or not the court believes it is necessary for me to withdraw from the case."  CT 10

8   (February 20, 1992 proceedings).  Both his written motion and his statements at the

9   ex parte hearing that took place the following day evidence the degree to which

10  Ms. Alfaro and Mr. Monroe were in conflict regarding Ms. Alfaro's desire to plead

11  guilty to the criminal charges, the substance of the defense, and whether or not

12  Ms. Alfaro would take the witness stand in her own defense.

13      24.  In his papers, Mr. Monroe informed the court that "my client, Maria del

14  Rosio Alfaro, refuses to follow my instructions and take the stand and implicate

15  'Beto' and refuses to allow to me [sic] to call and cross-examine 'Beto' on her

16  behalf." *Id.* at 9-10.  He writes, "If my client insists on pleading guilty to the special

17  circumstances, it is against my most rigorous advice." *Id*.

18      25.  During the ex parte hearing held February 21, 1992, Mr. Monroe informed

19  the court, "I believe I'm asking the court to give me a lead or advice as to whether or

20  not the court believes I should declare a conflict because I believe that a conflict may

21  exist."  RT 110 (February 21, 1992 proceedings).  Monroe explained that the heart

22  of the conflict was his refusal to consent to a guilty plea and insistence that

23  Ms. Alfaro take the stand and implicate "Beto," the man Monroe said he believed "is

24  the other killer," and Ms. Alfaro's desire to plead guilty, and her "adamant[],

25  adamant[] refus[al] to allow [him] to call Beto or to cross examine Shorty regarding

26  his relationship with Beto." *Id.* at 110-12.  Monroe informed the court that his and

27  Ms. Alfaro's conflict was fundamental, stating, "If she is instructing me not to present

28  that evidence, in effect she and I are at loggerheads." *Id.* at 113-14.  He told the court

that he could not effectively represent Ms. Alfaro because, as a result of her refusal to testify as he wished, he could not develop his sole defense theory. *Id.* at 115.

26.   Despite defense counsel's strong language, and the trial judge's admitted knowledge that the conflict was longstanding, the trial judge refused to take any action to unravel the fundamental dispute presented to it:

> [T]he mere fact that you and her [sic] disagree over her getting on the stand might be a conflict in fact between you.  But it is not the kind of a — kind of conflict that is a legal conflict that would justify the court in appointing new counsel to represent her especially on the eve of trial. And this thing has been going on for a long time and apparently you've had this — you have been at loggerheads with her for some time.

*Id.* at 116-117 (February 21, 1992 proceedings).

27.   Once it became clear to Mr. Monroe that he could prevent Ms. Alfaro from pleading guilty, but could not force her to take the witness stand, he realized that Ms. Alfaro's case was in trouble.  He urged, "at a minimum, Your Honor, we ought to have counsel appointed to advise her about the consequences of her act."  RT 117 (February 21, 1992 proceedings).  He repeated, "because of this conflict that she and I have, maybe an independent person should be talking to her."  *Id.*  But the trial judge, mischaracterizing Mr. Monroe's pleading, rejected even this request for limited assistance:

> Well, you haven't raised anything in this paperwork that would indicate that you are having a communication problem or that she is not understanding what you're saying or that somebody else would be in a better position to do it.  There is nothing in there at all.  You just basically have a basic disagreement over the tactics in defending her.

*Id.* at 118.  Anxious to avoid any misunderstanding as to the nature of the conflict, Mr. Monroe told the court:  "It's more profound than that.  It's a basic disagreement [over] what she wants to do with her life."  *Id.* at 118.  He emphasized, "*pleading guilty is more than tactics*."  *Id.* at 120 (emphasis added).

28.   In response, the trial judge repeated that he would not accept a guilty plea from Ms. Alfaro over Mr. Monroe's objection.  *Id.* at 118-119 (February 21, 1992 proceedings).  Mr. Monroe then turned to Ms. Alfaro:  "You understand that Rosie --

321

1  Miss Alfaro?" *Id.* at 119.  Ms. Alfaro, confounded by her situation, responded:

2  "Then what am I going to do?  I told you what I wanted to do." *Id.*  For the record,

3  Mr. Monroe  asked her to state: "What do you want to do?"  Her reply: "Plead

4  guilty."  *Id.*  At this point, Mr. Monroe turned back to the court: "*You put me in an*

5  *absolutely untenable position, Judge Millard*." *Id.* (emphasis added).  The court then

6  stated:

7
> That is what you think.  I don't think so.  *You are no different than other*
> *lawyers that have a disagreement over tactics.*  Cases are legion in the
8
> California courts that a mere disagreement over tactics does not justify --
> is not a legal conflict from the standpoint of such magnitude that will
9
> effectively deny the person their right to counsel.  There are all kinds
> of tactical conflicts that occur in cases of criminal and civil cases.  That
10
> doesn't mean that on the eve of trial all of a sudden we change attorneys
> and start the case all over again.  It just doesn't happen that way.
11

12  *Id.* at 119 (emphasis added).  The court failed to recognize that few other lawyers find

13  themselves in Mr. Monroe's position:  able to prevent his client from pleading guilty,

14  but not from refusing to testify to give crucial support to *his* theory of the defense.

15  **4.   March 5, 1992**

16  29.  On March 5, 1992, a mere four days before the beginning of the guilt

17  phase trial, Mr. Monroe filed a declaration requesting additional investigative funds.

18  In his declaration he revealed a disturbing attitude toward his client:

19
> The defense of this case has been based on the proposition that the
> crime was so heinous that it could have only been committed by a person
> under the extreme influence of PCP or some similar drug or the person
20
> had an absolutely abandoned, malignant, and vicious heart.
21
> The preliminary inquiry disclosed that the client was not under a
> hallucinogenic which would have left her out of control.  However, the
22
> initial investigation also strongly suggested that she was not capable
> of committing this crime alone.
23
> Although the police had initially investigated this area, they
24
> discounted it and it fell to the defense to begin to develop that particular
> theory.
25
> * * *
26
> The client . . . was less than candid during the initial stages of our
27
> investigation.
28
> * * *

322

The client's statements to defense counsel and his investigators changed as frequently as her decision as to whether or not to she would cooperate in her own defense.

* * *

It was because [the investigator went to Mexico] that we were able to develop independent evidence to *breakdown the client's changing facade and have her finally admit to what we believe is the true theory of the defense* which we are now in a position to present to the jury.

CT 535-39 (March 5, 1992, 987.9 records).

30.  To fully appreciate the implications of Mr. Monroe's statement that he was finally able "to breakdown the client's changing facade and have her finally admit to what we believe is the true theory," one need look no further than his declaration, filed April 17, 1992.  CT 1196-1207.  In this declaration, Mr. Monroe asked for a continuance of the retrial to insure that Dr. Consuelo Edwards, the defense psychiatrist, would be available to testify.  He stated that he expected Dr. Edwards to testify that Ms. Alfaro is "a follower" who *"suffers from a Dependent Personality Disorder which makes her subordinate herself to others and agree with them, even if she believes they are wrong, for fear of being rejected."*  CT 1202-03 (emphasis added); RT 4087.

### 5. <u>March 9-18, 1992:  The Guilt Phase Trial</u>

31.  Ms. Alfaro's conflict with Mr. Monroe could only have intensified after the jury was impaneled and the trial began.  Despite Mr. Monroe's insistence that Ms. Alfaro plead not guilty to the charges, during his opening statement he admitted to the jury that his defense was based on nothing more than conjecture; that he was grasping at straws:

The evidence will disclose that although there is no independent evidence to support the proposition that a third party was in the house, there will be testimony disclosing that other items of evidence had not been tested or analyzed to confirm or eliminate the possibility that a third person might have been in the house and was the real perpetrator.

RT 625-26.

32. Things got no better during the remainder of the guilt phase of the trial. Though she could not prevent her attorney from arguing that someone else killed Autumn Wallace, Ms. Alfaro could and did refuse to take the stand to support her counsel's theory. RT 1179. Despite Monroe's assurances to the court that he would present other defense witnesses (RT 1179), Mr. Monroe called no witnesses. RT 1179. And, in his closing remarks, seemingly oblivious to the fact that Ms. Alfaro had been charged with felony murder, Mr. Monroe conceded to the jury that Ms. Alfaro stabbed Autumn Wallace after entering the house to steal. He asked the jury to "find that, yes, Rosie Alfaro did stab little Autumn. Rosie Alfaro did not kill that little girl." RT 1294. Further conceding guilt, as well as demonizing his client in the eyes of the jury, he stated, "At one time [Ms. Alfaro] says, 'I stabbed her three or four times.' That might be consistent with the likes of Rosie Alfaro." RT 1303.

33. The jury returned a guilty verdict in less than a day. RT 1398; CT 1086. It found Ms. Alfaro guilty of first degree murder; it found true the special circumstances that the murder was committed while the defendant was engaged in the commission of a robbery and a burglary; and it found true that the defendant had personally used a knife in the commission of these crimes. RT 1398-1410; CT 1086-90.

**6.     March 30-April 1, 1992:  The First Penalty Phase Trial**

34. On March 30, 1992, the penalty phase began. CT 1096-98. During the penalty phase, Ms. Alfaro agreed to testify only after Mr. Monroe assured her that she would not be required to answer questions about the crime. RT 2127 (April 9, 1992 proceedings). On direct, Ms. Alfaro testified about her background and upbringing. RT 1592-1627. At Mr. Monroe's request, she also read a letter that she had written to Autumn Wallace which Monroe had previously reviewed. RT 1630. Ms. Alfaro read, "Autumn, if you could hear me, please don't turn away 'cause I want you to know that I'm sorry we took your innocent life." RT 1630-31.

35. When Mr. Monroe finished his direct examination of Ms. Alfaro, the district attorney proceeded to cross-examine her about the circumstances of the crime.

324

1   Although Mr. Monroe repeatedly objected, the trial judge ruled that the door had been
2   opened to cross-examination concerning the details of the crime.  RT 1631, 1633,
3   1635, 1647-52.

4          36.  In response to the district attorney's first question, "Rosie, who killed
5   Autumn Wallace?,"  Ms. Alfaro answered, "I did."  RT 1631.  The district attorney
6   then proceeded to question her about statements attributed to her by the defense
7   psychiatrist to the effect that another person had been involved in the crime.
8   RT 1632-37.  When Ms. Alfaro refused to name this person, the district attorney
9   asked her why she had mentioned him to Dr. Edwards.  Ms. Alfaro responded,
10  "Because I thought whatever I said to her she wasn't going to say anything."
11  RT 1633.  During the examination that followed, Ms. Alfaro confusedly affirmed
12  statements attributed to her by Dr. Edwards that were consistent with Mr. Monroe's
13  theory that another person was involved in the killing.  RT 1633.  In fact,
14  as Dr. Edwards later testified, Ms. Alfaro had not told her that Beto did it.  Rather,
15  on the occasion that the district attorney claimed Ms. Alfaro purportedly "said Beto
16  did it," in fact, Dr. Edwards had "confronted [Ms. Alfaro] with the fact that the
17  defense [had shown Dr. Edwards] a composite picture of one of the men that was in
18  front of the house and that this man was called Beto . . . ," at which point Ms. Alfaro
19  "said she didn't want any of this and was going to dismiss her attorney."  RT 4204.
20  As  the district attorney readily admitted during a hearing outside the presence of the
21  jury, his strategy in asking Ms. Alfaro these questions was to make her out to be a
22  liar; in particular, to undermine her earlier expression of remorse.  RT 1647.

23         37.  Ms. Alfaro was the last witness before the jury began its deliberations on
24  April 2, 1992.  On April 8, 1992, after deliberating for nearly a week, the jury
25  informed the court that they could not reach a verdict and a mistrial was declared.
26  RT 2113.

27         38.  The next morning, the parties returned to court and Ms. Alfaro asked the
28  trial court to replace Mr. Monroe.  RT 2119.

325

1

**7.      April 9, 1992:  The *Marsden* Hearing**

39.  Faced with the prospect of picking a new jury and having a second penalty phase trial, Ms. Alfaro unequivocally requested that Mr. Monroe be relieved as her counsel and that a new attorney be appointed to represent her.  RT 2119 (April 9, 1992 proceedings).  The following discussion took place during the ex parte in chambers hearing on this *Marsden*[31] motion:

> The Court:  All right.  You want to tell me about your attorney problem?
>
> The Defendant:  Yes.  I feel he misrepresented me.  He lied to me about --
>
> The Court:  I'm sorry, I didn't hear the first part of it.
>
> The Defendant:  He misrepresented to me, he lied to me, about going on the stand.  I thought there was never going to be any cross examination from what he had told me and there was.
>
> The Court:  Okay.
>
> The Defendant:  He's been wanting me to do things I never wanted to do.  He still goes ahead and does them.
>
> The Court:  All right.  Let me -- okay.  You're telling me that he represented to you that if you testified that you would not be cross examined?
>
> The Defendant:  Yes.
>
> The Court:  Do you have -- is that your main -- is that your main complaint?
>
> The Defendant:  Yes, it is.
>
> Mr. Monroe: Miss Alfaro told me she would not talk to me any more, she would not cooperate with me any more, she would not do anything that I asked that I wanted her to do.
>
> The Court:  Is that true, did you tell him that?
>
> The Defendant:  Yes, that's true.
>
> The Court:  Did you -- what kind of a statement did you make to her about cross examination, if you did?

---

[31] *See Marsden*, 2 Cal. 2d at 123 (Court held that judge who denies motion for substitution of attorneys solely on basis of his courtroom observations, despite defendant's offer to relate specific instances of misconduct, abuses exercise of discretion to determine competency of attorney).

Mr. Monroe: *I told her that we would limit the cross examination
to the areas that we covered in the taking her through her early life*,
and that the District Attorney would attempt to cross examine her
on the guilt phase testimony where she says she would not take the stand
and I would object to that testimony coming in.  Miss Alfaro feels that
basically I betrayed her.

The Court:  *. . . Let me see if I understand what you are telling me,
Mr. Monroe. You're telling me that you represented to her that you
would limit the examination to matters concerning her background not
involving the crime?*

Mr. Monroe:  *To the best of my recollection, Your Honor, yes.*

The Court:  Why is it then you asked questions about the day of the
crime?

Mr. Monroe:  I simply asked her if she had a statement to make to Linda
Wallace and that's when she made the apology to Linda Wallace.

The Court:  Well, I recall, I recall you asking her some questions about
how she felt or if she was sorry for what -- something about the day
of the crime.

Mr. Monroe:  I may have, Judge Millard.  As  I sit here now, I have
no clear recollection. . .

. . . I did not say to her unequivocally that I would keep Middleton's
cross examination out.  I said I would object to it in the event -- not
in the event, when he did attempt to go into it.

The Court:  Well, you're telling me some mixed things here.  Are you
telling me that you disagree with her statement that she would never
be cross examined on the day of the crime?  That's in effect what
Miss Alfaro is telling me.

* * *

Mr. Monroe:  I cannot tell you unequivocally I would have told her.
What I probably would have told her is yeah, Middleton will probably
go into it, or will go into it, and I would object to that.  That may be not
Miss Alfaro's recollection or perception of what I told her.

As the court can recall, Miss Alfaro was adamant in [not] taking
the stand in the guilt phase because of the fear of getting into that area.

* * *

I was clear about taking Miss Alfaro up through her childhood
and then I was clear about, as I said, in effect on the day of the crime
skirting everything regarding that day and saying "do you have
something to say to Linda Wallace?" --  something along those lines.
And she made that extemporaneous statement of remorse to Linda
Wallace and then I stopped and Mr. Middleton started his cross
examination.

327

1    RT 2119-23 (emphasis added) (April 9, 1992 proceedings).

2        40.  At this point, the judge recessed the hearing and requested that the court

3    reporter provide the court with a transcript of Ms. Alfaro's testimony.  RT 2123

4    (April 9, 1992 proceedings).  The proceedings then resumed:

5        The Court:  It appears from my review of the transcript that when Rosie
         got on the witness stand to testify that she had the letter [to] Autumn
6        with her.

7        Mr. Monroe:  May have or I may have given it to her.

8        The Court:  *And I assume, you can correct me if I'm wrong, you and
         your client went over the contents of that letter before you asked her
9        any questions about it in court.*

10       Mr. Monroe:  *Yep.*

11       The Court:  Okay.  And you've had some time to reflect on it.  Do you
         recall exactly what you told Rosie about the scope of cross examination?
12
         Mr. Monroe:  No, judge, we talked about it on and off both in the guilt
13       phase and the penalty phase about the pros and cons of going on the
         stand versus not going on the stand.  We went through her concerns
14       about her fear for her family and her life.  I talked about the importance
         of the jury hearing her, seeing her, and hearing about her remorse.  It
15       wasn't just a single conversation, it was a thread of a conversation over
         a period of time.
16
         The Court:  Well, did you ever tell her that under no circumstances
17       would Mr. Middleton be able to ask her about the circumstances of the
         crime?
18
         Mr. Monroe:  I cannot honestly tell you that I said under no
19       circumstances that Mr. Middleton could examine her under the
         circumstances of the crime.
20
             What I do recall telling her was Mr. Middleton would attempt
21       to and I'd object.  How Rosie perceived that, I can't say; or how she
         interpreted it, I can't say.
22
         The Court:  Okay.  Well let me ask you this.  You and she were aware
23       when she got on the stand that you were going to ask -- in effect, ask her
         to read that letter to Autumn.
24
             Is that a fair statement, Rosie?
25
         The Defendant:  Yes, it is.
26
         The Court:  I haven't read the letter but I have read the transcript where
27       she read the letter, so I assume she read it accurately or I assume the
         transcript is accurate.
28

                                     328

1    Mr. Monroe:  It is.

2    The Court:  *And I'm just puzzled, I guess, I'm puzzled if you read over*
     *the letter, how you in your professional opinion could have an idea that*
3    *Mr. Middleton wouldn't be able to examine on the day of the offense.*

4         I'll give you an example. . . .  It says, question was on [page] 1630
     line eighteen, "Rosie, did you write a letter to Autumn?"  And then Rosie
5    reads the letter. . . .  It says, "Autumn, if you were here, please don't turn
     away because I want you to know I'm sorry we took your innocent life."
6    Okay.  I can just stop right there.

7         As soon as she testified "I'm sorry we took your innocent life,"
     that would appear to me that under any reasonable interpretation
8    of evidence that anybody is going to be able to cross examine about what
     she meant by that.  So I'm puzzled as to what kind of advice you gave
9    her about that.

10   Mr. Monroe:  *I didn't give her specific advice about that.*
     The Court:  Rosie, can you remember exactly what he told you about this?
11   The Defendant:  He kept on asking me if I wanted to take the stand.  Not
     to that I wasn't suppose -- he wasn't going to go into the detail of what
12   happened the day of the crime.  And I kept on asking him, "is the D.A.
     going to ask me that?  Is he going to bring that up?"  And he told me he
13   wasn't going to.  And that's why I went up there on the stand.  But
     'cause he told me the D.A. wasn't going to ask me anything.
14
     * * *
15
     The Court [addressing Monroe]:  Well, did you tell her that?
16
     Mr. Monroe:  As  I told you, Your Honor, I cannot sit here and say
17   Rosie, yeah, the D.A. ain't going to ask you about that stuff.  My
     recollection is that I told her the D.A., the District Attorney, would
18   and I would object to its introduction.

19        That's not Rosie's interpretation or her perception of what I told her.

20   The Court:  I know, she -- but you might have told her that and she might
     have perceived it the way she perceived it.  She might understand it that
21   if you object he's not going to ask for it -- I mean he's not going to be
     able to examine.
22
     Mr. Monroe:  I don't want to sound like I'm slipping and sliding,
23   because I ain't, I'm not saying it unequivocally.

24   The Court:  You are not saying what unequivocally?

25   Mr. Monroe:  I am not saying that I told her that the D.A. could not
     examine her on this stuff.  I told her that the D.A. would and I would
26   object to it.

27   The Defendant:  But I had asked would he ask me anything about the day
     of the crime and he said no.
28

1    The Court:  Okay.  Do you recall making a statement like that?

2    Mr. Monroe:  I don't recall making a statement like that.  It doesn't
     sound very logical -- very likely.  I talked to Rosie about the importance
3    of getting on the stand and the jury seeing her or hearing her.

4    RT 2124-29 (emphasis added) (April 9, 1992 proceedings).

5        41.  Although Mr. Monroe may not have wanted to sound like he was "slipping

6    and sliding," that is exactly what he did.  The record establishes that as it became

7    clear to Mr. Monroe what the trial judge thought of the advice that he would limit

8    Ms. Alfaro's cross-examination to questions about her background, Mr. Monroe

9    began to backpedal, eventually denying that he had told her this, despite his earlier

10   admission that he had.  *Cf.* RT at 2120 (April 9, 1992 proceedings) ("I told her that

11   we would limit the cross examination to the areas that we covered in the taking her

12   through her early life"), with *id.* at 2129 ("I don't recall making a statement like that.

13   It doesn't sound very logical -- very likely.").  In both word and deed, Monroe

14   abandoned his client.

15       42.  Ms. Alfaro, on the other hand, remained consistent throughout the

16   *Marsden* hearing.  She clearly recalled pressing Mr. Monroe on the consequences

17   of her taking the stand, and his reassurance that she would not be required to testify

18   about the crime.  Given her refusal to testify at the guilt phase, her statement that she

19   only took the stand after Monroe assured her that she would not be questioned about

20   the crime rings true.  As  she repeats:

21   [H]e had told me we were only going to go through my childhood
     and that sort of stuff, and he had told me, and I know he told me the
22   D.A. wasn't going to go into that other guy, Beto, or what happened
     the day of the scene of the crime.  Nothing like that.  He told me flat
23   out that we weren't going to.

24   That's why I volunteered to go -- I mean, I decided to go up there
     on the stand because I thought all along I wasn't going to get cross
25   examined by the D.A. about what happened the day of the crime.
     I thought he was only going to go back to my childhood, what
26   happened to me, and when I grow up, stuff like that, because he
     made me believe that's what is going to happen.

27

28

330

1    *I know I didn't misunderstand him because I kept asking him, "Are you*
2    *sure he ain't going to ask me about the other guys and where did I go*
     *and stuff like that?"*

3    RT 2138-39 (emphasis added) (April 9, 1992 proceedings).

4        43.  But instead of listening to Ms. Alfaro, or to Mr. Monroe's admission that

5    *he told Ms. Alfaro "that we would limit the cross examination to the areas that we*

6    *covered in the taking her through her early life,"* (*id.* at 2120), and recalling

7    Monroe's many objections that the district attorney's cross was "beyond the scope,"

8    (*see, e.g.*, RT 1631), the court chose to "assume that Rosie misunderstood what

9    [Monroe] really told her." RT 2133 (April 9, 1992 proceedings).  The court then

10   went on to question the sincerity of Ms. Alfaro's "misunderstanding," expressing

11   disbelief that

12       anybody could believe that they are going to read a letter, 'I'm sorry that
         we took your innocent life,' and not be able to have anybody ask
13       questions about what did you mean by we took your -- her innocent life?
         And that's -- it seems to me . . . if you make a statement like that, that
14       everybody must know that the other side has got a right to cross examine
         you about it.  Especially after she sat in court and watched numerous
15       witnesses' testify and watched how the district attorney cross examines
         on things. . . .  So it does not appear to me that Mr. Monroe specifically
16       told you that if you testified . . . you wouldn't be cross examined about
         the facts of the crime."
17

18   *Id.* at 2133-34.  In essence, the court concluded that the advice Mr. Monroe initially

19   admitted to giving Ms. Alfaro was *so* incompetent, that he could not possibly have

20   given it.

21       44.  At the time of the *Marsden* hearing, the court had before it evidence

22   that Ms. Alfaro suffered from mental impairments affecting her ability to fully

23   comprehend the proceedings and to work with Mr. Monroe.  At a hearing on the

24   defense motion to suppress Ms. Alfaro's four-hour confession (a motion made by

25   Mr. Monroe only days before the trial began), Dr. Consuelo Edward, a psychiatrist,

26   reported that Ms. Alfaro's I.Q. had been measured at 78 (give or take at least five

27   points), which she characterized as borderline intellectual functioning.  RT 257-58.

28   Dr. Armando Morales, a clinical psychologist, also referred to Ms. Alfaro's I.Q.,

331

which he characterized as "mildly mentally retarded." RT 1902. Dr. Morales also reported that Ms. Alfaro had a history of treating symptoms of anxiety, fear and depression by self-medicating with substances such as paint thinner, marijuana, heroin and cocaine. RT 1826-27. Toby Silver, a registered nurse on the mental health team of the Orange County Jail, testified that Ms. Alfaro suffered from depression, low self-esteem, and an inability to assert her own position. RT 3828-34. Given these facts, the trial court's rejection of Ms. Alfaro's contention that Mr. Monroe had misled her because "anyone would have known" was simply unsupportable.

45. The court then proceeded to berate Ms. Alfaro for telling Mr. Monroe that she would no longer cooperate with him:

> I don't know if somebody in the jail told you that you can do that; but I'm telling you, you have a duty to cooperate with your attorney and that is to communicate with him and to cooperate with him. I can't force you to do that but you have the duty to do it. And if you don't do it, you really do it at your own risk because you don't have a right to just sit there and choose well, I don't like Judge Millard's decision, I wanted Mr. Monroe off the case and he's not off the case so I'm not going to talk to him. You basically don't have that right.
>
> And if you take that position, you're really jeopardizing your own future because no court decision has allowed a defendant to do that. And it definitely would not be in your best interest to take a position like that.
>
> And I'm more than willing, I'm not happy to, but I'm more than willing, if you believe there is an area that you don't fully understand in the future and you want some clarification about your rights or what your understanding of what the law is, and I have no objection, and the three of us getting together and talking about it in chambers to make sure that you understand what's going on.

RT 2136-37 (April 9, 1992 proceedings).

46. On the surface, the court's statement appears to be an offer to Ms. Alfaro of the court's services for legal advice about issues that might arise in her case. Yet it was hardly an invitation. Indeed, the court had already decided against Ms. Alfaro on the issues of central importance to her. Ms. Alfaro's response to the court's statements evidences the inadequacy of the court's analysis of the problem as well as its proposed "solution." Ms. Alfaro stated:

> I -- I really don't understand what is going on but -- I mean, I get mad because he makes me do things I don't want to do. And I -- he told me they're right but I don't know what to think because I'm so naive that I just go along with everything he said. But I really don't know what to do, what he wants me to do, and we argue about that all the time.

RT 2137 (April 9, 1992 proceeding). When asked whether there was anything else that she would like to tell the court that she and Mr. Monroe argued about "all the time," Ms. Alfaro repeated:

> The fact that he always wanted me to testify against the other guy. Okay. And I said from the beginning no, I ain't going to say anything.

*Id.* at 2138.

47. Mr. Monroe then brought up yet another conflict he and Ms. Alfaro had had which, he informed the court, was certain to become an even greater problem in the future. He referred to the anticipated testimony of defense psychiatrist Consuelo Edwards that it was Dr. Edwards' "clinical conclusion that as likely as not Rosie would have succumbed to the domination of this particular male Beto." RT 2140 (April 9, 1992 proceedings). Monroe stated, "Once again, Rosie goes absolutely up the wall when we get into this stuff about Beto." *Id.* at 2141. Ms. Alfaro confirmed, "she's going to go into this other person that was there that day and I don't want that. I told him from the very beginning . . . ." *Id*. The court then asked Ms. Alfaro:

> What gives you the idea that if we had another lawyer on the case the other lawyer wouldn't insist too?

> The Defendant: Well Mr. Monroe -- I mean, he totally does the opposite. Every time I tell him what I want, you know, he does the opposite. He tries to talk me out of it. Rosie, you know this is what I want you to do. Listen to me. I don't want you to bring nobody up. He always does the opposite.

*Id*.

At this point, the court gave Ms. Alfaro some advice:

> The Court:  . . . You know you can disagree over tactics, you don't have to agree on all of the tactics. The attorney -- that's why you have an attorney. The attorney's basically in charge of trial tactics unless the disagreement really affects your fundamental rights to the effective assistance of counsel or testifying.

333

And the chances are that -- first of all, if Mr. Monroe were taken off the case and another attorney put on the case, the other attorney is going to get Mr. Monroe's files. . . . Very well might reach the same conclusion that Mr. Monroe has reached. . . .

And we'd be back in the same place again because generally, Rosie, anyone who views that videotape, okay, is, if they are going to defend you at all, they are going to have to shift the blame away from you to somebody else and to make it appear as though you are not the sole person involved in Autumn's death, you know.

\* \* \*

And it's just -- I mean, I can't conceive if we gave the case to ten different attorneys they wouldn't all reach that same opinion, they wouldn't all want to do the same thing. That's really the only avenue available to take part of the gravity of this crime off of your shoulders so that the jury will -- that and your age and background and your children. But I don't mean to say that's the only thing, but that's really a significant thing.

Because when somebody listens to that videotape and looks at how Autumn died, if there is any way to get the blame away from you or have you share the blame with somebody else, they are going to do it.

\* \* \*

See, that's the problem, Rosie. . . . Mr. Monroe, as your lawyer, or Mr. Jones or Mr. Smith, whoever the lawyer is, is going to look at your case, they are going to get familiar with the evidence and say oh, my god, we have to figure out some way to water down this responsibility that Rosie put on herself in the videotape.

And pointing the finger or sharing the finger of blame or responsibility with another person is a very logical way to do it. . . .

I personally think a lawyer, whether it's Mr. Monroe or Mr. Jones or Mr. Smith, would do it. They are going to say well, I respect your view, Rosie, but this doesn't really involve, you know, your fundamental rights as such. It doesn't really mean that I'm not effectively assisting you. I'm just assisting you in a way that you don't want it done. And it doesn't otherwise involve your fundamental rights or anything of that nature. And I think you'd be in the same boat whatever lawyer we gave you.

The Defendant: You think another lawyer wouldn't -- I mean, he would go against what I want to do, what I just want them to do?

The Court: That's awful powerful evidence to have somebody else doing part of what happened to Autumn, you know. And even if you personally didn't want it done, the attorney is probably going to try to do it.

RT 2142-47. (April 9, 1992 proceedings). The court then ruled:

334

1
2
3

> So for the reasons indicated, I'm going to find that the *Marsden* motion is untimely. But mainly, mainly the court does not believe that there is any misconduct by Mr. Monroe or incompetence by Mr. Monroe that would substantially impair or deny Rosie's right to the effective assistance of legal counsel.

4
5
6
7
8
9

*Id.* at 2148. In so ruling, the court ignored Mr. Monroe's admission as well as the other evidence that Monroe had provided incompetent advice to Ms. Alfaro in the past, and disregarded the evidence that Ms. Alfaro's relationship with him had broken down to such an extent that she was likely to receive inadequate representation in the future.

10
11
12

48. That there was a strong likelihood that the conflict between Ms. Alfaro and Mr. Monroe would infect the adequacy of his representation of her at the penalty retrial is evident from Monroe's frustration, vividly expressed in his closing remarks:

13
14

> My trouble now is if she is going to refuse to see me in the jail or cooperate with me, do I end up with a conflict so I can't do the damn job for her?

15
16
17

RT 2148 (April 9, 1992 proceedings). The hearing concluded with the court's facile, yet ominous, response: "It's her duty to cooperate with you. If she takes the position she's not going to see you, she does that at her own peril." *Id.*

18

**8.    May 19-June 3, 1992:  The Second Penalty Trial**

19
20
21

49. The second penalty phase trial began on May 19, 1992, nearly six weeks after the court denied Ms. Alfaro's *Marsden* motion. In his opening, Mr. Monroe once again committed to defense, *sans* evidence, that someone else had committed the crime:

22
23
24

> I believe you will determine that this terrible crime was committed by a person with an abandoned and malignant heart. And that story you hear from the evidence of Rosie Alfaro is not that of an abandoned and malignant heart.

25
26

RT 3181.

27
28

50. On May 23, 1992, in the midst of trial, Ms. Alfaro was "classified for a housing change [by the Orange County Women's Jail staff] due to the need

335

1  for 'acute mental health care.'" CT 1745-46.  She continued to receive "acute mental

2  health care" until May 30, 1992. CT 1745-46.  On June 2, 1992, Ms. Alfaro waived

3  her right to testify.  RT 4237-38.  No analysis was done of her mental state at that

4  time.

5      51.   Both counsel and the court appreciated that if Ms. Alfaro did not testify,

6  she would be all but certain to receive a death sentence, as evidenced by the

7  following dialogue between the court and defense counsel, during the hearing held

8  April 9, 1992:

9          Mr. Monroe:  I talked to Rosie about the importance of her getting on the
           stand and the jury seeing her or hearing her.
10
           The Court:  *Well, if you wanted a chance to spare her life after listening
11         to the videotape, from a practical standpoint she had to testify.*

12         Mr. Monroe:  *That was my feeling.*

13         The Court:  *If she didn't testify, she didn't have much of a chance to save
           her life.*
14

15  RT 2129 (emphasis added) (April 9, 1992 proceedings).  Nevertheless, the court

16  asked Ms. Alfaro nothing more than "do you understand you have a right to testify

17  in this penalty phase of the trial?" before accepting her waiver of that right.  RT 4237.

18      52.   As  a result of Ms. Alfaro's refusal to testify at the second penalty trial,

19  an employee of the District Attorney's office was permitted to read selected portions

20  of her earlier testimony to the jury.  RT 3629-3731.  The portion in which Ms. Alfaro

21  expressed remorse for her crimes was not among them.  And, because Ms. Alfaro did

22  not testify, her attorney's ability to introduce mitigating evidence through defense

23  experts was dramatically curtailed.  *See, e.g.*, RT 3973-4199.

24      53.  Mr. Monroe's closing argument provides a final example of the breakdown

25  between Ms. Alfaro and her counsel.  Despite Ms. Alfaro's four-hour video taped

26  confession, her testimony in the first penalty phase that was read to the jury in the

27  second penalty phase in which she admitted that she killed Autumn Wallace, and her

28

deep remorse which caused her to choose to plead guilty to the charges, her attorney

argued as follows:

> Ladies and gentlemen of the jury, you look at those photographs, and you have to say this butchering had to be done by a person with an abandoned and malignant heart.
>
> Ladies and gentlemen, somebody who could do this terrible thing to this little girl had to have an abandoned and malignant heart.
>
> Ladies and gentlemen of the jury, I'm asking you to look at Rosie Alfaro over there and after you hear my analysis and interpretation of the evidence, coupled with what you recollect, that you will conclude that Rosie Alfaro does not have an abandoned and malignant heart, that Rosie Alfaro has value, and that Rosie Alfaro should live.

RT 4374.

54.  After three days of deliberations, the jury returned a verdict of death.

RT 4456-57.

**9.** **July 14, 1992:  Hearing On Defendant's Motion For Reduction Of Sentence**

55.  Judge Millard's belief that Mr. Monroe's decision to pursue the third-man

defense was incompetent, despite his statements to the contrary on April 9, 1992, is

apparent from his order denying Ms. Alfaro's motion for a reduction of her sentence

pursuant to Penal Code § 190.4(e), and for a new trial pursuant to Penal Code

§ 1181(7).  In assessing whether mitigating evidence that Ms. Alfaro had "acted

under extreme duress under the substantial domination of another person" (Pen. Code

§ 190.3(g)), had been presented, the court said:

> [T]he evidence pointing to this phantom third person being there was argued to the jury . . . [The Court] has gone over the evidence and [has] listened to counsel's arguments.  It is for the reasons Mr. Giffin testified to when he was on the stand, that is, he himself . . . had a hard time believing that a young woman the age of Rosie Alfaro could in fact have done this crime by herself.  So he gave her many, multiple opportunities at that time to come forward and indicate that someone else was involved in the offense. Each inquiry Mr. Giffin asked her on tape she replied in the negative . . . *It's not until after Ms. Alfaro gets legal counsel that this idea of the third party, the phantom third party, pops up in the case. . . The evidence is grossly insufficient to even raise that as a strong inference in the case, especially when you consider the numerous opportunities Mr. Giffin gave her on the videotape.  It appears to this*

337

*court, after having reviewed its notes and looked carefully at the defense expert testimony in the case, and prosecution's evidence in the case, it appears it's a figment of someone's imagination to say that another third person was present and that Miss Alfaro acted under the substantial domination of this unknown person.*

RT 4501-04 (emphasis added).

## C.   MS. ALFARO HAD THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

56.   The right to counsel is necessarily the right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 fn.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970).  Effective representation entails certain basic duties, including the duty of loyalty and the duty to consult with the defendant on important decisions.  *See Strickland*, 466 U.S. at 688.  Essential to insuring effective representation is a defendant's confidence in her attorney and her cooperation with that attorney.  All defendants in criminal cases, and particularly in capital cases, have an interest in establishing a relationship of trust with their appointed attorney.  The trust and confidence undergirding the attorney-client relationship is no less recognized, no less important, and no less deserving of protection between indigent clients and their appointed attorneys, as between wealthy defendants and their counsel.  When an accused is denied the ability to dispense with the constitutional safeguards designed to protect him, he is imprisoned in these privileges, which is not what the Framers intended.  *See Faretta*, 422 U.S. at 815; *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278-79, 63 S. Ct. 236, 87 L. Ed. 2d 268 (1942).

## D.   THE TRIAL COURT'S DENIAL OF MS. ALFARO'S MOTION FOR APPOINTMENT OF SUBSTITUTE COUNSEL VIOLATED HER CONSTITUTIONAL RIGHTS

57.   Ms. Alfaro established that her attorney was not providing adequate representation and that she and Mr. Monroe had become embroiled in such an irreconcilable conflict that ineffective representation was likely to result.  In denying

338

her motion for substitution of counsel, the trial court denied Ms. Alfaro's guaranteed constitutional right to the effective assistance of counsel.

**1.**   **MS. ALFARO SHOWED THAT SHE AND MR. MONROE HAD BECOME EMBROILED IN SUCH AN IRRECONCILABLE CONFLICT THAT INEFFECTIVE REPRESENTATION WAS LIKELY TO RESULT**

58.   When a defendant charged with a serious crime is compelled to undergo a trial with the assistance of an attorney "with whom [s]he has become embroiled in an irreconcilable conflict," she is deprived of the "effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).  Ms. Alfaro, charged with a capital crime, was forced to trial with a lawyer who had raised a defense she did not agree with and had ineffectively advised her concerning her exercise of her Fifth Amendment right to testify.  She had lost all faith in him as a result of their inability to work out their fundamental differences.

59.   Though the record indicates that Ms. Alfaro had been dissatisfied with her attorney for some time, Ms. Alfaro made a sustained good faith effort to work out her disagreements with Mr. Monroe.  Only when she realized that she would be retried did she seek to replace him.  At that point, she had earned the right to claim her conflict with Mr. Monroe was "irreconcilable."

60.   Mr. Monroe repeatedly expressed his opinion that he and Ms. Alfaro had an irreconcilable conflict.  He told the judge they were at "loggerheads."  When it became clear, at the end of the *Marsden* hearing, that Ms. Alfaro's request for substitute counsel would be denied, he actually lost his temper, exclaiming to the trial judge, "if she is going to refuse to see me in the jail or cooperate with me, do I end up with a conflict so I can't do the damn job for her?"  RT 2148 (April 9, 1992 proceedings).

61.   In asking the court to appoint new counsel for the second penalty phase Ms. Alfaro not only described her profound feeling of betrayal, she reminded the

1   court of her longstanding conflicts with Mr. Monroe that made it impossible for her

2   to continue working with him.  Mr. Monroe and Ms. Alfaro had a fundamental

3   disagreement over trial tactics so paramount to her defense that it created an

4   "irreconcilable conflict" resulting in Ms. Alfaro's denial of effective assistance.

5   Ms. Alfaro told the court that she had been opposed to Mr. Monroe's theory of the

6   defense from the very first:  "From the beginning I didn't want to say anything about

7   this other person.  All I wanted to do in my trial was to bring up the fact that, you

8   know, how my childhood was and how I grew up and stuff like that.  But never did

9   I want to go into someone else was involved.  And I kept on telling him that all along

10  . . . . But he always twisted everything around and kept on telling me I had to say

11  something."  RT 2144 (April 9, 1992 proceedings).

12      62.  Ms. Alfaro and Mr. Monroe were in conflict over the basic aspects of her

13  defense from almost the moment Mr. Monroe began representing Ms. Alfaro.

14  Ms. Alfaro persevered, despite Mr. Monroe's disregard of her wishes.  Once,

15  however, Mr. Monroe placed Ms. Alfaro by his own professional incompetence in the

16  most difficult position a defendant can face -- a grueling cross-examination regarding

17  the circumstances of a crime for which that defendant faces the death penalty -- she

18  could work with him no longer.  The law required no further effort on her behalf, and

19  the trial court erred in failing to replace Mr. Monroe.  Yet, despite the clear lack

20  of trust Ms. Alfaro now had in Mr. Monroe, the trial court forced her to proceed to a

21  critical phase of her trial -- the phase in which the jury would decide whether she

22  would live or die -- with an attorney she believed had lied to and misled her

23  concerning her testimony in the first penalty trial.

24      63.  The trial court further erred in its views on the extent of Ms. Alfaro's duty

25  to cooperate with counsel.  As  the hearing neared a close, Mr. Monroe said to the

26  court: "My trouble now is if she is going to refuse to see me in the jail or cooperate

27  with me, do I end up with a conflict so I can't do the damn job for her?"  The court

28  replied: "It's her duty to cooperate with you.  If she takes the position she's not going

340

1  to see you, she does that at her own peril."  Turning to Ms. Alfaro, the court said: "By

2  that I mean if he comes over to talk to you and you refuse to talk to him, you refuse to

3  do it, you have a duty to do it and you're violating your duty to cooperate with your

4  attorney, and that's not grounds to get another lawyer.  What it does, it really kind

5  of sinks you but you are doing it yourself."  RT 2148 (April 9, 1992 proceedings).

6       64.  Ms. Alfaro made every conceivable human effort to cooperate with and

7  trust her attorney.  Despite her efforts, her attorney betrayed her trust.  Given their

8  long standing conflicts and his incompetency, Ms. Alfaro need make no further

9  effort; no more explicit example of an "irreconcilable conflict" could be provided.

10  Having the evidence of their conflict before it, *the court* now was obligated to act,

11  and its failure to replace Mr. Monroe resulted in reversible error.  *Brown*, 424 F.2d

12  at 1169-70 (without blaming the defense attorney, holding that new counsel should

13  have been appointed so that the defendant would not have had to undergo a trial

14  with an attorney in whom he could not "repose his confidence").

15       65.  The direct consequence of the court's failure to replace counsel --

16  Ms. Alfaro's refusal to testify in the second penalty phase -- must be seen for

17  precisely how prejudicial it was:  at the end of the first penalty phase, despite the

18  devastating cross examination, the jury did not agree to vote for death.  During the

19  second penalty phase, however, having lost all faith in Mr. Monroe, Ms. Alfaro

20  refused to take the stand.  Instead, her cross examination was read by an employee

21  of the district attorney's office.  The second jury never had the opportunity to hear

22  Ms. Alfaro express remorse in her own voice.  Rather than being able to focus on her

23  as a person, they undoubtedly focused on the words of her difficult, often evasive,

24  and contradictory cross-examination.  After three days of deliberation, the second

25  jury voted for death.  Ms. Alfaro's refusal to take the stand because she felt betrayed

26  by her counsel must be understood as profoundly prejudicial, and because it was

27  based on her conflict with Mr. Monroe, that conflict left her effectively

28  unrepresented.

## 2.    MS. ALFARO SHOWED THAT MR. MONROE HAD PROVIDED HER WITH INADEQUATE REPRESENTATION[32]

### a.    Mr. Monroe Provided Inadequate Representation By Denying Ms. Alfaro The Right To Make Critical Decisions About Her Defense

66.    The United States Supreme Court has resoundingly affirmed the right of the defendant to control the most basic, critical aspects of her own defense. Affirming a defendant's right to self-representation, in *Faretta,* 422 U.S. at 806, the Supreme Court found that the Sixth Amendment's counsel provision *supplements* the accused's right to defend; it does not and cannot supplant the personal nature of the defendant's right to control and present a defense.  *Id.* at 820; *see also Adams*, 317 U.S. at 279 ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms.  They rest on considerations that go to the substance of an accused's position before the law.").

67.    The court's mischaracterization of the nature of Ms. Alfaro's conflict with Mr. Monroe -- describing their dispute as simply a dispute over tactics -- is at the core of the court's error in denying the *Marsden* motion.  Rather than a conflict over tactics, their conflict centered on who should exert basic control over the course of Ms. Alfaro's defense.  Mr. Monroe, despite his other egregious failures, rightly described their conflict as a conflict over the fundamental nature of the defense. RT 110-114 (February 21, 1992 proceedings).  Because the Constitution mandates that disputes regarding control over the basic decisions in a criminal case must always be resolved in favor of the competent defendant, Mr. Monroe's refusal to permit

---

[32]    To evaluate the merits of this claim, the Court must look at the evidence of the inadequacy of trial counsel's representation of Ms. Alfaro that appears from the record.  Ms. Alfaro has further developed and presented other claims of ineffective assistance of counsel in this petition.  Prejudice from counsel's errors must be "considered collectively, not item-by-item."  *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995).

1  Ms. Alfaro to plead guilty evidenced his inadequate representation of her as well

2  as the fact that he and Ms. Alfaro had an irreconcilable conflict.

3      **b.    Mr. Monroe Provided Inadequate Representation When He**

4           **Refused To Consent To A Guilty Plea**

5      68.  Mr. Monroe's refusal to consent to a guilty plea was not a reasonable

6  tactical decision.  In focusing exclusively on his modified duress defense,

7  Mr. Monroe completely failed to recognize that Ms. Alfaro faced felony murder

8  charges that would not require the jury to find that she had *any* kind of mental state

9  regarding the killing, only that she intended the robbery or burglary, and had stabbed

10 Autumn Wallace.  And Mr. Monroe acknowledged during his guilt phase opening

11 and closing remarks that Ms. Alfaro had, in fact, gone to the Wallace home with the

12 specific intent to burglarize the house, and had stabbed Autumn Wallace.  Thus, even

13 if Ms. Alfaro lacked any intention *at all* that Autumn Wallace die, Mr. Monroe had

14 no defense to the charge of first degree felony murder which exposed her to the death

15 penalty.  Thus, Mr. Monroe's refusal to permit Ms. Alfaro to plead guilty based on a

16 defense theory regarding the presence of the third person, and in the absence of a

17 defense to the felony murder charge, was completely unreasonable.  The detailed

18 analysis of Monroe's decision to withhold consent to Ms. Alfaro's guilty plea set

19 forth with more specificity above in Claim 1 is incorporated by reference at this point

20 as though set forth in full.

21     69.  But even assuming, *arguendo*, that there were some kind of modified

22 duress or aiding and abetting defense available, given the state of the physical

23 evidence, it clearly would require Ms. Alfaro's testimony.  Without Ms. Alfaro taking

24 the stand to testify that she was under duress, that she didn't intend for Autumn to

25 die, and that the third man delivered the fatal blows, her lawyer was left to try to

26 place the blame on someone else absent any evidence that the third man even entered

27 the house.  If his client had insisted on presenting this defense, or had insisted on

28 presenting some kind of defense, Mr. Monroe's strategy might have made sense,

1  simply because the client had forced the issue.  But for *Mr. Monroe* to force his client

2  to undergo a guilt phase trial and engage her in a "long standing" conflict over an

3  unreasonable defense was to provide her with inadequate representation.

4      70.  In refusing to allow Ms. Alfaro to plead guilty, Mr. Monroe deprived her

5  of the right to make a fundamental decision about her defense and the opportunity to

6  clearly accept responsibility for the crime and to put her willingness to accept

7  responsibility for the crime before the jury.  Ms. Alfaro gained no discernible benefit

8  by putting the government to its proof, and gave up the opportunity to appear in a

9  more sympathetic light and to gain a universally recognized mitigating circumstance.

10  In withholding his consent to Ms. Alfaro's guilty plea, Mr. Monroe provided

11  inadequate representation.

12      c.   **Mr. Monroe Provided Inadequate Representation When He**

13           **Advised Ms. Alfaro Concerning Her Testimony**

14      71.  Mr. Monroe's failure to properly advise Ms. Alfaro concerning her

15  testimony and his subsequent explanations for that conduct fail to meet the objective

16  standard of reasonableness constitutionally required.  The decision of whether or not

17  to testify on one's own behalf is a decision of "fundamental importance" for a

18  criminal defendant.  When a defendant testifies on her own behalf, she waives the

19  absolute protection against self-incrimination afforded by the Fifth Amendment to the

20  United States Constitution, which provides a defendant with an absolute right not to

21  be called as a witness and not to testify.  Thus, the decision whether to testify, a

22  question of fundamental importance, is made by the defendant after consultation with

23  counsel.  In failing to prepare a client for her impending testimony and failing to

24  prepare her for cross-examination, a counsel abandons his duty to assist his client

25  in her decision to testify.  *See Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987)

26  (in failing to prepare client for testimony and failing to advise client regarding cross-

27  examination, "counsel simply abandoned his duty to assist [client] in decision

28  whether to testify.").

72.  Here, while the decision to testify was Ms. Alfaro's, Mr. Monroe had a duty and responsibility to advise her on the pros and cons of taking the stand.  He also had a duty to prepare her to testify, and to prepare her for cross-examination.  The transcript of the *Marsden* hearing establishes that Mr. Monroe wholly failed to fulfill these duties.

73.  Mr. Monroe  admitted during the hearing that he had been aware of Ms. Alfaro's letter to Autumn Wallace for *two weeks* before she took the stand. RT 2130 (April 9, 1992 proceedings).  Yet, despite his knowledge that the letter included the phrase, "I'm sorry *we* took your innocent life," and his plan to have Ms. Alfaro read it on the stand, Monroe advised her that he would "limit the cross examination to the areas that we covered in the taking her through her early life."  *Id.* at 2120. This is not a case in which the client made a spontaneous statement on the stand that inadvertently opened the door to damaging cross examination.  Monroe knew the contents of the letter before he directed Ms. Alfaro to read it on direct.  He was responsible for opening the door to cross examination about the crime.  *See, e.g.,* RT 1651-52.  Despite the trial judge's disbelief that anyone could have thought that cross-examination would be restricted after this letter was read, Monroe's vigorous -- albeit ineffectual -- efforts to foreclose the cross-examination provide strong evidence that he did indeed believe that it could be.  *See* RT 1631, 1633, 1635, 1647-52.[33]

74.  At the very least, Mr. Monroe misled his client as to whether she would be questioned about the crime.  Even after he began to claim that he merely told Ms. Alfaro that if the district attorney tried to question her about the crime he would object, he never said that he advised her his objection could well be overruled.

75.  Monroe's failure to prepare Ms. Alfaro for cross examination about the crime further supports her testimony that he told her that she would not be cross

---

[33]  Indeed, once it became clear that the trial judge would permit cross-examination about the crime, Monroe went so far as to "request a short recess so [he could] talk to his client."  RT 1635.

1  examined about the crime.  This failure, alone, evidences ineffective assistance.

2  Ms. Alfaro's reluctant  responses to the district attorney's questions about the crime

3  caused her to appear evasive and *un*willing to accept responsibility for the crimes.

4  Though her direct may have helped the defense, her unprepared cross examination in

5  which she unconvincingly implicated another person in the crime hurt her

6  immeasurably.  Her evasiveness may be attributable to fear, but it must have appeared

7  to the jury as prevarication.  And indeed, the prosecutor admitted that the whole point

8  of his cross-examination was to make her out to be a liar.  RT 1647.

9       76.  Instead of focusing on Ms. Alfaro's life and its hardships, the jury was

10  taken once more through the crime.  Had he permitted Ms. Alfaro to plead guilty,

11  thereby evidencing her acceptance of responsibility, then limited her direct to "taking

12  her through her early life" and the time period preceding the day of the crime, all

13  of this could have been avoided.  RT 2120 (April 9, 1992 proceedings).  Mr. Monroe

14  — and Mr. Monroe alone — bears responsibility for what occurred.  In denying his

15  client acceptance of responsibility and opening the door to questions about the day

16  of the crime, Mr. Monroe rendered ineffective assistance of counsel.

17  **3.   MS. ALFARO'S REQUEST FOR SUBSTITUTE COUNSEL**

18  **WAS TIMELY**

19       77.  Ms. Alfaro's request for substitute counsel was made with more than

20  enough time for counsel to be replaced before the start of the second penalty phase.

21  Ms. Alfaro's request came on April 9, 1992; the second penalty phase trial did not

22  begin until nearly six weeks later, on May 19, 1992.  In denying her motion, the trial

23  court based his decision in part on Ms. Alfaro's failure to bring her concerns to the

24  court's attention on the day she testified, accusing her of  sitting on this issue in the

25  event that the jury did not return a verdict of life without the possibility of parole.  No

26  reference was made to any inconvenience or delay caused by Ms. Alfaro's decision to

27  wait until April 9, a mere week after she had testified.  RT 2129-33 (April 9, 1992

28

1  proceedings).  This is an inappropriate factor to consider when evaluating whether a

2  defendant's *Marsden* motion is timely or not.

3          78.  Furthermore, Ms. Alfaro offered a reasonable explanation to Judge Millard

4  for her delay:  She did not know the process for bringing up a motion to substitute

5  counsel and had only recently learned from the women in jail what she needed to do

6  to bring her concern to the court's attention.  RT 2130 (April 9, 1992 proceedings).

7  The court dismissed her confusion, saying that because he had met with Ms. Alfaro

8  and Mr. Monroe on other occasions in chambers, it should have been obvious to her

9  how to go about bringing her complaint to the court's attention.  *Id.*  This distorts

10 Ms. Alfaro's dilemma, however.  Ms. Alfaro's only experience with in-chambers

11 proceedings was when Mr. Monroe initiated them and was present.  Ms. Alfaro had

12 no independent experience on how to obtain an audience with the judge, and she was

13 understandably reluctant to ask Mr. Monroe to set up the meeting.  Ms. Alfaro made a

14 perfectly reasonable decision to wait until the jury finished  deliberating before

15 asking that Mr. Monroe be replaced.

16         79.  Most importantly, Ms. Alfaro made her request with ample time before the

17 beginning of the second penalty phase, and the court admitted as much.  After

18 denying Ms. Alfaro's request for substitution of counsel, the court stated, "and we're

19 going to have some *time* before the trial on the penalty phase recommences.  It would

20 seem to me that you have *ample time* to iron out whatever misunderstandings you

21 have . . . ."  *Id.* at 2134 (emphasis added).

22         **4.     THE COURT'S INQUIRY WAS INADEQUATE**

23         80.  When a criminal defendant believes that she is receiving inadequate

24 representation from her appointed counsel and seeks to have the court substitute

25 counsel, the trial court must allow the defendant to explain the basis of her

26 contentions and to relate specific instances of the attorney's inadequate performance.

27 Although the trial court permitted Ms. Alfaro some opportunity to articulate her

28 discontent in the *Marsden* hearing, the court's inquiry was insufficient.  RT 2138

347

(April 9, 1992 proceedings).  For example, rather than asking Ms. Alfaro whether she

felt that she could continue working with Mr. Monroe during a second penalty phase,

the court simply insisted that she must.  *Id.* at 2148.  Indeed, the court's admonition to

Ms. Alfaro could only have conveyed to her that further requests for new counsel

would get her in trouble:

> The Court:  [addressing Monroe's report to the court that Ms. Alfaro has told him she would not cooperate with him any longer] I don't know if somebody in the jail told you that you can do that; but I'm telling you, you have a duty to cooperate with your attorney and that is to communicate with him and to cooperate with him.  I can't force you to do that but you have the duty to do it.  And if you don't do it, you really do it at your own risk because you don't have a right to just sit there and choose well, I don't like Judge Millard's decision, I wanted Mr. Monroe off the case and he's not off the case so I'm not going to talk to him.  You basically don't have that right.
>
> And if you take that position, you're really jeopardizing your own future because no court decision has allowed a defendant to do that.  And it definitely would not be in your best interest to take a position like that.

*Id.* at 2136-37 (emphasis added).

**E.    CONCLUSION**

81.  The trial court inexcusably failed to act to resolve the dispute between

Ms. Alfaro and Mr. Monroe.  The court had before it evidence of a long standing

conflict, evidence of Ms. Alfaro's low I.Q., and direct evidence of Ms. Alfaro's

difficulty understanding the proceedings.  Under these circumstances, the court was

required either to substitute counsel who could develop a better relationship with her

or to order a competency hearing.  The court's own recognition of the inadequacy

of Mr. Monroe's defense strategy makes all the more evident the irresponsibility and

the profound error of the court's failure to replace Mr. Monroe.  The court forced

Ms. Alfaro to continue with Mr. Monroe despite the court's own belief in the

inadequacy and implausibility of Mr. Monroe's defense strategy.  At the time of the

*Marsden* hearing, the court had seen all of the prosecution's evidence and was in a

position to assess Mr. Monroe's strategy.  At the *Marsden* hearing, the court told

Ms. Alfaro that she simply must accept Mr. Monroe's defense strategy because any

1  attorney replacing him would develop the same defense strategy.  RT 2143-44

2  (April 9, 1992 proceedings).  But the court's true, disdainful opinion of Mr. Monroe's

3  defense theory was revealed at the imposition of Ms. Alfaro's judgment.  To the

4  extent that the trial judge's statements to Ms. Alfaro on April 9, 1992 might have

5  constituted legal advice, he, too, inadequately represented her.

6       82.  The foregoing violations of Ms. Alfaro's constitutional rights

7  constitute structural error and warrants the granting of this Petition without any

8  determination of whether the violations substantially affected or influenced the jury's

9  verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

10  doctrine applies to this claim, the foregoing constitutional violations so infected the

11  integrity of the proceedings that the error cannot be deemed harmless. The foregoing

12  violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

13  Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

14  resulting in a miscarriage of justice.

15       83.  The constitutional violations set forth in this claim alone mandate relief

16  from the convictions and sentence.  However, even if these violations do not mandate

17  relief standing on their own, relief is required when this claim is considered together

18  with the additional constitutional errors outlined in the remainder of this Petition.

19  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

20  sentence.  *Phillips v. Woodford,* 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett,*

21  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris,* 586 F.2d 1325, 1333

22  (9th Cir. 1978).

23  / / /

24  / / /

25

26

27

28

## XXVI.

## CLAIM 21:  THE TRIAL COURT DENIED MS. ALFARO HER SIXTH AND FOURTEENTH AMENDMENT RIGHTS IN DENYING THE DEFENSE CHANGE OF VENUE MOTION BEFORE THE RETRIAL OF THE PENALTY PHASE BECAUSE OF JURORS' EXPOSURE TO INFLAMMATORY PUBLICITY

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because trial court denied the change of venue motion.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 7 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.2d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

## A. __INTRODUCTION AND DESCRIPTION OF THE PUBLICITY__

6.  Extensive publicity surrounded Ms. Alfaro's arrest, trial, conviction, and the mistrial of the first penalty phase.  CT 1236-64; *see also* CT 464-73, 964, 974, 1099-1101, 1108-10, 1116-17, 1122-1124, 1131-32, 1194, 1236-64, 1458, 1559, 1561, 1577, 1579, 1730-34 (orders granting media access).  Nearly all of this publicity noted a death sentence as a likely punishment for Ms. Alfaro, as well as recounted evidence against Ms. Alfaro that would be relevant to establishing aggravating circumstances.  For example, several stories noted that Ms. Alfaro had confessed to killing the victim to "keep from being caught" for her planned theft of items from the house.  Others described her confession that she had been  "wired" on drugs at the time of the crime.  CT 1238, 1241, 1245, 1247.  One story described her as having "plott[ed] to kill the child," while another story published before the first trial stated that she had already been convicted of murder and indicated that she had hired a firm called Death Investigation International to administer Sodium Pentothal to her to enhance her memory of the slaying.  CT 82, 1244.  A third story headlined, "Defense Calls No Witnesses For Girl's Confessed Killer," provided yet another assurance of Ms. Alfaro's guilt.  CT 1245.

7.  In some of the stories, Ms. Alfaro's remorse for the crime was questioned by the victim's mother and by the first trial's jurors.  CT 1252, 1258.  In many of these articles, the district attorney was quoted as calling the case the most "senseless" killing imaginable, as well as calling the evidence against Ms. Alfaro "unusually strong" and "overwhelming."  CT 1247-49, 1250.

8.  Only six weeks before jury selection of Ms. Alfaro's retrial began, the potential jury pool was exposed to particularly inflammatory publicity that Ms. Alfaro "deserved to die." CT 1250, 1253.  After the first jury hung, the victim's mother, Orange County Superior Court employee Linda Wallace, called on jurors to vote for the death penalty as she spoke to the local newspaper, the *Orange County Register*, on the courthouse steps. CT 1250, 1253.  "For what she did, she deserves to die. . . . I want to see her get the death penalty.  It's been a long two years." CT 1250.  In an account of Ms. Alfaro's penalty phase testimony, Ms. Wallace stated: "I would like to believe she's remorseful. . . . But I have no pity for her. . . . It just makes me madder. Her saying that she's lost her four kids.  It's not the same.  I didn't kill her children." CT 1252.  At the closing of the first sentencing hearing, Ms. Wallace was quoted as saying:  "She wasn't a mother to her kids before she went to jail. . . I think she deserves the death penalty. . . I think she was crying because she was caught." CT 1253.  "I hope this [new] jury is better, not so indecisive," she told the Orange County edition of the *Los Angeles Times* a week later as the judge set a retrial date for the penalty phase.  CT 1260.  The district attorney echoed her feelings and provided encouragement to Times readers that the next jury would get it right:  "The jurors voting for death were so strong, it leads us to believe there is more than a good chance that another jury will vote for death." CT 1257.  One unidentified juror who deliberated on Ms. Alfaro's sentence added his two cents worth announcing that the aggravating factors outweighed the mitigating factors "by a long shot."  CT 1257-58.

9.  Potential Orange County jurors also learned that Ms. Alfaro was a drug-addicted prostitute from Anaheim's Hispanic "barrio" who "wasn't a mother to her [four] kids" even before she went to jail.  CT 1251, 1253-54.  They learned that she had confessed to butchering Autumn Wallace, a "popular" white nine-year-old A-student who was at home in a pink polka-dot dress cutting out paper dolls when the deranged killer slashed her 57 times.  CT 1247, 1251, 1253, 1254, 1258.  They learned that ten jurors from the first penalty phase felt "strongly" that Ms. Alfaro

1   deserved death, and lacked remorse for the crime, but that two "holdouts" kept the
2   jury deadlocked.  CT 1257-58.

3          10.  Amid the sensational local press reports and the cry of voices calling
4   for the death penalty, the trial court refused to grant Ms. Alfaro a change of venue,
5   explaining that the publicity in this case was not at all likely to have any impact on
6   the defendant's ability to select a fair and impartial jury.  RT 2172.  The judge clearly
7   erred in making this ruling and in denying defendant's motion for change of venue.
8   In so doing, he denied Ms. Alfaro's Fifth and Fourteenth Amendment rights to a fair
9   trial and due process, her Sixth Amendment right to a fair and impartial jury, and her
10  Eighth Amendment right to a reliable, rational and accurate determination of her
11  death-worthiness.

12  **B.    A CHANGE OF VENUE MUST BE GRANTED WHERE, AS HERE, A**
13         **REASONABLE LIKELIHOOD EXISTS THAT A FAIR AND**
14         **IMPARTIAL TRIAL CANNOT OTHERWISE BE HAD**

15         11.  "In essence, the right to jury trial guarantees to the criminally accused a
16  fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused
17  a fair hearing violates even the minimal standards of due process."  *Irvin*, 366 U.S.
18  at 722 (citing *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948)).
19  *McCleskey* v. *Kemp*, 481 U.S. 279, 309, fn. 30 (1987) ("widespread bias can make
20  change of venue constitutionally required").  Because a criminal defendant has the
21  right to an impartial jury, a court must grant a motion to change venue "if prejudicial
22  pretrial publicity makes it impossible to seat an impartial jury."  *Ainsworth v.*
23  *Calderon*, 138 F.3d 787, 795 (9th Cir. 1998), as amended, 152 F.3d 1223 (citations
24  and internal quotations omitted).

25         12.  To support a change of venue motion, defendant must demonstrate either
26  actual or presumed prejudice.  *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir. 1989)
27  (quoting *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984)).  To demonstrate
28  actual prejudice, the party must show that "the jurors demonstrated actual partiality

1  or hostility that could not be laid aside." *Id*. at 1363.  Prejudice is presumed only in
2  extreme instances "when the record demonstrates that the community where the trial
3  was held was saturated with prejudicial and inflammatory media publicity about
4  the crime." *Ainsworth*, 138 F.3d at 795.

5         13.  Three factors should be considered in determining presumed prejudice:
6  (1) whether there was a "barrage of inflammatory publicity immediately prior to trial,
7  amounting to a huge . . . wave of public passion"; (2) whether the news accounts were
8  primarily factual because such accounts tend to be  less inflammatory than editorials
9  or cartoons; and (3) whether the media accounts contained inflammatory or
10 prejudicial material not admissible at trial.  *Daniels v. Woodford*, 428 F.3d 1181,
11 1211-1212 (9th Cir. 2005)

12            **1.**    **The Nature And Gravity Of The Offense**

13        14.  Assessing these factors, change of venue clearly was compelled in
14 this case.   The nature and gravity of the offense favor change of venue.  This was
15 a capital murder case involving the brutal slaying of a Caucasian girl in her middle-
16 class home. The nine year old child was stabbed 57 times.  The defendant, who had
17 confessed to the crime, was a Hispanic woman who was high on drugs at the time she
18 stabbed the little girl and burglarized her home.  The defendant had brought her own
19 baby with her to the scene of the crime.   All of these facts made the crime sensational
20 and aroused the consciousness of the community, as witnessed by the extensive press
21 coverage of this case.  CT 1236-64.

22            **2.**    **The Standing Of The Victim And Accused In The Community**

23        15.  The standing of the victim and accused in the community also bolster the
24 case for change of venue.  The press described Autumn Wallace as "popular" and
25 well-liked in the community and described her in terms likely to evoke the sympathy
26 or concern of the community.  Her mother and her aunt, who had discovered Autumn
27
28

lying on the floor of the bathroom in her suburban home, worked for the very court in which the case was tried.  RT 731.[34]

16.  On the other hand, Ms. Alfaro, a member of a minority group, a drug addict since age 12, a prostitute living on the streets of Anaheim's minority neighborhood whose family had disintegrated, represents exactly the type of defendant whom publicity can most effectively prejudice.  Ms. Alfaro was a drop out from the community; she certainly had not been integrated into the middle-class life of Anaheim.  Rather, according to the news accounts, Ms. Alfaro was a threat to the community, the type of outcast who would break into peoples' homes to steal their property for drug money.

### 3.    The Sensational, Inflammatory Publicity

17.  Considered with these other factors, the sensational, inflammatory publicity leading up to Ms. Alfaro's penalty phase retrial virtually compelled a change of venue.[35]  Not only was the publicity inflammatory, it was extensive, and therefore likely to prejudice prospective jurors.  Many stories about the mistrial, and immediately preceding the mistrial, were published within a few short weeks of when prospective jurors were called for jury selection in the second penalty phase.  These stories extensively quoted the victim's mother, the district attorney, and jurors as calling for a death sentence or concluding that death should be the penalty in this case.

---

[34]  That Autumn Wallace's mother Linda Wallace and her aunt, who was with Linda Wallace when she discovered the crime, worked for the Orange County Superior Court might alone have given rise to a motion for change of venue. The issue is not developed in the record on appeal, but will be fully explored in Ms. Alfaro's petition for a writ of habeas corpus.

[35]  Although size of the community is a factor in the change of venue analysis, and Orange County does not qualify as a small or rural county, this Court's case law makes clear that this factor is not controlling or determinative in the change of venue analysis.

355

1

### 4.   The Impact On The Community

2      18.  The influence of this media coverage among potential Orange County

3  jurors is not speculative.  Of the 57 prospective jurors in the jury pool whom the

4  judge directly asked whether they had knowledge of the case, 37, or 65%, had read,

5  viewed or heard some of the media coverage.  RT 2275-3141.  About 25 of those

6  people had been exposed to news reports within the past several weeks.  At least half

7  of the jurors actually selected, and one alternate juror, had previous knowledge of the

8  case.  Moreover, the trial court excused six prospective jurors for cause because they

9  already had formed an opinion as to Ms. Alfaro's punishment due to the publicity.

10  In addition, several other jurors during the first two days of voir dire expressed

11  concern about their ability to judge the case fairly or to approach it with an open

12  mind.  RT  2333, 2336-37.  In fact, *one of the jurors selected to sit* hesitated when

13  asked if the information he acquired would have any effect on his ability to be

14  impartial.  RT 2312.  "I think so," he replied.  The judge asked if he was sure.  "Well,

15  I haven't got the facts yet," the juror equivocated.  *Id.*  Despite answers like this one,

16  the judge never asked any juror to describe what details of the case he or she had

17  gleaned from the press reports they had read.  *See Mu'Min v. Virginia*,  500 U.S. 415,

18  429 (1991) (where pretrial publicity engenders a "wave of public passion" in

19  connection with a trial, the Due Process Clause might well require a more extensive

20  examination of potential jurors than the judge's abject failure to ask jurors about the

21  specific contents of new reports to which they had been exposed).

22      19.  While most jurors responded that they could put aside the information they

23  learned from press reports and be fair, a juror's declaration of impartiality is not

24  conclusive.  *See Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d

25  847 (1984) ("adverse pretrial publicity can create such a presumption of prejudice in

26  a community that the jurors' claims that they can be impartial should not be

27  believed").

28

C.     **CONCLUSION**

20.  In this atmosphere, where nearly two-thirds of the jurors questioned, and half of the jurors actually selected,  knew something about the case, the trial judge was presented with persuasive evidence that a fair trial could not be had in light of the highly inflammatory pretrial publicity n the time period immediately preceding jury selection.  The court erred in failing to grant Ms. Alfaro's change of venue motion.

21.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638.

22.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

**XXVII.**

**CLAIM 22:  THE TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS BY COMMITTING NUMEROUS EVIDENTIARY ERRORS**

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth,

1  Eighth and Fourteenth Amendments to the United States Constitution because the
2  trial court failed to exclude improper, unreliable, and inflammatory expert evidence.

3      1.  Exhaustion of the claim:  This claim was fairly presented to the California
4  Supreme Court in the direct appeal.  It was presented as Claim 8 in Opening Brief.

5      2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*
6  *Alfaro*, 41 Cal. 4th 1277, 163 P.2d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the
7  state court's denial of this claim is both "contrary to" and an "unreasonable
8  application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts
9  must resolve the claim *de novo*.  Moreover, because the state court's adjudication of
10  this claim was dependent on an antecedent unreasonable application of federal law,
11  this Court "must then resolve the claim without the deference that AEDPA otherwise
12  requires."  *Panetti*, 127 S. Ct. at 2858.

13      3.  If Respondent disputes any of the facts alleged below, Petitioner requests an
14  evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has
15  been afforded discovery and the disclosure of material evidence by the State, the use
16  of this Court's subpoena power, and the opportunity to investigate fully, counsel
17  requests an opportunity to supplement or amend this petition.

18      4.  The declarations and other exhibits accompanying this petition, as well as
19  the allegations and facts set forth elsewhere in this petition, are hereby incorporated
20  by reference into this claim as though set forth in full.

21      5.  In support of this claim, Petitioner alleges the following facts, among others
22  to be presented after full discovery, investigation, adequate funding, access to this
23  Court's subpoena power, and an evidentiary hearing.

24  **A.    INTRODUCTION**

25      6.  At the second penalty trial, defense attorney William Monroe called two
26  experts, sociologist Armando Morales and psychiatrist Conseulo Edwards, to give
27  their diagnoses of Ms. Alfaro's sociological and psychiatric condition at the time
28  of the offenses and at the time of trial.  During cross-examination of these experts,

1   Assistant District Attorney Charles Middleton asked repeated questions about

2   raw data and rough notes related to a psychological test, the Minnesota Multiphasic

3   Personality Inventory ("MMPI"), that had been administered to Ms. Alfaro by or

4   at the direction of a third defense expert, psychologist Martha Rogers, who was not

5   called as a witness by the defense at trial.  RT 3980-94, 4117-29.   Dr. Rogers did not

6   prepare a report analyzing the MMPI data she had collected.  RT 4123.  She did,

7   however,  provide defense counsel with the raw data and some rough notes.  Defense

8   counsel subsequently provided this information to the other experts.  *Id*.  Although

9   the raw data and rough notes were of no use to Drs. Morales and Edwards, who

10  testified that they were unqualified to interpret the data and had not considered it

11  in rendering their opinions, the district attorney found it very useful indeed.  While

12  Dr. Rogers had written on one page that the test should be redone, on another

13  someone had written the phrase, "probable fake bad." *Id.*   This phrase, which the

14  district attorney equated with malingering (RT 4123-26), a term he defined for the

15  jury as describing "intentional production of false or grossly exaggerated physical

16  or psychological symptoms, motivated by external incentives such as . . . evading

17  criminal prosecution, obtaining drugs, or securing better living conditions" (RT 3996-

18  97), became his mantra.  Indeed, he repeated and elicited the phrase more than forty

19  times during his cross-examination of the defense experts, searing it into the minds

20  of the jurors.  RT 3980-96; 4123-29.

21       7.  Because Drs. Morales and Edwards could not interpret and therefore did not

22  consider the raw data from the MMPI, its probative value for the purposes of

23  assisting the jury in judging the credibility of their opinions was nil.  The prejudicial

24  impact of the prosecution's questioning, on the other hand, was enormous.  The

25  district attorney managed to bootstrap this hearsay evidence that had not been relied

26  upon by the experts into substantive evidence that Ms. Alfaro was "malingering;"

27  that she was intentionally producing false or grossly exaggerated psychological

28

1  symptoms, such as remorse, motivated by external incentives such as "evading

2  criminal prosecution, obtaining drugs, or securing better living conditions."

3      8.  Not only did the district attorney discuss the MMPI data as substantive

4  evidence during his cross-examinations of Drs. Morales and Edwards, he actually

5  subpoenaed Dr. Rogers, the psychologist who had been retained to conduct the test

6  but had not been called to testify by the defense, to testify for the prosecution as a

7  "rebuttal" witness.  Given that Drs. Morales and Edwards had testified that they

8  neither accepted nor rejected Dr. Rogers' preliminary results, Dr. Rogers was an

9  improper rebuttal witness.  The questions posed to her about her preliminary findings

10  left a highly misleading and damaging impression on the jury.  Defense counsel

11  William Monroe declined to ask any questions on cross, for reasons that are not

12  apparent from the record before the Court.[36]  In the absence of proper limiting

13  instructions, the jury now had reason to believe that Ms. Alfaro was malingering;

14  that she did not really feel the remorse she appeared to express on the videotape

15  for her crimes, and that as a result, she was undeserving of any sympathy whatsoever.

16  Once again, because she was denied the concrete evidence of her acceptance of

17  responsibility in the form of a guilty plea, Ms. Alfaro was cast as someone who did

18  not fully accept responsibility for what she had done, did not feel true remorse, and

19  should be put to death.

20  **B.    STATEMENT OF FACTS**

21      9.  As was made abundantly clear within the first few responses of each expert

22  to the prosecution's inquiries concerning the raw MMPI data and rough notes, neither

23  Dr. Morales nor Dr. Edwards was qualified to interpret or to rely upon the data.  Both

24  defense experts testified that they had not considered this material when forming their

25

26  [36]  Mr. Monroe's conduct in producing the useless, inflammatory data to
Drs. Morales and Edwards; his failure to have Dr. Rogers "redo" the MMPI and
complete a report once the District Attorney made clear that he would rely on the
27  raw data in the first trial; and his failure to prepare Dr. Rogers to testify and to take
the sting out of this explosive evidence will be addressed in Ms. Alfaro's petition
28  for a writ of habeas corpus.

1   opinions.  Nevertheless, over repeated objections by the defense, the trial judge

2   allowed the district attorney to go on to examine each expert *extensively* about the

3   terms "probable fake bad" and "malingering" and to call Dr. Rogers, the psychologist

4   who had overseen administration of the MMPI, as a rebuttal witness.  Thereafter, the

5   district attorney made "malingering" the theme of his closing argument in support of

6   the death penalty.

7           **1.    Dr. Morales**

8           10.  Four pages into his fifty page cross-examination of Dr. Morales,

9   Mr. Middleton asked the sociologist, "Did you review Dr. Rogers' report?"  RT 3980.

10  When Dr. Morales responded that he had reviewed "a report that was a substance

11  abuse inventory and survey," Mr. Middleton pressed on:  "Did you review the

12  MMPI?"  Dr. Morales' response left no question that (a) there was no "report"

13  concerning the MMPI, and (b) he had seen the raw MMPI data, but was not qualified

14  to interpret it and had not relied upon it:  "There was an MMPI that I looked at that

15  was in draft form that had a lot of raw data on it which, not being a licensed

16  psychologist, I could not understand it."  RT 3981.  He stated, "the actual raw data

17  makes no sense to me."  RT 3982.

18          11.  That Dr. Morales was not qualified to interpret an MMPI, and therefore

19  had not considered the raw data and rough notes, came as no surprise to the district

20  attorney.  During the first penalty trial, *Mr. Middleton* had argued the very point that

21  Dr. Morales was unqualified to answer questions regarding the MMPI as he was a

22  social worker and not a psychologist.  RT 1418-30.  Moving to preclude such an

23  examination at that time, Mr. Middleton stated, "he's not a psychiatrist.  He doesn't

24  have a doctor's degree or an M.D. in psychiatry in any way.  Psychiatrists are the

25  ones that interpret MMPI's and psychological testing and have psychologist perform

26  / / /

27  / / /

28

361

1   the testing in order to make those interpretations." CT 1418.[37]  Although the court

2   did not rule on Mr. Middleton's motion, the fact that the district attorney himself

3   had argued that Dr. Morales was not qualified to *form an opinion* regarding raw data

4   from an MMPI evaluation demonstrates that he did not seek to introduce this

5   evidence at Ms. Alfaro's second penalty trial to test Dr. Morales' opinion.  Rather,

6   his extensive questioning of Dr. Morales concerning the data was a calculated attempt

7   to get prejudicial hearsay before the jury.  The forced and aggressive manner in which

8   Mr. Middleton introduced the inflammatory information is exemplified below:

9   Mr. Middleton:  Let's go get back to the evaluation then.  Did you later
    on before coming to court today receive a legible copy of the MMPI
10  with the notes legible on it?[38]

11  Dr. Morales:  They were a little clearer.

12  Mr. Middleton:  The one I sent to you.

13  Dr. Morales:  Yes.

14  Mr. Monroe:  Objection, Your Honor, it's irrelevant and also argumentative.

15  The Court: The objection is overruled.

16  Mr. Middleton:  And could you read the notes?  *Let me ask you this,
    Doctor.  What does 'probable fake bad' mean?*
17
    Mr. Monroe:  Objection, Your Honor, irrelevant.   Objection.  It's 352 of
18  the Evidence Code.  It's beyond the scope.  It has nothing to do with the
    doctor's evaluation.  As a matter of fact, I believe the district attorney is
19  acting in bad faith in bring [sic] that up right now before the jury.

20  The Court:  The objection is overruled.

21  Dr. Morales:  Since I'm not a licensed clinical psychologist, I do not
    know what those terms mean.
22
    Mr. Middleton: Twenty-one years in the psychiatric area and you don't
23  know what probable fake bad means?

24  Dr. Morales: Yes, sir.

25

26      [37] In fact, it is psychologists, not psychiatrists, who are trained and therefore
    qualified to interpret tests such as the MMPI.  *See* RT 4267.
27
28      [38] At the first penalty trial, Dr. Morales testified that his copy of the MMPI was
    illegible.  Prior to the second trial, Mr. Middleton sent Dr. Morales a more legible set.

362

1    Mr. Monroe: Objection.  Argumentative, Your Honor.

2    The Court: The objection is overruled.

3    * * *

4    Mr. Middleton: In all of your 21 years of psychiatric background, you
     have never heard the term probable fake bad?
5
     Mr. Monroe: Objection, Your Honor, it's beyond the scope and 352 of
6    the Evidence Code.

7    The Court: The objection is overruled.

8    Dr. Morales: Sir, to me that sounds like a technical term.  But the MMPI
     evaluations at my institution --
9
     Mr. Middleton: Excuse me.
10
     Dr. Morales:  --They go into the interpretations --
11
     Mr. Middleton: Objection.  Nonresponsive.
12
     The Court: The objection will be sustained.  The answer is stricken.
13
     Mr. Middleton: My question, and I haven't gotten an answer yet, I don't
14   believe, in all of your 21 years of psychiatrict [sic] work you have never
     heard the term probable fake bad.
15
     Dr. Morales: No, sir.
16
     * * *
17
     Mr. Middleton: Now did you call Dr. Martha Rogers to inquire about the
18   MMPI . . . as I put in my letter to you?

19   * * *

20   Mr. Monroe: Objection.  It's irrelevant.  He was not in the employ, to use
     the district attorney's expression, of the prosecution.
21
     The Court: Objection overruled.
22
     Mr. Middleton: As an expert witness --
23
     The Court: I think -- well, he hasn't answered the question.
24
     Mr. Middleton: I'm sorry. . . .  Why didn't you call Dr. Martha Rogers
25   the source of the MMPI that I'm talking about?

26   Dr. Morales: I discussed your letter to me with the counsel.

27   Mr. Middleton: And after that discussion you didn't call her, did you?

28   Dr. Morales: No sir.

                                    363

1
2
Mr. Middleton: As a professional and an expert witness wouldn't you want to have everything at your disposal to come up to a reasonable diagnosis in a given case like this?

3
4
Mr. Monroe: Assumes a fact not in evidence that he didn't have all of the things that he needed at his disposal.

The Court: Well, the objection is overruled.

5
6
Dr. Morales: Absolutely.

RT 3987-91.

7
8
### 2.   Dr. Edwards

9
12.   A similar pattern emerged during the testimony of Dr. Edwards.

10
Anticipating that Dr. Edwards had not relied on the raw MMPI data and rough

11
notes, Mr. Middleton asked Dr. Edwards not what she had relied upon but "what

12
psychological tests [she had] at [her] *disposal*" before talking to Ms. Alfaro.

13
RT 4118 (emphasis added).  Defense counsel objected, but the trial judge overruled

14
the objection.  *Id.*  Dr. Edwards then responded, referring to the psychological tests,

15
"As I said before, there were considerable amount of papers and I went through them

16
to find out what they entail and I found out that there were no results of the test, that

17
everything were raw data."  RT 4118.  Mr. Middleton, unwilling to accept that

18
Dr. Edwards had not considered the material, proceeded to produce it and wave it in

19
front of the jury:

20
Mr. Middleton:  So you never read -- you didn't read through those documents that you had from Martha Rogers?

21
Dr. Edwards:  I read only enough to realize that they were raw data . . . .

22
23
Mr. Middleton:  Let me ask you.  Is this what you got a copy of, the psychological social history?

24
Mr. Monroe: Your Honor, I object.  Totally irrelevant.

25
Mr. Middleton:  I don't know because they --

26
Mr. Monroe:  Objection, Your Honor, it's irrelevant.  If the doctor did not use it or rely on it, it has no bearing in the case.

27
28
The Court:  Well, I think he is just showing it to her to ask her if that's part of the document she saw.  The objection is overruled.

364

CT 4119.

13.  Dr. Edwards was quite clear that she did not consider the raw data and rough notes when evaluating Ms. Alfaro's psychological condition.  But despite her testimony, and defense counsel's repeated objections, the trial judge let cross-examination continue unbounded.  Again and again the district attorney repeated the term "probable fake bad," ignoring the fact that this preliminary notation was neither considered nor rejected by Dr. Edwards, who also opined that the test should be redone.  Relentlessly, the district attorney waved this prejudicial concept in front of the jury, like a bull fighter would a red cape:

> Mr. Middleton:  So raw data you don't understand on the MMPI?
>
> Dr. Edwards:  I don't rely on anybody else from raw data whether it is MMPI or blood work or whatever.
>
> Mr. Middleton:  *What does the term "probable fake bad" mean to you?*
>
> Mr. Monroe:  Objection, irrelevant, your honor.
>
> The Court:  The objection is overruled.
>
> Dr. Edwards:  Fake bad is one of the concepts related with MMPI which have to do with face validity.  One of them is fake bad. . . . So fake bad would mean that she has answered a certain number of things in a way that in a tester's opinion would tend to present her in the worst light, whether it's worse in the sense of disease, whether it is worse in the moral sense, whatever.
>
> Mr. Middleton:  *Malingering can be lying, can't it?*
>
> Dr. Edwards:  Lying is involved in malingering.
>
> Mr. Middleton:  Okay. . . .

RT 4124 (emphasis added).

### 3.   Dr. Rogers

14.  After the defense rested, and over the objection of the defense, the district attorney called Dr. Martha Rogers as a rebuttal witness.  The entirety of her testimony follows:

> Mr. Middleton:  Good morning.
>
> Dr. Rogers:  Good morning.

365

1    Mr. Middleton:  What are you a doctor in?

2    Dr. Rogers:  Clinical and forensic psychology.

3    Mr. Middleton:  Okay.  So you are not a medical doctor, right?

4    Dr. Rogers:  No.

5    Mr. Middleton:  And what does a psychologist do?  In the way --
     I don't want the whole explanation, but as far as in relationship
6    with a psychiatrist in testing, what does a psychologist do?

7    Dr. Rogers:  Generally speaking, psychiatrists aren't trained to do
     psychological testing, either to administer, score, or interpret the results.
8    The generally have not had a background in tests and measurement,
     measurement theory, and those things that are needed.
9
          Psychologists, at least clinical psychologists, have usually had
10   a substantial amount of course work and training in the area of testing.

11   Mr. Middleton:  So do psychiatrists generally look to psychologists to
     administer testing, and then they read results?
12
     Dr. Rogers:  That happens, yes.
13
     RT 4266-67.  The above would appear to support, not impeach, the defense experts'
14
     testimony.  If there is impeachment, it should appear below.
15
16   Mr. Middleton: Okay.   Now, in this case -- well, you -- you're in a --
     you work with another individual, don't you, as a partnership or
17   something?

18   Dr. Rogers:  It's not a partnership, no.

19   Mr. Middleton:  Oh, okay.  Now, in this case, did you administer an
     MMPI to Miss Alfaro?

20   Dr. Rogers:  My assistant did.

21   Mr. Middleton:  How long ago was that?

22   Dr. Rogers:  This was October, 1990.

23   Mr. Middleton:  Okay.  And what you do is look at the scores and make
     notes on the MMPI?  Is that what you did in this case.
24
     Dr. Rogers:  Well, that's part of the process, yes.
25
     Mr. Middleton:  Okay.  All right.  And did you make some notes on this
26   case regarding the -- the Wiener-Harmon  subtle/obvious subscales?

27   Dr. Rogers:  Among other things, yes.

28

366

1   Mr. Middleton:  Okay.  Did you make a note at the bottom of page five
2   saying "probable fake bad?"

    Dr. Rogers:  Yes.

3   RT 4267.  Notably, neither defense expert had denied that this note was present.

4   It was the fact that it was not relied upon by the defense experts and was more

5   prejudicial than probative that led the defense to object.  But the District Attorney

6   pressed on.  Out of left field, in as substantive evidence, he asked:

7   Mr. Middleton:  What does "probable fake bad" mean?

8   Dr. Rogers:  This is a term that we use that may mean one of several
9   things.  What it always means is that probably the person has over
    responded in some way.  There may have been some exaggeration or
10  overstatement of whatever this person's current psychiatric condition is.

11  Mr. Middleton:  Is it one thing you look at in a -- is it one thing, among
    several things, you look at in say, malingering?  When you're looking at
12  the case of malingering?

13  Dr. Rogers:  It would be one thing you would consider.

14  Mr. Middleton:  Okay.  What is the MMPI, anyway?

15  Dr. Rogers:  The MMPI is a 567 item true-false type instrument for
    measuring personality functioning.  It's used with psychiatric patients.
16  Some of you may have taken it for job screening, for security type jobs.
    But it's basically used to measure overall personality functioning.
17
    Mr. Middleton:  Thank you.  No further questions.
18
    The Court:  You may examine.
19
    Mr. Monroe: I have no questions.
20
    RT 4268.
21
    **4.   The District Attorney's Closing Argument**
22
23  15.  As was to be expected, in his closing argument, Mr. Middleton argued that

24  Dr. Rogers' preliminary test data and the handwritten notes were substantive

25  evidence that could be considered for the truth of the matters asserted therein.  He

26  relied on this evidence *heavily*:

27  Mr. Middleton:  And then malingering.  Now, remember we got into
    malingering.  *I mean did we get into it.*  Malingering, by itself, is no big
28  deal.  But what have we got in this case?  All of a sudden we find out

                                367

1    that we have got some report out here that says there may be some
2    malingering, probable fake bad.

3    RT 4339 (emphasis added).  Throughout the remainder of his closing argument,

4    he referred to the raw data and the notes repeatedly as substantive evidence the jury

5    should take into consideration in determining whether Maria del Rosio Alfaro should

6    live or die.  RT 4339-40, 4342, 4345.  He argued:

7        [Dr. Morales] was asked as a professional, as an expert witness,
         "wouldn't you want to have everything at your disposal to come up
8        with a reasonable diagnosis in a given case like this?"  His answer:
         "Absolutely."  Think about the MMPI. . . .  He's working on an
9        assumption.  But the MMPI, he runs up to a block wall.  He asks for more
         stuff, he doesn't get it.  He has never clarified.  So this probable fake bad
10       that stands to maybe explain some things that he has in a different light,
         he doesn't have.  He'd sure like to have everything.

11

12   RT 4342.

13       Rogers, Dr. Rogers.  She came in and said, yes, there was an MMPI, yes,
         I did put down probable fake bad.  And she talked about that.  So you
14       heard that.  And so it kind of did the full circle.  You heard that there was
         an MMPI, you heard that the defense experts did not want to consider it.
15

16   RT 4357.

17       Who operates the defense?  It's at the operation of Ms. Alfaro.  She's the
         defendant.  She chooses to fabricate, fake, embellish and create.

18   RT 4366.

19       Remorse, Ladies and Gentlemen? . . . .

20   RT 4367.

21   C.   **LEGAL ANALYSIS**

22       The introduction of evidence that "is so extremely unfair that its admission

23   violates fundamental conceptions of justice" violates due process.  *Dowling v. United*

24   *States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); *Alberni v.*

25   *McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006).  Moreover, the combined effect

26   of violations of state law evidentiary rules may violate due process.  *Lewis v. Jeffers*,

27   497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990); *Pulley v. Harris*,

28   465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984).  As set forth below, the trial

1  courts evidentiary rules, either individually or collectively, violated Ms. Alfaro's due
2  process rights.

3      **1.      The Trial Court Erred In Permitting Extensive Cross-Examination**
4              **Of Drs. Morales and Edwards Based On Raw Data And**
5              **Rough Notes They Were Not Qualified To Interpret And**
6              **Had Not Relied Upon**

7      16.  Section 721, subdivision (a), of the Evidence Code provides:  "Subject
8  to subdivision (b), a witness testifying as an expert may be cross-examined to the
9  same extent as any other witness and, in addition, may be fully cross-examined as
10 to (1) his qualifications, (2) the subject to which his expert testimony relates, and
11 (3) the matter upon which his opinion is based and the reasons for his opinion."
12 Cal. Evid. Code § 721(a).  The expert invites investigation into the extent of his
13 knowledge, the reasons for his opinion including facts and other matters upon which
14 it is based, and which he took into consideration; and he may be subjected to the most
15 rigid cross-examination concerning his qualifications, and his opinion and its sources.

16     17.  The encouragement of cross-examination of experts is based on the
17 principle that probing into the reasons of an expert witness for his opinions is usually
18 the only recourse of the cross-examiner.  It may be as important to learn what facts
19 the witness disregarded as unimportant in the formation of his opinion, as to ascertain
20 what facts he believed and relied upon as the foundation of his opinion.  While it is
21 important for a cross-examiner to question an expert witness about facts he regarded
22 as important as well as those he disregarded in forming his opinion, the questioning
23 must involve facts that have been considered by the expert and, more importantly,
24 that the expert has the capability to consider.

25     18.  The raw MMPI data from Dr. Rogers should have been excluded by the
26 trial judge, as the record was in *Reyes*.  The raw data and rough notes could not be
27 interpreted by and had not been relied upon by Dr. Morales and Dr. Edwards.  These
28 two experts did not disregard the information they were given by Dr. Rogers, as to

disregard it would require Dr. Morales and Dr. Edwards to have understood the data and rejected it in the formation of their evaluations of appellant.  Instead, they set it aside because it was meaningless and unreliable to them.

19.  Even when the expert has relied on data, under California law, a trial court has discretion to "weigh the probative value of the inadmissible evidence relied upon by an expert witness as a partial basis for his opinion against the risk that the jury might improperly consider it as independent proof of the facts recited therein." *People v. Coleman*, 38 Cal. 3d 69, 91, 695 P.2d 189 (1985) (citing *People v. Chapman*, 261 Cal. App.2d 149, 178-179, 67 Cal. Rptr. 601 (1968)).  Although wide latitude has been given in cross-examination of experts in order to test their credibility, the trial court must exercise its discretion pursuant to Evidence Code § 352 so as to limit the evidence to its proper uses.[39]  *Coleman,* 38 Cal. 3d at 92.  The proper use of inadmissible evidence in cross-examination of an expert is as a factor to test the testifying expert's credibility and to assist the jury in determining what weight to give the testifying expert's opinion.  The improper use of inadmissible evidence is for the truth of the matter asserted.

20.  Here, the raw MMPI data and notes were clearly inadmissible hearsay. California Evidence Code §1200, subdivision (a) states that "'hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." Cal. Evid. Code §1200(a).  Opinions by outside experts that are referenced in court by testifying experts have long been recognized as such.  *See Mosesian v. Pennwalt Corporation*, 191 Cal. App. 3d 851, 860, 236 Cal. Rptr. 778 (1987) ("The opinions of the six outside experts were *unquestionably* hearsay opinions.").  The first prong of the hearsay definition, a statement made other than by a witness while testifying at the

---

[39]   Evidence Code § 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

hearing, is clearly met, as Dr. Rogers was not testifying at the time her MMPI preliminary results were referred to. The crucial inquiry, therefore, is whether the evidence is offered for the truth of the matter asserted. If it is, it is hearsay. *See People v. Harvey*, 233 Cal. App. 3d 1206, 1220, 258 Cal. Rptr. 158 (1991). No nonhearsay purpose existed for the introduction of Dr. Rogers' preliminary test scores and notations in this case. The hearsay evidence was clearly presented as substantive evidence, and particularly in the absence of a proper limiting instruction, the jury took it as such.

21. In Petitioner's case, the trial court abused its discretion by permitting the district attorney to cross-examine Dr. Morales and Dr. Edwards concerning the highly prejudicial hearsay contents of the notes contained on the raw MMPI data. Because Dr. Morales and Dr. Edwards testified under oath that they had not used Dr. Rogers' data or the notes in any way in the preparation of their evaluation of Ms. Alfaro, the extensive questioning of these two experts concerning these materials had no probative value for the appropriate purpose of exploring the basis of the defense their opinions.

22. Not only did the trial court admit the evidence, he failed to offer the jury any guidance concerning the permissible and impermissible uses for the testimony. Despite numerous objections by defense counsel, the only admonishment given during the prosecution's cross-examination was the following, delivered during the cross-examination of Dr. Edwards:

Mr. Middleton: Okay. And do you see about three pages after that some written-- handwriting on a piece of paper.

Mr. Monroe: Objection, calls for--

Dr. Edwards: There were lots of things --

Mr. Monroe: Objection as hearsay, your honor.

The Court: Objection is overruled. *It's all part of the same information that the person gets, the same admonishment that I gave you earlier. You can't consider it for the truth.*

371

1 RT 4120-21 (emphasis added).  Clearly, this instruction was not enough to rectify the

2 damage done by the prosecution's forcefully repeated references to Dr. Rogers' test

3 data and the rough notes.

4      23.  Worse still, the court's final instructions at the end of the penalty phase

5 served only to reinforce the jury's misconception that they could consider the

6 references to "probable fake bad" as substantive evidence of Dr. Roger's actual

7 opinion.  Although the court admonished the jury that they could not consider

8 *Ms. Alfaro's* statements made to a third party "in the course of an examination"

9 for their truth, the court failed to further admonish the jury that they also could not

10 consider that *third party's handwritten notes* for their truth.  RT 4414-15.

11      24.  The prejudicial impact on the jury of the hearsay evidence and

12 prosecution's repetitive questions concerning Dr. Rogers' MMPI data can be inferred

13 from the impact a similar cross-examination of Dr. Morales had on the first jury.

14 RT 2056-64.  During its deliberations, the jury asked for a definition of the word

15 "malingering."  RT 2056.  The jury obviously considered malingering, one of several

16 possible explanations for "probable fake bad," to define Ms. Alfaro's psychological

17 state.  Based on this unreliable evidence, she was denied the mitigating circumstance

18 of remorse.

19      25.  If the repetitive questioning about "probable fake bad" had a prejudicial

20 impact in the first penalty phase, it could only have had a more devastating impact

21 in the second penalty phase where Dr. Edwards also testified and was also questioned

22 extensively concerning Dr. Roger's MMPI results and the handwritten notes.  The

23 jury heard more than twice the amount of inadmissible and highly prejudicial hearsay

24 evidence than in the first penalty phase.  The second jury also received less guidance

25 from the trial judge in the second penalty phase than did the first jury.  In the first

26 penalty trial, the trial judge eventually ordered the prosecution to move on from the

27 MMPI.  RT 1865.  In the second penalty trial, the judge gave the District Attorney

28 free rein.  If the first jury was confused regarding how to use the expert testimony, the

second jury could only have been more confused.  Because the prejudicial impact was so clearly foreseeable in the second trial, the judge abused his discretion in permitting the prosecution to ask questions about the unreliable MMPI data which had minimal probative value and could only confuse and mislead the jury.

26.  The improper cross-examination, the introduction of unreliable, highly prejudicial hearsay, the trial judge's lack of guidance, and the prosecution's reliance on this bogus evidence in closing argument lead to the inescapable conclusion that the jury was misled and confused regarding the proper and limited use of hearsay evidence on cross-examination of an expert and therefore used it incorrectly in arriving at the death sentence for appellant.

## 2.     The Trial Court Erred In Allowing The District Attorney To Call Dr. Rogers As A Rebuttal Witness

27.  In a hearing on defense counsel's motion to quash the subpoena for Dr. Rogers, the prosecution argued that Dr. Rogers would be an appropriate rebuttal witness in the event that they explored the area of malingering.  RT 2202.  However, for Dr. Rogers to properly rebut defense experts' testimony regarding malingering, she would have had to rebut a fact underlying the defense experts' rejection of malingering as a diagnosis of Ms. Alfaro.  Proper rebuttal of a foundational fact by Dr. Rogers was simply not possible because there was no disagreement between the experts regarding the facts of Ms. Alfaro's psychological profile.  Drs. Morales and Edwards did not disagree with Dr. Rogers or reject her opinion.  They simply disregarded her raw data and rough notes as they were unqualified to interpret them.

28.  Dr. Rogers ended up testifying to the formation of her own opinion regarding Ms. Alfaro's psychological condition in light of the MMPI data.  She did not and could not have testified that Dr. Morales and Dr. Edwards disregarded, misunderstood, or simply did not know of an underlying fact about Ms. Alfaro's psychological condition.  This testimony was improper rebuttal, as Dr. Rogers was only offering a contrary opinion for the jury.

373

29.  A party may impeach an expert witness by contradiction, "i.e., by showing the falsity of the matter upon which the expert based his opinion.  This can be done either by cross-examination of the expert or by calling other witnesses to offer evidence showing the nonexistence or error in the data upon which the first expert based his opinion."  *Kennemur v. State of California*, 133 Cal. App. 3d 907, 922-23, 184 Cal. Rptr. 393 (1982).  The rationale for permitting impeachment of an expert regarding the basis of his or her opinion is that, if the facts relied upon are demonstrated to be false, the testimony in its entirety is called into question.  Therefore, the rules of impeachment treat foundational facts differently than the opinion itself;  "[i]f the expert's opinion is contradicted by the opinion of another expert, it merely suggests the first expert may have reasoned incorrectly;  it does not suggest his untruthfulness as a witness.  On the other hand, where the facts underlying the expert's opinion are proved to be false or nonexistent, not only is the expert's opinion destroyed but the falsity permeates his entire testimony;  it tends to prove his untruthfulness as a witness."  *Id*.

30.  The crucial inquiry in addressing whether or not an expert witness was properly called on rebuttal is whether or not she would be testifying to an underlying fact or just to a contradictory opinion.  The court in *Kennemur* recognized the difficulty in distinguishing between fact and opinion but emphasized that the distinction must be drawn by the trial courts.  *Kennemur*, 133 Cal. App. 3d at 924.  When drawing these distinctions, "the general rule that wide latitude is to be given to a party impeaching an expert witness must be abrogated insofar as it applies to impeachment. . . .  In many cases, the ultimate opinion of the expert is based on a series of underlying opinions.  Thus, rather than broadly construing what a foundational 'fact' is, *the term should be strictly construed by the trial court to prevent a party from offering a contrary opinion of his expert under the guise of impeachment*."  *Id.* (emphasis added).

374

31.  Here, the trial judge erred by failing to strictly construe the distinction between opinion and foundational fact when he permitted Dr. Rogers to testify as a rebuttal witness.  He erred by viewing Dr. Rogers' testimony as rebuttal of the facts underlying the opinions of the two defense experts, Dr. Edwards and Dr. Morales, when they had had no such "facts" before them.  The exchange between Dr. Rogers and the prosecution concerning the preliminary notation "probable fake bad" demonstrates how her testimony merely offered another underlying opinion for the jury to compare and contrast to that of the defense experts.  Dr. Rogers' testimony clearly illustrates that the prosecution's purpose in calling her was to improperly present tentative conclusions to the jury as substantive evidence, not to rebut.

32.  As the court in *Kennemur* stated, the division between underlying opinions and foundational facts must be strictly construed to prevent exactly the behavior exhibited by the district attorney here:  offering a contrary opinion of his expert under the guise of impeachment.  The district attorney basically conceded his improper motivation during the hearing on the motion to quash the subpoena of Dr. Rogers, by stating that he "just ha[s] her under subpoena because [he] anticipates if they have a doctor on the stand there may become a need for Dr. Rogers to authenticate the MMPI-II *or in some way rebut what has been said on the stand*."  RT 2205 (emphasis added).

33.  The trial judge did not follow the advice of the court in *Kennemur*, and strictly construe the nature of a foundational fact.  Instead, he demonstrated a flare for expanding the scope of admissibility of unreliable data, as evidenced by his remark during the hearing on defense counsel's motion to quash the subpoena: "[I]f it's customary and it's the customary practice in the particular field of endeavor to administer psychiatric reports and to rely in part or in whole on their results, [it] would seem to be kind of an anomalous event for an expert to say well, yeah, I'm aware of that report and I didn't put any credence in it.  And then have the other side be bound by it without being able to probe [and] go through the whole host of

1  scenarios, especially if it's a report that, if it was relied upon, would appear to change

2  the person's opinion."  CT 2209-10.[40]

3      34.  This reasoning constituted a clear misunderstanding of the issues presented

4  by a rebuttal witness.  In particular, it misstates the customary practice in the fields of

5  both Dr. Morales and Dr. Edwards, as the trial judge knew from the first penalty trial.

6  It was not the customary practice in Dr. Morales' field to use MMPI data that had not

7  been put into a final report by a psychologist.  RT 1863-65.  Notably, the trial judge's

8  description of probing the reasoning of an expert is an accurate statement of the

9  proper scope of *cross-examination* of an expert witness, not the proper scope of

10 impeachment through a rebuttal witness.  As stated by the *Kennemur* Court, the legal

11 standards for impeachment through these two different mechanisms must be

12 construed differently:  "the general rule that wide latitude is to be given to a party

13 impeaching an expert witness must be abrogated insofar as it applies to impeachment

14 under Evidence Code § 780, subdivision (i)." *Kennemur*, 133 Cal. App. 3d at 924.

15     35.  The trial judge here plainly did not appreciate the difference.  "Opening

16 the door" is simply not the standard by which expert rebuttal testimony is measured.

17 When it concerns an expert, the trial judge is expected to ask whether the subject

18 matter of rebuttal testimony is a foundational fact or an underlying opinion.  Here, the

19 trial judge simply did not engage in that inquiry, and as a result, allowed in improper

20 rebuttal testimony.

---

[40]  This flare is also evidenced by the following hypothetical he posed to defense counsel during the hearing on the defense motion to quash the prosecution's subpoena of Dr. Rogers:

Let [sic] assume Dr. Edwards testifies and she testifies that she was provided certain psychiatric test data and that she reviewed and considered it.  And let's assume that the MMPI-II that Martha Rogers allegedly administered was one of those tests.  Would not the calling of Dr. Edwards, who has seen that test, in effect open the door to the prosecution establishing what the test was?

CT 2207-08.

376

D.    **CONCLUSION**

36.   The district attorney knew, based on the videotape of Ms. Alfaro's confession, that a jury might give substantial weight to her remorse; it was a mitigating circumstance he clearly felt he had to defeat to get the death penalty.  His strategy led him to poison the proceedings with unreliable, inflammatory hearsay in the form of a non-testifying expert's raw data and rough notes. The District Attorney managed to take this hearsay evidence that both testifying defense experts averred they were unqualified to interpret and had not considered in rendering their opinions -- and parlay it into substantive evidence that Ms. Alfaro was "malingering;" that she was overstating her feelings of sorrow and remorse in order to deceive the jury into believing that she felt remorse for her crimes.  The trial judge erred in allowing the district attorney to continue questioning the defense experts about the raw data and rough notes after they testified that they had not relied on them.  He erred in allowing the district attorney to call the testing psychologist as a rebuttal witness.  He erred in allowing this unreliable, inflammatory hearsay to assume the role that it did in this case.  His denial of the defense objections to this improper evidence was highly prejudicial to Ms. Alfaro and mandates the reversal of her sentence.

37.   The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

38.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate

377

1   relief standing on their own, relief is required when this claim is considered together

2   with the additional constitutional errors outlined in the remainder of this Petition.

3   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

4   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

5   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

6   Cir. 1978).

7

8                                        **XXVIII.**

9       **CLAIM 23:  THE TRIAL COURT ERRED IN ADMITTING EVIDENCE**

10          **OVER DEFENSE COUNSEL'S OBJECTION CONCERNING**

11              **MS. ALFARO'S NON-FELONIOUS, NON-VIOLENT**

12          **CRIMINAL CONDUCT AND HER "INTENT TO KILL"**

13          Petitioner's conviction and sentence of death were rendered in violation

14   of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary,

15   and non-capricious determination of guilt and penalty, to the effective assistance

16   of counsel, to present a defense, and to due process of law as guaranteed by the Fifth,

17   Sixth, Eighth and Fourteenth Amendments to the United States Constitution because

18   the trial court failed to exclude unreliable, inflammatory evidence of Ms. Alfaro's

19   arrest record.

20          1.  Exhaustion of the claim:  This claim was fairly presented to the California

21   Supreme Court in the direct appeal.  It was presented as Claim 9 in the Opening Brief.

22          2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

23   *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

24   denial of this claim is both "contrary to" and an "unreasonable application" of clearly

25   established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim

26   *de novo*.  Moreover, because the state court's adjudication of this claim was

27   dependent on an antecedent unreasonable application of federal law, this Court "must

28

                                         378

1  then resolve the claim without the deference that AEDPA otherwise requires."

2  *Panetti*, 127 S. Ct. at 2858.

3      3.  If Respondent disputes any of the facts alleged below, Petitioner requests

4  an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

5  has been afforded discovery and the disclosure of material evidence by the State, the

6  use of this court's subpoena power, and the opportunity to investigate fully, counsel

7  requests an opportunity to supplement or amend this petition.

8      4.  The declarations and other exhibits accompanying this petition, as well as

9  the allegations and facts set forth elsewhere in this petition, are hereby incorporated

10  by reference into this claim as though set forth in full.

11      5.  In support of this claim, Petitioner alleges the following facts, among others

12  to be presented after full discovery, investigation, adequate funding, access to this

13  Court's subpoena power, and an evidentiary hearing.

14  **A.    <u>INTRODUCTION</u>**

15      6.  Until her arrest in connection with this case, Ms. Alfaro had no felony

16  record and no record of any criminal activity which involved the use or attempted use

17  of force or violence or the express or implied threat to use force or violence.  Indeed,

18  "[a]ccording to the records of the Federal Bureau of Investigation and the California

19  Department of Justice, [Ms. Alfaro] has no prior record of any type of criminal

20  activity."  *Id.* (Orange County Probation Department Report).  She had been arrested

21  on two occasions at age fourteen -- once for possession of less than an ounce of

22  marijuana and a hypodermic needle and syringe; once for petty theft of three men's

23  shirts from a Mervyn's Department Store -- and once at age sixteen for possession of

24  an open can of beer.  CT 1756-57.  But she had no prior convictions and no arrests for

25  conduct involving the use or attempted use of force or violence.  The absence of

26  felonious or violent past misconduct was potent, statutory, mitigating evidence.  But

27  during the penalty retrial, the trial judge permitted Mr. Middleton to unfairly deprive

28  Ms. Alfaro of the weight of these mitigating factors by eliciting evidence of her arrest

379

1  record, making it sound worse than it was.  The introduction of this inadmissible

2  evidence was highly prejudicial.  It deprived Ms. Alfaro of her Fifth, Sixth, Eighth

3  and Fourteenth Amendment rights and, as a result, her sentence must be reversed.

4  **B.**    **STATEMENT OF FACTS**

5      7.  Overruling repeated objections by defense counsel, the trial judge permitted

6  the district attorney to impress the jury with Ms. Alfaro's non-violent, non-felonious

7  juvenile criminal record in the second penalty phase trial.  During Mr. Middleton's

8  cross-examination of defense "psychosocial" expert Dr. Armando Morales, the

9  district attorney managed to elicit legally inadmissible evidence that Ms. Alfaro had

10  an arrest record; that she had been previously engaged in theft; that she drove while

11  drunk; and that she had been on probation.  The district attorney managed all this

12  through the clever ploy of having Dr. Morales apply the diagnostic criteria for "anti-

13  social personality disorder" to Ms. Alfaro; criterion which include "often initiates

14  physical fights" and "fire starting" -- things involving criminal behavior, which meant

15  that the expert was required to refer to Ms. Alfaro's criminal record in order to opine

16  whether her behavior so qualified.

17      8.  Although Dr. Morales had not testified on direct that he believed or did not

18  believe that Ms. Alfaro was suffering from "anti-social personality disorder," and the

19  defense objected to the questions for this reason, the court permitted Mr. Middleton

20  to proceed.  RT 3999.  Reading from his own copy of the DSM-III-R, Mr. Middleton

21  asked Dr. Morales to apply the standard diagnostic criteria for this disorder to Ms.

22  Alfaro.  RT 3994-4001.  When he reached the criterion "often initiating physical

23  fights," and the doctor stated that this did not apply to Ms. Alfaro, Mr. Middleton

24  prodded, "do you know for sure you have got that or not?"  RT 4001.  In order to

25  respond the doctor was required once again to describe the criminal records he had

26  reviewed; this time providing even more damaging evidence for Mr. Middleton to

27  work with:  "Based on the police reports, police records I have seen, she had an arrest

28  for I believe theft.  Other than the present offense."  RT 4001.  With this, Mr.

380

Middleton managed to show that Ms. Alfaro had a record for stealing, the very crime that had led her into the Wallace home.  But not yet satisfied, Mr. Middleton pried opened Pandora's box, responding:

> Is that all you looked for, *you just look at police reports of people caught doing something* before you determine if there was physical fights in somebody's background?

*Id*.  At this point defense counsel renewed his objection, but again, it was overruled. *Id*.  Mr. Middleton took this as a cue he could go a step further, and he did, asking: "Did you ask the family if she had any physical fights during that period of time?" *Id*.  Dr. Morales' response: "[Ms. Alfaro] had been in a couple of fights.  But when you are poor inner city and poor minority communities, at times one has to become involved in physical fights."  *Id*.  Again, Mr. Monroe's objection was overruled. RT 4002.  This caused Mr. Middleton to go further still, eliciting evidence that improperly (and completely incorrectly) suggested that Ms. Alfaro had something to do with *gangs*:

> Q: We're talking about Anaheim, Orange County, now.  Now is the Anaheim, Orange County, the epitome of inner city dwelling like you know it up in L.A.?
>
> A: There are little pockets of barrios where you have a certain amount of criminal activity, drug activity, and gang activity.  You have about eighteen gangs in this particular area.  And I'm sure some of these gangs are involved in conflict and fighting and so forth.  So what I'm saying is in certain areas fighting is not uncommon in some of the poor minority areas.

RT 4002.

9.  When Mr. Middleton got to the "anti-social personality disorder" criterion "fire-setting," he was able to reinforce his point, this time leading Dr. Morales to reference not just Ms. Alfaro's arrest record, but to suggest wholly incorrectly that she had a record of criminal convictions as well:  "I did not find that in any of the police reports . . . *or probation evaluations*."  RT 4004.

10.  Mr. Middleton also managed to get in inadmissible evidence of Ms. Alfaro's non-violent, non-felonious criminal conduct when he questioned

1    Dr. Morales about the criterion "Is reckless regarding his or her own or others'

2    personal safety, as indicated by driving while intoxicated, or recurrent speeding."

3    RT 4010.  When Dr. Morales testified that Ms. Alfaro did not meet this criterion,

4    Mr. Middleton responded, "No?  Did you see on that survey Dr. Rogers did where

5    she indicates that she often drove while intoxicated?"  *Id*.  Once again, the defense

6    attorney's objection to the admission of this question when the doctor had not relied

7    on the referenced report was overruled (RT 4011), and Mr. Middleton continued, this

8    time turning Ms. Alfaro's *lack* of a more extensive criminal record into an

9    aggravating circumstance.  When Dr. Morales attempted to justify his conclusion that

10   Ms. Alfaro did not fit the diagnostic criterion, testifying, "I did not come across any

11   history of traffic violations or citations or drunk driving offenses or things of that

12   nature," Mr. Middleton burst forth,  "But that's where the police catch her, right?"

13   RT 4010-11.  This comment was highly improper and grossly prejudicial, leading the

14   jury to consider all of the crimes Ms. Alfaro must have committed to get caught even

15   the few times she had.

16        11.  During his closing argument, Mr. Middleton told the jury that statutory

17   aggravating factors relating to prior felony convictions and prior violent conduct are

18   not applicable here.  But he said nothing about juvenile crimes and non-violent

19   conduct.  RT 4318.  He thus left the jury with the distinct impression--which the trial

20   court's instructions did nothing to dispel--that it was permissible to consider

21   Ms. Alfaro's past criminal conduct as an aggravating factor to be weighed in its

22   penalty determination.

23   **C.      THE COURT ERRED IN NOT EXCLUDING EVIDENCE OF MS.**

24   **ALFARO'S NON-FELONIOUS, NON-VIOLENT CRIMINAL RECORD**

25        12.  Penal Code § 190.3 provides that "[i]n determining the penalty, the trier

26   of fact *shall* take into account any of the following factors if relevant."  (Pen. Code,

27   §190.3.  Factors 190.3 (b) and (c) read as follows:

28

                                           382

1        (b)    The presence or absence of criminal activity by the defendant which
2    involved the use or attempted use of force or violence or the express or
     implied threat to use force or violence.

3        (c)    The presence or absence of any prior felony conviction.

4    *Id.* The well-settled principle in California is that evidence admitted in aggravation

5    in a death penalty case must be relevant to one of the factors set out in Penal Code

6    § 190.3. *See People v. Welch*, 85 Cal. Rptr. 2d 203, 241 (1999). The prosecution

7    may not introduce evidence of the defendant's alleged "bad character" in its case-in-

8    chief unless the evidence bears on one of the enumerated aggravating factors. *People*

9    *v. Ramirez*, 50 Cal. 3d 1158, 1192, 791 P.2d 965 (1990). Evidence of nonviolent

10   criminal activity that did not result in a felony conviction is inadmissible as an

11   aggravating factor. *See Ortiz v. Stewart*, 149 F. 3d 923, 941 (9th Cir. 1998) (a state

12   court's arbitrary and capricious application of state law constitutes an independent

13   due process or Eighth Amendment violation); *Lockett v. Ohio*, 438 U.S. 586, 604-05,

14   fn. 12 (1978) (requiring sentencer to consider all mitigating character evidence under

15   the Eighth and Fourteenth Amendments but noting that this does not limit the court's

16   authority to exclude as irrelevant evidence not bearing on character, prior record, or

17   circumstances of the offense). By failing to follow the provisions of the California

18   Penal Code, the trial court created an unreliable and arbitrary imposition of the death

19   penalty in violation of Ms. Alfaro's due process rights. *See Furman v. Georgia*,

20   408 U.S. 238 (1972); *see also Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909,

21   49 L. Ed. 2d 859 (1976).

22       13. The evidence the trial judge let in of Ms. Alfaro's non-violent, non-

23   felonious juvenile criminal conduct was clearly admitted in error. It raised the specter

24   that Ms. Alfaro had a history of bad conduct relevant to the jury's determination as to

25   whether she should live the rest of her life out in prison or be sentenced to die. Under

26   the law, this evidence was illegal. It was grossly inflammatory, particularly to the

27   extent that there was reference to theft, a crime involved in the instant prosecution,

28   and it was prejudicial. There is a likelihood that the jury assigned significant

1  aggravating weight to this inadmissible evidence of Ms. Alfaro's prior juvenile,

2  misdemeanor conduct.  The trial court's admission of this evidence constituted

3  reversible error.

4  **D.     CONCLUSION**

5       14.  The trial judge violated Ms. Alfaro's Fifth, Sixth, Eighth and Fourteenth

6  Amendment rights by allowing the District Attorney to elicit -- repeatedly --

7  references to Ms. Alfaro's non-violent, non-felonious juvenile conduct during the

8  second penalty trial.  This evidence was highly inflammatory and wholly improper.

9  Ms. Alfaro's sentence must be reversed as a result of the trial court's error.

10       15.  The foregoing violations of Ms. Alfaro's constitutional rights

11  constitute structural error and warrants the granting of this Petition without any

12  determination of whether the violations substantially affected or influenced the jury's

13  verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

14  doctrine applies to this claim, the foregoing constitutional violations so infected the

15  integrity of the proceedings that the error cannot be deemed harmless. The foregoing

16  violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

17  Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

18  resulting in a miscarriage of justice.

19       16.  The constitutional violations set forth in this claim alone mandate relief

20  from the convictions and sentence.  However, even if these violations do not mandate

21  relief standing on their own, relief is required when this claim is considered together

22  with the additional constitutional errors outlined in the remainder of this Petition.

23  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

24  sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

25  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

26  Cir. 1978).

27

28

1

**XXIX.**

2   **CLAIM 24:  THE TRIAL COURT'S DETERMINATION THAT THE**

3   **AGGRAVATING CIRCUMSTANCE OUTWEIGHED THE MITIGATING**

4   **CIRCUMSTANCES VIOLATED PETITIONER'S**

5   **CONSTITUTIONAL RIGHTS**

6         Petitioner's sentence of death was rendered in violation of her rights to a fair

7   trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

8   determination of guilt and penalty, to the effective assistance of counsel, to present

9   a defense, and to due process of law and equal protection as guaranteed by the Fifth,

10  Sixth, Eighth and Fourteenth Amendments to the United States Constitution because

11  the trial court's determination that the aggravating circumstance outweighed the

12  mitigating circumstances was contrary to  law and the evidence presented.  As

13  a result, habeas relief is warranted.

14         1. Exhaustion of the claim:  This claim was fairly presented to the California

15  Supreme Court in the direct appeal.  It was presented as Claim 13 in the Opening

16  Brief.

17         2. AEDPA:  The California Supreme Court denied this claim.  *People v.*

18  *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

19  denial of this claim is both "contrary to" and an "unreasonable application" of clearly

20  established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim

21  *de novo*.  Moreover, because the state court's adjudication of this claim was

22  dependent on an antecedent unreasonable application of federal law, this Court "must

23  then resolve the claim without the deference that AEDPA otherwise requires."

24  *Panetti v. Quarterman*, 127 S. Ct. at 2858.

25         3. If Respondent disputes any of the facts alleged below, Petitioner requests

26  an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

27  has been afforded discovery and the disclosure of material evidence by the State,

28

385

1   the use of this court's subpoena power, and the opportunity to investigate fully,

2   counsel requests an opportunity to supplement or amend this petition.

3       4.  The declarations and other exhibits filed with this petition, as well as the

4   allegations and facts set forth elsewhere in this petition, are hereby incorporated by

5   reference into this claim as though set forth in full.

6       5.  In support of this claim, Petitioner alleges the following facts, among others

7   to be presented after full discovery, investigation, adequate funding, access to this

8   Court's subpoena power, and an evidentiary hearing.

9   **A.   <u>INTRODUCTION</u>**

10      6.  The trial court's statement of its reasons for denying Ms. Alfaro's motion

11  for modification of the death verdict pursuant to Penal Code § 190.4(e) reflects

12  a profound misunderstanding of the law regarding the application of the mitigating

13  and aggravating factors set forth in Penal Code § 190.3.  Section 190.3 provides that

14  "[i]n determining the penalty, the trier of fact *shall* take into account any of the

15  following factors if relevant."  Pen. Code § 190.3 (emphasis added).  Yet the court

16  failed to give weight to at least three statutory mitigating factors that were clearly

17  present -- no prior record of criminal activity involving the use or attempted use

18  of force or violence (§ 190.3(b)), no prior felony convictions (§190.3(c)), and youth

19  (§ 190.3(i)) -- and deemed at least one other -- intoxication which impaired

20  Ms. Alfaro's ability to conform her conduct to the requirements of the law

21  (§ 190.3(h)) -- not to be present based on an improperly narrow reading of the

22  mitigating factor.  In addition, though never stating that it disbelieved Ms. Alfaro's

23  testimony, the court completely disregarded her reports of the threats made to her and

24  her child if she did not commit the crime (*see* § 190.3(g)), confusing the mitigating

25  circumstance of substantial domination with her *attorney's* unsupported argument

26  that someone else killed Autumn Wallace.  Finally, the court improperly counted

27  evidence introduced by the defense pursuant to § 190.3(k) as non-statutory

28  aggravating evidence that weighed against Ms. Alfaro.  The court's reasoning in

doing so took personal responsibility to new extremes by contending that a mentally

deficient child who had been raped and beaten by her father and turned to drugs

as self medication to dull the pain when twelve years old had "chosen" her path and

thus should be treated contemptuously, rather than afforded any sympathy. Because

the court rested its decision not to modify Ms. Alfaro's death sentence on

impermissible considerations, habeas relief is warranted.

7. By failing to follow the provisions of the California Penal Code, the trial

court created an unreliable and arbitrary imposition of the death penalty in violation

of Ms. Alfaro's due process rights. *See Furman v. Georgia*, 408 U.S. 238 (1972);

*see also Gregg v. Georgia*, 428 U.S. 153 (1976).

**B.      DESCRIPTION OF THE TRIAL COURT'S RULING**

8. On July 14, 1992, the trial court considered and denied Ms. Alfaro's

automatic application for modification of the verdict imposing the death penalty

pursuant to Penal Code § 190.4(e). RT 4484-4509. The court expressed its

understanding that it had a duty to determine whether the jury's verdict that the

aggravating circumstances substantially outweighed the mitigating circumstances

was contrary to the law and the evidence, and to state the reasons on the record for its

finding. RT 4499. The court then proceeded to address each of the factors listed

in Penal Code § 190.3.

9. The court initially skipped the factor set forth in § 190.3(a) -- the

circumstances of the crime -- beginning with a discussion of § 190.3(b), the presence

or absence of any criminal activity by a defendant involving the use or attempted use

of force or violence. RT 4500. Stated the court:

> 190.3(b), the presence or absence of any criminal activity by a defendant involving the attempted use of force or violence. *That factor is not present in our case.* And we even instructed the jury on that. There were some minor things that we talked about, some shoplifting, auto thefts, things of that nature, none of which involved any violence at all. *So that's simply not a factor that is present in the case. There is no evidence on that at all.*

387

RT 4500 (emphasis added).  While the court was correct that there was no evidence to support § 190.3(b) as a factor in aggravation, it erred in determining that it was "simply not a factor that is present in this case."  Where there is no evidence that the defendant has previously engaged in criminal activity involving the attempted use of force or violence, *the defendant is entitled to have this fact weighed in mitigation.*

10.  The court engaged in the same improper analysis with regard to the factor set forth in § 190.3(c), the presence or absence of any prior felony conviction.  Stated the court:

> Number (c), the presence or absence of any prior felony conviction.  There is no evidence of any prior felony conviction.

RT 4500.  Again, the court correctly noted that the factor should not be weighed in aggravation, but as confirmed by the court's concluding remarks, set forth below, the court erred in failing to consider Ms. Alfaro's lack of a felony record as mitigating evidence.

11.  Turning next to § 190.3(d), whether the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, the court acknowledged that there was some evidence of this, but concluded without explanation that "the evidence is insubstantial to justify a finding that that factor is present."  RT 4500.  The substantial evidence supporting this factor, which establishes that the court was wrong to disregard it, is discussed in connection with §§ 190.3(g) and (h), below.

12.  When it reached the factor set forth in § 190.3(g), "[w]hether or not defendant acted under extreme duress or under the substantial domination of another person," the court misquoted the law.  The Court then conflated Mr. Monroe's theory that the unidentified Hispanic man and not Ms. Alfaro killed Autumn Wallace with Ms. Alfaro's testimony that she was responsible for killing Autumn, but that the man had pressured her to do so by threatening both her and her child.  The former would have been a defense had there been any evidence to support it.  The latter should have

qualified as a mitigating circumstance.  But instead of either accepting or rejecting

Ms. Alfaro's testimony that she had been under the substantial domination of another

person at the time of the crime, the trial judge explained his conclusion that this

mitigating factor was not present as follows:

> This is one the defense has honed in on in their argument to the
> jury.  They honed it [sic] on it more in the argument than in the evidence.
> The evidence pointing to this phantom third person being there.  It was
> argued to the jury.  The jury apparently didn't feel that factor was there
> because that is a kind of a factor that if it was there it would appear to
> have some weight.
>
> But I've gone over the evidence and I have listened to counsel's
> argument this morning.  It kind of reminded me of the argument he made
> to the jury about the third party and how Miss Alfaro acted under the
> substantial domination of a third party.
>
> And I recall watching the four hours of videotape where
> Mr. Giffin went over very carefully, many times, he gave Miss Alfaro
> an opportunity, specifically afterwards, *was anyone else involved
> in this offense*?  Was anyone else in the house?  At the time the tape
> was played?  I remember.  But he at least gave her the opportunity
> to come forward at that time at least four or five times.
>
> I think it's for the reasons Mr. Giffin testified to when he was on
> the stand, that is, he himself when he conducted this interview and had
> viewed the crime scene had a hard time believing that a young woman
> the age of Rosie Alfaro could in fact have done this crime by herself.  *So
> he gave her many, multiple opportunities at that time to come forward
> and indicate that someone else was involved in the offense.  Each inquiry
> Mr. Giffin asked her on tape she replied in the negative.  No one else
> was involved in it.  No one else had anything to do with it.  It's not until
> after Miss Alfaro gets legal counsel that this idea of the third party, the
> phantom third party, pops up in the case.*
>
> And I looked at the evidence real careful.  The defense even had
> an expert who came in and testified about some alleged footprints, things
> of that nature.  We adopt the argument of the defense, that is to say that
> Miss Alfaro stabbed Autumn Wallace several times, three or four or five
> times, and then this other unknown person finished off the job stabbing
> young Autumn Wallace the other 47, 49 times, it's absolutely amazing
> that Miss Alfaro left bloody footprints on the floor.  And this other
> person who obviously was there, according to their argument, after the
> pool of blood is even larger than it would have been when Miss Alfaro
> left the room, somehow this person didn't leave a trace, not a single trace
> of any footprint in the blood.
>
> A fingerprint was also found in the bathroom and it matched
> Miss Alfaro.  *It's my belief that the jury rejected the defense's contention
> that a third person was present, did any of the stabbing in this case.
> I think the evidence is grossly insufficient to even raise that as a strong*

*inference in the case, especially when you consider the numerous opportunities Mr. Giffin gave her on the videotape.*

It appears to this court -- and I have had an opportunity to go over the evidence, I took a lot of notes. My notes are, I don't know, probably four or five inches thick in the case. I reviewed them, I looked carefully at the defense expert testimony in the case, I looked at the prosecution's evidence in the case, and it would seem to me *it's a figment of someone's imagination* to say that another third person was present and that Miss Alfaro acted under the substantial domination of this unknown person.

For those reasons the court does not feel the circumstances described in subdivision (g) are present in the case.

RT 4501-04 (emphasis added). In essence, the court concluded that Ms. Alfaro could not have been under the substantial domination of another person because (1) she never stated this to Investigator Giffin, despite his questions which invited her to tell him whether "anyone else was involved in the offense," and (2) there was no evidence to support a finding that another person stabbed Autumn Wallace.

13. Based on the fact that the court left out the "or" when purporting to quote this factor, stating it as follows: "whether or not the defendant acted under extreme duress under the substantial domination of another person" (RT 4501), it appears that a misunderstanding of the law was responsible for the court's failure to accept Ms. Alfaro's testimony that she killed Autumn, but had been threatened into doing so, as evidence of the presence of this factor, since the court never stated that it has chosen to reject her testimony. The court's demonstrable misrepresentation of the facts is more difficult to understand.

14. During Ms. Alfaro's video taped confession, the focus of Investigator Giffin's questions was not on whether either of the men outside the house was "involved in the offense" in that he had threatened her in the event she did not kill Autumn, as Ms. Alfaro later testified (*see* RT 1636), but on whether either of the men had participated in stabbing Autumn Wallace. *See* CT 533-34 (Q: "Who came into the house with you?" A: "Nobody, nobody came in there. . . . He just went like to the door. . . right there by the door, inside the house, by the door."); CT 534

(Q: "So he got, when in the screen door and through the front door and you were handing him stuff, is that right?"  A: "Yeah."); CT 544 (Q: "Don't you think he would of seen Autumn's body?"  A: "I don't know."); CT 545 (Q: "We just want you to tell us in your own words and you're not doing that."  A: "Well, I think he did come in because . . . .  But I don't know, I just can't remember seeing him walk in the house, but I think he did then to grab the microwave . . . ."); CT 554 (Q: "Don't try to protect other people."  A: "Oh, I ain't.  I told you who went with me and everything. I don't know that guy's name.  Shorty, I just know him by Shorty and he was there that day."); CT 572 (Q: "So if anyone besides you did the stabbing or if anyone besides you, in other words, if, if you didn't stab her but somebody else did or if all three of you stabbed her, took turns, then now is the time to tell us."  A: "I did."); CT 576  (Q: "You're absolutely sure you're the one that did all this?"  A: "Yes.") . The one time the investigators asked a question broad enough to encompass threats made to Ms. Alfaro in the event that she did not do something about Autumn, she gave no response:

> Investigator Bale: Is there anyone that you're afraid of or trying to protect or any reason that you're not telling us about other cars or other people, or other names?  See, it's real funny, Rosie, all those people in the street over there, guess what, a lot of them know you and they know your name.
>
> Ms. Alfaro: Uh-hum.
>
> Mr. Bale: They know your kids names, they know where you live.
>
> Ms. Alfaro: Uh-hum.
>
> Mr. Bale: You know, they know about Martin, they know about Manuel.
>
> Ms. Alfaro: Uh-hum.
>
> Mr. Bale: They know all this kind of stuff and you have this amnesia, this forgetfulness about who this people are.
>
> Ms. Alfaro: Uh-hum.
>
> Mr. Bale: It makes it hard for me to believe you about that?
>
> Ms. Alfaro: About what?

Mr. Bale: About who these people are that you sold things or gave things away to.  Did you trade any of the stuff . . .

Ms. Alfaro: . . . well, I know, I know . . .

Mr. Bale: . . .listen to me for a second now and then you can answer.  Did you trade any of the stuff for dope directly?

Ms. Alfaro:  No.

CT 582 (ellipses in the original).  Thus, the court's reliance on the fact that Ms. Alfaro was asked specifically to tell the investigators whether "anyone else was involved" and failed to do so was error.  Nothing in Ms. Alfaro's testimony at trial about the pressure she was placed under by the third man is inconsistent with her statements to the investigators.

15.  During her cross-examination in the first penalty trial, which was read to the jury in the second, Ms. Alfaro admitted that she stabbed Autumn and did not testify that she saw anyone else stab Autumn.  She stated, however, consistent with her confession, that the unidentified Hispanic man who had driven her to the Wallace's house threatened her because she had messed up after learning that Autumn was home (RT 1644); that he started cussing her out because she had messed up and told her she had to do something about it (RT 1690); that he had a knife behind her back and told her she had to do something about it (RT 1697); and that "he was threatening me first, and he was telling me about how I had Manny out there . . . and if I didn't do what he said, that something was going to happen." RT 1731-32.  She testified that she was afraid of this man and that she believed he would harm her.  RT 1735.  All of this constitutes evidence of substantial domination by another person that should have been but was not considered by the court in mitigation.

16.  The court next turned to the factor set forth in § 190.3(h), "whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of [her] conduct or to conform [her] conduct to the requirements of law was impaired

1  as a result of mental disease or defect, or the affects of intoxication."  Pen. Code

2  § 190.3(h).  Stated the court:

3       We did have some evidence on the videotape only, really, in our
        case here.  And there may have been some evidence in the transcript that
4       was read to the jury of the prior testimony of the defendant.  But it --
        and the defendant in the video indicates that she had shot up with some
5       heroin or speed balls or whatever the case might be.  And once again,
        *Mr. Giffin very carefully examined her in that area and she really did*
6       *not indicate and the evidence does not support that any intoxication*
        *had any substantial effect on her conduct in our case.*

7       So while there is evidence of intoxication, it would not appear
8       that it's of the quality that *interfered with* the defendant's capacity
        to appreciate the criminality of her conduct or to conform her conduct
9       to the requirements of the law.  So it does not appear to this court that
        the factor (h) is present.

10

11  RT 4504-05.  In fact, there was substantial evidence of both Ms. Alfaro's mental

12  defects and her intoxication at the time of the crime that should have weighted the

13  scales toward mitigation.  Investigator Giffin did not "carefully examine[ ] her in that

14  area," and she did not "indicate . . . that any intoxication had [had no] substantial

15  effect on her conduct."  Again, the trial judge based his ruling on a misrepresentation

16  of the facts.

17       17.  Investigator Giffin began the video taped interview by asking Ms. Alfaro

18  whether she was addicted to cocaine or heroin or both.  CT 507.  Her response was

19  "both."  *Id.*  The investigator then asked her to tell him what happened the day

20  of Autumn's murder.  She began, "I went over there on that day, I was already like,

21  like coked out and stuff, I don't know what I what I was doing . . . ."  *Id.* at 509.

22  She continued, "I was really wired and I was gonna just take something . . . ."  *Id.*

23       18.  After Ms. Alfaro admitted that she had stabbed Autumn, the investigator

24  took her back over the events of the day in more detail.  The second time through, she

25  told the investigator that she went to "Little TJ" around 12:00 p.m. that day (CT 516)

26  to "pick up" drugs.  CT 515-16.  After she "picked up" "two dimes of coke and two

27  dimes black [tar]," she went to her friend Juan's apartment and "did it there."  CT 516

28  She "cook[ed] it up," and injected herself in the neck.  CT 515-16.  This was at

393

approximately two o'clock in the afternoon.  CT 516.  She stated that shortly after she injected these drugs, "I came back down [to the apartment where she had purchased the drugs] cause I wanted more but I didn't have no money.  So some guy named Shorty came up . . . and he gave me some . . . ."  CT 517.  She stated, "I got like kind of greedy, you know, I wanted to do more and more and more and more."  CT 518.

19.  Ms. Alfaro described to Investigator Giffin how, when they got to the Wallace house, "I went and knocked and I asked [Autumn] if I could use the bathroom and she said, 'yeah.'  And I just went in the bathroom and I was like really, I don't know, I was like really wired, really coked out and stuff."  CT 526.  When the investigator asked her why she went to the bathroom, she responded, "I don't know, I just went in there.  I don't know, I was like really, I was really wired, I was real coked out."  *Id*.  After Ms. Alfaro admitted stabbing Autumn Wallace multiple times, the investigator asked her why she kept stabbing her.  CT 531.  Ms. Alfaro responded, "I don't know, I was scared, I don't know what I was doing, I just . . ."  CT 532.  The investigator asked Ms. Alfaro what she did after she left the house and again she stated, "I was just like really wired . . . ."  CT 542.  Later, she described waiting at a bus stop with some of the property she had taken from the Wallace's in a bag.  She says, "I dropped the bag and the mirror broke. . . . And there was a lady right there and since I was really high and loaded and stuff, I told the lady if she wanted it and I gave it to her."  CT 561.

20.  The investigators then took Ms. Alfaro through the sequence of events yet again:

> Investigator Giffin:  When you got over to Juan's, you hooked up with Sabrina, you went down and got a two and two, you came back up and you fixed, you and Sabrina and you still wanted to fix some more.

> Ms. Alfaro: Uh-huh.

> * * *

> Mr. Giffin: . . . you let Shorty use your rig.

1    Ms. Alfaro: Yeah.

2    Mr. Giffin: Then he gives you some more?  Then you decided you want
     some more?

3

     Ms. Alfaro: Yeah.

4    * * *

5

6    Mr. Giffin: Did you tell them you were going to get that stuff and sell it
     so you can buy some more dope?

7    Ms. Alfaro: Yeah, I told Shorty.

8    CT 548-49.  The investigator then asked Ms. Alfaro about a statement she had made

9    that Shorty had just gotten out of jail.  CT 573.  He asked her how she found out

10   he had just gotten out of jail, and she responded, "I didn't ask him, I . . .I was just

11   really high, I don't know."  CT 574.

12        21.  Towards the end of the interview, the investigators attempted to eliminate

13   any sort of intent defense with the following line of questioning, which clearly

14   established that Ms. Alfaro was not unconscious, but just as clearly left open the

15   possibility that her ability to conform her conduct to the requirements of the law

16   had been impaired:

17   Mr. Bale: . . . don't try to convince me that you were out of your head.

18   Ms. Alfaro: No, I wasn't out of my head.

19   Mr. Bale: I know.

20   Ms. Alfaro: And I'm not trying to do that.

21   Mr. Bale: You know what was, you know what . . .

22   Ms. Alfaro: . . . yes, I know.

23   Mr. Bale: You know exactly what was going on.

24   Ms. Alfaro: Yeah, I know.

25   Mr. Bale: What did you think would happened to, to Autumn when you
     started stabbing her, what do you think was gonna happen?  What
26   happens when you take a knife and poke holes in somebody?  What,
     what can happen to them?  What did you think was gonna happen?
27
     Ms. Alfaro: She was gonna die.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Mr. Bale: Okay. So you were, you were fully aware of that when you started stabbing her, that she could die from that.
>
> Ms. Alfaro: Yeah.

CT 577. This comprises the entirety of Mr. Giffin's questioning of Ms. Alfaro concerning the level of her intoxication. Far from stating that the drugs had not impaired her ability to conform her conduct to the requirements of the law, she repeatedly confirmed that she was heavily under the influence.

    22. During her cross-examination at the first penalty trial, which was read to the jury at the second penalty trial, Ms. Alfaro provided additional information about the level of her intoxication and the effects it had on her mental ability including the fact that after shooting up a "twenty and ten" she was high for approximately two hours. RT 1667. On redirect, she stated that she had shot up with heroin and coke an hour to an hour and a half before she went to the Wallace house. RT 1727. She explained that when she used the word "wired" she meant "when you're out of control, you're -- if you've done too much coke, you panic and you get wired. Just can't control your -- I don't know how to explain it, but just like in panic. You panic." RT 1727-28. She stated that this was the state she was in when she was in the house with Autumn. RT 1728. She clarified that while she had told the investigators she was not out of her head that day, she was in fact wired at the time she killed Autumn Wallace. RT 1729. There was clearly substantial evidence that Ms. Alfaro's capacity to conform her conduct to the requirements of the law was impaired by heroin and cocaine, and the trial court made a factual and legal error in disregarding it.

    23. The court next addressed the factor set forth in § 190.3(i), the age of the defendant at the time of the crime. RT 4505. The court noted that Ms. Alfaro was eighteen at the time of the crime. *Id*. The court then continued:

> If mere age by itself without any other factor is involved, it would appear perhaps that the age of eighteen might be a mitigating factor in the case. I think you have to put the age in context of what her background shows about she had dropped out of school at an early age, been out on the

1  streets for a substantial period of time, been involved in the drug culture
2  for a substantial period of time, things of that nature. So would appear
   that in a streetwise sense she was much more mature than her age would
3  indicate.

4      So it doesn't appear that the age of the defendant at the time of the
   crime is really a substantial mitigating factor in the case.

5  *Id.* As set forth below, this analysis was not only legally incorrect, it was

6  unenlightened.

7      24. Finding the factor set forth in § 190.3(j) inapplicable, the court next

8  addressed the § 190.3(k) factor. Stated the court:

9  I guess this is where counsel brings in the disadvantaged background
   of the defendant, her early involvement with drugs, her prostitution,
10  things of that nature. The problems she had with her father, allegedly,
   the problems she had with the father of her second child and third and
11  fourth child. I guess that's where all of these factors fit in. The fact
   that she is a mother of four children. Obviously at the time this offense
12  occurred she was only the mother of two children. But she is now as she
   sits there at counsel table the mother of four children. And I guess that's
13  where counsel tries to fit in all of those factors in item (k). And *those
   factors have kind of a two-edged sword in a way*. It appears that the
14  defendant did get involved in drug activity, came from a separated home,
   and had a disadvantaged youth.
15
       It also appears to the court that people are really the sum total
16  of the choices we make in our life. She chose to leave school. She chose
   to use drugs. She chose to engage in acts of prostitution on the streets.
17  She chose to hang out in the area on Jeffery Street over there where there
   is a -- the drug culture is involved. She made all of those choices. Those
18  are all choices. There was no evidence presented to the court that those
   were involuntary choices, anybody forced her into doing that, things
19  of that nature.

20      So on the one hand you can say well, she is the mother of four
   children and she is young. On the other hand, you can say that she made
21  those choices, she ought to be responsible for making those choices.

22      And it was a little shocking to the court, I'm sure it was shocking
   to the jury, that one of her children was taken to the crime scene and
23  was cared for in the hands of a relative stranger, a person who just got
   out of prison a couple of days earlier, left to take care of her young boy
24  of about eighteen months on the front lawn while she went into the
   house and stabbed Autumn Wallace over fifty times. *So that all cuts
25  a couple of ways.* And it would not appear to the court that the (k) factor
   has any substantial weight in our case.
26

27  RT 4505-07. In essence, the court weighed potentially mitigating evidence relevant

28  to the sympathy factor, such as Ms. Alfaro's abusive childhood and mental

disabilities which led her to self-medicate with drugs and to motherhood four times

over by the time she was eighteen, as "a two edged sword" which he then used

against her in finding that she should be put to death.

25.  Finally, the court returned to the factor codified in § 190.3(a), the

circumstances of the crime.  Stated the court, in full:

> It appears to the court that the -- I've been involved in the legal profession since January 1965.  I was involved with -- I first started in Orange County on a great day of April Fools Day of 1966, and I have been involved in the legal community in Orange County since that time.
>
> In my past I've prosecuted people accused of offenses like Miss Alfaro, I have defended people accused of noncapital homicide offenses when I was a defense attorney, and I have been a member of the Superior Court for over thirteen years.
>
> This case is one of the most senseless, brutal, vicious, callous killings that this court has ever seen.  The description that a picture is worth a thousand words, the circumstances of this offense shown by the photographs show a very vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case.
>
> So it does appear to this court that the circumstances of the offense in item (a) of Penal Code section 190.3, that the circumstances of the crime itself standing alone far outweigh *any mitigating circumstances, if there are any, that are presented in this case.*
>
> In conclusion on that I am satisfied that the jury's verdict imposing the death penalty and reviewing all of those factors is consistent with the evidence and the law that the factors in aggravation, as I have described, beyond all reasonable doubt outweigh any factors in mitigation, and therefore the motion to modify the penalty is denied.

RT 4507-09 (emphasis added).

## C.   <u>THE TRIAL COURT FAILED TO CONSIDER ALL OF THE</u>
## <u>MITIGATING EVIDENCE PRESENT IN THIS CASE</u>

26.  Pursuant to Penal Code § 190.4(e), in every case in which the trier of fact

has returned a verdict imposing the death penalty, the trial court must determine

whether the weight of the evidence adequately supports the jury's verdict in favor

of death.  The judge must make that determination independently, giving the evidence

the weight he believes it deserves.  *Id*.  Although the trial court is not required to

recount every piece of mitigating evidence it weighs for § 190.4(e) purposes, the

1  court may not ignore or overlook mitigating evidence.  *See Eddings*, 455 U.S.

2  at 113-15 ("Just as the State may not by statute preclude the sentencer from

3  considering any mitigating factor, neither may the sentencer refuse to consider, as a

4  matter of law, any relevant mitigating evidence. . . .  The sentencer, and the Court

5  of Criminal Appeals on review, may determine the weight to be given relevant

6  mitigating evidence.  But they may not give it no weight by excluding such evidence

7  from consideration."); *Lockett v. Ohio*, 438 U.S. 586 (1978).

8          27.  The trial judge never stated that he had considered all mitigating

9  circumstances raised during the trial.  To the contrary, his words establish that

10 he ignored or excluded from his consideration substantial mitigating evidence.  After

11 discussing the factors set forth in Penal Code § 190.3, the trial court concluded,

12 "[T]he circumstances of the crime itself standing alone far outweigh any mitigating

13 circumstances, *if there are any*, that are presented in this case."  CT 1815 (emphasis

14 added).  There were at least two mitigating circumstances -- Ms. Alfaro's lack

15 of a felony record and her lack of a history of criminal activity involving the use

16 or attempted use of force or violence -- that were undisputed and undisputable.

17 From the trial judge's words, this Court must conclude that he failed to give due

18 consideration to the undisputed mitigating circumstances presented by Ms. Alfaro --

19 let alone other factors such as her intoxication, her mental impairments, her

20 domination by another person, her youth, her abusive childhood, her cooperation with

21 the authorities, her relationships with her family members including her children, and

22 her ability to adjust in prison.  From Judge Millard's words, one can only conclude

23 that as far as he was concerned, there were no mitigating circumstances in this case.

24 In any number of ways, detailed below, the trial court's weighing process in this case

25 was fatally flawed.

26 / / /

27 / / /

28

1      **1.**      <u>**The Trial Court Ignored the Mitigating Evidence That Ms. Alfaro**</u>

2            <u>**Had No Felony Record or Record of criminal Activity Involving**</u>

3            <u>**the Use or Attempted Use of violence**</u>

4      28.  It is undisputed that at the time of her arrest, Ms. Alfaro had no prior

5 convictions of any kind, let alone felony convictions, and that she had no history

6 of criminal activity involving the use or attempted use of force or violence.

7 Ms. Alfaro was entitled to have these facts weighed in mitigation.  Pen. Code

8 §§ 190.3(b) and (c).  Because the trial court failed to recognize that at least these two

9 mitigating factors were clearly present, instead concluding that they "were not present

10 in this case," and referencing in closing the "mitigating circumstances, if there are

11 any, that are presented in this case," the trial court's decision to deny Ms. Alfaro's

12 motion for modification of the verdict should be reversed.

13      **2.**      <u>**The Trial Court Ignored Mitigating Evidence of the Affects**</u>

14            <u>**of Intoxication, Mental Defects, and Duress Which Impaired**</u>

15            <u>**Ms. Alfaro's Ability to Conform Her Conduct to the**</u>

16            <u>**Requirements of the Law**</u>

17      29.  The trial court concluded:  "While there is evidence of intoxication, it

18 would not appear that it's of the quality that interfered with the defendant's capacity

19 to appreciate the criminality of her conduct or to conform her conduct to the

20 requirement of the law.  So it does not appear to this court that the factor (h) is

21 present."  CT 1811.  Not only did the court misquote § 190.3(h) -- replacing "impair"

22 with "interfere" -- its conclusion was entirely at odds with the evidence.

23      30.  Drug intoxication at the time of the offense is indisputably a mitigating

24 factor.  A defendant need not show, as the trial judge claimed, that her "intoxication

25 had [a] substantial effect on her conduct" (*see* RT 4505) in order to establish the

26 mitigating circumstance set forth in Penal Code § 190.3(h).  She need only show that

27 her ability to conform her conduct to the requirements of the law was "impaired."

28 Pen. Code § 190.3(h).  By raising the bar in this way, the trial court misinterpreted the

1  law and failed to give the proper consideration to a mitigating circumstance that was

2  clearly present in this case.

3      31.  Likewise, the trial court failed to give due consideration to the evidence

4  that Ms. Alfaro acted under the substantial domination of another person, again

5  appearing to confuse the evidence that would be required to raise duress as a trial

6  defense with that necessary for consideration as a mitigating circumstance.  At no

7  time does the trial judge reject Ms. Alfaro's contention that she was pressured to kill

8  Autumn.  His conclusion is simply that the man did not participate in stabbing

9  Autumn.

10     32.  Finally, the trial court overlooked the evidence presented that Ms. Alfaro

11  suffered mental disabilities, including an IQ no higher than 78, and probably much

12  lower, learning disabilities exacerbated by a traumatic childhood (*see In re Ross*,

13  10 Cal. 4th 184, 196, 892 P.2d 1287 (1995)), Attention Deficit Disorder, a Conduct

14  Disorder characterized by childhood anti-social behavior, Adjustment Disorder

15  characterized by anxiety and depression, and a Dependent Personality Disorder.

16  These mental defects were mitigating evidence that she was entitled to have taken

17  into consideration.

18     **3.**     **The Trial Court Ignored the Mitigating Evidence of**

19          **Ms. Alfaro's Youth, Disadvantaged Background, and**

20          **Her Remorse**

21     33.  Youth is a mitigating factor.  *Eddings,* 455 U.S. at 115.  "Youth is more

22  than a chronological fact.  It is a time and condition of life when a person may be

23  most susceptible to influence and psychological damage."  *Id*.  The Court continued:

24      Our history is replete with laws and judicial recognition that minors,
        especially in their earlier years, generally are less mature and responsible

25      than adults.  Particularly "during the formative years of childhood and
        adolescence, minors often lack the experience, perspective, and

26      judgment" expected of adults. [Citation omitted.] . . . [J]ust as the
        chronological age of a minor is itself a relevant mitigating factor

27      of great weight, so must the background and mental and emotional
        development of a youthful defendant be duly considered in sentencing.

28

401

1    *Id.* at 115-17.  Similarly, in *Magill v. Dugger*, 824 F. 2d 879 (1987), the court
2    recognized that where the defendant was seventeen at the time of the crime, his age
3    was "a powerful mitigating circumstance."  *Id*. at 890.  The court noted that "[w]hen
4    a crime is committed by a minor the defendant's remorse and desire to repent are
5    particularly relevant mitigating factors."  *Id.* at 893.

6        34.  Ms. Alfaro turned eighteen barely eight months before the charged crimes.
7    Her youth had been far more than "disadvantaged."  *Cf.* RT 4506.  She had helplessly
8    watched her violent, alcoholic father beat her mother from babyhood.  She had been
9    regularly physically abused by her father herself.  She, along with her mother and
10   siblings, had been thrown out into the street by her father.  She had been raped,
11   purportedly by a drinking buddy of her father's, all by the time she reached the age
12   of nine years old.  Her mental capacity was borderline -- near the level deemed
13   retarded.  Her body had been racked by hard drugs from the age of twelve.  As
14   a result, her education ended before she completed the seventh grade.  She had been
15   impregnated and had given birth twice before she turned sixteen.  And she felt and
16   exhibited deep remorse for what she had done to Autumn Wallace.

17       35.  All of these issues have been considered mitigating circumstances.  *See*
18   *Parker v. Dugger*, 498 U.S. 308, 314, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991);
19   *McKoy v. North Carolina*, 494 U.S. 433, 436, 110 S. Ct. 1227, 108 L. Ed. 2d 369
20   (1990) (borderline intellectual functioning is a mitigating factor).  Yet, a "two-edged
21   sword" is how the trial court viewed them.  The court erroneously considered that its
22   skewed view of the mitigating evidence rendered it evidence in aggravation.
23   Agravation is not established, however, by the absence of mitigation.  In viewing it
24   as such, the trial court violated Ms. Alfaro's constitutional rights by impermissibly
25   turning evidence of her background, character, drug use, and motherhood under
26   factor (k) into aggravating circumstances.

27
28

1

2

3

4.      **The Trial Court's Determination That Ms. Alfaro Was Entitled to No Sympathy Based on "Choices" She Had Made Was Fundamentally Flawed**

4      36.   The trial court wrongly determined that Ms. Alfaro was not entitled

5   to sympathy because of the purported "choices" she had made in her young life:

> It appears that the defendant did get involved in drug activity, came from a separated home, and had a disadvantaged youth. ¶ It also appears to the court that people are really the sum total of the choices we make in our life.  She chose to leave school.  She chose to use drugs.  She chose to engage in acts of prostitution on the streets.  She chose to hang out in the area on Jeffery Street over there where there is a -- the drug culture is involved.  She made all of those choices.  Those are all choices.  There was no evidence presented to the court that those were involuntary choices, anybody forced her into doing that, things of that nature.

6

7

8

9

10

11

12   RT 4506-07.

13      37.   In making these remarks, the court was specifically addressing the

14   provisions of Penal Code § 190.3(k), the sympathy factor.  The court expressed its

15   view that when Ms. Alfaro stabbed Autumn Wallace to death, she did so with a free

16   and unfettered will, unmitigated by any circumstances of experience described by

17   § 190.3, a will as clear and as capable of reflection as to motive and consequence

18   as the court imagined its own to be.  The court concluded that as a result, Ms. Alfaro

19   was undeserving of any sympathy whatsoever.

20      38.   The court simply decided to overlook the tremendous constraints that

21   operated to limit the choices, opportunities, and exercise of free will of a person

22   with Ms. Alfaro's youth and experiences.  While the court concluded that Ms. Alfaro

23   "chose" to become a drug addict, it failed to consider what social or familial forces

24   might impel a twelve-year-old girl, that is to say, a child legally and morally,

25   to "choose" drug addiction.  Could such a choice, even if it were exercised as the

26   court states, be a free and informed one?  Or was it the act of a child in response

27   to a situation any human being might find intolerable.

28

403

39.  The court, in declaring that "it would not appear . . . that the (k) factor has any substantial weight in our case" (RT 4507), implied a chain of causality among the various petty crimes and moral infractions it cited, one thing leading inexorably to another, culminating, apparently, in the murder which brought Ms. Alfaro to stand before the bench.  But surely the court, arbitrarily and deliberately, picked up the chain in the middle, without a glance at the long train of horrors that preceded the ones it preferred.  The court did not venture far enough back in time in enumerating the various choices it supposed Ms. Alfaro to have made.  Had it done so, it might have said she chose to be born with an Intelligence Quotient no higher than 78, and conceivably much lower.  She must have chosen to be born into a family of modest, working class means, rather than one whose status and income may have helped in some measure to ameliorate other events.  She must have therefore chosen to be sired by a brutal and alcoholic father who beat her and her mother regularly and savagely.  At the age of nine, the court must have imagined, Rosie Alfaro chose to be raped by a family friend.  She also must have chosen, perforce, to never receive any moral instruction, apart from the purely negative and perverse lessons she derived from observation and personal, immediate and corporal experience.  All of these events -- the beatings, the drunkenness, the absenteeism, the moral vacuum -- must have been the product of free will on her part; in short, she was busily and of her own volition, building a crippled and twisted personality from the moment she was born until the moment she committed the crime under discussion.

40.  This view of her childhood was necessary for the court to logically and consistently hold to its view that human beings are the sum of the choices they make.  Otherwise, the court must allow the possibility that human beings are the sum of the choices they make plus something else, or allow that the choices they make might be influenced by past experiences beyond their control, e.g., in childhood, when all human beings are equally defenseless against viciousness, abandon, and want.

41.  Perhaps the court may have believed quite sincerely that a human being does not require moral instruction (which is usually inculcated in, rather than embraced by, the young), to lead an exemplary life.  In this belief the court would stand alone against the history of theology, philosophy, and law, which would hold that a spiritual discipline is necessary to distinguish good from evil, and to exercise the ability to embrace one and shun the other.  Ms. Alfaro's childhood was not only utterly devoid of positive moral instruction, the only illustrations of morality she was exposed to came from the beatings and abuse already described.  Those vivid and painful lessons were her sole experience of human interaction.

42.  The court chose to characterize Ms. Alfaro's childhood as disadvantaged.  This simple characterization falls far short, however, of describing Rosie Alfaro's childhood.  Her emotionally shattered and morally twisted childhood informed her later choices, just as any adult's choices are informed by their early circumstances.  She was, in fact, in a continuous state of extreme mental and emotional disturbance, and had been since childhood.

43.  And yet Rosie Alfaro is responsible.  Despite the influences of the horrors of her childhood, she found the moral strength to admit her responsibility, express remorse, and demand to be allowed to take public responsibility for her act and plead guilty.  This is a crucial point, and one that the court did its utmost to avoid.  She said she was responsible.  The court knew it, and colluded with her incompetent attorney to prevent her from telling the very people who would decide if she lived or died -- the jury.  The court then affirmed the death penalty, even knowing that she had long before demanded to take responsibility.  Not satisfied with that, it vilified her for her moral vacuity in not taking responsibility.  In so doing, the court prevented Ms. Alfaro from exercising the one choice demanded of her by her own conscience.

44.  The question is, if she was not incompetent, and could then and later apprehend the evil of her act, how impaired was Rosie Alfaro's ability to exercise the right use of will and resist the impulse to murder Autumn Wallace?  We say that

her life was such that her experiences, combined with a permanent state of severe emotional disturbance, crippled her will and her capacity to consciously reason out the consequences of her acts.  Her entire existence was a daily round of pain, sadness, anger, resentment, acute cravings and short-term efforts to satisfy them.  Each round of craving and satiation had its element of choice, to be sure, but just as surely each round eroded the ability to resist the next craving.  The will grew weaker, not stronger.  The intellect grew dimmer, and where there is not full consciousness there cannot be full reflection and full consent to the evil act.

45.  Human will is not limitless.  It is circumscribed by elements of life beyond our control and truncated by the realities of physical existence.  The great healer Paracelsus said, "How can a man do what he wants if he cannot so much as make a single hair white or black?"  Paracelsus, *Selected Writings* (c. 1951, The Princeton University Press), p. 206.

46.  Ms. Alfaro exercised her will, but within the severe and pitiless limits of a miserable life, which limits are recognized by law as mitigating factors, and the trial judge erred in dismissing them.

## C.   <u>CONCLUSION</u>

47.  In denying Ms. Alfaro's motion for modification of the death verdict, the trial court displayed a patent misunderstanding of the process of weighing the mitigating and aggravating factors described in Penal Code § 190.3.  Ms. Alfaro was entitled to have *all* these factors -- the lack of a felony record and past violent criminal activity, the effects of intoxication, her youth, her "disadvantaged" background, and her remorse -- actually weighed in mitigation, not dropped off the scale entirely.

48.  In each circumstance, the court entirely removed these factors from the balance.  For example, rather than considering the defendant's actual testimony that she was threatened by a third party, the court chose to ignore it, characterizing the substantial domination defense as a figment of someone's (that is, defense counsel's)

imagination.  The trial court explicitly doubted that there even *were* any mitigating factors.  This doubt manifested the fact that the court failed to give proper consideration to the undisputed mitigating circumstances that did exist, like Ms. Alfaro's lack of a felony record and her lack of a history of violent criminal activity.

49.  In an extraordinary application of individualism gone awry, the court weighs a childhood of rape, child abuse, drug addiction, homelessness, poverty, and prostitution not on the mitigating side of the scale, but as *aggravators* to cancel mitigation, because Rosie Alfaro "ought to be responsible for making these choices." The court relies on ideologically informed logic to blame the defendant for a disadvantaged youth.  Yet, the malformed logic that led the defendant to commit the act in question was the product of mitigating factors in her life that rendered it impossible for her to fully consent to the evil she did.  The phrase "abandoned and malignant heart" -- brandished by her own counsel -- cannot apply to such a person, who in any case suffered remorse and demanded to make amends, neither of which acts are the hallmarks of the abandoned and the maligned.

50.  Habeas relief is warranted.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

51.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together

1    with the additional constitutional errors outlined in the remainder of this Petition.

2    Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

3    sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

4    970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

5    (9th Cir. 1978).

6

7                                    **XXX.**

8    **CLAIM 25:  THE DENIAL OF PETITIONER'S MOTION FOR NEW TRIAL**

9         **VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**

10        Petitioner's sentence of death was rendered in violation of her rights to a fair

11   trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

12   determination of guilt and penalty, to the effective assistance of counsel, to present

13   a defense, and to due process of law and equal protection as guaranteed by the Fifth,

14   Sixth, Eighth and Fourteenth Amendments to the United States Constitution because

15   the trial court failed to modify the sentence, knowing, as it did, compelling mitigating

16   evidence that was not brought before the jury.  As  a result, habeas relief is warranted.

17        1. Exhaustion of the claim:  This claim was fairly presented to the California

18   Supreme Court in the direct appeal.  It was presented as Claim 14 in Opening Brief.

19        2. AEDPA:  The California Supreme Court denied this claim.  *People v.*

20   *Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's

21   denial of this claim is both "contrary to" and an "unreasonable application" of clearly

22   established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim

23   *de novo*.  Moreover, because the state court's adjudication of this claim was

24   dependent on an antecedent unreasonable application of federal law, this Court

25   "must then resolve the claim without the deference that AEDPA otherwise requires."

26   *Panetti v. Quarterman*, 127 S. Ct. at 2858.

27        3. If Respondent disputes any of the facts alleged below, Petitioner requests

28   an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

                                        408

1   has been afforded discovery and the disclosure of material evidence by the State,

2   the use of this court's subpoena power, and the opportunity to investigate fully,

3   counsel requests an opportunity to supplement or amend this petition.

4       4.  The declarations and other exhibits filed with this petition, as well as the

5   allegations and facts set forth elsewhere in this petition, are hereby incorporated by

6   reference into this claim as though set forth in full.

7       5.  In support of this claim, Petitioner alleges the following facts, among others

8   to be presented after full discovery, investigation, adequate funding, access to this

9   Court's subpoena power, and an evidentiary hearing.

10   **A.**    **INTRODUCTION**

11       6.  Penal Code § 1181(7) allows the trial court to reduce the punishment in lieu

12   of granting a new trial where the jury's finding of death is "contrary to evidence."

13   In Ms. Alfaro's case, partly because not all of the relevant mitigating evidence was

14   presented to the jury, the jury's finding that the aggravating factor outweighed all

15   of the mitigating factors was "contrary to evidence."  The trial court's denial

16   of Ms. Alfaro's motion for a new trial or reduction of penalty habeas relief is

17   warranted as by failing to follow the provisions of the California Penal Code, the trial

18   court created an unreliable and arbitrary imposition of the death penalty in violation

19   of Ms. Alfaro's due process rights.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *see*

20   *also Gregg v. Georgia*, 428 U.S. 153 (1976).

21   **B.**    **THE TRIAL COURT'S RULING**

22       7.  On July 14, 1992, immediately after stating its reasons for declining

23   to modify the jury's verdict of death pursuant to Penal Code § 190.4(e), the trial court

24   took up the defense motion for a new trial pursuant to Penal Code § 1181(7).  *See*

25   RT 4509-10.  The trial court began by acknowledging that it had the authority to

26   consider evidence that was not before the jury.  The court stated that while it is not

27   appropriate for a court to consider any evidence that was not before the jury in ruling

28   on a defendant's motion for modification of the verdict, it is appropriate for a court to

consider other evidence in ruling on a motion for new trial pursuant to Penal Code § 1181(7).  *See* RT 4509-10.  The court said that in addition to the evidence that was introduced at trial, it would consider the probation report and some of the attachments to that report in ruling on Ms. Alfaro's motion for a new trial.  RT 4509.  But rather than discuss the evidence included in the probation report that was not presented to the jury, and explain why it did or did not change the court's analysis of the § 190.3 mitigating and aggravating factors, the court made the following statement:

> And there being nothing more to add to that, the court is going to deny the motion for new trial as to the guilt phase.  ¶ The court feels the evidence is overwhelming on the guilt phase and the court is going to deny the motion for a new trial for substantially the same reasons already indicated on the 190.3 motion.  I'll incorporate all of those reasons and I'll deny the motion for new trial under 1181 sub 6 or 7.  It purports no review evidence.  If the court did grant a motion for new trial, that evidence is not admissible.  So it wouldn't get us anywhere anyway.  I think that's more appropriate for the court to consider in imposing sentence.  For those reasons, the court denies the motion for new trial.

RT 4510.

8.  From this ruling, it is apparent that the court misinterpreted the law.  Ms. Alfaro's remorse was among the evidence included in the probation report and known to the court.  This evidence -- that Ms. Alfaro had wanted to accept full responsibility for Autumn Wallace's murder and plead guilty unconditionally and had been prevented from doing so by her attorney, who raised the SODDI defense over her strenuous objection on the record -- was *admissible*.  Moreover, when a defendant brings a motion under § 1181(7) in a death penalty case, she moves for both a new guilt trial *and a new penalty trial.*  The trial court's comments indicate that it only considered the evidence as it pertained to a motion for a new guilt trial, failing to appreciate its duty to also analyze the evidence to determine whether a new penalty trial was required.  The trial court's comment, "I think that's more appropriate for the court to consider in imposing sentence," establishes that it gave no consideration whatsoever to ordering a new penalty trial.

9.  Although the court does not describe it, there was significant *admissible* mitigating evidence included in the probation report, including, but not limited to, additional evidence of Ms. Alfaro's remorse, that had not been before the jury.  That evidence included:

a.  The Probation Officer reported that subsequent to Ms. Alfaro's arrest, "[n]umerous hypodermic injection sites were located on [her] hands, left arm, and neck."  CT 1742.  This provided additional support for the mitigating factor set forth in Penal Code § 190.3(h).

b.  Under the section entitled "Adjustment at the Orange County Jail," the probation officer reported that "[o]n May 23, 1992, the defendant was classified for a housing change due to the need for 'acute mental health care.'  On May 30, 1992, an entry was placed in her 'jacket' indicating that she no longer needed mental health care of that nature."  CT 1745-46.  This is the first time the record reflects the trial court being informed that immediately before she waived her right to testify at her second penalty trial, Ms. Alfaro was receiving "acute mental health care."  The trial court was well aware that at the first penalty trial, during which Ms. Alfaro took the stand and expressed her remorse, the jury had been unable to reach a unanimous verdict, but that at the second penalty trial, where Ms. Alfaro had declined to testify, the jury had recommended the death penalty.

c.  In addition to the remorse expressed on the video tape, and the remorse represented by her attempt to plead guilty (a fact known to the judge but not the jury), the probation officer presented the court with the following evidence of Ms. Alfaro's remorse, in the form of a letter Ms. Alfaro had written to Linda Wallace, which reads in part:

> Mrs. Wallace I know sorry is not enough for what has happened sorry won't bring little Autumn back.  I am truely sorry and if I could turn back time I would and I would of made it me instead of your innocent 9 year old little girl.

CT 1747.

411

d.  If the court was under any misconceptions about Ms. Alfaro's prior criminal record, the probation officer cleared them up, establishing that her prior record consisted of nothing more than two arrests at age fourteen -- once for possession of less than an ounce of marijuana and a hypodermic needle and syringe; once for petty theft of three men's shirts from a Mervyn's Department Store -- and once at age sixteen for possession of an open can of beer.  CT 1756-57.

e.  The probation officer reaffirmed Ms. Alfaro's mental disabilities, reporting that "the defendant began experiencing difficulty in the school setting due to limited intellectual capacity, and she ultimately dropped out of school . . ." CT 1758.  This provided additional support for the mitigating factor set forth in Penal Code § 190.3(h).

f.  In the probation officer's statement of circumstances in mitigation, that professional included two that were wholly disregarded by the court:

> It appears that the defendant may have been suffering from a physical condition, namely drug influence and/or addiction, *which may have significantly reduced her culpability for the crime.*

CT 1761 (emphasis added).

> It appears that the defendant voluntarily acknowledged wrongdoing shortly after her arrest.

*Id.*

10.  The trial judge did not indicate that it had considered other mitigating evidence known to the court, but unknown to the jury in denying Ms. Alfaro's motion for a new trial or reduction in the penalty.  In particular, the court did not state that it had considered Ms. Alfaro's desire to plead guilty and not to implicate anyone else, a desire that was thwarted by her attorney whose action was ratified by the court. Nor did the court mention that Ms. Alfaro's desire to plead guilty was unconditional, and thus, should have been admitted even under the District Attorney's analysis of the law.  This highly relevant, admissible evidence of Ms. Alfaro's acceptance of responsibility was wholly overlooked by the court, and renders the court's

412

1  comment, "If the court did grant a motion for new trial, that evidence is not

2  admissible," fundamentally wrong.

3      11.  Nor does the court mention that after the first penalty jury hung, it was the

4  court that forced Ms. Alfaro to endure a second penalty trial with an attorney that

5  insisted on raising the defense that someone else was responsible for the crime,

6  against his client's wishes yet again.  It was the court, which would later describe the

7  idea that someone else had been involved as "a figment of someone's imagination"

8  (RT 4503-04) and that told Ms. Alfaro when she sought new counsel who would

9  allow her to accept responsibility without attempting to pin the crime on anyone else:

10         the chances are that -- first of all, if Mr. Monroe were taken off the case
           and another attorney put on the case, the other attorney is going to get
11         Mr. Monroe's files. . . . Very well might reach the same conclusion that
           Mr. Monroe has reached. . . .
12
           And we'd be back in the same place again because generally,
13     Rosie, anyone who views that videotape, okay, is, if they are going to
       defend you at all, they are going to have to shift the blame away from
14     you to somebody else and to make it appear as though you are not the
       sole person involved in Autumn's death, you know.
15
                              ***
16
           And it's just -- I mean, I can't conceive if we gave the case to ten
17     different attorneys they wouldn't all reach that same opinion, they
       wouldn't all want to do the same thing.  That's really the only avenue
18     available to take part of the gravity of this crime off of your shoulders so
       that the jury will -- that and your age and background and your children.
19     But I don't mean to say that's the only thing, but that's really a
       significant thing.
20
           Because when somebody listens to that videotape and looks at
21     how Autumn died, if there is any way to get the blame away from you or
       have you share the blame with somebody else, they are going to do it.
22
       * * *
23
           See, that's the problem, Rosie. . . . Mr. Monroe, as your lawyer,
24     or Mr. Jones or Mr. Smith, whoever the lawyer is, is going to look
       at your case, they are going to get familiar with the evidence and say
25     oh, my god, we have to figure out some way to water down this
       responsibility that Rosie put on herself in the videotape.
26
           And pointing the finger or sharing the finger of blame or
27     responsibility with another person is a very logical way to do it. . . .
       I personally think a lawyer, whether it's Mr. Monroe or Mr. Jones or
28     Mr. Smith, would do it.  They are going to say well, I respect your view,

1   Rosie, but this doesn't really involve, you know, your fundamental rights
2   as such. It doesn't really mean that I'm not effectively assisting you.
    I'm just assisting you in a way that you don't want it done. And it
3   doesn't otherwise involve your fundamental rights or anything of that
    nature. And I think you'd be in the same boat whatever lawyer we gave
4   you.

5   RT 2142-47. It was the court that after giving Ms. Alfaro this personal advice

6   held the fact that her attorney had adopted this strategy against her at her sentencing

7   hearing. Addressing the mitigating factor set forth in Penal Code § 190.3(g),

8   "[w]hether or not defendant acted under extreme duress or under the substantial

9   domination of another person," it was the court that stated:

10          This is one the defense has honed in on in their argument
    to the jury. *They honed it [sic] on it more in the argument than in the*
11  *evidence. The evidence pointing to this phantom third person being*
    *there.* It was argued to the jury. The jury apparently didn't feel that
12  factor was there because that is a kind of a factor that if it was there it
    would appear to have some weight.
13
            But I've gone over the evidence and I have listened to counsel's
14  argument this morning. It kind of reminded me of the argument he made
    to the jury about the third party and how Miss Alfaro acted under the
15  substantial domination of a third party.

16          And I recall watching the four hours of videotape where
    Mr. Giffin went over very carefully, many times, he gave Miss Alfaro
17  an opportunity, specifically afterwards, was anyone else involved in this
    offense? Was anyone else in the house? At the time the tape was
18  played? I remember. But he at least gave her the opportunity to come
    forward at that time at least four or five times.
19
            I think it's for the reasons Mr. Giffin testified to when he was on
20  the stand, that is, he himself when he conducted this interview and had
    viewed the crime scene had a hard time believing that a young woman
21  the age of Rosie Alfaro could in fact have done this crime by herself. So
    he gave her many, multiple opportunities at that time to come forward
22  and indicate that someone else was involved in the offense. Each inquiry
    Mr. Giffin asked her on tape she replied in the negative. No one else
23  was involved in it. No one else had anything to do with it. *It's not until*
    *after Miss Alfaro gets legal counsel that this idea of the third party, the*
24  *phantom third party, pops up in the case.*

25          And I looked at the evidence real careful. The defense even had
    an expert who came in and testified about some alleged footprints, things
26  of that nature. *We adopt the argument of the defense, that is to say that*
    *Miss Alfaro stabbed Autumn Wallace several times, three or four or five*
27  *times, and then this other unknown person finished off the job stabbing*
    *young Autumn Wallace the other 47, 49 times, it's absolutely amazing*
28  *that Miss Alfaro left bloody footprints on the floor. And this other*

414

1    *person who obviously was there, according to their argument, after the*
2    *pool of blood is even larger than it would have been when Miss Alfaro*
     *left the room, somehow this person didn't leave a trace, not a single*
3    *trace of any footprint in the blood.*

4         A fingerprint was also found in the bathroom and it matched Miss
     Alfaro. *It's my belief that the jury rejected the defense's contention that*
5    *a third person was present, did any of the stabbing in this case.  I think*
     *the evidence is grossly insufficient to even raise that as a strong*
6    *inference in the case, especially when you consider the numerous*
     *opportunities Mr. Giffin gave her on the videotape.*

7         It appears to this court -- and I have had an opportunity to go over
     the evidence, I took a lot of notes.  My notes are, I don't know, probably
8    four or five inches thick in the case.  I reviewed them, I looked carefully
     at the defense expert testimony in the case, I looked at the prosecution's
9    evidence in the case, and it would seem to me *it's a figment of someone's*
     *imagination to say that another third person was present* and that Miss
10   Alfaro acted under the substantial domination of this unknown person.

11        For those reasons the court does not feel the circumstances
     described in subdivision (g) are present in the case.
12
     RT 4501-04 (emphasis added).
13
14        12.  It was the court, that after depriving Ms. Alfaro of the concrete evidence

15   of her remorse a guilty plea would have represented, failed to give this universally

16   deemed mitigating circumstance any consideration whatsoever in sentencing her to

17   death.

18        13.  Ms. Alfaro's acknowledgment of responsibility for the crime and her

19   attempt to plead guilty, her genuine remorse, and the many other mitigating

20   circumstances present in this case tipped the scales in favor of life.  But, though the

21   probation report cited Ms. Alfaro's voluntary acknowledgment of wrongdoing as a

22   mitigating circumstance in the case, and the trial court knew Ms. Alfaro's acceptance

23   of responsibility to be genuine, the trial court failed to consider it in ruling on either

24   Ms. Alfaro's motion for modification of the verdict pursuant to Penal Code § 190.4(e)

25   or her motion for a new trial or reduction in penalty pursuant to Penal Code

26   § 1181(7).  In so doing, the trial court abused its discretion.

27
28
                                    415

1
2

## C.  THE COURT HAD A DUTY TO LOOK AT ANY EVIDENCE THAT RENDERED THE DEATH VERDICT INAPPROPRIATE

3  14.  Although a trial court may not rely on information outside the record in
4  ruling on a § 190.4(e) motion, no such restriction bars the court from considering
5  other evidence in ruling on a motion for a new trial or reduction in penalty pursuant
6  to § 1181(7).  The statutory language of Penal Code § 1181(7) allows the court to
7  grant a new trial or modify the verdict when the jury's finding of death is "contrary
8  to . . . evidence" in general.  On the other hand, § 190.4(e) explicitly states that the
9  court should assess whether the jury's finding is "contrary to law or the evidence
10 *presented*."  This distinction between the two motions is further evidenced by the fact
11 that in its other provisions § 1181 allows a defendant to apply for a new trial for
12 reasons exclusive of the evidence presented at trial, such as for newly discovered
13 evidence or for juror misconduct.  Pen. Code § 1181(8) and (3).[41]

14  15.  The trial court in Ms. Alfaro's case should have considered the mitigation
15 factor recognized in the probation report, as well as her prior attempt to plead guilty,
16 and any and all other mitigating evidence of which the court was aware in weighing
17 the mitigating evidence for § 1181 purposes.  Consideration of a defendant's
18 willingness to plead guilty as evidence in mitigation is appropriate since it reflects
19 on a defendant's remorse and acceptance of responsibility.  The trial court's comment
20 that even if it did grant a new trial, "that evidence is not admissible.  So it wouldn't
21 get us anywhere anyway," was incorrect and evidences the utter unreliability of the
22 analysis the court performed.

23
24
25

26  [41]  The fact that a § 1181(7) sentence modification application is deemed to
27 automatically follow from a § 190.4(e) motion under the latter statute does not mean
that all of the standards for modification and for a new trial are conflated.  If
anything, it suggests the opposite, since it is unlikely that the Legislature would have
28 created two different statutes providing the exact same post judgment remedies.

**D.     CONCLUSION**

16.  In light of all the powerful mitigating evidence known to the trial court, some of which was not presented to the jury, the trial court abused its discretion in denying Ms. Alfaro's motion for a new trial.  The court further erred in concluding that there was no point in granting a new trial because the additional evidence would be inadmissible therein.

17.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

18.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

/ / /

/ / /

417

1

**XXXI.**

2

**CLAIM 26:  THE TRIAL COURT'S ERRONEOUS AND PREJUDICIAL**

3

**DENIAL OF PETITIONER'S MOTIONS VIOLATED**

4

**PETITIONER'S CONSTITUTIONAL RIGHTS**

5

Petitioner's convictions and sentences were rendered in violation of her  rights

6

to due process, a fair trial, the effective assistance of counsel, a sentence that is

7

neither cruel nor unusual, and to a reliable, individualized, and non-arbitrary death-

8

penalty determination, as a result of the trial court's erroneous and prejudicial denial

9

of Petitioner's phase motions and erroneous and prejudicial granting of the State's

10

motions, all in violation of Petitioner's federal constitutional rights as guaranteed by

11

the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

12

Constitution.

13

1.  This claim has not been raised before the California Supreme Court.

14

2.  If Respondent disputes any of the facts alleged below, Petitioner requests

15

an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

16

has been afforded discovery and the disclosure of material evidence by the State,

17

the use of this Court's subpoena power, and the opportunity to investigate fully,

18

counsel requests an opportunity to supplement or amend this Petition.

19

3.  The declarations and other exhibits accompanying this Petition, as well as

20

the allegations and facts set forth elsewhere in this Petition, are hereby incorporated

21

by reference into this claim as though set forth in full.

22

4.  In support of this claim, Petitioner alleges the following facts, among others

23

to be presented after full discovery, investigation, adequate funding, access to this

24

Court's subpoena power, and an evidentiary hearing.

25

**A.**     **DEFENSE MOTIONS DENIED BY THE TRIAL COURT**

26

5.  The trial court erroneously and prejudicially denied Petitioner's motions,

27

including, but not limited to the following:

28

a. Petitioner's January 22, 1992 motion to continue the trial from February 24 to April 20.  Attached to the motion was the declaration of defense criminalist Marc Taylor who stated that further testing was required to clarify the events that took place in the commission of the murder.  The testing required involved the testing of blood droplets detected on various pieces of evidence.  Mr. Taylor believed that testing could take 6-8 weeks.  CT 333, 335.

b. Petitioner's February 24, 1992 motion to continue the commencement of trial.  In his attached declaration, defense criminalist Marc Taylor stated that during his preliminary examination of the evidence, he found evidence of the possible involvement of an additional individual in the murder -- a previously undetected shoeprint in blood.  He also found a drop of blood on the toe of a pair of tennis shoes seized from one of the other suspects.  CT 362-64.  The motion to continue was denied.  CT 1215.

c. Petitioner's April 17, 1992 motion to continue on grounds that defense expert, Consuela Edwards, Ph.D., was not available.  Counsel advised court of specific mitigating evidence which would be discussed by Dr. Edwards, including Petitioner's rape at the age of 9, as well as findings of dependent personality disorder and borderline intellectual functioning, based on IQ scores of 71-84.

d. Petitioner's motion for access to forensic evidence.  CT 346.  The motion was denied with respect to item number 8, without prejudice to renew.  CT 346.

e. Petitioner's motion to exclude photographs as prejudicial.  CT 349.

f. Petitioner's February 26, 1992 motion to exclude her video taped confession and all statements made to investigating officers.  CT 387, 2330.  In the motion, Petitioner argues that toxiclogical reports prepared by Orange County Sheriff's Department reflect that the drugs cocaine, benzoylecconine, and morphine were detected in Petitioner's blood at the time she confessed and made statement to law enforcement personnel.  Petitioner may have injected narcotics within an hour

prior to her arrest.  As such, Petitioner was under the influence of those drugs at time she was questioned.  On March 2, 1992, the trial court erroneously and prejudicially denied the motion, concluding that Petitioner knowingly and intelligently waived her *Miranda* rights and that her statements to law enforcement were voluntary.  CT 436; RT 302-307.

g.  Petitioner's motion for additional jury voir dire questions.  CT 397.

h.  Petitioner's motion for special jury instructions.  CT 405.

i.  Petitioner's motion to exclude the crime scene video and photographs of the crime scene.  CT 436.  Specifically, Petitioner objected to trial exhibits 6-16, 18, 19 and 26.  Exhibits 18 and 19 were withdrawn by the prosecution.  Petitioner's objections to Exhibits 14, 17 and 26 were sustained.  CT 436.  Certain portions of the crime scene video were ordered deleted.

j.  Petitioner's motion to ask follow-up questions of prospective jurors, including, but not limited to, Woodriff, Gorman, Goebel, Sanchez, Wiley, Saltz, Swanson, Lewis and Armstrong.  CT 230, 448.

k.  Petitioner's March 5, 1992 motion for additional peremptory challenges, argued on the basis that peremptories were used for prospective jurors who should have been excused for cause and on the basis that court did not allow additional voir dire questions as requested by Petitioner.  CT 459.

l.  Petitioner's motion to provide prospective jurors with defense counsel's questionnaire.  CT 156.

m.  Petitioner's April 7, 1992 request for a narrow instruction regarding a sentence of life without the possibility of parole.  CT 1136.

n.  Petitioner's motion requesting the trial court not to instruct the jurors regarding the governor's power to commute a sentence of life without the possibility of parole without mentioning the governor's power to commute a sentence of death as well.  CT 1136.

o.  Petitioner's March 9, 1992 objection to the use of a mannequin.  CT 468.

p.  Petitioner's March 19, 2992 motion to seal the courtroom during testimony by Petitioner.  CT 489.

q.  Petitioner's motion for additional jury instructions.  CT 1179, 1423 .

r.  Petitioner's motion for change of venue or continuance based on excessive publicity.  CT 1216, 1220.

s.  Petitioner's motion to quash a subpoena.  CT 1440.

t.  Petitioner's motion for *Hovey* or cluster voir dire.  CT 1440.

u.  Petitioner's challenge for cause as to prospective juror Pamela Albanesi.  CT 1478.

v.  Petitioner's motion regarding a sentence of life without the possibility of parole.  CT 1505.

w.  Petitioner's May 19, 1992 motion to exclude witnesses from the courtroom.  CT 1528.

x.  Petitioner's motion to strike Dr. Katsuyama's testimony.  CT 1528.

y.  Petitioner's motion to exclude the media during Janell Laird's testimony.  CT 1528.

z.  Petitioner's motion for a *Marsden* hearing.  CT 1195.

aa.  Petitioner's motion for additional expert fees for Norman Morein, sentencing consultant.  CT 1496-98.

bb.  Petitioner's motion for additional expert funds for Consuelo Edwards.  CT 1515.

cc.  Petitioner's motion for the address of Vicki Darr.  CT 1549.

dd.  Petitioner's motion for additional peremptories.

**B.** **HABEAS RELIEF IS WARRANTED**

6.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate

421

relief standing on their own, relief is required when this claim is considered together
with the additional constitutional errors outlined in the remainder of this Petition.
Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and
sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,
970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333
(9th Cir. 1978).

      7.  The foregoing violations of Ms. Alfaro's constitutional rights constitute
structural error and warrants the granting of this Petition without any determination
of whether the violations substantially affected or influenced the jury's verdict.
*Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies
to this claim, the foregoing constitutional violations so infected the integrity of the
proceedings that the error cannot be deemed harmless.  The foregoing violation
of Ms. Alfaro's rights had a substantial and injurious effect or influence on
Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and
resulting in a miscarriage of justice. These errors, both singularly and collectively,
so infected the integrity of the proceedings that it cannot be deemed harmless and the
State will be unable to meet its burden in showing this error harmless.  In any event,
the violation of Petitioner's rights in this regard had a substantial and injurious effect
or influence on the jury's penalty judgment, rendering Petitioner's death sentence
fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing
reasons, Petitioner respectfully requests that his petition be granted.

## XXXII.

## CLAIM 27:  THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS BY FAILING TO PROVIDE PETITIONER WITH THE NECESSARY ASSISTANCE OF COMPETENT AND INDEPENDENT EXPERTS

      Petitioner's conviction and sentence of death were rendered in violation of her
rights to due process, a fair trial, to present a defense, equal protection, a fair and

impartial jury, to the effective assistance of counsel, and to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Petitioner was not provided with the necessary assistance of competent, independent experts at her trial, which not only prejudiced her defense, but also his attorneys' ability to develop and present her defense effectively at both phases of trial.

1.  This claim has not been presented to the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

5.  Petitioner was not provided with the necessary assistance of competent, independent experts at her trial, which not only prejudiced her defense, but also his attorneys' ability to develop and present her defense effectively at both phases of trial.  The United States Supreme Court has expressly addressed the issue of psychiatric assistance in *Ake v. Oklahoma*,470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), finding that when the State puts a defendant's mental health in issue, the federal constitution itself mandates that the defendant be afforded the right to a competent independent mental health expert.

6. If defense counsel had been given adequate access to expert assistance, he would have been able to present a formidable defense to the State's case against Petitioner. The trial court's denial of trial counsel's request for experts violated Petitioner's constitutional rights. In addition, the denial of timely assistance rendered Petitioner's trial counsel utterly ineffective at Petitioner's trial.

7. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Petitioner's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

8. The foregoing violations of Petitioner's constitutional rights constitute structural error and warrants the granting of this petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless. In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice. For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

# XXXIII.

## CLAIM 28:  THE EXECUTION OF PETITIONER WOULD CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AS PETITIONER IS MENTALLY RETARDED

The United States Supreme Court has concluded that the execution of mentally retarded individuals is an excessive punishment and therefore violates the Eighth Amendment's proscriptions against cruel and unusual punishment.  *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).  Petitioner's execution would be cruel and unusual because she is mentally retarded.

## A.    INTRODUCTION

1.  Writing for the majority in *Atkins*, Justice Stevens stated, "[t]he practice [of executing mentally retarded individuals] . . . has become truly unusual, and it is fair to say that a national consensus has developed against it."  536 U.S. at 316. The actions of Congress, and of an increasing number of state legislatures in barring execution of the mentally retarded, constitute an objective indicator of contemporary values which demonstrates an expanding national opposition to the execution of the mentally retarded.  In *Atkins*, the Supreme Court recognized that the death penalty is cruel when imposed on those who are mentally retarded because, in light of their impairments, "by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."  536 U.S. at 318.  "[T]here is also abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings, they are followers rather than leaders."  *Id*.

## B.    PETITIONER IS MENTALLY RETARDED

2.  There is substantial evidence that Petitioner is mentally retarded.  In *Atkins*, the Court noted the definition of mental retardation provided by The American Association on Mental Retardation (hereinafter "AAMR") in *Mental Retardation:*

425

*Definitions, Classification, and Systems of Supports* (hereinafter "*Mental Retardation*") (9th ed. 1992).  *Id*. at 308, fn. 3.  As provided therein, a diagnosis of mental retardation requires the following criteria:

> Mental retardation refers to substantial limitations in present functioning. It is characterized by:  (1) Significantly subaverage intellectual functioning; existing concurrently with (2) Related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, work; (3) Mental retardation manifests before age 18.

Petitioner meets these criteria and is, therefore, retarded.

3.  Five days before issuance of the *Atkins* decision, the AAMR released the tenth edition of its publication and revised its definition of mental retardation.  The AAMR now defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  *Mental Retardation*, p. 8 (10th ed. 2002).  The California statutory definition of mental retardation adopts the same criteria for a diagnosis, but is much more general.[42]  The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") utilizes a definition that is very similar to the AAMR's 1992 definition.[43]

/ / /

/ / /

_____

[42]  "'Mentally retarded' means a condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period."  Ca. Penal Code § 1001.20(a).

[43]  The DSM-IV-TR defines mental retardation as follows:  The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev. 2000) ("DSM-IV-TR"), p. 41.)

4.  The AAMR's 1992 adaptive skills categories, as well as the AAMR's 2002 adaptive behavior definitions, will be utilized in the analysis of Petitioner's mental retardation.  Petitioner incorporates herein by reference Claim 1 above.

**1.    PETITIONER HAS WELL-DOCUMENTED SIGNIFICANT LIMITATIONS IN INTELLECTUAL FUNCTIONING**

5.  Petitioner has well-documented and long-standing mental deficiencies and significant limitations in intellectual functioning.  Intellectual functioning and "intelligence is not merely book learning, a narrow academic skill, or test-taking smarts.  Rather, it reflects a broader and deeper capacity for comprehending our surroundings - catching on, making sense of things, or figuring out what to do." *Mental Retardation*, page 40, (10th ed. 2002).  Petitioner suffered from learning disabilities and cognitive impairments throughout her childhood.  *See, e.g.*, Exhibit 7 (Declaration of Natasha Khazanov, Ph.D.) at ¶¶ 17-19.  Petitioner's specific developmental disabilities and borderline intellectual functioning are well-documented, as is her history of attentional disorder.  Exhibit 7 at ¶¶ 27, 133-138.  She She tried to pay attention in school, but could not.  Exhibit 7 at ¶ 120.  She sometimes behaved as if she were "not there mentally."  Exhibit 8 (Declaration of Pablo Steward, M.D.) at ¶¶ 28, 31.  It was impossible for her to focus on anything for long periods of time.  *Id.*

6.  Petitioner could never keep up with the other kids and she was incapable of getting her life together.  Exhibit 8 at ¶ 31.  At the age of 10, she continued to have trouble reading, and could read neither street signs nor labels.  Exhibit 89 (Declaration of Tamara Benedict) at ¶¶ 2-3.  She could not remember the rules to simple card games.  *Id.* at ¶ 4.  Her son, Danny, "apparently suffers from impairments similar to those of his mother."  Exhibit 8 (Declaration of Pablo Stewart, M.D.) at ¶ 35.  He has significant learning difficulties and, like his mother, attends Special Education classes, and may also have attentional deficits.  *Id.* at ¶¶ 35-36.  One of Petitioner's brothers has Downs Syndrome.

7.  As discussed more fully below, Petitioner's intellectual functioning in an academic setting has also been significantly substandard.  Petitioner simply was not able to function in a school setting, eventually dropping out of school because of her continual academic failures.  When she left school for the last time at the age of 14, she had a mental age of 9.  Exhibit 10 (Declaration of Cynthia Asprodites, Ph.D.) at ¶ 36.

8.  Petitioner has established concrete subaverage intellectual functioning that falls within the mentally retarded range.  Her I.Q. score was somewhere in the mid-70's.  In analyzing the actual number obtained from an I.Q. test, consideration must be given to the standard deviation for error which is 3 to 5 points.  *Mental Retardation*, p. 57 (10th ed. 2002).  Furthermore, there is no precise cut-off number in I.Q. scores which delineates whether or not an individual is mentally retarded.  In fact, a California Court of Appeals upheld a trial court finding that an individual with an I.Q. ranging as high as 83 was mentally retarded.  *Money v. Krall*, 128 Cal. App. 3d 378 (1982).  In that case, the Court found that:

> Treating the I.Q. with some flexibility permits the inclusion in the Mental Retardation category of individuals with I.Q.s somewhat higher than 70 who truly need special education or other programs . . .  The I.Q. level of 70 was chosen as the upper limit for Mental Retardation because most people with I.Q.s below 70 are so limited in their adaptive functioning that they require special services and protection . . .  The arbitrary I.Q. ceiling values are based on data indicating a positive association between intelligence (as measured by I.Q. score) and adaptive behavior.  This association declines at the upper levels of Mild Retardation.  Some individuals with an I.Q. near but below 70 may not have the impairment in adaptive behavior required for a diagnosis of Mental Retardation.

*Id.* at 400-401.  Thus, while low I.Q. standard scores alone are not sufficient for a diagnosis of mental retardation, a higher I.Q. does not rule out the diagnosis either.  One's adaptive behavior in daily functioning must also be evaluated.

/ / /

/ / /

428

**2.**   **PETITIONER HAS SIGNIFICANT LIMITATIONS IN ADAPTIVE BEHAVIOR AS EXPRESSED IN CONCEPTUAL, SOCIAL, AND PRACTICAL ADAPTIVE SKILLS**

9.  In order to apply the label of mental retardation to an individual, the second prong of the AAMR's definition must be met:  there must exist significant limitations in the individual's adaptive behavior.  Adaptive behavior is a "collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives."  *Mental Retardation*, p. 41 (10th ed. 2002). Conceptual skills include communication, self-direction, and academic skills. Practical skills are independent living skills, including such things as self-care, home care, community use, and occupational skills or work.  Social skills are those skills that enable one to interact successfully with other individuals.

10.  Again and again, the mental health professionals who have interviewed, tested, and examined Petitioner have not only found her to be lacking in intellectual incapacity, but they have also found significant limitations in Petitioner's adaptability.

**a.**   **Conceptual Skills**

11.  Conceptual skills include:  communication, the comprehension and expression of information; self-direction, generally relating to skills related to making choices; and functional academics, focusing on cognitive abilities and skills related to learning at school that can be applied to everyday living.

**(i)**   **Functional Academics**

12.  Petitioner incorporates by reference Claim 1.I above.

13.  Petitioner suffered from learning disabilities and cognitive impairments throughout her childhood.  Exhibit 7 (Declaration of Natasha Khazanov, Ph.d.) at ¶¶ 17-19.  Her specific developmental disabilities and borderline intellectual functioning are well-documented, and she has a history of attentional disorder.  *Id.* at ¶ 27.  Petitioner was referred for assessment for special education programs early

in the second grade.  Exhibit 10 (Declaration of Cynthia Asprodites, Ph.d.) at ¶ 8-11.
Her academic performance remained significantly behind what was expected of her
and her progress in school was consistently extremely poor.  *Id.* at ¶¶ 9-11.  Her
grades in school were consistently poor and she was diagnosed with learning
disabilities in elementary school.  *See* Exhibit 82 (Petitioner's school records).  She
always had trouble at school and learned things more slowly than her sister, Silvia,
who was two years her junior.  Exhibit 3 (Declaration of Silvia Melenedez Alonso)
at ¶ 23.

14.  Special Education records reveal academic and emotional difficulties.
Exhibit 7 at ¶¶ 66-70.  She was still reading at the 5th grade level in 2001.  Exhibit 7
at ¶ 91.  Her "significant learning difficulties were consistently recognized" and they
"significantly impaired her ability to function not only academically, but emotionally,
socially and cognitively as well."  Exhibit 10 at ¶¶ 12-15, 19-22, 36.  She could not
understand homework assignments even though they were explained to her multiple
times.  Exhibit 90 (Declaration of Jeff Hasner) at ¶¶ 5-9.

**(ii)    Communication**

15.  Petitioner has limitations in the area of communication.  She has always
had great difficulty in expressing herself and in comprehending information given
to her.  She has trouble paying attention and concentrating on tasks set before her.

**(iii)    Self-direction**

16.  Self-direction is the ability to make choices and decisions based upon
those choices.  It includes being able to create and follow a schedule.  Self-direction
also means having the ability to initiate activities, complete tasks, resolve problems,
and possess appropriate assertiveness when necessary.  Petitioner struggled with all
these areas.  Her younger sister, Silvia, reports that, "[e]ven though Rosie was two
years older than me, I always had a better understanding of how to make my way in
the world than Rosie did.  Rosie did things that did not make sense.  She would put
herself in harm's way. . . .  It seemed like she just did not have any common sense."

430

Exhibit 88 (2008 Silvia Alfaro Declaration) at ¶ 2; and see ¶ 3 ("She just didn't think right.").  At the age of 15, she fed her child curdled milk, and didn't know it.  *Id.* at ¶ 5.  She thought she could feed peanuts to her baby.  *Id.* at ¶ 6.

### b.    <u>Practical Skills</u>

17.  Practical skills are independent living skills, including the following categories:  self-care, which includes areas such as hygiene, grooming, and eating; home living, which includes such tasks as housekeeping, cooking, shopping, and finances; community use, which includes the ability to travel in a community and the use of public facilities; and work, including factors such as occupational skills, planning, and completion of tasks.

### (i)    <u>Self-Care</u>

18.  When she started using drugs, she stopped taking care of herself.  Exhibit 3 at ¶ 26.

### (ii)    <u>Home Living</u>

19.  Petitioner's mother reports that when Petitioner was nine, she developed a habit of cleaning the house excessively and constantly.  Exhibit 3 at ¶ 25.  She rearranged the furniture over and over again.  *Id.*

### (iii)    <u>Community Use</u>

20.  Community use includes the ability to navigate in a community, use public transportation, and follow the various laws and rules of society.  Petitioner's inadequate community use skills are evidenced by her inability to read street signs.  Exhibit 89 (Benedict Dec.) at ¶ 2.

### (iv)    <u>Occupational Skills/Work</u>

21.  In terms of occupational skills, Petitioner's experience in the work force was limited.  Her only employment was at McDonald's for a short period of time.

### c.    <u>Social Skills</u>

22.  Social skills are those related to social exchanges with other individuals, including interpersonal interaction, responsibility, self esteem, gullibility, naivete,

ability to follow rules/obey laws, and the ability to avoid victimization. *Mental Retardation*, p. 42 (10th ed. 2002).

### (i)      Interpersonal Relationships And Responsibility

23.  Petitioner has definite limitations in the area of social skills.  As a child, she was teased and taunted at school by her peers.  Exhibit 3 at ¶ 24.  She was significantly less mature socially than even the younger children in her classroom.  Exhibit 10 at ¶ 26.  As a teenager, she associated with dangerous men, apparently not understanding that she was placing herself in danger.  Exhibit 88 (2008 Silvia Alfaro Declaration) at ¶ 7.

### (ii)      Self-esteem, Gullibility, Naiveté, Capability to Obey Laws, and Avoidance of Victimization

24.  Petitioner was observed by both friends and mental health personnel as having low self-esteem and being depressed.  *See, e.g.*, Exhibit 9 (Silvia Alfaro Declaration) at ¶ 16.  She could be easily hurt and become despondent if she felt that she was being rejected by others.  She felt bad about her weight, but she couldn't stop eating.  Exhibit 3 at ¶ 22.  She cut her wrists (Exhibit 3, Silvia Melendez Alonso Declaration at ¶ 29) and at several points in her life was actively suicidal.  Exhibit 7 (Natasha Khazanov Declaration) at ¶ 30.  Her chronic drug use was, at least in part, a response to her unhappiness or perhaps clinical depression.  Exhibit 7 at ¶ 55-56.  Petitioner was extremely vulnerable to suggestion and domination.  Exhibit 8 (Pablo Stewart, M.D. Declaration) at ¶¶ 72-75.  She was was less mature than many young women of her age and lacked the insight, stability, confidence, judgment, and intellectual resources necessary to function as a healthy person.  Exhibit 10 at ¶ 38.

### 3.      PETITIONER'S MENTAL RETARDATION MANIFESTED BEFORE THE AGE OF 18

25.  With respect to the third prong of the AAMR's definition of mental retardation, as demonstrated above, Petitioner's mental retardation clearly manifested before the age of 18.

C. **CONCLUSION**

26.  Petitioner meets all three of the categories necessary to make a diagnosis of mental retardation.  Petitioner has established, concrete limited intellectual functioning.  While I.Q. alone does not conclusively confirm a mental retardation diagnosis, substantial evidence establishes that Petitioner clearly functions at a mentally retarded range in her adaptive behavior.  Under the 1992 AAMR definition of mental retardation, an individual must evidence limitations in at least two out of the ten itemized adaptive skills areas (communication, self-care, home living, social, community use, self-direction, heath and safety, functional academics, leisure, and work).  *Mental Retardation*, p. 38 (9th ed. 1992).  As outlined above, Petitioner has sufficiently evidenced these limitations in multiple categories.  Under the 2002 AAMR definition of mental retardation, an individual must demonstrate substandard performance in at least one of three itemized types of adaptive behavior (conceptual, practical, and social).  Petitioner has established substantial limitations in all three categories.  Finally, Petitioner's mental retardation manifested itself before the age of 18 years.

27.  The causal factors or etiology of mental retardation fall into the following categories:  biomedical, social, behavioral, and educational.  *Mental Retardation*, p. 127 (10th ed. 2002).  The specific factors that contributed to Petitioner's mental retardation are many and varied, including, but not limited to:  organic brain damage, child abuse and neglect, family poverty, lack of early intervention/special education services, and inadequate family support.

28.  In sum, an overwhelming amount of evidence establishes that Petitioner is mentally retarded and her execution would constitute cruel and unusual punishment under the Eighth Amendment.  As such, habeas relief is mandated.

/ / /

/ / /

**XXXIV.**

**CLAIM 29:  THE EIGHTH AMENDMENT PROHIBITS EXECUTION**

**OF PETITIONER DUE TO HIS MENTAL DISABILITIES**

Petitioner's death sentence was rendered in violation of his rights to be free from the imposition of cruel and unusual punishment as Petitioner suffers from mental disabilities which profoundly impair his mental functioning, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.  This claim has not been presented to the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits previously filed with this court and accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  On June 20, 2002, the United States Supreme Court issued its decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), which held that execution of mentally retarded individuals constitutes cruel and unusual punishment.  In reaching its conclusion that "death is not a suitable punishment for the mentally retarded criminal," the Supreme Court in *Atkins* concluded:

> We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or retributive purpose of the death penalty.  Construing and applying the Eighth Amendment in the light of

1  our 'evolving standards of decency,' we therefore conclude that such
2  punishment is excessive and that the Constitution 'places a substantive
   restriction on the State's power to take the life' of a mentally retarded
3  offender.

4  122 S. Ct. at 2252.

5       6.  In addition to mental retardation, Petitioner has significant organic brain

6  damage and other mental disabilities that profoundly affect her behavior and

7  functioning, particularly in conjunction with the signs and symptoms of mental illness

8  that were floridly present before and including the time of the offenses.  Petitioner

9  refers to and incorporates herein the allegations of Claims 1.I and 28.  It is plain that

10 Petitioner has suffered from mental impairments that are at least as severe as mental

11 retardation during her development, surrounding the time of the offenses with which

12 she was charged, and thereafter.  Accordingly, her execution would not "measurably

13 advance the deterrent or retributive purpose of the death penalty."  *Atkins*, 122 S. Ct.

14 at 2252.  For this reason, consistent with Eighth Amendment principles, Petitioner

15 cannot be executed.[44]

16

17                                    **XXXV.**

18 **CLAIM 30:  CALIFORNIA'S DEATH PENALTY SENTENCING SCHEME**

19            **VIOLATES CONSTITUTIONAL GUARANTEES**

20      Petitioner's sentence of death was rendered in violation of her rights to a fair

21 trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

22 determination of guilt and penalty, to the effective assistance of counsel, to present

23 a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and

24

─────────────────

25      [44]  Moreover, the execution of Petitioner, who has long suffered from mental
   impairments that are equivalent to mental retardation, at a time when the mentally
26 retarded are exempt from execution, would violate the Fourteenth Amendment's
   guarantees of equal protection of law and due process.  *See City of Cleburne v.*
27 *Cleburne Living Center*, 473 U.S. 432, 440-41, 105 S. Ct. 3249, 87 L. Ed. 2d 313
   (1985) (zoning decision against mentally retarded group home struck down because it
28 did not bear a rational relationship to legitimate state interests).

435

Fourteenth Amendments to the United States Constitution because many features of California's capital sentencing scheme, alone and in combination with each other, violate the federal Constitution.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 11 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

/ / /

/ / /

436

1    **A.    PENAL CODE § 190.2 FAILS TO ADEQUATELY NARROW THE**
2    **CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY**

3    6. To pass constitutional muster, a capital sentencing scheme must "provide

4    a 'meaningful basis for distinguishing the few cases in which the death penalty is

5    imposed from the many cases in which it is not.'" *Furman v. Georgia*, 408 U.S. 238,

6    313, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (White, J., concurring); *accord Godfrey*

7    *v. Georgia*, 446 U.S. 420, 427, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980).)  The Eighth

8    and Fourteenth Amendments require that a state's death penalty statute "'genuinely

9    narrow the class of persons eligible for the death penalty.'"  *Lowenfield v. Phelps*,

10   484 U.S. 231, 244, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988) (*quoting Zant v. Stephens*,

11   462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)); *McCleskey v. Kemp*,

12   481 U.S. 279, 305, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).  Despite this

13   constitutional mandate, California Penal Code § 190.2, which lists the "special

14   circumstances" that distinguish capital from non-capital offenses, makes virtually

15   every defendant found guilty of murder eligible for the death penalty.  Because the

16   "special circumstances" listed in § 190.2 do not perform the narrowing function

17   required by *Furman,* they fail to pass constitutional muster.

18   7. The sweeping nature of Penal Code § 189, which both fixes the degree

19   of murder and defines felony-murder, makes most murders first degree murders.

20   Under § 190.2, those found guilty of first degree murder with at least one special

21   circumstance are eligible for execution.  Section 190.2 currently identifies twenty-

22   nine special circumstances, embracing every type of first-degree murder that is likely

23   to occur.  The substantial overlap between the special circumstances listed in § 190.2

24   and the factors listed in § 189 makes almost all first degree murderers eligible to

25   receive the death penalty.  With respect to felony murders in particular, the list has

26   been greatly expanded and court decisions have made virtually any first degree

27   murder potentially death eligible, thereby abolishing all meaningful criteria for

28   distinguishing the most serious from the less serious homicides.

8. "[T]he risk of arbitrariness condemned in *Furman* is a function of the size of the class of convicted persons who are eligible for the death penalty." *Walton v. Arizona*, 497 U.S. 639, 715, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Stevens, J, dissenting).  "When juries are presented with a broad class, composed of persons of many different levels of culpability, and are allowed to decide who among them deserves death, the possibility of aberrational decisions as to life or death is too great [to satisfy the Eighth Amendment]." *United States v. Cheely*, 36 F.3d 1439, 1445 (9th Cir. 1994).  California's expansive death penalty statute violates the federal constitution by multiplying the "few" into the many.  Indeed, it appears that the proponents of the initiative which enacted § 190.2 had precisely this unconstitutional purpose in mind in drafting and advocating so expansive an array of special circumstances.  The proponents' argument in the Voter's Pamphlet assured voters that the statute would "apply to every murder." (*See* Cal. Votes Pamphlet, Gen. Elec. (Nov. 7, 1978) p. 34.

9. The California statute does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not," (*Spaziano v. Florida*, 468 U.S. 447, 460, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984)), and it provides no "principled basis" to "enable the sentencer to distinguish those who deserve capital punishment from those who do not." *Arave v. Creech*, 507 U.S. 463, 474, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993).  Because Ms. Alfaro was tried, convicted and sentenced under a statutory scheme that fails to meet these constitutional standards, habeas relief is warranted.  *Cheely*, 36 F.3d at 1444, fn.11.

**B.      PENAL CODE § 190.2 GIVES PROSECUTING AUTHORITIES UNGUIDED DISCRETION IN DECIDING WHETHER TO CHARGE STATUTORILY DEATH-ELIGIBLE DEFENDANTS WITH SPECIAL CIRCUMSTANCES AND TO SEEK THE DEATH PENALTY**

10. Under the California death penalty law, the 58 county district attorneys are given total discretion in deciding whether to charge special circumstances for

438

1    "eligible" defendants and to seek the death penalty.  Because of the failure of Penal

2    Code § 190.2 to constitutionally narrow the class of defendants who are "eligible"

3    for the death penalty, this standardless discretion serves as the de facto narrowing

4    procedure under the California death penalty scheme.  As  a result, the death penalty

5    is not applied on a uniform basis throughout the state, but instead is dependent upon

6    standardless, arbitrary, uncontrolled and shifting views of individual elected officials.

7        11.  The unbounded and unguided nature of the statutory scheme is illustrated

8    by Ms. Alfaro's case.  During the hearing on the district attorney's motion to exclude

9    evidence that Ms. Alfaro's attorney had offered to have her plead guilty in exchange

10   for a penalty of life without the possibility of parole, the district attorney explained

11   that the Orange County district attorney's position was that if the Penal Code

12   provided that a crime could be charged as a capital crime, it would be.  RT 185

13   (February 26, 1992 proceedings).  The district attorney admitted that there was no

14   limitation on the prosecutor's discretion to seek the death penalty so long as the crime

15   was included in the Penal Code.  *Id.* at 186.  He told the court, "I mean, if it were

16   totally up to the district attorney, there is discretion there, but it's also mandated by

17   the State that the district attorney proceed on cases that are in the Penal Code . . .

18   .This case falls squarely within the death penalty statutes."  *Id*. at 185  Such unguided

19   and unbounded discretion inevitably results in the kind of arbitrary imposition of the

20   death penalty condemned by the United States Supreme Court in *Furman* and *Gregg*

21   *v. Georgia*, 428 U.S. 153, 195, 198, 96 S. Ct 2909, 49 L. Ed. 2d 859 (1976).

22       12.  There can be no doubt that under this statutory scheme some offenders

23   will be chosen as candidates for the death penalty by one prosecutor, while other

24   offenders with similar qualifications in different counties will be spared by their

25   prosecutors.  The only explanation for these differences will be found in the personal

26   or political beliefs or office policies of one district attorney that cause a prosecutor

27   to seek the death penalty against a defendant, while, for precisely the same reasons

28   viewed differently by another prosecutor, an equally culpable offender will be spared.

1  Because there are no standards to guide the exercise of discretion, the prosecutor

2  will be able to rely on constitutionally irrelevant and impermissible considerations,

3  including race and economic status.  Where, as here, the defendant was Hispanic and

4  the victim was a white child whose mother worked for the Orange County Superior

5  Court, the risk of abuse of discretion was unacceptably high.

6       13.  The Eighth Amendment requires that the scheme by which a defendant is

7  made eligible for the death penalty ensure that "the death penalty is a proportionate

8  punishment and therefore not arbitrary or capricious in its imposition."  *Buchanan v.*

9  *Angelone*, 522 U.S. 269, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998).  Thus, as noted

10  above, a capital sentencing scheme must establish a meaningful basis for

11  distinguishing those cases in which it is imposed from those in which it is not.

12  *Lockett*, 438 U.S. at 600-01 (1978).  California's statutory scheme, as interpreted,

13  does not assure that like cases are treated alike and provides no mechanism to protect

14  against the arbitrary, capricious, or discriminatory winnowing of defendants

15  convicted of, or charged with, crimes punishable by death.  To be clear, Ms. Alfaro's

16  argument in the instant case is not limited to attacking unbridled prosecutorial

17  discretion, but rather is part of the broader claim, grounded in *Furman* and *Gregg*,

18  that neither the "eligibility" prong of California's death penalty statute (which

19  includes prosecutorial discretion), nor the "selection" prong of the statute, adequately

20  performs the "narrowing" function required by the United States Supreme Court in

21  *Furman* and *Gregg*.  *See also Zant v. Stephens*, 462 U.S. 862 (1983).  As a result,

22  California's present death penalty system, in allowing arbitrary and wanton

23  prosecutorial discretion, violates the Fifth and Fourteenth Amendment guarantees

24  to due process and a fair trial and the Eighth amendment protections against arbitrary,

25  inaccurate and irrational determination of death eligibility.

26  **C.    PENAL CODE § 190.3(A) as APPLIED IS UNCONSTITUTIONAL**

27       14.  Penal Code § 190.3 lists the various factors that the sentencer is to

28  consider, take into account and be guided by in deciding penalty.  The constitutional

errors resulting from the arbitrary manner in which defendants are deemed eligible or ineligible for the death penalty under § 190.2 are compounded by the ways in which California's death penalty "selection" criteria have been defined and applied by this Court. *See Tuilaepa v. California*, 512 U.S. 967, 971, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994) ("Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decision-making process: the eligibility decision and the selection decision.")

15. Of the eleven different § 190.3 factors a jury is directed to consider when selecting the appropriate sentence for a capital defendant, factor (a) -- the sole aggravating factor relied upon by the prosecution in Ms. Alfaro's case -- is the most susceptible to arbitrary interpretation and application. Section 190.3(a) directs the jury to consider the "circumstances of the crime" as a factor in aggravation. This Court has consistently found that the broad term "circumstances of the crime" meets constitutional scrutiny and has never applied a limiting construction to this factor. Indeed, this Court has allowed extraordinary expansions of factor (a), approving reliance on the "circumstance of the crime" aggravating factor because a defendant had a "hatred of religion,"[45] or because three weeks after the crime the defendant sought to conceal evidence,[46] or threatened witnesses after his arrest,[47] or disposed of the victim's body in a manner that precluded its recovery.[48] Although factor (a) has survived a facial Eighth Amendment challenge, (*see Tuilaepa v. California*, 512 U.S. 967 (1994)), when its actual application is scrutinized, it is clear that factor (a) has been used in ways so arbitrary and contradictory as to violate the guarantees of due process of law. Moreover, because § 190.3(a) fails to narrow the class

---

[45] *People v. Nicolaus*, 54 Cal. 3d 551, 581-82, 817 P.2d 893, 286 Cal.Rptr. 628 (1991).

[46] *People v. Walker*, 47 Cal. 3d 605, 640 fn.10, 765 P.2d 70 (1988).

[47] *People v. Hardy*, 2 Cal. 4th 86, 204, 825 P.2d 781 (1992).

[48] *People v. Bittaker*, 48 Cal .3d 1046, 1110 fn.35, 774 P.2d 659 (1989).

441

1  of death-eligible persons, it also renders the death selection criteria irremediably

2  vague, and "creates an unacceptable risk of randomness, the mark of the arbitrary and

3  capricious sentencing process prohibited by *Furman v. Georgia*, 408 U.S. 238

4  (1972)." *Tuilaepa*, 512 U.S. at 974-75.

5       16.  Prosecutors throughout California have argued that the jury could weigh in

6  aggravation almost every conceivable circumstance of the crime, even those that,

7  from case to case, reflect starkly opposite circumstances.  Thus, prosecutors have

8  been permitted to argue that "circumstances of the crime" is an aggravating factor

9  supporting the death penalty (1) because the defendant struck many blows and

10  inflicted multiple wounds,[49] or because the defendant killed with a single execution-

11  style wound;[50] (2) because the defendant killed the victim for some purportedly

12  aggravating motive (money, revenge, witness-elimination, avoiding arrest, sexual

13  gratification)[51] or because the defendant killed the victim without any motive at all;[52]

14  (3) because the defendant killed the victim in cold blood[53] or because the defendant

15  killed the victim during a savage frenzy;[54]  (4) because the defendant engaged in a

16

17  _____

18  [49] *See, e.g., People v. Zapien*, No. S004762, RT 36-38; *People v. Lucas*, No.
S004788, RT 2997-98; *People v. Carrera*, No. S004569, RT 160-61.

19  [50] *See, e.g., People v. Freeman*, No. S004787, RT 3674 (defendant killed with
20  single wound); *People v. Frierson*, No. S004761, RT 3026-27 (same).

21  [51] *See, e.g., People v. Howard*, No S004452, RT 6772 (money); *People v.
Allison*, No. S004649, RT 968-69 (same); *People v. Belmontes*, No. S004467, RT
22  2466 (eliminate a witness); *People v. Coddington*, No. S008840, RT 6759-60 (sexual
gratification); *People v. Ghent*, No. S004309, RT 2553-55 (same); *People v. Brown*,
No. S004451, RT 3543-44 (avoid arrest); *People v. McLain*, No. S004370, RT 31
23  (revenge).

24  [52] *See, e.g., People v. Edwards*, No. S004755, RT 10, 544 (defendant killed for
no reason); *People v. Osband*, No. S005233, RT 3650 (same); *People v. Hawkins*,
25  No. S014199, RT 6801 (same).

26  [53] *See, e.g., People v. Visciotti*, No. S004597, RT 3296-97 (defendant killed in
cold blood).

27

28  [54] *See, e.g., People v. Jennings*, No. S004754, RT 6755 (defendant killed
victim in savage frenzy (trial court finding).)

cover-up to conceal his crime,[55] or because the defendant did not engage in a cover-up and so must have been proud of it;[56]   (5) because the defendant made the victim endure the terror of anticipating a violent death[57] or because the defendant killed instantly without any warning;[58]   (6)  because the victim had children,[59] or because the victim had not yet had a chance to have children;[60]   (7) because the victim struggled prior to death,[61] or because the victim did not struggle;[62]   (8) because the defendant had a prior relationship with the victim,[63] or because the victim was a complete stranger to the defendant.[64]

---

[55]  *See, e.g.*, *People v. Stewart*, No. S020803, RT 1741-42 (defendant attempted to influence witnesses); *People v. Benson*, No. S004763, RT 1141 (defendant lied to police); *People v. Miranda*, No. S004464, RT 4192 (defendant did not seek aid for victim).

[56]  *See, e.g.*, *People v. Adcox*, No. S004558, RT 4607 (defendant freely informs others about crime); *People v. Williams*, No. S004365, RT 3030-31 (same); *People v. Morales*, No. S004552, RT 3093 (defendant failed to engage in a cover-up).

[57]  *See, e.g.*, *People v. Webb*, No. S006938, RT 5302, *People v. Davis*, No. S014636, RT 11, 125; *People v. Hamilton*, No. S004363, RT 4623.

[58]  *See, e.g.*, *People v. Freeman*, No. S004787, RT 3674 (defendant killed victim instantly); *People v. Livaditis*, No. S004767, RT 2959 (same).

[59]  *See, e.g.*, *People v. Zapien*, No. S004762, RT 37 (Jan. 23, 1987) (victim had children).

[60]  *See, e.g.*, *People v. Carpenter*, No. S004654, RT 16, 752 (victim had not yet had children).

[61]  *See, e.g.*, *People v. Dunkle*, No. S014200, RT 3812 (victim struggled); *People v. Webb*, No. S006938, RT 5302 (same); *People v. Lucas*, No. S004788, RT 2998 (same).

[62]  *See, e.g.*, *People v. Fauber*, No. S005868, RT 5546-47 (no evidence of a struggle); *People v. Carrera*, No. S004569, RT 160 (same).

[63]  *See, e.g.*, *People v. Padilla*, No. S014496, RT 4604 (prior relationship); *People v. Waidla*, No. S020161, RT 3066-67 (same); *People v. Kaurish*, 52 Cal. 3d 648, 717, 802 P.2d 278 (1990), *cert. den*. 502 U.S. 837 (same).

[64]  *See, e.g.*, *People v. Anderson*, No. S004385, RT 3168-69 (no prior relationship); *People v. McPeters*, No. S004712, RT 4264 (same).

1        17.  Further evidence of the contradictory applications of § 190.3(a) abounds:

2    Prosecutors have argued, and juries were free to find, that factor (a) was an

3    aggravating circumstance because the victim was a child, an adolescent, a young

4    adult, in the prime of life, or elderly; [65] because the victim was strangled, bludgeoned,

5    shot, stabbed or consumed by fire;[66] because the defendant killed for money, to

6    eliminate a witness, for sexual gratification, to avoid arrest, for revenge, of for no

7    motive at all;[67] because the victim was killed in the middle of the night, late at night,

8    early in the morning or in the middle of the day;[68] or because the victim was killed in

9    her own home, in a public bar, in a city park or in a remote location.[69]

10

11

12    [65]  *See, e.g.*, *People v. Deere*, No. S004722, RT 155-56 (victims were young, ages 2 and 6); *People v. Bonin*, No. S004565, RT 10, 075 (victims were adolescents, ages 14, 15 and 17); *People v. Kipp*, No. S009169, RT 5164 (victim was a young adult, age 18); *People v. Carpenter*, No. S004654, RT 16, 752 (victim was 20); *People v. Phillips*, 41 Cal. 3d 29, 63, 711 P.2d 423 (1985) (26 year old victim was "in the prime of his life"); *People v. Samayoa*, No. S006284, RT 49 (victim was an adult "in her prime"); *People v. Kimble*, No. S004364, RT 3345 (61 year old victim was "finally in a position to enjoy the fruits of his life's efforts); *People v. Bean*, No. S004387, RT 4715-16 (victim was "elderly").

16

17    [66]  *See, e.g.*, *People v. Clair*, No. S004789, RT 2474-75 (strangulation); *People v. Kipp*, No. S004784, RT 2246 (same); *People v. Fauber*, No. S005868, RT 5546 (use of an ax); *People v. Benson*, No. S004763, RT 1149 (use of a hammer]) *People v. Cain*, No. S006544, RT 6786-87 use of a club); *People v. Jackson*, No. S010723, RT 8075-76 (use of a gun); *People v. Reilly*, No. S004607, RT 14, 040 (stabbing); *People v. Scott*, No. S010334, RT 847 (fire).

20    [67]  *See, e.g.*, *People v. Howard*, No. S004452, RT 6772 (money); *People v. Allison*, No. S004649, RT 969-70 (same); *People v. Belmontes*, No. S004467, RT 2466 (eliminate a witness); *People v. Coddington*, No. S008840, RT 6759-61 (sexual gratification); *People v. Ghent*, No. S004309, RT 2553-55 (same); *People v. Brown*, No. S004451, RT 3544 (avoid arrest); *People v. McLain*, No. S004370, RT 31 (revenge); *People v. Edwards*, No. S004755, RT 10, 544 (no motive at all).

24    [68]  *See, e.g.*, *People v. Fauber*, No. S005868, RT 5777 (early morning); *People v. Bean*, No. S004387, RT 4715 (middle of the night); *People v. Avena*, No. S004422, RT 2603-04 (late at night); *People v. Lucero*, No. S012568, RT 4125-26 (middle of the day).

26    [69]  *See, e.g.*, *People v. Anderson*, No. S004385, RT 3167-68 (victim's home); *People v. Cain*, No. S006544, RT 6787 (same); *People v. Freeman*, No. S004787, RT 3674, 3710-11 (public bar); *People v. Ashmus*, No. S004723, RT 7340-41 (city park); *People v. Carpenter*, No. S004654, RT 16, 749-50 (forested area); *People v. Comtois*, No. S017116, RT 2970 (remote, isolated location).

18.  The foregoing examples of the actual applications of factor (a) make clear that factor (a) is being relied upon as an aggravating factor in every case, by every prosecutor, without any limitations whatsoever.  As  a consequence, from case to case, prosecutors have been permitted to turn entirely opposite facts -- or facts that are inevitable variations of every homicide -- into aggravating factors which the jury is urged to weigh on death's side of the scale.  In practice, § 190.3's broad "circumstances of the crime" aggravating factor licenses indiscriminate imposition of the death penalty upon no basis other than "that a particular set of facts surrounding a murder . . . were enough in themselves, and without some narrowing principles to apply to those facts, to warrant the imposition of the death penalty." *Maynard v. Cartwright*, 486 U.S. 356, 363, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988).  As  the United States Supreme Court has found, such insufficient narrowing violates the constitution.  *Id.*

## D.    THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON WHICH FACTORS SHOULD COULD BE CONSIDERED IN AGGRAVATION AND WHICH FACTORS COULD BE CONSIDERED IN MITIGATION

19.  The above errors were further exacerbated because neither of the juries responsible for determining Ms. Alfaro's fate was ever instructed that the potential factors in aggravation were limited to those set forth in § 190.3 (a), (b), (c), and to a limited extent (i),and that factors 190.3 (d), (e), (f), (g), (h), (j), and (k) may only be given mitigating weight and may not be used in aggravation.  *See* RT 2042-2044; RT 4431-4434; *see also People v. Hardy,* 2 Cal. 4th 86, 207 (1992); *People v. Hamilton,* 48 Cal. 3d 1142, 1184, 774 P.2d 730 (1989); *People v. Davenport,* 41 Cal. 3d 247, 288-90, 710 P.2d 861 (1985) (plur. opn. of Reynoso, J.); *cf. People v. Osband,* 13 Cal. 4th 622, 708-709, 919 P.2d 640 (1996) (age of the defendant under factor (i)

1  may be considered either in aggravation or mitigation[70]).  This error was compounded

2  because in the instruction listing the sentencing factors (d), (e), (f), (g), (h), and (j)

3  were each introduced by the phrase "[w]hether or not."  Thus, the jury could have

4  concluded that the absence of these mitigating factors constituted aggravation.  *Mills*

5  *v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988); *cf. Davenport,*

6  41 Cal. 3d at 289; *see also McCleskey v. Kemp, supra*, 481 U.S. at 313, fn. 37 ("It

7  would be improper and often prejudicial to allow jurors to speculate as to aggravating

8  circumstances wholly without support in the evidence."); *but see, People v. Marshall,*

9  50 Cal. 3d 907, 936-937, 790 P.2d 676 (1990); *People v. McLain,* 46 Cal. 3d. 97, 118,

10  757 P.2d 569 (1988).

11      20.  Without instructions as to which factors could be considered in

12  aggravation and which could not, the jury was given inadequate, misleading, and

13  erroneous guidance as to how it should evaluate the statutory factors essential to its

14  penalty determination.  *See, e.g.*, *Arave v. Creech,* 507 U.S. 463, 471 (1993)

15  (aggravating circumstance must provide some guidance to the sentencer to meet

16  constitutional requirements).  The undefined, unitary list provided to the jury allowed

17  the jurors to consider in aggravation factors such as Ms. Alfaro's youth, her mental

18  or emotional disturbance, drug impairment, and positive background and character

19  evidence, which may constitutionally only be considered in mitigation.  *See Zant v.*

20  *Stephens,* 462 U.S. at 885; *Penry v. Lynaugh*, 492 U.S. 302, 323-24 (1989)

21  (unconstitutional to not allow jury to give mitigating effect to evidence of mental

22  retardation where jury may mistakenly consider it as aggravating evidence).  The

23  likelihood that the jury improperly gave aggravating weight to mitigating factors

24  is illustrated by the fact that, in denying the motion to modify the sentence, the *judge*

25  improperly gave aggravating weight to factor (i), the youth of the defendant, and

26  to factor (k).  *See* RT 4505-07.  Similarly, the jury was allowed to and may have made

27

28

---

[70]  While age may be considered in mitigation or aggravation, youth is a mitigating factor.  *See Eddings v. Oklahoma,* 455 U.S. 104, 115-116 (1982).

1   the same mistake as did the trial in failing to consider Ms. Alfaro's lack of a felony

2   record or history of criminal conduct involving violence as a mitigating circumstance.

3        21.  This instructional error violated the federal constitution.  When state law

4   gives the jury a role in sentencing, the defendant has a liberty interest, protected

5   under the due process clauses of the Fifth and Fourteenth Amendments, in having

6   her sentence imposed by a jury accurately informed concerning the scope of their

7   sentencing function.  *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d

8   175 (1980); *see also McCoy v. Court of Appeals of , Dist. 1*, 486 U.S. 429, 434,

9   108 S. Ct. 1895, 100 L. Ed. 2d 440 (1988) (state's enforcement of its criminal laws

10   must comply with principles of equality and fair procedure embodied in Fourteenth

11   Amendment); *see also Fetterly v. Paskett*, 997 F. 2d 1295, 1300-01 (9th Cir. 1993);

12   *Fetterly v. Paskett*, 15 F. 3d 1472, 1479-80 (9th Cir. 1994) (conc. opn. of Trott, J.).

13   **E.     THE JURY WAS PRECLUDED FROM GIVING ANY MITIGATING**

14   **EFFECT TO EVIDENCE OF MS. ALFARO'S MENTAL OR**

15   **EMOTIONAL DISTURBANCE THAT WAS DEEMED TO BE LESS**

16   **THAN "EXTREME"**

17        22.  The trial court's error in failing to instruct the jurors that factors (d)

18   through (h) and (j) through (k) may be given only mitigating weight was further

19   compounded by the implied prohibition in the jury instructions that jurors not give

20   any mitigating effect to evidence of Ms. Alfaro's mental or emotional disturbance

21   that was deemed to be less than "extreme."  *See* Pen. Code, § 190.3(d).  Section

22   190.3(d) instructs a jury to consider "[w]hether or not the offense was committed

23   while the defendant was under the influence of *extreme* mental or emotional

24   disturbance."  *Id*.  It appears to limit the effect a juror may give to mental or

25   emotional problems characterized as less than "extreme."  So drafted, it is clear

26   that this jury instruction would have prevented a reasonable juror from giving

27   consideration to less-than-extreme mental and emotional conditions.

28

447

23.  The Eighth Amendment requires that the jury, during a capital sentencing hearing, be able "to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California,* 494 U.S. 370, 377-78, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *see also Penry,* 492 U.S. at 319; *Lockett,* 438 U.S. 586; *Eddings,* 455 U.S. 104 (1982).  A defendant's mental and emotional problems are undeniably relevant to a capital sentencing determination.  *See, e.g. Mills*, 486 U.S. at 376 (holding that mental infirmity, childhood therapy, and minimal brain damage were among "factors which may call for a less severe penalty"); *Eddings*, 455 U.S. at 111, fn. 6 (holding that a defendant's "emotional state at the time of the crime" is among "special facts about this defendant that mitigate against imposing capital punishment;" the "mental and emotional development" of a youthful defendant "must" be "duly considered in sentencing"); *see also, e.g.*, *Penry*, 492 U.S. at 302 (noting that mental retardation, arrested emotional development, and mental or emotional state must be considered by the jury); *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (conc. opn. of O'Connor, J.). Preventing a jury from considering less-than-extreme mental or emotional disturbances of a defendant violates the Fifth, Eighth, and Fourteenth Amendments.) *See, e.g. Smith v. McCormick*, 914 F. 2d 1153, 1165-66 (9th Cir. 1990) (Montana sentencing scheme held unconstitutional because it permitted sentencer to reject mitigating evidence falling below a certain weight); *Kenley v. Armontrout*, 937 F.2d 1298, 1309 (8th Cir. 1991) (defendant's mental health problems need not rise to the level of insanity in Order to be considered mitigating evidence).

24.  The conclusion that § 190.3(d) precludes reasonable jurors from considering less-than-extreme mental and emotional conditions is not avoided by reference to the language of 190.3(k), the "catch-all" category.  Factor (k) authorizes the jury to take into account "[a]ny other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime."  Factor (k) is limited by its terms to any "other" circumstance.  Thus, factor (k) would not appear

448

1   to a reasonable juror to permit consideration of the kinds of mitigation evidence that

2   has been *explicitly limited* by the language of one of the other specifically enumerated

3   circumstances, such as factor (d)'s restriction to a showing that the defendant acted

4   under "extreme" mental or emotional disturbance.  In this context, factor (k)'s

5   reference to "other" circumstances could only mean to a reasonable juror a

6   "mitigating matter of a different kind from the mitigating circumstances already

7   listed."  In other words, factor (d), mental disturbance, and factor (k), the catch-all

8   category, are perceived as being mutually exclusive.  Hence, less-than-extreme

9   mental and emotional disturbances are dismissed under factor (d), but would not be

10  considered by jurors under factor (k).

11      25.  Defense counsel here compounded the flaw of the implied limitation

12  contained in factor (d) when he failed to provide the jury with any clarification.

13  Mr. Monroe never informed the jury that a less-than-severe mental or emotional

14  disturbance had any relevance whatsoever to the sentencing determination.[71]  In fact,

15  Mr. Monroe's explication of factor (k) amounted to the statement that "you know

16  about the (k) factor.  We alluded to that."  RT 4379.  This statement was followed

17  by a brief description of Ms. Alfaro's troubled home life.  RT 4379-80.

18      26.  Such a profoundly inadequate discussion by Mr. Monroe did nothing to

19  correct the error inherent in the plain language of factors (d) and (k).  Moreover, such

20  an omission was inexcusable.  Evidence was adduced at both of Ms. Alfaro's trials

21  that Ms. Alfaro suffered from mental and/or emotional probleMs.  Dr. Consuelo

22  Edwards, psychiatrist and mental health expert witness, testified to Ms. Alfaro's

23  traumatic childhood and multiple psychiatric disturbances, as corroborated by several

24  experts, that unquestionably affected her at the time of the crime.  Ms. Alfaro had an

25  abusive, alcoholic father (RT 1826, 4064-68), and had been raped as a child by one

26  _____

27  [71]  Counsel's failure to argue about the relevance of factor (d) to the present
    case, or to make this critical point clear deprived Ms. Alfaro of the effective

28  assistance of counsel due to her under the Sixth Amendment.

of her father's friends.  RT 1866-67.  She became involved with drugs at an early age (RT 4061), and by fourteen, had been abandoned by her father, was addicted to drugs, had dropped out of school, was pregnant with her first child, and was being prostituted by an older woman.  RT 4061-68, 1666-73.  That Ms. Alfaro had chronic, *ever-present* mental impairments was confirmed by Dr. Edwards testimony, including: borderline intellectual functioning with an IQ no higher than 78, and probably much lower; Attention Deficit Hyperactivity Disorder; low impulse control; possible organic brain damage on the right side of the brain; learning disabilities; Dependent Personality Disorder; and disorders associated with anxiety and depression.  RT 4068-97.

27.  In sum, the court's instructions and the argument by counsel lead unavoidably to the conclusion that a reasonable juror would have understood, contrary to the commands of the Fifth, Eighth and Fourteenth Amendments, that Ms. Alfaro's mental and emotional disturbances were not available as bases for imposing a sentence less than death unless the disturbances were found to be "extreme."

**F.     THE TRIAL COURT FAILED TO INSTRUCT ON BURDEN AND STANDARDS OF PROOF AT CRUCIAL STEPS IN THE SENTENCING DETERMINATION.**

28.  In California, before sentencing a person to death, the jury must be persuaded that the factors in aggravation so substantially outweigh the factors in mitigation that a verdict of death is appropriate. (CALJIC No. 8.88; *People v. Cudjo*, 6 Cal. 4th  585, 634, 863 P.2d 635 (1993).)  In failing to instruct the jury or otherwise require (1) that all aggravating factors be proven beyond a reasonable doubt, (2) that aggravation must outweigh mitigation beyond a reasonable doubt, and (3) that death must be found to be the appropriate penalty beyond a reasonable doubt, the court violated federal principles of due process,  (*see Santosky v. Kramer*, 455 U.S. 745, 754-755, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Winship,* 397 U.S. 358, 364,

90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)), equal protection, and the Eighth and Fourteenth Amendments's requirements of heightened reliability in the death determination. *See Ford v. Wainwright*, 477 U.S. 399, 411, 414, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986); *Beck v. Alabama*, 477 U.S. 625, 637, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

29.   Penalty phase evidence invariably raises disputed factual issues.  The trial court's instructions commanded each juror to "determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise." RT 2034; RT 4408.  Thus, it is clear not only that the existence of an aggravating circumstance is a fact that is susceptible to proof under a reasonable doubt standard, but that due process requires that such a circumstance be proven beyond a reasonable doubt.  *See* 18 U.S.C. § 3593, subd. (c) ("The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt.").

30.   Further, to ensure the reliability of the jury's determination to sentence a person to death, the prosecution must bear the burden of proof to some degree. Because a capitally accused person stands to lose his or her life, a capital jury should be instructed that they may impose a sentence of death only if they are persuaded beyond a reasonable doubt as to each and every aggravating factor, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate penalty.

31.   Finally, the failure to require that aggravation must outweigh mitigation beyond a  reasonable doubt, and that death must be found to be the appropriate penalty beyond a reasonable doubt, violates the Fifth, Eighth and Fourteenth Amendments.  In cases where the jury finds the weight of the aggravating and mitigating evidence to be close or equal, it is unacceptable under the Eighth and Fourteenth Amendments that one person should live while another dies simply

1  because one jury assigns the burden of proof and persuasion to the State, while
2  another assigns it to the accused.

3  **G.      THE TRIAL COURT ERRED IN FAILING TO DELETE**
4  **        INAPPLICABLE FACTORS**

5          32.  Penal Code § 190.3 required the trial court to instruct the jury on factors
6  that were inapplicable to Ms. Alfaro's case.  The court's instructions as to these
7  inapplicable factors intolerably and unnecessarily risked juror confusion, and
8  capricious and unreliable decision making.  As  instructed, the jury was permitted
9  to aggravate Ms. Alfaro's sentence on the basis of factors that should have played
10 no role in the sentencing process, and interjected irrelevant and prejudicial
11 information into the jury's deliberations.  This danger was heightened because
12 the instructions did not explicitly designate which factors the jury should consider
13 as mitigating factors and which factors they should consider as aggravating.  When
14 combined with the court's failure to delete unsupported factors, jurors were left
15 to figure out, without direction or guidance, which factors were relevant and
16 applicable to Ms. Alfaro's case, creating the possibility that the jury rejected relevant
17 mitigating evidence because it thought that it was somehow inapplicable, as we know
18 the trial judge did.  *See* Claim 24.  Such a risk violated her rights under the Eighth
19 Amendment.  *Boyde*, 494 U.S. at 380 (instructions which create the reasonable
20 likelihood that the jury was prevented from giving mitigating effect to relevant
21 evidence violate the Eighth Amendment).

22         33.  Finally, the failure to delete inapplicable factors risked Ms. Alfaro's right
23 to an individualized sentencing determination based on permissible factors relating
24 to her and the crime.  This error, by potentially inflating the number of factors the
25 jury would consider as aggravation, violated the Fifth, Eighth and Fourteenth
26 Amendments' requirement of heightened reliability in the death determination.
27 *Ford v. Wainwright*, 477 U.S. 399, 411, 414 (1986); *Beck*, 477 U.S. at 637.

28

**H.**     <u>**THE TRIAL COURT ERRED IN FAILING TO INFORM THE JURY**</u>
<u>**THAT IT HAD THE DISCRETION TO DECLINE TO IMPOSE THE**</u>
<u>**DEATH PENALTY AND RETURN A VERDICT OF LIFE WITHOUT**</u>
<u>**PAROLE EVEN IF IT FOUND NO EVIDENCE IN MITIGATION**</u>

34.  Under California law, the jury has the right to fix the penalty at life without possibility of parole even in the absence of mitigating circumstances.  *See People v. Duncan*, 53 Cal. 3d 955, 979, 810 P.2d 131 (1991) (holding that "[t]he jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death").  The failure of the trial court to instruct the jurors that they could spare Ms. Alfaro's life even in the absence of mitigating evidence violated Ms. Alfaro's right to a reliable penalty determination guaranteed by the Eighth Amendment and her right to equal protection of the laws guaranteed by the Fourteenth Amendment.  *See Hicks*, 447 U.S. at 346; *Hewitt v. Helms*, 459 U.S. 460, 469, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983).

35.  Mr. Monroe requested that the trial judge properly inform the jury of its right to return a sentence less than death.  He asked the court to instruct that, "'the jury must reject death . . .' if the jury finds that the ' . . . mitigating factors . . .' outweigh the 'aggravating . . .' factors and the jury is 'free to do so even if the aggravating factors . . .' outweigh 'mitigating factors.'"  CT 429.  The trial judge refused Mr. Monroe's request, asserting that the proposed instruction was covered by other instructions.  RT 1974 (defense counsel renewed his request for special jury instructions during the second penalty phase and the judge refused them on the same grounds).  The court erred in so ruling; no other instruction informed the jurors they were free to impose a sentence of life in the absence of any mitigating evidence.  The court's error was particularly prejudicial in light of the district attorney's closing arguments.  The prosecutor argued at both trials the apparent lack of mitigating evidence (RT 1990-2006; RT 4341-66), even though this was factually incorrect (*see* Penal Code §§ 190.3(b) and (c)), and further remarked that the amount

453

1    of mitigation required to overcome a sentence of death would need to "penetrate[ ]

2    . . . [a] block wall." RT 4338.

3          36.  If a state law permits a jury to spare a defendant's life even if there is no

4    evidence in mitigation, the jury must be specifically so informed to avoid the Eighth

5    Amendment's prohibition of the "infliction of death under [a] legal system[ ] that

6    permit[s] this unique penalty to be so wantonly and so freakishly imposed." *Furman*,

7    408 U.S. at 309-10.  The failure of the trial judge to instruct the jurors that they could

8    spare Ms. Alfaro's life, even in the absence of mitigating evidence, denied Ms. Alfaro

9    her rights to due process and a reliable penalty determination in violation of the Fifth,

10   Eighth and Fourteenth Amendments.

11   **I.      THE TRIAL COURT ERRED IN FAILING TO REQUIRE A WRITTEN**

12   **        STATEMENT OF FINDINGS.**

13         37.  A sentencing jury in a capital case is faced with a complicated and

14   profound task.  A capital jury is expected to process an extensive body of evidence,

15   including the circumstances of the crime, the special circumstances, a defendant's

16   personal, criminal and family history, and a defendant's state of mind at the time the

17   crime was committed.  The jury must then determine, with no clear guidance, whether

18   such evidence should be treated as an aggravating or a mitigating factor and, finally,

19   must then determine the weight to be accorded to the evidence and the factors.

20   Despite the complicated nature of this process and the magnitude of the discretion

21   afforded to a capital sentencing jury, § 190.3 fails to require that the jury document,

22   in writing, its findings on the statutory aggravating and mitigating factors.  This

23   omission results in the complete abrogation of the defendant's right to meaningful

24   appellate review of the sentencing process in violation of the Fifth, Eighth and

25   Fourteenth Amendments.  *See Gregg*, 428 U.S. at 195, 198; *Proffitt v. Florida*,

26   428 U.S. 242, 250-51, 253, 259-60, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976).

27         38.  In a capital case, the sentencing process is highly subjective, (*see Turner v.*

28   *Murray*, 476 U.S. 28, 33-34, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986)), and the risk

that an errant procedure will result in the defendant's death is too great.  Because a statement of findings and reasons would alleviate that risk, yet would pose only a minimal burden on the State, due process also requires the sentencer to make such a record.  *Cf. Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  The requirement of written findings not only fortifies the record for appellate review, but also alerts the jury to the gravity of the task at hand by forcing accountability regarding each factor considered in reaching the conclusion that death is the appropriate penalty.  Requiring an explicit statement of the jury's findings would provide greater certainty that the determination of death was predicated on a rational ground and that any irrational decision to impose the death penalty will be uncovered and corrected.  The guarantee of meaningful appellate review under the Fifth, Eighth and Fourteenth Amendments cannot be satisfied under California's death penalty statute as it currently stands.

**J.**   **CONCLUSION**

39.  The defects in California's capital sentencing scheme prejudiced Ms. Alfaro.  Both individually and cumulatively, the defects outlined above warrant habeas relief.

## XXXVI.

## CLAIM 31:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED AS A RESULT OF THE DISCRIMINATORY MEANS OF SELECTING THE ORANGE COUNTY VENIRE

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Petitioner was denied an impartial jury drawn from a "fair cross section" of the community.  Given

that Ms. Alfaro is Hispanic, and the venire for her case was predominantly Caucasian, there is a serious question as to whether racial discrimination occurred in the selection process of the grand or petty jury.  As  a result, habeas relief is warranted.

1.  Exhaustion of the claim:  This claim was fairly presented as Claim 4 in the habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no. S099569.

2.  AEDPA:  The claim was rejected by an Order of the California Supreme Court dated November 18, 2007.  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858. The state court denied this claim without an opinion, and without affording Petitioner an evidentiary hearing, discovery, or any other means to further develop his claim. When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial was objectively unreasonable.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

6.  To establish a *prima facie* showing of a violation, a Petitioner must demonstrate that:  (1) the group alleged to have been excluded is a distinctive group in the community; (2) the representation of the group in venires from which juries are selected is not fair and reasonable in relation to their representation in the community; and (3) this underrepresentation is the result of a systematic exclusion of the group in the jury selection process.  An accused can show a systematic exclusion by demonstrating that the under-representation recurred over time and was inherent to the particular jury selection process utilized.  Furthermore, while the accused must show a "systematic exclusion," she need not prove intent.  The fair cross section requirement forbids any substantial under-representation of minorities, regardless of whether the State's motive is discriminatory.

7.  Petitioner in this case is part of a distinctive group in the community.  She is Hispanic.  There is a substantial Hispanic population in Orange County, as evidenced by the fact that the area of Anaheim where Ms. Alfaro went on the morning of June 15, 1990, is known as "Little Tijuana."  Census figures from 1990 indicate that Orange County had a total population of 2,410,556, of which 564,828 were Hispanic.  Exhibit 86.

8.  From the surnames of the jurors, it appears that there were few, if any, Hispanics in the venire.  CT 444-463, 1441-42, 1460-90, 1499-1508, 1517-20.  Because Ms. Alfaro is Hispanic and there were a minimal number of Hispanics in the venire from which her juries were chosen, Petitioner alleges that the jury pool was

457

1   unrepresentative of the population in Orange County at the time of the trials and as a

2   result, Ms. Alfaro was denied a fair trial.

3       9.   The constitutional violations set forth in this claim alone mandate relief

4   from the convictions and sentence.  However, even if these violations do not mandate

5   relief standing on their own, relief is required when this claim is considered together

6   with the additional constitutional errors outlined in the remainder of this Petition.

7   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

8   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

9   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

10  Cir. 1978).

11      10.  The foregoing violations of Ms. Alfaro's constitutional rights

12  constitute structural error and warrants the granting of this Petition without any

13  determination of whether the violations substantially affected or influenced the jury's

14  verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

15  doctrine applies to this claim, the foregoing constitutional violations so infected the

16  integrity of the proceedings that the error cannot be deemed harmless. The foregoing

17  violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

18  Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

19  resulting in a miscarriage of justice.

20

21                          **XXXVII.**

22  **CLAIM 32:  THE VIOLATIONS OF FEDERAL LAW ARTICULATED**

23              **IN THIS PETITION ALSO CONSTITUTE VIOLATIONS**

24                          **OF INTERNATIONAL LAW**

25      Petitioner's conviction and sentence of death were rendered in violation of her

26  rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-

27  capricious determination of guilt and penalty, to the effective assistance of counsel, to

28  present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth

and Fourteenth Amendments to the United States Constitution because the violations of federal law articulated in this petition constitute violations of international law. As a result, habeas relief is warranted.

1. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented as Claim 12 in the Opening Brief.

2. AEDPA: The California Supreme Court denied this claim. *People v. Alfaro*, 41 Cal. 4th 1277, 63 Cal. Rptr. 3d 433 (2007). Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*. Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

A. **INTRODUCTION**

6. The procedures employed to convict and sentence Ms. Alfaro to death violated her right to a fair trial by an independent tribunal and her right to protection

against the arbitrary deprivation of life and the discriminatory application of a state's criminal laws established by customary international law and the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights ("ICCPR"), and the American Declaration of the Rights and Duties of Man ("American Declaration").

**B.**      **THE UNITED STATES, BY COMMITTING ITSELF TO VARIOUS MULTINATIONAL ORGANIZATIONS AND TREATIES, HAS COMMITTED ITSELF TO FOLLOWING INTERNATIONAL HUMAN RIGHTS LAW**

7.   The two principle sources of international human rights law are treaties and customary international law.  The United States Constitution accords treaties equal rank with federal statutes.[72]  Customary international law is equated with federal common law.[73]  International law must be considered and administered in United States courts whenever questions of right depending on it are presented for determination.  *The Paquete Habana*, 175 U.S. 677, 700, 20 S. Ct. 290, 44 L. Ed. 320 (1900).  To the extent possible, courts must construe American law so as to avoid violating principles of international law.  *Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118 (1804).  When a court interprets a state or federal statute, the statute "ought never to be construed to violate the law of nations, if any possible construction remains . . . ."  *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S. Ct. 1510, 71 L. Ed. 2d 715 (1982) (quoting *Murray,* 6 U.S. at 118).  The United States Constitution also authorizes Congress to "define and punish . . . offenses against the

---

[72]   Article VI, § 1, clause 2 of the United States Constitution provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[73]   Restatement Third of the Foreign Relations Law of the United States , pp. 145, 1058 (1987).  *See also Eyde v. Robertson*, 112 U.S. 580, 5 S. Ct. 247, 28 L. Ed. 798 (1884).

law of nations," thus recognizing the existence and force of international law. U.S. Const., art. I, § 8. Courts within the United States have responded to this mandate by looking to international legal obligations, both customary international law and conventional treaties, in interpreting domestic law. *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252, 104 S. Ct. 1776, 80 L. Ed. 2d 273 (1984).[74]

   8. It is an established principle of international law that a country, by committing a certain subject-matter to a treaty -- including the individual rights of its citizens -- has internationalized that subject-matter to such an extent that each country can no longer assert that the subject falls exclusively within domestic jurisdictions.[75] The United Nations Charter, a multinational treaty, also proclaims that member states of the United Nations are obligated to promote "respect for, and observance of,

/ / /

/ / /

---

[74] *See also Oyama v. California*, 332 U.S. 633, 60 S. Ct. 269, 92 L. Ed. 249 (1948), which involved a California Alien Land Law that prevented an alien ineligible for citizenship from obtaining land and created a presumption of intent to avoid escheat when such an alien pays for land and then transfers it to a U.S. citizen. The court held that the law violated the equal protection clause of the United States Constitution. Justice Murphy, in a concurring opinion, noted, "Moreover, this nation has recently pledged itself, through the United Nations Charter, to promote respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language and religion. [The Alien Land Law's] inconsistency with the Charter, which has been duly ratified and adopted by the United States, is but one more reason why the statute must be condemned." *Id.* at 673. *See also, Namba v. McCourt*, 185 Or. 579, 204 P.2d 569 (1949), invalidating an Oregon Alien Land Law, in which the court stated: "The American people have an increasing consciousness that, since we are a heterogeneous people, we must not discriminate against any one on account of his race, color or creed . . . . When our nation signed the Charter of the United Nations we thereby became bound to the following principles (Article 55, subd. c, and *see* Article 56): 'Universal respect for, and observance of human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion.' (59 Stat. 1031, 1046.)" *Id.* at 604.

[75] *Advisory Opinion on Nationality Decrees Issued in Tunis and Morocco* (1923) P.C.I.J., Ser. B, No. 4.

461

1  human rights and fundamental freedoms for all without distinction as to race, sex,

2  language or religion."[76]

3       9.  In 1948, the UN drafted and adopted the Universal Declaration of Human

4  Rights.[77]  The Universal Declaration is part of the International Bill of Human

5  Rights,[78] which also includes the International Covenant on Civil and Political Rights

6  (ICCPR),[79] the Optional Protocol to the ICCPR,[80] the International Covenant on

7  Economic, Social and Cultural Rights,[81] and the human rights provisions of the

8  UN Charter.  As  a member of the United Nations, the United States is bound by these

9  instruments enumerating specific human rights and the duties of state parties, and that

10 illustrate the multilateral commitment to enforcing human rights through international

11 obligations.

12 / / /

13

---

14      [76] U.N. Charter, Jun. 26, 1945, art. 1(3), 59 Stat. 1031, T.S. 993 (eff. Oct. 24,

15 1945).

16      In his closing speech to the San Francisco United Nations conference,
   President Truman emphasized that:

17

18      "The Charter is dedicated to the achievement and observance
       of fundamental freedoMs.  Unless we can attain those objectives for all
       men and women everywhere --without regard to race, language or

19      religion -- we cannot have permanent peace and security in the world."

20 Robertson, Human Rights in Europe (1985) p. 22, n. 22 (quoting President Truman).

21      [77] Universal Declaration of Human Rights, Dec. 10, 1948, U.N. G.A. Res.
   217A (III).  It is the first comprehensive human rights resolution to be proclaimed by

22 a universal international organization (hereinafter Universal Declaration).

23      [78] See generally Newman, Introduction: The United States Bill of Rights,
   International Bill of Rights, and Other "Bills" (1991) 40 Emory L.J. 731.

24

25      [79] International Covenant on Civil and Political Rights, Dec. 16, 1966, 999
   U.N.T.S. 717, (eff. Mar. 23, 1976) (hereinafter ICCPR).

26      [80] Optional Protocol to the International Covenant on Civil and Political
   Rights, Dec. 16, 1966, 999 U.N.T.S. 302 (eff. March 23, 1976).

27

28      [81] International Covenant on Economic, Social and Cultural Rights, Dec. 16,
   1966, 993 U.N.T.S. 3 (eff. Jan. 3, 1976).

10. Equally pertinent are the human rights proclamations of the Organization of American States (OAS). The OAS, established to promote and protect human rights, provides in its charter: "The American States proclaim the fundamental rights of the individual without distinction as to race, nationality, creed or sex."[82] In 1948, the Ninth International Conference of American States presented the American Declaration of the Rights and Duties of Man, a resolution adopted by the OAS members states. The American Declaration is today the normative instrument that embodies the authoritative interpretation of the fundamental rights of individuals in this hemisphere. The Inter-American Commission on Human Rights, an OAS charter organization charged with protecting human rights, reinforces the normative effect of the American Declaration.

## C.   MS. ALFARO'S CONVICTION AND DEATH SENTENCE VIOLATE THE DUE PROCESS GUARANTEES OF INTERNATIONAL LAW

11. The factual and legal issues presented in this brief demonstrate that Ms. Alfaro was denied her right to a fair and impartial trial in violation of customary international law and Articles 6 and 14 of the International Covenant on Civil and Political Rights ("ICCPR")[83] as well as Articles 1 and 26 of the American Declaration of the OAS. Article 6 declares that "[n]o one shall be arbitrarily deprived of his life . . . [The death] penalty can only be carried out pursuant to a final judgment rendered by a competent court."[84] Article 14 of the ICCPR provides, "[a]ll persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him . . . everyone shall be entitled to a fair and public hearing by a competent,

---

[82] OAS Charter, 119 U.N.T.S. 3, Dec. 13, 1951, *amended* 721 U.N.T.S. 324 (eff. Feb. 27, 1970).

[83] The substantive provisions of the Universal Declaration have been incorporated into the ICCPR, so these are incorporated by reference in the discussion above. Moreover, as was noted above, the Universal Declaration is accepted as customary international law.

[84] International Covenant on Civil and Political Rights, *supra*.

independent and impartial tribunal established by law."  Likewise, these protections are found in the American Declaration: Article 1 protects the right to life, liberty and security of person; Article 2 guarantees equality before the law; and Article 26 protects the right of due process of law.[85]

## 1.   THE ARBITRARY IMPOSITION OF THE DEATH PENALTY AGAINST MS. ALFARO VIOLATES INTERNATIONAL LAW

12.  California's death penalty scheme results in the arbitrary and capricious imposition of a death sentence.  For all of the reasons cited in this brief, imposing the death penalty in Ms. Alfaro's case would be arbitrary and capricious.  The death penalty verdict imposed against her represents the arbitrary deprivation of life in violation of Article VI, § 1 of the ICCPR.

13.  The United States Senate has not reserved or otherwise derogated the obligation to refrain from "arbitrary" deprivations.  Further, Article IV, § 2 of the ICCPR does not permit derogations from Article VI.  Because this treaty, of which the United States is a signatory, prohibits the arbitrary deprivation of life, Ms. Alfaro's sentence stands in violation of Article VI of the ICCPR.

## 2.   THE CAPITAL PROSECUTION AND DEATH SENTENCE OF MS. ALFARO VIOLATE INTERNATIONAL LAW PROHIBITIONS AGAINST DISCRIMINATION ON THE BASIS OF RACE AND NATIONAL OR SOCIAL ORIGIN

14.  The capital prosecution and death sentence imposed against Ms. Alfaro violates the requirement of equal treatment without discrimination on the basis of race, color, sex, national or social origin, or other status in violation of Article XXVI of the ICCPR, Articles 1 and 2 of the American Declaration, and, as to race specifically, Articles V and VI of the International Convention on the Elimination of All Forms of Racial Discrimination (ICEAFRD).

---

[85] American Declaration of the Rights and Duties of Man, *supra*.

15.  Because California's statutory scheme provides no limits on a prosecutor's discretion in deciding whether to seek the death penalty against a "qualified" defendant, no mechanism exists to protect against the prosecutor's discriminatory motives in selecting to pursue the death penalty.  Ms. Alfaro was Hispanic and the victim Caucasian.  Statistics show that, in the United States, the chances that discriminatory motives will infect juries' penalty decisions when the victim is Caucasian and the defendant a minority are intolerably high.

16.  Because racially discriminatory motives likely infected the decisions to prosecute Ms. Alfaro for a capital offense and to impose a sentence of death, her conviction and sentence violate Articles II and XXVI of the ICCPR, Articles 1 and 2 of the American Declaration, and Article V and VI of the ICEAFRD.

**3.    TOGETHER THE TRIAL COURT'S MULTIPLE ERRORS AND CALIFORNIA'S DEATH PENALTY SCHEME FAILED TO GUARANTEE MS. ALFARO EFFECTIVE PROTECTION AGAINST DISCRIMINATION IN VIOLATION INTERNATIONAL LAW**

17.  Many of trial court's multiple errors suggest discrimination against Ms. Alfaro because she is a young woman and a Hispanic.  These errors include the court's failure to inquire into the reasonableness of Ms. Alfaro's counsel withholding his consent to her guilty plea, the court's failure to conduct adequate voir dire on the question of jurors biases against a female Hispanic defendant when the victim was a nine-year-old Caucasian child, the court's refusal to close the trial for Ms. Alfaro's testimony, the court's refusal to replace Ms. Alfaro's counsel despite the clear breakdown in their relationship, the court's refusal to order a change of venue, and, in the most explicit example of discriminatory animus, the court' final opinion in its ruling on Ms. Alfaro's request for a modification of the verdict and new trial.

18.  Further, as discussed above, the inadequate protections afforded by California's capital statutory scheme against the arbitrary and capricious prosecution

465

1  and imposition of a sentence of death for capital crimes allow discriminatory motives
2  to infect the process.  As  a consequence, the state's failure to prohibit discrimination
3  by law and to "guarantee to all persons equal and *effective* protection against
4  discrimination" on the basis of race, sex, and national and social origin violates
5  Article XXVI of the ICCPR, Articles 1 and 2 of the American Declaration, as to race
6  specifically, Article 5(a) of the ICEAFRD.

7      19.  The United States Senate did not issue a reservation regarding these
8  provisions as to State action.  In fact, in ratifying the ICEAFRD, the Senate indicated
9  that its "understanding" was the Convention would be "implemented by the Federal
10  Government to the extent that it exercise jurisdiction over the matters covered therein,
11  and otherwise by the state and local governments" as to which the federal government
12  would "take appropriate measure to insure the fulfillment of this Convention."

13  **D.    CONCLUSION**

14      20.  Ms. Alfaro's conviction and sentence stand in violation of international
15  law. In cases where the UN Human Rights Committee has found that a state party
16  violated Article 14 of the ICCPR, in that a defendant had been denied a fair trial,
17  the Committee has held that the imposition of the sentence of death also was
18  a violation of Article 6 of the ICCPR.[86]  Further, Article 4(2) of the ICCPR makes
19  clear that no derogation from Article 6's outright ban on the arbitrary deprivation
20  of life is allowed.[87]

21      21.  The due process violations that Ms. Alfaro suffered throughout her trial
22  and sentencing are prohibited by customary international law.  The United States
23  is bound by customary international law, as informed by such instruments as the
24  ICCPR and the American Declaration.  The purpose of these treaties is to bind
25  nations to an international commitment to further protections of human rights. The

26
27      [86] U.N. GAOR, Supp. No. 40 at p. 72 (Report of the Human Rights Committee).

28      [87] International Covenant on Civil and Political Rights, *supra*.

466

1    United States must honor its role in the international community by recognizing the

2    human rights standards in our own country to which we hold other countries

3    accountable.

4         22.  The foregoing violations of Ms. Alfaro's constitutional rights

5    constitute structural error and warrants the granting of this Petition without any

6    determination of whether the violations substantially affected or influenced the jury's

7    verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

8    doctrine applies to this claim, the foregoing constitutional violations so infected the

9    integrity of the proceedings that the error cannot be deemed harmless. The foregoing

10   violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

11   Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

12   resulting in a miscarriage of justice.

13

14                                      **XXXVIII.**

15   **CLAIM 33:  PETITIONER WAS DENIED HIS CONSTITUTIONAL AND**

16            **INTERNATIONAL LAW RIGHTS BECAUSE OF THE**

17                   **CUMULATIVE IMPACT OF ERRORS**

18        Petitioner's convictions and sentence of death were rendered in violation of his

19   rights to due process, a fair trial, equal protection, trial by jury, confrontation and

20   cross-examination, the effective assistance of counsel, a reliable and reviewable guilt

21   determination, fairness in capital case sentencing and to be free from cruel and

22   unusual punishments and to an individualized, non-arbitrary, reliable and reviewable

23   penalty determination, as a result of multiple instances of manifest error in

24   Petitioner's pre-trial and trial, all in violation of Petitioner's guaranteed constitutional

25   rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United

26   States Constitution and in violation of Petitioner's rights provided by international

27   law and treaties to which the United States is a signatory.

28        1.  This claim has not been presented to the California Supreme Court.

                                            467

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits previously filed with this court and accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  Each of the numerous errors discussed in this petition had a substantially prejudicial effect, with each contributing an essential part to either the finding of guilt or the determination in favor of the death penalty or the affirmance of the conviction and sentence.  Had even a few of these errors not occurred, the outcome, in all probability, would have been a more favorable guilt, or at least, penalty verdict.  *See* Exhibit 91 (Declaration of Ralph Glass).

6.  While the State may urge that each of these errors, viewed individually, was harmless or not prejudicial, the cumulative effect of the multiplicity or errors cannot be ignored.  In order to meet the special need for reliability in any capital murder conviction, the cumulative effect of multiple individual errors must be reviewed.  *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988); *Mak v. Blodgett*, 970 F. 2d 614, 622; *Walker v. Engle*, 703 F. 2d 959 (6th Cir 1983).

7.  The totality of errors, by their number and importance, totally skewed the guilt and penalty determination so as to greatly increase the probability that the jury would return a guilty verdict, that it would recommend the imposition of the death

1  penalty on the basis of improper considerations, and that the unsound conviction and
2  sentence would be affirmed.  The result was a trial and appeal process that was so
3  fundamentally unfair that the setting aside of the guilt and penalty phase verdicts is
4  required.

5       8.  These violations of Petitioner's constitutional and international law rights
6  warrant the granting of this petition without any determination of whether those
7  violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S.
8  at 638 n.9.  Furthermore, the constitutional violations so infected the integrity of the
9  proceedings that the errors cannot be deemed harmless.  In any event, the violations
10  of Petitioner's rights had a substantial and injurious effect or influence on the guilt
11  and penalty judgments, and result in a miscarriage of justice.

13  **XXXIX.**
14  **PRAYER FOR RELIEF**

15       Wherefore, Petitioner Maria Del Rosio Alfaro respectfully requests that
16  this Court:

17       1.  Issue a Writ of Habeas Corpus to have Ms. Alfaro brought before this Court
18  to the end that she might be discharged from her unconstitutional confinement and
19  restraint and that she might be relieved of her unconstitutional sentence of death.

20       2.  Continue the stay of Ms. Alfaro's execution, and any and all proceedings
21  relating thereto, pending final disposition of this Petition pursuant to 28 U.S.C.
22  § 2251.

23       3.  Permit Ms. Alfaro, who is indigent, to proceed without prepayment of costs
24  and fees and grant her authority to obtain subpoenas *in forma pauperis* for witnesses
25  and documents necessary to prove the facts alleged in this Petition.

26       4.  Grant Ms. Alfaro the right to conduct discovery, including the right to take
27  depositions, request admissions, and propound interrogatories, as well as the means
28  to preserve the testimony of witnesses.

469

5.  Permit Ms. Alfaro a reasonable opportunity to supplement this Petition to include claims which become known as a result of ongoing investigation and information which may hereafter become known to counsel.

6.  Order and conduct an evidentiary hearing at which time proof may be offered concerning each of the allegations in the Petition.

7.  After full consideration of the issues raised in this Petition, order that Ms. Alfaro be granted relief from her conviction and death sentence, and that she either be released from custody or retried by the Superior Court of the State of California within ninety (90) days after the issuance of the order.

8.  Grant Ms. Alfaro such further relief as is appropriate and just in the interests of justice.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

Dated:  August 1, 2008

/s/ Craig A. Harbaugh
CRAIG A. HARBAUGH
Deputy Federal Public Defender

/s/ Linda L. Griffis
LINDA L. GRIFFIS
Deputy Federal Public Defender

Attorneys for Petitioner
MARIA DEL ROSIO ALFARO

470

1
**VERIFICATION OF PETITION**

2
I, LINDA L. GRIFFIS, declare under penalty of perjury as follows:

3
1.  I am an attorney admitted to the practice of law in the State of California,

4
and admitted to the Bar of this Court.  I am employed with the Office of the Federal

5
Public Defender, which has been appointed to represent the Petitioner in this matter,

6
Maria Del Rosio Alfaro.

7
2.  I make this verification as someone acting on behalf of Ms. Alfaro pursuant

8
to 28 U.S.C. § 2242.

9
3.  I have read the foregoing Petition and I am familiar with its contents.  Some

10
of the information contained in the petition is information that I know to be true and

11
correct based on my personal knowledge.  The remaining information in the petition

12
is true and correct to the best of my knowledge, information, belief and

13
understanding.

14
4.  I am authorized to file this petition on Ms. Alfaro's behalf.

15
I declare under penalty of perjury under the laws of the United States

16
of America that the foregoing is true and correct.

17
Executed this 1st day of August 2008 at Los Angeles, California.

18

19
/s/Linda L. Griffis

20
Linda L. Griffis

21

22

23

24

25

26

27

28

471