## DECLARATION OF RAYMOND McGRATH

1. My name is Raymond McGrath. I am a private investigator in San Francisco, holding California license number PI 12744. I have been a private investigator for twenty-two years. I was retained by appellant's counsel in the matter of Maria del Rosio Alfaro, who was convicted of the crime of murdering Autumn Wallace and sentenced to death. In that capacity, I was charged by counsel with the task of determining, if possible, the identity of the third adult at the scene of the homicide. As my investigation proceeded, counsel asked me to perform additional investigative tasks that are described below.

### THE CRIME AND THE THIRD MAN

2. At the commencement of my work I reviewed Ms. Alfaro's statements to the Orange County investigators, including her second interview, in which she confessed to killing Autumn Wallace. (See C.T. pp. 510 et. seq.) In analyzing her account of her movements on the day of the burglary-murder at the heart of the case, I noted that Ms. Alfaro claimed to have obtained a ride from a neighbor, whom she was unable or unwilling to further identify or describe, a ride which took her from her house to the apartment of one Juan Jimenez, which I will hereinafter refer to as the drug-house. That apartment was located in an area known as Little Tijuana, which had been frequented by Ms. Alfaro for some years in her daily quest for narcotics.

3. Ms. Alfaro told the police that after consuming a quantity of drugs at the drug-house, greed for more drugs moved her to obtain another ride, this from a stranger in the Little Tijuana neighborhood--that is, someone unknown to Ms. Alfaro--who drove her from the drug-house to the crime scene at the Wallace home. Her purpose in going to the Wallace home, she said, was to steal items that she could then sell for money to buy more drugs. On this visit she was accompanied not

1

000001

only by the stranger, who drove a car she described as a blue Camaro but which was described as a brown Monte Carlo by independent witnesses. (See Snell Decl., Exhibit 18, [Interview with Susan Mata] and Exhibit 25 [Interview with Ryan Joseph Finan].) but by her two-year old son Manny and one Antonio Reynoso, also known as "Shorty," who during the burglary held Manny outside the Wallace home.

4.      Ms. Alfaro told the police she never learned the name of the third man, although she provided authorities with a description of the driver and of his car. (See C.T. 522 et. seq.) Shorty Reynoso, who was also interviewed by the police, and who admitted that Ms. Alfaro looked as if she had been taking drugs on the day of the crime before he accompanied her to the Wallace home, was equally unhelpful when it came to identifying the third man. (See Snell Decl., Exhibit 22 [Police Interview with Reynoso, aka Raul Rodriguez].)  Unlike Ms. Alfaro,  Reynoso was unable or unwilling to provide any description of the third man, even as to such issues as  whether he was fat or thin, tall or short. (Id.)

5.      Further review of the documents in the case showed me that yet a third drug addict who had taken drugs with Ms. Alfaro in the drug-house that day was one Sabrina Duran, who in her interview with the police stated that on another date than the date of the incident she had seen Ms. Alfaro with a  man Ms. Duran  identified as David Gonzalez, who drove a brown Monte Carlo. (Snell Decl., Police Exhibit 28 [Police Interview with Sabrina Duran].) Ms. Duran also mentions the name "Manuel" as being one of Ms.  Alfaro's boyfriends, although in my view she was clearly not  referring to Manuel Cuevas, with whom  Ms. Alfaro was living at the time of the crime.  (See id.) In her statement to the police, Ms.  Duran describes this second Manuel in the same way as she describes David Gonzalez, that is, with a mole on his lip.  (Id.)  It seemed to me, therefore, that Duran was saying, whether advertently or not, that David Gonzalez and the second Manuel were one

**Declaration of Raymond McGrath**

and the same man. It also appeared to me from reading the transcript of the Duran interview that Duran had some sort of familial connection with Juan Jimenez, the old man whose apartment was used as the drug-house. (Id.)

6.     In considering how to proceed, I first turned to the question of the rides that Ms. Alfaro said she received that day. I reasoned that it was likely that Ms. Alfaro knew the man who drove her that day, and that it was likely that the same man who drove her from her home to Little Tijuana also drove her from Little Tijuana to the Wallace house. It strained credulity to believe either that she relied on luck for her transportation, or that she, as an experienced petty criminal and addict, would involve a perfect stranger in her scheme to rob the Wallaces. I rejected the notion that either the driver of the car or Shorty Reynoso believed for one second that Alfaro was going to the Wallace home to retrieve her own belongings. Also, the implacable fact of Alfaro's relentless daily rut of seeking and consuming drugs, as embodied in the physical nexus of the drug-house and in Little Tijuana itself, convinced me that her movements on the day of the murder were a continuously connected whole.

7.     I proceeded on the hypothesis that Ms. Alfaro personally knew the driver of the car used in the crime, that he was the man who had given her all the rides she described to the police, and that she was deliberately protecting his identify from the police. I believed it was also likely that Mr. Reynoso and Ms. Duran, both of whom seemed to me to have been economical with the truth in their statements to the sheriff's investigators, were concealing the identity of the driver.

8.     It was notable to me that Ms. Alfaro felt she had to protect the third man even after she had confessed to her role in the murder, a role not shared by Ms. Duran and Mr. Reynoso, who

3

000003

**EX 1    3**

### Declaration of Raymond McGrath

were never charged with a crime in this connection. I decided provisionally therefore that (a) the third man was Ms. Alfaro's boyfriend, a view supported in part by Ms. Duran's statements to the police, and that this would explain in part her desire to shield his identity; (b) the third man was also Ms. Alfaro's drug dealer, because if she was with him continuously from the morning until after the murder (which was my view), he was in the drug-house with her, implying he was either another addict or a drug-dealer. I decided upon the latter because Ms. Duran and Mr. Reynoso were also shielding the third man, a decision which would have been logical if they knew him personally and he was also supplying them with drugs. This conclusion led me to another, namely: (c) Ms. Alfaro, Ms. Duran and Mr. Reynoso were either afraid of retaliation by the third man or his organization, or both, which provided them all with yet another good reason to shield the third man's identity.

9.     I also held the opinion that the third man lived in or nearby Little Tijuana, because as a drug dealer in that market he would naturally live in it or have daily prolonged contact with it.

10.     Ms. Alfaro's investigators in the guilt and penalty phases of her criminal trial were David Sandberg and his assistant Laura Lawhon. Lawhon was a brand-new investigator with no experience in homicide. In reading the witness lists prepared by Sandberg, I noticed two other people, in addition to Sabrina Duran, who had a familial connection with Juan Jimenez, the "old man" whose apartment was used as the drug-house. (See Snell Decl., Exhibit 51 [Sandberg Witness List].) These persons were Isabel Torres Hernandez, who lived nearby Juan Jimenez in Little Tijuana, and her brother, Manuel Torres Graciano. Mr. Sandberg's entry for Manuel Torres Graciano noted that Torres knew Shorty Reynoso. (Id.) I also saw in reading the transcript of Juan Jimenez' interview with the police that Jimenez mentioned that on the day of the murder he had

4

000004

**EX 1    4**

**Declaration of Raymond McGrath**

directed Ms. Alfaro to the local drug dealer, whom Jimenez identified only as "Manuel." (Snell

Decl., Exhibit 42 [Police Interview with Juan Jiminez].)  Why a habitual drug-consumer such as Ms.

Alfaro, who had haunted Little Tijuana for some years in pursuit of her addiction, should require

directions to a drug dealer was a question left unasked and unanswered by the interview, but in any

case I did not believe she did.  Rather, I believed that this was disinformation offered by Jimenez

to misrepresent the true relationship between Ms. Alfaro and the drug dealer, particularly the fact

that they knew each other well.  Jimenez described Manuel as 32 to 35 years old, 5'4" in height,

weighing 130 lbs., with a medium complexion and, notably to me, with a mole on the side of his

nose.  (Id.)

11.    I formed the opinion that Manuel Torres Graciano, Mr. Jimenez' relative, was the

same person as Manuel, Alfaro's drug dealer.  The mole on the side of his nose led me to believe

that he was also the Manuel described by Sabrina Duran, who she also identified as David Gonzalez,

who according to Duran was Alfaro's boyfriend and drove a brown Monte Carlo, a type of car which

was seen by witnesses to be parked at the murder house.  (See ¶ 3, supra.)

12.    Reading on, I saw that according to defense investigator Sandberg's witness list,

Manuel Torres Graciano is also known as Jose Manuel Torres.  His date of birth is ███████, 1960,

making him 30 years old at the time of Autumn Wallace's death.  His last known address was ███

████████████ 3, Anaheim--an address in the heart of Little Tijuana.  (Snell Decl., Exhibit

51[Sandberg's Witness List].)

13.    The Sandberg notes included criminal information on Torres Graciano, which

information may or may not have been complete: On August 18, 1989 he was booked in Orange

5

**Declaration of Raymond McGrath**

County for possession of and being under the influence of narcotics. He was sentenced to 45 days in county jail, and was released on September 7, 1989. On November 26, 1989 he was charged with violation of 597PC, animal fighting. On January 19, 1990 he was charged with cock fighting, and on January 26, 1990 he was released in custody from Orange to Los Angeles County. On that same date he was incarcerated in Los Angeles for cruelty to animals, a charge evidently stemming from his cock fighting activities. He was released on his own recognizance to appear on February 20, 1990. (Snell Decl., Exhibit 54 [Sandberg's Case Book Index Notes on Graciano's Criminal History].)

14.    The Sandberg notes state that Torres Graciano was released from Los Angeles County Jail in the spring of 1990. (Id.) The notes also state that Alfaro told defense investigators that she had stayed with Torres Graciano from June 18, 1990, or three days after the murder of Autumn Wallace, until the day of her arrest. (Id.) Sandberg also notes that Manuel Graciano had a "history of cruelty to animals," and that he sold drugs for a big dealer, whose name in the notes was rendered "GIKO Enrique" (id.), which I first took to mean Enrique Giko, it being the manner of some detectives to write names last name first, first name last. Later I thought "Giko" could be a nickname. According to Sandberg, Giko "drove them around," referring to Alfaro and Torres Graciano, "per defendant." (Id.) I later determined that "Giko" was in fact "Kiko," a Spanish diminutive of "Enrique." "Giko," then, was not a last name but a first name. I learned from Ms. Alfaro that Kiko had been a classmate of Rosie Alfaro's aunt at Loara High School, and therefore knew or could have known Ms. Alfaro's family. Ms. Alfaro subsequently identified Kiko as one Enrique Hernandez from year book photos I showed her of various men who had attended that high

6

## Declaration of Raymond McGrath

school with Ms. Alfaro's aunt Mercedes Melendez.  I interviewed Ms. Melendez, who stated that Enrique Hernandez had attended school  with her.

15.     Also appearing in the Sandberg documents are typed notes on a witness named Betty Cleary, who was Ms. Alfaro's manager at the Garden Grove McDonald's restaurant when Ms. Alfaro was employed in 1990. (Snell Decl., Exhibit 51.) The notes state that  Ms. Cleary sometimes gave Alfaro time off to visit her boyfriend in jail . (Id.)

16.     On December 3, 1999, I interviewed Betty Cleary, now married and going by the name of Betty Soto.  At the time of the interview, Mrs. Soto was the manager of the Cotella McDonald's  restaurant.  She told me that she had never met Ms. Alfaro's boyfriend, but she confirmed that she had given Ms. Alfaro time off to go visit him in jail.  Mrs. Soto also confirmed that Ms. Alfaro quit her job at McDonald's because her boyfriend was getting out of jail and she wanted to spend more time with him.  Ms. Alfaro quit her job at the Garden Grove McDonald's in the Spring of 1990. (Snell Decl., Exhibit 12 [Soto Declaration ].)

17.     While she never saw Ms. Alfaro's boyfriend, Mrs. Soto did tell me that she saw his car, which she described to me as a brown Monte Carlo. (Id.) Mrs. Soto saw this car when Ms. Alfaro's boyfriend came to pick her up from work.  Mrs. Soto told me that Eleanor Vasquez, a co-worker of Ms. Alfaro's, told Soto at the time that the car belonged to Ms. Alfaro's boyfriend.  Mrs. Soto was quite clear that she saw the brown Monte Carlo at  the time, and did not learn of it after the fact or during the trial.  (Id.)

18.     When I asked Mrs. Soto if she recalled the boyfriend's name, she answered that she did not.  When I asked her if it could have been David, she said "No," I then asked if the man's name

7

**000007**

**EX 1    7**

Declaration of Raymond McGrath

was "Meno or Manuel." Mrs. Soto replied, "Could have been." (Id.)

19.     Mrs. Soto also told me that she had been interviewed by defense investigators sometime before the trial, and that she had given them the information about the brown Monte Carlo at that time. (Id.)

20.     On December 8, 1999, I interviewed defense investigator Sandberg, who told me  he had  interviewed Manuel Torres Graciano in Mexico, on the same trip in which he interviewed a friend of Ms. Alfaro's father whom he believed to be the person Ms. Alfaro had accused of raping her when she was a child.  Sandberg told me he had found Torres Graciano in a small coastal village. The Sandberg notes state that Torres Graciano's mother lived in Tecuala, Nayarit State, west of Guadalajara.  (See Snell Decl., Exhibit 23 [Sandberg Interview with Torres Graciano].)  Reference to an atlas shows that Tecuala is near the Gulf of California, although not precisely on it.

21.     Mr. Sandberg told me in our interview that Torres Graciano was relaxed during the interview, even showing Sandberg his fighting roosters.  Mr. Sandberg believed that Torres Graciano was in Mexico either because he had fled the United States to avoid warrants (of what nature he could not say) or because he had been deported (for what reason Sandberg was also unable to state).

22.     I have read the transcript of Mr. Sandberg's interview with Manuel Torres Graciano. At the time he interviewed Torres Graciano, Mr. Sandberg knew that Torres Graciano and Ms. Alfaro had been lovers at the time of the crime, that Torres Graciano had stayed in motels  with Ms. Alfaro following the murder, that Torres Graciano was a drug dealer and associated with Kiko, and that Torres Graciano was one of four people on the defense investigation list of possible "third men," the others being Shorty Reynoso, "Beto" and Miguel Crisantos.  The defense had  also concluded

8

**Declaration of Raymond McGrath**

at the time of the Torres Graciano interview that Ms. Alfaro was shielding someone out of misplaced love for that person. (Snell Decl., Exhibit 45 [Defense Investigator Laura Lawhon Notes of Interview with Ms. Alfaro dated 3-25-91].) In brief, Mr. Sandberg knew or should have known that Ms. Alfaro was shielding her lover, and in Torres Graciano Mr. Sandberg was interviewing Ms. Alfaro's lover in the flesh. Yet Mr. Sandberg did not ask Torres Graciano if he owned or had ever owned a brown Monte Carlo, nor request that Torres Graciano account for all of his movements on the day of the murder, nor simply ask whether Torres Graciano was the third man. Mr. Sandberg did, however, elicit three significant statements from Torres Graciano: that he had been with Alfaro on the day of the murder; that following the murder, Alfaro had told him that Autumn Wallace was dead; and that he spent several days following the murder with Alfaro in various motels. (Snell Decl., Exhibit 23) In my opinion, these admissions on the part of Torres Graciano, together with the facts already developed by Mr. Sandberg, should have been enough to alert the defense that Torres Graciano was the third man.

23.    In my interview with him, Mr. Sandberg agreed that it was possible that Torres Graciano was the third man, although he still believes the third man was the person referred to as "Beto" in the trial transcripts. This man is named Robert, aka Roberto, Frias Gonzalez. Mr. Sandberg bases this persistent belief upon Frias Gonzalez's criminal record, his physical appearance as a "heavy hitter," and the fact that he resembled the composite drawing prepared by the police to advertise the existence of a suspect or witness in the case. Conversely, Mr. Sandberg did not believe Torres Graciano to be the third man because Torres Graciano was cooperative during the interview, because he did not look like a "heavy hitter" to Sandberg, and because he did not sufficiently

9

**Declaration of Raymond McGrath**

resemble the person in the composite drawing.

24.     My objection to this view can be summed up briefly: (1) no one has ever placed Roberto Frias Gonzalez at or near the crime scene, whereas Torres Graciano places himself with Alfaro before and after the killing; (2) apart from his status as a self-described "dope fiend" at the time of the event, it has never been demonstrated that Roberto Frias Gonzalez fits any of the criteria necessary to be the third man, whether theoretical (working as a drug dealer in Little Tijuana, and having a relationship to Alfaro, Jimenez, Duran and Reynoso, to cite two examples) or evidentiary (owning or driving a brown Monte Carlo);[1] (3) in my opinion, the composite drawing prepared by the police and relied upon by the defense as evidence of the appearance of the third man is a picture of Shorty Reynoso, not of the third man.  On December 16, 1998, I interviewed Roberto Frias Gonzalez in person, and I agree with Sandberg that he resembles the composite drawing.  He is also notably short in stature, so much so that, he told me, when he was brought in for questioning by the police they initially addressed him as "Shorty."  Mr. Gonzalez  misconstrued this nickname as an insulting reference to his height, and addressed the police as "Pigs" in retaliation.

25.     But I also interviewed Shorty Reynoso, and in my opinion his appearance, even now at some years' remove, matches the composite drawing much more closely than that of Mr. Frias Gonzalez, to the point that I feel confident in stating that the drawing is of Mr. Reynoso and no one else.  Moreover, Mr. Reynoso testified that the drawing depicts him, and that the reason he came forward after the crime was that he had seen the drawing in the Orange County newspaper, had

---

[1]Frias Gonzalez was seen by sheriff's deputies driving a blue Camaro, which was the car described by Ms. Alfaro.  But as the defense did not generally believe Ms. Alfaro's story, there was no reason to specifically believe her story of the existence of a blue Camaro in the case.

**Declaration of Raymond McGrath**

recognized himself, and had realized that the police were looking for him. (R.T. p. 961.)  Notably,

he told the police a somewhat different story during his interview (Snell Decl., Exhibit 22)  In that

interview, Mr. Reynoso told the police

> " ... when the guy told me that, you know, that it was, uh, a couple of narcs, you
> know, around the ___, you know, around the house looking for me ... right away I
> went to the phone, you know, because I don't want no trouble.  I just got out of
> prison ... "

Exhibit C.T. 3137 Reynoso Int. of 7-2-90

26.    In his interview with me, Mr. Frias Gonzalez denied knowing Ms. Alfaro at any time

during his life.  I believe that when the police detained him for questioning, based on his undoubted

resemblance to the composite drawing, the defense in turn assumed that Roberto was the third man,

based on that coincidence alone.  The continued use of the name "Beto"--a nickname for Roberto--by

the defense throughout the trial, in my opinion simply compounded a self-fulfilling analysis based

on no particular evidence.  Mr. Monroe's statements to the court, which I have reviewed, support

my belief.  (See R.T. p. 37; C.T. p. 2139.)  It is true that Ms. Alfaro herself referred to "Beto" in her

interviews with the defense, but only after they had supplied her with that name, as Dr. Consuelo

Edwards testified at trial.  (R.T. p. 4146.)  On November 16, 2000, I interviewed Dr. Edwards on

this point, and she confirmed that she confronted Ms. Alfaro with the name "Beto" only after she–Dr.

Edwards–had been given that name by defense counsel or the defense investigator.  Ms. Alfaro's

so-called admission that "Beto" was the name of the third man was deliberately misleading.  In my

opinion, Ms. Alfaro continued to shield the real identity of the third man throughout the trial; her

agreement with her counsel that "Beto" was the third man was consistent with that goal.  In my

opinion, the defense, which went so far as to administer Sodium Pentathol to Ms. Alfaro because

11

**Declaration of Raymond McGrath**

they did not believe her account of the third man, should have been more critical of their Beto theory, and Alfaro's acquiescence in it.

27.    But, granting that the defense (once they had advanced the Beto theory and had had it adopted by the compliant Ms. Alfaro) were disposed to believe in their own chimera, and granting further that they had an obligation to pursue that theory, it is nonetheless clear that Mr. Monroe and his investigators did nothing whatsoever to prove any supposed link between Beto and Ms. Alfaro. Based on my review of the defense files and my interviews with defense investigators David Sandberg and Laura Lawhon, it is clear to me that the defense did not investigate Beto's connection, if any, to Ms. Alfaro, or the crime scene at the Wallace home, or the crime scene at Jeffrey Street. They did not interview Beto, or Shorty Reynoso, or Duran regarding Beto, and in their interview with Juan Jimenez they spend little time on the identity of the third man at all. (See Snell Decl., Exh. 43 [Defense Interview with Juan Jiminez].) They did not pursue the Beto theory with the neighbors at either crime scene, whether the Wallace neighborhood or Little Tijuana. They did not display Beto's photograph to any of the percipient witnesses. They did not make a connection between Beto and the brown Monte Carlo. They did not test in any way Ms. Alfaro's statement, which was no more than an echo of theirs to her, that Beto was the third man. Thus, there was no real investigation, and consequently no corroboration, of the Beto theory. No evidence was ever developed that could demonstrate to a finder of fact that the theory was anything other than an insubstantial notion without foundation in fact. Had the defense investigated the Beto theory, it is conceivable that they would have arrived at the conclusion that it was unprovable and very probably untrue. They could then have proceeded to the next name on their list of four names (See Snell Decl., Exhibit 95 [Lawhon

12

000012

**Declaration of Raymond McGrath**

Notes of Interview with Ms. Alfaro].) and subjected that name to the test, and so forth, until they came to the last name on the list, that of Torres Graciano.

28.     In considering whether Torres Graciano was the third man, I found it interesting that Ms. Alfaro's description of the murder in her interview with the defense psychiatrist Dr. Consuelo Edwards, is consistent with her confession, and that in both instances Ms. Alfaro is clearly deceptive on only two points:  the description of the car, which was not corroborated by independent witnesses, and which she continued to insist was a blue Camaro; and the identity of the third  man.  (See Snell Decl., Exhibit 27 [Dr. Edward's Report].)  I believe Ms. Alfaro had enough awareness to know that persons could be traced through their vehicles, and that was why she lied about the car.  As to the description and identity of the third man, it is clear to me that she was being deceptive.  But the way in which she was deceptive intrigued me.  In her March 23, 1992, account to Dr. Edwards of the events leading up to the crime , Ms. Alfaro  describes taking drugs dealt by the dealer who she identified as "Manuel" who sold "downstairs."  But then Ms. Alfaro introduces a new figure, "Miguel," who she says raped her as a child.  It is the rapist, "Miguel, " Ms. Alfaro told Dr. Edwards, who drove her to the Wallace home, where Autumn was murdered.  (Id.).  In reading this, I asked myself what had happened to the drug dealer (whom we knew was named Manuel, per Juan Jimenez).  The substitution of the notional Miguel for the all too real Manuel the drug dealer was another clue that Manuel the drug dealer had driven Ms. Alfaro to the Wallace  home.  Indeed, Alfaro's account to Dr. Edwards in itself should have alerted doctor, lawyer and detective alike that the drug dealer might have been the third man.

29.     Dr. Edwards never did realize this; but she did tell me that she had urged Mr. Monroe

13

**000013**

**Declaration of Raymond McGrath**

to move to suppress Ms. Alfaro's confession on the basis of her drug use that day.  The defense

interviewed the family as to the identity of Miguel, and came up with the name Miguel Crisantos.

Later the name Miguel Baracho came up.  But both names were effectively abandoned by the defense

when they decided that Beto was the third man.  The defense confronted Ms. Alfaro with their

conviction that Beto, not Miguel Crisantos, was the third man, and she agreed with them.

30.     After considering all of this evidence and  information, I  formed the opinion that

Manuel Torres Graciano is the third man involved in the burglary of the Wallace home and the death

of Autumn Wallace.  He was a drug dealer operating in Little Tijuana, employed by a bigger drug

dealer named "Kiko," who remained at large after the murder.  He had a personal and romantic

relationship with Rosie Alfaro that spanned the weeks , and possibly some years, before the murder,

and for some time thereafter.  He also had what might be termed a business relationship with her,

as her drug dealer, which was the same relationship he had with Reynoso and Duran, two witnesses

who were reluctant to identify the third man to the police.  He was part of a larger organization of

drug dealers.  He has a familial relationship to Juan Jimenez, who identified the local drug dealer

as "Manuel," and in whose apartment the drug transactions took place.  He drove a brown Monte

Carlo.  He lived in Little Tijuana.  By his own admission he was with Alfaro on the day of the

murder, both before and after the event, and he spent several days with her after the killing as she

hid from the dragnet searching for the killer.  He was aware during that time that Autumn Wallace

was killed in the course of the burglary,  although he told defense investigator David Sandberg that

Alfaro's statement to that effect came as a surprise to him.  After Alfaro was arrested he left

California for Mexico, and while his statement to Sandberg does not touch upon that fact, it is a

14

**Declaration of Raymond McGrath**

permissible inference that if the chain of logic holds true, Torres Graciano returned to Mexico
because he feared further involvement in the murder case.

31.     There is another connection between Mr. Torres Graciano and Ms. Alfaro. On
information and belief, according to Marcy Arcueta, Jose Alfaro's mistress, Torres Graciano was a
friend and drinking companion of Ms. Alfaro's father, Jose Alfaro. This information clarifies the
statement of Maria Ruelas, the companion of the father of Manuel Cuevas, at whose home Ms.
Alfaro and Mr. Cuevas were staying at the time of the murder. Ms. Ruelas told me in an interview
on September 18, 2000, that Ms. Alfaro had called her just before Alfaro was arrested, and asked her
to organize some clothes for her–clothes that the police later seized. Ms. Alfaro informed Ms.
Ruelas that she needed the clothes because she was going to Mexico, "with her dad's friend," as Ms.
Ruelas put it. Ms. Ruelas had also told the police in an interview on June 26, 1990, that Rosie had
told her that she intended to go to Mexico. (See Snell Decl., Exhibit 53 [Det. Giffin's Statement of
Probable Cause.] This was especially interesting to me in light of the fact that the police learned five
days later that Manuel Torres Graciano had left for Mexico.

32.     Based on my investigation and document review, it is my opinion and belief that Ms.
Alfaro was in debt to Torres Graciano and Kiko Hernandez for the drugs she had already consumed
on the day of the offenses. The raid on the Wallace home was designed to cure that debt, which had
become acute. As the creditor, boyfriend, criminal mentor, drug dealer, and driver of the car
observed by witnesses parked at the crime scene, Torres Graciano accompanied Alfaro to the
Wallace home with the intent to commit burglary, taking Reynoso with them to watch Alfaro's two-
year-old son--and to hold him as security against Alfaro's repaying her debt--and to help with the

15

**Declaration of Raymond McGrath**

stolen goods. Following the murder, Torres Graciano helped Alfaro dispose of the items taken from the house. He stayed with her after that day because he was her boyfriend and because he wished to keep her under observation. Soon after she was arrested, he departed for Mexico to avoid further involvement in the case.

33.     On September 20, 2000 I interviewed Sabrina Duran in the women's section of the Orange County Jail. (See Snell Decl., Exhibit 6 [Declaration of Sabrina Duran].) She told me that on the day of the murder she had taken drugs with Reynoso and Alfaro in the apartment in Little Tijuana rented by Juan Jimenez. The drug dealer, Duran told me, was a Mexican male named Manuel Torres Graciano, who drove a brown Monte Carlo. She stated that sometime during the day, Graciano, Reynoso and Alfaro left the apartment and drove away in Graciano's brown Monte Carlo. Some time later they returned. Duran saw Reynoso and Alfaro carrying a typewriter and some clothes. Alfaro and Graciano were arguing in low voices as they went down the outside stairs. After that, everyone went his own way. A few days later, the police arrested Duran. Graciano was on the street when Duran was arrested. She never saw him or his car again. (Ibid).

34.     Raul Rodriguez, the man formerly known as Antonio Reynoso, nicknamed "Shorty," also confirmed to me in a personal interview on May 24, 2001, that Manuel Torres Graciano was the third man, and the driver of the brown Monte Carlo. Rodriguez-Reynoso said he had been at old Juan's apartment that day, but denied taking drugs. He went with Graciano and Alfaro to the Wallace home because he wanted to buy a VCR. Once there, Alfaro went into the house. Rodriguez stayed outside with Alfaro's two-year-old son. Rodriguez was not watching Graciano all the time, because he was preoccupied with taking care of the boy. He does not know if Graciano entered the

16

000016

EX 1   16

**Declaration of Raymond McGrath**

house. But he said Graciano could have entered the house. Rodriguez declined to provide me with a declaration, but I am informed and believe that he would testify as stated if subject to court process.

35.     There still remains the question of what exactly happened inside the Wallace home after Alfaro entered it that day. To begin with, I asked whether it was more likely than not that, when three people descend upon a house in order to rob it in broad daylight, and one of them is occupied with the care and detention of a two-year-old child, the third person would loiter outside instead of helping with the job. I thought not, always assuming that the two men in the case were aware that a burglary was intended. If they were, it was more probable that the third man would help, in the interest of efficiency, and in his own self-interest (payment of the debt) and self-preservation. For this reason, I thought Torres Graciano probably entered the house.

36.     There was circumstantial physical evidence to suggest that this happened. It revolved around three facts. Two of those facts were: the presence of the paring knife next to the body of the victim, and what I interpreted as the bloody outline of a much longer blade on a pink towel, which I personally inspected. I am aware that the prosecution asserted that the outline in question was a coincidence, and was not the result of blood being wiped from a long knife-blade. I do not hold myself out to be an expert in forensics. Nevertheless, though I could conceive of another explanation for that particular mark upon the towel, and could imagine a reason for its existence other than that a long-bladed knife was used to kill or to help to kill Autumn Wallace, I felt I must docilely accept, at least provisionally, the evidence of a long knife on its face, as the least intellectually tortuous explanation. I was aware that Linda Wallace testified under oath that a long-bladed knife was missing from the Wallace home, and that Alfaro in her confession to the police insisted that she had

17

## Declaration of·Raymond McGrath

taken the murder weapon with her, placing it in her purse, and disposed of it in a dumpster behind a Carl's Jr. Restaurant. This was a statement she never retracted, one which in my opinion caused some puzzlement on the part of the investigators who interviewed her. (See C.T. p. 537)

37.     I was also aware from my review of the discovery that a purse belonging to Alfaro was recovered by the police, in which there was a small quantity of blood never tested or matched to any person connected to the murder. (See Exhibit 52 [Report of Criminalist Wong].)

38.     I also noted in reading the transcript a passage on page 44 which refers to the wipe on the towel:

GIFFIN: Okay, what did you do with the towel?

ALFARO: I cou..I don't know, I didn't clean myself but I cleaned the knife, not myself.

GIFFIN: You wiped the knife off, didn't you?  What did you do with the towel?

ALFARO: I left it somewhere.  I left it there, I left it somewhere.  I can't remember.

39.     She left it in the house, where it was found by the police, and later entered into evidence with its intriguing long-knife-blade-shaped stain. Also on page 44,  Giffin  elicits the admission that Alfaro wiped blood off her tennis shoes, but on page 45, he makes a reference to a "damp rag. The rag that had water on it, the little towel, not the one you wiped the knife off with and left it on the floor." Alfaro told Giffin that she took that rag with her, and threw it away at some location she cannot recall.

40.     It was possible, then, that after Torres Graciano entered the home he picked up and brandished one of two knives, the paring knife or a longer-bladed knife which was later wiped off on a pink towel, and taken from the scene by Alfaro.  Such a scenario would help to explain the

18

EX 1   18

**Declaration of Raymond McGrath**

seeming contradiction between a short-bladed knife lying by the body, and the bloody outline of a long-bladed knife on the pink towel found in the house. But more compelling evidence was to be found in Alfaro's confession, where, under the persistently logical interrogation of the police, she admitted that the third man had been in the house with her, and, though not going so far as to name Manuel Torres Graciano as the third man in the crime, named "Manuel Flores something" as someone she had stayed with following the murder. This exchange occurs on pp. 31-32 of the transcript:

GIFFIN: Who helped you?

ALFARO: I was just taking the things out, and then Shorty, I told Shorty, put the baby in the car, I don't know if Shorty still had the baby. And that's, the man, the guy I don't know his name, was the one that was helping me take the things in the car.

GIFFIN: Who came into the house with you?

ALFARO: Nobody, nobody came in there.

BALE: You're real sure about that?

ALFARO: Yeah, I was just...

BALE: You better be real sure.

ALFARO: He just went to the door.

BALE: Okay.

Some further colloquy resulted in this statement five parts down page 32:

ALFARO: He just like went up to the door, like, in, right there by the door, inside the house, by the door.

**Declaration of Raymond McGrail**

GIFFIN: So he did go inside the house to get some of the stuff?

ALFARO: Yeah, right by the door.

      41.    "Inside the house by the door" would theoretically be sufficient to allow Torres Graciano to see the living Autumn Wallace. But the police elicited a further admission, on pages 41-43 of the transcript, and this had to do with the third fact that suggests to me that Torres Graciano entered the Wallace home:

GIFFIN: Well, there's some areas that you didn't tell me everything. I'm sure my partner can review his notes and tell you about it, but you know what, I'd rather they come from you without us prompting you to do it.

ALFARO: About the, the microwave?

GIFFIN: We kind of skipped over that, didn't we? Pretty heavy microwave, isn't it? Tell me about that.

ALFARO: Well, we didn't take it. But then, that's when the guy said that, that things didn't fit in his car. I didn't really...I thought all the time he had it, and then he told me when we were in the car, when we were already on the way, he told me he didn't and that he left it there.

GIFFIN; So he was really inside the house, wasn't he?

ALFARO: He was right there by the door. I kept on telling him not to come in, though.

Detective Giffin did not overlook the significance of this last piece of information: On page 42 he asks,

GIFFIN: How did that microwave get down off the shelf?

ALFARO: I got it off. I did.

20

**Declaration of Raymond McGrath**

GIFFIN: Well, you thought he had it.

ALFARO: Cause I had, I had told him to get it.

GIFFIN: So you told him to come in the house and get it.

ALFARO: I don't know, I was just--*--around, I was...

GIFFIN: Don't you think he would have seen Autumn's body?

ALFARO: I don't know.

To which Detective Bale responds: "How could he miss it?" This leads to a brief exchange about whether the third man was wearing gloves, and the importance of telling the truth. I noticed that in this part of the interrogation, the detectives seemed to assume that Autumn Wallace was already dead when the third man entered the house, an assumption which I did not believe was necessarily so. Nevertheless, the logic of their insistence that the third man had to have been in the house seemed to have worn Ms. Alfaro down, for on page 43 she states:

ALFARO: Well. I think he did come in, because...

BALE: You're, you're kind of down playing some things.

ALFARO: No, because now I'm thinking about it.

BALE: Okay.

ALFARO: And I had, I don't know, but I had given him the microwave or something, I don't know. But now thinking about it, he probably took, grabbed it and took it in the car and brought it back cause it didn't fit in there. And put it back on the...

BALE: ...uh-hum.

ALFARO: On the stove, on the laundromat, laundromat.

21

**Declaration of Raymond McGrath**

GIFFIN: On the washer and dryer?

ALFARO: On the dryer, yeah. But I don't know, just can't remember seeing him walk in the house, but I think he did then to grab the microwave, cause I had told him to. I don't know, I can't remember seeing him anywhere else.

     42.     There is an objection to this scenario, namely that one questions why the third man would bother to walk all the way back through the house with the rejected microwave when it would have been much simpler to leave it inside the front door. Then, too, Ms. Alfaro admits that she took the microwave down from its original perch. A simpler explanation of the event would be that the third man came back through the house into the rear of the house, saw the appliance, and rejected it as too large or too heavy. Another, subtler point is that in her confession it is Ms. Alfaro who is directing the actions of the third man, not the other way around. But the existence of the microwave, its location in the crime scene (which suggests that for the third man to have know about it he must have been well inside the house), and Ms. Alfaro's admission that the third man knew about the microwave, are solid facts that neither the interrogators nor Ms. Alfaro can avoid. These facts, and the inexorable logic of the interrogation, led directly to Ms. Alfaro's admission on page 43 that the third man entered the house, not just to within a step or two of the front door, but all the way to the back of the residence. There is no evidence which demonstrates, and no compelling reason to believe, that Autumn Wallace was not alive at that time.

     43.     I believe the police were completely correct in concluding that the third man was in the house at some point during the crime. The confession strengthened my conviction that the third man, whom I believe is Torres Graciano, participated in some way in the murder. There is nothing

000022

**Declaration of Raymond McGrath.**

in the transcript which weakened that conviction, even the fact that Torres Graciano's fingerprints were not found in the Wallace home. That fact is not evidence that he was not there, but the absence of a specific type of evidence that he was there, or rather, evidence that he left useful latent fingerprints on any object in the house. Police do not always find useful latent fingerprints at a crime scene, and it is possible that Torres Graciano did not touch the microwave, for example. Nevertheless, none of his fingerprints were found at the scene. Based on the records I have reviewed, including the defense cross-examination of police witnesses, it is not disclosed whether the police fingerprinted all the recovered items. Against this fact I placed the other evidence I have described here--not the least of which is Ms. Alfaro's own confession--and concluded that Torres Graciano was in the house when Autumn was alive. I believe he came into the house to help Ms. Alfaro with the burglary, saw that Autumn Wallace was in the house, and demanded that Ms. Alfaro do something about the girl. This is consistent with what Ms. Alfaro has stated in her prior declaration (See C.T. p. 4971-497c), and her testimony (R.T. 1636 et. seq.). It made sense to me that the thirty-year old drug dealer, not the eighteen-year-old drug addict, initiated the idea of attacking Autumn Wallace, if not the attack itself. He was on probation, and thus would have gone to prison for a burglary. (Snell Decl., Exhibit 36.) If I am correct, he would not have had to touch anything more than the front door (in which case any usable latent prints might have been obliterated by persons entering the house later), Autumn Wallace, and possibly certain items stolen from the house.

44.    Ms. Alfaro's confession supports the view that the third man was Manuel Torres Graciano, whom Alfaro describes as "Manuel Flores something," on page 84 of the transcript. She adds on page 85, in reference to the name of the man with whom she stayed in motels in the days

23

**Declaration of Raymond McGrath**

following the murder, that "It's a long name." When Detective Giffin notes that Flores is not a long

name, Alfaro states "No, but he's got some other last name." After Detective Bale recapitulates the

part of the confession which occurred while Giffin was out of the room, emphasizing that Alfaro had

claimed to have murdered Autumn Wallace by herself, Giffin asks her, "You wouldn't lie to cover

up would you?"

   45. In my opinion that is precisely what she did. Alfaro declined to identify Torres

Graciano out of personal feeling for a lover and a perverse refusal to play the role of informer,

because she reasonably felt responsible for Autumn Wallace's death, and because she continued to

fear retaliation against herself and her family from Torres Graciano and Kiko, who remained at large,

and therefore presented a danger to her and those around her.

   46. In reviewing the record, it appeared to me that by July 5, 1990, the police had in their

possession all the facts necessary to surmise the identity of the third man, to judge by the evidence

of Ms. Alfaro's confession, in which she admits the third  man entered the house and provides the

police with a fairly complete name, and by  their own record of their investigation. A summary of

part of the sheriff's detectives' investigation may be helpful:

   47. Ms. Alfaro was arrested on June 27, 1990. At 2:40 p.m. on July 2, 1990, some hours

before  Reynoso had given himself up and granted an interview to the police, the police went to Little

Tijuana in Anaheim and interviewed Juan Jimenez, in whose apartment at 1532 South Jeffrey Alfaro

and Duran, and possibly Rodriguez took drugs that day. Jimenez told the police that Alfaro, Duran,

and Reynoso had visited his apartment that day.  He also told them about a drug dealer named

Manuel, also there that day, whom Jimenez described to the police without giving Manuel's last

24

000024

EX 1   24

**Declaration of Raymond McGrath**

name. He told police Manuel knew Shorty. Jimenez then directed the police to the apartment of

Isabel Torres Hernandez, Torres Graciano's sister, who lived nearby at ▮▮▮▮▮▮▮▮▮▮

Apartment 3. When interviewed, Hernandez told the police that Torres Graciano had left that

morning at approximately 11:00 a.m. for Mexico. She did not know who he went away with. She

volunteered this information without being asked. She also told the police that Graciano knew

Shorty Reynoso. (Snell Decl., Exhibit 44 [Sheriff's Investigator Giffin's Notes].)

48.    The police–in the person of Detective Giffin-- seized two polaroid photographs from

Mrs. Hernandez. (Id.) These polaroids were not described in Detective Giffin's notes, and they were

neither produced to the defense nor made part of the exhibits in the trial. After obtaining the

polaroids, the police then returned to headquarters and ran Torres Graciano's criminal history and

obtained a mug shot, which Detective Bales pasted into his case notebook, presumably to aid him

in identifying Torres Graciano should he encounter him in the field, and in interviewing witnesses.

(See Exhibit 49 [Bales' Notebook].) Yet Rodriguez-Reynoso informed me the police did not show

him a photograph of Manuel Torres Graciano, whether mug shot or polaroid.

49.    Sabrina Duran subsequently identified Torres-Graciano as "Rosie's boyfriend" from

the booking photograph pasted in Bale's book. She told Bale that Ms. Alfaro stayed with him the

week after the murder at various motels. When asked if she had ever seen a Monte Carlo, she says

"A Monte Carlo? A brown Monte Carlo?" (Id. at Exhibit 48 [6/27/90 interview of Sabrina Duran]

p. 11.) The failure of the investigators to follow up on this point is glaring. When the detectives

interviewed Sabrina Duran, on July 5, 1990, she told Det. Giffin that she saw Shorty and Rosie "out

front" and saw a brown Regal or Monte Carlo. The driver of the Monte Carlo had a beauty mark or

25

## Declaration of Raymond McGrath

mole on his left upper lip and the flair of his nostril, she said. Giffin showed Ms. Duran a photo of Manuel Torres Graciano. (The notes refer to "Pix," which implies pictures in the plural, i.e., more than one photo, which makes one wonder if they showed her the polaroids but not the mug shot.) Duran identified Torres Graciano as Alfaro's boyfriend "after the 187," according to Det. Giffin's notes. In this interview she describes the beauty mark on the side of the face of the driver of the brown Monte Carlo. The police then show Duran a photo—which in Giffin's notes is referred to as one of Manuel Torres Graciano—and Duran identifies it as a photo of Manuel, whom she used to know, and who "split" for reasons unknown. She denied that he was the driver of the car. She also said he had been a drug dealer, but had stopped "when Rosie got busted stuff like that. That's when he had stopped. But yeah, he was dealing." She then identified Torres Graciano as Alfaro's boyfriend, and noted that the couple had stayed together in motels after the murder. (Snell Decl., Exhibit 48.)

50.    In my opinion, based on their interviews with Jimenez, Hernandez, and Ms. Alfaro and upon this interview with Duran, the police suspected that they had identified the third man. A series of exchanges between the police and Ms. Duran supports this conclusion, beginning with Detective Bale's statement on page 9:

BALE:  We got guys in Monte Carlos being stopped all over Southern California. Because everybody develops amnesia when it comes to the guy driving a car like that one. They can remember stuff that's unbelievable.

DURAN: Hum-um.

BALE:  But funny thing, for some reason, they can't remember this guy. And people don't usually

26

**Declaration of Raymond McGrath**

take perfect strangers to go do burglaries and murders and stuff like that.

DURAN:  I thought he turned himself in?  Oh, it was the other guy.  Another guy, Shorty, that turned

himself in.  Oh.  So you guys haven't found the guy that was driving her, right?  That chauffeured

her around or helped her do that?

BALE:  I don't know.  Have we?

51.    The detectives then asked Ms. Duran what she had heard.  She denied having heard

anything, other than that Shorty had turned himself in.  To which Giffin answered: "Yeah.  But you

know who drives that car."  She denied that, too, which led to a lengthy discussion of such topics as

the description of the driver of the brown Monte Carlo, of whom Duran had claimed to catch a

fleeting glimpse, and the desire of the common criminal not to be perceived as a "rat."  During this

discussion, Det. Bale observed:

52.    "Everybody had a tendency to hold back a little.  Nobody wants to give up their

connect." [Page 14].  This precedes a section in which the detectives try to get Duran to admit that

she took drugs with Alfaro on the day of the murder.

53.    On page 19 of the July 5 interview with Duran, Giffin tells her flatly, "Manuel is the

dope dealer."  To which Duran replies, illogically, "...Okay. ... But I don't think she was with him

at that time."

54.    After that interview, there is no record of the police attempting to locate Torres

Graciano, or pursuing the third man theory in any way.  That avenue of inquiry in the case simply

ceases.  (See Snell Decl., Exhibit 37 [Giffin's "Investigative Overview"].)  Later, Detective Giffin

testified at trial that while at one time he thought Alfaro could not have committed the murder alone,

27

**Declaration of Raymond McGrath**

he had come to believe she had done so, and there was no third man involved in the actual killing

of Autumn Wallace. Indeed, in his "Investigative Overview," written on November 7, 1990, Giffin

does not mention the interviews with Jimenez and Hernandez on July 2, and with Duran on July 5,

at all. Nor does he mention the polaroids he took from Isabel Torres Hernandez's apartment.

55.      Detective Giffin does recount his interview with Reynoso on July 2, 1990, and the

parole search of Reynoso's apartment on July 3. On page 14 of the Overview, Det. Giffin also notes

the fact that on July 5, 1990 he and Det. Bale picked up Reynoso from his holding cell and drove him

to the Little Tijuana neighborhood, from where Reynoso directed them to the Wallace home, thereby

demonstrating that he knew the way to the crime scene. Reynoso was returned to his cell almost two

hours after being picked up. This event is interesting to me because Giffin's report states that the

detectives took Reynoso from his cell at 1445 hours. The same detectives' interview with Sabrina

Duran on the same day, July 5, concluded at 1413 hours. As I have observed, that was the interview

at which the detectives showed Duran a picture of Manuel Torres Graciano, whom she identified,

and in which she agreed with them that "Manuel was the drug dealer," and in which she stated that

Torres Graciano was Rosie's boyfriend. Yet there is no record of the police asking Reynoso the

same questions about Torres Graciano on the heels of the Duran interview, nor of their showing him

either the polaroids or the mug shot of Torres Graciano. Rodriguez-Reynoso told me that had he

been shown a photograph of Torres Graciano and asked a direct question by the police, he would

have identified Torres Graciano as the driver of the brown Monte Carlo. He also told me that he

believed that the police had figured out that Torres Graciano was the driver of the brown Monte

Carlo. Had they shown Reynoso the photograph and allowed him to identify Torres Graciano as the

28

**Declaration of Raymond McGrath**

driver of the very car they were searching for, on the very day that they told Duran they were searching for it, the identification would have established probable cause to arrest Torres Graciano. That the police chose not to show the photographs to Reynoso when he acknowledged that they depicted the driver of the brown Monte Carlo suggests intentionality on the part of the police.

56.     In reading the transcript of Rodriguez-Reynoso's interview with the police on July 2, 1990, I noted that the police did ask Reynoso if "Manuel" had carried any of the stolen items up the stairs to Juan Jimenez' apartment.  (Snell Decl., Exhibit 22).  Reynoso responded "Manuel, Manuel, Manuel."  Giffin answered, "Manuel–the guy who sells pieces."  Reynoso answered, "I don't ... you got me that, right, right now."  Giffin said, "Manuel Torres," to which Reynoso replies "I don't know Manuel Torres."  (Id).  But immediately after that exchange, Giffin moved on to another name.

57.     I have never seen originals or copies of the polaroid photographs the police took from Isabel Torres Hernandez's house, though I have reviewed the defense trial counsel's and defense trial investigator's files.  I do not know what they depict.  To my knowledge, they are not in the materials provided to the defense and subsequently to appellate counsel.

58.     It is my conclusion, in light of all the evidence, Torres Graciano was the third man at the scene of the crime, and that he entered the Wallace house.  The evidence upon which this theory is based was available to both the defense and the police at the time of the investigation, and during the guilt and penalty phases of the trial.  I believe I have read nothing that was not in their possession during that time, and interviewed no one who was not disclosed as a witness at the time.

59.     My reasons for believing that Torres Graciano was the third man involved in the

29

**Declaration of Raymond McGrath**

murder can be summarized as follows.  The first set of reasons I derived from the record:

- Torres Graciano was Ms. Alfaro's drug dealer, criminal mentor, and boyfriend.

- Torres Graciano lived and dealt drugs in Little Tijuana.

- Juan Jimenez identified Torres Graciano as "Manuel" the drug dealer, and directed the police to the home of Torres Graciano's sister Isabel Torres Hernandez, for more information.

- Isabel Torres Hernandez told the police that Torres Graciano knew Shorty Reynoso.

- Torres Graciano admitted to defense investigator Sandberg that he was with Ms. Alfaro before and after the murder on the day of the murder.

- Torres Graciano was on probation at the time of the murder.

- Ms. Alfaro all but named Torres Graciano in her confession -- referring to "Manuel Flores ... something long."

60.     The next set of reasons were derived from inquiries made by myself, at the direction of appellate/habeas counsel, of witnesses known to both sides at the time of the trial:

- Betty Soto identified Ms. Alfaro's boyfriend as "Meno," a diminutive of Manuel, and stated that he drove a brown Monte Carlo.

- Rodriguez-Reynoso and Ms. Duran identified Torres Graciano as the drug dealer at the drug house, and as the driver of the brown Monte Carlo seen at the crime scenes.

- Torres Graciano was a friend and drinking companion of Ms. Alfaro's father Jose Alfaro, knew him in Little Tijuana, and was familiar with all the Alfaro family,

30

**Declaration of Raymond McGrath**

including Ms. Alfaro.

- Just before she was arrested, Ms. Alfaro told Maria Ruelas that she was going to Mexico with a friend of her father's.

- Mr. Torres Graciano subsequently did leave for Mexico (This fact, of course, I knew from the record, but I include it here for the sake of clarity.) Torres Graciano now lives in Nayarit, Mexico, where local police describe him as a violent spousal abuser and habitual drunk.

- "Kiko," Mr. Torres Graciano's alleged drug boss, has been identified as Enrique Hernandez, a high school classmate of Ms. Alfaro's aunt Mercedes.

- The Alfaro family lives today in the same house they lived in when Ms. Alfaro's aunt Mercedes was in high school.


## PAROLE PROCEDURES

61.     After he turned himself in, upon learning that the police were looking for him, Rodriguez-Reynoso was held in custody for approximately five days.  Based on Rodriguez-Reynoso's status as a recently released parolee in the company of a drug user and a drug seller at the time of the murder, there appeared to be a basis for moving to violate Mr. Rodriguez-Reynoso's parole and keep him in custody.  In fact, the police did arrest Rodriguez-Reynoso for parole violations and they conducted a parole search of his apartment.  However, after approximately five days, Rodriguez-Reynoso was freed.  I noted that in Det. Giffin's notebook he records a call he made to Reynoso's case officer Mike Lewis on July 9, 1990.  (See Snell Decl., Exhibit 44 [Giffin's

000031

EX 1   31

**Declaration of Raymond McGrath**

Investigation Notes].)  I spoke to Mike Lewis, Rodriguez-Reynoso's former parole officer, now a

lieutenant at the California Institute for Men at Chino in an effort to understand why the police

ultimately did not violate Reynoso's parole. Lt. Lewis told me he did not recall the Alfaro case, but

he did offer a description of standard procedures followed by his office at the time in making the

decision whether to reincarcerate an individual for parole violations.

        62.     Lt. Lewis said that he, as the case officer, would gather all the relevant documents in

the matter, including the arrest report, the detective reports, results of drug tests, and so forth. He

then would typically meet with his superior, in this case Victor Peñulas, who is still with the Parole

Office. They would discuss the matter, and consider such factors as the subject's commitment

history and institutional behavior, among others. Mr. Peñulas would ultimately make the decision

to revoke parole or not. If the police detectives requested that the parole authorities not revoke the

parole of a valuable witness, that request would also be considered. It was not automatic that the

parole authorities would grant such a request from the police. Lewis did not recall whether the

Orange County Sheriff's investigators in the Alfaro case made such a request. But the Alfaro case,

because it was a high profile case, would be just the type of case in which such a request would be

made, and granted.

        63.     I telephoned Det. Tom Giffin and Det. Gary Bale, both of whom are still with the

Orange County Sheriff's Department, and requested an interview. In those telephone conversations

I explained my belief as to the identity of the third man, and named Mr. Torres Graciano. Det.

Giffin, when I asked if he recalled the name Manuel Torres Graciano, said "No" without further

comment. When I asked about the polaroid photographs taken from Isabel Torres Hernandez and

32

### Declaration of Raymond McGrath

not produced to the defense, Det. Giffin said that he could not discuss the case without reviewing

his notes, and asked me to call after his vacation. Detective Bale listened to my request, and my

theory, including that I believed Manuel Torres Graciano was the third man at the scene, and told

me that he would have to refer my request for an interview to his superiors. He would do what they

advised, he said. He asked me to provide him with the name of the Assistant Attorney-General on

the case, which I later did, by e-mail. On June 21 I received an e-mail forwarded to me from Det.

Bale's address, which reproduced a correspondence between Det. Bale and Sgt. Bob Blackburn.

In it, Det. Bale asks for advice on the protocol in speaking to the "defense." (Snell Decl., Exhibit

50.) Det. Bale wished to know if he was required to speak to the defense, and wrote, "I really don't

have anything to say to them unless court ordered. Could you advise me what is customary?" In his

reply, Sgt. Blackburn advised Det. Bale to do nothing until he, Det. Bale, spoke to a Lew

Rosenblum, and gave the telephone number (714) 347-8462. (I telephoned this number on July 3

and learned that this is Mr. Rosenblum's number at the Orange County District Attorney's office).

Sgt. Blackburn told Det. Bale that Mr. Rosenblum would be aware of any pending appeal. Sgt.

Blackburn also advised Det. Bale to wait to be subpoenaed, then to advise the District Attorney and

County Counsel should that occur. (See Exhibit 50.)

     64.    I spoke to Det. Giffin on July 20, 2001. He told me he was speaking to me without

having reviewed his notes from the case. He does not recall the two polaroid photographs to which

I refer above, nor taking them from Isabel Torres Hernandez' apartment. He has, or the police have,

a case file in which all miscellaneous pieces of information not considered important are stored, and

the photos may be in that file. Det. Giffin told me he remains convinced Ms. Alfaro acted alone in

**Declaration of Raymond McGrath**

killing Autumn Wallace. He believes her discussion of the microwave, including the part about the third man coming to the door, referred to the back door, not the front door of the house, because the microwave was in the laundry or service porch near the back door. That would mean that the third man never entered the house proper, he said. He vaguely recalled referring Ms. Alfaro to a diagram or scheme of the house, and Alfaro pointing to the back door during that part of the confession. Det. Giffin also said that whereas at first the police thought the third man was a co-conspirator or even the killer, as time went on and Ms. Alfaro's confession matched the known facts and physical evidence, and there was a lack of physical evidence to suggest the presence of a third person in the house, the view of the police changed to regard the third man not as the killer, but as a witness in the same way that Reynoso was a witness. Ms. Alfaro was the leader in the scheme to rob the house, he believed. She knew the house, and what was in it, and in all ways was "leading the pack." Det. Giffin does not believe she was under the influence or control of anyone else when she killed Autumn Wallace, but is convinced that Ms. Alfaro was the initiator of both the robbery and the murder. The investigation into the identity of the third man "kind of petered out," he said. Although there were a few inquiries from other agencies as to the brown Monte Carlo, Det. Giffin and his colleagues moved on to other homicides. They never identified Manuel Torres Graciano as the third man, nor narrowed the field down to any particular individual. They never made a tactical decision to stop looking for the third man. He has no recollection of why Shorty Reynoso's parole was not violated, but he thought it possible that he--Det. Giffin--or his colleagues asked the parole officers not to violate him, as he was an important witness. Giffin said he has done so in other cases in the past.

34

000034

EX 1   34

## .Declaration of Raymond McGrath

65.    In my opinion, Det. Giffin's theory as to whether Torres Graciano or anyone else entered the Wallace home is based solely on the negative inference from the lack of fingerprints or other physical evidence such as bloody shoeprints. None of that proves the third man was not in the house, but merely that he did not leave the sort of obvious evidence which would have satisfied the police. Against this, as I have said, is Ms. Alfaro's own statement, elicited by Det. Giffin, that the third man came into the house. Det. Giffin has no factual basis for supposing that the third man--in my view, Torres Graciano--did not see the living Autumn Wallace and bring pressure to bear upon Ms. Alfaro to kill her. He equally has no factual basis--other than Ms. Alfaro's statement--for supposing that the robbery or the murder were her idea. In fact, Ms. Alfaro told Giffin during the videotaped confession that it was her intention merely to take something she could fit in her purse from the Wallace home, then leave. (C.T. p. 569.) As I have described above, I believe Ms. Alfaro's statement was true in many respects, including that she was responsible for the death of Autumn Wallace, but untrue as to the identity and incomplete as to the actions of the third man. Nor do I think I am alone in that opinion. Both the police and her own defense team believed she was covering up for someone. Finally, Det. Giffin may believe to his heart's content that Ms. Alfaro was not under the influence of another person when she killed Autumn Wallace, but by his own analysis of the case he has absolutely no factual basis for that assertion. If Det. Giffin in fact never identified the third man during his investigation, he could not and cannot say if that man was a mere witness, to paraphrase him, or someone of a more substantial relationship to Ms. Alfaro. And the actual identity of the third man is crucial to the question of influence. In my view, the fact that the third man was no casual acquaintance, or merely her usual drug dealer, but specifically Manuel Torres

35

000035

EX 1    35

## Declaration of Raymond McGrath

Graciano and no other person, is a highly significant fact. Ms. Alfaro told me in an interview on July 27, 2001 that she had been having sex with Torres Graciano in return for drugs since she was a young girl.   Ms. Alfaro named Shorty Reynoso without hesitation because he meant nothing to her and in fact he did not enter the house. She refused to name Torres Graciano because he meant a great deal to her  and because she feared him in equal measure. In my opinion Det. Giffin's assertion that Ms. Alfaro, an eighteen year-old semi-intelligent drug addict, sometime prostitute and habitual follower, directed the actions of much older criminals, including Torres Graciano, thirty-year-old drug dealer and Alfaro's  sometime pimp, is incredible on its face. Det. Giffin  told me in our interview that he would have been glad to have had the third man as another witness to the homicide in addition to Reynoso-Rodriguez, but he did not seem to consider that Torres Graciano was and is a participant in a felony murder, a crime with no statute of limitations in California.  I have also reviewed the part of Ms. Alfaro's confession relating to the microwave and there is no mention in it of the back door of the Wallace home from either Ms. Alfaro or Det. Giffin or Bale.  Neither detective showed Ms. Alfaro a scheme or diagram of the Wallace home and she did not point to any representation of the house at any time during the discussion of the microwave. Also, when Det. Giffin questioned Ms. Alfaro about who else entered the house, she said the driver of the car "just went to the door." Det. Giffin asked "So he did go inside the house to get some of the stuff?" After Alfaro answers yes, the detective continues, "So he got, went in the screen door and through the front door and you were handing him stuff, is that right?" Ms. Alfaro answered "Yeah." (C.T. p. 534 [Ms. Alfaro's Confession].)  Finally, I would  point out that Torres Graciano could have seen the living Autumn Wallace whether he entered the home through the front door or the back door.

36

000036

EX 1   36

**Declaration of Raymond McGrath**

### JUDGE MILLARD'S PERSONAL LIFE

66.     I was also requested by Petitioner's counsel to inquire into a curious report about Judge Theodore Millard, who was the trial judge.

67.     Judge Millard, in his pronouncing sentence of death upon Ms. Alfaro, noted that while Ms. Alfaro had a "disadvantaged" childhood,

> "It also appears to the court that people really are the sum total of the choices we make in our life. She chose to leave school. She chose to use drugs. She chose to engage in acts of prostitution on the streets. She chose to hang out in the area on Jeffrey Street over there where there is a -- the drug culture is involved. She made all of those choices, those are all choices ..." (R.T. pp. 4506-07.)

68.     It came to my attention that Judge Millard had struggled with his own difficult experience of habitual drug use in the family. In 1996, well after he had sentenced Ms. Alfaro to death, Judge Millard gave an interview to the Orange County Lawyer, the house organ of the local bar association, in which he recounted his stepson's long history of drug abuse. (Snell Decl., Exhibit 39.) In the article, Judge Millard characterized his stepson's drug problems as having originated when the stepson was a teenager. I calculated that if one assumed an adolescent's teen years to begin when they reach age thirteen, by the time Judge Millard sentenced Ms. Alfaro to death with the benefit of his views on free will, he had been dealing with his own family's drug drama for between 14 and 17 years. To explain this, it is necessary to give a brief history. According to public records, Judge Millard was originally married to one Ellen Patricia Millar, but they divorced in 1968. In 1973 Judge Millard married Sondra Kay Brooks, who was the mother of two sons by a previous marriage, named Steven Kelly Brooks, born ███████ 1962, and Jason Alan Brooks, born ███████, 1965.

37

**Declaration of Raymond McGrath**

69.     To further parallel Ms. Alfaro's own history, Judge Millard recounted in his interview with the Orange County Lawyer that that particular stepson had a child. The child's mother had died in a motor vehicle accident in the desert. The child of that liaison, Judge Millard's granddaughter, begged the judge not to let her return to her father. Judge Millard determined to honor the child's request, fought his stepson for custody of the granddaughter, and won.

70.     I believe the stepson in question is Jason Brooks, the younger of Judge Millard's stepsons. I developed an address for Jason Brooks in Santa Ana. When I drove there, I saw a dark-haired woman and a young girl, possibly 12 years of age, with blonde hair, enter a white mini-van parked in the driveway of the home. An older woman, blonde, who was standing in the driveway as I walked up and introduced myself, identified herself as Joy Beck, Judge Millard's sister-in-law, and told me "That's his granddaughter," indicating the young blonde girl in the van, which was now pulling out of the driveway. I asked Ms. Beck if the girl had been the subject of the custody battle between Judge Millard and Jason. Ms. Beck hesitated, then said, "I'd rather not talk to you about that. I'll ll let him talk to you about that." I left my card with Ms. Beck with a request for Jason and Judge Millard to call me, but at this writing neither of them has done so. I have also telephoned Judge Millard at his current employment, two arbitration and mediation services in Orange County, but he has not returned the calls as of this writing.

## WALLACE'S CONNECTION TO COURT PERSONNEL

71.     I also learned that there had been a bake sale on the courthouse grounds to raise money for the Wallace family. I researched the house publication of the Orange County Employees Association for the relevant years, but found no mention of a bake sale. I did note, however, that

**Declaration of Raymond McGrath**

in 1992  Sondra Millard , Judge Millard's wife, worked as a travel agent at "World Travel," an agency which advertised in the employee's association newspaper every month in 1992, an advertisement which featured a photograph of Mrs. Millard.  (Snell Decl., Exhibit 55.)

72.    I was informed by Sherry Lane, the appellate records clerk at the Orange County courthouse, that a number of clerks had regularly attended the Alfaro trial.  Ms. Lane mentioned the names Kathy Lear and Mery Dominguez, and added  that Linda and Joyce Wallace also attended the trial.  Neither Lear nor Dominguez wished to be interviewed by me when I requested it, however.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 30th day of July, 2001, at San Francisco, California.

Raymond McGrath

39

ORIGINAL

## DECLARATION OF MARTHA LEE ROGERS, PH.D.

I, Dr. Martha Lee Rogers, declare as follows:

1.    I am a clinical psychologist licensed to practice in the State of California.  I am also a forensic psychologist.  For 19 years, I have maintained a private practice of both clinical and forensic psychology in Orange County.  During that time, I have frequently been appointed to assess the mental state of defendants charged with serious criminal offenses in both state and federal courts, including several charged with capital homicide.  In most of these cases, I have been asked to evaluate the defendant for purposes of determining sanity, diminished capacity, or other possible mental state defenses.  I have also frequently been appointed as an expert witness in cases involving juveniles charged with crimes, dependency, child custody, criminal and sexual abuse, personal injury, in addition to adult criminal, assault and homicide cases.

2.    In September of 1990, I was appointed by the Superior Court of Orange County as an expert for the defense in *People v. Maria Del Rosio Alfaro*, Case No. C-82541.  Ms. Alfaro, known as "Rosie", was charged with capital homicide.  She was represented by William Monroe, who requested my appointment.

3.    To the best of my recollection, my role was to evaluate Rosie Alfaro to determine whether or not she had a mental state defense (*e.g.*, insanity or diminished actuality) to the offense itself.  The homicide occurred during the commission of a residential robbery and reportedly involved not only Rosie Alfaro, but also two men, one of whom had not been identified.  At the time of the offense, Ms. Alfaro's son was outside the house in the custody of the male who was identified by police shortly after the crime.  I understood that Mr. Monroe's theory of the case was that Rosie Alfaro had participated in the killing under duress arising from threats of harm to her young son, and possibly other family members as well.  I do not know

000 49

whether the third-party duress theory came from Rosie herself or from Mr. Monroe.  I do not recall ever hearing that particular scenario from Ms. Alfaro.

4.    Almost all of my work on this case took place during October and November of 1990.  It included a significant amount of psychological testing.  Most of the written parts of the tests were administered by my assistant, Irene Doland, R.N., at the Orange County Women's Jail; I personally conducted all of the face-to-face testing, as well as the clinical interviews.  I also personally supervised the selection of tests and the analyses of Ms. Alfaro's responses and performance.  We administered intelligence and memory, personality and projective tests, and some rough screening measures to determine gross neuropsychological impairments.

5.    Testing interpreted by non-psychologists may not be adequately understood or properly presented when reported by others.  Test data that is misinterpreted or presented out of context can be highly misleading, as psychological testing is a specialized area which may be unintelligible even to other mental health professionals.

6.    Among psychological tests, intelligence testing is perhaps the most familiar to lay persons.  I evaluated Rosie Alfaro's intelligence by means of the Wechsler Adult Intelligence Scale-Revised ["WAIS-R].  The WAIS-R was designed to provide an objective measure of an individual's cognitive abilities, expressed in terms of an "intelligence quotient" or "IQ."  It includes a series of subtests which are scored and computed to establish the patient's Verbal IQ, her Performance IQ, and her Full-Scale (or overall) IQ.  The "average" IQ is around 100.  The cut-off point for establishing diagnosis of Mental Retardation was, at that time, considered to be 70 or below.  Rosie Alfaro did not test out as mentally retarded.  Overall, she was functioning somewhere in the mid- to high 70's.  As a general rule, this IQ would not render one legally

2

incompetent or insane *per se,* but Rosie's scores were well below average, in the range of "borderline intellectual functioning." I also note that her performance was noticeably more impaired in areas requiring verbal skills (as opposed to non-verbal reasoning) — her Verbal IQ is 73, 17 points lower than her Performance IQ. Language factors did not appear to play a significant role, but to my knowledge, she was never tested in Spanish for IQ, but only for language competence while in grammar school.

       7.    The WAIS-R, and the resulting IQ scores, can reasonably be used by other evaluators as a measure of an individual's cognitive abilities, with the caveat that an IQ score is never a substitute for a full and reliable mental health evaluation. None of the other tests that we administered can be used in that way (that is, adopted by another evaluator and expressed in terms of a single score). Although my assistant and I conducted a fair amount of testing on Ms. Alfaro, we did not prepare a report of either her test performance or her mental state. I believe that I determined, based on our initial review of the test data and interviews with the defendant, that I could not assist Mr. Monroe in providing a full mental state defense to the crime. That was the referral question which shaped and informed my evaluation. I do not recall being asked to consider the existence of potential mitigating factors for sentencing purposes. The legal sentencing issues appear nowhere in either the order appointing me or my notes, although some of these factors were addressed in my clinical assessment, including potential mitigating issues.

       8.    I have recently reviewed his Motion and the Court's Order appointing me. The Order reads as follows:

> Martha L. Rogers, Ph.D. is appointed to investigate the case of MARIA DEL ROSIO ALFARO and to prepare a confidential report for the Defendant's attorney, William M. Monroe and to evaluate and explain the personality and

3

000342

behavior of MARIA DEL ROSIO ALFARO and to assist the attorney in cross-examining the expert testimony of the opposition and to point out the possible flaws in the conclusions reached by the opposition.

(October 11, 1990, *People v. Maria Del Rosio Alfaro*, Case No. 90CF01556.)  That was not standard language on such orders, either now or in 1990, in appointing experts in this county. Presumably, that language was Mr. Monroe's.

9.    On November 8, 1990, I submitted an invoice for my services on the Alfaro case. The case did not go to trial until 1992.  Although the 1990 invoice states that it is not a final billing, court records confirm that it was, in fact, the last bill I submitted.  That is consistent with my memory.  I failed to submit bills for some consultation time prior to appearing in court, as well as my actual courtroom time.  Although my records reflect brief contacts with Mr. Monroe in 1991 and early 1992, as well as some telephone contacts with the prosecutor, I did not participate in further development of Ms. Alfaro's defense.

10.    Around the time of my testing in 1990, I conveyed my initial clinical impressions to Mr. Monroe.  I also provided some of the test data and, I believe, my own notes of my clinical interviews with his client.  Those materials were not intended for disclosure to any other parties. It was not anticipated that I would testify or play any further role in the case, so I believed that my materials would remain confidential, as designated in the initial order.

11.    The materials I provided to Mr. Monroe consisted largely of raw test data, scoring forms, computerized interview notes and impressions.  To the extent that they included my own handwritten notes on test data or computerized interview notes, they in no way constituted a clinical report of any kind. They do, however, include suggestions of areas which should be explored or re-examined as part of a full mental state assessment.  For example, my notes reflect

4

that Ms. Alfaro had a long history of drug abuse, including solvents, as well as a history of

syphilis.  My handwriting in the margin of my typed notes states: "She should have Neuro work-

up because hx[history] of syphilis."  Elsewhere, on one of the testing record forms, my

handwritten notes state: "R/O[rule-out] organic sequelae from drugs or syphilis or solvents."

"R/O," when it precedes a DSM diagnosis (e.g., R/O Dysthymic Disorder) designates what is

generally referred to as a "rule-out diagnosis."  A R/O diagnosis indicates that there is sufficient

evidence or symptomatology to warrant additional assessment of that disorder.  As a practical

matter, the examiner must usually obtain additional data or conduct further testing before the

issue can be properly resolved.  I also note more than once that Ms. Alfaro displayed symptoms

consistent with Post-Traumatic Stress Disorder ["PTSD"].  Rosie Alfaro also demonstrated signs

of a personality disorder.

      12.    Rosie Alfaro went to trial in 1992 and was convicted of first degree murder.

Following her conviction, a penalty trail was held, at which mental health evidence was

presented by defense counsel.  I was told that the jury in that phase of the trial could not reach a

conclusion.  They were dismissed and a second penalty phase hearing was scheduled.  During the

first penalty phase or shortly thereafter, I learned that my test data and at least part of my notes

had been provided to the defense's testifying mental health experts — specifically, the raw data

and some of my notes regarding a test called the Minnesota Multiphasic Personality Inventory-2

[the "MMPI-2"].

      13.    The MMPI-2 is a standard measure of personality functioning used in a variety of

contexts, both therapeutic and forensic.  It is generally used as a part of a battery of psychological

tests, integrated with other sources of information as part of a broader mental health evaluation.

5

It is not, by itself, diagnostic.  Moreover, it is subject to a range of interpretations — in most instances, the profiles generated by MMPI-2 data will be consistent (or potentially consistent) with more than one diagnosis.  A clinician conducting an appropriate mental health assessment will consider an MMPI-2 profile as one of many factors, taken in context and interpreted with a broader understanding of the individual being evaluated.

14.     An individual's MMPI "profile" is measured in terms of her/his scores on a series of scales, both as individual scales and relative to each other.  There are 10 "clinical" scales, which reflect an individual's tendencies, characteristics and symptomatology.  These include, for example, scales referred to as the Schizophrenia (8) scale, the Paranoia (6) scale, the Mania (9) scale, and the Psychopathic Deviancy (4) scale. In addition to these, there are three "validity" scales which, separately and in relation to each other, provide a measure of whether an individual's scores on the clinical scales are likely to be valid.  Rosie Alfaro's scores on the validity scales were notable in that the scale which reflects infrequent responses ( the "F Scale") was extremely inflated.  That score strongly suggested to me that the MMPI profile which Rosie Alfaro produced was likely to be invalid.

15.     Although the results of that test were likely to be invalid, an exaggerated F Scale, in itself, does not explain why the individual has reported in that particular manner.  That can only be determined by exploring the circumstances surrounding the test and factors unique to the individual examinee.  In October of 1990, having scored Ms. Alfaro's exam, I recognized that her profile was not reliable and made a handwritten note reflecting both the invalidity and the range of possible explanations.  On a computer-generated "Extended Score Report," I wrote the following:

6

> Obviously invalid profile.  F + Fb grossly elevated.  TR does not suggest she
> indiscriminately acquiesces to true responses.  VR suggests very significant
> inconsistency in pairs of items with same or opposite meaning.  High F + VR
> suggest confusion or carelessness.  She had help with the test — reading is not an
> issue.  Clinically she is not psychotic.  She has been incarcerated for several
> months [and] should be past the floating profile that is reaction to arrest [and]
> incarceration, but testing should be redone.  Probable fake bad.

(10/23/90 Extended Score Report, handwritten notes on p.5.)

16.    I reached no conclusions regarding these validity scales, other than my belief that

the clinical scales were likely to inaccurate and, therefore, invalid.  The pattern of responses seen

in Rosie Alfaro's MMPI, and the F Scale score itself, suggest several other factors that might

result in an invalid profile, including learning disabilities (specifically language disorders, as has

been diagnosed when Rosie was in elementary school); possible language barriers; confusion;

organically-based deficits in concentration and/or attentiveness; increased stress or emotional

distress; or possibly medications taken at the time of test administration (which should be looked

into).

17.    I understand that it was the phrase "probable fake bad" that became an issue in

Rosie Alfaro's penalty phase trial.  That phrase describes a tendency to exaggerate and over-

report mental health symptoms, often for some secondary gain.  Especially in a forensic setting,

any competent clinician must consider the possibility of malingering — that is, faking symptoms.

However, malingering is only one of several possible explanations for a high F score; the two are

not synonymous.  Indeed, a computer-generated "Adult Interpretive Report" I ran at the time of

the test included the following "Configural Validity Scale Interpretation":

> This validity scale configuration is usually obtained by individuals who are
> admitting personal and emotional problems, requesting help with these problems,

7

> and are unsure of their own resources for dealing with them. As the elevation of
> the F scale increases, these individuals are acknowledging that they are
> experiencing more problems and feeling worse or are over-reporting their
> problems, perhaps to get help sooner.

Thus, to assume a direct correlation between this profile and malingering would be simplistic and
clinically inappropriate.

18.    I learned that during Ms. Alfaro's first penalty hearing, the prosecutor questioned
Mr. Monroe's mental health expert regarding my notation of "probable fake bad." When a
second penalty phase was scheduled, it was clear that the prosecutor again intended to use that
language to cross-examine Mr. Monroe's mental health experts. At some point, I provided Mr.
Monroe with information, including written materials, about the meaning of the term "probable
fake bad" and the alternative explanations for Rosie's elevated F scale. I discussed the range of
explanations with him and created eight or ten charts and lists taken from various psychological
texts. My comments to Mr. Monroe are reflected in his handwritten notes on the documents I
provided.

19.    Knowing that my test data would likely be raised in court, I became concerned
about my duties of confidentiality to Rosie Alfaro and retained Bill Kopeny to help me ensure
that my testimony, if necessary, would be narrowly circumscribed — that is, limited to specific
questions about the MMPI. My concerns were set forth in a letter to Judge Millard, copies of
which were provided to Mr. Monroe and Mr. Middleton. Prior to my trial testimony, Judge
Millard held a hearing outside the presence of the jury, at which he ruled that the scope of my
testimony would in fact be very limited. I therefore anticipated very limited questioning when I
was called by the prosecutor to testify before the sentencing jury.

20.    On June 2, 1992, I was called by the State to testify in Rosie Alfaro's sentencing

hearing.  I have recently reviewed the transcript of that testimony.  The prosecutor referred to my

notations on the MMPI and asked me about the term "probable fake bad."  He also asked about

its relevance to assessing malingering.  The transcript of that proceeding is clear:

> Q:    What does "probable fake bad" mean"?
>
> A:    This is a term that we use that may mean one of several things.  What it
>       always means is that probably the person has overresponded in some way.
>       There may have been some exaggeration or overstatement of whatever this
>       person's current psychiatric condition is.
>
> Q:    Is it one thing you look at in a — is it one thing, among several things, you
>       look at in, say, malingering?  When you're looking at the case of
>       malingering?
>
> A:    It would be one thing you would consider.
>
> Q :   Okay.  What is the MMPI, anyway?  (RT 4268:1-13.)

That was the last question Mr. Middleton asked me.  The alternative explanations, which he

himself implied in his question, were never mentioned, nor was I given the opportunity to put

this information in context.

21.    Having spoken with Mr. Monroe and educated him regarding the MMPI, I went to

court with the expectation that he would follow Mr. Middleton's questioning with questions of

his own that would allow me to explain this issue more fully and put that notation in proper

context.  However, that did not happen.  Mr. Monroe allowed the court to dismiss me without his

asking me a single question.  My exchange with Mr. Monroe, in its entirety, is as follows:

> Mr. Middleton:    Thank you.  No further questions.
> The Court:        You may examine.
> Mr. Monroe:       I have no questions.
> The Court:        May she be excused?

9

| Mr. Monroe: | Yes, your Honor. |
|---|---|
| Mr. Middleton: | Yes. |

(RT 4268:20-26)

I was very surprised by Mr. Monroe's failure to ask even a single question that would enable me to explain my notation and its significance.

22.    I do not know why Mr. Monroe chose not to question me or clarify this issue. It was not what I had anticipated. When I appeared in court that day, I brought a file of materials, including those which I had previously provided to Mr. Monroe. As a professional, it was surprising and unanticipated that alternative explanations were not elicited in my testimony.

23.    Prior to my actual trial testimony, I received a letter from Mr. Monroe which read, in its entirety:

> Can you consider whether or not Rosie's mental state might rise to a "mental or emotional disturbance" which emotional mental state could be induced as a result of a series of events which occur over a considerable period of time?

That question was not very intelligible to me. While I am not an attorney, I have done forensic work for more than twenty years and this is not a legal standard or a referral question. I can only assume that this was a reference to possible mitigation issues, but my records do not reflect any substantive discussions about this or any other case-related issues with Mr. Monroe. I did not participate in developing the penalty phase testimony he presented. Again, my notes from 1990 reflect a number of factors that might be raised in mitigation, but I was not asked to address or develop them.

I declare under penalty of perjury under the laws of the United States of America and the

10



State of California that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this *13* day of September, 2000 in _____*Tustin*_____, California.


_Martha L Rogar PhD_
Martha Lee Rogers, PH.D.


11