FROM : Driscoll & Sanislow       FAX NO. : 203 483 0888       Jul. 07 2001 08:42AM P2

ORIGINAL

## DECLARATION OF CHARLES A. SANISLOW, PH.D.

I, Dr. Charles Sanislow, declare as follows:

1. I am a clinical psychologist licensed to practice in the State of Connecticut since 1995. Prior to earning my doctoral degree in clinical psychology, I had previously been licensed at the Master-level as a psychological associate in the State of North Carolina. I received my Bachelor of Science degree from Northern Michigan University in 1985, with a major in psychology and minor focuses in mathematics, biology, and chemistry. In 1987, I received a Master of Arts degree in psychology from Ball State University. As part of that program, I completed clinical practicum at the Marion Veterans Administration Medical Center in the assessment of acute psychopathology and the assessment and treatment of veterans suffering from Posttraumatic Stress Disorder. Among the psychological assessment techniques that I was trained in there was the Minnesota Multiphasic Personality Inventory (MMPI). In 1994, I received a Ph.D. from Duke University. My doctoral dissertation examined personality characteristics hypothesized to be vulnerability factors for depression. At Duke, I also received extensive training in the MMPI from my mentor, Dr. Robert Carson, who published one of the first textbooks on the interpretation of the test. During my graduate school training, I also took a course in personality at the University of North Carolina at Chapel Hill from Dr. W. Grant Dahlstrom. Dr. Dahlstrom is one of the developers of the MMPI and the MMPI-2. Because of my experience, training, and interest using the MMPI, each year I was asked to teach the interpretation of the MMPI and MMPI-2 in the graduate-level personality assessment course at Duke throughout my training there.

1

2. From July of 1993 through June of 1995, I completed pre- and post-doctoral fellowships in clinical psychology at Yale University School of Medicine. My pre-doctoral fellowship training concentrated on the assessment and treatment of acute and severe psychopathology, including affective disorders (*e.g.*, depression and manic depression, also known as Bipolar Disorder) and schizophrenia; and on the treatment of dually diagnosed individuals (*e.g.*, those suffering a major mental illness in combination with a substance-abuse/dependence disorder). During my post-doctoral training, I specialized in the assessment and treatment of severely disturbed adolescents and young adults, developing a treatment program specifically aimed at dually diagnosed adolescents. I continued to oversee that program during my first year on the faculty of Yale University School of Medicine.

3. From July of 1995 through June of 1996, I was a Clinical Instructor on the faculty of the Yale University School of Medicine. During that time, I coordinated a partial-hospitalization program for adolescents and began development of a program to assess and triage juvenile offenders suffering mental illness. Since July of 1996, I have been an Assistant Professor of Psychiatry in the Psychology Section of the Department of Psychiatry at Yale University School of Medicine. In that capacity, I train and supervise psychiatric residents, pre- and post-doctoral fellows in clinical psychology, and social work fellows in conjunction with the Clinical Psychology Internship training program. My supervision of clinical psychology fellows (i.e., predoctoral interns and post-doctoral fellows) includes various methods for psychological assessment including the MMPI-2. In the formal assessment course required of clinical psychology interns at the Yale

University School of Medicine, I teach the module "Psychological Assessment using the MMPI-2" annually.

4. I presently coordinate a study funded by the National Institute of Mental Health [NIMH] to investigate the course and stability of personality psychopathology on which I hold the title Co-investigator. I am also the Co-director of the Assessment Unit at the Yale Center for the Assessment and Treatment of Borderline Personality Disorder. In my leadership capacities for these research programs, I supervise post-doctoral fellows in conducting semi-structured clinical diagnostic interviews and psychological assessments of persons with severe mental illnesses.

5. My work has been published in scholarly journals, including the *American Journal of Psychiatry*, *Canadian Journal of Psychology*, *Comprehensive Psychiatry*, *Journal of Social and Clinical Psychology*, *Journal of Abnormal Psychology*, *Journal of Comparative Psychology*, and *Small Group Behavior*. My work also includes two editions of a graduate-level textbook chapter on schizophrenia. I regularly present my research findings at national meetings of psychology and psychiatry associations.

6. At the request of counsel for Maria DelRosio ("Rosie") Alfaro, I have reviewed materials related to Ms. Alfaro's performance on the Minnesota Multiphasic Personality Inventory-2 [MMPI-2] administered in October of 1990 while she was awaiting trial at the Orange County Women's Jail. These materials include the raw data (answer sheets) and scoring form from the MMPI-2, administered by Irene Doland, R.N., an assistant to Dr. Martha Lee Rogers. They also include raw data and scoring forms from several other tests administered at Dr. Rogers' request, as well as computer-generated reports of Ms. Alfaro's test performance obtained by Dr. Rogers, Dr. Rogers'

handwritten notes regarding her performance and some initial impressions of Rosie Alfaro, and a declaration from Dr. Rogers dated September 13, 2000.

7. The MMPI-2 is an objective test of personality. It is a revised version of the MMPI, the original version of the test. The MMPI-2 was updated for cultural changes in language, and using more broadly based "normative" groups for comparison purposes. The MMPI-2 consists of three primary validity scales and ten primary clinical scales. There are additional, supplementary scales and subscales for both the validity and clinical scales. Interpretation of the MMPI-2 is accomplished through actuarial methods. Actuarial methods give probability statements for possible psychiatric syndromes. These methods can, when appropriate, be augmented by subscale and item analyses used to generate hypotheses that can be corroborated or disconfirmed with independent data.

8. The MMPI-2 is administered in the following manner: The person being tested is asked to read and respond to 567 true-false items. The items consist of brief statements, and the respondent is instructed to consider whether each item is "mostly true" or "mostly false" for them. There are a number of items on the test that repeat themselves with slight differences in wording and form. No single item is indicative of psychopathology. Rather, the items are examined in groups to produce a score that can be compared to other people with different problems who have taken the test. The scores are summed and converted to "standard scores" (i.e., "T-scores"), and these are plotted in a profile for the various clinical and validity scales.

9. There are several methods available for scoring the MMPI-2. It can be "hand-scored" by using templates placed over the answer sheets and counting various item sets. There are several computer services available for scoring the MMPI-2. A person's

response set (i.e., answers) can be sent to companies that provide computer scoring and computer-generated reports. Computer programs for administration and local production of computer-generated reports are also available from the test publisher. These reports are for use only by those trained in the administration and interpretation of the test, and the American Psychological Association's ethical principles state that computer-generated reports are intended for psychologist-to-psychologist consultation only. This is because the computer generated reports provide information that can be used to generate and evaluate clinical hypotheses, and are not definitive in and of themselves.

10. The MMPI-2 is properly administered in a supervised setting. It is not considered an acceptable practice for a person to complete an MMPI-2 in an unsupervised setting (e.g., to take the test "home" to complete). It can be administered by a psychologist-examiner, or by a properly trained technician. Interpretation of an MMPI-2 requires a psychologist with training in psychological assessment. To obtain a valid MMPI-2 assessment, the examinee's reading skills must be such that she or he can comprehend each test item. There are slight variations in reports of what constitutes an acceptable reading level. Most studies report that a reading level of at least sixth grade is required for a valid MMPI-2 assessment. However, some studies have noted that a valid MMPI-2 profile can be obtained for persons with a fifth grade reading level. These considerations and discussed widely in the clinical literature.[1]

11. In those instances where the reading level is on the border (especially for a fifth grade reading level), or in circumstances where there is reason to suspect deficits in comprehension or question reading abilities, it is appropriate practice to assess the

---

[1] *See generally* Pope, K.S., Butcher, J.N. & Seelen, J. (2000). *The MMPI, MMPI-2 & MMPI-A In Court.* Washington DC: American Psychological Association, p. 29; Lezak, M.D. (1995). *Neuropsychological Assessment-Third Edition.* New York: Oxford University Press, pp. 777-778.

person's reading level prior to administering the test.[2] This can best be done with tests of to reading ability is especially appropriate when there is evidence of prior learning difficulties or poor academic achievement. In Ms. Alfaro's case, Dr. Rogers reported only seven years of education, with learning disabilities diagnosed in elementary school.[3] This is the type of information that would warrant pre-testing inquiries regarding her reading abilities and the appropriateness of MMPI-2 administration.

12. For individuals with inadequate reading skills, or for those who are otherwise disabled (e.g., impaired vision), valid testing can sometimes be accomplished using a tape-recorded version of the MMPI-2. Individuals unable to comprehend the MMPI-2 items may render administration the MMPI-2 inappropriate. Thus, determination of the appropriateness for the use MMPI-2 includes a person's ability to comprehend and attend to the test in addition to evidencing an adequate reading level.[4]

13. Administration of the MMPI-2 to individuals with questionable reading, comprehension, or attention skills, or those with skills at the lower end of the acceptable range, raises the risk of invalid test results, such that many researchers caution examiners to carefully evaluate the validity scales for these patients. Individuals with reading or comprehension problems often produce elevated scores on the F, F(B) and VRIN (Variable Response Inconsistency) scales. High scores on these scales may indicate an invalid test, undermining its reliability in a manner similar to randomly responding.[5]

---

[2] *See* Dahlstrom, W.G., Archer, R.P., Hopkins, D.G., Jackson, E. & Dahlstrom, L.E. (1994). *Assessing the Readability of the Minnesota Multiphasic Personality Inventory Instruments—MMPI, MMPI-2, and MMPI-A.* Minneapolis: University of Minnesota Press.
[3] *See* Identification Form submitted with Rosie Alfaro's MMPI-2 data (10/23/90); Declaration of Martha Lee Rogers, Ph.D., ¶ 16 (9/13/00).
[4] *See, e.g.,* Lezak, *supra*, at 778.
[5] *See* Pope, Butcher & Seelen, *supra*, at 29.

14. Documents that I reviewed indicated that the MMPI-2 was administered to Rosie Alfaro by an assistant to Dr. Martha Rogers in 1990. Ms. Alfaro's responses were reportedly scored by a computer scoring service which produced a computer-generated report that was labeled "Extended Score Report." The profile in this report showed elevated scores on the F, F(B) and VRIN validity scales. The scores in this range indicate that the administration of the MMPI-2 was not valid. In cases where the validity scales indicate that MMPI-2 administration is not valid, it is inappropriate to analyze the clinical profiles of the test further.

15. There are several possible reasons why a pattern indicating an invalid test administration such as that obtained on the validity scales by Ms. Alfaro might be produced. One reason is that the person taking the MMPI-2 was unable to understand or otherwise fully comprehend the items. This might be the case in an individual with deficits in reading skills or comprehension. A second reason is that the individual may have not been able to fully attend to the test stimuli. This might be the case for a person who has attentional difficulties, or in the case where there are disruptions in the testing environment. Another reason that such a profile can be produced is if there person has organic brain deficits to lead to confused states, attentional or other cognitive deficits similar to those found in the examples noted above.

16. It may also be the case that the person is grossly confused or disoriented. This can happen when an individual has undergone an extreme stressor (e.g., an acute institutionalization in a hospital or forensic setting). It can also happen if the person is undergoing an acute psychotic break where they have lost touch with reality because of the rapid onset of a severe mental illness. In this instance, the validity profile might

colloquially be referred to as a "cry for help." Another reason that such a profile might be produced is that person intentionally attempts to present his or herself in the worst possible light by endorsing all items with an apparent negative valence to ostensibly communicate to the examiner the worst state of distress possible. This is colloquially referred to as a "fake-bad" profile. An invalid profile similar to that produced by Ms. Alfaro may also be obtained from a person who randomly answers the tests questions.

17. A closer examination of the validity scales, including several important subscales, can assist in determining likely possible reasons for why invalid profile might have been produced. These procedures involve examining if the respondent was less attentive to latter portions of the test compared to the first half (F(B)), or if there are patterns of inconsistent responses (VRIN). The appropriate procedure is to consider these possibilities systematically, and then to look for independent evidence that might corroborate or disconfirm these possibilities. Depending on conclusions, the MMPI-2 might be re-administered. In all cases of an invalid profile, however, it is inappropriate to interpret the clinical profile.

18. From the information provided to me in the computer-generated report, and from the handwritten notes of Dr. Rogers, it is not possible to conclusively determine the reason that an invalid profile was obtained. Elevations on both the F and the F(B) scales indicate that Ms. Alfaro's pattern of responding to test items (or lack thereof) did not vary from the first half to the second half of the test. Thus, it does not appear that the invalid profile was obtained because she fatigued during the administration of the test. The elevated VRIN (variable response inconsistency) suggests that Ms. Alfaro answered questions with slight semantic variation inconsistently. An elevated VRIN score is

consistent with an individual who is confused or unable to fully comprehend the test times. Given this pattern on the validity scales, it appears likely to me that the most straightforward explanation for an invalid test administration would pertain to Ms. Alfaro's reading and comprehension level.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 3rd day of July, 2001 in Branford, Connecticut.

_____
CHARLES A. SANISLOW, PH.D.

## Declaration of Sabrina Duran

I, Sabrina Duran, declare as follows:

On June 15, 1990 I was in an apartment on Jeffrey St. in Anaheim belonging to Juan Jimenez. Also there were Rosie Alfaro, a man named Shorty, and Manuel Torres Graciano. Manuel was a drug dealer and he was selling us drugs in the apartment that day. Manuel and Rosie were together a lot because he sold her drugs. Manuel drove a rusty brown Monte Carlo.

Sometime during the day Rosie, Manuel and Shorty left the apartment. I had hit up Rosie in the neck with drugs — a speedball — that day. They drove away in Manuel's brown Monte Carlo. Sometime later they returned. I saw Shorty and Rosie were carrying a typewriter and some clothes. I saw Rosie and Manuel were arguing in low voices as they went downstairs. Everyone went their own way

Declaration of Sabrina Duran      Page Two

A few days later the police swooped down on Jeffrey St. and took me in for questioning. Manuel Torres Graciano was on the street when the police came, but they didn't take him in. I never saw him or the brown Monte Carlo after that. Manuel was Mexican.

    I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and complete to the best of my knowledge and belief. Executed this 20th day of September 2000 at Orange County, California.

Signed: *Sabrina Duran*
Dated: 9/20/00

000076