## DECLARATION OF NATASHA KHAZANOV, PH.D.

I, Dr. Natasha Khazanov, declare as follows:

1.     I am a clinical psychologist licensed to practice in the State of California, specializing in the practice of clinical psychology and neuropsychological assessment. I received my B.A. degree in Psychology from Leningrad State University in 1975, a Masters of Science degree from Leningrad State University in 1977, and a Ph.D. in Clinical Psychology from the Bekhterev Psychneurological Institute in St. Petersburg, Russia in 1988. In 1993, I completed a Post-Doctoral Externship at California Pacific Medical Center in San Francisco, where I was responsible for conducting inpatient psychological evaluations and providing ongoing counseling for patients suffering from a wide range of neurological and somatic disorders, as well as those afflicted with multiple disorders and patients suffering from AIDS-related conditions.

2.     From 1993 to 1995, following my postdoctoral externship at California Pacific Medical Center in San Francisco, I worked as a Psychological Assistant in the private practices of two clinical practitioners in the San Francisco Bay area. Since 1996, I have also been employed as a Staff Psychologist in the Behavioral Medicine Unit, Division of General Internal Medicine, at the University of California-San Francisco [UCSF]. In that capacity, I conduct and oversee psychological evaluations, provide short- and long-term therapy to individuals and couples, and conduct comprehensive neuropsychological assessments of adults with a variety of disorders, including: closed head injury and related organic disorders; Attention Deficit Hyperactivity Disorder and other childhood neurological conditions; epilepsy and other seizure disorders; and a range of psychiatric conditions, many of which have neurological components. Many of the patients I treat have psychiatric/neurological conditions with multiple or, in some cases, uncertain etiologies. Prior to my appointment as Staff Psychologist, I worked at the same facility as a Mental Health Practitioner (1995-1996) and Triage Coordinator (1993-1995).

3.     I have a faculty appointment in the Department of Medicine at UCSF Medical School, where I teach seminars in behavioral medicine and cross-cultural issues in primary care

1

000 77

**EX 7   77**

to medical students and residents.  From 1988 to 1991, I was an Assistant Clinical Professor of Psychology at the Bekhterev Institute, where I taught neuropsychological assessment to postgraduate students.  From 1989 to 1991, I was also an Adjunct Professor of Psychology at Leningrad State University, teaching basic course in psychology and psychological assessment to Masters-level graduate students.  From 1980 through 1991, I provided clinical services to patients on the neuropsychiatric, geriatric and neurosurgical wards of the Bekhterev Psychoneurological Institute.  As a staff psychologist at that facility, I conducted pre- and post-operative assessments and cognitive rehabilitation for patients with medically-resilient epilepsy, brain tumors and cerebral palsy; participated in treatment planning; performed individual psychological assessments; and conducted individual, group and family counseling for patients with mood disorders.  From 1977 through 1980, I was a Staff Psychologist at Psychiatric Hospital #6 in St. Petersburg, Russia, which I provided intellectual, neuropsychological and other psychological assessments, as well as therapy, for patients with a broad of disorders, including schizophrenia, Alzheimer's disease, alcoholism, and the major affective disorders.

4.      I have received grants and conducted research neuropsychological assessment, brain pathology, and the assessment and treatment/rehabilitation of patients afflicted with cerebral palsy and epilepsy.  From 1988 to 1991, I was the principal investigator and supervisor of a research program that examined cognitive changes in patients diagnosed with chronic Schizophrenia.  From 1985 to 1988, I was the principal investigator and research supervisor of a study exploring the neuropsychological factors/correlates related to favorable outcomes of brain surgery in patients with medically resistant epilepsy.  In 1984 and 1985, I was a co-investigator in a research project assessing the effects of specific surgical interventions in patients with cerebral palsy and seizure disorders.

5.      I am the author or co-author of numerous scholarly articles published in professional journals and clinical texts, including: *Neurology*, *Problems in Clinical Psychology*, *Neurosurgery and Psychiatry*, *Rehabilitation of Epileptic Patients*, and *Psychological Assessment of Neuropsychiatric Disorders*.  I have presented the results of my research at

2

national and international conferences and seminars.  I also maintain a private practice in psychology, specializing in psychological and neuropsychological assessment.

## I.    REFERRAL QUESTIONS AND MATERIALS REVIEWED

6.    At the request of current counsel for Maria DelRosio ("Rosie") Alfaro, I conducted a comprehensive neuropsychological evaluation of Ms. Alfaro at the California Correctional Facility for Women [CCFW] in Chowchilla, California in May of this year.  The purpose of my evaluation was to determine whether measurable neuropsychological dysfunction or deficits were present and, if so, the nature, extent and effects of those impairments on Ms. Alfaro's behavioral, psychological and cognitive functioning.

7.    Specifically, I have been asked to address the unique aspects of Ms. Alfaro's history (personal and familial) suggesting the presence of significant organic deficits; the possible effects of multiple impairments, both on Ms. Alfaro's functioning and attempted clinical interventions; the absence of an appropriate or reliable assessment of organic impairments, despite good faith efforts by clinical evaluators during her childhood and early adolescence; and the continued failure to obtain an accurate and reliable assessment (and understanding) of Ms. Alfaro's cognitive and behavioral functioning.

8.    My formal assessment included the expanded Halstead-Reitan neuropsychological battery, as well as other standardized neuropsychological measures designed to assess more specifically the patient's frontal, parietal, temporal, and occipital lobe functions.  This battery of tests assesses a broad spectrum of cognitive and sensory-motor abilities dependent on the overall integrity of the brain.  Extensive clinical and research literature supports the validity of such measures in reliably assessing brain-behavior functioning and identifying specific areas of the brain where organic damage has been sustained.[1]

---

[1] *See, e.g.*, Lezak, M.D. (1995).  *Neuropsychological Assessment-Third Edition*.  New York:  Oxford University Press, at p. 710 [citations omitted]:

A distinctive feature of Reitan's handling of the examination data of the Halstead-Reitan Battery has been reliance on test scores for predicting the nature and site of the lesion as well as its presence [ ].  Predictions about the site of the lesion and its nature (diffuse or focal, static or changing) are based on statistical

9.     In addition to the full Halstead-Reitan battery, I administered the Wechsler Adult Intelligence Scale-III [WAIS-III], Wide Range Achievement Test-III [WRAT-3], Memory Assessment Scales [MAS], Digit Vigilance Test, Go-No-Go Tasks, Rapid Alternating Movements Test, Hand Position Sequences, Ruff Figural Fluency Test, Controlled Oral Word Association Test, and the Rey Complex Figures Test.  I also conducted a clinical interview, speaking with Ms. Alfaro at some length about her family background, personal history and experiences, and her current medical and emotional state.  Test administration and clinical interview with Miss Alfaro and interviews with s. Alfaro took approximately 10 hours over a two-day period.

10.     Prior to our meeting, I reviewed several volumes of documents, records, reports, and other data pertaining to Rosie Alfaro, her biological family, their life experiences (individually and as a family), and the circumstances leading to and surrounding Ms. Alfaro's arrest, trial and sentence of death.  These materials included Ms. Alfaro's medical, mental health and hospital records from childhood to the present; school records (including her full Special Education file); employment records; juvenile law enforcement records; and drug rehabilitation records (both inpatient and outpatient).[2]  They also included vital records, medical and hospital charts, criminal files, probation reports and other documents regarding Ms. Alfaro's siblings, parents, children and extended family members.

11.     I have reviewed law enforcement and court records relating to the 1990 offenses of which Ms. Alfaro was convicted, as well as testimony, exhibits, and court documents from her 1992 capital trial and both penalty phase hearings.  These materials included reports, testimony and raw test data (where available) of mental health professionals who testified or otherwise assisted in Ms. Alfaro's defense, including Martha Lee Rogers, Ph.D., Consuelo Edwards, M.D., and Armando Morales, D.S.W.  I have also reviewed Ms. Alfaro's medical and

---

relationships between test scores [ ].
[2]These records, especially those from Ms. Alfaro's outpatient counseling, appear to be quite incomplete.  Counsel informs me that they have been unable to locate the missing records.  I have advised and requested counsel to continue their efforts to obtain them and provide them to me as soon as possible.

000 30

psychiatric records from both the Orange County Women's Jail (1990-1992), and CDC (1992-2000),[3] as well as sworn declarations from trial experts, mental health professionals who have examined Ms. Alfaro (or specific records) more recently, and lay people -- including family members -- who have known Ms. Alfaro at critical points in her life.  All of the materials I reviewed contain the type of history, observations, and other data that competent mental health professionals routinely and properly rely upon in assessing patients and formulating reliable expert opinions.

12.    The purpose of a neuropsychological evaluation is to determine the existence, severity, and effect of brain damage and cognitive impairment and to analyze an individual's mental state and behavior in light of one or multiple etiologic factors, including inherited medical conditions, cognitive dysfunction, substance use or abuse, pre- or perinatal trauma, acquired brain injury, and psychiatric disorders.

13.    A complete and accurate assessment requires a thorough review of family and patient history, a clinical interview focusing on the historical antecedents of current functioning, and a valid neuropsychological evaluation using a recognized battery of tests.  Such an assessment must be conducted by a professional with specialized training.  Reliance on any single part of this assessment process -- *e.g.*, testing, patient self-reports, historical data, observations or screening measures by professionals from other fields -- is inadequate and falls below the acceptable professional standard of care.

## II.   ROSIE ALFARO'S DOCUMENTED CLINICAL HISTORY

14.    Neuropsychological testing is essential when certain hallmark signs and

---

[3]Although both her pre-trial records and her post-conviction CDC files contain a great deal of information, they appear to be somewhat incomplete.  The existing records (those provided to me) contain detailed information and observations, as well as other presumptively reliable data, providing a good deal of insight into the nature, severity, and course of Ms. Alfaro's condition(s).  As with the drug treatment records discussed in fn. 2, I have advised and requested counsel to continue their efforts to obtain them and make them available as soon as possible.

The records from this time period, while Ms. Alfaro was between the ages of 18 and (currently) 30, are especially critical in assessing mental state.  For some who develop major mental illness, it is often during their early- to mid-20's that obvious (and debilitating) symptoms become apparent, or more subtle (or prodromal) symptoms become more visible.

symptoms of organic brain damage are present. Of particular importance is an accurate assessment of a patient's history, including, among other factors, any family history of disorders such as seizures or the major psychiatric disturbances; a family history of cognitive deficits or learning difficulties; possible exposure to neurotoxins, including alcohol and illicit substances; head injuries and a range of related medical conditions; chronic substance abuse; academic difficulties; victimization, psychological trauma, and/or other deprivations at critical developmental periods; and/or medical conditions that may affect brain functioning.

15.     An unusual number of these hallmark signs and symptoms were present (and often documented) throughout Ms. Alfaro's childhood and adolescence. The records and historical data I reviewed were remarkably consistent in documenting a range of indicators (or "red flags") of possible cognitive, psychiatric and behavioral deficits which could significantly effect her capacity to store, retain, relate and accurately perceive critical information. The deficits suggested in these records (primarily affecting the frontal lobe), especially in combination with other conditions or impairments, could render her severely impaired. An accurate assessment of these deficits, including their severity and their effects on Ms. Alfaro's cognition, perceptions and behavior, can only be determined by comprehensive neuropsychological evaluation.

## A.    Early Indicators of Neuropsychological Deficits

16.     In the following paragraphs, I discuss several of the more prominent indicators of brain damage that were (or should have been) identified and addressed by previous examiners, prior to her 1992 trial. The severity and persistence of these signs and symptoms, as well as their continued effects on her mental state and behavior, will be discussed in more detail in a later section.

### 1.    Learning disabilities/cognitive impairments

17.     Throughout her childhood, Rosie Alfaro was placed in Special Education classes

as "learning disabled." When she was 8 years old and in the second grade (already one grade behind her chronological age), she was reading at the Beginning Kindergarten level.[4] During the same school year, formal testing showed that she "function[ed] 2 grade levels below expectancy in reading and spelling."[5] Despite interventions designed to improve Rosie's academic skills, her academic performance remained several years behind what would be expected of a child her age:

> Rosie always had trouble at school, and she learned things more slowly than her sister, Silvia. Silvia helped Rosie with her homework, even though she was eighteen months younger. (Melendez Declaration, ¶ 23.)

18.     In the sixth grade, a Speech/Language Specialist recognized that all testing to that point showed deficits in receptive skills and her ability to process and recall information: "Rosio has not made progress in this area altho it has been stressed in therapy sessions." She diagnosed "a disorder in language comprehension and expression."[6] Ms. Alfaro's academic record and the struggles she faced are set forth in detail by Dr. Asprodites, who concludes that "[Rosie Alfaro] had a mental age of 9 when she left school for the last time at the age of 14." (Asprodites Declaration, ¶ 36.)

19.     At the time of her capital trial, Rosie Alfaro's cognitive impairments and lack of academic achievement were evident not just to defense evaluators, but also to personnel at the Orange County Women's Jail, who had the opportunity to observe Ms. Alfaro on a daily basis for more than a year. The Pre-Sentence Report prepared prior to her sentencing hearing included an interview with Toby Silver, a registered nurse working with the jail's "Mental Health team":

> [Ms. Silver] said that the defendant is "not very literate" and appears to have some difficulty understanding simple words and phrases.[7]

### 2.     Familial history of cognitive and neurological impairments

---

[4] 10/9/79 Pupil Planning Form, by Anne B. Jones, Madison School, Anaheim City School District [ACSD].
[5] 3/18/80 Psychoeducational Report by Betty DiRegolo, School Psychologist, ACSD.
[6] 4/11/84 Speech & Language Evaluation Report by Erin Garcia, James Madison School, ACSD.
[7] 7/14/92 Pre-Sentence Report by Bruce M. Carel, Deputy Probation Officer, Orange County Probation Department, pp. 17-18.

20.     Many organic, cognitive, and psychiatric impairments have a genetic component to them, such that an accurate assessment must include as much familial medical and psychiatric history as possible.  Several facts suggest familial vulnerabilities to both cognitive deficits and neurological conditions.  Both of Rosie's full siblings had learning difficulties sufficiently severe that they, too, were placed in Special Education classes.  Jose repeated at least one grade before the age of 9.[8]  Like Rosie, "the last grade he completed at a conventional school was the 6th grade."[9]

21.     Ms. Alfaro's oldest son, Danny, now almost 14 years old, apparently displays many of the same impairments suffered by his mother:

> Danny is an RSP [Resource Specialist Program] student.[10]  He is supposed to go into the ninth grade next year, but he has always been behind.  When he was in sixth grade. I was told that he was reading at the second grade level.  He still can't read very well.  His teachers tell me that he is failing at least one of his classes.  They complain that he is hyperactive and acts out in class.  This makes me think of Rosie.  (Silvia Alfaro Declaration, ¶ 31.)

22.     Rosie's brother, Jose Jr., has suffered seizures and chronic neurological impairments since birth, conditions which occur more commonly in close relatives of patients with several of the disorders Rosie suffered.[11]  In 1990, Jose suffered a Grand Mal seizure:

> [U]nconscious 7-8 min yesterday...same incident 7-8 months ago....Dizziness b/4 [seizures?] daytime...urinary incontinence...eyes rolled up & head __?__ to right...

> BH [Birth History]: ...1 hr of age - had convulsion...Was on phenobarbital for x yrs.[12]

A subsequent Neurological Consultation provided more historical data:

> There is a hx [history] of seizures in the neonatal period.  It was a difficult delivery...There was an urgent C-section...He was on Phenobarbital for his first 2 years & had no more seizures, so that was discontinued.

> IMPRESSION:  Seizure Disorder, probably atypical absence type seizures with occasional generalization causing aversive movements.  The EKG is abnormal...The pt

---

[8]*See* 3/12/90 Pediatrics Face Sheet for Jose Alfaro, Jr., Southern California Permanente Medical Group records.
[9]1/29/99 Probation Report, p. 16.
[10]For definitions used in discussing Special Education programs, *see* Asprodites Declaration, ¶ 21.
[11]*See* Asprodites Declaration, ¶¶ 17-18.
[12]3/12/90 Pediatrics Face Sheet for Jose Alfaro, Jr., Southern California Permanente Medical Group records.

is begun on Valproate 250mg B.I.D., both to control the clear cut seizures & to see if his attention in school improves to the point that his education is better.[13]

This entry also suggests a possible neurological or organic basis for Jose's attentional deficits.

### 3. Broad disparity between verbal IQ and performance IQ

23. Further evidence of the need for neuropsychological testing is revealed in test results obtained by Dr. Martha Rogers pre-trial. Ms. Alfaro's performance on the Wechsler Adult Intelligence Scale-Revised [WAIS-R][14] revealed a 17-point discrepancy between her verbal IQ and her performance IQ, a discrepancy considered statistically significant:

> [H]er performance was noticeably more impaired in areas requiring verbal skills (as opposed to non-verbal reasoning) -- her Verbal IQ is 73, 17 points lower than her Performance IQ. (Rogers Declaration, ¶ 6.)

Dr. Rogers also found that for purposes of that test, "[l]anguage factors did not appear to play a significant role." (*Ibid.*)

24. Such a discrepancy might indicate any number of things, including a severe affective disorder or, in some cases, a left-side brain lesion. These could not be ruled out through personality or projective testing of the type administered by Dr. Rogers or any of the other experts retained by trial counsel to evaluated Rosie Alfaro. What was known at the time of Ms. Alfaro's trial, however, was that in many, if not most, instances, neuropsychological testing is more effective that other measures in identifying brain damage of whatever etiology:

> Projective tests and personality inventories have been of little use in the study of brain damage. The Wechsler Adult Intelligence Scale (WAIS) is divided into verbal and performance sections. *Organic deficit usually manifests itself as the disparity between the verbal scales and the performance scales....*"[15]

---

[13]3/13/90 Outpatient Consultation. His medication was changed several weeks later to Tegretol 200mg...sig 1 po tid. 4/3/90 Note, Kaiser-Permanente Medical center records. Phenobarbital, Valproate, and Tegretol are all anti-convulsant medications used in the treatment of seizure disorders.

[14]The WAIS-R was considered to be one of the most reliable measures of intelligence and cognitive functioning available at the time of Ms. Alfaro's trial. While variance between an individual's verbal and performance IQ's is quite common, a spread of 17 or 18 points is considered clinically significant. Recent (more complete) testing has revealed an even greater (and therefore more clinically significant) discrepancy in Ms. Alfaro's VIQ and PIQ.

[15]Pincus, J.H. & Tucker, G.J. (1985). *Behavioral Neurology - 3rd Edition.* New York: Oxford University Press, at 187 [emphasis added].

It is exactly the Verbal/Performance IQ disparity, measured by the WAIS-R, that was revealed in Ms. Alfaro in 1990 -- another indication that neuropsychological assessment at that time would have been appropriate, prudent, indeed critical to an accurate and reliable assessment of her cognitive, psychological and behavioral functioning.

### 4.    Impulsivity, suggestibility, memory impairments, attentional deficits

25.    A 1991 article published in *Psychological Assessment:  A Journal of Consulting and Clinical Psychology*, a professional journal highly regarded by clinicians practicing in many fields, confirmed what treating clinicians had known (or at least sensed) for many years:.

> Reports from patients with PTSD often indicate frequent complaints about a variety of cognitive disturbances, including memory, learning, attention, and concentration difficulties.  Deficits in planning, organization, and judgment [are] also noted during clinical evaluation....Although the relationship between neuropsychological deficits and disorders of mood appears complex [ ], ...detailed cognitive assessment may help define the nature of these symptoms and clarify their contribution to general psychological functioning.[16]

All of the capacities listed above (*i.e.*, memory, attention, concentration, planning, judgment, etc.) are functions which neuropsychological testing is designed to assess.  When these functions are intact, most individuals are able to function fairly effectively in the world, especially in areas of decision-making, impulse control and applying learned behavior to new or altered situations.

26.    Impairments in these areas, even mild ones, can severely distort one's perceptions and functioning, and the effects are sometimes similar to those of psychiatric illnesses.  Thus, when assessing symptoms or disorders of chronic anxiety, overwhelming stress, heightened emotions and impulsive behaviors, one must consider the possible role of neurologic insult on cognitive and behavioral stress- and mood-related symptoms.[17]  Because neuropsychological

---

[16]Wolfe, J. & Charney, D.S. (1991).  "Use of Neurological Assessment in Posttraumatic Stress Disorder." *Psychological Assessment:  A Journal of Consulting and Clinical Psychology*, Vol. 3, No. 4, 573-580 [citations omitted].

[17]Under the heading *"Biological Changes in Depression*," Drs. Pincus and Tucker state:
> [T]he soft signs of diffuse neurological dysfunction..., so often present in schizophrenics, are now also being reported in patients with affective disorder.  (McAllister, 1983)....[I]t is clear that many of these signs of central nervous system dysfunction are present in affective disorders....Since...[1967]...there has been a flood of investigations of neuroendocrine factors in affective illness...  (Pincus & Tucker, *supra.*, p.

impairments are not always visible (*e.g.*, memory deficits) or may not be specific to one area of functioning, there is a serious risk of overlooking them, often holding a subtly impaired individual to standards which, without treatment(s), he cannot meet. The *DSM-IV* warns that proper evaluation of depressive symptoms is "especially difficult" when they occur in individuals with suspected organic deficits.[18]

27.     Impairments in virtually all of these domains are (and have been since childhood) present and severe in Rosie Alfaro. Specific developmental disabilities and borderline intellectual functioning are well documented, and she has a history of ADHD:[19]

> Even when she wasn't using, it was like she was sometimes not there mentally. She couldn't focus for very long and had a really hard time in school. ... She seemed to live in her own world. (Silvia Alfaro Declaration, ¶¶ 28 & 31.)

Her performance on the Wechsler Memory Scale-Revised [WMS-R], administered by Dr. Rogers in 1990, showed not only significant memory impairments, but significant inconsistencies between her verbal memory capacity and visual memory. Finally, there are numerous reports of extremely low self-esteem and suggestibility. Rosie herself reported to Dr. Edwards:

> "I'll do anything to be liked; I am a follower, wanted to impress people, wanted everybody to like me, wanted to buy my friends by doing what they wanted me to do; first I wanted to be used: if you ever need me."[20]

Following extensive interviews, Dr. Edwards agreed, describing Rosie Alfaro as

> ...[A]n ideal candidate to subordinate herself to others, to agree with others even when she believes them to be wrong, for fear of being rejected. She would volunteer to do things that are unpleasant or demeaning in order to get others to like her.[21]

Dr. Edwards' handwritten interview notes describe Rosie Alfaro as "dependent, suggestible, <u>terrified</u>," as well as "ego dystonic, very passive."[22]

---

        252.)
[18]*See DSM-IV-TR,* at p. 322.
[19]*See* Edwards Report, p. 11.
[20]Edwards Report, p. 11.
[21]Edwards Report, p. 18.
[22]1/92 Interview notes of Dr. Consuelo Edwards.

**5.** **Chronic psychiatric symptoms**

28.      One of the most salient of these hallmark symptoms is a history (both in the

patient and within the family) of chronic, severe psychiatric illness.  Rosie Alfaro displayed

many signs and symptoms of mood disorders and/or trauma-based conditions as early as

elementary school.  Family members report that she was fearful, withdrawn, suffered extremely

low self-esteem and recurring nightmares beginning at the age of 7 or 8.  During the years

following her arrest and death sentence, Rosie Alfaro has been diagnosed with a broad range

potentially debilitating major psychiatric disorders, including Organic Brain Syndrome, most of

the Depressive Disorders (*e.g.*, Major Depression, Chronic; Major Depressive Episode, both

Single and Recurrent; Major Depression with Suicidal Ideation; Situational Depression; Atypical

Depression; and Dysthymia), several Anxiety Disorders, including Posttraumatic Stress Disorder

[PTSD], Adjustment Disorders (all of the recognized subtypes), Dependent Personality Disorder,

Alcohol Dependency, Polysubstance Abuse and Dependence, Borderline Intellectual

Functioning, Learning and Developmental Disabilities, Conduct Disorder, Attention Deficit

Hyperactivity Disorder, Borderline Personality Disorder, and an "ongoing organic mental

disorder."[23]

29.      At the time of Ms. Alfaro's trial, Drs. Edwards, Morales and Rogers all identified

classic signs and symptoms of PTSD, the "stressor" being childhood sexual trauma.  Since her

incarceration at Chowchilla, she has been prescribed a range of antipsychotic, antidepressant,

and other psychotropic medications, including Mellaril, Haldol, Triavil, Lithium, Prozac, Paxil,

---

[23]I refer to these disorders as they were identified at the time of diagnosis.  Standard psychiatric nomenclature is set forth in the *Diagnostic and Statistical Manual of Mental Disorders* [*DSM*], published by the American Psychiatric Association.  The current edition is the *DSM-IV-TR* [Fourth Edition-Text Revised], published in 2000.  That edition updated some of the descriptive sections of the *DSM-IV* (1994), but essentially left the diagnostic labels and criteria intact.  The edition in use at the time of Ms. Alfaro's arrest and trial was the *DSM-III-R* [Third Edition-Revised] (1987).  Although some diagnostic labels have been changed somewhat in subsequent editions, the conditions noted in Ms. Alfaro's records have been consistently recognized as serious psychiatric disorders.  It is not uncommon for evaluating clinicians to refer to patients' conditions in terms which are more general than specific *DSM* diagnoses (*e.g.*, "a psychotic disorder," as opposed to "Schizophrenia" or "Delusional Disorder") or more descriptive, reflecting the clinicians' personal observations.  "Diagnoses" in quotation marks are those which deviate from the standard nomenclature in use at the time; they do not reflect my assessment or opinion of the evaluator's findings.

EX 7   88

Imipramine, Dilantin, Sinequan, Desyrel, Elavil, Klonopin, Vistaril, Zoloft, Restoril, and Neurontin, often in high doses or in combination.

### 6. Suicidality

30.     At several points in her life, Ms. Alfaro has been actively suicidal. At least one suicide attempt occurred while she was awaiting trial in the Orange County Women's Jail, within days of her attempt to obtain new counsel. Correctional mental health records from 1990 reveal that, on at least one occasion, her attorney believed her to be suicidal and contacted the jail psychiatric staff.[24] A later note by a nurse on the jail's "Mental Health Team" states: "She [Rosie] is depressed - she is isolated and has no contact with other [inmates]...She said she always has suicidal thoughts..."[25] Five months later, the same nurse placed this entry in Ms. Alfaro's chart:

> T/C [telephone call] to Laura, investigator on the inmate's case. Informed Laura that Maria has given up - and doesn't care anymore. She is <u>very depressed</u> -- not suicidal.[26]

31.     Subsequent CDC records document additional suicide attempts in 1995 and 1997. Her mother describes what sounds like another suicide attempt several years earlier:

> At one time, I saw that Rosie had bandages around her wrists. I asked her what had happened and she told me that she had cut herself cleaning. I later asked her sister Silvia what had happened and Silvia told me that she had cut her wrists. (Melendez Declaration, ¶ 29.)

In her report to the trial court, Dr. Consuelo Edwards, M.D. finds a "[h]istory of overdoses with loss of consciousness at least five times,"[27] suggesting, if not active suicidal behavior, then a marked indifference to her own personal survival. A pre-trial report by defense counsel's investigator states:

---

[24] 11/8/90 Correctional Mental Health Contact Sheet, signed by K. Halac, R.N., OCWJ records.
[25] 3/21/91 Interdisciplinary Progress Note by Toby Silver, R.N., OCWJ records.
[26] 8/1/91 Interdisciplinary Progress Note by Toby Silver, R.N., OCWJ records [emphasis in original]. Whether or not Ms. Silver's final statement ("not suicidal") is clinically accurate, the entry reveals a level of despair and defeat which, presumably, was severe enough that it prompted Ms. Silver to contact Rosie's legal team.
[27] Edwards Report, p. 17.

13

Her parents are on record as knowing that she had been using heroin for the year prior to this hospitalization [Doctors Hospital of Lakewood (1984)]. She had a history of multiple suicide attempts by this time and had scarring on both wrists and forearms as a result of these attempts.[28]

### 7.    Familial patterns of mental/emotional disturbance

31.    It is generally understood the many chronic mental illnesses, including the major Mood Disorders, have a genetic component to them. The limited family records currently available suggest a familial pattern of this type in Ms. Alfaro's family. Her brother Jose was apparently referred for outpatient mental health treatment after his removal from the home at 14. Although the circumstances of that referral are not clear, his probation officer noted that during placement (ages 14 to 18), "he saw a psychologist on a one-to-one basis consistently while in placement, which he enjoyed." From ages 16 to 18, he remained in what his probation officer called "the county's most intensive psychiatric group home placement." No diagnoses are included in the report.[29]

32.    Rosie's maternal aunt reports that her son has also been treated for depression. (*See* Sanchez Declaration, ¶ 7.) Other reports suggest that Rosie's son Danny may also suffer from the early signs of depression or other mental disturbances:

> One teacher told me that Danny talks to himself. ... When I spoke to the teachers about him, they showed me test results where he had given answers to the effect that he was very lonely and had thought of killing himself. (Silvia Alfaro Declaration, ¶ 32.)

33.    There are indications that Rosie's grandmother and great-grandmother both suffered some form of mental or emotional disturbance. Given the scarcity of mental health services in poor, rural communities,  the stigmas attached to mental illness during past generations, and the family's report reliance on traditional, culturally based treatment (including witch-doctors, voo-doo dolls, and spells),[30]  the nature and extent of their disturbances are

---

[28]March 22, 1992 Report to William Monroe -- Subject: "Penalty Phase Social History" [PPSH], p. 7.
[29]1/29/99 Probation Report.
[30]Silvia Melendez describes the family's belief in "magic," "witches" and "witch doctors." For example, "Jose's father [Rosie Alfaro's grandfather]...was sick for many years, and believed he had been cursed by a witch...He went to regular doctors, but when he wasn't cured, he started going to witch doctors." (Melendez Declaration, ¶ 16.) These beliefs apparently extended to Rosie's father as well:

extremely difficult to estimate.  Still it is significant that, having interviewed several family members, Dr. Morales reported that Rosie's maternal grandmother suffers "nervios."  In his written report, he states:

> It might also be that in addition to the alcoholism genetic factor, there is an underlying endogenous (biological) depression which may also have a genetic base.[31]

With respect to her own grandmother, Silvia Melendez reports:

> I do not know what my grandmother died of, but I do know that she lost her mind at the end and that she could not recognize anybody a lot of the time.  She had high blood pressure and was sick in her brain and her stomach.  (Melendez Declaration, ¶ 5.)

### 8.     Head injuries, loss of consciousness, history of related medical symptoms

34.     In 1992, Dr. Edwards reported that Ms. Alfaro had suffered at least five drug overdoses during which she lost consciousness.[32]  This fact alone speaks not only to the level of toxins in her system on a fairly regular basis, but also to their effects on her brain.  Even a single episode of lost consciousness can have serious and potentially irreversible effects on the brain, especially when the patient is an adolescent and her brain is not yet fully developed.  Multiple episodes increase the risk of damage.  They also speak to the level of risk which Ms. Alfaro was subjected to (voluntarily or otherwise).  Also significant is the fact that she received no medical examination or treatment following these episodes.

35.     Ms. Alfaro also lost consciousness at 16 during a car accident.  She was taken by ambulance to Western Medical Center Emergency Department, whose staff documented:

> "Multiple abrasions over her forehead.  Pt [patient] covered with multiple small fragments of glass on face [and] in her hair."[33]

The records contain no reference to  follow-up care, but the emergency room assessment

---

One day, ...I found a small doll under [Jose's] bed that was made with my stockings and had a small picture of me on its face.  It had small nails stuck all over it.  I know that Jose believed in these things... [H]e believed in this type of magic."  (Melendez Declaration, ¶ 15.)

[31]3/29/92 Morales Report, p. 7.

[32]Edwards Report, p. 17.

[33]7/30/88 examination by L. Hunter, M.D., Western Medical Center Emergency Department.

suggests yet another insult to Ms. Alfaro's brain:

> Impressions:   R/O Cervical spine fracture;   805.10 Concussion by hx [history]; Multiple facial abrasions; Cervical spine sprain.[34]

This is consistent with her sister's account:

> After Manny [Jr.] was born, Rosie and Manuel were in a serious accident when he was driving drunk.  She ended up in the hospital with a concussion.  I picked her up when she was discharged from the hospital, so I remember how she looked.  She was all cut up where glass from the windshield had been embedded in her face and head.  (Silvia Alfaro Declaration, ¶ 10.)

36.     Earlier records report a history of possible head injuries following a motor vehicle accident in 1974.  Rosie's mother also reports a tragic incident in which Rosie (then 6-7 years old) was literally dragged along a concrete wall by a car driven by her own father, suffering injuries to her face and head which went untreated.  (*See* Melendez Declaration, ¶ 32.) Headaches, including migraine headaches and headaches related to changes in the weather, have been reportedly documented since her arrest in 1990.  Since her incarceration, she has frequently been prescribed medications for chronic headaches, including Tylenol #3 and Ibuprofen, often in combination.

### 9.     Physical victimization and family violence

37.     Neuropsychological assessment is also indicated when a patient has a known history of physical victimization, especially chronic violence in early childhood.  The need for assessment is even greater when the violence sustained was repeated, chronic, or sustained at critical developmental periods in the patient's life.  While there is some debate regarding cause and effect, numerous clinical studies support "previous observations that there is a significant association between childhood abuse and evidence of neurobiological abnormalities."[35]

---

[34]*Ibid.*

[35]Teicher, M.H., Ito, Y., Glod, C.A., Schiffer, F., Gelbard, H.A.  "Chapter 2:  Neurophysiological Mechanisms of Stress Response in Children," in Pfeffer, C.D. (Ed.) (1996), *Severe Stress and Mental Disturbance in Children*. Washington, DC:  American Psychiatric Press, Inc., p. 77:

> We cannot...disentangle the hypothesis that early abuse may lead to neurobiological abnormalities from the equally plausible hypothesis that neurobiological abnormalities may increase the risk of childhood abuse.

38.     Rosie Alfaro was physically abused (and apparently sustained serious injuries)
from the time he was 6 or 7 years old until she left the family home at 14.  The principle abuser
was Rosie's father:

> Sometimes he gave a reason for the beatings, sometimes he didn't need one....The
> beatings became very regular...[W]henever he was drunk, he found some reason to hit us.
> In addition to the beatings, he screamed at us and insulted us, calling us stupid and
> worthless, just as he did to our mother.... (Silvia Alfaro Declaration, ¶ 16.)

According to Jose Jr.'s probation records:  "Previous report indicate his father was physically
abusive to all family members..."  The same report found that Jose's trouble with the law "is no
surprise..., considering the abusive family situation he endured as a young boy."[36]

39.     Rosie's mother's own reports reveal that she, too, was implicated in the children's
abuse, not only for failing to protect them, but for affirmatively placing them in serious danger:

> When Rosie was 6 or 7, when we were living on Jeffrey Street, Jose had cashed his check
> and was leaving me alone with the girls and an empty refrigerator....I tried to stop him by
> putting Rosie in front of the car.  Jose did not stop.  He hit Rosie with the passenger side
> of the car and pushed her along the concrete wall. (Melendez Declaration, ¶ 32.)

40.     Not only were the Alfaro children subjected to vicious beatings and humiliation,
but they also witnesses to violent fights between their parents.  These "fights," apparently
initiated by Jose Luis Alfaro against his wife, became increasingly violent as Silvia Melendez
Alfaro attempted to defend herself:

> [H]e would hit me in the face with his fists, and I often had black eyes and split lips.  He
> would also kick me in the legs with his boots.  At first I would not fight back because I
> was scared of him, but I began to fight back more and more.  Sometimes I defended
> myself with a lamp or a broom or other things around the house.  I never called the
> police, though, because I was afraid of what Jose would do. (Melendez Declaration, ¶
12.)

A friend of Jose Alfaro [Sr.] during this period recalls the resulting injuries:

> I knew that she [Silvia] had once stabbed her husband and injured him.  Jose told me
> that he and his wife fought constantly.  When I saw him, he often had bruises and marks
> on his body. (Arcueta Declaration, ¶ 2.)

---

[36]1/29/99 Probation Report, *supra*.

41.     The unpredictable violence described by several family members and reported by several evaluators prior to Ms. Alfaro's trial, created a pervasive sense of danger that almost inevitably defined Rosie's childhood and that of her siblings:

> When we lived on Jeffrey Street, I could hear Jose getting drunk outside with his friends and I could hear him fighting with his friends. I knew that when he came home he would hit me, so I would take Rosie and Silvia and lock us either in the bathroom or in the closet until Jose either left or passed out asleep. I remember many nights making up a bed in the bathtub with pillows and blankets, so that Rosie and Silvia could sleep until we were safe enough to unlock the bathroom door. (Melendez Declaration, ¶ 12.)

> After he lost his job, he began spending every day in Little TJ drinking with his friends. He drank all the time at this point and would come home and hit me or hit Rosie and Silvia. He used a belt at times to hit Rosie and Silvia. (Melendez Declaration, ¶ 19.)

Rosie Alfaro's mother is describing a level of fear that was unrelenting. Rosie was then between the ages of 6 and 12.

42.     The effects of these repeated chaotic and terrifying experiences cannot be understood without an understanding of the brain through which these experiences and perceptions were perceived and interpreted. Likewise, a reliable assessment Rosie's cognitive functioning must consider external factors -- interpersonal, social, environmental -- that affected and shaped not only her physical and psychological development, but also such critical variables as treatment and other interventions (or the lack thereof), academic opportunities and obstacles, emotional support, training, personal safety socialization generally.

43.     Many of the signs and symptoms associated with organic deficits are similar to the long-term consequences of chronic childhood maltreatment. For example, attentional deficits, blackouts and memory lapses attributable to a seizure disorder may resemble dissociative episodes or withdrawal associated with trauma-related disorders. Without thorough historical data, the risk of misdiagnosis and inappropriate treatment is greatly increased. When a child appears to suffer from multiple impairments, the risk becomes even greater.

**10.     Terror, vulnerability, emotional and physiological anxiety**

18

EX 7     94

44.     One noted expert describes a specific phenomenon in which profound symptoms stemming from chronic physical or sexual maltreatment are routinely overlooked, simplified, minimized, and/or dismissed:

> Because post-traumatic symptoms are so persistent and so wide-ranging, they may be mistaken for enduring characteristics of the victim's personality. This is a costly error, for [the traumatized individual] is condemned to a diminished life, tormented by memory and bounded by helplessness and fear.[37]

A competent evaluation of Rosie Alfaro's mental state and functioning must consider the interplay between trauma and organic brain functioning.

45.     Children who live in a constant state of anxiety, especially those whose intellectual and emotional resources may already be compromised, are often forced to devote all of their energy, attention and emotions on their own daily survival. This unrelenting state of anxiety and hypervigilance can effectively thwart healthy development -- cognitive, psychological, social, even physical -- virtually every area critical to adult functioning.[38] Much of the clinical research has confirmed that in assessing or treating trauma-based symptoms or conditions, clinicians have had to expand the scope of their treatment to "foci" which include:

> (1) the role of traumatic reminders and secondary adversities; (2) comorbid conditions; (3) specific developmental consequences: (4) the impact of emerging personality and moral development; (5) serial and repeated traumatic experiences; (6)the interplay of traumatic experiences within a background of neglect or abuse and parental psychopathology; (7) the role of child intrinsic factors, such as temperament, intelligence, or prior successful coping; and (8) the link of PTSD and secondary disorders to specific familial predispositions.[39]

## 11.     Exposure to neurotoxins

---

[37]Herman, J.L. (1992). *Trauma and Recovery*. New York: Basic Books, p. 49.
[38]*See, e.g.*, Eth, S. & Pynoos, R.S. "Chapter 3:  Developmental Perspective on Psychic Trauma in Childhood," in Figley, C.R. (Ed.) (1985), *Trauma and Its Wake: The Study and Treatment of Post-Traumatic Stress Disorder.* New York: Brunner/Mazel; Green, A.H., Voeller, K., Gaines, R., et al. (1981). "Neurological impairment in maltreated children," *Child Abuse & Neglect* 5:129-134; Bryer, J.B., Nelson, B.A., Miller, J.B., Krol, P.A. (1987). "Childhood Sexual and Physical Abuse as Factors in Adult Psychiatric Illness," *Am. J. Psychiatry* 144:1426-1430.
[39]Pynoos, R.S., Steinberg, A.M., Goenjian, A. "Chapter 14: Traumatic Stress in Childhood and Adolescence-Recent Developments and Current Controversies," in van der Kolk, B.A., McFarlane, A.C., Weisaeth, L. (Eds.) (1996), *Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society.* New York: The Guilford Press, p. 334.

46.     By the age of 13, Rosie Alfaro was reportedly sniffing huge amounts of paint thinners and other organic solvents, neurotoxins known to cause physical damage to the brain itself.  Rosie discovered glue-sniffing when her mother sent her to stay with family in Mexico. She reports that she sniffed glue until she not only got high, but actually passed out asleep.  Her sister Silvia confirmed this:

> She [Rosie] stayed for several months and she was miserable.  The thing I remember about her time in Mexico was that she learned sniffing glue.  I guess she tried to stay high the whole time she was there.  (Silvia Alfaro Declaration, ¶ 27.)

47.     Mental health professionals who interviewed Rosie prior to trial recognized the connection between her drug use and brain dysfunction.  Dr. Edwards wrote:

> She tends to gloss over detail; there are lacunae, i.e. spotty areas in her past memory, especially in time frames.  Given her drug abuse, this is the least to be expected.[40]

Dr. Rogers never submitted a clinical report, but has submitted a declaration stating that:

> [M]y notes reflect that Ms. Alfaro had a long history of drug abuse, including solvents, as well as a history of syphilis....[O]n one of the testing record forms, my handwritten notes state: "R/O [rule-out] organic sequelae from drugs or syphilis or solvents." ... A R/O diagnosis indicates that there is sufficient evidence or symptomatology to warrant additional assessment of that disorder."  (Rogers Declaration, ¶ 11.)

## 12.     Chronic drug/alcohol abuse beginning in early adolescence

48.     Alcohol is also a known neurotoxin, one which can cause cortical atrophy which, in turn, results in a range of debilitating and irreversible impairments, including severe memory loss, mental inflexibility, learning deficits (or exacerbations in pre-existing deficits), and a marked tendency to perseverate.

49.     The effects of alcohol can be both acute (transient) and chronic -- i.e., lasting effects which persist whether or not the patient continues to drink.  The behavioral manifestations of acute substance intoxication tend to be psychiatric in nature (hallucinations, paranoia, depression, or euphoria, depending on the substance) or neurocognitive (impaired

---

[40]Edwards Report, p. 15.

20

attention, memory and motor coordination). The later manifestations, following extended use and/or addiction, arise from structural damage to the brain itself, causing cognitive deterioration, attentional disorders, permanent memory impairments, and sometimes motor coordination deficits. These conditions do not abate when the substance leaves the body.

50.     The effects of organic deficits are not necessarily limited to a specific realm (*e.g.,* memory, attention, psychomotor coordination). They can also exacerbate the effects of impairments in other areas, including major psychiatric disorders (*e.g.,* mood and trauma-related disorders), such as those suffered by Rosie Alfaro. Similarly, even minor deficits may be compounded and disabling when coupled with chronic alcoholism and/or extensive drug use.

51.     Rosie Alfaro's alcohol abuse was one part of a long history of severe and chronic drug abuse and dependence. As early as 11 or 12 years old, when Rosie Alfaro did not have access to alcohol, she drank over-the-counter cold products -- specifically, Robitussin, a product with a substantial percentage of alcohol. At 14, Rosie was admitted to a locked inpatient detox facility, after an unsuccessful attempt at outpatient treatment. Two entries from her records summarize her already lengthy struggle with drugs and alcohol:

> [Rosie] is a 13-year-old girl admitted here with a four year history of using drugs...[T]he patient has been using heroin and cocaine especially in the last few months...[S]he is using intravenous drugs about three times per day. She has also been sniffing paint thinners....

> ...She would either use heroin or cocaine and occasionally make speed balls and use them conjointly...[S]he is unable to give me any idea of how much....In addition to that, she was using alcohol...[41]

Ms. Alfaro abused and became addicted to several drugs, but her drug of preference was heroin:

> Rosie did all kinds of drugs, but the one she always wanted was heroin. She injected it in her neck and in the veins behind her knees....She got so high that her mind was totally blank. (Silvia Alfaro Declaration, ¶ 21.)

52.     The nature and course of Rosie Alfaro's chemical dependency strongly suggest brain impairment, such that a thorough and accurate assessment of her cognitive and behavioral

---

[41] 1/16/86 Discharge Summary; 1/8/86 History and Physical by Monsoor Shah, M.D., Doctors' Hospital of Lakewood records. (They erroneously give her age as 13; she had in fact turned 14 a few months earlier.)

functioning necessitated comprehensive neuropsychological evaluation. Not only was she very young when she began using drugs, but she was quickly using massive quantities of drugs on a regular basis. By all accounts, her drug use was out of control by the time she was 14 and, despite numerous attempts to stop.

53.     Thus, adolescents who are already brain-injured (or vulnerable to brain damage) are also more likely to exacerbate that damage by exposure to greater levels of drugs and/or alcohol. A high tolerance for these known neurotoxins (reflected in an individual's ability to drink or use "massive" quantities) has been linked to early brain damage. Consumption of large quantities of either, especially beginning in early childhood, is often an indicator of brain damage existing prior to the added insults of chronic exposure to what are essentially poisons. Regular ingestion of large quantities also increases the risk of greater dysfunction, as the already compromised brain is exposed to greater levels of the neurotoxins.

54.     Rosie Alfaro's addiction was apparently so severe that she frequently put her own safety at risk in order to obtain the drugs:

> When Rosie was using, she sometimes became desperate for the drugs....I heard that she sometimes had sex in exchange for drugs. This got her into trouble and I know it made her feel worse about herself. She sometimes accepted the drugs, then refused to have sex and tried to run away. When that happened, the men went after her and beat her up pretty badly. ... Rosie didn't like it but I guess she saw it as the price she had to pay. (Silvia Alfaro Declaration, ¶ 25.)

She also experienced severe physical withdrawal symptoms when she attempted to abstain. Detox records describe "severe withdrawal symptoms...diaphoretic...leg cramps, abdominal pain..."[42] Her sister's reports are consistent, but also reflect behavioral symptoms:

> Rosie couldn't stop using drugs. ... Whenever she stopped, she got violently ill and very crazy. When she started coming down from the drugs, she was totally out of control. She lashed out at everyone and even put herself at risk, but she never seemed to realize it at the time. She always regretted it later, always saying "I can't believe I did that," or "Why did I do that?" She also vomited a lot, and then slept for a long time..." (Silvia Alfaro Declaration, ¶ 23.)

---

[42] 1/16/86 Discharge Summary, Doctors' Hospital of Lakewood records.

22

**13.    Self-medication**

55.    Family members report that her drug use was, at least in part, a response to unhappiness or perhaps clinical depression:

> She was sad before she started doing drugs. I think one of the reasons she started doing drugs was because she was so unhappy. (Silvia Alfaro Declaration, ¶ 28.)

> When she spoke about the drugs, she cried a lot, especially after her son Danny was born. She wanted to stop using drugs but she didn't she to be able. She tried to stop man times, but then she fell apart again every time. (Sanchez Declaration, ¶ 5.)

The timing of her drug use should not be overlooked: "The beatings had started when Rosie starting using drugs..." (Silvia Alfaro Declaration, ¶ 21.)

56.    The experts who examined Ms. Alfaro agreed. Dr. Armando Morales described her drug and alcohol use as "self-medication beginning about age 10."[43] Dr. Rogers administered a test designed to assess an individual's use and attitudes toward alcohol. Rosie's answers resulted in a computer-generated profile which "strongly suggest[ed]" Alcohol Dependence which was related to "considerable anxiety and depression" and other "mental health problems..."[44]

**14.    Chronic drug-related diagnoses and failed attempts at treatment**

57.    Rosie Alfaro's attempts at drug detoxification and rehabilitation began at a very early age, including almost every clinical setting available to treat chronic, severe drug and alcohol dependence. A CDC chart entry states simply: "Pt has been in New Beginnings, Phoenix House, Victory Outreach since age 12."[45] By 14, she had also been through the CIGNA outpatient program in Anaheim, as well as a locked inpatient drug treatment program at Doctors Hospital of Lakewood.[46] Also at 14, she was arrested on drug-related charges after "[o]fficers

---

[43]3/29/92 Morales Report.
[44]10/24/90 Interpretive Report and Profile of Maria DelRosio Alfaro, Alcohol Use Inventory.
[45]3/2/94 Progress Note by S. Andrew, CCWF records.
[46]See 10/29/85 Progress Notes, CIGNA records; 1/86 Doctors Hospital of Lakewood records.

observed heroin tracks on minor's arms, estimate her habit at $100 per day."[47]

58.     By the time of trial, Ms. Alfaro had been affirmatively diagnosed with "Cocaine Abuse," "Polydrug Abuse," "Chemical Dependency," "Cocaine Withdrawal," "Heroin Withdrawal," "Alcoholism," "Polysubstance Dependence," and "Usually constant Organic Brain Syndrome, either Intoxication of cocaine and/or morphine or Withdrawal of either or both, with poor judgement associated with both syndromes."[48] Her drug and alcohol history itself warrants a thorough neuropsychological assessment. Given the extent of his substance abuse, it would be quite astonishing if he has not suffered permanent cognitive impairments.

### 15.     Multi-generational history of alcoholism/substance abuse

59.     It is widely believed that chemical dependency, like many serious mental illnesses, has a genetic component -- that is, some individuals are biologically more predisposed than others to become addicted to alcohol and/or other substances. In Ms. Alfaro's family, alcoholism is pervasive and severe on both sides. In his 1992 trial testimony, Dr. Armando Morales described the "powerful genetic loading" for alcoholism in Rosie's biological family, as evidenced by "four generations of alcoholism."[49]

60.     Rosie's childhood was, in large part, defined by her father's alcoholism and the violence that accompanied it. Her early drug treatment records, dated just after her 14th birthday, state that Jose Alfaro "...is chronic alcoholic who drinks all day every day."[50] It was alcohol that eventually killed Jose Alfaro, as reported in numerous records: "His father [Jose Alfaro, Sr.] passed away in 1996 from a diseased liver, caused by alcoholism."[51] Cirrhosis of the liver also killed both of Ms. Alfaro's maternal great-grandfathers.[52]

61.     Both of her grandfathers were/are alcoholics, although her maternal grandfather,

---

[47] 7/5/88 Pre-Trial Report, *In the Matter of Maria Rosio Alfaro*, Orange County Juvenile Court #J-136418.
[48] *See* 10/29/85 Progress Notes, CIGNA records; 1/86 Doctors Hospital of Lakewood records; Edwards Report.
[49] RT 1821 (3/31/92).
[50] 10/29/85 Progress Notes, CIGNA records.
[51] 1/29/99 Probation Report, *supra.*
[52] *See* Morales Report and attachments.

000110

with whom she spent much of her childhood, has reportedly been sober for more than a decade.[53]
His father (her maternal great-grandfather) was reportedly also an alcoholic, as was her paternal
grandmother, who was Rosie's caretaker when she was sent to Mexico. Rosie's sister Silvia and
her brother Jose (her only full siblings) both began drinking and using drugs in early
adolescence. Her cousin, "Junior" Sanchez, with whom she grew up, has struggled with similar
problems:

> [M]y son...has had serious problems with drugs for several years. Like Rosie, he has
> tried to stop several times. My husband and I have put him in hospitals and treatment
> programs, but each time he comes out, he ends up going back to the drugs. He also
> suffers from depression... (Sanchez Declaration, ¶ 7.)

62.     On both sides of the family, alcohol abuse was associated with family violence
and an atmosphere of chaos and fear which Rosie's parents replicated their own household. Her
mother's descriptions of both her family and her husband's reveal not only the role of alcohol,
but also its enduring affects on several generations of children:

> When I was young, my father was an alcoholic and had violent fights with my mother. I
> remember hearing them fight and being very scared by it. My father stopped drinking,
> but I believe that he felt sympathy for Jose because of his own alcoholism. His father,
> my grandfather, was also an alcoholic. The only person who tried to help me was my
> brother Guillermo. ... Guillermo said that he remembered how bad things were in our
> family when my father was drinking and that he did not want me to suffer in the same
> way with my own family. (Melendez Declaration, ¶ 14).

> Both of Jose's parents were alcoholic and Jose would tell me that he had seen his father
> beat his mother many times. ... Once, when we were visiting Mexico, both Jose and his
> father were drunk and got into a fight. Jose was very angry and reminded his father
> about the time that he (Jose's father) had hit Jose's mother over and over with the handle
> of his gun. The fight became very violent and then the police came. (Melendez
> Declaration, ¶ 17).

### 16.     Co-morbid depression, anxiety, substance- and trauma-based conditions

63.     Psychiatric and neurological issues are complex and unavoidably intertwined. It
simply makes no sense to attempt mental health treatment without evaluating all aspects of it.

---

[53]*See* Edwards Report, Morales Report; Melendez Declaration.

U00121

This is especially true in our understanding, diagnosis and treatment of depressive illness, Post-Traumatic Stress Disorder and, equally as important, the cumulative of effects of depressive and trauma-based symptomatology. This combination of symptoms/conditions also frequently includes the development of serious Substance-Related Disorders.[54] This "symptom complex" was the focus of a major study released while Ms. Alfaro was awaiting trial:

> [T]he following patient profile was found to be commonly associated with a past history of abuse: drug and/or alcohol abuse, suicidality on [hospital] admission (often chronic), and character pathology (especially symptoms of borderline and self-defeating personality disorders against a backdrop of family dysfunction and psychiatric illness (often alcoholism in the father or stepfather) and unsuccessful outpatient treatment...[55]

Pre-trial evaluations of Rosie Alfaro are striking in their agreement that she suffered an especially disabling and complex spectrum of these very symptoms. The consistency in these observations is not limited to defense-retained experts, but includes mental health professionals employed by the Orange County Jail as well. Other documents, as well as the observations of lay persons, indicate that she suffered similar symptoms as an adolescent and perhaps earlier.[56]

## B.    Absence of Appropriate Assessment or Intervention

64.    The records I reviewed confirm that Ms. Alfaro underwent psychological and academic testing at several points throughout her childhood and adolescence. Her test performance was the subject of numerous reports and evaluations by a range of clinicians in a range of settings, including the Anaheim public schools, substance abuse treatment programs (both outpatient and inpatient), hospital emergency rooms, and the Orange County Women's Jail. Several examinations were conducted at the request of trial counsel between 1990 and 1992. She has since been seen by CDC clinicians (or has, at least, received some level of treatment pursuant to clinical orders) on a fairly regular basis. Many of the early reports

---

[54]"Posttraumatic Stress Disorder is associated with increased rates of Major Depressive Disorder, Substance-Related Disorders, Generalized Anxiety Disorder, Social Phobia, Specific Phobia, and Bipolar Disorder." (*DSM-IV-TR*, p. 465.)

[55]Brown, G.R. & Anderson, B. (1991). "Psychiatric Morbidity in Adult Inpatients With Childhood Histories of Sexual and Physical Abuse." *Am. J. Psychiatry* 148:55-61.

[56]*See, e.g.*, Morales Report; Asprodites Declaration, ¶¶ 26-27; *see also* Sanchez, Alfaro, Melendez Declarations.

000133

**EX 7    102**

(including those from childhood and her pre-trial detention) provide information and insights discussed in the paragraphs above.

65.     To a lay person, it may appear that Ms. Alfaro's mental health has received substantial attention; aspects of her history are, in fact, quite well documented.  That history, however, is deceptive, as none of the reports or evaluations have included a thorough or reliable assessment of Rosie Alfaro's underlying neuropsychological impairments.  No evaluation of Ms. Alfaro's mental, emotional or cognitive state has ever included a basic assessment of organic brain damage and the effects of that damage on her overall emotional, intellectual and behavioral functioning.  Moreover, none of Ms. Alfaro's previous evaluators have been trained or qualified to conduct such an assessment.

### 1.     Childhood and Adolescence

#### a.     Special Education records

66.     Beginning in the second grade, Rosie was repeatedly examined and tested as part of the Anaheim City School District's Special Education program.  Those tests and the reports evaluating her intellectual capacity, her academic achievement, and her specific limitations and deficits are discussed and analyzed in a recent declaration by Dr. Cynthia Asprodites.  For purposes of my assessment, both the tests and the resulting reports are notable for several reasons.

67.     First, the documents I reviewed, generated between 1979 and 1987 (when Rosie was between 8 and 15 years old) were written by teachers, a school psychologist, speech and language therapists, the school nurse, and other members of the School Appraisal Team.  Their goal was to monitor Ms. Alfaro's academic progress and address specific educational needs.  These examinations (and the programs they served) were neither designed nor intended to assess organic deficits or underlying neurological or psychiatric impairments.  None of the examinations contained in her records were conducted by mental health professionals qualified

27

to assess the underlying impairments which clearly contributed to Ms. Alfaro's academic and emotional difficulties. Ms. Alfaro was never seen by, or referred to, a neurologist, neuropsychologist, or even a qualified physician for an assessment of her organic deficits.

68.     Second, although not designed to assess brain dysfunction, many of the tests administered to Rosie in elementary school, as well as the observations and assessments of school personnel, provide valuable historical data, confirming that classic indicators of underlying brain dysfunction were, in fact, evident throughout her childhood and adolescence. While not qualified to assess the significance of many of these signs and symptoms, the clinicians who examined Ms. Alfaro in elementary school were presumably qualified to observe and record the behavioral and cognitive signs (*e.g.*, continued academic performance "significantly behind what was expected, especially given her chronological age," despite repeated interventions)[57] that are essential to a more thorough neuropsychological assessment. Indeed, many of their diagnoses and conclusions (*e.g.*, specific developmental disorders, attentional deficits, and borderline intellectual functioning) are clinically salient, independent of their initial purpose, to the assessment of organic brain dysfunction. These early reports also reveal indicators of what Dr. Asprodites describes as "a strong emotional component to Ms. Alfaro's evident immaturity." (Asprodites Declaration, ¶ 27.)

69.     Finally, the tests given by the Special Education team included some of the same tests, or earlier versions of those tests, administered as part of my testing battery. Notable among them is the Wide Range Achievement Test-3 [WRAT-3], probably the most widely used measure of achievement in three areas:  Reading, Spelling and Arithmetic. Ms. Alfaro's earlier performance on this test is instructive, not just as a measure of her achievement at that time, but because it provides a comparison by which to view her current performance. By themselves, WRAT scores dating from elementary school are in no way a substitute for an assessment of organic dysfunction -- substandard performance on the WRAT may be attributable to a range of factors, including some which may be unrelated to underlying brain dysfunction. However, they

---

[57]Asprodites Declaration, ¶ 9.

EX 7   104

do reflect a specific functional impairment which is often indicative of possible organic damage.

70.     In Ms. Alfaro's case, her recent performance confirms that this deficit is chronic. The last recorded WRAT scores from Ms. Alfaro's records are/were extremely difficult to decipher, but other tests of academic achievement (*e.g.*, the Brigance Inventory of Basic Skills) showed that Rosie had never read even at the fourth grade level. Her spelling scores, however, on both the WRAT and other tests administered during the same period, were "adequate" for her grade level. Recent testing with the WRAT-3 measured her reading ability at the fifth grade level, in the 5th percentile; and again, her spelling was considerably higher, almost at the 50th percentile. Consistency in performance on the same test instrument, despite an intervening period of almost fifteen years, not only suggests that her scores validly reflect her abilities, they also serve to dispel any suggestions of malingering on Ms. Alfaro's part.

### b.     Other pre-trial medical/treatment records

71.     Ms. Alfaro's early medical/psychiatric history also includes records from at least two drug treatment programs (with references to others), and hospital emergency room records. Because these records were intended for other assessment or treatment purposes, they do not purport to address or identify the existence or nature of underlying organic deficits. Like the school records, however, they are instructive in that they reveal and describe many classic signs and symptoms of organic dysfunction.

72.     1988 emergency records document an automobile accident in which Ms. Alfaro apparently lost consciousness and suffered a concussion. Both her symptoms (loss of consciousness and subsequent headaches) and the diagnosed injury (concussion) strongly suggest the possibility of brain injury, the effects of which might be exacerbated by the deficits recorded in her earlier school records.

73.     Drug treatment records from 1985 and 1986 also document several salient factors, including: (1) Ms. Alfaro's early exposure to neurotoxins (*e.g.*, glue and paint thinners);[58] (2)

---

[58]*See, e.g.*, 1/86 inpatient records, Doctors' Hospital of Lakewood.

chronic and severe dependency on numerous substances beginning at an early age;[59] (3) severe

physiological withdrawal symptoms suggestive of a serious biochemical addiction;[60] (4) a

familial history of drug and alcohol dependence;[61] and (5) a chaotic and abusive family life

characterized by serious violence, the ongoing threat of violence, and frequent physical injuries

to the face and head.[62]

74.    The significance of these observations and findings is two-fold.  First, they

suggest possible etiologies of Ms. Alfaro's brain damage, including traumatic head injuries, pre-

existing genetic vulnerabilities, and exposure to chemicals known to cause permanent damage to

the brain itself.  Second, they describe many of the symptoms or responses seen in patients

suffering organic brain damage, including self-medication and polydrug abuse with severe

physiological symptoms.  Again, these experiences and responses take on greater significance in

light of Ms. Alfaro's earlier records documenting learning disabilities, poor academic

performance, and emotional immaturity.

### 2.    Pre-Trial Evaluations and Testing (1990-1992)

75.    The records I have reviewed include reports, test data, testimony, and

correspondence from several mental health professionals appointed to assist trial counsel in his

representation of Ms. Alfaro.  I have given special attention to files and documents relevant to

the assessments (or examinations) of Martha Lee Rogers, Ph.D.; Consuelo Edwards, M.D.; and

Armando Morales, DSW, three mental health professionals representing different areas of

expertise and training.  However, none of them undertook a thorough assessment of Ms. Alfaro's

organic brain dysfunction or its effects on her overall mental health.  That statement is not

intended as a criticism of their evaluations, but rather as an acknowledgment of their roles; for

any one of these experts to have undertaken this specific assessment would have exceeded the

---

[59]*Ibid.*
[60]*Ibid.*
[61]*See* 1985 CIGNA records.
[62]*Ibid.*

UCR 73

**EX 7    106**

limits of their professional training and competence.[63]

### a.     Selection of trial experts

76.     Of these mental health experts, only Mr. Rogers purported to address the possibility of neuropsychological deficits. Her recent declaration reveals that her inquiries (*i.e.*, testing) in this area were minimal, at best ("some rough screening measures"). Dr. Rogers neither analyzed Ms. Alfaro's test results, reached any clinical conclusions, nor prepared a report:

> We administered intelligence and memory, personality and projective tests, and some rough screening measures to determine gross neuropsychological impairments. ...
>
> Although my assistant and I conducted a fair amount of testing on Ms. Alfaro, we did not prepare a report of neither her test performance or her mental state. (Rogers Declaration, ¶¶ 4 & 7.)

77.     Like the school records discussed earlier, Dr. Rogers' data, as well as her notes at the time of administration and her declaration interpreting those notes, are revealing. She describes several signs and symptoms which are highly consistent with organic brain dysfunction, including the following:

> I evaluated Rosie Alfaro's intelligence by means of the Wechsler Adult Intelligence Scale-Revised ["WAIS-R"]. ... Overall, she was functioning somewhere in the mid- to high 70's. As a general rule, this IQ would not render one legally incompetent or insane *per se*, but Rosie's scores were well below average, in the range of "borderline intellectual functioning." I also note that her performance was noticeably more impaired in areas requiring verbal skills (as opposed to non-verbal reasoning) -- her Verbal IQ is 73, 17 points lower than her Performance IQ. (Rogers Declaration, ¶ 6.)

With respect to the controversy arising over Rosie's performance on the MMPI-II, a personality test administered by Dr. Rogers, she states:

> I reached no conclusions regarding these validity scales, other than my belief that the clinical scales were likely...inaccurate and, therefore, invalid. The pattern of responses

---

[63]Dr. Rogers is a clinical psychologist who, at the time of her examination, lacked any specialized training in neuropsychological assessment. Dr. Edwards, a physician and psychiatrist, was equally unqualified. Dr. Morales, a doctor of social work, lacked the training or qualifications to conduct or interpret psychological testing of any kind, as he himself testified in 1992. (*See* 1992 trial testimony of Dr. Armando Morales).

seen in Rosie Alfaro's MMPI...suggest several other factors that might result in an invalid profile, including learning disabilities...; possible language barriers; confusion,; organically based deficits in concentration and/or attentiveness; increased stress or emotional distress; or possibly medications... (Rogers Declaration, ¶ 16.)

78.    Dr. Rogers noted Ms. Alfaro's "long history of drug abuse, including solvents" and recommended further inquiry to assess "organic sequelae from drugs or syphilis or solvents." She also noted "symptoms consistent with Post-Traumatic Stress Disorder ["PTSD"]." (Rogers Declaration, ¶ 11.)

79.    Though not purporting to assess underlying brain dysfunction, Dr. Edwards formally diagnosed "Usually constant Organic Brain Syndrome," "History of Probable Attention Deficit Hyperactive Disorder," Specific Developmental Disorders "highly probable," "Borderline intellectual functioning," and a history of drug overdoses with at least five episodes of loss of consciousness,[64] all of which indicate the need for a thorough neuropsychological assessment. The same conditions and/or symptoms are documents by Dr. Morales, as well as chronic, untreated trauma-related symptoms, including self-medication with drugs that themselves posed a substantial threat of brain injury; chronic anxiety and depressive symptoms (including multiple suicide attempts); and a powerful familial (genetic) predisposition to drug and alcohol dependence extending over several generations on both sides of the family.[65]

80.    Despite these indicators of significant brain damage, documented over many years by a range of clinicians in diverse settings, no appropriate or reliable examination was ever conducted. This was apparently due (at least in part) to the fact that, despite recommendations by several evaluators, trial counsel never retained an expert or consultant qualified to conduct that examination. Organic deficits of the nature and severity suffered by Rosie Alfaro must be considered in any accurate mental health assessment. That omission, in itself, jeopardized the integrity and reliability of any mental claims that might have been raised. Absent that assessment, any assessment of mental state or cognitive and behavioral functioning is likely to be incomplete and unreliable. Sadly, that was true of the assessments provided by Rosie

---

[64]Edwards Report, pp. 16-17.
[65]Morales Report, p. 3.

000108

Alfaro's defense experts, including both those who advised counsel and those who testified before Rosie's sentencing juries.

81.     Given Ms. Alfaro's history and the multiple impairments contributing to her cognitive and behavioral functioning, the group of mental health experts retained by trial counsel was not inappropriate, but woefully incomplete. Though not trained in neuropsychological assessment, mental health practitioners from other fields often contribute a great deal of information, especially historical data, which is essential to a full understanding of any patient's cognitive and intellectual functioning. A competent assessment of organic impairments must take into consideration the full range of factors -- including external stressors and co-existing deficits -- which shape and influence that patient's cognitive and emotional development and later functioning. Likewise, just as an accurate knowledge of the patient's trauma history is necessary to an informed assessment of his/her organic impairments, an accurate understanding of that patient's organic impairments and limitations must inform any reliable psychological assessment.

82.     The mental health evaluations conducted pre-trial were not informed by accurate data regarding Ms. Alfaro's emotional, cognitive and behavioral limitations. That data had been neither sought nor obtained, despite multiple indicators of organic dysfunction. In fact, they were (almost by definition) uninformed, as that critical piece of information had never been obtained and that issue (organicity and its possible impairments on Ms. Alfaro's overall mental state) remained uninvestigated. That gap in the data provided to evaluating experts greatly increased the risk that the clinical findings of every mental health examiner would be incomplete and, therefore, unreliable.

83.     Given Rosie Alfaro's documented history, this configuration of mental health professionals was, at best, incomplete, increasingly the likelihood that their expert findings would be unreliable, vulnerable to attack, or, at the very least, suspect. Moreover, the increased risk of mis-assessment or an incomplete evaluation can easily undermine the accuracy of other evaluations, as well as the appropriateness (and, therefore, the effectiveness) of treatment

33

000109

programs (if any) offered at critical points in a patient's development.  In making this statement, I do not question the competence of these individual professionals acting within the scope of their training and expertise.  Rather, I question the absence of a clinician whose qualifications and experiences would have provided insight and competence in assessing a this aspect of Rosie Alfaro's impairments.

### b.    Specific tests and test interpretation

### (1)    Dr. Consuelo Edwards

84.    Of the pre-trial experts who examined Ms. Alfaro, two of them made references (one in a formal report, the other in her notes) to specific tests purported to assess "organicity" or brain damage/dysfunction.  The only reported findings were in the report of Dr. Consuelo Edwards, under the heading "Further Diagnostic Studies":

> Standard drawings of a clock, a potted plant, and a box rendered drawings that were well constructed, were well integrated, with the exception of the clock, where all the numbers on the left side of the clock are missing.  While this is quite characteristic of people with serious damage on the right side of the brain, this did not fit the clinical picture of the patient and upon questioning she revealed that she felt that the numbers were being placed wrong and she simply gave up.  She did not feel that this problem could be solved through her efforts.[66]

Both this "test" and Dr. Edwards' interpretation are clinically meaningless.  Her inclusion of this paragraph has meaning only in that it implies that Dr. Edwards considered (albeit briefly), and then ruled out, the possibility of underlying brain damage.  Whether or not this implication was intentional, the statement above is extremely misleading.

85.    The exercise described above is neither "diagnostic" nor a "study" in any clinical sense of the word.  This exercise would not even constitute a crude screening device intended to identify the need for a meaningful assessment of organic brain dysfunction.  While Ms. Alfaro's initial performance on this exercise *could*, as Dr. Edwards recognized, suggest right hemisphere

---

[66]Edwards Report, pp. 15-16.

000110

EX 7    110

brain injury. However, by her own account, Dr. Edwards took no clinically acceptable steps to investigate -- that is, confirm or rule out -- the existence of brain damage. Neither Ms. Alfaro's self-reported realization of, or explanations for, her mistakes (hopelessness or incompetence) negate the possibility of organic brain damage. What they more likely suggest is that Ms. Alfaro had learned to mask her deficits (in this case, significant brain damage) by dismissing or downplaying her disabilities. This pattern is very common among populations -- including those who live in constant danger, at home or on the streets -- who understand that their disabilities render them extremely vulnerable.

86.     Moreover, the possibility of right brain dysfunction *does*, in fact, "fit the clinical picture of the patient." Dr. Edwards diagnosed Rosie Alfaro with "Borderline intellectual functioning," based on Ms. Alfaro's performance the WAIS-R administered by Dr. Rogers. That test revealed several indicators of right hemisphere dysfunction, including a Performance IQ which was 17 points higher than her Verbal IQ, a phenomenon frequently associated with right brain dysfunction. She also diagnosed Ms. Alfaro with Organic Brain Syndrome, specifically those associated with chronic substance abuse.[67] She also found that "Specific Developmental Disorders (learning disabilities)" were "highly probable." These impairments have historically been associated in the clinical literature with right brain dysfunction.[68]

### (2)     Dr. Martha Rogers

87.     Dr. Rogers, though she never submitted a report of her findings, conducted extensive psychological testing, including a number of tests often included as part of a comprehensive neuropsychological assessment. As discussed in later sections of this declaration, Ms. Alfaro's performance on most of those tests was never interpreted or reported by an appropriate mental health professional. Those tests intended to measure aspects of

---

[67]The introduction to "Organic Mental Syndromes and Disorders" in the *DSM-III-R*, in use at that time, states that "[t]he essential feature of all these disorders is a psychological or behavioral abnormality associated with transient or permanent dysfunction of the brain." (*Ibid.*, at p. 98.)

[68]*See generally* Kaufman, A.F. (1990). *Assessing Adolescent and Adult Intelligence.* Boston: Allyn & Bacon, Inc., chapters 10-12.

000111

neuropsychological functioning, including the WAIS-R and the WMS-R, while never properly analyzed or incorporated into a comprehensive mental health assessment, nonetheless revealed deficits consistent with my findings more than ten years later. Those tests, and Ms. Alfaro's performance on them in 1990, are discussed in relation to my own findings in section IV, *infra*.

### (3)    The Minnesota Multiphasic Personality Inventory-2

88.    Because it was the subject of great focus and controversy during Ms. Alfaro's penalty hearings, I feel compelled to clarify a few basic points about the Minnesota Multiphasic Personality Inventory-2 [MMPI-2], which was administered to Ms. Alfaro in 1990 by Dr. Rogers' assistant. The MMPI-2 is an "objective" test of personality. Indeed, it is probably "[t]he most widely used of all paper-and-pencil personality tests,"[69] composed of 567 which the test-taker is asked to either endorse or deny. The examinee's responses are scored and the result is essentially a "profile" of that individual's personality or emotional status. It is perhaps the most widely used personality assessment tool used by mental health evaluators today, in settings as diverse as individual therapy, employment screening, and forensic assessment. Although the MMPI-2 is sometimes used by neuropsychologists to supplement the standard neuropsychological battery, that test was not designed to assess, or even screen for, organic brain dysfunction.

89.    I mention the MMPI-2 in this report because my review of the records suggests that the raw data obtained by Dr. Rogers had a profound impact, not only on her own ability to provide helpful clinical insights regarding Ms. Alfaro, but indeed on the credibility of the other testifying mental health professionals and the reliability of their findings. In her recent declaration, Dr. Rogers describes how the raw data from that single test (or more specifically, her handwritten notes which she assumed would remain confidential) were taken out of context, misinterpreted by individuals not qualified to interpret that data, and presented (in fact, misrepresented) to the judge and jury who determined Ms. Alfaro's fate. (*See* Rogers

---

[69]Lezak, *supra*, at 777.

36

000112

Declaration, ¶¶ 10-19.) The handling and presentation of selected notations from that single test are also discussed by Dr. Rogers. (*Ibid.*) Without restating those arguments, I concur with both her assessment and her dismay that a clinical instrument might be misused in such a fashion.

90.     My own testing of Ms. Alfaro has brought to light an additional fact which is critical to any discussion of the MMPI-2 administered to Ms. Alfaro and its subsequent role in her sentencing hearing. The MMPI-2 is, as stated above, a "pencil-and-paper" test requiring the examinee to read and response to 567 written items:

> It is an untimed test, suitable for older adolescents and adults. Verbal comprehension must be at the *low average* or better level (minimum reading skills at the sixth grade level) for useful results [ ]. Very impaired patients who have difficulty following or remembering instructions, who cannot make response shifts readily, or whose verbal comprehension is seriously compromised cannot take this test.[70]

Protocols have been devised to accommodate persons with vision impairments, impaired motor coordination, even "semi-literates," including tape-recorded testing forms which are subject to clearly articulated testing protocols.[71]

91.     Rosie Alfaro does not read at the sixth grade level. On the WRAT-3, a test specifically designed to measure reading, spelling and arithmetic levels, expressed in terms of grade level, Ms. Alfaro's scores revealed that she now reads at the fifth grade level.[72] That is surprising only in that her WRAT-3 scores are the highest she has ever achieved.[73] Her academic records show that Rosie Alfaro's reading abilities were always at least two full grade levels behind her actual grade level placement.[74] As Dr. Asprodites notes: "The records do not suggest that Rosie ever completely mastered the basic alphabet." (Asprodites Declaration, ¶ 9.) In 1992, a nurse at the Orange County Jail informed Probation Department that Rosie Alfaro, then 20 years old, was "not very literate."[75]

---

[70]*Ibid.*, at p. 778 [emphasis in original] [citations omitted].
[71]*Ibid.*
[72]*See* section IV.B., *infra*.
[73]Her relatively high performance at this time is not surprising. Her incarceration since 1990 very likely represents the most structured environment she has ever experienced. It is not at all unusual for an individual's reading skills to improve in that setting. A fair number of inmates learn to read for the first time while incarcerate.
[74]*See* Asprodites Declaration; ACSD records.
[75]7/14/92 Pre-Sentence Report, pp. 17-18, quoting Toby Silver, R.N.

000113

92.    The individual(s) selecting and administering the specific tests given in 1990 had no reason to believe that Ms. Alfaro could read at a level that justified giving the MMPI-2. Assuming that the initial test administration could initially be justified, the raw data indicating an "invalid" profile should have caused them to identify the reason(s) underlying this result. The MMPI-2 should never have been administered to Ms. Alfaro.

### c.    Non-clinical roles assigned to trial experts

93.    Even had counsel retained a competent neuropsychologist as part of his investigation, the circumstances surrounding Ms. Alfaro's clinical assessments, and the roles assigned to the trial experts by defense counsel, it is unlikely that a competent evaluator could have effectively assumed the role or performed the functions appropriate for a forensic mental health examiner.

### (1)    Dr. Martha Rogers

94.    In a recent declaration, Dr. Rogers explains what she perceived to be her role in Ms. Alfaro's defense:

> [M]y role was to evaluate Rosie Alfaro to determine whether or not she had a mental state defense (*e.g.*, insanity or diminished actuality) to the offense itself. The homicide occurred during the commission of a residential robbery and reportedly involved not only Rosie Alfaro, but also two men, one of whom had not been identified. At the time of the offense, Ms. Alfaro's son was outside the house in the custody of the male who was identified shortly after the crimes....Mr. Monroe's theory of the case was that Rosie Alfaro had participated in the killing under duress arising from threats of harm to her young son, and possibly other family members as well. (Rogers Declaration, ¶ 3.)

Having reviewed Dr. Rogers' file, it appears that her role was broader than the traditional mental state evaluation. Although no report was ultimately filed, Dr. Rogers' handwritten notes on several testing record forms suggest that her evaluation was intended not simply to assess Ms. Alfaro's mental state in connection with this duress defense, but also to investigate the circumstances underlying the offense itself.

38

95.     Any assessment of a defendant's mental state must, of course, be informed by the circumstances surrounding, and leading up to, the offense itself.  Questions regarding a defendant's mental state at the time of the offense, or her/his memory of that time period, are often part of an appropriate clinical interview.  That line of inquiry is not considered appropriate in the context of formal testing.  Her handwritten notes suggest that Dr. Rogers' analysis of Ms. Alfaro's performance on specific tests was colored by her interviews (or perhaps assumptions) regarding the crime scene.  For example, her handwritten "Summary" on the Record Form for the Wechsler Memory Scale-Revised [WMS-R] includes the following:

> Her story about the crime on videotape indicates one example of probable confabulation, e.g. she didn't report color of child's dress accurately.  No apparent gaps.  Then Pat. claims not to remember past the front door.  With persistent questioning a story __?__ time continuous with no gaps is given that is relatively consistent with physical evidence. Cannot assess if any confabulation.[76]

Her reliance on crime scene information in her assessment of Ms. Alfaro's functional memory is again apparent on another section of the WMS-R testing forms:

> Low General & Delayed [visual reproduction] consistent with WAISR Information [subtest score].  On Verbal Memory tends not to confabulate greatly but simply doesn't recall details.  Details about the crime are rather rich, however....Physical analysis of child's wounds as to whether more than 1 knife will be important.  She did not recognize knife found at scene...[77]

96.     I believe that her reliance on Ms. Alfaro's reports of the crime scene was clinically inappropriate.  Standardized testing instruments, including the WMS-R, are intended to provide an objective measure of an individual's baseline functioning.  This done through the use of questions and tasks which are uniformly posed to every examinee and validated against control groups responding to the same questions.  The introduction of questions unique to the individual test-taker, especially regarding memories or experiences which are emotionally charged and the subject of ongoing interrogations, is a gross deviation from the standard of care for forensic evaluators and renders any findings highly unreliable:

---

[76]WMS-R Record Form, p. 12 (handwritten notations).
[77]WMS-R Visual Reproduction-Copying Sheet, Card B (handwritten notations).

000115

EX 7    115

Standardization and reliability of tests require that they be administered and scored in a manner that closely approximates descriptions in the test manuals. When test data are to contribute to an assessment for legal purposes, there should be a very high level of accountability regarding both administration and scoring....[P]sychologists and lawyers should consider whether administration of the assessment methods also should be documented (for example, by audiotape or videotape) in order to be able to provide a complete record of the standardized conditions under which data contributing to the psychologist's conclusions were obtained.[78]

97.    In this case, Ms. Alfaro's test results were never synthesized in a formal report. The irregularities in Dr. Rogers' test administration are nonetheless significant. First, her notes indicate that the decision not to quantify and analyze the results of her testing was due, at least in part, to the extremely narrow focus of her examination -- *i.e.*, the referral question as defined by defense counsel and subsequently interpreted by Dr. Rogers herself. The trial court's order appoints Dr. Rogers:

...[T]o investigate the case of MARIA DEL ROSIO ALFARO and to prepare a confidential report for [counsel] and to evaluate and explain the personality and behavior of MARIA DEL ROSIO ALFARO..."[79]

According to Dr. Rogers:

That was not standard language on such orders, either now or in 1990, in appointing experts in this county. Presumably, that language was Mr. Monroe's. (Rogers Declaration, ¶ 8.)

Her narrow understanding of the referral question is reflected again in her handwritten notes on WMS-R forms: "I doubt that organic contribution of memory problems will be at a level providing mental defense."[80] That is consistent with her recent declaration:

I believe that I determined, based on our initial review of the test data and interviews with the defendant, that I could not assist Mr. Monroe in providing a full mental state defense to the crime. That was the referral question which shaped and informed my evaluation. I do not recall being asked to consider the existence of potential mitigating factors for sentencing purposes. (Rogers Declaration, ¶ 7.)

---

[78]Grisso, T., "Psychological Assessment in Legal Contexts," in Curran, W.J., McHarry, A.L. & Shah, S.A. (1986). *Forensic Psychiatry and Psychology: Perspectives and Standards for Interdisciplinary Practice.* Philadelphia: F.A. Davis Co., p. 143.

[79]10/11/90 Order Appointing Expert.

[80]WMS-R Visual Reproduction-Copying Sheet, Card B. I am not suggesting that Dr. Roger's interpretation of this referral question was unreasonable or clinically inappropriate. Rather, the question was so vague and, on its face, narrow, that the language was subject to a range of interpretations, creating the risk that the defendant (here, Rosie Alfaro) would receive legal counsel and expert assistance falling far short of zealous and competent representation.

000116

EX 7    116

98.     Whether or not they provided a "full mental state defense to the crime," Ms. Alfaro's scores on the WMS-R and other tests revealed that she did in fact suffer from significant organic impairments, including memory deficits as measured by the WMS-R.[81] These findings could not have been dismissed by an expert appointed "to evaluate and explain [her] personality and behavior."[82] They would also provide important insights to anyone conducting an overall mental health assessment, especially when the findings of that assessment were present to the sentencing jury (or juries).

99.     At one point, the possibility of Dr. Rogers testifying at penalty phase did in fact arise, albeit in an extremely convoluted fashion:

> Prior to my actual trial testimony, I received a letter from Mr. Monroe which read, in its entirety:
>
> > Can you consider whether or not Rosie's mental state might rise to a "mental or emotional disturbance" which emotional mental state could be induced as a result of a series of events which occur over a considerable period of time?
>
> That question was not very intelligible to me...I have done forensic work for more than twenty years and this is not a legal standard or a referral question.  I assume that this was a reference to possible mitigation issues, but my records do not reflect any substantive discussion about this....I did not participate in developing the penalty phase testimony he presented.  Again, my notes from 1990 reflect a number of factors that might be raised in mitigation, but I was not asked to address or develop them. (Rogers Declaration, ¶ 23.)

Had Dr. Rogers been approached with a more appropriate (or comprehensible) referral question with respect to penalty phase issues, and subsequently testified, her deviations from the testing protocol would have undermined the reliability of her findings, not just on that one test, but on her evaluation as a whole.

100.    Her unorthodox testing style is also significant in that it reveals the focus of her examination.  Her purpose, short of developing a "full mental state defense" to the crime, was to elicit facts of the crime which counsel had been unable to obtain to his satisfaction.  During my recent examination of Ms. Alfaro, when I asked whether any of the tests seemed familiar to her,

---

[81] *See* discussion in section IV.C., *infra*.
[82] *See* 10/11/90 Order Appointing Expert.

41

she stated that she recognized a few of them, but explained that during the pre-trial testing, the actual test administration was interspersed with inquiries about the circumstances of the offense:[83] "Her [Dr. Rogers'] thing was that she was always trying to get me to say that someone else did it [the offense]. Sometimes I got tired and just went along with it."[84]

### (2)   Dr. Consuelo Edwards

101.    It appears that trial counsel retained several mental health professionals to perform non-clinical functions, or to employ clinical practices and techniques (psychological testing and clinical interviews) for purposes other than assessing Ms. Alfaro's mental state and its possible role in the charged offenses. Dr. Consuelo Edwards was retained for the stated purpose of evaluating Ms. Alfaro's state of mind at the time of the offense. She recalls no mention of potential mitigation issues until shortly before she was called to testify at Ms. Alfaro's penalty phase hearing. However, like Dr. Rogers, she recalls that much of her evaluation was aimed at discovering the identity of the third party (the second, unidentified male) who was present at the crime scene. The bulk of her written report is a narrative discussion of Rosie Alfaro's recollections and reports of the events surrounding the offense, including Dr. Edwards' doubts with respect to several details provided by Rosie.

102.    At counsel's request, Dr. Edwards used one of their interview sessions to suggest the identity of the unnamed third party, confronting Ms. Alfaro with a name (Beto) provided by counsel:

> [W]hen faced with these inconsistencies as well as other [sic], she said that a person
> named Beto is to all intents and purposes the "Miguel" in the description of the main
> events, that a Miguel does exist and he is indeed a friend and contemporary of her father,
> but he had no participation whatsoever in the crime described, and that she never thought
> that he might be blamed because of her lies. She was just very unwilling to talk about
> Beto...[85]

Dr. Edwards has since clarified that neither the name "Beto" nor the account of Rosie's having

---

[83]This is consistent with Dr. Rogers' notes from the time of testing.
[84]May 24, 2001 interview with Rosie Alfaro.
[85]Edwards Report, p. 6.

' 000118

EX 7   118

withheld his identity came from Mr. Alfaro herself. Rather, the scenario described in her report had been suggested by Mr. Monroe, who presented it to Dr. Edwards as a possible explanation to the perceived inconsistencies in Ms. Alfaro's earlier accounts.[86] Although Ms. Alfaro "went along" with the proposed scenario, it soon became clear that she had done so in an attempt to provide her legal team with the answers she believed they wanted. Counsel's theory about "Beto" was later proven to be wrong.[87] Again, this strongly suggests that, despite her expertise and her status as a mental health expert, Dr. Edwards did not always function in that capacity.

### (3)    Other experts/consultants

103.    Further information from other experts and consultants retained by Mr. Monroe would be extremely helpful in assessing the extent to which he engaged mental health professionals to function essentially as investigators or interrogators. The records reveal that Mr. Monroe engaged at least one other expert to convince Rosie Alfaro to reveal the third-party's identity. Bruce Danto, M.D. was appointed in 1991.[88] He and his partner, a former homicide investigator and (reportedly) trained psychologist, Dr. Thomas Streed, worked together under the name Death Investigations International.[89]

104.    Court documents, as well as numerous entries in Ms. Alfaro's jail chart, confirm that on 9/26/91, Drs. Danto and Streed interviewed Ms. Alfaro after injecting her with sodium pentathol,[90] a drug known to many lay persons as "truth serum." Their purpose was to induce Ms. Alfaro to identify the third party at the crime scene. Dr. Danto made that clear in a

---

[86]*See* McGrath Declaration. This information has been provided by Mr. Raymond McGrath, a licensed investigator who has apparently been intimately involved in this investigation for several years. This type of information, when relayed by a credible source and obtained through reliable and professionally acceptable means, can be reasonably relied upon in conducting a clinical assessment such as this. I note that the McGrath Declaration has not yet been filed. However, the relevant information has been explained by counsel.

[87]*Ibid.*

[88]*See* Order for Transportation and Medical Examination (filed 9/9/91). That Order states, in part:
> BRUCE L. DANTO, M.D. and/or those under his direct supervision and control shall be allowed to administer medication or drugs and perform other testing as DR. DANTO determines necessary for the purpose of completing the examination for which this order is being granted. ....

[89]*See* Christensen, K., "Final Analysis: Investigation service combines psychiatry and sleuthing to examine violent deaths," in *The Orange County Register* (11/26/91); Transcript of 9/26/91 Sodium Pentothal interview.

[90]*See* Declaration of Bruce Danto, M.D. (filed 10/11/91).

43

newspaper interview published while Ms. Alfaro was still awaiting trial:

> ...Danto said he and his partner also have used sodium pentathol in the case of a young Orange County woman who has been convicted of murder. They have been hired by the woman not to prove her innocence but to enhance her memory, which she contends was affected by drugs she was taking at the time of the slaying.
>
> Their findings, Danto said, could save her from a death sentence. "We did the penthothal interview to bring out certain details of the crime to see if other people were there or whether there were mitigating circumstances," he said.[91]

105.    Jail records document that Ms. Alfaro spoke to several jail personnel about the interview, including very intimate details which were discussed. Among the issues discussed were her father's violence against her mother, her own physical maltreatment and unrelenting humiliation by her father, and her rape by her father's friend at the age of 9.[92] Three days after the interview with Dr. Danto, Rosie Alfaro discontinued her antidepressant medications, signing a "Refusal to Accept Treatment" form and adding, in her handwriting, "due to bad dreams."[93] She refused treatment for almost three weeks until her 21st birthday. On October 21, 1991, Ms. Alfaro slashed her left wrist, then "[r]efuse[d] sutures to L wrist and assoc'd medical care." Another entry that day states: "Very distraught-Doesn't want it repaired-wants it to look ugly."[94]

106.    Thus, while it appears that Ms. Alfaro received the benefits and services of several mental health professionals, that appearance is quite misleading. Too often, their evaluations were conducted for purposes unrelated to their expertise or the stated reasons for appointment by the court.

## III.    CLINICAL INTERVIEW / BEHAVIORAL OBSERVATIONS

107.    Ms. Alfaro is a 29-year-old, right-handed, Mexican-American woman currently incarcerated at the California Correctional Facility for Women in Chowchilla, California.

---

[91]Christensen, K., "Final Analysis: Investigation service combines psychiatry and sleuthing to examine violent deaths," in *The Orange County Register* (11/26/91).
[92]*See, e.g.*, 10/3/91 Progress Note by Toby Silver, R.N., OCWJ records.
[93]9/29/91 OCWJ records.
[94]10/21/91 OCWJ records.

000120

According to her records, her first language was Spanish, the language still spoken among her family members, but she was born in Orange County and all of her formal education was conducted in English. Prior to our meeting, I verified through both her attorneys and a Spanish-speaking mental health professional that Ms. Alfaro was equally fluent in both Spanish and English; indeed, she seemed to have no problem communicating in English throughout my interview and examination.

## A.    Presentation, Demeanor, Self-Reports of Medical Conditions

108.    Ms. Alfaro appeared in prison-issued clothing that was neat and clean. She is a relatively short woman (records give her height between 5'1" and 5'3½") and extremely heavy (clinically "obese"). She was extremely self-conscious about both her weight and her appearance in general. When I asked her weight, she stated that she weighted almost 300 pounds. The tone of embarrassment in her voice lead me to believe that her answer was sincere, but the weight she gave seemed inaccurate. (Although she is clearly overweight, CDC records suggest that her weight fluctuates greatly (between 152 and 232 pounds),[95] the higher end of which seems more accurate than her self-reported 300 pounds.) Her perceptions of her weight and her appearance appear to be quite distorted; her feeling of self-worth are extremely low.

109.    Despite self-consciousness regarding her weight, Ms. Alfaro clearly takes pride in maintaining her appearance. On the first day of my interview, I was accompanied by a member of her legal team. Ms. Alfaro reminded him several times that it was extremely important that she have advance notice of any visits. Her stated reason for this was to give her ample opportunity to fix her hair and feel good about her appearance. She made a point of stating that although she is "fat," she is not "sloppy-fat."

110.    Rosie Alfaro is the mother of four sons, the first of whom, Danny Alfaro, was

---

[95]Infirmary Admission Assessment (5/29/92); Western Medical Center records (1/31/91) (one week before delivering twin boys). A 1997 reports states that "[o]ver the past seven years she has gained over 100 pounds, entering prison at 130 pounds." (6/16/97 Psychiatric Evaluation by Mayna, M. Choudry, M.D., Staff Psychiatrist, CCWF.)

**000121**

**EX 7    121**

born when she was 15 years old.[96]  Records reflect that she was pregnant with twins at the time of her arrest in 1990, and subsequently (while awaiting trial) delivered twin boys weighing (together) more than 17 pounds.[97]  The last grade completed was the sixth grade at James Madison School in Anaheim, California.  Although she later enrolled in at least two alternative academic programs, Ms. Alfaro could not remember whether she had finished the seventh grade.

111.   I had been informed by counsel that Ms. Alfaro had been taking a combination of Prozac and Neurontin for some time, at least several months.  When I asked Ms. Alfaro about current medications, she reported that she had not taken Prozac since her doctor had told her that the Prozac was making her hungry.  She stated that when she discontinued the Prozac, she had not been hungry, but had stayed in her room for several days.  From her description, Ms. Alfaro's discontinuation of the Prozac was not medically supervised or done by means of a gradual tapering-off process, as would be clinically appropriate.  I have recommended to counsel that her medical and psychiatric records for the past several months be obtained and closely scrutinized, so as to ascertain what, if any, effects this change in medications might have on her medical and/or emotional well-being.

112.   Ms. Alfaro reported that she was then (at the time of our interview) taking Neurontin.  Neurontin is a medication originally used as an anticonvulsant but commonly prescribed as a mood stabilizer, mostly in patients with Bipolar Disorder.  Asked about its effects, Ms. Alfaro reported that she would often be up all night (unable to sleep), then sleep through most of the following day, after which the cycle seemed to reverse itself.  The use of this medication, alone and in combination with Prozac or other medications, should be fully investigated by a competent physician, preferably an experienced psychopharmacologist.

113.   It should be noted that Rosie Alfaro suffers from several medical conditions for which she may or may not be receiving medical treatment.  CDC records show that she tests

---

[96]Birth certificates of Daniel Alfaro (██/87); Manuel Cuevas, Jr. (██/89); Ehdie Berto Cuevas-Alfaro (██/91); Ernesto Cuevas-Alfaro (██/91).

[97]*See* 2/5/91 Western Medical Center records. Ms. Alfaro was arrested in July, 1990. Presumably, she was at least two months pregnant at the time of her arrest.

46

positive for Hepatitis C. Asked about treatment, she reported that she does not get medications for Hepatitis C, "because I don't go to the clinic." When asked further, she stated simply: "I just don't want to know how bad it is." She acknowledges, however, that she feels sick about once a week, including alternating chills and fevers that keep her confined to the bed for days at a time.

114.    Given her history of weight fluctuations and mood disorders, I asked whether her doctors had ever spoken to her about testing for a thyroid condition. She confirmed that they had, but her response, again, was one of denial and fear. She reports that she has refused testing: "I just don't want to know."

## B.    Reported Medical/Neurological Symptoms

115.    During our interview, Ms. Alfaro provided frank answers to questions concerning several areas of medical/cognitive/psychiatric symptomatology. When asked specifically about her memory, Ms. Alfaro disclosed, with some embarrassment, "I just forget things so easy." She reported that she gets dizzy quite often, especially since an altercation about eighteen months ago, during which she lost consciousness after being hit on the right side of her head/face. She stated that, following that incident, she was unable to get out of bed for at least three days. Ever since that time, she has had episodes of dizziness.

116.    Asked whether she has reported these symptoms, Ms. Alfaro explained that reporting medical symptoms necessarily requires answering questions regarding the cause of injuries, which (she believes) would leave her vulnerable to punitive actions by correctional staff. She attempted to downplay the seriousness of her recurring dizziness by suggesting that it is medication-related. That is, of course, a clinical possibility, but the etiology of symptoms such as dizziness, as well as the nature and severity of any underlying injuries, cannot be determined without a thorough examination.

117.    As for other head injuries, Ms. Alfaro reported that she "just got beaten up in the streets alot," beginning at approximately age 14. The worst episode she could remember

47

000123

EX 7    123

involved a beating by three male drug connections when she was 14 years old, a beating which resulted in two black eyes and lost consciousness (the period of which she, not surprisingly, could not recall). She reported being in a motor vehicle accident at 16 in which she bumped her forehead and was treated at the Emergency Room for cuts all over her face. She remembered being transported by ambulance, being told she had suffered whiplash, and being confined to bed for several days. She also remembered a fight, again around age 16, in which she was hit over the head with a bottle and may have briefly lost consciousness.

### C.   Reported Social/Personal History

118.   At all times during our interviews, Rosie Alfaro was pleasant and cooperative. She seemed very grateful for the attention she was receiving and wanted very much to make a good impression. She displayed a broad range of affect, particularly when asking for news about her family, especially her children. When speaking of her children, she was somewhat sheepish at first, and became tearful and somewhat distant. When asked specifically about them, she stated that she prays for them every night. She added that "I pray every night, but I never pray for myself. I just feel like I don't deserve it."

119.   Asked about her childhood, Rosie Alfaro remembered "good and bad things." The first memories she mentioned, which she repeatedly returned to, involved the violence between her parents which she witnessed. She stated that, even now, "I have that alot in my mind." She reports that when her father and mother fought, "I would try to get in the way." This report is consistent with other reports that Rosie tried to protect her mother from her father's assaults.[98] Her earliest memory (as opposed to that which she mentioned first) was of witnessing her father having sex. She believes that she was approximately five years old: "They went to the living room to have sex. I went and looked. It was scary. I didn't know what it was." Ms. Alfaro did not specify whether the woman involved was her mother or someone else.

120.   Rosie Alfaro did not like school, stated that she tried to pay attention but just

---

[98]*See* Melendez Declaration, ¶ 19; Silvia Alfaro Declaration, ¶ 14; Sanchez Declaration, ¶ 4.

000124

EX 7   124

could not. She had terrible problems learning to read and was "so nervous" when called upon to read in front of the class. When she was about 11 years old, she started hanging out with "older" kids. By then, she had started smoking pot and drinking alcohol. Her friend Tammy taught her to get high by drinking Robitussin, a cold remedy containing high levels of alcohol. By the seventh grade, she had begun using heroin and cocaine. She recounted that she when she first shot up (injected) heroin, she just fell asleep, but once she added cocaine to it, she was "hooked."

121.    It was during the seventh grade that her mother sent her to stay with relatives in Mexico. She noticed there that little boys and homeless people were sniffing glue and paint thinner "to keep warm." Rosie quickly began sniffing paint thinner on a daily basis. As she described it, she was miserable in Mexico and took paint thinner to bed with her and sniffed it until she fell asleep (or, more likely, passed out). Ms. Alfaro's report is further evidence that her early and chronic drug use was, at least in part, a form of self-medication.[99]

122.    Many of her early memories involved her father. She reports that when she was very young ("he could still carry me"), her father dressed himself in a very large jacket and carried her into the grocery store. He walked through the store, packing himself with meats which he hid under the jacket (and under his infant daughter). He stole food in this manner until she was too big too carry. When I asked specifically about her father, she reluctantly admitted: "I really didn't like my father at all." Later she stated: "When my uncle told me he had died, I made myself cry." She still thinks about him frequently, both consciously and in her dreams.

123.    Ms. Alfaro reported (again reluctantly): "Every dream I have about my father, we're having sex." She describes these as "very ugly dreams" which she has "maybe once a week." Ms. Alfaro reports that when she awakens from these dreams, she feels "miserable," "so angry": "I hate it. I feel so dirty." This report is extremely salient. It reveals ongoing signs and symptoms of early sexual trauma, reported with the affect and terror consistent with the "reliving" of a terrifying event. More striking, however, is the remarkable consistency between

---

[99]The details of Rosie Alfaro's drug history, as she reported them to me, are corroborated by numerous sources. *See, e.g.*, 1986 Doctors' Hospital of Lakewood records; 1986 CIGNA records; Silvia Alfaro Declaration, ¶¶ 21-25; Melendez Declaration, ¶¶ 26-28.

000125

her recent report to me and her 1992 report to Dr. Edwards, documented in the doctor's notes:

> Dreams of sexual intimacy -- upon awaking she thinks of her fa[ther] first (the man has no face in the dream), but she cannot ever remember her fa abusing her sexually in anyway.[100]

This strongly suggests that Ms. Alfaro continues to suffer severe post-traumatic symptoms, including nightmares and unwanted intrusions reminiscent of the original trauma.

124.    Asked whether she was sexually abused by anyone in the family, she stated, quite earnestly, that she just did not know.  Absent the label of "abuse," however, Ms. Alfaro reported (as she has in the past) that when she was 7 or 8 years old, she "fooled around" with her uncle Arturo.[101]  Although she did not characterize these experiences as "abuse," her affect suggested that these were not pleasant memories; she was uncomfortable discussing these incidents.  It was during this disclosure on her part that she stated that she was "not happy" as a child:  "such a loner."

125.    Rosie never reported these incidents, or sexual advances or misconduct of any kind, to her parents, explaining in very clear terms that this could only have gotten her in trouble.  Her father would not only have disbelieved her; he would, she believes have blamed her either for lying or for being "a slut."  Rosie's fears were apparently rooted in very real (and painful) experiences:

> [My grandfather] allowed my father to bring his drunken friends around.  They were often in front of the house when Rosie and I lives with my grandparents.  They were loud and could be scary.  If they had hurt one of us, my father would never believed it. Whenever we complained, he blamed the problems on us, usually on Rosie. ...

> My father blamed Rosie for everything  that went wrong in the family.  He also called us "sluts," especially Rosie.  His insults were very hurtful to both of us, but I think they went deeper for Rosie.  She had such low self-esteem and already felt so badly about herself that his name-calling hurt her very deeply. (Silvia Alfaro Declaration, ¶¶ 13 &16.)

With respect to her mother, Rosie believed (and still believes), that even if she knew that Rosie

---

[100]1992 interview notes of Dr. Edwards.
[101]Arturo Melendez, Rosie's maternal uncle, is five years older than Rosie. (Melendez Declaration, ¶ 2.)

000126

EX 7   126

had been physically or sexually mistreated, she would have done nothing to protect her, afraid that defending Rosie would leave her (Rosie's mother) vulnerable to her husband's violence and rage. Ms. Alfaro explained the same fears almost a decade ago, in the context of a sexual assault at the age of eight or nine. One examining expert reported: "She did not complain out of fear of her father."[102] Another reported that he same fears extended to Rosie's mother:

> [A]bout age 8 or 9, she was raped by one of her father's male companions. She bled vaginally and did not report the incident to her mother because she felt she would be blamed.[103]

126.   Ms. Alfaro spoke about her dreams in other context as well. She reports a dream in which "one of my co-defendants" calls her over to her grandfather's house -- when she arrives at the house, she sees Autumn Wallace standing in the driveway.[104] She reports that after these dreams, she often wakes up not knowing where she is. When that happens: "I sit there and I just have to cry." Most of her dreams, it seems, are sad or frightening, so much so that on those occasions (apparently quite rare) when she wakes from a good dream, she makes herself go back to sleep. Asked about her current feelings, Ms. Alfaro thought for some time before answering: "I guess I'm a very depressed person. I stay in my room and sometimes don't come out for days."

## D.   Signs/Symptoms of Psychiatric and Neuropsychological Impairment

127.   Throughout my interviews and assessment of Rosie Alfaro, she displayed clear signs of both neuropsychological and psychiatric impairments. Most of the signs and symptoms of organic impairment -- including significant memory deficits, cognitive inflexibility, attentional deficits, and impairments in information retrieval -- are discussed in the next section. However, both her test performance and my clinical interview also revealed pronounced symptoms of ongoing psychiatric disturbances, especially those associated with major affective

---

[102]Edwards Report, p. 11.
[103]Morales Report, p. 5.
[104]Autumn Wallace is the young girl whom Ms. Alfaro was convicted of killing. Ms. Alfaro did not mention the name of the co-defendant who appears in her dreams.

000127

**EX 7   127**

and trauma-related disorders.

128.    Some these symptoms were reported by Ms. Alfaro herself, although not in the context of psychiatric disturbances.  Sleep disturbances, hypersomnia (excessive sleep), chronic fatigue (unrelated to physical exercise), decreased energy, changes in mood and energy levels, irritability, and weight fluctuations, as well as persistent somatic complaints (*e.g.*, headaches, rashes and heart palpitations) are extremely common among patients with chronic psychiatric disturbances, especially depressive disorders and/or trauma-based conditions.  These symptoms were repeatedly documented by institutional treatment providers throughout Ms. Alfaro's pre-trial detention in Orange County.[105]  They have subsequently been observed and documented by treatment staff at CCFW.[106]

129.    When I returned for our second day of testing last May, I was informed that our meeting would be postponed, as Ms. Alfaro had earlier suffered heart palpitations severe enough that she was transported to the institution's "skilled nursing facility," where she was monitored, assessed and treated by medical staff, apparently with Nitroglycerin.  This course of events was reported by Rosie herself, and confirmed by a correctional officer who was apparently in contact with treatment staff.  When Rosie was released from the clinic and our visit commenced, she was visibly drained, showing very little of the energy I had witnessed the day before.  She was visibly distressed by the morning's events, at times becoming tearful or dissociative.

130.    When Ms. Alfaro felt more relaxed, she spoke about that morning's events, including the history or similar episodes and the circumstances surrounding them.  The somatic symptoms she described were those frequently related to severe anxiety and a level of terror associated with chronic, severe post-traumatic responses.  The physiological symptoms she experiences are most often triggered by the strip searches to which Ms. Alfaro is subjected prior to each contact visit.  She explained that, during these searches, she often experiences sudden

---

[105]*See* 1990-1992 OCWJ records, documenting depression, anhedonia, skin rashes, insomnia, hypersomnia, headaches, breathing difficulties, irritability, hopelessness.

[106]*See* CCFW records, documenting anxiety, dizziness, depression, suicidal ideation, chronic migraine headaches, insomnia, binge-eating, vomiting, "sleep difficulty and nightmares," isolation/withdrawal, a weight gain of 100 pounds, and "lack of drive and motivation."

000128

EX 7    128

nausea, dizziness, some mental confusion, and what sounded like a profound level of helplessness and vulnerability. These are classic symptoms experienced when a traumatized individual is subjected to "internal or external cues that symbolize or resemble an aspect of the [original] traumatic event."[107] The parallels or associations between her early rape and the forcible handling of her body (including "body cavity searches," to use the institution's characterization) are obvious. The sense of dread and helplessness she described, the pronounced and sudden physical responses (often anxiety-based), and her reliving of the initial terror and devastating, yet hallmark features of ongoing Post-traumatic Stress Disorder. My professional opinion is that, despite the frequent and predictable exposures to this procedure, Ms. Alfaro is repeatedly and profoundly re-traumatized by the process. This speaks to the chronic nature of her condition and the severity of her suffering.

## IV.    TEST RESULTS / CLINICAL FINDINGS

### A.    Effort, Malingering and Validity

131.    Throughout our interviews, Ms. Alfaro was cooperative and engaged. She stated that she had been looking forward to my visit. She answered all questions to the best of her ability, seeming very eager to please me. Prior to commencing my interview, the lawyer who accompanied me stressed to Ms. Alfaro that her cooperation was extremely important. She seemed embarrassed when her inability to answer questions or comply with instructions became apparent. Indeed, during the test administration itself, there were several points where, pursuant to standardized testing protocol, I offered to move on to another test when she seemed unable to proceed. In every case, she insisted on continuing. For example, on the Block Design subtest of the WAIS-III, I stated (after several unsuccessful attempts on her part): "You can stop now if you want to." Ms. Alfaro's reply: "No, I've got it...No, wait, I'll get it." Similarly, on the Arithmetic subtest, I suggested that we move on to the next task. She seemed intent on figuring out the answer: "No, please, wait..."

---

[107]*DSM-IV-TR*, p. 468.

000120

132.     I detected no indications of any effort to malinger or intentionally perform poorly. Ms. Alfaro's test results confirmed this: she scored significantly better in some areas, but well below the mean in others. Moreover, the disparity in her performance was consistent -- *i.e.*, she consistently performed better on tests measuring specific abilities, and consistently worse in areas where one would expect lower performance, based on prior testing and other factors. Moreover, on those tests (or prior versions of the same tests) which had been previously administered, Ms. Alfaro's performance was remarkably consistent.[108] Such consistent results are another sign that Ms. Alfaro gave her best effort, such that my test results are not effected by any level of malingering. The results of my test administration provide a valid estimate of Rosie Alfaro's neuropsychological functioning.

## B.     Intelligence and Achievement

133.     To assess Ms. Alfaro's intelligence (cognitive capacity) and achievement (academic performance), I administered the Wechsler Adult Intelligence Scale-Third Edition [WAIS-III], and the Wide-Range Achievement Test-Third Edition [WRAT-3]. Both of these tests are considered to be highly reliable.[109]

134.     Ms. Alfaro's scores on the WAIS-III reflect a Full-Scale IQ [FSIQ] of 84, in the low average range. More significant, however, is a remarkably broad disparity between her Verbal and Performance IQ's. Ms. Alfaro's Verbal IQ [VIQ] was 74, a score which falls within the range of "borderline intellectual functioning." Her Performance IQ [PIQ], on the other hand, was 98, considered to be "average." While some discrepancy between Verbal and Performance IQ's is not uncommon, a spread of 18 points or more is considered clinically significant. A 24-point spread is highly unusual and strongly suggestive of organic brain dysfunction. As quoted

---

[108]*Compare, e.g.*, subtest scores of the WAIS-III administered last month with from the WAIS-R in 1990.
[109]*See, e.g.*, Kaufman, A.F. (1990). *Assessing Adolescent and Adult Intelligence.* Boston: Allyn & Bacon, Inc. Although somewhat critical of the test's popularity, Kaufman nonetheless states that "the WRAT-R, like its predecessor the WRAT is clearly the king of clinical assessment of achievement for children, adolescents, and adults." (p. 617.) The WRAT, or parts of it, was administered to Ms. Alfaro several times during elementary school.

000130

EX 7   130

in an earlier section: "Organic deficit usually manifests itself as the disparity between the verbal scales and the performance scales."[110] The correlation between a broad VIQ/PIQ disparity and the presence of organic brain damage is especially reliable among those whose Full Scale IQ's fall within the "normal" range generally, including those, like Ms. Alfaro, with scores at the low end of "normal."

135.   Ms. Alfaro's performance on the WAIS-III are consistent with her performance on the WAIS-R administered in 1990 by Dr. Rogers. At that time, Ms. Alfaro obtained a FSIQ of 78, with a 17-point discrepancy between her VIQ (73) and PIQ (90).[111] Although the actual scores obtained by Dr. Rogers varied slightly, they still fell within the general ranges of intellectual functioning.

136.   Moreover, although Ms. Alfaro's Full-Scale IQ is several points higher than that reflected in Dr. Rogers', that difference (which, in itself, has very little clinical significance) is readily explained by several factors. First, in administering the WAIS-R, Dr. Rogers omitted one of the subtests ("Object Assembly") generally used to compute Performance IQ. While that omission was considered acceptable under the existing protocol, its omission may well have lowered the overall computation of Ms. Alfaro's Performance IQ and, hence, her VIQ-PIQ disparity. Second, Ms. Alfaro was given the WAIS-R in October of 1990, only a few months after the tragic death of Autumn Wallace, Ms. Alfaro's arrest and incarceration, during a point of extreme stress and (very likely) the effects of withdrawal and enforced abstinence from street drugs to which she had been highly dependent. She was 18-years-old, pregnant with twins, and facing the death penalty. It is not at all surprising that, more than 10 years later, with the passage of time and a certain level of structure in her daily existence, Ms. Alfaro might perform slightly better on certain aspect of the WAIS. Moreover, it is generally accepted that the WAIS-III is a more reliable measure than its predecessor, the WAIS-R.

137.   The minor differences in IQ scores are far less clinically salient than other points.

---

[110]Pincus & Tucker, *supra*, at 187.
[111]*See* Computer-generated analysis of Ms. Alfaro's WAIS-R scores, including Dr. Rogers' handwritten notes, provided and referred to by Dr. Martha Rogers.

000131

First, the more pronounced VIQ-PIQ discrepancy both confirms and strengthens the likelihood of significant brain damage. Its consistency over time speaks to the reliability of her scores, as does a notable pattern of consistency among the various subtests.

138.    Ms. Alfaro's performance on the WRAT-3 is extremely significant. The WRAT-3 measures achievement (as opposed to aptitude) in Reading, Spelling and Arithmetic. Interpreting of the WRAT-3 includes a Standard Score (computed similarly to the Verbal IQ), the grade level at which the individual is performing, a percentile in which that places her. Ms. Alfaro Reading scores reveal a Standard Score of 75 (the equivalent of her Verbal IQ), which translates to the 5th grade level (approximately the fifth percentile). This is significant for several reasons. First, because her performance in this area has remained constant, it strongly suggests that she did in fact suffer from a true Learning Disability throughout her childhood and adolescence. Her notable difficulties with Reading in particular also implicate the parietal and temporal lobes, suggesting significant left hemisphere damage. Second, the consistency of her WRAT-3 scores with both her Verbal IQ and her performance on the MAS (discussed later), as well as testing conducted throughout elementary school, strongly support its reliability as a measure of her academic achievement.[112]   Finally, it calls into question the reliability of any testing conducted by means of written instruments.

## C.    Memory

139.    The Memory Assessment Scales [MAS], which I administered to Ms. Alfaro in its entirety, is a reliable and widely-recognized test of mnestic functions. It consists of 12 subtests, the scores of which are used to assess "short-term," "verbal," and "visual" memory. Ms. Alfaro's performance on the MAS revealed significant impairments in frontal lobe dysfunction, with specific deficits in attention, concentration, visual recognition, auditory discrimination, and retrieval. Ms. Alfaro's scores in these areas are consistent with those obtained in 1990 when Dr.

---

[112]Ms. Alfaro's school records reflect that she consistently read at a level at least two years behind both her chronological age and her grade level. (*See* Asprodites Declaration; ACSD records.) Ms. Alfaro never completed the seventh grade.

060132

EX 7    132

Rogers administered the Wechsler Memory Scale-Revised [WMS-R].

140.    The first two subtests of the MAS -- Verbal Span and Visual Span -- measure the individual's attention and concentration. Rosie Alfaro did extremely poorly on both subtests, scoring in the 9th and 5th percentiles respectively. Taken together, her Short-Term Memory score was 76, falling in the 6th percentile. These scores confirm chronic deficits consist with her reported history of Attention Deficit Hyperactivity Disorder [ADHD]. Attention is a complex function involving numerous areas of the brain, including the frontal lobes where, as discussed in the next section, Ms. Alfaro's most disabling impairments are localized.

141.    On Global Memory, Ms. Alfaro obtained a standard score of 79, roughly equivalent to her scores on Verbal IQ [74 on the WAIS-III] and Reading [75 on the WRAT-3]. Comparable performances on these test instruments is generally to be expected. However, given the discrepancies shown on other tests (between verbal and performance IQ's, for example, and verbal and visual aptitudes generally), one would have expected Ms. Alfaro to obtain markedly higher scores in Visual Memory. To the contrary, her Visual Memory Score (74) was a full 15 points lower than Verbal Memory, falling in the 4th percentile, or "severely" impaired. These results indicate not only the existence of left hemisphere brain injury, but a combination of both diffuse and localized damage.

142.    Ms. Alfaro's difficulties with visual memory were quite striking. In the Visual Reproduction subtest, the patient is asked to reproduce a design two times from memory, the second time after the introduction of a visual distraction. In Rosie's case, she had absolutely no recall of the design when asked to draw it the second time. I had to introduce the design twice in order for her to complete the test. This indicates that her visual memory is in fact worse than her scores reflect. Still, even with the second administration, her score reflected significant impairments.

143.    Specific subtest scores were also revealing. Of the five subtests measuring verbal memory, three involve "list recall," in which the examinee is asked to repeat back to the examiner a list of specific words falling into four categories (colors, countries, birds, and cities).

000133

On all three tests, Rosie Alfaro's scores were more than one standard deviation below the norm, two of them in the 9th percentile and the third in the 16th percentile. Qualitative analysis of her performance revealed intrusions -- *i.e.*, she not only missed words from the original list, but also produced words which had never been part of the exercise. These intrusions appeared in three of the four word categories. This is very typical of patients with frontal lobe damage. Her performance also suggested deficits in auditory discrimination (*e.g.*, missing the word "sparrow" but offering "farrow" instead). Her performance on Delayed List Recall was extremely poor (in the ninth percentile), showing significant deficits in information retrieval.

### D.    Overall Organic Brain Dysfunction -- Halstead-Reitan Deficits

144.    On the Halstead-Reitan Neuropsychological Battery, Ms. Alfaro obtained an Overall Impairment Index of 0.6, placing her squarely in the range impaired neuropsychological functioning.[113] This Impairment Index is generally considered to be a sensitive and reliable indicator of brain damage.

145.    Ms. Alfaro's performance on specific subtests is especially revealing. The Category Test, for example, is one of the core subtests used to compute an examinee's overall Halstead Impairment Index. It is also widely recognized as one of the most reliable measures of brain damage generally:

Of the tests in Halstead's battery, HCT [the Halstead Category Test] is generally

---

[113]The Halstead-Reitan Neuropsychological Battery is scored according to a standardized protocol, as follows: "Raw scores" are computed based on objective counts of correct or incorrect performance results. Raw scores are statistically transformed to T-scores. The average T-score is 50. The standard deviation is 10 T-score points; the number of standard deviations (*i.e.*, 10-point increments) indicates how far an individual's score deviates from "normal." A score of 39T-30T is between one and two standard deviations from normal. Clinically, this signifies "mild" impairment. Scores of 29T-20T are between two and three standard deviations, indicating "moderate" impairment. A score of 19T-10T is more than three standard deviations below normal and indicates "severe" impairment.

"Mild," "moderate" and "severe," as used in this context, are terms of art which, taken out of context, may be deceptive or misunderstood by lay persons. The low end of the "mild" range includes patients who score in the 6th percentile -- *i.e.*, individuals who are outscored by 94% of the population. Those scoring within the "moderate" range fall in the 2nd to 5th percentiles, outscored by 95 to 98% of the population. Those showing "severe" impairment -- three standard deviations below normal -- are more brain-damaged than 99% of the population. In other words, the difference between "mild" impairment and "severe" impairment can reflect as few or sic percentile points.

000134

EX 7   134

recognized as the most sensitive to the presence of brain damage regardless of its nature or location [ ].[114]

It is also considered to be sensitive to frontal lobe damage in particular.[115] On this test, Ms. Alfaro performed extremely poorly, scoring below the 5th percentile. The test computes the number of errors, with a cut-off of 52 mistakes -- *i.e.*, more than 52 mistakes indicates the presence of significant brain damage. Rosie Alfaro made 86 mistakes, revealing notable frontal lobe impairment -- at least "moderate," as defined in the clinical literature. Of the hundreds of patients I have tested, Ms. Alfaro's performance on this particular test was among the worst I have ever observed.

146.   Her poor performance on the Category Test is consistent with her notably slow performance on another subtest, Trail Making Part B, a timed test of conceptual "tracking," on which she also performed at the 5th percentile. This test is widely used as a measure of cognitive flexibility. Again, her performance on this test confirms at least moderate impairment in frontal lobe functioning. The findings of specific impairments in Ms. Alfaro's cognitive flexibility are consistent with strategies I observed in her performance on the Category Test. On the Category Test, Ms. Alfaro consistently repeated old (and unsuccessful) patterns of addressing the tasks presented, a form of cognitive rigidity reflected both in Trail Making Part B and several other tests. This rigidity was repeatedly reflected in her inability to inhibit unwanted responses -- that is, she was sometimes able to correctly identify a new pattern, demonstrating a limited ability to form new concepts, yet when asked to apply that pattern to new data, she invariably reverted to the older pattern which had clearly been identified as incorrect.

147.   Several other tests showed the same underlying impairments -- specifically rigidity, perseveration, and marked inability to inhibit unwanted or inappropriate responses -- with respect to Ms. Alfaro's motor skills. Three of the tests I administered are especially

---

[114]Lezak, *supra*, at p. 610, *citing* Cullum, C.M. & Bigler, E.D. (1986), "Ventricle size, cortical atrophy and the relationship with neuropsychological status in closed head injury: A quantitative analysis," *Journal of Clinical & Experimental Neuropsychology* 8:437-452; Goldstein, G. & Ruthven, L. (1983), *Rehabilitation of the brain-damaged adult.* New York: Plenum Press; King, M.C. & Snow, W.G. (1981), "Problem-solving task performance in brain-damaged subjects," *Journal of Clinical Psychology* 37:400-404.
[115]*See* Lezak, *supra*, citing numerous studies dating from the 1940's and 1950's.

sensitive to frontal and pre-frontal lobe deficits in motor functions and dexterity: the Go-No-Go Test, Sequential Hand Movements, and Rapid Alternating Movements. Ms. Alfaro's performance on all three tests indicate significant impairments, ranging from "mild to "moderate." The Rapid Alternating Movement Test requires the individual to imitate a series of hand movements involving the open palm and closed fist. Ms. Alfaro had difficulty with reciprocal coordination – *i.e.*, keeping one hand open and the other closed. In the Sequential Hand Movements Test, when asked to change the patterns, she was unable to make the necessary shift, repeating the previous pattern (perseverating) despite her earnest attempts to adapt to the new concept. This inflexibility in motor functioning is the equivalent of the significant mental inflexibility she displayed on the Category and Trail Making Tests, described above. Again, her deficits in these areas indicate damage to the frontal lobes.

148.    Additional evidence of Ms. Alfaro's frontal lobe dysfunction is her impaired performance on both the Ruff Figural Fluency Test and the Controlled Oral Word Association Test. In the first of these tests, the examinee is given a page with identical sets of dots and instructed to use lines connecting these dots in as many different ways as possible. Rosie Alfaro was unable to create the expected number of unique designs, reflecting inflexibility and perseveration in the graphomotor area as well. The second test is similar in that the patient is asked to generate as many words as possible using the same initial letter. Although Ms. Alfaro was able to provide an appropriate number of words, the number and nature of her perseverations were significant. While it is not uncommon for some to repeat a word already on the list, the repetition generally occurs after several intervening words. In Ms. Alfaro's case, she provided the same word with not a single intervening word. Again, this is a sign of serious cognitive inflexibility.

149.    It should be noted that individuals with frontal lobe deficits, even severe deficits, often appear to the lay person as being relatively intact. As a result, the severity, or even the existence, of their organic deficits is often overlooked or assumed to be less devastating than it actually is. Thus, people with lobe impairments are often expected to function at a level which is

60

beyond their abilities, held to expectations which they are simply unable to meet. It should also be noted that frontal lobe deficits have been linked to dissociative symptoms and disorders. This is consistent with Rosie Alfaro's clinical history,[116] as well as her presentation during our interviews.

150.    Ms. Alfaro's performance on other tests suggested right hemisphere dysfunction as well. Impairments were evident on the Seashore Rhythm Test, a test of non-verbal auditory perception which is especially sensitive attention and concentration deficits. Poor performance on this test also suggests deficits in her ability to recognize or "track" rhythm patterns, suggesting right temporal lobe dysfunction. Ms. Alfaro also scored in the "impaired" range on the Grooved Pegboard, which measures discrepancies in motor performance between the individual's dominant and non-dominant hands. In non-damaged individuals, there is often a "10% advantage for the dominant hand."[117] A more pronounced discrepancy suggests damage on he side of the brain "contralateral" (or opposite) to the non-dominant hand. The dominant/non-dominant difference exhibited by Rosie Alfaro was significantly greater than expected, a full 1-a standard deviations below the mean. Again, this suggests some level of dysfunction in the right hemisphere. Thus, in addition to localized damage to the frontal lobes, it appears that Rosie Alfaro also suffered diffuse deficits in both the right and left hemispheres.


## V.    CONCLUSIONS

151.    Rosie Alfaro suffers from serious organic brain damage. The neuropsychological testing I conducted identified both localized dysfunction -- primarily in the frontal lobes -- and diffuse damage in both the left and right hemispheres, affecting her overall cognitive and neurological functioning. As a result of these impairments, her abilities to plan or carry out a

---

[116]See, e.g., 3/29/92 Morales Report, p. 5, describing episodes of "blocking out." Dissociative symptoms and episodes are also associated when early childhood victimization.
[117]Lezak, supra, at p. 676.

060137

EX 7    137

specific course of action, to act independently or make informed decisions, to interpret social or interpersonal cues (whether verbal or nonverbal), to assess her environment or specific situations and respond rationally or thoughtfully, are severely and chronically impaired. These impairments, debilitating in themselves, are likely to be exacerbated both by the presence of drugs and her ongoing dependency, and by the residual, long-term effects of chronic substance abuse, which is essentially a form of repeated exposure to highly damaging neurotoxins.

152.    Ms. Alfaro's ability to accurately perceive, retain and relate even basic information is severely impaired. Her perceptions of herself and others, and her ability to interpret basic social cues and the intentions of those around her, are often profoundly distorted. Moreover, Ms. Alfaro's ability to retain information and relay that information accurately (even as accurately as it was originally perceived) is seriously impaired. These impairments, individually and cumulatively, have left Ms. Alfaro an unreliable reporter of details, highly vulnerable to the influence and suggestions of those around her. They have also resulted in inconsistent reports by Ms. Alfaro which have raised the specter of manipulation and intentional dishonesty. Given her extensive impairment, such characterizations are highly suspect and likely ill-informed. Any characterizations or assumptions which overlook or fail to consider the effects of her multiple, severe impairments do her an extreme disservice and lack clinical credibility.

153.    The damage to Ms. Alfaro's brain was present at the time of trial. The signs and symptoms of this damage have been documented since elementary school and the findings and observations of numerous clinicians confirm that both the existence and the severity of her impairments are longstanding and irreversible. Moreover, the effects of her organic impairments are compounded by several co-existing conditions, including chronic underlying mental illness,

000138

seriously compromised intellectual functioning, and chronic substance abuse and dependency. At critical points in her life, the effects of her organic impairments have also been exacerbated by her history of chronic physical and psychological trauma. While it is impossible to determine the causes of these conditions, it is clear that their symptoms and effects are inter-related and cumulative.

154. It is my professional opinion that findings consistent with the foregoing would have been reached at the time of Ms. Alfaro's arrest and trial, had she been evaluated by a qualified neuropsychologist. It is also my opinion the need for a thorough neurological assessment was abundantly clear at all points relevant to Ms. Alfaro's trial, and for many years prior to that time. That assessment was never conducted. Until my assessment, the nature and extent of Rosie Alfaro's brain damage was never investigated or understood. Because this critical information was never obtained, all assessments of Rosie Alfaro's mental state rendered prior to her 1992 trial were incomplete and unreliable.

155. The many indicators of organic brain damage and the records documenting them (detailed in section II.A., above), coupled with the observations and impressions of the experts who examined Ms. Alfaro pre-trial, were sufficiently powerful and consistent to warrant further investigation of her mental state. This should have included interviews aimed at obtaining data and observations from a broader range of family members, other lay witnesses, and prior examining professionals. This additional investigation, including critical witness interviews, was essential to an accurate assessment of any issues pertaining to Rosie Alfaro's mental state and personal history.

156. Given Ms. Alfaro's long history of mental illness and substance abuse, any statements made while she was under the influence of drugs or experiencing symptoms of drug

63

000130

EX 7   139

withdrawal were very likely inaccurate, incomplete, or otherwise unreliable. The same is true of any statements made by Ms. Alfaro regarding events, perceptions, memories, or her own mental state which took place when she was using or withdrawing from drugs or alcohol.

157.   Ms. Alfaro's combined disabilities suggest that she well have been unable to assist in the preparation of her defense. Her profound deficits in memory and comprehension make it likely that she was unable to comprehend the issues involved in her case or to accurately relate to counsel relevant information concerning the offense, including but not limited to the extent of her participation and the roles played by others in that offense, and her personal history and experience, especially regarding the extent and consequences of her own impairments. These obstacles were almost certainly compounded by her age (18 years old at the time of arrest, 20 when convicted and sentenced to death) and the unique circumstances of her pre-trial detention, including giving birth to twins while in custody and the prolonged separation from her four sons. Given her history of victimization and betrayal, the combined stress of protracted legal proceedings including two hearings to determine whether she would live or die), the courtroom setting itself, and her perception of hostility from both the judge and her own attorney very likely produced further mental decompensation.

158.   Mental illness is not static. Especially in individuals like Rosie Alfaro, who suffer multiple disabilities, mental state can quickly deteriorate, especially in response to changes in environment, physical illness or medical conditions, external stressors, changes in psychiatric or other medications, or even the passage of time. Ms. Alfaro's history includes episodes of severe depression, a range of physically and emotionally self-destructive behaviors, and numerous suicide attempts. Given this history and the severity of her impairments, Ms. Alfaro's in-custody suicide attempt in October of 1991 should have triggered a re-investigation of her mental state

000140

**EX 7    140**

Similarly, her transfer to the mental health unit prior to her second penalty phase trial should have caused all parties to re-assess her mental state and competency to proceed.

159. My clinical findings and observations, confirming the presence of significant organic brain damage, including profound frontal lobe deficits, are extremely relevant to several specific factors, set forth in Penal Code § 190.3, to be considered in determining Ms. Alfaro's penalty. It is my opinion that at the time of this offense, Ms. Alfaro was serious mentally impaired. She suffered the cumulative effects of longstanding brain damage, low intelligence, and a serious psychiatric disorder characterized by chronic depression and dissociative features, all while under the influence of heroin and cocaine in significant quantities. As a result, her ability to conform her conduct to the requirements of the law, control her behavior, or comprehend the consequences of that behavior was severely impaired. At the time of the offense, Ms. Alfaro was only 18 years old and extremely immature. She had minimal education, profoundly impaired judgment, a mental age far below her chronological age of 18, and a long history of neglect, abandonment, sexual victimization, and physical abuse. It appears that her participation in the homicide was prompted, at least in part, by threats to herself and her 1-year-old son, who was at that moment in the physical custody of an older, domineering male co-defendant, a recently-released ex-convict with a known propensity for violence who had driven Ms. Alfaro to the crime scene.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 14th day of July, 2001 in San Francisco, California.

NATASHA KHAZANOV, PH.D.

65

000141

EX 7   141