

## DECLARATION OF PABLO STEWART, M.D.

I, Dr. Pablo Stewart, declare as follows:

1.      I am a physician licensed to practice in California, specializing in clinical and forensic psychiatry. I received my Doctor of Medicine degree in 1982 from the University of California-San Francisco School of Medicine. I received a Bachelor of Science degree in 1973 from the United States Naval Academy in Annapolis, Maryland, with a major in chemistry. In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment in public sector psychiatry. In 1985-1986, In was the Chief Resident in the department of Psychiatry at San Francisco General Hospital, where my duties included the direct clinical supervision of all other psychiatric residents and medical students.

2.      I have extensive clinical experience in the diagnosis and treatment of patients with substance-related disorders, including those who are "dually-diagnosed" -- *i.e.*, those who suffer from both substance abuse/dependence and a major mental illness. I am the author and co-author of numerous articles published in peer review journals on topics including the treatment of substance abuse and psychotic disorders, unique issues arising from dual diagnoses, and psychopharmacology. I have also worked for many years in community-based mental health programs, including those specifically designed to assess and treat patients with Posttraumatic Stress Disorder [PTSD] and other trauma-based disorders and syndromes. I have worked closely with state and local government agencies in designing and presenting educational programs about substance abuse and mental illness.

3.      I have held faculty appointments since 1989 at the University of California-San Francisco [UCSF] School of Medicine, where I am currently an Associate Clinical Professor. During my tenure at UCSF, I have taught courses on alcoholism and substance abuse, facilitated a weekly seminar for psychiatric interns called "Psychiatric Aspects of Medicine," and lectured at the School of Pharmacy on issues including

1

000142

**EX 8**    142

substance abuse and addictionology. I have also supervised medical students in the assessment and treatment of dually-diagnosed patients (mentally ill substance abusers) at the Haight Ashbury Free Clinic's Psychiatric Community Clinic. In 1987, I received the Henry J. Kaiser Award for Excellence in teaching. I have been named among the top ten faculty members at the UCSF School of Medicine for the academic years 1988-1989, 1990-1991 and 1994-1995.

4.     I am currently Chief of Psychiatric Services at Haight Ashbury Free Clinic, a position I have held since 1991. From 1997 to 1998, I was also Director of Clinical Services for San Francisco Target Cities Project. I have held numerous positions with the Department of Veterans Affairs Medical Center in San Francisco, including: Chief of their Intensive Psychiatric Community Care Program; Chief of the Department's Substance Abuse Inpatient Unit; and Medical Director of the Comprehensive Homeless Center.

5.     From 1986 to 1990, I was Senior Attending Psychiatrist of San Francisco General Hospital's Forensic Unit, a locked inpatient psychiatric facility, where my duties included frequent consultations with the San Francisco City Attorney's Office. In 1989 and 1990, I was also Director of Forensic Psychiatric Services for the City and County of San Francisco. I was a Physician Specialist to the Westside Crisis Center (1984-1987) and the Mission Mental Health Crisis Center (1983-1984), both of which are city-funded outpatient programs in San Francisco.

6.     I currently serve as medical and psychiatric consultant to the Institute of crime, Justice and Corrections at George Washington University, the agency appointed to monitor a memorandum of agreement between the state of Georgia and the federal government. The agreement is intended to improve the quality of medical and psychiatric treatment services, as well as educational programs, in state-run juvenile correctional facilities. I have been qualified and testified as an expert witness in both state and federal courts, including Madrid v. Gomez, a class action lawsuit addressing,

000143

among other issues, the quality of psychiatric services provided to inmates at Pelican Bay State Prison; and Gates v. Gomez, concerning the psychiatric care provided at the California Medical Facility-Vacaville. I am currently Technical Assistance Consultant to the Center for Substance Abuse Treatment, a federal program under the Department of Health and Human Services' Substance Abuse and Mental Health Services Administration. I am also the Psychiatric Consultant to the San Francisco Drug Court.

## I.    Referral Questions and Materials Reviewed

7.     Current counsel for Maria Del Rosio ("Rosie") Alfaro has requested that I conduct a psychiatric evaluation of Ms. Alfaro and address relevant aspects regarding her personal and familial history, her mental state at the time of the offense of which she was convicted, the circumstances leading to and surrounding the offense, and her emotional and psychiatric conditions at the time of her arrest and trial. Specifically, I have been asked to assess the nature and severity -- both individually and cumulatively -- of her impairments, as well as the nature and significance of attempted clinical interventions during her childhood and adolescence.

8.     As part of my evaluation, I have reviewed several volumes of documents, records, reports and other data pertaining to Rosie Alfaro, her biological family, and their life experiences (individually and as a family). These included Ms. Alfaro's medical, mental health and hospital records from childhood to the present; her school records (including her Special Education file); employment records; juvenile law enforcement records; and drug rehabilitation records (inpatient and outpatient). They also included vital records, medical and hospital files, criminal records, probation reports, and other documents regarding Ms. Alfaro's siblings, parents, children, and extended family members.

9.     I have reviewed law enforcement and court records relating to the 1990 offense of which Ms. Alfaro was convicted, as well as testimony, exhibits, and other

3

000144

court documents from her 1992 capital trial and both penalty phase hearings. These included reports, testimony, and raw test data of mental health professionals who testified or otherwise assisted in Ms. Alfaro's defense, including Martha Lee Rogers, Ph.D., Consuelo M. Edwards, M.D., Armando Morales, D.S.W., and Bruce Danto, M.D. I have been provided with Ms. Alfaro's medical and mental health records from the Orange County Women's Jail [OCWJ] (1990-1992) and California Department of Corrections [CDC] (1992-2000), as well as sworn declarations from Dr. Martha Rogers and several individuals, including family members, who have known Ms. Alfaro at critical points in her life. I have also read declarations recently provided by several mental health professionals, including Drs. Cynthia Asprodites, Charles A. Sanislow, and Natasha Khazanov. All of the materials I reviewed contain the type of history, observations, and other data that competent mental health professionals routinely and properly rely upon in assessing patients and formulating reliable expert opinions.

10.    Finally, I conducted a series of clinical interviews with Ms. Alfaro at the Central California Facility for Women [CCFW] in Chowchilla, California. These interviews took place on two occasions over a period of three months, for a total of approximately six hours. The interviews covered historical information about Ms. Alfaro's medical and psychiatric history, her history of substance abuse/dependence, and her memories and perceptions of critical experiences from her childhood and adolescence, as well as a structured mental status examination.

## II.    Background and History

11.    An accurate psychiatric assessment requires a thorough understanding of the patient's background, including the medical and psychiatric histories of immediate and extended family members and the familial patterns which emerge. One of the most widely recognized texts on psychiatric diagnosis and treatment states that a thorough assessment must include "a complete family history (including the patient's relationships

4

000145

with significant individuals, the role of illness in the family, and a history of mental illness within the extended family."[1]  A detailed family history is essential for several reasons.  First, it is generally understood that there is a genetic component to the etiology of many of the major psychiatric disorders, including the serious mood (or "affective") disorders (e.g., Major Depression, the other depressive disorders and Bipolar Disorder) and anxiety disorders (e.g., Posttraumatic Stress Disorder).  The same is true for substance-related disorders (e.g., alcoholism and drug abuse/dependence), as well as learning and behavioral disorders (e.g., Attention-Deficit/Hyperactivity Disorder and learning disabilities).  Thus, certain individuals are at increased risk of developing psychiatric conditions similar to biological relatives.[2]

12.     Many medical illnesses, especially neurological disorders, have enormous implications for an individual's mental state and behavior, often influencing (even disrupting) the entire family's emotional functioning.  Furthermore, many medical conditions have associated psychiatric features or consequences.  For example, epilepsy and other seizure disorders (suffered by Ms. Alfaro's brother throughout his childhood and adolescence) can cause significant impairments in memory, mood and perception; chronic pain is oft-en accompanied by severe depression or mental confusion; and

---

[1] Kaplan, H.I. & Sadock, B.J. (Eds.) (1995).  *Comprehensive Textbook of Psychiatry-Sixth Edition*, p. 526. This edition reiterates the standards articulated in earlier editions.  *See also* Ludwig, A.M. (1986), *Principles of Clinical Psychiatry (Second Edition-Revised)*.  New York:  The Free Press, at p. 37.  The same standard of care is specifically recognized in forensic settings.  *See, e.g.,* Bonnie & Slobogin (1980), "The Role of Mental Health Professionals in the Criminal Process:  The Case for Informed Speculation," 66 *Va. L. Rev.* 427.

[2] *See Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition-Text revised [DSM-IV-TR]* (2000).  Washington, DC:  American Psychiatric Association.  The *DSM*, first published by the APA in 1952 and periodically revised, sets forth the diagnostic criteria for all mental disorders.  The version in use at the time of Ms. Alfaro's arrest and trial (the *DSM-III-R*) and all subsequent revisions have stressed the genetic component of these psychiatric disorders.

Each revision of the *DSM* has included some changes in the standard diagnostic nomenclature. Some changes are semantic (e.g., Major Depressive Disorder, as opposed to Major Depression).  In other cases, new diagnoses have been included to recognize conditions which had previously been unnamed or otherwise characterized (e.g., Posttraumatic Stress Disorder, which was added to the *DSM-III* in 1980).  I use upper case letters when discussing specific diagnoses, as currently labeled; or to distinguish between psychiatric symptoms (or descriptions) and diagnoses at the relevant time (e.g., depression as a symptom, as opposed to Depression, a *DSM-III* diagnosis).

000146

migraine headaches (documented throughout Ms. Alfaro's jail and prison records) can cause a range of psychiatric symptoms, including depression and anxiety, disorientation, even hallucinations.[3]

13.    Moreover, an individual's mental state can be caused, exacerbated or complicated by her life experiences; one's environment and early development can have a powerful effect on mental health.  Thus, factors such as familial attitudes toward children (including incest and other forms of child maltreatment), the presence of mentally ill or drug-addicted family members, social disenfranchisement, cultural attitudes toward mental illness and medical treatment, economic deprivation, availability of community resources (including clinical and educational services) and access to those services, and the presence or absence of support -- financial and otherwise -- can shape and influence an individual's emotional development, cognitive functioning, and overall behavior.

### A.    Family History

14.    Rosie Alfaro was born in Orange County, California on ▮▮▮▮▮ 1971. She is the eldest of three children born to Silvia Melendez and Jose Luis Alfaro. According to Rosie's mother, both she and Rosie's father were born in a small rural village in Michoacan, Mexico, both of them in 1953.  They married in that village, called Tangancicuro.  A second child, Silvia Alfaro, was born in Tangancicuro in 1973.  Their third and last child, Jose Luis Alfaro Jr., was born in Anaheim, California in 1979.

15.    Ms. Alfaro[4] also has three younger half-brothers -- Ricardo, Salvador and Alejandro -- born to her mother during two subsequent relationships between 1989 and

---

[3]*See generally* Kaplan & Sadock, *supra*, at pp. 819-820.  Other medical conditions with psychiatric symptoms include hypertension, diabetes, thyroid disorders, syphilis, liver failure, Parkinson's disease, blunt head trauma, and cardiovascular disease, some of which appear in the records or are observed in lay reports regarding Ms. Alfaro's first- and second-degree relatives.
[4]To avoid confusion, I use "Ms. Alfaro" only when referring to Rosie Alfaro.

000147

EX 8    147

1992. The youngest was born during Rosie Alfaro's trial. (Silvia Melendez Declaration, paras. 1 & 7; Silvia Alfaro Declaration, para. 1.) Ms. Alfaro also has a half-sister, Wendy Alfaro, born in Anaheim in 1977, while Rosie's parents were still married. Rosie and Silvia (Rosie's full sister) have apparently never met Wendy.[5] (Arcueta Declaration., paras. 1-2; Silvia Alfaro Declaration, para. 1.)

### 1.     Maternal family

16.     Rosie's mother was the eldest of six children born to Mercedes Guillam and Jose Melendez, all in Tangancicuro, Mexico:

> I was born on ▓▓▓▓▓▓▓, 1953 in the village of Tangancicuro, located in the state of Michoacan, Mexico. My brothers and sisters include Rosa Melendez Sanchez, 46, Guillermo Melendez, 40, Jose Melendez, Jr., 38, Mercedes Melendez, 36, and Arturo Melendez, 31. (Silvia Melendez Declaration, para. 2.)

Ms. Alfaro's uncles -- Guillermo, Jose and Arturo -- are known as "Memmo," "Pepe" and "Turo." Rosie and her Uncle Turo are only five years apart. (Silvia Alfaro Declaration, para. 2.)

17.     Details about Rosie's maternal grandparents and the generations before them are sketchy. Few records of any kind were kept in small Mexican villages, so most of the available information comes from family members, primarily by or through Silvia Melendez. She reports that both her father and grandfather were alcoholics, although her father, still alive, no longer drinks. (Silvia Melendez Declaration, para. 14.) For Silvia and her siblings, Jose Melendez's alcoholism, and the violence that accompanied it, left a frightening and enduring legacy: "When I was young, my father was an alcoholic and had violent fights with my mother. I remember hearing them fight and being very scared by it." (*Ibid.*, para. 14.) The combination of alcoholism, the violence, and the pervasive

---

[5]Wendy Alfaro was born to Jose Luis Alfaro and Marcy Arcueta when Rosie was 6 years old; she has never met her (their) father. Ms. Arcueta has not seen Rosie or Silvia since they were children. (Arcueta Declaration, paras. 1-2.)

000148

**EX 8    148**

lack of safety they experienced was repeated decades later in Silvia's marriage to Rosie's father:

> Jose still drank every weekend and still beat me....The only person who tried to help me was my brother Guillermo....Guillermo said that he remembered how bad things were when my father was drinking and that he did not want me to suffer in the same way with my own family. (Silvia Melendez Declaration, paras. 13-14.)

18.    After Rosie's maternal grandparents left Mexico, her great-grandmother raised her aunts and uncles until she died in the early 1970's. (*Ibid.*, para. 5.) Descriptions of the great-grandmother suggest that she suffered from either some form of mental illness or medical condition(s) with psychiatric sequelae:

> I do not know what my grandmother died of, but I do know that she lost her mind at the end and that she could not recognize anybody a lot of the time. She had high blood pressure and was sick in her brain and her stomach. (*Ibid.*)

It is probably impossible to determine whether the "sick[ness] in her brain" was the result of a medical illness or a longstanding psychiatric condition. I should note, however, that it is fairly common for lay persons to seek medical labels for unfamiliar or frightening symptoms and aberrant behaviors, including those which are clearly psychopathological. Medical conditions are considered more palatable and less stigmatizing than psychiatric diagnoses.

19.    Silvia Melendez describes an extended family that struggled to survive in rural Mexico and eventually looked to the United States for a better life:

> My father worked as a carpenter, but as I was growing up, there was less and less work. Our family was poor and it was very hard for people to make a living there. My father's sister, Amalia, had come to the United States and was living in Livingston, California. She told my father that he could get work in California picking fruit and vegetables. My father first came to California around 1965 and worked picking almonds, sweet potatoes, apricots and peaches. (Silvia Melendez Declaration, para. 3.)

20.    Jose Melendez's attempts to find work resulted in long periods of separation from his wife and family:

8

> My father...lived in California during the picking season, for about seven or eight months, and during the rainy season he came home to Mexico. He did construction work in Mexico during the four or five months of the agricultural off-season. [He] traveled between California and Mexico for about three years. (*Ibid.*)

All six of the Melendez siblings eventually settled in Anaheim, but only after lengthy separations and numerous upheavals and changes in the family constellation. At 15, Rosie's mother moved to California while her brothers and sisters stayed behind:

> When my father returned to California in August of 1968, my mother and I came with him. My brothers and sisters stayed...with my father's parents....After three months we went back to Mexico for a visit. My mother's sister, Teresa Guerra, who was also visiting Tangancicuro at that time...told us that we should come to Anaheim because there was a lot of work and that it would not be so hard as picking fruit....We moved into a one-bedroom apartment on Michelle Street. (Silvia Melendez Declaration, para. 4.)

Three years later, Rosa and Guillermo (then 16 and 10 years old), joined their parents and older sister in the United States. It was another two or three years before the rest of the family was re-united: "My brothers Jose and Arturo and my sister Mercedes only came to the United States in 1973 or 1974 when my grandmother passed away." (Silvia Melendez Declaration, para. 5.) Jose Jr., the oldest of the three, was 10 or 11 years old. Neither Silvia nor her parents spoke English when they arrived in California. Spanish is still their primary language:

> Within the family, especially with our grandparents, we speak only Spanish. My mother's English is now quite good, but we spoke Spanish in the house when we were growing up....When someone in the family had to communicate with English-speakers, my Aunt Mercedes often translated....I often play that role now. (Silvia Alfaro Declaration, para. 4.)

### 2. Paternal family

21. Jose Alfaro's parents were both alcoholics. His father (Rosie's grandfather) was reportedly violent toward both Jose and his mother:

9

> Both of Jose's parents were alcoholic and Jose would tell me that he had seen his father beat his mother many times....Once, when we were visiting Mexico, both Jose and his father were 'drunk and got into a fight. Jose was very angry and reminded his father about the time that he (Jose's father) had hit Jose's mother over and over with the handle of his gun. The fight became very violent and the police came. (Silvia Melendez Declaration, para. 17)

The records regarding Mr. Alfaro make no mention of any siblings.

22.    Jose Alfaro's family believed in phenomena that might be described as either deeply religious or highly superstitious -- Silvia Melendez describes it as "magic." Their history must be seen in that context:

> Jose's father...was sick for many years, and he believed that he had been cursed by a witch. He had an infected foot and pieces of it became rotten and came off, but the doctors told him that it was not gangrene. He went to regular doctors, but when he wasn't cured, he started going to witch doctors. He spent a lot of money on those doctors over the years. Jose's father and mother had to sell all their cows and horses, except one horse, to pay the bills. (Silvia Melendez Declaration, para. 16.)

Like medical diagnoses, religious or spiritual causes for unusual behaviors or phenomena are frequently preferred over clinical (psychiatric) explanations. In this case, the family's responses to illness might reflect significant psychopathology (*e.g.*, somatic delusions, irrational belief systems, hyperreligiosity).

### 3.    Ms. Alfaro's parents

23.    Silvia Melendez and Jose Luis Alfaro were 17 years old when they married and 18 when Rosie was born. They had very little education and spoke no English when they moved from their village in Mexico: "I finished the sixth grade in Mexico and only wrote in Spanish." (*Ibid.*, para. 9.) They both worked long hours at low-paying jobs, Silvia as a maid and Jose as a busboy. They lived with Silvia's parents until they could afford a small apartment in "Little Tijuana" or "Little T.J." (*Ibid.*, para. 7.) Throughout their marriage, they struggled economically:

000151

EX 8    151

I worked [at the Disneyland Hotel] many different shifts -- day, swing and night shifts -- and would work for twelve to fourteen hours a day. During one period of over a year, I worked sixteen to eighteen hours a day. I also worked on weekends for many years. (*Ibid.*, para. 10.)

24.     The stressful working conditions were compounded by racial hostility, as Silvia Melendez Alfaro sought to advance her position:

When I first worked as a supervisor, the American women did not want to take instructions from me because I am Mexican. Sometimes I would inspect the rooms and they would still be dirty...[I]f I would show this to the American women and ask them to finish the job, they would tell me to clean it myself. (*Ibid.*, para. 9.)

Even her use of the term "American women" suggests both the estrangement she experienced in general and its effects on the workplace in particular.

25.     Like his father and grandfather, Jose Luis was a violent alcoholic:

From the very beginning of our marriage, Jose would beat me. At first, Jose only hit me on the weekends when he had been drinking, but he started drinking more and more, and the beatings came more often. He would only hit me when he was drunk, but he was drunk more and more often as time went by..." (*Ibid.*, para. 8.)

Silvia Melendez's reports are corroborated by other family members, including her sister Rosa, who describes Jose as an alcoholic who "got very drunk and fought with my sister, even when the children were young." (Declaration of Rosa Sanchez, para. 4.) The relationship between his drinking and his physical violence is a consistent theme in family reports:

When we were children, my father was often violent toward my mother. In me memory, the violence was almost always related to drinking. (Silvia Alfaro Declaration, para. 11.)

26.     Ms. Melendez's account of their homelife in 1977 reveals a pattern of familial violence which extended beyond her relationship with Jose Alfaro:

[W]hen I learned about Jose's child by another woman I was very hurt and I moved into my parents' house with Rosie and Silvia....Jose still drank every weekend and still beat me. My father and mother would always take Jose's side during these fights....They believed that a woman should stand by her husband.

11

000152

EX 8    152

My father once threw me out of the house, telling me that it was his house and if I didn't like how I was being treated by Jose, that I could leave. (*Ibid.*, para. 13.)

The pattern eventually became evident to Rosie's mother: "I believe that he felt sympathy for Jose because of his own alcoholism." (*Ibid.*, para. 14.) Her statement is echoed by Rosie's sister: "My grandfather had been an alcoholic, so I think he felt sorry for my father." (Silvia Alfaro Declaration, para. 13.)

27.    Rosie's mother, the battered wife, was blamed not only by her husband, but by her own parents: "[They] usually believed that I was at fault for Jose's beating me and for his drinking." (Silvia Melendez Declaration, para. 15.) She also describes ways in which Jose Alfaro's violence and hostility was manifested in the superstitions (or "magic") of the culture of his parents:

> When I was cleaning Jose's bedroom in the garage, I found a small doll under the bed that was made with my stockings and had a small picture of me on its face. It had small nails stuck all over it  I know that Jose believed in these things. I called my mother to show her the doll and she started crying for me." (*Ibid.*, para. 15.)[6]

28.    In 1980, Silvia received one of several promotions within hotel housekeeping staffs. She associates this time with an increase in both her husband's drinking and the violence within the home:

> Jose was very angry that I was offered a promotion....During this time, Jose started drinking more and more. He was working full time at Carl Jr.'s in their warehouse and he would only drink on the weekends, but he would be drunk every Friday, Saturday and Sunday....[H]e would hit me in the face with his fists, and I often had black eyes and split lips. He would also kick me in the legs with his boots. (*Ibid.*, paras. 11-12.)

Rosie's sister describes the pattern that emerged:

> My father came home drunk and my mother came home tired after work. He got mad and abused her, first verbally and then with his fists. We watched the same scene over and over again. (Silvia Alfaro Declaration, para. 14.)

---

[6]This account suggests that the superstitions held by Jose's family were held (or respected) by the Melendez family as well.

00015<

EX 8    153

29.     The verbal abuse sustained by Silvia Melendez was frequent and demoralizing, reinforcing the battering dynamic between Jose and Silvia that shaped Rosie's childhood and adolescence.  Silvia's job was a common theme.  In the mid-1970's, when she was promoted at the Grand Hotel, Jose reacted by attempting to undermine her sense of her own worth:

> He [Jose] told me that they were only promoting me so that they could see me fail and fire me.  He told me that I was stupid.  I believed him at first, but I took the job anyway. (*Ibid.*, para. 11.)

In 1980, "he told me that the only reason I was being promoted was because I was a 'kiss ass.'" (*Ibid.*, para. 11.)  These insults were not isolated incidents.  Rosie's sister describes their father's behavior as consistently and intentionally hurtful, part of an ongoing assault on their mother's self-esteem:  "He found whatever excuse he could to berate and insult her.  He constantly told her that she was stupid and worthless." (Silvia Alfaro Declaration, para. 11.)

30.     Before Rosie reached adolescence, her father using similar tactics to intimidate and control his daughters:

> [W]henever he was drunk, he would find some reason to hit us.  In addition to the beatings, he screamed at us and insulted us, calling us stupid and worthless, just as he did to our mother....He also called us "sluts," especially Rosie.  His insults were very hurtful to both of us, but I think they went deeper for Rosie.  She had such low self-esteem and already felt so badly about herself that his name-calling hurt her very deeply. (Silvia Alfaro Declaration, para. 16.)

31.     Silvia Melendez reports that she sometimes responded physically to her husband's violence:

> At first I would not fight back because I was scared of him, but I began to fight back more and more.  Sometimes I defended myself with a lamp or a broom or other things around the house. (Silvia Melendez Declaration, para. 12.)

Jose apparently acknowledged a certain level of violence in the household.  Marcy Arcueta, the mother of Rosie's half-sister, characterizes the relationship between Jose and Silvia in very different terms, suggesting that Silvia may have initiated the violence:

*000154*

**EX 8   154**

> [H]e was still living with his wife and she was a very difficult woman. I knew
> that she had once stabbed her husband and injured him. Jose told me that he and
> his wife fought constantly. When I saw him, he often had bruises and marks on
> his body. I believe that she [Silvia] caused these injuries during their fights at
> home. (Arcueta Declaration, para. 2.)

Silvia Melendez's account and that of her husband's mistress are not necessarily

inconsistent. Both describe a household steeped in unpredictable violence.

32.    Jose Alfaro left his wife and children in the mid-1980's and returned to

Mexico, where he lived with his mother until his death in 1996. Small details of the

intervening years are provided by Silvia Melendez, whose family was (by her account)

still reluctant to support her efforts to escape him:

> I told Jose that I needed help with Rosie. I said that if he wouldn't help me, then I
> could not continue living with him. He said that he wanted to leave. He told me
> that he would have gone to Mexico but that he did not have enough money. I
> asked my father for money to give to Jose so that he could go to Mexico. He
> refused, but my brother Guillermo gave me the money. I went to Jose the next
> day....He said that he wanted to leave, so I bought him a ticket, packed all of his
> clothes, and told him to go. This was in 1986. He came back within a year and
> asked me to take him back, but I said that it was too late. I never saw him again
> after that. (Silvia Melendez Declaration, para. 21.)

By his daughter Silvia:

> My father died about four years ago in Mexico. He had left the family many
> years earlier, around 1985 or 1986, and was living with his mother in the village
> where he was born....By the time he left the family, he was drinking and getting
> drunk every day. (Silvia Alfaro Declaration, para. 6.)

By Jose Alfaro, Jr.'s probation officer:

> His [Jose Jr.'s] father passed away in 1996 from a diseased liver, caused by
> alcoholism. After the divorce, his father deserted the family and went to Mexico
> to live.[7]

---

[7] 1/29/99 Pre-Sentence Report, *supra*, p. 14. This report, like Ms. Melendez's account, indicates that Jose
Alfaro and Silvia Melendez were divorced in 1986. I have seen no records confirming either their marriage
or their divorce.

14

### 4.    Ms. Alfaro's children

33.    Rosie Alfaro is the mother of four sons. Her first child, Daniel ("Danny") Alfaro, was born ███████, 1987.[8] Ms. Alfaro was 15 years old. Danny reportedly weighed 10 pounds at birth; he was delivered be Cesarean section.[9] Her second son, Manuel ("Manny" or "Morritto") Cuevas Jr., was born ████ 1989, weighing 11 pounds.[10] At the time of her arrest in 1990, Ms. Alfaro was pregnant with twins. Ehdie Berto Cueva-Alfaro and Ernesto ("Ernie") Cueva-Alfaro were born ███████, 1991, while Rosie was awaiting trial in the Orange County Women's Jail.[11] Each weighed more than 8 pounds at birth.[12] Ms. Alfaro was 19 years old. Her first sons (Danny and Manny Jr.) are older than her three half-brothers.

34.    Manny, Jr. and the twins are being raised by their father, Manuel Cuevas. Danny's father has apparently never been identified.[13] Since Ms. Alfaro's arrest, Danny has lived with Rosie's grandparents. Rosie's sister, Silvia, acts as his "guardian":

> [Danny] calls me "Mom" and I pretty much think of him as one of my own kids. I have basically been his guardian and the person in charge of his schooling. I meet with his teachers and attend the IEP [Individualized Education Plan] meetings for his Special Education classes. (Silvia Alfaro Declaration, para. 32.)

35.    Danny Alfaro apparently suffers from impairments similar to those of his mother. He has significant learning difficulties and attends Special Education classes. Despite these services, he is not doing well academically:

> Danny is an RSP student.[14] He is supposed to go into the ninth grade next year, but he has always been behind. When he was in sixth grade, I was told that he

---

[8]Birth certificate of Daniel Alfaro (Orange County, CA -- 8/14/87).
[9]*See* 2/5/91 History & Physical by T. Bond, M.D., Western Medical Center records.
[10]*See* ████/91 Birth certificate of Manuel Cuevas, Jr. (Orange County, CA -- 7/8/89); History & Physical by T. Bond, M.D., Western Medical Center records.
[11]*See* Birth certificates of Ehdie Berto and Ernesto Cueva-Alfaro (Orange County, CA -- ███/91); Western Medical Center records dated 2/5/91-2/9/91.
[12]2/5/91 History & Physical by T. Bond, M.D., Western Medical Center records ("These infants appear to be at least 8 lbs.").
[13]*See* Birth certificate of Daniel Alfaro (Orange County, CA -- ███/87).
[14]The RSP [Resources Specialist Program] provides specialized services to students identified as "learning

15

was reading at the second grade level. He still can't read very well. His teachers tell me that he is failing at least one of his classes. (Silvia Alfaro Declaration, para. 32.)

In assessing familial vulnerabilities with respect to learning disorders and impaired cognitive functioning, it is probably significant that Silvia Alfaro was the only one of the Alfaro children to finish high school. Jose Luis, Jr.'s court records state that "...the last grade he completed at a conventional school was the 6th grade."[15] All three of the Alfaro siblings -- Rosie, Silvia and Jose Jr. -- were place in Special Education classes.[16] Silvia graduated only after enormous struggles:

Rosie and I both dropped out of junior high school, but I later finished junior high and high school. It took me many years to finish and it was hard work. I had two babies by the time I graduated. Rosie was in prison and I was raising Danny. I also took care of my little brother Salvador, who has Down's Syndrome. (Silvia Alfaro Declaration, para. 30.)

36.    Silvia's descriptions of Danny suggest that he, like Rosie, may have attentional deficits. He apparently has some emotional difficulties as well:

They [his teachers] complain that [Danny] is hyperactive and acts out in class. This makes me think of Rosie. One teacher told me that Danny talks to himself. Danny says that he's doing that to make the other kids laugh, but this concerns me. When I spoke to the teachers about him, they showed me test results where he had given answers to the effect that he was very lonely and had thought of killing himself....I worry about him. (Silvia Alfaro Declaration, para. 32.)

Other records indicate that Rosie and Silvia's brother, Jose Jr., may also have some attentional deficits, or perhaps a neurological condition with similar symptoms:

His mother reports that his teacher says he often is not listening to what she says. She will give him instructions to take something somewhere: He will get there, turn around and come back, and ask for instructions again.[17]

---

disabled" and assigned to regular school classes. *See* Asprodites Declaration, para. 21.
[15] 1/29/99 Presentence Report, *supra*, p. 15.
[16] *See* 1/9/91 letter from ACSD to Dr. Blalock: "Would you be willing to give us your opinion as to whether the seizure disorder could be associated with his [Jose Jr.'s] learning disability. (He has so much difficulty and we are considering Special Ed.)"
[17] 3/13/90 Outpatient Consultation by Elizabeth Blalock, M.D., Kaiser-Permanente Medical Center records.

000157

EX 8    157

These symptoms and deficits are part of a broader familial pattern of illness, suggesting there is indeed a genetic component to both the cognitive deficits and the chronic depression which Rosie Alfaro suffers from. I note also that there has been a significant body of clinical research confirming both (a) the frequent co-morbidity of attentional deficits, specific learning disabilities, and underlying affective disorders, often including overlapping or highly similar symptoms; and (b) a regrettable tendency on the part of evaluators (only recently being more closely scrutinized) to confuse or mischaracterize these symptoms and overlook the underlying mental illness.[18]

### B.    Childhood and Adolescence

37.    Rosie Alfaro was born on ███████, 1971 in Orange County, California. According to her mother, she weighed 11 pounds at birth. (Silvia Melendez Declaration, para. 22.) Her parents were living on Jeffrey Street in "Little T.J.," which was then (and is now) predominately Hispanic. Many details of Ms. Alfaro's development and experiences are set forth in the declaration of Dr. Natasha Khazanov. Rather than repeat them here, I will briefly discuss some of the salient aspects of Ms. Alfaro's background.

---

[18]One 1990 study found that 15% of the children studied (offspring of adults with some form of panic disorder) suffered from ADHD, and that of those children, their ADHD was comorbid with anxiety disorder and/or depression. *See* McClellan, J.M., Rupert, M.P., Reichler, R.J., Sylvester, C.E. (1990). "Attention deficit disorder in children at risk for anxiety and depression," *J. Am. Acad. Child Adolesc. Psychiatry* 4:534-539, *discussed in* Last, C.G., Hersen, M., Kazdin, A., Orvaschel, H., Perrin, S. (1991). "Anxiety Disorders in Children and Their Families," *Arch. Gen. Psychiatry* 48:928-934. That and other studies have recognized that depressive symptoms are often difficult to assess in young children. They also noted that further diagnostic confusion can result from drug and alcohol abuse/dependence (by both the children and their reporting parents), which is closely associated with both ADHD and anxiety and depression. A 1992 study found high levels of comorbidity between ADHD and mood and anxiety disorders, and also that "the patterns of familial aggregation support initial hypotheses that ADHD and mood disorders share common familial vulnerabilities." Biederman, J., Faraone, S.V., Keenan, K., Benjamin, J., et al. (1992). "Further Evidence for Family-Genetic Risk Factors in Attention Deficit-Hyperactivity Disorder: Patterns of Comorbidity in Probands and Relatives in Psychiatrically and Pediatrically Referred Samples," *Arch. Gen. Psychiatry* 49:728-738.

000153

EX 8   158

### 1.    Chaotic/inconsistent caretaking

38.    One of the central themes in Ms. Alfaro's history is the presence and influence of her mother's extended family.  When Rosie was approximately 7 years old and Silvia was 5 or 6, the family moved in with their maternal grandparents, Jose and Mercedes Melendez, in a neighborhood across town.  By the late 1970's, all of her mother's siblings and their families had settled in the same neighborhood:

> About twenty-five years ago..., my sister Rosa and her husband bought the house that I live in now.  My parents and my brother Guillermo moved in with Rosa and her family.  About one year later, my father and Guillermo...bought a house just up the street from Rosa's.  My parents still in live in that same house.  My husband, Jose Alfaro, my children...and [I] moved in with my parents and my brother Guillermo in 1978....Guillermo later bought a house just across the street from my parents and he still lives there.  My brother Jose also lives across the street from my parents.  My sister Rosa lives about two blocks away, my sister Mercedes lives about one half mile away, and brother Arturo lives about four miles away.  (Silvia Melendez Declaration, para. 6.)

39.    Throughout her childhood, the close presence of so many relatives resulted in the merging of households and frequent changes in the family constellation: On one level, this speaks to the closeness of the Melendez family.  However, it also reflects (or was perhaps necessitated by) inconsistency in the Alfaro children's caretaking and frequent absences by both parents.

### 2.    Absent parents/emotional neglect

40.    Silvia Melendez Alfaro's efforts to support the family financially limited her presence -- physically and emotionally -- in the lives of her children:

> My mother has always worked very hard, often 14 or 16 hours a day.  When Rosie and I were children (elementary school and earlier), my mother usually left us with someone in the family while she worked.  That was usually my grandparents, but Uncle Guillermo and Aunt Rosa were always nearby.  When we were very little, my father sometimes watched us...if it was during the week.  (Silvia Alfaro Declaration, para. 5.)

18

·000159

EX 8    159

Asked about Rosie's homelife, Dr. Consuelo Edwards stated simply that Rosie Alfaro was left to raise herself.[19]

41.     As indicated by Rosie's sister, Jose Alfaro's presence was sporadic at best; his physical absence and emotional neglect were associated, at least in part, with his alcoholism:

> If my mother was working and he wanted to go drinking, he left us with my grandparents. When he was drinking he didn't care much about his kids. (*Ibid.*, para. 6.)

Even when he was physically present, he often ignored his daughters, leaving them to fend for themselves while he drank with his buddies from Little T.J. Studies of "alcoholic" families -- families in which one or both parents' alcohol or drug-dependence controls and dominates family dynamics -- demonstrate that:

> [The] interactions between parents and children are characterized by inconsistency in the parent and uncertainty in the child, lack of personal warmth, and coercive parent-child dynamics, which other research has linked to behavior disorders in children [ ].  School-age children who have grown up in families where one parent is an alcoholic have poorer social skills, peer relations, and academic performance [ ].[20]

### 3.     Physical violence/corruption/humiliation

42.     As stated above, Jose Alfaro's presence in the lives of his daughters was minimal and, even then,. often neglectful and/or violent. His unpredictable violence against both Rosie and Silvia, his emotional cruelty to Rosie, and her appointed role as scape-goat are set forth in some detail by Dr. Khazanov. (*See* Khazanov Declaration, paras. 37-41.) The effects and consequences of his maltreatment, however, go far beyond the immediate injuries and humiliation Rosie and her siblings sustained.  Records

---

[19]*See* McGrath Declaration.
[20]Davies, D. (1999). *Child Development:  A Practitioner's Guide.*  New York:  The Guilford Press, p. 71 [citations omitted].

19

000160

EX 8   160

and family reports confirm that Jose Alfaro's assaults permanently distorted Rosie's self-esteem and belief in her own worth; she believed that she must have been "stupid," "worthless," a "slut" and an "embarrassment."[21]  She believed she deserved nothing -- even today, she prays for her children and her family, "but never for myself."

43.    Jose Alfaro used Rosie as a pawn in his own criminal behavior.  Rosie reports that when she was a small child, her father took her to supermarkets.  Holding her in his arms, he stole large pieces of meat and secreted them in his jacket, hidden behind her body.  This process is known clinically as "corruption," one of many tactics which thwarts the child's perceptions of appropriate behavior and interpersonal relationships.  It also makes the child a participant in the adult's wrong-doing, instilling a sense of guilt and confusion, while also ensuring that his behavior will go unreported.[22]

44.    Rosie describes her childhood as "mostly ugly," although when Jose wasn't drinking, there were "okay little things."  Silvia describes one of those fond memories which, sadly, are quite few for both of them:

> I have a few good memories from my childhood.  Before his drinking got really out of control, he would stop at [a] liquor store on the way home and bring home drinks for himself and ice cream sandwiches for Rosie, Jose and me.  I still remember that every time I see an ice cream sandwich. (Silvia Alfaro Declaration, para. 7.)

Interestingly, the same ice-cream-sandwich story was the one example of a fond childhood memory that Rosie provided to me.  These rare and unexpected kindnesses caused considerable confusion for Rosie and Silvia.  Rosie reports that she did not want to feel this way, but she hated her father.  He was brutal to her mother and cruel to them.

---

[21] *See* Lebowitz, L. & Roth, S. (1992), "I felt like a slut: Cultural context and women's responses to being raped," *J. of Traumatic Stress* 7:3, 363-390.
[22] One of the earliest and most influential book on child maltreatment defines "psychological maltreatment" as "a concerted attack by an adult on a child's development of self and social competence, *a pattern* of psychically destructive behavior, and it takes five forms: *Rejecting....Isolating....Terrorizing....Ignoring.... Corrupting...* These are the basic threats to human development." Garbarino, J., Guttmann, E., Seeley, J.W. (1986). "Chapter 1: What Is Psychological Maltreatment?" in Garbarino, et al., *The Psychologically Battered Child.* San Francisco, CA: Jossey-Bass Publishers, at p. 8 [emphasis in original].

000161

She quickly added, however, that there were these few favors and good times that made it hard to believe that he was wrong for what he did. This, too, is a common phenomena discussed in the clinical research on child maltreatment.

45.    The unexpected treats (ice cream sandwiches), often given after a particularly violent or abusive episode, are "occasional indulgences" -- acts of kindness which effectively confuse the abused child, undermining her ability to label his behavior as wrong or inappropriate. When that child has no way of explaining her victimization, she assumes responsibility for her own maltreatment and believes that the insults are true. In Rosie Alfaro's case, this strategy was likely even more effective (and more damaging to 5-, 6-, 7-year-old Rosie), as it was reinforced by the long-standing familial patterns of drunken violence, with blame placed on the victim.

### 4.    Dangerous situations

46.    Jose Alfaro's violence and alcohol use repeatedly placed Rosie and her siblings at serious risk. Silvia Alfaro describes recurring incidents involving serious negligence, incidents which tainted what should have been happy family situations [?] :

> Whenever we went somewhere, he [my father] had to drive, but he was always drunk. We often drove to the beach in San Diego or San Juan Capistrano, but on the way home, my father would end up pulled up on the side of the freeway, passed-out drunk. Rosie and I knew what was happening, so we learned to just get comfortable in the back of the truck and go to sleep until he came back around again. This didn't happen just once, but many times. (Silvia Alfaro Declaration, para. 8.)

Predictably, Jose Alfaro's behavior sometimes resulted in serious injuries:

> [My father] was driving a convertible with me, Rosie and our mother in the car. He was drunk again and he drove the car into the back of a semi truck. I was about 5 years old and I was sitting on my mother's lap and I hit the windshield. I remember being in the hospital and being very frightened. I had been wrapped tightly in something and tied to a board. I still carry a scar less than an inch from my right eye. (Silvia Alfaro Declaration, para. 9.)

000162

47.    In other instances, the risk to Rosie was caused by both parents, and the injuries were intentional:

> When Rosie was 6 or 7 years old, when we were living on Jeffrey Street, Jose had cashed his check and was leaving me alone with the girls and an empty refrigerator. I begged him not to leave. I tried to stop him by putting Rosie in front of the car. (Silvia Melendez Declaration, para.32.)

The risk to Rosie is obvious; the outcome is a terrifying example of her early experiences:

> Jose did not stop. Hit he Rosie with the passenger side of the car and pushed her along the concrete wall. When I picked her up, her arm and the side of her face was bleeding. (*Ibid.*)

48.    In Rosie Alfaro's world, this behavior was usual; she and her sister both developed in an environment where this level of risk, especially when associated with alcohol, was the norm. Not surprisingly, both of them later became involved with men who had similar failings and put them at similar risk. In Silvia's case, she did not escape the risks entirely, but seems (at this point, almost 30 years old) to have taken steps to protect her children: "My own husband drinks, so I do not allow my children to be in the car with him." (Silvia Alfaro Declaration, para. 10.) Rosie was not so lucky. She was 16 years old when she became involved with Manuel Cuevas:

> Manuel Cuevas, the father of Rosie's son Manny and her twins, was a heavy drinker when they were together. After Manny was born, Rosie and Manuel were in a serious accident when he was driving drunk. She ended up in the hospital with a concussion. I picked her up when she was discharged from the hospital, so I remember how she looked. She was all cut up where glass from the windshield had been embedded in her face and head. (Silvia Alfaro Declaration, para. 10.)

Emergency room records confirm that she was taken by ambulance to the Western Medical Center on July 30, 1988. She was treated for a concussion, multiple facial abrasions, and a cervical spine sprain, with x-rays suggesting a possible spine fracture.[23]

---

[23] 7/30/88 Neurologic Exam and orders by L. Hunter, M.D., Western Medical Center Emergency Department records.

000163

**EX 8    163**

49.    I should add here that for any children raised by alcoholic parents, the risk of social, developmental, academic and behavioral difficulties is significantly higher. A 1984 review of the clinical literature found that:

> A number of studies point to the fact that parental alcoholism affects the functioning of the family and hence the emotional well-being of the children. In particular, there are connections to child abuse, juvenile delinquency, school performance, emotional problems and developmental disorders.[24]

The article concluded that: "The heightened psychiatric risk for all children with alcoholic parents was clearly shown..."[25]  Rosie Alfaro and her siblings are living proof of both the risks and the tragic outcome.


**5.    Sexual violence and exploitation**

50.    Despite the presence of extended family members, who played an active part in her life throughout her childhood and adolescence, Rosie and Silvia were often left with their father, who was almost always in the company of his "drinking buddies" from Little T.J.:

> Sometimes Jose would take care of them, but he often just had his friends over and they were drunk and noisy....One time I came home work and found that Jose and his friends had dressed Rosie up in a sombrero and cowboy boots and told her that she was a cowgirl. (Silvia Melendez Declaration, para. 18.)

Rosie and Silvia report that the presence of Jose and his "drinking buddies," often drunk, out-of-control, and fighting with each other, was frightening. They never felt safe. And indeed they were not.

51.    The children of abusive, absent, alcoholic or drug-addicted parents are at far greater risk of victimization. Jose's drinking, coupled with his wife's absence from the home, left Rosie and her sister unwatched and unprotected. At the same time, by

---

[24]Steinhausen, H.-C., Gobel, D., Nestler, V. (1984). "Psychopathology in the Offspring of Alcoholic Parents," *J. of the Amer. Acad. of Child Psychiatry* 23:4, 465-471, at p. 466.
[25]*Ibid.*, at p. 465.

000164

EX 8    164

bringing his friends to the house -- drunk, noisy, often violent even to each other -- Jose placed his daughters at even greater risk by introducing potentially dangerous men into their already chaotic home.

52.    At approximately 9 years of age, Rosie Alfaro was raped by one of her father's drinking buddies. The basic aspects of the sexual assault -- specifically, her age at the time and her relationship to the perpetrator -- have remained consistent since shortly after her arrest. Ms. Alfaro reported the rape to mental health professionals and jail staff prior to trial,[26] even while under the influence of Sodium Pentothal in 1991.[27] She also reported the rape to me during our recent interviews. It is significant that she did so reluctantly, with a marked change in affect as she discussed it. She spoke with a detached, somewhat blunted affect, almost as though she were recounting information about someone other than herself.

53.    Ms. Alfaro reported several emotions surrounding the rape, including fear, guilt, shame, and being "alone" and "dirty."[28] At the time of the rape, she was very confused by the emotions she experienced -- they did not make sense to her. When she disclosed the rape to me, she still displayed considerable confusion; she became anxious and apprehensive, stating that her emotions "don't make sense." As a clinician, this range of emotions "makes sense," reflecting the classic profile of PTSD following an acute trauma. The sexual assault of a young child can be literally incomprehensible. In that way, her confusion reflects the nature of the trauma she experienced. It also reflects the vulnerabilities -- her young age, relative immaturity, and low intelligence -- which undoubtedly facilitated her victimization. The same vulnerabilities prevented her from

---

[26] See, e.g., 3/23/92 Edwards report, p. 11; 3/29/92 Morales report; 10/3/91 Progress Note by T. Silver, R.N., OCWJ records.

[27] See Transcript of interview conducted by Bruce L. Danto, M.D. (9/22/91); 10/3/91 Progress Note by T. Silver, R.N., OCWJ records.

[28] See Lebowitz, L. & Roth, S. (1992), "I felt like a slut: Cultural context and women's responses to being raped," J. of Traumatic Stress 7:3, 363-390; Roth, S. & Lebowitz, L. (1988), "The Experience of Sexual Trauma," J. of Traumatic Stress 1:79-107.

000165

developing coping strategies (*i.e.*, a way to understand the rape as an event external to her own self-worth) or seeking help.

54.    Ms. Alfaro identified the perpetrator of the rape only as "a friend of my father" and "one of his drinking buddies." That characterization has been consistent over the years. It is possible that she did not know the man's name but recognized him (at the time) by sight and might recognize him again. It may also be that she knew the name but has since forgotten it. What is significant is that she associates her victimization with her father and his friends, and with his drinking. One of those drinking buddies was Manuel Torres-Graciano. Mr. Torres-Graciano has now been positively identified as the man who drove the car, and threatened Ms. Alfaro's 1-year-old son, on the day of Autumn Wallace's death. His presence, whether he was himself the perpetrator of the earlier rape or merely an associate of the rapist, would very likely retrigger the same overwhelming emotions and mental confusion that surrounded the initial trauma.

55.    Ms. Alfaro's rape occurred in the context of her home, while she was purportedly in the care of her father. The acute trauma (her rape) occurred in the context of the ongoing, chronic trauma of her father's physical and psychological abuse. It would have been almost impossible to report the rape at the time:

> [My grandfather] allowed my father to bring his drunken friends around....They were loud and scary. If they had hurt one of us, my father would never have believed it. Whenever we complained, he blamed the problems on us, usually on Rosie. (Silvia Alfaro Declaration, para. 13.)

Not only were Rosie's parents implicated (at least indirectly), but so was her grandfather, the family patriarch. She was betrayed, in different ways, by virtually all of the adults responsible for protecting her. The lack of safety articulated by Rosie and her sister was based in reality.

56.    Her family's role in her sexual exploitation was not always indirect. She reported to me, as she has to others, that when she was about 7 or 8 years old, she did "sexual things" with her Uncle Turo. Arturo Melendez, her mother's youngest brother, is

000166

**EX 8    166**

five years older than Rosie. There was apparently no force involved, at least none that has been reported. Rather than fear, she reports being bewildered, vaguely ashamed, but unsure why.

57.    These "sexual things" and Ms. Alfaro's recounting of them are significant for several reasons. Ms. Alfaro clearly distinguishes between the molestation (which was confusing and somehow shameful) and the rape (which was forcible and obvious) -- she does not exaggerate the reports, initially or over time. Ms. Alfaro learned (or perceived) that sexually inappropriate behavior, regardless of how it was characterized at that time, was accepted (or within the range of possible behavior) within the family.

58.    This is consistent with other evidence of sexual exploitation which was presumably learned and perpetrated by other family members. Rosie's brother, Jose Luis Alfaro Jr., was charged with sexually molesting Rosie's 2-year-old niece:

> [T]he defendant's sister [Silvia Alfaro] reported she tried to open the front door of her residence but it was locked. She looked through a window and saw the defendant, her brother [Jose Luis Jr.], with his pants down, get up and run out the back door. When her three-year-old daughter, victim Monica A., opened the door, her pants and underwear were down to her ankles. The victim said the defendant showed her his "toy", "his ugly toy." When her mother urged her to tell her more, the victim [3-year-old Monica Alfaro] said she didn't want Jose to go bye bye and that Jose told her he'd take her to Chucky Cheese if she didn't tell anyone.[29]

Like Rosie, Monica Alfaro was molested in her home by an older family member.

59.    The "bribe" offered by Jose to keep Monica quiet -- a trip to Chucky Cheese (a fast food restaurant catering to children) -- is characteristic of child molesters. Such bribes are often effective. For most children, non-forcible molestation perpetrated by a trusted adult is frightening and confusing. Absent overt threats or physical injury, most children have no schemas by which to understand the experience; they often lack the vocabulary to describe the adult's behavior, or even to classify it as "wrong." When a

---

[29]Pre-Sentence Report by Patricia M. Neal, Orange County Probation Office, *People v. Jose Luis Alfaro*, Orange County Superior Court #A-259902 (1/29/99).

000167

child accepts the bribe and fails to report the "sexual things" being done, disclosure becomes even less likely as she sees herself (on her own or through the perpetrator's statements) as a willing participant and, therefore, guilty as well.

60.    Rosie Alfaro's molestation at such an early age is significant because clinical research has consistently shown that victimized children, especially those whose trauma is not addressed or treated, are at greater risk of re-victimization in the future.[30] Again, Ms. Alfaro's subsequent history affirms the clinical research in this area.

## III.    Clinical Impressions

61.    Rosie Alfaro suffers from multiple psychiatric conditions which severely impair her ability to function in the world. These disabilities fall into four categories: (1) cognitive/intellectual deficits; (2) trauma-related symptoms and disorders; (3) substance abuse/addiction; and (4) serious, chronic underlying psychiatric disabilities. This combination of disabilities is not uncommon.[31] For example:

> There is a consistent finding...that PTSD is only one of a number of psychiatric disorders that can occur in settings. In fact, in the majority of cases..., PTSD is usually accompanied by another disorder (e.g., major depression, an anxiety disorder, or substance abuse)...[32]

---

[30]See, e.g., Roth, S. & Lebowitz, L. (1988). "The Experience of Sexual Trauma," *J. of Traumatic Stress* 1:1, at p. 82, *citing* Browne, A. & Finkelhor, D. (1986). "Impact of childhood sexual abuse: A review of the research," *Psychological Bull.* 99:66-77.

[31]See, e.g., Reischies, F.M. & Neu, P. (2000). "Comorbidity of mild cognitive disorder and depression -- a neuropsychological analysis," *Eur. Arch. Psychiatry Clin. Neurosci.* 250:186-193; McFarlane, A.C. (1998) "Epidemiological Evidence About the Relationship Between PTSD and Alcohol Abuse: The Nature of the Association," *Addictive Behaviors* 23(6):813-825; Stewart, S.H., Pihl, R.O., Conrod, P.J., Dongier, M. (1998). "Functional Associations Among Trauma, PTSD, and Substance-Related Disorders," *Addictive Behaviors* 23(6):797-812; Brady, K.L., Killen, T., Saladin, M.E., et al. (1994). "Co-morbid substance abuse and posttraumatic stress disorder: characteristics of women in treatment," *Am. J. on Addictions* 3:160-164; Deykin, D.P.H., Buka, S.L., Zeena, T.H. (1992). "Depressive Illness Among Chemically Dependent Adolescents," *Am. J. Psychiatry* 149:10, 1341-1347.

[32]McFarlane, AC & Yehuda, R. (1996). "Chapter 8: Resilience, Vulnerability, and the Course of Posttraumatic Reactions," in Van der Kolk, B.A., McFarlane, A.C., Weisaeth, L. (Eds.), *Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society.* New York: The Guilford Press, at p. 163.

000168

Their etiologies and their symptoms are intertwined and complicated; it is not always possible to separate or distinguish the symptoms of one from those caused by the others.[33] Moreover, the effects of any one of her conditions may be exacerbated or complicated (or possibly even triggered) by the others.[34] For purposes of clarity, I discuss these areas of Ms. Alfaro's disabilities separately, but each condition must be considered in the context of her overall functioning.

### A.   Organic Brain Damage/Compromised Intellectual Functioning

62.   Recent testing confirms that Ms. Alfaro suffers from serious organic brain damage. Dr. Khazanov identified "both localized dysfunction -- primarily in the frontal lobes -- and diffuse damage in both the left and right hemispheres, affecting her overall cognitive and neurological functioning." (Khazanov Declaration, para. 151.) Evidence of that damage was apparent early in Rosie's childhood, as reported both in school records and by family members, including Rosie's sister:

> She had always been considered "slow" and had problems that I didn't have. It took her longer to learn English and she never learned to read very well. She could never keep up with the other kids... (Silvia Alfaro Declaration, para. 31.)

According to her mother, Rosie relied on her sister, 18 months younger, to help her with her homework. (*See* Silvia Melendez Declaration, para. 23.) Throughout elementary school, Ms. Alfaro remained at least two years behind her peers. Dr. Asprodites notes that when she left school, 14 years old but not having finished the seventh grade, "she

---

[33] *See, e.g.,* Markou, A.M., Kosten, T.R., Koob, G.F. (1998). "Neurobiological Similarities in Depression and Drug Dependence: A Self-Medication Hypothesis," *Neuropsychopharmacology* 18:135-174; McFarlane, A.C. (1998). "Epidemiological Evidence About the Relationship Between PTSD and Alcohol Abuse: The Nature of the Association," *Addictive Behaviors* 23(6):813-825; Chilcoat, H.D. & Breslau, N. (1998). "Investigations of Causal Pathways Between PTSD and Drug Use Disorders," *Addictive Behaviors* 23(6):827-840; Kofoed, L., Friedman, M.J., Peck, R. (1993). "Alcoholism and drug use in patients with PTSD," *Psychiatric Quarterly* 64(2):151-171.

[34] *See, e.g.,* Stewart, S.H., Pihl, R.O., Conrod, P.J., Dongier, M. (1998). "Functional Associations Among Trauma, PTSD, and Substance-Related Disorders," *Addictive Behaviors* 23(6):797-812; Bryer, J.B., Nelson, B.A., Miller, J.B., Krol, P.A. (1987). "Childhood sexual and physical abuse as factors in adult psychiatric illness," *Am. J. Psychiatry* 144:1426-1430.

000163

**EX 8   169**

was performing academically and cognitively at roughly the level expected of a
9-year-old child." (Asprodites Declaration, para. 30.)

     63.    Beyond the limitations associated with low intelligence and learning
disabilities, Ms. Alfaro's cognitive impairments left her more vulnerable to physical and
psychological abuse. She was unable to interpret cues and protect herself from
potentially dangerous situations, even the recurring violence from her father:

> She couldn't even protect herself. I learned to keep a distance from my father
> when he was drunk, so that sometimes the beatings were less angry or less
> frequent. Rosie couldn't seem to stay out of his face. (Silvia Alfaro Declaration,
> para. 20.)

It is very likely that her deficits (being "slow") also made her an easy scapegoat --
according to her sister, "[m]y father blamed Rosie for everything that went wrong in the
family." (Silvia Alfaro Declaration, para. 16.) She also reports that Jose Alfaro's insults
and name-calling affected Rosie more deeply than they did Silvia. Rosie lacked the
intellectual resources to explain or understand the abuse she sustained; she therefore
internalized her father's words. Her extremely low self-esteem is noted throughout her
childhood and is immediately evident today.[35]

### B.    Trauma-Related Disorders and Symptomatology

     64.    Rosie Alfaro was raped when she was 9 years old, allegedly by a friend of
her father. The consequences of that assault have been pervasive and enduring. They
were (and are) exacerbated by the ongoing violence within the home and her parents'
failure to protect her. It was that neglect that facilitated the rape and created a home

---

[35] It should be noted that depressed intellectual abilities and poor academic achievement have been
consistently linked to early childhood abuse and neglect. While no one questions the permanent and
irreversible nature of organic brain damage and compromised cognitive functioning, studies reveal that
among children with comparable organic/intellectual deficits, children experiencing chronic abuse/neglect
were not only less likely to make even minimal academic progress, but they were also likely to regress more
quickly outside the structured setting. *See, e.g.*, Perez, C.M. & Widom, C.S. (1993). "Childhood
Victimization and Long-Term Intellectual and Academic Outcomes," *Child Abuse & Neglect* 18:8, 617-633

000170

environment that was unsafe and frightening. Rosie's sister confirms that "[their father] brought his drinking buddies over to the house when my mother was working."[36] (Silvia Alfaro Declaration, para. 6.) It was one of these "drinking buddies" who raped Rosie.

### 1.   History/symptoms/course of illness

65.   Ms. Alfaro exhibits a wide range of symptoms consistent with trauma-based conditions, including Posttraumatic Stress Disorder [PTSD]. She has recurring nightmares ("every day"), many of which are sexual in nature and include the unseen presence of Satan. She wakes from these dreams thinking of father, feeling "evil" and "dirty." She is frequently distracted and agitated by intrusive memories of both her father and her rape. She is easily agitated and has great difficulty concentrating. When discussing aspects of her childhood, Ms. Alfaro sometimes becomes extremely agitated; at other times (or when asked about other issues), she becomes emotionally detached. During my interviews with Ms. Alfaro, she appeared to dissociate and had to be brought back to the conversation at several points. These are hallmark symptoms of PTSD. Both Dr. Edwards and Dr. Morales diagnosed PTSD in their pre-trial evaluations of Rosie;[37] Dr. Rogers notes include numerous references to what she identifies as "symptoms consistent with [PTSD]." (Rogers Declaration, para. 11.)

66.   Ms. Alfaro's history is consistent with the trauma she reports and the subsequent development of the PTSD which continues today. Her feelings of helplessness and hopelessness are a recurring theme both in her records and in her conversation. ("If I take some pills and I die, that's OK," she stated. She then asked, "Why don't I care?" Her question and her distress seemed genuine.)

---

[36]Rosie's mother acknowledges that her husband "often...had his friends over and they were drunk and noisy..." (Silvia Melendez Declaration, para. 18.)
[37]3/22/92 report of Consuelo M. Edwards, M.D.; 3/29/92 report of Armando T. Morales, D.S.W.

000171

EX 8   171

67.    She also reports ongoing anxiety and somatic symptoms, especially in situations reminiscent of the initial (or primary) traumatizing event (*i.e.*, the rape). Dr. Khazanov's report includes an excellent example:

> The physiological symptoms she experiences are most often triggered by the strip searches to which Ms. Alfaro is subjected prior to each contact visit. She explained that, during these searches, she often experiences sudden nausea, dizziness, some mental confusion, and what sounded like a profound level of helplessness and vulnerability....The parallels or associations between her early rape and the forcible handling of her body (including "body cavity searches"...) are obvious. (Khazanov Declaration, para. 130.)

This is consistent with Ms. Alfaro's statement to me that, prior to leaving her "room" for a visit, she becomes "tense and scared." Substance abuse (using massive quantities of any drug available) and chronic addiction, beginning at a very young age, are also frequently related to untreated childhood victimization.[38]

68.    Another aspect of Ms. Alfaro's history (and behavior) is reported by her mother:

> When Rosie was about nine, she developed a habit of cleaning the house constantly....Rosie's cleaning was obsessive and constant. She was always cleaning the living room (under the sofa, behind the tables) and the kitchen. She made her sister get out of bed so that she could make the beds and clean in their bedroom. She also arranged and rearranged the furniture over and over. She moved the furniture in her own room and, when Jose and I were living in my parents' garage, she always wanted to rearrange the furniture in there. However, she refused to clean the beer cans from the front yard after her father and his friends would drink there. She complained about them but the beer cans were the one thing she wouldn't clean up. (Silvia Melendez Declaration, para. 25.)

This account is striking, for several reasons. First, it reports a marked change in Rosie's behavior at age 9, the same year that she was raped. Second, Rosie's cleaning and rearranging her environment was "obsessive." Obsessive-compulsive behaviors are consistent with a post-traumatic reaction.[39] Dr. Aaron T. Beck, one of the foremost

---

[38]*See, e.g.,* Stewart, S.H., Pihl, R.O., Conrod, P.J., Dongier, M. (1998). "Functional Associations Among Trauma, PTSD, and Substance-Related Disorders," *Addictive Behaviors* 23(6):797-812.
[39]"Posttraumatic Stress Disorder is associated with increased rates of...Obsessive-Compulsive Disorder...

31

000172

EX 8    172

authorities on the depression has identified obsessions and compulsions as salient manifestations of a specific type of depression -- the obsessive or compulsive behavior is an attempt to allay one's worries or avert an anticipated disaster through action.[40] Finally, in cleaning and arranging her world, Rosie specifically avoided reminders of her father's alcoholism and his "drinking buddies." One of the basic criteria for PTSD is the persistent avoidance of "stimuli associated with the trauma," often manifested in "efforts to avoid activities, places, or people that arouse recollections of the trauma."[41]

## 2.    Traumatic memory

69.    Ms. Alfaro's memory and perceptions are often confused or fragmented, especially with respect to stressful events and the people associated with them.[42] Asked about her memory of the offense, Ms. Alfaro stated that she sees "little spots here, then it goes black...little spots here, then it goes black..." This is common among traumatized individuals. In Rosie's case, her memory and perceptual distortions are compounded by pre-existing brain damage, as described by Dr. Khazanov; low intelligence and educational deficits, described by Dr. Asprodites; and her chronic substance abuse.[43] Some of the documents I reviewed mention that between her arrest and trial, Ms. Alfaro gave "inconsistent" accounts of the offense. Given her trauma history and her other disabilities, that is not at all surprising.

---

See *DSM-IV-TR*, p. 465.

[40]See Beck, A.T. (1967). *Depression: Causes and Treatments*. Philadelphia, PA: University of Pennsylvania Press, pp. 271-272.

[41]*DSM-IV-TR*, p. 468.

[42]See Van der Kolk, B.A., "Chapter 12: Trauma and Memory"; Van der Kolk, B.A., Van der Hart, O., Marmar, C.R., "Chapter 13: Dissociation and Information Processing in Posttraumatic Stress Disorder," in Van der Kolk, B.A., McFarlane, A.C., Weisaeth, L. (Eds.) (1996). *Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society*. New York: The Guilford Press.

[43]The memory impairments found by Dr. Khazanov are consistent with testing administered by Dr. Rogers in 1990. *See* Record Form, Wechsler Memory Scale-Revised (administered 10/23/90).

000173

EX 8    173

70.     I do not know what exactly took place inside the Wallace house on the day of Autumn Wallace's killing.  Regardless of the details, several critical points seem undisputed:

*Rosie Alfaro was in the company of two older men, one of whom was likely the drug dealer to whom she owed money or one of his associates, who were pressuring her to "pay up."

*While she was inside the Wallace house, she was surprised and confused by the appearance of Autumn Wallace and became frightened and agitated.

*Ms. Alfaro's one-year-old son, Manny Jr., was outside the house in a car with Rosie's older male accomplice.  The man holding her son had recently been released from prison.[44]

*Ms. Alfaro was under the influence of heroin and cocaine, both of which are known to impair perception, judgment and memory.

*Regardless of Ms. Alfaro's role in the crime, Autumn Wallace's death suggests a level of uncontrolled frenzy and chaos.  One would expect that crime scene alone to trigger "heightened arousal" of the central nervous system, increasing the likelihood of dissociative symptoms.[45]

The circumstances surrounding the offense might well have triggered memories of her assault and abuse.  More importantly, they very likely triggered memories of the emotions associated with it:  terror, confusion, guilt, helplessness.

71.     These factors make it extremely unlikely that Ms. Alfaro would come away from that experience with her memory intact.  Traumatic memory is, almost by definition, imprecise and fragmented.  One would also expect that Ms. Alfaro's access to

---

[44] *See* Arcueta Declaration, para. 2.  As "drinking buddy" of her father, presumably during the years when Ms. Alfaro chronically physically and psychologically abused, then raped by her father's friend, this accomplice would almost certainly have triggered the terror and helplessness associated with both the rape and the ongoing violence in the house.

[45] *See DSM-IV-TR*, p. 468.  There is a growing body of evidence suggesting that acute or severe traumatic experiences can in fact result in permanent neurological and endocrinological changes in the traumatized individual.  *See, e.g.*, Van der Kolk, B.A., "Chapter 10:  The Body Keeps the Score:  Approaches to the Psychobiology of Posttraumatic Stress Disorder," in Van der Kolk, B.A., McFarlane, A.C., Weisaeth, L. (Eds.) (1996). *Effects of Overwhelming Experience on Mind, Body, and Society.* New York:  The Guilford Press.

000174

EX 8   174

the details of these events and her ability to relate them accurately will be not only impaired, but also slightly different at different times, in different settings, with different people. These inconsistencies should not be glibly interpreted as intentionally misleading or dishonest. It is far more likely that they are the predictable results of ongoing confusion and her impaired cognitive functioning. As observed by Dr. Edwards just prior to trial:

> She...does not present her statement of stabbing Autumn five times as an attempt to exonerate herself, but as a perplexed commentary regarding the information given to her that there were more than five wounds in the child's body.[46]

### 3.    Suggestibility

72.    Additional factors should be considered in assessing the accuracy of Ms. Alfaro's reports and her underlying intent in making them. First, the same disabilities and experiences that distort her memory and perceptions -- early trauma (both acute and chronic), organic brain damage, and chronic substance abuse -- also render her extremely vulnerable to both suggestion and domination. Dr. Edwards, who interviewed Ms. Alfaro prior to her trial, notes that she was "dependent, suggestible, terrified."[47]

73.    Her suggestibility was apparent throughout our interviews. Ms. Alfaro often assumes that information provided by others is more accurate, or "right," than her own; she is generally willing to fill in her own memory gaps with that information. Her suggestibility make Ms. Alfaro eager to assume information she lacks and make it her own, in the ways that unimpaired individuals do. She is ready to believe as truth and, to some extent, accept the supplied information as part of her own information and/or experiences. Thus, she is an easy mark for manipulative, enterprising others, whose manipulation of her needs and impairments will intimidate her.

---

[46] 3/23/92 Edwards report, p. 18.
[47] 1/92 interview notes of Consuelo M. Edwards, M.D.

000175

EX 8    175

74.     However, her suggestibility can also be played out in seemingly normal (even "clinical" or "professional") relationships, including those between an attorney and client, and/or doctor and patient. Examples of that are seen throughout the records of Ms. Alfaro's counsel and the experts he retained as evaluators, testifying witnesses and expert consultants. Dr. Edwards, who documented Rosie's suggestibility, nonetheless agreed to Mr. Monroe's request that she suggest the concept that "Beto" was in fact the killer. Because Ms. Alfaro was unwilling or unable to reveal that man's identity, she quickly acquiesced. Dr. Edwards' suggestion, even if somewhat confrontational, was not ill-intentioned. Presumably, she hoped that, when confronted, Rosie would come clean. That presumption failed to consider her extensive intellectual and emotion limitations, the dynamics among the accomplices, and Rosie's ongoing terror. A more informed presumption would be that a confrontation (with an implicit accusation of having lied on this issue), followed by a proposed alternative description of the events surrounding the Wallace killing (that embraced by her counsel), might effectively secure the story they so clearly wanted to present. Wanting to provide "right" answers where she had none, and having been provided an alternative story that protected the true identity of this man she so feared, she confirmed Dr. Edwards' suggestion of Beto-as-killer.

75.     Ms. Alfaro's willingness to accept and relate information from others is not evidence of dishonesty. It is more likely a product of both her cognitive impairments and her history of trauma. Individuals with memory deficits are more vulnerable to the suggestions of others, especially those perceived as powerful or important, in part because they have huge gaps in their own histories.

### 4.     Consistencies in Ms. Alfaro's reports

76.     Finally, any assessment of Ms. Alfaro's reports of the offense must look not only to their inconsistencies, but also to those aspects which have remained consistent over time. The most striking aspect of her reports of the offense, both pre-trial

000176

and at the present, is her clear desire to accept responsibility for this tragic killing. That has been consistent since she was first arrested, despite inconsistencies with respect to specific details.[48]

77.    Also consistent are her reports that she was terrified of the second (non-testifying) accomplice. This terror was clear during our interviews, in both her words and her affect. This level of terror, and her exaggerated belief in her accomplice's power and her own vulnerability to him, are products of early trauma.

### 5.    Remorse

78.    Ms. Alfaro's assumption of responsibility is rooted in deep and genuine feelings of remorse for Autumn Wallace's death. She repeatedly expressed that remorse, clearly and unambiguously, during each of our interviews. More telling, however, was the remorse evident in her overall presentation, coloring her statements and responses to questions not intended to address that issue. As mentioned above, Ms. Alfaro prays daily, "but never for myself...I don't deserve it." Ms. Alfaro was reluctant to discuss her accomplices, or even to identify the man who drove the car on the day of the homicide, not only because she feared him (and still does), but also because she believed that whatever he might have done was irrelevant to her case. Her guilt, her responsibility, and her remorse are one. She stated quite frankly that, if she were Autumn's mother, she would "never forgive me."

79.    Ms. Alfaro's remorse has been asserted (and evidenced) consistently since before her trial. Despite her trial attorney's urgings, she sought to plead guilty..."because I am guilty." It was important to Ms. Alfaro then, and it is important to her now, that her remorse be known, both to Autumn's family and to her own family, who "went through Hell for me."

---

[48]*See, e.g.*, Declaration of Maria Del Rosio Alfaro, *People v. Alfaro* (filed 3/18/92).

000177

**EX 8    177**

### C.    Substance Abuse/Addiction

80.    Ms. Alfaro's drug history is remarkable in several respects. It began when she was a young girl (sniffing organic solvents at 8 or 9; alcohol at 10; PCP, heroin and cocaine at 12 or 13). She was first diagnosed with a substance-related disorder ("Cocaine Abuse (injecting)") at 14;[49] her first drug-related arrest (for possession of marijuana and drug paraphernalia (hypodermic needle and syringe)) occurred a few months later.[50] By that time, she had already been enrolled in three drug treatment programs, all of them unsuccessful.[51] Before her 15th birthday, Ms. Alfaro had been diagnosed with Cocaine Abuse and Withdrawal, Polydrug Abuse and Withdrawal, and Chemical Dependency, and Heroin Withdrawal.

81.    As noted by Dr. Khazanov, Ms. Alfaro's addiction history is part of a much larger familial pattern of drug- and alcohol-related disorders. Her father was a chronic alcoholic who died of cirrhosis of the liver.[52] Both grandparents, her paternal grandmother, and two great-grandfathers were also alcoholics. In her own generation, both her sister and her brother have had problems with drugs. Her brother struggled with methamphetamine abuse at 17, despite placement in drug counselling and mental health programs; he suffered a severe heroin addiction by the age of 18.[53] Like Rosie and her brother, their cousin Junior, Rosa Melendez Sanchez's son, has been institutionalized numerous times for drug addiction.[54]

---

[49] 10/25/85 CIGNA records.

[50] 2/27/86 arrest records, Anaheim Police Department #86-08504.

[51] *See* 10/85 CIGNA records; 1/86 Doctors Hospital records; 1/86 Phoenix House records.

[52] *See* 1/29/99 Pre-Sentence Report, *supra*, p. 14.

[53] *See* 1/29/99 Pre-Sentence Report, *supra*, p. 16 ("[H] first tried heroin when he was 18. He became addicted quickly...") Records containing Jose, Jr.'s specific diagnosis are not yet available. I have advised counsel to obtain his CDC records, which may shed further light on the Alfaro family's specific vulnerabilities.

[54] *See* Khazanov Declaration, paras. 59-62 (discussing the family members identified in this paragraph).

000178

EX 8    178

82.    Asked about the periods when she did not use drugs, or before she did drugs, Ms. Alfaro stated: "I really didn't like myself." When she smoked marijuana (beginning at age 9 or 10), she felt like she was "in my own little world...everything so slow." When she did PCP (around age 12), "everything was so far away." Even though PCP (which she calls "wack") made her unable to talk, she liked it because: "It was just the thing of feeling numb that I liked." The first time she did a "speedball" (a combination of heroin and cocaine), she felt "calm, relaxed." Her responses and her behavior (her drug use history) reveal a young girl who turned to drugs to deaden her emotional pain. The quantities she consumed, her young age, the fact that she became addicted almost immediately, her choice of drugs (heroin, preferably in combination with cocaine), and her willingness to take almost any substance to alter her consciousness are further evidence of self-medication.

83.    Ms. Alfaro's drug of choice was heroin, which she did for the first time at 13 (in the seventh grade) -- "my friend Betsy shot me up."[55] She became addicted almost immediately. When asked, she stated that she never knew whether she "needed" the heroin, or just "really wanted it," but she describes a serious physical addiction: "If I went with nothing for a half-day or something, then I'd be real sick." Severe withdrawal symptoms are documented in her inpatient treatment records, when she was 14.[56] They are also described by Rosie's sister: "She vomited a lot, and then slept for a long time." (Silvia Alfaro Declaration, para. 23.) Ms. Alfaro also did cocaine, but reports that she did not like it by itself. She describes what sounds like visual and tactile hallucinations: "I heard helicopters. I used to tell my mother to take the spiders off me." When she did her first "speedball," "I was gone."

---

[55]Treatment records from 1986 indicate that, at that time, Ms. Alfaro reported using heroin consistently since the age of 12. (1/8/86 Nursing Assessment by D. England, R.N., Doctors Hospital of Lakewood.)
[56]"At the time of admission she was...having severe withdrawal symptoms. She was diaphoretic, [complained of] leg cramps, abdominal pain....She required medication to help with the withdrawal sx's [symptoms]." She was "nauseated and vomiting consistently." (1/8/86 History & Physical & 1/16/86 Discharge Summary by Monsoor Shah, M.D., Doctors Hospital of Lakewood.)

000179

84.     I have extensive experience with adolescent substance abusers. In my experience, early abuse and addiction to heroin (for Rosie, her very early teens) often indicates an underlying mood disorder, usually a depressive disorder. Adolescent heroin addicts often have histories of chronic childhood trauma. Comorbidity of depression and substance abuse is documented in the clinical literature,[57] as is that of PTSD and substance abuse.[58] In many cases, the drugs are an attempt to medicate the underlying depression.[59] On the other hand, it is also true that substance abusers often stand a greater risk of exposure to dangerous or traumatizing circumstances.

85.     Rosie Alfaro is a tragic example: to feed her addiction, she repeatedly sacrificed her personal safety -- prostituting herself, living on the streets, associating with individuals known to be both violent and desperate:

> When Rosie was using, she sometimes became desperate for the drugs....I heard that she sometimes had sex in exchange for the drugs. This got her into trouble and I know it made her feel worse about herself. She sometimes accepted the drugs, then refused to have sex and tried to run away. When that happened, the men went after her and beat her up pretty badly. My mother has a picture of Rosie...on the day after that happened. She had two black eyes. This happened from time to time. (Silvia Alfaro Declaration, para. 25.)

During our interviews, Ms. Alfaro described other occasions when being high and living on the streets left her prey to other addicts desperate for drugs, or (as she said) "just regular old perverts."

---

[57] *See, e.g.,* Wilens, T.E., Biederman, J., Abrantes, A.M., Spencer, T.J. (1997). "Clinical characteristics of psychiatrically referred adolescent outpatients with substance use disorder," *J. Am. Acad. Child Adolesc. Psychiatry* 36(7):941-947; Deykin, D.P.H., Buka, S.L., Zeena, T.H. (1992). "Depressive Illness Among Chemically Dependent Adolescents," *Am. J. Psychiatry* 149:10, 1341-1347; "Patterns of affective comorbidity in a clinical population of dually diagnosed substance abusers," *J. Am. Acad. Child Adolesc. Psychiatry* 31:1041-1045; Bryer, J.B., Nelson, B.A., Miller, J.B., Krol, P.A. (1987). "Childhood sexual and physical abuse as factors in adult psychiatric illness," *Am. J. Psychiatry* 144:1426-1430.
[58] *See* fn. 27, *infra.*
[59] *See, e.g.,* Markou, A.M., Kosten, T.R., Koob, G.F. (1998). "Neurobiological Similarities in Depression and Drug Dependence: A Self-Medication Hypothesis," *Neuropsychopharmacology* 18:135-174; Burkstein, et al. (1992).

000180

EX 8    180

86.     On another level, however, "epidemiological evidence suggests that the two disorders, depression and drug dependence, may be linked and related disorders and not independent of each other."[60]  The same study showed that the links between depression and drug abusers was greatest among those dependent upon opioids, cocaine, and alcohol.[61]  Similarly, research has linked substance use disorders with PTSD: "There is little question that PTSD and substance use disorders are related," as demonstrated by "[n]umerous studies, regardless of study design and sample types."[62]  Moreover, studies beginning in the 1980's indicate that "PTSD and drug A/D [abuse/dependence] could share common genetic causes [ ] or common neurophysiological systems [ ]."[63]  Earlier studies repeatedly found "a strong association between childhood ADHD and a familial history of alcohol and drug dependence."[64]

87.     In the absence of heroin, Ms. Alfaro did any substance available to take her "far away" from reality.  Even in prison, she does everything possible to numb herself, including massive quantities of Sudafed, Benadryl (8 pills at a time, sometimes as many as 25 in one day), Tylenol, Actifed, other cold pills, and Robaxin (often taking 60 pills over a 2-day period; once taking 70 pills in a day).  She admits (sheepishly) to drinking hairspray.  She also reports that she often consented to psychiatric medication to get the side affects (specifically, sedation -- another form of "numbing").  This, too, strongly suggests that her drug abuse was an ongoing attempt to self-medicate.  It also speaks to the severity of her illness.  Even without illicit drugs, Ms. Alfaro's dependence upon mind-altering (mind-numbing) chemicals is not in remission.

---

[60]Markou, A.M., Kosten, T.R., Koob, G.F. (1998).  "Neurobiological Similarities in Depression and Drug Dependence:  A Self-Medication Hypothesis," *Neuropsychopharmacology* 18:135-174, at p. 136.
[61]*Ibid.*
[62]Chilcoat, H.D. & Breslau, N. (1998).  "Investigations of Causal Pathways Between PTSD and Drug Use Disorders," *Addictive Behaviors* 23(6):827.
[63]*Ibid.*, at p. 828 [citations omitted].
[64]Last, C.G., Hersen, M., Kazdin, A., Orvaschel, H., Perrin, S. (1991).  "Anxiety Disorders in Children and Their Families," *Arch. Gen. Psychiatry* 48:928-934, *citing* Cantwell, D.P. (1972).  "Psychiatric illness in the families of hyperactive children," *Arch. Gen. Psychiatry* 27:414-417; Morrison, J.R. & Stewart, M.A. (1971).  "A family study of the hyperactive child syndrome," *Biol. Psychiatry* 3:189-195.

000181

### D.    Psychiatric Impairments

88.    Rosie Alfaro's family history, and early life experiences put her at extremely high risk for developing a chronic psychiatric condition. An unusual number of known risk factors -- biological and environmental -- left her predisposed to suffer, in addition to her other disabilities, a severe depressive illness. Evidence of that depression was observed early in her childhood, and the signs and symptoms are painfully evident today. It is important to identity and acknowledge those risk factors, as they affect the illness's progression; complicate treatment; mask, exacerbate, or even trigger symptoms; or manifest themselves in relation to co-morbid conditions -- in Ms. Alfaro's case, substance abuse/dependence, PTSD, and organic brain damage.

89.    The most serious risk factors (and/or complicating circumstances) for Ms. Alfaro have included the following:

**Familial alcohol and drug abuse:**  Rosie's childhood was controlled by a violent alcoholic, the product of three generations of alcoholics and substance abusers: "Parental alcohol abuse has long been associated with depressive symptoms in children."[65]

**Early substance abuse and dependence:**  "The prevalence of depressive illness among these chemically dependent adolescents was between two and four times the prevalence...in clinical samples of comparable age..."[66]

**Early childhood trauma, especially sexual victimization:**  A 1991 study of adolescent substance-abusers found that while all forms of early victimization increased the risk of depression, sexual abuse more than doubled the likelihood of adolescent substance-abusers developing severe, chronic depression."[67]

**Pre-existing cognitive impairments:**  Research has shown increased co-morbidity rates between mild cognitive impairments and major depressive

---

[65]Deykin, D.P.H., Buka, S.L., Zeena, T.H. (1992).  "Depressive Illness Among Chemically Dependent Adolescents," *Am. J. Psychiatry* 149:10, 1341-1347, at p. 1344.
[66]*Ibid.*, at p. 1343.
[67]*Ibid.*, at p. 1345.

41

illness.[68]  Studies have shown a specific connection between learning disabilities and depression.[69]

**Attention-Deficit/Hyperactivity Disorder and related conditions:**  "In adolescents, Major Depressive Episodes are frequently associated with Disruptive Behavior Disorders, Attention-Deficit Disorders, Anxiety-Related Disorder, Substance-Related Disorders, and Eating Disorders."[70]  Throughout adolescence, and still as an adult, Ms. Alfaro has displayed symptoms and behaviors consistent with this entire range of disorders.

### 1.    History and records

90.    Experts who evaluated Ms. Alfaro prior to trial all found that, in addition to her other disorders, she also suffered from an underlying mental illness, most likely a mood disorder. Dr. Edwards diagnosed an anxiety disorder and adjustment disorder, and noted symptoms of chronic depression.[71]  Dr. Morales discussed Ms. Alfaro's depression, suggesting the possibility of an "underlying endogenous (biological) depression."[72]  Depression, anxiety, and related symptoms were documented by mental health professionals at the Orange County Jail, where she was treated with psychiatric medications, including antidepressants, for the year prior to her trial. In 1991, eight months prior to trial, Ms. Alfaro is described by jail staff as "anxious scared & depressed"; "hopeless & helpless"; "tearful at times"; "very depressed."[73]  Several entries note the presence of "anhedonia," a hallmark symptom of chronic depression.[74]  Ms. Alfaro attempted suicide twice prior to trial.[75]

---

[68]*See, e.g.*, Reischies, F.M. & Neu, P. (2000).  "Comorbidity of mild cognitive disorder and depression -- a neuropsychological analysis," *Eur. Arch. Psychiatry Clin. Neurosci.* 250:186-193.

[69]*See, e.g.*, Weinberg, W.A., McLean, A., Snider, R.L., Nuckols, A.S., Rintelmann, J.W., Erwin, P.R. (1989). "Depression, learning disability and school behavior problems," *Psychol. Rep.* 64:275-283.

[70]*DSM-IV-TR*, at p. 354; *see also* Biederman, J., Faraone, S.V., Keenan, K., Tsuang, M.T. (1991). "Evidence of familial association between attention deficit disorder and major affective disorders," *Arch. Gen. Psychiatry* 48:633-642; Biederman, et al. (1991). "Familial association between attention deficit disorder (ADD) and anxiety disorder." *Am. J. Psychiatry* 48:633-642.

[71]3/22/92 report of Consuelo M. Edwards, M.D.

[72]3/29/92 report of Armando T. Morales, D.S.W.

[73]OCWJ records dated 6/8/91, 6/13/91, 8/1/91.

[74]*See, e.g.*, OCWJ records dated 8/1/91.

[75]*See* 10/91; 4-5/92 OCWJ records.

000133

91.    Since her conviction, CDC staff have consistently diagnosed and prescribed medication for a serious, chronic psychiatric disorder, including Anxiety, Depression, Major Depression, "Depression with suicidal ideation," Atypical Depression, "Anxiety depression," Depressive Disorder NOS [not otherwise specified], Adjustment Disorder, and (most recently) Bipolar Disorder.[76]  They also document symptoms consistent with a chronic, debilitating psychiatric disorder, including paranoia, sleep disturbances (both insomnia and hypersomnia), nightmares, depression and anxiety, suicidal ideation, binge-eating and weight fluctuations, severe headaches, lethargy, and anhedonia.[77]  She again attempted suicide in 1995 and 1997.[78]  Since her conviction, Ms. Alfaro has been treated with a broad range of psychiatric medications, including antipsychotics and antidepressants.  In psychiatric assessments by CDC personnel, Ms. Alfaro's GAF (Global Assessment of Functioning) ranges between 30 and 55,[79] indicating that her overall level of functioning has consistently been impaired by serious, sometimes debilitating, psychiatric symptoms.[80]

## 2.    Current symptoms

92.    At the time of my interviews with Ms. Alfaro, she was taking Prozac and Neurontin.  Asked about her diagnosis, she stated the medications were prescribed for "pole-bearing disorder...or something like that."  This is presumably Bipolar Disorder, a serious affective disorder that has recently been treated with Neurontin.  Ms. Alfaro

---

[76]*See* CDC records dated 4/12/93, 6/26/95, 6/4/96, 8/12/96, 6/15/97, 7/22/97, 8/21/97.
[77]*See* CDC records dated 4/4/94, 8/12/94, 8/24/94, 11/6/96, 4/29/97, 5/21/97, 6/15/97, 7/22/97.
[78]*See* CDC records dated 12/6/95-1/10/96; 6/15-23/97.
[79]The Global Assessment of Functioning [GAF] is part of the multi-axial diagnosis described in the *DSM.*  It rates the patient's "overall level of functioning" on a scale of 0 to 100.  (*See DSM-IV-TR*, pp. 32-33.)  A GAF rating of 30 indicates that:

> Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability in function in almost all areas... (*DSM-IV-TR*, p. 34.)

A GAF rating of 55, the highest documented since her 1992 conviction, reflects moderate symptoms or moderate impairments in social, occupational, or school functioning.  (*Ibid.*)
[80]*See* CDC records dated 9/18/94, 8/12/96, 6/16/97, 8/19/97.

000134

described herself as "a mess," "stressed out," "really depressed because I'm so fat." She isolates herself, withdrawing into her room and coming out only when absolutely necessary. She states that she is often irritable and impulsive, doing "really petty things" which get her in trouble with custody staff and saying "stupid things I don't really mean" which antagonize other inmates.

93.    Ms. Alfaro has two recurring nightmares that haunt her. One, a sexual dream involving Satan and thoughts of her father, is described above. In the other nightmare, lions and tigers are at her grandfather's house, trying to kill her family. She tries to keep the animals out and save her family, but the doors are breaking at the point when she wakes up. The content of the dream may or may not be significant. What is significant is the fact that these nightmares are terrifying (in different ways), emotionally exhausting, and constant ("every day").

94.    She is often anxious and agitated. She prays for her children and her family, but not for herself, "because I don't deserve it." She has been on psychiatric medications almost constantly since her conviction, usually antidepressants. She states that she doesn't really like the medications (they make her "tired, sleepy and down"), but she does not refuse them because "I'm always looking for something that will numb me out." Talking about her family and her life in prison, her affect shifts frequently -- blunted or detached at times, weepy at others, occasionally animated or elated. These symptoms and behaviors, consistently observed since her arrest at age 18, are part of a serious and longstanding depressive disorder.

### 3.    Inconsistent/substandard treatment

95.    It is clear that Ms. Alfaro's depression has been seen by mental health staff since she was first arrested. It is equally clear that Ms. Alfaro's treatment (first in Orange County and later at Chowchilla) has been sporadic, inconsistent, and generally

000185

substandard. The examples below, representative of her treatment since her 1990 arrest, are illustrative.

### a.    Orange County Jail

96.    In August of 1991, while awaiting trial in the Orange County Women's Jail, Ms. Alfaro was put on Sinequan, a tricyclic antidepressant. After three months, her medication was changed to Imipramine, another antidepressant, which she took from October of 1991 through her trial in 1992, with several increases in dosage. The Imipramine was prescribed "to ↑ [increase] sleep & ↓ [decrease] suicidality & mood."[81] Nursing notes from the fall of 1991 describe Ms. Alfaro as "depressed," "apathetic," "anxious," "hopeless," "confused"; her affect is flat and she is unable to sleep.[82] A nurse on the unit stated that her "...mood is depressed, however she does not want to realize her depression & deal with it."[83]

97.    When asked about her trial, Ms. Alfaro said that she was "scared," "confused," and "so out of it when I was going to court." This is consistent with entries in her jail mental health records. An 11/2/91 entry states that "[inmate] went to court yesterday - She admits to not knowing what happened."[84] An 11/14/91 entry states that Rosie is "very confused about the upcoming trial next month."[85] Around the time of her trial, her Imipramine was increased from 50 mg./day to 150 mg./day, a fairly high dosage for a patient who was not seen regularly by a psychiatrist or physician. She had complained that her medications made her "sleepy," "confused," "hungover."[86]

---

[81] 10/29/91 entry by Allen, M.D., OCWJ records.
[82] See, e.g., 10/20/91, 10/26/91, 10/29/91, 11/2/91, 11/12/91, 11/14/91, 12/5/91, 12/12/91 OCWJ records.
[83] 12/12/91 entry by T. Silver, R.N., OCWJ records.
[84] 11/2/91 entry by T. Silver, R.N., OCWJ records.
[85] 11/14/91 entry by T. Silver, R.N., OCWJ records.
[86] See, e.g., 10/26/91 entry by T. Middlesworth, LVN, OCWJ records.

45

000136

98.     During her trial, Ms. Alfaro was reportedly awakened each morning at

5:00 a.m. and given her medications.  She states that she was unable to pay attention in

court; she does not remember most of her trial.  This is consistent with her sister's report:

> Rosie was grateful that we [her mother and sister] were there to support her, but
> she seemed very lost.  She looked like she did not understand what was going on.
> I did not understand many of the words that were being used.  I worried that Rosie
> did not understand the words either.  Even if she understood the words, she
> seemed very out of it....She did not look at the witnesses when they testified.
> (Silvia Alfaro Declaration, para. 33.)

Ms. Alfaro's aunt made similar observations:

> She tried not to show me how sad she was, but when I went to the courtroom I
> could see it.  She made a point of smiling at me when I came in, but then she
> turned back in her seat and I could see her go back within herself.  When
> witnesses testified, Rosie didn't seem to pay attention to them, or to anything else
> in particular.  Instead, she just looked down at herself.  (Sanchez Declaration,
> para. 8.)

These reports raise serious doubts about Ms. Alfaro's ability to assist counsel in

preparing and presenting a meaningful defense.


### b.     CCFW-Chowchilla

99.     A few examples serve to demonstrate the inconsistent and seemingly

arbitrary psychiatric care provided to Ms. Alfaro since her incarceration at CCWF.

Records from calendar year 1994 raise serious questions about inappropriate medications

(and the range and combinations of medications prescribed); frequent changes in

medications, often at the request of Ms. Alfaro herself (the mentally ill patient); and

inconsistency in her treatment overall, especially with respect to monitoring the unusual

number and range of psychotropic medications prescribed.

100.    The psychiatric medications prescribed for Ms. Alfaro during 1994

included three phenothiazines, "or antipsychotics" (Triavil, Mellaril and Haldol); two

antidepressants (Imipramine and Prozac); a benzodiazepine (Klonopin); and an

000187

**EX 8    187**

antianxiety agent (Vistaril). In two cases (Klonopin and Prozac), the same drug was discontinued and the restarted again after fairly brief periods. Two entries (months apart) note that Ms. Alfaro never received the prescribed medications.[87] Many of the medication changes were apparently made at the request of Ms. Alfaro herself. The medication changes during this period were ordered by at least three different doctors; no single clinician monitored Ms. Alfaro's progress on the medications.[88] During that calendar year, there were two periods (one lasting 2 months and the other for 3) during which Ms. Alfaro was not seen or monitored by the prescribing (or any other) psychiatrist.

101.   In 1995, Ms. Alfaro's medications were changed at least 8 times, by 3 different psychiatrists. These included a broad range of antipsychotics, benzodiazepines, antidepressants, and mood stabilizers. Some of the prescriptions, including those for new medications, were for 60-day periods, during which Ms. Alfaro was not observed or examined by psychiatric staff. In 1996, her chart reflects at least 7 medication changes, ordered by 5 or 6 different doctors.

102.   Also perplexing are the frequent changes in both diagnoses and treatments prescribed during the three months between May and August of 1997:

5/97:   Because Rosie requested a change of meds, Prozac and Vistaril were discontinued, and she was started on Paxil and Trazadone.[89]

6/97:   On 6/14, she was treated at the ER for "Caffeine interaction with meds."[90] On 6/15, admitted to the Crisis Bed Unit after overdosing on an "unknown # of Tylenol Ibuprofen pills";[91] diagnosed with an Adjustment Disorder, Depressive Disorder NOS, and Major Depressive Episode.[92] On 6/16,

---

[87]CDC entries dated 3/2/94; 5/24/94.
[88]See, e.g., 3/24/94 entry by S. Andrew, M.D.; 4/4/94 and 4/14/94 entries by Bruce A. Baker, M.D.; 6/18/94 entry by Susan Gold, M.D.; 7/12/94 and 8/12/94 entries by J. [illegible], M.D.
[89]5/21/97 Progress Note, CDC records.
[90]6/14/97 R.N. entry, CDC records.
[91]6/17/97 Discharge Note by M.M. Choudry, M.D., CDC records.
[92]6/15/97 Admitting Note by M.M. Choudry, M.D.; Admission Psychiatric Evaluation by M.M. Choudry, M.D.; Treatment Plan by Dr. Gold, CDC records.

000188

Paxil and Trazadone were increased.[93] Ms. Alfaro was discharged 6/17, with Paxil at the higher dose, but she was diagnosed: "Overweight female...with no apparent illness."[94] On 6/18, she was re-diagnosed with Adjustment Disorder.[95]

7/97:   Paxil and Desyrel were discontinued at Ms. Alfaro's request, replaced with Vistaril. She was diagnosed with Adjustment Disorder.[96]

8/97:   Again diagnosed with Depression NOS; Prozac restarted at her request.[97]

In the course of three months, Prozac and Vistaril were discontinued and subsequently restarted, apparently at Ms. Alfaro's request. During the intervening period, she was prescribed two different antidepressants, which were also discontinued at Ms. Alfaro's request. Two days after she was given three major psychiatric diagnoses and her antidepressant medication was doubled, she was found to have "no apparent illness" and discharged from the crisis unit, yet clinical staff maintained her medications at the higher dose. At the end of this three-month period, she had returned to her earlier medications and had been rediagnosed (once again) with Depression NOS.

### E.   Trial Experts

103.   In her recent declaration, Dr. Natasha Khazanov discusses in some detail the "non-clinical roles assigned to trial experts":[98]

> It appears that trial counsel retained several mental health professionals to perform non-clinical functions, or to employ clinical practices and techniques (psychological testing and clinical interviews) for purposes other than assessing Ms. Alfaro's mental state and its possible role in the charged offenses. (Khazanov Declaration, para. 101.)

Dr. Khazanov specifically identifies the non-clinical roles assumed by Drs. Martha Lee Rogers, Consuelo M. Edwards, and Bruce L. Danto, with the following conclusion:

---

[93] 6/16/97 entries by M.M. Choudry, M.D., CDC records.

[94] 6/17/97 History and Physical Report by M.M. Choudry, M.D., CDC records.

[95] 6/18/97 entry by S. Gold, M.D., CDC records.

[96] 7/22/97 M.D. entry, CDC records.

[97] 8/19/97 M.D. entry, CDC records.

[98] *See* Khazanov Declaration, paras. 93-106.

. 000139

EX 8   189

[W]hile it appears that Ms. Alfaro received the benefits and services of several mental health professionals [at trial], that appearance is quite misleading. Too often, their evaluation were conducted for purposes unrelated to their expertise or the stated reasons for appointment by the court. (Khazanov Declaration, para. 106.)

104.    I concur with Dr. Khazanov's assessment regarding the inappropriate use of mental health professionals at Ms. Alfaro's trial. I also concur with her conclusion that the assignment of non-clinical tasks to mental health evaluators effectively undermined the reliability of their clinical assessments. As a physician and psychiatrist, I especially concerned by the functions performed by the two physician/psychiatrists appointed to assist in Ms. Alfaro's defense, Drs. Consuelo Edwards and Bruce Danto.

### 1.    Consuelo M. Edwards, M.D.

105.    Although Dr. Edwards was retained for the stated purpose of evaluating Ms. Alfaro's mental state at the time of the offense, "she recalls that much of her evaluation was aimed at discovering the identity of the third party (the second, unidentified male) who was present at the crime scene." (Khazanov Declaration, para. 101.) Dr. Khazanov provides several examples of Dr. Edwards' role as an interrogator, rather than evaluator, of Ms. Alfaro. To her assessment, I would add one additional piece of evidence.

106.    Included in trial counsel's file is a 2-page, detailed chart comparing the physical features and characteristics of "SHORTY," "BETO," and "COMPOSITE."[99] Several entries on the chart suggest that it was compiled by an individual with medical training. For example, under "ANATOMICAL TYPE," Shorty is described as "ENDOMORPHIC," Beto as "MESOMORPHIC," and the composite drawing as "ATHLETIC MESOMORPHIC."[100]  A handwritten note on the first page states that "this is from Dr.

---

[99] See notes and documents provided by Laura Lawhorn, Sandberg Investigations.
[100] Ibid.

000190

Edwards."[101]  This chart is further evidence that Dr. Edwards devoted a significant amount of her time (and her medical training) to the identification of the second accomplice, an investigative task which conflicted with her duty to thoroughly assess Ms. Alfaro's mental state.

## 2.    Bruce L. Danto, M.D.

107.    Dr. Khazanov also notes that trial counsel engaged Bruce Danto, M.D. to inject Ms. Alfaro with sodium pentathol and thereby induce her to identify the third individual who was present at the crime scene. Court documents and Dr. Danto's statements to the press confirm that, despite his training and qualifications as a psychiatrist, Dr. Danto's role was essentially that of counsel's investigator or interrogator.[102] A series of clinical articles found in trial counsel's files confirms that Dr. Danto was indeed acting in a non-clinical (and non-therapeutic) capacity.  They also raise questions about the appropriateness of this technique (the sodium pentathol interview), even as an investigative tool.

108.    Among other materials in trial counsel's files regarding Dr. Danto and his examination of Rosie Alfaro, are five articles which shed light on the use of so-called "truth serums" and the role played by Dr. Danto in conducting a Sodium Pentathol interview of Rosie Alfaro.  Three of these articles are from highly respected professional journals.  These articles discuss the use of Sodium Amytal and "Amytal interviews" in the context of clinical assessment and diagnosis.[103] Although they reach different conclusions, these articles discuss the possible role of Sodium Amytal interviews in distinguishing between specific symptoms of psychotic and depressive disorders, and in

---

[101]*Ibid* [emphasis in original].  Counsel informs me that the handwriting is that of Ms. Lawhorn.
[102]*See* Khazanov Declarations, paras. 103-105 & fns. 86-91.
[103]Sodium Amytal (also known as Amytal Sodium and Sodium Amobarbital), Sodium Pentothal (or Thiopental Sodium), and Brevital Sodium (or Methohexital Sodium) are all classified as barbiturates and have the same general clinical effects.

000191

the treatment of catatonia and severe organic stuporous states.[104] At no point in his examination of Rosie Alfaro was Dr. Danto's interview focused on diagnostic or treatment issues.

109.    A fourth article in counsel's files discussed the use of hypnosis and Sodium Amytal interviews "in attempts to gain access to memories that do not seem to be readily accessible to usual conscious efforts of recall."[105] That article, presenting these issues in the context of one case history, found that "neither of these procedures turned out to be the hoped-for 'truth-serum...'"[106]

110.    Only one of the articles in counsel's files is specifically addressed to the use of "various truth serum drugs" as employed by Dr. Danto in his examination of Rosie Alfaro. That article -- "The Use of Brevital Sodium[107] in Police Investigation" -- was authored by Dr. Danto himself and appeared not in a clinical journal, but in a law enforcement magazine, *The Police Chief*.[108] In that article, the interviewee is referred to as "suspect, witness, or defendant." Perhaps more important, however, is Danto's description of himself as "a psychiatrist and police officer."[109]

111.    The presence of these articles in counsel's files is significant for several reasons. They indicate that, although this technique has potential clinical/diagnostic uses, those uses were neither explored nor considered as part of Dr. Danto's examination. They confirm that Dr. Danto, although trained as a mental health professional, was in fact acting as a criminal investigator/interrogator when he examined Ms. Alfaro. Finally,

---

[104]Perry, J.C. & Jacobs, D. (1982). "Overview: Clinical Applications of the Amytal Interview in Psychiatric Emergency Settings," *Am. J. Psychiatry* 139:5, pp. 552-559; Dysken, M.W., Kooser, J.A., Haraszti, J.S., Davis, J.M. (1979). "Clinical Usefulness of Sodium Amobarbital Interviewing," *Arch. Gen. Psychiatry* 36:789-794; Ward, N.G., Rowlett, D.B., Burke, P. (1978). "Sodium Amylobarbitone in the Differential Diagnosis of Confusion," *Am. J. Psychiatry* 135:1, pp. 75-76.

[105]Zonana, H.V. (1979). "Hypnosis, Sodium Amytal, and Confessions," *Bull. of the Amer. Acad, of Psychiatry and the Law* 7:1, pp. 18-28.

[106]*Ibid.*, at p. 18.

[107]*See* fn. 95, *supra*.

[108]Danto, B.L., "The Use of Brevital Sodium In Police Investigation." *The Police Chief* (May 1979).

[109]*Ibid.* When this article was published, Dr. Danto was both a professor of psychiatry and a deputy sheriff with the St. Clair County Sheriff's Department in Port Huron, Michigan.

000192

EX 8    192

the presence of these articles in counsel's files suggests that both Dr. Danto and Ms. Alfaro's attorney were aware that the techniques used in Danto's examination were clinically questionable. Their apparent indifference to the standard of care is also reflected in an E-Mail from counsel's lead investigator, David Sandberg, which states: "DANTO SCARES ME BUT WE HAVE NOTHING TO LOOSE [sic]."[110]

## IV.    Conclusions

112.    Rosie Alfaro suffers from severe psychiatric, neurological, cognitive and emotional disorders which are longstanding and debilitating. These disabilities existed at the time of the offense, and they have persisted at all times since. Indeed, Ms. Alfaro's brain damage, her chronic depressive disorder, and Posttraumatic Stress Disorder were present and observed throughout most of her childhood and adolescence. As Ms. Alfaro reached adolescence, they were compounded by chronic self-destructive drug abuse and addiction. It is my professional opinion that these conditions are related and intertwined; their effects are cumulative, disabling and overwhelming.

113.    The effects of Rosie Alfaro's cognitive impairments were consistently documented throughout elementary school. Early signs and symptoms of her underlying psychiatric illness were observed during the same years. Depressive and dissociative symptoms have been acknowledged and documented since the time of her arrest at the age of 18, yet rarely have they been treated in any consistent or meaningful way. Those symptoms, as well as a range of symptoms and behaviors associated with PTSD, persist today. The severity of her drug addiction, and its devastating effects on her mental and physical health, are beyond dispute.

114.    Rosie Alfaro's psychiatric conditions must be considered in the context of her early experiences. Ms. Alfaro suffered early and chronic physical and emotional

---

[110]8/20/91 E-Mail from DRS [David Sandberg] to LL [Laura Lawhorn], trial files of Laura Lawhorn.

000193

EX 8    193

abuse which was sufficiently severe to exacerbate pre-existing brain damage and underlying psychiatric illness. Her ongoing abuse also induced the post-traumatic symptomatology which profoundly impaired her perceptions, insight and behavior on the day of Autumn Wallace's death. Rosie Alfaro struggled through her childhood and adolescence in an environment characterized by chaos, unpredictable violence, and a pervasive lack of safety. In addition to the chronic abuse and neglect within her own home, Ms. Alfaro suffered acute traumas in the form of molestation and rape.

115.   All of Ms. Alfaro's impairments were present during her pre-trial detention and her trial. They were almost certainly exacerbated by the circumstances of her confinement (not the least of which was her pregnancy and delivery of twins while incarcerated at the Orange County Jail), by her young age and immaturity, by the prolonged separation from her four young sons, by her confusion regarding the legal process and the court proceedings themselves, and by her belief that her own attorney had first sabotaged her most fundamental desire -- to assume responsibility for this tragic crime -- and subsequently misled and humiliated her as she took the stand wholly unprepared.

116.   Many of Ms. Alfaro's impairments were recognized at trial. Drs. Edwards and Morales did, in fact, diagnose some of Ms. Alfaro's disabling conditions, any one of which might be debilitating in itself. However, those diagnoses, individually or in combination, do not accurately describe Ms. Alfaro's mental state. An accurate assessment of Ms. Alfaro's mental state must recognize and examine the complex interplay between and among these disabilities. That analysis was not conducted. A fundamental factor affecting every aspect of Ms. Alfaro's mental state -- *i.e.*, assessment of organic brain damage and neurocognitive impairments -- was never undertaken. Moreover, Ms. Alfaro herself was examined and judged by standards which failed to properly consider her unique limitations and the unique range of factors which impaired her perceptions and memory.

.000194

117.    The pre-trial evaluations and expert testimony at trial were, for these and other reasons, inherently flawed.  They were incomplete and unfocused, in large part because they were conducted by evaluators whose primary roles were neither clinical nor therapeutic.  The experts retained by trial counsel, although trained as mental health professionals, were charged with tasks unrelated to their clinical expertise -- specifically, identifying the third person present at the Wallace homicide (*i.e.*, the driver).  This role -- as investigator/interrogator -- necessarily interfered with the trial experts' ability to conduct accurate and competent clinical assessments.

118.    Although most of the experts retained by trial counsel were also charged with conducting forensic evaluations, even that aspect of their examinations was distorted and misdirected by defective, inappropriate, and/or meaningless referral questions.  Counsel failed to provide his mental health experts with the direction, clarity, context, and data necessary for meaningful and thorough examinations.

119.    For more than a year prior to her capital trial, Ms. Alfaro sought to plead guilty to the charges stemming from Autumn Wallace's death.  It is my professional opinion that this was the product of sincere remorse and a desire to accept responsibility for her actions -- to do "the right thing."  However, her desire to plead guilty was in no way an attempt to achieve was some have called "state-assisted suicide."  Despite her chronic psychiatric impairments, Ms. Alfaro did not want to be sentenced to death; to the contrary, she was terrified by that prospect.

120.    It is very possible that Ms. Alfaro's multiple disabilities rendered her unable to assist counsel in preparing and presenting a legal defense.  Her ability to recall and relate relevant information to her attorney were severely hampered by her longstanding cognitive impairments and memory deficits.  Her confusion with respect to legal issues is documented in pre-trial jail records, and descriptions of her affect and demeanor in the courtroom suggest that she was unable to comprehend or participate in the trial proceedings.  Her impairments in perception, attention, memory and

000195

comprehension may well have been exacerbated by the psychotropic medications prescribed and administered by clinical staff throughout her detention and trial.

121.    It is my professional opinion that these factors, in addition to her documented history of severe impairments, should have prompted a full investigation into Ms. Alfaro's competency to stand trial.  As part of that investigation, competent mental health evaluators should have considered the possible effects of all psychiatric medications administered to Ms. Alfaro in the weeks and months prior to trial and during the trial itself, including changes in her medication regimen and any corresponding changes in her behavior or presentation.

122.    It is also my opinion that a full and comprehensive evaluation of Ms. Alfaro's competency should have been conducted at the time of her second penalty phase hearing.  Her perceptions of sabotage and humiliation by her own attorney during the first penalty hearing were so powerful that Ms. Alfaro formally requested new counsel, an action quite out of character for this malleable young woman.  This in itself indicates that the damage she sustained during the first trial was indeed severe.  Furthermore, in the time between her first trial and the commencement of her second penalty hearing, her medication dosage was doubled.  During that same period, her classification within the Orange County Women's Jail was changed due to her need for "acute mental health care."  These changes, in addition to the cumulative effects of ongoing incarceration and the prospect of a second hearing to determine (literally) whether she would live or die, constitute circumstances sufficient to warrant a full evaluation (or re-evaluation) of Ms. Alfaro's competency to proceed.  Given her history of betrayal and victimization, and her perception of betrayal by counsel during her first penalty hearing, any competency evaluation at that time should have specifically addressed Ms. Alfaro's ability to assist Mr. Monroe, in particular, in the preparation and presentation of her case for mitigation.

123.    I understand that the sentencing court in Ms. Alfaro's case was required to consider specific factors in mitigation pursuant to California Penal Code section 190.3,

000199

including: subsections (d) that the offense was committed while Ms. Alfaro was under the influence of "extreme mental or emotional disturbance"; (g) that she acted under extreme duress or under the "substantial domination" of another; (h) the fact that, at the time of the offense, Ms. Alfaro's capacity to conform her conduct to requirements of the law was impaired "as a result of mental disease or defect, or the affects of intoxication"; and (i) Ms. Alfaro's youth at the time of the crime. It is my professional belief that, as a result of genetic, developmental, environmental, neurological and psychiatric factors beyond Ms. Alfaro's control, she suffered substantial cognitive and psychiatric impairments relevant to subsections (d), (g), and (h). With respect to subsections (d) and (h) in particular, Ms. Alfaro's mental capacity was severely impaired by multiple psychiatric disabilities *and* the affects of intoxication (both heroin and cocaine). It is my further belief that the same cognitive and psychiatric impairments render the mitigation of subsection (i) -- Ms. Alfaro's age (18 at the time of the offense) -- especially salient and compelling.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was signed this 23rd day of July, 2001 in San Francisco, California.

PABLO STEWART, M.D.

56

000197

## DECLARATION OF SILVIA ALFARO

I, Silvia Alfaro, declare as follows:

1.  I am the second daughter of Silvia Melendez and Jose Luis Alfaro. I was born █████ █ 1973 in Tangancicuro, Michoacan, Mexico, while my parents were visiting family. Both my parents had were born in that same village. They had moved from Michoacan to California several years earlier and were living in Anaheim. Maria DelRosio ("Rosie") Alfaro is my sister, born in Orange County in October of 1971. We have a younger brother named Jose Luis Alfaro, Jr., who was born in 1979. Rosie, Jose and I have three younger half-brothers — Ricardo Alonso, Salvador Alonso, and Alejandro Alonso — born to our mother during two relationships after our father left the family. I have heard that we also have a half-sister, Wendy Alfaro, through our father, but I have never met her.

2.  My mother is the oldest child both to Jose Melendez and Merecedes Guillam. She has two sisters — Rosa and Mercedes — and three brothers — Jose ("Pepe"), Guillermo ("Memmo"), and Arturo ("Turo"). They all lived close by when we were growing up in Anaheim. My younger aunts and uncles are close in age to Rosie and me, so we were very close. My grandparents have lived in the same house on Nutwood Street since I was 5 or 6 years old. Before that, they lived on Jeffrey Street in Little TJ, then briefly in an apartment on Cerrirots Street. There were many times when my family lived with them, both in Little TJ and on Nutwood. In the Nutwood Street house, we sometimes lived in the house and sometimes in the garage. For awhile, Rosie and I lived in the house with our grandparents while our parents and Jose lived in their garage. At other times, when my father had left us and after he returned to Mexico, my mother took us to live with them. At one point, when my half-brothers were very

1

000198

EX 9   198

young, my mother moved with them and Jose into a separate house while Rosie and I remained at our grandparents'.

    3.  Uncle Guillermo lived with my grandparents for awhile, then bought a house on the block where they live now. My mother's house is on the corner at the end of the same block. My Aunt Rosa had lived in that house when we were children; we had lived with her there for awhile. Rosa now lives just two blocks away. I see all of my aunts and uncles at least once a week. I talk to my Aunt Rosa several times a week. Rosie's oldest son, Danny, lives with my grandparents and I see them almost every day. Rosa's grandson also stays with my grandparents most of the time. My little brothers — now ages 9, 10 and 12 — often stay with my grandparents when my mother works.

    4.  Rosie and I were raised speaking Spanish as our first language. Within the family, especially with our grandparents, we speak only Spanish. My mother's English is now quite good, but we spoke Spanish in the house when we were growing up. When Rosie and I started school, we spoke almost no English at all. When someone in the family had to communicate with English-speakers, my Aunt Mercedes often translated for the family. I often play that role now. I work for the School District in Anaheim. One of my duties in translating for monolingual Spanish-speaking students and their parents.

    5.  My mother has worked at the Disneyland Hotel since before my brother Jose was born. Before that, she worked in housekeeping at another hotel. When my father still lived with us, he worked in the warehouse at Carl's Jr. For most of our lives, especially my mother made more money than my father. After he lost his job, she was the main source of support for the family. My mother has always worked very hard, often 14 or 16 hours a day. When Rosie and I

2

000100

**EX 9**    **199**

were children (elementary school and earlier), my mother usually left us with someone in the family while she worked. That was usually my grandparents, but Uncle Guillermo and Aunt Rosa were always nearby. When we were very little, my father sometimes watched us, especially if it was during the week.

6. My father died about four years ago in Mexico. He had left the family many years earlier, around 1985 or 1986, and was living with his mother in the village where he was born. My father was an alcoholic. By the time he left the family, he was drinking and getting drunk every day. When we were younger, he was drunk mostly on the weekends, but after he lost his job, it was every day. He brought his drinking buddies over to the house when my mother was working. If my mother was working and he wanted to go drinking, he left us with my grandparents. When he was drinking, he didn't care about his kids.

7. I have a few good memories of him from my childhood. Before his drinking got really out of control, he would stop at liquor store on the way home and bring home drinks for himself and ice cream sandwiches for Rosie, Jose and me. I still remember that every time I see an ice cream sandwich. After awhile, he stopped bringing the ice cream.

8. Even when we did things as a family, my father's drinking was a problem. Whenever we went somewhere, he had to drive, but he was always drunk. We often drove to the beach in San Diego or San Juan Capistrano, but on the way home, my father would end up pulled up on the side of the freeway, passed-out drunk. Rosie and I knew what was happening, so we learned to just get comfortable in the back of the truck and go to sleep until he came around and started driving again. This didn't happen just once, but many times.

9. Another time, he was driving a convertible with me, Rosie and our mother in the car.

3

He was drunk again and he drove the car into the back of a semi truck. I was about 5 years old and I was sitting on my mother's lap and I hit the windshield. I remember being in the hospital and being very frightened. I had been wrapped tightly in something and tied to a board. I still carry a scar less than an inch from my right eye.

10. My father was not the only one who has put us in danger with his drinking. Manuel Cuevas, the father of Rosie's son Manny and her twins, was a heavy drinker while they were together. After Manny was born, Rosie and Manuel were in a serious accident when he was driving drunk. She ended up in the hospital with a concussion. I picked her up when she was discharged from the hospital, so I remember how she looked. She was all cut up where glass from the windshield had been embedded in her face and head. My own husband also drinks sometimes, so I do not allow my children to be in the car with him.

11. When we were children, my father was often violent toward my mother. In my memory, his violence was almost always related to drinking. When he came home drunk, he often beat my mother. He found whatever excuse he could to berate and insult her. He constantly told her that she was stupid and worthless. They tried not to fight in front of the kids, but we often heard them yelling at each other and we heard my mother's screams when he hit her. Rosie was older than I was, so she seemed more aware of their fighting at an earlier age.

12. My parents' fighting often took place in front of my grandparents. We lived very close, so there was usually someone around. Sometimes my grandfather got between them and tried to talk to them. Someone (my grandmother or my Uncle Memo) would try to get us kids away from the fighting. Sometimes, Rosie would try to protect us by taking me and Jose into the garage so we couldn't see the fighting. Even when we could no longer see them, we could still

4

hear the screams.

13.   Sometimes my grandfather made my father leave the house until he sobered up, but sometimes he sided with my father.  My grandfather had been an alcoholic, so I think he felt sorry for my father.  He thought my father was a nice guy who just needed some help.  That may be why he allowed my father to bring his drunken friends around.  They were often in front of the house when Rosie and I lived with my grandparents.  They were loud and could be scary.  If they had hurt one of us, my father would never have believed it.  Whenever we complained, he blamed the problems on us, usually on Rosie.

14.   As we got older, the fighting became more frequent and more visible to us kids.  My father came home drunk and my mother came home tired after work.  He got mad and abused her, first verbally and then with his fists.  We watched the same scene over and over again.  After the fights, my father tried to get sympathy from us (the kids), tried to make us feel sorry for him.  Rosie always sided with my mother.  She always got very upset with my father and wanted to defend my mother.  Sometimes she even put herself physically ~~between~~ between my parents during their fights, but that just got her in trouble.  I got very frustrated.  I couldn't understand why my mother let herself be treated that way.

15.   The fighting continued until my mother finally kicked him out of the house.  I was in junior high school by then and Rosie had left school altogether.  My father had lost his job at Carl's Jr.  He hung out with his friends in Little TJ, a section of Anaheim where we had lived when we were little, then came home drunk, looking for money and threatening my mother.

16.   By the time Rosie and I went to junior high school, our father was beating on us, too.  Sometimes he gave a reason for the beatings, sometimes he didn't need one.  Sometimes our

000202

mother told him that we had misbehaved or skipped school, then he beat us for that. If he was

mad at her, he sometimes beat both of us. The beatings became very regular. We figured out

that whenever he was drunk, he would find some reason to hit us. In addition to the beatings, he

screamed at us and insulted us, calling us stupid and worthless, just as he did to our mother. My

father blamed Rosie for everything that went wrong in the family. He also called us "sluts,"

especially Rosie. His insults were very hurtful to both of us, but I think they went deeper for

Rosie. She had such low self-esteem and already felt so badly about herself that his name-calling

hurt her very deeply.

17.  When our father beat us, he almost always used a belt. He whipped us on the legs

where the welts didn't show under our clothes. He usually used the strap end of the belt but we

sometimes got the buckle, especially if we tried to block the blows. My mother saw the beatings

but she did nothing to stop my father or protect us. She probably believed that if she tried to help

us, my father would turn on her. Still, that left no one to protect us unless my grandfather

intervened. Sometimes he could get rid of my father for the night, but it never stopped him from

coming back and beating my mother, Rosie and me.

18.  When the beatings started, Rosie tried to protect me, like she had with my mother.

She tried to take the blame for both of us, telling my father that it was her fault we had stayed out

or that she had made me go out with her, but she just got whipped harder or we both got hit. She

tried to stand by me and protect<sub>and</sub> defend us. I have a very clear memory of Rosie getting badly

hurt as a result. I was on the bed and my father was whipping me with the belt when Rosie got in

the way. The metal prong from his belt buckle caught her and dug deep into the palm of her

hand. It left a deep open wound, like a hole in her hand.

6

000223

19.   Rosie and I started staying away from home to avoid the beatings. There was no reason to go home and we were never really safe. We stayed out all night, then crept back in to sleep. Then we got beaten for staying out. It didn't matter who was at fault or what our reasons were — we still got whipped with the belt. If I came home alone and Rosie wasn't there to take the beatings, I took them for her. Later, started staying away for longer periods of time. Our mother was always working and our father was drunk, so there was no one making sure we were going to school or taking care of us. It seemed like no one was paying attention at all.

20.   Rosie always looked out for me and Jose before herself. She gave us her food and tried to protect us from our father, but she really couldn't protect us. She couldn't even protect herself. I learned to keep a distance from my father when he was drunk, so that sometimes the beatings were less angry or less frequent. Rosie couldn't seem to stay out of his face, so we all got beat more. Her response to the beatings also got us in trouble. No matter how scared she was, she didn't let my father see her cry. That just made him madder.

21.   The beatings had started when Rosie started using drugs and staying away from home. Rosie started using serious drugs in junior high school. She had started drinking alcohol when she was 12 or 13 years old. She also drank my mother's Robitussin, which had alcohol in it. She told me about it, but she never gave me any or encouraged me. Rosie did all kinds of drugs, but the one she always wanted was heroin. She injected it in her neck and in the veins behind her knees. She also did a lot of cocaine. We were young girls and it seemed like it was always available. When she used, she could never get enough. She got so high that her mind was totally blank.

22.   I did drugs for awhile, too. We did them together sometimes and we hung out

7

000204

together a lot, but I didn't do cocaine with Rosie.  When I did that, I got it from other friends.
When Rosie found out that her friends had given me cocaine, she got furious.  Even when she
was doing drugs, Rosie was very protective of me and Jose.  She

had little ways that she tried to protect the family.  She knew it upset me and my mother to see her

so out of control, so she stayed away when she was on a real binge.  This was after she was 14 or

15 years old.  By then, she had been using cocaine and heroin for several years.  Later, when she

had the babies, she tried to make sure they were okay before getting high.  None of that really

made things any better, but in her own way, Rosie was trying to shield us.

    23.  Rosie couldn't stop using drugs.  She tried many times, and sometimes she stayed

clean for awhile, but she always ended up using again.  Whenever she stopped, she got violently

ill and very crazy.  When she started coming down from the drugs, she was totally out of control.

She lashed out at everyone around her and even put herself at risk, but she never seemed to realize

it at the time.  She always regretted it later, always saying "I can't believe I did that," or "Why did

I do that?"  She also vomited a lot, and then slept for a long time, but after withdrawal, I don't

think she ever slept very well.  When she and Manuel were living at my grandfather's house, I

noticed that she would stay up way into the night.  When she stopped doing drugs, she bloated up

almost immediately.  She always gained weight very easily, even as a little kid, but the weight

gain when she was off the drugs was very noticeable.

    24.  When she was using drugs, Rosie let herself go.  She didn't care what she looked like

and she didn't even keep herself clean.  That was very sad to watch because it was so unlike

Rosie.  When she wasn't using drugs, Rosie spent hours working on her hair and her appearance.

She was always chubby, but she took care of herself and was always worried about her hair and

8

000205

her makeup. I could always tell when she was using drugs because she looked like she just didn't care about herself.

25. When Rosie was using, she sometimes became desperate for the drugs. After I stopped hanging out with Rosie, I heard that she sometimes had sex in exchange for drugs. This got her into trouble and I know it made her feel worse about herself. She sometimes accepted the drugs, then refused to have sex and tried to run away. When that happened, the men went after her and beat her up pretty badly. My mother has a picture of Rosie taken at a family gathering on the day after that happened. She had two black eyes. This happened from time to time. Rosie didn't like it but I guess she saw it as the price she had to pay.

26. Our parents didn't really know how to help us when we got into drugs. Rosie was older and was in pretty bad shape by the time my mother knew what was happening. She wanted to help us, but didn't really know where to turn. One thing she tried was to send me and Rosie to stay in Mexico with family there. We went separately, at different times. I think Rosie was in seventh grade when she went back. She stayed for several months and she was miserable. The thing I remember about her time in Mexico was that she learned sniffing glue. I guess she tried to stay high the whole time she was there.

27. I went to Mexico in eighth grade. My mother took me back and I was supposed to stay with my father and his mother. I stayed there at first but I hated it. My father was already sick and he was drunk every day. I ended up staying with my great-uncle (my mother's father's brother) and his wife.

28. Even when she wasn't using, it was like she was sometimes not there mentally. She couldn't focus for very long and had a really hard time in school. Other kids made fun of her, so

9

000206

she kind of made fun of herself. It seemed like she would do anything to get attention, even if the attention was bad, like getting hit by my father. She was also sad a lot, especially when she couldn't take care of me and Jose. She was sad before she started doing drugs. I think one of the reasons she started doing drugs was because she was so unhappy. Maybe that is why she couldn't stop.

29. My little brother, Jose Luis Jr., has had a lot of the same problems that Rosie did. He got into drugs and couldn't seem to stop. He was constantly trying to get attention, even when the attention got him in trouble. I think that was partly because my mother was never around and no one really paid attention to the good things we were trying to do. My cousin Junior (Rosa's son) has had some of the same problems. He has been using drugs now for years. I've never understood that, because it seems like his parents were always there for him. Rosa and her husband have put Junior into hospital and treatment programs, and I have talked to him a lot, but he always goes back to using drugs. I'm not certain what drugs he's using but I know that he smokes them. Sometimes when he's using, he talks constantly and drives me crazy. Other times, he gets really dopey and out of it. He's also been depressed for a long time, especially since Rosie went to prison.

30. Rosie and I both dropped out of junior high school, but I later finished junior high and high school. It took me many years to finish school and it was hard work. I had two babies by the time I graduated. Rosie was in prison and I was raising Danny. I also took care of my little brother Salvador, who had Down's Syndrome. Rosie never went back to school.

31. After I stopped using drugs and went back to school, I was mad at Rosie for not getting her life together like I was trying to do. I realized after awhile that she just couldn't. She

10

000207

had always been considered "slow" and had problems that I didn't have. It took her longer to learn English and she never learned to read very well. Even as a little kid, she couldn't concentrate on anything for very long. She seemed to live in her own world. She could never keep up with the other kids and there was no one at home to help her. My mother didn't pay attention to what was happening (or not happening) at school, and she didn't speak English well enough to help Rosie herself. My father was either drunk or gone, so he just made her feel worse about her problems.

32.   Rosie has four sons. Danny was born when Rosie was 15 years old. Manny Jr. was only a year old when Rosie was arrested, and the twins — Eddie and Ernie -- were born while Rosie was in the Orange County Jail. Since Rosie was arrested, Danny has lived with my grandparents. He calls me "Mom" and I pretty much think of him as one of my own kids. I have basically been his guardian and the person in charge of his schooling. I meet with his teachers and attend the IEP meetings for his Special Education classes. Danny is an RSP student. He is supposed to go into the ninth grade next year, but he has always been behind. When he was in sixth grade, I was told that he was reading at the second grade level. He still can't read very well. His teachers tell me that he is failing at least one of his classes. They complain that he is hyperactive and acts out in class. This makes me think of Rosie. One teacher told me that Danny talks to himself. Danny says that he's doing that to make the other kids laugh, but this concerns me. When I spoke to the teachers about him, they showed me test results where he had given answers to the effect that he was very lonely and had thought of killing himself. I have told him that he can talk to me about anything whenever he needs to, and I hope he will. I worry about him.

11

000208

33. My mother and I went to Rosie's trial as often as we could. The only times we did not go is when Mr. Monroe, Rosie's lawyer, told us not to go. When Rosie saw us in court, she would turn around and smile at us. She was grateful that we were there to support her, but she seemed very lost. She looked like she did not understand what was going on. I did not understand many of the words that were being used. I worried that Rosie did not understand the words either. Even if she understood the words, she seemed very out of it. I felt like Rosie's side was not involved in what was going on. She did not look at the witnesses when they testified. I saw the prosecutor meeting with people during the trial. They always looked like they were in control. It did not seem to me that Mr. Monroe was in control of Rosie's case. When my mother and I walked out of the courtroom, Mr. Monroe sometimes tried to explain to us what was going on, but he was very brief and then he walked away. I once saw Mr. Monroe hug Linda Wallace in the hallway while I was standing there. It made me feel like he cared more for the Wallace family than for Rosie.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 22nd day of May, 2001 in Anaheim, California.

_SILVIA ALFARO_

12