ORIGINAL

## DECLARATION OF CYNTHIA ASPRODITES, PH.D.

I, Dr. Cynthia Asprodites, declare as follows:

1.      I am a School Psychologist, credentialed by the State of California to provide school psychologist services to public school agencies. I received my Ph.D. from the University of California-Berkeley in 1991 in Educational Psychology, a program which integrates theory and research with professional practice. Prior to my graduate work, I received a B.A. in Social Science Education in 1972 and a Master's degree in Guidance and Counseling in 1978. I am a member in good standing of the American Psychological Association, National Association of School Psychologists, and California Association of School Psychologists.

2.      I am currently a School Psychologist with the Alameda Unified School District, a position I have held since 1990. In this capacity, my responsibilities include consultation with teachers and school administrators, staff development and oversight, and a range of administrative duties. I meet with teachers upon request, conduct crisis counseling for students when problematic situations or needs arise, and advise on the development of behavior plans. I also conduct evaluations of individual students, primarily in elementary school (Kindergarten through 8th grade) who are suspected of suffering any of a wide range of disabilities, including initial assessments to determine whether placement in special education is appropriate. Both the assessment process and the development of Individualized Education Plans are governed by fairly detailed federal rules and regulations. Part of my job is to ensure that the school district remains in compliance with relevant legal requirements.

3.      Once a child is placed in a special education program, I monitor their progress both through ongoing consultation with that child's teachers and by chairing the annual IEP meetings, at which specific progress and areas of need are discussed. I also spend a fair amount of time observing students in the classroom. I review their records routinely, particularly when new children are enrolled in our programs or when individual students are not progressing as expected. I also supervise graduate students from the University of California and other graduate programs in their internship placements, which includes supervision of student assessments.

1

000210

**EX 10    210**

4.     From 1994 through 2000, I was also one of two Lecturers in the School Psychology program at the University of California-Berkeley.  In that capacity, I taught seminars in the professional program, supervised students in field placements (consultation, counselling and testing), and provided advice and supervision of students' academic research.  Each year, I taught one introductory seminar in the profession of school psychology, a second in the consideration (and assessment) of children's cognitive and academic development, and a third in the application of theory to practice, in which students identified student needs and concerns and designed intervention programs for pupils experiencing academic, emotional, and behavioral difficulties.  Prior to enrolling in Berkeley's graduate program, I worked for ten years as a Special Education teacher and School Counselor with middle school students in New Orleans, Louisiana.

## I.     Records Reviewed and Referral Questions

5.     At the request of counsel for Maria del Rosio ("Rosie") Alfaro, I have reviewed Ms. Alfaro's academic records from the Anaheim Unified School District for the period of her second through seventh grades, as well as a brief period in which Ms. Alfaro re-enrolled in the ninth grade.  Those records indicate that Ms. Alfaro was referred for assessment for special education programs early in the second grade.  She was evaluated by speech and language specialists, as well as a School Psychologist, Betty DiRegolo.  An Individualized Education Plan was developed, with an emphasis on speech and language skills; an IEP remained in effect throughout elementary school.  The records I reviewed are the type of records I routinely develop and review in the course of my work in Alameda Unified School District.

6.     I have also reviewed reports, evaluations, and treatment records of (or relevant to) Ms. Alfaro, including medical records of both Rosie Alfaro and several close family members, inpatient substance abuse treatment and rehabilitation records, pre-trial mental health evaluations, and institutional treatment and evaluation records from Orange County Women's Jail and the California Department of Corrections.  Also provided were court documents

000211

regarding Ms. Alfaro's brother, as well as his early medical records, and documents from Rosie Alfaro's arrest, trial and conviction.

7.      Current counsel for Ms. Alfaro have requested that I address the following issues: (1) Ms. Alfaro's academic record and the nature, severity and significance of the disorders reflected in those records; (2) the likely impact of the diagnosed conditions of Ms. Alfaro's development and functioning -- academic, psychological, social and cognitive -- given the surrounding circumstances and contributing factors of Rosie Alfaro's childhood and adolescence; (3) her level of maturity and functioning in clinical terms, as reflected by documented test performances and the presence of clinically significant external factors; and (4) the 1992 findings of Orange County Superior Court Judge Ted Millard regarding Ms. Alfaro's "age," "maturity," and the proper assessment of those factors in a clinical context.

## II.      The Records: Testing, Assessment and Academic Achievement

8.      Rosie Alfaro's records reflect that she was first identified and referred for a special needs assessment in the fall of second grade, just a few months after first enrolling at Madison School in the Anaheim City School District ["ACSD"]. Her second grade teacher observed that while her math skills were notably below grade level, her reading and language skills were even more delayed. A handwritten note on Rosie's "Pupil Planning Form" states: "Reading - Beg. K level."[1] She was 8 years old. Several months later, despite some improvement following provision of supplemental support services. A formal assessment was recommended to determine eligibility for special education services. As a result, it was determined that Rosie Alfaro "is functioning 2 grade levels below expectancy in reading and spelling."[2]

9.      Despite apparent efforts to provide a range of services -- including speech therapy, language acquisition and therapy, and reading labs -- her academic performance remained significantly behind what was expected, especially given her chronological age. At the

---

[1] 10/9/79 Pupil Planning Form, completed by Anne B. Jones, Madison School, ACSD records.
[2] 3/18/80 Psychoeducational Report by Betty DiRegolo, School Psychologist, ACSD records.

000212

**EX 10    212**

end of the second grade, about one full year older than her classmates, Ms. Alfaro could recognize only 22 letters of the alphabet and could name only 19 of them.[3]  The records do not suggest that Rosie ever completely mastered the basic alphabet.  It is quite unusual for a child at that grade level not to have mastered the alphabet.  This fact might suggest that Ms. Alfaro suffered cognitive impairments in addition to her specific learning disabilities.

10.     During the fourth grade, Rosie took the "Written Expression - Proficiency Standards" Test designed to assess students of her grade level.  The highest possible score was 18; minimum proficiency required at least 12 points.  Rosie Alfaro scored only 10.[4]  Other standardized tests given that year, including the Test of Language Development and Illinois Test of Psycholinguistic Abilities, "showed Rosio's receptive vocabulary to be at the 5-6 (5 years and 6 months) level."[5]  Rosie was 10 years old.  Rosie took the same tests one year later, in the fifth grade, at 11-1/2 years old, but she was never able succeed on iems beyond a 9-year-old level.[6]

11.     Rosie's progress in school was consistently extremely poor.  During the seventh grade and again in the ninth grade, after briefly enrolling in an alternative high school, Rosie Alfaro left school while failing (literally) every class she was enrolled in.[7]  At the time of Ms. Alfaro's trial, an evaluating psychiatrist noted:

> **Education:**  Rosie Alfaro did not finish 7th grade.  She always had difficulty reading, spelling...other subjects also bad.  She had poor attention, felt rejected by peers but had no problems with teachers.  She did not finish special courses in continuation school.[8]

### III.     Clinical Symptoms and Diagnoses

12.     Rosie Alfaro suffered significant learning difficulties which were consistently recognized, and which significantly impaired her ability to function not only academically, but emotionally, socially and cognitively as well.  In second grade, her learning difficulties (referred

---

[3]3/18/80 Psychoeducational Report by Betty DiRegolo, School Psychologist, ACSD records.
[4]5/25/82 tests administered by Ms. McCullough, ACSD records.
[5]4/12/82 Speech & Language Assessment, Madison School, ACSD records.
[6]4/26/83 Speech & Language Evaluation Report, Madison School, ACSD records.
[7]See 12/3/84 Student Transfer or Withdrawal Report, Ball Jr. High School, ACSD; 11/25/85 Student Transfer or Withdrawal Report, Loara High School, ACSD.
[8]3/23/92 report of Consuelo Edwards, M.D.

000013

to in some of her records as "handicapping conditions") were documented, diagnosed, and the subject of Individualized Education Plans [I.E.P.'s] intended to address her unique needs and impairments.  In early 1980, her disorder was identified as "a specific learning disability in the understanding and use of oral and written language"[9] -- *i.e.*, a language-based disability.  Shortly thereafter, the school psychologist identified "a specific learning disability in the establishment of the sound-symbol relationship basic to the understanding and use of written language."[10] When first tested in second grade, and throughout elementary school, it was agreed that Rosie Alfaro's learning difficulties were not attributable to language acquisition -- *i.e.*, they could not be explained by her limited exposure to English:

> Her basic learning skills fall far below the normal range of functioning and do not appear to be related to lack of exposure to English.[11]

She was subsequently placed in a Resource Special Program to address academic deficiencies.

13.     In the fourth grade, Rosie was diagnosed with a "disorder in language acquisition and language comprehension"; her IEP identified a "language disorder involving understanding and associating word meanings."[12]  Her condition in the fifth grade was similarly labeled a "disorder in language comprehension and language expression"; her "Handicapping Condition" was "Language disorder involving understanding and associating word concepts."[13]  Language therapy was provide to address deficits associated with a language disorder.  Assessment in sixth grade, as part of annual review, again confirmed a "disorder in language comprehension and expression."[14]

14.     These are serious and potentially disabling disorders.  They are recognized and set forth as part of the standard *Diagnostic and Statistical Manual of Mental Disorders* ["*DSM*"], published by the American Psychiatric Association.  The *DSM* sets forth the basic criteria for currently recognized mental diseases and disorders, including childhood developmental

---

[9] 2/25/80 IEP form, ACSD records.
[10] 3/18/80 Psychoeducational Report by Betty DiRegolo, School Psychologist, ACSD records.
[11] *Ibid.*
[12] 4/12/82 Speech & Language Assessment, Speech & Language Specialist, Madison School, ACSD records.
[13] 4/26/83 Speech & Language Evaluation Report, Speech-Language Therapist, Madison School, ACSD records.
[14] 4/11/84 Speech & Language Evaluation Report, Madison School, ACSD records.

000214

disorders. It was first published in 1952 and has subsequently been revised five times, most recently in 2000.

15.     During Rosie Alfaro's childhood and adolescence, the *DSM-III* was in use. That version, as well as the *DSM-III-R* (updated in 1987), included "Specific Developmental Disabilities" as a class of disorders. Despite variances in nomenclature, the criteria for those disorders and our understanding of them have remained fairly consistent for more than two decades. Relevant to any assessment of Ms. Alfaro are the consistent, documented findings, throughout her childhood, of the two most common developmental language disorders: "Expressive Type" (disorders of vocal expression or "encoding"); and "Receptive Type" (disorders of language comprehension).[15] Although I discuss these diagnoses separately, it should be understood that the presence of both disorders often has a cumulative impact on an individual child's academic and cognitive functioning, with the functional deficits of each being exacerbated by the other.

### A.     "Developmental Language Disorder: Expressive Type"

16.     This diagnosis was used throughout the 1980's to describe a specific disability:

> The essential feature is failure to develop vocal expression (encoding) of language...Articulation is generally immature, with the more difficult sounds, *e.g.*, th, r, s, z, y, l, being omitted or other sounds substituted for them. The child's vocabulary is severely restricted; and even by four years of age, the child is usually unable to generate more than short phrases. Old words appear to be forgotten when new ones are learned. ...[16]

The *DSM-III* identified several "Associated Features," including delays in achieving developmental milestones and impaired learning, "particularly in tasks involving perceptual skills or skills in recognizing and reproducing symbols in the proper sequence."[17]

17.     Subsequent revisions of the *DSM* have identified additional associated features and disorders, including other Learning Disorders, Developmental Coordination Disorder,

---

[15]*See DSM-III*, pp. 95-99; *DSM-III-R*, pp. 45-49; *DSM-IV*, pp. 55-61. The current *DSM* has an additional diagnostic category called "Mixed Receptive-Expressive Language Disorder."
[16]*DSM-III*, p. 95.
[17]*Ibid.*

000215

emotional problems, social withdrawal, and "some mental disorders," including

Attention-Deficit/Hyperactivity Disorder ["AD/HD"]. Clinical evaluations conducted pre-trial

indicate that Rosie very likely suffered undiagnosed AD/HD in childhood;[18] emotional problems

and social difficulties from an early age are also part of her academic record.[19] The *DSM* also

notes heightened levels of co-morbidity with neurological and psychological impairments:

> Expressive Language Disorder may be accompanied by EEG abnormalities,
> abnormal findings on neuroimaging, dysarthric or apraxic behaviors, or other
> neurological signs.[20]

### B.    "Developmental Language Disorder:  Receptive Type"

18.    This condition is characterized by "failure to develop comprehension (decoding)

and vocal expression (encoding) of language":

> Deficits occur in sensory perception (recognition of auditory symbols [sounds] or
> visual symbols [pictures]), integration (ability to relate or manipulate auditory or
> visual symbols [e.g., recognizing that a shoe and a sock are somehow related]),
> storage recall (ability to reproduce a sequence of auditory or visual stimuli some
> time after it has been presented), and "sequencing" (ability to recognize or
> reproduce sequences of symbols).[21]

"Associated Features" similar to those associated with expressive disorders are common.  The

*DSM-III* (1980) also described "Familial Patterns" associated with this disorder:

> Seizures and all Specific Developmental Disorders, especially Developmental
> Reading Disorder, are apparently more common among family members of
> individuals with Developmental Language Disorder, Receptive Type than in the
> general population.[22]

Rosie Alfaro's full brother, Jose Luis Alfaro, has suffered a serious seizure disorder since

infancy.  Other documents suggest that both Luis and Silfia Alfaro (Rosie's full-sister) also

suffered specific developmental disorders.

---

[18]*See* 3/23/92 report of Consuelo Edwards, M.D.
[19]*See* para. 27, *infra.*
[20]*DSM-IV-TR*, p. 59; *DSM-III-R*, p. 47.
[21]*DSM-III*, pp. 96-97.
[22]*Ibid.*, p. 97.

000216

**EX 10    216**

### C.   "Learning Disabilities," "Special Education" and the IEP

19.     In addition to the *DSM*, the assessment and treatment of learning disorders and developmental disabilities is subject to both specialized professional guidelines and a fairly complex body of state and federal statutes and regulations.  The term "specific learning disability" is defined (and has been since the 1970's) by federal law as:

> ...[A] disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations.  The term includes such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia....  (Public Law 94-142 (*Federal Register*, December 29, 1977, p. 65083, 121a.5.)[23]

20.     Other definitions are used by professional associations -- *e.g.*, the National Joint Committee for Learning Disabilities, which defines "learning disabilities" more broadly to include any disorder which seriously handicaps a child in specific (listed) areas of functioning.  Notably, that definition considers all learning disabilities to be physiologically-based: "These disorders are intrinsic to the individual and presumed to be due to central nervous system dysfunction."[24]  There is some dispute as to the etiology of learning disorders, although it is generally believed that the developmental of learning disabilities can be related to subnormal cognitive skills, organic deficits, social or emotional immaturity, severe anxiety and/or depression, environmental factors (*e.g.*, failure of educational systems), or a combination of several of these factors: "The origins of learning disability appear to be multifactorial."[25]

21.     California public school districts provide several types of services/programs to students identified as "learning disabled," including Resource Specialist Programs (for students assigned to regular classrooms), Special Day Classes (for students with intensive needs requiring small group instruction), Designated Instruction and Services (specific instruction or services provided by specialists), and regular classroom placements with "modifications."  By law, these programs and services must be set forth in a written IEP, including annual goals and review

---

[23]The basic requirements of Public Law 94-142 have since been recodified as the Individual with Disabilities Education Act Reauthorization of 1997 ["IDEA"], Public Law 101-476.
[24]Hammill, Leigh, McNutt & Larsen (1981), p. 336.
[25]*See* Sattler, J.M. (ed.) (1988).  *Assessment of Children-Third Edition*.  San Diego, p. 599.

000217

**EX 10    217**

procedures, as well as complete re-evaluation at least once every three years.[26]  These and other services/resources necessary to meet an individual student's identified needs or impairments, as set forth in the IEP, fall within what is often referred to as "Special Education."  That term is also defined by state law.[27]

       22.      Rosie Alfaro met eligibility criteria for the "handicapping condition" of "learning disabled," and therefore received special education services, in accordance with written IEP's, from the second grade through the sixth grade.  She was originally placed in the Resource Specialist Program and also received designated services from a Speech/Language Specialist.[28]  In third grade, her IEP extended the same programs for another year; as mandated, it considered, but apparently rejected, "regular class placement" as an alternative, as she was still in need of special education intervention.[29]  One year later, her IEP was modified to include only "Language Therapy" twice weekly.[30]  In the fifth and sixth grades, that IEP was extended, with "regular class full-time" rejected:  "Rosio...requires small group instruction."[31]  Throughout elementary school, she maintained the diagnoses (or "handicapping conditions") identified above, despite continued therapy language.

### IV.    Effects on Behavioral, Academic, and Social Functioning

       23.      The existence of functional impairments as a component of these disorders was included in the *DSM-III* introduction to the section on "Specific Developmental Disorders":

> **Course.**  In most cases, the disturbance is stable throughout childhood and adolescence, and many individuals continue to show some attenuated signs of the disturbance in adult life.  ...

---

[26]The requirements and procedures regarding the development of IEP's are set forth in the IDEA (*see* fn. ___, above).  State compliance with IDEA mandates is governed by the California Department of Education's Plan for Re-Designing the Special Education Service Delivery System, the goals of which are to be achieved by the year 2003.
[27]*See* California Education Code, section 56031.
[28]2/25/80 IEP, Anaheim City School District.
[29]4/6/81 IEP, Anaheim City School District.
[30]4/12/82 IEP, Anaheim City School District.
[31]5/9/83 and 4/13/84 IEP's, Anaheim City School District.

000218