# The Use of Brevital Sodium In Police Investigation

## By BRUCE L. DANTO, M.D.

For years detectives have been plagued by specific psychological problems when investigating suspects and witnesses. Loss of memory because of the trauma of a criminal event or lying because of guilt feelings have muddied and frustrated many crime investigations.

Recently, the field of psychiatry has been able to offer some assistance to law enforcement by using hypnosis and various truth serum drugs. One of the older and more dramatic examples of the use of such an agent was in the case of William Heirens in Chicago in 1946. Dr. Roy Grinker interviewed him with intravenous Amytal Sodium and learned that the young killer was psychotic and had a split personality.[1]

This technique of conducting an interview has not been written in the literature on police investigational methods. It is the aim of this paper to discuss the usefulness of a newer drug, Brevital Sodium, in police investigations.

### Historical Perspectives

Amytal Sodium was the first known drug used for psychiatric interview and treatment purposes. According to Naples and Hacket,[2] in 1930 W. J. Bleckwenn used it to induce sleep in disturbed psychiatric patients. It ended dangerous periods of prolonged excitement for them, and many recovered from the sleep with greater mental clarity. Catatonic muteness often ended when the drug was administered.

In 1932, Eric Lindeman investigated psychological phenomena and found that when the drug was administered intravenously, the patient seemed to find it easier to talk and answer questions as abnormal thoughts emerged; many patients awoke from the experience with a sense of relief after they were able to get something off their chests.

In 1936, J. Stephen Horsely used the drug to explore the unconscious mind of his patients and called this "narcoanalysis." He thought this would replace psychoanalysis, be a quicker and more economical way of conducting psychiatric treatment, and enable him to collect more information in a shorter period of time. An additional value, he thought, would be using the drug for making post-hypnotic suggestions to re-integrate the patient and induce symptomatic relief.

Early in World War II, Amytal was used by the British to assist the survivors of Dunkirk to deal with the trauma of that experience. The Nazis used Scopalamine as a truth serum for de-briefing Allied agents whom they had caught behind the lines. The Americans used Amytal to help liberated prisoners of war and veterans of combat experiences who developed war neuroses. Significant psychic relief was derived from use of the drug right through the Korean War.

Even today, Amytal is used to relieve the panic states following acute traumatic

sive psychotherapy, offers great help in relieving hysterical amnesia,[3] and can be used to treat conversion neurosis.[4] Finally it has been used successfully in forensic medical investigations.[5]

The only contraindications in use of this drug might be for persons with known liver or kidney disease, or heart failure. It is not medically wise to use it in cases of known drug addictions and porphyria. If the subject has been drinking alcohol excessively, it is best to wait until the drinking has stopped for about 12 hours.

### Brevital Sodium

In my efforts to use Amytal Sodium for psychiatric interviews, I found that the drug left too many patients with a sedative hangover. They remained sleepy, some developed headaches, and others were mildly disoriented. It was necessary to have someone else drive them home from my office. Furthermore, I found that if I injected the medications too rapidly the person's body responded too quickly; the sleep induced by the drug lasted so long and it was hard to keep asking questions or listen to answers with such interruptions due to sleep.

Lilly, the same company which produces Amytal Sodium, also produces Brevital Sodium. For all practical purposes, it is the same. It is Sodium a-dl-methyl-5-allyl-5 (1-methyl-2-pentynyl) barbiturate). However, it differs from other barbiturate anaesthetics in that it contains no sulphur. It is used for inducing anaesthesia (supplementing other agents inducing a hypnotic state, and is an anesthetic itself for short-term surgery. It the same contraindications as Amytal should not be used for patients with a known allergy or hypersensitivity to barbiturates.[6]

Some severe and adverse reactions include circulatory and/or respiratory pression, laryngospasm, bronchospasm hiccups, nausea, vomiting, and delirium. However, in my several years of using this drug, I have seen hiccups on only one occasion and that followed an injection which, on my part, was too rapid. I never seen the other adverse reactions


BRUCE L. DANTO, M.D., is Clinical Associate Professor, Department of Psychiatry, Wayne State University, School of Medicine, Detroit, Michigan, 48202, and Director of Suicide Prevention and Drug Information Center, Detroit Psychiatric Institute, 1151 Taylor Avenue, Detroit, Michigan 48202. Dr. Danto is also a deputy with the St. Clair County Sheriff's Department, Port Huron, Michigan, and has served as part-time faculty member of the School of Social Work at Wayne and instructor for the Detroit Police Academy and other police departments.

[1]L. Freeman, *Before I Kill More* (New York: Pocket 1958).

[2]M. Naples and T.P. Hackett: "The Amytal Interview and Current Uses," *Psychosomatics*, 19(2), 98-105.

[3]R. McGraw and J. Oliven, "Miscellaneous Therapies," Anes S. (ed), *American Handbook of Psychiatry* (New York: Basic Books, 1959), 2:1572-1577.

[4]L. Linn, "Diagnosis and Psychiatry: Symptoms of Psychiatric Disorders," in A. Friedman, H. Kaplan, & B. Sadock, (ed) *Comprehensive Textbook of Psychiatry*, 2nd. Ed. (Baltimore: Williams and Wilkins Co., 1975), 2:1968-1969.

[5]1. Stevenson, J. Buckman, et al. "The Use of Drugs in Psychiatric Interviews; Some Interpretations Based on . . . Experiments," *American Journal Psychiatry*, 131:707.

[6]"Brevital Sodium," *Physicians Desk Reference*, (New Jersey: Medical Economics, A . . tion Division), pp . . .

the patient or subject is awake in three minutes, has no sedative hangover, and can drive himself home alone.

It has never been necessary to have a nurse present while conducting such an interview, and there has not been one hypersensitive reaction or one single complication or adverse reaction. Following the interview, the patient is almost totally amnesic about what was discussed; and when questioned about the length of the interview, he usually responds that he had been talking a few minutes, when it was actually more than 30 minutes or an hour. There has been no emotionally traumatic reaction, aside from some tears in the event a patient was reliving an emotionally painful event. There has been no single incident of a drug-precipitated psychotic reaction. It has been used safely in drug addicted persons, psychotic individuals and alcoholics.

## Brevital V. Hypnosis

Hypnosis has become very popular in many areas besides entertainment. It has been used in medicine to relieve pain, to aid in the development of control to curb smoking and overeating, and to enhance the value of psychotherapy.[7] Harry Arons[8] was a pioneer in its development and use for police investigation and initiated hypnosis for that purpose in 1932. Similarly, I have used hypnosis for investigation and treatment since 1964. Herbert Spiegel[9] has developed important criteria for determining the eye-roll levitation method for hypnotic induction as well as the rating scale for hypnotizability of the subject.

Hypnosis doesn't work for everyone: some persons have a low hypnotizability profile or are too nervous. This leads to another question: What can be done if the patient cannot be hypnotized? And what can be done to test whether the patient is lying? Certainly levitation of the arm alone cannot guarantee either a valid hypnosis state or truth telling by the subject/patient.

Both questions can be answered in terms of the use of Brevital Sodium. In my experience, even with a known liar, honest responses are not only more likely to be forthcoming when the patient is in a light state of anaesthesia, but the person can be interrogated closely, and those persons familiar with the facts can be present during the examination. Such advantages do not arise with hypnosis. In the Brevital inter-

is being questioned and can follow interrogational directions. He will inform the test giver if he does not know an answer. In the Brevital test, it is easier to overcome unconscious resistance than with the use of hypnosis, because the patient under the latter procedure maintains control of the interview and will not say what he chooses not to say.

## Brevital V. Lie Detector

In the lie detector test, the subject must be free from any type of medications. The room in which the test is done must be quiet; the examiner and the person to be tested must be alone and free from distractions. Interrogation is not done during the test, only before or after, and the questions are posed in terms of "yes" or "no" answers. Anxiety about the test or one question may spill over into answers to other questions.

A recent example involves a sergeant from a local police department who had been suspended and indicted for illegal contact and business with a known fence. The sergeant had been offered the services of a prostitute at a party given by the fence; in a moment of weakness, the officer accepted the girl. Later when the officer had failed two lie detector examinations, he had been told that he would be questioned about his contact with the prostitute. He panicked because he was afraid his wife would find out about his sexual misadventure. He later passed a Brevital test with flying colors. At his criminal trial, because of the results of this Brevital test, plus some other-evidence, the fence admitted he had lied about the police sergeant; and consequently, the sergeant was acquitted.

When a Brevital Sodium test is administered, it is possible for the examiner to interrogate the suspect or witness and check for consistency and lying. Investigating police officers can be present during the test so that information can be checked during the interview. This has been most advantageous when questioning known liars such as habitual criminals. Background noise will not disturb the results of the test. Crosschecking questions can be repeated throughout the interview. Previous statements made by the subject or defendant can be checked against his views while under Brevital Sodium. A recording can be made of the entire inter-

matched by either the lie detector test hypnosis.

## Qualifications To Administer

On the surface, it would appear that th test has one major disadvantage over t use of hypnosis or the lie detector test. physician must administer the test becau blood pressure and a medical history mu be taken and assessed by a physician, ar any unanticipated adverse drug reaction must be treated by a physician. The factors need not be viewed as drawbacks

I have encouraged the development such a program for the Jefferson Paris Sheriff's Department, which hopes to us a trained and licensed physician to admir ister the drug, while a trained psychologi who is also a police officer performs th interrogation. This combination of profes sionals working together in the police-or ented interview should produce grea benefits so far as interviews are concerned

I am a trained and board certified psy chiatrist, and also a trained and certifie police officer. I have served for three year with the St. Clair County Sheriff's Depar ment and have worked with numerou other police departments nationally. M work has involved interviews with wit nesses, defendants, and police officers i internal affairs investigations.

Being a physician or psychiatrist is nc enough qualification to conduct this typ of interview. In the case of Dr. John Hill in a famous murder case in Houston Texas, an Amytal Sodium interview wa conducted by an anaesthesiologist. Th test was unclear, primarily because th doctor performing it was not familiar wit such interviews and did not have th necessary police background or have in hi possession police investigational report so that lying could be detected.

## Procedure

The suspect, witness, or defendant i brought into the test room. Appropriate reassurance should be given by the physi cian that he will not be questioned for great length of time and not about anythin irrelevant to the crime or investigation The examiner should make him feel ab solutely comfortable. The subject is in formed of his right to refuse the test and t have his attorney present if he so wishes. his attorney is present, the subject is in formed that the interview can be stopped any point if the attorney so directs. He i asked for permission to have the interviev taped, and is informed that the tape will b the property of the physician or interroga tor, but that the police will be given a cop once consent for the entire procedure ha

[7] E.R., Hilgard, *Hypnotic Susceptibility* (New York: Harcourt, Brace and World, Inc., 1965).

[8] H., Arons, *Hypnosis in Criminal Investigation* (Springfield: Charles C Thomas, 1967).

[9] H. Spiegel, *Manual for Hypnotic Induction Profile* (New York: Soni-Medica, Inc., 1974).

[10] T. Thompson, *Blood and Money* (New York: Dei Publishing Co., 1976).

[11] *People v. Dan Lewis*, Lenaway County, Michigan, Circuit Court, #8831, June 1970, Judge Rex B. Martin. *People v. Arville Garland*, Recorders Court, Detroit, Michigan 70-03042, 70-03317, 18, 19, Nov. 1970, Judge Joseph Gillis. *U.S. v. Arnold Fraudman*, 7-81079, Dec. 1977, Judge Charles Joiner.

000480

interview subject.

He is asked to lie down on a couch, roll his sleeve up, and have his blood pressure read. He is questioned about his general medical health and asked if there is a history of allergies. All this information is recorded on the tape.

A 1 percent solution of Brevital Sodium has already been prepared. That is done by mixing 5Ccc of distilled water with 500 mg. of the Brevital crystals. A 30cc disposable syringe is filled and the blood pressure cuff is used as a tourniquet. Slowly, the solution is injected into the vein of an arm. The subject is instructed to count backwards, very slowly, from 100. When the eyelids flutter and speech slurs, the injection can be stopped and resumed again to preserve the sedated or hypnotic state. If the subject has responded too quickly and falls asleep, a patient wait of a few minutes and the gentle pinching of skin on the arm will bring the subject to a state of hypnotic sedation.

If the interview is to focus on a specific event, the examiner or interviewer says, "Now (name of person) I want to take you back to (date in question). It is about (time of event) and you see something. I want you to pretend that you are watching a television screen and I want you to tell me what is happening." In the event the subject is a witness or heard something, then the following can be said, "I want you to tell me what you heard." When a subject repeats what he related to investigating officers, I have found it helpful to add, "Now I want you to pretend there is a stereo or radio in the wall of that room where you heard what you told me. I want you to turn up the volume as far as it will go. I want you to tell me now what you heard."

The time the interview was begun should be recorded on the tape and the time it ends also. Furthermore, the names of all parties present should be recorded because they are official witnesses to the interview. The subject should acknowledge he is aware of whoever else is in the room.

The interviewer should continue talking to the subject until he is fully awake, which takes a few minutes. The subject should be encouraged to sit up, dangle his feet over the edge of the couch, perhaps have a cup of coffee, before he arises slowly. Usually, within five minutes following the time the needle has been removed, the subject is fully awake, ambulatory, and without any distress whatever.

As a usual practice, I tell the subject who is a defendant if the interview helped him. This usually produces great relief, if it does not. I suspect that we missed something and retest the subject. In one case I

---

view: the defendant had been hiding information and was actually guilty of sexually molesting his niece.

One may play back the interview for the subject. In the event he is a witness, it might lead to conscious recall and bring out even more information after the unconscious block has been removed by the Brevital.

Usually after a defendant has heard his own account of what really happened, he may offer a spontaneous confession; if his attorney is present, he may be encouraged to work toward plea bargaining.

After the interview starts, it is a good idea to check the tape recorder to make sure it is operating.

## Case Illustrations

The most famous of my cases in which I used Brevital Sodium was in the disappearance of James Hoffa. I was asked by the Oakland County Prosecuting Attorney's office and a friend of Hoffa's son to conduct interviews with four witnesses who had heard Hoffa mention names of men with whom he was scheduled to have lunch the afternoon before his disappearance. The witnesses could not recall the names as they had been mentioned casually; they had not anticipated that the names would become so important later that same day. I was able to use conventional hypnosis on two of the subjects; in only one of those interviews was it possible to obtain a name. In the two Brevital interviews, three names emerged. Such information was vital to the early police investigations behind his disappearance.

In another case, a woman had been an auditory witness to the murder of her girlfriend, who had been murdered next door in her apartment. The witness/subject could only recall footsteps in the bathroom, some screams, and the sound of bodies colliding. After verifying such material in terms of what she had reported to the police, it was suggested she could hear better with the volume turned up on her stereo recorder. From this material it emerged that she recalled hearing the complete dialogue between the murderer and his victim, could positively identify his voice because the subject had doubledated with him and her girlfriend, and recalled hearing his footsteps leading down the stairs and out of the building in the direction of his home down the street. Following the interview, when she heard it played back, she recalled everything consciously including stepping close to her friend's apartment door the night of the murder to hear better. She had completely repressed the experience because she had felt guilty about not calling the police to save her friend. She had been too terrified to do so.

---

had killed a man, relived the shooting, and his girlfriend had been assaulted; her husband from whom she was seeking divorce. The husband had charged into room, threatened to kill the suspect, and upon questioning, it became apparent th the subject had pointed the gun to the ce ing to fire a warning shot. The deceas had lunged at him at the same time. But and man collided. It was apparent to police who witnessed the interview th the man had killed the victim accidental his only intention was to protect hims and his girlfriend and her daughter, who lives had been in grave danger from a crazed victim charging into the home.

In still another case, a 55-year-old m had been charged with sexually molest his daughter. The first Brevital intervi did not elicit all the facts. His forces repression were very intense. When I a nounced he seemed to be cleared from t standpoint of the test, he did not appe relieved or jubilant. I requested a retest obtain further information. He agree With deeper probing and more work break through the repressed material, admitted what he had done.

The final illustration involves a m accused of killing a victim who protest extortion efforts associated with a hom sexual extortion plot. The victim h struck the killer who shot him in the he seven times. The killer confessed to t crime in connection with an effort to k his girlfriend by stabbing her 43 times. Brevital interview was conducted as a ro tine part of the forensic defense investig tion; through the interview, I learned th the subject had killed three other persons

## Conclusion

I have attempted to present a case for tl use of Brevital Sodium in police inves gation. The author, as a psychiatrist ar police officer, feels that Brevital Sodiu interviews can offer law enforcement powerful and helpful tool in gathering ev dence. However, caution about drawir conclusions must be made in light of tr real evidence available. The intervie should be viewed as offering some dire tion to the investigation. It can aid in ruli in or out certain suspects, can help bringing out sharper kinds of observatio made by witnesses, and should aid t police in seeing how to proceed with case.

There have been two Michigan cases which Brevital Sodium interview mater has been accepted by courts.[11] In light this author's experience with the drug a its use in police investigation, he urg more attention be paid to its use and mc efforts brought to bear to train psyc atrists and police in its effective use crime investigation. ✱

00&482

# Overview: Clinical Applications of the Amytal Interview in Psychiatric Emergency Settings

BY J. CHRISTOPHER PERRY, M.D., M.P.H., AND DOUGLAS JACOBS, M.D.

*The authors review the evidence for the efficacy of the sodium amytal interview with particular reference to psychiatric emergencies and rapid assessment and treatment. Amytal interviews have a valid role in the assessment and initial management of catatonia, hysterical stupor, and unexplained muteness as well as in distinguishing between depressive, schizophrenic, and organic stuporous states. Valid therapeutic indications include the abreaction of traumatic neurosis, recovery of memory in amnesic and fugue states, and recovery of function in conversion disorders. The authors offer a protocol for application of the amytal interview in emergency settings.*

There has been a rapid increase in the growth and use of psychiatric emergency services over the past 15 years (1) and a concomitant broadening of the functional roles they play. Traditionally, the psychiatric emergency service has performed triage and gatekeeper roles for other, longer-term psychiatric services such as inpatient services and outpatient clinics. Increasingly, however, psychiatric emergency services have developed diagnostic and treatment capabilities specific for dealing quickly with emergencies. An example of this is the application of the rapid neuroleptization technique in emergency settings (2–4).

As techniques such as this arise, it is important to evaluate their effectiveness in both general and specific treatment contexts. Furthermore, it is important to specify both the therapeutically necessary aspects of the technique as well as the patient variables (diagnosis, for example) that will predict positive outcome. Several authors have stressed this requirement in evaluating any psychotherapeutic treatment (5–9). With both these points in mind we review the evidence for the valid uses of the sodium amytal interview with specific patients in settings requiring rapid diagnostic assessment and treatment.

The sodium amytal interview was introduced by

Received Aug. 19, 1980; revised Dec. 23, 1980; accepted Jan. 27, 1981.

From Cambridge Hospital and Harvard Medical School. Address reprint requests to Dr. Perry, Department of Psychiatry, Cambridge Hospital, 1493 Cambridge St., Cambridge, MA 02139.

Copyright © 1982 American Psychiatric Association 0002-953X/82/05-0552-08/$00.50.

Bleckwenn in 1930 as a specific technique for treating psychotic patients (10–12). In 1932 Lindemann (13) demonstrated possible benefits of subnarcotic doses of the drug for interviews with a nonpsychotic population as well. Over the next 20 years, indications for the amytal interview multiplied, as did enthusiasm for its alleged efficacy as an interviewing aid. Terms such as "narcoanalysis" (14), "narcosynthesis" (15–17), and "narcosuggestion" and "narcocatharsis" (18) arose, each describing a certain drug-assisted psychotherapeutic technique. Early reviewers noted as many as fourteen (19) or eighteen (20) indications, but a more recent review (21) suggested a modest nine. At the technique's peak in popularity, Tilkin (22) stated that "the future of narcosynthesis is infinite, and the possibilities endless."

Perhaps it is inevitable that the pendulum should swing the other way. More recent authors (23, 24) have questioned the usefulness of the amytal interview. We have found the amytal interview to be a valuable technique for specific patients in a rapid psychiatric evaluation and treatment setting. Because the clinical and research literature is rich yet sometimes equivocal or contradictory, we present the evidence for specific clinical applications of the technique and outline a protocol for its use. Thus we hope to delimit the appropriate use of the amytal interview from its overuse.

## DIAGNOSTIC APPLICATIONS

Appendix 1 divides the clinical applications of the amytal interview into diagnostic and therapeutic categories. The technique demonstrates its greatest diagnostic usefulness as an aid to interviewing the mute or stuporous patient. Here the procedure is of obvious validity, given that it allows verbal access to otherwise nonverbal patients. The disinhibiting effect of the sodium amytal makes the mute or uncommunicative patient more responsive to interviewing and may arouse the functionally stuporous patient to a fully awake and responsive state of consciousness.

### Catatonia

The catatonic state is characterized by the concurrence of several of the following symptoms: echolalia,

*Am J Psychiatry 139:5, May 1982*

PAUL CHODOFF   551

Masculinity, just as femininity, can be considered "natural," a stereotype, or some combination of the two. Masculine qualities as generally accepted include coolness and courage in the face of external danger, independence, a readiness to face challenges and take necessary risks, appropriate assertiveness, and logical thinking. What would be the outcome if these qualities were exaggerated and distorted to the point of caricature just as femininity is caricatured in the form of the hysterical personality? One answer has been to suggest that obsessionalism and the obsessional personality play the same cognate role with masculinity that hysterical traits and the hysterical personality do with femininity (26). Although obsessionality may serve as a caricature of the "orderly" male cognitive style, the other qualities I have listed as defining a desirable masculinity would not underlie obsessional behavior. Furthermore, the equation of obsessionalism with masculinity is by no means as clear-cut and exclusive as is the hysterical personality with femininity.

It seems that distortion and exaggeration of these masculine qualities (excluding the putative logicality) would lead to foolhardiness, bellicosity, overcompetitiveness, fragile hardness, and vengefulness.

In extreme form, these traits could serve as a fairly adequate description of the sociopath. However, if these traits are present to a lesser degree and occur without the lawlessness and lack of conscience of the sociopath, they delineate another state characteristic of males—one exemplified by a man like Ernest Hemingway. This state is known as "machoism."

If the concept of sex role caricature as a determinant of psychopathology has merit, it should apply to men as well as to women. Thus, if the hysterical personality is an accepted psychiatric diagnosis, should there not be a corresponding diagnostic niche for the *macho* personality, and should not this disorder be a matter of interest and concern to psychiatrists, just as is the hysterical personality?

## REFERENCES

1. Veith I: Hysteria: The History of a Disease. Chicago, University of Chicago Press, 1965
2. Chodoff P: The diagnosis of hysteria: an overview. Am J Psychiatry 131:1073–1078, 1974
3. Chodoff P: Psychotherapy of the hysterical personality disorder. J Am Acad Psychoanal 6:497–510, 1978
4. Jasper K: General Psychopathology. Translated by Hoenig J, Hamilton MW. Chicago, University of Chicago Press, 1963
5. Horowitz MJ (ed): Hysterical Personality. New York, Jason Aronson, 1977
6. Farber L: Will and willfulness in hysteria, in The Ways of the Will. New York, Basic Books, 1966
7. Janet P: The Major Symptoms of Hysteria (1907). New York, Hafner Press, 1965
8. Knox B: Word and Action. Baltimore, Johns Hopkins University Press, 1979
9. Simon B: Mind and Madness in Ancient Greece. Ithaca, NY, Cornell University Press, 1979
10. Szasz T: The Myth of Mental Illness. New York, Paul B Hocker, 1961
11. Trevor-Roper H: Religion, Reformation and Social Change. London, Macmillan, 1967, pp 90–192
12. Kroll J: A reappraisal of psychiatry in the Middle Ages. Arch Gen Psychiatry 29:276–283, 1973
13. Summers M (ed): Malleus Maleficarum. London, Pushkin Press, 1951
14. Demon Possession Discussed at Psychologists' Meeting. Psychiatric News, June 3, 1977, p 28
15. Bart PB, Scully DH: The politics of hysteria: the case of the wandering womb, in Gender and Disordered Behaviour. Edited by Gomberg ES, Franks V. New York, Brunner/Mazel, 1979
16. Smith-Rosenberg C: The hysterical woman: sex roles and conflict in 19th-century America. Social Research 39:652–678, 1972
17. Chodoff P, Lyons H: Hysteria, the hysterical personality and "hysterical" conversion. Am J Psychiatry 114:734–740, 1958
18. Sulloway FJ: Freud, Biologist of the Mind: Beyond the Psychoanalytic Legend. New York, Basic Books, 1979
19. Freud S: Three essays on the theory of sexuality (1905), in Complete Psychological Works, standard ed, vol 7. London, Hogarth Press, 1953
20. Freud S: Some psychical consequences of the anatomical distinction between the sexes (1925). Ibid, vol 19, 1961
21. Lips HM, Colwill NL: The Psychology of Sex Differences. Englewood Cliffs, NJ, Prentice-Hall, 1978
22. Money J: Love and Love Sickness. Baltimore, The Johns Hopkins University Press, 1980
23. Hollender M: The hysterical personality. Contemporary Psychiatry 1:17–24, 1971
24. Lerner HE: The hysterical personality, a "woman's disease." Compr Psychiatry 15:656–675, 1953
25. Marmor J: Orality in the hysterical personality. J Am Psychoanal Assoc 1:656–675, 1953
26. Stone MH: Traditional psychoanalytic characterology reexamined in the light of constitutional and cognitive differences between the sexes. J Am Acad Psychoanal 8:381–401, 1950
27. Rubin RT, Reinisch JM, Haskett RF: Postnatal gonadal steroid effects on human behavior. Science 211:1318–1324, 1981
28. Maccoby EE, Jacklin CN: The Psychology of Sex Differences. Stanford, Calif, Stanford University Press, 1974
29. Symons D: The Evolution of Human Sexuality. New York, Oxford University Press, 1979

EX 31   467

Am J Psychiatry 139:5, May 1982

J. CHRISTOPHER PERRY AND DOUGLAS JACOBS        553

echopraxia, negativism, mutism, waxy flexibility (cerea flexibilitas), catalepsy, automatic obedience, posturing, stereotypy, and stupor. Abrams and Taylor (25) found that this condition is associated with affective disorder, organic brain syndrome, and reactive psychoses, in descending order of frequency of occurrence.

Bleckwenn first described the effects of sodium amytal on catatonic patients when he began to use the drug to produce sleep in psychotic patients with severe insomnia (10, 11). After the patients awoke, following large oral doses, they had lucid intervals lasting from 2 to 14 hours with no catatonic symptoms (12). Bleckwenn observed that the intravenous route of administration was most efficacious, usually requiring from 600 to 900 mg of amytal (12). Eleven of 15 patients talked following the administration of the drug; all but 1 obeyed commands and ate voluntarily. A number had not talked for several years before the interview. Thorner (26–27) produced similar results in 18 catatonic patients. Ten (56%) patients began talking, although they had been previously mute; 1 patient continued to talk after the amytal wore off. Cerea flexibilitas was ameliorated in 5 out of 5 patients, and 12 of 14 patients with compromised eating and nourishment intake spontaneously requested food and ate ravenously. Thorner further demonstrated the availability of the patient to psychotherapeutic interviewing under the drug, something not possible without it. No other psychotic diagnostic group showed any such dramatic results with this technique.

More recent research, whether favorable (28–30) to the use of the amytal interview or more skeptical (23, 24), has not failed to note the dramatic results in the amelioration of catatonic symptoms following intravenous sodium amytal. Although more definitive treatment is available for the underlying disorders—such as the use of neuroleptics for schizophrenia—amytal has an unquestionable value as an aid to diagnostic interviewing and management of the catatonic patient in emergency and initial treatment settings.

### Hysterical Stupor

Hysterical stupor is rarely found anywhere except in emergency settings and features a profound dissociation of the normal level of consciousness. Characteristically the patient is not arousable, has diminished responsiveness to pain, resists forced opening of the eyelids, and demonstrates some voluntary muscle control—for instance, an arm raised over the head and passively dropped will fail to hit the patient's own face but is otherwise flaccid. Plum and Posner (31) also noted that although the oculocephalic response (doll's eyes) may or may not be present, caloric testing invariably produces nystagmus rather than tonic deviation of the eyes; furthermore, the EEG pattern is that of an awake individual. Medical workup for stupor is negative. Such patients may return to a normal level of

consciousness in a matter of hours if nothing is done, but efforts at diagnostic interviewing, hypnosis, or suggestion may be of little avail in the meantime. The amytal interview has definite diagnostic and therapeutic effects in these cases, allowing the staff in the emergency room to arouse and interview the patient, even preventing an otherwise unavoidable hospitalization. Generally a dramatic event precedes the dissociative state; the patient can relate this event once aroused under amytal. The remaining interview can proceed like any psychotherapeutic emergency interview.

*Case 1.* A young adult man was brought into the emergency room by police, who had found him lying unconscious near a bus station in town. On examination, the patient appeared unconscious, not arousable by command, and unresponsive to deep pain. He resisted forced opening of his eyelids. After an initial medical examination proved negative, an amytal interview was started. After 200 mg of amytal had been administered over 5 min, the patient awoke and carried on a coherent interview in which he described being without money or shelter and feeling troubled about his drifter life style. There were no psychotic symptoms. With the patient's permission his family was contacted, and the family brought him home.

### Unexplained Muteness

On rare occasions a patient is seen in the emergency service (usually brought in by relatives) who is fully alert and able to follow commands but mute. On examination no additional signs of catatonia are present. The patient makes no attempt to communicate, unlike the patient with a conversion aphonia who may gesture or otherwise demonstrate that there is a problem. There may be overt signs of hostility, suggesting passive aggression as a defense mechanism underlying the muteness, but this is not necessarily the case. The patient does not present the common problem that the passive-aggressive patient does: that of giving increasingly terse and unhelpful answers in the interview, in which the increasing silence is clearly contingent on the interviewer's questioning (unpublished paper by J.C. Perry). Without being able to interview the patient, the clinician has little recourse other than to hospitalize the patient, awaiting a spontaneous return of communication, because little else but custodial care could be given until that point.

*Case 2.* A 25-year-old single man was brought to the emergency ward by police. The patient had earlier made an obscene phone call to the police, which they had traced. When they showed up at his house at 2 a.m., the patient threw something at them and cried, "Kill me." After that he had been mute but cooperative after being brought to the police station.

Several hours later the patient was brought to the hospital for examination. He cooperated with the examiner, who spent many short intervals trying to interview him, returning again and again after suggesting that the patient would feel

*Am J Psychiatry 139:5, May 1982*

like talking soon. The patient remained mute but fully alert, moving about freely with his eyes open.

The patient cooperated with the amytal interview and developed nystagmus after 350 mg had been injected. The interviewer noted out loud that the patient was beginning to appear sad. After the interviewer iterated this observation, the patient cried out, "Can't you see, this is the only way I can kill myself!" A total of 700 mg was administered by the end of the interview. Apparently a lifelong stutterer, the patient claimed he had had increasing difficulties socially since a car accident 2 years earlier that had left him with some facial disfigurement. After one suicide attempt and a psychiatric hospitalization that he found to no avail, the patient decided that his life was not worth living. He made an obscene phone call to the police hoping that they would trace it and, in apprehending him, kill him. There were no vegetative symptoms of depression. Passive aggression appeared to be the defense mechanism behind his muteness, and the patient eventually requested hospitalization. He remained able to talk on the inpatient service.

### Depressive, Organic, and Schizophrenic Stupors

Some patients are nearly mute and unresponsive to the interviewer's attempts to obtain a history or perform an adequate cognitive examination. The most common diagnostic problem here is the differentiation between schizophrenia, depression (with a concomitant pseudodementia), and organic brain syndrome presenting as a stupor or a nearly mute state in the elderly. An amytal interview in such cases may offer definitive information differentiating the three conditions.

Bleckwenn (10) first noted that amytal made severely depressed patients more compliant and less retarded, and Lindemann (13) and, later, Sargant and Slater (32) noted the increased volubility and desire to communicate that occurs during the interview and brings delusions into bold relief. Woodruff (30) confirmed this finding in a study comparing the amytal interview data obtained from depressive patients, those with process schizophrenia, those with schizoaffective disorder, and control subjects. Four of 10 depressive patients had a normalization of mood and became less retarded, but 4 out of 5 schizophrenic patients admitted to additional symptoms unreported before they received amytal. There was no evidence, however, that any patient "switched diagnoses" under amytal; e.g., schizophrenic patients did not become depressed or vice versa.

The patient with an organic illness has a different response to amytal. Weinstein and associates (33–35) conducted a series of studies in which amytal interviews and a structured cognitive examination were given to 88 patients with known or suspected (and later verified) brain disease and 50 control patients. Fifty-seven (65%) of the patients with organic illness made at least one persistent mistake under amytal that they did not make before or after the interview. Control patients did not respond with an increase in mistakes

In descending order of frequency, the mistakes were disorientation for place, denial of illness or problem, misidentifying the role of the physician, and disorientation for time. The differentiation of patients with brain disease from control patients by more than one type of mistake was best for brain tumors (23 of 28 patients) and cerebrovascular diseases (10 of 14 patients) (33). When the patients were retested later, the tendency to perform with mistakes under amytal remained or became even worse, indicating that the authors' findings in brain disease are stable (34).

In summary, then, the depressive patient given amytal will become more verbal, appear to brighten, perhaps, and have a normalization of mood. The schizophrenic patient will be less guarded and sometimes reveal additional symptoms. The patient with organic illness will become increasingly confused, however, and his or her performance on cognitive examination will deteriorate. Patients with one of these diagnoses will not appear more like patients with any of the other diagnoses. The ability to make this differentiation under amytal has been used as an aid to the Rorschach test in patients who are reticent (36).

*Case 3.* A 70-year-old woman was brought to the psychiatric emergency service by the local police, who had discovered her standing on a street corner, appearing lost and in need of help. When approached, she became angry, uncooperative, and eventually uncommunicative; they then brought her to the hospital to see a psychiatrist because of her behavior.

On initial examination, the patient was quite withdrawn, appeared depressed, and refused to cooperate in the interview. She picked at her clothes and looked about the room but did not give any meaningful history. She gave her name but no other data. She had long fingernails, was unkempt, and exhibited mild agitation. She refused to cooperate with a cognitive examination; vital signs and physical and neurological examinations were within normal limits.

An amytal interview was administered to assist in the differential diagnosis. After she had received 150 mg of amytal, the patient developed nystagmus, became more relaxed and talkative, and cooperated with a cognitive examination. She gave her name and date of birth but was disoriented to time and place; she knew only that she lived somewhere in Boston. Her recall and fund of information were poor. The patient was admitted to the neurology service. Two days later, her sister appeared and revealed that the patient wandered a lot and had a poor memory. The patient was saved from an unnecessary psychiatric admission and received an appropriate workup for dementia.

### THERAPEUTIC APPLICATIONS

Although the diagnostic applications of the amytal interview are more often overlooked, the therapeutic applications are more often debated. Following Lindemann's observations on the effects of amytal on normal subjects (13), Horsley (14) introduced the tech-

Am J Psychiatry 139:5, May 1982   J. CHRISTOPHER PERRY AND DOUGLAS JACOBS   555

nique of narcoanalysis to aid in psychotherapeutic exploration. Kubie and Margolin (37) further elucidated its value in overcoming blocked areas of early conflicts, reviving early memories, and allowing transference phenomena to occur without censoring. Hoch (18) stated that the use of amytal interviewing could shorten the duration of psychotherapy in several ways: establishing a transference more rapidly, helping quiet or reticent patients who tend only to iterate their complaints overcome the resistance to talking more fully, and helping to ameliorate somatic symptoms. He further noted the advantage of amytal over hypnosis for these purposes: i.e., susceptibility was not a limiting problem.

Following this line of reasoning, recent research has attempted to determine whether there is any demonstrable advantage to using amytal in general psychotherapeutic interviewing and exploration. Hain and associates (38, 39) conducted interviews with hospitalized patients using amytal, hydroxydione, methamphetamine, or placebo given under double-blind conditions. The patients were not selected for any particular characteristics, and no dramatic abreactions occurred (38). These authors found that both amytal and hydroxydione produced less anxiety during the interview than either methamphetamine or saline placebo injections, and that interviewers and raters could generally identify which drug was given. They concluded that interview effects on patient outcome following the interview were greater than drug effects, but they cautioned that the research procedures probably limited the patients' emotional expression (39). A second study by these authors (40) produced similar results. In summarizing both studies, they concluded that many patients improved on self-report symptom and feeling measures administered 24 hours later, but that no drug or combination compared with placebo correlated with more than one measure of improvement. They did note, however, that patient "de-suppression" (that is, talking about normally inhibited subjects) did correlate with later improvement in feeling but that there was no evidence of de-repression (41). Finally, Dysken and associates (23) administered amytal or placebo injections to a largely psychotic inpatient population and then conducted a 30-min structured interview to elicit information for the Hamilton depression inventory and the New Haven Schizophrenia Index. Doses were generally low (150–350 mg), and nystagmus without slurring of speech typically occurred. They concluded that although new information was produced, there was no advantage of amytal over placebo.

The above studies could be interpreted as failing to produce evidence of the usefulness of amytal as an aid to psychotherapeutic interviewing and exploration. This broad conclusion is not warranted, however. In these studies patients were not selected for specific therapeutic reasons except that an interview might reveal something hitherto unknown. This is hardly a specific indication. Nor were specific patient characteristics, such as diagnosis, or specific therapeutic purposes considered. Although we might agree that amytal is not a useful interviewing adjunct when one is on a "fishing expedition," the authors have not addressed the specific therapeutic indications listed in appendix 1. We believe that there is evidence already available indicating the value of amytal in the rapid psychotherapeutic treatment of patients with these specific disorders. Because repression and dissociation are the defenses operative in these disorders, we do not rule out the possibility that other indications may also exist in which these defenses play an important role: aiding in overcoming blocked association processes in psychotherapy, for instance.

## Abreaction in Posttraumatic Stress Disorder (Traumatic Neurosis)

Interest in the treatment of traumatic neuroses usually peaks during wartime. This syndrome was called "shell shock" in World War I (42) and later, in that war and in World War II (43), was referred to as "war neuroses" (15, 17, 44). Early treatments focused on the role of hypnosis and suggestion in breaking down dissociation and relieving repression, but the importance of emotional revival of the original traumatic scene or event in producing abreaction was much debated (45–47). Later authors have emphasized the role that diminishing anxiety and negative affects have as a prerequisite for curative psychotherapeutic exploration, whether drug-assisted interviews are used (15, 17, 34, 41) or not (48).

Sargant and Slater (44) noted the appearance following the evacuation at Dunkirk of neurotic symptoms in a large number of personnel. These symptoms included sleeplessness, terrifying dreams, inner tension, a pronounced startle reaction to loud noises, tremors, and sometimes listless apathy and/or hysterical symptoms (amnesia or conversions); this syndrome has since been referred to as traumatic neurosis (49) and, recently, as posttraumatic stress disorder in DSM-III. Sargant and Slater (44) were the first to use intravenous amytal to the treatment regimens of interviewing, suggestion, hypnosis, and general sedation. They concluded that the amytal interviews were the quickest and most convenient way to obtain an account of the trauma and relieve the associated symptoms.

Grinker and Spiegel (15–17) carried the work further in elucidating the psychotherapeutic elements that they believed were facilitated by intravenous barbiturate (they preferred the ultra-short-acting barbiturate sodium pentothal). In what they called "narcosynthesis" (15) they described the following:

1. Release of repressed emotions is a process of so-called "abreaction."

**EX 31   470**

*Am J Psychiatry 139:5, May 1982*

2. Support of the patient's weakened and regressed ego through identification with the therapist's strength.

3. Desensitization from the memories of the anxiety-producing situations by repetitive recounting of traumatic experiences, as the therapist helps the ego to discriminate between past danger and present safety and between dangers of the world of reality and inner anxieties.

4. Neutralization of the severe superego reaction of guilt to the actual [failure] or sense of failure.

5. Instilling insight into the relationship between the neurotic reactions to war and the past character and personality trends.

6. Encouraging the ego in its experimental attempts to regain mature attitudes and to attempt adult activities, thereby giving new confidence to the weakened and regressed personality.

Grinker and Spiegel stressed the importance of rapid treatment before symptoms become fixed; they concluded that intravenous barbiturate is immediately indicated in the severe anxiety states associated with mutism, stupor, regressive somatic manifestations, regressive (psychotic-like) psychological manifestations, and amnesia (17, p. 78).

It is important to realize, as Janis (49) noted, that there are many peacetime sources of traumata, such as near-miss disasters, victimization (such as rape), personal injury or loss following trauma, being humiliated in front of friends, being fired from a job, and being unable to control violent rage against a rival. The following case report demonstrates the use of the amytal interview and subsequent brief psychotherapy following the development of a traumatic neurosis.

*Case 4.* A 44-year-old businessman was maintained on 45 mg of phenelzine sulfate daily for recurrent depression. He was seen intermittently for medicines only; he did not want psychotherapy because, he claimed, "I've gotten some awfully lousy advice from psychiatrists in my life." He prided himself on being very self-sufficient and able to handle anything, but his manner was slightly abrasive and compulsive.

During an emergency appointment he stated that he had become increasingly lethargic and had been sleeping and eating more in the past week. He also had developed daily frontal headaches, irritability, restless sleep, and nausea. On inquiry he noted that he had been in a car accident a week before, which he claimed had not bothered him at all. After being hit he had just climbed out of his car, left it at the intersection where the accident occurred, and went on with his usual day. His symptoms had started several days after the accident. His affect was unconcerned and even jocular as he talked about his ability to pick right up and continue his work after the accident.

After two sessions, the patient's symptoms worsened, and he revealed that he had sat in the wrecked car for 5–10 min immediately following the accident, which he agreed was strange. He said he had no recollection of why he had done so; he was unhurt, and the door opened readily.

The third session was conducted with sodium amytal. After 350 mg of amytal had been given, the patient devel-

oped nystagmus and began to slur his speech slightly. He recalled that he had sat in the car thinking over all of the unpredictable things which could happen to him that might strike him down when he was on an upswing toward success in his business. He also recalled looking at the spectators who scurried around: he felt disgusted that they were not coming to his aid. Although he was in great pain from several abrasions, when he got out of the car the pain disappeared, and he forgot what he had been thinking. At the end of the amytal interview (750 mg) the patient acknowledged with some amazement that he could have been killed and was lucky that he was not.

In follow-up sessions, the patient was now intrigued by his emotional reaction to and amnesia for the car accident. He reworked the details again and again and seemed visibly upset at times. Such symptoms as headaches diminished, but he reported that the morning following the amytal interview he had awakened with a pain across his chest "as if I had just hit a steering wheel," and his abrasions—now healed—had started to hurt as well. He was very responsive regarding his repression of conflicts over dependency and regarding his inability to admit helplessness and fear, as well as his tendency not to ask for help when he really needed and wanted it. He then could see that his continual reproaches of his employees for minor annoyances at work represented his inability to address directly his wish for their help (without his having to ask) at a time he felt helpless and most in need of others taking over. His symptoms disappeared after several sessions.

Amytal frees up a highly defended traumatic experience and aids in reintegration of dissociated ideas and affects. It provides a pharmacologic cushion that allows exploration and a lowering of defenses against the anxiety-provoking recollection of trauma; the final overall success of the treatment, as Lipton (20) noted, is in direct proportion to the amount of psychotherapy that is applied.

## Recovery of Memory in Psychogenic Amnesia and Fugue States

In 1938 Herman (50) described the use of the amytal interview in cases of psychogenic amnesia, a disorder characterized by extensive memory loss for a definite period of time. Several of his patients had fugues, in which there is also loss of identity. In 1938 such disorders were quite often noted, and the treatment consisted of custodial care, shrewd questioning, and, sometimes, hypnosis. Herman administered amytal to six patients who were refractory to questioning with and without hypnosis; the patients recovered their memories in a matter of minutes.

In their work on the treatment of acute war neuroses, Sargant and Slater (44) emphasized the importance of quick recovery of memory for amnesic episodes. They pointed out that with skillful interviewing the amnesic gap in such patients could be filled in one amytal interview—faster than conventional treatment with the exception of hypnosis, which worked in fewer cases, however. Lambert and Rees (51) reported on

*Am. J Psychiatry 139:5, May 1982*                                    J. CHRISTOPHER PERRY AND DOUGLAS JACOBS    557

247 servicemen treated for various hysterical symp-
toms. Their patients were divided nonrandomly into
three treatment groups: ordinary psychiatric methods
(persuasion, explanation, suggestion), hypnosis, and
intravenous barbiturates. Patients refractory to the
first two treatments were sometimes included in the
group receiving the drug-assisted interviews (amytal,
pentothal, and hexobarbitone were used variously).
They found that the barbiturate interview was by far
the easiest and quickest method of securing recovery
from amnesia (82% of the patients given the barbitu-
rate had complete memory recovery). They noted
three groups in which a lower success rate ensued:
malingerers, who tended to fall asleep; patients with
fugue states and a coexistent depression; and patients
in whom a too-deep level of narcosis was achieved.

Although none of the above studies was controlled,
they make a strong case for the efficacy of the amytal
interview in cases of amnesia and fugue. The rate of
recovery is striking given that many patients treated
by the amytal interviews had already failed to respond
to general interviewing and/or hypnosis. Thus any bias
in treatment assignment would be against the amytal.
Unfortunately, clear distinctions between amnesia and
fugue are lacking, but it is likely that amytal is useful in
both.

### Recovery of Function in Conversion Disorder

Conversion disorder, as the hysterical symptom par
excellence, has commanded the attention of neurolo-
gists and psychiatrists alike and has apparently de-
manded both physiological and psychological explana-
tions. Although Bernheim and Liébeault of the Nancy
School were the first to popularize the value of hypno-
sis in removing (and reproducing as well) hysterical
symptoms (52), Breuer and Freud (53) were the first to
emphasize the importance of amnesic phenomena in
conversion disorders; their work served as the corner-
stone for Freud's work on conflict and libido theory.
Janet (54) emphasized the role of a retraction in the
field of consciousness—including areas of bodily un-
awareness—in the production of the hysterical pa-
tient's symptoms. More recently, Ludwig (55) pro-
posed a neurophysiologic hypothesis to explain the
dissociation of attention in conversion disorder; the
theory is based on increased inhibition of sensory and
allied motor function from corticifugal tracts. He also
stressed the therapeutic role of barbiturate and seda-
tive drugs in general to relieve conversion disorders,
suggesting that they serve to disinhibit and allow a
return of normal attentional phenomena in the afflicted
patient. Ludwig cited a case study by Hernandez-Peon
and associates (56) in which evoked potentials from a
hysterical patient's hemianesthetic leg were lower
than his normal leg but returned to the level of the
normal leg following administration of a barbiturate.

In the clinical literature on treatment of conversion

disorders, Lambert and Rees (51) looked at the effica-
cy of amytal interviews versus hypnosis and conven-
tional treatment of servicemen with conversion disor-
ders. Complete recovery of function often occurred in
all treatment groups. They found the barbiturate inter-
view preferable in the treatment of motor conversions,
for which they would apply suggestion and passive
movement of the affected limb until the patient could
recover function and continue to use it into the fully
awakened state. They made patients with hysterical
gaits run as soon as possible; special sensory symp-
toms (blindness and deafness) also responded well to
suggestion under the barbiturate. Although this study
did not have an experimental design, it does argue
persuasively for the advantages of the amytal inter-
view in the treatment of conversion disorder. It sug-
gests rapid improvement of function, even for patients
refractory to suggestive and hypnotic treatment. Mor-
ris (57) also described rapid improvement in both
amnesias and conversion reactions following intrave-
nous amytal. He also noted a differential response to
the drug in a malingering subject who had an apparent
conversion symptom. One mute patient spontaneously
began to talk when, within his earshot, the doctor told
the nurse to prepare an injection that would yield
information as to whether the patient's illness was fake
or real. A second malingerer with camptocormia be-
came irritable and resistive to treatment under amytal.
He was clearly not grateful for attempts at symptom
relief and became more sullen and untalkative follow-
ing the injection. Both of these reactions are unidentifi-
teristic of patients with conversion symptoms.

### CLINICAL PROCEDURE

The intravenous administration of sodium amytal
must be carried out with caution. One should not
attempt it on a patient who actively refuses. Paranoid
patients, for instance, may view the procedure as an
assault or fear a sense of vulnerability, which they
associate with sedation.

Medical contraindications that must be considered
are 1) presence of upper respiratory infection or in-
flammation that might potentially encroach on the
airway, 2) evidence of severe liver or kidney impair-
ment, 3) hypotension, 4) history of porphyria, and 5)
barbiturate addiction. It is generally recommended
that a cardiopulmonary resuscitation cart be available
near the room where the procedure is carried out.

Appendix 2 describes the steps carried out in the
amytal interview. Before beginning the procedure, the
patient and/or any accompanying family member
should be adequately informed about the purpose and
procedure of the amytal interview. It is important to
answer any questions, dispell magical expectations,
and allay any fears about the procedure. We have not
needed to obtain formal, written informed consent

0C0489

Untoward effects of the amytal are rare. Hart and associates (19) had only one case of respiratory arrest in 500 amytal interviews, and this was due to administering the amytal too rapidly. Respiration returned promptly after administering intravenous caffeine sodium benzoate (not to exceed 1 g). Laryngospasm has not been reported in subanesthetic doses. A reaction of paradoxical excitement is very rare and may be cause to terminate the procedure. The maximum dose of amytal required for a successful interview is 1 g and should not be exceeded.

## CONCLUSIONS

We have reported on the applications of and procedure for the sodium amytal interview in emergency or rapid psychiatric assessment and treatment settings. Although the literature supports the validity of the indications we have noted, we do not imply that there may not be other valuable uses of the amytal interview, such as an adjunct in ongoing psychotherapy or in criminal-legal matters. Determination of these other indications must await further investigation.

The use of sodium amytal can serve as a valuable adjunct in the evaluation of selected patients in rapid psychiatric evaluation and treatment settings. It may have its most needed role in the emergency room, where it may aid the clinician in preventing otherwise inevitable hospitalization and allow early application of other definitive therapies to emergency patients.

## REFERENCES

1. Gerson S, Bassuk E: Psychiatric emergencies: an overview. Am J Psychiatry 137:1–11, 1980
2. Donlon PT, Hopkin J, Tupin JP: Overview: efficacy and safety of the rapid neuroleptization method with injectable haloperidol. Am J Psychiatry 136:273–278, 1979
3. Anderson WH, Kuchnie JC, Catanzano DM: Rapid treatment of acute psychosis. Am J Psychiatry 133:1076–1078, 1976
4. Stotsky BA: Relative efficacy of parenteral haloperidol and thiothixene for the emergency treatment of acutely excited and agitated patients. Dis Nerv Syst 38:967–973, 1977
5. Bergin A, Suinn R: Individual psychotherapy and behavior therapy. Annual Review of Psychology 26:509–556, 1975
6. Binder L: Toward specific psychological therapies for specific conditions. J Clin Consult Psychol 47:852–857, 1979
7. Frank J: The present status of outcome studies. J Clin Consult Psychol 47:310–316, 1979
8. Kazdin A: Nonspecific treatment factors in psychotherapy outcome research. J Clin Consult Psychol 47:846–851, 1979
9. Luborsky L, Singer B, Luborsky L: Comparative studies of psychotherapies: is it true that "everyone has won and all must have medals"? Arch Gen Psychiatry 32:995–1008, 1975
10. Bleckwenn WJ: Narcosis as therapy in neuropsychiatric conditions. JAMA 95:1168–1175, 1930
11. Bleckwenn WJ: The production of sleep and rest in psychotic cases. Arch Neurol Psychiatry 24:365–372, 1930
12. Bleckwenn WJ: The use of sodium amytal in catatonia. Res Publ Assoc Nerv Ment Dis 10:224–229, 1931
13. Lindemann E: Psychological changes in normal and abnormal individuals under the influence of sodium amytal. Am J Psychiatry NS 1083–1091, 1932
14. Horsley JS: Narcoanalysis. Lancet 1:55–56, 1936
15. Grinker R: Treatment of war neuroses. JAMA 126:142–145, 1944
16. Grinker R, Spiegel J: Brief psychotherapy in war neuroses. J Psychosom Med 6:123–131, 1944
17. Grinker R, Spiegel JP: War Neuroses. Philadelphia, Blakiston Co, 1945
18. Hoch PH: The present status of narco-diagnosis and therapy. J Nerv Ment Dis 103:248–259, 1946
19. Hart WL, Ebaugh F, Morgan DC: The amytal interview. Am J Med Sci 210:125–131, 1945
20. Lipton EL: The amytal interview: a review. Am Pract Digest Treat 1:148–163, 1950
21. Naples M, Hackett TP: The amytal interview: history and current uses. Psychosomatics 19:98–105, 1978
22. Tilkin L: The present status of narcosynthesis using sodium pentothal and sodium amytal. Dis Nerv Syst 10:215–218, 1949
23. Dysken MW, Kooser JA, Haraszti JS, et al: Clinical usefulness of sodium amobarbital interviewing. Arch Gen Psychiatry 36:789–794, 1979
24. Dysken MW, Chang SS, Cooper RC, et al: Barbiturate-facilitated interviewing. Biol Psychiatry 14:421–432, 1979
25. Abrams R, Taylor MA: Catatonia: a prospective clinical study. Arch Gen Psychiatry 33:579–581, 1976
26. Thorner MW: The psychopharmacology of sodium amytal. J Nerv Ment Dis 81:161–167, 1935
27. Thorner MW: The psychopharmacology of sodium amytal in catatonia. J Nerv Ment Dis 82:299–303, 1935
28. Elkes J: Effects of psychomimetic drugs in animals and man, in Neuropharmacology: Transactions of the Third Conference. Edited by Abramson HA. New York, Josiah Macy, Jr. Foundation, 1957
29. Stevens JM, Derbyshire AJ: Shifts along the alert-response continuum during remission of catatonic "stupor" with amobarbital. Psychosom Med 20:99–107, 1958
30. Woodruff R: The diagnostic use of amylobarbitone interview among patients with psychotic illnesses. Br J Psychiatry 112:727–732, 1966
31. Plum F, Posner JB: The Diagnosis of Stupor and Coma, 2nd ed. Philadelphia, FA Davis Co, 1972
32. Sargant W, Slater E: An Introduction to Physical Methods of Treatment in Psychiatry, 5th ed. New York, Science House, 1972, pp 142–143
33. Weinstein EA, Kahn RL, Sugarman LA, et al: The diagnostic use of amobarbital sodium ("amytal sodium") in brain disease. Am J Psychiatry 109:889–894, 1953
34. Weinstein EA, Kahn RL, Sugarman LA, et al: Serial administration of the "amytal test" for brain disease. Arch Neurol Psychiatry 71:217–226, 1954
35. Weinstein EA, Malitz S: Changes in symbolic expression with amytal sodium. Am J Psychiatry 111:198–206, 1954
36. Kelly D, Levine K, Pemberton W, et al: Intravenous sodium amytal as an aid to the Rorschach method. Psychiatr Q 15:68–73, 1941
37. Kubie LS, Margolin S: The therapeutic role of drugs in the process of repression, dissociation, and synthesis. Psychosom Med 7:147–151, 1945
38. Hain JD, Smith BM, Stevenson I: Effectiveness and processes of interviewing with drugs. J Psychiatr Res 4:95–106, 1966
39. Smith BM, Hain JD, Stevenson I: Controlled interviews using drugs. Arch Gen Psychiatry 22:2–10, 1970
40. Buckman J, Hain JD, Smith BM, et al: Controlled interviews using drugs. II: comparisons between restricted and freer conditions. Arch Gen Psychiatry 29:623–627, 1973
41. Stevenson I, Buckman J, Smith BM, et al: The use of drugs in psychiatric interviews: some interpretations based on controlled experiments. Am J Psychiatry 131:707–710, 1974
42. Brown W: Treatment of cases of shellshock in an advanced neurological centre. Lancet 2:197–200, 1918
43. Brown W: War neuroses. Proc R Soc Med 12:52–61, 1919
44. Sargant W, Slater E: Acute war neuroses. Lancet 2:1–2, 1940
45. Brown W: The revival of emotional memories and its therapeutic value. Br J Psychol 1:16–19, 30–33, 1920

000409

*Am J Psychiatry 139:5, May 1982*          J. CHRISTOPHER PERRY AND DOUGLAS JACOBS      559

46. Myers CS: The revival of emotional memories and its therapeutic value. II. Br J Psychol 1:20–22, 1920

47. MacDougall W: The revival of emotional memories and its therapeutic value. III. Br J Psychol 1:23–29, 1920

48. Davis DC: Clinical problems and experimental researches. Br J Med Psychol 31:74–82, 1958

49. Janis IL: Stress and Frustration. New York, Harcourt Brace Jovanovich, 1971

50. Herman M: The use of intravenous sodium amytal in psychogenic amnestic states. Psychiatr Q 12:738–742, 1938

51. Lambert C, Rees WL: Intravenous barbiturates in the treatment of hysteria. Br Med J 2:70–73, 1944

52. Nemiah JC: Hysterical neurosis, conversion type, in Comprehensive Textbook of Psychiatry, 2nd ed, vol 1. Edited by Freedman AM, Kaplan HI, Sadock BJ. Baltimore, Williams & Wilkins Co, 1975

53. Breuer J, Freud S: Studies on Hysteria (1893–1895): Complete Psychological Works, standard ed, vol 2. London, Hogarth Press, 1955

54. Janet P: The Major Symptoms of Hysteria. New York, Macmillan, 1907

55. Ludwig AM: Hysteria: a neurobiological theory. Arch Gen Psychiatry 27:771–777, 1972

56. Hernandez-Peon R, Chavez-Ibarra G, Augilar-Figueroa E: Somatic evoked potentials in one case of hysterical anesthesia. Electroencephalogr Clin Neurophysiol 15:881–892, 1963

57. Morris DP: Intravenous barbiturates: an aid in the diagnosis and treatment of conversion hysteria and malingering. Milit Surgeon 96:509–513, 1945

## APPENDIX 1. Valid Indications for Sodium Amytal Interviews

1. Aid to diagnostic interviewing of the mute or stuporous patient:

   a. Catatonia

   b. Hysterical stupor

   c. Unexplained muteness

   d. Differentiating depressive, schizophrenic, and organic stupors

2. Therapeutic interview aid for disorders of repression and dissociation:

   a. Abreaction of posttraumatic stress disorder (traumatic neurosis)

   b. Recovery of memory in psychogenic amnesia and fugue

   c. Recovery of function in conversion disorder

## APPENDIX 2. Protocol for Administering the Sodium Amytal Interview

1. Have the patient recline.

2. Explain again to the patient that medication should make him or her relax and feel like talking.

3. Insert narrow-bore scalp-vein needle.

4. Begin injecting a 5% solution of sodium amytal (500 mg of amytal dissolved in 10 cc of sterile water) at a rate no faster than 1 cc/min (50 mg/min) to prevent sleep or sudden respiratory depression.

5. Interview:

   a. With a verbal patient, begin with neutral topics, gradually approaching areas of trauma, guilt, and possible repression.

   b. With a mute patient, continue to make the technical suggestion that soon the patient will feel like talking. Prompting with known facts about the patient's life may also help.

6. Continue the infusion until either sustained rapid lateral nystagmus is present or drowsiness is noted. Slight slurring of speech is common at this point: the sedation threshold is usually reached at a dose between 150 mg (3 cc) and 350 mg (7 cc), but can be as little as 75 mg (1.5 cc) in the elderly patient or the patient with organic illness. Prompts to talk should have their strongest effect from here on in.

7. To maintain the level of narcosis, infuse the amytal at a rate of about 0.5–1.0 cc every 5 min or so.

8. Conduct the interview as you would any other psychiatric interview, but with several caveats:

   a. Approach affect-laden or traumatic material gradually and then work over it again and again to recover forgotten details, their attendant feelings, and the patient's current reactions to them.

   b. In the mute or verbally inhibited patient, do not press too hard on areas that would normally be inhibited (e.g., murderous rage toward an important attachment) to prevent the developing of panic following an interview.

9. Terminate the interview when enough material has been produced (often 30 min in the mute patient), or when therapeutic goals have been reached (sometimes an hour or so). Have the patient lie down for 15 min or so until he or she can walk with close supervision.

000491

000492

# Hypnosis, Sodium Amytal, and Confessions*

HOWARD V. ZONANA, M.D.**

"It was I . . ." began Raskolnikov.
   "Drink some water."
   Raskolnikov refused the water with his hand, and softly and brokenly, but distinctly said:
   "It was I killed the old pawnbroker woman and her sister Lizaveta with an axe and robbed them."
   Ilya Petrovitch opened his mouth. People ran up on all sides. Raskolnikov repeated his statement.

— Dostoevsky

Confessions are dramatic moments. When amnesia has been present they may be even more so. Both hypnosis and hypnotics have been used in attempts to gain access to memories that do not seem to be readily accessible to usual conscious efforts of recall. While the old Roman saying — *"in vino veritas"* — gives some awareness of the potential of hypnotics, it was not until the 1930's that the barbiturates began to be more systematically investigated as a method of obtaining information from patients.[1] Their use peaked during World War II and immediately after, when it seemed to be especially effective in aiding soldiers to deal with the stresses and the traumatic experiences that accompany combat.[2-6]

Interest in hypnosis waned when Freud abandoned the technique, and only more recently has there been a revival of scientific, professional, and lay interest in exploring this phenomenon.[7-8] It was soon learned that neither of these procedures turned out to be the hoped-for "truth serum" of fiction. Individuals can lie, fabricate, or even falsely confess in such a manner that it is impossible to separate fact from fiction.[9-11] Nevertheless, it is clear that these procedures can relieve amnesia, mutism or conversions and aid in recall. There are, however, no clear guidelines for the use of one technique over the other or even the usefulness of trying one technique after the other has failed. A recent case highlights these issues and provides an interesting example through which to explore these issues.

## CASE HISTORY

Roger was a 17-year-old high school junior when he was arrested and charged with the bludgeoning murders of his 80-year-old adoptive

*This paper was presented at the American Academy of Psychiatry and the Law meeting in October, 1978, at Montreal, Canada.
**Dr. Zonana is Associate Clinical Professor at the Yale University School of Medicine, Connecticut Mental Health Center, 34 Park Street, New Haven, Connecticut, 06508.

000493

14. Weinstein A: Evaluation through medical records and related information systems, in Handbook of Evaluation Research, Struening E and Guttentag M (eds.). Vol 1, Sage Publications, Beverly Hills (1975)

15. Lagos JM, Perlmutter K, Saelzinger H: Fear of the mentally ill: empirical support for the common man's response. Am J Psychiatry 134:1134-1137 (1977)

16. Tardiff K: A survey of psychiatrists in Boston and their work with violent patients. Am J Psychiatry 131:1008-1011 (1974)

17. Tardiff K, Maurice W: The care of violent patients by psychiatrists: a tale of two cities. Can Psychiat Assoc J 22:135-137 (1977)

18. Ponce DE, Lee V: Intraethnic violence in a Hawaii school: A mental health consultation experience. Am J Orthopsychiatry 47:451-455 (1977)

19. Brown S, Burkhart BR, King GD, Solomon R: Roles and expectations for mental health professionals in law enforcement agencies. Am J Comm Psychol 5:207-215 (1977)

20. Wolfgang M: Family violence and criminal behavior. Bull Am Acad Psychiatry Law 4:316-327 (1976)

21. Butler R: Psychiatry and the elderly: an overview. Am J Psychiatry 132:893-900 (1975)

*Bull. Ann. Acad. Psych. & Law Vol. 7 (i), 1979*

000194

grandmother (adoptive in that she had adopted Roger's mother) and her 62-year-old mentally retarded sister. Concerned relatives found both bodies buried nude in a shallow grave in their back yard four days after they were last seen alive. The inside of the house was splotched with blood, and the murder weapon was presumed to be a baseball bat which was found under one of the beds. The grandmother had told a relative that Roger was expected that weekend and that, because of difficulties with his father, he wanted to move in with her. Roger was arrested following his return from New York after a two-day spree, where he and companions had picked up some girls and spent a considerable amount of money. On the day following the crime, he bought a guitar and gave one hundred dollars to a friend. While being fingerprinted he stated, "I deserve to be punished." but refused to elaborate, stoutly maintaining that he did not kill his grandmother or aunt.

For one and a half years following this arrest, his story to his defense counsel and evaluating psychiatrists was fairly consistent. While he acknowledged the possibility that he might have killed them, he felt that he had not. His usual account of the event was as follows:

Three weeks prior to her death, his grandmother had told him that she was going to commit suicide, that she felt her realtives were waiting for her to die so that they could get her property. Upset by this, he told her that he did not want her to die. It was at this point that he decided to take drugs (LSD, cocaine, speed and THC) on a daily basis with the intent of appearing "messed up" to his grandmother so that she would become more concerned about him and less depressed. He spent approximately $400 on drugs during that period. He did not see her for the next three weeks until she called to ask him over. He was taking drugs heavily that day (especially LSD), and on the way to his grandmother's he felt the bus swaying and thought that people were laughing at him. He arrived at 11:00 p.m., and in spite of the hour he changed clothes and went out to shoot basketball. When he returned, the front door was open, and he saw his grandmother on the floor with no clothes on and her head bashed in. He began crying and tried to run for help. When he got to the door, a black man dressed in Roger's clothes told him to come back in. Following that, he was tied up and made to sit by his grandmother. He saw his grandmother die but did not remember anything after that. In some versions to other doctors he remembered being forced to bury them in the back yard before his memory faded.

### Past, Personal and Family History

The developmental and family history was obtained in a series of interviews with Roger, his parents, and his sister. Roger has one sister one and a half years older and four younger half-brothers ranging in age from 9-14. His father is a Polish immigrant who came to this country following World War II and married seven years later. During the war he spent 6-7 years in German work and concentration camps where he lost several toes. He acknowledges beating Roger and his sister fairly frequently when they were 6-15 years of age. He noted that Americans are too lenient in bringing up their children and that the Germans were good disciplinarians who developed better soldiers. Roger's mother died from bleeding during her third pregnancy when Roger was 12 months old. His stepmother married his

000495

father two years after his mother's death. In the interim he stayed with a paternal cousin.

There was no history of seizures or hospitalizations in early childhood. Developmental milestones were normal. When he began kindergarten he had no difficulty separating because "he fell in love with his teacher." His reading was always a little below grade level. In parochial school the nuns complained that he seemed to spend hours daydreaming. He was left back in the third grade. Frequent nightmares occurred accompanied by screaming, headaches, and crying. There was no history of tantrums, and he did not appear to hold grudges.

Roger reported that from the ages of 6-15, both he and his sister were beaten fairly frequently, and that there were many arguments in the house between his father and stepmother. Both he and his sister would often spend weekends with his grandmother to escape from this pressure. When Roger was 14, his sister, who admitted to being pregnant, was disowned and forced to leave. One month later, following the breakup with a girlfriend, Roger made his first suicide attempt. He took an overdose of Sominex, aspirin, and Tylenol. In the hospital emergency room, his father refused to allow a psychiatric evaluation. His sister also has made several suicide attempts and is on probation for passing bad checks.

Roger's only previous criminal record occurred a year prior to his current incarceration, when he was arrested for riding in a stolen car with a friend.

Socially, both he and his parents agreed that he had a number of friends and related easily to girls. In fact, his mother commented that girls would call him frequently. Roger reported that he began sexual relationships when he was eleven and subsequently continued with approximately six girls. During the tenth grade, his school records showed a "C" average. In the eleventh grade he was clearly flunking, receiving passing grades in only two subjects with a significant absentee record, prior to his transfer to the high school near his grandmother.

### Forensic Evaluations

Following his arrest, he remained in jail because he was unable to provide bond. During the next 18 months prior to his trial, he was seen by three psychiatrists who were asked by the defense counsel to evaluate him. Twelve months after his arrest, he claimed that he had been raped several times by another inmate, and wrote several desperate letters to his attorney and the Warden. When he was "inadvertently" transferred back to the same cell block, he wrote a suicide note and ingested a floor cleanser. He was transferred to a general hospital where he was treated, but just before he was to be sent back to jail, he claimed to have ingested razor blade fragments. Consequently, he was transferred to a maximum security treatment facility under the administration of the Department of Mental Health.

A few weeks following his transfer to the maximum security treatment center, he wrote another suicide note and again ingested floor cleanser. Notes from the hospital record describe his complaining of seeing "little green soldiers, devils, in his room at night that laugh at him." These hallucinations were accompanied by strong suicidal ideation. Shortly thereafter, subsequent to a court hearing, he was found sitting on top of a

locker with tape on his chest in the form of the letter "S" and shaving cream on his face. He claimed to be Superman holding up the ceiling. As a consequence of this behavior and a deteriorating relationship with his attorney, a competency evaluation was requested and performed by Dr. M. During that first interview "he claimed not to know where he was and stated that he was charged with breach of the peace and would be released the following day." He said that he was in a state home for boys and denied ever having been in jail. He denied that his relatives had been murdered and that he was accused of the crime. Dr. M. concluded in part: ". . . it became apparent that Roger was distorting aspects of his history and mental status. . . . it is unclear if this represented frank malingering or simply a relinquishing of vigilance over the pressure of a psychotic thought process." During the competency hearing, which lasted five hours, as defense counsel questioned Dr. M, Roger began to grunt, punch his head, slam it into the wall, and cry out, "Stop the voices." He asked where he was and complained of voices shouting at him. At that point, a second evaluation concerning his competency was requested, and I was appointed. The following morning the state's attorney requested that in addition to examining Roger for his competency to stand trial, I extend my evaluation to determine his state of mind at the time of the crime and prepare a report to that effect. I agreed on the condition that he contact Roger's attorney and obtain his consent. As I had recently worked with both attorneys, the defense counsel was willing to have me review his file, including the evaluations of the two defense psychiatrists and psychological report. The state's attorney made available the police investigation reports, autopsy evaluation, and other data that had been collected.

The two defense psychiatrists' opinions found him legally insane for somewhat different reasons. One was on the basis of acute drug use (LSD), and another diagnosed him as chronically psychotic. An EEG and psychological testing were performed nine months after his arrest. The EEG was described as normal. The psychological report, based on a Rorschach, WAIS, Bender-Gestalt, Abbreviated Wechsler Memory Scale, and Thematic Apperception Test, performed by Joel Allison, Ph.D., is quoted below.

### Psychological Report

This is a young man who presents himself as striving to be optimistic in the face of depression and external misunderstandings. He describes himself by saying "I like to make things happy with people" and in situations with others he strives consequently to minimize sadness, to emphasize wish fulfilling reconstructions of unpleasant realities, to keep things in order, to emphasize the positive in the face of pain, death, inability, and mistreatment. Yet even in the most structured tasks one sees chinks in what appears on the surface as a relatively successful degree of organization. Variable concentration is evident, as well as temporary inefficiencies and perhaps more noteworthy is a seeming ability to plan and organize his behavior which nonetheless contains essentially odd interpretations of reality and strange themes. Such strange themes involve the spread of destruction (both the rescuer and the person rescued in a short memory test are recalled as dead or

000497

EX 31    480

drowned), confusions between what is real and what is not real, such that inanimate objects become transformed into animate beings, and also mentally ill murderers who "toy" with the dead. It bears emphasis that for the most part he is either able to provide some context for these ideas, *e.g.* that they are science fiction and that ultimately he externalizes blame onto the test situation for eliciting such themes.

With less structure, greater novelty and more press for elaboration on his part, strange ideas take on an increasingly dominant role in his experience and the degree of his perceptual articulation of reality suffers similarly. His style becomes even more self-referential and associative and there appear dominant themes of fright, of things in deformed, persecuted, monstrous, suffering, punished states. It is clear that his thinking reaches paranoid proportions in the degree to which he feels personally threatened and attacked, but it is also clear that his differentiation between representations of himself and others becomes fuzzy and hard to sort out. Who is the attacker or the attacked, scary or suffering, hurting or hurt, helpful or harmful become unclear. His style is to take one image, transform it into different, discrepant attitudes yet never be precise as to whether these images are distinct or simultaneously are facets of one basic image. Consequently he is probably likely at times to be unclear as to who is doing what to whom, especially around themes of violence. His test responses, in fact, take images of destruction and freely embellish them into themes of total world destruction and mutilation of persons. In one response the sun is represented with black flames "taking it out on the earth" yet the earth is simultaneously described as destroying itself. People disintegrate, disappear, are "done in." Consistently he strives to rationalize his images as either stemming from the awfulness of prison life, or reflecting the dismal state of our country, the universe and people at the present time. His efforts to transform his thoughts into more philosophical and abstract observations, nonetheless, do not effectively mute either the raw intensity of his images or the poor organization that accompanies them. Moreover, he also shows a strong effort which increases with time to counter the essential fearfulness and the sense of fragmentation by shifting to images of strength, integration, excitement, celebration, newness. In this regard he exhibits hypomanic features in the degree to which he endeavors to have things strong, happy, new, colorful and good as opposed to threatened and threatening, old, wrinkled, damaged, deformed, black and evil.

Both the intensity of his haunting imagery (*e.g.* mouths with blood coming out, animals totally coated by their victims' blood), and the cognitive disruption surrounding his imagery appear to me to indicate a psychotic diagnosis. His ability to rationalize his thoughts and provide a context for them (*e.g.* science fiction or symbolic representation) saves him at times from being fully or floridly psychotic but the thrust of the test responses suggests an essentially psychotic picture, primarily paranoid in nature with counter-paranoid efforts largely of a hypomanic nature. Furthermore the juxtaposition of contrary ideas (such as a vampire bat whose ears are described as looking like a peace

00 0 498

sign), the fuzziness of boundaries between separate themes which almost blend into each other also suggests that the basic psychosis is both paranoid and schizophrenic. In sum, then, I believe there is evidence for a diagnosis of at least borderline paranoid schizophrenia with reconstituting efforts at a hypomanic level. Furthermore the juxtaposition of such intense imagery with poor perceptual organization and tendencies toward blurring the distinction between things, would suggest that he could be a person who might act on his destructive ideation either toward others, himself or in more confused blending of self and others. (In fact he made an uncorrected slip of the tongue in which he said he would try to get himself shot by running away if he is found *innocent.*)

Intellectual functioning is in the average range (Verbal IQ is 92; Performance IQ is 96 and Total IQ is 93). Given the amount of variability and spottiness in his efficiency, however, it is likely that his potential IQ is at least 10 points higher in the high Normal or low Bright Normal range. In addition to the variable concentration referred to earlier and the temporary inefficiencies, he showed a reduction in the expected level of memory efficiency solely involving verbal memory. Since his visual motor efficiency, visual motor memory and abstract abilities show no impairments I am not inclined to take his memory difficulties as indicative of organic difficulties especially since the short passages used in assessing verbal memory involve themes of hardship and destruction — themes which appear habitually to be essentially disorganizing and disrupting to him.

### Forensic Evaluation

Roger opened our first interview by saying that he was hearing voices telling him to kill people and in particular to snap my neck. During the remainder of that interview, he reiterated his past history and his version of the events which led to his arrest. He claimed to be innocent and reiterated the story of his drug use as previously described and of the black man.

Although oriented to person, place, and time and able to name the president and governor, he frequently referred to hallucinations and headaches which made him acutely uncomfortable. He was, however, able to concentrate sufficiently to subtract serial sevens with only two mistakes. He claimed that the voices were worse in the courtroom and asked if he could take some medication which would control them.

Roger additionally described auditory hallucinations since the age of 8. The voices said he was bad and told him to kill people. He felt them to be especially prominent following beatings when they would tell him to kill his father. These experiences never were reported as he did not want anyone to think he was "crazy."

Following this interview, my impression was that while there was undoubtedly some exaggeration of symptoms on his part, he was unable to acknowledge personal responsibility for the crime and was utilizing psychotic defenses to prevent his having to deal with these issues. The court hearings and psychiatric interviews placed him under increased pressure and exacerbated his symptoms, thus affecting his competence.

000499

EX 31    482

Accordingly, I felt that an interview under sodium amytal might enable him to have better access to his memory. Following his consent, as well as that of his attorney and parents, the drug was administered at the maximum security treatment center. His attorney, an anesthesiologist and I were present during this interview. Intravenous sodium amytal was administered through an indwelling catheter until he could no longer count backwards sequentially, his speech became slurred, and nystagmus was present. At this point it was suggested that he let his mind go back to the night of his grandmother's death and the prior two weeks to see if he could picture what was happening between him and his grandmother. During the course of this interview, more sodium amytal periodically was injected to maintain a somnolent level. (A total of 300-400 mg was administered over a 45-minute period.) During the course of the entire interview, he never became spontaneously talkative, as patients sometimes do with sodium amytal. He would respond, however, to direct questions. He then proceeded to reiterate the version of his story that has been previously described. This retelling was accompanied by no affect or any expression of emotion, and there was no change in his clinical status during the subsequent week.

In my third interview with him one week later, I began by saying that I thought he had been honest with me in some things but not in others, and that he had either exaggerated or had not told the truth, specifically about never having taken drugs prior to the three weeks before his grandmother died. At that point he acknowledged that he had taken drugs, including acid and cocaine, beginning at around age 14 or 15, but had shot heroin on only one occasion — when he was 16. While he was on heroin, the room began to sway, he saw bright colors, and he heard voices shouting at him to kill someone.

At this time, I also traced his school history in more detail, and learned that he had switched schools without notifying his parents. He told one school that he was moving to California with his parents and told the other school that his parents were moving and that he would be moving in with his grandmother. The school gave him papers to have her sign and he wrote in her name. The main reason he had switched schools was that he was told at the first one that he would not have any chance to play basketball. At the new school the coach had told him he could try out and had a good chance to make the team. In fact, he never did try out, because it was only five days after he had switched schools that his grandmother had talked about dying, and he dropped out of school for the subsequent three weeks. In response to a question about whether the school had sent letters about his absenteeism to his grandmother, he said that they did. He and she had argued about his not going to school, but he could not recall when. The night of her death, he brought a baseball bat and was planning to tell her that he was going to stay whether she liked it or not. At this point, he became more agitated and complained about the voices shouting at him. I commented that he seemed to get more upset when he discussed the details and that this would probably continue unless he could try to remember more. I offered to hypnotize him to see if this would help his memory. He agreed to this.

In terms of his hypnotic susceptibility on Spiegel's hypnotic induction

profile he tested out to be highly hypnotizable (a grade four, on a 0-5 scale).[8] Following the induction I told him to take his mind back to the date of his grandmother's death and that he would experience that night as if in the present. (The same instructions as before were given, but without Amytal.) I asked him to describe what was happening between his grandmother and himself. He began speaking in a bland, flat voice stating that, "She started talking by saying how come you're not going to school, and I said because I don't want you to die. She then started yelling at me — more, more. I was taking drugs heavy and was high." In response to my asking if his grandmother had the letters from the school, he said, "Yes, and then she added again that I should be going to school. She started getting mad. I also became angry and told her to shut up — she wouldn't keep quiet. She kept on yelling, 'Why aren't you going to school?' She was standing and I was sitting on the couch at that point, and she began to hit me with her cane on the legs. The bat was by the chair. She started to walk upstairs; I went to take the bat, started to hit her on the back of the head. I went upstairs and started hitting my aunt on the head; she was still sleeping." When asked what was going on in his mind at this time, he said that his mind was "mixed up." When asked if his grandmother said anything, he said that after he hit her the first time, she said "Oh my God, oh my God." "I was so high on drugs — the house started swaying back and forth. I then went downstairs and took the knife and stabbed my aunt in the chest, more, more . . . the voices said to kill them more and more." At this point he stated that he couldn't remember more, but in response to encouragement to continue, he said "I dragged them downstairs and buried them in the back yard. I dragged them by the hands and got a shovel from the shed and dug a hole." He commented that he was "too high to worry about people seeing me." Following this, "I went to bed in my own room and in the morning called up a friend and told him to come over, I had money that I wanted to spend." In response to other questions, he noted that his grandmother was initially dressed in her bathrobe, but that he took all the clothes and threw them in the fireplace and burned them. He said he told his friend that his grandmother had died, but that he was not feeling upset as he was still high on drugs.

At this poing in the interview he suddenly opened his eyes, shook his head, began to look around in a bewildered fashion, and asked what had happened. When I suggested that he probably could remember, he then said that he had no idea what he had said and pressed me to tell him. When I started to review the argument with his grandmother and his hitting her with the baseball bat, he interjected, *"I guess I really did it then."* At this point, he burst into tears, saying that he did not deserve to live, that he really loved them, that he couldn't live with that. While crying, he went on to say that while he wanted to leave the treatment center, he deserved to be in prison. He pleaded with me to help him, and we talked for an additional fifteen minutes in this more emotional state. He said that he could see no way he would be able to deal with this knowledge except by killing himself. When I suggested that he would have to come to terms with the truth in some way, and that he seemed to have cared about his grandmother, he said, "How can you come to terms with something like that? — I don't deserve to live."

Hypnosis, Sodium Amytal and Confessions                                    25

000501

EX 31   484

Shortly after this, he looked up and spontaneously said that the voices had stopped. He seemed quite depressed at this point, but asked if I would come back to see him again. He agreed to my discussing his current state and situation with the ward staff and his therapist, and he was placed on suicidal precautions for the next few days.

During this next week, hospital staff reported that he was acknowledging his responsibility for the deaths, not complaining of hallucinations and appearing appropriately depressed. In a follow-up interview nine days later, he stated initially that he was not hearing voices any more, and he seemed more alert. We reviewed some additional history, and he went on to say that he had been having dreams about hearing his grandmother say, "Oh my God, oh my God." What he remembered was that he saw his grandmother, started to hit her over the head, and felt frightened. It was hard for him to believe he did it. We then proceeded to review the rest of what he had said under the hypnosis, and this seemed to stimulate some of his memory. When I pressed him about hearing voices he did say that, by and large, the voices had disappeared but that occasionally he would hear some low voices, not commanding him to do anything. They usually occurred in the evening. We also reviewed some of the issues specifically concerning his competence to stand trial. He knew that he was charged with murder and the consequences of being found guilty; he stated that he hoped he would be able to stay at the treatment center, where he felt comfortable with the staff. He acknowledged having discussed a "not guilty by reason of insanity plea" and was aware of the difference between a trial with a jury and three judges, stating that he preferred to have three judges. He could outline the roles of the prosecutor, defense counsel, judge, and jury. At the end of the interview, he pressed me for my address, saying that he would like to write to me and to continue to see me, saying that I was like the father he wished that he had. He also stated that he was not now planning to kill himself, that he felt his family needed him, that in spite of the beatings and other feelings towards his father, his father had stuck by him, supporting him both emotionally and financially. He asked when the hearing was likely to occur and if I would see him prior to that time. He felt that he would not have the same difficulty in the courtroom as he had had previously, that he was more in control.

For approximately nine months prior to the trial, Roger was maintained on Prolixin 20 mg O.D. This medication was withdrawn 2-3 weeks following the trial. During the trial Roger was able to remain composed and attentive. The trial lasted one day and was held before a three-judge panel. The "Not Guilty by Reason of Insanity" plea was not contested by the prosecution.

## Discussion

Following World War II, Amytal interviews were in high vogue and seemed to offer an easier route into repressed material than hypnosis. Amytal, unlike hypnosis, could be given to anyone and seemed to be more universally effective than hypnosis where individual susceptibility seemed quite variable. Many patients were not sufficiently hypnotizable so that recall of memory and abreaction could take place.

In the present situation it was of interest that Amytal did not seem to

000502

induce the typical volubility and feeling states associated with an abreactive pattern. Rather it seemed to induce only sedation with a decrease in both verbal content and affect. If he had been looking for a "face-saving" opportunity to confess, the Amytal situation should have provided the necessary ingredients, e.g., a supportive hospital staff, his own attorney encouraging him, and a protective setting.

The hypnotic induction occurred with only the author present, five days later, with no intervening visits. Prior to the induction, Roger was confronted with some of the inconsistencies in his story which he then modified. It is of interest that during the hypnotic state, the details were told without affect. It was not a spontaneous recitation of the sequence of events, and some encouragement and questioning were required for him to continue. In addition, he spontaneously interrupted the trance and was amnesic for the trance period. The abreaction occurred when I repeated what he stated while in the trance, after he insisted on being told, claiming that he could not remember on his own. This abreaction was followed by a spontaneous comment that the hallucinations had stopped and an expression of depressive affect, feelings of worthlessness and suicidal impulses. Following this experience he remained better integrated on the ward, and no bizarre behavior and cognitive disorganization were subsequently evident.

Both Amytal and hypnosis induce altered states of consciousness. The barbiturates reversibly depress excitable tissues, with the CNS being exquisitely sensitive. The degree will vary from mild sedation to coma. The after-effects may be manifested as overt excitement. Thus at low blood levels a person may feel slightly intoxicated, euphoric and energetic. Depending upon environmental stimuli, he may also display irritability and a temper.

In small doses intravenous barbiturates produce an increase in the energy of the high frequency part of the EEG Spectrum — initially at 25-35 Hz. This fast activity, which has been termed barbiturate activation, starts from the frontal cortex, spreads to the parietal and occipital cortex and recedes in the reverse order as the drug wears off. It is accompanied by clouding of consciousness and occasionally euphoria. The early high frequency response of the EEG to barbiturates resembles that to electrical arousal of the retricular formation, and the threshold for EEG arousal may be transiently lowered; however, the hippocampal component of the arousal response is missing, and true arousal does not occur.[12]

In this particular situation, the predominant effect was drowsiness without the concomitant euphoria or increased willingness to verbalize in a less censored fashion. Some investigators add amphetamines to Amytal in order to enhance this "talkative" state.

Hypnosis, in spite of its name, also is associated with an alert EEG, and while it is not yet possible definitively to define a hypnotic state by physiological measures, the work of Orne et al. has demonstrated some unique features of a hypnotic state which allow for an acceptance of the state as something more than mere role playing. A working definition of hypnosis is a subjective state in which alterations of perception and memory can be elicited by suggestion. The ability to recover memories not in conscious awareness through the use of hypnosis has been one of the clinical situations which has intrigued many investigators, although the validity of

000503

EX 31   486

such recall always has been open to question. Independent confirmation is important as it is clear that both conscious and unconscious wishes can affect the details of memories that are recalled.

In this case hypnosis provided the context in which recall was facilitated, and the regressive symptoms which seemed secondary to his repression disappeared following his abreaction.

Psychiatric evaluations for the court in competency evaluations, for the State or defense in insanity evaluations are performed with the legal goals as primary. Although the evaluator was functioning as an agent for the State, it was also possible to effect a therapeutic result in this unusual situation. The major legal functions that the hypnotic abreaction served were to make Roger competent to stand trial and to convince the State's Attorney that this version was closer to what probably occurred. The use of an insanity defense in a drug-induced psychotic state has been discussed in several recent papers and decisions and is beyond the scope of the present review.[13] Suffice it to say that drug-induced psychoses alone usually are not sufficient to support an insanity defense. Some pre-existing or underlying mental condition usually is necessary.

As hypnosis becomes an increasingly "acceptable" modality in the psychiatrist's armamentarium of therapeutic techniques, we hope the study of this subjective state will increase our understanding and help remove from the magical and mystical arena this fascinating phenomenon which has intrigued both lay and professional groups.

### References

1. Lindemann E: Psychological changes in normal and abnormal individuals under the influence of Sodium Amytal. American J Psychiatry 88:1083, 1932
2. Grinker R, Speigel J: Men Under Stress. Philadelphia, Blakiston Co., 1945, pp. 170-171
3. Grinker R, Spiegel J: Brief psychotherapy in war neuroses. J Psychosomatic Medicine, 6:123, 1944
4. Grinker R: Treatment of war neuroses. JAMA, 126:142, 1944
5. Lipton E: The Amytal interview: A review. American Practitioner, Vol. 1, No. 2, pp. 98-105, 1978
6. Naples M, Hackett T: The Amytal interview: History and current uses. Psychosomatics, Vol. 19, No. 2, pp. 98-105, 1978
7. Orne M: The construct of hypnosis: Implications of the definition for research and practice. Annals of the New York Academy of Science, Vol. 296, pp. 14-33, 1977
8. Spiegel H: The Hypnotic Induction Profile (HIP): A review of its development. Annals of the New York Academy of Sciences, Vol. 296, pp. 129-143, 1977
9. Redlich FC, Ravitz L, Dession GH: Narcoanalysis and truth. American Journal Psychiatry, 107, p. 586, 1951
10. Gottschalk LA: The use of drugs in information seeking interviews, in Uhr LM and Miller JG eds. Drugs and Behavior. New York: Wiley, pp. 515-518, 1960
11. Dession GH *et al.*: Drug induced revelation and criminal investigation. Yale Law Journal, 6162:315-347, 1953
12. Redlich *et al.*, *op. cit.*, n. 9
13. Barter JT and Reite M: Amer J Psychiatry, Crime and LSD: The insanity plea, 126:113-119, October 1969

*Am J Psychiatry 135:1, January 1978*

# Sodium Amylobarbitone in the Differential Diagnosis of Confusion

BY NICHOLAS G. WARD, M.D., DAVID B. ROWLETT, M.D., AND PATRICK BURKE, M.B., CH.B., PH.D.

*The authors describe the use of intravenous sodium amylobarbitone to differentiate between functional and organic confusion. Four psychiatric patients with functional confusion developed a clear sensorium on this drug. Since previous studies have demonstrated that organic confusion is increased by sodium amylobarbitone, the authors conclude that the drug can be an aid in the differential diagnosis of confusion. They discuss possible applications.*

IN THE EARLY stages of hospitalization, it can be very difficult to distinguish between functional and organic disorientation in psychotic patients. Disorientation is more common in organic conditions, but it also occurs in several psychiatric conditions. It may be "caused by acute conflicts, intense affective factors, distractibility or lack of interest or attention" (1). Disorientation is observed in severe manic excitement, 10% of depressions of the aged, severe agitated depression (2), schizophreniform psychosis (3), and acute reactive psychoses (4), and it may be a feature of pseudodementia (5).

Observation, history, and specific tests can be helpful in differentiating organic and functional confusion. Patients who are oriented in behavior (e.g., can find their rooms and know who their doctors are) but give bizarre responses to questions are likely to be functionally confused. Those who respond with "near miss" answers are more likely to be organically impaired (6), and those who give "don't know" answers are usually just uncooperative. There are also reports of delusional-like disorientation in psychotics, in which cases the patient stubbornly maintains the wrong date or place although he or she is fully aware that others have different conclusions, and of "double orientation" in which cases the patient may sometimes know the place, date, etc., but will at other times give inaccurate answers, maintaining that the accurate orientation is an illusion (7). Other clues to a functional etiology include a history of psychotic episodes with confusion or a rapid onset with a normal EEG and no evidence of toxicity (5).

All of these features suggest but do not confirm a particular diagnosis and differentiation becomes especially difficult when the psychotic patient for whom a good history is unavailable manifests neurologic deficits or shows some superficial head trauma. How, then, can functional confusion be more certainly distinguished from organic confusion?

Sodium amylobarbitone appears to be a promising diagnostic agent for this purpose. First, in patients with brain disease, it not only increases preexisting confusion but can induce confusion. Weinstein and associates (8, 9) found that sodium amylobarbitone brought about of previously unmanifested disorientation in 65% of patients who had underlying brain disease. This change was not seen in a control group with no brain disease.

Second, in patients with functional psychiatric disturbances, sodium amylobarbitone appears to improve symptoms. In psychotics, attention defects and contact with the environment were found to improve considerably after administration of the drug, out of proportion to other factors (10). Similarly, schizophrenics under the influence of sodium amylobarbitone have shown improvement in memory, attention, comprehension, thought organization, and goal orientation (11), and it has been reported that sodium amylobarbitone can reverse psychogenic states and thus differentiate them from organically induced amnesia (12, 13).

These findings suggest that confusion or disorientation in psychiatric patients might be cleared by sodium amylobarbitone, but an extensive literature search has revealed no reports of this. In fact, there is one report of a confused psychiatric patient whose confusion persisted under this medication (14).

In spite of this one negative finding and with the support of the data already described we hypothesized that functional confusion in psychotic patients would clear under the influence of sodium amylobarbitone.

Dr. Ward is Assistant Professor of Psychiatry and Behavioral Sciences, University of Washington School of Medicine, Seattle, Wash. 98195, where Dr. Rowlett is Instructor of Psychiatry and Behavioral Sciences and Dr. Burke is Resident in Psychiatry and Behavioral Sciences. Dr. Rowlett is also Director of Inpatient Psychiatry, Harborview Medical Center, Seattle, Wash. Address reprint requests to Dr. Ward.

The authors wish to thank Drs. Robert O. Friedel, Marc Schuckit, and David Raskin for critical assistance in the preparation of this manuscript.

0002-953X/78/0001-0075$0.45 © 1978 American Psychiatric Association

75

EX 31   488

METHOD

All subjects signed statements of informed consent. Subjects were confused. psychotic patients admitted to a locked psychiatric unit in a general hospital. Within 48 hours of admission. sodium amylobarbitone was administered to each subject in a procedure similar to that reported by Weinstein's group (8, 9). modified by injection of a lower concentration (75 mg/ml) at a slower rate (1 ml/minute for the first 2 minutes, with each additional 1 ml delivered over 1 minute. followed by a 1 minute wait to assess effect). Throughout the procedure. attempts were made to keep the patient talking. When yawning. slurring of speech. or nystagmus appeared, drug administration was stopped and the patient's orientation was tested. In some cases, we performed a full Weinstein-Kahn interview, which includes questions to asses not only orientation but also intermediate memory and anosognosia (denial of illness). The following four case reports describe patients diagnosed as having functional confusion.

CASE REPORTS

*Case 1.* Mr. A, a 63-year-old man with a 30-year-plus history of periodic psychotic depressive episodes characterized by vegetative signs, crying, and delusions of worthlessness, was admitted after he developed marked confusion and disorientation over a period of 1–2 weeks. His chief complaint was that he felt he should be dead. He was unable to give the month, year, or place accurately, spoke incoherently, and did not respond to most questions. During the previous 3 years, he had had two similar psychotic episodes with confusion. Diagnoses assigned in recent admissions included diabetes insipidus, a seizure disorder, hypertension, and dementia, with the remote possibility of a recurrent eosinophilic granuloma that had been treated previously by rib resection. On one admission, 8 months before this admission, he was found to have a bromide level of 2 mEq/liter. Four years before this admission, Mr. A had shot himself in the face. His wife reported that he experienced memory and cognitive deficits after the shooting, but no formal documentation of these difficulties was obtained.

Because his behavior was inconsistent with the verbalized degree of memory deficit and seemed goal-directed and manipulative at times, we elected to use sodium amylobarbitone diagnostically. A total of 325 mg was administered intravenously, and he immediately became oriented to person, place, and year, and knew where he lived, how far away his home was, that he had been in this hospital before, and how he got here. After interview, he relapsed into confusion and was started on thiothixene, 5 mg t.i.d. Within 3 days he showed no evidence of disorientation or psychosis. A full Weinstein-Kahn interview done 3 days later revealed no deficits, and further psychological tests showed no memory or cognitive impairment. Results of all neurological studies were within normal limits, except for an EEG that revealed diffuse slowing (possibly secondary to treatment medication) but no evidence of epileptic activity.

*Case 2.* Mr. B, a 36-year-old man with a history of chronic schizophrenia and both grand mal and petit mal epilepsy since an illness (or injury) at age 3½, was admitted after he

76

exhibited bizarre, agitated behavior. He had been found running around an apartment building, screaming and pounding on walls, and had been hit on the nose by the apartment manager. He was brought to the hospital by the police. The rapidity of onset could not be determined because of the lack of an objective historical source. The patient was uninformative. talking loudly and incoherently with loose associations and affect that varied from elation to anger to calm (leading one evaluator to suggest an affective disorder). He exhibited paranoid ideation and was not oriented to place; he refused to answer other questions regarding orientation. Over the next 2 days. we learned that the patient had been treated for a seizure disorder with primidone (50 mg h.s.) for approximately 1 year; previous treatment had been with phenobarbitol and diphenylhydantoin. No toxicity or overdose symptoms had been noted.

On the day after admission, he was disoriented to date. time, and person but oriented to place. Because of the diagnostic question of functional versus organic confusion, historical information that was compatible with both, and some inconsistency in memory impairment, we elected to administer sodium amylobarbitone. He was given 250 mg I.V. and immediately became fully oriented and could give his full name, the exact date, and time of day. Following the interview and throughout his hospital stay, he maintained orientation to place. time, and person, although he frequently misidentified patients and staff. A history was obtained of at least seven prior state hospital psychiatric admissions over approximately 10 years. Further investigation revealed mild retardation and marked diffuse EEG abnormalities with a left-sided predominance and no focal abnormalities.

A diagnosis of schizophrenia was made because of his affective constriction, inappropriateness, disorganized and idiosyncratic thought processes, delusions, hallucinations, and the above history. Psychosis secondary to epilepsy was ruled out, because psychosis of this duration has been reported only in psychomotor epilepsy, and in such cases "there is never a continuous spike and wave discharge" (15). as was seen in this patient.

He was given thiothixene in dosages that reached 80 mg h.s. by the time of discharge. In addition, from the time of admission the seizure disorder was treated with phenobarbital in doses up to 30 mg t.i.d. No seizures were noted during his hospitalization and after 2 weeks the misidentification, delusions, hallucinations, and agitation had diminished markedly.

*Case 3.* Mr. C, a 20-year-old man with a history of schizophrenia since at least age 18, was admitted with extreme latency. disorganization of speech, auditory hallucinations. and thought broadcasting. His history was sparse, and it was difficult to obtain information from him throughout his stay. He had moved from one halfway house to another, had never worked, and had received antipsychotic medications and sporadic psychiatric care since the age of 18. In the past. after someone around him pointed out that he was behaving abnormally, he would go to a hospital appearing quiet and uncommunicative and was usually diagnosed as schizophrenic. One year before this admission, his manifest confusion led to a neurologic evaluation, which revealed no organic basis.

On this admission he was disoriented to person, place, and time. The next day. while still disoriented in three spheres. he was given a full Weinstein-Kahn interview using 300 mg of sodium amylobarbitone. and he immediately gave the correct time of day and place but missed the date by months.



# Clinical Usefulness of Sodium Amobarbital Interviewing

Maurice W. Dysken, MD; Judith A. Kooser, MSN; Joseph S. Haraszti, MD; John M. Davis, MD

• We report a double-blind, randomized, placebo-controlled study utilizing a within-subjects design on 20 hospitalized, psychiatric patients who participated in sodium amobarbital interviews to determine if the drug has a specific effect in eliciting clinically useful information. The patients selected had difficulty communicating with their primary therapists during the postadmission, diagnostic interviews. Two raters completed a Hamilton Depression Scale, a New Haven Schizophrenic Index, and a Brief Psychiatric Rating Scale after each interview. Although both the amobarbital and saline interviews were moderately useful in obtaining new information, we found no significant difference in the primary therapists' assessments of clinical usefulness. In addition, the drug interview did not uncover material that would aid in the differential diagnosis between depression and schizophrenia. There was, however, a significant negative correlation between the assessment of general usefulness and the time interval between admission and interviewing. We report our only exception, a case of catatonic schizophrenia, in which the patient responded specifically to the drug.

(Arch Gen Psychiatry 36:789-794, 1979)

Over the past 50 years, physicians have administered both sedative and stimulant drugs to patients in an effort to facilitate diagnostic interviewing. We became interested in assessing the usefulness of sodium amobarbital interviewing as a result of our own clinical experience in using the drug during diagnostic evaluations in hospitalized psychiatric patients. We could agree with previous reports that barbiturate-facilitated interviews were productive in eliciting information that was valuable

in clarifying diagnostic and therapeutic issues, but we were uncertain to what extent the benefit was a function of a specific pharmacologic effect, the result of an expectation that a special drug would help the patient talk, or the consequences of an additional interview during the patient's hospital stay.

The American literature on barbiturate interviewing, which began in 1930 with Bleckwenn's reports,[1-3] contains largely anecdotal evidence that argues for some diagnostic,[4-17] therapeutic,[18-41] or prognostic[42,43] benefit. Many of these studies on hospitalized patients conclude that sodium amobarbital has a specific drug effect in uncommunicative patients who are often able to express underlying depressive or schizophrenic symptoms under the influence of the medication. Although a few recent investigations on drug-facilitated interviewing have been controlled studies,[44-50] the focus has been primarily on the effect of amobarbital in further diminishing intellectual functioning in patients with organic brain syndrome[44] or in promoting behavioral and emotional expression in nonpsychotic patients.[47-50]

Because we could not find any placebo-controlled study in the literature that attempted to evaluate the clinical usefulness of amobarbital in uncovering schizophrenic or depressive symptoms as an aid in the differential diagnosis of the functional psychoses, we designed the present study to answer the following four questions: (1) How useful are amobarbital interviews in hospitalized psychiatric patients? (2) Are the interviews useful in the differential diagnosis of schizophrenia vs depression? (3) Are they useful in eliciting new information, in clarifying treatment options, or in furthering psychodynamic understanding? (4) Compared to placebo, does amobarbital have a specific effect in eliciting clinically useful information?

## SUBJECTS AND METHODS

We employed a within-subjects design in which the patient served as his own control. Suitable subjects were hospitalized

Accepted for publication Mar 22, 1978.
From the Departments of Psychiatry (Drs Dysken, Haraszti, and Davis) and Nursing (Ms Kooser), University of Chicago, and the Illinois State Psychiatric Institute, Chicago (Drs Dysken, Haraszti, and Davis).
Read in part before the 32nd annual convention of the Society of Biological Psychiatry, Toronto, April 29, 1977.
Reprint requests to Illinois State Psychiatric Institute, 1601 W Taylor St, Chicago, IL 60612 (Dy Dysken).

000507

EX 31   490

patients on three metabolic research units at the Illinois State Psychiatric Institute, Chicago, who were receiving no psychotropic medications and who had some difficulty in communicating with their primary therapist during the initial psychiatric evaluation. The primary therapists chose patients for the study when they thought that an amobarbital interview would clarify diagnostic questions by helping the patient talk more easily. Each patient gave written informed consent and was told that two interviews, conducted on the same day, would be undertaken to see if medication would make it easier to talk with the physician during the interview.

The patient's primary therapist had the task not only of initiating the request for the interviews, but also of obtaining written consent and completing preinterview and postinterview questionnaires. The preinterview questionnaire asked the primary therapist what he hoped to learn from the barbiturate interview and what he thought the patient's diagnosis was. The postinterview questionnaire attempted to establish how useful each interview was to the primary therapist on a scale from 0 to 8. In addition to rating general usefulness, the primary therapist scored the usefulness of each interview according to the following six subgroups: new information, new behavior, known information with an altered perspective, diagnosis, treatment options, and psychodynamics. The primary therapist attended both interviews and was blind to the drug condition. One of the authors (M.W.D.) conducted all of the interviews, the first one occurring in the late morning and the second one, at least four hours later. The interviewer followed a semistructured format that lasted about 30 minutes, in which he initially asked open-ended questions and later, more specific ones to complete a Hamilton Depression Scale, a New Haven Schizophrenia Index (NHSI), and a Brief Psychiatric Rating Scale (BPRS) following each interview. We chose these particular rating scales to assess any change in depressive or schizophrenic symptoms between drug and placebo interviews. The interviewer, who was not blind to the drug condition, administered both the saline and amobarbital, the order being determined by the toss of a coin. Sodium amobarbital was injected at a

rate of 25 mg/min and administration ceased when sustained horizontal nystagmus developed. The total dosage ranged from 150 to 350 mg. At the conclusion of both interviews, the interviewer asked the primary therapist to state in which of the two interviews he thought the drug was administered.

We audio-recorded each interview. Another of the authors (J.A.K.) functioned as a blind independent rater and completed a Hamilton Depression Scale, NHSI, and BPRS after listening to each taped interview. The interviewer and independent rater then compared their scores. When any major discrepancies arose, they discussed the observations that entered into the particular scores in question and made any adjustments accordingly. Occasionally, it was necessary to relisten to the taped interview to resolve scoring differences. An arithmetic average for each item was used in the statistical analysis of the data.

The patient was blind to the drug administered and completed a postinterview questionnaire within a day or two of the interviews. This questionnaire asked the patient if, during either interview, he found it easier to talk with the doctor and if he detected any drug effect during the first and second interviews. After the patient left the hospital, the primary therapist completed a discharge questionnaire to reassess the usefulness of the interviews in an effort to determine if events during the remainder of the hospitalization altered his initial assessment.

We studied 20 patients during a 20-month period in which a total of 267 patients were admitted to the research units. Thus, the primary therapists selected approximately one patient who they thought would be a suitable subject for every 13 patients who were admitted. Table 1 summarizes the demographic characteristics of the patient population. Most of the patients had a discharge diagnosis of either schizophrenia or major affective disorder. The sixth column in Table 1 illustrates the length of time in years, rounded off to the nearest one-half year, that the primary therapist had spent conducting psychotherapy with hospitalized patients. The last column depicts the number of days between admission to the hospital and the day the interviews were conducted.

Table 1.—Patient Sample Characteristics, Primary Therapist's Experience Conducting Psychotherapy, and Interval Between Hospital Admission and Interview Day

| Case/Age, yr/Sex/Race | Diagnosis | Psychotherapy Experience, yr[*] | Interval, Days |
|---|---|---|---|
| 1/17/M/B | Acute schizophrenia | 6.0 | 5 |
| 2/25/F/W | Borderline personality | 2.0 | 14 |
| 3/39/F/B | Chronic schizophrenia | 2.5 | 16 |
| 4/48/F/W† | Phobic neurosis | 2.5 | . . . |
| 5/24/M/W | Catatonic schizophrenia | 5.0 | 10 |
| 6/44/F/W | Paranoid schizophrenia | 2.0 | 10 |
| 7/19/F/W | Inadequate personality | 0 | 16 |
| 8/27/M/W | Schizoaffective schizophrenia | 1.0 | 160 |
| 9/25/M/B | Chronic schizophrenia | 4.0 | 22 |
| 10/27/F/B | Paranoid schizophrenia | 1.0 | 7 |
| 11/29/M/W | Manic depressive illness | 1.0 | 23 |
| 12/28/F/W | Depressive neurosis | 2.0 | 16 |
| 13/50/F/W | Depressive neurosis | 2.0 | 9 |
| 14/29/F/B | Psychotic depression | 1.0 | 8 |
| 15/35/M/W | Chronic schizophrenia | 0.5 | 181 |
| 16/27/F/B | Chronic schizophrenia | 8.0 | 10 |
| 17/25/M/B | Depressive neurosis | 13.0 | 22 |
| 18/24/F/W | Hysterical personality | 3.0 | 2 |
| 19/18/M/B | Acute schizophrenia | 3.0 | 7 |
| 20/25/F/W | Catatonic schizophrenia | 4.5 | 6 |

*Rounded off to nearest one-half year.
†Only outpatient in the sample at the time of interviewing.

000508

EX 31   491

All correlations reported are Pearson product-moment correlations, with the exception of the correlation between general usefulness and length of time from admission to first interview, which is a Spearman rank-order correlation. All tests on mean differences between drug and placebo trials are $t$ tests.

## REPORT OF CASES

We shall summarize several interviews to illustrate the kind of material that primary therapists found useful.

Case 2.—A 25-year-old woman was admitted to the hospital with a two-week history of anxiety associated with the belief that "demons" were closing in on her at night. She denied hallucinatory experiences and gave no evidence for a thinking disorder. The patient participated in amobarbital interviewing on the 14th hospital day. During the first interview (saline), she revealed for the first time a sexual fantasy that she had kept to herself for a number of years. She stated that while she had intercourse with her husband, she would imagine the face of her dead brother. This experience had interfered with her sexual adjustment and was a factor that led to separation from her husband one year before. During the second interview (amobarbital), she went on to say that she and her brother had had an incestuous relationship from the time she was 7 until she was 13 years of age. She recalled how the relationship had developed into a hostile one and remembered the day her brother left to go swimming. She had fought with him earlier in the day and told him that she wished he was dead. He drowned that very same day. The primary therapist rated the general usefulness of the first interview as 6, and the second as 7.

Case 5.—A 24-year-old man was admitted to the hospital with a one-month history of psychomotor retardation, insomnia, indecision, and personal neglect. Because the patient was nonverbal, it was difficult to decide if he was either depressed or schizophrenic. The initial diagnosis was catatonic schizophrenia. The patient participated in amobarbital interviewing on the tenth hospital day. The content of the first (saline) and second (amobarbital) interviews was similar: the patient showed depressive affect associated with expressions of hopelessness and guilt. For the first and second interviews, the Hamilton scores were 26 and 25, respectively, and the NHSI scores, 0 and 0, respectively. The primary therapist rated the general usefulness of the first interview as 6, and the second interview as 7.

Case 12.—A 28-year-old woman was transferred from another hospital, where she had been admitted following a nearly fatal, self-inflicted gunshot wound to the chest. She gave a two-year history of chronic depression characterized by feelings of hopelessness and worthlessness, insomnia, loss of interest, and suicidal ideation. She participated in amobarbital interviewing on the 16th hospital day. During the first interview (amobarbital), she appeared relaxed and focused for the first time during the hospitalization on problems in her marriage. She expressed the fear that her husband would leave her. During the second interview (saline), she revealed that she had been pressured by her husband to have an abortion two years before. She described feelings of guilt and resentment since the abortion and stated that she had not been able to talk about the experience with anyone. The primary therapist rated the general usefulness of the first interview as 6, and the second as 8. Hamilton depression scores were 16 and 15, respectively.

Case 16.—A 27-year-old woman was admitted to the hospital with a two-week history of bizarre behavior that included wandering the streets and living in vacant buildings. She was uncommunicative and showed little affective response. She participated in amobarbital interviewing on the tenth day and revealed for the first time (saline interview) a fantasy world she called "C." During the second interview (amobarbital), she described in greater detail

the world of "C," saying that she often went there because it was so pleasant. Her autistic, inner world was a place where food and books were free and where beautiful music could always be heard. The primary therapist rated the general usefulness of the first interview as 2, and the second interview as 6. The NHSI scores were 2 and 6, respectively.

The last case, which follows, could not be included in our statistical analysis of usefulness scores and behavioral ratings because the patient was catatonic and could not give consent to participate in the protocol. Because of the extreme condition of the patient and our opinion that the intravenous amobarbital might reverse the catatonic state, we administered the drug.

Case 20.—A 25-year-old woman was admitted to the hospital with a several-month history of deteriorating functioning at home. On admission, she lay motionless in bed, kept her eyes closed, and would not speak. She required intravenous fluids, an indwelling Foley catheter, and periodic positioning in bed. Although she exhibited waxy flexibility, there was only minimal increase in muscle tone. Despite attempts to converse with the patient, these catatonic behaviors persisted for several days. On the sixth hospital day, a total of 350 mg of sodium amobarbital was given intravenously. The patient gradually became more animated as the drug was being administered and began to answer numerous questions in detail. She stated her reluctance to sign the voluntary admission form and gave a number of reasons why she would not do so. She got up, brushed her teeth, and read a newspaper. As the effect of the barbiturate diminished over the next several hours, she relapsed into the same catatonic state she had been in prior to the injection of amobarbital. On the following day, intravenous saline was administered, without any change in the patient's catatonia.

## RESULTS

In conducting amobarbital and saline interviews in this group of patients, we found that both the drug and the placebo interviews were clinically useful. When we asked the primary therapists to assess the general usefulness of both amobarbital and saline interviews on a scale ranging

| Table 2.—Primary Therapist Assessment of Interview Usefulness | | | | |
|---|---|---|---|---|
| | Interviews* | | | |
| Usefulness | Drug (Mean ± SEM) | Placebo (Mean ± SEM) | First (Mean ± SEM) | Second (Mean ± SEM) |
| General usefulness | 4.2 ± 0.5 | 3.5 ± 0.5 | 3.4 ± 0.5 | 4.3 ± 0.5 |
| Subgroups | | | | |
| New information | 4.1 ± 0.6 | 3.3 ± 0.5 | 3.3 ± 0.6 | 4.1 ± 0.5 |
| New behavior | 1.1 ± 0.4 | 2.4 ± 0.6 | 1.8 ± 0.6 | 1.6 ± 0.5 |
| Known information | 2.0 ± 0.6 | 2.4 ± 0.6 | 1.8 ± 0.6 | 2.6 ± 0.5 |
| Diagnosis | 2.6 ± 0.5 | 2.6 ± 0.4 | 2.4 ± 0.6 | 2.8 ± 0.5 |
| Treatment options | 2.6 ± 0.6 | 2.5 ± 0.6 | 2.2 ± 0.6 | 2.8 ± 0.6 |
| Psychodynamics | 2.8 ± 0.6 | 2.0 ± 0.6 | 2.1 ± 0.6 | 2.7 ± 0.7 |

*Scale: 0 indicates not useful; 1 to 2, slightly useful; 3 to 4, moderately useful; 5 to 6, very useful; and 7 to 8, extremely useful.

000509

EX 31   492

| Table 3.—Correlations Between General Usefulness Scores and Usefulness Subscores | | |
|---|---|---|
| | General Usefulness | |
| Usefulness Subscores | r | P |
| New information | | |
| Drug | .97* | 1.0 × 10⁻¹⁴ |
| Placebo | .89† | 3.0 × 10⁻⁷ |
| New behavior | | |
| Drug | .41 | .08 |
| Placebo | .46 | .04 |
| Known information | | |
| Drug | .43 | .06 |
| Placebo | .64 | .003 |
| Diagnosis | | |
| Drug | .54 | .02 |
| Placebo | .64 | .003 |
| Treatment options | | |
| Drug | .77 | 1.0 × 10⁻³ |
| Placebo | .62 | 4.0 × 10⁻³ |
| Psychodynamics | | |
| Drug | .65 | .002 |
| Placebo | .56 | .01 |

*Significantly greater than correlations between general usefulness and remaining scores (P < .003) for drug trials.
†Significantly greater than correlations between general usefulness and remaining scores (P < .003) for placebo trials.

| Table 4.—Postinterview Rating Scale Values | | | | |
|---|---|---|---|---|
| | Interviews | | | |
| Rating Scale | Drug (Mean ± SEM) | Placebo (Mean ± SEM) | First (Mean ± SEM) | Second (Mean ± SEM) |
| Hamilton* | 20.3 ± 2.4 | 20.2 ± 2.3 | 20.6 ± 2.4 | 19.9 ± 2.3 |
| NHSI† | 2.0 ± 0.5 | 1.9 ± 0.5 | 1.8 ± 0.5 | 2.1 ± 0.5 |
| BPRS‡ | 20.4 ± 1.4 | 20.1 ± 1.4 | 20.8 ± 1.4 | 19.7 ± 1.4 |

*Hamilton Depression Scale.
†New Haven Schizophrenic Index.
‡Brief Psychiatric Rating Scale.

| Table 5.—Dosage Range and Detection of Drug Condition by Therapist | | |
|---|---|---|
| Case | Sodium Amobarbital Dosage, mg | Detection by Therapist* |
| 1 | 150 | . . . |
| 2 | 175 | . . . |
| 3 | 150 | C |
| 4 | 225 | C |
| 5 | 200 | I |
| 6 | 175 | C |
| 7 | 175 | I |
| 8 | 225 | C |
| 9 | 200 | I |
| 10 | 175 | C |
| 11 | 225 | I |
| 12 | 175 | I |
| 13 | 220 | I |
| 14 | 225 | C |
| 15 | 300 | C |
| 16 | 200 | C |
| 17 | 150 | C |
| 18 | 200 | C |
| 19 | 200 | I |
| 20 | 350 | . . . |

*C indicates correct; I, incorrect.

from 0 (not useful) to 8 (extremely useful), we found that the mean scores for both the interviews were in the moderately useful (3 to 4) range (Table 2). When we compared the drug with the placebo condition and the first with the second interview, however, we found no significant differences in the assessment of general usefulness. This finding suggested that neither the amobarbital nor the interview sequence had a specific effect in facilitating the interview process. We would like to emphasize that if our study had not been placebo-controlled, we would have concluded, like most of the studies before, that amobarbital had been a significant factor during the interviews.

We next examined usefulness subscores that detailed the particular ways in which the interviews were useful. The primary therapist assessed usefulness in terms of eliciting new information, new behavior, and known information, and in terms of clarifying the diagnosis, treatment options, and psychodynamic formulation. We considered known information to be useful if the meaning or context of past history became clearer as a result of interviewing the patient. With the exception of new information, all of the mean scores were in the slightly useful (1 to 2) range. We again compared the drug with the placebo condition and the first with the second interview for each subgroup and found no significant differences (Table 2). This result further supports our conclusion that neither the drug nor the interview sequence had a specific effect in producing clinically useful information.

We were interested in examining the relationship between general usefulness and the six usefulness subgroups (Table 3). General usefulness scores correlated most closely with the new information subscores. This finding suggested that the primary therapists rated general usefulness principally on the basis of their acquiring new information.

In order to evaluate the significance of the interviewing process in relationship to the length of time the patient had already been in the hospital, we determined an average general usefulness value. We averaged the drug and placebo general usefulness scores for each patient and then compared this value to the number of days between admission to the hospital and the day of interviewing. We found, on the basis of a significant, negative rank order correlation (r = −.54, P = .012), that the earlier the interviews were conducted in the patient's hospital stay, the more useful they tended to be. This result is not surprising and confirms our common-sense notion that the fewer the number of sessions a clinician has had to interview a patient, the more likely he will find an additional interview valuable in eliciting clinically useful information.

In order to test the hypothesis that schizophrenic symptoms and depressive symptoms are unmasked during amobarbital interviewing, we analyzed the scores from the Hamilton Depression Scale, NHSI, and BPRS (Table 4). We compared the drug with the placebo condition and the first with the second interview for each of the rating scales and found no significant differences. When we compared NHSI and Hamilton Depression Scale ratings in patient subgroups with diagnoses of schizophrenia and depression, respectively, we again found no significant differences between drug and placebo and between first and second

000520

interviews. A similar analysis with use of BPRS subscores for schizophrenia and depression yielded no significant correlations. We concluded from these findings that amobarbital had no significant effect in releasing repressed schizophrenic or affective material in our patient sample.

We next examined the amount of drug given in relationship to the blind conditions (Table 5) and to general usefulness scores. The dosage ranging from 150 mg to 350 mg was rarely enough to produce slurred speech. The primary therapists were able to detect the drug condition correctly ten out of 17 times, which is hardly better than chance alone. Patients who completed the patient's postinterview questionnaire indicated the drug condition correctly four times, incorrectly twice, and were unable to distinguish the difference six times. We concluded that both the primary therapists and the patients were able to remain blind to the drug condition. We also found no significant correlation between any usefulness score and the amount of amobarbital that was administered.

Returning to the demographic variables shown in Table 1, there was no significant correlation between assessment of general usefulness and the patient's age, sex, or race. Nor was there any significant correlation between the number of years of experience that primary therapists had in conducting psychotherapy and the general usefulness ratings (Table 1). We asked the primary therapists to reassess all usefulness scores after the patients were discharged from the hospital to determine if subsequent work with patients would modify their initial assessment of usefulness. There was no significant difference in the initial ratings, compared to those after the patients left the hospital.

## COMMENT

Returning to the research questions that we outlined earlier, our study would indicate that amobarbital interviewing is useful in eliciting new information in hospitalized patients with a variety of psychiatric diagnoses. This finding, however, appears to be due to the nondrug conditions of the interview, since the placebo interviews were also moderately useful in eliciting new information. The timing of the diagnostic interviews was significantly correlated with general usefulness: the earlier we interviewed the patient during the hospitalization, the more likely the primary therapist would find the procedure useful. We found that the administration of the drug did not change the level of depressive or schizophrenic symptoms and therefore, was not useful in uncovering latent schizophrenic or depressive symptoms. Because our sample was primarily selected from hospitalized, psychotic patients, we would like to stress that these conclusions do not necessarily extend to patients with nonpsychotic illnesses such as hysterical or traumatic neuroses.

There are numerous reports in the literature describing a lucid interval that occurs in catatonic patients who have received intravenous amobarbital.* In the catatonic

*References 1-3, 5, 14, 19, 20, 25, 27, 30, 34, 39.

patient described in case 20, we administered both drug and placebo and found a clear difference in behavior and verbal report that distinguished the drug from the placebo. This observation suggests that amobarbital does have a pharmacologic effect in retarded forms of catatonia and is consistent with Elkes' placebo-controlled study of nine catatonic patients who responded to amobarbital with a definitive increase in accessibility, mobilization, and speech, but did not respond to saline.** Although the patient described in case 5 appears to represent a catatonic patient who in unresponsive to amobarbital, we would like to emphasize the presence of prominent depressive symptoms that we observed. The retarded motor behavior may have been more a manifestation of depression, which in our experience does not show a differential response to amobarbital.

We have not yet taken into account the possibility that some amobarbital might be present in the brain after the four-hour period that separated the drug interview from the subsequent saline interview. To deal with this possibility, we estimated from known amobarbital pharmacokinetics that after four hours, approximately 70% of the initial peak plasma level will have left the so-called central compartment as a result of redistribution and metabolism.[31] If we arbitrarily assign unity to the peak barbiturate concentration following the intravenous administration of amobarbital in each patient, we shall then be able to estimate the relationship between usefulness scores and the inferred plasma drug levels. Patients who received saline initially are assigned peak values of 0 and 1.0 for each interview, respectively, while the remaining patients who first received amobarbital are assigned values of 1.0 and 0.3, respectively. When we analyze the 38 interview scores for each usefulness category based on the assumption of this model, we find no significant correlation between the usefulness scores and the estimated plasma drug concentrations. We conclude that even though some amobarbital is present at the start of a second saline interview, it is not a significant factor in the assessment of clinical usefulness.

It could be argued that our negative findings are the result of using subnarcotic amounts of amobarbital and that with larger doses, more pronounced differences would emerge between saline and drug interviews. We did not intend, however, to answer the question of dose response in this study. Instead, we decided to give just enough drug to produce horizontal nystagmus, stopping short of producing either slurred speech or noticeable drowsiness, because both the primary therapist and the patient would have had a much better chance of detecting the drug condition if these signs had developed. We are also aware of studies[10-12,13] in which definite cognitive changes could be attributed to subnarcotic amounts of amobarbital and we reasoned that the barbiturate was certainly active centrally at this dosage level.

We conclude that for most hospitalized psychiatric patients who are selected for a barbiturate interview, the chief value in performing the drug interview lies in the information that can be obtained by an additional session with the patient. Several nondrug factors may be particularly important in facilitating the interviewing process. In

000511

addition to the timing of the interview that we have already described; we would include the patient's expectations that he will participate in a special interview involving a special drug and that the interviewer may be an expert who has the ability to make it easier for the patient to communicate. We also note that the amobarbital interview was not useful in eliciting additional material that would aid in the differential diagnosis between schizophrenia and depression.

### Nonproprietary Name and Trademark of Drug

Sodium amobarbital—*Amytal Sodium.*

### References

1. Bleckwenn WJ: Production of sleep and rest in psychotic cases. *Arch Neurol Psychiatry* 24:365–372, 1930.
2. Bleckwenn WJ: Narcosis as therapy in neuropsychiatric conditions. *JAMA* 95:1168–1171, 1930.
3. Bleckwenn WJ: Sodium amytal in certain nervous and mental conditions. *Wisc Med J* 29:693–696, 1930.
4. Lorenz WF: Criminal confessions under narcosis. *Wisc Med J* 31:245–250, 1932.
5. Thorner MW: The psycho-pharmacology of sodium amytal in catatonia. *J Nerv Ment Dis* 82:299–303, 1935.
6. Herman M: The use of intravenous sodium amytal in psychogenic amnesic states. *Psychiatr Q* 12:738–742, 1938.
7. Ludwig AO: Clinical features and diagnosis of malingering in military personnel. *War Med* 5:378–382, 1944.
8. Morris DP: Intravenous barbiturates: An aid in the diagnosis and treatment of conversion hysteria and malingering. *Milit Surg* 96:509–513, 1945.
9. Ripley HS, Wolf S: The intravenous use of sodium amytal in psychosomatic disorders. *Psychosom Med* 9:260–268, 1947.
10. Weinstein EA, Kahn RL: Patterns of disorientation in organic brain disease. *J Neuropathol Clin Neurol* 1:214–225, 1951.
11. Weinstein EA, Kahn RL, Sugarman LA, et al: The diagnostic use of amobarbital sodium ("amytal sodium") in brain disease. *Am J Psychiatry* 109:889–894, 1953.
12. Weinstein EA, Kahn RL, Sugarman LA, et al: Serial administration of "amytal test" for brain disease. *Arch Neurol Psychiatry* 71:217–226, 1954.
13. Hoch PH, Cattell JP, Pennes HH: Theoretical considerations from a psychological viewpoint. *Am J Psychiatry* 108:585–589, 1952.
14. Katzenelbogen S, Fang AD: Narcosynthesis effects of sodium amytal, methadrine, and LSD-25. *Dis Nerv Syst* 14:85–88, 1953.
15. Pennes HH: Clinical reactions of schizophrenics to sodium amytal, pervitin hydrochloride, mescaline sulfate, and d-lysergic acid diethylamide (LSD-25). *J Nerv Ment Dis* 119:95–112, 1954.
16. Cohn WM, Speck RV, Howard WJ: Sodium amytal as an aid in state hospital practice: Single interviews with 100 patients. *Psychiatry* 31:289–300, 1957.
17. Ehrentheil OF: Thought content of mute chronic schizophrenic patients: Interviews after injection of amobarbital sodium (sodium amytal) and methamphetamine hydrochloride (methadrine). *J Nerv Ment Dis* 137:187–197, 1963.
18. Solomon HC, Kaufman, MR, D'Elseaux F: Some effects of the inhalation of carbon dioxide and oxygen, and of intravenous sodium amytal on certain neuropsychiatric conditions. *Am J Psychiatry* 87:761–769, 1931.
19. Lindemann E: The psychopathological effect of sodium amytal. *Proc Soc Exp Biol Med* 28:864–866, 1931.
20. Lindemann E: Psychological changes in normal and abnormal individuals under the influence of sodium amytal. *Am J Psychiatry* 88:1083–1091, 1932.
21. Bohn RW: Sodium amytal narcosis as a therapeutic aid in psychiatry. *Psychiatr Q* 6:301–309, 1932.
22. Murray VF, Burns MM: The use of sodium amytal in the treatment of psychosis. *Psychiatr Q* 6:273–300, 1932.
23. Wagner CP: Pharmacologic actions of barbiturates. *JAMA* 101:1787–1792, 1933.
24. Lindemann E, Malamud W: Experimental analysis of the psychopathological effects of intoxicating drugs. *Am J Psychiatry* 13:853–870, 1934.
25. Gildea EF, Himwich HE, Hubbard A, et al: A comparative study of some of the changes produced by various types of drugs in schizophrenic patients. *Am J Psychiatry* 91:1289–1309, 1935.
26. Skoog AL: A treatment for neuropsychiatric syndromes employing "twilight narcosis." *South Med J* 28:468–473, 1935.
27. Thorner MW: The psycho-pharmacology of sodium amytal. *J Nerv Ment Dis* 81:161–167, 1935.
28. Horsley JS: Narco-analysis. *J Ment Sci* 82:416–422, 1936.
29. Palmer HD, Braceland FJ: Six years experience with narcosis therapy in psychiatry. *Am J Psychiatry* 94:37–57, 1937.
30. Berrington WP: A psycho-pharmacological study of schizophrenia, with particular reference to the mode of action of cardiazol, sodium amytal and alcohol in schizophrenic stupor. *J Ment Sci* 85:406–488, 1939.
31. Reitmann F: Some observations on sodium amytal experiments. *J Ment Sci* 87:96–100, 1941.
32. Davidoff E, Reifenstein EC, Goodstone GL: Amphetamine sulfate-sodium amytal treatment of schizophrenia. *Arch Neurol Psychiatry* 45:439–445, 1941.
33. Wilde JF: Narco-analysis in the treatment of war neuroses. *Br Med J* 2:4–7, 1942.
34. Rubin MA, Malamud W, Hope JM: The electroencephalogram and psychopathological manifestations in schizophrenia as influenced by drugs. *Psychosom Med* 4:355–361, 1942.
35. Cline WM: Treatment of emotional disorders with amobarbital, diazepam, and psychotherapy. *Tex J Med* 59:512–517, 1963.
36. Grinker RR, Spiegel JP: *Men Under Stress.* Philadelphia, Blakeston, 1945.
37. Freed H: Narcosynthesis for the civilian neurosis. *Psychiatr Q* 20:39–55, 1946.
38. Wolf S, Ripley HS: Studies on the action of intravenously administered sodium amytal. *Am J Med Sci* 215:56–62, 1948.
39. Elkes J: Effects of psychosomimetic drugs in animals and man, in Abramson HA (ed): *Neuropharmacology: Transactions of the Third Conference.* New York, Josiah Macy, Jr, Foundation, 1957, pp 205–295.
40. Kraines SH: Sodium amytal, hypnosis and psychotherapy. *Int J Neuropsychiatry* 3:248–256, 1967.
41. Harris MM, Horwitz WA, Milch EA: Regarding sodium amytal as a prognostic aid in insulin and metrazol shock therapy of mental patients. *Am J Psychiatry* 96:327–333, 1939.
42. Gottlieb JS, Hope JM: Prognostic value of intravenous administration of sodium amytal in cases of schizophrenia. *Arch Neurol Psychiatry* 46:86–100, 1941.
43. Weinstein EA, Malitz S: Changes in symbolic expression with amytal sodium. *Am J Psychiatry* 111:198–206, 1954.
44. Stevens JM, Derbyshire AJ: Shifts along the alert-response continuum during remission of catatonic "stupor" with amobarbital. *Psychosom Med* 20:99–107, 1958.
45. Woodruff R: The diagnostic use of the amylobarbitone interview among patients with psychotic illnesses. *Br J Psychiatry* 112:727–732, 1966.
46. Hain JD, Smith BM, Stevenson I: Effectiveness and processes of interviewing with drugs. *J Psychiatr Res* 4:95–106, 1966.
47. Smith BM, Hain JD, Stevenson I: Controlled interviews using drugs. *Arch Gen Psychiatry* 22:2–10, 1970.
48. Buchman J, Hain JD, Burke MS, et al: Controlled interviews using drugs: II. Comparisons between restricted and freer conditions. *Arch Gen Psychiatry* 29:625–627, 1973.
49. Stevenson I, Buckman J, Smith BM, et al: The use of drugs in psychiatric interviews: Some interpretations based on controlled experiments. *Am J Psychiatry* 131:707–710, 1974.
50. Balasubramaniam K, Lucas SB, Mawer DE, et al: The kinetics of amylobarbitone metabolism in healthy men and women. *Br J Pharmacol* 39:564–572, 1970.

90-2663J

**SHERIFF'S DEPARTMENT**
**ORANGE COUNTY**
**SANTA ANA, CALIFORNIA**

---

**CRIMINAL INVESTIGATION REPORT**

| OFFENSE: PC 187 Murder | LOCATION: 10462 Hedlund, Anaheim |
|---|---|
| VICTIM:  Wallace, Autumn | DATE: June 15, 1990 | GRID: 15E1 |

**DETAILS OF INCIDENT:**

On 06-16-90 at about 0005 hours, I was asked to interview Joyce Lorena Wallace, ████-50 and her husband, Roy Chester Wallace, ████-44. Joyce and Roy are the sister-in-law and brother-in-law of Linda Wallace. They both reside at ████ ████ in the City of Garden Grove, and were present at the crime scene.

I spoke first with Joyce in the Investigation Division of the Stanton station. When asked to recall the events of the day as she best could, she related the following: She and Linda both work in the courthouse in Santa Ana. They carpool to work everyday with another employee (Nancy). They left work and dropped Nancy off at about 1730 hours. They got to Linda's house at about 1740 ar 1745 hours, at which time, she noticed April and Frank standing on the porch with a bunch of little kids around. April immediately told her and Linda that it looked as though someone had broken into the house and didn't know where Autumn was. Linda decided to go into the house, so Joyce turned off the car and went in with her. The house looked disorganized so they looked around to see how "they" had gotten in, because she knows Autumn never would have let any strangers in the house, and according to April, the front door was locked when she and Frank got there. She said before they went any further, April told them that the VCR was gone from the livingroom, the T.V. was gone that was in her bedroom and a sack of clothes was dumped on her bed and the sack was gone. She and Linda then looked further into the house and noticed the microwave had been moved off the shelf and onto the washer and dryer. That was when Linda opened the door that leads into the bathroom and started screaming hysterically. Joyce looked, saw a large pool of blood on the floor and immediately led Linda into the livingroom. April in the mean time had gone across the street and called the Sheriff's Department. While in the livingroom trying to

---

*I/O:Inv. J.Allen #136 Rpt by:J. Allen DATE: 06-26-90 APPRVD:* ⸴ *⸴*

7C

000513

| CONTINUED | Page 2 | 90-26853 |

calm Linda down, Joyce was met by Sheriff's personnel, as well as, the paramedics.

She couldn't understand why Autumn had to be killed, unless it was someone that she recognized or knew. She knows for a fact that Autumn never would have opened the door for someone she didn't know.

Joyce had no knowledge of the car we were interested in, nor did she know of any mexican males other than Juan or Frank that hang around Linda's house. Joyce had no more to contribute but said she would call if she learned of anything that might help us.

I spoke with Roy Wallace next. Roy related the following; He was at work when he received an emergency phone call from April to get to the house. When he arrived at about 1815 hours, the Sheriff's Department and fire equipment were already there. He went into the house, and was asked to assist in removing Linda from the house, which he did.

Roy isn't real close with the family since his brother died three years ago from cancer. He doesn't care much for Juan, because Linda was carrying on with Juan while she was still married to his brother. He has no ill feelings toward anyone in the immediate family, he just doesn't bother much with them. The only real problem he is aware of at the present is that Linda has a serious gambling problem. She goes to the card parlors almost nightly and spends hour upon hour there.

He can't imagine why anyone would want to hurt or kill Autumn, unless it was someone she knew and could identify. He said he would notify us if he learned of anything at all that would aid us in the investigation.

I/O:Inv. J.Allen #136 Rpt by:J. Allen DATE: 06-26-90 APPRVD:

ORANGE COUNTY SHERIFF - CORONER DEPARTMENT
FORENSIC SCIENCE SERVICES

------------------------------------
REPORT OF TOXICOLOGICAL EXAMINATION
------------------------------------

NAME (L/F/M): ALCASO/MARIA _____   L R # : 9 0 - 4 0 9 9 9 - A

VIAL # _____   SAMPLE TYPE: EA BLOOD #268942   DATE SUBMITTED 06/29/90

SUBMITTING AGENCY: ORANGE COUNTY SHERIFF'S DEPARTMENT   DEPT CASE # 90-34453

CHARGE 187 _____   OTHER CHARGES NONE _____   COURT _____

ARRESTING OFFICER UNKN _____   ARREST DATE/TIME 6-15-90 _____

TECHNICIAN SUMMERS _____   COLLECTION DATE/TIME: 6-28-90 1525   LOCATION CCCD 110

SPECIAL REQUEST SID _____

CHAIN LAFERTY, DALIE _____

OTHER NAMES: NONE _____

OTHER SAMPLES: NONE _____

------------------------------------
LABORATORY ANALYTICAL RESULTS
------------------------------------

BLOOD ALCOHOL RESULT = __0 00__ % (WT/VOL)

THE SAMPLE WAS SCREENED FOR THE FOLLOWING

| DRUG | DATE | ANALYST | INITIALS |
|------|------|---------|----------|
| COCAINE | 07/05/90 | BITTNER | |
| PHENCYCLIDINE | 07/05/90 | BITTNER | |
| OPIATES | 07/05/90 | BITTNER | |
| METHAMPHETAMINE | 07/05/90 | BITTNER | |
| ** COCNE | 08/09/90 | WUERDEMANN | (W) |
| ** COCNE | 07/23/90 | AJS | AJS |
| ** OPNE | 07/26/90 | WUERDEMANN | (W) |
| ** OPNE | 08/09/90 | DTE | DTE |

DRUGS DETECTED:

COCAINE & BENZOYLECGONINE        CWuerdemann AJ Schematic

MORPHINE                          D. Wuerdes Eck CWuerdemann

VIII-1      INV. Giffin    9/14/90 man                    3533

8-29-90  TF

ORANGE COUNTY SHERIFF - CORONER DEPARTMENT
FORENSIC SCIENCE SERVICES

------------------------------------
REPORT OF TOXICOLOGICAL EXAMINATION
------------------------------------

NAME (L/F/M): ALFARO/MARIA _____     LR#: 90-40997-1

VIAL #: _____     SAMPLE TYPE: EA BLOOD #268942     DATE SUBMITTED: 06/28/90

SUBMITTING AGENCY: ORANGE COUNTY SHERIFF'S DEPARTMENT     DEPT. CASE #: 90-26853

CHARGE: 187 _____     OTHER CHARGES: NONE _____     COURT: _____

ARRESTING OFFICER: UNKN _____     ARREST DATE/TIME: 6-15-90

TECHNICIAN: SUMMERS _____     COLLECTION DATE/TIME: 6-28-90 1535     LOCATION: OCSD HQ

SPECIAL REQUEST: SFD _____

CHAIN: LAFERTY, DALIE _____         *COCMS analysts*
                                        *are AJS, CW ᵇᵗ*
OTHER NAMES   NONE _____
                                        *Reprint Report*
OTHER SAMPLES   NONE _____             *?-29-97*

------------------------------------
LABORATORY ANALYTICAL RESULTS

BLOOD ALCOHOL RESULT = ___0.00___ % (WT/VOL).

THE SAMPLE WAS SCREENED FOR THE FOLLOWING

| DRUG | DATE | ANALYST | INITIALS |
|------|------|---------|----------|
| COCAINE | 07/05/90 | BITTNER | *MᵇB* |
| PHENCYCLIDINE | 07/05/90 | BITTNER | |
| OPIATES | 07/05/90 | BITTNER | |
| METHAMPHETAMINE | 07/05/90 | BITTNER | ✓ |

*COCMS 7-11-90 MᵇB*          *COCMS 8-9-90 CW*
*COCMS 7/27/90 AJS*
*OPMS 7-26-90 CW*
*OPMS 8-9-90 DTE*

------------------------------------

DRUGS DETECTED:                ANALYST:

*Cocaine + benzoylecgonine*    *mgbittner*
            *morphine*         *CWeislemann  D. Wissler*

*XIII-3*

Date _____ By _____

000516                         WORK SHEET            *3535*

```
Data file: V3:AB3AA18A.D
File type: GC / MS DATA FILE

Name Info: 90-40997-A
Misc Info:
Operator : SHUMAKER   EXT 7/23/90

Date     : 25 Jul 90  10:17 am
Instrment: MS_5970
Inlet    : GC

Sequence index :    1
Als bottle num :   18
Replicate num  :    1
```



The abundance ratio for the maximum 182/303 ions:  8.39
The abundance ratio for the maximum 210/331 ions:  8.15

----------------------------------------------------------

The max peak height for ion 182 is 8746.00
The max peak height for ion 185 is 207144.00
The 182 ion/185 ion peak ratio x 1000 is 42.22

THE COCAINE CONC. IS                42        NG/ML
----------------------------------------------------------


----------------------------------------------------------
The max peak height for ion 210 is 53497.00
The max peak height for ion 213 is 86060.00
The 210 ion/213 ion peak ratio x 1000 is 621.62

THE BENZOYLECGONINE CONC. IS        620       NG/ML

a g Shumak

XIII-4

3536

000517

EX 33   500



COCAINE ANALYSIS BY GCMS

File Name:  >WH907
Date:  8/10/90 17:47
Sample: 90-40997-A
C HUERDEMANN EXT 09AUG90
User: ANALYST

Cocaine Ht:-160  3546  3706.
Int Std Ht:       27109.
Cocaine Ratio:  .046  .048
303/182:   .16  17  J

BE Ht:        26129.
Int Std Ht:   49177.
BE Ratio:       .531
331/210:   .21 /

Analyst  CWuedemann

[√ Blood 0.5 m] [] _____

Int. Std.   0.5   ml

COCAINE
CONC.   46   NG/ML

BENZOYL
ECGONINE   530   /NG/ML
CONC.

XIII-5

000513

File Type: GC / MS DATA FILE

Name Info: 90-40997-A
Misc Info:
Operator : MJ BITTNER   EXT 7/11/90

Date     : 12 Jul 90   1:37 pm
Instrment: MS_5970
Inlet    : GC

Sequence index :   1
Als bottle num :   8
Replicate num  :   1



The abundance ratio for the maximum 182/303 ions:  8.98 ✓
The abundance ratio for the maximum 210/331 ions:  9.25 ✓

--------------------------------------------------------
The max peak height for ion 182 is 8358.00
The max peak height for ion 185 is 157853.00
The 182 ion/185 ion peak ratio x 1000 is 52.95

THE COCAINE CONC. IS            53      NG/ML
--------------------------------------------------------


--------------------------------------------------------
The max peak height for ion 210 is 60990.00
The max peak height for ion 213 is 79560.00
The 210 ion/213 ion peak ratio x 1000 is 766.59

THE BENZOYLECGONINE CONC. IS    770     NG/ML
--------------------------------------------------------

XIII - (ALPHACOPY)

353

000519

EX 33   502

Data file : V3:HH5HA05A.D
File type: GC / MS DATA FILE

Sample Name: 90-40997-A
 Misc Info:
 Operator : C WUERDEMANN EXT 26JUL90

 Date     : 26 Jul 90   9:02 pm
Instrument: MS_5970
 Inlet    : GC

 Sequence index :    1
 Als bottle num :    5
 Replicate num  :    1



The abundance ratio for the maximum 395/282 ions:0.79
The abundance ratio for the maximum 364/477 ions:2.90
------------------------------------------------------
The max peak height for ion 395 is 846.00
The max peak height for ion 398 is 91867.59
The 395 ion/398 ion peak ratio x 100 is 0.92

**The Free Codeine Conc. is** _____0.9_____ ng/ml
------------------------------------------------------
The max peak height for ion 364 is 7710.33
The max peak height for ion 367 is 111980.05
The 364 ion/367 ion peak ratio x 100 is 6.89

**The Free Morphine Conc. is** _____7_____ ng/ml
------------------------------------------------------

Data processing completed at 9:11 pm on 26 Jul 90



000520

3539

EX 33   503

Data file: V3:K08KA19A.D
File type: GC / MS DATA FILE

Name Info: 90-40997-A (1/2 + 1/2)
Misc Info:
Operator : D. TURNER ECK   EXT. 8/9/90

Date     : 9 Aug 90  12:09 pm
Instrument: MS_5970
Inlet    : GC

Sequence index :   1
Als bottle num :  19
Replicate num  :   1



The abundance ratio for the maximum 282/395 ions:  3.01
The abundance ratio for the maximum 364/477 ions:  4.11

------------------------------------------------
The max peak height for ion 395 is 398.00
The max peak height for ion 398 is 55091.00
The 395 ion/398 ion peak ratio x 100 is 0.72

THE FREE CODEINE CONC. IS    _____0_____ NG/ML
------------------------------------------------

------------------------------------------------
The max peak height for ion 364 is 800.00 750.00
The max peak height for ion 367 is 10765.00
The 364 ion/367 ion peak ratio x 100 is 8.36 6.97

THE FREE MORPHINE CONC. IS    _____7_____ NG/ML
------------------------------------------------

D. Owrnes Ec

VIII - ALPHACOPY

3540

SHERIFF-CORONER DEPARTMENT, ORANGE COUNTY
SANTA ANA, CALIFORNIA

TELETYPE MESSAGE FORM

__xx__ Orange County Stations                          **Date:** 7-6-90

_____ Southern California Only (area 300)              **Time:** 2130

__xxx__ All Calif. (areas 100, 200, 300)

_____ Nationwide

_____ Specific Agency: ANAHEIM PD _____      BRAD GATES, SHERIFF-CORONER
========================================================================

### NEW AND UPDATED INFORMATION****ONE SUSPECT IN CUSTODY, ONE OUTSTANDING

### SUBJECT IN COMPOSITE DRAWING NOW IDENTIFIED - MATERIAL WITNESS

**ATTENTION:** All Homicide, Burglary, Pawn, and Narcotics Details

**OFFENSE:** PC 187 Murder / PC 459 Residential Burglary

**VICTIM:** Autumn WALLACE   F C 9

**SUSPECT IN CUSTODY:** ALFARO, Maria del Rosio ( ███-71)

**TE/TIME:** Friday, 6-15-90 / 1605

**OUTSTANDING
SUSPECT:**        PROBABLE HYPE - JEFFREY-LYNNE NEIGHBORHOOD - ANAHEIM

         M  Possibly Hispanic, brown hair, white s/s T-shirt

**SUSPECT VEHICLE:** Golden brown 1978-79 Chevy Monte Carlo 2-dr, paint is in fair
          condition, perhaps starting to oxidize.  There may be a tan
          spot on the vehicle (vinyl roof? / primer ?)

          THE WITNESS IS CERTAIN THE SUSPECT VEHICLE IS A MONTE CARLO
          AND NOT A GM PRODUCT LOOK-A-LIKE.  MONTE CARLO'S IN 1978 AND
          1979 SHARE THE SAME BODY STYLE.

**PROPERTY STOLEN (STILL OUTSTANDING):**
          AKAI 4-Head VCR, Model # VS-33UB, S/N 20625-04919
          PORTLAND 13" Portable Color TV, Model # DCB-415PR
          SHARP Electronic Printing Calculator, Model # EL-1197S
          SOUNDESIGN AM/FM Electronic Clock Radio with Cassette Player,
               Model # 3826
          BLACK & DECKER Automatic Shut-Off Electronic Iron, Model # F440WHD
          NORTHWESTERN BELL "FAVORITE" Telephone, Trimline style with push
               buttons in the handset, white in color
          NORTHWESTERN BELL "FAVORITE PLUS" Telephone, Trimline style with push
               buttons in the handset, memory dialing, mauve in color
          NINTENDO Video Game with three game tapes and electronic gun.
          MISCELLANEOUS clothing items for victim's 18 yr old sister (SIZE 13)
          SEARS "Best" lighted and magnifying make-up mirror with textured
               beige plastic exterior finish

_297_

000523

**SYNOPSIS:**
     The victim is home alone after school and lets Suspect ALFARO in the home.
ALFARO, who is known to the victim through the victim's 18 year old sister,
then stabs the victim to death and steals the previously listed property items.
ALFARO is assisted by the outstanding suspects in removing the property from
the home. Witnesses see the suspect vehicle, backed into the driveway at 1605
ours, with the trunk open.  The material witness is kneeling on the front
Lawn, playing with ALFARO's one year old child.  The outstanding suspect is
seen bending over and leaning into the open vehicle trunk.  ALFARO is inside
the residence.


Refer:    Invs. GIFFIN / BALE / MANDALA                    HOMICIDE DETAIL
                                                           (division)

Phone (714) 647-7055  24 HR (714)647-1850  Case # 90-26853


OCS SHERIFF-CORONER, ORANGE COUNTY        SANTA ANA, CALIFORNIA


*290*

**SHERIFF-CORONER DEPARTMENT, ORANGE COUNTY**
**SANTA ANA, CALIFORNIA**

**TELETYPE MESSAGE FORM**

**XXX** Orange County Stations        **Date:** 7-1-90

____ Southern California Only (area 300)    **Time:** 1000

**XXX** All Calif. (areas 100, 200, 300)

____ Nationwide

____ Specific Agency: <u>ANAHEIM PD</u>       **BRAD GATES, SHERIFF**-CORONER
=================================================================
**\*\*\*\*\*NOT FOR PRESS RELEASE - CONFIDENTIAL\*\*\*\*\***

**NEW AND UPDATED INFORMATION\*\*\*\*ONE SUSPECT IN CUSTODY, TWO OUTSTANDING**

**ATTENTION:** All Homicide, Burglary, Pawn, and Narcotics Details

**OFFENSE:** PC 187 Murder / PC 459 Residential Burglary

**VICTIM:** Autumn WALLACE   F C 9

**SUSPECT IN CUSTODY:** ALFARO, Maria del Rosio ████-71)

**DATE/TIME:** Friday, 6-15-90 / 1605

**OUTSTANDING**     PROBABLE HYPES - JEFFREY-LYNNE NEIGHBORHOOD - ANAHEIM
**SUSPECTS:**
       # 1 - M H 27 to 32 Avg Hgt & Wgt, Thick full black hair combed
          straight back, full bushy mustache, brn eyes, wearing a lt.
          blu s/s button-down sports shirt, slightly faded blu jeans
          (501's?)
       # 2 - M Possibly Hispanic, brown hair, white s/s T-shirt

**SUSPECT VEHICLE:** Golden brown 1978-79 Chevy Monte Carlo 2-dr, paint is in fair
          condition, perhaps starting to oxidize. There may be a tan
          spot on the vehicle (vinyl roof? / primer ?)

          THE WITNESS IS CERTAIN THE SUSPECT VEHICLE IS A MONTE CARLO
          AND NOT A GM PRODUCT LOOK-A-LIKE. MONTE CARLO'S IN 1978 AND
          1979 SHARE THE SAME BODY STYLE.

**PROPERTY STOLEN (STILL OUTSTANDING):**
       AKAI 4-Head VCR, Model # VS-33UB, S/N 20625-04919
       PORTLAND 13" Portable Color TV, Model # DCB-415PR
       SHARP Electronic Printing Calculator, Model # EL-1197S
       SOUNDESIGN AM/FM Electronic Clock Radio with Cassette Player,
          Model # 3826
       BLACK & DECKER Automatic Shut-Off Electronic Iron, Model # F440WHD
       NORTHWESTERN BELL "FAVORITE" Telephone, Trimline style with push
          buttons in the handset, white in color
       NORTHWESTERN BELL "FAVORITE PLUS" Telephone, Trimline style with push
          buttons in the handset, memory dialing, mauve in color
       NINTENDO Video Game with three game tapes and electronic gun.
       MISCELLANEOUS clothing items for victim's 18 yr old sister (SIZE 13)
       SEARS "Best" lighted and magnifying make-up mirror with textured
          beige plastic exterior finish

000525

**SYNOPSIS:**
   The victim is home alone after school and lets Suspect ALFARO in the home.
ALFARO, who is known to the victim through the victim's 18 year old sister,
then stabs the victim to death and steals the previously listed property items.
ALFARO is assisted by the outstanding suspects in removing the property from
the home. Witnesses see the suspect vehicle, backed into the driveway at 1605
hours, with the trunk open.  Suspect # 1 is kneeling on the front lawn, playing
with ALFARO's one year old child.  Suspect # 2 is seen bending over and leaning
into the open vehicle trunk.  ALFARO is inside the residence.


Refer:    Invs. GIFFIN / BALE / MANDALA               HOMICIDE DETAIL
                                                      (division)

Phone (714) 647-7055  24 HR (714)647-1850  Case # 90-26853


OCS SHERIFF-CORONER, ORANGE COUNTY        SANTA ANA, CALIFORNIA


000526                    207

ZAQ13000 3100 1630. ALL CALIF AGENCIES
DATE: 070290   TIME: 1245 PDT
SHRF-COR ORANGE CO

      ***** N O T     F O R     P R E S S     R E L E A S E *****
  *** NEW & UPDATED INFO *** ONE SUSP IN CUSTODY, TWO OUTSTANDING ***

ATTENTION:  ALL HOMICIDE, BURGLARY, PAWN, AND NARCOTICS DETAILS

CRIME:      CPC 187 MURDER / CPC 459 RESIDENTIAL BURGLARY
VICTIM:     AUTUMN WALLACE  F/W/9
SUSPECT:    (IN CUSTODY)  ALFARO, MARIA DEL ROSIO  ████-71
DATE/TIME:  FRIDAY, 6-15-90  1605 HRS
SUSPECTS:   (OUTSTANDING) PROBABLE HYPES - JEFFREY-LYNNE NEIGHBORHOOD, ANAHEIM
            1) M/H/27-32  AVG HGT & WGT, THICK FULL BLK HAIR COMBED STRAIGHT
               BACK, FULL BUSHY MOUSTACHE, BRN EYES, WEARING A LT. BLU S/S
               BUTTON-DOWN SPORTS SHIRT, SLIGHTLY FADED BLU JEANS (501'S?).
            2) M POSSIBLY HISPANIC, BRN HAIR, WHITE S/S T-SHIRT
SUSP VEH:   GOLDEN BRN 1978-79 CHEVY MONTE CARLO 2-DR, PAINT IS IN FAIR
            CONDITION, PERHAPS STARTING TO OXIDIZE.  THERE MAY BE A TAN SPOT
            ON THE VEHICLE (VINYL ROOF? / PRIMER?)

            THE WITNESS IS CERTAIN THE SUSP VEHICLE IS A MONTE CARLO AND NOT
            A GM PRODUCT LOOK-A-LIKE.  MONTE CARLO'S IN 1978 AND 1979 SHARE
            THE SAME BODY STYLE.
LOSS:       (STILL OUTSTANDING)
            AKAI 4-HEAD VCR, MODEL# VS-33UB, S/N 20625-04919
            PORTLAND 13" PORTABLE COLOR TV, MOD# DCB415PR
            SHARP ELECTRONIC PRINTING CALCULATOR, MOD# EL-1197S
            SOUNDESIGN AM/FM ELECTRONIC CLOCK RADIO W/CASS PLAYER, MOD# 3826
            BLACK & DECKER AUTO SHUT-OFF ELECTRONIC IRON, MOD# F440WHD
            NORTHWESTERN BELL "FAVORITE" TELEPHONE, TRIMLINE STYLE WITH PUSH
              BUTTONS IN THE HANDSET, WHITE IN COLOR
            NORTHWESTERN BELL "FAVORITE PLUS" TELEPHONE, TRIMLINE STYLE WITH
              PUSH BUTTONS IN THE HANDSET, MEMORY DIALING, MAUVE IN COLOR
            NINTENDO VIDEO GAME WITH THREE GAME TAPES AND ELECTRONIC GUN
            MISC CLOTHING ITEMS FROM VICT'S 18 YR OLD SISTER (SIZE 13)
            SEARS "BEST" LIGHTED AND MAGNIFYING MAKE-UP MIRROR WITH TEXTURED
              BEIGE PLASTIC EXTERIOR FINISH

MO:  THE VICT IS HOME ALONE AFTER SCHOOL AND LETS SUSP ALFARO IN THE HOME.
ALFARO, WHO IS KNOWN TO THE VICT THROUGH THE VICT'S 18 YEAR OLD SISTER, THEN
STABS THE VICT TO DEATH AND STEALS THE PREVIOUSLY LISTED PROPERTY ITEMS.
ALFARO IS ASSISTED BY THE OUTSTANDING SUSPS IN REMOVING THE PROPERTY FROM THE
HOME.  WITNESSES SEE THE SUSP VEHICLE, BACKED INTO THE DRIVEWAY AT 1605 HRS,
WITH THE TRUNK OPEN.  SUSP #1 IS KNEELING ON THE FRONT LAWN, PLAYING WITH
ALFARO'S ONE YEAR CHILD.  SUSP #2 IS SEEN BENDING OVER AND LEANING INTO THE
OPEN VEHICLE TRUNK.  ALFARO IS INSIDE THE RESIDENCE.

REF:  INV GIFFIN, INV BALE & INV MANDALA/CASE# 90-26853
PHONE: (714) 647-7055 OR 24 HRS (714) 647-1850
SHERIFF-CORONER ORANGE COUNTY/HOMICIDE DETAIL   PAM

000527

INTERVIEW OF:                    VICKI RAE DARR

                                PEOPLE V. ALFARO

                                CASE NUMBER: 90-26853
                                ATTORNEY: WILLIAM MONROE
                                TRANSCRIBED BY LS FOR SANDBERG

INTERVIEWER(S):                 T. CARNEY

T. CARNEY:                      TC
VICKY RAE DARR:                 VD

DATE: 12/07/90

TAPE NO. 22 SIDE 1 (TAPE MARKED TAPE A-22)

(***) DENOTES PART OF CONVERSATION UNINTELLIGIBLE)

---

TC:  One second, I'll be right with you.

VD:  Alrighty.

[BACKGROUND NOISES]

TC:  Hey, how're you doing?

VD:  (***) Alfaro that's who...(***)

TC:  Alright.  Okay.  How do you spell your last name?

VD:  D-A-R-R.

TC:  And it's V-I-C-K-I?

VD:  Yeah.  Rae is the middle.

TC:  R-A-E?

VD:  Uh huh.

TC:  Your date of birth?

VD:  ████/46.

TC:  And what's your Social Security number?

VD:  █████████.

1

000520

TC: Where're you from, back east?

VD: Cincinnati, Ohio.

TC: Are you really?

VD: Yeah.

TC: Born and raised?

VD: Yeah.

TC: That's a beautiful town. I was just back there.

VD: Really?

TC: Yeah. I was just back there this summer.

VD: Was it pretty this summer?

TC: Yeah. I...

VD: I haven't been back....

TC: You know where the fountain is?

VD: Yeah.

TC: In the plaza...

VD: (***) square. Town square.

TC: Yeah. I stayed in the...the hotel right in front of that.

VD: Just beautiful.

TC: My room overlooked it, yeah. I can't remember what hotel it was, I think it was...

VD: I don't even know if I was...was there then..I mean...I've been back about 7, 8 years ago.

TC: Oh yeah. I'm talking about this summer.

VD: Yeah.

TC: Went to a Reds game, you'd just walk right down the street.

VD: Yeah. (***) you know the (***) when they named that stadium, they had a contest in the paper. And (**) they,

2

you know picked who named it, you'd get tickets for every game from then on.  The lady died two months later.

TC:  Oh.  Too bad.

VD:  Yeah.

TC:  They won the series this year too.

VD:  I know.  (***) with Pete Rose.

TC:  Do you have a California driver's license?

VD:  Yeah, but I don't know the number.  I mean it's expired, but I do have one.

TC:  Okay.  And what's your home address?

VD:  I have none.

TC:  Okay.  Do you have any relatives?

VD:  Not in...not in California, well the kids, but I'm not too sure where they (***).

TC:  Okay.

VD:  See the guy I was with they don't like and I just got separated (***).

TC:  In case of emergency or something like that, a next of kin, who would be most likely...

VD:  You can call um, Charles Chastain from Seal Beach Police Department.

TC:  Okay.

VD:  And he would probably know how to..you know.

TC:  Where're you going to spend the night tonight?

VD:  I don't know.  That's a good question.  That's why I would like to get this check cashed, I could at least get a motel.

TC:  Do you have a job?

VD:  No.  I got...uh, pins in my shoulder, I can't (***) go to therapy every day from Western Med.  On Monday I'm..

TC:  Are you going to stay out here in California?

3

000531

VD: Yeah. Monday I'm going to go to GR, and they'll put me on GR until my shoulder gets better and then (***).

TC: What's GR?

VD: General relief.

TC: Where do you go for that?

VD: Anaheim.

TC: What...or where do you go?

VD: Welfare Department.

TC: A Welfare Department? Yeah? What street's that on?

VD: Uh, Homer.

TC: On Homer Street in Anaheim?

VD: You know where La Palma Park is?

TC: Uh huh.

VD: Right by there.

TC: So it's like the old downtown area?

VD: Uh huh.

TC: And they put you on...

VD: They'll give me a check for $400 a month and I already got one waiting so...between the two I should be able to get like a place and go from there, you know. Just make it till Monday.

TC: You plan on staying out here though?

VD: Oh yeah. Cause I'll be on probation for this. I (***)

TC: You're on probation?

VD: Yeah. Never liked (**).

TC: Do you have a probation officer?

VD: Not yet. I gotta go, they told me 48 hours, though I can't go till Monday. I won't get in trouble for that will I?

4

000532

TC:  No, I think it means, they mean like two working days I think.

VD:  Okay.

TC:  You won't get in trouble.  Just make sure you do it.

VD:  Oh I'm going to do it, exactly like I said, it's the first time I ever been in jail.  (***) 44 years old.

TC:  Alright.  So what...what office did they tell you to report to?

VD:  Santa Ana.

TC:  Santa Ana probation department?

VD:  Uh huh.

TC:  Not parole..

VD:  No.  Probation.

TC:  Orange County Probation in Santa Ana.  And it's for uh, the grand theft charge that you were on?

VD:  Yeah.

TC:  How many years are you on probation for?

VD:  Three.  But he..the Judge told me and...and the PNS lady that comes out?

TC:  Uh huh.

VD:  Cause I got...I'm not on drugs or nothing.

TC:  Uh huh.

VD:  So there's no drugs involved.  She said if I got a job or some kind of, you know, training in a job then I could go back I'd probably get dismissed after a year cause I had no record.

TC:  That's probably true.

VD:  Keep stick with it.

TC:  Stay...stay in touch with your probation officer.

VD:  Yeah.

5

000533

TC: Do whatever you proba...usually on probation (***) real rigid at first.. and then..

VD: Yeah.

TC: As they get to know you they lax up a little bit.

VD: Yeah.

TC: Okay. Anyways, you were arrested for some other...for some reason (**) and you did some time in jail. Right?

VD: Uh huh.

TC: You understand, you're not in custody now, right?

VD: Yes.

TC: Okay. What's...what's today, the 7th?

VD: Yes. I'll never forget..

TC: December 7th...oh that's right, and it's what, 5:00 o'clock?

VD: I've been at the hospital. They drove me to the hospital, sent to court to testify and...

TC: I didn't see my case number here, 9026853. Okay. Uh, what I want to do is, you...you were in jail and you just got released, right?

VD: Uh huh.

TC: Just moments ago. What I want to do is I want to talk to you about uh, some information you might have regarding a homicide that uh, my department has been involved with as far as the investigation.

And uh, Vicki, again, all I'm after is the truth.

VD: Of what I know.

TC: Of what you know. Whether...what you know or not may be the truth or not...

VD: Yeah.

TC: Who knows, but I just want to know what you know.

VD: Uh huh. Not really too much.

6

000534

TC:  Okay.  You went to jail when?

VD:  Uh, I turned myself in October 24th.

TC:  Okay.  You were in...

VD:  October 24th.

TC:  October 24th, and you got out today.

VD:  Yes.

TC:  Okay.  And prior to October 24th had you heard anything
     about a homicide involving a little girl by the name of
     Autumn?

VD:  I get (**) just from reading it in the paper.

TC:  Okay.  Autumn Wallace?

VD:  Yes.  Just from reading the paper.

TC:  (***) okay.  When you got in jail, did...did you come
     upon some more information about it?

VD:  Okay.  When I got in jail about a month ago, she was put
     in PC with me, Maria.

TC:  Maria...?

VD:  Alfaro.

TC:  Maria Alfaro was put in...

VD:  Uh huh.  And she was only charged on the...on Autumn
     Wallace case.

TC:  Okay.  And so,how...why'd you go to PC?

VD:  Because uh, my boyfriend was a ex-(***) brotherhood and
     was...plus I didn't want to (***).

TC:  Narcotics?

VD:  Yeah.

TC:  Okay.

VD:  And CTF.

TC:  CTF.

7

000535

VD:   (***)

TC:   Oh, okay.  That's the...they also do the...

VD:   Fullerton.

TC:   Okay.  Good enough.

VD:   Seal Beach.

TC:   You probably know a lot of people I know then.

VD:   I know and uh, AVC and..

TC:   Okay.

VD:   DA's and..

TC:   So you say about one month ago?

VD:   She was put in PC where we are.

TC:   Where you were at?

VD:   Uh huh.

TC:   Okay.  You know why she was put in PC?

VD:   Because the tank she was in, there was a black girl that
      kept harassing her.  So they put her in with us.

TC:   What was the harassment over?

VD:   Cause of being a baby killer.

TC:   Okay.  And while she was in PC, did you come to know her?

VD:   Pretty well, yeah.

TC:   Okay.  Did she ever discuss the case with you or...

VD:   She just...the only thing she really said to me is that
      um, she done uh...a tape of it and admitted doing it, and
      she just said she did it for drugs but she was covering
      up for somebody.

TC:   What'd she say about that?

VD:   And she said she couldn't...she was not going to release
      who it was.

TC:   Well, what did she tell you about it?

8

000536

VD: She said I...I didn't do it, she goes, but I'll stick to
my story. And I said why?  I said, if you didn't do it,
she goes well I'm protecting somebody and I said well
Maria, that makes you just as guilty to me.  And uh, I
said I'm, you know, I'm not trying to put you down, I
said, but I mean there's a little girl that was killed.
And you've got a set of twins (***).  And she goes, (***)
she goes I'll never tell who really did it.

(***) and I said (***) who did it, or the real truth?
She said the real truth of what really happened.

TC: Okay.  How many times would you say...

VD: I'd say about five or six...

TC: In 30 days have you talked to her?

VD: About five or six times cause I...kinda shied away from
her after that, cause...you know.

TC: Over how much of a period of time would you talk to her?

VD: Oh, all together?  Maybe an hour, hour and a half.

TC: So the five or six times you talked to her..

VD: About an hour and a half (***).

TC: So you're....anywheres from one to ten minutes each time
you talked to her?

VD: Yeah.

TC: Okay.  And was she closest to you in there or
anybody..she was...(***)

VD: No, she was closer to um, uh, Vivian San...Sanchez.

TC: Who?

VD: Vivian Sanchez.

TC: Vivian.

VD: Sanchez.  And Sally Martinez, but she was released today
too.

TC: Did she ever discuss the...her case with these two girls?

VD: I'm not too sure.  I'm not too sure.  I know that Vivian
did a lot of drawings for her and (**).

9

000537

EX 35   518

TC:   (***) drawings mean....

VD:   Like on...you know, on paper and...

TC:   Cartoon type things?

VD:   Yeah.

TC:   Okay.  Did um, when you talked to her about the case, was anybody else present or was it just kinda a conversation between you two.

VD:   No, we would just talk cause see, she was always on lockup.  She could only (***) with us locked up.

TC:   Uh huh.

VD:   And I just talked through her door (**) times.  Like I gave her the article out of the paper, the last one was in the paper.  But she just had her head down, she goes I don't want to talk (***).  And I said (***) you gotta watch, you're going to get the death penalty over this. If you don't speak up, if you didn't really do it.  And she goes well I'm never going to (***) the whole truth.

TC:   Was there...

VD:   Then there was the time she mentioned um, oh she started talking about a guy and I said..and mentioned Long Beach. She was talking to Vivian and them.  And that's all that was mentioned.  I jumped up, I said, cause I know a lot of people in Long Beach.  I said, oh, let me see his picture, who's (**) in Long beach?  She said oh never mind, I can't talk about it.

TC:   Uh, run that by me again.

VD:   She goes never mind, I can't talk about it.

TC:   No, how did..

VD:   She...she said...somebody...she had a picture or something and somebody said who's that picture of.

TC:   You mean like a...

VD:   A photograph.

TC:   A photograph of somebody.

VD:   And she goes...and..I think it was Vivian said who's that photograph of?  And she goes oh that's somebody in Long

10

000538

        Beach.  And I said oh, Long Beach.  I said who is it, I
        might know him?  I said I know...when I first got here,
        (***)

TC:  Did you see the picture?

VD:  No.

TC:  But you know...

VD:  She pulled it down, you know.

TC:  Do you know if it was a picture of a guy (***)

VD:  It was a guy, cause she said I...you don't know him.

TC:  Okay.

VD:  And she goes and, uh, I don't want...and I said, well,
     who is he?  She goes never mind.  I said is that who
     you're protecting?  And then at night, like on Sunday
     night, she always asked to come out at night.  And she
     does make a phone call.

TC:  Uh huh.

VD:  And she talks real low.  But usually she don't talk like
     that on the phone.

TC:  Have...other than yourself, had you ever heard her
     talking to anybody else about her case, whether it be on
     the telephone or...

VD:  NO I haven't, no I haven't.

TC:  ANy other inmate or anything like that?

VD:  No.

TC:  How about attorneys?

VD:  Not that I know of cause they take her out for that.

TC:  Okay.  How about uh, clergy?

VD:  Nope.

TC:  Okay.  Offices...

VD:  Not that I know of, nothing.  To my knowledge, I don't
     know.

11

00053

TC:  Okay.  Now, where did she have...when you saw her with this picture, where was the picture?

VD:  In her room.  On her table, but...it's not there any more.

TC:  Just laying on top of the table or...in a frame or...

VD:  No, just, you can't have frames there.

TC:  Right, but you make the cigarette frame.

VD:  No, she don't...you can't make them either there...

TC:  Oh.

VD:  ...PC.

TC:  Okay.

VD:  She just had it propped up against a card.

TC:  What did...(***)

VD:  And then when I mentioned I knew him, uh the picture was never put back up.

TC:  So it was a guy.

VD:  Uh huh.

TC:  And what did she say about the picture?

VD:  I said who is...you know, who is it?  I said let me see it, I might know him.  I said a lot of...you know, when I first come to California in Long Beach, I lived there for a long time.  And I said in...in the slums, you know.  And she goes, no, no, you don't know him.  She goes never mind.

TC:  Did she ever indicate in any way that this guy may have been the guy...

VD:  No, she didn't.  But, no, she didn't.

TC:  She's covering for?

VD:  No she didn't.  And I...well I did say to her is that who you're protecting?

TC:  And what'd she say?

12



VD: And she goes well, well, she goes, I don't even want to talk about it.  She didn't say no or yes. She just said I don't want to talk about it.

TC: Well, if it's somebody she was protecting, do you think she would've said yeah, that's why I don't want you to see it?

VD: No, not necessarily.

TC: (***) don't know the guy.

VD: If she was protecting him, to me, she'd of said no, no it isn't.  She (***) right off the bat, she'd have showed it.  Well then why...why wouldn't she show it?  And I asked her that.

TC: And what...

VD: I said there's some reason why you're not showing that picture.  I said all your other ones are out.  I said why don't you let me see it and tell me his name and see if I know him. She says no.  I said (**) protecting with that picture.  (**) that's the way I took it.

TC: Uh huh.  Was this like...

VD: This was about a week and a half, two weeks ago.

TC: Okay.

VD: And I never really talked to her since then about it, because I...she just...I think it's disgusting.

TC: Okay.  So let me...let me back up now.  She came into PC..

VD: About a month ago.

TC: About a month ago.

VD: Uh huh.

TC: The first time you ever had any conversations with her about her case was about how...how much sooner...

VD: About two days, about two days later.  Cause I said, you know, I feel bad for you, I said if you didn't really do it, a lot of people get blamed for things that they don't do, you know.

TC: Uh huh.

13

VD: And so, I mean uh, she really didn't say too much then. She...most of the time she wouldn't even look at you, you know, like she'll hold her head down, you know. And I said Maria, you know you're a young kid, I said you've got two kids, you've got two twins in you, I said, you know, I said if you didn't do it, you know...

She goes well, she..I said what about the video, you know the tapes? And she goes well, um, I'm protecting somebody. She goes, I...I'll keep telling 'em that. She's I'll keep telling 'em that. She goes because nobody will ever know the real truth of it.

TC: Okay.

VD: And then when I give her the article in the paper....

TC: ...talking about...this is one conversation now?

VD: Yeah.

TC: All this stuff is...

VD: And then we just dropped it.

TC: Alright.

VD: And then..

TC: Did you show her an article in the newspaper that time?

VD: No, no.

TC: Alright. Okay. Let's wait till we get to that point. So during this conversation did she...she said she...she's just protecting somebody?

VD: Uh huh.

TC: Did she say the person she's protecting is the guy that killed the kid?

VD: She didn't say. She just said I will never tell the real truth.

TC: Alright.

VD: Of what's happening. She goes I'm protecting somebody, she just said but I will never tell the real truth about of really happened. She did not who...man, woman, what.

TC: Okay. So she never did...

14

000542

VD:  No.

TC:  Indicated what sex it was or what nationality.

VD:  Uh uh.

TC:  She never said what the person's involvement was?

VD:  No.  Nothing.

TC:  Except for that there is a person who..

VD:  She is protecting.

TC:  Also knows.

VD:  Yes. She is protecting.

TC:  Protecting but when she said protecting, she didn't say..

VD:  She didn't say knows or nothing.  She just says I'm protecting.

TC:  Right.

VD   And she goes nobody will ever know the real truth.

TC:  Okay. Now, and I don't want to put words in your mouth so..

VD:  No, I'm not (**).

TC:  So I want...I want to try and understand what was going through her mind at the time.  Can you best tell me what you assumed she was talking about when she said that?

VD:  I just assumed there was somebody else there and it's somebody that she cared about or something and she's protecting.

TC:  Okay.

VD:  And she don't want to involve them.

TC:  So let me ask this volley of questions here.

VD:  Uh huh.

TC:  It's somebody that she's protecting and she didn't indicate what sex or anything.  Is it a person that she would...is...did she indicate that this person either committed the murder...

**15**

000543

EX 35   524

VD: No, I'm..really at first I did not think that.

TC: Alright.

VD: At first I just thought maybe somebody was there also that got away...that didn't get arrested.

TC: Okay. So it could've been someone that was with her or someone that helped her.

VD: That just tried to (***)

TC: Or it was...but didn't do it, but...

VD: I didn't think that until the day of the picture.

TC: Okay. Alright, we'll....and we're going to get to that. But this person, this mystical person she's referring to..

VD: Uh huh.

TC: ...is either...the way you took it, was somebody who uh, was either there, either knew about it..

VD: Uh huh.

TC: ...or either committed the murder or watched her do it.

VD: Yeah.

TC: Alright?  I mean, was there any other options occur to you?

VD: No.  But I mean, at first I didn't think it was somebody that really committed the murder, cause she...that's the only time she looked at me in the eye.

TC: Okay.

VD: You know, looked at me face to face.  Usually she holds her head down.

TC: You just felt she was protecting somebody that..

VD: I think I...I took it that she was protecting somebody that have...that was there and she don't want to involve 'em.

TC: Okay.  Good.  Now, after that conversation, when's the next time you talk to her about it?

16

000544

VD: Um, just a couple days later and that was only for a second, really.

TC: Okay.  What was the conversation?

VD: Um, I just (***) I said aren't you worrying about the...no, she was crying, that's it (***).  And I walked past and I said why're you crying?  I was (***) that's why it was only a few seconds.  And I said why're you crying?  She said, well I'm worried about my kids. I said you're what?  I said you're worried about your kids?  This little 9 year old girl that's stabbed to death and you are worried about your kids?

She said the holidays are coming up, I said yeah, (***) I said that poor mother, her holidays are coming up too.  And she says well, I don't want to talk about it. And I said I know.  And then when I...the next time, that's all I said to her and I walked away.  In fact we got locked down and then she come out.  And the next time was when I (***) the paper.

TC: Okay.  So that time, there was no discussion about if she was...

VD: No, I was...

TC: ...protecting anybody or if there was anybody else involved.  Is that right?

VD: No, I just was (***).

TC: Okay.  So the next time you talked to her was how...how much later?

VD: Uh, well, was it just two or three days when that article was in the paper?

TC: I...

VD: I mean we'd talked off and on but not really about the case, you know. Just how're you doing and...

TC: I'm just talking about the case.

VD: Okay.  The time we...the next time I really talked to her about the case was when the article was in the paper.  She had went to court that...the day before.

TC: Okay.  Wait a minute.  So the first time you talked to her was about....uh, about a month ago.

17

VD: When she...yeah.

TC: Two days after she got there?

VD: Yeah.

TC: The second day you talked to her...the second time you talked to her was two days later.

VD: Two days to a week. I...

TC: Alright. Two to one week.

VD: Time in there is nothing.

TC: I understand.  And then..

VD: And then I...you know, bits a pieces, hi, are you alright.

TC: Right.

VD: And then uh, the last time I really talked to her about the case was when I...I...(***) did the article on the case.

TC: Okay, wait a minute.

VD: No, no.  No.  The in between was the picture part.

TC: I'm going to do this, so I understand what you're talking about.  You say uh, 30 days ago, right?

VD: Yeah.

TC: Is when she got in there?

VD: Yeah, yeah, approximately.  Then about two days after that.

TC: Two days after that is the first time she talked to you..

VD: Uh huh.

TC: And that's when she indicated..

VD: That she was protecting somebody.

TC: Protecting somebody.

VD: And that's when I realized Autumn was just, you know, somebody there and..

18

000546

TC: Right. And then it was after that, about two more days later?

VD: That I got a devious with her and then about..

TC: Okay.

VD: ...oh maybe two or three days after that.

TC: No indication that she was protecting anybody at that time?

VD: No. And two or three days after that is when the picture come up. And I was sitting there then. And she mentioned Long Beach.

TC: Okay.

VD: And that's when I jumped up and started talking to her.

TC: Okay. And uh, she was talking to other girl, uh, Martinez and uh, Sanchez.

VD: Sanchez, yeah.

TC: And you didn't overhear the conversation except for...

VD: Uh, no except that, you know, I heard Long Beach. In fact, I don't really think there was a conversation...I think somebody, one of 'em had said who's that picture of?

TC: Uh huh.

VD: And she says I can't remember if she said a guy in Long Beach or somebody in Long Beach. I can't remember.

TC: Uh huh.

VD: But as soon as I heard Long Beach, I said oh who is it? You know?

TC: Okay.

VD: I said, I...you know, when I first come to california, I knew everybody in Long Beach.

TC: Uh huh.

VD: And she grabbed the picture real quick and put it...put it (**) face down.

19

TC: Uh huh.

VD: And she goes oh, nothing...she...nobody. She goes you don't need...you don't know. And I said where in Long Beach do they live? She goes no, you don't need...you don't know 'em. I said is that who you're protecting? She goes, no, no, no, it don't matter. And I said well you know what, I said, that's (***) you're just as guilty for protecting somebody that (**) do it. I said to me that's (***) taking 'em out.

TC: Okay. What's she say to that?

VD: And then....She said no, she goes nobody, she goes uh, in the tape, she goes I admitted doing it, and I admitted doing it for dope, and she goes but I'll never tell the real truth about what really happened.

TC: Okay. Anything else?

VD: And uh, no. And then the next time..

TC: Now wait a minute, before we get there. So, actually when...this incident with the picture, she never even indicated she said no, no, no, no...

VD: Well you could tell she was...I took it she was protecting it because, you know, the incident and that's why she...I mean...I would've shown the picture. Wouldn't you have showed a picture if it wasn't somebody you didn't want nobody to know about?

TC: Or there's some reason I don't want you to know about it. Maybe it's an old boyfriend and my new boyfriend...you know what I mean?

VD: Yeah, but we have...

TC: I don't know. That's why I'm asking you. But when you asked her, is this the picture of someone she's protecting, you asked her that question, right?

VD: Yes.

TC: She said..

VD: She didn't say no.

TC: I thought you said, said no, no, no.

VD: No. No, she said I don't want to talk about it. When I asked her that part.

20

000548

TC: Okay.

VD: When she said...when she said no I don't want to talk about it.

TC: But she said no...

VD: I don't want to talk about it.

TC: I don't want to talk about it.

VD: But I..I took it like, I don't want to talk about it.

TC: Okay.  But she did say no, though.

VD: I don't want to talk about it, yeah.

TC: Alright. And you're she said no with that?

VD: I think.  I'm..you know what, I'm really con...I know she said I don't want to talk about it.

TC: Okay.  And you just took the...you just had the impression at that point in time that maybe that was the guy she was referring to (***)

VD: Uh huh.  Cause I...I...you know, I said why..why didn't you show it to me? I know a lot of people in Long Beach. She said don't matter.

TC: Okay. And during this conversation, you're the one that said is that she's protec..is that the one you're protecting?

VD: Uh huh.

TC: Okay.  She says no, I don't know, or I don't want to talk about it.  Did she say any other..at that point in time did she ever talk about the case at all...or...

VD: No.

TC: As far as protecting anybody?

VD: No. She was shut up.  She (***)

TC: Is that the end of that conversation?

VD: Yeah. See now, except my (**).

TC: Okay.  Now, okay, after the picture incident, have you talked to her again about the case?

21

·· 00054 ʂ

VD: No. No.  Yeah, when I showed her the article in the paper and I can't remember, that was just...last (***) last week.  And uh, they had a little article, you know, where they got all the metro part.

TC: Okay.

VD: And it said um, she had videotaped, she did it, she did it for drugs, (***) which she already told me that. And um, I showed...you know, I was talking to her one day and I said, (***) you.

TC: Uh huh.

VD: I said you did it, look, you did it.

TC: Can you...can you talk to each other through the glass?

VD: Yeah, you can hear.

TC: Okay.

VD: I said you did it huh, look at that.  And she goes no, I didn't, she goes, but I'll never say who really did it. I said why are you protecting this person? She says I just don't want to talk about it.  And I said well you want to read it?  She goes yeah and she read (***) I said you know you're going to get fried. I said you're too young.  If you didn't do it, speak up.  And she goes I can't, she goes nobody'll ever know the real truth.  And (***) to her, except, you know, all right and...(***) talk to her (***) sit around and cry away.  (***) it's cold.

TC: During that conversation, did she say she was protecting anybody?

VD: Yeah, she said I'll....I'm protecting somebody.  I don't want to talk about it.

TC: Did she say it or did you say it?

VD: No, she said...I said are you protecting somebody? She goes, I can't talk about it. No, she didn't really say it no, she didn't, you're right.

TC: Okay.

VD: I said are you protecting, you know, why are you protecting him?

TC: Uh huh.

22

A 000550

VD: And she's...I don't want to talk about it.  She goes nobody will know the real truth.

TC: Okay.  She did not say she was protecting...

VD: No.  She said...I don't want to talk about nobody will know the real truth.

TC: So actually the only time she mentioned she was...and have you talked to her since then?

VD: No.  Not about the case, just...

TC: Okay. So the only time she's ever mentioned out of her mouth, protecting somebody, is on that second time?

VD: ` Uh huh.

TC: And she said...and..where she specifically said...

VD: Said she was protecting somebody.

TC: Protecting somebody.

VD: Yes.  And...and (***) like I said, they talked to her a lot.

TC: Uh huh.

VD: And uh, me and Sally almost got into it over, cause I mean, I just...I have a 9 year old girl, you know.

TC: Uh huh.

VD: And uh, Sally said (***) protecting somebody and I said why?  I said she's scared of 'em ...or...or why is she protecting somebody?  She said, all she...she had told her evidently that she was protecting somebody.  I said well are they threatening her or..you know...I said my God she's going to be in jail the rest of her life, what the hell can they do to her?

TC: What did they say?

VD: And she said that she...she just says she protecting somebody.  Now Vivian is still in jail.  Sally's (***).

TC: You think they know any...you think she's confided in anybody?

VD: The only one I think she might've would've been Sally.

23

000551

TC:  Uh huh.

VD:  I don't know for sure if she has but that would've been
     the one she would.

TC:  What's uh...what's outside of these...you've had other
     contact with her, right?  You see her on a daily basis.

VD:  Oh yeah, but she's always in her room.

TC:  Okay. What's her uh, mental uh, head like? What's her
     head like?

VD:  She's alright, (***) fixes her hair, puts makeup on.
     (**)

TC:  She talks rationally?  She writes?

VD:  Oh yeah, well you know what?  Sometime she don't because
     like one night uh, we was just about ready, we...lights
     were out and everything and she and George Anne had
     (***), it's my room here, George Anne and then her room.
     She goes George, George, you awake? George goes yeah,
     why? She goes a rat just ran past her door.  They're not
     rats in (***).  Go a rat? She goes yeah, it was all
     hairy, she goes...and George, you know, it looks like a
     rat, you know. And she goes, well it was only about this
     big.

TC:  Oh, a mouse.

VD:  Yeah.  But there ain't no rats in (***) you know.

TC:  Well, I don't know about that.

VD:  Nobody has ever...nobody's ever seen 'em...(***) a book
     or something, you know, something. And uh, I forget what
     else.  There was something she come off the wall with. I
     asked her one time, that's right, I asked her one time,
     were you on uh, PCP, along with you know (**) she goes.
     No.  I said you have flashbacks (***).

TC:  Did she say she was using drugs at the time of this...

VD:  She was on heroin for two months, kicked (***).

TC:  Okay.  Did you ever talk to her about drug use?

VD:  No, she just said she was kicking and (***) heroin (**).
     Just somebody told me that and I said...well, somebody
     told me she was already, you know, kicking when she come

                              24

in and then, I think that was the first day she got there, or second day. After (***)

And uh, cause I...we just talked bits and pieces.

TC: Are there drugs in jail?

VD: Not in IRC that I know of.. It'd be very hard to get 'em in. Very, very hard. In fact the only way you could possibly get 'em in, is through your lawyer and I do know one...(***) and (***).

TC: (***)

VD: Lawyer, Biraldi.

TC: Biraldi?

VD: Yeah.

TC: Is he a public defender?

VD: No, he was a lawyer. I know a girl in ....(***) got crystal running there through him.

TC: At the IRC?

VD: Yeah. Yeah. I told 'em, make him my lawyer, let me (***) his ass, cause I'm definitely against drugs. My daughter got on it and I...busted her boyfriend.

TC: And he...this girl said that he brought meth in (***)

VD: She wanted me uh, cause she...her...her dad is Chief of Police in Long Beach (***), Todd, Lorraine Todd (***). And she was in there for grand theft auto and she was pretty pissed that they put in PC.

TC: Uh huh.

VD: And she wanted to me to request...request him a lawyer, as a lawyer so I could get it brought it for her.   (***) I said (***) crazy Mary, I got no record, all I need is a drug charge (***).

TC: Where's this...where's this attorney from, Orange County?

VD: I guess.  Think so.

TC: Never heard of him.  Um..

VD: But yes, she was kicking heroin when she first came in.

25

000553

TC:   Okay.

VD:   And she's got a few marks on her.  Not bad, but..

TC:   NOt bad?

VD:   No.

TC:   Could you tell how...how much of a habit she had?

VD:   I...I don't know that much about heroin to really tell.

TC:   Well....okay. What um, what's her mental state, I mean
      you think she's...she knows what's happening or..

VD:   She's...oh yeah, she knows what happened, yeah.  She
      knows.

TC:   Not a nut or anything.

VD:   She's...No, no, no.  She just...like I said, I..I don't
      think there was more than heroin.  She was, you know,
      because there's...you know, goofy things like that, like
      the rat and (***) you know. But um, no she's sound, she
      knows what she's talking about and stuff, yeah.  She'll
      laugh and cut up with everyone when she's out in the day
      room.  You know, (***) with everybody, and cut up and
      stuff.  (***).

TC:   Did she ever tell you she was sorry for what happened?

VD:   No,no.

TC:   Never did?

VD:   Uh uh.

TC:   When she...when the subject of her case comes up, does
      she appear to be saddened about it or happy about it? Or
      (***)

VD:   No, no, not too...well, not too much, like I said she
      keeps her head down.  She won't look at you in the eye
      even when she talks (***).

TC:   About her case?

VD:   No, she just , you know, like um...

TC:   When you talk about other things, does she...will she
      look you in the eye?

26

000554

VD:   When you're laughing and cutting up with her and stuff, you know.

TC:   But if you want to talk about the gulf crisis or something..

VD:   But she...yeah, she'll look at you, yeah.

TC:   She'll look at you, but if yo talk about her case, she'll look down and away?

VD:   (***) yeah.  I don't know whether she's feeling bad or if she feels like somebody could tell if she's lying through her eyes or what, you know.

TC:   Uh huh.

VD:   I don't know (***) look at you in the eyes.  (***)

TC:   Is there anything else you think I should know about this?

VD:   Not really that I could think of.  Uh, like I said you're best bet is to talk to (***) uh, Vivian Sanchez would know how to get ahold of Sally.

TC:   Uh huh.

VD:   Or both, I'm not sure what (***).

TC:   Do you know where Sally San...or Martinez is living?

VD:   Somewhere in...in fact she was supposed to wait for me. I was supposed to go with her, but I didn't see her out there.

TC:   She's living somewhere where?

VD:   In Temple City in L.A.  Some guy took her in, he's been helping her quite a bit.

TC:   What's...what is she doing for a living or do you know?

VD:   Um, she's going to go back to uh, work she has training in word processing and computers and stuff.

TC:   She got released the same day.  Today?

VD:   Today, uh huh.

TC:   She was in there for what?

27

VD: She's fighting to get her daughter back.  (***)

TC: What was she in jail for?

VD: I'm not sure, I think violating probation (***).

TC: How old is she?

VD: She...about 32, (***) I don't..somewhere in the early 30's.

TC: How about Vivian?

VD: Viv's about 28.

TC: What's she in there for?

VD: They're girlfriend, girlfriends.

TC: Oh, are they Lesbians?

VD: Yeah.  (***)

TC: How about Rosie? Is she bisexual or homosexual or...

VD: No, no, uh uh.  No.

TC: Heterosexual?

VD: Not that I know, she's never shown nothing that would make me think she is.

TC: Okay.

VD: Nothing.

TC: And yourself?

VD: Hell no.

TC: Okay.

VD: (***)

TC: Okay. Um, is there anybody that she particularly talks to on the phone, do you know?

VD: I don't know who she talks to on the phone.  Like I said, I...and usually, I mean I know she calls her mom, her mom visits her and...she tells her (***)

TC: Have you ever heard her talk to her mom?

28

050 556

VD: No, not in..you know, like I said, we're locked in when she was out. And (***) I mean you could...she don't really try and hide them conversations.

TC: Uh huh.

VD: Even on Sunday night, she'll ask for nights to come out, and that conversation is low. You can't hear nothing. And usually you can't make out what she's saying but you can hear her talk on the phone.

TC: You ever hear her talk about her case?

VD: No. I mean like...I can't make out, like I said. And the phone's way over here and the rooms are right here.

TC: You ever hear her crying in the middle of the night or anything like that?

VD: No. Just that one time.

TC: You ever hear her screaming or nightmares or anything like that?

VD: Uh uh.

TC: If she were crying or had nightmares, could you have heard her?

VD: Yeah, cause I'm up all of the hours with my arm hurting. I get (***)

TC: Plus the sound carries to your room?

VD: It kinda echoes. See the vents, there's intercom systems..

TC: Uh huh.

VD: And you can hear through each intercom, or the vents.

TC: Okay.

VD: But I...like I said, I'm...at night especially, I am up almost all night, every night, because my arm like cramps.

TC: Okay. Okay. Uh, is there anything else that I should know about?

VD: Not that I can think of. Like I say, your best bet is ...

**29**

000557

EX 35   538

TC: So if I need to get ahold of you to talk to you about something else...

VD: I...I keep in touch with Seal Beach (***)

TC: ...or Probation?

VD: Or Probation.

TC: Okay.  With Seal Beach who?

VD: Um, Charles Chesting, or it's...4312541.

TC: 431.

VD: 2541.  Just ask for Charlie cause..

TC: Charles Chastine?

VD: Chastine or something like that.

TC: And he's an officer?

VD: He's a...uh huh, yeah.

TC: And what does he work? What kind of crimes?

VD: I got his card I think, if you want it.

TC: That's alright.  You said it was Seal Beach?

VD: Yeah.

TC: Seal Beach PD?

VD: Uh huh.

TC: And what...what kind of crime...does he work uniform or..

VD: No, no, he's a detective.

TC: And what is he...what kind of crime.

VD: I think homicide.

TC: Homicide?

VD: Either homicide or drugs, one of 'em.  Him or Harden, Steve Harden.

TC: Harden?

30

001553

VD:  But see this number, just ask for Charlie and Darryl or Charlie either one will answer it.

TC:  Okay.  Do they answer it hello?

VD:  Yeah.

TC:  Okay.  They might be a drug unit they want to..

VD:  But see um, um, I have to keep in contact cause they want me to (***) case is preliminary (***) going to go down.

TC:  What case?

VD:  (***)

TC:  Alright.  When did you first meet these guys?

VD:  (***) soon as Danny got killed, it's about, I don't know, five, six months. I lose track of time (***).

TC:  Uh huh.  Well how did you get...how did you..how are you involved in that homicide? Just..

VD:  Cause Danny was a real good friend of mine.

TC:  Oh, so you...

VD:  And they come down and talk to us because I mean, when...I'm really (**) found Danny dead.

TC:  Okay.  So you're going to stay in touch with these...your probation officer, well, both these people, probation and Officer Chastain. Alright. So I have a way to get hold of...

VD:  Or Bob Brown of Anaheim Police.

TC:  Why Bob Brown?

VD:  Cause I always call him.  Ended up being a buddy.

TC:  What's he work at Anaheim?

VD:  CTF, is 998-1808.

TC:  I know that number.

VD:  You don't know that?

TC:  No, I said I know that number.

31

000559

VD:  OH.

TC:  I know, I mean I know that number. (***)

VD:  Steve Hal...uh, Steve Hollenbeck, Bob Brown, um..

TC:  You called that what, CTF?

VD:  Yeah.

TC:  You must know um,...um...Vincent too, uh, what's his name.

VD:  He's in narcotics, ain't he?

TC:  Yeah.

VD:  Yeah.

TC:  He's a lieutenant now.

VD:  (***)

TC:  Do you know Flannery?

VD:  I might if I see him, I usually know the first names, (***). But Vincent uh, took me in one time.  (***)?

TC:  Uh huh.

VD:  Uh huh, they couldn't bust these Mexicans (***) I (***) black and white from 'em, they wanted to come in the car and shoot up.

TC:  Is that right>

VD:  (***) oh God.

TC:  Okay, what time is it?  2:25?

VD:  So where can I cash this check do you think?

TC:  Uh, hold on a second, let me..take care of this.


**END OF INTERVIEW**


32

000560