1  SEAN K. KENNEDY, Bar no. 145632
   Federal Public Defender
2  CRAIG A. HARBAUGH, Bar No. 194309
   eMail:  craig_hargaugh@fd.org
3  LINDA L. GRIFFIS, Bar No. 100827
   eMail: linda_griffis@fd.org
4  Deputy Federal Public Defenders
   321 East 2nd Street
5  Los Angeles, California 90012-4202
   Telephone (213) 894-2854
6  Facsimile (213) 894-7566

7  Attorneys for Petitioner
   MARIA DEL ROSIO ALFARO
8

9            **UNITED STATES DISTRICT COURT**

10           **CENTRAL DISTRICT OF CALIFORNIA**

11

12  MARIA DEL ROSIO ALFARO,      )    Case No. CV 07-7072-CJC
                                 )
13          Petitioner,          )    **DEATH PENALTY CASE**
                                 )
14      v.                       )    **FIRST AMENDED PETITION FOR**
                                 )    **WRIT OF HABEAS CORPUS**
15  MARY LATTIMORE, Warden of    )
    Central California Women's Facility, )  **EXHIBITS 93 - 130 FILED**
16                               )    **CONCURRENTLY (Exhibits 110 - 121**
            Respondent.          )    **filed under seal)**
17                               )
                                 )    **(Exhibits 1-92 filed with 2008 petition)**
18  ─────────────────────────────)

19         Petitioner, Maria Del Rosio Alfaro, by and through her counsel, hereby

20  petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 *et seq*.,

21  and Rule 83-17.3 of the Local Rules for the United States District Court for the

22  Central District of California.[1] [2]

23  ─────────────────────

24       [1]  In conformance with Rule 2 of the Rules Governing Section 2254 Cases in
    the United States District Courts, Petitioner hereby substitutes Mary Lattimore,
25  Warden, Central California Women's Facility, for Deborah Patrick, who is now the
    former warden.  Counsel for Petitioner respectfully request that the docket sheet in
26  this matter be amended to reflect this change in Respondent.

27       [2]  The initial petition filed on August 1, 2008 (docket nos. 10-16) was a
    "protective petition" filed in the event that the expedited-review procedures of
28  Chapter 154 of the federal habeas statute (28 U.S.C. § 2261, *et seq*.) and, in
    particular, the 180-day statute of limitations contained in 28 U.S.C. § 2263(a), are
    held to apply to Petitioner's case retroactively.

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

Exhibit Index. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xvii

I.
INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.
JURISDICTIONAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.
INCORPORATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

IV.
PROCEDURAL HISTORY AND BACKGROUND. . . . . . . . . . . . . . . . . . . .  7

V.
STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

VI.
CLAIM 1:  PETITIONER WAS DEPRIVED OF HER RIGHT TO
THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR
AND RELIABLE DETERMINATION OF GUILT AND PENALTY
BY TRIAL COUNSEL'S DEFICIENT PERFORMANCE. . . . . . . . . . . . . . .  29

A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

B.   COUNSEL'S REFUSAL TO PERMIT PETITIONER TO PLEAD
GUILTY DESPITE HER DESIRE TO DO SO. . . . . . . . . . . . . . . . . .  32

C.   COUNSEL'S FAILURE TO MOVE TO WITHDRAW OR TO
ADVISE CLIENT TO MOVE FOR SUBSTITUTE COUNSEL
DESPITE COMPLETE BREAKDOWN OF ATTORNEY-CLIENT
RELATIONSHIP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

D.   COUNSEL'S FAILURE TO REQUEST CO-COUNSEL. . . . . . . . . . . .  49

E.   COUNSEL'S FAILURE TO ADMIT PETITIONER'S OFFER TO
ENTER A GUILTY PLEA IN THE PENALTY PHASE. . . . . . . . . . . . .  52

F.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND
DISCOVER THE IDENTITY OF THE MAN PRESENT AT THE
CRIME SCENE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

G.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND
ACCURATELY IDENTIFY THE DRIVER AND ATTENDANT
FAILURE TO DEVELOP AND PRESENT SUBSTANTIAL
DOMINATION/EXTREME DURESS MITIGATION EVIDENCE. . . . .  65

i

**Table of Contents (cont')**                                          **Page**

H.   COUNSEL'S FAILURE TO ADEQUATELY ARGUE THE FACTS
     THAT SUPPORTED A PENALTY PHASE DEFENSE OF
     SUBSTANTIAL DOMINATION AND EXTREME DURESS . . . . . . . . .  69

I.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE
     AND DEVELOP MITIGATION EVIDENCE, TO UTILIZE
     RETAINED EXPERTS, TO RETAIN NECESSARY EXPERTS
     AND TO PRESENT AVAILABLE MITIGATION EVIDENCE . . . . . . .  72

     1.  Counsel's Failure to Conduct an Adequate Penalty phase
         Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

     2.  Counsel's Failure to Effectively Utilize the Experts He Retained . . . . .  76

         a.  Martha Rogers, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

         b.  Consuelo Edwards, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

         c.  Armando Morales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

         d.  Marc Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

     3.  Counsel's Failure to Retain and Present the Testimony of
         Appropriate Experts and Lay Witnesses. . . . . . . . . . . . . . . . . . . . . . . . .  84

         a.  Failure to Retain and Present Testimony of a Neuro-psychologist
             and Appropriate Lay Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

         b.  Failure to Retain and Present Testimony of a Qualified
             Psychiatrist and Appropriate Lay Witnesses . . . . . . . . . . . . . . . . . . .  88

         c.  Failure to Retain and Present Testimony of a School Testing
             Expert and Present Appropriate Lay Witness Testimony . . . . . . . . .  96

         d.  Failure to Retain and Present Testimony of a Qualified
             Psychologist and Appropriate Law Witnesses. . . . . . . . . . . . . . . .  105

         e.  Failure to Retain and Present Testimony of an Expert on Brain
             Development and Appropriate Lay Witness Testimony . . . . . . . . .  107

         f.  Failure to Retain and Present Testimony of an Expert
             on Environmental Toxicity and Appropriate Lay Witness
             Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

         g.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

J.   COUNSEL'S FAILURE TO MOVE FOR A CHANGE OF VENUE . . .  109

K.   COUNSEL'S FAILURE TO FILE A TIMELY MOTION
     TO SUPPRESS PETITIONER'S CONFESSION . . . . . . . . . . . . . . . . . .  110

L.   COUNSEL'S FAILURE TO ADEQUATELY ADVISE PETITIONER
     REGARDING HER FIFTH AMENDMENT RIGHT . . . . . . . . . . . . . . .  112

**Table of Contents (cont')**                                                    **Page**

   M.   COUNSEL'S FAILURE TO SEEK AN  EVALUATION OF
         PETITIONER'S COMPETENCY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   116

   N.   COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF THE
         PSYCHOTROPIC DRUGS PETITIONER WAS PRESCRIBED
         WHILE IN JAIL AS MITIGATING EVIDENCE AND TO EXPLAIN
         HER APPARENT INATTENTIVENESS DURING TRIAL. . . . . . . . .   119

   O.   COUNSEL'S FAILURE TO PRESENT EVIDENCE AVAILABLE
         AND NECESSARY TO ADDRESS THE AGGRAVATORS. . . . . . . .   120

   P.   ADDITIONAL INSTANCES OF COUNSEL'S FAILURE
         TO PROVIDE EFFECTIVE ASSISTANCE. . . . . . . . . . . . . . . . . . . . . .   123

   Q.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   130

VII.
    CLAIM 2:  TRIAL COUNSEL PROVIDED INEFFECTIVE
ASSISTANCE OF COUNSEL BY FAILING TO PROVIDE
AUTHORITY TO THE TRIAL COURT FOR THE ADMISSION OF
PETITIONER'S UNCONDITIONAL OFFER TO PLEAD GUILTY AS
MITIGATION EVIDENCE IN THE PENALTY PHASE OF THE TRIAL. .   131

   A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   132

   B.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   133

   C.   TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF
         COUNSEL BY FAILING TO PROVIDE AUTHORITY FOR THE
         ADMISSIBILITY OF PETITIONER'S WILLINGNESS TO PLEAD
         GUILTY AS MITIGATING EVIDENCE IN EITHER PENALTY
         PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   135

   D.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   136

VIII.
    CLAIM 3:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE
VIOLATED AS HE AS INCOMPETENT TO STAND TRIAL. . . . . . . . . .   138

   A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   139

   B.   THE TRIAL COURT VIOLATED PROCEDURAL DUE PROCESS
         BY FAILING TO CONDUCT A COMPETENCY HEARING. . . . . . .   141

   C.   PETITIONER'S SUBSTANTIVE DUE PROCESS RIGHTS WERE
         VIOLATED BECAUSE SHE WAS INCOMPETENT TO STAND
         TRIAL, AT LEAST DURING THE SECOND PENALTY PHASE. . . .   143

   D.   TRIAL COUNSEL FAILED TO ENSURE THAT MS. ALFARO
         WAS COMPETENT DURING HER TRIAL. . . . . . . . . . . . . . . . . . . .   144

   E.   PETITIONER'S INCOMPETENCE TO STAND TRIAL REQUIRES
         HABEAS RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   144

1

**Table of Contents (cont')**                                                    **Page**

2    IX.
3         CLAIM 4:  ASSUMING PETITIONER WAS COMPETENT TO STAND
          TRIAL, PETITIONER WAS DENIED HER RIGHT TO BE PRESENT
4         FOR ALL PROCEEDINGS IN HER CAPITAL TRIAL. . . . . . . . . . . . . . .   145

5         A.    PETITIONER WAS ABSENT FROM CRITICAL STAGES OF HER
                CAPITAL TRIAL PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . .   146

6         B.    PETITIONER'S ABSENCE FROM HER CAPITAL TRIAL
                REQUIRES HABEAS RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   146
7
8    X.
          CLAIM 5:  APPELLATE COUNSEL PROVIDED INEFFECTIVE
          ASSISTANCE BY FAILING TO ASSERT A VIABLE *BATSON*
9         CLAIM ON APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   147

10   XI.
          CLAIM 6:  TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
11        BY FAILING TO OBJECT AFTER THE PROSECUTOR STRUCK THE
          SECOND AND THIRD LATINO JURORS. . . . . . . . . . . . . . . . . . . . . .   151
12
     XII.
13        CLAIM 7:  HE PROSECUTION'S FAILURE TO PRODUCE
          EXCULPATORY EVIDENCE AND THE PRESENTATION OF FALSE
14        TESTIMONY VIOLATED PETITIONER'S CONSTITUTIONAL
          RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   153
15
          A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   154
16
          B.    LAW IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . .   155
17
          C.    FACTS IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . .   156
18
                1.   The Prosecutor Failed to Disclose Exculpatory Evidence and
19                   Presented False Testimony Regarding Third-Party Culpability. . . . .   156

20              2.   The Prosecutor Failed to Disclose and Presented False Testimony
                     Regarding Impeachment Evidence of Reynoso. . . . . . . . . . . . . . . .   161
21
     XIII.
22        CLAIM 8:  NEW CLAIM - PETITIONER'S CONSTITUTIONAL
          RIGHTS WERE VIOLATED WHEN LAW ENFORCEMENT
23        DESTROYED EXCULPATORY EVIDENCE. . . . . . . . . . . . . . . . . . . . .   162

24        A.    FACTUAL BASIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   163

25        B.    THE POLICE VIOLATED PROCEDURAL DUE PROCESS BY
                INTENTIONALLY DESTROYING APPARENTLY
26              EXCULPATORY EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   164

27        C.    HABEAS RELIEF IS WARRANTED. . . . . . . . . . . . . . . . . . . . . . . .   165

28

**Table of Contents (cont')**                                              **Page**

XIV.
    CLAIM 9:  THE DISTRICT ATTORNEY ENGAGED IN EGREGIOUS
    AND PERVASIVE MISCONDUCT THAT RENDERED PETITIONER'S
    PENALTY PHASE RETRIAL FUNDAMENTALLY UNFAIR. . . . . . . . . . 166

    A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

    B.    LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

    C.    THE PROSECUTOR ELICITED IMPROPER AGGRAVATING
          EVIDENCE AT THE SECOND PENALTY TRIAL. . . . . . . . . . . . . . . 170

        1. Petitioner's Non-felonious, Non-violent Criminal Record
           Was Improperly Introduced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

        2. Mr. Middleton Improperly Introduced Other Inadmissible
           "Bad Acts" Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

        3. Mr. Middleton Improperly Argued Lack Of Remorse. . . . . . . . . . . 174

        4. Mr. Middleton Improperly Attempted to Introduce Evidence
           Of Intent to Kill.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

        5. Mr. Middleton Improperly Suggested that Petitioner Had Been
           "Coaxed" to Tell the Jury About Being Raped as a Child and
           Improperly Denigrated the Defense Experts. . . . . . . . . . . . . . . . . . 176

    D.    THE PROSECUTOR MISCHARACTERIZED THE LAW.. . . . . . . . . 177

    E.    THE PROSECUTOR INFLAMED THE JURY'S PASSIONS. . . . . . . 178

    F.    THE CUMULATIVE PREJUDICE OF THE PROSECUTOR'S
          MISCONDUCT REQUIRES REVERSAL OF PETITIONER'S
          SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

XV.
    CLAIM 10:  THE PROSECUTION ENGAGED IN REPEATED
    MISCONDUCT THROUGHOUT ALL PHASES OF PETITIONER'S
    TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

XVI.
    CLAIM 11:  THE PROSECUTOR VIOLATED THE EQUAL
    PROTECTION CLAUSE BY EXERCISING PEREMPTORY
    CHALLENGES BASED UPON A RACIALLY DISCRIMINATORY
    MOTIVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

    A.    FACTS IN SUPPORT OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . . 186

        1. Richard Sanchez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

        2. Susan Mayor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

        3. Jaime Soto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

v

1

<u>**Table of Contents (cont')**</u>           **<u>Page</u>**

2

3

B.    LAW IN SUPPORT OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . .  197

4

  1. The Defendant is Latina and the Victim Was White in a Case With Strong Racial Undertones. . . . . . . . . . . . . . . . . . . . . . . . . . . .  201

5

6

  2. At the Time of the Prosecutor's Strike of Sanchez, No Latinos Were on the Panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  202

7

  3. The Prosecutor Struck Three Latino Jurors Eligible for Causal or Peremptory Challenges for Both Jury Selections.. . . . . . . . . . . . .  202

8

  4. There was no Plausible Justification for the Prosecutor to Strike Sanchez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  203

9

10

  5. There Was No Difference Between Juror Sanchez and the Remaining White Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  203

11

  6. The Prosecutor Refused to Explain His Reasons for Striking Juror Sanchez Despite Being Given an Opportunity to Do So By the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  204

12

13

XVII. CLAIM 12: PETITIONER WAS DENIED A FAIR-CROSS SECTION OF VENIRE PERSONS BASED UPON A FLAWED PROCESS USED TO SELECT AND IMPANEL HER JURIES. . . . . . . . . . .  205

14

15

A.    FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  206

16

B.    APPLICABLE LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  207

17

XVIII. CLAIM 13: PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE IMPANELMENT OF JURORS WHO WERE BIASED IN FAVOR OF THE DEATH PENALTY. . . . . . . . .  210

18

19

XIX. CLAIM 14: PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE CONCEALMENT OF MATERIAL INFORMATION ON VOIR DIRE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  213

20

21

22

XX. CLAIM 15: PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE EXCUSAL OF JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT EXCUSAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  217

23

24

25

XXI. CLAIM 16: PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN JURORS WERE NOT REMOVED FOR CAUSE OR BIAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  219

26

27

28

vi

1    **Table of Contents (cont')**                                                    **Page**

2    XXII.
         CLAIM 17:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE
3        VIOLATED BY THE TRIAL COURT'S BIAS. . . . . . . . . . . . . . . . . . . . . . . 222

4        A.    LAW IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

5        B.    FACTS IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . 225

6              1.  The Trial Judge Was Biased Based Upon His Emotional
                   Entanglement With a Custody Proceeding Against His Stepson
7                  Who Was a Drug Addict Identical to Petitioner. . . . . . . . . . . . . . . 225

8              2.  Trial Judge's Conduct Throughout Trial Evidenced His Strong
                   Bias Against Petitioner. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226
9
               3.  The Trial Judge Had a Personal Interest in the Case Based Upon
10                 His Work Relationship With the Victim's Mother. . . . . . . . . . . . . . 234

11   XXIII.
         CLAIM 18: THE CONFLICT BETWEEN PETITIONER AND TRIAL
12       COUNSEL VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS. . . 235

13       A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

14       B.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

15       C.    LEGAL BASIS OF THE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . 244

16             1.  The Trial Court's Refusal to Substitute Counsel Violated
                   Petitioner's Sixth Amendment Right to Conflict-Free Counsel. . . . . 244
17
               2.  Mr. Monroe's Decision to Prevent Petitioner from Pleading
18                 Guilty Adversely Affected His Performance. . . . . . . . . . . . . . . . . . 247

19       D.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

20   XXIV.
         CLAIM 19:  THE TRIAL COURT ERRED BY PRECLUDING
21       EVIDENCE OF PETITIONER'S OFFER TO PLEAD GUILTY. . . . . . . . . 250

22       A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

23       B.    LAW IN SUPPORT OF THIS CLAIM. . . . . . . . . . . . . . . . . . . . . . . . 252

24       C.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

25       D.    THE TRIAL COURT ERRED IN EXCLUDING THE EVIDENCE
               OF PETITIONER'S WILLINGNESS TO PLEAD GUILTY DURING
26             THE PENALTY PHASES OF HER TRIAL. . . . . . . . . . . . . . . . . . . . 255

27       E.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

28

1

**Table of Contents (cont')**                                                    **Page**

2
XXV.

3
    CLAIM 20:  THE TRIAL COURT COMMITTED MULTIPLE ERRORS
CONDUCTING VOIR DIRE FOR EACH OF PETITIONER'S TRIALS. . . . 258

4
    A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

5
    B.   THE TRIAL COURT ERRED IN DENYING THE DEFENSE
REQUEST FOR ADDITIONAL VOIR DIRE ABOUT THE CHILD

6
VICTIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

7
        1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

8
        2. Where A Particular Factor In A Case Would Cause A Juror To
Invariably Vote For Death, That Juror Is Not Fair And Impartial. . . . 260

9

10
        3. In this Case, the Defense Urged That the Fact the Victim Was a
Child Could Cause Certain Jurors to Invariably Vote for Death. . . . . 265

11
           a.  First Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

12
           b.  Second Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

13
        4. The Court Improperly Restricted Inquiry Into Jurors' Views
Regarding a Child Victim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

14

15
        5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

16
    C.   THE TRIAL COURT ERRED IN REFUSING TO EXCUSE
JUROR PATTON FOR CAUSE AND IN FAILING TO GRANT

17
THE DEFENSE ADDITIONAL PEREMPTORY CHALLENGES. . . . . 273

18
        1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

19
        2. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

20
        3. The Defense Was Forced To Exhaust All Of Its Peremptory
Challenges As A Result of the Trial Court's Failure to Strike
For Cause Jurors Who Had Strong Feelings That Would Render

21
Them Biased Against Petitioner. . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

22
        4. The Trial Court Erred In Failing To Remove Mr. Patton For
Cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

23

24
        5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

25
    D.   THE TRIAL COURT ERRED BY DENYING THE DEFENSE
REQUEST FOR SEQUESTERED VOIR DIRE DURING THE

26
DEATH QUALIFICATION PROCESS. . . . . . . . . . . . . . . . . . . . . . . . 282

27
        1. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

28
           a.  First Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

1

**Table of Contents (cont')**                                              **Page**

2

      b.  Second Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   285

3

  2.  The Trial Court Failed To Exercise Its Discretion To Hold Sequestered Voir Dire, Resulting In A Capital Jury That Was

4

Conditioned To Impose The Death Sentence. . . . . . . . . . . . . . . . . . . .   288

5

      a.  In Capital Cases Courts Must Be Especially Vigilant To Guard Against Biased Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   288

6

      b.  *Hovey v. Superior Court.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   290

7

      c.  Death Qualification After Code of Civil Procedure § 223's

8

Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   292

9

  3.  The Trial Court Failed to Exercise Its Discretion.  . . . . . . . . . . . . . . .   294

10

  4.  If This Court Finds That The Trial Court Exercised Discretion, It Must Find That The Trial Court Abused its Discretion. . . . . . . . . . . .   296

11

  5.  The Court's Failure to Conduct Individual or Group Voir Dire

12

Resulted in a Miscarriage of Justice. . . . . . . . . . . . . . . . . . . . . . . . . .   300

13

E.    THE TRIAL COURT'S MULTIPLE ERRORS IN CONDUCTING VOIR DIRE DEPRIVED PETITIONER OF HER RIGHT TO A

14

FAIR AND IMPARTIAL JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   300

15

  1.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   300

16

  2.  Statement Of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   301

17

      a.  The First Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   301

18

      b.  The Second Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   304

19

  3.  The Magnitude Of The Capital Jury's Responsibility Requires That The Trial Court Be Scrupulous In Maintaining Both the

20

Appearance And The Fact Of Impartiality. . . . . . . . . . . . . . . . . . . . . .   308

21

  4.  The Trial Court's Decisions Regarding The Conduct of Voir Dire Deprived Petitioner Her Right To An Impartial Jury. . . . . . . . . . . . .   309

22

      a.  The Court's Decision To Deny Sequestered Voir Dire Was

23

Erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   309

24

      b.  The Court's Decision To Deny A Jury Questionnaire Was Erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   310

25

      c.  The Court's Refusal To Ask Questions About The Child

26

Victim Was Erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   311

27

28

<u>**Table of Contents (cont')**</u>                                                   <u>**Page**</u>

d. The Court Compounded Each Of The Above Errors Through Its Fashioning Of The Death Qualification Questions, Resulting In A Jury Predisposed To Find Petitioner Guilty And To Sentence Her To Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 313

XXVI.
CLAIM 21:  THIS IS A NEW CLAIM:  THE TRIAL COURT'S ARBITRARY DENIAL OF THE REQUESTED  CONTINUANCE VIOLATED DUE PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

A.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

B.   LAW IN SUPPORT OF CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

C.   HABEAS RELIEF IS WARRANTED. . . . . . . . . . . . . . . . . . . . . . . . . 319

XXVII.
CLAIM 22:  THE TRIAL COURT'S FAILURE TO CLOSE PETITIONER'S TRIAL SO THAT SHE COULD TESTIFY WITHOUT FEAR OF RETALIATION VIOLATED HER CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320

A.   PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 321

B.   LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

C.   THE TRIAL COURT'S REFUSAL TO CLOSE THE COURTROOM DURING PETITIONER'S TESTIMONY VIOLATED HER CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

D.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

XXVIII.
CLAIM 23:  THE TRIAL COURT'S FAILURE TO SUBSTITUTE PETITIONER'S COUNSEL VIOLATED HER CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

A.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 331

B.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

1.  September 1991. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

2.  November 1991. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

3.  February 20-21, 1992. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

4.  March 5, 1992. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

5.  March 9-18, 1992:  The Guilt Phase Trial. . . . . . . . . . . . . . . . . 342

**<u>Table of Contents (cont')</u>**                                                            **<u>Page</u>**

6.  March 30-April 1, 1992:  The First Penalty Phase Trial. . . . . . . . . .  343

7.  April 9, 1992:  The *Marsden* Hearing.  . . . . . . . . . . . . . . . . . . . . . . .  344

8.  May 19-June 3, 1992:  The Second Penalty Trial.  . . . . . . . . . . . . . . .  354

9.  July 14, 1992:  Hearing On Defendant's Motion For Reduction
    Of Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  356

C.  PETITIONER HAD THE RIGHT TO THE EFFECTIVE
    ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  356

D.  THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION
    FOR APPOINTMENT OF SUBSTITUTE COUNSEL VIOLATED
    HER CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . .  357

1.  Petitioner Showed That She and Mr. Monroe Had Become
    Embroiled in Such an Irreconcilable Conflict That Ineffective
    Representation Was Likely to Result. . . . . . . . . . . . . . . . . . . . . . . . .  357

2.  Petitioner Showed That Mr. Monroe Had Provided Her with
    Inadequate Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  360

    a.  Mr. Monroe Provided Inadequate Representation By Denying
        Petitioner The Right To Make Critical Decisions About Her
        Defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  360

    b.  Mr. Monroe Provided Inadequate Representation When He
        Refused To Consent To A Guilty Plea. . . . . . . . . . . . . . . . . . . . .  361

    c.  Mr. Monroe Provided Inadequate Representation When He
        Advised Petitioner Concerning Her Testimony.  . . . . . . . . . . . . . .  362

3.  Petitioner's Request for Substitute Counsel Was Timely.  . . . . . . . . .  365

4.  The Court's Inquiry Was Inadequate. . . . . . . . . . . . . . . . . . . . . . . . .  366

E.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  366

XXIX.
    CLAIM 24:  THE TRIAL COURT DENIED PETITIONER HER SIXTH
    AND FOURTEENTH AMENDMENT RIGHTS IN DENYING THE
    DEFENSE CHANGE OF VENUE MOTION BEFORE THE RETRIAL
    OF THE PENALTY PHASE BECAUSE OF JURORS' EXPOSURE
    TO INFLAMMATORY PUBLICITY. . . . . . . . . . . . . . . . . . . . . . . . . . . .  368

A.  INTRODUCTION AND DESCRIPTION OF THE PUBLICITY. . . . . .  369

B.  A CHANGE OF VENUE MUST BE GRANTED WHERE, AS HERE,
    A REASONABLE LIKELIHOOD EXISTS THAT A FAIR AND
    IMPARTIAL TRIAL CANNOT OTHERWISE BE HAD. . . . . . . . . . . .  371

1.  The Nature And Gravity Of The Offense. . . . . . . . . . . . . . . . . . . . . .  372

**Table of Contents (cont')**                                              **Page**

       2. The Standing Of The Victim And Accused In The Community. . . . . 373

       3. The Sensational, Inflammatory Publicity. . . . . . . . . . . . . . . . . . . . . . 373

       4. The Impact On The Community. . . . . . . . . . . . . . . . . . . . . . . . . . . . 374

  C. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 375

XXX.
  CLAIM 25: THE TRIAL COURT VIOLATED PETITIONER'S DUE
PROCESS RIGHTS BY COMMITTING NUMEROUS EVIDENTIARY
ERRORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 375

  A. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376

  B. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 378

       1. Dr. Morales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

       2. Dr. Edwards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

       3. Dr. Rogers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

       4. The District Attorney's Closing Argument. . . . . . . . . . . . . . . . . . . 385

  C. LEGAL ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 386

       1. The Trial Court Erred In Permitting Extensive Cross-Examination
Of Drs. Morales and Edwards Based On Raw Data And Rough
Notes They Were Not Qualified To Interpret And Had Not Relied
Upon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387

       2. The Trial Court Erred In Allowing The District Attorney To Call
Dr. Rogers As A Rebuttal Witness. . . . . . . . . . . . . . . . . . . . . . . . . . 391

  D. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

XXXI.
  CLAIM 26: THE TRIAL COURT ERRED IN ADMITTING EVIDENCE
OVER DEFENSE COUNSEL'S OBJECTION CONCERNING
PETITIONER'S NON-FELONIOUS, NON-VIOLENT CRIMINAL
CONDUCT AND HER "INTENT TO KILL". . . . . . . . . . . . . . . . . . . . 396

  A. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

  B. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

  C. THE COURT ERRED IN NOT EXCLUDING EVIDENCE OF
PETITIONER'S NON-FELONIOUS, NON-VIOLENT CRIMINAL
RECORD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

  D. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Table of Contents (cont')**                                                    **Page**

XXXII.
CLAIM 27:  THE TRIAL COURT'S DETERMINATION THAT
THE AGGRAVATING CIRCUMSTANCE OUTWEIGHED THE
MITIGATING CIRCUMSTANCES VIOLATED PETITIONER'S
CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  403

A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  404

B.    DESCRIPTION OF THE TRIAL COURT'S RULING. . . . . . . . . . . . .  405

C.    THE TRIAL COURT FAILED TO CONSIDER ALL OF THE
      MITIGATING EVIDENCE PRESENT IN THIS CASE. . . . . . . . . . . .  416

      1.  The Trial Court Ignored the Mitigating  Evidence That Ms. Alfaro
          Had No Felony Record or Record of Criminal Activity Involving
          the Use or Attempted Use of Violence. . . . . . . . . . . . . . . . . . . . . . . .  418

      2.  The Trial Court Ignored Mitigating Evidence  of the Affects
          of intoxication, Mental Defects, and Duress Which Impaired
          Ms. Alfaro's Ability to Conform Her Conduct to the Requirements
          of the Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  418

      3.  The Trial Court Ignored the Mitigating Evidence of Ms. Alfaro's
          Youth, Disadvantaged Background, and Her Remorse. . . . . . . . . . . .  419

      4.  The Trial Court's Determination That Ms. Alfaro Was Entitled
          to No Sympathy Based on "Choices" She Had Made Was
          Fundamentally Flawed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  421

C.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  424

XXXIII.
CLAIM 28:  THE DENIAL OF PETITIONER'S MOTION FOR NEW
TRIAL VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS. . . . . . .  426

A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  427

B.    THE TRIAL COURT'S RULING. . . . . . . . . . . . . . . . . . . . . . . . . . .  427

C.    THE COURT HAD A DUTY TO LOOK AT ANY EVIDENCE
      THAT RENDERED THE DEATH VERDICT INAPPROPRIATE. . . . .  434

D.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  435

XXXIV.
CLAIM 29:  THE TRIAL COURT'S ERRONEOUS AND PREJUDICIAL
DENIAL OF PETITIONER'S MOTIONS VIOLATED PETITIONER'S
CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  436

A.    DEFENSE MOTIONS DENIED BY THE TRIAL COURT. . . . . . . . .  436

B.    HABEAS RELIEF IS WARRANTED. . . . . . . . . . . . . . . . . . . . . . . .  439

xiii

1

**Table of Contents (cont')**                                                    **Page**

2

XXXV.
    CLAIM 30:  THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS
    BY FAILING TO PROVIDE PETITIONER WITH THE NECESSARY
    ASSISTANCE OF COMPETENT AND INDEPENDENT EXPERTS. . . . . .   440

XXXVI.
    CLAIM 31:  THE EXECUTION OF PETITIONER WOULD
    CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AS
    PETITIONER IS MENTALLY RETARDED.. . . . . . . . . . . . . . . . . . . . . . .   443

    A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   443

    B.    PETITIONER IS MENTALLY RETARDED.. . . . . . . . . . . . . . . . . . . .   443

          1. Petitioner Has Well-documented Significant Limitations in
             Intellectual Functioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   445

          2. Petitioner Has Significant Limitations in Adaptive Behavior
             as Expressed in Conceptual, Social and Practical Adaptive Skills. . .   447

                a. Conceptual Skills. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   447

                      (i)      Functional Academics. . . . . . . . . . . . . . . . . . . . . . . . .   447

                      (ii)     Communication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   448

                      (iii)    Self-direction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   448

                b. Practical Skills. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   449

                      (i)      Self-Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   449

                      (ii)     Home Living. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   449

                      (iii)    Community Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   449

                      (iv)     Occupational Skills/Work. . . . . . . . . . . . . . . . . . . . .   449

                c. Social Skills. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   449

                      (i)      Interpersonal Relationships And Responsibility.  . . . . . . . .   450

                      (ii)     Self-esteem, Gullibility, Naiveté, Capability to
                               Obey Laws, and Avoidance of Victimization. . . . . . . . . . .   450

          3. Petitioner's Mental Retardation Manifested Before the
             Age of 18.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   450

    C. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   451

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **Table of Contents (cont')** | **Page**

2  XXXVII.
3      CLAIM 32: THE EIGHTH AMENDMENT PROHIBITS EXECUTION
   OF PETITIONER DUE TO HER MENTAL DISABILITIES. . . . . . . . . . . .  452

4  XXXVIII.
5      CLAIM 33: CALIFORNIA'S DEATH PENALTY SENTENCING
   SCHEME VIOLATES CONSTITUTIONAL GUARANTEES. . . . . . . . . . .  453

6      A.  PENAL CODE § 190.2 FAILS TO ADEQUATELY NARROW THE
       CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY. . . .  455
7
8      B.  PENAL CODE § 190.2 GIVES PROSECUTING AUTHORITIES
       UNGUIDED DISCRETION IN DECIDING WHETHER TO
       CHARGE STATUTORILY DEATH-ELIGIBLE DEFENDANTS
9      WITH SPECIAL CIRCUMSTANCES AND TO SEEK THE
       DEATH PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  456
10
       C.  PENAL CODE § 190.3(A) AS APPLIED IS UNCONSTITUTIONAL. .  458
11
12     D.  THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE
       JURY ON WHICH FACTORS SHOULD COULD BE CONSIDERED
13     IN AGGRAVATION AND WHICH FACTORS COULD BE
       CONSIDERED IN MITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . .  464

14     E.  THE JURY WAS PRECLUDED FROM GIVING ANY MITIGATING
       EFFECT TO EVIDENCE OF PETITIONER'S MENTAL OR
15     EMOTIONAL DISTURBANCE THAT WAS DEEMED TO BE
       LESS THAN "EXTREME". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  466
16
       F.  THE TRIAL COURT FAILED TO INSTRUCT ON BURDEN
17     AND STANDARDS OF PROOF AT CRUCIAL STEPS IN THE
       SENTENCING DETERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . .  469
18
19     G.  THE TRIAL COURT ERRED IN FAILING TO DELETE
       INAPPLICABLE FACTORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  470

20     H.  THE TRIAL COURT ERRED IN FAILING TO INFORM THE
       JURY THAT IT HAD THE DISCRETION TO DECLINE TO
21     IMPOSE THE DEATH PENALTY AND RETURN A VERDICT
       OF LIFE WITHOUT PAROLE EVEN IF IT FOUND NO EVIDENCE
22     IN MITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  471

23     I.  THE TRIAL COURT ERRED IN FAILING TO REQUIRE A
       WRITTEN STATEMENT OF FINDINGS. . . . . . . . . . . . . . . . . . . . . . .  473
24
       J.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  474
25
   XXXIX.
26     CLAIM 34: PETITIONER'S CONSTITUTIONAL RIGHTS WERE
   VIOLATED AS A RESULT OF THE DISCRIMINATORY MEANS OF
27 SELECTING THE ORANGE COUNTY VENIRE. . . . . . . . . . . . . . . . . . . .  474

28

1

**Table of Contents (cont')**                                                    **Page**

2

XL.
CLAIM 35:  THE VIOLATIONS OF FEDERAL LAW ARTICULATED IN
THIS PETITION ALSO CONSTITUTE VIOLATIONS OF
INTERNATIONAL LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   477

A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   478

B.    THE UNITED STATES, BY COMMITTING ITSELF TO VARIOUS
MULTINATIONAL ORGANIZATIONS AND TREATIES, HAS
COMMITTED ITSELF TO FOLLOWING INTERNATIONAL
HUMAN RIGHTS LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   478

C.    PETITIONER'S CONVICTION AND DEATH SENTENCE
VIOLATE THE DUE PROCESS GUARANTEES OF
INTERNATIONAL LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   482

     1.   The Arbitrary Imposition of the Death Penalty Against Petitioner
          Violates International Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   483

     2.   The Capital Prosecution and Death Sentence of Petitioner Violate
          International Law Prohibitions Against Discrimination on the
          Basis of Race and National or Social Origin. . . . . . . . . . . . . . . . . .   483

     3.   Together the Trial Court's Multiple Errors and California's Death
          Penalty Scheme Failed to Guarantee Petitioner Effective Protection
          Against Discrimination in Violation International Law.. . . . . . . . . . .   484

D.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   485

XLI.
CLAIM 36:  PETITIONER WAS DENIED HER CONSTITUTIONAL
AND INTERNATIONAL LAW RIGHTS BECAUSE OF THE
CUMULATIVE IMPACT OF ERRORS. . . . . . . . . . . . . . . . . . . . . . . . . . .   486

XLII.
PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   488

VERIFICATION OF PETITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   490

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## EXHIBITS IN SUPPORT OF PETITION

2  **EXH.**          **DESCRIPTION**

3                    Filed with August 1, 2008 Petition

4   1.   Declaration of Raymond McGrath, 07/30/2001

5   2.   Declaration of Martha Lee Rogers, Ph.D., 09/13/2000

6   3.   Declaration of Silvia Melendez Alonso, 05/21/2001

7   4.   Declaration of Maria Del Rosio Alfaro, 07/27/2001

8   5.   Declaration of Charles A. Sanislow, Ph.D., 07/03/2001

9   6.   Declaration of Sabrina Duran, 09/20/2000

10  7.   Declaration of Natasha Khazanov, Ph.D., 07/14/2001

11  8.   Declaration of Pablo Stewart, M.D., 07/23/2001

12  9.   Declaration of Silvia Alfaro, 05/22/2001

13  10.  Declaration of Cynthia Asprodites, Ph.D., 05/28/2001

14  11.  Declaration of Marcy Arcueta, 05/21/2001

15  12.  Declaration of Betty Cleary-Soto, 09/18/2000

16  13.  Declaration of Rosa Melendez Sanchez, 05/21/2001

17  14.  Memorandum from Stephen Shepard to William Monroe, 11/22/1991

18  15.  Note from Laura Lawhon's file (Monroe's Investigator), 08/20/1991

19  16.  Transcript of Dr. Danto's Sodium Pentothal Interview with Petitioner on 09/27/1991

20
21  17.  Orange County Register Article "Final Analysis: Investigation Service Combines Psychiatry and Sleuthing to Examine Violent Deaths", 11/26/1991

22
23  18.  O.C.S.D. Deputy Allen's Interview Notes, 06/16/1990

24  19.  Flyer of Composite Drawing

25  20.  Discovery page 2185 (Clue #584)

26  21.  Discovery Page 2185 (Clue #642)

27  22.  Police Interview with Antonio "Shorty" Reynoso / Raul Rodriguez, 07/02/1990

28  23.  Sandberg Interview of Torrres-Graciano in Mexico, 01/26/1992

xvii

1    **Exhibits in Support of Petition (cont'd)**

2    24.    Autopsy Report of Autumn Wallace, 06/16/1990

3    25.    O.C.S.D. Criminal Investigation Report re Telephone Interview with
            Ryan Joseph Finan, 06/25/1990

4
5    26.    Interview of Lien Nguyen by Inspector Giffin, 06/17/1990

6    27.    Psychiatric Evaluation by Consuelo Edwards, M.D., 03/23/1992

7    28.    Criminal Record of Antonio "Shorty" Reynoso / Raul Rodriguez

8    29.    Report by Armando T. Morales, DSW, 03/29/1992

9    30.    Anatomical Type Chart, by Consuelo Edwards, M.D.

10   31.    Clinical Articles re Sodium Pentathol

11   32.    Interview of Joyce Wallace and Roy Chester Wallace, 06/15/1990

12   33.    Orange County Sheriff-Coroner Department forensic Services, Report
            of Toxicological Examination, 06/28/1990

13   34.    Sheriff-Coroner Department Teletype Messages, 07/06/1990

14   35.    Interview of Vicky Darr, 12/1990

15   36.    Criminal History of Manuel Torres-Graciano

16   37.    O.C.S.D. Investigator Giffin's Investigative Overview, 11/02/1990

17   38.    Memo from Laura Lawhon to William M. Monroe Regarding
            Toxicologist, 01/13/2001

18
19   39.    News Article About Hon. Theodore Millard, 01/01/2001

20   40.    Jury Interview Notes (L. Lawhon email to W. Monroe) 04/28/1992

21   41.    Pretrial News Articles Regarding Murder of Autumn Wallace

22   42.    O.C.S.D. Interview of Juan Jiminez, 07/02/1990

23   43.    Defense Investigator Interview of Juan Jiminez, 10/11/1990

24   44.    O.C.S.D. Investigator Tom Giffin's Notes

25   45.    Laura Lawhon Notes re Interview of Petitioner, 03/25/1991

26   46.    Laura Lawhon Notes re Linda Wallace, 11/11/1991

27   47.    Notation re William Monroe's Request to District Attorney for Life
            Without Possibility of Parole

28   48.    O.C.S.D. Interview of Sabrina Duran, 07/05/1990

1    **Exhibits in Support of Petition (cont'd)**

2    49.    Excerpt from O.C.S.D. Investigator Gary Bale's Notebook

3    50.    Investigative Email from Detective Bale to Investigator Raymond
            McGrath, 06/21/2001
4
     51.    David Sandberg Witness List Exchange, 05/02/1992
5
     52.    O.C.S.D. Coroner's report of Evidence Examination, 07/19/1990
6
     53.    Statement of Probable Cause and Arrest Affidavit for Ms. Alfaro
7
     54.    Sandberg's Case Book Index notes on Manuel Torres-Graciano's
8           Criminal History

9    55.    Advertisement in 1992 Clerk's Union Newsletter

10   56.    Multi-Generational Family Alcohol History Chart

11   57.    WAIS-R Records, 11/06/1990

12   58.    WMS-R Records, 11/08/1990

13   59.    MMPI-Z Records, 02/03/1992

14   60.    Interpretive Report and Profile of Maria Del Rosio Alfaro, Alcohol
            Use Inventory, 10/24/1990
15
     61.    Juvenile Records of Ms. Alfaro
16
     62.    Pre-Sentence Report by Bruce M. Carel, Deputy Probation Officer,
17          Orange County Probation Department, 07/14/1992

18   63.    Interview Notes of Dr. Consuelo Edwards, 01/31/1992

19   64.    190.4(e) Hearing Order, 07/14/1992

20   65.    Order Appointing Dr. Martha Rogers as Expert Witness, 10/11/1990

21   66.    Jose Alfaro Medical Records

22   67.    Jose Alfaro's Pre-Sentence Report, 01/29/1999

23   68.    Birth Certificate of Manuel Cueva, Jr.

24   69.    Birth Certificate of Ehdie Berto Cueva-Alfaro

25   70.    Birth Certificate of Ernesto Cueva-Alfaro

26   71.    Birth Certificate of Daniel Alfaro

27   72.    CIGNA Healthplans, 10/20/1985 through 12/04/1985

28   73.    Lakewood Hospital and New Beginnings, 01/ 8-16/1987

**Exhibits in Support of Petition (cont'd)**

74.     Phoenix House, 01/16-18/1987

75.     Family Health Plan - Fountain Valley, 08/14/1987

76.     Medical Records from Western Medical Center, 12/31/1989

77.     Medical Records from University of California Irvine Medical Center, July 4-15, 1989

78.     Medical Records from Western Medical Center, 12/31/1989

79.     Orange County Jail Records

80.     Medical Records from Western Medical Center, 02/05/1981

81.     California Correctional Women's Facility Records

82.     Anaheim County School District Records

83.     Declaration of Karen Snell, 07/30/2001

84.     Lawhon Notes, 1990

85.     Email re Toby Silver, 9/1991

86.     U.S. Census Bureau Data for Orange, CA., 1990

87.     Voir Dire Chart

88.     Declaration of Silvia Alfaro, 7/16/2008

89.     Declaration of Tamara Benedict, 7/18/2008

90.     Declaration of Jeff Hasner, 7/29/2008

91.     Declaration of Ralph Glass, 7/29/08

92.     Declaration of Ian MacNeil, 7/30/08

Filed with March 2009 Petition

93.     Birth Certificate of Jose Luis Alfaro, Jr.

94.     Birth Certificate of Jose Luis Alfaro Medina

95.     Marriage Certificate of Silvia Melendez and Jose Luis Alfaro, Sr., 1/13/1971

96.     Death Certificate of Jose Luis Alfaro Medina, 7/17/1996

97.     W-2 Wage and Tax Statement for Jose Luis Alfaro, Sr., 1983

xx

**Exhibits in Support of Petition (cont'd)**

98.   Record Search Information Certification re Jose Luis Alfaro, Sr., 6/13/2008

99.   Birth Certificate of Monica Alfaro

100.  Medical Records from CHOC re Monica Alfaro, 8/11/1995

101.  Medical Record Excerpt from Kaiser re Monica Alfaro, 10/2007

102.  Photograph of Maria Del Rosio Alfaro at Approximately 7 Years of Age

103.  Health History Summary re Silvia Alfaro, 10/25/2004

104.  Medical Record Excerpt from Kaiser re Silvia Alfaro

105.  Birth Certificate of Alejandro Alonso

106.  Birth Certificate of Salvador Alonso, Jr.

107.  Photograph of Salvador Alonso, Jr. at Approximately 10 Years of Age

108.  Medical Records from Kaiser re Salvador Alonso, Jr.

109.  Birth Certificate of Jose Melendres

110.  Medical Record Excerpts from CHOC re Jose Luis Alfaro, Jr., 1979- SEALED

111.  Medical Records from St. Joseph Hospital re Jose Luis Alfaro, Jr., 6/6/79 - SEALED

112.  School Record re Jose Luis Alfaro, Jr., 1991-1992 - SEALED

113.  Juvenile Court Records re Jose Luis Alfaro, Jr. - SEALED

114.  Authorization for Medical Care re Jose Luis Alfaro, Jr., 5/30/1992 - SEALED

115.  Special Education School Record re Jose Luis Alfaro, Jr., 9/1992 - SEALED

116.  Orange County Social Services Agency Records, 1993-1996 - SEALED

117.  Psychological Records re Jose Luis Alfaro, Jr. - SEALED

118.  Probation Records re Jose Luis Alfaro, Jr., 12/1995-1/1999 - SEALED

119.  EEG Test Results re Jose Luis Alfaro, Jr., 12/13/1995 - SEALED

120.  Letter from Dr. Baram to Dr. Nguyen re Jose Luis Alfaro, Jr., 1/22/1996 - SEALED

1    **Exhibits in Support of Petition (cont'd)**

2        121.    ECG Graph re Jose Luis Alfaro, Jr., 7/31/1996 - SEALED

3        122.    Declaration of Denise Coburn, 2/6/2009

4        123.    Declaration of Brent Conley, 1/28/2009

5        124.    Declaration of Dianne De La Mare, 12/16/2008

6        125.    Declaration of Roger Ellison, 2/6/2009

7        126.    Declaration of  Gerard Rangel, 9/25/2008

8        127.    Forensic Report by Marc Taylor, 3/17/1992

9        128.    Declaration of Ellen Turlington re Sabrina Duran, 2/25/2009

10       129.    Declaration of Lisa Di Meo, 2/25/2009

11       130.    Declaration of Lorelei Sontag, Ph.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## **INTRODUCTION**

1.  Petitioner Maria Del Rosio Alfaro was eighteen years old on June 15, 1990, the date of the crime of which she stands convicted.  As will be shown below, Ms. Alfaro became addicted to heroin at approximately the age of twelve and she was under the influence of both heroin and cocaine at the time of the crime.  Her social history and background reflects that preceding her drug addiction, Ms. Alfaro suffered from organic brain damage, well below average intellectual functioning, and a violently abusive and dysfunctional childhood.  Although Ms. Alfaro confessed to first-degree murder with a special circumstance,  the physical evidence is consistent with the theory that at the time of the crime, she was under the substantial domination of an older man who threatened to harm her child and that she acted while under extreme duress.

# II.

## **JURISDICTIONAL ALLEGATIONS**

1.  Place of detention:  Central California Women's Facility, Chowchilla, California.

2.  Conviction on which Petition is based:

a.  Nature of offenses involved:  first-degree murder with special circumstance.

b.  California Penal Code sections:  Information of November 30, 1990: (1) Count 1, Penal Code § 187 (first-degree murder); (2) Count 2, Penal Code § 459/460.1 (residential burglary); (3) Penal Code § 211/212.5(a) (first degree robbery).  It was alleged as to all counts that Petitioner personally used a deadly and dangerous weapon, a knife, in violation of Penal Code § 12022(b).  The following special circumstances were alleged:  Petitioner was engaged in the commission of a robbery (Penal Code § 190.2(a)(17)(i)), and a burglary in the first degree (Penal Code § 190.2(a)(17)(vii)).

c.  Name and location of sentencing court:  Orange County Superior Court, California.

d.  Case number:  C-82541.

e.  Date of conviction:  March 23, 1992.

f.  Date of sentence:  June 9, 1992.

g.  Sentence on each count: (1) Count 1, death; (2) Count 2, seven years, (3) Count 3, seven years.

h.  Plea:  Not guilty.

i.  Kind of trial:  jury.

j.  Did you testify at trial?:  Petitioner testified only at the first penalty phase, which resulted in a mistrial.

3.  Automatic appeal:

a.  Name of Court:  Supreme Court of the State of California, Crim. No. S027730.

b.  Affirmed.

c.  Date of result:  August 6, 2007.

d.  Citation or number of opinion:  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).

e.  In summary, the grounds raised in Petitioner's automatic appeal included, but were not limited to:

(1)  Claim I - The Trial Court Erred in Failing to Adequately Address the Conflict That Arose Between Ms. Alfaro and Her Counsel Regarding Her Desire to Plead Guilty and His Refusal to Consent (And Trial Counsel Was Ineffective);

(2)  Claim II - The Trial Court Erred by Precluding Evidence of Ms. Alfaro's Offer to Plead Guilty;

(3)  Claim III - Trial Counsel Provided Ineffective Assistance of Counsel by Failing to Provide Authority to the Trial Court for the Admission

1  of  Ms. Alfaro's Unconditional Offer to Plead Guilty as Mitigation Evidence in the

2  Penalty Phase of the Trial;

3  (4)  Claim IV - The Trial Court Committed Multiple Errors

4  Conducting Voir Dire for Each of Ms. Alfaro's Trials;

5  (5)  Claim V -  The Trial Court Erred in Failing to Close

6  Ms. Alfaro's Trial So That She Could Testify Without Fear of Retaliation;

7  (6)  Claim VI - The Trial Court Denied Ms. Alfaro Her Sixth

8  Amendment Right to Counsel by Failing to Substitute Counsel;

9  (7)  Claim VII - In Denying the Defense Change of Venue Motion

10  Before the Retrial of the Penalty Phase Because of Jurors' Exposure to Inflammatory

11  Publicity, the Trial Court Denied Ms. Alfaro Her Sixth and Fourteenth Amendment

12  Rights;

13  (8)  Claim VIII - The Trial Court Erred in Allowing Extensive

14  Cross-examination of Defense Experts Based on Inflammatory Rough Notes and Raw

15  Data That They Were Not Qualified to Interpret and Had Not Relied Upon, and in

16  Allowing the Prosecutor to Call the Defense Consulting Psychologist as a "Rebuttal"

17  Witness;

18  (9)  Claim IX - The Trial Court Erred in Admitting Evidence over

19  Defense Counsel's Objection Concerning Ms. Alfaro's Non-felonious, Non-violent

20  Criminal Conduct and Her "Intent to Kill";

21  (10)  Claim X - The District Attorney Engaged in Egregious and

22  Pervasive Misconduct That Rendered Ms. Alfaro's Penalty Phase Retrial

23  Fundamentally Unfair;

24  (11)  Claim XI - Many Features of California's Death Penalty

25  Sentencing Scheme, as Interpreted and Applied by this Court, Violate the Federal

26  Constitution;

27  / / /

28  / / /

4

(12)  Claim XII - The Violations of State and Federal Law Articulated above Likewise Constitute Violations of International Law and Require That Ms. Alfaro's Conviction and Penalty Be Set Aside;

(13)  Claim XIII - The Trial Court's Determination That the Aggravating Circumstance Outweighed the Mitigating Circumstances Was Contrary to Law and the Evidence Presented;

(14)  Claim XIV - Based on Mitigating Evidence Known to the Trial Judge That Was Not Brought Before the Jury, the Trial Court Had a Duty to Exercise its Authority to Modify the Verdict Pursuant to Penal Code § 1181(7);

(15)  Claim XV - Based on the Errors in Ms. Alfaro's Case That Mandate Reversal, Ms. Alfaro Urges this Court to Exercise its Authority to Modify the Verdict.

f.  The facts supporting these grounds are included in the claims below.

4.  Petition for Writ of Habeas Corpus:

a.  Name of Court: Supreme Court of the State of California, Crim. No. S099569.

b.  Result:  Denied.

c.  Date of result:  November 28, 2007.

d.  Citation or number of opinion:  2007 Cal. Lexis 13400.

e.  In summary, the grounds include, but are not limited to:

(1)  Claim 1 - Petitioner Was Deprived of Her Right to the Effective Assistance of Counsel and to a Fair and Reliable Determination of Guilt and Penalty by Trial Counsel's Deficient Performance;

(2)  Claim 2 - Petitioner's Conviction and Sentence Were Obtained by means of False Evidence and In Violation of *Brady v. Maryland* and *Giglio v. United States*;

(3)  Claim 3 - Petitioner's Constitutional Rights were Violated by the Trial Court's Bias;

5

1           (4)  Claim 4 - Petitioner's Constitutional Rights were Violated as a

2  Result of the Discriminatory Means of Selecting the Orange County Venire.

3         f.  The facts supporting these grounds are included in the claims below.

4         g.  No evidentiary hearing was held.

5     5.  Petition for Writ of Certiorari:

6         a.  Name of court: United States Supreme Court, case number 07-8483.

7         b.  Result:  Denied.

8         c.  Date of denial:  March 3, 2008.

9         d.  Citation or number of opinion: *Alfaro v. California*, ___ U.S. ___,

10  128 S. Ct. 1476, 170 L. Ed. 2d 300 (2008).

11         e.  In summary, the questions presented included:

12         (1)  Does California Penal Code Section 1018, which prohibits a

13  defendant from pleading guilty to a capital crime without his or her counsel's

14  consent, violate the defendant's Sixth Amendment right to make this fundamental

15  decision in his or her case ?

16     6.  Petitioner presently has no appeal pending before the state court.

17     7.  The following attorneys have represented Petitioner:

18         a.  At the trial:  William Monroe, Esq.

19         b.  On appeal and state habeas level:  Karen L. Snell, Esq.; Nanci L.

20  Clarence, Esq.

21  **III.**

22  **INCORPORATION**

23     1.  While Petitioner has endeavored to specifically state all facts and law

24  supporting each claim herein, additional supporting facts and law may have been

25  stated in separate claims.  For this reason, Petitioner incorporates by reference each

26  and every paragraph of this petition into each and every claim presented as if fully set

27  forth therein.  Petitioner additionally incorporates all exhibits appended to this

28  petition.  All references to exhibits are to those exhibits unless otherwise specified.

1     2.  Petitioner requests that this Court take judicial notice of the certified record

2 on appeal and all pleadings, briefs, orders and exhibits filed with the California

3 Supreme Court in connection with Petitioner's appeal (*People v. Alfaro*, Supreme

4 Court of the State of California, Crim. No. S027730) and in connection with

5 Petitioner's state habeas petition (*In re Maria Del Rosio Alfaro on Habeas Corpus*,

6 Supreme Court of the State of California, No. S099569).

7 <center>**IV.**</center>

8 <center>**PROCEDURAL HISTORY AND BACKGROUND**</center>

9     1.  The crimes at issue in this case were committed on June 15, 1990.  A

10 warrant for Ms. Alfaro's arrest was issued on June 26, 1997.  Ms. Alfaro was arrested

11 on June 27, 1990.  Immediately after her arrest, Ms. Alfaro confessed to the crimes

12 during a four hour videotaped interrogation by Orange County Sheriff's Investigators.

13     2.  On July 16, 1990, William Monroe, a member of the Alternate Defense

14 Panel of the Orange County Superior Court, was appointed to represent Ms. Alfaro

15 as the Public Defender's Office had a conflict of interest in that it had previously

16 represented Antonio "Shorty" Reynoso, aka Raul Rodriguez (hereinafter "Reynoso"),

17 one of two men who were present with Ms. Alfaro at 10462 Hedlund Avenue,

18 Anaheim, California, at the time of the crimes.

19     3.  On November 30, 1990, a three-count Information was filed in the Superior

20 Court charging Ms. Alfaro with:  (1)  having murdered Autumn Wallace, a violation

21 of Penal Code § 187(a); (2)  residential burglary of the dwelling occupied by Autumn

22 Wallace, a violation of Penal Code §§ 459/460.1; and (3)  first degree robbery

23 of Autumn Wallace, a violation of Penal Code §§ 211/212.5(a).  CT 63-64.[3]  It was

24 alleged as to all counts that Petitioner personally used a deadly and dangerous

25 weapon, a knife, in violation of Penal Code § 12022(b).  The following special

26 circumstances were alleged: Petitioner was engaged in the commission of a robbery

27 _____

28     [3]  "CT" hereinafter refers to the Clerk's Transcript in this matter.

<center>7</center>

(P.C. § 190.2(a)(17)(i)) and a burglary in the first degree (P.C. § 190.2(a)(17)(vii)) at the time Autumn Wallace was killed.  CT 63-64.

4. On November 30, 1990, Ms. Alfaro entered a plea of not guilty to each count and denied the special circumstances.  CT 62.

5. On September 19, 1991, the defense filed a motion for specific jury selection procedures which included a request for attorney conducted voir dire, a written jury questionnaire, and/or individual questioning of jurors outside the presence of other prospective jurors.  CT 118.  The motion was heard and denied on November 1, 1991.  CT 230.

6. On February 20, 1992, defense counsel William Monroe filed, ex parte, a "Request For Special Instructions And For An Order To Obtain Specific Jail Records."  CT 361.  On February 21, 1992, an in camera hearing was held during which Mr. Monroe asked the court whether he had a duty to withdraw due to "an out and out conflict" that had arisen between himself and Ms. Alfaro because she wanted to plead guilty unconditionally and proceed to the penalty phase of the trial and he refused to consent.  RT 106-23 (February 21, 1992 proceedings[4]).  The court refused to advise Monroe, citing California Penal Code § 1018 and stating, "I don't know why you talk about pleading guilty.  There is no way she'll plead guilty without the consent of her attorney of record, period.  You have indicated very clearly you don't consent to that.  So there isn't going to be a plea of guilty, period."  *Id*.  At no time did Monroe move to withdraw.

7. On February 26, 1992, the court heard the district attorney's oral in limine motion to exclude any reference at trial to Petitioner's counsel's offer to have his client plead guilty in exchange for a sentence of life without the possibility of parole.  CT 400.  Though the district attorney conceded that an offer to plead guilty unconditionally would constitute mitigating evidence, neither the court nor

---

[4]  "RT" hereinafter refers to the Reporter's Transcript in this matter.

1    Mr. Monroe informed the district attorney that Ms. Alfaro had made such an offer.

2    The court instead "direct[ed] counsel not to bring up that issue, or the defendant

3    herself if she were to testify not to bring up that issue, without leave of court. . . .

4    In all phases of the trial . . . ." RT 187.

5          8.  On February 26, 1992, defense counsel filed a motion to exclude

6    Ms. Alfaro's videotaped confession and all statements made to investigating officers

7    based on a blood test indicating that Ms. Alfaro was under the influence of cocaine,

8    benzoylecconine and morphine at the time she made the statements.  CT 380.  After

9    a hearing held March 2, 1992, the motion was denied.  CT 436.

10         9.  After a number of continuances, jury selection began on March 3, 1992 (CT

11   44) and concluded on March 5, 1992.  CT 463.  A defense motion concerning the

12   prosecution's use of peremptory challenges in a discriminatory manner was made and

13   denied on March 4, 1993.  CT 456.  On March 5, 1992, the court denied the defense

14   motion for additional peremptory challenges, which argued that the defense had been

15   required to use peremptory challenges to excuse prospective jurors who should have

16   been excused for cause and further, that the court did not allow additional voir dire

17   questions -- in particular, questions aimed at bias based on the fact that the victim was

18   a child -- as requested by defendant.  CT 462.

19         10.  On March 9, 1992, the court granted a request for media coverage of trial

20   proceedings over defendant's objection and the guilt phase of the trial commenced.

21   CT 468.  The prosecution's case-in-chief concluded March 18, 1992.  CT 500.  Also

22   on March 18, 1992, defense counsel moved to exclude the press and public from the

23   courtroom during Ms. Alfaro's testimony only.  CT 489  The motion was supported

24   by a declaration signed by Ms. Alfaro, in which she stated:

25              On the day of the murder of Autumn Wallace, June 15, 1990,
         I was in the company of two male hispanics [sic].  The name of one
26       of them is Shorty, the name of the other person I am afraid to disclose
         because I fear for my personal safety and the safety of my family.  On the
27       day of the murder, this other male hispanic [sic] was in the house of
         Autumn Wallace with me. . . .

28

9

1
2
3

> If I testify in public so the newspapers get the information and I identify this male hispanic [sic], I believe my family will be harmed because the man is still out in the community.
> I cannot and will not testify unless my testimony is taken in a closed courtroom with my testimony sealed.

4   CT 497a-497c.  The motion was denied.  CT 499.  Thereafter, Ms. Alfaro waived her

5   right to testify at the guilt phase (CT 500-01) and the defense rested without calling

6   any witnesses.  CT 500.

7       11.  On March 23, 1992, jury deliberations began.  CT 966.  On the same day,

8   the jury delivered its verdict, finding Ms. Alfaro guilty on all counts and further

9   finding the weapon allegation and the special circumstances to be true.  CT 1086-90.

10   One week later, on March 30, 1992, the penalty phase began.  CT 1096-97.

11   Ms. Alfaro took the stand in her own defense.  RT 1592-1816.  On direct she

12   described her background and expressed her remorse.  On cross-examination, she was

13   questioned extensively about the circumstances of the crime.  Both sides rested on

14   April 1, 1992, after the prosecution was permitted to present rebuttal witnesses over

15   defense counsel's objection.  CT 1113.  Closing arguments and instructions were

16   given on April 2, 1992.  CT 1119.  After requests by the jury for further instructions

17   and re-reading of testimony, the jury declared that it had reached an impasse on April

18   8, 1992.  CT 1141.  After determining pursuant to California Penal Code § 1140 that

19   there was no possibility the jurors could reach a decision, the court declared a

20   mistrial.  CT 1147.

21       12.  The day after the mistrial was declared, April 9, 1992, Ms. Alfaro

22   requested that substitute counsel be appointed for her retrial due to an irreconcilable

23   conflict with Mr. Monroe.  RT 2119-49 (April 9, 1992 proceedings).  The court

24   denied the motion.  CT 1195.  Thereafter, the court scheduled the penalty phase

25   retrial for May 11, 1992.  CT 1440-a.

26       13.  Due to the excessive television and newspaper publicity surrounding the

27   first trial and the verdict, on April 24, 1992, defense counsel filed a motion for

28   change of venue or, in the alternative, a continuance of the retrial to allow the

publicity to die down. CT 1220. On April 29, 1992, the trial court denied the motion. CT 1292. On May 6, 1992, the trial court denied defendant's motion to quash the district attorney's subpoena of non-testifying defense expert Dr. Martha Rogers as well as defense counsel's renewed motion to exclude Ms. Alfaro's videotaped confession. CT 1440.

14. On May 7, 1992, the trial court denied defense counsel's renewed motion for sequestered voir dire. CT 1440A. Jury selection in the penalty re-trial commenced on May 11, 1992 (CT 1441), and concluded on May 18, 1992. CT 1519. The trial court denied the defense request to exclude witnesses on May 19, 1992, and the taking of evidence at the penalty re-trial commenced that same day. CT 1528. The re-trial proceeded May 19, 20, 21, 26, 27, 28 and June 1, 2 and 3, 1992.

15. On May 23, 1992, the Orange County Women's Jail classified Ms. Alfaro for a housing change due to the need for "acute mental health care." CT 1745-46. On May 30, 1992, an entry was placed in her "jacket" indicating that she no longer needed "mental health care of that nature." *Id.* at 1746. On June 2, 1992, Ms. Alfaro waived her right to testify at the second penalty trial. CT 1556.

16. On June 2, 1992, the district attorney was permitted to call defense expert Dr. Martha Rogers. CT 1557. That same day, closing arguments and instructions were given and jury deliberations began. CT 1572. Jury deliberations continued June 8, 1992 (CT 1576), and June 9, 1992, on which date the jury determined that Ms. Alfaro should be sentenced to death. CT 1586.

17. On June 30, 1992, defense counsel filed a motion for a new trial. CT 1699. On July 14, 1992, the motion was heard and denied, as was Petitioner's motion to modify the verdict. CT 1815. On that same date, the trial court pronounced the judgment of death as to count 1 and stayed execution of sentence on the remaining counts pursuant to California Penal Code § 654. CT 1818-19.

18. Petitioner's notice of appeal was filed on July 16, 1992. CT 1820. The appeal was denied on August 6, 2007.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# V.

## STATEMENT OF FACTS

1.  Petitioner Maria del Rosio Alfaro was eighteen years old on June 15, 1990, the date of the crimes of which she stands convicted.

2.  Ms. Alfaro was under the influence of heroin and cocaine at the time of the crimes. She became addicted to heroin at approximately age twelve. According to medical records, school records, and witnesses, Ms. Alfaro had well below average intellectual functioning (her IQ tested at 78 at the time of trial, but may in fact be much lower), organic brain damage, a violently abusive childhood resulting in post traumatic stress disorder, major depressive disorder and borderline mental retardation, all of which are documented to have preceded her drug addiction.

3.  The morning of June 15, 1990, Ms. Alfaro got up and fed her eighteen month old son, Manny. She then headed for "Little Tijuana," an area of Anaheim known for its drug trade, to obtain heroin. Once there, Ms. Alfaro obtained a mixture of black tar heroin and cocaine from a drug dealer named Manuel Torres Graciano, who provided her with drugs on "credit." By mid-afternoon, she had injected herself with the black tar heroin/cocaine mixture at least twice.

4.  Manuel Torres Graciano, then thirty years old, was a drinking buddy of Ms. Alfaro's father. Torres Graciano distributed drugs for Enrique "Kiko" Hernandez, who had gone to high school with Ms. Alfaro's aunt. As of June 15, 1990, Ms. Alfaro owed Hernandez several hundred dollars for drugs, and Torres Graciano informed her it was time for her to pay up. Torres Graciano agreed to give Ms. Alfaro a ride to a house she told him about where there was property that could be sold to pay her debt. They were accompanied by "Shorty" Reynoso, a convicted drug dealer who had been paroled the week before after serving three years in prison for selling narcotics. Torres Graciano himself was on probation at the time. Reynoso held Ms. Alfaro's baby in the back seat of the car, a brown Monte Carlo, while she

12

1    rode up front with Torres Graciano.  Reynoso hoped to buy a VCR from Ms. Alfaro

2    that he understood she was going to pick up at the house.

3         5.  The group arrived at the home of Joyce Wallace and her daughters April and

4    Autumn at approximately 3:45 p.m.  Ms. Alfaro got out of the car and went inside.

5    Torres Graciano also got out of the car.  Reynoso later testified that at first he

6    believed Ms. Alfaro was retrieving her own property, but quickly came to realize that

7    she was in fact burglarizing the home.

8         6.  Ms. Alfaro had previously stayed at the house with her friend, April

9    Wallace.  That afternoon, nine year old Autumn Wallace, who was home alone, let

10    Ms. Alfaro into the house.  Sending Autumn to do an errand for her in the back of the

11    house, Ms. Alfaro began gathering items and placing them by the front door.  Torres

12    Graciano entered the house to collect the items Ms. Alfaro placed by the front door

13    and take them to the car.  At some point, Torres Graciano saw Autumn Wallace, and

14    realized there was a witness to their crime.  He began screaming at Ms. Alfaro,

15    calling her a stupid whore and ordering her to do something, as he was on probation

16    and did not want to be caught.  Still yelling and threatening Ms. Alfaro, Torres

17    Graciano grabbed a knife from the kitchen drawer, and pulled Autumn through the

18    house into the back bathroom.  Torres Graciano handed Ms. Alfaro the knife,

19    shouting, "do it, do it, do it" in Spanish.  Scared and intoxicated, Ms. Alfaro stabbed

20    Autumn then fled past Torres Graciano, who remained in the doorway of the

21    bathroom where Autumn had fallen, taking the knife that she had used with her after

22    wiping it off on a towel which she left at the scene.

23         7.  After loading the stolen property into the car, Torres Graciano drove

24    Ms. Alfaro, Manny, and Reynoso back to Little Tijuana, screaming obscenities

25    at Ms. Alfaro along the way.  Once they reached "Little TJ," Ms. Alfaro sold some

26    of the Wallace's property.  Most of the stolen items remained with Torres Graciano,

27    payment for Ms. Alfaro's drug debt.

28

8.  At approximately 6:15 p.m., Ms. Alfaro called Manuel Cuevas, the father of Manny, from a phone booth near a Carl's Junior restaurant and asked for a ride. While at the Carl's Junior, she dropped the knife she had used to stab Autumn Wallace in a dumpster.

9.  Autumn Wallace's body was discovered by her mother and her aunt at approximately 5:40 p.m.  Later that evening, while the Orange County Sheriff's Investigators were still present, Ms. Alfaro walked by the Wallace's home, with Manuel Cuevas and Manny.  Having interviewed Susan Mata, a witness who had driven by the Wallace home at approximately 4:05 p.m. and described seeing a Hispanic man with a baby in front of the Wallace home at the time of the crimes, and having heard from April Wallace about her friend Rosie Alfaro, who was a "hype," Investigator Giffin approached them.  Ms. Alfaro identified herself and asked if she could speak to April Wallace.  She admitted to Investigator Giffin that she had been at the Wallace house earlier in the day, but denied involvement in the crime.

10.  The following day, the investigators went to Ms. Alfaro's home and asked her to accompany them to the Sheriff's Department to provide "elimination prints." Ms. Alfaro did so.  In response to the investigators' questions, Ms. Alfaro again denied involvement in the crime.  Later that day, Torres Graciano picked Ms. Alfaro up, and over the course of the next two weeks, stayed with her in several different motels.

11.  Based on the description of the Hispanic man with a baby provided by Susan Mata, a composite drawing of this suspect was prepared and distributed.

12.  On June 24, 1990, the investigators received information that a fingerprint found at the crime scene matched that of Ms. Alfaro.  On June 26, 1990, they obtained a warrant for her arrest.  Ms. Alfaro was arrested on June 27, 1990.

13.  The evening of her arrest, Ms. Alfaro was interrogated by Sheriff's Investigators Giffin and Bale for four hours.  Before questioning her, the investigators had a nurse draw blood.  The blood test established that Ms. Alfaro was

14

1  under the influence of cocaine, benzoylecconine and morphine.  The investigators

2  observed numerous hypodermic needle marks on Ms. Alfaro's arms and neck.  In

3  response to their questions, Ms. Alfaro admitted that she was addicted to both heroin

4  and cocaine.  CT 507.

5        14.  Almost immediately after the interrogation began, Ms. Alfaro admitted

6  entering the Wallace home to "take something" and to stabbing Autumn Wallace.

7  CT 509-510.  She told them she arrived in Little TJ at approximately 11:00 a.m. or

8  12:00 p.m., where she obtained "speedballs" consisting of heroin and cocaine, which

9  she and a woman named Sabrina injected.  She told them that shortly thereafter, she

10  headed out for more drugs, and ran into a man named "Shorty" who agreed to give

11  her drugs if she let him use her "rig."  She told the Investigators that Shorty later

12  accompanied her to the Wallace house.  She told them that he was the one in the

13  composite drawing that they were looking for and that he had been nearby when they

14  arrested her.  She said they got a ride to the Wallace house from a Mexican guy, about

15  30 years old, who she claimed she had never seen before.  She described his car

16  as being like a blue Camaro, which the investigators knew was untrue as Susan Mata

17  had seen a brown Monte Carlo in the Wallace's driveway at the time of the crimes.

18  Investigator Giffin concluded that Ms. Alfaro knew who the driver was, but would

19  not reveal his identity.  RT 1156.

20        15.  Ms. Alfaro stated that she knocked on the Wallace's door and when

21  Autumn answered, asked if she could use the bathroom.  Meanwhile, she said,

22  "Shorty had my baby."  CT 525.  Ms. Alfaro repeated several times that at the time

23  she entered the house she was "really wired, really coked out and stuff."  CT 526.

24  The following exchange then occurred:

25          Giffin:            Autumn knew who you were and the only way you could rip

26                                off and get away with it was kill Autumn, is that right?

        Alfaro:            Yes.

27

28

| | | |
|---|---|---|
| 1 | Giffin: | Now those words came out of my mouth cause that's why I think you did it.  I don't know, did I just put that idea in your head?  Did you think about that before? |
| 2 | | |
| 3 | Alfaro: | Before what? |
| 4 | * * * | |
| 5 | Giffin: | So when did you really first think about killing Autumn? |
| 6 | Alfaro: | What do you mean? |
| 7 | Giffin: | Well, you could . . . |
| 8 | Alfaro: | . . . when I was at Juan's apartment? |
| 9 | Giffin: | When you were at Juan's apartment? |
| 10 | Alfaro: | Yeah. |
| 11 | Giffin: | That's when you really thought about it the first time? |
| 12 | Alfaro: | Uh-hum.  Well, I didn't think of killing her, I just thought of just going over there and I was just gonna get something and put it in my purse or something and walk out. |
| 13 | | |
| 14 | Giffin: | Okay.  But in the back of your mind over at Juan's apartment, I mean, this had to be half hour, maybe an hour before you went over there, wasn't it? |
| 15 | | |
| 16 | Alfaro: | When? |
| 17 | Giffin: | When you were at Juan's apartment and you were thinking about going over to Autumn's house . . . |
| 18 | Alfaro: | . . . uh-huh. |
| 19 | Giffin: | . . . to rip them off. |
| 20 | Alfaro: | I didn't plan on killing her. |
| 21 | Giffin: | But you thought about it? |
| 22 | Alfaro: | No.  I thought of going there and taking things. |
| 23 | * * * | |
| 24 | | |
| 25 | Giffin: | Now, you're inside the house.  Now, are you sure you didn't think about it before you got over there?  Truthfully? |
| 26 | Alfaro: | What do you mean, before? |
| 27 | Giffin: | Before you got over to Autumn's house?  Truthfully now?  Let's be honest with each other. |
| 28 | | |

16

| | | |
|---|---|---|
| 1 | Alfaro: | I know, I don't know. |
| 2 | Giffin: | You didn't think about killing Autumn before you got inside the house? |
| 3 | | |
| | Alfaro: | No. |
| 4 | | |
| | Giffin: | Once you got inside the house, when did you first think about it? |
| 5 | | |
| 6 | Alfaro: | When, when I got there.  Just thought about it. |
| 7 | Giffin: | When you got there, where? |
| 8 | Alfaro: | In the bathroom.  And I was going towards, when I was like there. |
| 9 | | |
| | * * * |
| 10 | | |
| | Giffin: | So that's why you opened the drawer because you knew that's where the knives were and you needed something to kill her with, is that right?  Don't let me put words in your mouth.  I wanna hear it from you. |
| 11 | | |
| 12 | | |
| 13 | Alfaro: | Yes. |
| 14 | Giffin: | After you got the knife, tell me some more. |
| 15 | Alfaro: | Tell some more what? |
| 16 | Giffin: | Where did you go? |
| 17 | Alfaro: | After I got the knife?  I'm in the bathroom. |
| 18 | | * * * |
| 19 | Giffin: | . . . Rosie, I haven't heard it from you.  I told you why I thought you stabbed her.  You tell me why. |
| 20 | | |
| | Alfaro: | Cause she knew who I was? |
| 21 | | |
| | Giffin: | Sounds like a question.  It sounds like you're asking me a question. |
| 22 | | |
| 23 | Alfaro: | Cause she knew who I was. |
| 24 | Giffin: | You got some things you wanna ask her Gary? |
| 25 | CT 569-571. | |

26        16.  From other questions posed to Ms. Alfaro during the interrogation, it is

27 clear that the investigators believed that another person and not just Ms. Alfaro was

28 involved in the murder of Autumn Wallace.  *See, e.g.*, CT 600 (Bale: "Well we know

the guys were involved in stealing the property and we know that they knew that that's what they were doing.  Right?  Come on.  They knew exactly what was going on.").  Giffin and Bale repeatedly asked her whether there was someone she was afraid of or was protecting.  *See, e.g.* CT 534, 543, 554, 582.  Although Investigator Giffin testified at the preliminary examination that during the interrogation he gave Ms. Alfaro every opportunity to tell him who else was involved, and that she insisted that she had acted alone, a close reading of her statement does not support this testimony.  *See, e.g.*, CT 543 (Giffin: "Well, there's some areas that you didn't tell me everything.  I'm sure my partner can review his notes and tell you about it, but you know what, I'd rather they come from you without us prompting you do to it."  Alfaro: "About the, the microwave?"  Giffin: "We kind of skipped over that, didn't we?  Pretty heavy microwave, isn't it?  Tell me about that."  Alfaro: "Well, we didn't take it.  But then, that's when the guy said that, that things didn't fit in the car.  I don't really . . . I thought all the time he had it and then he told me when we were in the car, when we already on the way, he told me he didn't and that he left it there."  Giffin: "So he was really inside the house, wasn't he?").  *See also* CT 534; RT 1640-45 (Ms. Alfaro testified that someone else came in the house).  While Ms. Alfaro clearly accepted responsibility for Autumn Wallace's murder and did not state that anyone else had stabbed Autumn, she stated that the driver had entered the house.  As will be shown below, though Ms. Alfaro clearly confessed to first degree murder with a special circumstance, nothing she said rules out the driver's knowing participation in the crimes.  The physical evidence is consistent with the theory that Ms. Alfaro was under the substantial domination of another when she stabbed Autumn Wallace and that she acted while under extreme duress.

  17. Meanwhile, Orange County investigators worked around the clock on the case, canvassing the neighborhood where Ms. Alfaro had met up with Reynoso and Torres Graciano.  On July 2, 1990, hearing that investigators had been asking questions about him, Reynoso contacted the Anaheim Police to turn himself in.

1   Also on July 2, 1990, the Investigators learned from Torres Graciano's sister, Isabel
2   Torres, that Torres Graciano had left for Mexico earlier that day. *See* Exhibit 1
3   (Declaration of Ms. Alfaro's Habeas Investigator Raymond McGrath and exhibits
4   cited therein).

5          18.   On July 3, 1990, the investigators obtained a Department of Motor
6   Vehicles picture of Manuel Torres Graciano.  Investigator Bales proceeded to paste
7   a copy of Torres Graciano's picture in his crime book.  On July 5, the investigators
8   showed pictures of Torres Graciano to Sabrina Duran, who confirmed that the man
9   in the picture, Torres Graciano, had been present at Juan's apartment with Ms. Alfaro
10  on June 15, 1990; that he was Ms. Alfaro's "boyfriend", and that he drove a brown
11  Monte Carlo.

12         19.   Curiously, Investigator Giffin's "Investigative Overview," dated
13  November 7, 1990, contains no mention of Torres Graciano.  Nor does it disclose
14  any efforts made to identify the man who had driven Ms. Alfaro and Mr. Reynoso
15  to the Wallace home on June 15, 1990, efforts that are referenced elsewhere, though
16  they appear to have come to an abrupt halt after the investigators learned that Torres
17  Graciano had left the country.

18         20.   Throughout the trial court proceedings, both Ms. Alfaro and Mr. Reynoso
19  maintained their silence as to Torres Graciano's identity as the man who drove them
20  to the Wallace home.

21         21.   Shortly after her arrest, Ms. Alfaro told her mother that she wanted to
22  plead guilty.  She also told her attorney, repeatedly, that she wished to plead guilty
23  to the crimes.  She did not wish to commit state assisted suicide.  Rather, she sought
24  to proceed to the penalty phase of the trial, where her acceptance of responsibility
25  could serve as concrete evidence of her remorse.  However, her attorney, William
26  Monroe, would not consent to a guilty plea.  Instead, he insisted, over Ms. Alfaro's
27  strenuous objection, on arguing that the driver of the Monte Carlo, who he

28

1  erroneously identified as Roberto "Beto" Frias Gonzalez ("Frias Gonzalez"), and not

2  Ms. Alfaro, was responsible for Autumn Wallace's death.

3      22. Ms. Alfaro's trial jurors were sworn on March 3, 1992. Jury deliberations

4  began on March 23rd. The jury reached a guilt phase verdict within four hours. The

5  jury found Ms. Alfaro guilty of the charges and found the allegation that she had used

6  a knife and had committed the murder in the course of a first degree burglary and a

7  robbery to be true.

8      23. The penalty phase began on March 30, 1992. The prosecution rested after

9  introducing a photograph of Autumn when alive. RT 1441. The defense called a

10  number of witnesses, who testified in cursory fashion as follows:

11          a. Manuel Cuevas, Ms. Alfaro's common law husband, testified that she

12  was the loving and caring mother of four children, two of them twins born after her

13  arrest in this case. RT 1445-50. After her arrest, Ms. Alfaro continued to express

14  concern for the children and to write and talk to them. RT 1448.

15          b. Janell Laird, a friend who had known Ms. Alfaro since pre-school,

16  testified that Ms. Alfaro's father was an alcoholic who often vomited in front of them

17  (RT 1458, 1464), and that he hit his wife and Ms. Alfaro. RT 1465. Ms. Laird was

18  afraid of Ms. Alfaro's father, who eventually abandoned the family. Ms. Laird

19  testified that Ms. Alfaro was in the sixth grade when she started to use drugs. RT

20  1457. Despite her own problems, Ms. Alfaro wrote Ms. Laird from jail and told her

21  the importance of staying away from drugs and living a law-abiding life. RT 1460.

22  During one telephone call from jail, Ms. Alfaro told Ms. Laird that Autumn Wallace

23  did not deserve to die and that she never planned on hurting her. RT 1468, 1472.

24          c. Tamara Benedict, Ms. Alfaro's childhood neighbor, remembered

25  Ms. Alfaro's father as a violent alcoholic. RT 1488. She testified that Ms. Alfaro

26  dropped out of school in seventh grade, at which time she started running away and

27  shooting up "speed balls," a mixture of heroin and cocaine, up to 50 times a day.

28  RT 1483-84. Ms. Alfaro often told Ms. Benedict that she wanted to quit drugs,

20

but was unable to overcome the addiction she had developed to them.  RT 1486.
Sometimes, Ms. Alfaro slept with her drug dealers in order to get her drugs.
RT 1499.  She tried to clean up many times and was able to get temporary jobs.
RT 1487.  Since being incarcerated, Ms. Alfaro had written several letters to
Ms. Benedict expressing sorrow for what she had done.  RT 1490.

        d.  Sylvia Alfaro, Ms. Alfaro's's mother, testified that she worked 10
to 14 hours per day and sometimes seven days a week.  RT 1506.  She testified
that her husband, Ms. Alfaro's father, was an alcoholic, often hit her in front of the
children, and threw the family out of the house during drunken rages.  RT 1506-07,
1509.  She testified that Ms. Alfaro started skipping school at age eleven.
RT 1511-12.  Mrs. Alfaro realized that her daughter had a drug problem at age twelve
and began counseling with her three to four times a week.  RT 1515.  When
Ms. Alfaro was thirteen, she became a prostitute as a means of supporting her drug
habit.  RT 1516-17.  Mrs. Alfaro sent her to live in Mexico with her grandmother,
but the grandmother sent her back to Anaheim five months later.  RT 1518.  After her
return, her mother often found Ms. Alfaro on the streets dirty, hungry, and shoeless.
RT 1519.  Ms. Alfaro's father refused his wife's pleas for help with their daughter
and finally abandoned the family when Ms. Alfaro was fourteen; the same year
Ms. Alfaro became pregnant with her first son, Danny.  RT 1511, 1520.

        e.  Mrs. Alfaro testified that at one point she was able to put her daughter
into a drug rehabilitation/detoxification program, but Ms. Alfaro was unable to stay
more than ten days because her insurance coverage expired.  RT 1521.  Three months
after her first son Danny was born, Ms. Alfaro returned to the use of drugs.  RT 1523.
Her mother saw the needle marks on her arms, but did not kick her out of the house
because she loved her.  RT 1525.  On one occasion, Mrs. Alfaro chased her daughter
down the street and threw her to the ground in an effort to talk to her, but a 38 year
old woman named "Betsy" threatened to call the police unless she left Ms. Alfaro

1    alone.  RT 1527, 1528.  Mrs. Alfaro testified that on that occasion, her daughter cried
2    and asked her for help.  RT 1527.

3              f.  Mrs. Alfaro testified that she often took Ms. Alfaro's children to visit
4    her at the jail and would continue to do so if Ms. Alfaro received a sentence of life
5    imprisonment without the possibility of parole, and that she did not want to see her
6    little girl die.  RT 1530.

7              g.  Dolores Onofre, who had known Ms. Alfaro since she was a small
8    child, recalled Ms. Alfaro's father as a drunk who was violent in front of the children
9    and threatened to kill his wife.  RT 1552-53.

10             h.  Betty Cleary, a manager at a McDonald's restaurant where Ms. Alfaro
11   had worked, recalled her as dependable, congenial, and a good employee.  RT 1540.

12             i.  Sylvia Archuleta, who worked for a Christian program called "Teen
13   Challenge," testified that she met Ms. Alfaro at the Orange County Jail.  RT 1558.
14   She testified that Ms. Alfaro often broke down crying and expressed sorrow for the
15   grief she had caused Autumn Wallace's family.  RT 1560.

16             j.  Norman Morein, a sentencing consultant, testified that Ms. Alfaro had
17   adjusted satisfactorily at the county jail and that her confrontation with an inmate
18   there was natural and expected behavior.  RT 1920.  Mr. Morein further testified that
19   Ms. Alfaro expressed genuine remorse and sorrow for the crime (RT 1922), and that
20   she had become religious since being incarcerated.  RT 1923.  Mr. Morein opined that
21   Ms. Alfaro could have a positive influence on people if allowed to live.  RT 1927.

22             k.  Dr. Armando Morales, a sociologist, testified that Ms. Alfaro had
23   a relatively stable childhood to age five.  RT 1823.  Thereafter, she was abused by her
24   violent and alcoholic father (RT 1826); was raped at age nine by her father's friend
25   (RT 1867); experienced racism at school (RT 1823); and suffered the ravages of drug
26   abuse.  RT 1825.  According to Dr. Morales, Ms. Alfaro developed emotional
27   problems, including depression associated with trauma, which contributed to her self-
28   medication in the form of substance abuse.  RT 1826-27.  He testified that because

of her very early childhood, she was able to develop close attachments and be a positive influence on others.  RT 1828-34.  Dr. Morales testified that Ms. Alfaro felt remorse and empathy for the victim and her family.  RT 1828.

l.  Finally, after receiving assurances from her trial counsel that she would not be questioned about the circumstances of the crime but would only be questioned about her background, Ms. Alfaro testified.  She provided the jury with a general account of her unhappy home life (RT 1594), her violent and alcoholic father (RT 1595-99), the racial prejudice she suffered at school, (RT 1599-00), and her problems with substance abuse.  She testified that she began to use hard drugs in the sixth grade.  She was introduced to them by a woman named Betsy who, after Ms. Alfaro became addicted, forced her to prostitute herself to get drugs.  RT 1602-27, 1653-62, 1666-73.  She testified she had also stolen property to get money to pay for drugs.  Ms. Alfaro described the depth of her drug addiction and her mother's efforts to get her into a drug rehabilitation program.  RT 1620.  She also expressed her sorrow and remorse for the death of Autumn Wallace, to whom she read a letter in which she had written, "I'm sorry we took your innocent life."  RT 1629-31, 1651.

24.  Although Ms. Alfaro's attorney had planned to avoid cross-examination about the crime by limiting his direct examination of Ms. Alfaro to her background and remorse,  the court ruled that the door had been opened when Ms. Alfaro read the letter she had written to Autumn Wallace (which defense counsel had reviewed before asking her to read it on the stand), and permitted extensive cross-examination about the circumstances of the crime.  During this cross-examination, for which she was wholly unprepared, Ms. Alfaro admitted that she had murdered Autumn Wallace.  When asked whether it was true that she had told the defense psychiatrist that the man there with her was "Beto", she stated that this was true, but later stated that "Beto" had in fact done "nothing."  RT 1633-35.  When asked later whether the "third party that was in the house" had forced her to stab Autumn Wallace, she answered, "Yes, he did . . . He was threatening me."  RT 1636.  She said she believed he would harm

23

her."  RT 1735.  She testified that she had used cocaine and heroin shortly before
going to the house and was "out of her head" when she got there.  RT 1725-29.  She
stated that when she came down from her drug high, she could not believe that
Autumn was dead.  RT 1740.

25.  Following arguments and instructions, the issue of the penalty was
submitted to the jury.  RT 2113.  They could not, however, arrive at a unanimous
verdict.  The trial court declared a mistrial on April 8, 1992.

26.  On April 9, 1992, one day after the mistrial was declared and outside the
presence of the prosecution, Ms. Alfaro made a motion for substitute counsel.
RT 2119-2149.  Ms. Alfaro explained to the trial judge that her lawyer had insisted
on blaming "Beto" over her objection, and that she no longer trusted her lawyer
because he had lied to her about the scope of her cross-examination.  She stated
that Mr. Monroe  "misrepresented to me, he lied to me, about going on the stand.
I thought there was never going to be any cross-examination from what he had told
me and there was ...  He's been wanting me to do things I never wanted to do.  He
still goes ahead and does them."  RT  2119-20 (April 9, 1992 proceedings).
Mr. Monroe confirmed, "Miss Alfaro feels that basically I betrayed her."  *Id.* 2120.
Ms. Alfaro described other conflicts that had arisen between them, and her own sense
of helplessness as a result.  The court denied the motion.  *Id.* 2149.

27.  The case received substantial print and television coverage during the trial.
Particularly during and after the jury hung in the penalty phase, both the Orange
County Register and the Los Angeles Times printed highly inflammatory articles.
*See, e.g.*, Exhibit 42.  As a result, the defense filed a motion for a change of venue for
the penalty retrial, which the court denied.

28.  A second jury was empaneled on May 11, 1992.

29.  At the penalty re-trial, the prosecution presented the majority of the
witnesses it had presented during the guilt phase of the first trial, which provided the
newly empaneled jury with evidence of the circumstances of the crime.  RT 3196.

24

1    The prosecutor also had an employee of the district attorney's office read portions

2    of Ms. Alfaro's cross-examination from the first penalty trial. RT 3630-31. Although

3    offered the opportunity by the trial judge, defense counsel declined to introduce other

4    portions of Ms. Alfaro's testimony at the first penalty trial, in which she had

5    expressed her remorse and provided factual information about her violently abusive

6    childhood as well as other mitigating evidence.

7        30.  In the defense case, Mr. Monroe attempted to convince the jury that the

8    Hispanic man who had driven Ms. Alfaro to the Wallace home, and not Ms. Alfaro,

9    had killed Autumn Wallace. He called Marc Taylor, a criminalist retained as an

10    expert by the defense, to testify that he had examined various items of evidence,

11    including pieces of clothing, bloodstained flooring, shoe prints, blood spattered

12    furniture, a bloodstained towel, plastic casts of shoe prints found outside the Wallace

13    house, men's and women's LA Gear tennis shoes, boots and sandals. RT 3762. He

14    testified that some of the shoe prints found inside and outside the house did not match

15    defendant's LA Gear shoes. RT 3766. Mr. Taylor testified that he had conducted

16    experiments with a red lotion liquid and knives in order to analyze the patterned

17    bloodstains on the towels. RT 3770. He concluded that the blood stains on one

18    of the towels were caused by wiping a knife other than Exhibit 61, the paring knife

19    found at the scene. RT 3774-75, 3815-17. Mr. Taylor conceded, however, that

20    examining blood swipes was not an exact science and that the patterns could have

21    been caused by wiping a belt or shoe. RT 3803-10.

22        31.  Kenneth Harer, a deputy sheriff at the Orange County Jail, testified that

23    he identified a man named "Beto" who resembled the suspect depicted in a flier

24    posted after Autumn Wallace's death. RT 3842. The same man was seen by Harer

25    entering a blue Camaro. RT 3843. Monroe had argued to the jury in the first trial,

26    and continued to argue in the second penalty phase, based on this evidence alone, that

27    this was the man who was responsible for killing Autumn Wallace.

28

32.  Mr. Monroe also presented most of the witnesses who had testified on behalf of Ms. Alfaro at the first penalty trial, as well as the following witnesses:

a.  Toby Silver, a registered nurse on the mental health team of the Orange County Jail during Ms. Alfaro's incarceration there, testified that during clinical sessions, Ms. Alfaro manifested signs of depression and low self-esteem, expressed remorse for her crimes and stated that she missed her children. RT 3825-31.

b.  Gerardo Rangel, a bilingual paraprofessional who knew Ms. Alfaro at Ball Junior High School, testified that he met with her mother regarding her absenteeism and performance problems at school.  RT 3886.  Mr. Rangel was unsuccessful in helping Mrs. Alfaro enroll her daughter in drug rehabilitation programs because Mrs. Alfaro was not capable of paying the required fee. RT 3887-88.

c.  Albert Lopez, a minister with "Gleaners," testified that he visited with Ms. Alfaro approximately 20 to 25 times at the Orange County Jail and that he believed she was sorry for the crime.  RT 3915.  On one occasion, Ms. Alfaro broke down and cried, and Lopez believed her sorrow to be genuine.  RT 3916-17.

d.  Finally, the defense presented Dr. Consuelo Edwards, a medical doctor from Spain, as a mental health expert witness.  RT 4032.  Dr. Edwards described Ms. Alfaro's childhood and life to the point of her incarceration at age eighteen, including her abusive father; her drug use (RT 4061); her multiple pregnancies (RT 4062); her limited but acceptable work as an employee at McDonald's (RT 4063); and her relationship with the father of three of her four children.  RT 4063.  Dr. Edwards described Ms. Alfaro's borderline intellectual functioning, her low IQ of 78, give or take five points, and her learning disabilities which were exacerbated by her traumatic experiences as a child.  RT 4068-73. Dr. Edwards described testing she had done which suggested the possibility of organic brain damage on the right side of Ms. Alfaro's brain, although she

1  admitted that the test she had relied upon did not establish such damage.  RT 4079.

2  According to Dr. Edwards, Ms. Alfaro's low impulse control was further

3  compromised under the influence of drugs.  RT 4074.  She testified that Ms. Alfaro

4  was a passive and dependant person who considered herself unimportant and

5  followed others.  RT 4084-85.

6       e.  For the most part, Monroe used Dr. Edwards to tell the story of the

7  crime that she had extracted from Ms. Alfaro at Monroe's request.  Dr. Edwards

8  testified that Ms. Alfaro had confessed to her that she killed Autumn Wallace, and

9  had recounted the sequence of events preceding the murder (RT  4040-46), but had

10  refused to answer Dr. Edwards' questions regarding the unidentified Hispanic man,

11  other than to say that he was a friend of her father's named "Miguel."  RT 4046.  She

12  testified that Ms. Alfaro told her that the man threatened to harm both her and her

13  baby unless she killed Autumn.  RT 4052-54.  She testified that Ms. Alfaro told her

14  she remembered stabbing Autumn four or five times before running from the room.

15  RT 4054-55.  She testified that Ms. Alfaro told her she did not plan to kill Autumn.

16  RT 4058.  Dr. Edwards described how in a later interview she confronted Ms. Alfaro

17  with the fact that she -- Dr. Edwards -- had been shown a picture of a man named

18  "Beto," not Miguel, who had been identified by the defense lawyer and investigator

19  as the man seen outside the Wallace house, and that Ms. Alfaro then agreed that the

20  man was named "Beto."  RT 4060.  She testified that Ms. Alfaro expressed great

21  sorrow for the crime.  RT 4075.

22       f.  Dr. Edwards opined that at the time of the crime, Ms. Alfaro was

23  legally sane but was suffering from an ongoing organic mental disorder, namely

24  under the influence of drugs -- either intoxication or withdrawal.  RT 4091, 4103.

25  Additional diagnoses included Attention Deficit Disorder, Learning Disabilities,

26  a Conduct Disorder characterized by childhood anti-social behavior, Adjustment

27  Disorder characterized by anxiety and depression, and a Dependent Personality

28  Disorder.  RT 4092-97.  Dr. Edwards further opined that Ms. Alfaro was not

27

1   malingering (RT 4095, 4211, 4126-38), and that she possessed the potential for

2   change and improvement.  RT 4194.

3        33.  From May 23, 1992, the Orange County Women's Jail classified

4   Ms. Alfaro for a housing change due to the need for "acute mental health care."

5   CT 1745-46.  On May 30, 1992, an entry was placed in her "jacket" indicating that

6   she no longer needed "mental health care of that nature."  *Id.* 1746.  On June 2, 1992,

7   Ms. Alfaro waived her right to testify at the second penalty trial.  CT 1556.  At no

8   time did Monroe ask the court to have Ms. Alfaro's competency to proceed with trial

9   evaluated.

10        34.  The following witnesses testified during the prosecution's rebuttal case:

11        a.  One Orange County Jail employee testified that he had seen

12   Ms. Alfaro strike another inmate.  RT 4250.  Other jail employees testified to hearing

13   her comment "I'm a frustrated person who takes things out on people, and have to

14   learn to live with that," (RT 4249), and "I'm not going to be able to do this again.

15   I'm no actor.  I'm going to be cold this time.  I just want to get this over with."

16   RT 4253.

17        b.  Sheriff's Department Investigators Harper and Giffin also provided

18   rebuttal testimony in order to refute the defense claim that Robert Frias Gonzalez was

19   the "Beto" identified outside the Wallace home, based on a specific tattoo he had on

20   his neck (RT 4259), and to establish that defense witness Lopez had stated he was

21   going to marry Ms. Alfaro when her trial was over.  RT 4260.

22        c.  Finally, in an attempt to establish that Ms. Alfaro was "malingering,"

23   the prosecution called defense consulting psychologist Martha Rogers, who was

24   questioned by the district attorney about the meaning of the phrase "probable fake

25   bad," which she had purportedly noted during her examination of Ms. Alfaro's MMPI

26   raw test data.  RT 4267.  Dr. Rogers told the district attorney that "malingering was

27   one possible interpretation."  Inexplicably, defense counsel failed to ask her about the

28   others.  *See* Exhibit 2 (Declaration of Martha Rogers).

35. After argument and instructions, the issue of penalty was submitted to the jury. On June 9, 1992, after deliberating for five days, the jury returned a verdict of death. CT 1584.

36. On June 14, 1992, the trial court denied Ms. Alfaro's automatic motion for a reduction of the sentence from death to life without the possibility of parole pursuant to Penal Code § 190.4(e) and her motion for a new trial pursuant to Penal Code § 1181(7) and sentenced her to death.

# CLAIMS FOR RELIEF

## VI.

## CLAIM 1: PETITIONER WAS DEPRIVED OF HER RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR AND RELIABLE DETERMINATION OF GUILT AND PENALTY BY TRIAL COUNSEL'S DEFICIENT PERFORMANCE

The convictions and sentence of death were rendered in violation of Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because Petitioner's trial counsel rendered constitutionally deficient representation at all critical stages of the criminal proceedings.

1. Exhaustion of the claim: Most of the subsections of this claim were fairly presented as Claim 1 in the habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no. S099569. Additional subsections have been included and are pending before the state supreme court.

2. Antiterrorism and Effective Death Penalty Act ("AEDPA"): The claim was rejected by an Order of the California Supreme Court dated November 18, 2007. Because the state court's denial of this claim is both "contrary to" and an

1    "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d),

2    the federal courts must resolve the claim *de novo*.  Moreover, because the state

3    court's adjudication of this claim was dependent on an antecedent unreasonable

4    application of federal law, this Court "must then resolve the claim without the

5    deference that AEDPA otherwise requires." *Panetti v. Quarterman*, ___ U.S. ___,

6    127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007).  The state court denied this claim

7    without an opinion, and without affording Petitioner an evidentiary hearing,

8    discovery, or any other means to further develop his claim.  When there is

9    no reasoned state court decision denying an issue presented to the state court and

10   raised in a federal habeas petition, this Court must perform an independent review of

11   the record to ascertain whether the state court decision was objectively unreasonable.

12   *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*,

13   400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial was objectively

14   unreasonable.

15        3.  If Respondent disputes any of the facts alleged below, Petitioner requests

16   an evidentiary hearing so that the factual disputes may be resolved. After Petitioner

17   has been afforded discovery and the disclosure of material evidence by the State, the

18   use of this Court's subpoena power, and the opportunity to investigate fully, counsel

19   requests an opportunity to supplement or amend this petition.

20        4.  The declarations and other exhibits filed with this petition, as well as the

21   allegations and facts set forth elsewhere in this petition, are hereby incorporated by

22   reference into this claim as though set forth in full.

23        5.  In support of each claim of ineffective assistance of counsel below,

24   Petitioner alleges the following facts, among others to be presented after full

25   discovery, investigation, adequate funding, access to this Court's subpoena power,

26   and an evidentiary hearing:

27   / / /

28   / / /

## A.     INTRODUCTION

6.  Trial counsel unreasonably failed to conduct a timely or adequate investigation of the potential guilt and penalty phase issues, did not develop or present a coherent trial strategy, and was unable to make informed and rational decisions regarding potentially meritorious defenses and tactics.  Ms. Alfaro's counsel's errors and omissions were such that a reasonably competent attorney acting as a diligent and conscientious advocate would not have performed in such a fashion.

7.  Reasonably competent counsel handling a capital case at the time of Ms. Alfaro's trial knew that a thorough investigation of the prosecution theories of guilt, independent analysis of the physical evidence supporting those theories, and possible objections to the introduction of such evidence was essential to the development and presentation of a defense at trial.  Reasonably competent counsel handling a capital case at the time of Petitioner's trial knew that where the defendant has fully confessed to the crime, a timely and thoroughly prepared suppression motion must be filed, and that in the event that the motion is unsuccessful, this must be taken into account in determining trial strategy.  Reasonably competent counsel handling a capital case at the time of Petitioner's trial knew that a thorough investigation of the defense theories, including any legal bar to such theories, the physical evidence that may or may not support those theories, and possible obstacles to the introduction of evidence to support those theories was essential to the development and presentation of a defense at trial.

8. Reasonably competent counsel handling a capital case at the time of Petitioner's knew that defense experts require referral questions that enable them to perform within the scope of their expertise.  Reasonably competent counsel handling a capital case at the time of Petitioner's trial knew that a change of venue motion should be filed when the victim's family members work for the court where the matter would otherwise be heard and there had been extensive inflammatory pretrial publicity concerning the matter in that locality.  Reasonably competent

31

counsel knew that a defendant has a constitutional right to make the fundamental decision as to how to plead and that absent evidence that the defendant is incompetent -- in which case an evaluation of competency to stand trial should be performed -- or evidence that the defendant merely wishes to commit state-assisted suicide, the client's desire to be permitted to plead guilty should be honored. Reasonably competent counsel know that when a client will not communicate with counsel or assist in her own defense, her competency should be questioned and/or counsel should advise the client to seek substitute counsel and move to withdraw.

9.  Reasonably competent counsel handling a capital case at the time of Ms. Alfaro's trial knew that a thorough investigation of the role his client played in the crime, her background and family history, including her academic, social, medical, and institutional history, was essential to the adequate preparation of both guilt and penalty phase defenses.  Reasonably competent counsel knew that a plea of guilty can serve as mitigating evidence and that a client will not automatically suffer the death penalty if she enters such a plea.

10.  Counsel's failures to investigate adequately and present defenses and protect Petitioner's statutory and constitutional rights prejudiced the defense.  But for counsel's unprofessional errors, the result of the proceeding would have been different.

**B.    COUNSEL'S FAILURE TO PERMIT PETITIONER TO PLEAD GUILTY DESPITE HER DESIRE TO DO SO[5]**

11.  Trial counsel acted unreasonably in withholding his consent to Ms. Alfaro's entry of an unconditional guilty plea despite her desire to enter such a plea and proceed to the penalty phase, where her guilty plea would have constituted concrete evidence of her acceptance of responsibility and remorse.  In so doing, he

---

[5]  As set forth in Claims 1.B. and C., counsel's withholding of his consent to plead guilty constituted an actual conflict of interest that adversely affected his performance, which requires no proof of prejudice.  To the extent the Court finds the absence of a conflict, his actions constitute ineffective assistance of counsel.

1   deprived Ms. Alfaro of her right to make decisions involving her fundamental right to

2   decide how to plead and what defense to present, and all other rights included in the

3   Sixth Amendment right to self-representation and right to effective representation,

4   Fifth Amendment right to due process, Eighth Amendment right to reliable

5   sentencing, and Fourteenth Amendment right to due process.  Ms. Alfaro did not

6   want to commit state-assisted suicide.  She wanted to plead guilty in order to advance

7   her penalty phase defense.  Because she was denied this universally recognized

8   mitigating evidence of her remorse for her crimes, habeas relief is warranted.

9        12.  On June 27, 1991, the day of her arrest, Ms. Alfaro agreed to be

10  interviewed by law enforcement officers without counsel present.  Less than five

11  minutes after having been read her *Miranda* rights, Ms. Alfaro admitted that she

12  stabbed Autumn Wallace.  CT 509-10.  During the nearly four hours of questioning

13  that followed, Ms. Alfaro repeatedly confessed to stabbing Autumn Wallace and

14  described in detail the circumstances of the crime, including her intention to steal

15  property when she went into the Wallace home.  CT 504-603.  She admitted knowing

16  that the wounds she inflicted could cause death.  CT 577.

17       13.  Ms. Alfaro told her mother shortly after her arrest that she wanted to plead

18  guilty and consistently maintained throughout her pretrial incarceration and trial that

19  she wanted to plead guilty.  Exhibit 3 (Declaration of Silvia Melendez Alonso).  She

20  further told her mother that she wanted to present a penalty phase defense.  *Id*.

21       14.  Ms. Alfaro also told her attorney William Monroe that she wanted to plead

22  guilty unconditionally and did not want him to argue that someone else was

23  responsible for Autumn Wallace's death.  *See, e.g.*, RT 106-23 (February 21, 1992

24  proceedings).  She did not want to die; she wanted to present a strong penalty phase

25  defense.  Exhibit 4 (Declaration of Maria del Rosio Alfaro).

26       15.  On February 20, 1992, eleven days before jury selection was to begin,

27  Mr. Monroe sought guidance from the court concerning the conflict that had arisen

28  between himself and Ms. Alfaro regarding her desire to plead guilty and his refusal to

33

consent.  In a "request for special instructions" filed *in camera*, he informed the court, "[m]y client . . . refuses to follow my instructions and take the stand and implicate 'Beto'. . . .  If my client insists on pleading guilty to the special circumstances, it is against my most rigorous advice.  I am requesting instructions from the court as to whether or not the court believes it is necessary for me to withdraw from the case at this late stage or whether or not I should remain on the case."  CT 355.

16.  The following day, February 21, 1992, the court met with defense counsel and Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992 proceedings).  During the discussion that ensued, defense counsel described an "out and out conflict" between himself and Ms. Alfaro regarding her desire to plead guilty and his "wish to proceed to trial on the guilt phase":

> The Court:  You've asked the court for some instructions here and I'm not really in a position to give any instructions concerning your relationship vis-a-vis your client.  No one has made a motion to be relieved.  No one has made a motion to have substitute counsel.  So there is really nothing — there is really nothing before, properly before the court, to consider that.
>
> So you have expressed some concerns here and I don't know if the purpose of this in-camera hearing is to allow you to put on the record what your concerns are and make sure your client understands certain rights she has or what we are doing.
>
> Mr. Monroe:  . . . Your Honor, I believe I'm asking the court to give me a lead or advice as to whether or not the court believes I should declare a conflict because I believe that a conflict may exist.  I wish to proceed to trial on the guilt phase.  I wish to call Shorty, one of the witnesses, and that Beto who we believe is the other killer.
>
> My client has adamantly, adamantly refused to allow me to call Beto or to cross examine Shorty regarding his relationship with Beto . . . because my client has told me she is in absolute fear of her safety and she's in absolute fear of the safety of her family should it become known to Beto that we in some way, shape, or form, for lack of a better term, have given him up. . . .  I'm concerned, Your Honor, if I proceed the way I want I'm placing my client's life and her family's lives in jeopardy according to my client.  If I proceed the way my client wants to proceed, it's against my vigorous, vigorous advice because she wants to plead guilty to a special circumstance homicide where there is no evidence of a 211 circumstance --
>
> The Court:  She can't plead guilty without the consent of counsel.  That's Penal Code section 1018.  In a capital case the court doesn't have

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the authority to accept a guilty plea from a defendant without the consent of the attorney.

Mr. Monroe:  I, in good conscience could not consent.

The Court:  There could not be a guilty plea.

Mr. Monroe:  That's right.  However, my client insists on pleading guilty.

The Court:  She might insist on it.  The court is not going to accept any guilty plea on a capital case without the consent of the attorney.

Mr. Monroe:  Then my client turns around and tells me she does not want certain witnesses called or me to conduct the trial the way I think it should be conducted.  I have an out and out conflict.

The Court:  I'm not sure you do have an out and out conflict that would justify your being taken off the case.  I think what you should do is basically what you are doing.  You should indicate where you disagree, make sure she understands that she's going against your advice, going against your desires, and that she consents to it and specifically has directed you to proceed in a certain fashion.

I'm not sure a lawyer is entirely quote "independent" from the best interests and desires of the client.  Basically, lawyers are really here to serve the client.

Mr. Monroe:  That's exactly the point.  But I can't turn around and say I consent to allow my client to plead guilty when I know she's pleading guilty for all intents and purposes to a death sentence.

The Court:  There is no problem with that.  If you don't want to consent to it, you don't have to consent to it.  But that doesn't cause any automatic conflict that would relieve you and put some other attorney in, not unless we are going to call up all of the attorneys in Orange County and see who would consent to somebody pleading guilty to a capital offense.  And I don't plan to do that.  And I am not sure you would find any, if any, that would do it if they were competent legal counsel.

Mr. Monroe:  . . . In effect she and I are at loggerheads.

The Court:  Well, you might be at loggerheads but that doesn't mean that you have a conflict of interest between the two of you that is of such magnitude that she is denied the right to effective assistance of counsel. She has instructed counsel what she wants to do.

Mr. Monroe:  And I cannot effectively represent her if I follow her instructions.

The Court:  Well, you cannot represent her the way you want to represent her.

Mr. Monroe:  So I'm suppose[d] to represent her incompetently then by not presenting a vigorous defense.

35

The Court:  No.

Mr. Monroe:  I cannot present the defense I need because she won't allow me to.

The Court:  You can't force her to testify. . . . That doesn't cause any conflict of interest. . . .

Mr. Monroe:  I cannot effectively represent my client at this stage in light of the instructions she has given me.

The Court:  You cannot represent her the way you want to represent her, but that doesn't mean you can't effectively represent her to the best of your abilities within the guidelines or parameters she has outlined for you.

Mr. Monroe:  Which is to put on a shallow bare-bones sham defense.

The Court:  . . . I don't know what you want to call it.  But she has an absolute right not to testify.
    And your whole defense, from what I read in this in-camera document, your whole defense is based on her getting on the stand and pointing the finger at somebody else.  And she is not going to do that, according to this, not unless she changes her mind.  And if she doesn't do it, it definitely handicaps your efforts to defend her.

***

The Court:  Bottom line.  Bottom line is clients have a lot of control over how a case is presented.  And the mere fact that you and her disagree over her getting on the stand might be a conflict in fact between you.  But it is not the kind of a — kind of conflict that is a legal conflict that would justify the court in appointing new counsel to represent her especially on the eve of trial.

    And this thing has been going on for a long time and apparently . . . you have been at loggerheads with her for some time.  I don't think this is the first time that you mentioned to me she didn't want to testify.

Mr. Monroe:  This is the first time I mentioned to you that she does not want to testify. . . . [T]his is the first time last week or on the 12th when she told me she wanted to plead guilty and did not want to testify.

The Court:  Well, the court cannot accept and will not accept a guilty plea from her without your consent under Penal Code section 1018.

Mr. Monroe:  I think as a minimum, Your Honor, we ought to have counsel appointed to advise her about the consequences of her act.

The Court:  I'm sure you have advised her of what the consequences of her not testifying are.

Mr. Monroe:  I certainly have.  However, maybe because of this conflict that she and I have, maybe an independent person should be talking to her.

36

1

2    The Court:  Well, you haven't raised anything in this paperwork that
     would indicate you are having a communication problem or that she is
     not understanding what you're saying or that somebody else would be
3    in a better position to do it. . . . You just basically have a basic
     disagreement over the tactics in defending her.

4    Mr. Monroe:  Its more profound than that.  It's a basic disagreement
     what she wants to do with her life.

5
     The Court:  But it is her life.  It's not your life.
6
     Mr. Monroe:  It's my obligation to look after her life.
7
     The Court:  That's right.  But it is your obligation to serve her to the best
8    you can within the ethical framework of being her attorney.  But we
     should never lose sight of the fact that it's her case.  She is a party to the
9    case.  She is the one that has the constitutional rights.  You don't have
     any constitutional rights in this case.
10
     Mr. Monroe:  She's a 20-year-old girl.
11
     The Court:  She is the one that has the constitutional rights.
12
     Mr. Monroe:  A 20-year-old child is going to plead guilty to a death
13   penalty?

14   The Court:  I don't know why you talk about pleading guilty.  There is
     no way she'll plead guilty without the consent of her attorney of record,
15   period.  You have indicated very clearly you don't consent to that.  So
     there isn't going to be a plea of guilty, period.
16
     Mr. Monroe:  You understand that Rosie--Miss Alfaro?
17
     The Defendant:  Then what am I going to do?  I told you what I wanted to do.
18
     Mr. Monroe:  What do you want to do?
19
     The Defendant:  Plead guilty.
20
     Mr. Monroe:  You put me in an absolute[ly] untenable position, Judge
21   Millard.

22   The Court:  That is what you think.  I don't think so.  You are no
     different than other lawyers that have a disagreement over tactics.
23   Cases are legion in the California courts that a mere disagreement
     over tactics does not justify -- is not a legal conflict from the standpoint
24   of such magnitude that will effectively deny the person their right to
     counsel.  There are all kinds of tactical conflicts that occur in cases
25   of criminal and civil cases.  That doesn't mean on the eve of trial all of a
     sudden we change attorneys and start the case all over again.  It just
26   doesn't happen that way.

27   ***

28   Mr. Monroe:  Pleading guilty is more than tactics.

                                    37

1

2      The Court:  As  I indicated, unless she can convince you to consent to
       her pleading guilty, there won't be any plea of guilty in the case.  So
3      I don't know what else to tell you.

4      RT 110-20 (February 21, 1992 proceedings).

5          17.  As  this transcript and the evidence filed herewith plainly demonstrate, it

6      was Ms. Alfaro's desire to enter an unconditional guilty plea.  She wanted to accept

7      responsibility for the crimes with which she was charged and proceed to the penalty

8      phase of her case, where she hoped that her guilty plea would demonstrate to the jury

9      that she accepted responsibility for the crimes and felt remorse for what she had done.

10     She did not want her lawyer to attempt to absolve her of responsibility by blaming

11     someone else for the crimes or to contest her guilt.  She did not want to commit state-

12     assisted suicide.  She wanted to present a strong penalty phase defense and hoped that

13     the jury would find that the mitigating circumstances outweighed the aggravating

14     circumstances and impose a sentence of life in prison without the possibility

15     of parole.

16         18.  If Mr. Monroe withheld his consent to Ms. Alfaro's entry of a guilty plea

17     because he believed she was incompetent to make the fundamental decision of how to

18     plead and defend against the death penalty in her capital case, then he unreasonably

19     and ineffectively failed to raise this issue before trial, and Ms. Alfaro so claims

20     herein.  At no time did Mr. Monroe ask the court for or obtain an evaluation of his

21     client's competency to enter a guilty plea or proceed to trial.

22         19.  There was no tactical reason for Mr. Monroe to withhold consent to a

23     guilty plea.  Ms. Alfaro had confessed to the crimes and Monroe's expert,

24     Dr. Consuelo Edwards, testified at the suppression hearing that she did so knowingly

25     and intelligently.  RT 261-262.  Ms. Alfaro was unwilling to testify at the guilt phase

26     trial and to implicate the Hispanic male in the murder.  RT 111 (February 21, 1992

27     proceedings).  There was no physical evidence that the man entered the bathroom and

28     there was no witness other than Ms. Alfaro to support an argument that someone

38

other than Ms. Alfaro had killed Autumn Wallace.  Duress is not a defense to a capital crime.  *See* Penal Code § 26.  And aiding and abetting is not a defense where, as here, the defendant admits the intent to kill.  CT 570.  Tactically, it would have been to Ms. Alfaro's advantage to plead guilty and thereby obtain concrete proof of her acceptance of responsibility and remorse which would help mitigate the crime, the sole aggravating circumstance cited by the prosecution.  Instead, because Monroe refused to consent, she was forced to proceed to trial with an unsupported guilt phase defense which, predictably, resulted in an argument by the prosecution that she had not accepted responsibility and felt no remorse during the penalty phase of the trial.  *See, e.g.*, RT 4367-68.

20.  The Information charged two theories of murder:  first degree felony murder and first degree premeditated murder.  *See* RT 1203.  Assistant District Charles Middleton:  "Basically, my theory is going to be they don't even have to get past felony murder but they also have premeditation and deliberation in the case."].  During the videotaped interrogation, Ms. Alfaro stated that she entered the Wallace house in order to commit burglary, that she took the knife "to kill Autumn" (CT 570), and that she stabbed Autumn Wallace.  This constituted a confession to first degree murder with special circumstances.

21.  Monroe did not file a motion to suppress Ms. Alfaro's confession until February 26, 1992, five days before trial. CT 380.  At the hearing, Monroe called Dr. Edwards to testify, but had not prepared her beforehand.  On cross-examination, she readily admitted that Ms. Alfaro's confession was knowing and voluntary, having neither the competence to describe the toxicological effect of the drugs on Ms. Alfaro nor appreciation for the nuances of the term "knowing and voluntary."  RT 261-62.  Yet even after he knew the confession would be admitted, Monroe unreasonably persisted in refusing to allow Ms. Alfaro to plead guilty.

22.  In order to have any hope of presenting a defense based on the participation of another person in the murder of Autumn Wallace, Monroe needed

some evidence -- either physical proof or Ms. Alfaro's testimony to this effect.  In papers filed February 20, 1992, Mr. Monroe informed the court that "my client, Maria del Rosio Alfaro, refuses to follow my instructions and take the stand and implicate 'Beto' and refuses to allow to me [sic] to call and cross-examine 'Beto' on her behalf."  *Id.* at 9-10; *see, e.g.*, RT 111( February 21, 1992 proceedings).  Mr. Monroe claimed that her reluctance was due to a fear of reprisal from the second Hispanic man, and prepared and filed a declaration signed by Ms. Alfaro that described the man's participation in the crime and her refusal to testify while he remained "out in the community," moving to close the courtroom for her testimony.  *See* CT 497a-497c.  Yet he unreasonably failed to do so until March 18, 1992, more than a week into the trial.  And when his motion was denied, he again unreasonably failed to re-consider his decision to prevent Ms. Alfaro from pleading guilty.

23.  That Monroe was unable to come up with forensic evidence linking the driver to the crime is clear from the record.  During a hearing held November 8, 1991, a year and a half into his representation of Ms. Alfaro and only days from the then current trial date, Monroe reported that he had been "aggressively developing that theory [that the driver had come into the house and committed the crime]," but that he needed more discovery and more time.  *Id.* at 28.  Before ruling, the trial court called Mr. Monroe and Ms. Alfaro into chambers and asked Mr. Monroe for an offer of proof as to what he hoped to glean from the materials he had requested.  *Id*. at 34.  Monroe responded, "the problem we have right now is that we have yet to find any independent evidence to support the premise that this guy was in the house."  RT 35 (Nov. 8, 1991 proceedings).  Thereafter, the judge announced in open court that it was "this court's opinion that good cause has not been shown for a continuance."  *Id.* at 40.  Again, Monroe failed to reconsider and allow Ms. Alfaro to plead guilty.  By the time trial began, the situation had not improved.  Monroe told the jury in his opening statement, "[t]he evidence will disclose that though there is no independent

40

1   evidence to support the proposition that a third party was in the house . . . ."  RT

2   25-26.

3          24.  Not only did Monroe unreasonably insist on mounting a guilt phase

4   defense, given Ms. Alfaro's confession, the lack of any forensic evidence that anyone

5   else stabbed Autumn Wallace and Ms. Alfaro's refusal to testify that someone else

6   had, he unreasonably pursued a defense that was unavailable as a matter of law.

7   Penal Code § 26 provides: "All persons are capable of committing crimes except

8   those belonging to the following classes:  Six -- Persons (*unless the crime be*

9   *punishable with death*) who committed the act or made the omission charged under

10  threats or menaces to show that they had reasonable cause to and did believe their

11  lives would be endangered if they refused."  Pen. Code § 26 (emphasis added).

12         25.  That Mr. Monroe spent well over a year of the pretrial period pursuing a

13  defense that was unavailable as a matter of law is beyond dispute.  On November 14,

14  1991, Monroe filed a Declaration Under Seal in which he stated:  "The position of the

15  defense is that the defendant MARIA DEL ROSIO ALFARO, did not act alone but

16  acted in concert with another party and under the direction and duress of that person."

17  Supplemental Record Re: Corrections at 272-d.  In an ex parte hearing held

18  November 15, 1991, in arguing for discovery related to a variety of individuals, who,

19  Monroe conjectured, could have been the unidentified Hispanic male present at the

20  scene, Monroe asserted:  "Perhaps we can develop it.  That's the whole point.  And

21  the balance of what we are talking about is the prospect of a death penalty sentence

22  versus a possibility of a second degree under the duress theory.  Unless we have a

23  chance to chase that guy down, we can't even determine that . . . ."  RT 48 (Nov. 15,

24  1991 proceedings).

25         26.  According to Monroe's former law clerk, Stephen Shepard, on November

26  22, 1991, a year and a half after being appointed to represent Ms. Alfaro, barely three

27  months before the trial actually began, and after six continuances of the trial date (at

28  the request of the defense), Mr. Shepard prepared a memorandum in response to a

41

request from Monroe regarding jury instructions to support a duress defense.  Upon completing his research, Shepard informed Monroe that Penal Code § 26 makes duress unavailable as a defense as a matter of law.  Shepard's memorandum states: "Mr. Monroe, in view of the discovery that duress is not available as a defense, I have submitted the following motion for your approval . . . . I admit discovering PC 26 came as a surprise and the following was all I could think of at the last moment . . . ." Exhibit 14.

27.  Even after he learned that duress was unavailable as a matter of law, Monroe continued to pursue what was effectively a duress defense, as evidenced by the following exchange during the hearing on the defense motion to close the trial for Ms. Alfaro's testimony, held March 17, 1992:

> Assistant District Attorney Middleton:  I don't know where it's leading, but from my reading of the defense motion, there appears to be the potential of a duress defense in this case.  And I wanted to draw the court's and defense counsel's attention to CALJIC 4.41 that says duress is not a defense to a capital case.

> Mr. Monroe:  Penal Code section 26.

> Mr. Middleton:  And also Penal Code section 26.  I just wanted to make sure everybody's aware of that.

> The Court:  . . . If you reviewed the defendant's special jury instructions, it would have given you some clue about that.

> Mr. Middleton:  I have.

CT 1128.

The court then stated to Monroe,

> Let me ask you a question you might care to address.  First of all, as the district attorney pointed out, the defense of duress may not be available in a capital offense.  What impact does that have on whether or not she's able to present a defense?

> Mr. Monroe:  I think the --

> The Court:  I guess what I'm saying is if somebody wants to get -- wants to present a defense that somebody made me do it by way of duress and that defense is not available by law, then it's not a defense.

42

1   Mr. Monroe:  I'm suggesting to the court that a different standard would be
    applied to an aider and abettor as opposed to a primary perpetrator.  And that
2   we suggest that the evidence would support that.

3   The Court:  Well, you lost me there.  If somebody does something under the
    compulsion of duress, they're a direct actor.  They're not a -- they would not be
4   an aider and abettor within the sense of being an aider and abettor.  They're a
    direct actor in the homicide.
5
    Mr. Monroe:  Not necessarily, as the facts would come out as expressed in that
6   declaration.  (Referring to a declaration signed by Ms. Alfaro.)

7   The Court:  Well, let's assume hypothetically that you and I go somewhere and
    we're going to rip off Mr. Middleton's house, okay?  And you and I get
8   together and we plan to go over there, and we both arm ourselves with guns,
    okay?  And we don't think Mr. Middleton is going to be home.  And let's
9   assume that we go over there and we're in the process of -- we have broken in,
    we're in the process of taking Mr. Middleton's large-screen television in the
10  back of our van and Mr. Middleton shows up, and you tell me that, "Ted,
    you're going to have to blow his ass away or I'm going to kill you."  And I
11  blow his ass away.  Penal Code section 26 says that's not a defense.  I'm still
    culpable.  I'm still responsible for that conduct.
12
    Mr. Monroe:  What If I didn't blow his ass away, I simply threw my gun at him
13  and ran out and you blew his ass away?

14  The Court:  Well, that's a hypothetical upon which there's no evidence.

15  Mr. Monroe:  I can't comment any further, your honor, other than what we
    have in our declaration.
16
    The Court:  Okay.  See, that's a hypothetical that's not -- there's just no
17  evidence to support that.

18  RT 1134-36.

19      28.  Monroe also acted unreasonably to the extent that he pursued an aider and

20  abettor defense.  An aider and abettor in a felony murder case will escape liability

21  for first degree murder only if she can establish that she is not the actual killer and

22  that she did not intend the death of the victim.  Having failed to suppress Ms. Alfaro's

23  confession, in which she admitted (among other things) that she took the knife "to kill

24  Autumn" (CT 570), it was unreasonable for Monroe to pursue an aider and abettor

25  defense.  It was also unreasonable because Monroe knew that Ms. Alfaro would not

26  testify that another person had killed Autumn and that she had not intended to kill.

27  *See* February 21, 1992 proceedings at 111.

28

43

29. After forcing his client to trial, Monroe acted unreasonably when he conceded during his opening statement that, "[t]here is some question as to whether or not anybody else went into the house." RT 624. He acted unreasonably when the most he could say for the defense case was,

> The evidence will disclose that although there is no independent evidence to support the proposition that a third party was in the house, there will be testimony disclosing that other items of evidence had not been tested or analyzed to confirm or eliminate the possibility that a third person might have been in the house and was the real perpetrator.

RT 625-26.

30. Things got no better during the remainder of the guilt phase of the trial. Though she could not prevent her attorney from arguing that someone else killed Autumn Wallace, Ms. Alfaro could and did refuse to take the stand to support her counsel's theory. RT 1179. And despite Monroe's assurances to the court that he would present other defense witnesses (RT 1179), Monroe called no witnesses. RT 1179. In his closing remarks, seemingly oblivious to the fact that Ms. Alfaro had been charged with felony murder, Monroe conceded to the jury that Ms. Alfaro stabbed Autumn Wallace after entering the house to steal. He asked the jury to "find that, yes, Rosie Alfaro did stab little Autumn. Rosie Alfaro did not kill that little girl." RT 1294. Further conceding guilt, as well as demonizing his client in the eyes of the jury, he stated, "At one time [Ms. Alfaro] says, 'I stabbed her three or four times.' That might be consistent with the likes of Rosie Alfaro." RT 1303.

31. In light of the above, it is not surprising that Monroe withdrew his request for an aider and abettor instruction, thereby effectively conceding that there was no legal defense to the crimes with which Ms. Alfaro was charged. *See* Special Instruction # 7 (CT 988), and agreement to withdraw (RT 1226) ("The court: Number 7, . . . are you withdrawing that one, too? Monroe: We have 8.83.1 in now, so I can withdraw that one. The court: Okay.") Monroe agreed to withdraw 8.83.1. RT 1215. Monroe's other proposed instructions regarding first degree murder sought only to allow the jury to find no malice, which would not have prevented a verdict

of first degree felony murder.  *See* CT 967-96.  As  it turned out, the jury found

Ms. Alfaro guilty of all charges, including first degree murder with special

circumstances, in less than four hours.  RT 1399-1411; CT 1086.  There was no

tactical reason for Monroe to withhold consent to a guilty plea and deprive his client

of critical evidence that would have mitigated the sole aggravating factor in this case,

the circumstances of the crime.

32.  The prejudice that arose from Mr. Monroe's insistence on proceeding to

trial on the issue of guilt is glaring.  In his opening statement during the penalty

phase, the district attorney told the jury, "You're going to find, ladies and gentlemen,

from the evidence that Rosie Alfaro has not accepted the responsibility for the killing

of Autumn Wallace."  RT 1436.  After the first penalty jury hung, and the second jury

was impaneled, the district attorney again told the jurors that: "Miss Alfaro has not

accepted any responsibility.  That's what the evidence will show."  RT 3179.  During

his closing in the second penalty trial, the District Attorney returned to this theme.

> Remorse, Ladies and Gentlemen? . . . Ladies and Gentlemen, th[e] remorse [Ms. Alfaro exhibits in the video-taped confession] was not for her, that little girl.  That remorse was for the plight of Rosie Alfaro only. You can say a whole lot of things.  You can mouth the words. . . . Especially once you get into the system and you know what's expected, you can mouth the words, "I have sympathy" or "I have remorse" or "I feel sorry."  *But actions speak louder than words.*  The only remorse she has is for sitting in jail for what she's done.

RT 4367-68 (emphasis added).  Had Mr. Monroe consented to Ms. Alfaro's guilty

plea, these powerful arguments in favor of a verdict of death could not have been

made.  The jury would have known that Ms. Alfaro was willing to accept full

responsibility for her crimes, knowing that she faced life in prison without the

possibility of parole, if not death, in so doing.

33.  The prejudice to Ms. Alfaro that flowed from Monroe's unreasonable

decision to present the third man defense is also obvious from the trial court's

comments, at sentencing:

1
2
3
4
5
6
7
8
9

If we adopt the argument of the defense, that is to say that Miss Alfaro stabbed Autumn Wallace several times, three or four or five times, and then this other unknown person finished off the job stabbing young Autumn Wallace the other 47, 49 times, it's absolutely amazing that Miss Alfaro left bloody footprints on the floor.  And this other person who obviously was there, according to their argument, after the pool of blood is even larger than it would have been when Miss Alfaro left the room, somehow this person didn't leave a trace, not a single trace of any footprint in the blood. . . .  It is the Court's belief that the jury rejected the defense's contention that a third person was present, did any of the stabbing in this case.  The evidence is grossly insufficient to even raise that as a strong inference in the case . . . .  It appears to this court . . . it's a figment of someone's imagination to say that another third person was present and that Miss Alfaro acted under substantial domination of this person. . . .  [T]he circumstances of the crime itself standing alone far outweigh any mitigating circumstances, if there are any, that are presented in this case.

10
11

CT 1810-15.

12
13
14
15
16
17
18
19
20
21
22
23

34.   In unreasonably withholding his consent to Ms. Alfaro's guilty plea, trial counsel deprived her of universally recognized mitigating evidence of remorse and acceptance of responsibility.  Studies show that juries are much more likely to impose a sentence of life without possibility of parole rather than a death sentence if they believe the defendant has taken responsibility for the crime.  *See* Scott Sundby*, The Capital Jury and Absolution:  The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 Cornell L. Rev. 1557 (1998).  There was no tactical reason for Monroe's refusal to permit his client to plead guilty.  But for Mr. Monroe's ineffective assistance as counsel in refusing to consent to Ms. Alfaro's entry of a guilty plea, it is probable that the result at the penalty phase of the trial would have been different.  *See*, Exhibit 122 (Declaration of Denise Coburn) at ¶ 2; Exhibit 123 (Declaration of Brent Conley) at ¶ 3.

/ / /

24
/ / /

25
26
27
28

46

C.   **COUNSEL'S FAILURE TO MOVE TO WITHDRAW OR TO ADVISE CLIENT TO MOVE FOR SUBSTITUTE COUNSEL DESPITE COMPLETE BREAKDOWN OF ATTORNEY-CLIENT RELATIONSHIP**

35.   Ms. Alfaro was denied her right to counsel, to due process and to a fair trial as a result of Monroe's failure to move to withdraw despite the complete breakdown of their attorney-client relationship. It is clear from the record that Monroe's relationship with Ms. Alfaro deteriorated to such an extent that in failing to make a motion to withdraw and for substitute counsel, he deprived Ms. Alfaro of effective representation of counsel. Mr. Monroe failed to move to withdraw despite his admitted knowledge that he and Ms. Alfaro had arrived at an insurmountable conflict over the most fundamental aspects of the case. This conflict involved her desire to plead guilty and Mr. Monroe's unwillingness to consent to such a plea and the question of whether Ms. Alfaro would disclose the identity of the driver or testify on her own behalf, as well as other issues. It is probable that had Ms. Alfaro been afforded counsel with whom she could communicate and participate in her own defense, the outcome would have been different. Ms. Alfaro's defense was prejudiced by Monroe's failure to move the court to allow him to withdraw and his failure to advise Ms. Alfaro of her right to move for substitute counsel.

36.   In a pleading filed ex parte on February 20, 1992, entitled "Request for Special Instructions," Monroe wrote: "[m]y client . . . refuses to follow my instructions and take the stand and implicate 'Beto' . . . . If my client insists on pleading guilty to the special circumstances, it is against my most rigorous advice. I am requesting instructions from the court as to whether or not the court believes it is necessary for me to withdraw from the case at this late stage or whether or not I should remain on the case." CT 355.

37.   On February 21, 1992, at a hearing held on Monroe's "Request for Special Instructions," the court told Monroe, "I'm not really in a position to give any

47

instructions concerning your relationship vis-a-vis your client.  No one has made a
motion to be relieved.  No one has made a motion to have substitute counsel.  So
there is really nothing -- there is really nothing before, properly before the court."
RT 110 (February 21, 1992 proceedings).  Despite the Court's invitation, Monroe's
response was not to make a motion or to advise Ms. Alfaro of her right to make a
motion for substitute counsel.  Instead, he asked the Court for a "lead":  "Your Honor,
I believe I'm asking the court to give me a lead or advice as to whether or not the
court believes I should declare a conflict because I believe that a conflict may exist."
*Id.* at 110.  Later, Monroe declared, "I have an out and out conflict."  *Id.* at 112.  He
said, "In effect, she and I are at loggerheads."  *Id.* at 113-14.  He told the court the
conflict was "profound;" that it was "a basic disagreement what she wants to do with
her life."  *Id.* at 118.  He said, "I cannot effectively represent my client at this stage in
light of the instructions she has given me."  *Id.* at 115.  He told the court, "I think
as [sic] a minimum, Your Honor, we ought to have counsel appointed to advise her
about the consequences of her act."  *Id.* at 117.  But when the court declined to take
action, Monroe did nothing but declare "You put me in an absolutely untenable
position, Judge Millard."  *Id.* at 119.  Monroe filed no motion to withdraw nor did he
advise his client of her right to do so.  The transcript of the February 21, 1992,
hearing contains no such advisement and on April 9, 1992, when Ms. Alfaro did
make a *Marsden* motion, she explained that the reason she had not made one earlier
was, "Well, I didn't know what I was supposed to do to bring it up.  I had to ask one
of the girls in the jail. . . .".  RT 2130 (April 9, 1992 proceedings).

    38.  During the April 9th hearing, on Ms. Alfaro's *Marsden* motion, it again
emerged that Ms. Alfaro's relationship with Monroe rendered him ineffective as her
counsel.  Monroe informed the Court, "Miss Alfaro told me she would not talk to me
any more, she would not cooperate with me any more, she would not do anything that
I asked that I wanted her to do."  At first he admitted that her lack of trust arose out
of the fact that he had given her inaccurate advice about the scope of cross-

48

examination, should she take the stand.  But when he realized that the Court viewed his advice as incompetent, he denied that he had given it.  RT 2124-29 (April 9, 1992 proceedings).  Instead of joining Ms. Alfaro in requesting substitute counsel, Monroe back-pedaled about the nature of his advice, placing his own concerns about his performance above his client's right to an attorney with whom she could communicate and would cooperate in her death penalty proceeding.

39.  Ms. Alfaro had ample reason in addition to Monroe's incompetent advice about cross to stop cooperating with Monroe.  She was not upset over a mere tactical error.  Nor was she being unreasonably obstinate.  The record establishes a long-running conflict, full of quarrels and disagreements, between herself and Mr. Monroe over numerous situations over the course of the proceedings.  He had a duty, as an officer of the Court sworn to uphold her constitutional rights, to move to withdraw.  Had he done so, it is probable that the result of the penalty trial would have been different.

**D.    COUNSEL'S FAILURE TO REQUEST CO-COUNSEL**

40.  In capital cases, an attorney may request that the court appoint an additional attorney as co-counsel.  Pen. Code § 987(d); *Keenan v. Superior Court (San Francisco)*, 31 Cal. 3d 424, 430, 640 P.2d 108, 180 Cal. Rptr. 489 (1982).  A request for appointment of co-counsel is made by the defendant's first attorney by filing a confidential affidavit with the court outlining the reasons why co-counsel is required.  Pen. Code § 987(d).  The court weighs several factors in deciding to appoint additional counsel, including, but not limited to, the factual and legal complexity of the case and evidentiary differences between the guilt phase and the penalty phase of trial.  *Keenan* 31 Cal. 3d at 432.  Mr. Monroe's failure to request co-counsel in a case where it was objectively unreasonable not to do so, amounted to deficient performance - representation below common professional norms.  This error prejudiced Ms. Alfaro's defense, seriously undermining confidence in the outcome,

1  that is, the death penalty verdict.  But for Mr. Monroe's error, there is a reasonable

2  probability that the result of the proceedings would have been different.

3      41.  Ms. Alfaro's case involved a particularly heinous crime and a video taped

4  confession by the defendant.  The case required the analysis of over 4,000 pages

5  of discovery and extended scientific testimony of experts.  CT 536 (March 5, 1992,

6  987.9 records).  Discovery filled twenty-one three-inch binders. *Id*. There were facts

7  from which a reasonably competent attorney would realize that it was necessary to

8  conduct a thorough investigation, hire forensic experts, and hire mental health experts

9  to study the defendant's personal history, psychological and neurological

10 development, drug use and mental state at the time of the crimes.  In evaluating the

11 need for a second attorney, the court also focuses on the complexity of the legal

12 issues involved.  It is probable that had Monroe requested appointment of second

13 counsel, his request would have been granted.

14     42.  Instead, Monroe used a rookie investigator (*see* Exhibit 1 (McGrath

15 Declaration) at ¶ 10) to perform legal work properly performed only by lawyers.

16 *See* CT 536 (March 5, 1992, 987.9 records) (Monroe:  "I did not ask the court to

17 provide co-counsel to this case and so a good many of the quasi-legal issues which

18 co-counsel might have done were completed by the investigator.").  While it is true

19 that defense counsel in capital cases may ease the burden of preparing for trial by

20 employing an investigator, because many of the tasks involved in preparation for trial

21 cannot be delegated to non-attorneys, the court cannot assume that authorization

22 of funds for an investigator makes appointment of a second attorney unnecessary.

23 Regardless of work done by an investigator, the ultimate responsibility for

24 coordinating the investigation and assimilating the results must remain with an

25 attorney sensitive to the potential legal issues involved.

26     43.  In this case, the investigator's role was plainly not limited to quasi-legal

27 tasks but extended far into the domain of an additional counsel.  The investigator

28 inappropriately developed defense theories, as evidenced in several different

50

declarations to the court. *See, e.g.*, CT 67, 101, 108 (Monroe declared: "I and the investigator under my direction have been diligently examining appropriate areas of defense and/or mitigation. We have yet to formulate a clearly delineated avenue of defense and mitigation . . . "); CT 538 (March 5, 1992, 987.9 records) ("Had it not been for the extraordinary efforts by the investigator, who assumed almost a position of quasi co-counsel in analyzing the evidence, examining some of the legal issues, obtaining and performing the extensive investigation and then obtaining the appropriate experts to support the theory of this defense, we would have had no defense at all to mount and the trial would have been reduced to a sham.") Having "legal issues" examined by the investigator was patently unreasonable under prevailing professional norms. Trial preparation for a capital case involves especially complicated factual and legal issues that cannot necessarily be resolved through the use of an investigator, but require the employment of a second attorney.

44. Ms. Alfaro suffered the consequences of a flawed legal defense co-devised by a non-attorney. She was denied the benefits of defense and mitigation theories developed by a qualified legal co-counsel that would have averted a sentence of death. Mr. Monroe's decision severely prejudiced Ms. Alfaro's case. That these acts affected the outcome of the case is made apparent by the fact that the duress defense theory developed in collaboration with the investigator did not exist as a matter of law and Monroe rested the guilt phase defense he had insisted on without presenting any affirmative evidence. CT 500. The fact that Mr. Monroe admitted the almost "quasi-counsel" status of his investigator, "without whom there would have been no defense at all," confirms the objective necessity of co-counsel.

45. Mr. Monroe's faulty reliance on his investigator and resulting failure to request co-counsel from the court undermined the reliability of the verdict. There is a reasonable probability that, had Mr. Monroe not relied on his investigator for legal theory but requested a second counsel instead, a feasible defense would have been

1   promoted and a jury would have concluded that the balance of aggravating and

2   mitigating circumstances in Ms. Alfaro's situation did not warrant the death penalty.

3   **E.      COUNSEL'S FAILURE TO ADMIT PETITIONER'S OFFER TO**

4   **ENTER A GUILTY PLEA IN THE PENALTY PHASE**

5          46.  Mr. Monroe acted unreasonably not only in refusing to consent to

6   Ms. Alfaro's entry of an unconditional guilty plea, but in failing to introduce

7   evidence that she had wanted to plead guilty in the penalty phases of her trial.

8   Neither jury was informed that Ms. Alfaro had sought to plead guilty to the charges,

9   let alone to plead guilty without any guarantee of leniency, despite both the court's

10  and defense counsel's knowledge that this was, in fact, the case.  This was mitigating

11  evidence of which Ms. Alfaro was deprived as a result of her counsel's ineffective

12  representation of her.  But for Monroe's incompetence as counsel in this regard, there

13  is a reasonable probability that the result of the penalty phase of Ms. Alfaro's trial

14  would have been different.  *See*, Exhibit 122 (Declaration of Denise Coburn) at ¶ 2;

15  Exhibit 123 (Declaration of Brent Conley) at ¶ 3.

16         47.  On February 21, 1992, the trial court met with defense counsel and

17  Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992).  During the discussion that

18  ensued, defense counsel made it clear, as did Ms. Alfaro herself, that Ms. Alfaro

19  desired to enter an unconditional guilty plea and proceed to the penalty phase of her

20  trial.  *Id.*

21         48.  The District Attorney was not present for the February 21, 1992 *ex parte*

22  in camera hearing.  And, based on a motion he made five days later, it can be inferred

23  that he was unaware of Ms. Alfaro's desire to enter an unconditional guilty plea and

24  proceed to the penalty phase.  It can also be inferred that at some point, Mr. Monroe

25  approached the District Attorney and asked if he would be willing to plea bargain: a

26  sentence of life without the possibility of parole in exchange for Ms. Alfaro's plea

27  of guilty.  *See* CT 400-01; RT 169-87; Exhibit 15 (note to Lawhon from Monroe re

28  District Attorney's Death Penalty Committee's rejection of his offer to have

52

Ms. Alfaro plead guilty).  In an oral motion made February 26, 1992, district attorney

Middleton argued that evidence of an offer to plead to life without parole should be

precluded because it is only an unconditional offer to plead guilty that constitutes a

mitigating circumstance:

> Mr. Middleton:  [I]f the defendant wanted to plead guilty, she can plead guilty right up front, right now.  *Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation.*  Not the fact that she extended or her attorney extended some kind of offer, because the attorney extending some kind of an offer isn't anything.
>
> I could say yes and then they could say, you know, fly their fingers right in front of my face and say we just wanted to see if you would do it: *to me it doesn't really mean anything unless there is an actual acceptance with the offer to really give some validity to the fact that the person is offering to plead guilty.*
> Mr. Monroe:  If that's Mr. Middleton's concern, Your Honor, I can have Miss Alfaro on the record represent to the Court to show the extent of her remorse -- she really does -- that she is willing now to plead guilty in return for life without possibility of parole.
>
> Mr. Middleton:  That's not the concern of the People that it's valid. I'm saying without -- I mean *she could make it valid to the jury, this remorse or whatever else the defense is saying she has, by actually pleading guilty and going to the penalty phase.*

RT 185-86 (February 26, 1992 proceedings) (emphasis added).  Despite the court's

and Monroe's actual knowledge that Ms. Alfaro was willing to plead guilty

unconditionally -- a fact that the district attorney conceded amounted to a mitigating

circumstance -- neither of them informed the district attorney of this fact.  Instead,

Monroe stood mute as the court ruled as follows:

> The Court: Well, it's definitely not relevant to anything in the guilt phase of the trial.  And it would appear to me -- unless you can submit some authority to the court, it would appear to me a mere offer to plead guilty, if the District Attorney strikes the -- or does not seek the death penalty, appears to me from a logic and common sense standpoint not to be the proper subject matter of mitigating testimony in a penalty phase, if we ever get to a penalty phase, in the trial.
>
> And it's. . . a motion in limine.  So, *in effect, the court would -- what it does, it directs counsel not to bring up that issue, or the defendant herself if she were to testify not to bring up that issue, without leave of court.*

53

1

2
    And whenever you feel you have some authority or some analogy
by some cases or something of that nature you want me to look at, I will
be more than happy to review the motion in limine.

3
            * * *

4
    Mr. Monroe: Certainly in guilt but also in penalty?

5
    The Court: In all phases of the trial unless you have leave of the court
otherwise.

6    *Id.* at 186-87.

7        49.   Despite the court's invitation to Monroe to present "some authority or

8    some analogy by some cases or something of that nature" that would support the

9    admissibility of evidence of a defendant's willingness to plead guilty in the penalty

10   phase of a capital trial, Monroe failed to do so.  Had Monroe stated on the record

11   at the February 26, 1992 hearing that Ms. Alfaro had, in fact, wanted to enter an

12   unconditional guilty plea, the district attorney would have been hard-pressed to object

13   to the admissibility of the evidence, given his concession that an unconditional plea

14   offer would be admissible.  Instead, Monroe failed to argue, in light of the district

15   attorney's concession, that an offer to enter an *un*conditional plea of guilty would be

16   admissible in any event.  RT 183-87 (February 26, 1992 proceedings).

17       50.   Monroe's unreasonable failure to offer evidence of Ms. Alfaro's desire

18   to enter a guilty plea was highly prejudicial.  Even if he had a valid tactical reason for

19   withholding consent to her entry of a guilty plea, there could have been no tactical

20   reason for failing to present the court with authority for introducing her desire to

21   plead guilty in the penalty phase or for failing to argue that her offer had been

22   unconditional, and that the district attorney had conceded that such an offer qualified

23   as admissible evidence.  As  a result of his failure to argue that Ms. Alfaro's offer

24   to plead guilty was undisputably admissible, Monroe allowed the jury to be misled.

25   Stated the district attorney, in his closing to the penalty jury, "Who operates the

26   defense?  It's at the operation of Ms. Alfaro.  She's the defendant.  She chooses

27   to fabricate, fake, embellish and create."  RT 4366.  "Remorse, Ladies and

28   Gentlemen?"  RT 4367.  There was no tactical reason for Mr. Monroe to have failed

to offer this obviously mitigating evidence that would have supported a finding that Ms. Alfaro accepted responsibility for the crimes and felt remorse.  Had he done so, it is probable that the result of the penalty trial would have been different.

### F.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND DISCOVER THE IDENTITY OF THE MAN PRESENT AT THE CRIME SCENE

51.   While duress was not available as a defense at the guilt phase of the trial, evidence that Ms. Alfaro was under extreme duress or the substantial domination of another person would have constituted admissible mitigating evidence during the penalty phase.  *See* Penal Code § 190.3(g).  Trial counsel unreasonably failed to conduct an adequate investigation to ensure a fair and reliable determination of guilt and penalty.  In particular, he unreasonably failed to interview or to instruct the defense investigator to interview key witnesses and unreasonably failed to use the information available to him to draw the correct conclusion regarding the identity of the man who drove Ms. Alfaro, her baby, and Reynoso to the Wallace home.  Had he done so, he would have been able to present powerful mitigating evidence about this man's substantial domination over Ms. Alfaro and her extreme duress.

52.   Instead, trial counsel unreasonably blamed the wrong man, and unreasonably argued, absent any evidence, that this man, and not Ms. Alfaro, had been responsible for killing Autumn Wallace.  He made this argument first at the guilt phase of the trial, and after the jury rejected it, he made it again at both penalty trials. Mr. Monroe's unreasonable approach squandered the mitigating evidence that Ms. Alfaro had been dominated and threatened by the driver at the time she committed the crimes, succeeding only in convincing the jurors that she did not accept responsibility for her conduct.  But for her counsel's incompetence in this regard, Ms. Alfaro's sentence probably would have been different.

53.   This was Mr. Monroe's first capital case.  He had previously represented only one client charged with murder.  Although he hired Sandberg Investigation to

assist him with the case (*see* CT, 987.9 material), the primary investigator assigned to work the case, Laura Lawhon, had no prior experience investigating a capital case or even a murder case. *See* Exhibit 1 (Declaration of Raymond McGrath) at ¶ 10.

54. While Monroe devoted the vast majority of the defense team's time and resources to finding out the identity of the Hispanic man who drove Ms. Alfaro to the Wallace home, he did so in a wholly incompetent manner.

55. To begin with, he failed to explain to Ms. Alfaro the value of the man's role in the crimes as mitigating evidence, regardless of her own confession to the crimes. *See* Exhibit 4 (Alfaro Declaration). Instead, he told Ms. Alfaro that he wanted to defend her by arguing that this man, and not she, had killed Autumn Wallace, a strategy to which she strongly objected. *See, e.g.*, RT 111 (February 21, 1992 proceedings). As a result, Ms. Alfaro refused to cooperate with Monroe by disclosing the man's identity.

56. Having failed to extract this information from his client himself, Monroe unreasonably moved the court for funds to hire "experts" for the purpose of extracting this information from her, voluntarily or involuntarily, despite his admitted knowledge that her reasons for withholding the information included fear for her safety and that of her family members if she told. In the process of obtaining funds for these experts, Monroe betrayed his duty as defense counsel for Ms. Alfaro by making prejudicial statements about her to the judge.

57. On September 9, 1991, for example, Monroe filed a declaration under seal in which he requested funds to hire an expert by the name of Dr. Bruce Danto of "Death Investigation International," Fullerton, California, to administer Sodium Pentothal to Ms. Alfaro. CT 274-76 (Sept. 9, 1991, 987.9 records). Stated Monroe:

[T]he information provided by my client tends to be inconsistent at times . . . .
    It is imperative that we obtain information from the defendant which is not colored by some subconscious fear, ulterior motive or hidden bias.
    My interviews with other experts who have examined MARIA DEL ROSIO ALFARO, have suggested there is a substantial likelihood

1
2

> that I may be able to obtain the information I need by employing certain
> chemical devices including but not limited to the use of sodium
> pentothal [sic].

3   CT 274-75 (Sept. 9, 1991, 987.9 records).  That Monroe felt the need to administer

4   Sodium Pentothal to his client speaks volumes about their relationship, as well as his

5   level of desperation in his quest for a defense.  *See* Exhibit 15 (note from Monroe's

6   investigator's file:  "Danto scares me but we have nothing to loose [sic].").  That he

7   told the judge Ms. Alfaro had been "inconsistent" and that he needed to give her

8   drugs to obtain information not colored by "ulterior motive[s]" served to bias the

9   court against her.  That Monroe sent Ms. Alfaro to Dr. Danto in the custody

10  of Sheriff's Deputies who were present during the administration of the "truth serum"

11  and subsequent interrogation of Ms. Alfaro about the crime is truly mind-boggling.

12  *See* CT 277-78 (Sept. 9, 1991, 987.9 records); *see also* Exhibit 16 (Transcript

13  of Dr. Danto's Sept. 27, 1991 Sodium Pentothal interview with Ms. Alfaro in

14  presence of Sheriff's Deputies).  During the interview, Dr. Danto elicited a number

15  of inculpatory statements from Ms. Alfaro, including, Ms. Alfaro:  "I didn't know

16  what I was doing."  Dr. Danto:  "Well, how can that be since you planned on getting a

17  VCR that you were going to sell to Miguel?  You knew what you were doing there,

18  didn't you, dear?"  Ms. Alfaro:  "Yeah."  *Id.* at p. 28.

19      58.  Predictably, the district attorney became aware of Dr. Danto's

20  administration of "truth serum" to Ms. Alfaro.  Not only were Sheriff's deputies

21  present throughout the interrogation, but Dr. Danto gave an interview about his

22  session with Ms. Alfaro to the Orange County Register.  It appeared on November 26,

23  1991, shortly before trial.  Exhibit 17 (Orange County Register article).  The article,

24  which does not mention Ms. Alfaro by name, but recites facts which clearly identify

25  her, erroneously states that she has been convicted of murder, and that Dr. Danto gave

26  her Sodium Pentothal to "enhance her memory which she contends was affected by

27  drugs she was taking at the time of the slaying."  *Id*.  Yet, despite the district

28  attorney's reference to this article on the record in Monroe's presence, Monroe

1    unreasonably failed to take any action -- be it motion for change of venue,

2    continuance, or targeted voir dire -- to blunt the prejudicial impact of this information

3    on his client.

4         59.  In the end, Monroe did not get what he wanted from his client or Dr. Danto

5    and was left to analyze the evidence.  Had he done so in a competent manner, he

6    would have learned the identity of the driver.  Instead, Monroe unreasonably fixated

7    on one Roberto "Beto" Frias Gonzalez, stubbornly insisting that he was the man who

8    had driven Ms. Alfaro to the Wallace home, despite the absence of any evidence

9    connecting Frias Gonzalez to Ms. Alfaro or the crimes.

10        60.  On the day of the crimes, a witness named Susan Mata told an Orange

11   County Sheriff's Deputy that at approximately 4:00 to 4:15 p.m. on June 15, 1990,

12   she saw a medium brown Monte Carlo backed in the driveway of the Wallace home

13   with its trunk open.  She also stated that she saw a male Hispanic, about 27-32 years

14   old, with hair straight back and a big mustache near the sidewalk with a Hispanic

15   child about 1-1/2 to 2 years old.  She said she got a good look at both the man and the

16   child.  She said she saw a second man behind the trunk, but was not able to see him

17   very well.  *See* Exhibit 18 (Deputy Allen's Susan Mata interview notes).  In an

18   interview the following day, Ms. Mata told investigators that she could not be certain

19   that the man leaning into the trunk of the Monte Carlo was Hispanic (*id.* at 7); that

20   she saw only a part of his arm (*id.*); and that she couldn't see his face.  *Id*.  Based on

21   Ms. Mata's description of the first Hispanic man, a composite drawing was prepared

22   and flyers asking the public for information about the man in the drawing were

23   distributed.  Exhibit 19 (copy of flyer).

24        61.  On June 22, 1990, Roberto Frias Gonzalez was identified by Sheriff's

25   Deputy Kenneth Harper as a possible suspect because he looked like the drawing

26   based on the observations of Susan Mata.  *See* Exhibit 20 (Clue # 584; Discovery

27   page 1793l).  On June 29, 1990, Mr. Gonzalez was booked into the Orange County

28   Jail for a probation violation and was questioned about the crime.  See Exhibit 21

(Clue # 642, Discovery page 2185).  He denied knowing Petitioner and indicated that he had an alibi for June 15.  *Id.* at 2186. On July 2, 1990, deputies interviewed Mr. Gonzalez's sister, and she confirmed his alibi.  *Id.* at 2188.  In addition, Sheriff's Deputies showed a picture of Mr. Gonzalez to members of Petitioner's family and none recognized him.  *Id*.

62.  The man in the composite drawing turned out to be Antonio "Shorty" Reynoso, who surrendered to the police on July 2, 1990.  RT 3489.  During questioning, Reynoso admitted that he had been outside the Wallace home with Ms. Alfaro's baby on June 15th, and thus, clearly he was the man Ms. Mata described.  Exhibit 22 (transcript of Reynoso's interview with Sheriff's investigators). During a hearing held February 26, 1992, the district attorney explained that the prosecution had considered and eliminated Roberto Frias Gonzalez as a suspect for this and other reasons: "Robert Frias Gonzalez is not a suspect in this case as far as the prosecution goes, and was only a suspect as far as he appeared to be similar to the drawing of the person that had a child outside the victim's home which turned out to be Antonio Reynoso."  RT 135-36 (February 26, 1992).

63.  Yet despite Ms. Mata's statement that she did not get a good look at the second man in front of the Wallace home, the fact that the drawing looked just like Reynoso, the fact that Reynoso admitted that he had been outside the Wallace home with the baby, and the fact that there was no other evidence even remotely suggesting that Frias Gonzalez was involved in the crimes, Monroe persisted in believing that the composite drawing supported the conclusion that Roberto Frias Gonzalez was the third man.  During a hearing held November 15, 1991 on Monroe's request for subpoenas, he explained his theory that the composite was not simply a picture of "Shorty" Reynoso, but also of the third man:  The court: "And this [referring to a subpoena] apparently does not relate to your third party duress defense for Raul Roger Rodriguez?"  Mr. Monroe:

1
2
3
4
5
6
7

> Yes, because if the court remembers when I mentioned the possibility of the existence of that person in our last hearing, who goes under the name of Robert Frias Gonzales, also, the eye witness identification of Shorty and a composite of Shorty which is a composite of this third person, Shorty and this third person look almost alike. It's our contention or suggestion really that there may be a relative relationship between those two because it is inconceivable to us, Your Honor, that Shorty, who got out of state prison the day before this homicide, goes down to the place of this homicide with this third person and never knows -- is never aware of the fact that a homicide goes down after he's seen outside with Miss Alfaro's two-year-old child. We believe there's a connection between Shorty and that third person and we are trying to trace that connection down.

8   RT 52-53 (Nov. 15, 1991 proceedings). Days before the trial began, Monroe repeated

9   his belief that Frias Gonzalez was the driver, based on nothing more than his

10   resemblance to the composite drawing of the man Susan Mata had seen -- and

11   Ms. Alfaro's insistence that he *not* blame Roberto "Beto" Frias Gonzalez for the

12   crime:

13
14
15
16

> Monroe: My client has adamantly, adamantly refused to allow me to call Beto or to cross examine Shorty regarding his relationship with Beto or to show photographs of Mrs. Mata who I.D.ed a person outside of the house. We believe she [referring to Susan Mata] I.D.ed Beto because my client has told me she is in absolute fear of her safety and she's in absolute fear of the safety of her family should it become known to Beto that we in some way, shape, or form, for lack of a better term, have given him up.

17   RT 111 (February 21, 1992 proceedings).

18       64. There is no evidence that Monroe ever interviewed Rosalinda Gonzalez,

19   Roberto's sister, to question her about his alibi. There is no evidence that Monroe

20   ever found anything other than Frias Gonzalez's resemblance to the composite

21   drawing to link him to Ms. Alfaro or the crimes. Nevertheless, Monroe continued to

22   argue, through the guilt trial, penalty trial, and penalty re-trial, that Frias Gonzalez,

23   and not Ms. Alfaro, killed Autumn Wallace.

24       65. That Monroe and not Ms. Alfaro was responsible for identifying and

25   seeking to blame "Beto" for the crimes is evidenced by Monroe's statements to the

26   court,

27
28

> The defense of this case has been based on the proposition that the crime was so heinous that it could have only been committed by a person under the

60

1   extreme influence of PCP or some similar drug or the person had an absolutely
2   abandoned, malignant, and vicious heart.

3      The preliminary inquiry disclosed that the client was not under a
    hallucinogenic which would have left her out of control.  However, the
    initial investigation also strongly suggested that she was not capable
4   of committing this crime alone.

5      Although the police had initially investigated this area, they
6   discounted it and it fell to the defense to begin to develop that particular
    theory.

7      * * *

8      The client . . . was less than candid during the initial stages of our
9   investigation.

       * * *
10

11     The client's statements to defense counsel and his investigators
    changed as frequently as her decision as to whether or not to she would
12  cooperate in her own defense.

       * * *
13

14     It was because [the investigator went to Mexico] that we were able
    to develop independent evidence to *breakdown the client's changing
15  facade and have her finally admit to what we believe is the true theory
    of the defense* which we are now in a position to present to the jury.

16  CT 535-39 (March 5, 1992, 987.9 records).

17    66.  The unreasonableness of Monroe's approach -- "to break down the client's

18  changing facade and have her finally admit to what we believe is the true theory", i.e.

19  that "Beto" drove her to the Wallace home -- is highlighted by his own declaration,

20  filed April 17, 1992, in which he acknowledges that his client suffers from a

21  personality disorder which makes her unnaturally susceptible to suggestion.  CT

22  1196-1207.  Monroe states that Dr. Consuelo Edward would testify that Ms. Alfaro is

23  "a follower" who"suffers from a Dependent Personality Disorder which makes her

24  subordinate herself to others and agree with them, even if she believes they are

25  wrong, for fear of being rejected."  CT 1202-03; RT 4087.

26    67.  Knowing that Ms. Alfaro would "agree," "for fear of being rejected,"

27  Monroe used Dr. Edwards to get Ms. Alfaro to agree that "Beto" was the man who

28  drove her to the Wallace home.  When she testified at Ms. Alfaro's penalty re-trial,

61

Dr. Edwards confirmed that the notion that "Beto" was the driver came from Monroe or his investigator, and not Ms. Alfaro.  She testified that Monroe or his investigator informed her that Roberto "Beto" Frias Gonzalez was the second Hispanic man seen at the Wallace house, and used her to pressure Petitioner to agree:

> D.A. Middleton:  In relationship to when the defense showed you these three exhibits, when was it that Maria Alfaro said Beto did it?
>
> Dr. Edwards:  It was after I confronted her with the fact that the defense has shown me a composite picture of one of the men that was in front of the house and that this man was called Beto and that Miguel was not to be found anywhere, and yet a Beto was there.  And then she said that but became very angry.  She said she didn't want any of this and was going to dismiss her attorney.
>
> D.A. Middleton:  You used this information that you got from the defense in questioning -- in asking questions to Maria Alfaro, didn't you?
>
> Dr. Edwards:  Yes.
>
> D.A. Middleton:  Well, did the defense tell you that Exhibit 90 was the person holding the child out in front?
>
> Dr. Edwards:  No, they didn't say that. . . .
>
> D.A. Middleton:  Did they tell you that the person in exhibit 90 was in fact one of the persons that was in the front yard?
>
> Dr. Edwards:  Yes.
>
> D.A. Middleton:  And did they tell you that the person in exhibit 89 was the other person that was in the front yard?
>
> Dr. Edwards:  Yes sir. . . .
>
> D.A. Middleton:  Did they tell you that both of those individuals were in the front yard?
>
> Dr. Edwards:  They told me that this individual was in the front yard, that that individual was the picture seen as being there, and that that person had been identified as Beto.

*See* RT 4204-06; *see also* Supp. CT 355 (February 20, 1992 pleading entitled "Request for Special Instructions").

68.  Monroe's erroneous identification of Roberto Frias Gonzalez as the second male present at the Wallace house at the time of the crimes severely prejudiced Ms. Alfaro at trial.

69.  During the first penalty trial, Ms. Alfaro was cross-examined by the assistant district attorney based on Dr. Edwards's report in which Dr. Edwards states that Ms. Alfaro first told her that the driver's name was "Miguel," then later agreed that it was "Beto."  RT 1633-34.  The fact that it was Dr. Edwards who pressured Ms. Alfaro to give a name, then told Ms. Alfaro that the man's name was "Beto," did not emerge until the second penalty trial, as Monroe chose not to call Dr. Edwards to testify at the first penalty trial.  RT 1978-80 (April 2, 1992 proceedings).  This rendered the production of Dr. Edwards's report to the prosecution unnecessary and unreasonable.

70.  In response to Monroe's argument that "Beto" did it, the district attorney subpoenaed Mr. Frias Gonzalez to court to allow him to establish his alibi, thereby making it look like Ms. Alfaro had lied about his involvement.  RT 1944.  Though insisting on usurping his client's right to decide how to plead, Mr. Monroe acceded to her request that he not cross-examine Mr. Frias Gonzalez (RT 1949), further convincing the jury that Ms. Alfaro had presented a trumped up defense.

71.  Monroe's erroneous identification of Beto as the third man also gave rise to the district attorney's devastating cross-examination of Ms. Alfaro and Dr. Edwards about Ms. Alfaro's inconsistency.  The district attorney used the fact that Ms. Alfaro had first told Dr. Edwards the driver was "Miguel" and then told Dr. Edwards that the driver was "Beto" as evidence that Ms. Alfaro was malingering; that she was lying about everything, including her remorse.  It was his knowledge that the district attorney would use Dr. Edwards to highlight Ms. Alfaro's inconsistency about the identity of the driver that caused him not to call her at the first penalty trial (*see* RT 1978-80 (April 2, 1992 proceedings)), thereby leaving him with no psychiatric expert to testify on Ms. Alfaro's behalf at the penalty trial.

72.  In addition, Monroe's erroneous identification of "Beto" as the driver undermined his cross-examination of Reynoso, whose testimony that Ms. Alfaro did not appear to be under the influence of drugs and that the second Hispanic man did

not enter the house was highly prejudicial.  Had he identified the proper subject, rather than focusing erroneously on Roberto Frias Gonzalez, Monroe could have proved Reynoso a liar, based on his false testimony that he did not know the driver, and the fact that the driver, with whom Reynoso spent the day while on parole for drug trafficking, was a well known drug dealer.  Instead, Monroe managed to bolster Reynoso's credibility by showing him a photograph of Frias Gonzalez and not the person who was present at the scene and asking him whether this was the man driving the car, to which Mr. Reynoso credibly answered, in agreement with what the jury had been told by the police, "That's not him."  RT 3491.

73.  In sum, because Frias Gonzalez was obviously not involved, Monroe's unsupported conclusion that he was, his continuing insistence that he was, and the evidence he created to make it look like Ms. Alfaro had admitted that he was, made her look like a liar who was trying to escape responsibility by blaming the crime on an innocent third party.  It caused her to lose the jury's sympathy.  In fact, a number of the jurors believed that trial counsel's claim that a man present at the scene was responsible for forcing Ms. Alfaro to commit the crime was just a defense ploy and that the man in fact never existed.  *See,* Exhibit 91 (Declaration of Ralph Glass) at ¶¶ 2-3; Exhibit 92 (Declaration of Ian MacNeil) at ¶ 2. It resulted in ineffective cross-examinations of key witnesses.  And it squandered the mitigating evidence that Ms. Alfaro was under extreme duress and the substantial domination of another person at the time of the crimes.  It resulted in Monroe's failure to develop other mitigating evidence arising out of the true identity of the driver as a drinking buddy of Ms. Alfaro's father and to whom she owed money for drugs he had provided to her within the preceding hours and days.  But for Monroe's conduct, it is probable that the outcome of the penalty phase would have been different.  *See*, Exhibit 125 (Declaration of Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶ 4.

64

## G.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND ACCURATELY IDENTIFY THE DRIVER AND ATTENDANT FAILURE TO DEVELOP AND PRESENT SUBSTANTIAL DOMINATION/EXTREME DURESS MITIGATION EVIDENCE

74.   Had Monroe adequately investigated the case, he would not have made the mistake he did concerning the identity of the driver.  All of the information necessary to accurately determine the identity of this individual was available to him.  But for his ineffective assistance as counsel, Ms. Alfaro could have presented a strong mitigation case based on Manuel Torres Graciano's substantial domination of her at the time of the crimes and the extreme duress she was under as a result of his threats to harm her and her family.  But for Monroe's ineffective assistance in this regard, it is probable that the result of the penalty phase would have been different.  *See*, Exhibit 126 (Declaration of Gerardo Rangel); Exhibit 124 (Declaration of Dianne De La Mare); Exhibit 125 (Declaration of Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶ 4; Exhibit 130 (Declaration of Lorelei Sontag, Ph.D.).

75.   There were substantial clues from which a reasonably competent attorney would have been able to accurately identify the driver of the brown Monte Carlo seen at the Wallace home at the time of the crimes as Manuel Torres Graciano.  *See* Exhibit 1 (McGrath Declaration) at ¶¶ 2-65.  Among them were the following:

76.   Through refusing to say who drove her to the Wallace home, Ms. Alfaro told the detectives during her confession that in the days after the crimes, she stayed in various motels with a man named "Manuel Flores ... something ... it's a long name."  CT 585-87.

77.   Juan Jiminez, who lived in the apartment where Ms. Alfaro stated she used drugs before going to the Wallace home, told police that on the day of the crimes, he had directed Ms. Alfaro to a local drug dealer named "Manuel."  Exhibit 43 (Jiminez interview).

78. Juan Jiminez had two relatives living nearby in Little TJ: Isabel Torres Hernandez, and Manuel Torres Graciano. Exhibit 51 (Sandberg notes). Manuel Torres Graciano was booked in Orange County for being in possession of and being under the influence of narcotics on August 8, 1989. On November 26, 1989, he was charged with violating Penal Code § 597, cruelty to animals. On January 19, 1990, he was charged with the same offense. On June 15, 1990, Torres Graciano was on probation. Exhibit 36 (Torres Graciano criminal record).

79. McDonald's manager Betty Cleary Soto told investigators that Ms. Alfaro had a boyfriend who picked her up at work in a brown Monte Carlo. Exhibit 1 (McGrath Declaration) at ¶ 19.

80. When Sheriff's investigators interviewed Isabel Torres on July 2, 1992, she told them that her brother Manuel Torres Graciano had "just" left for Mexico. She also told them that her brother knew Antonio Reynoso. Exhibit 44 (Tom Giffin's investigative notes) at 865-66 .

81. When defense investigator Sandberg interviewed Manuel Torres Graciano in Mexico, Torres Graciano told Sandberg that he was present when Rosie was arrested (Exhibit 23 at 5); that she was doing drugs that day (*id.* at 6); that Rosie was "messed up" on drugs -- cocaine and black tar heroin -- when they arrested her (*id.* at 7); that the "narcs" stopped and showed him a picture of Rosie and questioned him about his relationship to her and he identified her as a friend (*id.* at 8); that he sold drugs for a guy named "Kiko" (*id.* at 10); and that he left the U.S. shortly after Rosie's arrest. *Id.* at 12. Unreasonably, Sandberg failed to ask Torres Graciano if he was the one who had driven Ms. Alfaro to the Wallace home and whether he knew Reynoso, among other things.

82. Monroe did appreciate that Torres Graciano could have been involved, in that he sought fingerprint evidence for him, along with various other players, including Frias Gonzales. *See* Supp. CT 344-d (January 13, 1992). Yet he failed to draw the obvious conclusions that a reasonable attorney would have made; to wit:

66

1  Torres Graciano was the man who drove Ms. Alfaro to the Wallace home on June 15,
2  1990.

3      83.  Ms. Alfaro's defense was prejudiced as a result of Monroe's failure to
4  accurately identify the driver.

5      84.  Because he failed to find the right man, Monroe failed to develop and
6  credibly present evidence during the penalty phases of her trial to support the fact that
7  Ms. Alfaro was under extreme duress and the substantial domination of another
8  person at the time of the crime.  Ms. Alfaro herself could have provided this evidence
9  if Torres Graciano had been identified and rendered incapable of harming her and her
10  family.  *Cf.* CT 497a-497c (Ms. Alfaro attests that she is afraid to testify and will not
11  testify in open court so long as the driver is at large).  Facts about Torres Graciano --
12  such as his relationship with Ms. Alfaro's father, the fact that he had raped
13  Ms. Alfaro as a child (*see* Exhibit 1 (McGrath Declaration) at ¶¶ 28-30) and Exhibit
14  16 (Danto transcript) at 45), his role as Ms. Alfaro's drug dealer, his criminal history,
15  and his decision to flee to Mexico on July 2, 1990 -- would have provided a solid
16  foundation for an extreme duress/substantial domination defense.  It may also have
17  led to discoveries of forensic evidence further linking him to the crime scene.

18      85.  In addition, Monroe's erroneous conclusion about the identity of the driver
19  undermined Ms. Alfaro's defense in that it prevented Monroe from effectively cross-
20  examining key prosecution witnesses against Ms. Alfaro.  For example, Reynoso's
21  testimony that Ms. Alfaro had not used drugs on the day of the crime and that the
22  driver had not gone into the house was harmful to Ms. Alfaro's case.  Instead
23  of impeaching Reynoso for falsely denying knowledge of the driver's identity (as
24  noted above, Torres Graciano's sister Isabel had told Sheriff's investigators that
25  Torres Graciano knew Reynoso), Monroe ended up bolstering Reynoso's credibility
26  by showing him a photograph of Beto and eliciting Reynoso's truthful testimony that
27  the man in the picture was not the driver of the Monte Carlo.  RT 965.  Likewise,
28  Investigator Giffin's testimony that he had concluded that Ms. Alfaro acted on her

1  own could have been impeached by the records indicating that the investigator knew

2  Torres Graciano was the driver, but failed to pursue him even though the facts

3  supported the conclusion that he bore criminal responsibility for burglary, robbery,

4  and murder.

5      86.  Had Monroe correctly identified the driver, and provided the substantial

6  evidence that supported his role in the offense to the district attorney, he would have

7  substantially advanced Ms. Alfaro's penalty phase defense by undermining the

8  prosecution's theory of the case -- that Ms. Alfaro acted alone and thus was solely

9  responsible for the crimes.  As noted above, the available evidence established

10 probable cause to believe that Manuel Torres Graciano aided and abetted the burglary

11 of the Wallace home, and arguably the robbery and murder of Autumn Wallace.  This,

12 as well as the fact that Torres Graciano had left the country while on probation,

13 would have supported a request by the prosecution for Torres Graciano's extradition

14 as well as other efforts to obtain custody of Torres Graciano.  Had he been returned to

15 Orange County and charged with crimes arising out of the burglary, robbery and/or

16 murder of Autumn Wallace, the defense goal of spreading the responsibility for the

17 crimes would have been achieved.  Had the prosecution chosen not to take the

18 necessary steps to obtain Torres Graciano's presence, then Monroe would have been

19 entitled to argue that the prosecution knew of his role in the offenses and was

20 intentionally preventing the jury from hearing from him and that the jury should infer

21 that, had he been available, he would have supported Ms. Alfaro's statement that she

22 entered the home with the intent to burglarize it only, and that Torres Graciano, on

23 probation at the time, was furious that Autumn Wallace had seen him and pressured

24 Ms. Alfaro to kill her.  But for Monroe's conduct, it is probable that the outcome

25 of the penalty phase would have been different.

26     87.  A death sentence was not a foregone conclusion in this case.  It is

27 reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different

28 result would have been obtained at trial.  *See* Exhibit 91 (Declaration of Ralph Glass)

68

1   at ¶ 4; Exhibit 122 (Declaration of Denise Coburn) at ¶4; Exhibit 125 (Declaration of

2   Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶¶ 2-4; Exhibit

3   130 (Declaration of Lorelei Sontag, Ph.D.).

4   **H.   COUNSEL'S FAILURE TO ADEQUATELY ARGUE THE FACTS**

5         **THAT SUPPORTED A PENALTY PHASE DEFENSE OF**

6         **SUBSTANTIAL DOMINATION AND EXTREME DURESS**

7       88.   During both the guilt and penalty phases of Ms. Alfaro's trial, Monroe

8   acted unreasonably in arguing that the second Hispanic man present at the Wallace

9   home, and not Ms. Alfaro, was responsible for Autumn Wallace's death.  In trying to

10  prove too much -- that Petitioner was not the killer and had not intended to kill

11  Autumn Wallace -- Monroe undermined Petitioner's mitigation case by failing to

12  effectively present the evidence that would have supported the mitigating factor set

13  forth in Penal Code § 190.3(g), whether or not defendant acted under extreme duress

14  or under the substantial domination of another person.  In truth, Ms. Alfaro was under

15  extreme duress and the substantial domination of another person at the time she

16  committed the crimes.  *See, e.g.*, CT 497a-497c; Exhibit 16 (Danto interview) at 43-

17  54.  Monroe's failure to make the mitigation argument consistent with the evidence

18  and his insistence on making an argument that was not supported by the evidence

19  rendered his representation ineffective.

20      89.   There was no evidence to support the argument that the driver of the

21  Monte Carlo, and not Ms. Alfaro, delivered the fatal stab wound to Autumn Wallace.

22      90.   There was evidence that the Hispanic man entered the home, and thus, that

23  he could have seen Autumn Wallace and pressured Ms. Alfaro to "do something"

24  about this eyewitness to their burglary:

25        a.   Ms. Alfaro said the third man came inside the house during her

26  videotaped confession.  CT 534, 543; *see also* RT 625-26.

27        b.   A blood stained paring knife was found on the floor outside the

28  bathroom where Autumn Wallace was killed.  During her confession and thereafter,

1  Ms. Alfaro insisted that the paring knife was not the knife she had used to stab
2  Autumn.  She described the knife she used as bigger than the paring knife, and
3  consistently reported that she had placed it in her purse and had taken it with her after
4  wiping it off on a pink towel that she did not take with her.  CT 527-28, 546, 579-80,
5  597; RT 919, 1152, 1704-08, 1728, 3559, 3572, 4261, 4265.  She stated that later that
6  afternoon, she discarded the knife she used in a dumpster behind a Carl's Junior
7  restaurant.  CT 537-38, 543, 578.  Criminalist Kenny Wong reported finding blood
8  smears on the exterior front and back of a shoulder bag and bloodstains on the inside
9  of the bag belonging to Ms. Alfaro.  Exhibit 52 (Wong report re blood in handbag).
10 He testified that Ms. Alfaro's vinyl handbag tested positive for blood, but that he did
11 not test the blood for age or type.  The investigators testified that Mrs. Wallace had
12 reported a knife larger than the paring knife missing from her kitchen drawer.  RT
13 4263 (Wong); RT 735, 737 (Linda Wallace testifies a knife was missing).
14          c.  A pink towel with a blood smear that looked significantly like a knife
15 swipe was found by Orange County Sheriff's Office investigators inside the house in
16 April Wallace's bedroom on the day after the crime.  Defense forensic expert, Mark
17 Taylor, testified that the mark on the pink towel could not have been produced by the
18 paring knife left at the scene.  RT 3806.
19          d.  Coroner David Masamichi Katsuyama testified at Ms. Alfaro's guilt
20 phase trial that Autumn Wallace's wounds were consistent with the paring knife
21 found at the scene.  RT 759, 768-69.  He noted, however, that some of the wounds
22 could have been caused by a larger knife blade.  RT 769-773, 805.  At the second
23 penalty trial, Dr. Katsuyama stated that a "large number of wounds [were] probed,"
24 and that a twelve inch blade could not have caused the wounds because it would have
25 penetrated to the depth of the blade.  RT 3247-54.  On cross-examination,
26 Dr. Katsuyama admitted that he probed "most of [the wounds]" (RT 3277), but only
27 measured six of the more than fifty wounds.  RT 3278.  He admitted that he earlier
28 testified that he probed only six wounds.  RT 3279. He further admitted that some

of the wounds had openings that were about one and one fourth inch in maximum dimension.  RT 3288.  Moreover, he testified that nothing specifically indicated that the knife was inserted up to hilt.  RT 3293.  Notably, the autopsy report indicates that only two wounds were measured for depth of penetration.  *See* Exhibit 24 (autopsy report).

     e.  A footprint, approximately size 12, was found outside the Wallace's front door in the dirt that could not be identified as that of anyone known to be present at the scene.  RT 1042.

     f.  Two witnesses contradicted the prosecution's story that only Ms. Alfaro went inside the Wallace home because all the witnesses who saw the car outside the house at the time of the crime also saw two men outside the house.  Ryan Joseph Finan, who was on Monroe's February 25, 1992 potential witness list, but was never called, told Orange County Sheriff's investigators that he saw the car, but saw no people.  *See* Exhibit 25.  Lien Nguyen told the investigators that she saw two people in the back of the car, presumably referring to Antonio "Shorty" Reynoso and Ms. Alfaro's child, Manny, and not Manuel Torres Graciano.  *See* Exhibit 26; CT 551 (Shorty and Manny were seated in the back of the car).  Thus, these witnesses would have supported the defense argument that Manuel Torres Graciano entered the house with Ms. Alfaro, thereby supporting Ms. Alfaro's testimony that she was under extreme duress and the substantial domination of another person at the time of the crime.  *See, e.g.*, CT 497a-497c; RT 1636, 1735.

91.  Nevertheless, Monroe unreasonably stated during his opening statement in the guilt phase that there was no evidence that anyone other than Ms. Alfaro had entered the house.  *See* RT 625-26.

92.  Not only did Monroe fail to make the argument he could have made regarding Ms. Alfaro's substantial domination by the other person, he persisted in presenting the argument that the third man, and not Ms. Alfaro, had killed Autumn Wallace after the jury rejected it in the guilt phase.  Moreover, he persisted in

presenting it to the second penalty jury even though he knew that it had been rejected by eleven of the twelve jurors in the first guilt phase. *See* Exhibit 40 (Laura Lawhon's notes dated April 28, 1992 of interviews with first penalty phase jurors).

93. In sum, while the argument that the driver of the Monte Carlo and not Ms. Alfaro had killed Autumn Wallace was inconsistent with Ms. Alfaro's confession, and there was no evidence to support it, the evidence was consistent with the defense that Ms. Alfaro acted under the substantial domination of another person and under extreme duress. Monroe provided ineffective assistance of counsel to Ms. Alfaro in failing to present this argument and in presenting the same argument to the second penalty jury that had been rejected by the jury in the guilt phase and by first penalty phase jury. A death sentence was not a foregone conclusion in this case. It is reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different result would have been obtained at trial. *See* Exhibit 91 (Declaration of Ralph Glass) at ¶¶ 2-4; Exhibit 124 (Declaration of Dianne De La Mare); Exhibit 125 (Declaration of Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶ 4; Exhibit 130 (Declaration of Lorelei Sontag).

**I.   COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND DEVELOP MITIGATION EVIDENCE, TO UTILIZE RETAINED EXPERTS, TO RETAIN NECESSARY EXPERTS AND TO PRESENT AVAILABLE MITIGATION EVIDENCE**

94. Mr. Monroe unreasonably failed to conduct an adequate penalty phase investigation and develop mitigation evidence that was available to him at the time of trial; unreasonably utilized the experts that he retained, thereby wholly undermining their value as credible mitigation experts. Trial counsel furthermore failed to consult appropriate and necessary experts to explore and explain matters raised by the investigation that was conducted, and by the investigation that should have been conducted. There was no tactical reason for counsel's failures in this regard.

72

1        **1.      Counsel's Failure to Conduct an Adequate Penalty Phase**

2                  **Investigation**

3        95.  All penalty phase investigations in capital cases must be thorough.

4   *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S. Ct. 2527, 2538, 156 L. Ed. 2d 471

5   (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) ("[T]rial counsel did not fulfill

6   their obligation to conduct a thorough investigation of the defendant's background"),

7   *citing*, ABA Standards for Criminal Justice 4-4.1 cmt. at p. 4-55 (2d ed. 1980); *also*

8   *see* 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1982)

9   ("The lawyer also has a substantial and important role to perform in raising mitigating

10  factors both to the prosecutor initially and to the court at sentencing . . . .

11  Investigation is essential to fulfillment of these functions.").  "When it comes to the

12  penalty phase of a capital trial, '[i]t is imperative that all relevant mitigation

13  information be unearthed for consideration.'" *Stankewitz v. Woodford*, 365 F.3d 706,

14  719 (9th Cir. 2004), *citing Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir.

15  2003), *quoting Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).  Counsel's

16  duty is not discharged merely by presenting some limited evidence.  *Id.* at 716.

17       96.  Trial counsel failed to conduct reasonably necessary investigation to

18  determine and document Ms. Alfaro's family background and social, medical and

19  psychiatric history.  Had he done so, he would have discovered many aspects

20  of Ms. Alfaro's life that her jury should have known before they were charged with

21  the responsibility of determining her fate.  *See*, i.e., Exhibits 93-121 (family history

22  records); Exhibit 130 (Declaration of Lorelei Sontag, Ph.D).  For example, the jury

23  was totally unaware that when Ms. Alfaro was six or seven years old, her mother

24  placed her in front of her husband's car to prevent him from leaving home.  Instead

25  of staying home, however, Ms. Alfaro's father proceeded to hit his daughter with the

26  passenger side of the car and push her along the concrete wall, leaving her scraped

27  and bloody.  Exhibit 3 (Declaration of Silvia Melendez Alonso) at ¶ 32.

28

97.   Unpredictable familial violence peppered with verbal intimidation and insults was rampant, committed against Ms. Alfaro by her mother, father and grandfathers. *Id.* at 11-14, 17; Exhibit 7 (Khazanov Declaration) at ¶¶ 37-41.  This treatment had a direct and extremely negative impact on Ms. Alfaro's self-esteem. *Id*.

98.   Ms. Alfaro's father used her as a pawn in his own criminal behavior. Exhibit 8 (Stewart Declaration) at 19.  He took her to supermarkets, where he held her in his arms as he stole large pieces of meat, which he hid in his jacket, behind her body. *Id*.  This process is known clinically as "corruption," one of many tactics which thwarts the child's perceptions of appropriate behavior and interpersonal relationships.  It also makes the child a participant in the adult's wrong-doing, instilling a sense of guilt and confusion. *Id*.

99.  Counsel also failed to pursue lines of investigation concerning Petitioner's family history of mental illness, her cognitive deficits, and Petitioner's behavior and functioning near and during the time of the alleged offenses.  Ms. Alfaro has a genetic predisposition to addiction.  Not only was her father an alcoholic, her grandfathers on both sides were alcoholics.  Aberrant behavior by numerous relatives on both sides, likely reflecting significant psycho-pathology, is also reported.  Exhibit 8 (Declaration of Pablo Stewart, M.D.) at 7, 9.  Ms. Alfaro's cognitive deficits and her learning disabilities are shared by her brother and at least one of her sons. *Id.* at 15-17.  School records that appear not to have been provided to Dr. Morales include concrete evidence of severe cognitive disabilities from a very early age.  Exhibit 10 (Declaration of Cynthia Asprodites, Ph.D.).  At approximately age 16, Ms. Alfaro suffered a concussion in a car accident resulting from her boyfriend driving drunk. She hit the windshield and suffered multiple facial abrasions, a cervical spine sprain and a possible spine fraction, in addition to the concussion.  Exhibit 8 (Stewart Declaration) at 21.

100.  The scattershot penalty phase case Monroe presented failed to effectively emphasize the mitigating factors present in Ms. Alfaro's case, including but not

74

limited to, her lack of a criminal felony record or record of crimes of violence, her violently abusive childhood, physically and mentally, her mental disabilities, the fact that she became a mother at fourteen, her youth, and her genuine remorse.  Although trial counsel presented a smattering of disabilities suffered by Ms. Alfaro, Monroe failed to have an expert discuss the cumulative impact of her mental disabilities, use of drugs, and other relevant information.

101.  Among his other failings, Mr. Monroe asked the experts he did retain the wrong referral question -- focusing on the guilt phase of the trial, and not the penalty phase.  He failed to provide the experts with records and witness statements necessary for them to draw appropriate conclusions.  And he failed to retain other experts, including but not limited to a neuro-psychologist, despite clear indications from the experts he did hire that testing for organic brain damage was called for.  Counsel have an obligation to conduct an investigation that will allow a determination of what sort of experts to consult.  Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert.  The instances of Monroe's ineffective assistance with respect to the experts he did hire and the resulting prejudice to Petitioner, resulted in Petitioner receiving ineffective assistance of counsel.

102.  Had trial counsel conducted the investigation reasonably required and consulted appropriate experts, they would have been able to present abundant, compelling evidence that Ms. Alfaro suffers organic brain damage, and the effects of those deficits upon her development, behavior, and functioning; that Ms. Alfaro has a family history of psychiatric illness and substance abuse, and the effects of that history; that Ms. Alfaro suffered much more extensive effects of abuse, trauma, and neglect than was demonstrated at trial; and the nature and effects of Ms. Alfaro's psychiatric illness and substance abuse disorders.  But for counsel's failure to develop and present this evidence, it is reasonably likely a more favorable outcome would

1    have been obtained. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,

2    80 L. Ed. 2d 674 (1984).

3         **2.**    **Counsel's Failure to Effectively Utilize the Experts He Retained**

4              **a.**    **Martha Rogers, Ph.D.**

5         103.   At Mr. Monroe's request, psychologist Martha Rogers, Ph.D., was

6    appointed as a defense expert by order dated September 25, 1990.  The order

7    provides:  "The purpose of the appointment will include, but is not limited to, the

8    evaluation and explanation of the personality and the behavior of MARIA DEL

9    ROSIO ALFARO and to assist the attorney in cross-examining the expert testimony

10   of the conclusions reached by the opposition.  It may also assist the attorney in

11   discovering a possible defense based on mental defect."  Exhibit 2 (Declaration

12   of Martha Rogers) at 4; CT 987.9 materials.  Monroe unreasonably restricted his

13   preparation of Ms. Alfaro's defense to the guilt phase of the trial, thereby

14   unreasonably failing to use Dr. Rogers to develop and present penalty phase

15   mitigation evidence which could have been developed and presented had Monroe

16   provided effective assistance of counsel. *Id*.

17        104.   In addition, Monroe acted unreasonably in having Dr. Rogers administer

18   an MMPI test to Ms. Alfaro, instructing her not to complete her analysis or write a

19   final report, and then providing her raw data and rough notes to other defense experts

20   who were unqualified to interpret them. *See* Claim 23.  During his cross-

21   examinations of defense experts Morales and Edwards about Dr. Rogers's rough note

22   "probable fake bad," the district attorney succeeded in making Ms. Alfaro look like a

23   liar who was faking remorse for the crimes she had committed.  Had Monroe

24   instructed Dr. Rogers to prepare a final report, it would have emerged that the

25   notation "probable fake bad" was an incorrect conclusion. *See* Exhibit 2 (Rogers

26   Declaration) and Exhibit 5 (Declaration of Charles Stanislaw, Ph.D.).  Instead, the

27   district attorney was able to make much of the phrase, calling Dr. Rogers himself to

28   have her explain that it meant that "there may have been some exaggeration or

overstatement of whatever this person's current psychiatric condition is," and that it could mean the person was malingering.  RT 4268.  Had Monroe taken the opportunity to cross-examine Dr. Rogers after she was called to testify by the prosecutor, which, unreasonably, he did not (*id*.), he could have brought out the many alternative explanations for the results, which Dr. Rogers had specifically told him about, such as that the test subject was admitting personal and emotional problems to get help sooner.  *See* Exhibit 2 (Rogers Declaration) at 7-8.

105.  In addition, Monroe ignored Dr. Rogers' conclusion that Ms. Alfaro "should have Neuro work up."  *Id.* at 5.

### b.    Consuelo Edwards, M.D.

106.  At Monroe's request, psychiatrist Consuelo Edwards was appointed as a defense expert by order dated August 13, 1991.  CT 987.9 materials.  Her sole referral question was, "What was the state of mind of Miss Alfaro at the time of the alleged crime?"  *See* Exhibit 27 (Edwards' psychiatric evaluation); RT 4102.  Once again, Monroe unreasonably focused his preparation of Ms. Alfaro's defense on the guilt phase of the trial, failing to use Dr. Edwards to develop and present available penalty phase mitigation evidence.

107.  In addition, Monroe unreasonably used Dr. Edwards to force Ms. Alfaro to identify Roberto Frias Gonzalez as the third man.  *See* Claim I.F, *supra*.  At the time Monroe set up Dr. Edwards to have the discussion with Ms. Alfaro in which she pressured Ms. Alfaro to admit that "Beto" was the second Hispanic man present at the Wallace house, Monroe knew that Ms. Alfaro was unwilling to identify this individual or to implicate anyone else in killing Autumn Wallace.  If he sought to use Dr. Edwards' testimony to provide the jury with his version of the facts, the effort was wasted.  As  Monroe told the trial judge when he rested at Ms. Alfaro's first trial, he was unable to call Dr. Edwards to testify because, as a result of the fact that he had used her to elicit inconsistent information from Ms. Alfaro, her testimony would have been harmful to Ms. Alfaro's case.  RT 1978-81 (April 2, 1992 proceedings).  This

did not, however, prevent him from calling her at Ms. Alfaro's second penalty trial, which was in and of itself unreasonable and ineffectual. Inasmuch as the jury was instructed at the second penalty trial not to consider Ms. Alfaro's statements relayed through Dr. Edwards (*see, e.g.*, RT 4038-50) for the truth, but only to consider them for the impact they had on Dr. Edwards' opinion (RT 4039), his effort was again in vain. Furthermore, revisiting the facts of the crime through Dr. Edwards served to diminish the impact of Dr. Edwards' testimony about Ms. Alfaro's impairments that, if viewed alone and independently, would have been powerful mitigation testimony.

108. Additionally, Monroe unreasonably presented evidence developed by Dr. Edwards regarding Ms. Alfaro's Post Traumatic Stress Disorder and depression to defend against guilt, thereby undermining its value as mitigation evidence.

109. Finally, Monroe failed to explain to Ms. Alfaro that her statements to psychiatrist Edwards were not confidential. *See* Exhibit 4 (Maria del Rosio Alfaro Declaration). When Ms. Alfaro learned that this was not the case, that Dr. Edwards' report had been provided to the prosecutor, who used it to cross-examine her, the attorney-client relationship was further eroded.

110. Monroe had available to him substantial evidence that Ms. Alfaro was intoxicated at the time of the offense. Monroe's unreasonable failure to present evidence that Ms. Alfaro could not conform her conduct to the requirements of law because of intoxication at the time of the offense (Penal Code § 190.3(h)) resulted in ineffective assistance of counsel.

111. During Ms. Alfaro's interrogation on June 27, 1990, Ms. Alfaro informed Investigator Giffin that she had started using daily the week or so before the crime (CT 510); that she obtained two dimes of coke and two dimes of black tar heroin on the day of the crimes before she committed the crimes; that Sabrina injected her in the neck and she injected Sabrina in the neck around 2:00 p.m.; that Shorty asked to use her needle after this and she used a second time with Shorty (CT 515-18); and that she was coked out at the time of the crimes. CT 526.

78

112.   Sabrina Duran has attested that she and Ms. Alfaro used drugs together the morning of the crime.  Exhibits 6, 48, 128.  There is no evidence that Monroe interviewed Ms. Duran about her use of drugs with Ms. Alfaro, despite Ms. Alfaro's statement to the Sheriff's investigator that she used drugs with Sabrina on the day of the crime.  Exhibit 128.

113.   Though Antonio Reynoso denied at trial that he had used drugs with Ms. Alfaro on the day of the crime, his statement to law enforcement on July 2, 1990 indicates that he believed Ms. Alfaro was under the influence.  Exhibit 22 (Transcript of Reynoso's statement to sheriff's investigators).  Yet Monroe neither questioned Reynoso about this nor attempted to interview him or other witnesses to Ms. Alfaro's drug use on June 15th, such as Juan Jimenez.  Exhibit 1 (McGrath Declaration) at ¶ 54.  Moreover, Reynoso had been out of prison, for selling drugs, only one week at the time of the crime and was jailed for a parole violation on July 2, 1990, the day he surrendered to police.  *Id.* at ¶¶ 58-82.  He was sent to prison for violating his parole on October 12, 1990, as a result of being under the influence of drugs.  Exhibit 28 (Reynoso's criminal record).  Monroe failed to question him about any of this  to impeach his testimony that he was not using drugs on the day of the crime and that he did not believe Ms. Alfaro had done so.

114.   The evidence of Ms. Alfaro's intoxication on the day of the offenses is so compelling that in Respondent's Brief, the Attorney General admits that Ms. Alfaro was addicted to heroin and cocaine at the time (RT 4); and that she injected these drugs shortly before committing the crimes.  *Id.* at 4-5.  Specifically, the Attorney General admits that Ms. Alfaro bought two dime bags that afternoon and that she shot up at least twice, including once with Shorty.  *Id.; see also* CT 515 (during interrogation, Investigator Giffin asks Ms. Alfaro, "how much did you pick up?" A: "Um, I think it was two (2) and two (2).  Like two (2) dimes of coke and two (2) dimes black.").

115.  From her testimony at the suppression hearing, it is clear that Dr. Edwards was qualified to make at least a preliminary assessment regarding Ms. Alfaro's intoxication at the time of offenses and that Monroe unreasonably failed to ask her to do so.  *See* RT 196-277.  Additionally, although Monroe had references to toxicologists who could develop this evidence, he declined to retain them.  Exhibit 38.

### c.      Armando Morales

116.  Monroe unreasonably retained Dr. Armando Morales as the sole mitigation expert at the first penalty trial, unreasonably failed to retain him until March 18, 1992, the day both the prosecution and defense rested in the guilt phase of the trial, and unreasonably failed to provide Dr. Morales with all of Ms. Alfaro's relevant family history and background materials.  *See* Exhibit 29 (Morales' report).  Monroe's failure to begin preparing a penalty phase defense in an adequate amount of time violated Ms. Alfaro's right to receive the effective assistance of counsel during the penalty phase.  Had Morales been able to spend more time with the family, he would have been able to learn key facts, known to family members, that supported the mitigation case.  Similarly, had Dr. Morales been provided with all relevant materials regarding Ms. Alfaro's family and social history and background, his testimony regarding critical events in Ms. Alfaro's life and their impact on her development would have been significantly bolstered and one may reasonably posit that Ms. Alfaro's sentence would have been life without the possibility of parole, instead of death.  *See* Exhibits 3, 7, 8, 9; Exhibits 93-121 (family history records); Exhibit 126 (Declaration of Gerardo Rangel); Exhibit 124 (Declaration of Dianne De La Mare); Exhibit 130 (Declaration of Lorelei Sontag, Ph.D.).

### d.      Marc Taylor

117.  Marc Allen Harstein, a forensic specialist with the Orange County Sheriff Coroner's Forensic Sciences Service, gathered and analyzed evidence collected at the crime scene.  RT 1029.  Among the items he examined was a Kenmore microwave,

1  which was found in the master bathroom of the Wallace home.  According to Mr.

2  Harstein, a latent print of Ms. Alfaro's left palm was found on the top left corner of

3  the microwave.  RT 1052-53.  Mr. Harstein did not indicate whether other finger

4  prints or hand prints were found on the microwave.

5      118.  Defense counsel retained, Marc Taylor, a crime scene forensic expert.

6  Although Mr. Taylor reviewed the forensic evidence in this case, it does not appear

7  he was asked to conduct a latent print examination of the microwave from the

8  Wallace home.

9      119.  This omission was unquestionably ineffective.  Ms. Alfaro repeatedly

10  insisted that a third person was in the Wallace home with her.  As such, trial counsel

11  had an obligation to develop any and all information that would establish this

12  person's presence in the home.  Based upon information and belief, there is a strong

13  likelihood that the latent prints of the third party will be found on the microwave.

14      120.  Unfortunately, Petitioner has been thwarted in her efforts to establish this

15  claim by the State.  On February 13, 2009, Petitioner's forensic specialist, Lisa Allyn

16  DiMeo,  personally examined several trial exhibits retained by the Orange County

17  Superior Court.  Exhibit 129 (Declaration of Lisa Allyn Di Meo).  Although Ms.

18  DiMeo examined the Kenmore microwave oven that was recovered at the scene

19  (Exhibit 64), the evidence custodian precluded her from processing the microwave

20  for evidence of latent prints.  Exhibit 129 at ¶ 10.

21      121.  Trial counsel was also ineffective for failing to present complete

22  testimony regarding the shoe prints found at the scene of the crime.  Defense trial

23  expert Marc Taylor prepared a detailed report regarding his findings.  Specifically, he

24  concluded the following regarding a shoe print found at the scene:

25       During the initial examination of evidence, shoe prints in blood were
        examined that could have been produced by the shoes . . . . purported to
26       belong to Maria Alfaro.  These shoes did not produce the shoe prints that
        were photographed and cast from outside the house.   On Item #49
27       [bathroom tile], additional shoe prints were found that did not match any
        of the shoes examined in this case.  These shoe prints were produced in a
28       transparent liquid that tests positive with a presumptive test for blood.

1
2

The prints appear to have been produced by stepping in serus fluid
separated from blood in the area of the body after the stabbing.

3    Exhibit 127 (Report by Marc Taylor, March 17, 1992).

4    122.  At trial, Mr. Taylor testified regarding his findings.  As a demonstrative
5    aid, he referred to a foam board containing four photographs.  RT 3763-67.
6    Photograph A was a portion of bathroom flooring.  Photograph B was a cast of the
7    shoe print located in the driveway area in front of the Wallace home.  The cast
8    reflects zigzag shoe prints.  Photographs C and D were photographs of shoe prints
9    found on the bathroom tile and both had zigzag prints.  Accordingly to Mr. Taylor's
10   testimony, the shoe prints from C and D matched "the class characteristics of the
11   pattern that is in the cast of the shoe prints from outside."  Mr. Taylor confirmed that
12   neither C nor D matched any other shoe prints, including Ms. Alfaro's L.A. Gear
13   shoes.  RT 3765-66.

14   123.  Mr. Taylor was never given an opportunity to explain how the footprint
15   in Photograph C contained serus material.  After asking Mr. Taylor to explain serus
16   material, which is "the liquid component within the blood," Mr. Monroe went directly
17   to discussing the blood found on the pink towel in the bathroom.  RT 3768.   Noticing
18   the omission, Mr. Taylor attempted to volunteer his opinion regarding shoe prints:
19   "By the way, my final conclusion on these shoe prints - -."  RT 3768.  The prosecutor
20   objected to Mr. Taylor's answer because there was "no question pending."  RT 3769.
21   Unfortunately, Mr. Monroe refused to ask the question Mr. Taylor required to deliver
22   his critical opinion.  Instead, he persisted in his discussion of the pink towel.  RT
23   3769.  Nor did Mr. Monroe revisit the issue with Mr. Taylor at a later time in the trial.
24   As a result, the jury never learned that the same zigzag shoe print that matched the
25   shoe print found in the driveway area of the house -- the same place where the Brown
26   Camaro was located -- was made in the bathroom at or near the time of Autumn's
27   death.

28

124.   The omission was devastating to Ms. Alfaro's case.  The entire defense theory was that another person threatened to murder Ms. Alfaro's infant if Ms. Alfaro did not kill Autumn.  But without any independent evidence to establish that someone was not only in the bathroom, but there at the time of the murder, the jury would have been hard-pressed to believe it.  As the lone hold-out during the second penalty phase of Ms. Alfaro's trial explained, such evidence would have been critical to a life verdict:

> While there was mention of a third person in the house with Rosie, the defense never presented the jury with information about who that third person was.  I don't believe that Rosie was alone in the house.  If some evidence of the third person had been given to the jury, I would not have been convinced to change my vote to death.

Exhibit 123 (Declaration of Brent Conley) at ¶ 4.  Mr. Taylor could have also refuted the prosecution's expert, Douglas J. Lucas.  Mr. Lucas claimed that these shoe prints were made *before* the blood was put down on top of them.  RT 3406.  Mr. Taylor could explained that the shoe prints contained serum, showing that they were made at or near the time of Autumn's death.

125.   Not only did trial counsel deprive the jury of critical evidence regarding the timing of the zigzag shoe print, trial counsel failed to elucidate the strong similarity between the zigzag shoe print in the dirt outside (Photograph B) and the zigzag shoe prints in the bathroom (Photographs C and D).  A competent, well-informed expert could have drawn a much more compelling conclusion for the jury.  As Forensic Specialist Di Meo explains:

> In reviewing the photographs of the shoeprint impressions recovered from the soil in front of the victim's residence, I noted two different shoeprint patterns.  Several partial prints were observed that exhibited a zigzag pattern.  Also noted were prints made by a different design of athletic shoes.  These shoeprints are in the area of the front door where witnesses reported seeing the occupants of the Monte Carlo.  The source of these impressions was never determined.  However, a comparison between the partial zigzag shoe tread pattern of the imprints documented outside the residence to the zigzag prints on the floor in the bathroom correspond in size, shape and design to each other, and may have originated from the same source shoes.

Exhibit 129 (Declaration of Lisa Di Meo), at ¶ 7.

1

2

**3.** **Counsel's Failure to Retain and Present the Testimony**

**Of appropriate Experts and Lay Witnesses**

3   126.  Monroe unreasonably failed to develop and present mitigation evidence,

4   including, but not limited to, mental health evidence, that was available at the time

5   of trial, had he collected all relevant information, interviewed necessary lay

6   witnesses, followed the suggestions of the experts he did hire, and hired qualified

7   experts.  Counsel's failure in this regard rendered his representation of Ms. Alfaro

8   ineffective.

9   **a.** **Failure to Retain and Present Testimony of a Neuro-**

10   **psychologist and Appropriate Lay Witnesses**

11   127.  The facts of which Monroe was aware triggered the need for him to hire a

12   neuropsychologist to determine whether Ms. Alfaro suffered from organic brain

13   damage at the time of the crime and sentencing.  *See, e.g.*, Exhibit 2 (Rogers

14   Declaration) at ¶ 5.  His failure to retain a neuropsychologist and present that expert's

15   testimony, as well as the testimony of lay witnesses who would lend support to a

16   finding of brain damage, was ineffective assistance of counsel.  *See*, Exhibit 126

17   (Declaration of Gerardo Rangel); Exhibit 124 (Declaration of Dianne De La Mare);

18   Exhibits 93-121 (family history records); Exhibit 130 (Declaration of Lorelei Sontag).

19   128.  Natasha Khazanov, Ph.D., the neuropsychologist retained by state habeas

20   counsel, has concluded after testing that Ms. Alfaro suffers from serious organic brain

21   damage and did so at the time of the offenses.  Exhibit 7 (Khazanov Declaration).

22   Dr. Khazanov identified "both localized dysfunction -- primarily in the frontal lobes -

23   - and diffuse damage in both the left and right hemispheres, affecting her overall

24   cognitive and neurological functioning."  *Id.* at ¶ 151.  As  a result of these

25   impairments, Ms. Alfaro's abilities to plan or carry out a specific course of action, to

26   act independently or make informed decisions, to interpret social or interpersonal

27   cues (whether verbal or nonverbal), to assess her environment or specific situations

28   and respond rationally or thoughtfully, are severely and chronically impaired.  These

84

1  impairments, debilitating in themselves, are likely to be exacerbated both by the
2  presence of drugs and her ongoing dependency, and by the residual, long-term effects
3  of chronic substance abuse, which is essentially a form of repeated exposure to highly
4  damaging neurotoxins. *Id*.

5      129.  Moreover, Ms. Alfaro's ability to retain information and relay that
6  information accurately (even as accurately as it was originally perceived) is seriously
7  impaired.  These impairments, individually and cumulatively, have left Ms. Alfaro an
8  unreliable reporter of details, highly vulnerable to the influence and suggestions
9  of those around her.  They have also resulted in inconsistent reports by Ms. Alfaro
10  which have raised the specter of manipulation and intentional dishonesty.  Given her
11  extensive impairments, such characterizations are highly suspect and likely
12  ill-informed.  Any characterizations or assumptions which overlook or fail to consider
13  the effects of her multiple, severe impairments do her an extreme disservice and lack
14  clinical credibility. *Id*.

15      130.  The signs and symptoms of this damage have been documented since
16  elementary school and the findings and observations of numerous clinicians confirm
17  that both the existence and the severity of her impairments are longstanding and
18  irreversible.  Moreover, the effects of her organic impairments are compounded by
19  several co-existing conditions, including chronic underlying mental illness, seriously
20  compromised intellectual functioning, and chronic substance abuse and dependency.
21  At critical points in her life, the effects of her organic impairments have also been
22  exacerbated by her history of chronic physical and psychological trauma.  While it is
23  impossible to determine the causes of these conditions, it is clear that their symptoms
24  and effects are inter-related and cumulative. *Id*.

25      131.  It is Dr. Khazanov's professional opinion that findings consistent with the
26  foregoing would have been reached at the time of Ms. Alfaro's arrest and trial, had
27  she been evaluated by a qualified neuropsychologist.  It is also her opinion that the
28  need for a thorough neurological assessment was abundantly clear at all points

85

relevant to Ms. Alfaro's trial, and for many years prior to that time.  That assessment
was never conducted.  Until Dr. Khazanov's assessment, the nature and extent
of Ms. Alfaro's brain damage was never investigated or understood.  Because this
critical information was never obtained, all assessments of Ms. Alfaro's mental state
rendered prior to her 1992 trial were incomplete and unreliable.  *Id.*

132.  The many indicators of organic brain damage and the records
documenting them (detailed in section II.A. of Exhibit 7 (Declaration
of Dr. Khazanov)), coupled with the observations and impressions of the experts who
examined Ms. Alfaro pre-trial, were sufficiently powerful and consistent to warrant
further investigation of her mental state.  This should have included interviews aimed
at obtaining data and observations from a broader range of family members, other lay
witnesses, and prior examining professionals.  This additional investigation,
including critical witness interviews, was essential to an accurate assessment of any
issues pertaining to Rosie Alfaro's mental state and personal history.

133.  Given Ms. Alfaro's long history of mental illness and substance abuse,
any statements made while she was under the influence of drugs or experiencing
symptoms of drug withdrawal were very likely inaccurate, incomplete, or otherwise
unreliable.  The same is true of any statements made by Ms. Alfaro regarding events,
perceptions, memories, or her own mental state which took place when she was using
or withdrawing from drugs or alcohol.  Exhibit 7.

134. Ms. Alfaro's combined disabilities suggest that she may well have been
unable to assist in the preparation of her defense.  Her profound deficits in memory
and comprehension make it very likely that she was unable to comprehend the issues
involved in her case or to accurately relate to counsel relevant information concerning
the offense, including but not limited to the extent of her participation and the roles
played by others in that offense, and her personal history and experience, especially
regarding the extent and consequences of her own impairments.  These obstacles
were almost certainly compounded by her age (18 years old at the time of arrest, 20

86

when convicted and sentenced to death) and the unique circumstances of her pre-trial detention, including giving birth to twins while in custody and the prolonged separation from her four sons.  Given her history of victimization and betrayal, the combined stress of protracted legal proceedings (including two hearings to determine whether she would live or die), the courtroom setting itself, and her perception of hostility from both the judge and her own attorney very likely produced further mental decompensation.  *Id*.

135.  Mental illness is not static.  Especially in individuals like Ms. Alfaro, who suffer multiple disabilities, mental state can quickly deteriorate, especially in response to changes in environment, physical illness or medical conditions, external stressors, changes in psychiatric or other medications, or even the passage of time.  Ms. Alfaro's history includes episodes of severe depression, a range of physically and emotionally self-destructive behaviors, and numerous suicide attempts.  Given this history and the severity of her impairments, Ms. Alfaro's in-custody suicide attempt in October of 1991, should have triggered a re-investigation of her mental state.  Similarly, her transfer to the mental health unit during her second penalty phase trial should have caused all parties to re-assess her mental state and competency to proceed.  *Id*.

136.  Dr. Khazanov's clinical findings and observations, confirming the presence of significant organic brain damage, including profound frontal lobe deficits, are extremely relevant to several specific factors, set forth in Penal Code § 190.3, to be considered in determining Ms. Alfaro's penalty.  It is her opinion that at the time of this offense, Ms. Alfaro was serious mentally impaired.  She suffered the cumulative effects of longstanding brain damage, low intelligence, and a serious psychiatric disorder characterized by chronic depression and dissociative features, all while under the influence of heroin and cocaine in significant quantities.  As  a result, her ability to conform her conduct to the requirements of the law, control her behavior, or comprehend the consequences of that behavior was severely impaired.

87

At the time of the offense, Ms. Alfaro was only 18 years old and extremely immature. She had minimal education, profoundly impaired judgment, a mental age far below her chronological age of 18, and a long history of neglect, abandonment, sexual victimization, and physical abuse.  It appears that her participation in the homicide was prompted, at least in part, by threats to herself and her 1-year-old son, who was at that moment in the physical custody of an older, domineering male co-defendant, a recently-released ex-convict with a known propensity for violence who had driven Ms. Alfaro to the crime scene.  *Id.*

### b.   Failure to Retain and Present Testimony of a Qualified Psychiatrist and Appropriate Lay Witnesses

137.  Monroe recognized that he had undermined Dr. Edwards value as a psychiatric expert by using her to extract contradictory information from Ms. Alfaro regarding the identity of the man who drove Ms. Alfaro and Reynoso to the Wallace home.  *See* RT 1978-81 (April 2, 1992 proceedings).  But instead of hiring a psychiatrist who could testify about Ms. Alfaro's mental disabilities without significant impeachment, and focusing that expert on the *penalty* phase of the case, he persisted in using Dr. Edwards.  Had Mr. Monroe retained a qualified psychiatric expert to focus on the penalty phase of the trial, and presented the testimony of lay witnesses who could have provided support to the psychiatrist's findings, he would have developed evidence that would have had a probability of changing the outcome of the case.  Exhibits 8 (Stewart Declaration) and 7 (Khazanov Declaration); *see also* Exhibit 126 (Declaration of Gerardo Rangel); Exhibit 124 (Declaration of Dianne De La Mare); Exhibits 93-121 (family history records); Exhibit 130 (Declaration of Lorelei Sontag).  In particular, the following findings, among others noted in the declarations referenced above, would have contributed to a finding of mitigating circumstances warranting a sentence less than death:

138.  At the time of the crimes, Ms. Alfaro suffered from serious organic brain damage, chronic depressive disorder, Posttraumatic Stress Syndrome, and substance abuse/dependence.

139.  The effects of Rosie Alfaro's cognitive impairments were consistently documented throughout elementary school.  Early signs and symptoms of her underlying psychiatric illness were observed during the same years.  Depressive and dissociative symptoms have been acknowledged and documented since the time of her arrest at the age of 18, yet rarely have they been treated in any consistent or meaningful way.  Those symptoms, as well as a range of symptoms and behaviors associated with PTSD, persist today.  The severity of her drug addiction, and its devastating effects on her mental and physical health, are beyond dispute.

140.  Ms. Alfaro's psychiatric conditions must be considered in the context of her early experiences.  Ms. Alfaro suffered early and chronic physical and emotional abuse which was sufficiently severe to exacerbate pre-existing brain damage and underlying psychiatric illness.  Her ongoing abuse also induced the post-traumatic symptomatology which profoundly impaired her perceptions, insight and behavior on the day of Autumn Wallace's death.  Rosie Alfaro struggled through her childhood and adolescence in an environment characterized by chaos, unpredictable violence, and a pervasive lack of safety.  In addition to the chronic abuse and neglect within her own home, Ms. Alfaro suffered acute traumas in the form of molestation and rape.

141.  All of Ms. Alfaro's impairments were present during her pre-trial detention and her trial.  They were almost certainly exacerbated by the circumstances of her confinement (not the least of which was her pregnancy, delivery of twins, and separation from her babies while incarcerated at the Orange County Jail), by her young age and immaturity, by the prolonged separation from her four young sons, by her confusion regarding the legal process and the court proceedings themselves, and by her belief that her own attorney had first sabotaged her most fundamental desire --

1    to assume responsibility for this tragic crime -- and subsequently misled and

2    humiliated her as she took the stand wholly unprepared.

3        142.  Beyond the limitations associated with low intelligence and learning

4    disabilities, Ms. Alfaro's cognitive impairments left her more vulnerable to physical

5    and psychological abuse.

6        143.  Ms. Alfaro exhibits a wide range of symptoms consistent with trauma-

7    based conditions.  In addition to the unpredictable violence suffered regularly in her

8    home, Ms. Alfaro has consistently reported being raped by a "drinking buddy" of her

9    father as a young child.  Her mother's description of her obsessive compulsive house

10   cleaning, which began at the age of nine, supports Ms. Alfaro's report of a rape.  In

11   addition, substance abuse (using massive quantities of any drug available) and

12   chronic addiction, beginning at a very young age, are frequently related to untreated

13   childhood victimization.  The circumstances of the offense might well have triggered

14   memories of her assault and abuse.  More importantly, they very likely triggered

15   memories of the emotions associated with it: terror, confusion, guilt, helplessness.

16   These factors make it extremely unlikely that Ms. Alfaro would come away from that

17   experience with her memory intact, thereby explaining inconsistencies in her report

18   of the crime.  Exhibit 8.

19       144.  Any assessment of Ms. Alfaro's reports of the offense must look not only

20   to their inconsistencies, but also to those aspects which have remained consistent over

21   time.  The most striking aspect of her reports of the offense, since her arrest, is her

22   clear desire to accept responsibility for this tragic killing.  *Id*.

23       145.  Ms. Alfaro's drug history is remarkable in several respects.  It began

24   when she was a very young girl (sniffing organic solvents at 8 or 9; alcohol at 10;

25   PCP, heroin and cocaine at 12).  Before her 15th birthday, Ms. Alfaro had been

26   diagnosed with Cocaine Abuse and Withdrawal, Polydrug Abuse and Withdrawal,

27   and Chemical Dependency and Heroin Withdrawal.  Her responses and her drug use

28   history reveal a young girl who turned to drugs to deaden her emotional pain.  The

90

quantities she consumed, her young age, the fact that she became addicted almost immediately, her choice of drugs (heroin, preferably in combination with cocaine), and her willingness to take almost any substance to alter her consciousness are further evidence of self-medication.  Adolescent heroin addicts often have histories of chronic childhood trauma.  Comorbidity of depression and substance abuse is documented in the clinical literature, as is that of PTSD and substance abuse.  *Id.*

146.  An unusual number of known risk factors -- biological and environmental -- left Ms. Alfaro predisposed to suffer, in addition to her other disabilities, a severe depressive illness.  Evidence of that depression was observed early in her childhood.  Ms. Alfaro attempted suicide twice prior to trial.  Since her conviction, California Department of Corrections personnel have consistently diagnosed her and prescribed medication for serious, sometimes debilitating, chronic psychiatric disorders.  *Id.*

147.  Many of Ms. Alfaro's impairments were recognized at trial.  Drs. Edwards and Morales did, in fact, diagnose some of Ms. Alfaro's disabling conditions, any one of which might be debilitating in and of itself.  However, those diagnoses, individually or in combination, do not accurately describe Ms. Alfaro's mental state.  Her conditions are such that an accurate assessment must recognize and examine the complex interplay between and among these disabilities.  That analysis was not conducted.  A fundamental factor affecting every aspect of Ms. Alfaro's mental state -- i.e., assessment of organic brain damage and neuro-cognitive impairments -- was never undertaken.  Moreover, Ms. Alfaro herself was examined and judged by standards which failed to properly consider her unique limitations and the unique range of factors which impaired her perceptions and memory.  The pre-trial evaluations and expert testimony given at trial were, for these and other reasons, inherently flawed.  They were incomplete and unfocused, in large part because they were conducted by evaluators whose primary role was neither clinical nor therapeutic.  The experts who assisted trial counsel were charged with discovering the identity

91

1    of the third accomplice at the Wallace homicide.  This role necessarily interfered with

2    a competent professional's ability to conduct an accurate clinical assessment.  (*Id*.

3           148.  While it is true that most of the trial experts were also charged with

4    conducting forensic evaluations, even that aspect of their examinations was distorted

5    and misdirected by defective, inappropriate, and/or meaningless referral questions.

6    Counsel failed to provide his mental health experts with the direction, clarity, and

7    context necessary for a meaningful and truly relevant examination.  (*Id*.

8           149.  Although Dr. Edwards was retained for the stated purpose of evaluating

9    Ms. Alfaro's mental state at the time of the offense, "she recalls that much of her

10   evaluation was aimed at discovering the identity of the third party (the second,

11   unidentified male) who was present at the crime scene."  Exhibit 7 (Khazanov

12   Declaration) at ¶ 101.  Dr. Khazanov provides several examples of Dr. Edwards' role

13   as an interrogator, rather than evaluator, of Ms. Alfaro.

14          150.  In addition, included in trial counsel's file is a two-page, detailed chart

15   comparing the physical features and characteristics of "SHORTY," "BETO," and

16   "COMPOSITE."  Exhibit 30 (Anatomical type chart by Consuelo Edwards).  Under

17   "ANATOMICAL TYPE," Shorty is described as "ENDOMORPHIC," Beto

18   as "MESOMORPHIC," and the composite drawing as "ATHLETIC

19   MESOMORPHIC."  A handwritten note on the first page states that "this is from

20   Dr. Edwards."  (Id.  This chart is further evidence that Dr. Edwards devoted a

21   significant amount of her time (and her medical training) to the identification of the

22   second accomplice, an investigative task which conflicted with her duty to thoroughly

23   assess Ms. Alfaro's mental state.

24          151.  Trial counsel engaged Bruce Danto, M.D. to inject Ms. Alfaro with

25   Sodium Pentathol and thereby induce her to identify the third individual who was

26   present at the crime scene.  Court documents and Dr. Danto's statements to the press

27   confirm that, despite his training and qualifications as a psychiatrist, Dr. Danto's role

28   was essentially that of counsel's investigator or interrogator.  *See* Exhibit 16

(transcript of interview); Exhibit 7 (Khazanov Declaration) at ¶¶ 103-105, notes 86-91; and, Exhibit 17.  A series of clinical articles found in trial counsel's files and appended to his request for expert funds confirms that Dr. Danto was indeed acting in a non-clinical (and non-therapeutic) capacity.  Exhibit 31; *see also* Exhibit 17.  They also raise questions about the appropriateness of this technique (the Sodium Pentathol interview), even as an investigative tool.

152.  The articles shed light on the use of so-called "truth serums" and the role played by Dr. Danto in conducting a Sodium Pentathol interview of Ms. Alfaro.  Three of these articles are from highly respected professional journals.  These articles discuss the use of Sodium Amytal and "Amytal interviews" in the context of clinical assessment and diagnosis.  Although they reach different conclusions, these articles discuss the possible role of Sodium Amytal interviews in distinguishing between specific symptoms of psychotic and depressive disorders, and in the treatment of catatonia and severe organic stuporous states.  At not point in his examination of Rosie Alfaro was Dr. Danto's interview focused on diagnostic or treatment issues.

153.  A fourth article in counsel's files discussed the use of hypnosis and Sodium Amytal interviews "in attempts to gain access to memories that do not seem to be readily accessible to usual conscious efforts of recall."  That article, presenting these issues in the context of one case history, found that "neither of these procedures turned out to be the hoped-for 'truth-serum...'"

154.  Only one of the articles in counsel's files is specifically addressed to the use of "various truth serum drugs" as employed by Dr. Danto in his examination of Rosie Alfaro.  That article -- "The Use of Brevital Sodium in Police Investigation" -- was authored by Dr. Danto himself and appeared not in a clinical journal, but in a law enforcement magazine, *The Police Chief*.  In that article, the interviewee is referred to as "suspect, witness, or defendant."  Perhaps more important, however, is Danto's description of himself as "a psychiatrist and police officer."

155.  The presence of these articles in counsel's files is significant for several reasons.  They indicate that, although this technique has potential clinical/diagnostic uses, those uses were neither explored nor considered as part of Dr. Danto's examination.  They confirm that Dr. Danto, although trained as a mental health professional, was in fact acting as a criminal investigator/interrogator when he examined Ms. Alfaro.  Finally, the presence of these articles in counsel's files suggests that both Dr. Danto and Ms. Alfaro's attorney were aware that the techniques used in Danto's examination were clinically questionable.  Their apparent indifference to the standard of care is also reflected in an e-mail from counsel's lead investigator, David Sandberg, which states: "DANTO SCARES ME BUT WE HAVE NOTHING TO LOOSE [sic]."

156.  In sum, Rosie Alfaro suffered from severe psychiatric, neurological, cognitive and emotional disorders which are longstanding and debilitating.  These disabilities existed at the time of the offense, and they have persisted at all times since.  Indeed, Ms. Alfaro's brain damage, her chronic depressive disorder, and Posttraumatic Stress Disorder were present and observed throughout most of her childhood and adolescence.  As  Ms. Alfaro reached adolescence, they were compounded by chronic self-destructive drug abuse and addiction.  It is Dr. Stewart's professional opinion that these conditions are related and intertwined; their effects are cumulative, disabling and overwhelming.

157. For more than a year prior to her capital trial, Ms. Alfaro sought to plead guilty to the charges stemming from Autumn Wallace's death.  It is Dr. Stewart's professional opinion that this was the product of sincere remorse and a desire to accept responsibility for her actions -- to do "the right thing."  However, her desire to plead guilty was in no way an attempt to achieve what some have called "state-assisted suicide."  Despite her chronic psychiatric impairments, Ms. Alfaro did not want to be sentenced to death; to the contrary, she was terrified by that prospect.

158.  It is very possible that Ms. Alfaro's multiple disabilities rendered her unable to assist counsel in preparing and presenting a legal defense.  Her ability to recall and relate relevant information to her attorney were severely hampered by her longstanding cognitive impairments and memory deficits.  Her confusion with respect to legal issues is documented in pre-trial jail records, and descriptions of her affect and demeanor in the courtroom suggest that she was unable to comprehend or participate in the trial proceedings.  Her impairments in perception, attention, memory and comprehension may well have been exacerbated by the psychotropic medications prescribed and administered by clinical staff throughout her detention and trial.

159.  It is Dr. Stewart's professional opinion that these factors, in addition to her documented history of severe impairments, should have prompted a full investigation into Ms. Alfaro's competency to stand trial.  As  part of that investigation, competent mental health evaluators should have considered the possible effects of all psychiatric medications administered to Ms. Alfaro in the weeks and months prior to trial and during the trial itself, including changes in her medication regimen and any corresponding changes in her behavior or presentation.

160.  It is also Dr. Stewart's opinion that a full and comprehensive evaluation of Ms. Alfaro's competency should have been conducted at the time of her second penalty phase hearing.  Her perceptions of sabotage and humiliation by her own attorney during the first penalty hearing were so powerful that Ms. Alfaro formally requested new counsel, an action quite out of character for this malleable young woman.  This in itself indicates that the damage she sustained during the first trial was indeed severe.  Furthermore, in the time between her first trial and the commencement of her second penalty hearing, her medication dosage was doubled.  During that same period, her classification within the Orange County Women's Jail was changed due to her need for "acute mental health care."  These changes, in addition to the cumulative effects of ongoing incarceration and the prospect of a second hearing to determine (literally) whether she would live or die, constitute

circumstances sufficient to warrant a full evaluation (or re-evaluation) of Ms. Alfaro's competency to proceed.  Given her history of betrayal and victimization, and her perception of betrayal by counsel during her first penalty hearing, any competency evaluation at that time should have specifically addressed Ms. Alfaro's ability to assist Mr. Monroe, in particular, int eh preparation and presentation of her case for mitigation.

161.  The sentencing court in Ms. Alfaro's case was required to consider specific factors in mitigation pursuant to California Penal Code § 190.3, including: subsections (d) that the offense was committed while Ms. Alfaro was under the influence of "extreme mental or emotional disturbance"; (g) that she acted under extreme duress or under the "substantial domination" of another; (h) the fact that, at the time of the offense, Ms. Alfaro's capacity to conform her conduct to requirements of the law was impaired "as a result of mental disease or defect, or the affects of intoxication"; and (i) Ms. Alfaro's youth at the time of the crime.  It is Dr. Stewart's professional belief that, as a result of genetic, developmental, environmental, neurological and psychiatric factors beyond Ms. Alfaro's control, she suffered substantial cognitive and psychiatric impairments relevant to subsections (d), (g), and (h).  With respect to subsections (d) and (h) in particular, Ms. Alfaro's mental capacity was severely impaired by multiple psychiatric disabilities *and* the affects of intoxication (both heroin and cocaine).  It is Dr. Stewart's further belief that the same cognitive and psychiatric impairments render the mitigation of subsection (i) -- Ms. Alfaro's age (18 at the time of the offense) -- especially salient and compelling.

### c.   **Failure to Retain and Present Testimony of a School Testing Expert and Present Appropriate Lay Witness Testimony**

162.  Ms. Alfaro was eighteen years old at the time of the offenses.  CT 1737. Her age should have been a significant factor in mitigation.  *See* Penal Code § 190.3(i).  Instead, however, the trial judge discounted her age as mitigating evidence, stating,

96

1
2
3
4
5
6

it does appear that the defendant was eighteen years old at the time of the crime. If mere age by itself without any other factor is involved, it would appear perhaps that the age of eighteen might be a mitigating factor in the case. The Court feels that you have to put the age in context of what her background shows that she had dropped out of school at an early age, been out on the streets for a substantial period of time, been involved in the drug culture for a substantial period of time, things of that nature. So it would appear that in a streetwise sense she was much more mature than her age would indicate. So it doesn't appear that the age of the defendant at the time of the crime is really a substantial mitigating factor in the case.

7    CT 1812. Had Monroe hired the appropriate experts, and introduced the testimony

8    of both an expert and appropriate lay witnesses, this conclusion would have been

9    impossible for the trial court to reach and Ms. Alfaro would have been given credit

10   for the substantial mitigating factor her youth represented. Exhibit 10 (Declaration

11   of Cynthia Asprodites, Ph.D.). As habeas expert Dr. Cynthia Asprodites has

12   concluded:

13       163. Rosie Alfaro's records reflect that she was identified and referred for a

14   special needs assessment in the fall of second grade, just a few months after first

15   enrolling at Madison School in the Anaheim City School District ["ACSD"]. Her

16   second grade teacher observed that while her math skills were notably below grade

17   level, her reading and language skills were even more delayed. A handwritten note

18   on Ms. Alfaro's "Pupil Planning Form" states: "Reading - Beg. K level." She was 8

19   years old. Several months later, despite some improvement following provision

20   of supplemental support services, a formal assessment was recommended to

21   determine eligibility for special education services. As a result, it was determined

22   that Rosie Alfaro "is functioning 2 grade levels below expectancy in reading and

23   spelling." *Id*.

24       164. Despite apparent efforts to provide a range of services -- including speech

25   therapy, language acquisition and therapy, and reading labs -- her academic

26   performance remained significantly behind what was expected, especially given her

27   chronological age. At the end of the second grade, about one full year older than her

28   classmates, Ms. Alfaro could recognize only 22 letters of the alphabet and could

97

name only 19 of them.  The records do not suggest that Rosie ever completely
mastered the basic alphabet.  It is quite unusual for a child at that grade level not to
have mastered the alphabet.  This fact might suggest that Ms. Alfaro suffered
cognitive impairments in addition to her specific learning disabilities.  *Id*.

165.  During the fourth grade, Ms. Alfaro took the "Written Expression -
Proficiency Standards" Test designed to assess students of her grade level.  The
highest possible score was 18; minimum proficiency required at least 12 points.
Ms. Alfaro scored only 10.  Other standardized tests given that year, including the
Test of Language Development and Illinois Test of Psycholinguistic Abilities,
"showed Rosio's receptive vocabulary to be at the 5-6 (5 years and 6 months) level."
Ms. Alfaro was 10 years old.  Ms. Alfaro took the same tests one year later, in the
fifth grade, at 11-1/2 years old, but she was never able to succeed on items beyond a
9-year-old level.  *Id*.

166.  Ms. Alfaro's progress in school was consistently extremely poor.  During
the seventh grade and again in the ninth grade, after briefly enrolling in an alternative
high school, Rosie Alfaro left school while failing (literally) every class she was
enrolled in.  At the time of Ms. Alfaro's trial, an evaluating psychiatrist noted:

> Education:  Rosie Alfaro did not finish 7th grade.  She always had
> difficulty reading, spelling ... other subjects also bad.  She had poor
> attention, felt rejected by peers but had no problems with teachers.  She
> did not finish special courses in continuation school.

*Id*.

167.  Rosie Alfaro suffered significant learning difficulties which were
consistently recognized, and which significantly impaired her ability to function not
only academically, but emotionally, socially and cognitively as well.  In second
grade, her learning difficulties (referred to in some of her records as "handicapping
conditions") were documented, diagnosed, and the subject of Individualized
Education Plans [I.E.P.'s] intended to address her unique needs and impairments.  In
early 1980, her disorder was identified as "a specific learning disability in the
understanding and use of oral and written language" -- i.e., a language-based

98

disability.  Shortly thereafter, the school psychologist identified "a specific learning

disability in the establishment of the sound-symbol relationship basic to the

understanding and use of written language."  When first tested in second grade, and

throughout elementary school, it was agreed that Rosie Alfaro's learning difficulties

were not attributable to language acquisition -- i.e., they could not be explained by

her limited exposure to English:

> Her basic learning skills fall far below the normal range of functioning
> and do not appear to be related to lack of exposure to English.

She was subsequently placed in a Resource Special Program to address academic

deficiencies.  *Id*.

168.  In the fourth grade, Ms. Alfaro was diagnosed with a "disorder in

language acquisition and language comprehension"; her IEP identified a "language

disorder involving understanding and associating word meanings."  Her condition in

the fifth grade was similarly labeled a "disorder in language comprehension and

language expression"; her "Handicapping Condition" was "Language disorder

involving understanding and associating word concepts."  Language therapy was

provide to address deficits associated with a language disorder.  Assessment in sixth

grade, as a part of annual review, again confirmed a "disorder in language

comprehension and expression."  *Id*.

169.  These are serious and potentially disabling disorders.  They are

recognized and set forth as part of the standard *Diagnostic and Statistical Manual

of Mental Disorders* ("*DSM*"), published by the American Psychiatric Association.

The *DSM* sets forth the basic criteria for currently recognized mental diseases and

disorders, including childhood developmental disorders.  It was first published in

1952 and has subsequently been revised five times, most recently in 2000.  *Id*.

170.  During Rosie Alfaro's childhood and adolescence, the *DSM-III* was in

use.  That version, as well as the *DSM-III-R* (updated in 1987), included "Specific

Developmental Disabilities" as class of disorders.  Despite variances in nomenclature,

the criteria for those disorders and our understanding of them have remained fairly consistent for more than two decades. Relevant to any assessment of Ms. Alfaro are the consistent, documented findings, throughout her childhood, of the two most common developmental language disorders: "Expressive Type" (disorders of vocal expression or "encoding"); and "Receptive Type" (disorders of language comprehension). It should be understood that the presence of both disorders often has a cumulative impact on an individual child's academic and cognitive functioning, with the functional deficits of each being exacerbated by the other. *Id.*

171. Clinical evaluations conducted pre-trial indicate that Rosie very likely suffered undiagnosed AD/HD in childhood; emotional problems and social difficulties from an early age are also part of her academic record. *Id.*

172. Ms. Alfaro's full brother, Jose Luis Alfaro, has suffered a serious seizure disorder since infancy. Other documents suggest that both Luis and Silvia Alfaro (Ms. Alfaro's full-sister) also suffered specific developmental disorders. *Id.*

173. The severity of an individual's impairments is likely to be exacerbated by the co-existence of neurological deficits, other mental or emotional disturbances, or multiple learning disabilities. This is a critical consideration in a thorough evaluation of Ms. Alfaro, not only during the critical developmental years of childhood and adolescence, but also in young adulthood. The records Dr. Asprodites reviewed suggested that several (if not all) of these potentially exacerbating factors were present during Rosie Alfaro's development. Notes of Dr. Rogers, written during psychological and intelligence testing, suggested that "[s]he should have Neuro workup..." and considered the possibility of "organic sequelae from drugs or syphilis or solvents." Several evaluators have either diagnosed, or noted significant symptoms of, a range of psychiatric and/or emotional disorders, including the following: Organic Brain Syndrome, Anxiety Disorders, Depressive Disorders (including Major Depressive Disorder and Dysthymia), Post-Traumatic Stress Disorder, Adjustment Disorders, Dependent Personality Disorders, and numerous

1  chronic substance-related conditions.  Records also consistently place her cognitive
2  abilities int eh range of "Borderline intellectual functioning."  *Id*.

3      174.  The records indicate that Rosie Alfaro, despite her chronological age (a
4  full year older than her classmates), was significantly less mature -- academically and
5  socially -- than the younger children in the classroom.  In second grade, her "Normal
6  Grade Placement" was consistently identified as "third."  Nonetheless, she
7  consistently performed academically at least two to three years below her already-
8  adjusted grade placement.  *Id*.

9      175.  At 8 years old, Rosie Alfaro took the Peabody Picture Vocabulary Test,
10 a well-established measure of receptive vocabulary, which reveals that Rosie had a
11 Mental Age of only 3-5 (3 years and 5 months).  Four months later, her Mental Age
12 on the same test had risen, but only to 4-4 (4 years and 4 months).  Despite evident
13 improvements within a short period, her performance on this test was unusually
14 deficient.  Scores like this in a young child suggest serious impairments.  In the case
15 of the Peabody Tests, Dr. Asprodites points to two factors: (1) the gap between her
16 chronological age and her measured mental age (8-1 vs. 3-5 on the first test; 8-4 vs.
17 4-4 on the second); and (2) the fact that on both tests, despite interventions aimed at
18 improving her skills, Ms. Alfaro's Mental Age was measured at approximately one-
19 half her chronological age.  This suggests that Ms. Alfaro was very possibly
20 struggling with a more disabling cognitive or neurological impairment.  *Id*.

21     176.  On other tests of achievement taken during the same period, her Age
22 Equivalency continued to trail about two years behind what was expected of someone
23 at her grade placement.  At approximately 8-1/2 years old, her Age Equivalency was
24 measured at 6-8 and 6-10.  At 9, her Performance Age still lagged two years behind
25 her chronological age: several tests measured her Age Equivalency as two years
26 behind, while other tests placed her mental age between three and four years below
27 her chronological age.  When Ms. Alfaro left school in her early teens, she was
28

101

1    performing academically and cognitively at roughly the level expected of a 9-year-old

2    child. *Id*.

3        177. An accurate assessment of Ms. Alfaro's maturity and her level of

4    functioning requires full consideration of the context of her abilities and life

5    circumstances. The Court's order (Exhibit 62 (190.4(e) hearing order dated 7/14/92))

6    identified several factors which provide critical information and insights regarding

7    her emotional and intellectual development and her level of functioning, including:

8    (1) her extremely limited academic progress and the brevity of her education; (2) the

9    unstable and chaotic childhood adolescence which left her homeless and vulnerable

10   for extended periods of time; and (3) early and prolonged exposure to toxic

11   substances, including alcohol, heroin and cocaine, known to compromise intellectual

12   and behavioral functioning, especially among those, like Rosie Alfaro, already

13   suffering with compromised intellectual functioning. *Id*.

14       178. This last factor is especially salient, as Ms. Alfaro's records confirm that

15   she became dependent on street drugs at a very young age and used chronically and

16   habitually for many years, including substances (such as organic solvent) known to

17   cause physical injury to the brain itself. She was admitted into detoxification and

18   rehabilitation programs at least twice as an adolescent. The extent of her addiction,

19   including the poor judgment and emotional turmoil which so often accompany (or

20   lead to) dependence and abuse, is reflected in her inpatient records from Doctors'

21   Hospital of Lakewood:

22       This is 13-year-old girl admitted here with a four year history of using
         drugs... [T]he patient has been using heroin and cocaine especially in the
23       last few months... [S]he is using intravenous drugs about three times per
         day. She has also been sniffing paint thinners. ... She required
24       medications to help with the withdrawal symptoms....

25   Another entry notes:

26       ...She would either use heroin or cocaine and occasionally make speed
         balls and use them conjointly...[S]he is unable to give me an idea of how
27       much....In addition to that, she was using alcohol...

28

1  Her diagnoses upon discharge were: (1) Polydrug Abuse, (2) Heroin Withdrawal, and

2  (3) Cocaine Withdrawal.  *Id.*

3  179.  Other evaluations also report heavy I.V. drug use (mostly heroin and

4  cocaine) by 13, chronic PCP use beginning at 14, and paint thinners while she was

5  only 11 years old.  these are toxins that almost certainly exacerbated whatever pre-

6  existing cognitive and intellectual impairments she suffered.  While awaiting trial,

7  Rosie Alfaro was given the Alcohol Use Inventory, the results of which "very

8  strongly suggest[ed] a diagnosis of Alcohol Dependence," closely related to

9  "considerable anxiety and depression" and "mental health problems of a significant, if

10 not serious, nature."  Another evaluator described her use of drugs and alcohol

11 as "self-medication beginning about age 10."  *Id.*

12 180.  Other documents and data point to several additional factors and

13 circumstances which might have a profound impact on a young woman's

14 development in all areas, including the following:

15 *Chronic violence within the home, with Rosie Alfaro as a frequent
16 witness to brutal beatings of her mother at the hands of her father;

17 *Sexual victimization (apparently including rape) in her own home by a family
   friend (or perhaps even a relative), when she was approximately 9 years old,
18 undoubtedly exacerbated by the secrecy, shame, terror, distrust, and betrayal
   commonly associated with early childhood exploitation;

19 *A striking lack of emotional support or even physical protection within her
20 parents' home, which was quite unstable, and usually consisted of an alcoholic
   (and frequently violent and periodically absent) father and an overworked
21 mother whose work responsibilities rendered her effectively absent for most
   of Rosie Alfaro's childhood and adolescence;

22 *Sporadic school attendance, including extended absences from the academic
23 programs made available to her, often triggered by unperfected (or
   unannounced) returns (sometimes for several months) to her grandparents'
24 village in rural Mexico, during which Ms. Alfaro apparently received no
   schooling of any kind;

25 *What appears to be a range of co-existing psychiatric and/or emotional
26 disorders which went unidentified and untreated, including several conditions
   known to be associated with Rosie's diagnosed developmental language
27 disorders -- *e.g.*, social difficulties (including extremely poor self-esteem),
   anxiety symptoms, depressive episodes, chronic concentration and attentional
28 deficits, trauma-related symptoms and behaviors, adjustment disorders,
   borderline intellectual functioning, and possible organic deficits; and

103

1   \*A home life characterized by a severe lack of boundaries (emotional, sexual,
2   and even generational), unrelenting intrusive criticism by her parents, and
    several other needy (disabled) household members whose needs distracted
3   from her own, including (for many years) an infirm and alcoholic father, a
    brother with a chronic seizure disorder from infancy, and a half-brother with
4   Down's Syndrome, born very close in time to the birth of Rosie's own first
    child.

5   *Id.*

6   181.  These are salient factors which would presumably be expected to

7   influence the emotional, intellectual, physical and social development of any

8   adolescent.  Any one of these factors places the child at greatly increased risk of

9   developing or exacerbating emotional, social, behavioral and/or cognitive

10  impairments which can severely thwart that individual's ability to function in society.

11  In Ms. Alfaro's case, these included significant deficits in her ability to reason and

12  her ability to accurately comprehend and interpret verbal information.  She had a

13  mental age of 9 when she left school for the last time at the age of 14.  The obstacles

14  to her academic achievement are well documented.  She made very little progress,

15  despite what appear to have been good faith efforts by appropriate professionals

16  to address her unique needs.  Lack of educational continuity, coupled with social

17  difficulties and low self-esteem, a chaotic (and frequently terrifying) home life,

18  the emotional upheaval of several moves between Anaheim and Mexico, as well

19  as complicating co-existing co-existing conditions (physical, cognitive and

20  emotional), diminished any possibility of progress beyond the very basic elementary

21  education she attended.  Her severe and chronic substance problem at an early age

22  intensified these risks.  It is possible that her academic and social failure and her early

23  addictions were, to some degree, related.  *Id*.

24  182.  These and other factor undoubtedly influenced her development, but not

25  in the manner suggested by Judge Millard.  None of the circumstances or events he

26  identified could be expected to render a severely compromised young woman

27  "more mature than her age would indicate."  They might result in a lifestyle, an

28  environment, and/or early experiences that most young women would hope to avoid.

104

Those circumstances would neither encourage nor result in maturity, insight, good judgment, or even basic personal safety.  Rather, the experiences, deprivations and afflictions suffered by Rosie Alfaro -- individually and cumulatively -- would almost inevitably result in extremely impaired social functioning, emotional and psychiatric disturbances, chronic vulnerability, self-destructive behaviors, and (ultimately) tragedy for herself and others.  *Id.*

183.  It is Dr. Asprodites professional opinion, based on the records, documents, and court transcripts she was reviewed, that at the time of the offense for which she has been convicted, Ms. Alfaro was in no sense, clinical or otherwise, "more mature than her age would indicate."  Rather, the materials strongly suggest that she was functioning at the other end of the spectrum, significantly *less* mature than many young women of her age.  She lacked the insight, stability, confidence, judgment, emotional support and intellectual resources necessary to function as a healthy 18-year-old young woman; instead, Rosie Alfaro labored under multiple impairments which further hindered her already-compromised ability to function and survive as a young adult.  *See also* Exhibit 126 (Declaration of Gerardo Rangel); Exhibit 124 (Declaration of Dianne De La Mare); Exhibits 93-121 (family history records); Exhibit 130 (Declaration of Lorelei Sontag, Ph.D.).

### d.    Failure to Retain and Present Testimony of a Qualified Psychologist and Appropriate Law Witnesses

184.  The prosecution was able to substantially advance its case in favor of the death penalty by introducing and repeatedly referring to Dr. Martha Rogers' preliminary notation on the raw MMPI test data "probable fake bad."  *See* Claim 22. Had Monroe hired a qualified psychologist to review the MMPI data once he knew Dr. Rogers' preliminary notation would be admitted, which he did after it was admitted in the first penalty trial and that trial ended in a mistrial, he would have developed substantial mitigating evidence.  Exhibit 5 (Declaration of Charles A. Sanislow, Ph.D.).  As  habeas expert, Dr. Charles Sanislow, Ph.D., has concluded:

105

185.  There are several possible reasons why a pattern indicating an invalid test administration such as that obtained on the validity scales by Ms. Alfaro might be produced.  One reason is that the person taking the MMPI was unable to understand or otherwise fully comprehend the items.  This might be the case in an individual with deficits in reading skills or comprehension.  A second reason is that the individual may have not been able to fully attend to the test stimuli.  This might be the case for a person who has attentional difficulties, or in the case where there are disruptions in the testing environment.  Another reason that such a profile can be produced is if the person has organic brain deficits to lead to confused states, attentional or other cognitive deficits similar to those found in the examples noted above. *Id*.

186.  It may also be the case that the person is grossly confused or disoriented. This can happen when an individual has undergone an extreme stressor (e.g., an acute institutionalization in a hospital or forensic setting).  It can also happen if the person is undergoing an acute psychotic break where they have lost touch with reality because of the rapid onset of a severe mental illness.  In this instance, the validity profile might colloquially be referred to as a "cry for help."  Another reason that such a profile might be produced is that person intentionally attempts to present his or herself in the worst possible light by endorsing all items with an apparent negative valence to ostensibly communicate to the examiner the worst state of distress possible.  This is colloquially referred to as a "fake-bad" profile.  An invalid profile similar to that produced by Ms. Alfaro may also be obtained from a person who randomly answers the test's questions. *Id*.

187.  A closer examination of the validity scales, including several important subscales, can assist in determining likely possible reasons for why invalid profile might have been produced.  These procedures involve examining if the respondent was less attentive to latter portions of the test compared to the first half (F(B)), or if there are patterns of inconsistent responses (VRIN).  The appropriate procedure is to consider these possibilities systematically, and then to look for independent evidence

106

that might corroborate or disconfirm these possibilities.  Depending on conclusions, the MMPI-2 might be re-administered.  In all cases of an invalid profile, however, it is inappropriate to interpret the clinical profile.  *Id*.

188.  From the information provided to Dr. Sanislow, including the computer-generated report and the handwritten notes of Dr. Rogers, Dr. Sanislow cannot conclusively determine the reason that an invalid profile was obtained.  Elevations on both the F and the F(B) scales indicate that Ms. Alfaro's pattern of responding to test items (or lack thereof) did not vary from the first half to the second half of the test.  Thus, it does not appear that the invalid profile was obtained because she fatigued during the administration of the test.  The elevated VRIN (variable response inconsistency) suggests that Ms. Alfaro answered questions with slight semantic variation inconsistently.  And elevated VRIN score is consistent with an individual who is confused or unable to fully comprehend the test times.  Given this pattern on the validity scales, it appears likely to Dr. Sanislow that the most straightforward explanation for an invalid test administration would pertain to Ms. Alfaro's reading and comprehension level.  *Id*.

e.   **Failure to Retain and Present Testimony of an Expert on Brain Development and Appropriate Lay Witness Testimony**

189.  Ms. Alfaro's turbulent and abusive childhood, compromised intellectual functioning and history of chronic substance abuse and dependency, which started at a very early age, also put trial counsel on notice that he should have retained an expert to explain the impact of those events on brain development.  Heredity may determine the basic number of brain nerve cells children are born with, and their initial arrangement, but this is just a framework.  A child's environment has enormous impact on how these cells get connected or "wired" to each other.  A child's experiences, good or bad, influence the wiring of her brain and the connection in her nervous system.  Loving interactions with caring adults strongly stimulate a child's brain, causing synapses to grow and existing connections to get stronger. Connections

107

1  that are used become permanent. If a child receives little stimulation early on, the

2  synapses will not develop, and the brain will make fewer connections.

3       190.  Stressful experiences also shape a child's developing brain. When

4  children are faced with physical or emotional stress or trauma, the hormone cortisol is

5  released.  High levels of cortisol can cause brain cells to die and reduces the

6  connections between the cells in certain areas of the brain.  Too much cortisol in the

7  brain can make it hard for children to learn and to think. And they may have trouble

8  acting appropriately in stressful situations.  Deprived of a positive, stimulating

9  environment, a child's brain suffers.

10       191.  A tremendous amount of structural and functional brain development

11  takes place during the teenage years.  As such, high levels of drinking and substance

12  abuse, particularly the use of heroine and cocaine, result in particularly devastating

13  impairments to the brain.  Alcohol and drugs impact both behavior and brain function

14  differently in adolescents than in and adults.  For instance, adolescents are more

15  vulnerable than adults to the effects of alcohol on both memory and memory-related

16  brain function.  *See* Exhibit 126 (Declaration of Gerardo Rangel); Exhibit 124

17  (Declaration of Dianne De La Mare); Exhibits 93-121 (family history records);

18  Exhibit 130 (Declaration of Lorelei Sontag).

19           **f.**    **Failure to Retain and Present Testimony of an Expert on**

20                **Environmental Toxicity and Appropriate Lay Witness**

21                **Testimony**

22       192.  Trial counsel should have conducted an investigation and retained an

23  expert to determine if Ms. Alfaro's childhood environment, particularly toxic factors,

24  caused her many disabilities and impairments.

25           **g.**    **Conclusion**

26       193.  A death sentence was not a foregone conclusion in this case.  It is

27  reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different

28  result would have been obtained at trial.  *See* Exhibit 91 (Declaration of Ralph Glass)

1  at ¶ 4; Exhibit 122 (Declaration of Denise Coburn) at ¶4; Exhibit 125 (Declaration of

2  Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶¶ 2-4.

3  Trial counsel's failure to retain and present the testimony of the above-named experts,

4  as well as the testimony of lay witnesses who would lend support to a finding of brain

5  damage, was ineffective assistance of counsel. Had trial counsel retained the

6  appropriate experts, provided those experts with necessary materials, it is probably

7  that the verdicts in this case would have been different.  Exhibit 130 (Declaration of

8  Lorelei Sontag, Ph.D.).

9  **J.      COUNSEL'S FAILURE TO MOVE FOR A CHANGE OF VENUE**

10      194.  Monroe unreasonably failed to move for a change of venue due to the fact

11  that the victim's mother and aunt worked for the Orange County Superior Court in

12  which Petitioner's trial was held.  Based on the victim's family's relationship to court

13  personnel, including the fact that one member of the court, the trial judge, would later

14  decide if Ms. Alfaro should live or die, and others, and including the prosecution

15  team, which had the discretion to seek or not to seek the death penalty and exercised

16  it to seek the death penalty, Monroe's failure to move for a change of venue was

17  unreasonable.

18      195.  As  she testified at trial, Linda Wallace, Autumn Wallace's mother, who

19  found her daughter's body in the bathroom of her home when she returned from

20  work, worked as a clerk for the Orange County Superior Court, where Petitioner's

21  trial was held.  RT 731, 3345.  Mrs. Wallace had worked there for approximately

22  fifteen years.  Exhibit 83 (Snell Declaration) at 6-7.

23      196.  Joyce Wallace, Autumn Wallace's aunt, also worked for the Orange

24  County Superior Court.  Exhibit 32 (Joyce Wallace Interview).  Joyce Wallace

25  worked in the financial division of the court (Exhibit 83 (Snell Declaration) at 6-7)),

26  where it is likely that she knew many of the court personnel involved in the trial.

27      197.  Monroe's investigator took notes on November 11, 1991, which indicate

28  that "lots of deputies" inquired of Ms. Alfaro why her attorney did not move for a

change of venue.  One deputy said she had lunch with Mrs. Wallace every day, according to Ms. Lawhon's notes.  Exhibit 46.

198.  Trial judge Theodore Millard's wife, Sondra, a travel agent, advertised in the Clerk's Union newsletter every month in 1992 in an advertisement that features a photograph of Sondra.  Exhibit 55; and Exhibit 1 at ¶ 71.  It is likely, as a result, that she knew many of the court personnel involved in the trial.  This also gives rise to a potential financial connection between the Millard's and clerks of the court.

199.  During the trial, employees of the Orange County Superior Court regularly attended the trial and held a bake sale on the courthouse grounds to raise money for the Wallace family.  *See* Exhibit 1 (McGrath Declaration) at ¶ 71.  This and other incidents evidenced a partiality on behalf of the justice system against Ms. Alfaro.

200.  State habeas counsel's investigator attempted to interview employees of the Court who were involved in and/or attended the trial, but they were unwilling to be interviewed absent court process.  *See* Exhibit 1 (McGrath Declaration) at ¶ 72.  State habeas counsel's investigator also attempted to contact Judge and Mrs. Millard, but was unable to do so.  *Id*. at ¶ 70.  If afforded discovery, additional facts supporting this claim and other claims would be established.  But for Monroe's incompetence in failing to move for a change of venue, there is a probability that the result of Ms. Alfaro's penalty trial would have been different.

**K.    COUNSEL'S FAILURE TO FILE A TIMELY MOTION TO SUPPRESS PETITIONER'S CONFESSION**

201.  Monroe's failure to raise the issue of the voluntariness of Ms. Alfaro's confession before the first day of trial, and his failure to adequately prepare for the hearing on the motion, resulted in Petitioner receiving the ineffective assistance of counsel.  In connection with this claim, Ms. Alfaro also alleges a violation of her Fourth Amendment rights.

110

202.  Monroe failed to raise the issue of the involuntariness of Ms. Alfaro's confession until Dr. Edwards raised it immediately before trial.  He did not file the motion until February 26, 1992.  CT 380.  Indeed, the court commented on Monroe's untimely filing as follows:  The court: "My clerk also explained to me when I was getting ready to come out on the bench this morning you had some other motion you wanted to file that you forgot about it.  I told her to give it back to you and you could attempt to file it in open court.  I don't know what it is.  I didn't look at it at all."  Monroe:  "It's a motion to exclude the defendant's videotape and statements, your honor, and the statements made to the investigating officers.  I can proffer that to the clerk of the court now."  The court: "Can I ask why that motion wasn't filed earlier?"  Monroe: "Because it only became evidence to me when I was discussing with Dr. Edwards testimony, possible testimony, with respect to the penalty phase.  And she was going over certain material and she was the one who observed that she believed that Miss Alfaro was under the influence at the time she had submitted to the videotape and had signed the Miranda warning."  *See* RT 133 (February 26, 1992 proceedings).

203.  It was unreasonable for Monroe to have failed to investigate fully the issue raised by his client's documented narcotics intoxication at the time she was questioned by the police.  An Orange County Sheriff-Coroner Department Forensic Services Report, Report of Toxicological Examination, produced to the defense, reports in bold print, "DRUGS DETECTED: COCAINE & BENZOYLICCONINE MORPHINE."  Exhibit 33.  Although Monroe's investigator appears to have identified a toxicologist who could perform the necessary investigation and provide expert testimony, Monroe did not pursue the matter.  Exhibit 38.  A reasonable attorney would have sought expert advice regarding the impact of the narcotics in Ms. Alfaro's system on her ability to make a knowing and intelligent waiver.

204.  It was particularly ineffective for Monroe to fail to bring a motion to suppress the confession until immediately before trial, given his theory of the case,

111

1   which was in direct conflict with Ms. Alfaro's video-taped confession.  Had he

2   brought the motion earlier, he would have appreciated that the confession would be

3   admitted and thus the impossibility of successfully defending Ms. Alfaro at a guilt

4   phase trial.

5       205.  Monroe's ignorance of the legal issues and his failure to prepare

6   Dr. Edwards to testify at the hearing are apparent from the hearing transcript.

7   *See* RT 196-278 (February 26 and 27, 1992 proceedings).  Dr. Edwards clearly

8   had no idea what the legal issues were or the meaning of the term "knowing and

9   voluntary."  Monroe, too, apparently had no idea what the legal issues were,

10  as he failed to draw or assist Dr. Edwards in drawing crucial distinctions, resulting

11  in Dr. Edwards giving a blanket endorsement to Ms. Alfaro's waiver of her right

12  to remain silent.  She responded to the prosecutor's question, "Did she understand

13  the Miranda rights?"  "She understood the Miranda rights."  RT 262.  Had Monroe

14  appreciated the legal issue and had he properly prepared the witness, she would have

15  clarified that while Ms. Alfaro may have understood her rights, she did not knowingly

16  and voluntarily waive them.

17      206.  Had Monroe retained a qualified expert, he would have been able to

18  establish that the influence of drugs on Petitioner rendered her confession involuntary

19  and the results of the guilt and penalty phases probably would have been different.

20  **L.   COUNSEL'S FAILURE TO ADEQUATELY ADVISE PETITIONER**

21  **REGARDING HER FIFTH AMENDMENT RIGHT**

22      207.  Monroe's advice to Ms. Alfaro concerning her Fifth Amendment right

23  to testify or not to testify was unreasonable, inadequate, and ineffective.  Monroe

24  misled Ms. Alfaro into taking the stand at her first penalty trial by telling her she

25  would not be cross-examined about the circumstances of the crime.  His advice was

26  unreasonable in that he had reviewed a letter she had written to Autumn Wallace

27  prior to her taking the stand, which he asked her to read to the jury while on the stand,

28  in which she wrote, "I'm sorry *we* took your innocent life."  A reasonably competent

attorney would have known this passage would open the door to cross-examination
about the circumstances of the crime, which in fact occurred.  Monroe unreasonably
failed to prepare Ms. Alfaro to testify about the circumstances of the crime given this
fact, and the fact that he had produced Dr. Edwards' report to the prosecutor (which
was in itself unreasonable, given that he did not call her at the first guilt or penalty
trial, and Petitioner so alleges), then opened the door for district attorney Middleton
to cross-examine Ms. Alfaro about the circumstances of the crime, in particular her
purported identification of "Beto" as the man who had pressured her to kill Autumn,
which he extracted from Dr. Edwards' report, making Ms. Alfaro look like a liar.
This was clearly prejudicial and, but for Monroe's incompetence, there is a
reasonable probability that the sentence would have been different.

208.  On direct examination, Monroe had Ms. Alfaro read a letter he had
previously reviewed (see RT 2130 (April 9, 1992 proceedings)) in which she had
written to Autumn Wallace, "I'm sorry we took your innocent life."  RT 1630-31.

209.  The following passage from the hearing outside the presence of the jury
requested by Monroe after the district attorney began to cross-examine Ms. Alfaro
about the circumstances of the crime establishes his unreasonable misunderstanding
of the scope of cross-examination, should Ms. Alfaro take the stand:

> Monroe:  We didn't raise anything in our direct examination to suggest
> any lingering doubt, your honor.  We strictly limited it to the background
> of the defendant as she was growing up and then the nature and extent
> of her genuine remorse for the family.
>
> Middleton:  However, that genuine remorse has to go to something, has
> to be to some crime that she must have committed.  Because the way
> she's telling it's self defense ---
>
> Monroe:  That was not anything that came out in her examination.
>
> Middleton:  Or defense of her child.
>
> Monroe:  Once again, your honor, none of that came out in the direct
> examination, and that was issues that the district attorney raised in the --
> what I consider the improper cross-examination.
>
> The court:  Well, you asked her specifically about how she felt about
> the killing of Autumn Wallace, okay.  And I think that definitely puts

113

1   in issue what she claims happened to Autumn Wallace and what her
2   culpability is in that.  Is she the primary actor?  Is she the only actor?
    Was there somebody else there?  We know that the idea of duress is not
3   a legal defense in California to a capital offense, there's a code section
    right on point.

4   Monroe:  PC 26.

5   The court:  And but that doesn't mean that that type of evidence in --
6   it doesn't exclude that kind of evidence in the penalty phase of a trial.

7   Monroe:  We didn't raise it.  etc....

8   The court:  I mean those are -- those are -- those circumstances could
    weigh very heavily in a trier of fact's mind to determine the real extent
9   of the culpability of the person in weighing the circumstances of the
    offense.

10  Monroe:  But they already had the opportunity to see that and weigh that,
    your honor, in the guilt phase.

11  The court:  Well, that doesn't mean they can't weigh further
12  circumstances of the offense in a penalty phase.

13  Monroe:  I don't deny that.  And they would be able to consider those
    factors from the guilt phase in the penalty phase.  I'm simply saying that
14  this is not issues that were raised by the defense in the penalty phase, and
15  it is improper cross-examination because it goes beyond the scope . . .

16  RT 1648-1651.

17      210.  As  a result of his erroneous and unreasonable belief that Ms. Alfaro

18  would not be cross-examined about the circumstances of the crime after he asked her

19  to read the letter, Monroe failed to prepare her for such cross-examination.  Exhibit 4

20  (Alfaro Declaration).

21      211.  In addition to his unreasonable advice concerning the scope of her cross-

22  examination, Monroe unreasonably misled Ms. Alfaro to believe that her discussions

23  with Dr. Consuelo Edwards were confidential and failed to prepare her for cross-

24  examination based on Dr. Edwards' report, which was produced to the prosecution.

25  Exhibit 4 (Alfaro Declaration).  Thus, when the district attorney began to cross-

26  examine Ms. Alfaro based on Dr. Edwards' report, Ms. Alfaro was wholly

27  unprepared.

28

114

212. Ms. Alfaro's unprepared testimony at the first trial was prejudicial to her and, but for Monroe's ineffective assistance, it is probable the outcome of her penalty trials would have been different.

213. The fact that the prosecution introduced Ms. Alfaro's testimony during her first penalty phase in its case in chief at her second penalty trial evidences its prejudicial nature. An employee of the District Attorney's office was permitted to read selected portions of Ms. Alfaro's earlier testimony to the jury. RT 3629-3731. The portion in which Ms. Alfaro expressed remorse for her crimes was not among them. Monroe unreasonably failed to admit this portion of Ms. Alfaro's testimony, although he had the opportunity to do so, further evidencing his incompetence as counsel.

214. As a result of Ms. Alfaro's experience testifying unprepared by her counsel for cross-examination at the first trial, she refused to testify at her second penalty trial. That her failure to testify at the second penalty trial was prejudicial is beyond dispute, as evidenced by the trial court's comments during the *Marsden* hearing on April 9, 1992, after the first jury had hung on penalty and before the second jury was impaneled:

> Mr. Monroe: I talked to Rosie about the importance of her getting on the stand and the jury seeing her or hearing her.
>
> The Court: Well, if you wanted a chance to spare her life after listening to the videotape, from a practical standpoint she had to testify.
>
> Mr. Monroe: That was my feeling.
>
> The Court: If she didn't testify, she didn't have much of a chance to save her life.

RT 2129 (April 9, 1992 proceedings).

215. Because Ms. Alfaro did not testify, her attorney's ability to introduce mitigating evidence through defense experts was dramatically curtailed. (*See*, *e.g.*, RT 3973-4199. None of her hearsay statements to these experts, including her expressions of remorse, came in for the truth of the matter asserted. Because this

115

1  prejudice flowed from Monroe's ineffective assistance to his client regarding her
2  Fifth Amendment right, and but for his ineffectiveness, the result of the proceeding
3  probably would have been different.  Habeas relief is warranted.

4  **M.    COUNSEL'S FAILURE TO SEEK AN  EVALUATION**
5        **OF PETITIONER'S COMPETENCY**

6        216.  According to the psychiatric expert retained by Petitioner's counsel,
7  a number of factors in addition to Ms. Alfaro's documented history of severe
8  impairments, should have prompted a full investigation into Ms. Alfaro's competency
9  to stand trial.  Exhibit 8 (Stewart Declaration) at ¶ 53; *also see* Exhibit 126
10 (Declaration of Gerardo Rangel); Exhibit 124 (Declaration of Dianne De La Mare).
11 Monroe's failure to request such an evaluation was unreasonable and rendered his
12 assistance as counsel ineffective.

13       217.  At no time did Monroe seek to have Ms. Alfaro evaluated to determine
14 whether she was competent to stand trial, despite the evidence available to him (from
15 the experts he hired and other facts of which reasonable counsel would have been
16 aware and he was or should have been aware) that indicated such an evaluation
17 should be undertaken.

18       218.  Monroe apparently believed that Ms. Alfaro's request to plead guilty was
19 unreasonable.  *See* RT 118 (February 21, 1992 proceedings).  Reasonably effective
20 counsel would have had her competency evaluated under these circumstances.

21       219.  Monroe knew that Ms. Alfaro had no intention of participating in her own
22 defense (see RT 110-11 ( February 21, 1992 proceedings); RT 2129 (April 9, 1992
23 proceedings)) and apparently believed that Ms. Alfaro's refusal to cooperate in her
24 own defense was unreasonable.  Reasonably effective counsel would have had her
25 competency evaluated under these circumstances.

26       220.  As  established by the Orange County Jail's medical records and the notes
27 of experts hired by the defense, throughout the pretrial period and during all phases
28 of her trial, Ms. Alfaro had symptoms of mental illness and was heavily medicated.

116

*See e.g.*, Exhibits 79 and 85 (Orange County Jail nurse Toby Silver's psych notes, which indicate as follows: 11/8/90 - Note atty concern b/c patient may be suicidal; 11/8/90 psych note - GAF 50; borderline personality disorder;  per DSM-IV, GAF 50= Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job); 3/17/91 - high risk of depression; 3/21/91 - depressed, suicidal thoughts, disturbing dreams; 3/26/91 - she has difficulty making decisions, she doesn't want to disagree with anyone, because she wants everyone to like her; 4/2/91 - she appears to be of low intelligence; 4/30/91 - depressed, feelings of hopelessness and helplessness and having difficulty concentrating; 5/7/91 - mood is depressed, complains of having poor concentration; 5/30/91 - mood is depressed; 6/13/91 - mood is depressed, complains of not sleeping well, she is scared, confused, irritable and hopeless; 6/17/91 - still is feeling depressed and still wants to try an antidepressant; 8/1/91 - Maria is very depressed today . . . she said she has given up, T. Silver calls L. Lawhon to express concern re: Petitioner's depression and that she has given up and doesn't care anymore; 8/6/91 - psychiatry notes, symptoms of depression started after delivery; 8/6/91 - adjustment disorder w/mixed features; 8/8/91 - inmate is very depressed, hopeless, helpless,  start Sinequan 50 mg qHS PO x5d, then increase 100 mg qHS PO x30d; 8/15/91 - affect is flat, mood is depressed, continues to feel hopeless and helpless; 8/27/91 - mood is depressed; 10/17/91 - she continues to feel hopeless about the outcome of her case and she has not helped her lawyer to defend her, she chooses not to think about her situation, which is her way of coping; 10/21/91 - suicide attempt, slashed wrist with razor, reports being very depressed and suicidal, moved for special observation; 10/22/91 - depressed; 10/24/91 - she is depressed, very depressed; 10/29/91 - stops taking Sinequan, prescribed Desyrel; 11/2/91 - went to court and admits to not knowing what happened, she claims she doesn't know, nor does she care, apathetic, depressed, has no interest in her case; 11/12/91 - she is unhappy with her attorney and wants to fire

117

him & get a new attorney; 11/14/91 - continues to feel hopeless and depressed; 11/27/91 - taking Elvaril; 12/12/91 - mood is depressed, however, she doesn't want to realize her depression, stopped taking Desyrel; 12/17/91 - mood is depressed, affect is flat; 12/19/91 - mood is depressed; 1/2/92 - anxious and depressed; 1/18/92 - affect is flat, mood is depressed; 1/30/92 - mood is depressed; 2/14/92 - feels hopeless and helpless; 2/29/92 - anxious and depressed; 3/7/92 - very depressed; 3/11/92 - mood is depressed, hopeless, helpless; 3/14/92 - depressed; 3/25/92 - affect is flat, mood is depressed; 3/28/92 - depressed; 4/4/92 - mood is depressed; 4/23/92 - depressed; 4/24/92 - prescribed imipramine); Exhibit 82 (Martha Rogers' notes, which indicate: 11/6/90 interview notes relate suicidal ideation - reported to jail psych team; Exhibit 84 8/26/90 notes from interview w/Laura Lawhon: "She is 3 mo pg c twins, v excited abt this, her mother said it is strange, she has no comprehension of the trouble she is in, has image she will live happily ever after with these 2 babies. Dn realize she is in death penalty case, MMPI (?) possible diagnoses: Axis I: R/O Organic Disorders, R/O Schizophrenic Disorders, Schizophrenia, Paranoid, R/O Paranoid Disorders; Axis II: R/O Schizoid PD, R/O Schizotypal PD). Records reflect that around the time of her trial, her Imipramine was increased from 50 mg./day to 150 mg./day, a fairly high dosage. *See* Exhibit 8 (Stewart Declaration) at 44-45. Monroe's investigator's notes of his September 25, 1991, interview with Nurse Silver establish that he was aware, or should have been aware, of the above. Exhibit 85. Reasonably effective counsel would have had her competency evaluated under these circumstances.

221. During trial, Ms. Alfaro "seemed very lost. She looked like she did not understand what was going on. . . .[S]he seemed very out of it." Exhibit 9 (Silvia Alfaro Declaration) at ¶ 33. Reasonably effective counsel would have had her competency evaluated under these circumstances.

222. As noted above, from May 23 through May 30, 1992, during Ms. Alfaro's second penalty trial, Ms. Alfaro was determined by the Orange County

118

1  Jail authorities to require "acute mental health care."  CT 1745-46.  Monroe

2  unreasonably failed to seek an evaluation of Ms. Alfaro's competency to assist in her

3  own defense based on this concrete evidence that she might well be incompetent to

4  stand trial

5      223.  On June 2, 1992, two days after Ms. Alfaro left the "acute mental health

6  care" ward, but while she was still receiving mental health care at the jail, Ms. Alfaro

7  waived her right to testify (CT 1556), which Monroe knew meant she was likely to be

8  sentenced to death, but still failed to request a competency evaluation.  His failure to

9  have his client's competency evaluated at this point was unreasonable.

10  **N.     COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF THE**

11  **PSYCHOTROPIC DRUGS PETITIONER WAS PRESCRIBED WHILE**

12  **IN JAIL AS MITIGATING EVIDENCE AND TO EXPLAIN HER**

13  **APPARENT INATTENTIVENESS DURING TRIAL**

14      224.  From shortly after she was arrested through sentencing, Ms. Alfaro was

15  heavily medicated with psychotropic drugs by Orange County Jail doctors.  *See*

16  Exhibit 77.  The drugs, especially combined with her pre-existing mental health

17  disabilities, rendered Ms. Alfaro unable to concentrate on the trial, and she appeared

18  inattentive and occasionally fell asleep during trial.  *See* Exhibit 9.  Yet Monroe

19  unreasonably failed to seek an expert opinion on the impact of the drugs on

20  Ms. Alfaro's ability to assist in her own defense, unreasonably failed to introduce the

21  fact that she was being prescribed these drugs by jail doctors and unreasonably failed

22  to inform the jury of the fact she was taking prescribed drugs during trial, which

23  accounted for her apparent inattentiveness to the trial proceedings.  Monroe's failure

24  was prejudicial to Ms. Alfaro in that it denied Ms. Alfaro mitigating evidence and left

25  the jury to draw erroneous, prejudicial conclusions about the sincerity of Ms. Alfaro's

26  expression of remorse for her crimes.  But for his failures in this regard, it is probable

27  that the results of the penalty phase would have been different.

28

1    **O.    COUNSEL'S FAILURE TO PRESENT EVIDENCE AVAILABLE AND**

2    **NECESSARY TO ADDRESS THE AGGRAVATORS**

3    225.  Monroe failed to present an effective defense to the prosecution's

4    evidence regarding aggravating circumstances.

5    226.  As  set forth above, Monroe unreasonably failed to present evidence to

6    rebut the prosecution's theory of the circumstances of crime.  *See* Penal Code

7    § 190.3(a).  The prosecution argued that Ms. Alfaro alone was responsible for what

8    occurred.  Monroe failed to identify and develop the available evidence that Manuel

9    Torres Graciano, a convicted felon and drug dealer who was on probation when he

10   drove Ms. Alfaro to the Wallace home on June 15, 1990, and fled to Mexico as the

11   police were closing in on him (*see* Exhibit 1 (McGrath Declaration)), had Ms. Alfaro

12   under his substantial domination and caused her extreme duress.

13   227.  Monroe also unreasonably failed to provide rebuttal evidence to the

14   prosecution's evidence concerning Ms. Alfaro's violent relationship with Manuel

15   Cuevas.  *See, e.g.*, RT 4218 (Middleton uses violence in relationship with Manuel

16   Cuevas to rebut Edwards' conclusion that Petitioner was a caring person).  In fact,

17   there was substantial evidence available which Monroe failed to develop and present

18   that Petitioner was not violent to Manuel Cuevas but only acted in self defense.

19   228.  As  noted above, Monroe failed to effectively cross-examine key

20   prosecution witnesses, including Reynoso, the Sheriff's investigators, and jailhouse

21   informant Vicki Darr despite substantial facts from which effective cross-

22   examinations could have been crafted.

23   229.  For example, Monroe unreasonably failed to cross-examine Orange

24   County Sheriff's Investigator Tom Giffin regarding his belief that Ms. Alfaro acted

25   alone.  He failed to point out that while Ms. Alfaro may have stabbed Autumn

26   Wallace, the evidence is consistent with a finding that she was under extreme duress

27   and the substantial domination of another person at the time.  He failed to point out

28   that Ms. Alfaro told Giffin that the Hispanic man who had driven her to the Wallace

1  home entered the home and, indeed, went as far as the area where the micro-wave

2  oven was located.  Instead, during the first trial, Monroe merely asked Giffin whether

3  he suspected Ms. Alfaro was trying to protect someone else (RT 1156), to which he

4  responded, "Did I ever suspect that?  No, I didn't."  Monroe then asked: "You did not

5  suspect that she was trying to protect somebody else?"

6
      Giffin:  No.

7
      Monroe: To cover for somebody else?

8
      Giffin: I believed that there were other people involved that were

9        with her at the house, the two male Hispanics outside, and I still
      believe she knows who the driver is and she won't tell me.  But after

10        her confession, we were looking at them as witnesses.

11  RT 1156.

12      230.  A reasonable attorney, properly focused on the penalty phase of the trial,

13  would have pointed out that the evidence did not compel the conclusion Giffin

14  claimed he had reached.  It did not compel the conclusion that the driver was merely a

15  witness and bore no criminal responsibility.  To the contrary, the evidence suggested

16  -- to the investigators themselves --that the driver knew the items he removed from

17  the Wallace home did not belong to Ms. Alfaro.  Exhibit 1 (McGrath Declaration),

18  ¶¶ 2-57.  During his interview of Ms. Alfaro, Giffin challenged her when she said

19  that the two men didn't know what she had done or that she was stealing the items.

20  CT 541.  Bale accused her of "bullshitting" them.  CT 542.

21      231.  Moreover, contrary to the impression left by Giffin's testimony, as late

22  as July 6, 1990, the police were identifying the third man as a suspect, not a mere

23  witness, in inter-office teletypes.  *See* Exhibit 34 (July 6, 1990 teletypes).  Reasonably

24  effective cross-examination would have supported Ms. Alfaro's testimony that she

25  was under extreme duress and the substantial domination of another person who was

26  involved in the criminal conduct at the time she stabbed Autumn Wallace.

27      232.  At the second penalty trial, Monroe again failed to effectively cross-

28  examine Giffin on this point.  Once again, he focused on guilt and squandered the

1   opportunity to develop mitigating evidence.  Indeed, he asked only the following

2   (of Giffin) on the issue of whether the driver could have been involved: "Did you

3   have reason to believe during the course of your interview that you thought Rosie

4   Alfaro was covering up for someone?"

5           Giffin:  Yes.

6           Monroe:  You believe she was trying to protect somebody?

7           Giffin:  Initially, yes.

8           Monroe:  Why did you feel that way, Detective Giffin?

9           Giffin:  Initially it was my opinion that so brutal a murder was not
            likely to have been committed by a female.  As the interview
10          continued, Rosie's minute details and her knowledge and her
            recollection of the crime scene, of the details of the murder, of her
11          participation in it, led me to believe that it was someone with
            firsthand knowledge of the murder, and she did in fact commit the
12          murder by herself.

13          Monroe:  By firsthand knowledge of the murder, could it have
            been a person who had witnessed it as well as participated in it; is
14          that not so?

15          Giffin:  That is not my opinion at all.

16          Monroe:  But is that not a possibility?

17          Giffin:  Well, certainly that's subject to possibility.

18          Monroe:  I have no further questions.

19  RT 3563.

20          233.  Monroe's cross-examination of Reynoso was also ineffective.  He failed

21  to rebut Reynoso's patently false assertion that he had not used drugs on the day

22  of the offenses and that he did not believe Ms. Alfaro had used drugs, despite

23  considerable evidence to the contrary.  In particular, he failed to point out that

24  Reynoso had indicated to the police that Ms. Alfaro was under the influence (*see*

25  Exhibit 22); that Mr. Reynoso was a drug addict; that he had spent three years in

26  prison for selling drugs and had only been out a week at the time of the offenses; that

27  he was placed in custody for violating his parole when he contacted the police after

28

122

1   hearing that they were looking for him on July 2, 1990; and that his parole was again

2   revoked in October, 1990, for drug use.  Exhibit 22, Exhibit 28.

3       234.  Monroe also failed to effectively cross-examine Vicki Darr, a jailhouse

4   informant who testified that Ms. Alfaro told her that she "got off on" killing Autumn

5   Wallace.  RT 916.  Among other things, Monroe failed to point out that Ms. Darr had

6   told the police in December 1990, that Rosie told her she was protecting somebody

7   and never mentioned "getting off on it."  Exhibit 35 at 7-8 (12/90 interview with

8   Vicki Darr).  But for Monroe's incompetence in these regards, it is probable that the

9   results of the trial would have been different.

10  **P.    ADDITIONAL INSTANCES OF COUNSEL'S FAILURE TO PROVIDE**

11  **EFFECTIVE ASSISTANCE**

12      235.  Petitioner's trial counsel and/or appellate counsel rendered ineffective

13  assistance to Petitioner and denied Petitioner her constitutional rights through

14  countless other derelictions of his professional responsibility to zealously and

15  effectively defend Petitioner.  There could be no rational tactical justification for

16  counsel's failures in this regard.  Counsel's actions and omissions, which fell below

17  an objective standard of reasonableness under prevailing professional norms, include,

18  but are not limited to the following:.

19          a.  Trial counsel failed adequately to investigate the facts of the case, the

20  crime, and all other bad acts and uncharged offenses, which were presented by the

21  prosecution to the jury.

22          b.  Trial counsel failed adequately to investigate Petitioner's background,

23  history, involvement in the offense in chief, and her mental, physical and medical

24  condition at the time of all offenses noted by the prosecution during this case, both

25  charged and un-charged, which were presented to the jury at trial.  Had counsel

26  performed sufficient investigations, he would have learned of substantial exculpatory

27  and/or mitigating evidence and he would have investigated, developed and presented

28

123

such evidence to the jury during one/or both phases of trial, either through lay witnesses, and/or through expert witnesses.

c. Trial counsel failed adequately to investigate all aspects of the prosecution's case and/or interview all witnesses presented at trial.

d. Trial counsel failed to seek and conduct adequate testing of all of the evidence upon which the prosecution relied at trial.

e. Trial counsel failed adequately to investigate all avenues and lines of defense, and failed to present critical evidence at trial which would have proven that Petitioner was less than fully culpable of malice murder, and not eligible or otherwise not suitable for a death sentence during the sentencing phase. Rather, trial counsel left all aspects of the investigation up to non-lawyers without sufficient expertise, time, or resources adequately to conduct a proper and thorough investigation of Petitioner's background, social history, education, and medical and mental health history, record and status. As a result, substantial avenues of critical mitigating factual information were left completely overlooked and undiscovered despite its availability to anyone who merely asked the questions on Petitioner's behalf.

f. Trial counsel failed adequately to investigate, develop and present evidence of Petitioner's mental health, mental retardation, and other mental and physical disabilities, all of which would have rendered her ineligible for the death penalty, incompetent to stand trial, and otherwise not deserving of a sentence of death.

g. Trial counsel failed adequately to investigate, interview, consult with, and prepare those defense witnesses, lay and expert, which counsel did call to testify at both phases of trial.

h. Trial counsel failed to seek funds for numerous expert witnesses who could have assisted the defense in proving all of this information to the trial court and to the jury.

i.  Trial counsel affirmatively presented to the jury evidence that was damaging and prejudicial to Petitioner during the trial.

j.  Trial counsel failed to seek funds for experts and/or to make an adequate showing of his need for defense expert services to assist him in preparing for all of the pre-trial and trial proceedings, the direct examination of the defense's own witnesses, and the cross-examination of prosecution witnesses, the rebuttal of the prosecution's case at the sentencing phase of trial, and the presentation of the defense case at all phases of Petitioner's trial.

k.  Trial counsel was not sufficiently experienced nor qualified to represent Petitioner in her capital trial.

l.  Trial counsel failed to file numerous pre-trial motions to preserve and protect the rights of Petitioner, and/or failed to investigate, research, and/or present available evidence regarding those motions he did file before, during and after trial.

m.  Trial counsel failed properly to preserve and file and argue those motions he did file before, during and after trial.

n.  Trial counsel improperly sought, developed and utilized at trial, and/or failed to seek and obtain altogether, critical and important evidence that was in the possession of the prosecution, its agents or assigns, and/or other agencies and/or entities, and/or was otherwise readily available to the defense from these and/or other sources, which would have been exculpatory and which, if discovered, investigated, developed and presented at trial proceedings, would have materially altered the outcome at all phases of the trial.

o.  Trial counsel failed to move properly, or at all, for a mistrial during repeated instances in the trial when a mistrial was warranted and should/would have been granted had such motions been made.

p.  Trial counsel conducted an inadequate voir dire, thereby failing to learn of the factual information that would have provided the basis to for-cause challenges of numerous potential jurors and actual jurors, and thereby also failing to

learn of biases and prejudices of all potential and actual jurors in the case, knowledge of which was essential to the proper exercise of for-cause and peremptory challenges, as well as to address and rebut the prosecution's for-cause challenges and its unlawful and/or unconstitutional use of peremptory challenges.

q.  Trial counsel failed to assert, argue and preserve numerous challenges to the prosecution's conduct during voir dire, including, but not limited to, engaging in improper and/or erroneous factual assertions and/or legal assertions or arguments before the venire either in general or individually, tainting some members of the venire by engaging in misconduct in the presence of such members, exercising peremptory challenges in an unlawful and/or unconstitutional manner, and numerous other instances of misconduct in which the prosecution engaged during voir dire.

r.  Trial counsel failed properly to object and preserve numerous issues that arose or occurred during voir dire, including, but not limited to, the restrictive manner in which the trial judge conducted the voir dire, the trial court's refusal to allow questioning of certain members of the venire and/or to allow certain questions of some and/or all members of the venire, the prosecution's unlawful use of peremptory challenges, the trial court's dismissal of members of the venire without adequate legal justification, and/or the trial court's unlawful reliance upon *in camera*, *ex parte* proceedings to conduct portions of the voir dire.

s.  Trial counsel failed to object to the testimony in whole or in part of numerous witnesses throughout all stages of the pre-trial and trial proceedings, and such failure resulted in an unfair trial and/or in the jury erroneously hearing substantial prejudicial testimony which would not have been heard had counsel performed adequately.

t.  Trial counsel repeatedly failed properly to object to, argue, and preserve numerous legal issues that arose and/or occurred throughout the pre-trial, trial and post-trial.

126

u.  Trial counsel failed properly and/or effectively to cross-examine and/or impeach each of the State's witnesses who testified throughout the pre-trial, trial and post-trial.

v.  Trial counsel failed properly and effectively to examine and present evidence through each of the defense witnesses who testified throughout the pre-trial, trial and post-trial.

w.  Trial counsel also was ineffective for failing to advise Petitioner concerning whether or not to testify and concerning the investigative leads and/or other potential witnesses that may or should have been interviewed and/or called at all phases of the trial.

x.  Trial counsel failed to raise and preserve numerous meritorious issues for appeal and/or for litigation in post-conviction proceedings.

y.  Trial counsel was insufficiently familiar with the State's case, its witnesses, the relevant documents, the crime scene, the possible defenses and defense witnesses.

z.  Trial counsel improperly failed to object to numerous erroneous and unlawful jury instructions, and improperly failed to request necessary instructions, at both phases of the trial.

aa.  Trial and appellate counsel failed adequately to research and/or understand the relevant law and legal principles governing all aspects of all phases of the pre-trial, trial, and post-trial proceedings.

bb.  Trial counsel failed to develop a coherent and/or consistent theory of the case for use at trial, and failed to investigate, develop and present a theory or theories of the case that were available and should have been presented at either or both phases of trial.  The theory of the defense that was chosen by the defense was clearly not mitigating and thus completely undermined Petitioner's ability to receive a fair trial.

1          cc.  Trial counsel failed adequately to investigate and present evidence

2    on the theory of the defense counsel did choose at either or both phases of the trial.

3          dd.  Trial and appellate counsel failed to argue the appropriate state and

4    federal law, constitutional, statutory, or otherwise, in support of the issues counsel

5    did assert and raise at all stages of the pre-trial, trial, and post-trial proceedings.

6          ee.  After trial, counsel failed adequately to continue investigating and

7    developing new evidence that would have been related to a variety of claims to be

8    presented at the motion for new trial, including all claims raised (and incorporated by

9    express reference herein) in this amended petition, and specifically including juror

10   misconduct, prosecutorial misconduct, a miscarriage of justice due to Petitioner's

11   mental retardation, and ineffective assistance of trial counsel.

12         ff.  Trial counsel erroneously opened the door to substantial highly

13   prejudicial testimony from both prosecution and defense witnesses at all phases of the

14   trial.

15         gg.  Trial counsel failed properly to preserve objections to evidence,

16   arguments, instructions, court rulings, and other prejudicial occurrences throughout

17   all phases of the pre-trial, trial and post-trial proceedings.

18         hh.  Trial counsel was aware of, but failed adequately to investigate,

19   develop and present, numerous affirmative and factual defenses at both phases of

20   trial.

21         ii.  Trial counsel failed to make proper opening and closing statements

22   at both phases of the trial, by failing to respond to prejudicial and/or unlawful

23   arguments by the prosecution, by failing to address material misstatements of fact

24   or law relied upon by the prosecution, and/or by failing affirmatively to raise helpful

25   facts or arguments for the defense, and/or by failing to provide proper and helpful

26   advocacy in any and all respects.

27         jj.  Trial and appellate counsel were rendered ineffective by virtue of the

28   prosecution's misconduct at all phases of the pre-trial, trial, and post-trial proceedings

128

1  in this case, including, but not limited to: the affirmative failure to disclose evidence

2  that was exculpatory at either or both phases of trial with respect to the factual and

3  legal issues, the witnesses who did testify, or those who did not but had relevant

4  information which was concealed from the defense by the prosecution; the knowing

5  use of perjured testimony at both phases of trial; and the improper and/or illegal

6  arguments made in the prosecution's opening and closing statements at both phases

7  of trial.

8         kk.  Trial and appellate counsel were rendered ineffective by virtue of

9  the rampant jury misconduct that occurred throughout all phases of the pre-trial, trial,

10  and post-trial proceedings.

11         ll.  Trial and appellate counsel were rendered ineffective by virtue

12  of any and/or all of the judge's erroneous rulings in this case, including, but not

13  limited to, all such rulings cited by counsel for appellant in all appellate briefing filed

14  by appellant on direct appeal and any such ruling identified herein or to be identified

15  hereafter in these habeas corpus proceedings.

16         mm.  Trial and appellate counsel were rendered ineffective by virtue

17  of the trial judge's bias against the defense in this case.

18         nn.  Trial and appellate counsel were rendered ineffective by the acts

19  of misconduct of the trial judge and/or the court's officials, employees, and assigns

20  that occurred before, during and after the trial in this case.

21         oo.  Trial and appellate counsel were rendered ineffective by virtue

22  of the trial judge's refusal to allow the defense to obtain, investigate, develop and/or

23  present relevant exculpatory and/or mitigating evidence which was otherwise

24  unobtainable by the defense absent court order or authorization to do so.

25         pp.  Trial and/or appellate counsel failed adequately to investigate facts

26  and issues about which they were or should have been on notice -- including trial

27  and/or appellate counsel's ineffectiveness for failing to present information related

28  to all aspects of Petitioner's ineffective assistance of counsel claims -- at the motion

1    for new trial, the failure of which may have waived or did waive Petitioner's right

2    to present and litigate those issues on appeal or in habeas corpus proceedings.

3          qq. Appellate counsel failed to enumerate, assert, and argue numerous

4    state and federal constitutional and/or legal issues that were readily apparent on the

5    face of the record in the appellate proceedings.

6          rr. Trial and/or appellate counsel failed properly to preserve any facts,

7    claims or issues asserted here by Petitioner (or to be asserted later) which this Court

8    or some future court may deem to have been waived by virtue of trial or appellate

9    counsel's failure to have properly preserved such facts, claims or issues.

10         ss. Trial counsel failed to properly rehabilitate jurors who expressed

11   opposition to the death penalty.

12   **Q.   CONCLUSION**

13         236. Any single instance, or sub-set of instances, of ineffective assistance of

14   counsel set forth herein was and is sufficient to undermine confidence in the verdict

15   at both phases of trial, and but for such instance, the outcome would have been

16   different at all phases of Petitioner's trial.  All instances of ineffectiveness of counsel

17   set forth anywhere in this petition, when viewed in combination, were and are

18   sufficient to undermine confidence in the verdict at both phases of trial, and but for

19   such instances, the outcome of both the guilt and penalty phases of Petitioner's trial

20   would have been different.

21         237. A death sentence was not a foregone conclusion in this case.  It is

22   reasonably likely that, but for trial counsel's ineffectiveness in this regard, a different

23   result would have been obtained at trial.  *See* Exhibit 91 (Declaration of Ralph Glass)

24   at ¶ 4; Exhibit 122 (Declaration of Denise Coburn) at ¶4; Exhibit 125 (Declaration of

25   Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶¶ 2-4; Exhibit

26   130 (Declaration of Lorelei Sontag, Ph.D.).  Trial counsel's unreasonable acts and

27   omissions alleged herein were below the standard of care for capital defense lawyers

28   practicing at the time of Ms. Alfaro's trial, were without reasonable tactical

justification and prejudiced Ms. Alfaro.  But for counsel's failures in these regards, it is reasonably probable that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 669.

## VII.

## CLAIM 2:  MR. MONROE PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO PROVIDE AUTHORITY TO THE TRIAL COURT FOR THE ADMISSION OF  PETITIONER'S UNCONDITIONAL OFFER TO PLEAD GUILTY AS MITIGATION EVIDENCE IN THE PENALTY PHASE OF THE TRIAL

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because trial counsel failed to provide legal authority to present critical mitigation evidence during the penalty phase resulting in the trial court's exclusion.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Claim 3 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

131

has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

A.   **INTRODUCTION**

6. Although the trial court granted the District Attorney's motion to exclude evidence that Ms. Alfaro had offered to plead guilty as mitigation at the penalty phase, he expressed a willingness to revisit the issue by stating to defense counsel, "whenever you feel you have some authority or some analogy by some cases or something of that nature you want me to look at, I will be more than happy to review the motion in limine." RT 187 (February 26, 1992 proceedings).

7. Four years earlier, the California Supreme Court in *People v. Williams (Michael)*, 45 Cal. 3d 1268, 756 P.2d 221, 248 Cal. Rptr. 834 (1988) expressly stated that California's death penalty law does not prevent "a defendant from offering in mitigation his expressed willingness to plead guilty — when that expressed willingness does in fact tend to show remorse, etc." *People v. Williams (Michael)*, 45 Cal. 3d at 1332, fn. 9. Yet, despite the trial court's invitation, Mr. Monroe never presented the *Williams* case to the court or sought leave of court to introduce evidence of Ms. Alfaro's desire to plead guilty. His failure constituted ineffective assistance of counsel in that he deprived his client of concrete evidence in mitigation that would have resulted in a sentence of life in prison without the possibility of parole and not death had it been before the jury.

1    **B.    STATEMENT OF FACTS**[6]

2    8.  On February 20, 1992, Mr. Monroe filed a "request for special instructions"

3    *in camera* in which he informed the court that Ms. Alfaro "insists on pleading guilty

4    to the special circumstances," "against my most rigorous advice."  He told the court

5    he was "requesting instructions . . . as to whether or not the court believes it is

6    necessary for me to withdraw from the case . . . "  CT 355.  The following day,

7    February 21, 1992, the court met with Mr. Monroe and Ms. Alfaro ex parte.

8    RT 106-3 (February 21, 1992 proceedings).  During the discussion that ensued,

9    Mr. Monroe described an "out and out conflict" between himself and Ms. Alfaro

10   regarding her desire to plead guilty and his "wish to proceed to trial on the guilt

11   phase."  *Id.* at 110-11, 112.  He stated, "my client insists on pleading guilty;" "I can't

12   turn around and say I consent to allow my client to plead guilty when I know she's

13   pleading guilty for all intents and purposes to a death sentence;" "she told me she

14   wanted to plead guilty and did not want to testify;" "A 20-year-old child is going

15   to plead guilty to a death penalty?"  *Id.* at 113-18.  Though Mr. Monroe's statements

16   cast doubt on his understanding of the possibility of mounting a penalty phase

17   defense in his client's case, there is no question that he understood that his client was

18   desirous of entering an unconditional guilty plea.

19   9.  From comments made by the District Attorney five days later, we can infer

20   that at some point Mr. Monroe went to Mr. Middleton and offered to have Ms. Alfaro

21   plead guilty in exchange for an agreed upon sentence of life in prison without the

22   possibility of parole.  In an oral motion made February 26, 1992, the District Attorney

23   argued that evidence of an offer to plead guilty in exchange for a sentence of life in

24   prison without parole should not come in because it is only an unconditional plea of

25   guilty that constitutes a mitigating circumstance.  Mr. Middleton stated, "[I]f the

26   defendant wanted to plead guilty, she can plead guilty right up front, right now.

27

28   [6] For a more detailed statement of the facts pertinent to this argument, please see the Statement of Facts set forth above, which is incorporated by reference herein.

Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation." RT 185 (February 26, 1992 proceedings).

10. Although Mr. Monroe knew that Ms. Alfaro was, in fact, willing to "plead guilty right up front, right now," and "[g]o right into the penalty phase," he failed to argue that this mitigation was present in this case, even under the District Attorney's analysis. The court, which was also aware of Ms. Alfaro's willingness to plead guilty unconditionally, granted the District Attorney's motion nevertheless, stating:

> Well, it's definitely not relevant to anything in the guilt phase of the trial. And it would appear to me -- unless you can submit some authority to the court, it would appear to me a mere offer to plead guilty, if the District Attorney strikes the -- or does not seek the death penalty, appears to me from a logic and common sense standpoint not to be the proper subject matter of mitigating testimony in a penalty phase, if we ever get to a penalty phase, in the trial.

> And it'. . . a motion in limine. So, *in effect, the court would -- what it does, it directs counsel not to bring up that issue, or the defendant herself if she were to testify not to bring up that issue, without leave of court.*

> And whenever you feel you have some authority or some analogy by some cases or something of that nature you want me to look at, I will be more than happy to review the motion in limine.

> * * *

> Mr. Monroe: Certainly in guilt but also in penalty?

> The Court: In all phases of the trial unless you have leave of the court otherwise.

RT 187 (February 26, 1992 proceedings).

11. Seemingly unaware of the easily accessible authority from this Court supporting the admissibility of Ms. Alfaro's desire to plead guilty, Mr. Monroe never sought leave of court to introduce this evidence. This is true despite the fact that the District Attorney proceeded to make Ms. Alfaro's *lack of acceptance of responsibility* the linchpin of both his penalty phase opening statements. In his opening during the first penalty trial he stated: "You're going to find, ladies and gentlemen from the evidence that Rosie Alfaro has not accepted the responsibility for the killing of Autumn Wallace. That will be borne out by the evidence." RT 1436. In his opening

in the second penalty trial he stated: "Miss Alfaro has not accepted any responsibility. That's what the evidence will show." RT 3179. Having presented no evidence, the only argument Mr. Monroe offered in closing that even touched upon Ms. Alfaro's acceptance of responsibility--that Mr. Alfaro "was remorseful a month after her arrest when she was talking to Janell. Before she had Monroe as a lawyer, by the way"-- was successfully objected to as "outside the scope of the evidence." RT 2024-25.

**C.    MR. MONROE PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO PROVIDE AUTHORITY FOR THE ADMISSIBILITY OF PETITIONER'S WILLINGNESS TO PLEAD GUILTY AS MITIGATING EVIDENCE IN EITHER PENALTY PHASE**

12.   While no formula exists by which to measure counsel's performance, "[r]epresentation of a criminal defendant entails certain basic duties." *Strickland*, 466 U.S. at 688. At a minimum, "counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). Mr. Monroe's performance was below accepted norms of practice and as such, denied Ms. Alfaro her right to counsel guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687.

13.   While it is a truism that courts will begin assessing an ineffective assistance of counsel claim with the presumption that counsel's challenged action might simply have been sound trial strategy, if the record affirmatively discloses "the lack of a rational tactical purpose for the challenged act or omission," a defendant shows that her counsel behaved unreasonably. *People v. Ray*, 13 Cal. 4th 313, 349 (1996); *People v. Majors*, 18 Cal. 4th 385, 403, 956 P.2d 1137 (1998). Mr. Monroe had no rational tactical purpose for his failure to present authority for or to attempt to offer evidence that Ms. Alfaro told him repeatedly before trial that she wanted to take full responsibility for the death of Autumn Wallace and plead guilty to the charges. To the contrary, his remarks to the trial judge after hearing his ruling precluding such

135

1   evidence on February 26, 1992, "Certainly in guilt but also in penalty?," indicate that

2   had he understood he was able, he would have offered this evidence.

3       14.  Because the state court had decided in *People v. Williams (Michael)*,

4   45 Cal. 3d 1268, four years earlier, that "[n]othing in the death penalty law even

5   purports to bar such evidence," at 1332, Mr. Monroe's failure to call this case to the

6   court's attention constituted ineffective assistance of counsel.

7       15.  Indeed, it is not possible to imagine a tactical reason for declining to

8   introduce at the penalty trials the concrete evidence of the universally recognized

9   mitigating circumstance of remorse in the form of Ms. Alfaro's willingness to plead

10  guilty to the charges.  She had already been convicted; thus, an admission of

11  culpability could not hurt her case.  Moreover, she had not testified in the guilt phase,

12  and thus, would not be seen as a manipulative liar for offering to plead guilty, then

13  testifying in her own defense, then after being convicted, introducing her willingness

14  to plead pre-trial.  It was only Mr. Monroe who might have lost credibility with the

15  jury by introducing evidence that Ms. Alfaro had been willing to plead guilty all

16  along and that he had prevented her from doing so.  But he was not on trial.  She was.

17  He had a duty to put his own sensibilities aside.  Because Mr. Monroe failed to

18  introduce evidence of Ms. Alfaro's offer to plead guilty, evidence which would have

19  concretely assisted her in her penalty phase defense, Ms. Alfaro's constitutional right

20  to the effective assistance of counsel was violated and her death penalty must be

21  reversed.  *See*, Exhibit 122 (Declaration of Denise Coburn) at  ¶2; Exhibit 123

22  (Declaration of Brent Conley) at ¶ 3.

23  **D.    CONCLUSION**

24      16.  When the trial judge granted the District Attorney's motion to exclude

25  evidence of Ms. Alfaro's willingness to plead guilty on February 26, 1992, he

26  suggested that he would be willing to reconsider his ruling if Mr. Monroe presented

27  authority for the admissibility of this evidence.  Four years earlier, this Court had

28  ruled that the death penalty law does not preclude evidence of an offer to plead guilty

136

1    in the penalty phase of a capital case when it tends to show remorse.  Yet Mr. Monroe
2    made no attempt to provide the court with either the facts or the law, both of which
3    would have supported a ruling admitting the evidence.  His failure deprived his client
4    of concrete evidence of her remorse, a universally recognized mitigating
5    circumstance.  There is no imaginable tactical reason for Mr. Monroe's failure to
6    introduce this evidence.  His failure to inform the jury that Ms. Alfaro had been
7    willing to accept responsibility for her crimes during the penalty phase fell below
8    accepted standards of practice.  Ms. Alfaro was not afforded effective assistance of
9    counsel.  Her Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated,
10   and as a result, her sentence must be reversed.

11          17.  The foregoing violations of Ms. Alfaro's constitutional rights are
12   prejudicial and warrant the granting of this Petition without any determination of
13   whether the violations substantially affected or influenced the jury's verdict.  *Kyles v.*
14   *Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (noting that
15   *Brady* violation, which has the same "reasonable probability" prejudice showing as
16   *Strickland*, is not subject to harmless error analysis under *Brecht v. Abrahamson*,
17   507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

18          18.  The constitutional violations set forth in this claim alone mandate relief
19   from the convictions and sentence.  However, even if these violations do not mandate
20   relief standing on their own, relief is required when this claim is considered together
21   with the additional constitutional errors outlined in the remainder of this petition.
22   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and
23   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,
24   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th
25   Cir. 1978).

26

27

28

137

1

**VIII.**

2

**CLAIM 3:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE**

3

**VIOLATED AS SHE WAS INCOMPETENT TO STAND TRIAL**

4      Petitioner's convictions and sentences were rendered in violation of her

5 guaranteed constitutional rights to due process, a fair trial, to present a defense, to

6 confrontation, to the effective assistance of counsel, and to a reliable, individualized

7 and non-arbitrary death-penalty determination, as Petitioner was tried while

8 incompetent to understand adequately the proceedings against her or to aid and assist

9 in her defense as the result of the unreasonable actions and inactions of his trial

10 counsel, all in violation of Petitioner's federal constitutional rights as guaranteed by

11 the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

12 Constitution.  *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636

13 (1986); *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975);

14 *Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).

15      1.  If Respondent disputes any of the facts alleged below, Petitioner requests

16 an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

17 has been afforded discovery and the disclosure of material evidence by the State,

18 the use of this Court's subpoena power, and the opportunity to investigate fully,

19 counsel requests an opportunity to supplement or amend this petition.

20      2.  The declarations and other exhibits previously filed with this court and

21 those accompanying this petition, as well as the allegations and facts set forth

22 elsewhere in this petition, are hereby incorporated by reference into this claim as

23 though set forth in full.

24      3.  In support of this claim, Petitioner alleges the following facts, among others

25 to be presented after full discovery, investigation, adequate funding, access to this

26 Court's subpoena power, and an evidentiary hearing.

27

28

1    **A.    <u>INTRODUCTION</u>**

2         4.  As set forth in the Orange County Jail's medical records and the notes

3    of experts hired by the defense, throughout the pretrial period and during all phases

4    of her trial, Ms. Alfaro had symptoms of mental illness and was heavily medicated.

5    *See e.g.*, Exhibits 79 and 85 (Orange County Jail nurse Toby Silver's psych notes,

6    which indicate as follows: 11/8/90 - Note of atty concern b/c patient may be suicidal;

7    11/8/90 psych note - GAF 50; borderline personality disorder;  per DSM-IV, GAF

8    50= Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent

9    shoplifting) OR any serious impairment in social, occupational, or school functioning

10   (e.g. no friends, unable to keep a job); 3/17/91 - high risk of depression; 3/21/91 -

11   depressed, suicidal thoughts, disturbing dreams; 3/26/91 - she has difficulty making

12   decisions, she doesn't want to disagree with anyone, because she wants everyone to

13   like her; 4/2/91 - she appears to be of low intelligence; 4/30/91 - depressed, feelings

14   of hopelessness and helplessness and having difficulty concentrating; 5/7/91 - mood

15   is depressed, complains of having poor concentration; 5/30/91 - mood is depressed;

16   6/13/91 - mood is depressed, complains of not sleeping well, she is scared, confused,

17   irritable and hopeless; 6/17/91 - still is feeling depressed and still wants to try an

18   antidepressant; 8/1/91 - Maria is very depressed today . . . she said she has given up,

19   T. Silver calls L. Lawhon to express concern re: Petitioner's depression and that she

20   has given up and doesn't care anymore; 8/6/91 - psychiatry notes, symptoms

21   of depression started after delivery; 8/6/91 - adjustment disorder w/mixed features;

22   8/8/91 - inmate is very depressed, hopeless, helpless,  start Sinequan 50 mg qHS PO

23   x5d, then increase 100 mg qHS PO x30d; 8/15/91 - affect is flat, mood is depressed,

24   continues to feel hopeless and helpless; 8/27/91 - mood is depressed; 10/17/91 - she

25   continues to feel hopeless about the outcome of her case and she has not helped her

26   lawyer to defend her, she chooses not to think about her situation, which is her way

27   of coping; 10/21/91 - suicide attempt, slashed wrist with razor, reports being very

28   depressed and suicidal, moved for special observation; 10/22/91 - depressed;

10/24/91 - she is depressed, very depressed; 10/29/91 - stops taking Sinequan, prescribed Desyrel; 11/2/91 - went to court and admits to not knowing what happened, she claims she doesn't know, nor does she care, apathetic, depressed, has no interest in her case; 11/12/91 - she is unhappy with her attorney and wants to fire him & get a new attorney; 11/14/91 - continues to feel hopeless and depressed; 11/27/91 - taking Elvaril; 12/12/91 - mood is depressed, however, she doesn't want to realize her depression, stopped taking Desyrel; 12/17/91 - mood is depressed, affect is flat; 12/19/91 - mood is depressed; 1/2/92 - anxious and depressed; 1/18/92 - affect is flat, mood is depressed; 1/30/92 - mood is depressed; 2/14/92 - feels hopeless and helpless; 2/29/92 - anxious and depressed; 3/7/92 - very depressed; 3/11/92 - mood is depressed, hopeless, helpless; 3/14/92 - depressed; 3/25/92 - affect is flat, mood is depressed; 3/28/92 - depressed; 4/4/92 - mood is depressed; 4/23/92 - depressed; 4/24/92 - prescribed imipramine); Exhibit 82 (Martha Rogers' notes, which indicate: 11/6/90 interview notes relate suicidal ideation - reported to jail psych team; Exhibit 84 8/26/90 notes from interview w/Laura Lawhon: "She is 3 mo pg c twins, v excited abt this, her mother said it is strange, she has no comprehension of the trouble she is in, has image she will live happily ever after with these 2 babies. Dn realize she is in death penalty case, MMPI (?) possible diagnoses: Axis I: R/O Organic Disorders, R/O Schizophrenic Disorders, Schizophrenia, Paranoid, R/O Paranoid Disorders; Axis II: R/O Schizoid PD, R/O Schizotypal PD). Records reflect that around the time of her trial, her Imipramine was increased from 50 mg./day to 150 mg./day, a fairly high dosage. *See* Exhibit 8 (Stewart Declaration) at 44-45. Mr. Monroe's investigator's notes of his September 25, 1991, interview with Nurse Silver establish that he was aware, or should have been aware, of the above. Exhibit 85.

5. During trial, Ms. Alfaro "seemed very lost. She looked like she did not understand what was going on. . . .[S]he seemed very out of it." Exhibit 9 (Silvia Alfaro Declaration) at ¶ 33.

140

6.  From May 23 through May 30, 1992, during Ms. Alfaro's second penalty trial, Ms. Alfaro was determined by the Orange County Jail authorities to require "acute mental health care."  CT 1745-46.  Monroe unreasonably failed to seek an evaluation of Ms. Alfaro's competency to assist in her own defense based on this concrete evidence that she might well be incompetent to stand trial

7.  On June 2, 1992, two days after Ms. Alfaro left the "acute mental health care" ward, but while she was still receiving mental health care at the jail, Ms. Alfaro waived her right to testify (CT 1556), which Monroe knew meant she was likely to be sentenced to death, but still failed to request a competency evaluation.

**B.**     **THE TRIAL COURT VIOLATED PROCEDURAL DUE PROCESS BY FAILING TO CONDUCT A COMPETENCY HEARING**

8.  Competency issues can implicate both procedural and substantive due process.  *Lounsbury v. Thompson*, 374 F.3d 785, 788 (9th Cir. 2004); *see Davis v. Woodford*, 384 F.3d at 644, 646 (discussing types of claims).  Principles of substantive due process prevent the trial of an incompetent person.  *Medina v. California*, 505 U.S. 437, 439, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *Williams v. Woodford*, 384 F.3d 567, 603 (9th Cir. 2004), *cert. denied*, 546 U.S. 934, 126 S. Ct. 419, 163 L. Ed. 2d 319 (2005).  Competency requires that the defendant have the "capacity to understand the nature and object of the proceedings against [her], to consult with counsel, and to assist in preparing [her] defense."  *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *Pate v. Robinson*, 383 U.S. at 387; *Boyde v. Brown*, 404 F.3d 1159, 1165 (9th Cir. 2005), *amended on other grounds*, 421 F.3d 1154 (9th Cir. 2005).  The defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and must have "a rational as well as a factual understanding of the proceedings against him."  *Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680, 125 L. Ed. 2d

141

321 (1993) (citation and quotations omitted); *Dusky United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960).

9. Where genuine doubt exists as to a criminal defendant's competence to stand trial, principles of procedural due process require that a trial court conduct a hearing on the defendant's competency. *Drope v. Missouri*, 420 U.S. 162, 174, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *Pate v. Robinson*, 383 U.S. at 385-86; *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri*, 420 U.S. at 180; *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2004).

10. With respect to procedural incompetency, the Court must determine whether the evidence of incompetence was such that a reasonable judge would be expected to experience a bona fide doubt concerning the defendant's competence. *See Davis v. Woodford*, 384 F.3d at 644.

11. Here, the trial court had ample evidence to trigger a competency hearing. Whether the trial court was unaware of Alfaro's extensive mental health treatment throughout trial, the judge was certainly aware of Alfaro's admission to a psychiatric ward just days before she waived her right to testify during the second penalty phase. "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181. Thus, there is no question the trial judge was obligated to conduct a competency hearing to evaluate Alfaro's mental health.

/ / /

/ / /

1  ## C.    PETITIONER'S SUBSTANTIVE DUE PROCESS RIGHTS WERE

2  ## VIOLATED BECAUSE SHE WAS INCOMPETENT TO STAND TRIAL,

3  ## AT LEAST DURING THE SECOND PENALTY PHASE

4       12.  Even if the trial court did not error in failing to conduct a competency

5  hearing, there is no question Ms. Alfaro was incompetent.  According to the

6  psychiatric expert retained by her counsel, a number of factors, in addition to

7  Ms. Alfaro's documented history of severe impairments, cast serious doubt on

8  Ms. Alfaro's competency to stand trial.  Exhibit 8 (Stewart Declaration) at 53, 89-98.

9  As Dr. Stewart explained, anecdotal evidence at trial, combined with Ms. Alfao's

10 extensive medication "raise serious doubts about Ms. Alfaro's ability to assist counsel

11 in preparing and presenting a meaningful defense."

12      13.  During her trial, Ms. Alfaro was reportedly awakened each morning at

13 5:00 a.m. and given her medications.  She states that she was unable to pay attention

14 in court and that she does not remember most of her trial.  This is consistent with her

15 sister's report:

16        Rosie was grateful that we [her mother and sister] were there to support
          her, but she seemed very lost. She looked like she did not understand
17        what was going on.  I did not understand many of the words that were
          being used. I worried that Rosie did not understand the words either.
18        Even if she understood the words, she seemed very out of it.. ..She did
          not look at the witnesses when they testified.
19

20 Exhibit 9 (Declaration of Silvia Alfaro) at ¶ 33.  Ms. Alfaro's aunt made similar

21 observations:

22        She tried not to show me how sad she was, but when I went to the
          courtroom I could see it. She made a point of smiling at me when I came
23        in, but then she turned back in her seat and I could see her go back
          within herself. When witnesses testified, Rosie didn't seem to pay
          attention to them, or to anything else in particular. Instead, she just
24        looked down at herself.

25 Exhibit 13 (Declaration of Rosa Melendez Sanchez) at ¶ 8.

26 / / /

27 / / /

28

143

**D.    TRIAL COUNSEL FAILED TO ENSURE THAT MS. ALFARO WAS COMPETENT DURING HER TRIAL**

14.    As set forth above in Claim 1.M above, which is incorporated at this point by reference, trial counsel's failure to ensure that Ms. Alfaro was competent during the course of her trial was ineffective assistance of counsel.

**E.    PETITIONER'S INCOMPETENCE TO STAND TRIAL REQUIRES HABEAS RELIEF**

15.    Petitioner's incompetence to stand trial prevented her from having a fair trial, meaningfully cooperating with counsel, receiving the effective assistance of counsel, confronting and cross-examining witnesses, presenting herself in an accurate light to the jury, or receiving the requisite due process, heightened capital case due process, or heightened capital case reliability guaranteed by the federal constitution.

16.    Petitioner's incompetence meant that she could not have a rational understanding of the proceedings, the legal issues, the tactical considerations involved in reaching decisions about the presentation of the defense, or the relative risks and benefits of decisions such as the defense to present.  Her inherent deficits, symptoms, circumstances during incarceration and pain and medication, moreover, rendered her not mentally present, and the jury, not being apprised of these matters, necessarily viewed her n a false light.

17.    Petitioner's incompetence to stand trial meant that she could not meaningfully assist counsel in developing and presenting his defense because she lacked adequate understanding of the issues, adequate means of acquiring necessary information or an adequate ability to understand and use the information, and reach rational conclusions.

18.    Ms. Alfaro lacked the ability to participate in her trial meaningfully and rationally.  Because Petitioner's mental incompetence is a fundamental flaw in the trial proceedings pervading every aspect thereof, Ms. Alfaro is entitled to guilt and penalty habeas relief without specifically proving the prejudice arising from her

144

incompetence.  Assuming, arguendo, that the error is not per se prejudicial, the error so infected the integrity of the proceedings that the error cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless.  In any event, the violations of Ms. Alfaro's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, rendering them fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner should properly be granted habeas relief.

## IX.

## CLAIM 4:  ASSUMING PETITIONER WAS COMPETENT TO STAND TRIAL, PETITIONER WAS DENIED HER RIGHT TO BE PRESENT FOR ALL PROCEEDINGS IN HER CAPITAL TRIAL

Petitioner's convictions and sentences were rendered in violation of her rights to due process, a fair trial, equal protection, effective assistance of counsel, confrontation and cross-examination, to present a defense, a reliable determination of guilt, and to a reliable, individualized, and non-arbitrary death-penalty determination, because she was denied the right to be present at all critical stages of the criminal proceedings against her, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.  This claim is being presented to the California Supreme Court.

2.  Petitioner's right to be present at all proceedings in his capital trial was nonwaivable, and in any event, her purported waivers were not constitutionally valid. Petitioner's trial counsel performed below the standard of care, and to Petitioner's prejudice, because he permitted Petitioner to purport to waive her presence during the trial proceedings.  To the extent that the rights violated were state-created, Petitioner had a substantial and legitimate expectation in that interest, and was arbitrarily deprived of that liberty interest.  *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

145

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner incorporates the above facts and alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

**A.    PETITIONER WAS ABSENT FROM CRITICAL STAGES OF HER CAPITAL TRIAL PROCEEDINGS**

6.  Petitioner was absent from critical stages of her capital proceedings, including, but not limited to, the following:  An in-chambers proceeding held on March 3, 1992 (CT 444) and an in-chambers conference held on March 9, 1992 (CT 468).

**B.    PETITIONER'S ABSENCE FROM HER CAPITAL TRIAL REQUIRES HABEAS RELIEF**

7.  Petitioner's absence from significant portions of the proceedings against her violated her federal constitutional rights to be present at all stages of his criminal trial.  *Illinois v. Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970).  Petitioner's personal presence at critical stages of her capital case was nonwaivable and any such waiver by Petitioner or her counsel violated Petitioner's constitutional rights.  *Bustamante v. Eyman*, 456 F.2d 269, 273-74 (9th Cir. 1972).  Even if Petitioner could waive her right to be personally present at all critical stages of the proceedings, the record fails to establish a constitutionally valid waiver to allow her to be absent.

8.  Further, Petitioner was incompetent to waive her rights and counsel could not waive or stipulate away Petitioner's substantial and constitutional right to be present during her capital trial.  On the face of the record, there was no specific and clear explanation of the rights Petitioner would give up by her absence.  It cannot be inferred that Petitioner's rights were adequately explained and understood with respect to the proceedings at which she was not present.  Petitioner's waivers of her presence were not knowingly and intelligently made, as Petitioner could not make a valid and informed choice without an understanding of the rights being abandoned.

9.  Petitioner was prejudiced by her absence from critical stages of her capital trial.  This error, when considered individually or cumulatively, cannot be said to be harmless beyond a reasonable doubt, the State will be unable to meet its burden in showing this error harmless and the error so infected the integrity of the proceedings that it cannot be deemed harmless.   In any event, the violation of Petitioner's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, rendering them fundamentally unfair and resulting in a miscarriage of justice.

## X.

## CLAIM 5:  APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO ASSERT A VIABLE *BATSON* CLAIM ON APPEAL

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because appellate counsel failed to raise a viable *Batson* claim on appeal.

1.  Petitioner's appellate counsel did not raise a claim of her own ineffectiveness either on appeal or in state habeas (appellate counsel handled both proceedings).  The claim is being presented to the California Supreme Court.

147

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  Under the Sixth and Fourteenth Amendments to the United States Constitution, a state criminal defendant is guaranteed the right to counsel on a first appeal as of right. *Penson v. Ohio*, 488 U.S. 75, 79, 109 S. Ct. 346, 102 L. Ed. 2d 300 (1988); *Douglas v. California*, 372 U.S. 353, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963).[7]  The right to appellate representation necessarily entails the concomitant right to effective assistance of counsel. *Evitts v. Lucey,* 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985).  Claims of ineffective assistance of appellate counsel are analyzed on the same basis as trial counsel. *Smith v. Robbins,* 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).  To prevail on a claim of ineffective assistance of counsel, the petitioner must satisfy a two-pronged test:  (1) competency and (2) prejudice.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  The proper inquiry under the first prong is whether counsel's conduct fell below an objective standard of reasonableness, or was it

---

[7]  A criminal appellant is not merely entitled to appellate counsel, he can actually be compelled to proceed on appeal with legal representation despite his protestations. *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (concluding that there is no constitutional right to self-representation on appeal).

outside the "wide range of professionally competent assistance." *Strickland,*
466 U.S. at 694.  The second prong is satisfied by showing a reasonable probability
that, but for counsel's unprofessional errors, the result of the proceeding would have
been different. *Id.*

6.  The responsibilities of appellate counsel "includ[e] the duty to prepare
a legal brief containing citations to the transcript and appropriate authority[ ]
and setting forth all arguable issues. . ." *People v. Lang*, 11 Cal. 3d 134, 139,
520 P.2d 393, 396, 113 Cal. Rptr. 9, 12 (1974)  (citations omitted); *see People v.
Scobie*, 36 Cal. App. 3d 97, 99, 111 Cal. Rptr. 600, 601 (Cal. App. 2d Dist. 1973);
*People v. Feggans*, 67 Cal. 2d 444, 432 P.2d 21, 62 Cal. Rptr. 419 (1967).  This is
consistent with American Bar Association Guidelines, which requires appellate
counsel "to present to the appropriate court or courts all arguably meritorious issues .
. ." ABA Guidelines for the Appointment and Performance of Counsel in Death
Penalty Cases 11.9.3 (C), p. 126 (1989); *see Wiggins v. Smith*, 539 U.S. 510, 522, 123
S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (endorsing ABA standards as a benchmark for
evaluating trial counsel's performance);  *Strickland,* 466 U.S. at 688-89 ("Prevailing
norms of practice as reflected in American Bar Association standards and the like . . .
are guides to determining what is reasonable").  At base, appellate counsel has an
obligation to raise all " crucial assignments of error, which arguably might have
resulted in reversal."  *People v. Rhoden*, 6 Cal. 3d 519, 524, 492 P.2d 1143,
99 Cal. Rptr. 751 (1972); *In re Smith*, 3 Cal. 3d 192, 202, 474 P.2d 969, 90 Cal. Rptr.
1, 7 (1970) (inexcusable failure of appellate counsel to raise crucial assignments of
error that arguably could have resulted in reversal deprived defendant of effective
assistance of appellate counsel).

7.  Appellate counsel provided ineffective assistance by failing to allege the
*Batson* claim.  First, appellate counsel's failure to include the *Batson* claim
constituted deficient performance.  There is no question that appellate counsel was
aware of the *Batson* issue, given that trial counsel had made a *Wheeler* objection on

149

the record.  Second, there is a reasonable probability that Alfaro would have prevailed on the *Batson* claim had appellate counsel appealed.  Alfaro had met her burden to establish a *prima facie* showing to raise an inference of racial animus.  Thus, had her claim been presented on appeal, there is a reasonable likelihood that the California Supreme Court would have remanded the case for a full *Batson*/*Wheeler* hearing.

8.  That the California Supreme Court had been applying an unduly onerous *prima facie* showing at the time Alfaro's case was pending on appeal is irrelevant. For purposes of evaluating prejudice, courts may not consider "idiosyncracies of the particular decisionmaker" but instead must "proceed under assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Strickland*, 466 U.S. at 695.  Thus, the court must assume the state court would have applied the constitutionally minimal standard under *Batson*, which Alfaro clearly met.

9.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (noting that *Brady* violation, which has the same "reasonable probability" prejudice showing as *Strickland*, is not subject to harmless error analysis under *Brecht*, 507 U.S. at 638.

/ / /

/ / /

**XI.**

## CLAIM 6:  TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT AFTER THE PROSECUTOR STRUCK THE SECOND AND THIRD LATINO JURORS

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because trial counsel failed to object to the prosecutor's second and third strike of Latino jurors.

1.  Petitioner did not raise this claim on appeal or in her first state habeas petition.  The claim is being presented to the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  To establish ineffective assistance of counsel, a petitioner must establish the familiar two-pronged test:  (a) trial counsel's representation was deficient, falling "below an objective standard of reasonableness," and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688.

151

6.  It is beyond cavil that trial counsel's failure to object to the prosecutor's subsequent strikes of the Latino jurors was objectively unreasonable.  The failure to raise and adequately preserve a viable *Batson* motion constitutes ineffective assistance of counsel.  *See Davis v. Sec'y for the Dept. of Corr.*, 341 F.3d 1310, 1314 (11th Cir. 2003); *Gov't of Virgin Islands v. Forte*, 865 F.2d 59 (3rd Cir. 1989); *Hollis v. Davis*, 941 F.2d 1471 (11th Cir. 1991); *State v. Robertson*, 90 Ohio App. 3d 715, 630 N.E.2d 422 (Ohio Ct. App. 2d Dist. 1993).  Trial counsel's omission was particular egregious in this case.  First, trial counsel was well aware of his obligation to challenge potentially discriminatory strikes by the prosecutor, as evidence by his first *Wheeler* objection.  Second, trial counsel should have been alert to the prosecutor's discriminatory strikes, given the trial judge's expressed willingness to revisit the *Wheeler* motion in the event the prosecutor struck another Latino juror.

7.  Not only did the failure to raise the *Batson* issue constitute deficient performance, but had trial counsel asserted there is a reasonable probability that a motion would have been successful.  Because the strike of Sanchez ran counter "to accepted trial strategy," *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 1040, 154 L. Ed. 2d 931 (2003), the prosecutor would have had a difficult time explaining his decision.  Even assuming *arguendo* that a subsequent *Batson* motion would have fallen on deaf ears and the motion ultimately denied, this is not fatal.  Just as a defendant has "no entitlement to the luck of a lawless decisionmaker," *Strickland*, 466 U.S. at 695, neither must she endure a lawless decisionmaker who refuses to apply clearly established federal constitutional law.  At a minimum, the issue would have been preserved for appeal.  Therefore, because there is a reasonable probability of a different result had trial counsel objected to the prosecutor's strike of two Latino jurors, the trial court would have granted the *Batson* motion, Petitioner was denied effective assistance of counsel.

8.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of

1  whether the violations substantially affected or influenced the jury's verdict.  *Kyles v.*

2  *Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (noting that

3  *Brady* violation, which has the same "reasonable probability" prejudice showing as

4  *Strickland*, is not subject to harmless error analysis under *Brecht*, 507 U.S. at 638.

5  <div align="center">**XII.**</div>

6  <div align="center">**CLAIM 7:  THE PROSECUTION'S FAILURE TO PRODUCE**</div>

7  <div align="center">**EXCULPATORY EVIDENCE AND THE PRESENTATION OF FALSE**</div>

8  <div align="center">**TESTIMONY VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**</div>

9  Petitioner's conviction and sentence of death were rendered in violation of her

10  rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

11  determination of guilt and penalty, to the effective assistance of counsel, to present

12  a defense, and to due process of law as guaranteed by the Fourth, Fifth, Sixth, Eighth

13  and Fourteenth Amendments to the United States Constitution because the

14  prosecution violated its duty to disclose exculpatory information, including, but

15  not limited to evidence harmful to the credibility of prosecution witnesses, and in

16  knowingly presenting perjured testimony (knowingly false or misleading testimony

17  by a law enforcement officer is imputed to the prosecution), allowing a witness

18  to give a false impression of the evidence to the jury and allowing false evidence

19  to go uncorrected.  The prosecution also violated its duty not to present false or

20  misleading testimony by offering opinion evidence that Petitioner acted alone in

21  committing the murder.

22  1.  Exhaustion of the claim:  This claim was fairly presented as Claim 2 in the

23  habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no.

24  S099569.

25  2.  AEDPA:  The claim was rejected by an Order of the California Supreme

26  Court dated November 18, 2007.  Because the state court's denial of this claim is both

27  "contrary to" and an "unreasonable application" of clearly established federal law,

28  28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover,

<div align="center">153</div>

1    because the state court's adjudication of this claim was dependent on an antecedent

2    unreasonable application of federal law, this Court "must then resolve the claim

3    without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

4    The state court denied this claim without an opinion, and without affording Petitioner

5    an evidentiary hearing, discovery, or any other means to further develop his claim.

6    When there is no reasoned state court decision denying an issue presented to the state

7    court and raised in a federal habeas petition, this Court must perform an independent

8    review of the record to ascertain whether the state court decision was objectively

9    unreasonable. *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also*

10   *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial

11   was objectively unreasonable.

12       3.  If Respondent disputes any of the facts alleged below, Petitioner requests

13   an evidentiary hearing so that the factual disputes may be resolved. After Petitioner

14   has been afforded discovery and the disclosure of material evidence by the State, the

15   use of this Court's subpoena power, and the opportunity to investigate fully, counsel

16   requests an opportunity to supplement or amend this petition.

17       4.  The declarations and other exhibits filed with this petition, as well as the

18   allegations and facts set forth elsewhere in this petition, are hereby incorporated by

19   reference into this claim as though set forth in full.

20       5.  In support of this claim, Petitioner alleges the following facts, among others

21   to be presented after full discovery, investigation, adequate funding, access to this

22   Court's subpoena power, and an evidentiary hearing:

23   **A.      INTRODUCTION**

24       6.  Habeas relief is compelled because the state created false impressions

25   that were material in that the false testimony could, in reasonable likelihood, have

26   affected the judgment of the jury.  The record establishes a reasonable likelihood that

27   during deliberations the jurors considered false evidence and argument related to the

28   identity of the man who drove Ms. Alfaro to the Wallace home and his role in the

154

1  offenses as a result of the prosecution's misconduct, and that this had a prejudicial

2  impact on Ms. Alfaro.  Additionally, there is substantial evidence that key

3  prosecution witness Reynoso received a benefit from the prosecution in that his

4  parole was not revoked, despite evidence that he had violated its conditions, at the

5  request of Inspector Giffin, and that this was not disclosed to the defense.

6      7.  If Respondent disputes any of the facts alleged below, Petitioner requests

7  an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

8  has been afforded discovery and the disclosure of material evidence by the State, the

9  use of this court's subpoena power, and the opportunity to investigate fully, counsel

10  requests an opportunity to supplement or amend this petition.

11      8.  The declarations and other exhibits filed with this petition, as well as the

12  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

13  reference into this claim as though set forth in full.

14  **B.    LAW IN SUPPORT OF CLAIM**

15      9.  "[T]he suppression by the prosecution of evidence favorable to an accused

16  upon request violates due process where the evidence is material either to guilt or

17  to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.*

18  *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  In order to

19  prevail on a Brady claim, a petitioner must demonstrate that:  (1) "The evidence

20  at issue must be favorable to the accused, either because it is exculpatory, or because

21  it is impeaching," (2) "that evidence must have been suppressed by the State," and

22  (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82,

23  119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *accord Jackson v. Brown*, 513 F.3d 1057,

24  1070-71 (9th Cir. 2008).

25      10.  A conviction obtained using knowingly perjured testimony violates due

26  process.  *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935).

27  The prohibition against the use of false testimony applies even when the testimony

28  in question was relevant only to the witness's credibility.  *Napue v. Illinois*, 360 U.S.

155

1   264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  To prevail on a claim based on

2   *Mooney-Napue*, the petitioner must show "(1) the testimony (or evidence) was

3   actually false, (2) the prosecution knew or should have known that the testimony was

4   actually false, and (3) the false testimony was material."  *Hayes v. Brown*, 399 F.3d

5   972, 984 (9th Cir. 2005) (en banc).

6   **C.**    **FACTS IN SUPPORT OF CLAIM**

7       **1.    The Prosecutor Failed to Disclose Exculpatory Evidence and**

8              **Presented False Testimony Regarding Third-Party Culpability**

9       11.  The prosecution fashioned its case entirely on the theory that Petitioner

10  was in the house alone and acted alone.  Consequently, any evidence raising a doubt

11  about whether someone else entered the house and was involved in the murder in

12  any way, including substantially dominating Ms. Alfaro or placing her under extreme

13  emotional duress, would have materially weakened the prosecution's penalty case and

14  materially strengthened the defense mitigation case.  *See, e.g., Holmes v. South*

15  *Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (upholding

16  defendant's right to present evidence of third-party culpability).

17      12.  A review of the evidence leads to the conclusion that the investigators

18  knew the identity of the man who drove Ms. Alfaro to the Wallace home, but failed

19  to reveal his identity to the defense and, instead, took steps to mislead the jury about

20  this individual's role in the offense.  *See* Exhibit 1 (McGrath Declaration) at ¶¶ 2-65.

21  Because one of the State's investigators refused to submit to an interview with

22  Petitioner's state habeas investigator absent a court order, and the other told

23  Petitioner's state habeas investigator a story that was not credible, discovery is

24  warranted on this issue.  *Id.* at ¶¶ 64-65; Exhibit 50 (Email from Bale to McGrath).

25  However, while discovery will clearly strengthen Petitioner's claim, the conclusion

26  that the prosecution knew Torres-Graciano's identity as the driver can be drawn from

27  the following.

28

13. During her videotaped statement, Ms. Alfaro told Giffin and Bale about Manuel Torres-Graciano. Giffin asked Ms. Alfaro who she stayed with at the Princess Motel during the time period between the crime and her arrest, and she responded,

> Ms. Alfaro: The guy that sells.
>
> Giffin: What's his name?
>
> Ms. Alfaro: Manuel.
>
> Giffin: Manuel what?
>
> Ms. Alfaro: I don't know his last name. . . . Manuel Flores
> something . . . it's a long name.

CT 585-87. She told the investigators that she stayed with Manuel, the father of her children, the first night, but then began staying with Manuel "Flores something . . . It's a long name." CT 586-87. *See also* CT 565. This interchange occurred after Bale had stated to Ms. Alfaro: "You know, we showed, we showed people your picture around there they know you. . . . They know Manuel." CT 582-83.

14. In his notebook, Giffin indicated that on July 2, 1990, Juan Jimenez Garcia told Giffin that Ms. Alfaro hung out at the next apartment house with a Mexican male with a mole on his right nostril named Manuel. Exhibit 44. He said that on June 15, 1990, he saw Ms. Alfaro around noon with Reynoso, and that Manuel, "the dealer" (*id.*), was in the area, standing in front of the apartments. *Id.*

15. The notebook indicates that Giffin also interviewed Isabelle Torres, Manuel Torres-Graciano's sister, living at 1536 S. Jeffrey # 3, on July 2, 1990. She described Manuel Torres-Graciano as 5'5", and 170 pounds, and stated that he had recently been released from Los Angeles County jail (4-5 months prior). She said that Manual "the dealer" knew Shorty. Exhibit 44. Without being asked, she stated that he had just left for the Nayarit area of Mexico. *Id.*

16. That afternoon, officers took two Polaroid photos from Ms. Torres and obtained the address of their mother in Nayarit, Mexico from her. Exhibit 44.

Crucially, and in violation of the due process clause and Ms. Alfaro's right to a fair trial, these Polaroid photographs were not produced as discovery to the defense. Nor were any photos of Torres Graciano shown to Reynoso when he was interviewed later that night (or at any time thereafter), despite the fact that Reynoso told investigators that he would recognize the driver if he saw him. Exhibit 22 (transcript of investigator's interview with Reynoso); Exhibit 1 (McGrath Declaration) at ¶¶ 46-47.

17. Also on July 2, 1990, detective Bale pasted a picture of Torres-Graciano in his investigative notebook. Exhibit 49.

18. During an interview on July 5, 1990, Sabrina Duran (who Juan Jimenez had told the investigators "shot-up" with Ms. Alfaro on June 15th (Exhibit 44)) identified Torres-Graciano as "Rosie's boyfriend" from the booking photograph pasted in Bale's book. *Also see* Exhibit 128. She told Bale that Ms. Alfaro stayed with him the week after the murder at various motels. Exhibit 44. When asked if she had ever seen a Monte Carlo, she asked if it was a brown Monte Carlo. Exhibit 48.

19. Torres-Graciano had an August 1989 Orange County felony conviction for the possession or purchase for sale of a controlled substance. He was given 36 months probation, served 45 days jail time, and was still on probation at the time of the offense. Warrants were issued in Santa Ana for the possession of a controlled substance for sale and a bench warrant was issued November 26, 1989 for training animals for fighting. Exhibit 36.

20. Given all of the evidence the investigators had amassed concerning Torres-Graciano's participation in the offenses, it is noteworthy that they failed to record any information concerning Torres-Graciano in their November 7, 1990 "Investigative Overview." Exhibit 37. The fact that they failed to pursue this line of investigation while arguing to the jury, without cause, that the driver of the Monte Carlo played no role in the offense, violated Ms. Alfaro's constitutional rights.

21.   Moreover, from what they did know about Torres Graciano -- that he was nearly twice Ms. Alfaro's age; that he was a drinking buddy of her father; that he had a criminal record and was on probation on June 15, 1990; that he was not only a drug dealer, but *her* drug dealer; that he had been described as her "boyfriend;" and that he fled to Mexico within days of her arrest -- they knew that he could provide exculpatory evidence, at least with respect to the penalty phase.

22.   The prosecution further perverted the course of justice by calling Roberto Frias Gonzalez as a witness at trial, knowing that the defense had erroneously identified him as the driver (*see* RT 1944-49; 4256 (Middleton calls D.A. Investigator Robert Harper to testify at penalty retrial as Robert Frias Gonzalez is not available)), succeeding in prejudicing Ms. Alfaro in the eyes of the jury and creating the false impression that there was no one with Ms. Alfaro inside the house on the day of the crimes, when they clearly believed that this was not true.  *See* CT 534, 543, 554, 582, 600.

23.   The prosecution failed to show a photograph of Torres-Graciano to Reynoso, leading to the inference that they did not want him to confirm Torres-Graciano's identity as the driver, and thereby complicate their case, knowing that Torres Graciano had fled to Mexico, and even if they could get him back, might provide evidence that would assist Ms. Alfaro in the penalty phase.  Exhibit 1 (McGrath Declaration) at ¶ 47.  Additionally, because the prosecution knew that Torres-Graciano and Reynoso knew one another, they knowingly presented perjured testimony from Reynoso that he did not know the driver of the Monte Carlo.  *Cf.* Exhibit 44 (Isabel Torres tells Giffin that Torres Graciano knows Reynoso); *with* RT 944-45, 3371 (Reynoso testifies he does not know the driver).

24.   Investigator Giffin himself provided false testimony.  Though he knew that Manuel Torres-Graciano drove a brown Monte Carlo, he testified at the first trial as follows:  "Q: Did you ever locate the car that you believed was the one that was in front of the house?  A:  Not that we know of.  I don't believe so."  RT 1145.

Regarding whether he believed another person had been involved, his testimony at the two trials was not only false, it was inconsistent.  At the guilt phase trial, he testified:  "Quite personally, I had a very difficult time believing that Rosie Alfaro acting alone could have committed such an atrocious murder.  But all the physical evidence, all the witness statements, absolutely everything we found in the investigation, including her confession, indicated to me that she did act alone.  Monroe:  But you did suspect that she was trying to protect somebody else?"  A: "No."  Q:  "To cover for somebody else?"  A:  " . . . But after her confession, we were looking at them as witnesses."  RT 1156.  In contrast, he testified at the second penalty trial as follows:  Q:  "Did you have reason to believe during the course of your interview that you thought Rosie Alfaro was covering up for someone?"  A:  "Yes."  Q:  "You believe she was trying to protect somebody?  A:  Initially, yes."  Q:  "Why did you feel that way, Detective Giffin?"  A:  "Initially it was my opinion that so brutal a murder was not likely to have been committed by a female.  As the interview continued, Rosie's minute details and her knowledge and her recollection of the crime scene, of the details of the murder, of her participation in it, led me to believe that it was someone with firsthand knowledge of the murder, and she did in fact commit the murder by herself."  RT 3563.  Notably, Ms. Alfaro's interrogation took place on June 27, 1990.  Bulletins issued by the Orange County Sheriff's Department ("OCSD") on July 6, 1990, indicate that as of that date, the OCSD still considered the missing third person as a suspect.  *See* Exhibit 34.

    25.  Moreover, Giffin's testimony that "all the physical evidence, all the witness statements, absolutely everything we found in the investigation, including her confession, indicated to me that she did act alone" was false.  During the interrogation on June 27, 1990, Giffin asked Ms. Alfaro whether she was sure nobody came into house, at which point she admitted that the man came inside, "right there by the door."  CT 534.  Later, she admitted that the man came all the way into the house, when she told the investigators that she believed he had taken the Wallace's

microwave oven, located in their laundry room near the kitchen, to the car.
CT 543-44.   Giffin was also aware of Ms. Alfaro's testimony that she took the knife
she used with her after wiping it with a towel, and knew that such a towel had in fact
been found at the scene, as had a second knife.  *See* CT 546.  And finally, he was
aware of at least one footprint found at the scene which could not be identified.
RT 3422.

**2.** **The Prosecutor Failed to Disclose and Presented False Testimony Regarding Impeachment Evidence of Reynoso**

26.  In addition to the above, the prosecution failed to disclose to the defense
that Reynoso had been granted a substantial benefit by the prosecution in exchange
for his testimony.  Despite the fact that he had been out of custody only one week,
after serving three years for drug trafficking at the time of the offenses, and despite
the fact that he admitted being in the presence of drug users and drug sellers on the
day of the offenses, his parole was not violated.  He was held in custody for
approximately a week, and his home was subjected to a parole search, but he escaped
what would otherwise have been a return to custody for several months at the request
of the prosecution.  Exhibit 1 (McGrath Declaration) at  ¶¶ 61-64.  Giffin admitted to
Petitioner's investigator that it was possible that he or one of his colleagues asked
Reynoso's parole officer not to violate him.  *Id.* at ¶ 63.  In fact, Giffin's notes, which
he had not looked at it the time he spoke to Mr. McGrath, indicate that on July 9,
1990, he did in fact contact Reynoso's parole agent, Mike Lewis.  Exhibit 44.
Mr. Lewis informed state habeas counsel's investigator that, although he had no
specific recollection of Ms. Alfaro's case, it was common for law enforcement
officers to contact parole agents and ask them not to revoke the parole of a valuable
witness, and that such requests would have been considered and granted in a high
profile case such as Ms. Alfaro's.  Exhibit 1 (McGrath Declaration) at ¶ 62.

27.  Based on the available evidence, it appears highly likely that Giffen
arranged for Reynoso's parole not to be revoked, and thereby gave a significant

benefit to Reynoso in exchange for his "cooperation." Yet this fact appears not to have been disclosed to the defense. It does not appear in the discovery. And it was not brought out on cross-examination of Reynoso at trial, as it would have been by any competent attorney, had it been known. Should it emerge that this information was disclosed to the defense pretrial, then Petitioner alleges that the failure to use this highly potent impeachment material constitutes another instance of trial counsel's incompetence as counsel.

28. Despite Reynoso's admission during his July 2, 1990 interview with the investigators that Ms. Alfaro had used drugs on June 15, 1990, and police interviews with numerous other witnesses, including Juan Jimenez (*see, e.g.*, Exhibit 44), district attorney Middleton elicited testimony from Reynoso at trial that Ms. Alfaro had not used drugs, thereby perverting the course of justice.

29. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence. *Jackson v. Brown,* 513 F.3d 1057, 1071-72 (9th Cir. 2008) (requiring the prejudice from *Napue* and *Brady* violations to be analyzed cumulatively); *accord Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (requiring the consideration of multiple constitutional violations collectively to determine whether harmless).

## XIII.

## CLAIM 8: PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN LAW ENFORCEMENT DESTROYED EXCULPATORY EVIDENCE

Petitioner's convictions and sentences were rendered in violation of her rights to due process, a fair trial, to present a defense, to confrontation, to the effective assistance of counsel, and to a reliable, individualized and non-arbitrary death-penalty

determination, because law enforcement officials destroyed exculpatory evidence in bad faith, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.  This claim is being presented to the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits previously filed with this court and those accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

**A.**   **FACTUAL BASIS**

5.  Russell Mumford, senior criminalist with the Orange County Sheriff Coroner's Department, aided in the execution of a search warrant at 10271 Antingua, Anaheim, California.  RT 828.  Mr. Mumford retrieved clothing believed to belong to Ms. Alfaro, including a pair of black Levi's- type pants with black belt.  RT 831.  The crime lab cut out numerous holes on the black pants, presumably to test for blood. *See* Trial Exhibit 67.  None of these swatches were maintained with the evidence at the Orange County courthouse.  Based upon information and belief, this material has been destroyed.

**B.    THE POLICE VIOLATED PROCEDURAL DUE PROCESS BY**
1
2   **INTENTIONALLY DESTROYING APPARENTLY EXCULPATORY**
3   **EVIDENCE**

4   6.  "Law enforcement agencies have a duty, under the due process clause of the
5   Fourteenth Amendment, to preserve evidence 'that might be expected to play a
6   significant role in the suspect's defense.'"  *California v. Trombetta*, 467 U.S. 479,
7   488, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984).  The destruction of such evidence
8   violates due process where (1) the exculpatory value of the destroyed evidence was
9   apparent before the evidence was destroyed, and (2) the defendant would have been
10  unable to obtain comparable evidence by other reasonably available means. *Ibid*.
11  Where the exculpatory value of the evidence relies on scientific testing, a petitioner
12  must show that the evidence was destroyed in "bad faith." *Arizona v. Youngblood*,
13  488 U.S. 51, 56 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); *Illinois v. Fisher*, 540 U.S.
14  544, 124 S. Ct. 1200, 157 L. Ed. 2d 1060 (2004).  The "bad faith" of the police is
15  apparent where the "police themselves by their conduct indicate that the evidence
16  could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 56.

17  7.  The prosecution violated Ms. Alfaro's guaranteed constitutional rights to
18  due process by cutting cloth swatches from Ms. Alfaro's pants.  First, the exculpatory
19  nature of the swatches was either known, or should have been known, at the time the
20  swatches were destroyed.  The prosecution's theory was that Ms. Alfaro acted alone
21  in killing Autumn.  However, the infinitesimal spots on the  pants purportedly worn
22  by Ms. Alfaro at the time of the killing indicate otherwise.  It seems inconceivable
23  that someone, who allegedly stabbed a victim 52 times, would only have tiny droplets
24  of blood on their pants.  This is particularly true, given the fact that the victim was
25  small in stature and, thus, the wounds would have been inflicted at a such an angle
26  that the pants should have been saturated with blood.

27  8.  A far more plausible theory of the blood spatter is consistent with Ms.
28  Alfaro's duress explanation at trial.  Even assuming Ms. Alfaro carried out the initial

164

1    stab wounds, another person most likely inflicted the remaining blows as Ms. Alfaro

2    stood nearby.  This would explain the tiny blood droplets which would have been

3    deposited on someone within a distance from the victim, rather than incurred by

4    someone who was a direct participant.

5           9.  Second, the defense has no way of obtaining comparable evidence.  The

6    only way to analyze the blood spatter pattern would have been to conduct a thorough

7    physical examination of the pants in their original state.  As forensic specialist Ms. Di

8    Meo explains, it is not possible to conduct an examination now:

9            I examined and photographed the pair of black "Sivan" women's denim
             jeans marked as Exhibit 67.  Numerous self-adhesive labels were present
10           on areas of the pant's exterior.  Some of the labels had fallen off the
             pants and were found loose within the evidence bag.  The original
11           locations of the labels cannot be determined.  Laboratory personnel had
             cut out numerous small sections of the fabric on the front of the pant
12           legs, and the swatches were not available for my examination.  I as
             unable to conduct an independent examination of the areas that were
13           removed from the pants, or determine whether the swatches bore
             bloodstains or other foreign materials.  Assuming these were areas that
14           bore bloodstains, I cannot provide Petitioner's counsel with any forensic
             analysis of their size, shape or distribution, or manner of deposition
15           without personal observation.

16   Exhibit 129 (Declaration of Lisa Di Meo) at ¶ 8.

17          10.  Consequently, because the prosecution destroyed exculpatory evidence,

18   and there is no way to replicate such evidence, Ms. Alfaro's due process rights were

19   violated.

20   **C.    HABEAS RELIEF IS WARRANTED**

21          11.  The constitutional violations set forth in this claim alone mandate relief

22   from the convictions and sentence.  However, even if these violations do not mandate

23   relief standing on their own, relief is required when this claim is considered together

24   with the additional constitutional errors outlined in the remainder of this petition.

25   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

26   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

27   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

28   (9th Cir. 1978).

12.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrant the granting of this petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.  These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless.  In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XIV.

## CLAIM 9:  THE DISTRICT ATTORNEY ENGAGED IN EGREGIOUS AND PERVASIVE MISCONDUCT THAT RENDERED PETITIONER'S PENALTY PHASE RETRIAL FUNDAMENTALLY UNFAIR

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecutor engaged in misconduct.

/ / /

/ / /

166

1       1.  Exhaustion of the claim:  This claim was fairly presented to the California

2   Supreme Court in the direct appeal.  It was presented as Claim 10 in the Opening

3   Brief.

4       2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

5   *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

6   state court's denial of this claim is both "contrary to" and an "unreasonable

7   application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

8   must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

9   this claim was dependent on an antecedent unreasonable application of federal law,

10  this Court "must then resolve the claim without the deference that AEDPA otherwise

11  requires." *Panetti*, 127 S. Ct. at 2858.

12      3.  If Respondent disputes any of the facts alleged below, Petitioner requests an

13  evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

14  been afforded discovery and the disclosure of material evidence by the State, the use

15  of this court's subpoena power, and the opportunity to investigate fully, counsel

16  requests an opportunity to supplement or amend this petition.

17      4.  The declarations and other exhibits accompanying this petition, as well as

18  the allegations and facts set forth elsewhere in this petition, are hereby incorporated

19  by reference into this claim as though set forth in full.

20      5.  In support of this claim, Petitioner alleges the following facts, among others

21  to be presented after full discovery, investigation, adequate funding, access to this

22  Court's subpoena power, and an evidentiary hearing.

23  **A.     INTRODUCTION**

24      6.  After the first jury failed to unanimously agree on the death penalty, the

25  People opted to retry the penalty phase.  During the second penalty trial, Deputy

26  District Attorney Charles Middleton's determination to secure a death verdict caused

27  him to step out of the bounds of acceptable prosecutorial conduct.  His unethical and

28

deceptive behavior was so pervasive that it poisoned the proceeding, in violation of Ms. Alfaro's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

7. During voir dire, the district attorney misled the jury regarding its duty to consider evidence in mitigation, telling the jurors that there was only "one side" to the evidence they would be hearing. During the evidentiary phase of the trial, he intentionally elicited inadmissible evidence from witnesses about Ms. Alfaro's prior non-felonious, non-violent criminal conduct and other "bad acts." He mischaracterized the evidence to suggest that Ms. Alfaro's description of being raped as a child was coached and to paint her as a bad mother. And he improperly asked the coroner to comment on whether he thought Ms. Alfaro had possessed "intent to kill." During his closing argument, Mr. Middleton mischaracterized the law as well as the evidence to confuse  jurors about their responsibility to weigh all of the evidence and to encourage jurors to view mitigating circumstances as non-statutory aggravating factors. Some of his comments were clearly calculated to arouse the passion and prejudice of the jury, and it is likely that they did so.  The cumulative prejudice flowing from all of these instances of misconduct rendered Ms. Alfaro's penalty hearing fundamentally unfair.[8]

**B.    <u>LEGAL STANDARDS</u>**

8. It is well established that misconduct by a prosecuting attorney during closing argument may be grounds for reversal. *Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). A defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright,* 477 U.S. 168, 183, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Courts in federal habeas cases review claims of prosecutorial misconduct "to determine whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U.S.

---

[8] Where a proper objection was lodged and overruled we submit that the trial court erred as well, and address the trial court's errors in Section XIII, *supra.*

637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).  In capital cases, the Eighth

Amendment is also violated where the prosecutors urges the jury to reach the

sentence determination based upon factors other than those it is instructed to

consider.  *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231

(1985); *Sandoval v. Calderon,* 241 F.3d 765 (9th Cir. 2000).  In evaluating habeas

challenges to comments by the prosecution, federal courts consider "(1) whether the

prosecutor's comments manipulated or misstated the evidence; (2) whether the trial

court gave a curative instruction; and (3) the weight of the evidence against the

accused."  *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) .

9.  A prosecutor has the duty to guard against statements by his witnesses

containing inadmissible evidence.  *People v. Earp*, 20 Cal. 4th 826, 978 P.2d 154,

85 Cal. Rptr. 2d 857, 882 (1999) (quoting *People v. Warren*, 45 Cal. 3rd 471, 481-82,

754 P.2d 218, 247 Cal. Rptr. 172 (1988)).  The well-settled principle is that evidence

admitted in aggravation in a death penalty case must be relevant to those factors set

out in Penal Code § 190.3.  *See People v. Welch*, 20 Cal. 4th 701, 976 P.2d 754,

85 Cal. Rptr. 2d 203, 241 (1999) (citing *People v. Boyd*, 38 Cal. 3d 762, 774 (1985));

*see also Ortiz v. Stewart*, 149 F.3d 923, 94 (9th Cir. 1998) (a state court's arbitrary

and capricious application of state law constitutes an independent due process or

Eighth Amendment violation).  The prosecution may not introduce evidence of the

defendant's alleged "bad character" in its case-in-chief unless the evidence bears on

one of the enumerated aggravating factors.  *People v. Ramirez*, 50 Cal. 3d 1158, 1192

(1990) (explaining the *Boyd* decision); *see also People v. Millwee*, 18 Cal. 4th 96,

151-52, 954 P.2d 990, 74 Cal. Rptr. 2d 418 (1998) (negative references to

defendant's character/personality are permissible only when based on evidence

introduced in prosecutor's case-in-chief under sect. 190.3(a), (b), and (c)).  Evidence

of nonviolent criminal activity that did not result in a felony conviction is

inadmissible as an aggravating factor.  *People v. Visciotti*, 2 Cal. 4th 1, 72, 825 P.2d

388, 5 Cal. Rptr. 2d 495 (1992). And it is highly improper for a prosecutor to argue

1   that defendant's clear record might only mean he did not get caught. *People v.*

2   *Ochoa*, 19 Cal. 4th 353, 466, 966 P.2d 442, 79 Cal. Rptr. 2d 408 (1998). A

3   prosecutor commits misconduct by intentionally eliciting inadmissible, irrelevant and

4   improper testimony. *See United States v. Chu*, 5 F.3d 1244, 1250 (9th Cir. 1993);

5   *People v. Scott*, 15 Cal. 4th 1188, 1218 (1997).

6         10.  "When [a misconduct] claim focuses upon comments made by the

7   prosecutor before the jury, the question is whether there is a reasonable likelihood

8   that the jury construed or applied any of the . . . remarks in an objectionable fashion."

9   *People v. Smithey*, 20 Cal. 4th 936, 960 (1999) (quoting *People v. Samayoa*,

10  15 Cal. 4th 795, 841 (1997).  The cumulative effect of Mr. Middleton's

11  misstatements, mischaracterizations and inflammatory comments prejudiced the jury

12  and denied Ms. Alfaro her right to a fair trial.

13  **C.**      **THE PROSECUTOR ELICITED IMPROPER AGGRAVATING**

14          **EVIDENCE AT THE SECOND PENALTY TRIAL**

15          **1.**      **Petitioner's Non-felonious, Non-violent Criminal Record Was**

16                  **Improperly Introduced**

17        11.  Penal Code § 190.3 provides that "[i]n determining the penalty, the trier

18  of fact *shall* take into account any of the following factors if relevant."  (Pen. Code,

19  §190.3.  Factors 190.3 (b) and (c) read as follows:

20      (b)     The presence or absence of criminal activity by the defendant which
                involved the use or attempted use of force or violence or the express or
21              implied threat to use force or violence.

22      (c)     The presence or absence of any prior felony conviction.

23  *Id*.

24        12.  Until her arrest in connection with this case, Ms. Alfaro had no felony

25  record and no record of any criminal activity which involved the use or attempted use

26  of force or violence or the express or implied threat to use force or violence.

27  CT 1756-58.

28

13.  The absence of qualifying past misconduct was potent, statutory, mitigating evidence.   But during the penalty retrial, Mr. Middleton unfairly deprived Ms. Alfaro of the weight of these mitigating factors by eliciting evidence of her non-felonious and non-violent criminal record.  He then converted this inadmissible evidence into a factor in aggravation that bolstered his case for death.  Both his introduction of prejudicial, inadmissible evidence at trial and his use of this evidence as a factor in aggravation were improper and highly prejudicial.

14.  Mr. Middleton did not just bring up Ms. Alfaro's inadmissible "criminal record" once.  He brought it up several times.  On most occasions he asked questions that appeared innocuous, but that he had to have known would elicit damaging, inadmissible evidence.  For example, during Investigator Giffin's testimony, Mr. Middleton asked the investigator about his first contact with Ms. Alfaro; notably, a question having little to no relevance to the case.  "[I] received information from Doug Lucas, who's previously testified, that he had obtained a Cal. I.D. hit," the investigator said.  Obviously aware of what the investigator was referring to, Mr. Middleton charged on:  "Was that -- a hit, what do you mean?," he asked. RT 3537.  Mr. Giffin's response:  "It's a computerized fingerprint system in the state of California that has in its data base *people that have been arrested in the state of California*.  And when an unknown fingerprint is entered into the base, it compares the points of identification with the known fingerprints in the data base, and it puts out a list of potential matches."  RT 3537 (emphasis added).  Investigator Giffin went on to explain that after learning of the match between a fingerprint contained in the data base and a print lifted from the victim's bathroom, he contacted Ms. Alfaro. RT 3538.  The unavoidable inference of his testimony was that Ms. Alfaro had an arrest record.

15.  Mr. Middleton was able to further impress the jury with Ms. Alfaro's criminal record during his cross-examination of defense "psychosocial" expert Dr. Armando Morales.  Again, Mr. Middleton's question *appeared* innocuous.  He

asked: "What did you review in this case before talking to any of the family members or Rosie Alfaro?" RT 3980. But Mr. Middleton, who had been provided with the documents Dr. Morales had reviewed before trial, knew that his question was far from harmless. Dr. Morales' response:

> I saw some reports from places where she had been hospitalized for her drug problems when she was thirteen or fourteen years of age or fifteen years of age. *I saw a juvenile court report, probation report.* . . .

RT 3980.

16. Later in Dr. Morales' testimony, Mr. Middleton deviously elicited additional evidence of Ms. Alfaro's criminal past. Although Dr. Morales had not testified on direct that he believed or did not believe that Ms. Alfaro was suffering from antisocial personality disorder, and the defense objected to the questions for this reason, the court permitted Mr. Middleton to proceed. RT 3999. Reading from his own copy of the DSM-III-R, Mr. Middleton asked Dr. Morales to apply the standard diagnostic criteria for this disorder to Ms. Alfaro. RT 3994-4001. When he reached the criterion "often initiating physical fights," and the doctor stated that this did not apply to Ms. Alfaro, Mr. Middleton prodded, "do you know for sure you have got that or not?" RT 4001. In order to respond, the doctor was required once again to describe the criminal records he had reviewed; this time providing even more damaging evidence: "Based on the police reports, police records I have seen, she had an arrest for I believe theft. Other than the present offense." RT 4001. The prosecutor now brought before the jury evidence of an inadmissible criminal record. Not yet satisfied that he brought the full effect of this evidence to the jury's attention, Mr. Middleton hammered the point, responding:

> Is that all you looked for, *you just look at police reports of people caught doing something* before you determine if there was physical fights in somebody's background?

*Id*. At this point defense counsel renewed his objection, but again, it was overruled. *Id.* Mr. Middleton took this as a cue he should press on, and he did, asking: "Did you ask the family if she had any physical fights during that period of time?" *Id.*

172

Dr. Morales' response: "[Ms. Alfaro] had been in a couple of fights.  But when you are poor inner city and poor minority communities, at times one has to become involved in physical fights."  *Id*.  Again, Mr. Monroe's objection was overruled. RT 4002.  And again, this caused Mr. Middleton to go further still, eliciting evidence that improperly (and completely incorrectly) suggested that Ms. Alfaro had something to do with *gangs*:

> Q: We're talking about Anaheim, Orange County, now.  Now is the Anaheim, Orange County, the epitome of inner city dwelling like you know it up in L.A.?
>
> A: There are little pockets of barrios where you have a certain amount of criminal activity, drug activity, and gang activity.  You have about eighteen gangs in this particular area.  And I'm sure some of these gangs are involved in conflict and fighting and so forth.  So what I'm saying is in certain areas fighting is not uncommon in some of the poor minority areas.

RT 4002.

17.  When Mr. Middleton got to the "anti-social personality disorder" criterion "fire-setting," he was able to reinforce his point, this time leading Dr. Morales to reference not just Ms. Alfaro's arrest record, but to suggest that she had a record of criminal convictions as well:  "I did not find that in any of the police reports . . . *or probation evaluations*."  RT 4004.  Mr. Middleton was again able to reinforce his case in aggravation when he questioned Dr. Morales about the criterion:  "Is reckless regarding his or her own or others' personal safety, as indicated by driving while intoxicated, or recurrent speeding."  RT 4010.  When Dr. Morales testified that Ms. Alfaro did not meet this criterion, Mr. Middleton responded, "No?  Did you see on that survey Dr. Rogers did where she indicates that she often drove while intoxicated?"  *Id*.  Once again, the defense attorney's objection was overruled (RT 4011) and Mr. Middleton continued; this time turning Ms. Alfaro's *lack* of a more extensive criminal record into a factor in aggravation.  In response to Dr. Morales' statement that he had concluded Ms. Alfaro did not fit the diagnostic criterion because he "did not come across any history of traffic violations or citations

173

1  or drunk driving offenses or things of that nature," Mr. Middleton exploded,  "But

2  that's where the police catch her, right?"  RT 4011.

3       18.  During his closing argument, Mr. Middleton told the jury that statutory

4  aggravating factors relating to prior felony convictions and prior violent conduct are

5  not applicable here.  But he said nothing about juvenile and uncharged crimes.  RT

6  4317-18.  And he certainly did not clarify or concede that these factors should be

7  weighed in mitigation.  There is a likelihood that the jurors were misled to consider

8  this evidence in aggravation.  If the prosecutor did not think there was, he would not

9  have worked so hard to get it before them.

10       **2.    Mr. Middleton Improperly Introduced Other Inadmissible**

11           **"Bad Acts" Evidence**

12       19.  Not satisfied with the evidence described above, Mr. Middleton inflamed

13  the jury with inadmissible evidence that Ms. Alfaro had been a bad mother.  He asked

14  Dr. Morales:

15       Were you aware of the fact that she had -- she would have Danny be -- or
     Manny.  Let's go to Manny.  Have Manny be babysat by ex-cons, drug
16       addicts and --

17  RT 4008.  This time even Judge Millard thought Mr. Middleton had gone too far, and

18  sustained defense counsel's objection.  *Id*.  But the damage was done.

19       **3.    Mr. Middleton Improperly Argued Lack of Remorse**

20       20.  In his opening statement at the penalty retrial, Mr. Middleton argued,

21  "Miss Alfaro has not accepted any responsibility.  That's what the evidence will

22  show."  RT 3179.  In his closing argument, Mr. Middleton's comments about remorse

23  went further, amounting to an invitation to the jury to consider absence of remorse a

24  factor in aggravation of the offense, in clear violation of the law.

25       21.  First, Mr. Middleton listed "no remorse" as one of the facts and

26  circumstances of the crime that required a death sentence.  RT 4331.  Later, he

27  expanded on this theme:

28

174

1
2
3
4
5
6
7

Remorse, Ladies and Gentlemen?  (¶)The video shows it, but look at this for a moment.  Don't look at the inconsistencies, but look at the consistencies. (¶) The night of the crime she's there, not shedding a tear, acting inquisitive and just -- just fine. (¶)  The audio tape, "I don't know anything about it," acting just fine.  She's not buckling under the heavy weight of knowledge of what she did to that little child.  Not one tear, not one tear. (¶) Until you're under arrest for murder.  Now all of the sudden the well springs.  It just goes. (¶)  Ladies and Gentlemen, that remorse was not for her, that little girl.  That remorse was for the plight of Rosie Alfaro only. . . . (¶) But actions speak louder than words.  The only remorse she has is for sitting in jail for what she's done. . . . (¶) She chose her bed; let her lie in it.

8   RT 4367-68.  These statements were not made during Mr. Middleton's attack on the
9   "weak" evidence presented in mitigation.  They were made while he was in the
10   process of describing whether the death penalty was appropriate for this murder given
11   the facts in aggravation.  RT 4359.  In this context, his argument was grossly
12   improper.  *See People v. Williams (Barry),* 16 Cal. 4th 153, 254, 940 P.2d 710,
13   66 Cal. Rptr. 2d 123 (1997) (lack of remorse may not be considered by jury as a
14   factor in aggravation).

15       **4.   Mr. Middleton Improperly Attempted to Introduce Evidence**
16          **of Intent To Kill**

17       22.  A prosecutor's question seeking to elicit an expert's conclusion on the
18   defendant's intent is misconduct.  *See People* v. *Smithey,* 20 Cal. 4th 936, 960 (1999).
19   Mr. Middleton elicited precisely such an impermissible legal conclusion from his own
20   expert in this case on the crucial issue of Ms. Alfaro's intent *to kill*.  On redirect of
21   the coroner, Mr. Middleton asked the coroner: "I think you would agree with me that
22   if somebody were to stab somebody else just in the heart area a multiplicity of times,
23   it would go toward their state of mind as far as whether they intended to kill?"  RT
24   3285.  Over defense counsel's objection, the coroner was permitted to respond:  "If
25   the intent is to cause major damage, one would probably attempt to direct attention to
26   the more vulnerable area."  *Id.*

27       23.  Although Mr. Middleton asked his question about "intent to kill" during
28   the penalty and not the guilt phase of the trial, the question was nevertheless

175

1   improper.  The only aggravating factor offered by the prosecution in support of a

2   death sentence was the nature and circumstances of the crime itself.  As defense

3   counsel's objection to this question noted, there was no supporting factual foundation

4   justifying an intent to kill here.  Soliciting the coroner's opinion of intent from the

5   crime itself was simply an impermissible attempt to bolster, without evidentiary

6   support, the jury's sense that the only aggravating factor present in this case

7   warranted the death penalty.

8          **5.      Mr. Middleton Improperly Suggested that Petitioner Had Been**

9                  **"Coaxed" To Tell the Jury About Being Raped as a Child and**

10                 **Improperly Denigrated the Defense Experts**

11         24.  During his cross-examination of Dr. Morales, Mr. Middleton improperly

12  indicated that Ms. Alfaro had been "coaxed," or coached, to give a false story that she

13  had been raped as a child by one of her father's friends.  RT 4021.  Mr. Middleton

14  could point to no evidence that suggested Ms. Alfaro was lying about being raped as

15  a child, and the trial court sustained the defense attorney's objection.  *Id.*

16  Nevertheless, Mr. Middleton continued in his closing argument, without evidentiary

17  support, to insinuate that the defense experts were deceitful.  Stated Mr. Middleton:

18  "It's a big game, these [defense] experts."  RT 4333.  Even though the court sustained

19  defense counsel's objection to this comment, Mr. Middleton continued to denigrate

20  the defense's experts merely because they did not rely on evidence Mr. Middleton

21  wanted them to in forming their conclusions:

22          Ladies and Gentlemen, I couldn't think of anything to call this kind of --
            the testimony that you heard other than a fact that there -- it appeared
23          that there was some kind of deceit going on. (¶)  What's going on here,
            Ladies and Gentlemen?  A little sleight of hand?
24

25  RT 4333-34, 4341.  He later implied that Ms. Alfaro's accomplice defense only arose

26  once "she ha[d] a defense team."  RT 4362.  These comments were highly improper.

27  *See United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999) (prosecutor

28  commits misconduct in denigrating defense as a sham); *People* v. *Earp*, 85 Cal. Rptr.

                                          176

1  2d 857, 880 (1999) (a prosecutor's suggestion that defense counsel fabricated the

2  defense is misconduct when there is no evidence to support that claim); *People v.*

3  *Hill,* 17 Cal. 4th 800, 823, 952 P.2d 673 (1998) (although prosecutors have latitude to

4  draw inferences from the evidence, mischaracterizing the evidence is misconduct).

5  **D.    THE PROSECUTOR MISCHARACTERIZED THE LAW**

6       25.  During voir dire, Mr. Middleton misstated the law of mitigation in an

7  apparent effort to confuse jurors.  One juror opined that a justification defense would

8  change her mind about imposing a death sentence for a premeditated murder.  Instead

9  of clarifying what "mitigation" means, Mr. Middleton provided this erroneous

10 response: "But just you're coming out with if they had a reason, that's mitigation.

11 You see, you're already looking -- not knowing it, but you're already looking at the

12 other side of the equation, you're looking at the mitigation side.  If there was a reason

13 for doing it, that would be mitigation." RT 2618.  As if he had not already confused

14 the potential jurors enough, Mr. Middleton went on to say that he was just presuming

15 that another "side to the equation" existed. There really is not another side at all.[9]

16      26.  Mr. Middleton did not stop there, however.  He also built his closing

17 argument on an improper analogy designed to confuse and mislead the jury as to its

18 responsibility to *weigh* all the evidence in reaching its decision on an appropriate

19 punishment.  The analogy was that of a "steel-reinforced, double-thick block wall

20 with cement poured into the open areas." RT 4333.  That wall, Mr. Middleton told

21 the jury, represented the circumstances of the crime itself,  the only aggravating

22 factor.  He told the jury that it was the defense's responsibility to "penetrate" that

23 block wall with persuasive mitigating evidence.  *Id*.  As to the mitigating

24

25      [9]   JUROR: I think there are two sides to every situation and I rarely make a
   decision -- I can't remember making a decision without hearing two sides.

26

       MR. MIDDLETON: What if there isn't another side to the story?

27

   RT 2670.  The trial court overruled defense counsel's objection that Mr. Middleton's

28 remarks were intended to prejudge the evidence.  *Id*.

177

1  circumstance of age, he said, "Sure the defense could use that to try to penetrate that

2  block wall."  RT 4338.  Dr. Morales' theory, in failing to consider the MMPI test

3  results, "runs up to a block wall."  RT 4342.  Nor did Ms. Alfaro's drug use or her

4  four children penetrate the wall.  RT 4357-58, 4370.  "In fact," Mr. Middleton

5  concluded, "take it all together, everything the defense throws at you, and see how

6  much of a deflection, see how much of even maybe a chipping away of that block

7  wall might occur."  RT 4371.

8      27.  This analogy was designed to mislead the jurors into failing to properly

9  weigh the aggravating and mitigating circumstances against each other, and to

10  conclude that the aggravating circumstance must *substantially outweigh* the

11  mitigating ones.  Although Mr. Middleton said he was not claiming that the defense

12  had the burden of proof, that is precisely what his analogy had done.  Mr. Middleton

13  implied that one aggravating circumstance of this crime (which was all he had to

14  work with) already justified a death sentence, and that the defense had to convince

15  the jury that the mitigating evidence was sufficient to chip away at that *fait accompli*.

16  This suggestion misrepresented the law and the jury's responsibility in this

17  proceeding.  *See Hill*, 17 Cal. 4th at 829 (it is misconduct for the prosecutor to

18  misstate the law, including absolving itself of its evidentiary burdens).

19  **E.    THE PROSECUTOR INFLAMED THE JURY'S PASSIONS**

20      28.  Mr. Middleton committed misconduct at the end of his closing argument

21  in making comments calculated to arouse the passion or prejudice of the jury.  *See*

22  *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999).  Mr. Middleton urged

23  jurors to view the defendant, not as an individual accused of a crime, but as an

24  embodiment of all their fears for their children's safety:

25      You saw every parent's nightmare, Ladies and Gentlemen.  Think of the
        times that you call home to your child, "I'm coming home from work" or
26      whatever, and maybe that fleeting thought "will this be the last time I see
        my child, are you doing things okay," and then hang up.  (¶) Think of the
27      things you see about the child molesters, the different things that occur in
        our society, and you can think of every parent's nightmare. (¶) That's
28      what you have in this case.  (¶) Now, the very — one segment of our

178

1   society that we cherish the most is our children.  That's the one segment
2   of our society.  They're going to grow.  They have minds like little
    sponges.

3   Ladies and Gentleman, this is what Maria Alfaro saw when she knocked
    on the front door that day.  That's what she saw (holding up photograph
4   of Autumn Wallace).  (¶) This is what she saw when she left (holding up
    crime scene photograph).
5

6   RT 4371-72.  The inflammatory remarks clearly were improper appeals to the jurors'

7   emotions and to the community's fears that by rejecting a death sentence they reject

8   their children's future.  As the Ninth Circuit has explained:

9       A prosecutor may not urge jurors to convict a criminal defendant in order
        to protect community values. . . .  The evil lurking in such prosecutorial
10      appeals is that the defendant will be convicted for reasons wholly
        irrelevant to his own guilt or innocence.  Jurors may be persuaded by
11      such appeals that, by convicting a defendant, they will assist in the
        solution of some pressing social problem.
12

13  *Leon-Reyes*, 177 F.3d at 822 (citations omitted).

14      29.  Likewise, display of the photograph of Autumn in life did not depict the

15  circumstances of the crime and was "wholly irrelevant" to the sentencing

16  determination.  The prosecutor simply utilized the photograph to support an improper

17  emotional appeal.

18  **F.    THE CUMULATIVE PREJUDICE OF THE PROSECUTOR'S**

19  **MISCONDUCT REQUIRES REVERSAL OF PETITIONER'S**

20  **SENTENCE**

21      30.  The district attorney engaged in a pervasive pattern of misconduct that

22  rendered Ms. Alfaro's penalty hearing fundamentally unfair.  *See Donnelly v.*

23  *DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)

24  (prosecutorial misconduct may so infect trial with unfairness as to make the resulting

25  conviction a denial of due process; *see also United States v. Bagley*, 473 U.S. 667,

26  676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (due process violation if the

27  prosecutorial misconduct of sufficient significance to result in denial of defendant's

28  right to fair trial).  He committed misconduct numerous times by eliciting improper

179

evidence of Ms. Alfaro's prior non-felonious, non-violent conduct for no other apparent purpose than to prejudice her case for life imprisonment.  He committed misconduct by turning her evidence of remorse into an aggravating factor.  He committed misconduct by attempting to elicit an opinion from the coroner about Ms. Alfaro's state of mind.  He committed misconduct by insinuating several times that Ms. Alfaro and the experts who testified on her behalf had fabricated their evidence and conclusions.  He committed misconduct by mischaracterizing the law of mitigation during voir dire and his closing argument so as to confuse the jury about its responsibility to weigh the evidence.  He committed misconduct by urging jurors to sentence Ms. Alfaro to death to protect their children and by showing photographs designed to arouse the jury's passions.

31.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

32.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

**XV.**

**CLAIM 10:  THE PROSECUTION ENGAGED IN REPEATED**

**MISCONDUCT THROUGHOUT ALL PHASES**

**OF PETITIONER'S TRIAL**

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, to present a defense, equal protection, a fair and impartial jury, to the effective assistance of counsel, and to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the prosecution committed gross and repeated misconduct throughout all stages of Petitioner's trial.

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

5.  The prosecution and/or its agents, officials, assigns, employees, including but not limited to all personnel, both current and those personnel employed at the time of Petitioner's trial, and at any intervening time period, in the Office of Orange County District Attorney and the Orange County Sheriff's Department ("State

181

1  attorneys and law enforcement"), all other police departments and/or sheriffs

2  departments in the Anaheim area:

3        a.  Failed to disclose relevant, material exculpatory files, materials,

4  information, documents, and/or evidence, during all phases of the pre-trial, trial, and

5  appellate proceedings, and continues at this time to fail to disclose all such files,

6  materials, information, documents, and/or evidence.

7        b.  Engaged in repeated acts of misconduct throughout all phases of the

8  pre-trial, trial, and appellate proceedings, and continue at this time to engage in such

9  misconduct, both by failing to disclose relevant, material exculpatory files,

10 documents, information, materials, and/or evidence, and by relying upon and/or

11 presenting information, statements, arguments, assertions, etc., to the defense, the

12 court, and/or the jury, that the prosecution knew and/or should have known was false.

13       c.  Engaged in repeated acts of misconduct throughout all phases of the

14 pre-trial, trial, and appellate proceedings, and continues at this time to engage in such

15 misconduct, by failing to disclose relevant, material exculpatory files, documents,

16 information, materials, and/or evidence, regarding acts of misconduct by members of

17 the jury venire, the actual jurors, and/or the alternate jurors.

18       d. Engaged in repeated acts of misconduct throughout all phases of the

19 pre-trial, trial, and appellate proceedings, and continues at this time to engage in such

20 misconduct, by failing to disclose relevant, material exculpatory files, documents,

21 information, materials, and/or evidence, regarding acts of misconduct by the trial

22 court and/or its officials, employees, agents and/or assigns.

23       e.  Knowingly relied upon perjured testimony, both during pre-trial

24 proceedings in presenting evidence in defense against defense motions, as well as

25 during all phases of the trial, and during the hearing on the motion for new trial,

26 which testimony was false and said prosecution knew and/or had reason to believe

27 and/or should have known that such testimony was false.

28

182

f.  Knowingly presented and relied upon testimony, both during pre-trial proceedings in presenting evidence in defense against defense motions, as well as during all phases of the trial, and during the hearing on the motion for new trial, in which witnesses falsely testified about any possible deals, benefits, proceeds, or other inducements they had received, expected to receive, and/or did in fact receive in exchange for such testimony.

g.  Engaged in misconduct that denied Petitioner her right to a fair trial, including eliciting improper or false testimony and making improper arguments to the jury.  This misconduct also included reliance upon impermissible factors such as race and socio-economic class in selecting this case for prosecution as a capital case.

h.  Allowed its witnesses -- either knowingly or negligently -- to convey a false impression to the jury, and there is a reasonable likelihood that the false impression could have affected the jury.  *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 311 L. Ed. 2d 104 (1972).  Regardless of whether the prosecution knew or should have known that it was presenting false evidence, the mere presentation of such evidence and the jury's reliance upon such evidence deprived Petitioner of due process.  *Sanders v. Sullivan*, 863 F.2d 218, 244 (2d Cir. 1988).

6.  In closing argument, the prosecution made a series of improper, misleading, unlawful, inaccurate and inadmissible comments and arguments.  For example,  it was constitutionally improper for the prosecution to comment on the Petitioner's failure to waive her privilege against self-incrimination during trial.  *Griffin v. California*, 380 U.S. 609, 85 s. Ct. 1229, 14 L. Ed. 2d 106 (1965).  There can be no such "penalty imposed … for exercising constitutional privileges…."  *Griffin*, 380 U.S. at 614.  Furthermore, the prosecution's closing argument also contained comments that denigrated the jurors' right to exercise mercy in violation of *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987).  During argument the prosecutor also argued facts not in evidence and improperly offered his own personal opinion about the evidence and the proper outcome.

183

1       7.  It has long been held that a conviction obtained by the knowing use of

2  perjured testimony must be set aside if there is any reasonable likelihood that the false

3  testimony could have affected the jury's verdict.  *United States v. Bagley*, 473 U.S.

4  667, 679, n. 9, (1985); *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824,

5  17 L. Ed. 2d 705 (1967), *Napue v. Ill.*, 360 U.S. 264, (1959).  This standard is

6  equivalent to the "harmless beyond a reasonable doubt" standard.  *Chapman*,

7  386 U.S. at 24.

8       8.  The constitutional violations set forth in this claim alone mandate relief

9  from the convictions and sentence.  However, even if these violations do not mandate

10  relief standing on their own, relief is required when this claim is considered together

11  with the additional constitutional errors outlined in the remainder of this petition.

12  Cumulatively, these errors mandate relief from Petitioner's convictions and sentence.

13  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d

14  614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

15       9.  The foregoing violations of Petitioner's constitutional rights constitute

16  structural error and warrants the granting of this petition without any determination

17  of whether the violations substantially affected or influenced the jury's verdict.

18  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies

19  to this claim, the foregoing constitutional violations so infected the integrity of the

20  proceedings that the error cannot be deemed harmless. The foregoing violation

21  of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's

22  convictions and sentence, rendering them fundamentally unfair and resulting in a

23  miscarriage of justice. These errors, both singularly and collectively, so infected the

24  integrity of the proceedings that it cannot be deemed harmless and the State will be

25  unable to meet its burden in showing this error harmless.  In any event, the violation

26  of Petitioner's rights in this regard had a substantial and injurious effect or influence

27  on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally

28

1  unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner

2  respectfully requests that his petition be granted.

3  <div align="center">**XVI.**</div>

4  <div align="center">**CLAIM 11:  THE PROSECUTOR VIOLATED THE EQUAL PROTECTION**</div>

5  <div align="center">**CLAUSE BY EXERCISING PEREMPTORY CHALLENGES BASED**</div>

6  <div align="center">**UPON A RACIALLY DISCRIMINATORY MOTIVE**</div>

7  Petitioner's conviction, confinement and sentence of death are illegal

8  and unconstitutional under the Fifth, Sixth, Eighth and Fourteenth Amendments to the

9  United States Constitution due to the prosecutor exercising peremptory strikes against

10  jurors based upon a racially discriminatory purpose.

11  1.  Petitioner presented this claim at trial, but her appellate counsel did not raise

12  the issue on appeal.  Because the state court's denial of this claim is both "contrary

13  to" and an "unreasonable application" of clearly established federal law, 28 U.S.C.

14  § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the

15  state court's adjudication of this claim was dependent on an antecedent unreasonable

16  application of federal law, this Court "must then resolve the claim without the

17  deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858.

18  2.  If Respondent disputes any of the facts alleged below, Petitioner requests an

19  evidentiary hearing so that the factual disputes may be resolved. After Petitioner has

20  been afforded discovery and the disclosure of material evidence by the State, the use

21  of this Court's subpoena power, and the opportunity to investigate fully, counsel

22  requests an opportunity to supplement or amend this petition.

23  3.  The declarations and other exhibits filed with this petition, as well as the

24  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

25  reference into this claim as though set forth in full.

26  4.  In support of this claim, Petitioner alleges the following facts, among others

27  to be presented after full discovery, investigation, adequate funding, access to this

28  Court's subpoena power, and an evidentiary hearing:

<div align="center">185</div>

## A.   <u>FACTS IN SUPPORT OF THIS CLAIM</u>

5.  On March 3, 1992, jury selection began. On March 3, 1992, jury selection began as selected prospective jurors assembled in Judge Millard's courtroom.[10]  After all these prospective jurors were sworn *en masse*, Judge Millard began the hardship portion of voir dire by explaining how long the trial was expected to last and what generally constituted good cause to be excused from serving as a juror due to undue hardship.  RT 3-9.  Then, beginning with the prospective jurors sitting in the jury box, Judge Millard requested that any juror who believed they could not serve to approach the podium and state his or her reasons. RT 9.  This process then repeated on a row by row basis for the prospective jurors sitting in the spectator section. RT 18.  Excused jurors were asked to report back to the jury assembly room.  RT 12.  Hardship voir dire was essentially voluntary, those prospective jurors who felt they could not serve were encouraged to come forward, but not everyone felt as thought they had good cause to be excused due to undue hardship, so not everyone participated.[11]

6.  After prospective jurors were screened regarding hardship, the Clerk then called the names of the first 12 prospective jurors to be questioned by the Court and

--------

[10]  Apparently, the entire venire first assembled in a jury assembly room and assigned panel and juror numbers, and randomly selected veniremen were then called by panel and juror number from the assembly room to Judge Millard's courtroom, where they sat throughout the courtroom in both the jury box and the spectator section.  However, the record does not show as to whether prospective jurors were required to sit in assigned areas or whether prospective jurors were free to sit where they chose.  Petitioner attempted to acquire a list of the entire assembly room venire and a list of those selected for Judge Millard's courtroom, along any instructions or documents regarding the general procedures regarding jury selection, but was told by the Orange County Court Commissioner that any lists or documents regarding the venire were destroyed years ago.

[11]  A typical exchange occurred as follows:

THE COURT: All right. You would be excused, sir.  If you would report back to -- pick up your card and report back to jury assembly room.  Anyone else in the jury box? Yes, ma'am, what panel are you on?  RT 12.

186

1  requested that they sit in the jury box.[12]  RT 56.  The Court asked more substantive

2  questions and whenever one of the 12 prospective jury-box jurors was excused either

3  by the Court for cause, challenged by counsel and excused for cause, or excused after

4  a peremptory challenge, another from the spectator section was called as a

5  replacement and sat in the jury box.  *See*, *e.g.*, RT 83-84.  This process repeated until

6  12 jurors and four alternates were seated and accepted by counsel.  In total, and

7  excluding those prospective jurors excused due to hardship, 64 prospective jurors

8  were seated in the jury box and questioned by the Court for the first trial. Only four

9  were Latino or had Spanish surnames.  Another 67 prospective jurors were

10  questioned for the penalty phase retrial, and only five prospective jurors were Latino

11  or had Spanish surnames.  Of a total of nine jurors, the Court excused two jurors for

12  cause (one juror in the first trial had an out-of-court conversation with another juror,

13  and one in the retrial was excused for bias because his wife worked for the Anaheim

14  Police) and two were excused for hardship (one each in the first and second trials).

15  One Latino sat as a primary juror in the first trial, and another sat as an alternate on

16  the penalty phase retrial.  The prosecutor struck a total of three Latino jurors.

17  **1.    Richard Sanchez**

18  7.  Richard Sanchez was Juror No. 20 on Panel No. 116.  RT 56.  Other than his

19  common ethnicity with Ms. Alfaro, there was nothing about Mr. Sanchez that would

20  have concerned the prosecutor.

21  8.  Consistent with the judge's treatment of other jurors, Mr. Sanchez was

22  subject to court-directed voir dire in a group setting.  As set forth in the chart below,

23  the vast majority of questions prompted only a "Yes" or "No" response, all of which

24  Mr. Sanchez answered to the satisfaction of the People:

---

[12]  It is assumed, but record does not conclusively show that those prospective jurors remaining in the jury box at the end of the hardship voir dire were asked to leave the jury box and sit in the spectator area.  It is assumed they were either asked or not allowed to return to the jury  after the 15 minute recess, the jury box was empty when the first 12 prospective jurors were called and substantive voir dire began. RT 54-56.

| Judge's Question | Sanchez's answer |
|---|---|
| So you would be able, in so far as the first phase of the trial, in determining whether or not the defendant was guilty of first degree murder or not guilty, for example – you wouldn't allow your feelings about the death penalty to have any bearing on that?  RT 80-81 | No.  RT 81. |
| Do you, to your knowledge, have any co-workers, friends, or any relatives that have expressed to you strong feelings about the death penalty either for or against it at all?  RT 91. | No. RT 91. |
| The second question is assuming you were convinced it was first degree murder and assuming the special circumstances were true, one or both of them were true, would you in effect have any hesitation in making that finding, knowing that if you do, you're going to go into the penalty phase of the trial merely because of your beliefs about capital punishment.  RT 108-09 | No. RT 110. |
| And the question is, assume we're in that penalty phase of trial, would you, because of any views you have concerning the death penalty or capital punishment, automatically refuse to vote in favor of the death penalty regardless of the evidence that might be developed during the penalty phase of the trial?  RT 116-17 | No.  RT 117. |
| Would you, because of any views that you may have concerning the death penalty or capital punishment, automatically vote in favor of the death penalty and automatically refuse to vote in favor of life imprisonment without possibility of parole regardless of what the evidence in the case may show?  RT 121. | No. RT 121. |

| | |
|---|---|
| Anybody feel that there has to be -- you would require multiple victims in a case before you would consider the death penalty? Any of you have any moral, religious, or philosophical views that might affect your jury deliberations on the death penalty? RT 124. | No. RT 125. |
| Do you have any particular age in mind under which you would never -- you would think somebody should never receive the death penalty?  RT 128 | No. RT 128. |
| The question is would you require somebody to have a past history of violence before you would consider the death penalty. RT 129-30. | No. RT 130. |
| Do any of you believe that the state should never execute a woman no matter how vicious or cruel the crime is that she may have committed?  RT 131. | No. RT 131. |
| Do any of you feel in all honesty that you would find it more difficult to vote to impose a death penalty in a case where the defendant is a Mexican-American other than where the defendant was white or Caucasian?  RT 133 | No. RT 133. |
| Do any of you feel that you would find it less difficult to vote to impose the death penalty in a case were the defendant is a Mexican-American as opposed to a case where the defendant is white?  RT 135. | No. RT 136. |
| Would you in your own mind feel that they should have to prove that the death penalty is not appropriate?  RT 142. | No. RT 142. |

| | |
|---|---|
| Do you feel that because of your sympathetic or compassionate nature, if you should have one,  that you would always vote against imposing the death penalty no matter what the evidence in the case shows? RT 143-44. | No. RT 144. |
| Your family, close friends to your knowledge have any contact with drugs or special knowledge of drugs, is there anyone else in the jury box who would answer that yes?  RT 146. | No. RT 146. |
| Would any of you be more inclined to vote for the death penalty, in favor of the death penalty, rather than life without possibility of parole, assuming the jury gets through the first phase and finds the defendant guilty of first degree murder and the special circumstances, because you believe the cost of maintaining a person for the rest of their life in state prison is too costly or an unfair burden on the  taxpayer? RT 149. | No. RT 149. |
| Have any of you or any member of your family or any close friends to your knowledge had any experience with any mental health professional -- and that would include  psychologists, psychiatrists, or anyone else in the mental health field -- that would make it extremely difficult for you to fairly assess the credibility of a mental health professional?  RT 166. | No. RT 166. |
| The evidence in our case may show that the defendant is a Mexican-American and the victim was a Caucasian. And it may show that the victim was a Caucasian minor, a female.  Do any of you believe that the racial differences between the defendant and the victim would have any effect on your ability to be a fair and impartial juror in our case? RT 176-77. | No. RT 177. |

190

| | |
|---|---|
| Are there any of you that feel if you were required as a juror to examine that kind of evidence that would have such an emotional impact that you couldn't be fair and impartial to both sides of the case? RT 179. | No. RT 179. |
| So far is there anyone who does not agree that the mere fact that the defendant's been arrested, accused of these offenses, brought to trial, may appear to be in custody, that those are zero factors that have nothing to do with guilt or innocence of the defendant? Those are mere procedural matters that the court is in charge of, legal matters, if you want to call it that, falls within the court's division of labor, not your division of labor.  Do you have any problem with that . . .?  RT 186. | No. RT 186. |
| Do you agree with [the proposition that the only verdict is not guilty] if there no evidence presented in this case?  RT 189. | Yes. RT 190. |
| In the event that there are two reasonable interpretations, you have got to follow that presumption of innocence.  Anyone have any problem with that?  RT 207. | No.  RT 207. |
| I do want you to understand that time gap between June of '90 and now, insofar as the trial is concerned, those legal proceedings that you aren't concerned about is part of my job and not part of your job.  Anybody have any problem with that? RT 216. | No. RT 216. |

9.   The only time the judge permitted Sanchez to elaborate was regarding his views on the death penalty.  When asked to "describe your general feelings about the death penalty," Mr. Sanchez replied, "depends on the crime," specifically, "how bad the crime was."  RT 90-91.  Mr. Sanchez assured the court that, in addition to the facts of the crime, he would be willing to consider both aggravating and mitigating

circumstances.  RT 91.  At no time did Mr. Sanchez indicate that he harbored any

reservations about voting for death.

      10.  The prosecution passed Sanchez for cause.  RT 216.

      11.  Later, the prosecutor made a peremptory strike against Sanchez.  RT 263.

Monroe immediately moved for a *Wheeler*[13] hearing.  *Id.*  Monroe explained the

reason for his challenge:

> Mr. Middleton just excused the -- Mr. Sanchez, the only identifiable
> Hispanic on the jury box.  And I want to inquire as to whether or not we
> are beginning to eliminate people with an identifiable class. Since Miss
> Alfaro is Hispanic.

RT 263.  The trial judge noted that "unless the district attorney voluntarily wants to

respond to it, it would seem to me the burden is on you to make some *prima facie*

showing that there has been some intentional exclusion."  RT 264.  Mr. Monroe again

emphasized that the prosecutor struck the "only one Hispanic in the jury box" and

asked the trial judge to "inquire as to whether or not there was a racial basis for it."

*Id.*  Rejecting the trial judge's offer to explain the basis of his strike of Juror Sanchez,

Middelton gave this curious response:

> Sounds to me like [Monroe] doesn't know, so sounds to me like he
> hasn't met the *prima facie* showing that the prosecution has exercised a
> peremptory challenge on the basis of race.

RT 264.  The trial judge believed that Monroe had failed to "point[ ] to anything at all

other than the fact [Sanchez is] the only Hispanic that's presently seated in the jury

box."  *Id.*  The trial judge relied upon the fact that "other Hispanics were seated in the

jury box earlier that were excused by stipulation of counsel."  *Id.*  Monroe reminded

the court that the prior excusal was based upon "language problems" but the trial

judge was undeterred.  *Id.*  According to the trial judge, "without anything more,

I don't think you've made a *prima facie* showing to require the district attorney to

---

[13] This type of challenge derives from *People v. Wheeler*, 22 Cal. 3d 258, 280,
583 P.2d 748, 148 Cal. Rptr. 890 (1978), where the California Supreme Court
concluded that the exclusion of a cognizable group on the basis of race violated the
state and federal constitutions.

1 respond to it."  RT 264-65.  The trial judge left the door open for Monroe to renew his
2 motion "[i]n the event that there is . . . another Hispanic seated in the jury and
3 excused by the prosecution, that obviously might change."  RT 265.

**2.   Susan Mayor**

5 12.  Susan Mayor, another juror with a Spanish surname,[14] was summoned as
6 part of the first jury with Sanchez.  The prosecutor struck her too.

7 13.  Susan Mayor was a mother and wife.  RT 438.  She was a United States
8 citizen and had never been convicted of a felony.  RT 439.  At the time of Alfaro's
9 trial, Mayor lived in Placentia, California for twelve years.  Mayor had a part-time at
10 California school book fairs while husband worked as a programmer at Team
11 Industry.  RT 438.  She had an eleven-year old son.  RT 439.

12 14.  Prior to any questioning, Mayor expressed concern about sitting as a juror
13 because of her English.  RT 44.  Mayor had previously indicated on her jury
14 summons that she did not understand English well enough.  RT 45.  When asked to
15 explain, Mayor felt that sometimes her "pronunciation like that is not good."  RT 45.
16 Mayor further mentioned that she spoke English for her job, that she had been
17 speaking English for twelve years, and had taken courses in English.  RT 45-46.  The
18 judge emphasized that he was mainly concerned about Mayor's ability to understand
19 what was happening in the trial.  RT 47.  When Mayor assured the judge that such
20 was the case, the judge denied her request to be relieved from jury duty.  *Id.*

21 15.  Similar to Sanchez, Mayor was asked a series of questions about the case.
22 She had not heard about the case before being called as a juror, had not spoken to
23 anyone about it since arriving at court, and was not familiar with any witnesses, the
24 attorneys or the accused.  RT 417.  Mayor "agreed with the death penalty" but
25 believed the imposition "depends on the crime committed."  RT 420.  Willing to

_____

[14] Petitioner is not certain about the ethnicity of Mayor.  Based upon her Spanish surname and her difficulty with English, Petitioner believes Mayor may be Latino or Spanish decent.

193

accept the judge's characterization that "you don't think it should be applied in ever first degree murder case, but you would be willing to look at all of the circumstances down at the bottom end there." RT 420. No friends or relatives who have strong feelings about the death penalty nor any "moral, religious or philosophical views that might affect [her] decision in the death penalty. RT 422, 423. No requirement for a past history of violence to vote for death, RT 423, would not require multiple victims, RT 424, no minimum adult age for the defendant, RT 424, no objection to executing a woman or a Mexican-American, RT 424, 427. Would not be affected by the "racial differences" between the defendant and victim, RT 425. Mayor denied possessing any specialized knowledge about the effects of cocaine or heroin on the body nor would she find that merely because defendant took such drugs she would not be responsible for her conduct, RT 428, 429. No experience with mental health professional that would cause her to automatically accept or reject their opinion or the testimony of such witnesses. RT 429. Would not consider cost of maintaining person in prison for LWOP in deciding whether to impose sentence. RT 430. Would not refuse to find defendant guilty, find special circumstances true, or vote for death based upon any opposition to the capital punishment. RT 431, 432. Mayor would not automatically vote for death either. RT 432.

16. Following questions, Mayor brought the Court's attention to her concern about "the evidence" because Mayor had previously gotten "so upset" about an accident she had witnessed. RT 435-36. She saw her co-worker's hand get cut off. When asked whether she thought she would have an emotional reaction to the autopsy photographs and videos, Mayor said she was "not sure right now." RT 435. Mayor did not know whether her reaction would be different if she did not know the victim. RT 436-37.

17. Not long after Mayor's voir dire, the prosecutor exercised a peremptory challenge against Mayor. This was the prosecutor second strike against a Latino juror. Despite the trial judge's invitation to renew his *Wheeler* objection indicated

194

1   that another strike of a Latino juror by the prosecutor "might change" the

2   circumstances of whether a *prima facie* case had been made, Monroe sat silent.

3       **3.    Jaime Soto**

4       18.   Jaime Soto was a Latino juror called during the penalty phase retrial.

5   He was the third Latino victim of the prosecutor's peremptory strike.

6       19.   Jaime Soto worked with the Disability Insurance Office for the State of

7   California for 20 years.  RT 2819.  Mr. Soto was divorced and had two teenage sons

8   who lived with him in Anaheim.  RT 2819-20.  He had never been convicted of a

9   felony.  CT 2820

10      20.   Soto was asked a number of questions during voir dire and he answered

11  them all in significant detail.  Soto had never heard about the case before coming into

12  the courtroom nor was he familiar with the area known as "Little Tijuana."  RT 2807.

13  Soto volunteered that three years earlier, one of his son's had "spent a few days in the

14  Orange County juvenile hall."  RT 2808.[15]  At the time of his son's arrest by officers

15  with the Anaheim police department, Soto had asked the officers for identification.

16  RT 2809.[16]  During the course of his inquiry, Soto explained, "the detective exceeded

17  his authority . . . lost his temper, got me in a choke hold, and shortly afterwards three

18  other police officers came and jumped on me and assisted me to the ground."  *Id.*[17]

19

20      [15]  The charges against his son did not involve violence or drugs.  Soto assured
    the court that the experience would have no impact on his ability to remain impartial.
21  *Id.*

22      [16]  Middleton confirmed that none of the prosecution's witnesses were from the
    Anaheim police department.  RT 2811.
23

        [17]  Soto provided the court with full details of the experience:
24
25      And I found the experience very interesting because I had one police
        officer that would be pulling my right arm in one direction and another
        police officer would be pulling my left arm in the other direction. And
26      one of them would say "would you please cooperate and get down on the
        ground, okay," and I would -- so the only thing I could do, because I
27      could see that this was a no-win situation for me, I just relaxed my body
        and let my body weight, you know, ease me down because I could see if
28      I didn't do that, we weren't going to get anywhere. My arms were going

1 Soto filed a formal complaint with the Anaheim police department against the
2 particular sergeant.  RT 2811.  Later, Soto received a letter from the Chief of Police
3 indicating that his complaint had been reviewed and then was contacted by an
4 investigator.  RT 2811.  When Soto was interviewed about his experience, he was
5 told that the officer had been accused of other incidents of excessive force.  Soto did
6 not choose to pursue the matter further but offered to testify if necessary.  RT 2810.
7 Soto assured the court that his experience would not affect his ability to assess
8 credibility of law enforcement witnesses:

9
10
> Well, I believe it's like any other field.  You know, degrees of integrity
> vary with each individual.  So it would be unfair to me to say that all
> policemen were like this particular individual.

11 RT 2810.  Despite this experience, Soto knew several individuals who were members
12 of law enforcement, including a retired Long Beach policeman and a cousin who was
13 a motorcycle officer with the City of Irvine.  RT 2812.

14       21.  Regarding special knowledge or experience, Soto disclosed that he had
15 "a little medical background" as part of his employment.  RT 2813.  Although there
16 was some confusion with the judge's questioning, Soto clearly did not believe that
17 psychological opinion was infallible.  RT 2814.  Soto suggested that testing could be
18 manipulated because "if the individual taking the test pays attention to what they're
19 doing and they'll see, for example, that the same question keeps occurring but is
20 worded differently, they may  go ahead and give the answer that they believe the
21 exam is looking for."  *Id.*  Not only was Soto unwilling to believe that testing was
22 "100 percent" accurate, he would not automatically accept the opinion of a mental
23 health professional.  According to Soto, "I think I would have to hear, you know, the
24 merits of everything that's being presented before I could even, you know, arrive at a
25 conclusion."  *Id.*

26
27
28

_____

     to get longer.
RT 2809.

1    22.  Mr. Soto was completely candid about other aspects of his life.  For

2 example, he admitted that he had "experimented a little" with controlled substances

3 in high school.  RT 2815.  Soto also admitted that he had attended Alcoholic

4 Anonymous meetings for ten years and had spent a few hours in the San Pedro

5 substation for drunk driving in 1979 (thirteen years before trial).  RT 2809.

6    23.  When prompted, Soto described his feelings about the death penalty.

7 Soto has never been opposed to the death penalty and was willing to consider it as a

8 reasonable sentence.  RT 2816.   Soto "believe[d] that there are some circumstances

9 that would warrant serious consideration.  I don't believe that it should be an

10 automatic thing. It would depend on the merits of the case -- or circumstances." *Id.*

11 Soto insisted on no minimum requirements or had no disqualifying grounds for

12 imposing the death penalty.  RT 2817.  For Soto, the defendant did not have commit

13 multiple murders or even have a history of violence to receive the death penalty.

14 Nor did it matter to Soto that the defendant was a woman or a Mexican-American.

15 RT 2817-18.

16    24.  The prosecutor passed Soto for cause.  However, when the parties were

17 permitted to exercise peremptory challenges, the prosecutor struck Soto.  The defense

18 did not lodge any objection to the prosecutor's third strike of a Latino juror.  The

19 second penalty-phase jury was entirely white.

20 **B.    LAW IN SUPPORT OF THIS CLAIM**

21    25.  Under clearly established federal law, courts must apply a three-step

22 approach to determine whether a prosecutor's peremptory challenge violated the

23 Equal Protection Clause.  First, the defendant must make out a *prima facie* case

24 "by showing that the totality of the relevant facts gives rise to an inference of

25 discriminatory purpose." *Batson v. Kentucky*, 476 U.S. 79, 93-94, 106 S. Ct. 1712,

26 90 L. Ed. 2d 69 (1986) (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 96 S. Ct.

27 2040, 48 L. Ed. 2d 597 (1976)).  Second, once the defendant has made out a *prima*

28 *facie* case, the "burden shifts to the State to explain adequately the racial exclusion"

1  by offering permissible race-neutral justifications for the strikes.  *Batson*, 476 U.S.,

2  at 94; *see also Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S. Ct. 1221,

3  31 L. Ed. 2d 536 (1972).  Third, "[i]f a race-neutral explanation is tendered, the trial

4  court must then decide . . . whether the opponent of the strike has proved purposeful

5  racial discrimination."  *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769,

6  131 L. Ed. 2d 834 (1995) (per curiam).

7       26.  Trial judge's finding that no *prima facie* case had been made was contrary

8  to clearly established federal law.  Habeas relief cannot be granted unless the state

9  court decision was "contrary to, or involved an unreasonable application of, clearly

10  established Federal law" or (2) "resulted in a decision that was based on an

11  unreasonable determination of the facts in light of the evidence presented in the State

12  court proceeding." 28 U.S.C. § 2254(d).  But "[w]hen a state court's adjudication

13  of a claim is dependent on an antecedent unreasonable application of federal law,"

14  the federal courts "must then resolve the claim without the deference that AEDPA

15  otherwise requires."  *Panetti*, 127 S. Ct. at 2858.  This limitation applies to procedural

16  as well as substantive determinations.  Thus, where "the state fail[s] to provide the

17  procedures mandated by . . . clearly established law," "no deference is due."  *Panetti*,

18  127 S. Ct. at 2858.

19       27.  In *People v. Wheeler*, 22 Cal. 3d 258, 280, 583 P.2d 748 (1978), the

20  California Supreme Court held that, to show a *prima facie* case, the party challenging

21  the strike must show a "strong likelihood" that the party exercising the strike did

22  so on account of the juror's race.  The United States Supreme Court subsequently

23  rejected the "strong likelihood" standard, finding it impermissibly places on the

24  defendant a more onerous burden of proof than is permitted under federal law.

25  *Johnson v. California*, 545 U.S. 162, 168, 170-73, 125 S. Ct. 2410, 162 L. Ed. 2d 129

26  (2005).  Therefore, where the state court applies the *Wheeler* threshold for

27  establishing a *prima facie* case, the state court's findings are not entitled to deference

28  and the claim is reviewed *de novo*.  *Williams v. Runnels*, 432 F.3d 1102, 1105 (9th

Cir. 2006); *Paulino v. Castro,* 371 F.3d 1083, 1090 (9th Cir. 2004); *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).

28.  As an initial matter, Alfaro adequately preserved her *Batson* claim because trial counsel asserted a *Wheeler* motion, the procedural equivalent to a challenge made under *Batson*.  *Paulino v. Castro*, 371 F.3d 1083, 1088 n.4 (9th Cir. 2004); *McClain v. Prunty*, 217 F.3d 1209, 1216 n.2 (9th Cir. 2000); *see also Fernandez v. Roe*, 286 F.3d 1073, 1075 (9th Cir. 2002).[18]  Nevertheless, because the trial court evaluated the defendant's *prima facie* showing under *Wheeler* rather than *Batson*'s less onerous standard, the state court decision was based upon an unreasonable application of clearly established federal law.  Consequently, the federal court must review Alfaro's *Batson* claim *de novo.*

29.  Under *de novo* review, Alfaro adequately met the *prima facie* standard. "[T]he threshold for making a prima facie *Batson* claim is quite low."  *Boyd v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006).   "A defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170.  In establishing her burden, a defendant may rely on "any other relevant circumstances" to raise an inference of discriminatory purpose. *Johnson*, 545 U.S. at 170; *Batson*, 476 U.S. at 96-97 (noting that in "deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances").  When assessing the existence of a *prima face* case, trial courts must consider all relevant factors, including:

(a) the number of members of the cognizable group in the panel,  *United States v. Chinchilla,* 874 F.2d 695, 698 & n.4 (9th Cir. 1989);

---

[18]   The California Supreme Court also recognizes that "an objection under Wheeler suffices to preserve a *Batson* claim on appeal."  *People v. Lenix,* No. S148029 (Cal. S. Ct. Jul. 24, 2008); *People v. Lancaster,* 41 Cal. 4th 50, 73, 158 P.3d 157, 58 Cal. Rptr. 3d 608 (2007).

1      (b)  the race of the defendant and the victim, *United States v. Clemons,* 843

2 F.2d 741, 748 (3rd Cir. 1988);

3      (c) statistical disparity in the prosecutor's use of peremptory challenges

4      (d) "prosecutor's questions and statements during *voir dire* examination and in

5 exercising his challenges," *Batson*, 476 U.S. at 96-97;

6      (e) comparative analysis between the struck minority juror and the remaining

7 panel members.  *Boyd v. Newland,* 467 F.3d 1139, 1144-45 (9th Cir. 2006); *Bush v.*

8 *Pliler*, No. 04-56348, 2008 U.S. App. LEXIS 4548, *4-5 (9th Cir. Feb. 29, 2008).

9      (f) the absence of plausible reasons for the strike;

10      (g) "the prosecutor's refusal to justify his strike in light of the court's request,"

11 *Johnson*, 125 S. Ct. at 2418;

12      30.   There is no minimum number of strikes that is necessary to satisfy a *prima*

13 *facie* threshold.  A defendant can make out a *prima facie* case merely by showing the

14 prosecution struck a single juror because of race.  *See Snyder v. Louisiana*, __ U.S.

15 __, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008) ("'[T]he Constitution forbids

16 striking even a single prospective juror for a discriminatory purpose.'") (quoting

17 *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)); *Cousin v. Bennett*,

18 511 F.3d 334, 339 (2d Cir. 2008) ("a 'pattern' of discriminatory exclusions is not

19 required for a *prima facie* showing, and the exclusion of a single juror could, in

20 circumstances tending to show racial motivation, be sufficient."); *Clemons*, 843 F.2d

21 at 747 ("[s]triking a single black juror could constitute a prima facie case even when

22 blacks ultimately sit on the panel and even when valid reasons exist for striking other

23 blacks"); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987); *United States*

24 *v. Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987) (*prima facie* case established "even

25 though we are here concerned with only a single juror").  While the fact that "juror

26 was the one [minority] member of the venire does not, in itself, raise an inference of

27 discrimination," *Vasquez-Lopez*, 22 F.3d at 902, an inference may be drawn when

28 considered in light of the "relevant circumstances surrounding a peremptory

challenge." *Fernandez v. Roe*, 286 F.3d 1073 (9th Cir. 2002); *Bush*, 2008 U.S. App. LEXIS 4548, 4-5 (9th Cir. Feb. 29, 2008) (concluding *prima facie* showing had been made based upon the prosecution's single strike of a Black juror where the defendant was African American and the victim was white, the strike resulted in an all-white jury, and a comparative analysis between the struck Black juror and remaining jurors did not reveal "significant" differences).

**1.**   **Petitioner is Latina and the Victim Was White in a Case With Strong Racial Undertones**

31.  It is difficult to imagine a more racially charged case.  Extensive pretrial publicity reported that Ms. Alfaro was a drug-addicted prostitute from Anaheim's Hispanic "barrio" who "wasn't a mother to her [four] kids."  CT 1251, 1253-54.  In contrast, the victim, Autumn Wallace, was a "popular" white nine-year-old A-student who was at home in a pink polka-dot dress cutting out paper dolls when she was slashed 57 times.  CT 1247, 1251, 1253, 1254, 1258.  Nearly all of this publicity noted a death sentence as a likely punishment for Ms. Alfaro, as well as recounted evidence against Ms. Alfaro that would be relevant to establishing aggravating circumstances.  For example, several stories noted that Ms. Alfaro had confessed to killing the victim to "keep from being caught" for her planned theft of items from the house.  Others described her confession that she had been "wired" on drugs at the time of the crime.  CT 1238, 1241, 1245, 1247.

/ / /

/ / /

1    **2.** **At the Time of the Prosecutor's Strike of Sanchez, No Latinos Were**

2    **on the Panel**

3        32.  Sanchez was the first Latino juror to survive excusal for hardship.  Four

4    other jurors with Spanish surnames had been excused by the court.[19]  At the time

5    Sanchez was struck, no other Latino jurors were on the panel.[20]

6    **3.** **The Prosecutor Struck Three Latino Jurors Eligible for Causal or**

7    **Peremptory Challenges for Both Jury Selections**

8        33.  In addition to striking Sanchez, the prosecutor also struck Mayor during

9    the first jury selection.  Only after the Wheeler motion was raised did the prosecutor

10   allow one Latino juror to sit.  Later, the prosecutor struck Soto, one of only a handful

11   Latino jurors eligible for the second jury.  No Latinos sat on the second jury resulting

12   in an all-white jury for the penalty phase retrial.

13

14

       _____

15       [19]  Fustino Rios was the first Latino juror excused.  Because jury service would
     make it difficult for him to make his house payment, he was excused for financial
16   hardship.  RT 10-11.  Juror Martinez was the next Latino juror excused because her
     absence would cause an undue hardship for her employer (she was only one of seven
17   tellers working at an active bank).  RT 23-24.  The prosecutor stipulated to both
     excusals.  RT 11, 24.
18       Prior to voir dire, Juan Magana asked to be excused because of his "problem"
     with "poor English."  RT 48.  Although Magana had lived in the United States for
19   twenty years, he spoke Spanish at work and he was the only person at home that
     spoke English.  RT 51. Magana was mainly concerned that he would not be able to
20   express his views to the other jurors.  RT 50. The judge sua sponte excused Magana
     and neither side objected.  RT 51.
21       During voir dire, Dorothy Laguna disclosed that Juror Baptie had spoken to her
     about Alfaro's case while waiting to be called.  RT 314.  Baptie told Laguna that the
22   crime happened in her neighborhood and that the victim was a child.  RT 346.
     Laguna assured the court that the information was "very vague" and that it would not
23   affect her ability to impartial.  RT 316, 218, 347-48.  Baptie testified that she had
     spoken to Laguna as well as a third juror, Lynne.  RT 352.  Although finding that
24   good cause had not been shown, the court proposed to excuse all three jurors,
     including Laguna; the prosecutor concurred.  RT 354.
25
         [20]  Although it appears that the prosecutor subsequently allowed one Latino
26   juror, Alice Costa, to remain on the panel, this occurred after he struck Sanchez and
     after the trial judge warned that  "[i]n the event that there is . . . another Hispanic
27   seated in the jury and excused by the prosecution, that obviously might change."
     RT 265.
28

1
2

**4.     There was no Plausible Justification for the Prosecutor to Strike Sanchez**

3      34.   There was no valid reason from the record for the prosecutor to have
4   wanted to strike Sanchez.  As Sanchez's voir dire answers make abundantly clear,
5   Sanchez supported the death penalty.  Sanchez would not require the defendant
6   to have a violent background or commit multiple murders before imposing death.
7   Neither would Sanchez have refrained from imposing death based upon any
8   immutable characteristic of the defendant, such as young age, gender or race.  From
9   the prosecution's perspective, there was absolutely nothing objectionable about
10  Sanchez - except, perhaps, his shared ethnicity with Alfaro.

11
12

**5.     There Was No Difference Between Juror Sanchez and the Remaining White Jurors**

13     35.   A comparative analysis between Sanchez and the jurors that were
14  ultimately seated shows no discernable difference.  Sanchez was asked approximately
15  twenty questions regarding his views on the death penalty.  Exhibit 87, Comparative
16  Juror Analysis.  His answers were all favorable to the prosecution and mirrored those
17  given by the seated jurors.  Even when Sanchez was given an opportunity to provide
18  a more detailed explanation of his views regarding the death penalty, he stated a
19  position virtually identical to ones held by three of the seated (nonLatino) jurors.
20  Juror Sanchez explained that the death penalty "depends on the crime," specifically,
21  "how bad the crime was."  RT 90-91.  Both Jurors Armstrong and Saltz indicated that
22  the death penalty "depends" on the crime.  RT 105 ("depends on crime"); RT 93
23  ("depends on the violence of the crime").  Similarly, Juror Goebel indicated that he
24  "would probably support" the death penalty if the "crime was violent enough."
25  RT 90.  Indeed, some of the jurors the prosecutor permitted to sit appeared reticent to
26  impose the death penalty while Sanchez had exhibited no reservation whatsoever.
27  For example, Juror Abouchar indicated that despite his support for the death penalty,
28  he found it "is not a preferred way of going."  RT 522.  Juror O'Dell used to be

opposed to the death penalty under all circumstances but had "tempered" this view
and was now "somewhere smack dab in the middle."  RT 478-79.  Nevertheless, the
prosecutor allowed these white jurors to sit while striking Sanchez.

**6.**    **The Prosecutor Refused to Explain His Reasons for Striking Juror**
**Sanchez Despite Being Given an Opportunity to Do So By the Court**

36.  Even though the prosecutor was technically not required to offer his
reason, Middelton's odd rebuttal to the defense request for a *Wheeler* inquiry was
certainly suggestive of a discriminatory intent.  The judge informed the parties that
although he would not compel the prosecutor to explain his strike of Sanchez, the
prosecutor was entitled to volunteer his reason.  RT 264.  But Middleton did not even
offer an affirmative denial, much less his specific reasons for striking Sanchez.
Instead, Middleton made the unremarkable observation that trial counsel "doesn't
know" why he (the prosecutor) struck Sanchez.  Then, Middleton parroted the Court's
conclusion that the defense had failed to meet "the *prima facie* showing that the
prosecution has exercised a peremptory challenge on the basis of race."  *Id.*

37.  Middelton's response betrayed racial animus.  First, it is reasonable to
assume that an attorney confronted with an allegation of impropriety would have at
least offered an emphatic denial.  At the time of Alfaro's trial in 1992, *Wheeler* had
been the law for over a decade.  Given that Middleton was a seasoned prosecutor
(indeed since *Wheeler* was announced in 1979), he was undoubtedly aware of the
need to avoid even the appearance of racial bias in jury selection.  Second, because
there was nothing about Sanchez's voir dire answers that objectively supported the
prosecutor's strike, Middleton should have felt more compelled to explain his
reasoning not less.  It is likely that prosecutor was simply unable to proffer a facially
neutral reason because he had none.  *Miller-El v. Dretke*, 545 U.S. 231, 247,
125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (noting that one of the struck African
American jurors "should have been an ideal juror in the eyes of a prosecutor seeking a

1    death sentence, and the prosecutors' explanations for the strike cannot reasonably be

2    accepted").  Middelton's silence speaks volumes.

3         38.  In sum, a review of all relevant circumstances establishes that Alfaro had

4    met the *prima facie* burden under *Batson.*  Therefore, because the "state has never

5    been required to present evidence of the prosecutor's actual, non-discriminatory

6    reasons for striking [the juror]," the Court must hold a hearing to give the prosecutor

7    a chance to offer a race-neutral explanation so that the Court may determine whether

8    the prosecutor violated *Batson*.  *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir.

9    2004); *Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006) (remanding to district

10   court for evidentiary hearing where state trial court did not find *prima facie* showing

11   under incorrect *Wheeler* standard).

12        39.  The foregoing violation of Ms. Alfaro's constitutional right constitutes

13   structural error and warrants the granting of this Petition without any determination of

14   whether the violations substantially affected or influenced the jury's verdict.  *United*

15   *States v. McFerron*, 163 F.3d 952, 955-56 (6th Cir. 1998).

16                                           **XVII.**

17   **CLAIM 12:  PETITIONER WAS DENIED A FAIR-CROSS SECTION OF**

18   **VENIRE PERSONS BASED UPON A FLAWED PROCESS USED**

19   **TO SELECT AND IMPANEL HER JURIES**

20        Petitioner's conviction and sentence of death were rendered in violation of her

21   rights to due process, a fair trial by an impartial jury drawn from a fair cross-section

22   of the community, fundamental fairness, an impartial tribunal, effective assistance

23   of counsel, confrontation, presentation of evidence, equal protection, right to

24   compulsory process, self-incrimination, and a fair, reliable, and non-

25   arbitrary determination of guilt and penalty as guaranteed by the Fifth, Sixth, Eighth

26   and Fourteenth Amendments to the United States Constitution as a result of the

27   systematic underrepresentation of Hispanics in the venire.

28

                                            205

1. This claim is pending before the California Supreme Court.

2. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

3. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

## A.   **FACTUAL BACKGROUND**

4. After prospective jurors were screened regarding hardship, the Clerk then called the names of the first 12 prospective jurors to be questioned by the Court and requested that they sit in the jury box.[21]  RT 56.  The Court asked more substantive questions and whenever one of the 12 prospective jury-box jurors was excused either by the Court for cause, challenged by counsel and excused for cause, or excused after a peremptory challenge, another from the spectator section was called as a replacement and sat in the jury box. *See*, *e.g.*, RT 83-84.  This process repeated until 12 jurors and four alternates were seated and accepted by counsel.  In total, and excluding those prospective jurors excused due to hardship, 64 prospective jurors were seated in the jury box and questioned by the Court for the first trial. At most six were Latino or had Spanish surnames.  Another 67 prospective jurors were questioned for the penalty phase retrial, and only five prospective jurors were Latino or had Spanish surnames.  Of a total of nine jurors, the Court excused two jurors for cause (one juror in the first trial had an out-of-court conversation with another juror, and one in the retrial was excused for bias because his wife worked for the Anaheim Police) and two were excused for hardship (one each in the first and second trials).

---

[21]  It is assumed, but record does not conclusively show that those prospective jurors remaining in the jury box at the end of the hardship voir dire were asked to leave the jury box and sit in the spectator area.  It is assumed they were either asked or not allowed to return to the jury  after the 15 minute recess, the jury box was empty when the first 12 prospective jurors were called and substantive voir dire began. RT 54-56.

One Latino sat as a primary juror in the first trial, and another sat as an alternate on the penalty phase retrial.

**B.**    **APPLICABLE LAW**

5.  A defendant has a constitutional right to a jury drawn from a fair cross section of the community.  *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).  To establish a prima facie fair cross-section claim, the defendant needed to identify "a recognizable, distinct class," show substantial underrepresentation of that class of persons in jury pools over a "significant period of time,"and prove that the jury selection process is "susceptible of abuse or is not racially neutral."  *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977).

a.  Hispanics are a distinctive group for purposes of this constitutional analysis.  *Castenada v. Partida*, 430 U.S. 482, 495, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977); *People v. Ramos*, 15 Cal. 4th 1133, 1154 (1997).

b.  At the time of Ms. Alfaro's trial, Hispanics constituted at least 28.1 percent of the population of Orange County.  The number of Hispanics who were at least eighteen years old comprised at least 25.3 percent of individuals eighteen and over in Orange County.

c.  Hispanics were under represented in the jury pool in Orange County at the time of Ms. Alfaro's trials in 1992.

d.  At Ms. Alfaro's first trial, Hispanics constituted only 9.3 percent of the trial jury panel.

e.  At Ms. Alfaro's second trial, Hispanics made up only 7.4 percent of the trial jury panel.  This under representation is not fair and reasonable in relation to the number of Hispanics in the community

f.  Trial counsel rendered ineffective assistance of counsel by failing to investigate the jury selection process, seek discovery, and prepare and present

207

1   arguments by way of objection and/or motion during Ms. Alfaro's trial.  Such failings

2   further limit Ms. Alfaro's analysis herein.

3             g.  The under representation of Hispanics is due to the systematic

4   exclusion of Hispanics in the jury selection process.  The mechanisms affecting the

5   creation of this disparity include, but are not limited to the following:

6             (1)  The knowing and intentional failure to use random selection

7   procedures throughout the jury selection process.

8             (2)  The knowing and intentional failure to use more than the list

9   of registered voters and the Department of Motor Vehicles list as the source lists for

10  the selection of jurors.

11            (3)  The knowing and intentional failure to properly merge and

12  purge the source lists of duplicate names before creating the master list of prospective

13  jurors.

14            (4)  The knowing and intentional failure to update the source lists

15  and the master jury list.

16            (5)  The knowing and intentional failure to follow up on

17  prospective jurors who do not complete and return juror questionnaires or who fail to

18  appear when summoned for jury service.

19            (6)  The knowing and intentional failure to properly apply juror

20  qualification and exemption criteria.

21            (7)  The knowing and intentional failure to properly review and

22  excuse prospective jurors for undue hardship.

23            (8)  The knowing and intentional failure to make adequate

24  transportation available to prospective jurors.

25            (9)  The knowing and intentional failure to comply with the

26  statutory mandates for the selection of jurors set forth in the Penal Code and the Code

27  of Civil Procedure.

28

1    h.  The under representation of Hispanics in Ms. Alfaro's jury pools
2    was part of a pattern of under representation in Orange County that continued after
3    Ms. Alfaro's trial, at least through 1995.

4    (1)  At the 1993 capital trial of Cristhian Monterroso, there were
5    276 presently identifiable members of the potential jury pool.  Twenty-three of these
6    individuals were Hispanic.  Thus, Hispanics made up 8.33 percent of the jury panel,
7    for an absolute disparity of 16.97 percentage points and a comparative disparity of
8    67.1 percent.

9    (2)  In 1995 for the capital trial of Ignacio Tafoya, 17 of the
10   prospective jurors out of a panel of 168 prospective jurors were Hispanic.  This
11   translates into an absolute disparity of 15.2 percentage points and a comparative
12   disparity of 60.1 percent.

13   6.  The exclusion of Hispanics from the jury selection process in Orange
14   County violated the equal protection guarantee of the state and federal constitutions.
15   *Castenada*, 430 U.S. 482.  The absolute disparities and comparative disparities of
16   Hispanics in Ms. Alfaro's trial jury panels are constitutionally substantial under
17   representation.  The jury selection process in Orange County is subject to abuse and
18   is not class neutral.  The selection system is filled with discretionary and ad hoc
19   decision-making by the jury commissioner and his/her staff, and the trial court.  The
20   jury  commissioner and the trial court did not comply with the statutory mandates
21   governing the selection of jurors.

22   7.  Trial counsel rendered ineffective assistance of counsel in violation of the
23   Sixth Amendment by failing to investigate the jury selection process, seek discovery,
24   and prepare and present arguments by way of objection and/or motion during Ms.
25   Alfaro's trial, and such failings further limit Ms. Alfaro's analysis herein.

26   8.  The process used to select Ms. Alfaro's jury, including but not limited
27   to the policy of the Orange County Jury Services Department to destroy each old jury
28   source list as soon as a new source list is created, materially violated California

mandatory statutory and decisional laws concerning jury selection.  (Code Civ. Proc., §§ 191, 197, 198, 203, 204, 207, 209, 218, 219, 222, 228.)  These material departures from state mandates resulted in a selection process that was so inherently defective that habeas corpus relief is mandated.

9.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638.

10.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XVIII.

## CLAIM 13:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE IMPANELMENT OF JURORS WHO WERE BIASED IN FAVOR OF THE DEATH PENALTY

Petitioner's death sentence was rendered in violation of her rights to due process and equal protection, to a fair trial, to an impartial jury, and to fair and accurate guilt determination and to a reliable, individualized, and non-arbitrary death-penalty determination, as a result of juror bias in favor of the death penalty, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

1.  This claim is pending before the California Supreme Court.

1      2.  If Respondent disputes any of the facts alleged below, Petitioner requests an

2  evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

3  been afforded discovery and the disclosure of material evidence by the State, the use

4  of this Court's subpoena power, and the opportunity to investigate fully, counsel

5  requests an opportunity to supplement or amend this petition.

6      3.  The declarations and other exhibits filed with this petition, as well as the

7  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

8  reference into this claim as though set forth in full.

9      4.  In support of this claim, Petitioner alleges the following facts, among others

10  to be presented after full discovery, investigation, adequate funding, access to this

11  Court's subpoena power, and an evidentiary hearing.

12      5.  A number of the jurors on Petitioner's second penalty phase trial were

13  ready, willing and prejudicially predisposed to impose a sentence of death.

14      6.  Petitioner had a constitutional right to an impartial jury and to a jury aware

15  of its undivided responsibility to determine the appropriateness of a death sentence.

16  *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).  One

17  of the most fundamental Eighth Amendment principles is that a capital defendant will

18  not be sentenced to death unless and until a sentencer has adequately considered

19  whether the death penalty is appropriate.  To satisfy this principle, it is essential that

20  the sentencer understand that it has the "*undivided responsibility* for deciding whether

21  a defendant's punishment should be increased from life to death."  Gillers, *The*

22  *Quality of Mercy:  Constitutional Accuracy at the Selection Stage of Capital*

23  *Sentencing*, 18 U.C. Davis L. Rev. 1037, 1046 (1985) (emphasis in original).

24      7.  Those jurors who were predisposed to impose a sentence of death were

25  without a principled basis upon which to distinguish between the appropriateness of a

26  life without the possibility of parole sentence and a sentence of death.  Their strong

27  inclination towards handing down a death sentence precluded the jury from giving a

28  reasoned moral response to the mitigating evidence presented on Petitioner's behalf at

211

1   the penalty phase of her trial and created the risk that death was imposed despite

2   evidence which might otherwise have been seen to call for a life sentence.  This

3   violated Petitioner's rights to due process and equal protection of the law, to

4   reasonably effective assistance of counsel, and to a reliable, non-arbitrary, and

5   individualized determination that death was the appropriate penalty in this case as

6   guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

7   States Constitution.  See *Caldwell v. Mississippi*, 472 U.S. 320, 329, 335-337,

8   105 S. Ct. 2633, 2639, 2643-2644, 86 L. Ed. 2d 231 (1985); *Lockett v. Ohio*, 438 U.S.

9   586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Gardner v. Florida*, 430 U.S. 349,

10  97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977); *Woodson v. North Carolina*, 428 U.S. 280,

11  96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).

12      8.  The presence of pro-death jurors on Petitioner's jury prejudiced Petitioner

13  because their predisposition in favor of the death penalty precluded them from fairly

14  considering the evidence favorable to Petitioner during the guilt phase and inclined

15  them toward imposition of a death sentence without regard to mitigation evidence

16  presented by Petitioner.  This jurors' bias in favor of the death penalty was per se

17  prejudicial and relief is warranted without any showing that the error was harmless.

18  Assuming, arguendo, that the error is not per se prejudicial, the error so infected the

19  integrity of the proceedings that it cannot be deemed harmless and the state will be

20  unable to meet its burden in showing this error harmless.  In any event, the violation

21  of Petitioner's rights had a substantial and injurious effect or influence on the jury's

22  penalty judgment, rendering Petitioner's death sentence fundamentally unfair and

23  resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully

24  requests that his petition be granted.

25  / / /

26  / / /

27

28

212

**XIX.**

**CLAIM 14:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE**

**VIOLATED BY THE CONCEALMENT OF MATERIAL**

**INFORMATION ON VOIR DIRE**

Petitioner's convictions and sentences were rendered in violation of his rights to due process and equal protection, to a fair trial, to an impartial jury, the effective assistance of counsel, and to fair, accurate, reliable and non-arbitrary guilt and penalty determinations as a result of the misconduct of jurors concealing material information prior to their impanelment, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The United States Constitution guarantees Petitioner's right to a fair trial before an impartial jury.  One touchstone of a fair trial is an impartial trier of fact -- a jury capable and willing to decide the case solely on the evidence before it.  Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury.

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

213

5.  Prior to impanelment of each jury, the prospective jurors were asked to respond truthfully to questions designed to elicit information with respect to the prospective juror's qualifications to sit as a juror in the pending case.  Some of the responses provided by prospective jurors were dishonest.  Petitioner was prejudiced by this misconduct.  The concealment of critical information indicates that these jurors were not impartial, violated Petitioner's unquestioned right to challenge the jurors for cause and violated Petitioner's right to exercise peremptory challenges.

6.  The Sixth Amendment to the United States Constitution guarantees a defendant's right to a fair trial before a panel of impartial, "indifferent" jurors.  U.S. Const., 6th and 14th Amends; *Tinsley v. Borg*, 895 F.2d 520, 523 (9th Cir. 1990) (citations omitted).  The United States Supreme Court has defined "an impartial trier of fact" as "a jury capable and willing to decide the case solely on the evidence before it."  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984), *citing Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  Even if "only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury," *Tinsley*, 895 F.2d at 523-24 (citations omitted), and "doubts regarding bias must be resolved against the juror." *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991).

7.  The importance of a truthful voir dire examination in assuring a constitutionally unbiased jury is explained in the *McDonough* case:

> Voir dire examination serves to protect that right [an impartial trier of fact] by exposing possible biases, both known and unknown, on the part of potential jurors.  Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.  The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

464 U.S. at 554.

8.  False answers or concealment on voir dire render nugatory the unquestioned right to challenge a prospective juror for cause and also eviscerate a party's right to exercise a peremptory challenge.  The denial of the right to reasonably exercise a

peremptory challenge, be it by either the trial court or a juror through concealing material facts, is not a mere matter of procedure, but the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of an defendant against an unlawful conviction. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981).

9.   Concealment or false answers by a juror during voir dire, whether inadvertent or intentional, interferes with the right of a criminal defendant to conduct voir dire for the purpose of discovering bias or impartiality, and constitutes serious misconduct.  The prosecution, the defense and the trial court rely on the voir dire responses in making their respective decisions, and if potential jurors do not respond candidly the jury selection process is rendered meaningless.  Falsehood, or deliberate concealment or nondisclosure of facts and attitudes deprives both sides of the right to select an unbiased jury and erodes the basic integrity of the jury trial process.

10.   When a prospective juror fails to disclose material information on voir dire, the ultimate issue for the court to consider is whether the juror nevertheless was impartial.  As the Supreme Court stated, "only those reasons [for concealing information] that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.  Dishonesty by a prospective juror during voir dire supports an inference of bias. *Dyer v. Calderon*, 151 F.3d 970, 981-983 (9th Cir. 1998); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984) (a juror's dishonesty "is a strong indication that [the juror] was not impartial"); *see also McDonough*, 464 U.S. at 556 (Blackmun, J. concurring) ("in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial"); *id.* at 558 (Brennan, J., concurring) (dishonesty is a factor to be considered in the determination of bias).

11.   Although the opinion of the Court in *McDonough* suggests that juror dishonesty is a prerequisite to obtaining a new trial, the five concurring justices make clear that such a showing of dishonesty on voir dire is not required.  *See* 464 U.S. at

215

1  556-557 (Blackmun, J., joined by Stevens, J. and O'Connor, J., concurring)

2  ["regardless of whether a juror's answer is honest or dishonest, it remains within a

3  trial court's option . . . to order a post-trial hearing at which the movant has the

4  opportunity to demonstrate actual bias, or, in exceptional circumstances, that the facts

5  are such that bias is to be inferred"]; and *id.* at 558 (Brennan, J., joined by Marshall,

6  J., concurring) ("[w]hether the juror answered a particular question on *voir dire*

7  honestly or dishonestly, or whether an inaccurate answer was inadvertent or

8  intentional, are simply factors to be considered in [the] determination of actual bias".)

9       12.  Petitioner was prejudiced by the concealment of critical material

10  information.  Such deliberate concealment indicates that these jurors, or any of them,

11  were not impartial during their participation in this case.  As a result of the jurors'

12  concealment, Petitioner was also deprived of his right to the effective assistance of

13  counsel.  *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d

14  491 (1968); *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961);

15  *Bayramoglu v. Estelle*, 806 F.2d 880, 888 (9th Cir. 1986).  In addition, Petitioner was

16  deprived of his constitutional right to a reliable death sentencing determination, free

17  from constitutionally irrelevant factors.  *See Zant v. Stephens*, 462 U.S. 862, 879,

18  103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Gardner v. Florida*, 430 U.S. 349, 358,

19  97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

20       13.  The concealment of this information prior to impanelment violated

21  Petitioner's unquestioned right to challenge the jurors for cause and also violated

22  Petitioner's right to exercise peremptory challenges.  Prejudice is presumed; such

23  error amounts to a structural defect in the proceedings that is not subject to harmless

24  error analysis.  *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  Assuming,

25  arguendo, that the error is not per se prejudicial, these constitutional violations so

26  infected the integrity of the proceedings that the error cannot be deemed harmless

27  and the State will be unable to meet its burden in showing this error harmless.  In any

28  event, the violations of Petitioner's rights had a substantial and injurious effect or

216

influence on the guilt and penalty judgments, rendering them fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XX.

## CLAIM 15:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE EXCUSAL OF JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT EXCUSAL

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, a fair and impartial jury, the effective assistance of counsel, equal protection, and to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a result of the excusal of prospective jurors whose views on the death penalty were not extreme enough to warrant excusal.

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1    5.  The trial court violated Petitioner's constitutional rights by excusing for

2  cause potential jurors whose views on the death penalty were not extreme enough to

3  warrant exclusion. A capital defendant's right to an impartial jury prohibits the

4  exclusion of venire members "simply because they voiced general objections to the

5  death penalty or expressed conscientious or religious scruples against its infliction."

6  *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).

7  To permit the exclusion for cause of prospective jurors based on their views of the

8  death penalty unnecessarily narrows the cross section of venire members.  It "stack[s]

9  the deck against the [defendant]."  *Gray v. Mississippi*, 481 U.S. 648, 658, 107 S. Ct.

10  2045, 95 L. Ed. 2d 622 (1987) (quoting *Witherspoon*, 391 U.S. at 523).

11    6.  The exclusion of venire members based on their views concerning the death

12  penalty must be limited to those who are "irrevocably committed … to vote against

13  the penalty of death regardless of the facts and circumstances that might emerge in

14  the course of the proceedings," and to those whose "attitude toward the death penalty

15  would prevent them from making an impartial decision as to the defendant's guilt."

16  *Witherspoon*, 391 U.S. at 523 n.21; *see also Burns v. Estelle*, 626 F.2d 396, 397 (5th

17  Cir. 1980).  "[T]hose who firmly believe that the death penalty is unjust may

18  nevertheless serve as jurors in capital cases so long as they state clearly that they are

19  willing to temporarily set aside their own beliefs in deference to the rule of law."

20  *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).

21    7.  When a trial court misapplies *Witherspoon* and excludes from a capital jury

22  a prospective juror who in fact is qualified to serve, a death sentence cannot stand.

23  *Davis v. Georgia*, 429 U.S. 122, 97 S. Ct. 399, 50 L. Ed. 2d 339 (1976) (*per curiam*).

24  Because the trial court improperly excused for cause venire members who were

25  qualified to be seated as jurors under *Witherspoon*, Petitioner has been denied her

26  right to a fair trial and impartial jury in violation of the Fifth, Sixth, Eighth and

27  Fourteenth Amendments to the United States Constitution.

28    8.  The constitutional violations set forth in this claim alone mandate relief

218

from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Petitioner's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

9.  The foregoing violations of Petitioner's constitutional rights constitute structural error and warrants the granting of this petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless.  In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XXI.

## CLAIM 16:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN JURORS WERE NOT REMOVED FOR CAUSE OR BIAS

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, to present a defense, equal protection, a fair and impartial jury, to the effective assistance of counsel, and to a reliable, fair, non-

arbitrary, and non-capricious determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a result of the trial court's refusal to excuse for cause numerous potential jurors who were biased against Petitioner and/or whose views regarding the death penalty would have substantially impaired their ability fairly to consider a sentence less than death and fairly to consider and give weight and meaning to all proffered mitigating evidence.

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

5. The trial court's refusal to excuse for cause numerous potential jurors who were biased against Petitioner and/or whose views regarding the death penalty would have substantially impaired their ability fairly to consider a sentence less than death and fairly to consider and give weight and meaning to all proffered mitigating evidence, violated Petitioner's guaranteed constitutional rights.  But for these errors, the outcome would have been different at all stages of the pre-trial, trial, post-trial and appellate proceedings.

6.  A criminal defendant has a fundamental right to an impartial jury that will perform its legal duty.  A cornerstone of this constitutional right is the court's duty

and power to remove biased and improper venire members from the jury pool for cause. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 , 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). A defendant's constitutional rights are violated if a court does not dismiss a biased venire member for cause because the defendant is then required to use his valuable peremptory strikes on the constitutionally improper jurors. *Bradham v. State*, 243 Ga. 638, 639, 256 S.E.2d 331, 332 (1979). In a capital case, the trial court is constitutionally required to strike for cause any potential jurors whose views in support of the death penalty are sufficiently in favor that their ability to consider a sentence other than death is substantially impaired. *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). This includes jurors who, for any reason, are incapable of or unwilling to consider and give weight to mitigating circumstances as that concept is broadly defined by the United States Supreme Court. *See Lockett v. Ohio*, 438 U.S. 586 (1978).

7. In this case, the trial court refused to strike for cause many jurors who were clearly biased against Petitioner, and/or were incapable of giving proper consideration to mitigating evidence and/or to a sentence less than death. Petitioner's rights were violated when several venire members were not dismissed for cause or bias even though they showed a clear bias against Petitioner. Each of these venire persons should have been removed because each expressed evident bias against Petitioner during questioning on voir dire.

8. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Petitioner's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

221

9.  The foregoing violations of Petitioner's constitutional rights constitute structural error and warrants the granting of this petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless.  In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XXII.

## CLAIM 17:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE TRIAL COURT'S BIAS

The convictions and sentence of death were rendered in violation of Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to a neutral and impartial decision-maker, and to due process of law as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial judge was biased.

1.  Exhaustion of the claim:  This claim was fairly presented as Claim 3 in the habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no. S099569.

2.  AEDPA:  The claim was rejected by an Order of the California Supreme Court dated November 18, 2007.  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858. The state court denied this claim without an opinion, and without affording Petitioner an evidentiary hearing, discovery, or any other means to further develop his claim. When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  Here, the state court's denial was objectively unreasonable.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

/ / /

223

1    **A.    LAW IN SUPPORT OF CLAIM**

2        6.  "A neutral judge is one of the most basic due process protections."

3    *Sanchez-Cruz v. I.N.S.*, 255 F.3d 775, 779 (9th Cir. 2004); *Withrow v. Larkin*,

4    421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975); *In re Murchison*, 349 U.S.

5    133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955).  A judge violates a defendant's due

6    process rights if he is biased against the defendant or has an interest in the outcome of

7    the case. *Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97

8    (1997).  The likelihood or even appearance of bias can also disqualify a judge.

9    *Taylor v. Hayes*, 418 U.S. 488, 501, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974).  "A

10   criminal defendant tried by a partial judge is entitled to have his conviction set aside,

11   no matter how strong the evidence against him."  *Edwards v. Balisok*, 520 U.S. 641,

12   647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997) (citations omitted).

13       7.  Actual bias occurs when the judge harbors personal animosity toward the

14   defendant or has a personal interest in the outcome of the particular case.  *Aetna Life*

15   *Ins. Co. v. Lavoie*, 475 U.S. 813, 823, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986)

16   (calling for recusal where state supreme court justice's interest was "direct, personal,

17   substantial, [and] pecuniary"); *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437,

18   71 L. Ed. 749 (1927); *Murchison*, 349 U.S. at 138 (finding bias where judge acting as

19   one-man grand jury in secret hearings charged two witnesses with contempt and then

20   presided over witnesses' contempt hearings); *Taylor*, 418 U.S. at 501-03 (finding bias

21   where judge was subject to litigant's direct personal insults).

22       8.  The standard for determining implied or presumptive bias is "'whether

23   a reasonable person with knowledge of all the facts would conclude that the judge's

24   impartiality might reasonably be questioned.'"  *United States v. Hernandez (James)*,

25   109 F.3d 1450, 1453 (9th Cir. 1997) (quoting *United States v. Studley*, 783 F.2d 934,

26   939 (9th Cir. 1986); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610,

27   64 L. Ed. 2d 182 (1980).  While judicial bias is ordinarily derived from an

28   extrajudicial source, this is not the only basis.  *Liteky v. United States*, 510 U.S. 540,

551, 554-55, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).  "Bias exists where a court

has prejudged, or reasonably appears to have prejudged, an issue." *Kenneally v.*

*Lungren*, 967 F.2d 329, 333 (9th Cir. 1992).  Judicial bias may also be inferred from

misconduct occurring during trial if the judge "display[s] a deep-seated favoritism or

antagonism that would make fair judgment impossible." *Liteky*, *Id*. at 555. (internal

quotation marks omitted).  Finally, judicial bias is well-established when the trial

judge "assume[s] the posture of an advocate."  *Anderson v. Sheppard*, 856 F.2d 741,

747 (6th Cir. 1988); *Owens v. United States*, 483 F.3d 48, 66 (1st Cir. 2007) ("a

'judge's participation in a trial must be balanced; he cannot become an advocate or

otherwise use his judicial powers to advantage or disadvantage a party unfairly'");

*Abdulrahman v. Ashcroft,* 330 F.3d 587, 596 (3d Cir. 2003) (noting judges "must

assiduously refrain from becoming advocates for either party"); *Reserve Mining Co.*

*v. Lord*, 529 F.2d 181, 185-6 (8th Cir. 1976) (en banc) ("Judge Lord seems to have

shed the robe of the judge and to have assumed the mantle of the advocate.").

*Jorgensen v. Cassiday*, 320 F.3d 906, 911 (9th Cir. 2003).

**B.**     **FACTS IN SUPPORT OF CLAIM**

    **1.**     **The Trial Judge Was Biased Based Upon His Emotional Entanglement With a Custody Proceeding Against His Stepson Who Was a Drug Addict Identical to Petitioner**

    9.  Judge Millard was biased against Petitioner as a drug user because his own

stepson had a serious drug problem.  An article entitled "Grandfather Knows Best,"

published in the *Orange County Lawyer* in July 1996, describes how the judge, who

was normally expressionless and therefore hard for attorneys to read, had tears in his

eyes and his voice cracked with emotion when he talked about his own court battle to

gain custody of his then eight-year-old granddaughter.  Exhibit 39.  The article states

that her father, Judge Millard's stepson, had been using hard drugs since he was a

teenager and that when he became a parent, he could hardly take care of himself.

Judge Millard described how his granddaughter once found her father passed out on

the floor and she could not wake him up.  The article indicates that before the girl started kindergarten -- presumably, in 1992 -- her parents split up.  "Soon after," her mother was killed in an accident.  With only Judge Millard's stepson to care for her, the circumstances deteriorated to the point that neighbors and other family members asked Judge Millard to intervene.  They feared for the girl's safety.  After finding a lawyer, Judge Millard fought for custody of his granddaughter and eventually won, based on evidence of drug abuse and neglect.  *Id*.

10.  The article indicates that at the same time Judge Millard was serving as the trial and sentencing judge in Ms. Alfaro's case, he was going through an emotional legal battle as a result of his stepson's drug addiction and its harmful effects on his granddaughter.  His feelings were so strong that he could not talk about his case for guardianship of his granddaughter -- which he won -- without displaying strong emotions several years after the fact.  Crucially, it appears that Ms. Alfaro's case took place during the time period when Judge Millard's concerns for his granddaughter as a result of his stepson's drug addiction were at a high point.

## 2.    The Trial Judge's Conduct Throughout Trial Evidenced His Strong Bias Against Petitioner

11.  Judge Millard's conduct throughout the trial evidences his bias against Ms. Alfaro.  As the trial judge, Judge Millard was charged with ensuring that Ms. Alfaro was tried by a fair and impartial jury of her peers.  His questions of the potential jurors indicate that his personal bias against Ms. Alfaro impeded his ability to carry out this crucial function.  The questions that the Judge Millard asked potential jurors during voir dire[22] neutralized the mitigating evidence and guaranteed

---

[22]  The questions asked include:  Whether they "believe[d] in any particular adult age at which a person should never receive the death penalty, no matter how vicious or cruel the crime might be committed?"; whether they would "require that the defendant have a past history of violence before you would ever consider voting for the death penalty?"; whether any of the jurors "believe[d] that the state should never execute a woman no matter how vicious or cruel the crime is that she may have committed?"; whether they "would find it more difficult to vote to impose the death

a jury prepared to sentence Ms. Alfaro to death.  The court's bias against Ms. Alfaro is further evidenced in his refusal to voir dire the jurors on the aggravating factor -- whether they could be fair and impartial in light of the fact that the victim was a nine-year-old child -- contending that such questions would cause the jurors to "prejudge" the evidence.  *See* AOB, pp. 118-182.

12.  The trial court's acknowledgment that Ms. Alfaro's counsel's strategy had no hope of success unless she testified, and refusal to close the courtroom to allow her to testify freely about the circumstances of the crime, despite her declaration indicating her fear to do so otherwise, while the third man remained "out in the community," also evidence his bias against her.  *See* CT at 497a-497c.  His reasoning for refusing to close the courtroom for her testimony only -- that doing so would cause the jury to believe her concerns that her family was at risk had some validity and would thereby prejudice the prosecution (see RT 1171) -- was dubious.

13.  After the guilt and the first penalty trial, the judge had a very clear idea of the evidence -- or rather the lack thereof -- that someone other than Ms. Alfaro could be blamed for the crime.  By defense counsel's own admission, the trial judge knew that Ms. Alfaro had received incorrect advice about the scope of her cross-examination, should she take the stand in the penalty phase, and that she felt he had betrayed her as a result.  The trial judge knew that there were numerous other conflicts between them focused on defense counsel's decision to blame "Beto" for the crime.  Notwithstanding, the trial judge dismissed Ms. Alfrao's request for substitute counsel, consigning her to a penalty phase retrial with a lawyer she did not trust and who would not honor her decisions.  Judge Millard's statements at the sentencing hearing were in direct conflict with his earlier ruling.  While on April 9, 1992, he told Ms. Alfaro that "anyone" would try to blame the crime on someone else, at

---

penalty in a case where the defendant was a Mexican-American than you would if the defendant were white?"; and whether the jurors felt "that the death penalty should only be reserved for multiple-victim cases?"

227

1    sentencing he referred to that defense as a "figment of someone's imagination."

2    While denying a change of venue based on inflammatory pretrial publicity because he

3    believed there was nothing special about her case, the judge now said, "I can't

4    imagine a more vicious, senseless killing. I have never seen one that compares with

5    this case, nor could I imagine that anyone could ever dream one up that would match

6    this case." Before sentencing Ms. Alfaro to death, Judge Millard never once

7    mentioned Ms. Alfaro's desire to plead guilty unconditionally and gave no weight

8    whatsoever to the mitigating factors.

9        14. Other examples of Millard's bias are to be found in the transcript of the

10   sentencing proceedings.

11       15. Regarding the applicability of Penal Code § 190.3(h), "whether or not at

12   the time of the offense the capacity of the defendant to appreciate the criminality of

13   [her] conduct or to conform [her] conduct to the requirements of law was impaired as

14   a result of mental disease or defect, or the affects of intoxication," he stated:

15            We did have some evidence on the videotape only, really, in our
         case here. And there may have been some evidence in the transcript that
16       was read to the jury of the prior testimony of the defendant. But it —
         and the defendant in the video indicates that she had shot up with some
17       heroin or speed balls or whatever the case might be. And once again,
         Mr. Giffin very carefully examined her in that area and she really did not
18       indicate and the evidence does not support that any intoxication had any
         substantial effect on her conduct in our case.
19       So while there is evidence of intoxication, it would not appear that it's of
         the quality that *interfered with* the defendant's capacity to appreciate the
20       criminality of her conduct or to conform her conduct to the requirements
         of the law. So it does not appear to this court that the factor (h) is
21       present.

22   RT 4504-05 (emphasis added). In fact, there was substantial evidence of both

23   Ms. Alfaro's mental defects and her intoxication at the time of the crime that should

24   have weighted the scales toward mitigation. Investigator Giffin did not "carefully

25   examine[ ] her in that area," and she did not "indicate . . . that any intoxication had

26   [had no] substantial effect on her conduct." Again, the trial judge based his ruling on

27   a misrepresentation of the facts.

28

                                          228

16. Investigator Giffin began the video taped interview by asking Ms. Alfaro whether she was addicted to cocaine or heroin or both. CT 507. Her response was "both." *Id.* The investigator then asked her to tell him what happened the day of Autumn's murder. She began, "I went over there on that day, I was already like, like coked out and stuff, I don't know what I what I was doing . . . ." CT 509. She continued, "I was really wired and I was gonna just take something . . . ." *Id.*

17. After Ms. Alfaro admitted that she had stabbed Autumn, the investigator took her back over the events of the day in more detail. The second time through, she told the investigator that she went to "Little TJ" around 12:00 p.m. that day (CT 516) to "pick up" drugs. CT 515. After she "picked up" "two dimes of coke and two dimes black [tar]," she went to her friend Juan's apartment and "did it there." *Id.* She "cook[ed] it up," and injected herself in the neck. CT 515-16. This was at approximately two o'clock in the afternoon. CT 516. She stated that shortly after she injected these drugs, "I came back down [to the apartment where she had purchased the drugs] cause I wanted more but I didn't have no money. So some guy named Shorty came up . . . and he gave me some . . . ." CT 517. She stated, "I got like kind of greedy, you know, I wanted to do more and more and more and more." CT 518.

18. Ms. Alfaro described to Investigator Giffin how, when they got to the Wallace house, "I went and knocked and I asked [Autumn] if I could use the bathroom and she said, 'yeah.' And I just went in the bathroom and I was like really, I don't know, I was like really wired, really coked out and stuff." CT 526. When the investigator asked her why she went to the bathroom, she responded, "I don't know, I just went in there. I don't know, I was like really, I was really wired, I was real coked out." *Id.* After Ms. Alfaro admitted stabbing Autumn Wallace multiple times, the investigator asked her why she kept stabbing her. CT 531. Ms. Alfaro responded, "I don't know, I was scared, I don't know what I was doing, I just . . ." CT 532. The investigator asked Ms. Alfaro what she did after she left the house and again she stated, "I was just like really wired . . . ." CT 542. Later, she described waiting

229

1  at a bus stop with some of the property she had taken from the Wallace's in a bag.

2  She says, "I dropped the bag and the mirror broke. . . . And there was a lady right

3  there and since I was really high and loaded and stuff, I told the lady if she wanted it

4  and I gave it to her." CT 561.

5      19.  The investigators then took Ms. Alfaro through the sequence of events

6  yet again:

7      Investigator Giffin:  When you got over to Juan's, you hooked up with
       Sabrina, you went down and got a two and two, you came back up and
8      you fixed, you and Sabrina and you still wanted to fix some more.

9      Ms. Alfaro:  Uh-huh.

10     * * *

11     Mr. Giffin:  . . . you let Shorty use your rig.

12     Ms. Alfaro:  Yeah.

13     Mr. Giffin:  Then he gives you some more?  Then you decided you want
       some more?
14
       Ms. Alfaro:  Yeah.
15
       * * *
16
       Mr. Giffin:  Did you tell them you were going to get that stuff and sell it
17     so you can buy some more dope?

18     Ms. Alfaro:  Yeah, I told Shorty.

19  CT 548-49.  The investigator then asked Ms. Alfaro about a statement she had made

20  that Shorty had just gotten out of jail.  CT 573.  He asked her how she found out he

21  had just gotten out of jail, and she responded, "I didn't ask him, I . . .I was just really

22  high, I don't know."  CT 574.

23      20.  Towards the end of the interview, the investigators attempted to eliminate

24  any sort of intent defense with the following line of questioning, which clearly

25  established that Ms. Alfaro was not unconscious, but just as clearly left open the

26  possibility that her ability to conform her conduct to the requirements of the law had

27  been impaired:

28

1   Mr. Bale:  . . . don't try to convince me that you were out of your head.

2   Ms. Alfaro:  No, I wasn't out of my head.

3   Mr. Bale:  I know.

4   Ms. Alfaro:  And I'm not trying to do that.

5   Mr. Bale:  You know what was, you know what . . .

6   Ms. Alfaro:  . . . yes, I know.

7   Mr. Bale:  You know exactly what was going on.

8   Ms. Alfaro:  Yeah, I know.

9   Mr. Bale:  What did you think would happened to, to Autumn when you
10  started stabbing her, what do you think was gonna happen?  What
    happens when you take a knife and poke holes in somebody?  What,
    what can happen to them?  What did you think was gonna happen?

11
    Ms. Alfaro:  She was gonna die.
12
    Mr. Bale:  Okay.  So you were, you were fully aware of that when you
13  started stabbing her, that she could die from that.

14  Ms. Alfaro:  Yeah.

15  CT 577.  This comprises the entirety of Mr. Giffin's questioning of Ms. Alfaro

16  concerning the level of her intoxication.  Far from stating that the drugs had not

17  impaired her ability to conform her conduct to the requirements of the law, she

18  repeatedly confirmed that she was heavily under the influence.

19          21.  During her cross-examination at the first penalty trial, which was read to

20  the jury at the second penalty trial, Ms. Alfaro provided additional information about

21  the level of her intoxication and the effects it had on her mental ability including the

22  fact that after shooting up a "twenty and ten" she was high for approximately two

23  hours.  RT 1667.  On redirect, she stated that she had shot up with heroin and coke an

24  hour to an hour and a half before she went to the Wallace house.  RT 1727.  She

25  explained that when she used the word "wired" she meant "when you're out of

26  control, you're -- if you've done too much coke, you panic and you get wired.  Just

27  can't control your -- I don't know how to explain it, but just like in panic.  You

28  panic."  RT 1727-28.  She stated that this was the state she was in when she was in

the house with Autumn.  RT 1728.  She clarified that while she had told the

investigators she was not out of her head that day, she was in fact wired at the time

she killed Autumn Wallace.  RT 1729.  There was clearly substantial evidence that

Ms. Alfaro's capacity to conform her conduct to the requirements of the law was

impaired by heroin and cocaine, and the trial court made a factual and legal error in

disregarding it.  His errors evidence his bias.

22.  Charged with deciding whether Ms. Alfaro should live or die, Judge

Millard was also required to address whether her youth constituted mitigating

evidence.  Penal Code § 190.3(i).  His ruling clearly indicates his bias.  After noting

that Ms. Alfaro was eighteen at the time of the crime, the court stated:

> If mere age by itself without any other factor is involved, it would appear
> perhaps that the age of eighteen might be a mitigating factor in the case.
> I think you have to put the age in context of what her background shows
> about she had dropped out of school at an early age, been out on the
> streets for a substantial period of time, been involved in the drug culture
> for a substantial period of time, things of that nature.  So would appear
> that in a streetwise sense she was much more mature than her age would
> indicate.
>
> So it doesn't appear that the age of the defendant at the time of the crime
> is really a substantial mitigating factor in the case.

RT 4505.  As set forth in Claim I, school records, medical records, and the testimony

of experts belie this conclusion.  The fact that it is so completely wrong evidences the

trial court's bias.

23.  Judge Millard was also required to address whether any other evidence

gave rise to sympathy and thereby constituted mitigating evidence.  Penal Code

§ 190.3(k).  The court stated:

> I guess this is where counsel brings in the disadvantaged background
> of the defendant, her early involvement with drugs, her prostitution,
> things of that nature.  The problems she had with her father, allegedly,
> the problems she had with the father of her second child and third and
> fourth child.  I guess that's where all of these factors fit in.  The fact that
> she is a mother of four children.  Obviously at the time this offense
> occurred she was only the mother of two children.  But she is now as she
> sits there at counsel table the mother of four children.  And I guess that's
> where counsel tries to fit in all of those factors in item (k).  And *those
> factors have kind of a two-edged sword in a way*.  It appears that the

1    defendant did get involved in drug activity, came from a separated home,
2    and had a disadvantaged youth.

3        It also appears to the court that people are really the sum total of
     the choices we make in our life.  She chose to leave school.  She chose to
     use drugs.  She chose to engage in acts of prostitution on the streets.  She
4    chose to hang out in the area on Jeffery Street over there where there is a
     -- the drug culture is involved.  She made all of those choices.  Those are
5    all choices.  There was no evidence presented to the court that those were
     involuntary choices, anybody forced her into doing that, things of that
6    nature.

7        So on the one hand you can say well, she is the mother of four
     children and she is young.  On the other hand, you can say that she made
8    those choices, she ought to be responsible for making those choices.

9        And it was a little shocking to the court, I'm sure it was shocking
     to the jury, that one of her children was taken to the crime scene and was
10   cared for in the hands of a relative stranger, a person who just got out of
     prison a couple of days earlier, left to take care of her young boy of
11   about eighteen months on the front lawn while she went into the house
     and stabbed Autumn Wallace over fifty times.  *So that all cuts a couple*
12   *of ways.*  And it would not appear to the court that the (k) factor has any
     substantial weight in our case.
13

14   RT 4506-07.  In essence, the court weighed potentially mitigating evidence relevant

15   to the sympathy factor, such as Ms. Alfaro's abusive childhood and mental

16   disabilities which led her to self-medicate with drugs and to motherhood four times

17   over by the time she was eighteen, as "a two edged sword" which he then used

18   against her in finding that she should be put to death.  This clearly indicates the trial

19   court's bias.

20       24.  When the trial court addressed the factor codified in §190.3(a), the

21   circumstances of the crime, Judge Millard made it clear that he was biased against

22   Ms. Alfaro -- in part because of her attorney's conduct -- but also because of the

23   particulars of this case:

24       It appears to the court that the -- I've been involved in the legal
     profession since January 1965.  I was involved with -- I first started in
25   Orange County on a great day of April Fools Day of 1966, and I have
     been involved in the legal community in Orange County since that time.
26
     In my past I've prosecuted people accused of offenses like Miss Alfaro,
27   I have defended people accused of noncapital homicide offenses when
     I was a defense attorney, and I have been a member of the Superior
28   Court for over thirteen years.

233

1
2
3
4

This case is one of the most senseless, brutal, vicious, callous killings that this court has ever seen.  The description that a picture is worth a thousand words, the circumstances of this offense shown by the photographs show a very vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case.

5
6

So it does appear to this court that the circumstances of the offense in item (a) of Penal Code section 190.3, that the circumstances of the crime itself standing alone far outweigh *any mitigating circumstances, if there are any, that are presented in this case.*

7
8
9

In conclusion on that I am satisfied that the jury's verdict imposing the death penalty and reviewing all of those factors is consistent with the evidence and the law that the factors in aggravation, as I have described, beyond all reasonable doubt outweigh any factors in mitigation, and therefore the motion to modify the penalty is denied.

10   RT 4508-09 (emphasis added).  There is no question that this was a brutal crime, but

11   for Judge Millard to say that he could not "imagine that anyone could ever dream one

12   up that would match this case," evidences his bias.

13       **3.      The Trial Judge Had a Personal Interest in the Case Based Upon His**

14            **Work Relationship With the Victim's Mother**

15       25.  Because the victim's family included two long time Orange County court

16   employees, the trial court also had a connection to the family.  Deputies assigned

17   to escort Ms. Alfaro to court asked why her attorney had not moved for a change

18   of venue.  Judge Millard's status as a colleague of the victim's mother and aunt

19   compelled a knowing and intelligent waiver by Ms. Alfaro.  The Judge's wife

20   advertised in the Clerk's Union newsletter every month of 1992.  A bakesale was held

21   on the courthouse grounds at or around the time of trial, and Orange County clerks

22   attended the trial whenever possible to show their support for the Wallace family.

23   Exhibit 1 (McGrath Declaration) at ¶¶ 63-71; Exhibit 83 (Snell Declaration) at 6-7.[23]

24       26.  The foregoing violations of Ms. Alfaro's constitutional rights

25
26
27
28

[23]   Discovery of evidence of the relationship between the trial court and the victim's family members is warranted.  State habeas counsel's investigator attempted to interview court personnel and the Millards, to no avail.  Exhibit 1 (McGrath Declaration) at ¶¶ 68-70.  State habeas counsel did not believe it was appropriate to approach the Wallace family without this Court's authorization.  Exhibit 83 (Snell Declaration) at 6-7.

1 constitute structural error and warrants the granting of this Petition without any

2 determination of whether the violations substantially affected or influenced the jury's

3 verdict.  *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906

4 (1997) ("A criminal defendant tried by a partial judge is entitled to have his

5 conviction set aside, no matter how strong the evidence against him.")

6 <div align="center">**XXIII.**</div>

7 <div align="center">**CLAIM 18:  THE CONFLICT BETWEEN PETITIONER AND TRIAL**</div>

8 <div align="center">**COUNSEL VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**</div>

9 The convictions and sentence of death were rendered in violation

10 of Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and

11 non-capricious determination of guilt and penalty, to a neutral and impartial decision-

12 maker, and to due process of law as guaranteed by the Fifth, Sixth, Eighth, and

13 Fourteenth Amendments to the United States Constitution because trial counsel had

14 an actual conflict of interest that adversely affected his performance.

15 1. Exhaustion of the claim:  This claim was fairly presented to the California

16 Supreme Court in the direct appeal.  It was presented as Claim 1 in the Opening Brief.

17 2. AEDPA:  The California Supreme Court denied this claim.  *People v.*

18 *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

19 state court's denial of this claim is both "contrary to" and an "unreasonable

20 application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

21 must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

22 this claim was dependent on an antecedent unreasonable application of federal law,

23 this Court "must then resolve the claim without the deference that AEDPA otherwise

24 requires."  *Panetti*, 127 S. Ct. at 2858.

25 3. If Respondent disputes any of the facts alleged below, Petitioner requests an

26 evidentiary hearing so that the factual disputes may be resolved. After Petitioner has

27 been afforded discovery and the disclosure of material evidence by the State, the use

28

<div align="center">235</div>

1  of this Court's subpoena power, and the opportunity to investigate fully, counsel
2  requests an opportunity to supplement or amend this petition.
3      4.  The declarations and other exhibits filed with this petition, as well as the
4  allegations and facts set forth elsewhere in this petition, are hereby incorporated by
5  reference into this claim as though set forth in full.
6      5.  In support of this claim, Petitioner alleges the following facts, among others
7  to be presented after full discovery, investigation, adequate funding, access to this
8  Court's subpoena power, and an evidentiary hearing:
9  **A.    INTRODUCTION**
10     6.  Maria del Rosio Alfaro gave a four-hour videotaped confession immediately
11  after her arrest in which she took full responsibility for the death of Autumn Wallace.
12  She told her attorney William Monroe repeatedly before trial that she wanted to plead
13  guilty to the charges.  She told him that she did not want to implicate anyone else.
14  Mr. Monroe refused, however, to allow her to enter a guilty plea.  Over her objection,
15  and in the absence of any evidence to support his theory, he chose to pursue a defense
16  that the unidentified man who had driven Ms. Alfaro to the scene was responsible for
17  Autumn Wallace's murder.
18     7.  When a capital defendant seeks to plead guilty and counsel withholds
19  consent, there is an actual, irreconcilable conflict that adversely affects trial counsel's
20  performance.  The trial court's refusal to appoint alternate counsel requires reversal.
21     8.  Petitioner's conviction and sentence of death were rendered in violation of
22  her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and
23  non-capricious determination of guilt and penalty, to the effective assistance of
24  counsel, to present a defense, and to due process of law as guaranteed by the Fifth,
25  Sixth, Eighth and Fourteenth Amendments to the United States Constitution as a
26  result of the trial court's failure to resolve the conflict between Petitioner and her trial
27  counsel.
28

236

9.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

10.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

11.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

**B.** **STATEMENT OF FACTS**

12.  On June 27, 1991, the day of her arrest, Ms. Alfaro agreed to be interviewed by law enforcement officers without counsel present.  Less than five minutes after having been read her *Miranda* rights, Ms. Alfaro admitted that she stabbed Autumn Wallace.  CT 509-10.  During the nearly four hours of questioning that followed, Ms. Alfaro repeatedly confessed to killing Autumn Wallace and described in detail the circumstances of the crime, including her intention to steal property when she went into the Wallace home.  She described taking a knife from the kitchen drawer shortly after entering the house.  CT 570.  She admitted inflicting all of Autumn's wounds:

Q:  So if anyone besides you did the stabbing or if anyone besides you, in other words, if, if you didn't stab her but somebody else did or if all three (3) of you stabbed her, took turns, then now is the time to tell us.

A:  I did.

Q:  You did it all.  Nobody did any stabbing except you?  Was she injured in any way when you got there?

A:  No.

1  CT 572.  She admitted stabbing Autumn both in the back and the front (CT 531-32);

2  she admitted knowing that the wounds she inflicted could cause death (CT 577); and

3  she admitted deliberating, although perhaps at the detective's urging and not because

4  she actually understood the concept.  CT 529.  Consistently, throughout the course of

5  the interview, Ms. Alfaro took sole responsibility for Autumn's death.

6      13.  On February 20, 1992, eleven days before jury selection was to begin,

7  Ms. Alfaro's counsel sought guidance from the court.  In a "request for special

8  instructions" filed *in camera*, he informed the court, "[m]y client . . . refuses to follow

9  my instructions and take the stand and implicate 'Beto'. . . .  If my client insists on

10  pleading guilty to the special circumstances, it is against my most rigorous advice.

11  I am requesting instructions from the court as to whether or not the court believes

12  it is necessary for me to withdraw from the case at this late stage or whether or not

13  I should remain on the case."  CT 355.

14      14.  The following day, February 21, 1992, the court met with defense counsel

15  and Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992 proceedings).  During the

16  discussion that ensued, defense counsel described an "out and out conflict" between

17  himself and Ms. Alfaro regarding her desire to plead guilty and his "wish to proceed

18  to trial on the guilt phase":

19      The Court:  You've asked the court for some instructions here and
20  I'm not really in a position to give any instructions concerning your relationship vis-a-vis your client.  No one has made a motion to be relieved.  No one has made a motion to have substitute counsel.  So there
21  is really nothing -- there is really nothing before, properly before the court, to consider that.

22  So you have expressed some concerns here and I don't know if the
23  purpose of this in-camera hearing is to allow you to put on the record what your concerns are and make sure your client understands certain
24  rights she has or what we are doing.

25  Mr. Monroe:  . . . Your Honor, I believe I'm asking the court to give me
26  a lead or advice as to whether or not the court believes I should declare a conflict because I believe that a conflict may exist.  I wish to proceed to trial on the guilt phase.  I wish to call Shorty, one of the witnesses, and
27  that Beto who we believe is the other killer.

28

1  My client has adamantly, adamantly refused to allow me to call Beto or
   to cross examine Shorty regarding his relationship with Beto . . . because
2  my client has told me she is in absolute fear of her safety and she's in
   absolute fear of the safety of her family should it become known to Beto
3  that we in some way, shape, or form, for lack of a better term, have given
   him up. . . .  I'm concerned, Your Honor, if I proceed the way I want I'm
4  placing my client's life and her family's lives in jeopardy according to
   my client.  If I proceed the way my client wants to proceed, it's against
5  my vigorous, vigorous advice because she wants to plead guilty to a
   special circumstance homicide where there is no evidence of a 211
6  circumstance --

7  The Court:  She can't plead guilty without the consent of counsel.  That's
   Penal Code section 1018.  In a capital case the court doesn't have the
8  authority to accept a guilty plea from a defendant without the consent of
   the attorney.
9
   Mr. Monroe:  I, in good conscience could not consent.
10
   The Court:  There could not be a guilty plea.
11
   Mr. Monroe:  That's right.  However, my client insists on pleading guilty.
12
   The Court:  She might insist on it.  The court is not going to accept any
13 guilty plea on a capital case without the consent of the attorney.

14 Mr. Monroe:  Then my client turns around and tells me she does not
   want certain witnesses called or me to conduct the trial the way I think
15 it should be conducted.  I have an out and out conflict.

16 The Court:  I'm not sure you do have an out and out conflict that would
   justify your being taken off the case.  I think what you should do is
17 basically what you are doing.  You should indicate where you disagree,
   make sure she understands that she's going against your advice, going
18 against your desires, and that she consents to it and specifically has
   directed you to proceed in a certain fashion.
19
   I'm not sure a lawyer is entirely quote "independent" from the best
20 interests and desires of the client.  Basically, lawyers are really here to
   serve the client.
21
   Mr. Monroe:  That's exactly the point.  But I can't turn around and say
22 I consent to allow my client to plead guilty when I know she's pleading
   guilty for all intents and purposes to a death sentence.
23
   The Court:  There is no problem with that.  If you don't want to consent
24 to it, you don't have to consent to it.  But that doesn't cause any
   automatic conflict that would relieve you and put some other attorney in,
25 not unless we are going to call up all of the attorneys in Orange County
   and see who would consent to somebody pleading guilty to a capital
26 offense.  And I don't plan to do that.  And I am not sure you would find
   any, if any, that would do it if they were competent legal counsel.
27
   Mr. Monroe:  . . . In effect she and I are at loggerheads.
28

239

1  The Court:  Well, you might be at loggerheads but that doesn't mean that
2  you have a conflict of interest between the two of you that is of such
   magnitude that she is denied the right to effective assistance of counsel.
3  She has instructed counsel what she wants to do.

4  Mr. Monroe:  And I cannot effectively represent her if I follow her
   instructions.

5  The Court:  Well, you cannot represent her the way you want to represent
6  her.

7  Mr. Monroe:  So I'm suppose[d] to represent her incompetently then by
   not presenting a vigorous defense.

8  The Court:  No.

9  Mr. Monroe:  I cannot present the defense I need because she won't
10 allow me to.

11 The Court:  You can't force her to testify. . . . That doesn't cause any
   conflict of interest. . . .

12 Mr. Monroe:  I cannot effectively represent my client at this stage in
13 light of the instructions she has given me.

14 The Court:  You cannot represent her the way you want to represent her,
   but that doesn't mean you can't effectively represent her to the best of
15 your abilities within the guidelines or parameters she has outlined for
   you.

16 Mr. Monroe:  Which is to put on a shallow bare-bones sham defense.

17 The Court:  . . . I don't know what you want to call it.  But she has an
18 absolute right not to testify.

        And your whole defense, from what I read in this in-camera
19 document, your whole defense is based on her getting on the stand and
   pointing the finger at somebody else.  And she is not going to do that,
20 according to this, not unless she changes her mind.  And if she doesn't
21 do it, it definitely handicaps your efforts to defend her.

        ***

22
   The Court:  Bottom line.  Bottom line is clients have a lot of control over
23 how a case is presented.  And the mere fact that you and her disagree
   over her getting on the stand might be a conflict in fact between you.
24 But it is not the kind of a -- kind of conflict that is a legal conflict that
   would justify the court in appointing new counsel to represent her
25 especially on the eve of trial.

26 And this thing has been going on for a long time and apparently . . . you
   have been at loggerheads with her for some time.  I don't think this is the
27 first time that you mentioned to me she didn't want to testify.

28

                                    240

1    Mr. Monroe:  This is the first time I mentioned to you that she does not
2    want to testify. . . . [T]his is the first time last week or on the 12th when
     she told me she wanted to plead guilty and did not want to testify.

3    The Court:  Well, the court cannot accept and will not accept a guilty
4    plea from her without your consent under Penal Code section 1018.

5    Mr. Monroe:  I think as a minimum, Your Honor, we ought to have
     counsel appointed to advise her about the consequences of her act.

6    The Court:  I'm sure you have advised her of what the consequences
7    of her not testifying are.

8    Mr. Monroe:  I certainly have.  However, maybe because of this conflict
     that she and I have, maybe an independent person should be talking to
9    her.

10   The Court:  Well, you haven't raised anything in this paperwork that
     would indicate you are having a communication problem or that she is
11   not understanding what you're saying or that somebody else would be
     in a better position to do it. . . . You just basically have a basic
12   disagreement over the tactics in defending her.

13   Mr. Monroe:  It's more profound than that.  It's a basic disagreement
     what she wants to do with her life.

14   The Court:  But it is her life.  It's not your life.

15   Mr. Monroe:  It's my obligation to look after her life.

16   The Court:   That's right.  But it is your obligation to serve her to the
     best you can within the ethical framework of being her attorney.  But we
17   should never lose sight of the fact that it's her case.  She is a party to the
     case.  She is the one that has the constitutional rights.  You don't have
18   any constitutional rights in this case.

19   Mr. Monroe:  She's a 20-year-old girl.

20   The Court:  She is the one that has the constitutional rights.

21   Mr. Monroe:  A 20-year-old child is going to plead guilty to a death
     penalty?

22   The Court:  I don't know why you talk about pleading guilty.  There is
23   no way she'll plead guilty without the consent of her attorney of record,
     period.  You have indicated very clearly you don't consent to that.  So
24   there isn't going to be a plea of guilty, period.

25   Mr. Monroe:  You understand that Rosie -- Miss Alfaro?

26   The Defendant:  Then what am I going to do?  I told you what I wanted to do.

27   Mr. Monroe:  What do you want to do?

28   The Defendant:  Plead guilty.

241

Mr. Monroe:  You put me in an absolute[ly] untenable position, Judge Millard.

The Court:  That is what you think.  I don't think so.  You are no different than other lawyers that have a disagreement over tactics.  Cases are legion in the California courts that a mere disagreement over tactics does not justify -- is not a legal conflict from the standpoint of such magnitude that will effectively deny the person their right to counsel. There are all kinds of tactical conflicts that occur in cases of criminal and civil cases.  That doesn't mean on the eve of trial all of a sudden we change attorneys and start the case all over again.  It just doesn't happen that way.

***

Mr. Monroe:  Pleading guilty is more than tactics.

The Court:  As I indicated, unless she can convince you to consent to her pleading guilty, there won't be any plea of guilty in the case.  So I don't know what else to tell you.

RT 106-23 (February 21, 1992 proceedings).

15.  On February 26, 1992, defense counsel filed a motion to suppress Ms. Alfaro's confession.  CT 380.  Mr. Monroe argued that drugs affected Ms. Alfaro's judgment and rationality at the time her statement was made to the police. CT 383.  Claiming that she was incompetent at the time, Mr. Monroe argued that introduction of the confession would violate her right to counsel, right against compulsory self-incrimination, and right to due process.  CT 383.  The motion was heard on February 26, 1992.  RT 133-87 (February 26, 1992 proceedings).  The court found that the statements made were voluntary products of her own free will, and that the degree of drugs in her system did not appreciatively affect her ability to knowingly and voluntarily waive her rights.  RT 306-07.  As well, on cross examination, defense psychiatric expert Dr. Consuelo Edwards admitted that Ms. Alfaro knew what she was being told and was not irrational or incoherent. RT 253-55.  Despite defense counsel's knowledge as of March 2, 1992, that Ms. Alfaro's confession would be admitted, there is no evidence that defense counsel reconsidered his decision to prevent her from entering a guilty plea.  RT 307.

16.  The record further reflects that although defense counsel continued to search for evidence that the mysterious third man had entered the Wallace home until the eve of trial, his efforts were unsuccessful.  But again, there is no evidence that his fruitless efforts caused him to reconsider his decision to prevent Ms. Alfaro from entering a guilty plea.

17.  On March 3, 1992, jury selection began.  The people rested on March 18, 1992.  As anticipated, Ms. Alfaro waived her right to testify, and the defense rested the same day.  RT 1179; CT 498-501.  On March 23, 1992, the jury found Ms. Alfaro guilty of all charges, including first degree murder with special circumstances.  RT 1398-1411; CT 1086-90.

18.  On March 30, 1992, the penalty phase began.  In his opening statement, the District Attorney told the jury, "You're going to find, ladies and gentlemen, from the evidence that Rosie Alfaro has not accepted the responsibility for the killing of Autumn Wallace."  RT 1436.  After the first penalty jury hung, and the second jury was impaneled, the District Attorney again told the jurors that:  "Miss Alfaro has not accepted any responsibility.  That's what the evidence will show."  RT 3179.  During his closing in the second penalty trial, the District Attorney returned to this theme.

> Remorse, Ladies and Gentlemen? . . . Ladies and Gentlemen, th[e] remorse [Ms. Alfaro exhibits in the video-taped confession] was not for her, that little girl.  That remorse was for the plight of Rosie Alfaro only.  You can say a whole lot of things.  You can mouth the words. . . . Especially once you get into the system and you know what's expected, you can mouth the words, "I have sympathy" or "I have remorse" or "I feel sorry."  *But actions speak louder than words.*  The only remorse she has is for sitting in jail for what she's done.

RT 4367-68 (emphasis added).

19.  Neither jury was informed that Ms. Alfaro had sought to plead guilty to the charges without any guarantee of leniency, but had been prevented from doing so by her counsel, despite both the court's and defense counsel's knowledge that this was,

in fact, the case.[24]  Instead, both Ms. Alfaro's attorney and the judge sat silent as the District Attorney argued during the second penalty phase, "Who operates the defense?  It's at the operation of Ms. Alfaro.  She's the defendant.  She chooses to fabricate, fake, embellish and create."  RT 4366.  "Remorse, Ladies and Gentlemen?"  RT 4368.

20.  On June 9, 1992, after deliberating for three days, the second penalty phase jury sentenced Ms. Alfaro to death.  CT 1584.

## C.   LEGAL BASIS OF THE CLAIM

21.  Upon notification that an actual or potential conflict of interest exists, a trial court has the obligation "either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); *see also Wood v. Georgia*, 450 U.S. 261, 272, & n.18, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981).  If the trial court fails to undertake either of these duties, the defendant's Sixth Amendment rights are violated.  *See Holloway*, 435 U.S. at 484.   Complete reversal is required where the attorney's performance was "adversely affected" by the conflict of interest.  *Mickens v. Taylor*, 535 U.S. 162, 174, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

### 1.   The Trial Court's Refusal to Substitute Counsel Violated Petitioner's Sixth Amendment Right to Conflict-Free Counsel

22.  That there was an actual conflict between Ms. Alfaro and her counsel on February 21, 1992, is obvious.  Although Mr. Monroe initially sought the court's advice on whether he had a conflict, he later Mr. Monroe made clear that he had "an out and out conflict."  He knew that his client wanted to plead guilty, an intention she unequivocally reaffirmed before the judge.  Nevertheless, Mr. Monroe refused

---

[24]  Mr. Monroe's failure to introduce Ms. Alfaro's unconditional offer to plead guilty as mitigating evidence during the penalty phase of her trial, see *People v. Williams*, 45 Cal. 3d 1268, 1232 (1988), is addressed in Claim I.E..

1  to give his consent.  ("I can't turn around and say I consent to allow my client

2  to plead guilty when I know she's pleading guilty for all intents and purposes

3  to a death sentence.").  Instead, Mr. Monroe wanted to present at the guilt phase

4  "the defense [he] need[ed]," which was that a third person committed the murder.

5  Given the clear contradiction between his client's express wishes and his desire

6  to present a complete guilt phase presentation, Mr. Monroe was, in his view, in

7  an "absolute[ly] untenable position."

8      23.  Mr. Monroe's recognition of the conflict should have been the end

9  of the matter.  Criminal defense counsel are "in the best position professionally and

10  ethically to determine when a conflict of interest exists or will probably develop

11  in the course of a trial."  *Holloway*, 435 U.S. at 485.  Due to trial counsel's unique

12  perspective, the courts "necessarily rely in large measure upon the good faith and

13  good judgment of defense counsel."  *Cuyler*, 446 U.S. at 347, *Mickens*, 535 U.S.

14  at 167-68 (recognizing how the *Holloway* Court "deferred to the judgment of counsel

15  regarding the existence of a disabling conflict, recognizing that a defense attorney

16  is in the best position to determine when a conflict exists, that he has an ethical

17  obligation to advise the court of any problem, and that his declarations to the court

18  are 'virtually made under oath'").

19      24.  The trial counsel's attempts to recharacterize the conflict as a strategic

20  disagreement constituted an unreasonable determination of the facts.  During the *in*

21  *camera* hearing, the trial judge disagreed with trial counsel's representation that a

22  conflict had arisen:  "I'm not sure you do have an out and out conflict that would

23  justify your being taken off the case.  I think what you should do is basically what

24  you are doing.  You should indicate where you disagree, make sure she understands

25  that she's going against your advice, going against your desires, and that she consents

26  to it and specifically has directed you to proceed in a certain fashion."  RT 112-13

27  (February 21, 1992 proceedings).  Then, seconds later, the court contradicts itself,

28  telling counsel, "If you don't want to consent to [a guilty plea] you don't have to

245

consent to it." RT 113 (February 21, 1992 proceedings).  At another point, the court

stated, "[y]ou might be at loggerheads but that doesn't mean that you have a conflict

of interest between the two of you that is of such magnitude that she is denied the

right to effective assistance of counsel.  She has instructed counsel what she wants

to do."  But then, when counsel responds, "[a]nd I cannot effectively represent her if

I follow her instructions," the court must concede that this is true:

> The Court: . . . I don't know what you want to call it.  But she has an
> absolute right not to testify.  And your whole defense, from what I read
> in this in-camera document, your whole defense is based on her getting
> on the stand and pointing the finger at somebody else.  And she is not
> going to do that, according to this, not unless she changes her mind.  And
> if she doesn't do it, it definitely handicaps your efforts to defend her.

RT 116 (February 21, 1992 proceedings).

25.  The trial judge even admitted that he had been aware "for some time" that

Ms. Alfaro and her counsel "have been at loggerheads."  RT 117 (February 21, 1992

proceedings).  He acknowledged that they have "a basic disagreement over the tactics

in defending her."  RT 118 (February 21, 1992 proceedings).

26.  Finally, the trial judge recognized that Ms. Alfaro could not pursue her

desired course without trial counsel's consent.  The judge hid behind § 1018, telling

defense counsel, "I don't know why you talk about pleading guilty.  There is no way

she'll plead guilty without the consent of her attorney of record, period.  You have

indicated very clearly you don't consent to that.  So there isn't going to be a plea of

guilty, period."  RT 118-19 (February 21, 1992 proceedings).

27.  But in the end, the trial judge denied that this created a conflict, telling

defense counsel that he is "no different than other lawyers that have a disagreement

over tactics."  RT 119 (February 21, 1992 proceedings).

28.  In this respect -- that a disagreement over whether a defendant should

plead guilty is simply a tactical disagreement -- the trial judge was clearly wrong and

defense counsel, who portrayed the dispute as "more profound than that," was clearly

right.

**2.**      **Mr. Monroe's Decision to Prevent Petitioner From Pleading Guilty**
            **Adversely Affected His Performance**

29.   "[C]ertain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Florida v. Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551; 160 L. Ed. 2d 565 (2004). Chief among these basic trial rights is the decision to determine whether to plead guilty. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (Burger, C. J., concurring) (stating "such basic decisions as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the accused to make."). Thus, before deciding whether to exercise or waive the right to plead not guilty, "an attorney must both consult with the defendant and obtain [the defendant's] consent to the recommended course of action." *Nixon*, 543 U.S. at 187.

30.   The American Bar Association's standards for the administration of criminal justice also provide that certain decisions must be left to the defendant. Standard 4-5.2 provides:

> Certain decisions relating to the conduct of the case are ultimately for the accused . . .   The decisions which are to be made by the accused after full consultation with counsel are . . . [¶] what plea to enter.

31.   ABA Standards for Criminal Justice, 4-5.2 (1982) (emphasis added). While "counsel is free to engage in fair persuasion and to urge the client to follow the proffered professional advice," "the accused must make the decision[ ]." 4-5.2 cmt.

32.   A defendant's fundamental right to decide how to plead to a criminal charge is beyond question.  California cannot abrogate this right through legislation. Section 1018 of California Penal Code provides, in pertinent part:

> No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel.

33.  This section of the Penal Code prevents a capital defendant from pleading guilty without the consent of his or her counsel.  Where, as here, trial counsel refuses to consent to a guilty plea, notwithstanding the client's wishes, the statute creates an intractable conflict.  State law cannot absolve trial counsel of his obligations under the Sixth Amendment.

34.  As an initial matter, it is unclear whether Petitioner need even demonstrate that pleading guilty is a "plausible alternative defense strategy." *Hovey*, 458 F.3d at 908, because the decision whether to plead guilty rests solely with the client. *Jones*, 463 U.S. at 751.  In withholding consent from a client who desires to plead guilty, Mr. Monroe's conflict undoubtedly had an adverse affect on his performance. *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006).

35.  Assuming *arguendo* Petitioner must demonstrate her decision to plead guilty was a plausible strategy, this showing is easily met.  Given the overwhelming evidence, including Alfaro's confession, her conviction was a foregone conclusion.  Even with strong evidence of third party culpability (which trial counsel failed to develop and the prosecution withheld), Alfaro was faced with no chance to succeed at trial because duress is never a defense to murder.  Accordingly, Alfaro's only hope was to convince the jury to spare her life.  There is no better way to do so than through a guilty plea.  "A guilty plea demonstrates remorse, and, since the same jury sits during the guilt and penalty phases of  a capital trial, it also lessens the exposure of jurors to the often dramatic evidence of the crime." *Meyer v. Branker*, 506 F.3d 358, 370 (4th Cir. 2007).  There is no question that expressions of remorse by the defendant clearly qualify as relevant mitigation evidence at the penalty phase. *Brown v. Payton*, 544 U.S. 133, 143, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005) ("[R]emorse . . . is something commonly thought to lessen or excuse a defendant's culpability."); *Williams (Terry) v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (noting that expressions of remorse, along with other mitigating evidence, "might well have influenced the jury's appraisal of his moral culpability"); *People v.*

1  *Smith*, 30 Cal. 4th 581, 627, 68 P.3d 302, 134 Cal. Rptr. 2d 1 (2003) ("the presence

2  of remorse is relevant at the penalty phase").  Indeed, few factors have a greater

3  ability to tip the scales in favor of life than the exhibition of remorse by the

4  defendant.  *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S. Ct. 1810, 118 L. Ed. 2d 479

5  (1992) ("In a capital sentencing proceeding, assessments of character and *remorse*

6  may carry great weight and, perhaps, be determinative of whether the offender lives

7  or dies.") (emphasis added); Sundby, *The Capital Jury and Absolution:  The*

8  *Intersection of Trial Strategy, Remorse, and the Death Penalty,* 83 Cornell L.Rev.

9  1557 (1998) (noting death jurors frequently comment that if the defendant had shown

10  some sign that he was sorry they never could have voted for death); *Meyer*, 506 F.3d

11  at 373 ("there is broad consensus on the fact that evidence of remorse is extremely

12  important to capital sentencing juries").

13  **D.**      **CONCLUSION**

14       36.  Ms. Alfaro chose to accept responsibility for her crimes by pleading guilty

15  unconditionally.  When Ms. Alfaro's defense attorney refused to consent to her guilty

16  plea, a conflict erupted between them that was serious enough for defense counsel to

17  seek guidance from the court, informing the court that defense counsel believed he

18  had an "out and out conflict" with his client that might warrant his withdrawal.  Yet

19  the court refused to become involved; citing California Penal Code § 1018, and

20  apparently interpreting that section to relieve the court of its duties to inquire into and

21  seek to resolve conflicts between defense attorneys and their clients, and thereby

22  protect the clients' Fifth, Sixth, Eighth and Fourteenth Amendment rights.  Had the

23  trial court performed its duty to inquire and resolve the conflict, the court should have

24  appointed substitute counsel.  The court's failure to do so violated Ms. Alfaro's Sixth

25  Amendment right to counsel.

26       37.  There is no question that the actual conflict adversely affected

27  Mr. Monroe's performance.  As a result of Mr. Monroe's view that Ms. Alfaro should

28  not plead guilty, he affirmatively prevented her from doing so.  As such, Mr. Monroe

divided his loyalties between what he viewed as the 'right' course of action and the course of action sought by his client.  Mr. Monroe's conflict did not merely affect a narrow aspect of the trial but permeated the trial itself but precluding Ms. Alfaro from making a fundamental decision in her case.  Therefore, because Mr. Monroe labored under an actual conflict that adversely affected his performance, automatic reversal is required.

38.  The foregoing violation of Ms. Alfaro's constitutional right to conflict-free counsel constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.

39.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition.  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XXIV.

## CLAIM 19:  THE TRIAL COURT ERRED BY PRECLUDING EVIDENCE OF PETITIONER'S OFFER TO PLEAD GUILTY

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court excluded critical mitigation evidence during the penalty phase.

1      1. Exhaustion of the claim:  This claim was fairly presented to the California

2  Supreme Court as Claim 2 in the direct appeal.

3      2. AEDPA:  The California Supreme Court denied this claim.  *People v.*

4  *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

5  state court's denial of this claim is both "contrary to" and an "unreasonable

6  application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

7  must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

8  this claim was dependent on an antecedent unreasonable application of federal law,

9  this Court "must then resolve the claim without the deference that AEDPA otherwise

10  requires." *Panetti*, 127 S. Ct. at 2858.

11      3. If Respondent disputes any of the facts alleged below, Petitioner requests an

12  evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

13  been afforded discovery and the disclosure of material evidence by the State, the use

14  of this court's subpoena power, and the opportunity to investigate fully, counsel

15  requests an opportunity to supplement or amend this petition.

16      4. The declarations and other exhibits filed with this petition, as well as the

17  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

18  reference into this claim as though set forth in full.

19      5. In support of this claim, Petitioner alleges the following facts, among others

20  to be presented after full discovery, investigation, adequate funding, access to this

21  Court's subpoena power, and an evidentiary hearing.

22  **A.    INTRODUCTION**

23      6. Ms. Alfaro sought to enter an unconditional plea of guilty to the charges

24  and proceed to the penalty phase, but her attorney prevented her from doing so.

25  The District Attorney, seemingly unaware that Ms. Alfaro had sought to enter

26  an unconditional plea, moved before trial to exclude evidence that her attorney

27  had offered to have her plead guilty in exchange for a sentence of life without the

28  possibility of parole.  He argued that while an actual guilty plea would be mitigating

251

evidence, Ms. Alfaro's attorney's offer to have her enter a conditional plea was not. Despite its knowledge that Ms. Alfaro had wanted to plead guilty unconditionally, the court granted the District Attorney's motion and ordered Ms. Alfaro and her attorney not to bring up the "issue" during either the guilt or the penalty phase of trial.

**B.     LAW IN SUPPORT OF THIS CLAIM**

7.   Under clearly established federal law, the sentencer cannot be precluded from considering any relevant mitigating evidence offered by the defendant.[25] *Payne v. Tennessee*, 501 U.S. 808, 822, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) ("a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death"); *Hitchcock v. Dugger*, 481 U.S. 393, 394, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).  The Supreme Court has spoken of relevant mitigating evidence "in the most expansive terms."  *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 2570, 159 L. Ed. 2d 384 (2004).  "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."  *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (internal quotations omitted).  "Thus, a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'"  *Tennard*, 542 U.S. at 284; *see McKoy*, 494 U.S. at 441.  ("Once this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's

---

[25] Following the Supreme Court lifting the moratorium on the death penalty imposed in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Supreme Court imposed a number of requirements to ensure fairness in the capital sentencing process.  Chief among them was limitation on the State's ability to narrow a sentencer's discretion to consider mitigation evidence. *McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) ("States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.")

1    mitigating evidence.").  "[T]he jury must be allowed not only to consider such

2    evidence, or to have such evidence before it, but to respond to it in a reasoned, moral

3    manner and to weigh such evidence in its calculus of deciding whether a defendant

4    is truly deserving of death."  *Brewer v. Quarterman*, 550 U.S. 286, 127 S. Ct. 1706,

5    1714, 167 L. Ed. 2d 622 (2007).

6         8.  While relevant mitigation logically entails aspects of a defendant's conduct

7    as it pertains to circumstances of the offense, *Lockett v. Ohio*, 438 U.S. 586, 604,

8    98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (plurality opinion) (Berger, C.J.), it also

9    includes conduct and characteristics without regard for the defendant's demeanor

10   at the time of the crimes.  *Skipper v. South Carolina*, 476 U.S. 1, 7, 106 S. Ct. 1669,

11   90 L. Ed. 2d 1 (1986) ("a defendant's disposition to make a well-behaved and

12   peaceful adjustment to life in prison is itself an aspect of his character that is by its

13   nature relevant to the sentencing determination"); *Tennard*, 542 U.S. at 281-82

14   (dispensing with any "nexus" requirement between the defendant's mental retardation

15   and low intelligent quotient and the circumstances of the crime before that evidence is

16   admissible in mitigation).  By the same token, the prosecution may introduce a broad

17   scope of evidence in aggravation to include evidence wholly unrelated to the

18   particular defendant.  *Barefoot v. Estelle*, 463 U.S. 880, 896, 103 S. Ct. 3383,

19   77 L. Ed. 2d 1090 (1983) ("the likelihood of a defendant committing further crimes

20   is a constitutionally acceptable criterion for imposing the death penalty") (relying

21   on *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Payne*,

22   501 U.S. at 825 (establishing the State's authority to introduce evidence of the

23   specific harm caused by the defendant to include victim impact evidence).

24   **C.**    **STATEMENT OF FACTS**

25         9.  On February 21, 1992, the trial court met with defense counsel and

26   Ms. Alfaro ex parte.  RT 106-23 (February 21, 1992 proceedings).  During the

27   discussion that ensued, defense counsel made it clear, as did Ms. Alfaro herself, that

28

253

Ms. Alfaro desired to enter an unconditional guilty plea and proceed to the penalty

phase of her trial.  *See* RT 106-23 (February 21, 1992 proceedings).

10.  The District Attorney was not present for the February 21, 1992 in camera

hearing.  However, based on a motion he made five days later, it can reasonably

be inferred that was unaware of Ms. Alfaro's desire to enter an unconditional guilty

plea and proceed to the penalty phase.  Rather, it is apparent that at some point,

Mr. Monroe approached the District Attorney and asked if he would be willing

to plea bargain:  a sentence of life without the possibility of parole in exchange

for Ms. Alfaro's plea of guilty.  *See* CT 400-01; RT 183-87 (February 26, 1992

proceedings).  In an oral motion made February 26, 1992, the District Attorney

argued that evidence of an offer to plead to life without parole should be precluded

because only an unconditional offer to plead guilty constituted a mitigating

circumstance:

> Mr. Middleton:  [I]f the defendant wanted to plead guilty, she can plead guilty right up front, right now.  *Go right into the penalty phase and show the jury that she pled guilty and that's the mitigation.*  Not the fact that she extended or her attorney extended some kind of offer, because the attorney extending some kind of an offer isn't anything.
>
> I could say yes and then they could say, you know, fly their fingers right in front of my face and say we just wanted to see if you would do it: *to me it doesn't really mean anything unless there is an actual acceptance with the offer to really give some validity to the fact that the person is offering to plead guilty.*
>
> Mr. Monroe:  If that's Mr. Middleton's concern, Your Honor, I can have Miss Alfaro on the record represent to the Court to show the extent of her remorse -- she really does -- that she is willing now to plead guilty in return for life without possibility of parole.
>
> Mr. Middleton:  That's not the concern of the People that it's valid.  I'm saying without -- I mean *she could make it valid to the jury, this remorse or whatever else the defense is saying she has, by actually pleading guilty and going to the penalty phase.*

RT 185-86 (emphasis added) (February 21, 1992 proceedings).  Despite the court's

actual knowledge that Ms. Alfaro was willing to plead guilty unconditionally -- a fact

that the District Attorney conceded amounted to a mitigating circumstance -- the

court ruled as follows:

254

1  The Court:  Well, it's definitely not relevant to anything in the guilt
2  phase of the trial.  And it would appear to me -- unless you can submit
   some authority to the court, it would appear to me a mere offer to plead
3  guilty, if the District Attorney strikes the -- or does not seek the death
   penalty, appears to me from a logic and common sense standpoint not to
4  be the proper subject matter of mitigating testimony in a penalty phase,
   if we ever get to a penalty phase, in the trial.

5          And it's. . . a motion in limine.  So, *in effect, the court would --
6  what it does, it directs counsel not to bring up that issue, or the
   defendant herself if she were to testify not to bring up that issue, without
   leave of court.*

7          And whenever you feel you have some authority or some analogy
8  by some cases or something of that nature you want me to look at, I will
   be more than happy to review the motion in limine.

9                    * * *

10  Mr. Monroe:  Certainly in guilt but also in penalty?

11
12  The Court:  In all phases of the trial unless you have leave of the court
    otherwise.

13  *Id.* at 187.

14  **D.     THE TRIAL COURT ERRED IN EXCLUDING THE EVIDENCE OF**
15          **PETITIONER'S WILLINGNESS TO PLEAD GUILTY DURING THE**
16          **PENALTY PHASES OF HER TRIAL**

17          11.  The trial court knew that Ms. Alfaro wanted to enter an unconditional

18  guilty plea and did not want to implicate anyone else in Autumn Wallace's murder.

19  The court knew that Ms. Alfaro was ready and willing but unable to take full

20  responsibility for Autumn's death by pleading guilty to the charges, as her attorney

21  had refused to allow her to enter a guilty plea and insisted instead on putting on

22  a "sham" defense.  RT 115 (February 21, 1992 proceedings).  The court had heard the

23  district attorney admit that, even in his view, an unconditional guilty plea qualified

24  as mitigating evidence.  And it knew that the District Attorney was unaware of the

25  unconditional offer Ms. Alfaro had in fact been prepared to make.  Yet it "direct[ed]

26  counsel not to bring up that issue, or the defendant herself if she were to testify not

27  to bring up that issue, without leave of court."  RT 186-87.

28

255

1    12.  By refusing to admit evidence of Ms. Alfaro's willingness to plead guilty,
2  the trial court's error rises to the level of a constitutional violation.  Expressions of
3  remorse by the defendant clearly qualify as relevant mitigation evidence.  *Brown v.*
4  *Payton*, 544 U.S. 133, 143, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005) ("[R]emorse
5  . . . is something commonly thought to lessen or excuse a defendant's culpability.");
6  *Williams (Terry) v. Taylor*, 529 U.S. 362, 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389
7  (2000) (noting that expressions of remorse, along with other mitigating evidence,
8  "might well have influenced the jury's appraisal of his moral culpability");  *People v.*
9  *Smith*, 30 Cal. 4th 581, 627, 68 P.3d 302,134 Cal. Rptr. 2d 1 (2003) ("the presence of
10  remorse is relevant at the penalty phase").  Indeed, few factors have a greater ability
11  to tip the scales in favor of life than the exhibition of remorse by the defendant.
12  *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)
13  ("In a capital sentencing proceeding, assessments of character and *remorse* may carry
14  great weight and, perhaps, be determinative of whether the offender lives or dies.")
15  (emphasis added); Sundby, *The Capital Jury and Absolution:  The Intersection*
16  *of Trial Strategy, Remorse, and the Death Penalty,* 83 Cornell L.Rev. 1557 (1998)
17  (noting death jurors frequently comment that if the defendant had shown some sign
18  that he was sorry they never could have voted for death); *Meyer v. Branker*, 506 F.3d
19  358, 373 (4th Cir. 2007) ("there is broad consensus on the fact that evidence of
20  remorse is extremely important to capital sentencing juries").  *See*, Exhibit 122
21  (Declaration of Denise Coburn) at ¶2; Exhibit 123 (Declaration of Brent Conley)
22  at ¶ 3.

23    13.  Ms. Alfaro clearly demonstrated contrition for her crimes.  She he
24  attempted to plead guilty before trial.  The fact that Ms. Alfaro did not actually plead
25  guilty should not have kept the jury from considering all evidence related to her offer
26  to enter a guilty plea.
27  / / /
28

1 **E.     CONCLUSION**

2      14.  Neither jury was informed that Ms. Alfaro had sought to plead guilty to the

3 charges without any guarantee of leniency, but had been prevented from doing so by

4 her counsel, despite the fact that even the District Attorney recognized that this was

5 mitigating evidence.  The failure to permit the mitigating evidence of Ms. Alfaro's

6 willingness to accept responsibility, violated her Fifth, Sixth, Eighth and Fourteenth

7 Amendment rights.  As a result, her death penalty must be reversed.

8      15.  The foregoing violations of Ms. Alfaro's constitutional rights constitute

9 structural error and warrants the granting of this Petition without any determination of

10 whether the violations substantially affected or influenced the jury's verdict.  *Brecht,*

11 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this

12 claim, the foregoing constitutional violations so infected the integrity of the

13 proceedings that the error cannot be deemed harmless. The foregoing violation of

14 Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's

15 convictions and sentence, rendering them fundamentally unfair and resulting in a

16 miscarriage of justice.

17      16.  The constitutional violations set forth in this claim alone mandate relief

18 from the convictions and sentence.  However, even if these violations do not mandate

19 relief standing on their own, relief is required when this claim is considered together

20 with the additional constitutional errors outlined in the remainder of this petition.

21 Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

22 sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

23 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

24 Cir. 1978).

25 / / /

26 / / /

27

28

**XXV.**

## CLAIM 20:  THE TRIAL COURT COMMITTED MULTIPLE ERRORS CONDUCTING VOIR DIRE FOR EACH OF PETITIONER'S TRIALS

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because trial court committed numerous errors during voir dire.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 4 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires."  *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

1    5.  In support of this claim, Petitioner alleges the following facts, among others

2  to be presented after full discovery, investigation, adequate funding, access to this

3  Court's subpoena power, and an evidentiary hearing.

4  **A.    <u>INTRODUCTION</u>**

5    6.  The capital trial of Maria del Rosio Alfaro involved a number of highly

6  inflammatory facts which, even with the extremes usually associated with death

7  penalty cases, made hers remarkable.  She was only 18 at the time of the crime, a

8  young woman and mother, the victim was a nine-year-old girl who died of multiple

9  stab wounds.  Ms. Alfaro was Hispanic, Autumn Wallace a Caucasian.  Ms. Alfaro

10  had used drugs from an early age, she was poor, she never finished high school.  The

11  trial court itself recognized that Ms. Alfaro's case was anything but ordinary, even in

12  the realm of capital trials.  Because her case could be expected to present jurors with

13  many difficult issues likely to engender strong emotions, the trial court was obligated

14  to employ voir dire methods that would neither overlook jurors whose biases or

15  prejudices made them unfit nor inject prejudice through the court's conduct directing

16  the process.  The trial court failed in each of its obligations.

17    7.  The United States and the California Constitution guarantee that each

18  defendant brought before a court of law to answer to criminal charges and face a

19  possible sentence of death if found guilty shall have a fair and impartial jury decide

20  her fate.  This principle is a fundamental tenet of the American faith in the jury

21  system.  In committing multiple errors while presiding over the voir dire for each of

22  Ms. Alfaro's trials, the trial court did violence to this covenant between the defendant

23  and our constitutions that she is entitled to be judged without bias or prejudice.

24  / / /

25  / / /

26

27

28

259

**B.      THE TRIAL COURT ERRED IN DENYING THE DEFENSE REQUEST FOR ADDITIONAL VOIR DIRE ABOUT THE CHILD VICTIM**

### 1.      Introduction

8.  During the course of jury voir dire in both Ms. Alfaro's first and second trials, Mr. Monroe sought to have prospective jurors questioned on whether they could remain fair and impartial once they learned that the victim in the case was a nine-year-old girl who had been stabbed to death.  The murder of a child provokes people's strongest emotions.  Mr. Monroe sought to determine if certain jurors would find that the only appropriate punishment could be death.  Such deeply human views may be perfectly understandable.  They nonetheless preclude the person who holds them from sitting on a jury in which the defendant could be found guilty of a first degree murder involving a child and in which special circumstances could be found true, and a life or death verdict must then be decided.  Monroe proposed a jury questionnaire which included the questions:

> It is expected that you will hear testimony regarding the multiple stabbing death of a 8-year-old [*sic*] girl.  Do you expect that such testimony would so upset you that you could not <u>honestly</u> be fair and impartial?

> If such evidence is introduced and proved to your individual satisfaction beyond a reasonable doubt, do you believe that would prompt you to automatically urge the death penalty regardless of any potential mitigating factors?

CT 137.  But the trial court refused to allow Mr. Monroe to explore this area of the prospective jurors' biases, claiming that such questions would be asking the individual juror to prejudge the evidence.

9.  The trial court's characterization of Mr. Monroe's proposed questioning was erroneous.  The jurors would not have been asked to prejudge the case.  Rather, Monroe sought to discover those prospective jurors who had in fact prejudged the case in that they had already decided the punishment and would thus improperly disregard any and all mitigating evidence.

10.  In denying the defense request for evidence that would identify jurors who should be stricken for cause, the trial court abused its discretion, and, as a result, deprived Ms. Alfaro of her Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial sentencing jury at each of her trials.

## 2. <u>Where A Particular Factor In A Case Would Cause A Juror To Invariably Vote For Death, That Juror Is Not Fair And Impartial</u>

11.  "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." *People v. Earp,* 20 Cal. 4th 826, 85 Cal. Rptr. 2d 857, 873-74 (1999) (citation omitted). Moreover, when a state provides for jury sentencing, as California does, the right to a fair and impartial jury is as unassailable at the penalty phase as it is at the guilt phase of a capital trial; that right is secured by both the Fourteenth Amendment of the federal Constitution and by the California Constitution. *See* Cal. Const., art. I,  §§ 1, 7(a), 15, 16; *see also People v. Williams*, 16 Cal. 4th 635, 666 (1997) (citing *Morgan*, 504 U.S. at 726-728; *People v. Johnson*, 3 Cal. 4th 1183, 1210-1211 (1992); *see also People v. Gordon*, 50 Cal. 3d 1223, 1248, fn. 4. (1990)). Thus, when a prospective juror's views about the death penalty would "prevent or substantially impair the performance of his [or her] duties as a juror," *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), that juror is not impartial and may be challenged "for cause." *See People v. Danielson*, 3 Cal. 4th 691, 712, 838 P.2d 729, 13 Cal. Rptr. 2d 1 (1992); *see also People v. Coleman*, 46 Cal. 3d 749, 764-65, 759 P.2d 1260 (1988).

12.  "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Morgan,* 504 U.S. at 729-734 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  Therefore, "to preserve the right to a fair and impartial jury on the question of penalty, the death qualification process must probe

261

'prospective jurors' death penalty views as applied to the general facts of the case, whether or not those facts [have] been expressly charged." *People v. Earp*, 85 Cal. Rptr. 2d at 874 (quoting *People v. Kirkpatrick*, 7 Cal. 4th 988, 1004-05, 874 P.2d 248, 30 Cal. Rptr. 2d 818 (1994)).

13. "A prospective juror who would invariably vote either for or against the death penalty *because of one or more circumstances likely to be present in the case being tried*, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause, whether or not the circumstance that would be determinative for that juror has been alleged in the charging document." *People v. Kirkpatrick*, 7 Cal. 4th at 1005 (emphasis added). As the United States Supreme Court stated, "Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty." *Morgan*, 504 U.S. at 738.

14. As a result, although a trial court has "considerable discretion . . . to contain voir dire within reasonable limits," the court may not so restrict voir dire as to preclude inquiry into jurors' views "on one or more circumstances likely to be present in the case" that would cause the juror to invariably vote for the death penalty. *See People v. Kirkpatrick*, 7 Cal. 4th at 1005. Limitations on voir dire examination that create unreasonable risks of biases or prejudice violate a defendant's right to an impartial jury. *See Turner v. Murray*, 476 U.S. 28, 35-37, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986).

15. The Sixth Amendment guarantees criminal defendants trial by an impartial jury. A juror who is not "life-qualified" -- that is, one who would automatically vote for the death penalty after conviction in every capital case -- is not considered impartial. *Morgan*, 504 U.S. at 729. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.*

1   "*Voir dire* plays a critical function in assuring the criminal defendant that his

2   [constitutional] right to an impartial jury will be honored.  Without an adequate voir

3   dire the trial judge's responsibility to remove prospective jurors who will not be able

4   impartially to follow the court's instructions and evaluate the evidence cannot be

5   fulfilled."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629,

6   68 L. Ed. 2d 22 (1981) (plurality opinion).

7       16.  "Were *voir dire* not available to lay bare the foundation of petitioner's

8   challenge for cause against those prospective jurors who would *always* impose death

9   following conviction, his right not to be tried by such jurors would be rendered as

10   nugatory and meaningless as the State's right, in the absence of questioning, to strike

11   those who would *never* do so."  *Morgan*, 504 U.S. at 733-34.  "Inadequacy of *voir*

12   *dire*" itself -- completely apart from whether any of the seated jurors was actually

13   biased -- requires the reversal of a death sentence.  Indeed, this was the result in

14   *Morgan* itself.  *Id.* at 739.

15       17.  As for the substance of voir dire, general questions about prospective

16   jurors' fairness and impartiality are not sufficient to satisfy the Constitution.  *Morgan*,

17   504 U.S. at 735.  The defendant must be permitted to inquire about the jurors' ability

18   to discharge their sentencing obligations in the case at hand.  *Uttecht v. Brown*,

19   127 S. Ct. 2218, 2226, 167 L. Ed. 1014 (2007) (upholding a trial court finding that

20   a prospective juror was disqualified under *Witherspoon v. Illinois*, 391 U.S. 510,

21   88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), because his voir dire questioning revealed

22   that "he had both serious misunderstandings about his responsibility as a juror and

23   an attitude toward capital punishment that could have prevented him from returning

24   a death sentence *under the facts of this case*" (emphasis added)).

25       18.  It is both permissible and necessary to explore juror bias with respect

26   to particular aggravating and mitigating factors likely to be presented to the jurors

27   in the case before them.  *See generally United States v. Johnson*, 366 F. Supp. 2d 822

28   (N.D. Ia 2005).  For example, a prospective juror who states, in response to abstract

questions, that he could vote for life without parole, while in actuality, he could never

so vote in a case of murder of a child, would not be qualified to serve in a child-

murder case.  Such a juror would certainly vote for death following conviction in that

case, rendering the penalty phase a meaningless exercise.  If the defendant were

forbidden from inquiring about the prospective juror's views on the death penalty in

cases of murder for hire, the juror's bias could never be uncovered.  *See State v.*

*Williams*, 113 N.J. 393, 550 A.2d 1172, 1184 (1988) (reversing conviction and death

sentence largely because defendant was prevented from inquiring about prospective

jurors' ability to vote for life in the case at hand, which involved murder and rape);

*see also State v. Maxie*, 653 So. 2d 526, 538, No. 93-2158 (La. 1995) ("A potential

juror who indicates that she will not consider a life sentence and will automatically

vote for the death penalty under the factual circumstances of the case before her is

subject to a challenge for cause."); *People v. Kirkpatrick*, 7 Cal. 4th 988, 1005,

874 P.2d 248, 30 Cal. Rptr. 2d 818 (1994) (as modified) ("A prospective juror who

would invariably vote . . . for . . . the death penalty because of one or more

circumstances likely to be present in the case being tried, without regard to the

strength of aggravating or mitigating circumstances, is therefore subject to challenge

for cause . . . .").

     19.  The same principle applies to types of mitigating evidence.  A juror who

would never consider evidence of an abusive childhood to be mitigating, for example,

is not qualified to sit on a case in which the defendant relies wholly or primarily on

such evidence, even if the juror could, in theory, find some other type of evidence

to have a mitigating effect.  Such a juror could not, in the case at hand, follow the

constitutional imperative to "consider[ ] any constitutionally relevant mitigating

evidence."  *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d

702 (1998); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d

1 (1982) ("Just as the State may not by statute preclude the sentencer from

considering any mitigating factor, neither may the sentencer refuse to consider, as

a matter of law, any relevant mitigating evidence. . . . [Sentencers] determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration.").

20.  Petitioner's voir dire did not live up to the demands of the Constitution -- it was not a serious, meaningful inquiry into the qualifications and biases of the prospective jurors.  In denying the defense's multiple requests for specific inquiries into prospective jurors' views on how the murder of a child would affect their ability to be fair and impartial in determining the appropriate sentence for Ms. Alfaro, the trial court denied Ms. Alfaro a fair and impartial jury.

**3.**   **In this Case, the Defense Urged That the Fact the Victim Was a Child Could Cause Certain Jurors to Invariably Vote for Death**

      **a.**   **First Trial**

21.  Prior to the commencement of Ms. Alfaro's first trial, both Mr. Monroe and the prosecution asked the court to use jury questionnaires prepared by counsel. As noted above, Mr. Monroe proposed two questions designed to elicit jurors' feelings about a child victim.  In a second questionnaire submitted by Mr. Monroe, he proposed the following, similar question:  "Please explain if the fact that the victim in this case is an eight year old little girl would prohibit you from being a fair and impartial juror in this case?"  CT 264.

22.  The court denied each party's request for a juror questionnaire, although it did indicate that it would incorporate some of the questions proposed into the court-conducted voir dire, and invited counsel to submit any additional topics they wished the court to explore.  RT 24 (November 1, 1991 proceedings); RT 125 (February 24, 1992 proceedings).  Mr. Monroe subsequently filed a motion objecting to the court's assuming complete control of the entire voir dire process and asked for time in which to pose additional follow-up questions and to personally voir dire the jury.  The court denied Monroe's request for direct voir dire, as well as his renewed request, made March 2, 1992, to conduct personally some follow up voir dire with jurors once the

265

1  voir dire process started.  RT 353 (March 2, 1992 proceedings).  Although the court

2  had indicated previously that it was "inclined in these kind of cases to allow counsel

3  supplemental voir dire of a limited nature," once voir dire commenced, the court

4  refused to permit counsel to ask any questions of the jurors directly.

5       23.  Jury selection started March 3, 1992.  In addition to its own questions, the

6  court asked nearly verbatim all the questions that the prosecution had previously

7  proposed, including questions addressing jurors' views on specific circumstances that

8  were expected to be presented to the jury as mitigators.  CT 394.  The court refused,

9  however, to ask any of the questions suggested by Mr. Monroe regarding jurors'

10  feelings on the child victim.  Because the court denied the attorneys the opportunity

11  to ask voir dire questions, the only way for Mr. Monroe to probe further into specific

12  jurors' possible biases was to submit follow-up questions to the court.  CT 448.

13  Among the follow-up questions proposed by Mr. Monroe was one asking the jurors

14  what effect the fact that the victim was nine years old would have on the ability of the

15  jurors to be fair and impartial.  CT 452-53.

16       24.  During a meeting between the court and counsel, Mr. Monroe urged the

17  court to ask his question about the child victim, referencing two prospective jurors

18  who had already expressed a possible pro death penalty bias:

19       Mr. Monroe:  We're not trying to prejudge the evidence, but it's
20  something to ask the questions academically.  But then if they are faced
   with that prospect of having to decide, when they hear that about a little
   eight-year-old girl that had been brutally stabbed, like Mr. Lewis, the eye
21  for an eye routine, or Mr. Swanson discounting mitigating factors, they
   might be subject to a challenge for cause under *Witherspoon*.
22

23  The prosecution, however, argued that Monroe was asking the jurors to prejudge the

24  evidence, and the trial court agreed:

25       The prosecution:  But bringing up the facts of the case is not what is
   proper in this case and that's what the defense is doing.  The defense,
26  in my estimation, is afraid because of the violence involved in this case
   that a jury might find that this is violent.  And to tell them the facts of
27  this case to see if they are going to prejudge and say yes, that's violent
   in my mind, I think that's improper.
28

1    The court:  I think it's clearly asking them if you do that, I think is
2    clearly asking them to prejudge the evidence.  The example with
     Mrs. Salta, juror number 7, on page 3 of your supplemental request you
3    say without asking her to prejudge the evidence, would the court
     explore how she would feel if the child were killed as a result of multiple
     stab wounds on somebody analogous thereto [*sic*].  I don't know how
4    you would do that without asking her to prejudge.

5    Mr. Monroe:  What if there are certain kinds of cases wherein some
     of these jurors, like Mr. Swanson, would say under no circumstances
6    could I vote but for the death penalty.

7    The court:  But that's not the issue here in this case.  Let's assume
     that the juror has a mindset that Adolf Hitler should have died under
8    all circumstances.  Adolf Hitler or Charles Manson should have died.
     What does that have to do with what we are dealing with?  That could
9    not be a challenge for cause.

10                                    * * *

11   The court:  I don't know what that shows them other than to ask them
     to prejudge the evidence.  You are trying to get the facts before them
12   it's a little girl and how many times she was stabbed and all of that stuff
     in voir dire and I don't think that's appropriate.  Anyway, I have made
13   the record on this issue and it is filed.

14   RT 210-13.

15        25.  After ruling, the court indicated that it would, when they returned to the

16   courtroom, ask whether either counsel had challenges for cause.  RT 214.  When the

17   court asked Mr. Monroe, he stated: "No, I will not pass for cause.  But if the court is

18   not going to let me explore the questions that I have already posed as part of my

19   follow-up, I don't have any other questions I can ask the jurors right now."  RT 214.

20                    **b.    Second Trial**

21        26.  Prior to voir dire in the penalty phase retrial, Mr. Monroe repeated his

22   request for additional voir dire, again asking the court to inquire of jurors whether the

23   fact that the victim was a child would prevent them from being fair and impartial.

24   CT 1328.  As Mr. Monroe explained to the court once again, his questions were

25   designed to expose jurors who had a predisposition to giving the death penalty

26   regardless of the evidence in any case involving the murder of a child.  RT 2227-33.

27        27.  Although the court agreed with the defense "that jurors' views might

28   be a lot different if it's an infant, a baby, a nine year old, a teenager, and adult,

                                          267

1  whatever the case may be, jurors' views might be different on it," RT 2235, the court

2  again refused to ask prospective jurors whether the victim's age would affect their

3  ability to be fair and impartial.

4      28.  The court did permit both counsel to conduct limited direct voir dire during

5  this second trial.  Based on the views previously expressed by the court, however,

6  Monroe was only able to follow up with questions regarding the appropriate

7  punishment when the victim is a child where the juror had previously volunteered that

8  he or she simply could not be fair because of the age of the victim.  RT 2629-31;

9  3000-03.

10      **4.**    **<u>The Court Improperly Restricted Inquiry Into Jurors' Views</u>**

11          **<u>Regarding a Child Victim</u>**

12      29.  There can be no question that "a case involving a child victim can

13  implicate personal bias . . . ."  *See e.g.*, *State v. Clark,* 981 S.W.2d 143, 147 (Mo.

14  1998) (trial court abused discretion in restricting voir dire on critical fact that victim

15  was three years old); *see also Maddux v. State*, 862 S.W.2d 590 (Tex. Crim. App.

16  1993) (trial court abused discretion by preventing defense counsel from questioning

17  jurors about potential bias because victim was child).  Studies have shown that capital

18  juries are more likely to give the death sentence when the victim is a child.  *See*

19  McCord, *Judging the Effectiveness of the Supreme Court's Death Penalty*

20  *Jurisprudence According to the Court's Own Goals: Mild Success or Mild Disaster?*

21  (1997) 24 Fla. St. U.L.Rev. 545, 589 (stating that "death sentences are not imposed in

22  domestic killings unless there are multiple homicides . . ., overkill . . ., or a child

23  victim. . . .").  In Ms. Alfaro's case, the trial court's failure to ask the jurors

24  specifically about their views and feelings about a case involving a child victim, and

25  the court's limiting Mr. Monroe's ability to probe specifically into this area of

26  potential juror bias during the second trial, was clearly erroneous.

27      30.  Indeed, this Court has recently affirmed the right of a defendant and the

28  obligation of a trial court to probe into jurors views' on specific circumstances

of a case -- especially when the case involves a crime against a child -- as essential to the protection of the defendant's right to a fair and impartial jury.  In *People v. Earp*, *supra*, this Court found that the trial court's use of a jury questionnaire which stated that "the charges against defendant pertained to 'sexual misconduct involving the death of a child,'" and that specifically asked each prospective juror whether those charges would have any effect on the juror's ability to be fair and impartial satisfied the demands of the federal and state constitutions.  *People v. Earp,* 85 Cal. Rptr. 2d at 874.  The Court found that the trial court's questions served to protect the defendant's right to a fair and impartial jury because "[a]nswers to these questions provided an adequate basis for the trial court and counsel to determine whether a prospective juror's views or attitudes about child molestation would prevent the juror from impartially deciding defendant's guilt." *Id.* at 874 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 430, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991); *see also e.g., People v. Sanchez*, 208 Cal. App. 3d 721, 739, 256 Cal. Rptr. 446 (Cal. App. 4th Dist. 1989) (appropriate to ask jurors about experience with and attitudes about case when prosecution expected to introduce evidence about child victim).  Here, in contrast, by failing to ask prospective jurors specifically whether the fact that the victim was a child would impair their ability to be fair and impartial, the trial court deprived Ms. Alfaro of the right to learn "prospective jurors' death penalty views as applied to the general facts of the case." *People v. Kirkpatrick*, 7 Cal. 4th at 1004.

31.  The fact that some jurors were forthright enough to volunteer information regarding their views on a child victim only confirms that the issue of a child victim is particularly sensitive and that the court should have specifically inquired into this area of possible bias with each individual juror. *See Dyer v. Calderon*, 151 F.3d 970, 975-76 (1998) (holding that a trial court has a duty to examine a juror further or take other affirmative steps to uncover potential juror bias).  And surely, the court's failure "to probe into particular jurors viewpoints" cannot be deemed harmless simply because some jurors *volunteered* their feelings.  Jurors may be shy; others reluctant

to state publicly their biases or prejudices.  Only when questioned *directly, with specificity, and under oath*, can both the court and counsel trust that a prospective juror will be obligated to reveal a bias that would cause him or her invariably to vote for the death penalty.  *Cf. Cabe v. Superior Court*, 63 Cal. App. 4th 732, 742, 74 Cal. Rptr. 331 (1998) (juror not subject to perjury prosecution when question poorly crafted and invites misleading and/or incomplete answer); *see also Earl v. Times-Mirror Co.*, 185 Cal. 165, 181, 196 P. 57 (1921).

32.  For example, during voir dire for the first trial, prospective juror Woodruff stated that she remembered the nature of a case on which she previously sat as a juror "because it involved a child -- more than one child I should say."  RT 70.  Prospective juror Eales stated that the age of the victim would be a difficult factor for him.  RT 251.  When asked to elaborate, Mr. Eales stated that "[i]f we see this picture and it turns out that it's a child, that it would be very -- very -- it would make me feel very bad."  RT 251.  The court informed Mr. Eales that the alleged victim in the case is "hypothetically" in the ten-year-old category, and Mr. Eales responded that that might have a real influence on him.  RT 252.  Only after continual prodding from the court did Mr. Eales respond "I think so" to the question of whether he could evaluate the evidence fairly.  RT 252-53.

33.  Other evidence that specific questioning about the child victim would have been likely to reveal bias in this case includes the fact that during the first trial, three prospective jurors had to be excused because they had talked about the facts of the case and they each remembered the case because it involved a child victim.  RT 346, 352.  In another instance, prospective juror Becker stated that "I have two small children living at home.  And I'm wondering about my ability to be impartial in a case like this."  RT 371.  The court then asked if "hypothetically, the victim in our case is a ten-year-old girl, approximately ten years old, do you think that fact alone would cause you to become impartial when you consider your situation?"  RT 372.  Becker responded "I don't know for sure that it could but it might."  RT 372.  The court did

270

not strike Mr. Becker for cause and Mr. Monroe was forced to use a peremptory to remove Mr. Becker from the jury.  RT 372-73.  In another instance, prospective juror Patton volunteered that he had three granddaughters who were witnesses in a trial involving the rape and murder of a ten- or twelve-year-old girl and that he felt strongly about the experience.  RT 463. Mr. Monroe moved to strike Mr. Patton for cause.  RT 465.  The court denied the request and Mr. Monroe again was forced to use a peremptory.  RT 549.

34.    Evidence that bias was likely also emerged during voir dire in the second penalty trial.  In response to the court's question of prospective juror DeYoung, "[d]o you think what you heard about the case and what you recall about it would affect your ability to be a completely fair and impartial juror in the case," (RT 2289), Mr. DeYoung responded, "possibly, because a young child died ... with a child dying, I think it should be a death penalty."  RT 2290.  The court then asked if the death penalty should automatically be imposed in any child murder case and Mr. DeYoung replied, "[u]nless it's accidentally, yes."  RT 2290.  While the court excused Mr. DeYoung for cause, it did not see from his answers the need to more specifically question the other prospective jurors.

35.    Yet again, prospective juror Jans' statement that he was "against murder" and "for the death penalty" evidenced the presence of bias, "especially when I heard children are involved that got killed."  RT 2308.  Mr. Jans told the court that in a case involving the murder of a nine year old during a burglary, his opinion was set that the only appropriate penalty was death.  RT 2308-09.  The court excused Mr. Jans for cause, but despite these repeated examples of bias, the court saw no reason to specifically question the other prospective jurors.  And other examples abound. Prospective juror Rouse told the court that she had read only one article about the case in the Los Angeles Times, but that when she finished reading the article, she made a decision on what she thought the penalty should be, and was excused for cause.  RT 2303.  The same was true for prospective juror Orr.  RT 2311.  Prospective

271

juror Dale, a school teacher, had the insight to recognize that she might be prejudiced because the victim was a child (RT 2337), and prospective juror Anaya admitted that he had a preconceived notion that death was the appropriate punishment, "especially when there is a nine-year-old involved." RT 2364. Prospective juror Fields told the court that "the fact that there is a child involved" weighed heavily on the case and that the nature of the crime was very overbearing (RT 2514), and admitted that she would have a very difficult time keeping an open mind when listening to the evidence after seeing a "picture of a dead nine-year-old girl." RT 2630-31.[26]

36. In striking at least some jurors for cause after they volunteered that they would invariably vote for death once they learned that the victim in the case had been a child, the court recognized that jurors holding such views could not be fair and impartial. But relying on jurors to *voluntarily* reveal their biases cannot satisfy the trial court's *duty* to conduct adequate voir dire in order to discover and remove biased jurors.

37. This Court cannot be sanguine that because some jurors revealed their biases against a defendant accused of a crime against a child, all biased jurors were

---

[26]   Prospective juror Fields: I don't like to think of myself as being a close-minded person. But I think involuntarily it might be closed.

Mr. Monroe: So that you would sit there and listen to what William Monroe said about mitigating factors, but you would really not consider them?

Prospective juror Fields: I would be sitting there listening to what you were saying with the picture of a dead nine year old in my mind.

Mr. Monroe: And would that prevent you, then, from considering those mitigating factors?

Prospective juror Fields: Possibly. Possibly.

Mr. Monroe: You feel, than, that you would not be able to be a fair and impartial juror?

Prospective juror Fields: Under the circumstances, I really can't --
I would try to be fair, but it's very difficult under these circumstances.

RT 2630-2631. The court eventually excused Ms. Fields for cause. RT 2634.

exposed.  Jurors cannot be expected to reveal information they have never explicitly or specifically been asked to reveal.  Thus, it is the law that while jurors are "required to be cooperative, and should volunteer information about any matter which could be construed as rendering them biased . . . *the judge has a corresponding duty.  He or she is required first to ask direct and specific questions*."  *Cabe v. Superior Court*, 63 Cal. App. 4th 732, 741-42, 74 Cal. Rptr. 2d 331 (1998) (emphasis added).

### 5. <u>Conclusion</u>

38.  It is certainly true that the court has considerable discretion in structuring voir dire.  But that discretion is limited by the court's obligation to ensure that the defendant's right to a fair and impartial jury is jealously guarded and to remove "prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence . . . ."  *People v. Earp*, 85 Cal. Rptr. at 874.  Because the trial court refused to permit inquiry into prospective jurors' views on a highly charged, deeply sensitive, emotional circumstance that would be present in Ms. Alfaro's case -- the murder of a child -- it is likely that biased jurors sat on the jury. As a result, her death sentence must be overturned as her fundamental Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated.  *See Morgan*, 504 U.S. at 739.

## C. <u>THE TRIAL COURT ERRED IN REFUSING TO EXCUSE JUROR PATTON FOR CAUSE AND IN FAILING TO GRANT THE DEFENSE ADDITIONAL PEREMPTORY CHALLENGES</u>

### 1. <u>Introduction</u>

39.  As discussed in Section A.4 above, prospective juror Patton expressed feelings to the court suggesting that he would have difficulty being a fair and impartial juror on a trial involving the murder of a young girl.  Mr. Patton made his strong feelings known to the court during voir dire in the first when he asked to speak to the court and counsel outside the presence of the other jurors.  In a conference in chambers, Mr. Patton tearfully disclosed that a ten to twelve year old friend of his

273

1   young granddaughters had been murdered and raped:  "the girl was at their home and

2   they took her from their home and sometime in the next few hours she was murdered

3   and raped.  And these girls have been subject to going to trial for the last couple of

4   years."  Mr. Patton explained that this -- by which he apparently meant the nature of

5   Ms. Alfaro's case -- was "emotional to me."  Nevertheless, in response to the court's

6   question, "How do you feel your emotional feelings would impact your fairness in

7   this case here?," Mr. Patton answered, "I don't think it would have any impact on the

8   case.  I think I could act fair in this trial."  After asking but one follow-up question,

9   the court asked Mr. Patton to return to the courtroom and denied Mr. Monroe's

10  request for additional questioning and his motion to strike for cause.  As a result,

11  Mr. Monroe was forced to use his last peremptory challenge to strike Mr. Patton.

12  When Mr. Monroe requested additional peremptory challenges, the court denied his

13  request.

14      40.  Based on the personal experience Mr. Patton emotionally described --

15  the death of a child near Autumn Wallace's age who had been a friend of his

16  granddaughters and was with them immediately before she was taken from their home

17  and raped and murdered -- the court erred by failing to strike him for cause or, at the

18  very least, take more care to insure that he could put his emotions aside.  A number

19  of other jurors expressed concern about the fact that the victim was a child, and most

20  of them remained in the venire.  The court's error deprived Ms. Alfaro of her right

21  to a fair, impartial, and unbiased jury in violation of her Fifth, Sixth, Eighth and

22  Fourteenth Amendment rights.

23          **2.**     **Statement of Facts**

24      41.  On the third day of voir dire for Ms. Alfaro's first trial, Albert Patton was

25  called to the jury box for questioning as a prospective juror.  RT 442.  Other than

26  informing the court that his granddaughters have informed him that their father

27  (his deceased daughter's former husband) does dope, Mr. Patton answered the court's

28  general questions unremarkably, but then asked to speak with the court in chambers

274

1   outside the presence of the other jurors.  RT 461.  During the next break, the court

2   and counsel met in chambers with Mr. Patton.  The court asked Mr. Patton what he

3   wished to talk about:

4          Mr. Patton:  Well, it's just I'm emotional.  Like I said before, I have three
           granddaughters.  And my daughter is deceased.  And they were -- had to
5          go to court because of a girl being murdered and raped.  A little girl, ten
           or twelve.  And the girl was at their home and they took her from their
6          home and sometime in the next few hours she was murdered and raped.
           And these girls have been subject to going to trial for the last couple of
7          years.  And that's all.  But it's just emotional to me.

8          The Court:  Okay.  How do you feel your emotional feelings would
           impact your fairness in this case here?
9
           Mr. Patton:  I don't think it would have any impact on the case.  I think
10         I could act fair in this trial.

11         The Court:  All right.  There may be evidence in the case that the victim
           in our case is a young girl, ten to twelve years old.  Is that going to have
12         any --

13         Mr. Patton:  I don't think that would weigh my factor. [*Sic.*]

14         Mr. Monroe:  Your honor, if the court would approve, perhaps --

15   RT 463.  Before Mr. Monroe could continue, the court had Mr. Patton leave the room.

16   The court and counsel remained in chambers, and the following discussion ensued:

17         Mr. Monroe: Would the court touch on the photograph issues with some
           of the newer jurors, the fact that they may be viewing grisly
18         photographs?

19         The Court:  I haven't done it recently but it's a topic that several jurors
           have brought up on their own.  They are aware that we talked about it,
20         so when I asked about these topics, I haven't talked about it.  Seems like
           the jurors that have a concern about it, bring it up.
21
           Mr. Monroe:  My concern with Mr. Patton would be --
22
           The Court:  I can ask Mr. Patton some more questions along those lines.
23
           Mr. Monroe:  I think you would have to share those terrible experiences
24         either by body language or speaking about it in jury deliberations, if he
           was in the jury.  It's a terrible thing for the man to go through with his
25         grandchildren.

26         The Court:  That's true.  I don't have any problem with that. That doesn't
           mean they think everybody accused of a crime is guilty.
27
           Mr. Monroe:  It would have an effect on the jury.
28

275

1    The Court:  It may or may not have.  If you're making a challenge for
     cause -- I don't know if you are.

2    Mr. Monroe:  I would challenge for cause right now.

3    The Court:  You want to state the basis of it?

4    Mr. Monroe:  That his feelings that he expressed here, both in his
5    emotion and the fact that he was crying, is something that is going
     to impact him despite his disclaimer.  If it happened here when we are
6    talking about things in the abstract, when those photographs come in,
     if he were a juror, it is almost impossible for him to be able to separate
7    his personal tragedy from the tragedy of this trial.  And I think that
     would taint the other members of the jury.  I don't believe that he could
8    truly be fair and impartial under these circumstances.

9    The Court:  Does the District Attorney care to respond?

10   Mr. Middleton:  I don't have a degree in psychology, so I can't really
     read the man as far as what he's going to do in the future.  It looks like
11   he said it wouldn't affect him, he would try to keep it out.  It was mainly
     talking about his granddaughter and that's something close and dear
12   to him.  That is altogether different.  I think if he did truly feel that
     he couldn't do it, he would tell us.
13
     The Court:  That's the impression I got.  I asked him and robed into that
14   area *a little bit* to try to make sure that -- and I have no reasons to suspect
     that he's being anything other than candid with the court.  And for those
15   reasons, the court is going to deny the challenge for cause to excuse
     Mr. Patton.
16

17   RT 464-66 (emphasis added).

18        42.  After voir dire resumed, the court indicated to Mr. Patton that there might

19   be some evidence such as "a videotape that might show part of the alleged crime

20   scene, and there may be some photographs of the decedent."  RT 470.  The trial judge

21   then asked him:  "Do you believe you would be able to examine that kind of evidence

22   and not have a strong -- a strong emotional reaction to it?"  RT 470.  Mr. Patton

23   responded, in full, "I think I could." RT 470.  The court then said, "All right.  All

24   right.  The topic we touched on just before lunch when everyone else left, have you

25   thought more about it over the lunch hour?"  Mr. Patton responded, "Well, yes, I

26   think about it whenever."  He went on to say that he would not change the answers

27   he had given previously; "I don't think it would have any effect on the way I would

28   think in a different case."  RT 470-71.  The district attorney then passed Mr. Patton

                                    276

1   for cause; Mr. Monroe "rest[ed] on his remarks in chambers," and Mr. Patton
2   remained in the venire.  Thereafter, Mr. Monroe was forced to use his final
3   peremptory strike to remove Mr. Patton from the jury.  RT 549.

4       43.  A number of other jurors volunteered that the age of the victim might
5   affect their ability to be fair and impartial as well.  For example, Mr. Monroe was
6   required to use a peremptory strike to remove Mr. Eales after Mr. Eales stated that the
7   age of the victim would be difficult for him (RT 251), and that "[i]f we see this
8   picture and it turns out that it's a child, that it would be very -- very -- it would make
9   me feel very bad."  RT 251.  Mr. Monroe used a peremptory to strike Mr. Becker,
10  although Mr. Becker had revealed that he had two small children living at home and
11  wondered about his ability to be impartial.  RT 371.  The court's inadequate voir dire
12  makes it impossible to know how many other jurors should have been stricken for
13  cause.  Mr. Swanson, for example, who extolled an "eye for an eye" ethic and
14  essentially admitted that he would have a difficult time finding mitigating
15  circumstances, (*see* RT 94-102), would undoubtedly have been subject to removal
16  for cause if the court had questioned him sufficiently.  Instead, Mr. Monroe was
17  forced to use a peremptory.  RT 218.  The same inadequate voir dire of prospective
18  juror Lewis, whose pro-death penalty views revealed a "substantial impairment"
19  in his ability to consider mitigating evidence, forced Mr. Monroe to use a peremptory
20  strike to remove him from the jury.  RT 217.

21      44.  After exhausting all of his peremptory challenges, Mr. Monroe requested
22  an in-camera hearing in order to move for more.  RT 557.  In chambers, Mr. Monroe
23  told the court:

24      Move for additional perempts.  I feel that I have had to use my perempts
        for people who should have otherwise been challenged for cause,
25      specifically the last one I exercised my perempt on, juror number nine,
        who was Mr. Patton.
26
27          In addition, the fact that the court would not use all of my follow-
        up questions before to determine whether or not we had people who
28      should have been further explored for challenge for cause.

The Court:  All right.  District Attorney have any position in the matter?

Mr. Middleton:  Yes, my position is the court's made all the proper rulings up to this point and there's no more challenges for cause, period.

The Court:  Well, the -- I'm not going to argue with you about whether the court asked all your appropriate follow-up questions that I felt were appropriate, and I think the jury's been thoroughly voir dired.  And I never got any additional supplemental questions from counsel, nor has counsel ever attempted to make a showing of any kind of cause for any direct voir dire in the case.  So for those reasons, the request for additional peremptory challenges is denied.

RT 557-558.  Mr. Monroe objected to the jury as constituted, the court overruled his objection, and the jurors were sworn.  RT 559.

**3.**     **The Defense Was Forced To Exhaust All Of Its Peremptory Challenges As A Result Of The Trial Court's Failure To Strike For Cause Jurors Who Had Strong Feelings That Would Render Them Biased Against Petitioner**

45.  The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors.  "It cannot be gainsaid that a fair system for the administration of justice must include the guarantee of 'an impartial jury' for the criminally accused."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977); *see generally Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *Irvin*, 366 U.S. at 722.  If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied her right to an impartial jury.  *See U.S. v. Hendrix*, 549 F.2d at 1227; *see also Dyer v. Calderon*, 151 F.3d 970, 973 (1998) ("The bias or prejudice of even a single juror would violate [the defendant's] right to a fair trial.").

46.  This Court has held, "[t]o complain on appeal of the composition of the jury, the defendant must have exhausted [all of her peremptory] challenges."  *Coleman*, 46 Cal. 3d at 770; *see also People v. Kirkpatrick*, 7 Cal. 4th 988, 1005 (1994).  "[E]xhaustion of peremptory challenges is a 'condition precedent' to an appeal based on the composition of the jury."  *Coleman*, 46 Cal. 3d at 770; *People v.*

278

*Ramos*, 15 Cal. 4th 1133, 1158-1159, 938 P.2d 950 (1997).  Because the trial court's error forced the defense to consume all peremptory challenges, and because Mr. Monroe complained of the jury as constituted, Ms. Alfaro's claim that the first jury responsible for determining her guilt and proper sentence was neither fair nor impartial is properly before this Court.

**4.     The Trial Court Erred In Failing To Remove Mr. Patton For Cause**

47.   The court should have removed Mr. Patton for cause.  Mr. Patton had strong enough concerns that the painful emotions surrounding his granddaughters' participation in a trial involving the murder and rape of their young friend might somehow affect his role as a juror in a trial involving the murder of a young girl that he felt compelled to bring this information to the court's attention.  Mr. Patton was obviously disturbed enough about the situation to seek a private meeting with the court in chambers and distressed enough to cry in the presence of strangers.  Although Mr. Patton gamely responded to the court's completely inadequate inquiry about his ability to remain fair, the court needed either to inquire further into the extent of his concerns or simply dismiss Mr. Patton for cause based on his obvious agitation.

48.   The trial court acknowledged that it had probed into the depths of Mr. Patton's feelings only "a little bit."  RT 464-66.  The court's cursory examination did nothing to explore the extent of Mr. Patton's emotions and how those emotions would impact his ability to fairly and impartially assess the evidence.  Simply asking Mr. Patton whether he could be fair put Mr. Patton in the uncomfortable and unrealistic situation of having both to recognize that, in fact, he did have biases and to then admit as much in a public setting.

49.   The United States Supreme Court acknowledges, particularly in the context of the death qualification process, that asking jurors general questions about their ability to be fair does little to illuminate whether they can, in fact, be fair.  The Court has stated that "[a]s to general questions of fairness and impartiality, [biased]

1   jurors could in all truth and candor respond affirmatively, personally confident that

2   such dogmatic views are fair and impartial, while leaving the specific concern

3   unprobed." *Morgan*, 504 U.S. at 733.  As discussed above in Section A.4, only when

4   a juror has been questioned *directly, with specificity, and under oath*, can both the

5   court and counsel trust that a prospective juror will be obligated to reveal a bias that

6   would cause him or her invariably to vote for the death penalty.  *Cf. Cabe v. Superior*

7   *Court*, 63 Cal. App. 4th 732, 742 (1998) (juror not subject to perjury prosecution

8   when question poorly crafted and invites misleading and/or incomplete answer); *see*

9   *also Earl v. Times-Mirror Co.*, 185 Cal.165, 181 (1921).

10      50.  "[B]ias is seldom overt and admitted.  More often, it lies hidden and

11  beneath the surface." *People v. Taylor*, 5 Cal. App. 4th 1299, 1312-1313,

12  7 Cal. Rptr. 2d 676 (Cal. App. 2d Dist. 1992).  An individual juror may have

13  an interest in concealing his or her own bias, or a juror may very well be unaware of

14  his or her biases. *See Smith v. Phillips*, 455 U.S. 209, 221, 222 (1982) (O'Connor, J.

15  concurring).  "'[B]ecause . . . bias is a thief which steals reason and makes unavailing

16  intelligence -- and sometimes even good faith efforts to be objective -- trial judges

17  [must, where appropriate, be willing to ask] prospective jurors relevant questions

18  which are substantially likely to reveal such juror bias or prejudice, whether

19  consciously or unconsciously held.'" *People v. Taylor*, 5 Cal. 4th at 1312-1313

20  (quoting *People v. Wells*, 149 Cal. App. 3d 721, 727, 197 Cal. Rptr. 163 (Cal. App.2d

21  Dist. 1983)).

22      51.  His daughter having died, Mr. Patton had custody of his granddaughters

23  and cared for them deeply.  A young friend of theirs had been murdered only a few

24  hours after having been in their company.  Mr. Patton's anguish stemmed no doubt

25  in part because he would naturally think that his granddaughters could have been

26  victims as well; that, "but for the grace of God," they, too, might have been murdered.

27  The conspicuousness of Mr. Patton's struggle with the impact of his granddaughters'

28  experience as it related to the facts of this case demanded that the court either inquire

280

more deeply into its effect on him or simply dismiss him for cause.  For the court only to have asked Mr. Patton "a little bit" about his feelings, when he stood before the court and counsel in tears, and when the issue of a child victim as a general matter is already a highly emotional issue, was inexcusable.

52.  That Mr. Patton himself stated that he could be fair should have done nothing, by itself, to reassure the court that Mr. Patton would be able to put aside his obviously very intense feelings regarding the murder of a child when evaluating the accusation that Ms. Alfaro had murdered a child.  That Mr. Patton wanted to believe that he could be fair is entirely understandable; that Mr. Patton himself may not have been fully aware of how this deeply disturbing experience would affect him during jury deliberations is highly probable.  *See Dyer v. Calderon*, 151 F.3d at 973-74.  The evidence of Mr. Patton's biases was too clear and the danger arising from a failure to strike a biased juror too great for the court to have been confident that its inquiry was sufficient and for refusing to strike Mr. Patton for cause.  And he is but the most egregious example of the trial court's failure to strike for cause.

**5.    Conclusion**

53.  Mr. Monroe was forced, at a minimum, to use five peremptory strikes to remove jurors who should have been removed for cause.  As a consequence, the court's errors denied Ms. Alfaro her fully statutory allotment of twenty peremptory challenges and resulted in a jury neither fair nor impartial. The trial court's failure to permit adequate voir dire and to strike Mr. Patton for cause resulted in a denial of Ms. Alfaro's Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury.

/ / /

/ / /

1    **D.     THE TRIAL COURT ERRED BY DENYING THE DEFENSE REQUEST**
2           **FOR SEQUESTERED VOIR DIRE DURING THE DEATH**
3           **QUALIFICATION PROCESS**

4           **1.     Statement of Facts**

5           54.  Prior to the commencement of both the guilt phase and the second penalty

6    phase trials, Mr. Monroe asked the court to interview jurors individually during the

7    death qualification process pursuant to its authority under the California Code of

8    Civil Procedure § 223.   Ms. Alfaro's case involved a number of potentially

9    inflammatory factors, including the fact that the victim was a nine-year-old child, the

10   victim was Caucasian and the defendant was Hispanic, the defendant was a grade

11   school "dropout," at a time when drug related crime was at its height, the defendant's

12   own lawyer described her as a "hyped out kid," and finally, the fact that Ms. Alfaro,

13   at 18, was an unwed mother and her eleven-month-old child had been with her on the

14   day of the crime. Mr. Monroe argued, as recognized by this Court in *Hovey v.*

15   *Superior Court*, 28 Cal. 3d 1, 70-71, 616 P.2d 1301, 168 Cal. Rptr. 2d 128 (1980),

16   that individual questioning of jurors would facilitate truthfulness and full disclosure

17   during voir dire, and insulate each individual juror from the potentially prejudicial

18   effect of repeated exposure to the death qualification process.  The prosecution

19   opposed the request for sequestered voir dire, although it had joined the defense in

20   requesting questioning by counsel and the use of juror questionnaires.  But the court

21   denied both the defense request for sequestered voir dire and the parties' requests for

22   attorney conducted voir dire and a questionnaire.

23          **a.     First Jury**

24          55.  On November 1, 1991, the court denied without prejudice the defense

25   pre-trial request for sequestered voir dire.  Concluding that Proposition 115 had

26   "overruled the requirements of the *Hovey* case," RT 17 (Nov. 1, 1991 proceedings),

27   the court stated:

28

Let me address the easiest one first. *People* versus *Hovey*. My understanding was one of the principal reasons Proposition 115 passed was to eliminate -- the court overruled the requirements of the *Hovey* case. I recognize the court would have discretion to have individual voir dire, but counsel hasn't pointed out on the *Witherspoon* type of voir dire any unique aspect of the case, to my knowledge, that would separate this case from any other special circumstances case insofar as individual voir dire on death penalty qualifications. If you want to address that issue -- I didn't see it in your papers. It just appears that you are urging the court because the charge is a capital case we are entitled to *Hovey* voir dire period. In your response you indicate that even though Prop. 115 might have overruled *Hovey*, the court still has discretion to do it. I agree with that and I would exercise my discretion to allow it if there was some unique fact of this case that would separate it just from the ordinary, if there is such a thing, capital case. I didn't see that in here and that might be an issue you want to address.

My tentative ruling on the issues are number one, I think there is a pretty strong public policy and legal policy behind Proposition 115. I'm not inclined, unless there is some unusual circumstances, to allow *Hovey* voir dire.

*Id.* at 18.

56.  On February 24, 1992, in the week preceding jury selection, the court and both counsel met to address outstanding issues related to voir dire. Mr. Monroe inquired again into whether the court would permit sequestered voir dire. Mr. Monroe asked:  "The court is also rejecting the *Hovey* voir dire; is that correct?" RT 126 (February 24, 1992 proceedings). The court repeated that the right to individualized voir dire had been intentionally eliminated by the Legislature since *Hovey*.

The Court:  I'm not rejecting the *Hovey* voir dire. It's not permissible under Proposition 115.

Mr. Monroe: Would the court consider cluster voir dire, say a group of twelve --

The Court:  You can make whatever proposal you want. You should consider Proposition 115. It has been affirmed by the California Supreme Court and you can make whatever suggestions you want to make. But it's my impression that Proposition 115 was specifically designed to basically do away with *Hovey* voir dire and I don't know why this court wouldn't follow the mandates of Prop. 115.

RT 126 (February 24, 1992 proceedings)

57. Jury selection for Ms. Alfaro's first trial began on March 3, 1992. Each prospective juror seated in the jury box was questioned in the presence of the entire venire. Following each strike either for cause or peremptory, new jurors were called from the venire and the death qualification process began anew. RT 56.

58. The vast majority of the court's voir dire questions were death qualification questions. Some were designed to elicit the jurors' views on the death penalty generally. Others asked how the presence of certain characteristics, specific to Ms. Alfaro or to the crime, might affect their willingness to impose a death sentence. *See, e.g.*, RT 73-180. The court took the specific questions it asked verbatim from those proposed by the prosecution. *See, e.g.*, CT 394-95.

59. The court began by asking each juror whether his or her views on the death penalty would cause him or her to "refuse to find the defendant guilty of first degree murder even though you personally believe the defendant to be guilty . . . just to prevent the penalty phase" or to automatically refuse to vote for death. *See, e.g.*, RT 77-78. In the presence of the entire venire, each juror was also asked whether any members of the juror's family, friends or co-workers had strong views on the death penalty (RT 89); whether the juror had any moral, philosophical or religious views that "might affect your jury deliberations on the death penalty" (RT 124); and whether their "sympathetic or compassionate nature" would prevent them from voting for death. RT 144. The court phrased approximately ten out of twelve of its questions in a way calculated to screen for jurors who would be inclined to vote against the death penalty; the court asked only one question to screen for jurors who would be inclined to vote for the death penalty. *See, e.g.*, RT 120-121.

60. The court also asked each jurors questions addressing specific characteristics of the crime and Ms. Alfaro. As noted above, most of these questions were taken verbatim from the questions proposed by the prosecution. *See, e.g.*, CT 394-95. The phrasing of these questions was clearly geared towards spotlighting jurors who would be reluctant to vote for the death penalty if any of the identified

factors or characteristics were present.  At the same time, the court molded the potential jurors approach to the case.  The court asked whether the jurors felt "that the death penalty should only be reserved for multiple-victim cases?" (*see, e.g.*, RT 124); whether they "believe[d] in any particular adult age at which a person should never receive the death penalty, no matter how vicious or cruel the crime might be committed?" (*see, e.g.*, RT 128); whether they would "require that the defendant have a past history of violence before you would ever consider voting for the death penalty?" (*see, e.g.*, RT 129); whether any of the jurors "believe[d] that the state should never execute a woman no matter how vicious or cruel the crime is that she may have committed?" (*see, e.g.*, RT 131), and whether they "would find it more difficult to vote to impose the death penalty in a case where the defendant is a Mexican-American than you would if the defendant were white?"  *See, e.g.*, RT 132.  The court asked the jurors a single, non-specific question devised to explore their willingness to consider mitigating evidence.  *See e.g.*, RT 121.

61.  The court repeated this series of questions sixteen times.  *See* RT 222-581.

**b.   Second Jury**

62.  The first jury found Ms. Alfaro guilty of first degree murder and found true the special circumstances but could not decide on the appropriate penalty.  After three days of deliberation, the court declared a mistrial on April 8, 1992.  Jury selection for the second penalty phase trial began five weeks later.

63.  Prior to the commencement of the second voir dire, Mr. Monroe asked the court to consider either sequestered voir dire during the death qualification process or voir dire in small groups, thereby limiting the potential jurors' exposure to the questions intended to insure willingness to impose the death penalty.  RT 2222.  In addition to the case-specific factors that weighed in favor of sequestered voir dire in the first trial, Mr. Monroe learned from a letter to the court from the first jury's foreman, J.W. Abouchar, that voir dire in the first trial had failed to identify four or five jurors as "implacable deaths."  CT 83-84 (April 21, 1992 proceedings).  The

1  foreman had written to the court to express his views about the case and to inform
2  the court that one of the jurors had been, in Mr. Abouchar's opinion, "against
3  the death penalty," a "bleeding heart," and a "liberal of the seventies." The tone
4  of Mr. Abouchar's letter was decidedly hostile to the defense.  Supp. CT 83-84.
5  Mr. Monroe clearly hoped, by conducting sequestered voir dire, to uncover others
6  who were biased against Ms. Alfaro and the defense.  RT 2222-23.

7      64.  This second time around, the court again denied the request for either
8  sequestered or cluster voir dire:

9      [T]hat's extremely time consuming and I'm not sure the beneficial
       effects of it are that great. So I'm going to deny your request for *Hovey*
10     or cluster voir dire for right now without prejudice in the event it looks
       like that would be required.
11

12 RT 2224-25.

13     65.  Jury selection began on May 11, 1992.  As in the first jury selection
14 process, most of the court's questioning focused on the jurors' views about the death
15 penalty.   And, as with the first jury, the court's formulation of questions primarily
16 targeted jurors who expressed disapproval of the death penalty.  Focused on the
17 foreman's characterization of one juror as "against the death penalty," the court
18 aggressively screened jurors who expressed any hint of disapproval for the death
19 penalty.  "I was going to add a few topics primarily to cover topics suggested by
20 Mr. Abouchar in his letter to the court."  RT 2220.

21     66.  During selection of the second jury, Mr. Monroe repeated his request
22 for sequestered questioning when one of the prospective jurors revealed to the court
23 and counsel that she had "fibbed" the previous day about having undergone
24 counseling and treatment for depression.  RT 2564.  Mr. Monroe again suggested
25 that individual questioning would provide jurors with an environment in which they
26 would feel more comfortable revealing relevant, sensitive information about
27 themselves, as well as revealing their biases and prejudices.  RT 2565.  The court
28 again denied the request.

286

67.  Voir dire took five days.  During this second selection process, the court permitted both counsel to conduct limited voir dire themselves.  Because counsel were restricted to following up in areas covered by the court, this only increased the jurors exposure to questions regarding their willingness to impose the death penalty.

68.  The court's questions were particularly prejudicial.  They were clearly constructed to ferret out those jurors who had any qualms against the death penalty generally or who might hesitate in applying it to Ms. Alfaro.  In addition to asking jurors whether they had strong feelings against the death penalty at the time of trial, the court asked whether they had *ever* "in [their] past been against the death penalty?" *See, e.g.*, RT 2521, 2525, 2583.  The court also again asked jurors whether they felt "the death penalty should only be applied in murder cases where there is more than one victim?" (*see e.g.*, RT 2527, 3042); where they would "require a defendant to have a past history of violence before [they] would even consider voting for the death penalty as a reasonable probability?" (*see, e.g.*, RT 2528, 3042), whether any of them "believe[d] there is any particular adult age, it might be a young age or an old age, at which a person should -- at which a person should never receive the death penalty no matter how vicious or cruel the crime is that may have been committed?" (*see, e.g.*, RT 2528), and whether they "believe[d] that the state should never execute a woman, no matter how vicious or cruel the crime is that she may have committed?"  *See, e.g.*, RT 2528.

69.  When one juror expressed some discomfort with the death penalty but indicated a willingness to consider it in certain circumstances, rather than accepting the juror's statement that he would follow the law and consider the penalty, the court asked the juror to describe specifically under what circumstances he would find the penalty appropriate.  RT 2584.  Responding to the court's request that he explain how he would describe his feelings about the death penalty to his friends, the juror responded, "As I sort of indicated before, I feel it is appropriate under certain circumstances."  RT 2584.  Dissatisfied with this adequate and proper response, the

1   court pressed:  "All right.  Do you want to give me an example in your mind of the

2   circumstances under which you think it might be appropriate."  RT 2585.

3       70.  Both indirectly and directly, the court revealed its personal approval of the

4   death penalty to the entire venire.  When explaining that the law requires "special

5   circumstances" to distinguish capital from non-capital offenses, the court expressed

6   satisfaction that "killing a judge" qualified as a special circumstance in California.

7   RT 2765.  Later, when a juror expressed frustration that the legal process had taken so

8   long in the Robert Alton Harris case, the court responded:

9           I couldn't agree with you more wholeheartedly, okay?  And I don't mean
            to pass the buck, because people think a judge is a judge just like they
10          think lawyers are lawyers are lawyers.  But those last-minutes stays that
            were issued in that case were all done by the federal court, primarily the
11          Ninth Circuit Court of Appeal.  Unfortunately, state court judges don't
            have any control over them.  So whatever frustration you have about
12          that, please don't blame us for that, okay?

13  RT 2837.   Rather than fulfilling its duty to ensure an impartial jury, the court in Ms.

14  Alfaro's case sought out a jury predisposed to return a sentence of death.  In failing to

15  insulate the jurors from the effects of its questioning by conducting individual voir

16  dire, the court unfairly infected the entire venire.

17      **2.      The Trial Court Failed To Exercise Its Discretion To Hold**

18              **Sequestered Voir Dire, Resulting In A Capital Jury That Was**

19              **Conditioned To Impose The Death Sentence**

20          **a.      In Capital Cases Courts Must Be Especially Vigilant To Guard**

21                  **Against Biased Jurors**

22      71.  In denying the defense request for sequestered voir dire of jurors during

23  the death qualification process, the trial court denied Ms. Alfaro a reasonable

24  procedure designed to intelligently and meaningfully determine the bias or prejudices

25  of jurors.  *See Irvin*, 366 U.S. at 722; *see also People v. Wheeler*, 22 Cal. 3d 258, 272

26  (1978); *People v. Balderas*, 41 Cal. 3d 144, 187-190, 711 P.2d 480 (1985).  As

27  a result, her conviction must be reversed.

28

288

72.  A criminal defendant is guaranteed the right to a fair trial by an impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States and under the California Constitution.  *See* Cal. Const., art I, §§ 1, 7, 13, 15, 16, 17.  The United States Supreme Court recognizes that in capital trials, "the jury is called upon to make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves.'"  *Turner v. Murray*, 476 U.S. 28, 33 (1986) (citations omitted).  Because of the range of discretion entrusted to such a jury, and because of the "qualitative difference of death from all other punishments," (*id.* at 35), the court must be especially vigilant to guard against allowing jurors whose biases or prejudices would prevent them from being impartial and following the dictates of the law from remaining in a capital defendant's venire.

73.  The standard a court applies when determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *see also Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (death sentence illegal when imposed by jury from which veniremen were excluded simply because they voiced general objections to the death penalty).  This standard applies to exclude prospective jurors whose opposition to the death penalty would substantially impair their ability to follow the law as well as to exclude prospective jurors biased in favor of death.  *See Morgan*, 504 U.S. at 729; *see also Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); *Coleman*, 46 Cal. 3d at 763-765.

74.  The principle animating the so-called *Witherspoon/Witt* "death qualification process" -- the questioning of prospective jurors in a capital case on their views about the death penalty -- is that "where an *adversary* wishes to exclude a juror because of bias," the adversary seeking exclusion should be permitted to demonstrate, through questioning, that a potential juror lacks impartiality.  *Witt*,

469 U.S. at 423 (emphasis added). The trial court's duty is to determine whether the challenge is proper. *Id*. Further, the standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* at 424. The Court in *Witt* recognized that "'veniremen' may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Id.* at 425. Thus, the purpose of the *Witherspoon/Witt* questioning is to elicit, as thoroughly as possible, jurors pro or anti-death penalty biases. The trial court is then called upon to assess whether a juror's viewpoint -- *regardless of whether it is an anti death penalty viewpoint or a pro death penalty viewpoint* -- will substantially impair that juror's ability to be fair and impartial.

### b.    *Hovey* v. *Superior Court*

75.  In California, prior to 1990 and the passage of Proposition 115, this Court found, in *Hovey v. Superior Court*, 28 Cal. 3d 1 (1980), that individual, sequestered questioning of prospective jurors during the death qualification process provided the best environment to uncover jurors' biases and prejudices and insulate jurors from the deleterious effects of repeated exposure to the death qualification process itself. *See e.g.*, *People v. Freeman*, 8 Cal. 4th 450, 482, 882 P.2d 249, 34 Cal. Rptr. 2d 558 (1994) ("while 'death-qualifying the jury,' the Court and parties questioned the prospective jurors individually, as mandated in *Hovey*"); *People v. DeSantis*, 2 Cal. 4th 1198, 1217 (1992) ("*Hovey* . . .requires, in a capital case, a sequestered examination of prospective jurors."); *People v. Visciotti*, 2 Cal. 4th 1, 50-1, 825 P.2d 388 (1992) ("the right to a sequestered voir dire was recognized in response to concerns of capital defendants over the potentially prejudicial effects of an open voir dire on jurors' views and willingness to reveal their views about capital punishment"). In *People v. Avena*, 13 Cal. 4th 394, 412 (1996), the trial court "asked each prospective juror in camera his or her views on the death penalty . . . ." This was because *Hovey*, "requir[es] sequestered jury voir dire due to the potential bias that may result from the process of death qualifying prospective jurors."

76.  The Court's insight in *Hovey*, which was supported by research, was that repeatedly exposing all jurors to the death qualification questions "create[d] in the minds of the jurors certain expectations unfavorable to the accused and predispose[d] the jurors to receive and interpret evidence in ways unfavorable to the defense." *Hovey*, 28 Cal. 3d at 69.  The Court noted that "[t]hese repeated displays of concern about the death penalty before any evidence of guilt has been presented may prompt the jurors to infer that the court and counsel assumes the penalty trial will occur." *Id.* at 71-72.

77.  The Court also recognized that people naturally look to authority figures when they find themselves in novel or unfamiliar circumstances and that, in the courtroom, the judge is the foremost figure of authority.  The Court realized that when confronted with the peculiar process of voir dire in a capital trial, "[j]urors undergoing death-qualification would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion.  Only such an inference could serve to explain to the jurors why so much time and energy are devoted to an extensive discussion of penalty before trial." *Id.* at 71.  Thus, the Court noted, "[a] capital jury, which has been predisposed by virtue of the very process by which it has been selected to think the accused guilty in advance of trial, is unlikely to function properly or maintain its neutrality." *Id.* at 72.

78.  The Court further acknowledged that group death qualification not only may make a jury more prone to convict, but may also "alter the states of mind of the jurors exposed to it in ways which make them more likely to impose a death sentence." *Id.* at 73.  Thus, the Court found that "a process which systematically reduces whatever 'doubts about the wisdom of capital punishment' or 'reluctan(ce) to pronounce the extreme penalty' is as constitutionally infirm as a jury from which individuals who hold such views are systematically 'culled.'  Neither jury can 'speak for the community.'  Both juries are 'less than neutral' with respect to the

1   choice of penalty." *Id.* at 74 (quoting *Witherspoon,* 391 U.S. at 520) (citations

2   omitted).

3       79.  The Court concluded that, to avoid the insidious consequences of group

4   voir dire, individual questioning of jurors provided the most reasonable safeguard.

5   The Court thus held that:

6       The most practical and effective procedure available to minimize the
        untoward effect of death qualification is individualized sequestered voir
7       dire. Because jurors would then witness only a single death-qualifying
        voir dire -- their own -- each individual juror would be exposed to
8       considerably less discussion and questioning about the various aspects of
        the penalty phase before hearing any evidence of guilt.
9

10  *Hovey v. Superior Court*, 28 Cal. 3d at 80.

11              c.      **Death Qualification After Code of Civil Procedure § 223's**

12                      **Amendment**

13      80.  As part of Proposition 115, the Crime Victims Justice Reform Initiative,

14  § 223 of the Code of Civil Procedure was amended to effect substantial changes to

15  jury selection procedures.  Prior to 1990, for example, both counsel routinely asked

16  questions of the jurors during voir dire; after 1990, the court is required to conduct

17  the examination (*see* Code Civ. Pro. § 223 (["[T]he court *shall* conduct the

18  examination of prospective jurors"]), and only upon a showing of good cause are

19  counsel permitted to examine the jurors directly.  (*Id*. The amended version of § 223

20  further provides that "[v]oir dire of any prospective jurors shall, *where practicable*,

21  occur in the presence of the other jurors in all criminal cases, including death penalty

22  cases."  (Code Civ. Pro. § 223 (emphasis added); *see Covarrubias v. Superior Court*

23  *(Monterey)*, 60 Cal. App. 4th 1168, 1175, 71 Cal. Rptr. 2d 91 (Cal. App. 6th Dist.

24  1998 ).

25      81.  The question following the 1990 amendment to § 223 is the extent to

26  which that amendment abrogates the requirement established in *Hovey v. Superior*

27  *Court* that jurors be questioned individually during the death qualification process.

28  Section 223 states that "any prospective juror" shall be questioned, "where

1   practicable," in the presence of the other jurors in all criminal cases, including in

2   death penalty cases.  The California Supreme Court has yet to address the question

3   of the impact of the amendment to § 223 on the *Hovey* requirements, but the Sixth

4   District Court of Appeal (on a writ of mandate the Court declined to review), held

5   that although § 223 overrules *Hovey*'s mandate that jurors be questioned individually,

6   a trial court must exercise its discretion to determine whether it is "practicable"

7   to conduct group voir dire or whether individual questioning is warranted.  *See*

8   *Covarrubias v. Superior Court*, 60 Cal. App. 4th 1168.

9           82.  In *Covarrubias*, a capital defendant sought a writ of mandate from the

10  court of appeals after the trial court denied his request for sequestered voir dire on the

11  ground that Proposition 115 had overruled *Hovey*.  *Covarrubias*, 60 Cal. App. 4th

12  at 1171.  The Sixth District issued the writ after finding that the trial court had failed

13  to exercise its discretion by simply ruling that individual sequestered voir dire was

14  "not only not required, but that the lawful process and the best process is to conduct

15  voir dire whenever possible in the presence of other jurors."  *Covarrubias, supra*,

16  at 1183.  The *Covarrubias* court found that such a statement "demonstrate[d] the trial

17  court's misunderstanding of section 223."  *Id*.  The trial court's error, according to the

18  Sixth District, was "that it seemed to be focused upon the fact that individual

19  sequestered voir dire was no longer required, *rather than engaging in a careful*

20  *consideration of the practicability of large group voir dire as applied to petitioner's*

21  *case*."  *Id.* (emphasis added).   The court of appeals went on:

22          This seems especially evident given the trial court's repeated emphasis
            upon its review of "the authorities."  Those authorities may have
23          supported the trial court's interpretation of section 223 with respect to
            *Hovey*, but the trial court's emphasis upon them indicates that the court
24          did not thoroughly examine the application of section 223 to the specific
            circumstances before it.
25  *Id*.

26          83.  *Covarrubias* thus stands for the proposition that a trial court must

27  exercise its discretion to "engage in a careful consideration of the practicability

28  of large group voir dire as applied to petitioner's case."  *Id*.  Although declining

1  to define "practicable," the *Covarrubias* court found that the trial court erred in

2  concluding that "practicable" should be understood as utilizing group voir dire

3  "whenever possible."  *Id*.  The court of appeals stated:

> [S]ection 223 vests the trial court with discretion to determine the
> advisability of practicability of conducting voir dire in the presence
> of the other jurors.  Accordingly, a finding that large group voir dire
> should be utilized "whenever possible" does not comport with section
> 223's description of the trial court's duty to decide whether such voir dire
> was in fact practicable.

8  *Id.* at 1184.

9  ### 3.   **The Trial Court Failed to Exercise Its Discretion**

10  84.  As with the trial court in *Covarrubias*, the trial court in Ms. Alfaro's case

11  failed to exercise its discretion to determine whether, under the specific circumstances

12  of her case, group voir dire was "practicable."  Although the trial court initially

13  appeared to recognize that it had discretion to conduct individual voir dire under

14  § 223, it failed to "thoroughly examine the application of § 223 to the specific

15  circumstances before it." *Covarrubias*, 60 Cal. App. 4th at 1184.  Rather, the court

16  simply stated in response to Mr. Monroe's first request for sequestered questioning

17  that Monroe had failed to point out "any unique aspect of the case, to my knowledge,

18  that would separate this case from any other special circumstance case."  RT 17 (Nov.

19  1, 1991 proceedings).  The trial court went on, finding that the "pretty strong public

20  policy and legal policy behind Proposition 115" placed a burden on Mr. Monroe to

21  establish something "unique" or "unusual" about the case before the court would

22  permit sequestered voir dire or voir dire in small groups. *Id.* at 18.

23  85.  The trial court later disclosed the full extent of its misunderstanding

24  regarding its obligation to "engag[e] in a careful consideration of the practicability of

25  large group voir dire."  After Mr. Monroe renewed his inquiry into the court's

26  willingness to consider *Hovey* voir dire, the court responded:

> You can make whatever proposal you want.  You should consider
> Proposition 115.  It has been affirmed by the California Supreme Court
> and you can make whatever suggestions you want to make.  But it's my

294

1    impression that Proposition 115 was specifically designed to basically do
2    away with *Hovey* voir dire and I don't know why this court wouldn't
     follow the mandates of Prop. 115.

3    *Id.* at 19.

4        86.  In basing its rejection of Mr. Monroe's request for sequestered voir dire on

5    the purported policies and mandates of Proposition 115, rather than assessing whether

6    group voir dire was practicable in the specific circumstances of the case -- which

7    involved a drug related murder of a young Caucasian child and a defendant who was

8    Hispanic --  the trial court failed to exercise discretion and fulfill its duty under § 223.

9        87.  The trial court also failed to exercise its discretion when Mr. Monroe

10   repeated his request for sequestered voir dire prior to the commencement of the

11   second penalty phase trial.  When Mr. Monroe reiterated his request for sequestered

12   voir dire prior to jury selection for the second penalty phase trial, the court responded:

13   "[T]hat's extremely time consuming and I'm not sure the beneficial effects of it are

14   that great."  RT 2224-25.  The denial of sequestered voir dire based on a general

15   complaint that such a procedure may be time consuming cannot be understood as an

16   exercise of discretion.  The court again failed to assess whether, under the specific

17   circumstances of Ms. Alfaro's case, such a process was warranted.  In failing to

18   evaluate Mr. Monroe's request in the context of Ms. Alfaro's case specifically, the

19   court failed to comply with its duty to exercise discretion when assessing the

20   practicability of sequestered voir dire.  *See Covarrubias*, 60 Cal. App. 4th at 1183.

21       88.  The trial court's abdication of its duty to exercise discretion means that

22   Ms. Alfaro's conviction must be reversed.  *See Covarrubias*, 60 Cal. App. 4th

23   at 1184.  The trial court has an affirmative duty to ensure that a defendant is tried

24   before an impartial jury.  In the death penalty context, this means that the court must

25   ensure that no juror whose "views would 'prevent or substantially impair the

26   performance of his duties as a juror in accordance with his instructions and his

27   oaths,'" *Witt*, 469 U.S. at 424 (citations omitted) be permitted to remain as a juror.

28   The trial court's duty to exercise its discretion to assess the practicability of

295

sequestered voir dire is inextricable from the trial court's duty to ensure that no jurors whose views would prevent *or* substantially impair their performance of their duties remain seated to judge the defendant.  Ms. Alfaro's case presented jurors with the difficult and emotionally demanding task of assessing a young Latina's guilt of the first degree murder of a nine-year-old girl, and whether, if they found her guilty, she deserved to die or instead to spend the remainder of her life in prison.  The trial court's failure to exercise its discretion to evaluate the practicability of sequestered voir dire in order to insulate jurors from the "untoward effects" of group voir dire and more accurately screen jurors for bias and prejudice is reversible error.

**4.** **If This Court Finds That The Trial Court Exercised Discretion, It Must Find That The Trial Court Abused its Discretion**

89.  Should this Court conclude that the trial court did, in fact, exercise its discretion, Ms. Alfaro respectfully submits that in denying Mr. Monroe's request for sequestered voir dire, the trial court abused its discretion.

90.  The *Hovey* Court recognized that when people find themselves in unfamiliar circumstances, they tend to look to the behavior of authority figures for guidance.  *Hovey v. Superior Court*, 28 Cal. 3d at 70.  Being called as a juror in a capital trial is an enormous responsibility that is thrust upon many citizens who have no prior experience applying the law.  The *Hovey* Court realized that in the anxiety of finding themselves in such a novel situation, and when repeatedly exposed to questions by court and counsel about their views on the death penalty and how those views would affect their ability to impose a sentence of death on the accused, jurors "would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion."  *Hovey*, 28 Cal. 3d at 71.

91.  Recognizing that jurors will see the judge as the foremost figure of authority, this inference is especially dangerous when it is only the court, and not counsel, conducting the voir dire.  Jurors expect that each counsel is the advocate for

1    a particular position, and as a consequence, may understand that a counsel's questions

2    regarding the jurors' views on the death penalty are designed to seek out a particular

3    perspective.  When, on the other hand, the judge conducts all or most of the voir dire,

4    including all of the death qualification questions, jurors may be persuaded that if the

5    judge, who is ostensibly meant to be a neutral arbiter, is so concerned about the

6    penalty phase, it is likely that a penalty phase will take place.  *See Hovey*, 28 Cal. 3d

7    at 70-71.

8            92.  Furthermore, when it is the judge spending a substantial amount of time

9    screening jurors for a particular viewpoint, the jurors will perceive that the judge --

10   again, the presumably neutral arbiter -- disapproves of that view.  That is precisely

11   the prejudice that resulted from the way this judge conducted the death qualification

12   process.  By denying the motion for sequestered voir dire the trial court abused its

13   discretion, and by asking numerous questions designed to screen for those opposed

14   to the death penalty while asking markedly fewer questions designed to screen for

15   those who favored the death penalty, over and over in the presence of all jurors, the

16   trial court grossly prejudiced Ms. Alfaro.  Had the trial court permitted counsel to

17   conduct most of the death qualification questions, sequestering may not have been

18   necessary.  But because the court insisted, in the guilt phase, on asking *all* of the

19   questions, and in the penalty phase, asking most of the questions, and moreover,

20   insisted on aggressively screening for jurors who held views against the death

21   penalty, the court's failure to conduct sequestered voir dire resulted in an unbalanced

22   jury biased against Ms. Alfaro.

23           93.  Section 223 directs a trial court to conduct group voir dire "when

24   practicable."  The *Covarrabius* court declined to evaluate application of the term

25   "practicable" in the context of the case before it.  *See Covarrubias*, 60 Cal.App.4th

26   at 1183 (whether large group voir dire is practicable in petitioner's case is not for us

27   to decide).  The statute itself provides no guidance on what factors a trial court should

28   look to when assessing the "practicability" of conducting group voir dire.  While the

1   statute's drafters could have meant "practicable" as either physically practicable or

2   practicable in terms of the length of time group versus individual voir dire might take,

3   these narrow definitions of "practicability" do not work to promote the interests of

4   fairness and impartiality that court conducted voir dire is designed to ensure.

5       94.  "Practicable" must refer to specific factors in the case other than the

6   physical limitations of a courtroom or the time it might take to conduct sequestered

7   voir dire -- "practicable" must refer to the substantive factors of the case.  Section

8   223's specific reference to group voir dire, "including death penalty cases," is a

9   recognition that while the specific requirements of *Hovey* are no longer mandated,

10  § 223 did not eliminate sequestered voir dire entirely.  Consequently, trial courts must

11  continue to recognize that in certain cases, the repeated exposure to death

12  qualification questions that necessarily takes place in group voir dire could result in

13  a biased jury.  Trial courts must assess how, within the context of specific facts of the

14  case before it, the particular death qualification process it intends to utilize may affect

15  the venire, and assess whether group voir dire is practicable or whether individual or

16  small group voir dire would be the better choice.

17      95.  The trial court in Ms. Alfaro's case denied sequestered voir dire because it

18  believed Proposition 115 mandated against such a process and that Mr. Monroe had

19  failed to establish anything "unique" about Ms. Alfaro's case.  As shown by

20  *Covarrubias*, the court erred in concluding that Proposition 115 mandated against

21  individual voir dire.   Furthermore, the court's position that Mr. Monroe failed to

22  identify anything unusual in Ms. Alfaro's case that warranted individual voir dire is

23  simply wrong.  In his motion requesting sequestered voir dire, Mr. Monroe identified

24  the very factors that made this case particularly sensitive, such as a child victim, drug

25  addiction, and a woman defendant.  CT 120-28.   Nor is the court's insinuation that

26  there is nothing unique about this case that would warrant individual voir dire

27  consistent with its later pronouncement that the case is "one of the most senseless,

28  brutal, vicious, callous killings that this Court has ever seen. . . . I can't imagine a

more vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case."  RT 4508.  All the facts that caused the court to view the case in that way were known to the court at the time voir dire began.

96.  As the trial court well knew, this case was not routine -- even in the capital context.  A number of jurors in both the first and second trials remarked that a child victim made this case different.  That the defendant and the victim were of different ethnicities -- Ms. Alfaro Hispanic, the victim Caucasian -- made this case particularly sensitive.  Indeed, this factor has been recognized as capable of triggering jurors' deepest prejudices.  *See Tuilaepa v. California*, 512 U.S. 967, 982, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994); *see also McCleskey v. Kemp*, 481 U.S. 279, 312 (1987); *Turner v. Murray*, 476 U.S. 28 (1986).  The court's later acknowledgment of the remarkable nature of the case reflected the nature of the case from its inception.

97.  Also evidencing that this case was different is the fact that the court, both sua sponte and at the urging of the prosecution, asked many more specific questions than would be asked in a "routine" capital case.  *Compare People v. Balderas*, 41 Cal. 3d 144, 187-190 (1985) (The trial court asked each panel member, out of the presence of the other members, five questions designed to learn the member's views on the death penalty).  The trial court here repeatedly asked the jurors whether they would be unwilling to impose the death penalty if the defendant were young; if the defendant were a woman; if the defendant were Mexican-American; if the defendant had no past history of violence.  These are all factors that could be considered mitigators.  By asking the jurors in the presence of other jurors whether the existence of any of those factors would make it more difficult for them to impose the death penalty, the court effectively conveyed the message that it expected Ms. Alfaro's case to proceed to the penalty phase and that they should be immunized from finding those factors to be mitigators.  The court's own conduct made group voir dire impracticable and resulted in a jury biased against Ms. Alfaro.

299

**5.    The Court's Failure to Conduct Individual or Group Voir Dire Resulted in a Miscarriage of Justice**

98.  Section 223 of the Code of Civil Procedure provides, in relevant part, that:

> The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution.

Code Civ. Pro. § 223.  It cannot be disputed that the trial of a defendant before a biased and partial jury is a miscarriage of justice.  *Irvin*, 366 U.S. at 722.  "The failure to accord an accused a fair hearing violates even the minimal standards of due process."  *Id.*  In failing to grant the defense request for sequestered voir dire, the trial court abused its discretion and caused Ms. Alfaro to be tried and then sentenced before a biased jury.  As a consequence, the trial court violated her Fifth and Fourteenth Amendment rights to due process, her Sixth Amendment right to a fair and impartial jury, and her Eighth Amendment right to a reliable, non-arbitrary, individualized determination that death is the appropriate penalty.  Ms. Alfaro's sentence must be reversed.

**E.    THE TRIAL COURT'S MULTIPLE ERRORS IN CONDUCTING VOIR DIRE DEPRIVED PETITIONER OF HER RIGHT TO A FAIR AND IMPARTIAL JURY**

**1.    Introduction**

99.  As each of the above arguments makes clear, the voir dire methods employed by the trial court in this case created a grave risk that a biased jury would be empaneled.  The court refused to permit a written questionnaire and refused to conduct individual voir dire, instead exposing jurors not just to repeated questions that presupposed guilt, but to questions that had been crafted by the district attorney and adopted wholesale by the trial court which conditioned the jury against the specific mitigating circumstances it was obvious Ms. Alfaro would argue -- her age, the fact that she had no prior felony convictions, the fact that she was Hispanic,

a mother, and poor.  At the same time, the court refused to adequately question the prospective jurors as to whether they could overcome the emotions that might bias them against the defendant in a case involving the murder of a nine year old child, calling this question too "case specific."  Taken both alone and together, the trial court's voir dire procedures created an unacceptable likelihood that Ms. Alfaro would be tried by a jury predisposed to find her guilty and too willing to sentence her to death.

100.  The Sixth and Fourteenth Amendments "prohibit the State from 'entrust[ing] the determination of whether a [woman] should live or die to a tribunal organized to return a verdict of death,' and from 'stack[ing] the deck against the [defendant].' . . . [T]he decision whether a [woman] deserves to live or die must be made on scales that are not deliberately tipped toward death." *Gray v. Mississippi*, 481 U.S. 648, 666 (1987) (citations omitted).  The California Constitution provides the same guarantees. *See People v. Wheeler*, 22 Cal. 3d 258, 266 (fn. omitted) (1978) .  The jury selection procedures employed by the court did violence to the protections afforded Ms. Alfaro by both the United States and California constitutions.

101.  Every action taken by the court during voir dire further diminished Ms. Alfaro's fundamental right to have a fair and impartial jury determine her fate.  Together, they denied her the rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

**2.**    **Statement Of Facts**

**a.**    **The First Jury**

102.  During voir dire for Ms. Alfaro's first trial, all but one of the court's general death qualification questions were crafted to ferret out jurors who were opposed to the death penalty.  The court asked whether jurors would refuse to find defendant guilty to avoid a death sentence (RT 108); whether they would refuse to find special circumstances true to avoid a penalty phase (RT 109, 114, 227); and whether they would refuse to vote in favor of death because of views regarding

capital punishment.  RT 116, 228, 279.  The court repeatedly sought from each prospective juror a commitment that he or she would be willing to impose the death penalty, while failing to convey in a balanced fashion that the jury was also free to choose a sentence of life without the possibility of parole.  The court's questions conveyed the impression that the court viewed with displeasure *any* opposition to the death penalty, no matter to what degree.

103.  The court also asked prospective jurors whether they had any moral, religious, or philosophical views that *might affect* their deliberations on the death penalty.  *See e.g.*, RT 124, 231, 281, 301.  The United States Supreme Court has held that a prospective juror may not be excused for cause on the basis of moral or ethical opposition to the death penalty *unless* that juror's views would prevent the juror from judging guilt or innocence or would cause the juror to reject the death penalty regardless of the evidence.  "Excusal is permissible only if the juror makes this position 'unmistakably clear.'"  *People v. Holt*, 15 Cal. 4th 619, 650 (1998) (citing *Witherspoon*, 391 U.S. at 522, fn. 21).  While the court could ask jurors whether their moral, religious or philosophical views would "prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath," the court's question regarding a general *effect* religious or moral views might have on their decision to vote for death cast too broad a net.

104.  After refusing to ask the prospective jurors whether the fact that the victim was a child would make it difficult for them to be fair (RT 2263), the trial judge proceeded to question jurors about specific evidence that the defense could be expected to present in mitigation.  The court asked whether the jurors believed there was an age at which a person should not receive the death penalty, "no matter how vicious or cruel the crime might be committed?" (*see, e.g.*, RT 128, 232, 283), aware that Ms. Alfaro was only eighteen at the time of the crime.  The court asked whether the jurors would require a defendant to have a past history of violence before

imposing death, knowing that Ms. Alfaro had no prior history of violence.  *See, e.g.*, RT 129, 231, 282.

105.  The court screened for jurors who might find other issues in the case made it difficult to impose the death penalty as well.  The court asked whether the jurors thought that the death penalty should only be applied in murder cases involving more than one victim, knowing that that was not the case here.  RT 124, 231, 281.  It asked whether the jurors would be reluctant to sentence a woman to death, repeating again and again, "any of you believe that the state should never execute a woman *no matter how vicious or cruel the crime is that she may have committed*?"  RT 131, 232, 284 (emphasis added).

106.  Turning the history of racial prejudice in the imposition of the death penalty on its head, the court asked prospective jurors whether "in all honesty," they would find it more difficult to vote to impose the death penalty in a case where the defendant is a Mexican-American than they would if the defendant were white. RT 132, 233, 284.  In fact, significant evidence exists that a juror is *more likely* to impose the death penalty when the victim is Caucasian and the defendant is a minority.  *See McCleskey v. Kemp*, 481 U.S. 279 (1987).  Though the court followed this question with the converse, the order of its questions squandered any chance there was of identifying jurors who were, in fact, racially biased against Ms. Alfaro.

107.  The prejudice that flowed from the court's imbalanced questioning was made starkly evident by the district attorney's closing argument.  After the court adopted verbatim the district attorney's questions that had been constructed to discourage jurors from considering characteristics applicable to Ms. Alfaro and/or the crime as mitigating factors, the district attorney was able to take advantage of the court's imprimatur of approval at closing:

> I just want to read a couple things and have you recall some of the questions that were read -- that were asked of you:

303

1   One, "Do any of you have any religious views that might affect your
2   deliberations on the death penalty?"  All of you said no.

3   "Do you feel the death penalty should only be applied in murder cases
    where there are multiple victims."  All of you said no.

4   "Would you require that a defendant have a past history of violence
    before you would even consider voting for the death penalty?"  All
5   of you said no again.

6   "Do any of you believe there's any particular adult age at which a person
    should never receive the death penalty no matter how vicious or cruel the
7   crime committed?"  All of you said no.

8   Regarding gender bias, "Do any of you believe the state should never
    execute a woman no matter how vicious or cruel the crime is that she's
9   committed?"  All of you said no.

10  Then we got into racial bias.  And nobody was racially biased on the
    jury.
11
    Those are important considerations in a case like this, *and I think by now
12  you can see why*.

13  RT 1983-84.  The district attorney turned immediately to the jurors' responsibility

14  to weigh aggravating and mitigating factors.  RT 1984.  Having reminded jurors that

15  they swore not to take into account their religious or moral views, the age of the

16  defendant, the gender of the defendant, the social background of the defendant, and

17  the absence of a prior history of violence when deciding whether Ms. Alfaro should

18  live or die, the district attorney effectively discouraged the jurors from considering

19  the real evidence of mitigation present in Ms. Alfaro's case, and was able to do so

20  with the court's conspicuous assistance.

21              **b.     The Second Jury**

22          108.  The court's imbalanced approach became even more pronounced during

23  voir dire for Ms. Alfaro's retrial.  As discussed in herein, despite its best efforts in the

24  first jury selection process, the court learned from the first jury's foreman, J. W.

25  Abouchar, that jurors had not been adequately screened to remove those who had *any*

26  sentiments against the death penalty.  RT 2220.  In his letter to the court, dated April

27  21, 1992, Mr. Abouchar blamed one of the other jurors who had refused to vote for

28

304

the death penalty for Ms. Alfaro of lying during voir dire about her willingness to

impose the death penalty.  Wrote Mr. Abouchar:

> The third [educational] event was discovering that one of the jurors was
> against the death penalty.  This was Ms. Paulette O'Dell, who is
> probably an only child who "had a good childhood" and "it was her
> adulthood she screwed up."  She "did" designer drugs, has joined AA
> in the past four months, is a controlling person, divorced, smokes like
> a fiend, and is twenty years older and forty pounds heavier than she
> thinks she is (the last two are my observations).  She is a liberal of the
> seventies and admires Cranston, Jerry Brown, etc. . . . She still wouldn't
> stop being an emotionally involved sympathetic person who blamed
> Alfaro's upbringing rather than the person, despite other jurors who
> bared their souls about the bad childhood to discourage the essentially
> "bleeding heart" position she took.
>
> One of the investigators for the defense, Laura Lawhon, stopped by my
> home, talked to my wife, and name dropped that she knew one of our
> neighbors (which she does, it turns out).  I have not talked to her yet, but
> courtesy requires that I do so this week . . . I will tell her the same profile
> information about how to hang a jury by finding another high school
> teacher such as Ms. O'Dell.  However, please educate the prosecuting
> attorney that when the judge asks jurors your standard question about the
> death penalty, she never really answered it.  Her first answer was she had
> been opposed to it; in later life she "had nothing against it."  This is not
> an answer. This cost all of us in excess of one hundred thousand dollars.
> You may wish to pass this on to Mr. Littleton. [*Sic*].  Too many vague
> answers are given today, such as "I don't see why not," "I have nothing
> against it," etc.  These very often turn out to not be answers.  I have been
> burned before.

CT 83-84 (April 21, 1992 proceedings).

109.  Rather than treating this letter as simply the expression of an unhappy

man and accepting that reasonable people who believe in the appropriateness of the

death penalty might have found it inappropriate in Ms. Alfaro's case (the jury hung at

ten to *two*), the court accepted Mr. Abouchar's unsupported conclusion that this juror

had lied about her ability to weigh the evidence.[27]  Before jury selection began on

---

[27]  In the afternoon on April 6, 1992, Mr. Abouchar informed the court that the
jury had reached an impasse.  RT 2077.  Attempting to determine how far apart the
jurors were, the court asked what the split had been on the most recent ballots.  Mr.
Abouchar indicated that the jury was split "two, four and six.  The six were zeros."
RT 2080.  The court asked whether "six equal zeros" meant that those jurors could go
either way.  Mr. Abouchar responded "yes."  RT 2080.  After being given instructed
on the meaning of life without the possibility of parole, the jury deliberated another
day and a half, but was unable to reach a verdict.  The court declared a mistrial on
April 8, 1992.  RT 2113.

May 11, 1992, Mr. Monroe asked the court to inform the jury that the first trial ended in a hung jury. RT 2416-17. Mr. Monroe argued that the court's refusal to inform the second jury that the first jury could not reach a verdict, "is not totally in response to the question of the jurors, why are we here on the second penalty phase. It begs the question." RT 2420. The court responded: "What do you propose we tell them? You propose we tell them the absolute truth?" Mr. Monroe said: "Which is?" The court replied, "Which is a juror lied on jury selection, failed to answer the questions honestly, and that's why we're here?" RT 2420. The questions asked by the court for Ms. Alfaro's retrial, based on the unsupported allegations of a disgruntled ex-juror, further influenced the jurors toward death.

110. Jury selection for the retrial began on May 11, 1992. The court asked the same questions that it asked at the first trial. The court also asked, prompted by Mr. Abouchar's suggestion but in contravention of the dictates of the United States Supreme Court, whether jurors *would hesitate* before imposing death:

> Do you think if you were satisfied in your mind from the evidence you received from the witness stand here, not from anything you see in the newspaper, that the aggravating circumstances in this case substantially outweigh any mitigating circumstances, would you have *any hesitation* in rendering the imposition of the death penalty?

RT 2685. Such a question directly violates the United States Supreme Court's holding that "a court seeking to eliminate jurors who "might hesitate" to return a verdict imposing death violates a defendant's Sixth and Fourteenth Amendment rights to an impartial jury." *Witherspoon*, 391 U.S. at 518; *see also Morgan,* 504 U.S. at 731.

111. As before, the court went on to ask jurors not only whether they opposed the death penalty *now*, but also asked them whether they had *ever* been against the death penalty. RT 2682-83. The court said to one prospective juror: "I'm not sure I really got an answer when you mentioned that you -- I got the impression that you said you didn't know if you have ever been against the death penalty and I'm puzzled how you could have that opinion." RT 2522. The court asked whether the juror

1   could recall having gotten "into one of those high school debates" about the death

2   penalty (RT 2523), and whether she recalled "whether you have ever, I'm not saying

3   had a strong feeling, but if you ever had feelings that you expressed to others against

4   the death penalty?" RT 2523. The court's prying into this juror's *high school*

5   opinions about the death penalty served no legitimate voir dire purpose.

6          112. In response to the court's question of another prospective juror

7   as to whether she had ever been against the death penalty, the juror, Ms. Densham,

8   responded:

9          Against it, no. Questioned, yes. My first husband was vehemently
           opposed to it so we could get into debates on it." RT 2525. The court
10         continued: "Okay. And how long ago, if you can just give me a handle
           on it, has it been more than ten years ago that you had your last debate on
11         that with your ex-husband?" Ms. Densham: "Much more than that."
           The court: "Okay. And I gather you have always taken the position that
12         in appropriate cases the death penalty is an appropriate penalty?"

13   RT 2525.

14         113. Another prospective juror was subjected to the same scrutiny when he

15   suggested he might, in the past, have been opposed to the death penalty. When

16   Mr. MacNeil responded to the question, "Have you ever been against the death

17   penalty before?", "When I was younger, a teenager," the court responded, "All right.

18   There's various degrees of being against it. Did you ever participate in any debates

19   with your friends about the appropriateness of the death penalty?" RT 2583. The

20   court went on to ask him when he changed his mind and what changed his mind about

21   it, and to describe the circumstances under which he might find the penalty

22   appropriate. RT 2584.

23         114. Such invasive inquiries went far beyond the inquiry necessary to

24   illuminate the jurors who should be struck for cause. It communicated the court's

25   disapproval of anyone who had *ever* expressed any criticism of the death penalty.

26   The court's questioning clearly gave the district attorney an advantage -- albeit

27   unconstitutional -- by providing him with significant information to guide his

28   decisions on how to best use his peremptory strikes.

115.  The court also asked its questions about whether jurors believed that the state should never execute a woman, "no matter how vicious or cruel the crime is that she may have committed," (*see, e.g.*, RT 2528), whether they would find it more difficult to vote to impose the death penalty in a case where the defendant is Mexican-American than they would if the defendant were white (*see, e.g.*, RT 2530), whether they would find it difficult to vote for death if the defendant were young (*see, e.g.*, RT 2639, 2686), and whether they would find it difficult to vote for death if the defendant had no prior history of violence.  *See, e.g.*, RT 2528, 2638, 2686.

116.  Finally, in abrogation of its responsibility to be scrupulously impartial, the court revealed its personal approval of the death penalty to the venire.  *See also* Claim 18.  The court expressed satisfaction that "killing a judge" qualified as a special circumstance in California (RT 2765), and later, when a juror expressed frustration that the legal process had taken so long in the Robert Alton Harris case, the court agreed wholeheartedly and blamed federal judges for the alleged "delays."  RT 2837.

**3.    The Magnitude Of The Capital Jury's Responsibility Requires That the Trial Court Be Scrupulous In Maintaining Both the Appearance And the Fact Of Impartiality**

117.  Capital juries are entrusted to render a "highly subjective, 'unique individualized judgment regarding the punishment that a particular person deserves.'" *Caldwell v. Mississippi*, 472 U.S. 320, 340-41, fn. 7 (1985) (quoting *Zant v. Stephens*, 462 U.S. 862, 900 (1983) (Rehnquist, J. concurring).  Because of the irrevocable nature of the punishment a capital jury may impose, the court must be especially vigilant to ensure that biased jurors be excluded.  (*See Morgan*, 504 U.S. at 730 ("The adequacy of voir dire is not easily the subject of appellate review, but we have not hesitated, *particularly in capital cases*, to find that certain inquiries must be made to effectuate constitutional protections.") (emphasis added).  A capital defendant possesses the constitutional right not to be sentenced by a "'tribunal organized to

308

1  return a verdict of death.'"  *Gray*, 481 U.S. at 668 (quoting *Fay v. New York*, 332 U.S.

2  261, 294, 67 S. Ct. 1613, 91 L. Ed. 2d 2043 (1947).)

3       118.  By their very nature, capital cases often involve facts and events which

4  are more repugnant than those of non-capital cases.  As a consequence, a far greater

5  likelihood exists that biases and prejudices may operate undetected in capital cases.

6  *Turner v. Murray*, 476 U.S. 28, 35 (1986).  To help ensure impartial juries in capital

7  cases, the judicial system has developed and encouraged the use of jury

8  questionnaires, sequestered voir dire, and the right of counsel to question potential

9  jurors directly.  When the trial court denied Ms. Alfaro the opportunity to utilize *any*

10  *of these tools*, it frustrated the purpose behind voir dire of revealing biased and

11  incompetent jurors, and it prevented Ms. Alfaro's counsel from making the necessary

12  record from which to challenge jurors for cause.  It paved a direct path to her

13  conviction and death sentence.

14      **4.**     **The Trial Court's Decisions Regarding The Conduct of Voir Dire**

15           **Deprived Petitioner of Her Right To An Impartial Jury**

16          **a.**     **The Court's Decision To Deny Sequestered Voir Dire Was**

17             **Erroneous**

18       119.  The court denied Mr. Monroe's request for sequestered voir dire and did

19  so without analyzing whether, in the context of Ms. Alfaro's case, such voir dire was

20  practicable.  As discussed herein, in a case involving such highly charged factors as

21  different ethnicities -- a Caucasian child murder victim stabbed multiple times and a

22  Hispanic teenager defendant -- and drug addiction, sequestered voir dire, at least for

23  the purpose of evaluating prospective jurors' views on the death penalty, was

24  particularly appropriate.  Such repeated exposure to the death qualification process

25  risks that the jurors will conclude that the court expects them to find the defendant

26  guilty and then sentence her to death.  *See Hovey v. Superior Court*, 28 Cal. 3d 1

27  (1980).

28

1
2

**b.     The Court's Decision To Deny A Jury Questionnaire Was Erroneous**

3       120.  In addition to denying sequestered voir dire, the court denied the requests

4   of both Mr. Monroe and the District Attorney that juror questionnaires be used.

5   RT 125-26 (February 24, 1992 proceedings).  The court could have minimized the

6   dangers inherent in collective voir dire by use of a questionnaire, yet failed, without

7   reason, to do so.

8       121.  The use of juror questionnaires is not uncommon.  Rather, it is *routine*

9   in death penalty cases.  *See e.g.*, *People v. Earp*, 85 Cal. Rptr. 857, 874 (1999);

10  *see also People v. Welch*, 85 Cal. Rptr. 2d 203 (1999); *Zamudio v. Superior Court*

11  *(Los Angeles)*, 64 Cal. App. 4th 24, 74 Cal. Rptr. 2d 765 (1998); *People v. Millwee*,

12  18 Cal. 4th 96 (1998); *People v. Dennis*, 17 Cal. 4th 468, 950 P.2d 1035,

13  71 Cal. Rptr. 2d 680 (1998); *People v. Bradford*, 15 Cal. 4th 1229 (1997); *People v.*

14  *Holt*, 15 Cal. 4th 619 (1997); *People v. Carpenter*, 15 Cal. 4th 312, 935 P.2d 708,

15  63 Cal. Rptr. 2d 1 (1997); *People v. Mayfield*, 14 Cal. 4th 668, 928 P.2d 485,

16  60 Cal. Rptr. 2d 1 (1997); *People v. Jackson*, 13 Cal. 4th 1164, 282 P.2d 898 (1996);

17  *People v. Osband*, 13 Cal. 4th 622 (1996); *People v. Arias*, 13 Cal. 4th 92, 913 P.2d

18  980, 51 Cal. Rptr. 2d 770 (1996); *People v. Lucas*, 12 Cal. 4th 415, 907 P.2d 373,

19  48 Cal. Rptr. 2d 525 (1995); *People v. Cudjo*, 6 Cal. 4th 585, 863 P.2d 635, 25 Cal.

20  Rptr. 2d 390 (1993); *People v. Johnson*, 6 Cal. 4th 1 (1993); *People v. Cummings*,

21  4 Cal. 4th 1233, 850 P.2d 1, 18 Cal. Rptr. 2d 796 (1993).  Indeed, the use of

22  questionnaires since the advent of Proposition 115 has been deemed "extremely

23  important:"

24          Jury selection questionnaires are *commonly* used in death cases.  *In light*
            *of the elimination of sequestered, individual voir dire, the use of such*
25          *questionnaires, answered by jurors before judge or attorney questioning,*
            *has become extremely important.  This device at least partially preserves*
26          *the former benefits of individual questioning with the concomitant*
            *expenditure of court time.*
27

28

(Cal. Criminal Law Procedure and Practice (Cont. Ed. Bar 1998) p. 1472.  As the California Supreme Court recognized in *People v. Cudjo,* 6 Cal. 4th at 629, "[b]ecause the prospective jurors answered the questionnaires individually and in isolation from each other, defendant received the primary advantage of *Hovey* voir dire -- minimizing each prospective juror's exposure to the death qualification voir dire of others."  At the same time, the procedure avoids the length of time required for sequestered voir dire.  *Id*.

122.  The trial court's explanation for refusing juror questionnaires was that counsel had framed their questions too broadly, seeking information not only relevant to strikes for cause, but also clearly to inform their peremptory challenges, and that questionnaires do not remain confidential.  At a minimum, if the court believed the questions too broad, it should have afforded counsel the opportunity to narrow their proposed questions or narrowed them itself.  RT 24 (Nov. 1, 1991 proceedings); RT 125 (February 24, 1992 proceedings).  Given the substantial risks collective voir dire posed in Ms. Alfaro's case and the ease with which those risks could have been minimized through the use of juror questionnaires, the court's failure to employ them cannot be found harmless.

<div align="center">

c.    **The Court's Refusal To Ask Questions About The Child Victim Was Erroneous**

</div>

123.  The risk of picking a biased jury grew as a result of the court's refusal to question jurors individually about the fact that the victim was a child.  The district attorney claimed that in proposing questions such as, "Please explain if the fact that the victim in this case is, say, a nine-year-old-little girl who knew and had been befriended by the defendant would prohibit you from being a fair and impartial juror in this case," the defense was seeking to have jurors "prejudge the evidence." RT 2263.  This ruling misstated the law.  The court's failure to either inquire itself or to permit defense counsel to inquire into such a sensitive and potentially prejudicial area cannot be excused.

<div align="center">

311

</div>

1
2
3
4

**d.    The Court Compounded Each Of The Above Errors Through Its  Fashioning Of The Death Qualification Questions, Resulting In A Jury Predisposed To Find Petitioner Guilty And To Sentence Her To Death**

5    124.  The court's method of conducting the voir dire fatally compounded
6  the errors described above.  All jurors were subjected to repeated questions and
7  discussion of each prospective juror's views on the penalty before Ms. Alfaro had
8  been found guilty of the crimes.  But the inevitable dangers of group voir dire
9  identified by this Court in *Hovey* were exponentially amplified in this case by the
10  manner in which the court fashioned the death qualification questions, and the way
11  in which it injected its own pro-death penalty views into the process.  The court went
12  overboard in ensuring that jurors would be willing to impose the death penalty.  It
13  empaneled a jury predisposed to vote for death.

14    125.  "The State's power to exclude for cause jurors from capital juries does
15  not extend beyond its interest in removing those jurors who would 'frustrate the
16  State's legitimate interest in administering constitutional capital sentencing schemes
17  by not following their oaths.'"  *Gray,* 481 U.S. at 658 (quoting *Wainwright v. Witt*,
18  469 U.S. 412, 423 (1985).  A court seeking to eliminate jurors who "might hesitate"
19  to return a verdict imposing death violates a defendant's Sixth and Fourteenth
20  Amendment rights to an impartial jury.  *Witherspoon*, 391 U.S. at 518; *see also*
21  *Morgan,* 504 U.S. at 731 (citing *Witherspoon,* 391 U.S. at 512-513).

22    126.  The court's sole obligation is to screen for jurors whose views "would
23  'prevent or substantially impair the performance of his duties as a juror in accordance
24  with his instructions and his oath.'"  *Wainwright v. Witt*, 469 U.S. at 424.  The United
25  States Supreme Court has held that a juror who would automatically vote for the
26  death penalty is as incompetent to sit as a juror as one who would vote against the
27  death penalty. *See Morgan*, 504 U.S. at 729 ("A juror who will automatically vote for

28

1   the death penalty in every case will fail in good faith to consider the evidence of

2   aggravating and mitigating circumstances as the instructions require him to do.").

3        127.  In using the prosecution's proposed voir dire questions nearly verbatim

4   and in shaping its own questions to screen for prospective jurors who were opposed

5   *or had ever been opposed* to the death penalty, the court blatantly disregarded the

6   general principle that a judge must "sedulously avoid all appearances of advocacy as

7   to those questions which are ultimately to be submitted to the jury," (*United States v.*

8   *Hickman*, 592 F.2d 931, 933 (6th Cir. 1979)), and inexcusably ignored the recognized

9   fact that repeated exposure to questioning by a judge about a juror's willingness to

10  impose the death penalty prompts the jurors "to infer that the court . . . assumes the

11  penalty trial will occur." *Hovey v. Superior Court,* 28 Cal. 3d at 70-71.  The

12  imbalanced nature of the court's questioning cannot be deemed harmless.

13       **5.   Conclusion**

14       128.  "'[S]ome constitutional rights [are] so basic to a fair trial that their

15  infraction can never be treated as harmless error.' . . . The right to an impartial

16  adjudicator, be it judge or jury, is such a right." *Gray,* 481 U.S. at 668 (quoting

17  *Chapman v. California*, 386 U.S. 18, 23 (1967)).  The trial court failed in its duty

18  to ensure that an impartial jury was chosen to assess Ms. Alfaro's guilt and determine

19  her sentence.  Instead, it managed to convey as early as voir dire the feelings it later

20  voiced during the hearing on Ms. Alfaro's motion to modify the verdict.  Stated the

21  court:

22       In my past I've prosecuted people accused of offenses like Miss Alfaro,
         I have defended people accused of noncapital homicide offenses when
23       I was a defense attorney, and I have been a member of the superior court
         for over thirteen years.

24
         This case is one of the most senseless, brutal, vicious, callous killings
25       that this court has ever seen.  The description that a picture is worth
         a thousand words, the circumstances of this offense shown by the
26       photographs show a very vicious, senseless killing.  I can't imagine
         a more vicious, senseless, killing.  I have never seen one that compares
27

28

313

1  with this case, nor could I image that anyone could ever dream one
2  up that would match this case.

3  RT 4508.

4      129.  A trial court may be -- and should be -- moved by the cases that come
5  before it.  The court must not, however, permit those private opinions to subvert its
6  obligation to dispassionately apply the law.  The court here sought out and empaneled
7  a jury designed to impose the death sentence that the court clearly thought
8  appropriate.  In so doing, the court violated Ms. Alfaro's Fifth and Fourteenth
9  Amendment rights to due process, her Sixth Amendment right to a fair and impartial
10 jury, and her Eighth Amendment right to a reliable, non-arbitrary, individualized
11 determination of whether death is the appropriate penalty.

12     130.  The trial court's errors, singularly and together, violated Ms. Alfaro's
13 rights to a fair and impartial jury.  At a minimum, Ms. Alfaro's death sentence must
14 be reversed.

15     131.  The foregoing violations of Ms. Alfaro's constitutional rights are
16 structural error and warrant the granting of this Petition without any determination of
17 whether the violations substantially affected or influenced the jury's verdict.  *Brecht*,
18 507 U.S. at 638.

19     132.  The constitutional violations set forth in this claim alone mandate relief
20 from the convictions and sentence.  However, even if these violations do not mandate
21 relief standing on their own, relief is required when this claim is considered together
22 with the additional constitutional errors outlined in the remainder of this petition.
23 Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and
24 sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,
25 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th
26 Cir. 1978).

27 / / /

28

314

# XXVI.

## CLAIM 21:  THE TRIAL COURT'S ARBITRARY DENIAL OF THE REQUESTED  CONTINUANCE VIOLATED DUE PROCESS

Petitioner's convictions and sentences were rendered in violation of her rights to due process, a fair trial, to present a defense, to confrontation, to the effective assistance of counsel, and to a reliable, individualized and non-arbitrary death-penalty determination, as Petitioner was denied a reasonable continuance, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983).

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits previously filed with this court and those accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

## A.     FACTUAL BACKGROUND

5.  At the conclusion of the penalty phase, Ms. Alfaro's trial counsel, Mr. Monroe, moved for a continuance until October or November 1992.  Monroe sought a continuance "in light of the material that we covered in the *Marsden* hearing."  RT

315

2150.[28]   Monroe believed a continuance was "need[ed] to have time to reconcile those things that the court covered in the Marsden hearing to present an effective defense in the penalty phase."  RT 2150-51; RT 2153 ("in light of what we've covered, especially in chambers, I just think the additional time is necessary").

6.   The judge dismissed defense counsel's concerns.  According to Judge Millard, it was important for the case to proceed because they "were almost coming up to the second annual anniversary of this case."  RT 2154.  The trial judge also wanted the case to go forward while "this case is still fresh in everyone's mind."[29]  RT 2155.  Neither attorney complained about the inability to recall sufficient facts a later date.  Despite defense counsel's repeated protestations that he needed additional time to work through his representation with Ms. Alfaro, the judge claimed he had not "heard [Monroe] ask for time to prepare."  RT 2153.

**B.     LAW IN SUPPORT OF CLAIM**

7.   Arbitrary denial of a continuance violates due process.  *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983).  While not every denial of a request for more time violates due process, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."  *Ungar Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964); *accord Middleton v. Roper*, 498 F.3d 812, 816 (8th Cir. 2007); *Hernandez-Gil v. Gonzales*, 476 F.3d 803, 807-08 (9th Cir.

---

[28]   As set forth in Claim 1.J. (Change of Venue), Monroe also asked for a continuance to allow the pretrial publicity to subside.

[29]   The judge explained his reasoning as follows:

Well, I used to be a trial lawyer and I know that it's real[ly] tough to keep the facts in your mind forever. And once you get up for a trial and let the trial go by, or it gets continued, it seems like every time that happens it's tougher and tougher to get the facts back to the same level you had them at the time when you first really expected to go to trial. And I'm mindful of that.

RT 2155.

2007); *accord United States v. Nguyen*, 262 F.3d 998, 1003 (9th Cir. 2001).  When the defendant's Sixth Amendment right to counsel is implicated based on a denial of a continuance, a court must balance several factors to determine if the denial was "fair and reasonable."  *United States v. Leavitt*, 608 F.2d 1290, 1293 (9th Cir 1979); *United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986).  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.  *Ungar*, 376 U.S. at 589-90.

8.  That the denial of a continuance violates a host of constitutional protections when, as here, there is an "arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay,'" is well known.  *See United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir. 1984) (*quoting Morris*, 461 U.S. at 18 and *Sarafite*, 376 U.S. at 589); *United States v. Cronic*, 466 U.S. 648, 656, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) ("The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."); *Wright v. Van Patten*, 128 S. Ct. 743, 746, 169 L. Ed. 2d 583 (2008) (*Cronic* applies when circumstances at trial were such that no lawyer could provide effective assistance); *White v. Ragen*, 324 U.S. 760, 764, 65 S. Ct. 978, 89 L. Ed. 1348 (1945) ("[I]t is a denial of the accused's constitutional right to a fair trial to force him to trial with such expedition as to deprive him of the effective aid and assistance of counsel. [citations omitted]"); *Bennett v. Scroggy*, 793 F. 2d 772 (6th Cir. 1986) (denial of continuance may violate Sixth and Fourteenth Amendment rights to present a defense); *United States v. Gallo*, 763 F.2d 1504, 1523-24 (6th Cir. 1985) (erroneous denial of a continuance constitutes abuse of discretion and violates the defendant's Sixth Amendment right to counsel).

9.  In considering whether the denial of a continuance implicating a defendant's right to counsel is an abuse of discretion, the Ninth Circuit has applied these factors: (1) the degree of diligence by the defendant prior to the date beyond which a continuance is sought; (2) whether continuance would have served a useful purpose if

317

granted; (3) whether a continuance would have caused the court or the government

inconvenience; and (4) the amount of prejudice suffered by the defendant. *Mejia*, 69

F.3d at 315 n.5 (finding abuse of discretion where court denied one day continuance

so defense could present live testimony of government's two main witnesses); *Armant*

*v. Marquez*, 772 F.2d 552, 556-57 (9th Cir. 1985) (finding prejudice where denial of

continuance effectively denied defendant opportunity to prepare own defense); *see*

*United States v. Pope*, 841 F.2d 954, 958 (9th Cir. 1988) (defendant prejudiced where

denial of brief continuance prevented him from introducing "the only testimony that

could plausibly have helped him"); *Linton v. Perini*, 656 F.2d 207, 212 (6th Cir.

1981) (trial judge acted arbitrarily in denying a continuance where there was no

evidence of a scheme to delay the trial, no showing of inconvenience to the witnesses,

opposing counsel, or the court, and the length of the requested delay was not

unreasonable).

    10.  There is no question that trial judge's denial of the continuance motion was

arbitrary.  First, Mr. Monroe was clearly diligent in raising the motion for

continuance at the earliest possible opportunity.  The morning after the mistrial was

declared, Mr. Monroe moved for a continuance.  *See* RT 2113 (April 8, 1992, jury

declares impasse and judge orders a mistrial); RT 2150 (April 9, 1992, Mr. Monroe

seeks continuance).

    11.  Second, the continuance would have served a vital purpose if granted.  As

reflected during the *Marsden* hearing, there had been a serious breakdown in the

relationship between Ms. Alfaro and her attorney.  No doubt the judge should have

appointed alternate counsel.  But even if the denial of the *Marsden* motion was

appropriate, the judge certainly had an obligation to continue the trial for a reasonable

period to allow attorney and client to attempt to repair their strained relationship.

    12.  Third, neither the judge or the prosecution would have been harmed by the

continuance.   Beyond a general desire to "resolve this matter," RT 2151, the

prosecutor proffered no specific reason to oppose the continuance.  Although the

1    prosecutor could not "see a need to put it off until October," RT 2151, he did not

2    claim that the prosecution would be prejudiced in any way.

3        13.   Neither did the trial judge identify any reason that a continuance would be

4    harmful to the Court.  Although citing the "interest of justice," RT 2155, the trial

5    judge's primary goal was to complete the case before the ensuing anniversary of the

6    victim's death:

7        Well we are almost coming up to the second annual anniversary of this
         case.  And it would appear, it would appear to me that the matter should
8        proceed on for a final resolution as soon as feasible.

9    RT 2154.  It is difficult to an imagine a more arbitrary justification for refusing to

10   grant a continuance motion.

11       14.   Finally, Ms. Alfaro was prejudiced by the denial.  Had the continuance

12   been granted, there is a reasonable probability that the two may have reconciled,

13   resulting in Ms. Alfaro cooperating in her defense and testifying on her own behalf.

14   Her heartfelt expressions of remorse would have convinced at least one juror to vote

15   for a life sentence.  The key distinguishing factor between the first and second penalty

16   phases was Ms. Alfaro's testimony.  Two jurors who sat during the second penalty

17   phase indicated that they would have liked to have heard from Ms. Alfaro.  Exhibit

18   122 (Declaration of Denise Coburn) at ¶ 2; Exhibit 123 (Declaration of Brent Conley)

19   at ¶ 3.  One of those jurors, who was initially a hold-out, said that he would have

20   persisted in his life vote if Ms. Alfaro had testified about her remorse.  Exhibit 123

21   (Declaration of Brent Conley) at ¶ 3.

22   **C.    HABEAS RELIEF IS WARRANTED**

23       15.   The constitutional violations set forth in this claim alone mandate relief

24   from the convictions and sentence.  However, even if these violations do not mandate

25   relief standing on their own, relief is required when this claim is considered together

26   with the additional constitutional errors outlined in the remainder of this petition.

27   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

28   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

16. The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless. In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice. For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XXVII.

## CLAIM 22:  THE TRIAL COURT'S FAILURE TO CLOSE PETITIONER'S TRIAL SO THAT SHE COULD TESTIFY WITHOUT FEAR OF RETALIATION VIOLATED HER CONSTITUTIONAL RIGHTS

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because of the

320

1   trial court's failure to close Petitioner's trial so that she could testify without fear

2   of retaliation.  As  a result, habeas relief is warranted.

3       1.  Exhaustion of the claim:  This claim was fairly presented to the California

4   Supreme Court in the direct appeal.  It was presented as Claim 5 in the Opening Brief.

5       2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

6   *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

7   state court's denial of this claim is both "contrary to" and an "unreasonable

8   application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

9   must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

10  this claim was dependent on an antecedent unreasonable application of federal law,

11  this Court "must then resolve the claim without the deference that AEDPA otherwise

12  requires."  *Panetti*, 127 S. Ct. at 2858.

13      3.  If Respondent disputes any of the facts alleged below, Petitioner requests an

14  evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

15  been afforded discovery and the disclosure of material evidence by the State, the use

16  of this court's subpoena power, and the opportunity to investigate fully, counsel

17  requests an opportunity to supplement or amend this petition.

18      4.  The declarations and other exhibits filed with this petition, as well as the

19  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

20  reference into this claim as though set forth in full.

21      5.  In support of this claim, Petitioner alleges the following facts, among others

22  to be presented after full discovery, investigation, adequate funding, access to this

23  Court's subpoena power, and an evidentiary hearing.

24  **A.    PROCEDURAL HISTORY**

25      6.  On March 18, 1992, after the prosecution had rested its case in chief,

26  Mr. Monroe moved to exclude the press and public from the courtroom during

27  Ms. Alfaro's testimony on the ground that "the presence of the press and public

28  during her testimony will be so prejudicial to the defendant that she will be deprived

of a fair trial." CT 489-95.  In support of this motion, Mr. Monroe filed a declaration

signed by Ms. Alfaro, which summarizes the testimony Ms. Alfaro would give

in her own defense and states that Ms. Alfaro fears retaliation from the "other male

hispanic" [sic] if she testifies in open court.  CT 497-a-c (March 18, 1992

proceedings).  Ms. Alfaro's declaration concludes:

> If I testify in public so the newspapers get the information and I identify this male hispanic [sic], I believe my family will be harmed because the man is still out in the community.
>
> I cannot and will not testify unless my testimony is taken in a closed courtroom with my testimony sealed.

CT 497 (March 18, 1992 proceedings).

7.  Although Ms. Alfaro admits in this declaration that she stabbed Autumn

Wallace,[30] and does not directly implicate the "other hispanic [sic] man" in Autumn's

murder, she does attest that he encouraged her to commit the murder by threatening

to harm her and her family if she did not "do something about Autumn."  CT 497-a-c

(March 18, 1992 proceedings).  Given that duress is not a defense to a capital crime,

*see* Cal. Penal Code § 26, this testimony, even if believed, would not have provided

a complete defense to the crimes charged.  It might, however, have given rise to

a defense at the penalty phase of the trial.  *See* California Penal Code § 190.3(g).

8.  The trial court agreed with Mr. Monroe that it had the authority to exclude

the public and media during Ms. Alfaro's testimony.  RT 1163-64.  Nevertheless, it

refused to do so, finding that while what Ms. Alfaro would testify to "might be

somewhat revolting and shocking," it had already been disclosed on the videotape"

(RT 1167-68); Ms. Alfaro's case "[didn't] involve any alleged abnormal practices, be

---

[30]  This declaration provides that Ms. Alfaro stabbed Autumn Wallace  "3 or 4 times."  CT 497-b (March 18, 1992 proceedings).  During her video-taped confession on June 27, 1990, Ms. Alfaro responded "I don't know, a couple of times" when asked how many times she had stabbed Autumn Wallace.  CT 531.  She then went on to describe stabbing Autumn an indeterminate number of times.  *Id.* at 531-32.  The declaration does not challenge the accuracy of Ms. Alfaro's confession in this regard, and may be read to convey that Ms. Alfaro only *remembered* stabbing Autumn three or four times.

322

1  it sexual, ritual, satanic, or anything else" (RT 1168); and, and that there was "no

2  evidence that our accused is in the condition of extreme emotional disturbance and

3  bewilderment at the prospect of testifying." RT 1168.  The court concluded that

4  Ms. Alfaro's sole concern was a "desire to avoid an alleged threat to herself or her

5  family, because that's the bottom line of it."  RT 1170.

6      9.  The court  also found that the "deterrence of an open hearing to the

7  commission of perjury," and "the possibility that the publicity attendant on an open

8  hearing will lead to the discovery of important witnesses," weighed against closing

9  the courtroom.  RT 1169-70.  Looking at the "the quality of the threat," the court

10  noted that the last threats had been made a year and half previously and that no

11  evidence existed that "this person is even in the area or counsel would have been able

12  to locate the person."  RT 1170-71.  The court also expressed concern that excluding

13  the public would cause "the jury to infer that the court assessed some credibility or,

14  in fact, believed that there was a valid threat to exclude the public during her

15  testimony. . . .  And I don't believe any instruction to the contrary would alleviate

16  the possible danger of that interpretation."  RT 1171.

17      10.  Without once mentioning Ms. Alfaro's right to testify and her assertion

18  that her fear was such that absent a closed courtroom, she would not testify, the court

19  concluded that Ms. Alfaro had not made the showing necessary to justify the court

20  exercising its discretion to close the courtroom.  The court appears to have based its

21  decision on its belief that closing the courtroom "could very well prejudice the other

22  side's case; that is, the prosecution's case, and may very well lead to us never finding

23  out who this alleged driver is."  RT 1172.  The court reasoned:

24          Maybe if we didn't have the four-hour video confession that we have
           already watched it might be a different story.  But we have already had
25          that.  And this court also questions the credibility of the defendant's
           story, especially in view of the numerous times on the tape that the
26          police allowed her an opportunity to tell them if anyone else was
           involved in the stabbings [*sic*]. . . . She was given many opportunities
27          to tell the police. . . .But I'm not making my decision on that basis.
           I'm making my decision on weighing all of the factors involved in the
28          *Kirstowsky* case, the public policy reasons and the common law reasons

1    for open hearings, and the lack of a showing of the quality that was
2    shown in the *Kirstowsky* case.

3    RT 1173.

4    11.   After the court denied the defense motion to close the courtroom during

5    Ms. Alfaro's testimony, Ms. Alfaro waived her right to testify, and Mr. Monroe

6    indicated that he had no affirmative defense to present and rested his case.  RT 1179.

7    Five days later, the jury found Ms. Alfaro guilty of all charges, and found the alleged

8    special circumstances to be true.  CT 1086-90.

9    **B.**    **LEGAL STANDARD**

10   12.   A criminal defendant's right to take the stand to testify on her own behalf

11   is a fundamental right "essential to due process of law in a fair adversary process."

12   *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (quoting

13   *Faretta v. California*, 422 U.S. 806, 819, fn.15, 95 S. Ct. 2525, 47 L. Ed 2d 562

14   (1975)).  The right to testify in one's own defense has its source in several

15   Constitutional provisions, including the Fifth Amendment's due process guarantee,

16   the Sixth Amendment's right to call witnesses in one's defense, and the right of a

17   defendant to control her own defense.  *See Rock*, 483 U.S. at 52 (citing *United States*

18   *v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982)).

19   In addition, the Fourteenth Amendment's guarantee "that no one shall be deprived

20   of liberty without due process of law include[s] a right to be heard and offer

21   testimony."  *Rock*, 483 U.S. at 51 (quoting *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct.

22   499, 92 L. Ed. 682 (1948).  Thus, "[e]very criminal defendant is privileged to testify

23   in [her] own defense, or to refuse to do so."  *Harris v. New York*, 401 U.S. 222, 225.

24   91 S. Ct. 643, 28 L. Ed. 2d 1 (1971).

25   13.   At the same time, criminal defendants are guaranteed the right to a speedy

26   and public trial by the United States.  U.S. Const., amend. VI.  The public trial

27   guarantee is a right created for the benefit of the defendant.  *See Gannett Co., Inc. v.*

28   *DePasquale*, 443 U.S. 368, 379, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979).  Public

1   trials give the defendant the assurance that the proceedings will be conducted fairly,

2   and are designed to discourage perjury, the misconduct of the participants, and

3   decisions based on secret bias or partiality.  *See Richmond Newspapers, Inc. v.*

4   *Virginia*, 448 U.S. 555, 569, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (citing

5   3 W. Blackstone Commentaries 372-73).

6       14.  The United States Supreme Court has recognized that "[t]he right

7   of 'public trial' is not one belonging to the public, but one belonging to the accused."

8   *Estes v. Texas*, 381 U.S. 532, 588-89, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965).  It is

9   this principle -- that the defendant has a right to a public trial --  upon which the

10  presumption that trials will be open is based.  The public's right of access to a

11  criminal trial, in contrast, is a qualified one, which must yield to a defendant's right

12  to a fair trial.  *See Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 81 L. Ed. 2d

13  31 (1984) ("the right to an open trial may give way in certain cases to other rights or

14  interests, such as the defendant's right to a fair trial"); *see also Richmond Newspapers*

15  *Inc. v. Virginia*, 448 U.S. 555, 581, fn. 18 (1980) (in the interests of the fair

16  administration of justice, a trial judge may impose reasonable limitations on access to

17  a trial); *Press-Enterprise Co. v. Superior Court (Riverside County)*, 464 U.S. 501,

18  508, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) ("[n]o right ranks higher than the right

19  of the accused to a fair trial").

20      15.  The United States Supreme Court has also recognized that "the most

21  important witness for the defense in many criminal cases is the defendant [her]self."

22  *Rock,* 483 U.S. at 52.  When the right of public access would interfere with a

23  defendant's right to testify, the trial court has an obligation to close the trial during

24  the defendant's testimony.

25      16.  Contrary to the trial court's ruling in this case, Ms. Alfaro did not have to

26  show that her testimony will be "revolting and shocking" to establish that in order to

27  preserve her right to a fair trial, the courtroom should be closed, at least temporarily.

28  Many courts have recognized that justice may require that a courtroom be closed

when a witness fears harassment or retaliation by a third party.  *See e.g.*, *United States v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir. 1992) (citing *Waller*, 467 U.S. at 45) (a trial court properly closes the courtroom for a non-defendant witness's testimony after finding that without closure, that witness would experience either harassment or discomfort or fear); *see also United States v. Hernandez (Juan)*, 608 F.2d 741, 747-48 (9th Cir. 1979); *United States v. Eisner*, 533 F.2d 987, 993-94 (6th Cir. 1976) (citing cases upholding closure based on the testifying witness's fear).  The justification for closing the courtroom because a witness fears a third party only grows when the witness is the defendant, who has a fundamental, constitutional right to testify.

17.  Given the fundamental nature of the defendant's right to testify, if full closure is not an option, the trial court has a duty to find an alternative.  *See Waller*, 467 U.S. at 48 (failure to consider alternatives to complete closure of suppression hearing violated defendant's right to a public trial).  The United States Supreme Court has stated that "courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966).[31]  A trial court may, for example, prohibit news reporters from attending or publishing information about the trial, "if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal." *Branzburg v. Hayes*, 408 U.S. 665, 684-685, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972).  Conversely, the trial judge could exclude the public and order the press to refrain from broadcasting or printing specific information.  *See Geise v. United States*, 262 F.2d 151 (9th Cir. 1958) (order of trial court excluding all spectators except members of the press, members of the bar or relatives of the victim and the defendant was not an abuse of the trial court's discretion).

---

[31]  The trial court in *Sheppard* failed to adopt stricter rules governing the use of the courtroom by newsmen, neglected to insulate witnesses from the press, and made no "effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides." *Id.* at 359.

1    ## C.    **THE TRIAL COURT'S REFUSAL TO CLOSE THE COURTROOM**

2    **DURING PETITIONER'S TESTIMONY VIOLATED HER**

3    **CONSTITUTIONAL RIGHTS**

4         18.  According to the declaration apparently signed by Ms. Alfaro on May 18,

5    1992, the third man threatened to harm her son if she did not "do something" about

6    Autumn.  CT 497-b (March 18, 1992 proceedings).  He also threatened Ms. Alfaro

7    herself at the scene and two days later, he sought her out and told her that he would

8    "get [her] and her kids and [her] mom if [she] talked."  CT 497-c (March 18, 1992

9    proceedings).

10        19.  The trial judge understood that Ms. Alfaro's testimony was critical to the

11   defense to which he had consigned her when, on February 21, 1992, he refused to do

12   anything to resolve the conflict that had erupted between Ms. Alfaro and her attorney

13   over her desire to plead guilty and her counsel's insistence on mounting a defense.  At

14   the hearing, the court had stated (addressing Mr. Monroe):

15        The Court: [Y]our whole defense is based upon her getting on the stand
          and pointing the finger at somebody else.  And she is not going to do
16        that, . . . not unless she changes her mind.  *And if she doesn't do it, it
          definitely handicaps your efforts to defend her.*

17

18   RT  116 (emphasis added).  (February 21, 1992 Hearing).  Less than a month later,

19   informed what it would take to get Ms. Alfaro to "change[ ] her mind," the trial judge

20   denied the defense motion to close the courtroom.  In so doing, the judge virtually

21   insured that the defense strategy he had forced on Ms. Alfaro against her will would

22   fail.

23        20.  Some of the reasons articulated by the court for refusing to close the

24   courtroom were proper while others were not.  But even the proper considerations did

25   not outweigh Ms. Alfaro's right to a fair trial, which includes both honoring her right

26   to testify and her right to present a defense.  Moreover, Ms. Alfaro requested only

27   a partial closure of the trial -- just enough to allow her to testify free of fear.  Given

28   the constitutional weight of her interests and the limited nature of the request,

Ms. Alfaro's motion for a temporary and partial closure of the proceedings in order to protect her constitutional rights to testify in her own defense, to present a defense, and to a fair trial, should never have been denied. *See United States v. Hernandez*, 608 F.2d at 747 (noting that "the right to a public trial does not preclude a limited exclusion of spectators when there is a demonstrated need to protect the witness from threatened harassment or physical harm.").

21.   The trial court based its decision to deny the motion to close the courtroom, in part, on the dubious ground that *the trial court* had doubts about Ms. Alfaro's credibility.  RT 1173 (court "questions the credibility of the defendant's story, especially in view of the numerous times on the tape that the police allowed her an opportunity to tell them if anyone else was involved in the stabbings").  While one may question whether Ms. Alfaro's testimony would have amounted to a guilt phase defense, testimony concerning the threats to her own child that preceded the murder of Autumn Wallace would have supported a penalty phase defense.  Moreover, while Ms. Alfaro's testimony may not have provided a sufficient showing to justify an aiding and abetting instruction, it might have supported a lingering doubt mitigating circumstance at the penalty phase.

22.   First, Ms. Alfaro was not required to testify that "anyone else was involved in the stabbings" in order to assert her constitutional right to take the stand. Moreover, as Wigmore observed, "'if the evidence is really of no appreciable value, no harm is done in admitting it:  but if the evidence is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt.'"  Wigmore, *Evidence* (Tillers rev. ed. 1980) § 139, p. 1724.

23.   But perhaps even more importantly, Ms. Alfaro's right to testify did not depend on her ability to convince the judge of the truth of her story.  Whether her testimony was credible or not was a question for the jury.  "A fundamental premise of our criminal trial system is that 'the jury is the lie detector.'"  *United States v.*

1   *Sheffer*, 523 U.S. 303, 313, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998) (quoting

2   *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973). "Determining the

3   weight and credibility of witness testimony, therefore, has long been held to be the

4   'part of every case [that] belongs to the jury, who are presumed to be fitted for it by

5   their natural intelligence and their practical knowledge of men and the ways of men

6   [and women].'" *U.S. v. Sheffer*, *523* U.S. at 313 (quoting *Aetna Life Ins. Co. v. Ward*,

7   140 U.S. 76, 88, 11 S. Ct. 720, 35 L. Ed. 371 (1891).

8       24.  The trial court also based its decision to deny Ms. Alfaro's motion on its

9   perception that closing the courtroom would be giving credibility to Ms. Alfaro's

10  fears, and as a result, would amount to the court taking sides. RT 1171-72 ("In fact,

11  it would appear to this court that so doing could very well prejudice the other side's

12  case, that is, the prosecution's case, and may very well lead to us never finding out

13  who this alleged driver is.").  No one who reads the transcript of this trial will be

14  concerned that the trial judge gave the appearance at any time of taking sides with

15  Ms. Alfaro.  But even if it had, the court gave too much weight to the influence

16  of appearances on the jury.  A well placed curative instruction could have avoided

17  any risk of the jury assuming Ms. Alfaro was telling the truth based solely on the fact

18  that the doors of the courtroom were closed during her testimony.  The court usurped

19  the jury's function and denied Ms. Alfaro her right to testify in rendering its decision

20  not to close the courtroom on this basis.

21  **D.   CONCLUSION**

22      25.  Having forced Ms. Alfaro to endure a guilt phase trial, the court proceeded

23  to deprive her of any conceivable advantage from her counsel's ill-formed strategy.

24  Fearful to implicate the third man in any way, Ms. Alfaro was unwilling to tell her

25  story absent some protection from retaliation.  That there was a third man present at

26  the scene was not in doubt.  Ms. Alfaro's fears were not unbelievable.  The effect

27  of the trial court's refusal to close the trial was to deprive Ms. Alfaro of her most

28  fundamental constitutional rights.  The court's error is compounded by its failure to

even consider an alternate remedy.  As  a result of the trial court's failure to give due weight to Ms. Alfaro's right to a fair trial, her Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated and habeas relief is required.  *See*, Exhibit 122 (Declaration of Denise Coburn) at ¶ 2; Exhibit 123 (Declaration of Brent Conley) at ¶ 3.

26.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 637-38.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

27.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XXVIII.

## CLAIM 23:  THE TRIAL COURT'S FAILURE TO SUBSTITUTE PETITIONER'S COUNSEL VIOLATED HER CONSTITUTIONAL RIGHTS

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to

330

present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court failed to substitute her trial counsel.  As  a result, habeas relief is warranted.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 6 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

**A.     <u>INTRODUCTION</u>**

6. This case involved an irreconcilable conflict between client and counsel which resulted in a complete breakdown of their relationship.  The conflict arose when Ms. Alfaro expressed her desire to plead guilty to the charges and Mr. Monroe

refused to give his consent.  It grew when Mr. Monroe sought to blame an
unidentified person who was observed outside the Wallace home for Autumn's
murder, and Ms. Alfaro refused to assist him in identifying or implicating this
individual.  Its impact became obvious when Ms. Alfaro refused to testify at the guilt
phase of her trial and, bereft of physical evidence or witnesses to support his
hypothesis, Mr. Monroe was forced to abandon all semblance of a defense, conceding
Ms. Alfaro's guilt to first degree murder in his closing argument, and withdrawing his
request for an aiding and abetting instruction.

7.  During the first penalty phase, all vestiges of Ms. Alfaro's trust in
Mr. Monroe were destroyed.  Having refused to testify at the guilt phase, Ms. Alfaro
agreed to take the stand during the penalty phase only after her counsel assured her
that she would not be required to respond to questions about the crime.  But when,
on direct, Mr. Monroe had Ms. Alfaro read a letter she had written to Autumn
Wallace -- one he had previously reviewed -- in which she stated, "Autumn, if you
could hear me, please don't turn away cause I want you to know that I'm sorry
we took your innocent life," the trial court ruled that the door had been opened
to cross-examination about the details of the crime.  The district attorney proceeded
to interrogate Ms. Alfaro using statements attributed to her by the defense psychiatrist
that Ms. Alfaro understood to have been made in confidence.  Wholly unprepared for
such an examination, Ms. Alfaro felt utterly and completely betrayed by her counsel.

8.  That the jury, having heard Ms. Alfaro express her remorse, could not reach
a verdict, meant that the case would go on.  Having made a sustained, good faith
effort to work with Mr. Monroe, Ms. Alfaro was unwilling to endure a retrial
represented by the attorney who had lied to and misled her.  When brought to court
for the setting of her retrial, Ms. Alfaro sought substitute counsel.  The colloquy
between Ms. Alfaro, Mr. Monroe, and the court during the ex parte hearing that
followed her motion leaves no doubt as to the depth of the division between client
and counsel.  Nevertheless, finding the motion untimely and that Mr. Monroe had not

332

1  performed incompetently, and informing Ms. Alfaro that she would refuse to
2  cooperate with Mr. Monroe "at her own peril," the court denied Ms. Alfaro's motion
3  for substitute counsel.

4      9.  Six weeks later, the second penalty trial began.  In his opening statement,
5  Mr. Monroe continued to peddle his story that a mystery man was responsible for
6  Autumn Wallace's fatal wounds.  The damage done to his relationship with
7  Ms. Alfaro by his insistence on this insupportable defense, as well as his inadequate
8  advice concerning her testimony in the previous trial, took a serious toll.
9  Ms. Alfaro's mental condition deteriorated to the point that she needed "acute mental
10  health care" during the second penalty trial.  And there is no evidence that
11  Mr. Monroe brought this fact to the attention of the court.[32]  Ms. Alfaro refused to
12  take the stand.  Her failure to testify meant that much of the mitigating evidence
13  admitted at the first penalty trial was excluded at the second.  And, as her counsel and
14  the trial court had agreed during the *Marsden*[33] hearing, without her testimony "she
15  didn't have much of a chance to save her life."  After deliberating three days, the jury
16  sentenced her to death.

17      10.  Confronted with a second penalty trial, believing that her counsel had
18  inadequately represented her at her first trial, and finding herself and her counsel
19  "embroiled in an irreconcilable conflict,"  Ms. Alfaro asked the trial court to replace
20  Mr. Monroe.  At the *Marsden* hearing held April 9, 1992, she presented evidence
21  of both inadequate representation and of an irreconcilable conflict likely to prevent
22  her from receiving effective representation at her penalty retrial.

23      11.  Ms. Alfaro's request could not have been more timely.  Believing the case
24  to be nearing its end, and uncertain as to how to go about bringing the issue to the

25

26      [32]  This information appears in the Probation Officer's Presentence Report, in
   the section devoted to "Adjustment In Orange County Jail."  CT 1745-46.
27
28      [33]  *People v. Marsden*, 2 Cal. 3d 118, 123, 465 P.2d 44, 84 Cal. Rptr. 156
   (1970).

court's attention, she did not request a hearing during the week the first jury was deliberating.  But the day it became clear that a second trial would be held, she asked to be heard.  Her request came one week after her testimony; immediately after the first jury had been discharged; before the retrial had been scheduled; and six weeks before the second penalty trial actually commenced.

12.  A bedrock principle of our criminal justice system, embodied in the Sixth Amendment, is that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for [her] defense."  U.S. Const., 6th Amend.  Because "fair trials before impartial tribunals" require that each defendant, poor as well as rich, stands equal before the law, the Constitution further requires that states provide counsel to assist indigent defendants if they are unable to retain counsel.  *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).  For this right to have meaning, publicly paid and privately retained counsel alike must provide adequate representation.  *See Douglas v. California*, 372 U.S. 353, 354-57, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963).

13.  When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.  A defendant is entitled to relief if the record shows that the first appointed attorney is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.

14.  The conflict between Ms. Alfaro and Mr. Monroe regarding the course of her defense cannot be described as a disagreement over tactics.  Their disagreements encompassed the most fundamental decisions a defendant must make, including the plea to the criminal charges, the substance of the defense, and whether or not she would testify in her own defense.  When the trial court denied Ms. Alfaro's request to replace Mr. Monroe with another attorney, he consigned her to counsel

1   with whom she could not communicate.  As  a consequence, she did not receive

2   adequate representation at her second penalty phase trial, in violation of her Fifth, and

3   Fourteenth Amendment rights to due process, a fair trial, her Sixth Amendment right

4   to effective counsel, and her Eighth Amendment right to a reliable, rational and

5   accurate determination of death eligibility and death worthiness.

6   **B.    STATEMENT OF FACTS**

7        15.  The record is replete with examples of the conflict that existed between

8   Ms. Alfaro and her counsel, William Monroe, concerning the fundamental issues

9   of how she would plead to the charges, the substance of her defense, and whether or

10  not she would testify in her own defense.  April 9, 1992, was not the first time the

11  attorney-client conflict was brought to the trial court's attention.  But on each

12  occasion when the issue was raised, the trial judge downplayed the nature

13  of Ms. Alfaro's and her counsel's disagreement and steadfastly refused to take any

14  action to insure that Ms. Alfaro received adequate representation at her capital trial.

15       16.  To fully understand the desperation experienced by Ms. Alfaro as a result

16  of her conflict with Mr. Monroe, it is important to keep in mind the core of their

17  dispute.  While a plea of guilty to the charges would have exposed Ms. Alfaro to a

18  penalty trial, it would also have provided a mitigating factor universally deemed

19  relevant to the jury's penalty determination.  On the other hand, the defense chosen

20  by Mr. Monroe, that someone other than Ms. Alfaro committed the crime, was

21  doomed to failure.  Ms. Alfaro's four-hour videotaped confession, the physical

22  evidence tying her to the crime scene and Ms. Alfaro's unwillingness to implicate

23  anyone else in the murder, ensured that the defense would be rejected.  Even if the

24  jury had overlooked all of these problems, Mr. Monroe's defense strategy addressed

25  only one of the state's alternative theories of Ms. Alfaro's liability for first degree

26  murder.  The Information charged that Ms. Alfaro acted "willfully and unlawfully and

27  with malice aforethought," but it also alleged that the murder was committed "while

28  the defendant was engaged in the commission of" robbery and burglary in the first

335

degree.  CT 63-64.  Thus, even if successful, Monroe's theory of the defense would not have prevented a conviction for first degree felony-murder.  As  Mr. Monroe made no attempt to defend Ms. Alfaro against the charged special circumstances, Mr. Monroe's strategy had no chance of avoiding a penalty trial.

### 1.    **September 1991**

17.  On September 9, 1991, Mr. Monroe filed a declaration under seal in which he requested funds to hire an expert by the name of "Dr. Danto" to administer Sodium Pentothal to his client.  CT 274-76 (Sept. 9, 1991, 987.9 records).  In the course of his declaration, Mr. Monroe not only disparaged his client, he did so to the judge who would later weigh the aggravating and mitigating factors to decide whether Ms. Alfaro would live or die.  Crucially, this was not a situation in which Ms. Alfaro had waived her attorney-client privilege.  Stated Monroe:

> [T]he information provided by my client tends to be inconsistent at times . . . .
>
> It is imperative that we obtain information from the defendant which is not colored by some subconscious fear, ulterior motive or hidden bias.
>
> My interviews with other experts who have examined MARIA DEL ROSIO ALFARO, have suggested there is a substantial likelihood that I may be able to obtain the information I need by employing certain chemical devices including but not limited to the use of sodium pentothal [sic].

CT 274-75 (September 9, 1991, 987.9 records).

18.  That Monroe felt the need to administer "truth serum" to his client speaks volumes about their relationship.  That he told the judge Ms. Alfaro had been "inconsistent" and that he needed to give her drugs to obtain information not colored by "ulterior motive[s]" not only served to bias the court against her, it put the court on notice that theirs was a relationship in serious trouble.  That Monroe sent Ms. Alfaro to Dr. Danto in the custody of Sheriff's Deputies who were required to be present during the doctor's administration of Sodium Pentothal and subsequent interrogation

of Ms. Alfaro about the crime is beyond comprehension.[34]  CT  277-78 (Sept. 9, 1991, 987.9 records).

### 2.   November 1991

19.  On November 1, 1991, Mr. Monroe filed a motion to continue the trial on the ground that more time was required to obtain and analyze evidence.  CT 231-39.  In his declaration in support of the motion, Monroe confirmed that the story that someone other than his client was responsible for the murder was *his*:

> *Defendant's counsel* has contended that a third person perpetrated this heinous act and that defendant confessed in fear for the safety of her family.  Evidence of a third person in the home will support the theory.  *Defendant's attorney* also contends that blood which is neither that of the defendant nor the victim may be on the clothing yet to be examined.

CT 236 (emphasis added).

20.  At the hearing on this motion, Monroe explained the genesis of his theory of defense:  "[T]his terrible crime was so heinous, so awful, that it had to be committed by a person either under some terrible state of drugs or with an absolutely malignant heart," and that although the defendant "admitted to being wired," "the background which has been developed with respect to the defendant does not disclose, quote, that malignant heart that could have perpetrated this kind of crime to which she apparently has admitted to this to the police department."  RT 27-28 (Nov. 8, 1991 proceedings).  Monroe reported that he had been "aggressively developing that theory," but that he needed more time.  *Id.* at 28.

---

[34]  Although the Sheriff's Deputies who transported Ms. Alfaro and attended her session were instructed to keep the matter confidential (CT 278 (Sept. 9, 1991, 987.9 records)), the District Attorney did become aware of Ms. Alfaro's interview by Dr. Danto while under the influence of Sodium Pentothal, as a result of an article in the Orange County Register on November 26, 1991.  RT 82 (Dec. 2 1991 proceedings).  The article, which appeared *pretrial*, erroneously reported that Ms. Alfaro had been *convicted* of murder and that Dr. Danto had been hired to give her Sodium Pentothal and thereby "enhance her memory which she contends was affected by drugs she was taking at the time of the slaying."  RT 82 (Dec. 2 1991 proceedings).

21.  In response, the district attorney pointed out that during her interview with the arresting officers, Ms. Alfaro had "admitted not once, not twice, not four, not seven times, probably in excess of ten times how she did it.  She was alone in the house when she did it."  RT 30-31 (Nov. 8, 1991 proceedings).  The district attorney opined that the defense request for additional discovery was "just a fishing expedition."  *Id.* at 31.

22.  Before ruling, the trial court called Mr. Monroe and Ms. Alfaro into chambers.  RT 33-39 (Nov. 8, 1991 proceedings).  During this ex parte conference, the court asked Mr. Monroe for an offer of proof as to what he hoped to glean from the materials he had requested.  *Id*. at 34.  Monroe proceeded to tell the court his theory of the case, concluding with the statement, "the problem we have right now is that we have yet to find any independent evidence to support the premise that this guy was in the house."  *Id*. at 35.  Thereafter, the judge announced in open court that it was "this court's opinion that good cause has not been shown for a continuance."  *Id.* at 40.

### 3.    <u>February 20-21, 1992</u>

23.  On February 20, 1992, approximately two weeks before trial, Mr. Monroe filed an ex parte request for "special instructions from the court as to whether or not the court believes it is necessary for me to withdraw from the case."  CT 10 (February 20, 1992 proceedings).  Both his written motion and his statements at the ex parte hearing that took place the following day evidence the degree to which Ms. Alfaro and Mr. Monroe were in conflict regarding Ms. Alfaro's desire to plead guilty to the criminal charges, the substance of the defense, and whether or not Ms. Alfaro would take the witness stand in her own defense.

24.  In his papers, Mr. Monroe informed the court that "my client, Maria del Rosio Alfaro, refuses to follow my instructions and take the stand and implicate 'Beto' and refuses to allow to me [sic] to call and cross-examine 'Beto' on her

338

1  behalf." *Id.* at 9-10.  He writes, "If my client insists on pleading guilty to the special
2  circumstances, it is against my most rigorous advice." *Id.*

3      25.  During the ex parte hearing held February 21, 1992, Mr. Monroe informed
4  the court, "I believe I'm asking the court to give me a lead or advice as to whether or
5  not the court believes I should declare a conflict because I believe that a conflict may
6  exist." RT 110 (February 21, 1992 proceedings).  Monroe explained that the heart
7  of the conflict was his refusal to consent to a guilty plea and insistence that
8  Ms. Alfaro take the stand and implicate "Beto," the man Monroe said he believed "is
9  the other killer," and Ms. Alfaro's desire to plead guilty, and her "adamant[],
10 adamant[] refus[al] to allow [him] to call Beto or to cross examine Shorty regarding
11 his relationship with Beto." *Id.* at 110-12.  Monroe informed the court that his and
12 Ms. Alfaro's conflict was fundamental, stating, "If she is instructing me not to present
13 that evidence, in effect she and I are at loggerheads." *Id.* at 113-14.  He told the court
14 that he could not effectively represent Ms. Alfaro because, as a result of her refusal to
15 testify as he wished, he could not develop his sole defense theory. *Id.* at 115.

16     26.  Despite defense counsel's strong language, and the trial judge's admitted
17 knowledge that the conflict was longstanding, the trial judge refused to take any
18 action to unravel the fundamental dispute presented to it:

19      [T]he mere fact that you and her [sic] disagree over her getting on the
        stand might be a conflict in fact between you.  But it is not the kind of a
20      — kind of conflict that is a legal conflict that would justify the court in
        appointing new counsel to represent her especially on the eve of trial.
21      And this thing has been going on for a long time and apparently you've
        had this — you have been at loggerheads with her for some time.
22

23 *Id.* at 116-117 (February 21, 1992 proceedings).

24     27.  Once it became clear to Mr. Monroe that he could prevent Ms. Alfaro from
25 pleading guilty, but could not force her to take the witness stand, he realized that
26 Ms. Alfaro's case was in trouble.  He urged, "at a minimum, Your Honor, we ought to
27 have counsel appointed to advise her about the consequences of her act." RT 117
28 (February 21, 1992 proceedings).  He repeated, "because of this conflict that she

1   and I have, maybe an independent person should be talking to her." *Id*.  But the

2   trial judge, mischaracterizing Mr. Monroe's pleading, rejected even this request

3   for limited assistance:

> Well, you haven't raised anything in this paperwork that would indicate
> that you are having a communication problem or that she is not
> understanding what you're saying or that somebody else would be in a
> better position to do it.  There is nothing in there at all.  You just
> basically have a basic disagreement over the tactics in defending her.

7   *Id.* at 118.  Anxious to avoid any misunderstanding as to the nature of the conflict,

8   Mr. Monroe told the court:  "It's more profound than that.  It's a basic disagreement

9   [over] what she wants to do with her life."  *Id.* at 118.  He emphasized, "*pleading*

10  *guilty is more than tactics*."  *Id.* at 120 (emphasis added).

11      28.   In response, the trial judge repeated that he would not accept a guilty plea

12  from Ms. Alfaro over Mr. Monroe's objection.  *Id.* at 118-119 (February 21, 1992

13  proceedings).  Mr. Monroe then turned to Ms. Alfaro:  "You understand that Rosie --

14  Miss Alfaro?"  *Id.* at 119.  Ms. Alfaro, confounded by her situation, responded:

15  "Then what am I going to do?  I told you what I wanted to do."  *Id.*  For the record,

16  Mr. Monroe  asked her to state:  "What do you want to do?"  Her reply:  "Plead guilty."

17  *Id.*  At this point, Mr. Monroe turned back to the court: "*You put me in an absolutely*

18  *untenable position, Judge Millard*."  *Id.* (emphasis added).  The court then stated:

> That is what you think. I don't think so.  *You are no different than other
> lawyers that have a disagreement over tactics*.  Cases are legion in the
> California courts that a mere disagreement over tactics does not justify --
> is not a legal conflict from the standpoint of such magnitude that will
> effectively deny the person their right to counsel.  There are all kinds
> of tactical conflicts that occur in cases of criminal and civil cases.  That
> doesn't mean that on the eve of trial all of a sudden we change attorneys
> and start the case all over again.  It just doesn't happen that way.

24  *Id.* at 119 (emphasis added).  The court failed to recognize that few other lawyers find

25  themselves in Mr. Monroe's position:  able to prevent his client from pleading guilty,

26  but not from refusing to testify to give crucial support to *his* theory of the defense.

27  / / /

28  / / /

**4.**    <u>March 5, 1992</u>

29.  On March 5, 1992, a mere four days before the beginning of the guilt phase trial, Mr. Monroe filed a declaration requesting additional investigative funds.  In his declaration he revealed a disturbing attitude toward his client:

> The defense of this case has been based on the proposition that the crime was so heinous that it could have only been committed by a person under the extreme influence of PCP or some similar drug or the person had an absolutely abandoned, malignant, and vicious heart.
>
> The preliminary inquiry disclosed that the client was not under a hallucinogenic which would have left her out of control.  However, the initial investigation also strongly suggested that she was not capable of committing this crime alone.
>
> Although the police had initially investigated this area, they discounted it and it fell to the defense to begin to develop that particular theory.
>
> * * *
>
> The client . . . was less than candid during the initial stages of our investigation.
>
> * * *
>
> The client's statements to defense counsel and his investigators changed as frequently as her decision as to whether or not to she would cooperate in her own defense.
>
> * * *
>
> It was because [the investigator went to Mexico] that we were able to develop independent evidence to *breakdown the client's changing facade and have her finally admit to what we believe is the true theory of the defense* which we are now in a position to present to the jury.

CT 535-39 (March 5, 1992, 987.9 records).

30.  To fully appreciate the implications of Mr. Monroe's statement that he was finally able "to breakdown the client's changing facade and have her finally admit to what we believe is the true theory," one need look no further than his declaration, filed April 17, 1992.  CT 1196-1207.  In this declaration, Mr. Monroe asked for a continuance of the retrial to insure that Dr. Consuelo Edwards, the defense psychiatrist, would be available to testify.  He stated that he expected Dr. Edwards to testify that Ms. Alfaro is "a follower" who *"suffers from a Dependent Personality*

341

1   *Disorder which makes her subordinate herself to others and agree with them, even*

2   *if she believes they are wrong, for fear of being rejected.*"  CT 1202-03 (emphasis

3   added); RT 4087.

### 5.  March 9-18, 1992:  The Guilt Phase Trial

31.  Ms. Alfaro's conflict with Mr. Monroe could only have intensified after the jury was impaneled and the trial began.  Despite Mr. Monroe's insistence that Ms. Alfaro plead not guilty to the charges, during his opening statement he admitted to the jury that his defense was based on nothing more than conjecture; that he was grasping at straws:

> The evidence will disclose that although there is no independent evidence to support the proposition that a third party was in the house, there will be testimony disclosing that other items of evidence had not been tested or analyzed to confirm or eliminate the possibility that a third person might have been in the house and was the real perpetrator.

RT 625-26.

32.  Things got no better during the remainder of the guilt phase of the trial. Though she could not prevent her attorney from arguing that someone else killed Autumn Wallace, Ms. Alfaro could and did refuse to take the stand to support her counsel's theory.  RT 1179.  Despite Monroe's assurances to the court that he would present other defense witnesses (RT 1179), Mr. Monroe called no witnesses.  RT 1179.  And, in his closing remarks, seemingly oblivious to the fact that Ms. Alfaro had been charged with felony murder, Mr. Monroe conceded to the jury that Ms. Alfaro stabbed Autumn Wallace after entering the house to steal.  He asked the jury to "find that, yes, Rosie Alfaro did stab little Autumn.  Rosie Alfaro did not kill that little girl."  RT 1294.  Further conceding guilt, as well as demonizing his client in the eyes of the jury, he stated, "At one time [Ms. Alfaro] says, 'I stabbed her three or four times.'  That might be consistent with the likes of Rosie Alfaro."  RT 1303.

33.  The jury returned a guilty verdict in less than a day.  RT 1398; CT 1086.  It found Ms. Alfaro guilty of first degree murder; it found true the special circumstances that the murder was committed while the defendant was engaged in the commission

1    of a robbery and a burglary; and it found true that the defendant had personally used a

2    knife in the commission of these crimes.  RT 1398-1410; CT 1086-90.

3         **6.    March 30-April 1, 1992:  The First Penalty Phase Trial**

4         34.  On March 30, 1992, the penalty phase began.  CT 1096-98.  During the

5    penalty phase, Ms. Alfaro agreed to testify only after Mr. Monroe assured her that she

6    would not be required to answer questions about the crime.  RT 2127 (April 9, 1992

7    proceedings).  On direct, Ms. Alfaro testified about her background and upbringing.

8    RT 1592-1627.  At Mr. Monroe's request, she also read a letter that she had written to

9    Autumn Wallace which Monroe had previously reviewed.  RT 1630.  Ms. Alfaro

10   read, "Autumn, if you could hear me, please don't turn away 'cause I want you to

11   know that I'm sorry we took your innocent life."  RT 1630-31.

12        35.  When Mr. Monroe finished his direct examination of Ms. Alfaro, the

13   district attorney proceeded to cross-examine her about the circumstances of the crime.

14   Although Mr. Monroe repeatedly objected, the trial judge ruled that the door had been

15   opened to cross-examination concerning the details of the crime.  RT 1631, 1633,

16   1635, 1647-52.

17        36.  In response to the district attorney's first question, "Rosie, who killed

18   Autumn Wallace?," Ms. Alfaro answered, "I did."  RT 1631.  The district attorney

19   then proceeded to question her about statements attributed to her by the defense

20   psychiatrist to the effect that another person had been involved in the crime.

21   RT 1632-37.  When Ms. Alfaro refused to name this person, the district attorney

22   asked her why she had mentioned him to Dr. Edwards.  Ms. Alfaro responded,

23   "Because I thought whatever I said to her she wasn't going to say anything."

24   RT 1633.  During the examination that followed, Ms. Alfaro confusedly affirmed

25   statements attributed to her by Dr. Edwards that were consistent with Mr. Monroe's

26   theory that another person was involved in the killing.  RT 1633.  In fact,

27   as Dr. Edwards later testified, Ms. Alfaro had not told her that Beto did it.  Rather,

28   on the occasion that the district attorney claimed Ms. Alfaro purportedly "said Beto

343

page

did it," in fact, Dr. Edwards had "confronted [Ms. Alfaro] with the fact that the defense [had shown Dr. Edwards] a composite picture of one of the men that was in front of the house and that this man was called Beto . . . ," at which point Ms. Alfaro "said she didn't want any of this and was going to dismiss her attorney."  RT 4204. As  the district attorney readily admitted during a hearing outside the presence of the jury, his strategy in asking Ms. Alfaro these questions was to make her out to be a liar; in particular, to undermine her earlier expression of remorse.  RT 1647.

37.  Ms. Alfaro was the last witness before the jury began its deliberations on April 2, 1992.  On April 8, 1992, after deliberating for nearly a week, the jury informed the court that they could not reach a verdict and a mistrial was declared. RT 2113.

38.  The next morning, the parties returned to court and Ms. Alfaro asked the trial court to replace Mr. Monroe.  RT 2119.

## 7.     April 9, 1992:  The *Marsden* Hearing

39.  Faced with the prospect of picking a new jury and having a second penalty phase trial, Ms. Alfaro unequivocally requested that Mr. Monroe be relieved as her counsel and that a new attorney be appointed to represent her.  RT 2119 (April 9, 1992 proceedings).  The following discussion took place during the ex parte in chambers hearing on this *Marsden*[35] motion:

The Court:  All right.  You want to tell me about your attorney problem?

The Defendant:  Yes.  I feel he misrepresented me.  He lied to me about --

The Court:  I'm sorry, I didn't hear the first part of it.

The Defendant:  He misrepresented to me, he lied to me, about going on the stand.  I thought there was never going to be any cross examination from what he had told me and there was.

The Court:  Okay.

---

[35]  *See Marsden*, 2 Cal. 2d at 123 (Court held that judge who denies motion for substitution of attorneys solely on basis of his courtroom observations, despite defendant's offer to relate specific instances of misconduct, abuses exercise of discretion to determine competency of attorney).

1   The Defendant:  He's been wanting me to do things I never wanted to do.
    He still goes ahead and does them.

2
    The Court:  All right.  Let me -- okay.  You're telling me that he
3   represented to you that if you testified that you would not be cross
    examined?

4
    The Defendant:  Yes.
5
    The Court:  Do you have -- is that your main -- is that your main
6   complaint?

7   The Defendant:  Yes, it is.

8   Mr. Monroe: Miss Alfaro told me she would not talk to me any more, she
    would not cooperate with me any more, she would not do anything that I
9   asked that I wanted her to do.

10  The Court:  Is that true, did you tell him that?

11  The Defendant:  Yes, that's true.

12  The Court:  Did you -- what kind of a statement did you make to her
    about cross examination, if you did?

13
    Mr. Monroe: *I told her that we would limit the cross examination*
14  *to the areas that we covered in the taking her through her early life,*
    and that the District Attorney would attempt to cross examine her
15  on the guilt phase testimony where she says she would not take the stand
    and I would object to that testimony coming in.  Miss Alfaro feels that
16  basically I betrayed her.

17  The Court:  . . . *Let me see if I understand what you are telling me,*
    *Mr. Monroe. You're telling me that you represented to her that you*
18  *would limit the examination to matters concerning her background not*
    *involving the crime?*

19
    Mr. Monroe:  *To the best of my recollection, Your Honor, yes.*
20
    The Court:  Why is it then you asked questions about the day of the
21  crime?

22  Mr. Monroe:  I simply asked her if she had a statement to make to Linda
    Wallace and that's when she made the apology to Linda Wallace.

23
    The Court:  Well, I recall, I recall you asking her some questions about
24  how she felt or if she was sorry for what -- something about the day
    of the crime.

25
    Mr. Monroe:  I may have, Judge Millard.  As  I sit here now, I have
26  no clear recollection. . .

27  . . . I did not say to her unequivocally that I would keep Middleton's
    cross examination out.  I said I would object to it in the event -- not
28  in the event, when he did attempt to go into it.

345

1   The Court:  Well, you're telling me some mixed things here.  Are you
2   telling me that you disagree with her statement that she would never
    be cross examined on the day of the crime?  That's in effect what
3   Miss Alfaro is telling me.

4           * * *

5   Mr. Monroe:  I cannot tell you unequivocally I would have told her.
    What I probably would have told her is yeah, Middleton will probably
6   go into it, or will go into it, and I would object to that.  That may be not
    Miss Alfaro's recollection or perception of what I told her.

7           As the court can recall, Miss Alfaro was adamant in [not] taking
8   the stand in the guilt phase because of the fear of getting into that area.

            * * *
9
            I was clear about taking Miss Alfaro up through her childhood
10  and then I was clear about, as I said, in effect on the day of the crime
    skirting everything regarding that day and saying "do you have
11  something to say to Linda Wallace?" --  something along those lines.
    And she made that extemporaneous statement of remorse to Linda
12  Wallace and then I stopped and Mr. Middleton started his cross
    examination.
13

14  RT 2119-23 (emphasis added) (April 9, 1992 proceedings).

15      40.  At this point, the judge recessed the hearing and requested that the court

16  reporter provide the court with a transcript of Ms. Alfaro's testimony.  RT 2123

17  (April 9, 1992 proceedings).  The proceedings then resumed:

18  The Court:  It appears from my review of the transcript that when Rosie
    got on the witness stand to testify that she had the letter [to] Autumn
19  with her.

20  Mr. Monroe:  May have or I may have given it to her.

21  The Court:  *And I assume, you can correct me if I'm wrong, you and
    your client went over the contents of that letter before you asked her
22  any questions about it in court.*

23  Mr. Monroe:  *Yep.*

24  The Court:  Okay.  And you've had some time to reflect on it.  Do you
    recall exactly what you told Rosie about the scope of cross examination?
25
    Mr. Monroe:  No, judge, we talked about it on and off both in the guilt
26  phase and the penalty phase about the pros and cons of going on the
    stand versus not going on the stand.  We went through her concerns
27  about her fear for her family and her life.  I talked about the importance
    of the jury hearing her, seeing her, and hearing about her remorse.  It
28

346

1   wasn't just a single conversation, it was a thread of a conversation over a period of time.

2

3   The Court:  Well, did you ever tell her that under no circumstances would Mr. Middleton be able to ask her about the circumstances of the crime?

4

5   Mr. Monroe:  I cannot honestly tell you that I said under no circumstances that Mr. Middleton could examine her under the circumstances of the crime.

6

7        What I do recall telling her was Mr. Middleton would attempt to and I'd object. How Rosie perceived that, I can't say; or how she interpreted it, I can't say.

8

9   The Court:  Okay.  Well let me ask you this.  You and she were aware when she got on the stand that you were going to ask -- in effect, ask her to read that letter to Autumn.

10

11        Is that a fair statement, Rosie?

12   The Defendant:  Yes, it is.

13   The Court:  I haven't read the letter but I have read the transcript where she read the letter, so I assume she read it accurately or I assume the transcript is accurate.

14

15   Mr. Monroe:  It is.

16   The Court:  *And I'm just puzzled, I guess, I'm puzzled if you read over the letter, how you in your professional opinion could have an idea that Mr. Middleton wouldn't be able to examine on the day of the offense.*

17

18        I'll give you an example. . . .  It says, question was on [page] 1630 line eighteen, "Rosie, did you write a letter to Autumn?"  And then Rosie reads the letter. . . .  It says, "Autumn, if you were here, please don't turn away because I want you to know I'm sorry we took your innocent life."  Okay.  I can just stop right there.

19

20

21        As soon as she testified "I'm sorry we took your innocent life," that would appear to me that under any reasonable interpretation of evidence that anybody is going to be able to cross examine about what she meant by that.  So I'm puzzled as to what kind of advice you gave her about that.

22

23   Mr. Monroe:  *I didn't give her specific advice about that.*

24   The Court:  Rosie, can you remember exactly what he told you about this?
    The Defendant:  He kept on asking me if I wanted to take the stand.  Not to that I wasn't suppose -- he wasn't going to go into the detail of what happened the day of the crime.  And I kept on asking him, "is the D.A. going to ask me that?  Is he going to bring that up?"  And he told me he wasn't going to.  And that's why I went up there on the stand.  But 'cause he told me the D.A. wasn't going to ask me anything.

25

26

27

28   * * *

347

1    The Court [addressing Monroe]:  Well, did you tell her that?

2    Mr. Monroe:  As I told you, Your Honor, I cannot sit here and say
     Rosie, yeah, the D.A. ain't going to ask you about that stuff.  My
3    recollection is that I told her the D.A., the District Attorney, would
     and I would object to its introduction.

4
          That's not Rosie's interpretation or her perception of what I told her.
5
     The Court:  I know, she -- but you might have told her that and she might
6    have perceived it the way she perceived it.  She might understand it that
     if you object he's not going to ask for it -- I mean he's not going to be
7    able to examine.

8    Mr. Monroe:  I don't want to sound like I'm slipping and sliding,
     because I ain't, I'm not saying it unequivocally.
9
     The Court:  You are not saying what unequivocally?
10
     Mr. Monroe:  I am not saying that I told her that the D.A. could not
11   examine her on this stuff.  I told her that the D.A. would and I would
     object to it.
12
     The Defendant:  But I had asked would he ask me anything about the day
13   of the crime and he said no.

14   The Court:  Okay.  Do you recall making a statement like that?

15   Mr. Monroe:  I don't recall making a statement like that.  It doesn't
     sound very logical -- very likely.  I talked to Rosie about the importance
16   of getting on the stand and the jury seeing her or hearing her.

17   RT 2124-29 (emphasis added) (April 9, 1992 proceedings).

18        41.  Although Mr. Monroe may not have wanted to sound like he was "slipping

19   and sliding," that is exactly what he did.  The record establishes that as it became

20   clear to Mr. Monroe what the trial judge thought of the advice that he would limit

21   Ms. Alfaro's cross-examination to questions about her background, Mr. Monroe

22   began to backpedal, eventually denying that he had told her this, despite his earlier

23   admission that he had.  *Cf.* RT at 2120 (April 9, 1992 proceedings) ("I told her that

24   we would limit the cross examination to the areas that we covered in the taking her

25   through her early life"), with *id.* at 2129 ("I don't recall making a statement like that.

26   It doesn't sound very logical -- very likely.").  In both word and deed, Monroe

27   abandoned his client.

28

                                        348

42.   Ms. Alfaro, on the other hand, remained consistent throughout the *Marsden* hearing.  She clearly recalled pressing Mr. Monroe on the consequences of her taking the stand, and his reassurance that she would not be required to testify about the crime.  Given her refusal to testify at the guilt phase, her statement that she only took the stand after Monroe assured her that she would not be questioned about the crime rings true.  As  she repeats:

> [H]e had told me we were only going to go through my childhood and that sort of stuff, and he had told me, and I know he told me the D.A. wasn't going to go into that other guy, Beto, or what happened the day of the scene of the crime.  Nothing like that.  He told me flat out that we weren't going to.
>
> That's why I volunteered to go -- I mean, I decided to go up there on the stand because I thought all along I wasn't going to get cross examined by the D.A. about what happened the day of the crime.  I thought he was only going to go back to my childhood, what happened to me, and when I grow up, stuff like that, because he made me believe that's what is going to happen.
>
> *I know I didn't misunderstand him because I kept asking him, "Are you sure he ain't going to ask me about the other guys and where did I go and stuff like that?"*

RT 2138-39 (emphasis added) (April 9, 1992 proceedings).

43.   But instead of listening to Ms. Alfaro, or to Mr. Monroe's admission that *he told Ms. Alfaro "that we would limit the cross examination to the areas that we covered in the taking her through her early life,"* (*id.* at 2120), and recalling Monroe's many objections that the district attorney's cross was "beyond the scope," (*see, e.g.*, RT 1631), the court chose to "assume that Rosie misunderstood what [Monroe] really told her."  RT 2133 (April 9, 1992 proceedings).  The court then went on to question the sincerity of Ms. Alfaro's "misunderstanding," expressing disbelief that

> anybody could believe that they are going to read a letter, 'I'm sorry that we took your innocent life,' and not be able to have anybody ask questions about what did you mean by we took your -- her innocent life?  And that's -- it seems to me . . . if you make a statement like that, that everybody must know that the other side has got a right to cross examine you about it.  Especially after she sat in court and watched numerous witnesses' testify and watched how the district attorney cross examines

349

1

2

on things. . . .  So it does not appear to me that Mr. Monroe specifically told you that if you testified . . . you wouldn't be cross examined about the facts of the crime."

3  *Id.* at 2133-34.  In essence, the court concluded that the advice Mr. Monroe initially

4  admitted to giving Ms. Alfaro was *so* incompetent, that he could not possibly have

5  given it.

6        44.  At the time of the *Marsden* hearing, the court had before it evidence

7  that Ms. Alfaro suffered from mental impairments affecting her ability to fully

8  comprehend the proceedings and to work with Mr. Monroe.  At a hearing on the

9  defense motion to suppress Ms. Alfaro's four-hour confession (a motion made by

10  Mr. Monroe only days before the trial began), Dr. Consuelo Edward, a psychiatrist,

11  reported that Ms. Alfaro's I.Q. had been measured at 78 (give or take at least five

12  points), which she characterized as borderline intellectual functioning.  RT 257-58.

13  Dr. Armando Morales, a clinical psychologist, also referred to Ms. Alfaro's I.Q.,

14  which he characterized as "mildly mentally retarded."  RT 1902.  Dr. Morales also

15  reported that Ms. Alfaro had a history of treating symptoms of anxiety, fear and

16  depression by self-medicating with substances such as paint thinner, marijuana,

17  heroin and cocaine.  RT 1826-27.  Toby Silver, a registered nurse on the mental

18  health team of the Orange County Jail, testified that Ms. Alfaro suffered from

19  depression, low self-esteem, and an inability to assert her own position.  RT 3828-34.

20  Given these facts, the trial court's rejection of Ms. Alfaro's contention that

21  Mr. Monroe had misled her because "anyone would have known" was simply

22  unsupportable.

23        45.  The court then proceeded to berate Ms. Alfaro for telling Mr. Monroe that

24  she would no longer cooperate with him:

25

26

27

28

        I don't know if somebody in the jail told you that you can do that; but I'm telling you, you have a duty to cooperate with your attorney and that is to communicate with him and to cooperate with him.  I can't force you to do that but you have the duty to do it.  And if you don't do it, you really do it at your own risk because you don't have a right to just sit there and choose well, I don't like Judge Millard's decision, I wanted

Mr. Monroe off the case and he's not off the case so I'm not going to talk to him. You basically don't have that right.

And if you take that position, you're really jeopardizing your own future because no court decision has allowed a defendant to do that. And it definitely would not be in your best interest to take a position like that.

And I'm more than willing, I'm not happy to, but I'm more than willing, if you believe there is an area that you don't fully understand in the future and you want some clarification about your rights or what your understanding of what the law is, and I have no objection, and the three of us getting together and talking about it in chambers to make sure that you understand what's going on.

RT 2136-37 (April 9, 1992 proceedings).

46. On the surface, the court's statement appears to be an offer to Ms. Alfaro of the court's services for legal advice about issues that might arise in her case. Yet it was hardly an invitation. Indeed, the court had already decided against Ms. Alfaro on the issues of central importance to her. Ms. Alfaro's response to the court's statements evidences the inadequacy of the court's analysis of the problem as well as its proposed "solution." Ms. Alfaro stated:

I -- I really don't understand what is going on but -- I mean, I get mad because he makes me do things I don't want to do. And I -- he told me they're right but I don't know what to think because I'm so naive that I just go along with everything he said. But I really don't know what to do, what he wants me to do, and we argue about that all the time.

RT 2137 (April 9, 1992 proceeding). When asked whether there was anything else that she would like to tell the court that she and Mr. Monroe argued about "all the time," Ms. Alfaro repeated:

The fact that he always wanted me to testify against the other guy. Okay. And I said from the beginning no, I ain't going to say anything.

*Id.* at 2138.

47. Mr. Monroe then brought up yet another conflict he and Ms. Alfaro had had which, he informed the court, was certain to become an even greater problem in the future. He referred to the anticipated testimony of defense psychiatrist Consuelo Edwards that it was Dr. Edwards' "clinical conclusion that as likely as not Rosie would have succumbed to the domination of this particular male Beto." RT 2140 (April 9, 1992 proceedings). Monroe stated, "Once again, Rosie goes absolutely up

351

the wall when we get into this stuff about Beto." *Id.* at 2141.  Ms. Alfaro confirmed, "she's going to go into this other person that was there that day and I don't want that. I told him from the very beginning . . . ." *Id*.  The court then asked Ms. Alfaro:

> What gives you the idea that if we had another lawyer on the case the other lawyer wouldn't insist too?
>
> The Defendant:  Well Mr. Monroe -- I mean, he totally does the opposite. Every time I tell him what I want, you know, he does the opposite.  He tries to talk me out of it.  Rosie, you know this is what I want you to do. Listen to me.  I don't want you to bring nobody up.  He always does the opposite.

*Id*.

> At this point, the court gave Ms. Alfaro some advice:
>
> The Court:  . . . You know you can disagree over tactics, you don't have to agree on all of the tactics.  The attorney -- that's why you have an attorney.  The attorney's basically in charge of trial tactics unless the disagreement really affects your fundamental rights to the effective assistance of counsel or testifying.
>
> And the chances are that -- first of all, if Mr. Monroe were taken off the case and another attorney put on the case, the other attorney is going to get Mr. Monroe's files. . . . Very well might reach the same conclusion that Mr. Monroe has reached. . . .
>
> And we'd be back in the same place again because generally, Rosie, anyone who views that videotape, okay, is, if they are going to defend you at all, they are going to have to shift the blame away from you to somebody else and to make it appear as though you are not the sole person involved in Autumn's death, you know.
>
> * * *
>
> And it's just -- I mean, I can't conceive if we gave the case to ten different attorneys they wouldn't all reach that same opinion, they wouldn't all want to do the same thing.  That's really the only avenue available to take part of the gravity of this crime off of your shoulders so that the jury will -- that and your age and background and your children.  But I don't mean to say that's the only thing, but that's really a significant thing.
>
> Because when somebody listens to that videotape and looks at how Autumn died, if there is any way to get the blame away from you or have you share the blame with somebody else, they are going to do it.
>
> * * *
>
> See, that's the problem, Rosie. . . . Mr. Monroe, as your lawyer, or Mr. Jones or Mr. Smith, whoever the lawyer is, is going to look at your case, they are going to get familiar with the evidence and say

352

1   oh, my god, we have to figure out some way to water down this
2   responsibility that Rosie put on herself in the videotape.

    And pointing the finger or sharing the finger of blame or
3   responsibility with another person is a very logical way to do it. . . .

4       I personally think a lawyer, whether it's Mr. Monroe or Mr. Jones
    or Mr. Smith, would do it.  They are going to say well, I respect your
5   view, Rosie, but this doesn't really involve, you know, your fundamental
    rights as such.  It doesn't really mean that I'm not effectively assisting
6   you.  I'm just assisting you in a way that you don't want it done.  And
    it doesn't otherwise involve your fundamental rights or anything
7   of that nature.  And I think you'd be in the same boat whatever lawyer
    we gave you.
8
    The Defendant:  You think another lawyer wouldn't -- I mean, he would
9   go against what I want to do, what I just want them to do?

10  The Court:  That's awful powerful evidence to have somebody else
    doing part of what happened to Autumn, you know.  And even if you
11  personally didn't want it done, the attorney is probably going to try
    to do it.
12
    RT 2142-47 (April 9, 1992 proceedings).  The court then ruled:
13
        So for the reasons indicated, I'm going to find that the *Marsden*
14  motion is untimely.  But mainly, mainly the court does not believe that
    there is any misconduct by Mr. Monroe or incompetence by Mr. Monroe
15  that would substantially impair or deny Rosie's right to the effective
    assistance of legal counsel.
16
17  *Id*. at 2148.  In so ruling, the court ignored Mr. Monroe's admission as well as the

18  other evidence that Monroe had provided incompetent advice to Ms. Alfaro in the

19  past, and disregarded the evidence that Ms. Alfaro's relationship with him had broken

20  down to such an extent that she was likely to receive inadequate representation in the

21  future.

22      48.  That there was a strong likelihood that the conflict between Ms. Alfaro

23  and Mr. Monroe would infect the adequacy of his representation of her at the penalty

24  retrial is evident from Monroe's frustration, vividly expressed in his closing remarks:

25      My trouble now is if she is going to refuse to see me in the jail
    or cooperate with me, do I end up with a conflict so I can't do
26  the damn job for her?

27

28

353

1  RT 2148 (April 9, 1992 proceedings).  The hearing concluded with the court's facile,

2  yet ominous, response:  "It's her duty to cooperate with you.  If she takes the position

3  she's not going to see you, she does that at her own peril."  *Id*.

### 8.   May 19-June 3, 1992:  The Second Penalty Trial

49.   The second penalty phase trial began on May 19, 1992, nearly six weeks

after the court denied Ms. Alfaro's *Marsden* motion.  In his opening, Mr. Monroe

once again committed to defense, *sans* evidence, that someone else had committed the

crime:

> I believe you will determine that this terrible crime was committed
> by a person with an abandoned and malignant heart.  And that story
> you hear from the evidence of Rosie Alfaro is not that of an abandoned
> and malignant heart.

RT 3181.

50.   On May 23, 1992, in the midst of trial, Ms. Alfaro was "classified

for a housing change [by the Orange County Women's Jail staff] due to the need

for 'acute mental health care.'"  CT 1745-46.  She continued to receive "acute mental

health care" until May 30, 1992. CT 1745-46.  On June 2, 1992, Ms. Alfaro waived

her right to testify.  RT 4237-38.  No analysis was done of her mental state at that

time.

51.   Both counsel and the court appreciated that if Ms. Alfaro did not testify,

she would be all but certain to receive a death sentence, as evidenced by the

following dialogue between the court and defense counsel, during the hearing held

April 9, 1992:

> Mr. Monroe:  I talked to Rosie about the importance of her getting on the
> stand and the jury seeing her or hearing her.
>
> The Court: *Well, if you wanted a chance to spare her life after listening
> to the videotape, from a practical standpoint she had to testify.*
>
> Mr. Monroe: *That was my feeling.*
>
> The Court: *If she didn't testify, she didn't have much of a chance to save
> her life.*

354

RT 2129 (emphasis added) (April 9, 1992 proceedings).  Nevertheless, the court asked Ms. Alfaro nothing more than "do you understand you have a right to testify in this penalty phase of the trial?" before accepting her waiver of that right.  RT 4237.

52.  As a result of Ms. Alfaro's refusal to testify at the second penalty trial, an employee of the District Attorney's office was permitted to read selected portions of her earlier testimony to the jury.  RT 3629-3731.  The portion in which Ms. Alfaro expressed remorse for her crimes was not among them.  And, because Ms. Alfaro did not testify, her attorney's ability to introduce mitigating evidence through defense experts was dramatically curtailed.  *See, e.g.*, RT 3973-4199.

53.  Mr. Monroe's closing argument provides a final example of the breakdown between Ms. Alfaro and her counsel.  Despite Ms. Alfaro's four-hour video taped confession, her testimony in the first penalty phase that was read to the jury in the second penalty phase in which she admitted that she killed Autumn Wallace, and her deep remorse which caused her to choose to plead guilty to the charges, her attorney argued as follows:

> Ladies and gentlemen of the jury, you look at those photographs, and you have to say this butchering had to be done by a person with an abandoned and malignant heart.
>
> Ladies and gentlemen, somebody who could do this terrible thing to this little girl had to have an abandoned and malignant heart.
>
> Ladies and gentlemen of the jury, I'm asking you to look at Rosie Alfaro over there and after you hear my analysis and interpretation of the evidence, coupled with what you recollect, that you will conclude that Rosie Alfaro does not have an abandoned and malignant heart, that Rosie Alfaro has value, and that Rosie Alfaro should live.

RT 4374.

54.  After three days of deliberations, the jury returned a verdict of death.  RT 4456-57.

/ / /

/ / /

355

1
2

**9.     July 14, 1992:  Hearing On Petitioner's Motion For Reduction Of Sentence**

3   55.  Judge Millard's belief that Mr. Monroe's decision to pursue the third-man

4   defense was incompetent, despite his statements to the contrary on April 9, 1992, is

5   apparent from his order denying Ms. Alfaro's motion for a reduction of her sentence

6   pursuant to Penal Code § 190.4(e), and for a new trial pursuant to Penal Code

7   § 1181(7).  In assessing whether mitigating evidence that Ms. Alfaro had "acted

8   under extreme duress under the substantial domination of another person" (Pen. Code

9   § 190.3(g)), had been presented, the court said:

> [T]he evidence pointing to this phantom third person being there was argued to the jury . . . [The Court] has gone over the evidence and [has] listened to counsel's arguments.  It is for the reasons Mr. Giffin testified to when he was on the stand, that is, he himself . . . had a hard time believing that a young woman the age of Rosie Alfaro could in fact have done this crime by herself.  So he gave her many, multiple opportunities at that time to come forward and indicate that someone else was involved in the offense. Each inquiry Mr. Giffin asked her on tape she replied in the negative . . . *It's not until after Ms. Alfaro gets legal counsel that this idea of the third party, the phantom third party, pops up in the case. . . The evidence is grossly insufficient to even raise that as a strong inference in the case, especially when you consider the numerous opportunities Mr. Giffin gave her on the videotape.  It appears to this court, after having reviewed its notes and looked carefully at the defense expert testimony in the case, and prosecution's evidence in the case, it appears it's a figment of someone's imagination to say that another third person was present and that Miss Alfaro acted under the substantial domination of this unknown person.*

20   RT 4501-04 (emphasis added).

21   **C.     PETITIONER HAD THE RIGHT TO THE EFFECTIVE ASSISTANCE**
22   **OF COUNSEL**

23   56.  The right to counsel is necessarily the right to effective assistance

24   of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 fn.14, 90 S. Ct. 1441,

25   25 L. Ed. 2d 763 (1970).  Effective representation entails certain basic duties,

26   including the duty of loyalty and the duty to consult with the defendant on important

27   decisions.  *See Strickland*, 466 U.S. at 688.  Essential to insuring effective

28   representation is a defendant's confidence in her attorney and her cooperation with

356

1    that attorney.  All defendants in criminal cases, and particularly in capital cases, have

2    an interest in establishing a relationship of trust with their appointed attorney.  The

3    trust and confidence undergirding the attorney-client relationship is no less

4    recognized, no less important, and no less deserving of protection between indigent

5    clients and their appointed attorneys, as between wealthy defendants and their

6    counsel.  When an accused is denied the ability to dispense with the constitutional

7    safeguards designed to protect him, he is imprisoned in these privileges, which is not

8    what the Framers intended.  *See Faretta*, 422 U.S. at 815; *Adams v. United States ex*

9    *rel. McCann*, 317 U.S. 269, 278-79, 63 S. Ct. 236, 87 L. Ed. 2d 268 (1942).

10   **D.**     **THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION FOR**

11           **APPOINTMENT OF SUBSTITUTE COUNSEL VIOLATED HER**

12           **CONSTITUTIONAL RIGHTS**

13           57.  Ms. Alfaro established that her attorney was not providing adequate

14   representation and that she and Mr. Monroe had become embroiled in such an

15   irreconcilable conflict that ineffective representation was likely to result.  In denying

16   her motion for substitution of counsel, the trial court denied Ms. Alfaro's guaranteed

17   constitutional right to the effective assistance of counsel.

18           **1.**     **Petitioner Showed That She and Mr. Monroe Had Become**

19                   **Embroiled in Such an Irreconcilable Conflict That Ineffective**

20                   **Representation Was Likely to Result**

21           58.  When a defendant charged with a serious crime is compelled to undergo

22   a trial with the assistance of an attorney "with whom [s]he has become embroiled in

23   an irreconcilable conflict," she is deprived of the "effective assistance of any counsel

24   whatsoever."  *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).  Ms. Alfaro,

25   charged with a capital crime, was forced to trial with a lawyer who had raised

26   a defense she did not agree with and had ineffectively advised her concerning her

27   exercise of her Fifth Amendment right to testify.  She had lost all faith in him

28   as a result of their inability to work out their fundamental differences.

59.  Though the record indicates that Ms. Alfaro had been dissatisfied with her attorney for some time, Ms. Alfaro made a sustained good faith effort to work out her disagreements with Mr. Monroe.  Only when she realized that she would be retried did she seek to replace him.  At that point, she had earned the right to claim her conflict with Mr. Monroe was "irreconcilable."

60.  Mr. Monroe repeatedly expressed his opinion that he and Ms. Alfaro had an irreconcilable conflict.  He told the judge they were at "loggerheads."  When it became clear, at the end of the *Marsden* hearing, that Ms. Alfaro's request for substitute counsel would be denied, he actually lost his temper, exclaiming to the trial judge, "if she is going to refuse to see me in the jail or cooperate with me, do I end up with a conflict so I can't do the damn job for her?"  RT 2148 (April 9, 1992 proceedings).

61.  In asking the court to appoint new counsel for the second penalty phase Ms. Alfaro not only described her profound feeling of betrayal, she reminded the court of her longstanding conflicts with Mr. Monroe that made it impossible for her to continue working with him.  Mr. Monroe and Ms. Alfaro had a fundamental disagreement over trial tactics so paramount to her defense that it created an "irreconcilable conflict" resulting in Ms. Alfaro's denial of effective assistance.  Ms. Alfaro told the court that she had been opposed to Mr. Monroe's theory of the defense from the very first:  "From the beginning I didn't want to say anything about this other person.  All I wanted to do in my trial was to bring up the fact that, you know, how my childhood was and how I grew up and stuff like that.  But never did I want to go into someone else was involved.  And I kept on telling him that all along . . . .  But he always twisted everything around and kept on telling me I had to say something."  RT 2144 (April 9, 1992 proceedings).

62.  Ms. Alfaro and Mr. Monroe were in conflict over the basic aspects of her defense from almost the moment Mr. Monroe began representing Ms. Alfaro.  Ms. Alfaro persevered, despite Mr. Monroe's disregard of her wishes.  Once,

358

however, Mr. Monroe placed Ms. Alfaro by his own professional incompetence in the most difficult position a defendant can face -- a grueling cross-examination regarding the circumstances of a crime for which that defendant faces the death penalty -- she could work with him no longer.  The law required no further effort on her behalf, and the trial court erred in failing to replace Mr. Monroe.  Yet, despite the clear lack of trust Ms. Alfaro now had in Mr. Monroe, the trial court forced her to proceed to a critical phase of her trial -- the phase in which the jury would decide whether she would live or die -- with an attorney she believed had lied to and misled her concerning her testimony in the first penalty trial.

63.  The trial court further erred in its views on the extent of Ms. Alfaro's duty to cooperate with counsel.  As  the hearing neared a close, Mr. Monroe said to the court: "My trouble now is if she is going to refuse to see me in the jail or cooperate with me, do I end up with a conflict so I can't do the damn job for her?"  The court replied:  "It's her duty to cooperate with you.  If she takes the position she's not going to see you, she does that at her own peril."  Turning to Ms. Alfaro, the court said: "By that I mean if he comes over to talk to you and you refuse to talk to him, you refuse to do it, you have a duty to do it and you're violating your duty to cooperate with your attorney, and that's not grounds to get another lawyer.  What it does, it really kind of sinks you but you are doing it yourself."  RT 2148 (April 9, 1992 proceedings).

64.  Ms. Alfaro made every conceivable human effort to cooperate with and trust her attorney.  Despite her efforts, her attorney betrayed her trust.  Given their long standing conflicts and his incompetency, Ms. Alfaro need make no further effort; no more explicit example of an "irreconcilable conflict" could be provided.  Having the evidence of their conflict before it, *the court* now was obligated to act, and its failure to replace Mr. Monroe resulted in reversible error.  *Brown*, 424 F.2d at 1169-70 (without blaming the defense attorney, holding that new counsel should have been appointed so that the defendant would not have had to undergo a trial with an attorney in whom he could not "repose his confidence").

65.   The direct consequence of the court's failure to replace counsel --
Ms. Alfaro's refusal to testify in the second penalty phase -- must be seen for
precisely how prejudicial it was:  at the end of the first penalty phase, despite the
devastating cross examination, the jury did not agree to vote for death.  During the
second penalty phase, however, having lost all faith in Mr. Monroe, Ms. Alfaro
refused to take the stand.  Instead, her cross examination was read by an employee
of the district attorney's office.  The second jury never had the opportunity to hear
Ms. Alfaro express remorse in her own voice.  Rather than being able to focus on her
as a person, they undoubtedly focused on the words of her difficult, often evasive,
and contradictory cross-examination.  After three days of deliberation, the second jury
voted for death.  Ms. Alfaro's refusal to take the stand because she felt betrayed by
her counsel must be understood as profoundly prejudicial, and because it was based
on her conflict with Mr. Monroe, that conflict left her effectively unrepresented.

**2.**   **Petitioner Showed That Mr. Monroe Had Provided Her with Inadequate Representation**[36]

**a.**   **Mr. Monroe Provided Inadequate Representation By Denying Petitioner The Right To Make Critical Decisions About Her Defense**

66.   The United States Supreme Court has resoundingly affirmed the right
of the defendant to control the most basic, critical aspects of her own defense.
Affirming a defendant's right to self-representation, in *Faretta,* 422 U.S. at 806, the
Supreme Court found that the Sixth Amendment's counsel provision *supplements* the
accused's right to defend; it does not and cannot supplant the personal nature of the
defendant's right to control and present a defense.  *Id.* at 820; *see also Adams*,

---

[36]   To evaluate the merits of this claim, the Court must look at the evidence
of the inadequacy of trial counsel's representation of Ms. Alfaro that appears from the
record.  Ms. Alfaro has further developed and presented other claims of ineffective
assistance of counsel in this petition.  Prejudice from counsel's errors must be
"considered collectively, not item-by-item." *Kyles v. Whitley*, 514 U.S. 419, 436,
115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995).

317 U.S. at 279 ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms.  They rest on considerations that go to the substance of an accused's position before the law.").

67.  The court's mischaracterization of the nature of Ms. Alfaro's conflict with Mr. Monroe -- describing their dispute as simply a dispute over tactics -- is at the core of the court's error in denying the *Marsden* motion.  Rather than a conflict over tactics, their conflict centered on who should exert basic control over the course of Ms. Alfaro's defense.  Mr. Monroe, despite his other egregious failures, rightly described their conflict as a conflict over the fundamental nature of the defense. RT 110-114 (February 21, 1992 proceedings).  Because the Constitution mandates that disputes regarding control over the basic decisions in a criminal case must always be resolved in favor of the competent defendant, Mr. Monroe's refusal to permit Ms. Alfaro to plead guilty evidenced his inadequate representation of her as well as the fact that he and Ms. Alfaro had an irreconcilable conflict.

**b.    Mr. Monroe Provided Inadequate Representation When He Refused To Consent To A Guilty Plea**

68.  Mr. Monroe's refusal to consent to a guilty plea was not a reasonable tactical decision.  In focusing exclusively on his modified duress defense, Mr. Monroe completely failed to recognize that Ms. Alfaro faced felony murder charges that would not require the jury to find that she had *any* kind of mental state regarding the killing, only that she intended the robbery or burglary, and had stabbed Autumn Wallace.  And Mr. Monroe acknowledged during his guilt phase opening and closing remarks that Ms. Alfaro had, in fact, gone to the Wallace home with the specific intent to burglarize the house, and had stabbed Autumn Wallace.  Thus, even if Ms. Alfaro lacked any intention *at all* that Autumn Wallace die, Mr. Monroe had no defense to the charge of first degree felony murder which exposed her to the death penalty.  Thus, Mr. Monroe's refusal to permit Ms. Alfaro to plead guilty based on a defense theory regarding the presence of the third person, and in the absence of a

361

1   defense to the felony murder charge, was completely unreasonable.  The detailed

2   analysis of Monroe's decision to withhold consent to Ms. Alfaro's guilty plea set

3   forth with more specificity above in Claim 1 is incorporated by reference at this point

4   as though set forth in full.

5       69.  But even assuming, *arguendo*, that there were some kind of modified

6   duress or aiding and abetting defense available, given the state of the physical

7   evidence, it clearly would require Ms. Alfaro's testimony.  Without Ms. Alfaro taking

8   the stand to testify that she was under duress, that she didn't intend for Autumn to

9   die, and that the third man delivered the fatal blows, her lawyer was left to try to place

10  the blame on someone else absent any evidence that the third man even entered the

11  house.  If his client had insisted on presenting this defense, or had insisted on

12  presenting some kind of defense, Mr. Monroe's strategy might have made sense,

13  simply because the client had forced the issue.  But for *Mr. Monroe* to force his client

14  to undergo a guilt phase trial and engage her in a "long standing" conflict over an

15  unreasonable defense was to provide her with inadequate representation.

16      70.  In refusing to allow Ms. Alfaro to plead guilty, Mr. Monroe deprived her

17  of the right to make a fundamental decision about her defense and the opportunity to

18  clearly accept responsibility for the crime and to put her willingness to accept

19  responsibility for the crime before the jury.  Ms. Alfaro gained no discernible benefit

20  by putting the government to its proof, and gave up the opportunity to appear in a

21  more sympathetic light and to gain a universally recognized mitigating circumstance.

22  In withholding his consent to Ms. Alfaro's guilty plea, Mr. Monroe provided

23  inadequate representation.

24      c.    **Mr. Monroe Provided Inadequate Representation When He**

25                **Advised Petitioner Concerning Her Testimony**

26      71.  Mr. Monroe's failure to properly advise Ms. Alfaro concerning her

27  testimony and his subsequent explanations for that conduct fail to meet the objective

28  standard of reasonableness constitutionally required.  The decision of whether or not

362

to testify on one's own behalf is a decision of "fundamental importance" for a criminal defendant. When a defendant testifies on her own behalf, she waives the absolute protection against self-incrimination afforded by the Fifth Amendment to the United States Constitution, which provides a defendant with an absolute right not to be called as a witness and not to testify. Thus, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel. In failing to prepare a client for her impending testimony and failing to prepare her for cross-examination, a counsel abandons his duty to assist his client in her decision to testify. *See Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987) (in failing to prepare client for testimony and failing to advise client regarding cross-examination, "counsel simply abandoned his duty to assist [client] in decision whether to testify.").

72. Here, while the decision to testify was Ms. Alfaro's, Mr. Monroe had a duty and responsibility to advise her on the pros and cons of taking the stand. He also had a duty to prepare her to testify, and to prepare her for cross-examination. The transcript of the *Marsden* hearing establishes that Mr. Monroe wholly failed to fulfill these duties.

73. Mr. Monroe  admitted during the hearing that he had been aware of Ms. Alfaro's letter to Autumn Wallace for *two weeks* before she took the stand. RT 2130 (April 9, 1992 proceedings). Yet, despite his knowledge that the letter included the phrase, "I'm sorry *we* took your innocent life," and his plan to have Ms. Alfaro read it on the stand, Monroe advised her that he would "limit the cross examination to the areas that we covered in the taking her through her early life." *Id.* at 2120. This is not a case in which the client made a spontaneous statement on the stand that inadvertently opened the door to damaging cross examination. Monroe knew the contents of the letter before he directed Ms. Alfaro to read it on direct. He was responsible for opening the door to cross examination about the crime. *See, e.g.,* RT 1651-52. Despite the trial judge's disbelief that anyone could have thought that

363

cross-examination would be restricted after this letter was read, Monroe's vigorous -- albeit ineffectual -- efforts to foreclose the cross-examination provide strong evidence that he did indeed believe that it could be.  *See* RT 1631, 1633, 1635, 1647-52.[37]

74.  At the very least, Mr. Monroe misled his client as to whether she would be questioned about the crime.  Even after he began to claim that he merely told Ms. Alfaro that if the district attorney tried to question her about the crime he would object, he never said that he advised her his objection could well be overruled.

75.  Monroe's failure to prepare Ms. Alfaro for cross examination about the crime further supports her testimony that he told her that she would not be cross examined about the crime.  This failure, alone, evidences ineffective assistance. Ms. Alfaro's reluctant  responses to the district attorney's questions about the crime caused her to appear evasive and *un*willing to accept responsibility for the crimes. Though her direct may have helped the defense, her unprepared cross examination in which she unconvincingly implicated another person in the crime hurt her immeasurably.  Her evasiveness may be attributable to fear, but it must have appeared to the jury as prevarication.  And indeed, the prosecutor admitted that the whole point of his cross-examination was to make her out to be a liar.  RT 1647.

76.  Instead of focusing on Ms. Alfaro's life and its hardships, the jury was taken once more through the crime.  Had he permitted Ms. Alfaro to plead guilty, thereby evidencing her acceptance of responsibility, then limited her direct to "taking her through her early life" and the time period preceding the day of the crime, all of this could have been avoided.  RT 2120 (April 9, 1992 proceedings).  Mr. Monroe — and Mr. Monroe alone — bears responsibility for what occurred.  In denying his client acceptance of responsibility and opening the door to questions about the day of the crime, Mr. Monroe rendered ineffective assistance of counsel.

---

[37]  Indeed, once it became clear that the trial judge would permit cross-examination about the crime, Monroe went so far as to "request a short recess so [he could] talk to his client."  RT 1635.

### 3.    Petitioner's Request for Substitute Counsel Was Timely

77.    Ms. Alfaro's request for substitute counsel was made with more than enough time for counsel to be replaced before the start of the second penalty phase. Ms. Alfaro's request came on April 9, 1992; the second penalty phase trial did not begin until nearly six weeks later, on May 19, 1992.  In denying her motion, the trial court based his decision in part on Ms. Alfaro's failure to bring her concerns to the court's attention on the day she testified, accusing her of sitting on this issue in the event that the jury did not return a verdict of life without the possibility of parole.  No reference was made to any inconvenience or delay caused by Ms. Alfaro's decision to wait until April 9, a mere week after she had testified.  RT 2129-33 (April 9, 1992 proceedings).  This is an inappropriate factor to consider when evaluating whether a defendant's *Marsden* motion is timely or not.

78.    Furthermore, Ms. Alfaro offered a reasonable explanation to Judge Millard for her delay:  She did not know the process for bringing up a motion to substitute counsel and had only recently learned from the women in jail what she needed to do to bring her concern to the court's attention.  RT 2130 (April 9, 1992 proceedings). The court dismissed her confusion, saying that because he had met with Ms. Alfaro and Mr. Monroe on other occasions in chambers, it should have been obvious to her how to go about bringing her complaint to the court's attention.  *Id*.  This distorts Ms. Alfaro's dilemma, however.  Ms. Alfaro's only experience with in-chambers proceedings was when Mr. Monroe initiated them and was present.  Ms. Alfaro had no independent experience on how to obtain an audience with the judge, and she was understandably reluctant to ask Mr. Monroe to set up the meeting.  Ms. Alfaro made a perfectly reasonable decision to wait until the jury finished  deliberating before asking that Mr. Monroe be replaced.

79.    Most importantly, Ms. Alfaro made her request with ample time before the beginning of the second penalty phase, and the court admitted as much.  After denying Ms. Alfaro's request for substitution of counsel, the court stated, "and we're

going to have some *time* before the trial on the penalty phase recommences.  It would seem to me that you have *ample time* to iron out whatever misunderstandings you have . . . ." *Id.* at 2134 (emphasis added).

### 4. The Court's Inquiry Was Inadequate

80.  When a criminal defendant believes that she is receiving inadequate representation from her appointed counsel and seeks to have the court substitute counsel, the trial court must allow the defendant to explain the basis of her contentions and to relate specific instances of the attorney's inadequate performance. Although the trial court permitted Ms. Alfaro some opportunity to articulate her discontent in the *Marsden* hearing, the court's inquiry was insufficient.  RT 2138 (April 9, 1992 proceedings).  For example, rather than asking Ms. Alfaro whether she felt that she could continue working with Mr. Monroe during a second penalty phase, the court simply insisted that she must.  *Id.* at 2148.  Indeed, the court's admonition to Ms. Alfaro could only have conveyed to her that further requests for new counsel would get her in trouble:

> The Court:  [addressing Monroe's report to the court that Ms. Alfaro has told him she would not cooperate with him any longer] I don't know if somebody in the jail told you that you can do that; but I'm telling you, you have a duty to cooperate with your attorney and that is to communicate with him and to cooperate with him.  I can't force you to do that but you have the duty to do it.  And if you don't do it, you really do it at your own risk because you don't have a right to just sit there and choose well, I don't like Judge Millard's decision, I wanted Mr. Monroe off the case and he's not off the case so I'm not going to talk to him.  You basically don't have that right.
>
> And if you take that position, you're really jeopardizing your own future because no court decision has allowed a defendant to do that.  And it definitely would not be in your best interest to take a position like that.

*Id.* at 2136-37 (emphasis added).

### E.  CONCLUSION

81.  The trial court inexcusably failed to act to resolve the dispute between Ms. Alfaro and Mr. Monroe.  The court had before it evidence of a long standing conflict, evidence of Ms. Alfaro's low I.Q., and direct evidence of Ms. Alfaro's

1   difficulty understanding the proceedings.  Under these circumstances, the court was

2   required either to substitute counsel who could develop a better relationship with her

3   or to order a competency hearing.  The court's own recognition of the inadequacy

4   of Mr. Monroe's defense strategy makes all the more evident the irresponsibility and

5   the profound error of the court's failure to replace Mr. Monroe.  The court forced

6   Ms. Alfaro to continue with Mr. Monroe despite the court's own belief in the

7   inadequacy and implausibility of Mr. Monroe's defense strategy.  At the time of the

8   *Marsden* hearing, the court had seen all of the prosecution's evidence and was in a

9   position to assess Mr. Monroe's strategy.  At the *Marsden* hearing, the court told

10   Ms. Alfaro that she simply must accept Mr. Monroe's defense strategy because any

11   attorney replacing him would develop the same defense strategy.  RT 2143-44

12   (April 9, 1992 proceedings).  But the court's true, disdainful opinion of Mr. Monroe's

13   defense theory was revealed at the imposition of Ms. Alfaro's judgment.  To the

14   extent that the trial judge's statements to Ms. Alfaro on April 9, 1992 might have

15   constituted legal advice, he, too, inadequately represented her.

16       82.  The foregoing violations of Ms. Alfaro's constitutional rights

17   constitute structural error and warrants the granting of this Petition without any

18   determination of whether the violations substantially affected or influenced the jury's

19   verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

20   doctrine applies to this claim, the foregoing constitutional violations so infected the

21   integrity of the proceedings that the error cannot be deemed harmless. The foregoing

22   violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

23   Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

24   resulting in a miscarriage of justice.

25       83.  The constitutional violations set forth in this claim alone mandate relief

26   from the convictions and sentence.  However, even if these violations do not mandate

27   relief standing on their own, relief is required when this claim is considered together

28   with the additional constitutional errors outlined in the remainder of this petition.

1   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

2   sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

3   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

4   (9th Cir. 1978).

5                                                    **XXIX.**

6   **CLAIM 24:  THE TRIAL COURT DENIED PETITIONER HER SIXTH AND**

7   **FOURTEENTH AMENDMENT RIGHTS IN DENYING THE DEFENSE**

8   **CHANGE OF VENUE MOTION BEFORE THE RETRIAL OF THE**

9   **PENALTY PHASE BECAUSE OF JURORS' EXPOSURE TO**

10                              **INFLAMMATORY PUBLICITY**

11        Petitioner's conviction and sentence of death were rendered in violation of her

12   rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-

13   capricious determination of guilt and penalty, to the effective assistance of counsel,

14   to present a defense, and to due process of law as guaranteed by the Fifth, Sixth,

15   Eighth and Fourteenth Amendments to the United States Constitution because trial

16   court denied the change of venue motion.

17        1.  Exhaustion of the claim:  This claim was fairly presented to the California

18   Supreme Court in the direct appeal.  It was presented as Claim 7 in the Opening Brief.

19        2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

20   *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

21   state court's denial of this claim is both "contrary to" and an "unreasonable

22   application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

23   must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

24   this claim was dependent on an antecedent unreasonable application of federal law,

25   this Court "must then resolve the claim without the deference that AEDPA otherwise

26   requires." *Panetti*, 127 S. Ct. at 2858.

27        3.  If Respondent disputes any of the facts alleged below, Petitioner requests an

28   evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has

                                                    368

1  been afforded discovery and the disclosure of material evidence by the State, the use

2  of this court's subpoena power, and the opportunity to investigate fully, counsel

3  requests an opportunity to supplement or amend this petition.

4      4.  The declarations and other exhibits filed with this petition, as well as the

5  allegations and facts set forth elsewhere in this petition, are hereby incorporated by

6  reference into this claim as though set forth in full.

7      5.  In support of this claim, Petitioner alleges the following facts, among others

8  to be presented after full discovery, investigation, adequate funding, access to this

9  Court's subpoena power, and an evidentiary hearing.

10  **A.     INTRODUCTION AND DESCRIPTION OF THE PUBLICITY**

11     6.  Extensive publicity surrounded Ms. Alfaro's arrest, trial, conviction, and the

12  mistrial of the first penalty phase.  CT 1236-64; *see also* CT 464-73, 964, 974, 1099-

13  1101, 1108-10, 1116-17, 1122-1124, 1131-32, 1194, 1236-64, 1458, 1559, 1561,

14  1577, 1579, 1730-34 (orders granting media access).  Nearly all of this publicity

15  noted a death sentence as a likely punishment for Ms. Alfaro, as well as recounted

16  evidence against Ms. Alfaro that would be relevant to establishing aggravating

17  circumstances.  For example, several stories noted that Ms. Alfaro had confessed to

18  killing the victim to "keep from being caught" for her planned theft of items from the

19  house.  Others described her confession that she had been  "wired" on drugs at the

20  time of the crime.  CT 1238, 1241, 1245, 1247.  One story described her as having

21  "plott[ed] to kill the child," while another story published before the first trial stated

22  that she had already been convicted of murder and indicated that she had hired a firm

23  called Death Investigation International to administer Sodium Pentothal to her to

24  enhance her memory of the slaying.  CT 82, 1244.  A third story headlined, "Defense

25  Calls No Witnesses For Girl's Confessed Killer," provided yet another assurance of

26  Ms. Alfaro's guilt.  CT 1245.

27     7.  In some of the stories, Ms. Alfaro's remorse for the crime was questioned by

28  the victim's mother and by the first trial's jurors.  CT 1252, 1258.  In many of these

1    articles, the district attorney was quoted as calling the case the most "senseless"

2    killing imaginable, as well as calling the evidence against Ms. Alfaro "unusually

3    strong" and "overwhelming." CT 1247-49, 1250.

4        8.  Only six weeks before jury selection of Ms. Alfaro's retrial began, the

5    potential jury pool was exposed to particularly inflammatory publicity that Ms. Alfaro

6    "deserved to die." CT 1250, 1253.  After the first jury hung, the victim's mother,

7    Orange County Superior Court employee Linda Wallace, called on jurors to vote for

8    the death penalty as she spoke to the local newspaper, the *Orange County Register*,

9    on the courthouse steps. CT 1250, 1253.  "For what she did, she deserves to die. . . .

10   I want to see her get the death penalty.  It's been a long two years." CT 1250.  In an

11   account of Ms. Alfaro's penalty phase testimony, Ms. Wallace stated: "I would like to

12   believe she's remorseful. . . . But I have no pity for her. . . . It just makes me madder.

13   Her saying that she's lost her four kids.  It's not the same.  I didn't kill her children."

14   CT 1252.  At the closing of the first sentencing hearing, Ms. Wallace was quoted as

15   saying:  "She wasn't a mother to her kids before she went to jail. . . I think she

16   deserves the death penalty. . . I think she was crying because she was caught."

17   CT 1253.  "I hope this [new] jury is better, not so indecisive," she told the Orange

18   County edition of the *Los Angeles Times* a week later as the judge set a retrial date

19   for the penalty phase.  CT 1260.  The district attorney echoed her feelings and

20   provided encouragement to Times readers that the next jury would get it right:  "The

21   jurors voting for death were so strong, it leads us to believe there is more than a good

22   chance that another jury will vote for death." CT 1257.  One unidentified juror who

23   deliberated on Ms. Alfaro's sentence added his two cents worth announcing that the

24   aggravating factors outweighed the mitigating factors "by a long shot." CT 1257-58.

25       9.  Potential Orange County jurors also learned that Ms. Alfaro was a drug-

26   addicted prostitute from Anaheim's Hispanic "barrio" who "wasn't a mother to her

27   [four] kids" even before she went to jail. CT 1251, 1253-54.  They learned that she

28   had confessed to butchering Autumn Wallace, a "popular" white nine-year-old A-

1  student who was at home in a pink polka-dot dress cutting out paper dolls when the
2  deranged killer slashed her 57 times.  CT 1247, 1251, 1253, 1254, 1258.  They
3  learned that ten jurors from the first penalty phase felt "strongly" that Ms. Alfaro
4  deserved death, and lacked remorse for the crime, but that two "holdouts" kept the
5  jury deadlocked.  CT 1257-58.

6      10.  Amid the sensational local press reports and the cry of voices calling
7  for the death penalty, the trial court refused to grant Ms. Alfaro a change of venue,
8  explaining that the publicity in this case was not at all likely to have any impact on
9  the defendant's ability to select a fair and impartial jury.  RT 2172.  The judge clearly
10  erred in making this ruling and in denying defendant's motion for change of venue.
11  In so doing, he denied Ms. Alfaro's Fifth and Fourteenth Amendment rights to a fair
12  trial and due process, her Sixth Amendment right to a fair and impartial jury, and her
13  Eighth Amendment right to a reliable, rational and accurate determination of her
14  death-worthiness.

15  **B.   A CHANGE OF VENUE MUST BE GRANTED WHERE, AS HERE, A**
16  **REASONABLE LIKELIHOOD EXISTS THAT A FAIR AND**
17  **IMPARTIAL TRIAL CANNOT OTHERWISE BE HAD**

18      11.  "In essence, the right to jury trial guarantees to the criminally accused a
19  fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused
20  a fair hearing violates even the minimal standards of due process."  *Irvin*, 366 U.S.
21  at 722 (citing *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948)).
22  *McCleskey* v. *Kemp*, 481 U.S. 279, 309, fn. 30 (1987) ("widespread bias can make
23  change of venue constitutionally required").  Because a criminal defendant has the
24  right to an impartial jury, a court must grant a motion to change venue "if prejudicial
25  pretrial publicity makes it impossible to seat an impartial jury."  *Ainsworth v.*
26  *Calderon* (9th Cir. 1998) 138 F.3d 787, 795, as amended, 152 F.3d 1223 (citations
27  and internal quotations omitted).

28

12.    To support a change of venue motion, defendant must demonstrate either actual or presumed prejudice. *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir. 1989) (quoting *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984)).  To demonstrate actual prejudice, the party must show that "the jurors demonstrated actual partiality or hostility that could not be laid aside." *Id*. at 1363.  Prejudice is presumed only in extreme instances "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Ainsworth*, 138 F.3d at 795.

13.    Three factors should be considered in determining presumed prejudice: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion"; (2) whether the news accounts were primarily factual because such accounts tend to be  less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial. *Daniels v. Woodford*, 428 F.3d 1181, 1211-1212 (9th Cir. 2005)

### 1.    The Nature And Gravity Of The Offense

14.    Assessing these factors, change of venue clearly was compelled in this case.   The nature and gravity of the offense favor change of venue.  This was a capital murder case involving the brutal slaying of a Caucasian girl in her middle-class home. The nine year old child was stabbed 57 times.  The defendant, who had confessed to the crime, was a Hispanic woman who was high on drugs at the time she stabbed the little girl and burglarized her home.  The defendant had brought her own baby with her to the scene of the crime.   All of these facts made the crime sensational and aroused the consciousness of the community, as witnessed by the extensive press coverage of this case.  CT 1236-64.

/ / /

/ / /

372

## 2.    The Standing Of The Victim And Accused In The Community

15.  The standing of the victim and accused in the community also bolster the case for change of venue.  The press described Autumn Wallace as "popular" and well-liked in the community and described her in terms likely to evoke the sympathy or concern of the community.  Her mother and her aunt, who had discovered Autumn lying on the floor of the bathroom in her suburban home, worked for the very court in which the case was tried.  RT 731.[38]

16.  On the other hand, Ms. Alfaro, a member of a minority group, a drug addict since age 12, a prostitute living on the streets of Anaheim's minority neighborhood whose family had disintegrated, represents exactly the type of defendant whom publicity can most effectively prejudice.  Ms. Alfaro was a drop out from the community; she certainly had not been integrated into the middle-class life of Anaheim.  Rather, according to the news accounts, Ms. Alfaro was a threat to the community, the type of outcast who would break into peoples' homes to steal their property for drug money.

## 3.    The Sensational, Inflammatory Publicity

17.  Considered with these other factors, the sensational, inflammatory publicity leading up to Ms. Alfaro's penalty phase retrial virtually compelled a change of venue.[39]  Not only was the publicity inflammatory, it was extensive, and therefore likely to prejudice prospective jurors.  Many stories about the mistrial, and immediately preceding the mistrial, were published within a few short weeks of when prospective jurors were called for jury selection in the second penalty phase.  These

---

[38]  That Autumn Wallace's mother Linda Wallace and her aunt, who was with Linda Wallace when she discovered the crime, worked for the Orange County Superior Court might alone have given rise to a motion for change of venue. The issue is not developed in the record on appeal, but will be fully explored in Ms. Alfaro's petition for a writ of habeas corpus.

[39]  Although size of the community is a factor in the change of venue analysis, and Orange County does not qualify as a small or rural county, this Court's case law makes clear that this factor is not controlling or determinative in the change of venue analysis.

373

1   stories extensively quoted the victim's mother, the district attorney, and jurors as

2   calling for a death sentence or concluding that death should be the penalty in this

3   case.

4        **4.    The Impact On The Community**

5        18.  The influence of this media coverage among potential Orange County

6   jurors is not speculative.  Of the 57 prospective jurors in the jury pool whom the

7   judge directly asked whether they had knowledge of the case, 37, or 65%, had read,

8   viewed or heard some of the media coverage.  RT 2275-3141.  About 25 of those

9   people had been exposed to news reports within the past several weeks.  At least half

10  of the jurors actually selected, and one alternate juror, had previous knowledge of the

11  case.  Moreover, the trial court excused six prospective jurors for cause because they

12  already had formed an opinion as to Ms. Alfaro's punishment due to the publicity.

13  In addition, several other jurors during the first two days of voir dire expressed

14  concern about their ability to judge the case fairly or to approach it with an open

15  mind.  RT  2333, 2336-37.  In fact, *one of the jurors selected to sit* hesitated when

16  asked if the information he acquired would have any effect on his ability to be

17  impartial.  RT 2312.  "I think so," he replied.  The judge asked if he was sure.  "Well,

18  I haven't got the facts yet," the juror equivocated.  *Id.*  Despite answers like this one,

19  the judge never asked any juror to describe what details of the case he or she had

20  gleaned from the press reports they had read.  *See Mu'Min v. Virginia*,  500 U.S. 415,

21  429 (1991) (where pretrial publicity engenders a "wave of public passion" in

22  connection with a trial, the Due Process Clause might well require a more extensive

23  examination of potential jurors than the judge's abject failure to ask jurors about the

24  specific contents of new reports to which they had been exposed).

25       19.  While most jurors responded that they could put aside the information they

26  learned from press reports and be fair, a juror's declaration of impartiality is not

27  conclusive.  *See Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d

28  847 (1984) ("adverse pretrial publicity can create such a presumption of prejudice in

1  a community that the jurors' claims that they can be impartial should not be
2  believed").

3  **C.    <u>CONCLUSION</u>**

4      20.  In this atmosphere, where nearly two-thirds of the jurors questioned,
5  and half of the jurors actually selected,  knew something about the case, the trial
6  judge was presented with persuasive evidence that a fair trial could not be had in light
7  of the highly inflammatory pretrial publicity n the time period immediately preceding
8  jury selection.  The court erred in failing to grant Ms. Alfaro's change of venue
9  motion.

10      21.  The foregoing violations of Ms. Alfaro's constitutional rights constitute
11  structural error and warrants the granting of this Petition without any determination
12  of whether the violations substantially affected or influenced the jury's verdict.
13  *Brecht,* 507 U.S. at 638.

14      22.  The constitutional violations set forth in this claim alone mandate relief
15  from the convictions and sentence.  However, even if these violations do not mandate
16  relief standing on their own, relief is required when this claim is considered together
17  with the additional constitutional errors outlined in the remainder of this petition.
18  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and
19  sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,
20  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333
21  (9th Cir. 1978).

22  <div align="center">**XXX.**</div>

23  <div align="center">**CLAIM 25:  THE TRIAL COURT VIOLATED PETITIONER'S DUE**</div>
24  <div align="center">**PROCESS RIGHTS BY COMMITTING NUMEROUS**</div>
25  <div align="center">**EVIDENTIARY ERRORS**</div>

26      Petitioner's conviction and sentence of death were rendered in violation of her
27  rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-
28  capricious determination of guilt and penalty, to the effective assistance of counsel,

to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court failed to exclude improper, unreliable, and inflammatory expert evidence.

1. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented as Claim 8 in Opening Brief.

2. AEDPA: The California Supreme Court denied this claim. *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007). Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*. Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4. The declarations and other exhibits accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

A.   <u>**INTRODUCTION**</u>

6. At the second penalty trial, defense attorney William Monroe called two experts, sociologist Armando Morales and psychiatrist Conseulo Edwards, to give their diagnoses of Ms. Alfaro's sociological and psychiatric condition at the time

of the offenses and at the time of trial.  During cross-examination of these experts, Assistant District Attorney Charles Middleton asked repeated questions about raw data and rough notes related to a psychological test, the Minnesota Multiphasic Personality Inventory ("MMPI"), that had been administered to Ms. Alfaro by or at the direction of a third defense expert, psychologist Martha Rogers, who was not called as a witness by the defense at trial.  RT 3980-94, 4117-29.   Dr. Rogers did not prepare a report analyzing the MMPI data she had collected.  RT 4123.  She did, however,  provide defense counsel with the raw data and some rough notes.  Defense counsel subsequently provided this information to the other experts.  *Id*.  Although the raw data and rough notes were of no use to Drs. Morales and Edwards, who testified that they were unqualified to interpret the data and had not considered it in rendering their opinions, the district attorney found it very useful indeed.  While Dr. Rogers had written on one page that the test should be redone, on another someone had written the phrase, "probable fake bad." *Id.*   This phrase, which the district attorney equated with malingering (RT 4123-26), a term he defined for the jury as describing "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution, obtaining drugs, or securing better living conditions" (RT 3996-97), became his mantra.  Indeed, he repeated and elicited the phrase more than forty times during his cross-examination of the defense experts, searing it into the minds of the jurors.  RT 3980-96; 4123-29.

7.  Because Drs. Morales and Edwards could not interpret and therefore did not consider the raw data from the MMPI, its probative value for the purposes of assisting the jury in judging the credibility of their opinions was nil.  The prejudicial impact of the prosecution's questioning, on the other hand, was enormous.  The district attorney managed to bootstrap this hearsay evidence that had not been relied upon by the experts into substantive evidence that Ms. Alfaro was "malingering;" that she was intentionally producing false or grossly exaggerated psychological symptoms, such as

1   remorse, motivated by external incentives such as "evading criminal prosecution,

2   obtaining drugs, or securing better living conditions."

3       8. Not only did the district attorney discuss the MMPI data as substantive

4   evidence during his cross-examinations of Drs. Morales and Edwards, he actually

5   subpoenaed Dr. Rogers, the psychologist who had been retained to conduct the test

6   but had not been called to testify by the defense, to testify for the prosecution as a

7   "rebuttal" witness.  Given that Drs. Morales and Edwards had testified that they

8   neither accepted nor rejected Dr. Rogers' preliminary results, Dr. Rogers was an

9   improper rebuttal witness.  The questions posed to her about her preliminary findings

10  left a highly misleading and damaging impression on the jury.  Defense counsel

11  William Monroe declined to ask any questions on cross, for reasons that are not

12  apparent from the record before the Court.[40]  In the absence of proper limiting

13  instructions, the jury now had reason to believe that Ms. Alfaro was malingering;

14  that she did not really feel the remorse she appeared to express on the videotape

15  for her crimes, and that as a result, she was undeserving of any sympathy whatsoever.

16  Once again, because she was denied the concrete evidence of her acceptance of

17  responsibility in the form of a guilty plea, Ms. Alfaro was cast as someone who did

18  not fully accept responsibility for what she had done, did not feel true remorse, and

19  should be put to death.

20  **B.    STATEMENT OF FACTS**

21      9.  As was made abundantly clear within the first few responses of each expert

22  to the prosecution's inquiries concerning the raw MMPI data and rough notes, neither

23  Dr. Morales nor Dr. Edwards was qualified to interpret or to rely upon the data.  Both

24  defense experts testified that they had not considered this material when forming their

25

26      [40]  Mr. Monroe's conduct in producing the useless, inflammatory data to
    Drs. Morales and Edwards; his failure to have Dr. Rogers "redo" the MMPI and

27  complete a report once the District Attorney made clear that he would rely on the
    raw data in the first trial; and his failure to prepare Dr. Rogers to testify and to take

28  the sting out of this explosive evidence will be addressed in Ms. Alfaro's petition
    for a writ of habeas corpus.

1  opinions.  Nevertheless, over repeated objections by the defense, the trial judge

2  allowed the district attorney to go on to examine each expert *extensively* about the

3  terms "probable fake bad" and "malingering" and to call Dr. Rogers, the psychologist

4  who had overseen administration of the MMPI, as a rebuttal witness.  Thereafter, the

5  district attorney made "malingering" the theme of his closing argument in support of

6  the death penalty.

7          **1.    Dr. Morales**

8          10.  Four pages into his fifty page cross-examination of Dr. Morales,

9  Mr. Middleton asked the sociologist, "Did you review Dr. Rogers' report?"  RT 3980.

10  When Dr. Morales responded that he had reviewed "a report that was a substance

11  abuse inventory and survey," Mr. Middleton pressed on:  "Did you review the

12  MMPI?"  Dr. Morales' response left no question that (a) there was no "report"

13  concerning the MMPI, and (b) he had seen the raw MMPI data, but was not qualified

14  to interpret it and had not relied upon it:  "There was an MMPI that I looked at that

15  was in draft form that had a lot of raw data on it which, not being a licensed

16  psychologist, I could not understand it."  RT 3981.  He stated, "the actual raw data

17  makes no sense to me."  RT 3982.

18          11.  That Dr. Morales was not qualified to interpret an MMPI, and therefore

19  had not considered the raw data and rough notes, came as no surprise to the district

20  attorney.  During the first penalty trial, *Mr. Middleton* had argued the very point that

21  Dr. Morales was unqualified to answer questions regarding the MMPI as he was a

22  social worker and not a psychologist.  RT 1418-30.  Moving to preclude such an

23  examination at that time, Mr. Middleton stated, "he's not a psychiatrist.  He doesn't

24  have a doctor's degree or an M.D. in psychiatry in any way.  Psychiatrists are the ones

25  that interpret MMPI's and psychological testing and have psychologist perform

26

27

28

the testing in order to make those interpretations." CT 1418.[41]  Although the court

did not rule on Mr. Middleton's motion, the fact that the district attorney himself

had argued that Dr. Morales was not qualified to *form an opinion* regarding raw data

from an MMPI evaluation demonstrates that he did not seek to introduce this

evidence at Ms. Alfaro's second penalty trial to test Dr. Morales' opinion.  Rather,

his extensive questioning of Dr. Morales concerning the data was a calculated attempt

to get prejudicial hearsay before the jury.  The forced and aggressive manner in which

Mr. Middleton introduced the inflammatory information is exemplified below:

> Mr. Middleton:  Let's go get back to the evaluation then.  Did you later on before coming to court today receive a legible copy of the MMPI with the notes legible on it?[42]

> Dr. Morales:  They were a little clearer.

> Mr. Middleton:  The one I sent to you.

> Dr. Morales:  Yes.

> Mr. Monroe:  Objection, Your Honor, it's irrelevant and also argumentative.

> The Court: The objection is overruled.

> Mr. Middleton:  And could you read the notes?  *Let me ask you this, Doctor.  What does 'probable fake bad' mean?*

> Mr. Monroe:  Objection, Your Honor, irrelevant.   Objection.  It's 352 of the Evidence Code.  It's beyond the scope.  It has nothing to do with the doctor's evaluation.  As a matter of fact, I believe the district attorney is acting in bad faith in bring [sic] that up right now before the jury.

> The Court:  The objection is overruled.

> Dr. Morales:  Since I'm not a licensed clinical psychologist, I do not know what those terms mean.

> Mr. Middleton: Twenty-one years in the psychiatric area and you don't know what probable fake bad means?

> Dr. Morales: Yes, sir.

---

[41]  In fact, it is psychologists, not psychiatrists, who are trained and therefore qualified to interpret tests such as the MMPI.  *See* RT 4267.

[42]  At the first penalty trial, Dr. Morales testified that his copy of the MMPI was illegible.  Prior to the second trial, Mr. Middleton sent Dr. Morales a more legible set.

1    Mr. Monroe: Objection.  Argumentative, Your Honor.

2    The Court: The objection is overruled.

3    * * *

4    Mr. Middleton: In all of your 21 years of psychiatric background, you
     have never heard the term probable fake bad?
5
     Mr. Monroe: Objection, Your Honor, it's beyond the scope and 352 of
6    the Evidence Code.

7    The Court: The objection is overruled.

8    Dr. Morales: Sir, to me that sounds like a technical term.  But the MMPI
     evaluations at my institution --
9
     Mr. Middleton: Excuse me.
10
     Dr. Morales:  --They go into the interpretations --
11
     Mr. Middleton: Objection.  Nonresponsive.
12
     The Court: The objection will be sustained.  The answer is stricken.
13
     Mr. Middleton: My question, and I haven't gotten an answer yet, I don't
14   believe, in all of your 21 years of psychiatrict [sic] work you have never
     heard the term probable fake bad.
15
     Dr. Morales: No, sir.
16
     * * *
17
     Mr. Middleton: Now did you call Dr. Martha Rogers to inquire about the
18   MMPI . . . as I put in my letter to you?

19   * * *

20   Mr. Monroe: Objection.  It's irrelevant.  He was not in the employ, to use
     the district attorney's expression, of the prosecution.
21
     The Court: Objection overruled.
22
     Mr. Middleton: As an expert witness --
23
     The Court: I think -- well, he hasn't answered the question.
24
     Mr. Middleton: I'm sorry. . . .  Why didn't you call Dr. Martha Rogers
25   the source of the MMPI that I'm talking about?

26   Dr. Morales: I discussed your letter to me with the counsel.

27   Mr. Middleton: And after that discussion you didn't call her, did you?

28   Dr. Morales: No sir.

381

1  Mr. Middleton: As a professional and an expert witness wouldn't you
2  want to have everything at your disposal to come up to a reasonable
   diagnosis in a given case like this?

3  Mr. Monroe: Assumes a fact not in evidence that he didn't have all of the
   things that he needed at his disposal.
4

5  The Court: Well, the objection is overruled.

6  Dr. Morales: Absolutely.

7  RT 3987-91.

8      **2.    Dr. Edwards**

9      12.  A similar pattern emerged during the testimony of Dr. Edwards.

10 Anticipating that Dr. Edwards had not relied on the raw MMPI data and rough

11 notes, Mr. Middleton asked Dr. Edwards not what she had relied upon but "what

12 psychological tests [she had] at [her] *disposal*" before talking to Ms. Alfaro.  RT 4118

13 (emphasis added).  Defense counsel objected, but the trial judge overruled the

14 objection.  *Id*.  Dr. Edwards then responded, referring to the psychological tests, "As I

15 said before, there were considerable amount of papers and I went through them to

16 find out what they entail and I found out that there were no results of the test, that

17 everything were raw data."  RT 4118.  Mr. Middleton, unwilling to accept that

18 Dr. Edwards had not considered the material, proceeded to produce it and wave it in

19 front of the jury:

20 Mr. Middleton:  So you never read -- you didn't read through those
   documents that you had from Martha Rogers?
21

22 Dr. Edwards:  I read only enough to realize that they were raw data . . . .

23 Mr. Middleton:  Let me ask you.  Is this what you got a copy of, the
   psychological social history?

24 Mr. Monroe: Your Honor, I object.  Totally irrelevant.

25 Mr. Middleton:  I don't know because they --

26 Mr. Monroe:  Objection, Your Honor, it's irrelevant.  If the doctor did
   not use it or rely on it, it has no bearing in the case.
27

28 The Court:  Well, I think he is just showing it to her to ask her if that's
   part of the document she saw.  The objection is overruled.

382

1   CT 4119.

2       13.  Dr. Edwards was quite clear that she did not consider the raw data and

3   rough notes when evaluating Ms. Alfaro's psychological condition.  But despite

4   her testimony, and defense counsel's repeated objections, the trial judge let cross-

5   examination continue unbounded.  Again and again the district attorney repeated the

6   term "probable fake bad," ignoring the fact that this preliminary notation was neither

7   considered nor rejected by Dr. Edwards, who also opined that the test should be

8   redone.  Relentlessly, the district attorney waved this prejudicial concept in front

9   of the jury, like a bull fighter would a red cape:

10      Mr. Middleton:  So raw data you don't understand on the MMPI?

11      Dr. Edwards:  I don't rely on anybody else from raw data whether it is
        MMPI or blood work or whatever.

12
        Mr. Middleton:  *What does the term "probable fake bad" mean to you?*
13
        Mr. Monroe:  Objection, irrelevant, your honor.
14
        The Court:  The objection is overruled.
15
        Dr. Edwards:  Fake bad is one of the concepts related with MMPI which
16      have to do with face validity.  One of them is fake bad. . . . So fake bad
        would mean that she has answered a certain number of things in a way
17      that in a tester's opinion would tend to present her in the worst light,
        whether it's worse in the sense of disease, whether it is worse in the
18      moral sense, whatever.

19      Mr. Middleton:  *Malingering can be lying, can't it?*

20      Dr. Edwards:  Lying is involved in malingering.

21      Mr. Middleton:  Okay. . . .

22  RT 4124 (emphasis added).

23      **3.    Dr. Rogers**

24      14.  After the defense rested, and over the objection of the defense, the district

25  attorney called Dr. Martha Rogers as a rebuttal witness.  The entirety of her testimony

26  follows:

27      Mr. Middleton:  Good morning.

28      Dr. Rogers:  Good morning.

1    Mr. Middleton:  What are you a doctor in?

2    Dr. Rogers:  Clinical and forensic psychology.

3    Mr. Middleton:  Okay.  So you are not a medical doctor, right?

4    Dr. Rogers:  No.

5    Mr. Middleton:  And what does a psychologist do?  In the way --
     I don't want the whole explanation, but as far as in relationship
6    with a psychiatrist in testing, what does a psychologist do?

7    Dr. Rogers:  Generally speaking, psychiatrists aren't trained to do
     psychological testing, either to administer, score, or interpret the results.
8    The generally have not had a background in tests and measurement,
     measurement theory, and those things that are needed.

9
          Psychologists, at least clinical psychologists, have usually had
10   a substantial amount of course work and training in the area of testing.

11   Mr. Middleton:  So do psychiatrists generally look to psychologists to
     administer testing, and then they read results?
12
     Dr. Rogers:  That happens, yes.
13

14   RT 4266-67.  The above would appear to support, not impeach, the defense experts'

15   testimony.  If there is impeachment, it should appear below.

16   Mr. Middleton: Okay.   Now, in this case -- well, you -- you're in a --
     you work with another individual, don't you, as a partnership or
17   something?

18   Dr. Rogers:  It's not a partnership, no.

19   Mr. Middleton:  Oh, okay.  Now, in this case, did you administer an
     MMPI to Miss Alfaro?
20
     Dr. Rogers:  My assistant did.
21
     Mr. Middleton:  How long ago was that?
22
     Dr. Rogers:  This was October, 1990.
23
     Mr. Middleton:  Okay.  And what you do is look at the scores and make
24   notes on the MMPI?  Is that what you did in this case.

25   Dr. Rogers:  Well, that's part of the process, yes.

26   Mr. Middleton:  Okay.  All right.  And did you make some notes on this
     case regarding the -- the Wiener-Harmon  subtle/obvious subscales?
27
     Dr. Rogers:  Among other things, yes.
28

384

Mr. Middleton:  Okay.  Did you make a note at the bottom of page five saying "probable fake bad?"

Dr. Rogers:  Yes.

RT 4267.  Notably, neither defense expert had denied that this note was present. It was the fact that it was not relied upon by the defense experts and was more prejudicial than probative that led the defense to object.  But the District Attorney pressed on.  Out of left field, in as substantive evidence, he asked:

Mr. Middleton:  What does "probable fake bad" mean?

Dr. Rogers:  This is a term that we use that may mean one of several things.  What it always means is that probably the person has over responded in some way.  There may have been some exaggeration or overstatement of whatever this person's current psychiatric condition is.

Mr. Middleton:  Is it one thing you look at in a -- is it one thing, among several things, you look at in say, malingering?  When you're looking at the case of malingering?

Dr. Rogers:  It would be one thing you would consider.

Mr. Middleton:  Okay.  What is the MMPI, anyway?

Dr. Rogers:  The MMPI is a 567 item true-false type instrument for measuring personality functioning.  It's used with psychiatric patients. Some of you may have taken it for job screening, for security type jobs. But it's basically used to measure overall personality functioning.

Mr. Middleton:  Thank you.  No further questions.

The Court:  You may examine.

Mr. Monroe: I have no questions.

RT 4268.

### 4.      The District Attorney's Closing Argument

15.  As was to be expected, in his closing argument, Mr. Middleton argued that Dr. Rogers' preliminary test data and the handwritten notes were substantive evidence that could be considered for the truth of the matters asserted therein.  He relied on this evidence *heavily*:

Mr. Middleton:  And then malingering.  Now, remember we got into malingering.  *I mean did we get into it.*  Malingering, by itself, is no big deal.  But what have we got in this case?  All of a sudden we find out

385

1    that we have got some report out here that says there may be some
2    malingering, probable fake bad.

3    RT 4339 (emphasis added).  Throughout the remainder of his closing argument,

4    he referred to the raw data and the notes repeatedly as substantive evidence the jury

5    should take into consideration in determining whether Maria del Rosio Alfaro should

6    live or die.  RT 4339-40, 4342, 4345.  He argued:

7        [Dr. Morales] was asked as a professional, as an expert witness,
         "wouldn't you want to have everything at your disposal to come up
8        with a reasonable diagnosis in a given case like this?"  His answer:
         "Absolutely."  Think about the MMPI. . . .  He's working on an
9        assumption.  But the MMPI, he runs up to a block wall.  He asks for more
         stuff, he doesn't get it.  He has never clarified.  So this probable fake bad
10       that stands to maybe explain some things that he has in a different light,
         he doesn't have.  He'd sure like to have everything.

11

12   RT 4342.

13       Rogers, Dr. Rogers.  She came in and said, yes, there was an MMPI, yes,
         I did put down probable fake bad.  And she talked about that.  So you
14       heard that.  And so it kind of did the full circle.  You heard that there was
         an MMPI, you heard that the defense experts did not want to consider it.
15

16   RT 4357.

17       Who operates the defense?  It's at the operation of Ms. Alfaro.  She's the
         defendant.  She chooses to fabricate, fake, embellish and create.
18

19   RT 4366.

20       Remorse, Ladies and Gentlemen? . . . .

21   RT 4367.

22   C.   **LEGAL ANALYSIS**

23       The introduction of evidence that "is so extremely unfair that its admission

24   violates fundamental conceptions of justice" violates due process.  *Dowling v. United*

25   *States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); *Alberni v.*

26   *McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006).  Moreover, the combined effect

27   of violations of state law evidentiary rules may violate due process.  *Lewis v. Jeffers*,

28   497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990); *Pulley v. Harris*,

386

465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984).  As set forth below, the trial

courts evidentiary rules, either individually or collectively, violated Ms. Alfaro's due

process rights.

**1.** **The Trial Court Erred In Permitting Extensive Cross-Examination Of Drs. Morales and Edwards Based On Raw Data And Rough Notes They Were Not Qualified To Interpret And Had Not Relied Upon**

16.  Section 721, subdivision (a), of the Evidence Code provides:  "Subject to subdivision (b), a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his qualifications, (2) the subject to which his expert testimony relates, and (3) the matter upon which his opinion is based and the reasons for his opinion."  Cal. Evid. Code § 721(a).  The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based, and which he took into consideration; and he may be subjected to the most rigid cross-examination concerning his qualifications, and his opinion and its sources.

17.  The encouragement of cross-examination of experts is based on the principle that probing into the reasons of an expert witness for his opinions is usually the only recourse of the cross-examiner.  It may be as important to learn what facts the witness disregarded as unimportant in the formation of his opinion, as to ascertain what facts he believed and relied upon as the foundation of his opinion.  While it is important for a cross-examiner to question an expert witness about facts he regarded as important as well as those he disregarded in forming his opinion, the questioning must involve facts that have been considered by the expert and, more importantly, that the expert has the capability to consider.

18.  The raw MMPI data from Dr. Rogers should have been excluded by the trial judge, as the record was in *Reyes*.  The raw data and rough notes could not be interpreted by and had not been relied upon by Dr. Morales and Dr. Edwards.  These

387

two experts did not disregard the information they were given by Dr. Rogers, as to disregard it would require Dr. Morales and Dr. Edwards to have understood the data and rejected it in the formation of their evaluations of appellant.  Instead, they set it aside because it was meaningless and unreliable to them.

19.  Even when the expert has relied on data, under California law, a trial court has discretion to "weigh the probative value of the inadmissible evidence relied upon by an expert witness as a partial basis for his opinion against the risk that the jury might improperly consider it as independent proof of the facts recited therein." *People v. Coleman*, 38 Cal. 3d 69, 91, 695 P.2d 189, 211 Cal. Rptr. 102 (1985) (citing *People v. Chapman*, 261 Cal. App.2d 149, 178-179, 67 Cal. Rptr. 601 (Cal. App. 3d Dist. 1968)).  Although wide latitude has been given in cross-examination of experts in order to test their credibility, the trial court must exercise its discretion pursuant to Evidence Code § 352 so as to limit the evidence to its proper uses.[43]  *Coleman,* 38 Cal. 3d at 92.  The proper use of inadmissible evidence in cross-examination of an expert is as a factor to test the testifying expert's credibility and to assist the jury in determining what weight to give the testifying expert's opinion.  The improper use of inadmissible evidence is for the truth of the matter asserted.

20.  Here, the raw MMPI data and notes were clearly inadmissible hearsay. California Evidence Code §1200, subdivision (a) states that "'hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." Cal. Evid. Code §1200(a).  Opinions by outside experts that are referenced in court by testifying experts have long been recognized as such.  *See Mosesian v. Pennwalt Corp.*, 191 Cal. App. 3d 851, 860, 236 Cal. Rptr. 778 (Cal. App. 5th Dist. 1987) ("The opinions of the six outside experts were *unquestionably* hearsay opinions.").  The first

---

[43]   Evidence Code § 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

1   prong of the hearsay definition, a statement made other than by a witness while

2   testifying at the hearing, is clearly met, as Dr. Rogers was not testifying at the time

3   her MMPI preliminary results were referred to.  The crucial inquiry, therefore, is

4   whether the evidence is offered for the truth of the matter asserted.  If it is, it is

5   hearsay.  *See People v. Harvey*, 233 Cal. App. 3d 1206, 1220, 285 Cal. Rptr. 158

6   (Cal. App. 4th Dist. 1991).  No nonhearsay purpose existed for the introduction of Dr.

7   Rogers' preliminary test scores and notations in this case.  The hearsay evidence was

8   clearly presented as substantive evidence, and particularly in the absence of a proper

9   limiting instruction, the jury took it as such.

10       21.  In Petitioner's case, the trial court abused its discretion by permitting the

11   district attorney to cross-examine Dr. Morales and Dr. Edwards concerning the highly

12   prejudicial hearsay contents of the notes contained on the raw MMPI data.  Because

13   Dr. Morales and Dr. Edwards testified under oath that they had not used Dr. Rogers'

14   data or the notes in any way in the preparation of their evaluation of Ms. Alfaro,

15   the extensive questioning of these two experts concerning these materials had no

16   probative value for the appropriate purpose of exploring the basis of the defense

17   their opinions.

18       22.  Not only did the trial court admit the evidence, he failed to offer the jury

19   any guidance concerning the permissible and impermissible uses for the testimony.

20   Despite numerous objections by defense counsel, the only admonishment given

21   during the prosecution's cross-examination was the following, delivered during the

22   cross-examination of Dr. Edwards:

23       Mr. Middleton:  Okay.  And do you see about three pages after that some
         written-- handwriting on a piece of paper.

24
         Mr. Monroe:  Objection, calls for--
25
         Dr. Edwards:  There were lots of things --
26
         Mr. Monroe:  Objection as hearsay, your honor.
27

28

1    The Court:  Objection is overruled.  *It's all part of the same information
     that the person gets, the same admonishment that I gave you earlier.*
2    *You can't consider it for the truth.*

3    RT 4120-21 (emphasis added).  Clearly, this instruction was not enough to rectify the

4    damage done by the prosecution's forcefully repeated references to Dr. Rogers' test

5    data and the rough notes.

6         23.  Worse still, the court's final instructions at the end of the penalty phase

7    served only to reinforce the jury's misconception that they could consider the

8    references to "probable fake bad" as substantive evidence of Dr. Roger's actual

9    opinion.  Although the court admonished the jury that they could not consider

10   *Ms. Alfaro's* statements made to a third party "in the course of an examination"

11   for their truth, the court failed to further admonish the jury that they also could not

12   consider that *third party's handwritten notes* for their truth.  RT 4414-15.

13        24.  The prejudicial impact on the jury of the hearsay evidence and

14   prosecution's repetitive questions concerning Dr. Rogers' MMPI data can be inferred

15   from the impact a similar cross-examination of Dr. Morales had on the first jury.

16   RT 2056-64.  During its deliberations, the jury asked for a definition of the word

17   "malingering."  RT 2056.  The jury obviously considered malingering, one of several

18   possible explanations for "probable fake bad," to define Ms. Alfaro's psychological

19   state.  Based on this unreliable evidence, she was denied the mitigating circumstance

20   of remorse.

21        25.  If the repetitive questioning about "probable fake bad" had a prejudicial

22   impact in the first penalty phase, it could only have had a more devastating impact

23   in the second penalty phase where Dr. Edwards also testified and was also questioned

24   extensively concerning Dr. Roger's MMPI results and the handwritten notes.  The

25   jury heard more than twice the amount of inadmissible and highly prejudicial hearsay

26   evidence than in the first penalty phase.  The second jury also received less guidance

27   from the trial judge in the second penalty phase than did the first jury.  In the first

28   penalty trial, the trial judge eventually ordered the prosecution to move on from the

MMPI.  RT 1865.  In the second penalty trial, the judge gave the District Attorney free rein.  If the first jury was confused regarding how to use the expert testimony, the second jury could only have been more confused.  Because the prejudicial impact was so clearly foreseeable in the second trial, the judge abused his discretion in permitting the prosecution to ask questions about the unreliable MMPI data which had minimal probative value and could only confuse and mislead the jury.

26.  The improper cross-examination, the introduction of unreliable, highly prejudicial hearsay, the trial judge's lack of guidance, and the prosecution's reliance on this bogus evidence in closing argument lead to the inescapable conclusion that the jury was misled and confused regarding the proper and limited use of hearsay evidence on cross-examination of an expert and therefore used it incorrectly in arriving at the death sentence for appellant.

**2.   The Trial Court Erred In Allowing The District Attorney To Call Dr. Rogers As A Rebuttal Witness**

27.  In a hearing on defense counsel's motion to quash the subpoena for Dr. Rogers, the prosecution argued that Dr. Rogers would be an appropriate rebuttal witness in the event that they explored the area of malingering.  RT 2202.  However, for Dr. Rogers to properly rebut defense experts' testimony regarding malingering, she would have had to rebut a fact underlying the defense experts' rejection of malingering as a diagnosis of Ms. Alfaro.  Proper rebuttal of a foundational fact by Dr. Rogers was simply not possible because there was no disagreement between the experts regarding the facts of Ms. Alfaro's psychological profile.  Drs. Morales and Edwards did not disagree with Dr. Rogers or reject her opinion.  They simply disregarded her raw data and rough notes as they were unqualified to interpret them.

28.  Dr. Rogers ended up testifying to the formation of her own opinion regarding Ms. Alfaro's psychological condition in light of the MMPI data.  She did not and could not have testified that Dr. Morales and Dr. Edwards disregarded, misunderstood, or simply did not know of an underlying fact about Ms. Alfaro's

psychological condition.  This testimony was improper rebuttal, as Dr. Rogers was only offering a contrary opinion for the jury.

29.  A party may impeach an expert witness by contradiction, "i.e., by showing the falsity of the matter upon which the expert based his opinion.  This can be done either by cross-examination of the expert or by calling other witnesses to offer evidence showing the nonexistence or error in the data upon which the first expert based his opinion."  *Kennemur v. The State of California*, 133 Cal. App. 3d 907, 922-23, 184 Cal. Rptr. 393 (Cal. App. 5th Dist. 1982).  The rationale for permitting impeachment of an expert regarding the basis of his or her opinion is that, if the facts relied upon are demonstrated to be false, the testimony in its entirety is called into question.  Therefore, the rules of impeachment treat foundational facts differently than the opinion itself;  "[i]f the expert's opinion is contradicted by the opinion of another expert, it merely suggests the first expert may have reasoned incorrectly;  it does not suggest his untruthfulness as a witness.  On the other hand, where the facts underlying the expert's opinion are proved to be false or nonexistent, not only is the expert's opinion destroyed but the falsity permeates his entire testimony;  it tends to prove his untruthfulness as a witness."  *Id.*

30.  The crucial inquiry in addressing whether or not an expert witness was properly called on rebuttal is whether or not she would be testifying to an underlying fact or just to a contradictory opinion.  The court in *Kennemur* recognized the difficulty in distinguishing between fact and opinion but emphasized that the distinction must be drawn by the trial courts.  *Kennemur*, 133 Cal. App. 3d at 924.  When drawing these distinctions, "the general rule that wide latitude is to be given to a party impeaching an expert witness must be abrogated insofar as it applies to impeachment. . . .  In many cases, the ultimate opinion of the expert is based on a series of underlying opinions.  Thus, rather than broadly construing what a foundational 'fact' is, *the term should be strictly construed by the trial court to*

*prevent a party from offering a contrary opinion of his expert under the guise of impeachment*." *Id.* (emphasis added).

31.  Here, the trial judge erred by failing to strictly construe the distinction between opinion and foundational fact when he permitted Dr. Rogers to testify as a rebuttal witness.  He erred by viewing Dr. Rogers' testimony as rebuttal of the facts underlying the opinions of the two defense experts, Dr. Edwards and Dr. Morales, when they had had no such "facts" before them.  The exchange between Dr. Rogers and the prosecution concerning the preliminary notation "probable fake bad" demonstrates how her testimony merely offered another underlying opinion for the jury to compare and contrast to that of the defense experts.  Dr. Rogers' testimony clearly illustrates that the prosecution's purpose in calling her was to improperly present tentative conclusions to the jury as substantive evidence, not to rebut.

32.  As the court in *Kennemur* stated, the division between underlying opinions and foundational facts must be strictly construed to prevent exactly the behavior exhibited by the district attorney here:  offering a contrary opinion of his expert under the guise of impeachment.  The district attorney basically conceded his improper motivation during the hearing on the motion to quash the subpoena of Dr. Rogers, by stating that he "just ha[s] her under subpoena because [he] anticipates if they have a doctor on the stand there may become a need for Dr. Rogers to authenticate the MMPI-II *or in some way rebut what has been said on the stand*."  RT 2205 (emphasis added).

33.  The trial judge did not follow the advice of the court in *Kennemur*, and strictly construe the nature of a foundational fact.  Instead, he demonstrated a flare for expanding the scope of admissibility of unreliable data, as evidenced by his remark during the hearing on defense counsel's motion to quash the subpoena:  "[I]f it's customary and it's the customary practice in the particular field of endeavor to administer psychiatric reports and to rely in part or in whole on their results, [it] would seem to be kind of an anomalous event for an expert to say well, yeah, I'm

aware of that report and I didn't put any credence in it.  And then have the other side be bound by it without being able to probe [and] go through the whole host of scenarios, especially if it's a report that, if it was relied upon, would appear to change the person's opinion."  CT 2209-10.[44]

34.  This reasoning constituted a clear misunderstanding of the issues presented by a rebuttal witness.  In particular, it misstates the customary practice in the fields of both Dr. Morales and Dr. Edwards, as the trial judge knew from the first penalty trial. It was not the customary practice in Dr. Morales' field to use MMPI data that had not been put into a final report by a psychologist.  RT 1863-65.  Notably, the trial judge's description of probing the reasoning of an expert is an accurate statement of the proper scope of *cross-examination* of an expert witness, not the proper scope of impeachment through a rebuttal witness.  As stated by the *Kennemur* Court, the legal standards for impeachment through these two different mechanisms must be construed differently:  "the general rule that wide latitude is to be given to a party impeaching an expert witness must be abrogated insofar as it applies to impeachment under Evidence Code § 780, subdivision (i)." *Kennemur*, 133 Cal. App. 3d at 924.

35.  The trial judge here plainly did not appreciate the difference.  "Opening the door" is simply not the standard by which expert rebuttal testimony is measured. When it concerns an expert, the trial judge is expected to ask whether the subject matter of rebuttal testimony is a foundational fact or an underlying opinion.  Here, the

---

[44]  This flare is also evidenced by the following hypothetical he posed to defense counsel during the hearing on the defense motion to quash the prosecution's subpoena of Dr. Rogers:

> Let [sic] assume Dr. Edwards testifies and she testifies that she was provided certain psychiatric test data and that she reviewed and considered it.  And let's assume that the MMPI-II that Martha Rogers allegedly administered was one of those tests.  Would not the calling of Dr. Edwards, who has seen that test, in effect open the door to the prosecution establishing what the test was?

CT 2207-08.

1  trial judge simply did not engage in that inquiry, and as a result, allowed in improper

2  rebuttal testimony.

3  **D.     CONCLUSION**

4       36.  The district attorney knew, based on the videotape of Ms. Alfaro's

5  confession, that a jury might give substantial weight to her remorse; it was a

6  mitigating circumstance he clearly felt he had to defeat to get the death penalty.  His

7  strategy led him to poison the proceedings with unreliable, inflammatory hearsay in

8  the form of a non-testifying expert's raw data and rough notes. The District Attorney

9  managed to take this hearsay evidence that both testifying defense experts averred

10  they were unqualified to interpret and had not considered in rendering their opinions

11  -- and parlay it into substantive evidence that Ms. Alfaro was "malingering;" that she

12  was overstating her feelings of sorrow and remorse in order to deceive the jury into

13  believing that she felt remorse for her crimes.  The trial judge erred in allowing the

14  district attorney to continue questioning the defense experts about the raw data and

15  rough notes after they testified that they had not relied on them.  He erred in allowing

16  the district attorney to call the testing psychologist as a rebuttal witness.  He erred in

17  allowing this unreliable, inflammatory hearsay to assume the role that it did in this

18  case.  His denial of the defense objections to this improper evidence was highly

19  prejudicial to Ms. Alfaro and mandates the reversal of her sentence.

20       37.  The foregoing violations of Ms. Alfaro's constitutional rights constitute

21  structural error and warrants the granting of this Petition without any determination of

22  whether the violations substantially affected or influenced the jury's verdict.  *Brecht,*

23  507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this

24  claim, the foregoing constitutional violations so infected the integrity of the

25  proceedings that the error cannot be deemed harmless. The foregoing violation of Ms.

26  Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's

27  convictions and sentence, rendering them fundamentally unfair and resulting in a

28  miscarriage of justice.

38.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition.  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XXXI.

## CLAIM 26:  THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OVER DEFENSE COUNSEL'S OBJECTION CONCERNING PETITIONER'S NON-FELONIOUS, NON-VIOLENT CRIMINAL CONDUCT AND HER "INTENT TO KILL"

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court failed to exclude unreliable, inflammatory evidence of Ms. Alfaro's arrest record.

1.  Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 9 in the Opening Brief.

2.  AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law,

1  this Court "must then resolve the claim without the deference that AEDPA otherwise

2  requires." *Panetti*, 127 S. Ct. at 2858.

3      3.  If Respondent disputes any of the facts alleged below, Petitioner requests

4  an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

5  has been afforded discovery and the disclosure of material evidence by the State, the

6  use of this court's subpoena power, and the opportunity to investigate fully, counsel

7  requests an opportunity to supplement or amend this petition.

8      4.  The declarations and other exhibits accompanying this petition, as well as

9  the allegations and facts set forth elsewhere in this petition, are hereby incorporated

10  by reference into this claim as though set forth in full.

11      5.  In support of this claim, Petitioner alleges the following facts, among others

12  to be presented after full discovery, investigation, adequate funding, access to this

13  Court's subpoena power, and an evidentiary hearing.

14  **A.    INTRODUCTION**

15      6.  Until her arrest in connection with this case, Ms. Alfaro had no felony

16  record and no record of any criminal activity which involved the use or attempted use

17  of force or violence or the express or implied threat to use force or violence.  Indeed,

18  "[a]ccording to the records of the Federal Bureau of Investigation and the California

19  Department of Justice, [Ms. Alfaro] has no prior record of any type of criminal

20  activity." *Id.* (Orange County Probation Department Report).  She had been arrested

21  on two occasions at age fourteen -- once for possession of less than an ounce of

22  marijuana and a hypodermic needle and syringe; once for petty theft of three men's

23  shirts from a Mervyn's Department Store -- and once at age sixteen for possession of

24  an open can of beer.  CT 1756-57.  But she had no prior convictions and no arrests for

25  conduct involving the use or attempted use of force or violence.  The absence of

26  felonious or violent past misconduct was potent, statutory, mitigating evidence.  But

27  during the penalty retrial, the trial judge permitted Mr. Middleton to unfairly deprive

28  Ms. Alfaro of the weight of these mitigating factors by eliciting evidence of her arrest

1  record, making it sound worse than it was.  The introduction of this inadmissible

2  evidence was highly prejudicial.  It deprived Ms. Alfaro of her Fifth, Sixth, Eighth

3  and Fourteenth Amendment rights and, as a result, her sentence must be reversed.

4  **B.     STATEMENT OF FACTS**

5      7.  Overruling repeated objections by defense counsel, the trial judge permitted

6  the district attorney to impress the jury with Ms. Alfaro's non-violent, non-felonious

7  juvenile criminal record in the second penalty phase trial.  During Mr. Middleton's

8  cross-examination of defense "psychosocial" expert Dr. Armando Morales, the

9  district attorney managed to elicit legally inadmissible evidence that Ms. Alfaro had

10  an arrest record; that she had been previously engaged in theft; that she drove while

11  drunk; and that she had been on probation.  The district attorney managed all this

12  through the clever ploy of having Dr. Morales apply the diagnostic criteria for "anti-

13  social personality disorder" to Ms. Alfaro; criterion which include "often initiates

14  physical fights" and "fire starting" -- things involving criminal behavior, which meant

15  that the expert was required to refer to Ms. Alfaro's criminal record in order to opine

16  whether her behavior so qualified.

17      8.  Although Dr. Morales had not testified on direct that he believed or did not

18  believe that Ms. Alfaro was suffering from "anti-social personality disorder," and the

19  defense objected to the questions for this reason, the court permitted Mr. Middleton to

20  proceed.  RT 3999.  Reading from his own copy of the DSM-III-R, Mr. Middleton

21  asked Dr. Morales to apply the standard diagnostic criteria for this disorder to Ms.

22  Alfaro.  RT 3994-4001.  When he reached the criterion "often initiating physical

23  fights," and the doctor stated that this did not apply to Ms. Alfaro, Mr. Middleton

24  prodded, "do you know for sure you have got that or not?"  RT 4001.  In order to

25  respond the doctor was required once again to describe the criminal records he had

26  reviewed; this time providing even more damaging evidence for Mr. Middleton to

27  work with:  "Based on the police reports, police records I have seen, she had an arrest

28  for I believe theft.  Other than the present offense."  RT 4001.  With this, Mr.

398

1  Middleton managed to show that Ms. Alfaro had a record for stealing, the very crime

2  that had led her into the Wallace home.  But not yet satisfied, Mr. Middleton pried

3  opened Pandora's box, responding:

> Is that all you looked for, *you just look at police reports of people caught doing something* before you determine if there was physical fights in somebody's background?

6  *Id*.  At this point defense counsel renewed his objection, but again, it was overruled.

7  *Id*.  Mr. Middleton took this as a cue he could go a step further, and he did, asking:

8  "Did you ask the family if she had any physical fights during that period of time?"  *Id*.

9  Dr. Morales' response: "[Ms. Alfaro] had been in a couple of fights.  But when you

10 are poor inner city and poor minority communities, at times one has to become

11 involved in physical fights."  *Id*.  Again, Mr. Monroe's objection was overruled.

12 RT 4002.  This caused Mr. Middleton to go further still, eliciting evidence that

13 improperly (and completely incorrectly) suggested that Ms. Alfaro had something to

14 do with *gangs*:

> Q: We're talking about Anaheim, Orange County, now.  Now is the Anaheim, Orange County, the epitome of inner city dwelling like you know it up in L.A.?
>
> A: There are little pockets of barrios where you have a certain amount of criminal activity, drug activity, and gang activity.  You have about eighteen gangs in this particular area.  And I'm sure some of these gangs are involved in conflict and fighting and so forth.  So what I'm saying is in certain areas fighting is not uncommon in some of the poor minority areas.

21 RT 4002.

22      9.  When Mr. Middleton got to the "anti-social personality disorder" criterion

23 "fire-setting," he was able to reinforce his point, this time leading Dr. Morales to

24 reference not just Ms. Alfaro's arrest record, but to suggest wholly incorrectly that

25 she had a record of criminal convictions as well:  "I did not find that in any of the

26 police reports . . . *or probation evaluations*."  RT 4004.

27      10.  Mr. Middleton also managed to get in inadmissible evidence of

28 Ms. Alfaro's non-violent, non-felonious criminal conduct when he questioned

1  Dr. Morales about the criterion "Is reckless regarding his or her own or others'
2  personal safety, as indicated by driving while intoxicated, or recurrent speeding."
3  RT 4010.  When Dr. Morales testified that Ms. Alfaro did not meet this criterion,
4  Mr. Middleton responded, "No?  Did you see on that survey Dr. Rogers did where
5  she indicates that she often drove while intoxicated?"  *Id*.  Once again, the defense
6  attorney's objection to the admission of this question when the doctor had not relied
7  on the referenced report was overruled (RT 4011), and Mr. Middleton continued, this
8  time turning Ms. Alfaro's *lack* of a more extensive criminal record into an
9  aggravating circumstance.  When Dr. Morales attempted to justify his conclusion that
10  Ms. Alfaro did not fit the diagnostic criterion, testifying, "I did not come across any
11  history of traffic violations or citations or drunk driving offenses or things of that
12  nature," Mr. Middleton burst forth,  "But that's where the police catch her, right?"
13  RT 4010-11.  This comment was highly improper and grossly prejudicial, leading the
14  jury to consider all of the crimes Ms. Alfaro must have committed to get caught even
15  the few times she had.

16         11.  During his closing argument, Mr. Middleton told the jury that statutory
17  aggravating factors relating to prior felony convictions and prior violent conduct are
18  not applicable here.  But he said nothing about juvenile crimes and non-violent
19  conduct.  RT 4318.  He thus left the jury with the distinct impression--which the trial
20  court's instructions did nothing to dispel--that it was permissible to consider
21  Ms. Alfaro's past criminal conduct as an aggravating factor to be weighed in its
22  penalty determination.
23  / / /
24  / / /
25
26
27
28

400

1  **C.    THE COURT ERRED IN NOT EXCLUDING EVIDENCE OF**
2  **PETITIONER'S NON-FELONIOUS, NON-VIOLENT CRIMINAL**
3  **RECORD**

4    12.  Penal Code § 190.3 provides that "[i]n determining the penalty, the trier
5  of fact *shall* take into account any of the following factors if relevant."  (Pen. Code,
6  §190.3.  Factors 190.3 (b) and (c) read as follows:

7    (b)    The presence or absence of criminal activity by the defendant which
            involved the use or attempted use of force or violence or the express or
8            implied threat to use force or violence.

9    (c)    The presence or absence of any prior felony conviction.

10  *Id.*  The well-settled principle in California is that evidence admitted in aggravation
11  in a death penalty case must be relevant to one of the factors set out in Penal Code
12  § 190.3.  *See People v. Welch*, 85 Cal. Rptr. 2d 203, 241 (1999).  The prosecution
13  may not introduce evidence of the defendant's alleged "bad character" in its case-in-
14  chief unless the evidence bears on one of the enumerated aggravating factors.  *People
15  v. Ramirez*, 50 Cal. 3d 1158, 1192, 791 P.2d 965 (1990).  Evidence of nonviolent
16  criminal activity that did not result in a felony conviction is inadmissible as an
17  aggravating factor.  *See Ortiz v. Stewart*, 149 F.3d 923, 941 (9th Cir. 1998) (a state
18  court's arbitrary and capricious application of state law constitutes an independent
19  due process or Eighth Amendment violation); *Lockett v. Ohio*, 438 U.S. 586, 604-05,
20  fn. 12 (1978) (requiring sentencer to consider all mitigating character evidence under
21  the Eighth and Fourteenth Amendments but noting that this does not limit the court's
22  authority to exclude as irrelevant evidence not bearing on character, prior record, or
23  circumstances of the offense).  By failing to follow the provisions of the California
24  Penal Code, the trial court created an unreliable and arbitrary imposition of the death
25  penalty in violation of Ms. Alfaro's due process rights.  *See Furman v. Georgia*,
26  408 U.S. 238 (1972); *see also Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909,
27  49 L. Ed. 2d 859 (1976).

28

13.   The evidence the trial judge let in of Ms. Alfaro's non-violent, non-felonious juvenile criminal conduct was clearly admitted in error.  It raised the specter that Ms. Alfaro had a history of bad conduct relevant to the jury's determination as to whether she should live the rest of her life out in prison or be sentenced to die.  Under the law, this evidence was illegal.  It was grossly inflammatory, particularly to the extent that there was reference to theft, a crime involved in the instant prosecution, and it was prejudicial.  There is a likelihood that the jury assigned significant aggravating weight to this inadmissible evidence of Ms. Alfaro's prior juvenile, misdemeanor conduct.  The trial court's admission of this evidence constituted reversible error.

**D.   <u>CONCLUSION</u>**

14.   The trial judge violated Ms. Alfaro's Fifth, Sixth, Eighth and Fourteenth Amendment rights by allowing the District Attorney to elicit -- repeatedly -- references to Ms. Alfaro's non-violent, non-felonious juvenile conduct during the second penalty trial.  This evidence was highly inflammatory and wholly improper.  Ms. Alfaro's sentence must be reversed as a result of the trial court's error.

15.   The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

16.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together

with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

## XXXII.

## CLAIM 27:  THE TRIAL COURT'S DETERMINATION THAT THE AGGRAVATING CIRCUMSTANCE OUTWEIGHED THE MITIGATING CIRCUMSTANCES VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS

Petitioner's sentence of death was rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law and equal protection as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the trial court's determination that the aggravating circumstance outweighed the mitigating circumstances was contrary to  law and the evidence presented.  As a result, habeas relief is warranted.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 13 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim.  *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law,

1   this Court "must then resolve the claim without the deference that AEDPA otherwise

2   requires." *Panetti v. Quarterman*, 127 S. Ct. at 2858.

3       3.  If Respondent disputes any of the facts alleged below, Petitioner requests

4   an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

5   has been afforded discovery and the disclosure of material evidence by the State,

6   the use of this court's subpoena power, and the opportunity to investigate fully,

7   counsel requests an opportunity to supplement or amend this petition.

8       4.  The declarations and other exhibits filed with this petition, as well as the

9   allegations and facts set forth elsewhere in this petition, are hereby incorporated by

10  reference into this claim as though set forth in full.

11      5.  In support of this claim, Petitioner alleges the following facts, among others

12  to be presented after full discovery, investigation, adequate funding, access to this

13  Court's subpoena power, and an evidentiary hearing.

14  **A.    INTRODUCTION**

15      6.  The trial court's statement of its reasons for denying Ms. Alfaro's motion

16  for modification of the death verdict pursuant to Penal Code § 190.4(e) reflects

17  a profound misunderstanding of the law regarding the application of the mitigating

18  and aggravating factors set forth in Penal Code § 190.3.  Section 190.3 provides that

19  "[i]n determining the penalty, the trier of fact *shall* take into account any of the

20  following factors if relevant."  Pen. Code § 190.3 (emphasis added).  Yet the court

21  failed to give weight to at least three statutory mitigating factors that were clearly

22  present -- no prior record of criminal activity involving the use or attempted use

23  of force or violence (§ 190.3(b)), no prior felony convictions (§190.3(c)), and youth

24  (§ 190.3(i)) -- and deemed at least one other -- intoxication which impaired

25  Ms. Alfaro's ability to conform her conduct to the requirements of the law

26  (§ 190.3(h)) -- not to be present based on an improperly narrow reading of the

27  mitigating factor.  In addition, though never stating that it disbelieved Ms. Alfaro's

28  testimony, the court completely disregarded her reports of the threats made to her and

1    her child if she did not commit the crime (*see* § 190.3(g)), confusing the mitigating

2    circumstance of substantial domination with her *attorney's* unsupported argument

3    that someone else killed Autumn Wallace.  Finally, the court improperly counted

4    evidence introduced by the defense pursuant to § 190.3(k) as non-statutory

5    aggravating evidence that weighed against Ms. Alfaro.  The court's reasoning in

6    doing so took personal responsibility to new extremes by contending  that a mentally

7    deficient child who had been raped and beaten by her father and turned to drugs

8    as self medication to dull the pain when twelve years old had "chosen" her path and

9    thus should be treated contemptuously, rather than afforded any sympathy.  Because

10   the court rested its decision not to modify Ms. Alfaro's death sentence on

11   impermissible considerations, habeas relief is warranted.

12       7.  By failing to follow the provisions of the California Penal Code, the trial

13   court created an unreliable and arbitrary imposition of the death penalty in violation

14   of Ms. Alfaro's due process rights.  *See Furman v. Georgia*, 408 U.S. 238 (1972);

15   *see also Gregg v. Georgia*, 428 U.S. 153 (1976).

16   **B.**     **DESCRIPTION OF THE TRIAL COURT'S RULING**

17       8.  On July 14, 1992, the trial court considered and denied Ms. Alfaro's

18   automatic application for modification of the verdict imposing the death penalty

19   pursuant to Penal Code § 190.4(e).  RT 4484-4509.  The court expressed its

20   understanding that it had a duty to determine whether the jury's verdict that the

21   aggravating circumstances substantially outweighed the mitigating circumstances

22   was contrary to the law and the evidence, and to state the reasons on the record for its

23   finding.  RT 4499.  The court then proceeded to address each of the factors listed

24   in Penal Code § 190.3.

25       9.  The court initially skipped the factor set forth in § 190.3(a) -- the

26   circumstances of the crime -- beginning with a discussion of § 190.3(b), the presence

27   or absence of any criminal activity by a defendant involving the use or attempted use

28   of force or violence.  RT 4500.  Stated the court:

405

1    190.3(b), the presence or absence of any criminal activity by a
2    defendant involving the attempted use of force or violence. *That factor
     is not present in our case.* And we even instructed the jury on that.
3    There were some minor things that we talked about, some shoplifting,
     auto thefts, things of that nature, none of which involved any violence at
4    all. *So that's simply not a factor that is present in the case. There is no
     evidence on that at all.*

5    RT 4500 (emphasis added). While the court was correct that there was no evidence to

6    support § 190.3(b) as a factor in aggravation, it erred in determining that it was

7    "simply not a factor that is present in this case." Where there is no evidence that the

8    defendant has previously engaged in criminal activity involving the attempted use

9    of force or violence, *the defendant is entitled to have this fact weighed in mitigation.*

10       10. The court engaged in the same improper analysis with regard to the factor

11   set forth in § 190.3(c), the presence or absence of any prior felony conviction. Stated

12   the court:

13       Number (c), the presence or absence of any prior felony
         conviction. There is no evidence of any prior felony conviction.
14

15   RT 4500. Again, the court correctly noted that the factor should not be weighed in

16   aggravation, but as confirmed by the court's concluding remarks, set forth below, the

17   court erred in failing to consider Ms. Alfaro's lack of a felony record as mitigating

18   evidence.

19       11. Turning next to § 190.3(d), whether the offense was committed while

20   the defendant was under the influence of extreme mental or emotional disturbance,

21   the court acknowledged that there was some evidence of this, but concluded without

22   explanation that "the evidence is insubstantial to justify a finding that that factor

23   is present." RT 4500. The substantial evidence supporting this factor, which

24   establishes that the court was wrong to disregard it, is discussed in connection with

25   §§ 190.3(g) and (h), below.

26       12. When it reached the factor set forth in § 190.3(g), "[w]hether or not

27   defendant acted under extreme duress or under the substantial domination of another

28   person," the court misquoted the law. The Court then conflated Mr. Monroe's theory

1  that the unidentified Hispanic man and not Ms. Alfaro killed Autumn Wallace with

2  Ms. Alfaro's testimony that she was responsible for killing Autumn, but that the man

3  had pressured her to do so by threatening both her and her child.  The former would

4  have been a defense had there been any evidence to support it.  The latter should have

5  qualified as a mitigating circumstance.  But instead of either accepting or rejecting

6  Ms. Alfaro's testimony that she had been under the substantial domination of another

7  person at the time of the crime, the trial judge explained his conclusion that this

8  mitigating factor was not present as follows:

9         This is one the defense has honed in on in their argument to the
   jury.  They honed it [sic] on it more in the argument than in the evidence.
10  The evidence pointing to this phantom third person being there.  It was
   argued to the jury.  The jury apparently didn't feel that factor was there
11  because that is a kind of a factor that if it was there it would appear to
   have some weight.
12
          But I've gone over the evidence and I have listened to counsel's
13  argument this morning.  It kind of reminded me of the argument he made
   to the jury about the third party and how Miss Alfaro acted under the
14  substantial domination of a third party.

15         And I recall watching the four hours of videotape where
   Mr. Giffin went over very carefully, many times, he gave Miss Alfaro
16  an opportunity, specifically afterwards, *was anyone else involved
   in this offense?*  Was anyone else in the house?  At the time the tape
17  was played?  I remember.  But he at least gave her the opportunity
   to come forward at that time at least four or five times.
18
          I think it's for the reasons Mr. Giffin testified to when he was on
19  the stand, that is, he himself when he conducted this interview and had
   viewed the crime scene had a hard time believing that a young woman
20  the age of Rosie Alfaro could in fact have done this crime by herself.  *So
   he gave her many, multiple opportunities at that time to come forward
21  and indicate that someone else was involved in the offense.  Each inquiry
   Mr. Giffin asked her on tape she replied in the negative.  No one else
22  was involved in it.  No one else had anything to do with it.  It's not until
   after Miss Alfaro gets legal counsel that this idea of the third party, the
23  phantom third party, pops up in the case.*

24         And I looked at the evidence real careful.  The defense even had
   an expert who came in and testified about some alleged footprints, things
25  of that nature.  We adopt the argument of the defense, that is to say that
   Miss Alfaro stabbed Autumn Wallace several times, three or four or five
26  times, and then this other unknown person finished off the job stabbing
   young Autumn Wallace the other 47, 49 times, it's absolutely amazing
27  that Miss Alfaro left bloody footprints on the floor.  And this other
   person who obviously was there, according to their argument, after the
28  pool of blood is even larger than it would have been when Miss Alfaro

left the room, somehow this person didn't leave a trace, not a single trace of any footprint in the blood.

A fingerprint was also found in the bathroom and it matched Miss Alfaro. *It's my belief that the jury rejected the defense's contention that a third person was present, did any of the stabbing in this case. I think the evidence is grossly insufficient to even raise that as a strong inference in the case, especially when you consider the numerous opportunities Mr. Giffin gave her on the videotape.*

It appears to this court -- and I have had an opportunity to go over the evidence, I took a lot of notes. My notes are, I don't know, probably four or five inches thick in the case. I reviewed them, I looked carefully at the defense expert testimony in the case, I looked at the prosecution's evidence in the case, and it would seem to me *it's a figment of someone's imagination* to say that another third person was present and that Miss Alfaro acted under the substantial domination of this unknown person.

For those reasons the court does not feel the circumstances described in subdivision (g) are present in the case.

RT 4501-04 (emphasis added). In essence, the court concluded that Ms. Alfaro could not have been under the substantial domination of another person because (1) she never stated this to Investigator Giffin, despite his questions which invited her to tell him whether "anyone else was involved in the offense," and (2) there was no evidence to support a finding that another person stabbed Autumn Wallace.

13. Based on the fact that the court left out the "or" when purporting to quote this factor, stating it as follows: "whether or not the defendant acted under extreme duress under the substantial domination of another person" (RT 4501), it appears that a misunderstanding of the law was responsible for the court's failure to accept Ms. Alfaro's testimony that she killed Autumn, but had been threatened into doing so, as evidence of the presence of this factor, since the court never stated that it has chosen to reject her testimony. The court's demonstrable misrepresentation of the facts is more difficult to understand.

14. During Ms. Alfaro's video taped confession, the focus of Investigator Giffin's questions was not on whether either of the men outside the house was "involved in the offense" in that he had threatened her in the event she did not kill Autumn, as Ms. Alfaro later testified (*see* RT 1636), but on whether either of the men

408

had participated in stabbing Autumn Wallace. *See* CT 533-34 (Q: "Who came into the house with you?"  A: "Nobody, nobody came in there. . . .  He just went like to the door. . . right there by the door, inside the house, by the door."); CT 534 (Q: "So he got, when in the screen door and through the front door and you were handing him stuff, is that right?"  A: "Yeah."); CT 544 (Q: "Don't you think he would of seen Autumn's body?"  A: "I don't know."); CT 545 (Q: "We just want you to tell us in your own words and you're not doing that."  A: "Well, I think he did come in because . . . .  But I don't know, I just can't remember seeing him walk in the house, but I think he did then to grab the microwave . . . ."); CT 554 (Q: "Don't try to protect other people."  A: "Oh, I ain't.  I told you who went with me and everything.  I don't know that guy's name.  Shorty, I just know him by Shorty and he was there that day."); CT 572 (Q: "So if anyone besides you did the stabbing or if anyone besides you, in other words, if, if you didn't stab her but somebody else did or if all three of you stabbed her, took turns, then now is the time to tell us."  A: "I did."); CT 576 (Q: "You're absolutely sure you're the one that did all this?"  A: "Yes.") .  The one time the investigators asked a question broad enough to encompass threats made to Ms. Alfaro in the event that she did not do something about Autumn, she gave no response:

> Investigator Bale: Is there anyone that you're afraid of or trying to protect or any reason that you're not telling us about other cars or other people, or other names?  See, it's real funny, Rosie, all those people in the street over there, guess what, a lot of them know you and they know your name.

> Ms. Alfaro: Uh-hum.

> Mr. Bale: They know your kids names, they know where you live.

> Ms. Alfaro: Uh-hum.

> Mr. Bale: You know, they know about Martin, they know about Manuel.

> Ms. Alfaro: Uh-hum.

> Mr. Bale: They know all this kind of stuff and you have this amnesia, this forgetfulness about who this people are.

409

1    Ms. Alfaro: Uh-hum.

2    Mr. Bale: It makes it hard for me to believe you about that?

3    Ms. Alfaro: About what?

4    Mr. Bale: About who these people are that you sold things or gave things
     away to.  Did you trade any of the stuff . . .
5
     Ms. Alfaro: . . . well, I know, I know . . .
6
     Mr. Bale: . . .listen to me for a second now and then you can answer.
7    Did you trade any of the stuff for dope directly?

8    Ms. Alfaro:  No.

9    CT 582 (ellipses in the original).  Thus, the court's reliance on the fact that

10   Ms. Alfaro was asked specifically to tell the investigators whether "anyone else

11   was involved" and failed to do so was error.  Nothing in Ms. Alfaro's testimony

12   at trial about the pressure she was placed under by the third man is inconsistent

13   with her statements to the investigators.

14        15.  During her cross-examination in the first penalty trial, which was read

15   to the jury in the second, Ms. Alfaro admitted that she stabbed Autumn and did not

16   testify that she saw anyone else stab Autumn.  She stated, however, consistent

17   with her confession, that the unidentified Hispanic man who had driven her to the

18   Wallace's house threatened her because she had messed up after learning that

19   Autumn was home (RT 1644); that he started cussing her out because she had messed

20   up and told her she had to do something about it (RT 1690); that he had a knife

21   behind her back and told her she had to do something about it (RT 1697); and that "he

22   was threatening me first, and he was telling me about how I had Manny out there . . .

23   and if I didn't do what he said, that something was going to happen."  RT 1731-32.

24   She testified that she was afraid of this man and that she believed he would harm her.

25   RT 1735.  All of this constitutes evidence of substantial domination by another

26   person that should have been but was not considered by the court in mitigation.

27        16.  The court next turned to the factor set forth in § 190.3(h), "whether or not

28   at the time of the offense the capacity of the defendant to appreciate the criminality

410

1   of [her] conduct or to conform [her] conduct to the requirements of law was impaired

2   as a result of mental disease or defect, or the affects of intoxication."  Pen. Code

3   § 190.3(h).  Stated the court:

> We did have some evidence on the videotape only, really, in our case here.  And there may have been some evidence in the transcript that was read to the jury of the prior testimony of the defendant.  But it -- and the defendant in the video indicates that she had shot up with some heroin or speed balls or whatever the case might be.  And once again, *Mr. Giffin very carefully examined her in that area and she really did not indicate and the evidence does not support that any intoxication had any substantial effect on her conduct in our case.*
>
> So while there is evidence of intoxication, it would not appear that it's of the quality that *interfered with* the defendant's capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law.  So it does not appear to this court that the factor (h) is present.

12  RT 4504-05.  In fact, there was substantial evidence of both Ms. Alfaro's mental

13  defects and her intoxication at the time of the crime that should have weighted the

14  scales toward mitigation.  Investigator Giffin did not "carefully examine[ ] her in that

15  area," and she did not "indicate . . . that any intoxication had [had no] substantial

16  effect on her conduct."  Again, the trial judge based his ruling on a misrepresentation

17  of the facts.

18      17.  Investigator Giffin began the video taped interview by asking Ms. Alfaro

19  whether she was addicted to cocaine or heroin or both.  CT 507.  Her response was

20  "both."  *Id*.  The investigator then asked her to tell him what happened the day

21  of Autumn's murder.  She began, "I went over there on that day, I was already like,

22  like coked out and stuff, I don't know what I what I was doing . . . ."  *Id.* at 509.

23  She continued, "I was really wired and I was gonna just take something . . . ."  *Id*.

24      18.  After Ms. Alfaro admitted that she had stabbed Autumn, the investigator

25  took her back over the events of the day in more detail.  The second time through, she

26  told the investigator that she went to "Little TJ" around 12:00 p.m. that day (CT 516)

27  to "pick up" drugs.  CT 515-16.  After she "picked up" "two dimes of coke and two

28  dimes black [tar]," she went to her friend Juan's apartment and "did it there."  CT 516

She "cook[ed] it up," and injected herself in the neck.  CT 515-16.  This was at approximately two o'clock in the afternoon.  CT 516.  She stated that shortly after she injected these drugs, "I came back down [to the apartment where she had purchased the drugs] cause I wanted more but I didn't have no money.  So some guy named Shorty came up . . . and he gave me some . . . ."  CT 517.  She stated, "I got like kind of greedy, you know, I wanted to do more and more and more and more."  CT 518.

19.  Ms. Alfaro described to Investigator Giffin how, when they got to the Wallace house, "I went and knocked and I asked [Autumn] if I could use the bathroom and she said, 'yeah.'  And I just went in the bathroom and I was like really, I don't know, I was like really wired, really coked out and stuff."  CT 526.  When the investigator asked her why she went to the bathroom, she responded, "I don't know, I just went in there.  I don't know, I was like really, I was really wired, I was real coked out."  *Id*.  After Ms. Alfaro admitted stabbing Autumn Wallace multiple times, the investigator asked her why she kept stabbing her.  CT 531.  Ms. Alfaro responded, "I don't know, I was scared, I don't know what I was doing, I just . . ."  CT 532.  The investigator asked Ms. Alfaro what she did after she left the house and again she stated, "I was just like really wired . . . ."  CT 542.  Later, she described waiting at a bus stop with some of the property she had taken from the Wallace's in a bag.  She says, "I dropped the bag and the mirror broke. . . . And there was a lady right there and since I was really high and loaded and stuff, I told the lady if she wanted it and I gave it to her."  CT 561.

20.  The investigators then took Ms. Alfaro through the sequence of events yet again:

> Investigator Giffin:  When you got over to Juan's, you hooked up with Sabrina, you went down and got a two and two, you came back up and you fixed, you and Sabrina and you still wanted to fix some more.

> Ms. Alfaro: Uh-huh.

> * * *

412

1  Mr. Giffin: . . . you let Shorty use your rig.

2  Ms. Alfaro: Yeah.

3  Mr. Giffin: Then he gives you some more?  Then you decided you want
some more?

4

5  Ms. Alfaro: Yeah.

   * * *

6

7  Mr. Giffin: Did you tell them you were going to get that stuff and sell it
so you can buy some more dope?

8  Ms. Alfaro: Yeah, I told Shorty.

9  CT 548-49.  The investigator then asked Ms. Alfaro about a statement she had made

10  that Shorty had just gotten out of jail.  CT 573.  He asked her how she found out

11  he had just gotten out of jail, and she responded, "I didn't ask him, I . . .I was just

12  really high, I don't know."  CT 574.

13        21.  Towards the end of the interview, the investigators attempted to eliminate

14  any sort of intent defense with the following line of questioning, which clearly

15  established that Ms. Alfaro was not unconscious, but just as clearly left open the

16  possibility that her ability to conform her conduct to the requirements of the law

17  had been impaired:

18  Mr. Bale: . . . don't try to convince me that you were out of your head.

19  Ms. Alfaro: No, I wasn't out of my head.

20  Mr. Bale: I know.

21  Ms. Alfaro: And I'm not trying to do that.

22  Mr. Bale: You know what was, you know what . . .

23  Ms. Alfaro: . . . yes, I know.

24  Mr. Bale: You know exactly what was going on.

25  Ms. Alfaro: Yeah, I know.

26  Mr. Bale: What did you think would happened to, to Autumn when you
started stabbing her, what do you think was gonna happen?  What
27  happens when you take a knife and poke holes in somebody?  What,
what can happen to them?  What did you think was gonna happen?

28

413

1   Ms. Alfaro: She was gonna die.

2   Mr. Bale: Okay.  So you were, you were fully aware of that when you
3   started stabbing her, that she could die from that.

    Ms. Alfaro:  Yeah.
4

5   CT 577.  This comprises the entirety of Mr. Giffin's questioning of Ms. Alfaro

6   concerning the level of her intoxication.  Far from stating that the drugs had not

7   impaired her ability to conform her conduct to the requirements of the law, she

8   repeatedly confirmed that she was heavily under the influence.

9       22.  During her cross-examination at the first penalty trial, which was read

10  to the jury at the second penalty trial, Ms. Alfaro provided additional information

11  about the level of her intoxication and the effects it had on her mental ability

12  including the fact that after shooting up a "twenty and ten" she was high for

13  approximately two hours.  RT 1667.  On redirect, she stated that she had shot up with

14  heroin and coke an hour to an hour and a half before she went to the Wallace house.

15  RT 1727.  She explained that when she used the word "wired" she meant "when

16  you're out of control, you're -- if you've done too much coke, you panic and you get

17  wired.  Just can't control your -- I don't know how to explain it, but just like in panic.

18  You panic."  RT 1727-28.  She stated that this was the state she was in when she

19  was in the house with Autumn.  RT 1728.  She clarified that while she had told the

20  investigators she was not out of her head that day, she was in fact wired at the time

21  she killed Autumn Wallace.  RT 1729.  There was clearly substantial evidence that

22  Ms. Alfaro's capacity to conform her conduct to the requirements of the law was

23  impaired by heroin and cocaine, and the trial court made a factual and legal error

24  in disregarding it.

25      23.  The court next addressed the factor set forth in § 190.3(i), the age of the

26  defendant at the time of the crime.  RT 4505.  The court noted that Ms. Alfaro was

27  eighteen at the time of the crime.  *Id*.  The court then continued:

28

414

1
2
3
4
5
6

If mere age by itself without any other factor is involved, it would appear perhaps that the age of eighteen might be a mitigating factor in the case. I think you have to put the age in context of what her background shows about she had dropped out of school at an early age, been out on the streets for a substantial period of time, been involved in the drug culture for a substantial period of time, things of that nature.  So would appear that in a streetwise sense she was much more mature than her age would indicate.

So it doesn't appear that the age of the defendant at the time of the crime is really a substantial mitigating factor in the case.

7   *Id*.  As  set forth below, this analysis was not only legally incorrect, it was

8   unenlightened.

9   24.  Finding the factor set forth in § 190.3(j) inapplicable, the court next

10   addressed the § 190.3(k) factor.  Stated the court:

11
12
13
14
15
16
17

I guess this is where counsel brings in the disadvantaged background of the defendant, her early involvement with drugs, her prostitution, things of that nature.  The problems she had with her father, allegedly, the problems she had with the father of her second child and third and fourth child.  I guess that's where all of these factors fit in.  The fact that she is a mother of four children.  Obviously at the time this offense occurred she was only the mother of two children.  But she is now as she sits there at counsel table the mother of four children.  And I guess that's where counsel tries to fit in all of those factors in item (k).  And *those factors have kind of a two-edged sword in a way*.  It appears that the defendant did get involved in drug activity, came from a separated home, and had a disadvantaged youth.

18
19
20
21

It also appears to the court that people are really the sum total of the choices we make in our life.  She chose to leave school.  She chose to use drugs.  She chose to engage in acts of prostitution on the streets. She chose to hang out in the area on Jeffery Street over there where there is a -- the drug culture is involved.  She made all of those choices.  Those are all choices.  There was no evidence presented to the court that those were involuntary choices, anybody forced her into doing that, things of that nature.

22
23

So on the one hand you can say well, she is the mother of four children and she is young.  On the other hand, you can say that she made those choices, she ought to be responsible for making those choices.

24
25
26
27
28

And it was a little shocking to the court, I'm sure it was shocking to the jury, that one of her children was taken to the crime scene and was cared for in the hands of a relative stranger, a person who just got out of prison a couple of days earlier, left to take care of her young boy of about eighteen months on the front lawn while she went into the house and stabbed Autumn Wallace over fifty times.  *So that all cuts a couple of ways*.  And it would not appear to the court that the (k) factor has any substantial weight in our case.

415

RT 4505-07.  In essence, the court weighed potentially mitigating evidence relevant

to the sympathy factor, such as Ms. Alfaro's abusive childhood and mental

disabilities which led her to self-medicate with drugs and to motherhood four times

over by the time she was eighteen, as "a two edged sword" which he then used

against her in finding that she should be put to death.

25.  Finally, the court returned to the factor codified in § 190.3(a), the

circumstances of the crime.  Stated the court, in full:

> It appears to the court that the -- I've been involved in the legal profession since January 1965.  I was involved with -- I first started in Orange County on a great day of April Fools Day of 1966, and I have been involved in the legal community in Orange County since that time.
>
> In my past I've prosecuted people accused of offenses like Miss Alfaro, I have defended people accused of noncapital homicide offenses when I was a defense attorney, and I have been a member of the Superior Court for over thirteen years.
>
> This case is one of the most senseless, brutal, vicious, callous killings that this court has ever seen.  The description that a picture is worth a thousand words, the circumstances of this offense shown by the photographs show a very vicious, senseless killing.  I have never seen one that compares with this case, nor could I imagine that anyone could ever dream one up that would match this case.
>
> So it does appear to this court that the circumstances of the offense in item (a) of Penal Code section 190.3, that the circumstances of the crime itself standing alone far outweigh *any mitigating circumstances, if there are any, that are presented in this case*.
>
> In conclusion on that I am satisfied that the jury's verdict imposing the death penalty and reviewing all of those factors is consistent with the evidence and the law that the factors in aggravation, as I have described, beyond all reasonable doubt outweigh any factors in mitigation, and therefore the motion to modify the penalty is denied.

RT 4507-09 (emphasis added).

## C.    THE TRIAL COURT FAILED TO CONSIDER ALL OF THE MITIGATING EVIDENCE PRESENT IN THIS CASE

26.  Pursuant to Penal Code § 190.4(e), in every case in which the trier of fact

has returned a verdict imposing the death penalty, the trial court must determine

whether the weight of the evidence adequately supports the jury's verdict in favor

of death.  The judge must make that determination independently, giving the evidence

416

1  the weight he believes it deserves. *Id*. Although the trial court is not required to

2  recount every piece of mitigating evidence it weighs for § 190.4(e) purposes, the

3  court may not ignore or overlook mitigating evidence. *See Eddings*, 455 U.S.

4  at 113-15 ("Just as the State may not by statute preclude the sentencer from

5  considering any mitigating factor, neither may the sentencer refuse to consider, as a

6  matter of law, any relevant mitigating evidence. . . . The sentencer, and the Court

7  of Criminal Appeals on review, may determine the weight to be given relevant

8  mitigating evidence. But they may not give it no weight by excluding such evidence

9  from consideration."); *Lockett v. Ohio*, 438 U.S. 586 (1978).

10       27. The trial judge never stated that he had considered all mitigating

11  circumstances raised during the trial. To the contrary, his words establish that

12  he ignored or excluded from his consideration substantial mitigating evidence. After

13  discussing the factors set forth in Penal Code § 190.3, the trial court concluded,

14  "[T]he circumstances of the crime itself standing alone far outweigh any mitigating

15  circumstances, *if there are any*, that are presented in this case." CT 1815 (emphasis

16  added). There were at least two mitigating circumstances -- Ms. Alfaro's lack

17  of a felony record and her lack of a history of criminal activity involving the use

18  or attempted use of force or violence -- that were undisputed and undisputable.

19  From the trial judge's words, this Court must conclude that he failed to give due

20  consideration to the undisputed mitigating circumstances presented by Ms. Alfaro --

21  let alone other factors such as her intoxication, her mental impairments, her

22  domination by another person, her youth, her abusive childhood, her cooperation with

23  the authorities, her relationships with her family members including her children, and

24  her ability to adjust in prison. From Judge Millard's words, one can only conclude

25  that as far as he was concerned, there were no mitigating circumstances in this case.

26  In any number of ways, detailed below, the trial court's weighing process in this case

27  was fatally flawed.

28

1    **1.      The Trial Court Ignored the Mitigating Evidence That Petitioner**
2    **Had No Felony Record or Record of criminal Activity Involving**
3    **the Use or Attempted Use of violence**

4    28.  It is undisputed that at the time of her arrest, Ms. Alfaro had no prior
5    convictions of any kind, let alone felony convictions, and that she had no history
6    of criminal activity involving the use or attempted use of force or violence.
7    Ms. Alfaro was entitled to have these facts weighed in mitigation.  Pen. Code
8    §§ 190.3(b) and (c).  Because the trial court failed to recognize that at least these two
9    mitigating factors were clearly present, instead concluding that they "were not present
10   in this case," and referencing in closing the "mitigating circumstances, if there are
11   any, that are presented in this case," the trial court's decision to deny Ms. Alfaro's
12   motion for modification of the verdict should be reversed.

13   **2.      The Trial Court Ignored Mitigating Evidence of the Affects**
14   **of Intoxication, Mental Defects, and Duress Which Impaired**
15   **Petitioner's Ability to Conform Her Conduct to the**
16   **Requirements of the Law**

17   29.  The trial court concluded:  "While there is evidence of intoxication, it
18   would not appear that it's of the quality that interfered with the defendant's capacity
19   to appreciate the criminality of her conduct or to conform her conduct to the
20   requirement of the law.  So it does not appear to this court that the factor (h) is
21   present."  CT 1811.  Not only did the court misquote § 190.3(h) -- replacing "impair"
22   with "interfere" -- its conclusion was entirely at odds with the evidence.

23   30.  Drug intoxication at the time of the offense is indisputably a mitigating
24   factor.  A defendant need not show, as the trial judge claimed, that her "intoxication
25   had [a] substantial effect on her conduct" (*see* RT 4505) in order to establish the
26   mitigating circumstance set forth in Penal Code § 190.3(h).  She need only show that
27   her ability to conform her conduct to the requirements of the law was "impaired."
28   Pen. Code § 190.3(h).  By raising the bar in this way, the trial court misinterpreted the

1  law and failed to give the proper consideration to a mitigating circumstance that was
2  clearly present in this case.

3      31.  Likewise, the trial court failed to give due consideration to the evidence
4  that Ms. Alfaro acted under the substantial domination of another person, again
5  appearing to confuse the evidence that would be required to raise duress as a trial
6  defense with that necessary for consideration as a mitigating circumstance.  At no
7  time does the trial judge reject Ms. Alfaro's contention that she was pressured to kill
8  Autumn.  His conclusion is simply that the man did not participate in stabbing
9  Autumn.

10     32.  Finally, the trial court overlooked the evidence presented that Ms. Alfaro
11  suffered mental disabilities, including an IQ no higher than 78, and probably much
12  lower, learning disabilities exacerbated by a traumatic childhood (*see In re Ross*,
13  10 Cal. 4th 184, 196, 892 P.2d 1287, 40 Cal. Rptr. 2d 544 (1995)), Attention Deficit
14  Disorder, a Conduct Disorder characterized by childhood anti-social behavior,
15  Adjustment Disorder characterized by anxiety and depression, and a Dependent
16  Personality Disorder.  These mental defects were mitigating evidence that she was
17  entitled to have taken into consideration.

18     **3.**     **The Trial Court Ignored the Mitigating Evidence of**
19           **Petitioner's Youth, Disadvantaged Background, and**
20           **Her Remorse**

21     33.  Youth is a mitigating factor.  *Eddings,* 455 U.S. at 115.  "Youth is more
22  than a chronological fact.  It is a time and condition of life when a person may be
23  most susceptible to influence and psychological damage."  *Id*.  The Court continued:

24     Our history is replete with laws and judicial recognition that minors,
       especially in their earlier years, generally are less mature and responsible
25     than adults.  Particularly "during the formative years of childhood and
       adolescence, minors often lack the experience, perspective, and
26     judgment" expected of adults. [Citation omitted.] . . . [J]ust as the
       chronological age of a minor is itself a relevant mitigating factor
27     of great weight, so must the background and mental and emotional
       development of a youthful defendant be duly considered in sentencing.
28

419

*Id.* at 115-17.  Similarly, in *Magill v. Dugger*, 824 F. 2d 879 (1987), the court recognized that where the defendant was seventeen at the time of the crime, his age was "a powerful mitigating circumstance." *Id.* at 890.  The court noted that "[w]hen a crime is committed by a minor the defendant's remorse and desire to repent are particularly relevant mitigating factors." *Id.* at 893.

34.  Ms. Alfaro turned eighteen barely eight months before the charged crimes.  Her youth had been far more than "disadvantaged." *Cf.* RT 4506.  She had helplessly watched her violent, alcoholic father beat her mother from babyhood.  She had been regularly physically abused by her father herself.  She, along with her mother and siblings, had been thrown out into the street by her father.  She had been raped, purportedly by a drinking buddy of her father's, all by the time she reached the age of nine years old.  Her mental capacity was borderline -- near the level deemed retarded.  Her body had been racked by hard drugs from the age of twelve.  As a result, her education ended before she completed the seventh grade.  She had been impregnated and had given birth twice before she turned sixteen.  And she felt and exhibited deep remorse for what she had done to Autumn Wallace.

35.  All of these issues have been considered mitigating circumstances. *See Parker v. Dugger*, 498 U.S. 308, 314, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991); *McKoy v. North Carolina*, 494 U.S. 433, 436, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (borderline intellectual functioning is a mitigating factor).  Yet, a "two-edged sword" is how the trial court viewed them.  The court erroneously considered that its skewed view of the mitigating evidence rendered it evidence in aggravation.  Agravation is not established, however, by the absence of mitigation.  In viewing it as such, the trial court violated Ms. Alfaro's constitutional rights by impermissibly turning evidence of her background, character, drug use, and motherhood under factor (k) into aggravating circumstances.

/ / /

/ / /

**4.** **The Trial Court's Determination That Petitioner Was Entitled to No Sympathy Based on "Choices" She Had Made Was Fundamentally Flawed**

36.  The trial court wrongly determined that Ms. Alfaro was not entitled to sympathy because of the purported "choices" she had made in her young life:

> It appears that the defendant did get involved in drug activity, came from a separated home, and had a disadvantaged youth.  ¶  It also appears to the court that people are really the sum total of the choices we make in our life.  She chose to leave school.  She chose to use drugs.  She chose to engage in acts of prostitution on the streets.  She chose to hang out in the area on Jeffery Street over there where there is a -- the drug culture is involved.  She made all of those choices.  Those are all choices.  There was no evidence presented to the court that those were involuntary choices, anybody forced her into doing that, things of that nature.

RT 4506-07.

37.  In making these remarks, the court was specifically addressing the provisions of Penal Code § 190.3(k), the sympathy factor.  The court expressed its view that when Ms. Alfaro stabbed Autumn Wallace to death, she did so with a free and unfettered will, unmitigated by any circumstances of experience described by § 190.3, a will as clear and as capable of reflection as to motive and consequence as the court imagined its own to be.  The court concluded that as a result, Ms. Alfaro was undeserving of any sympathy whatsoever.

38.  The court simply decided to overlook the tremendous constraints that operated to limit the choices, opportunities, and exercise of free will of a person with Ms. Alfaro's youth and experiences.  While the court concluded that Ms. Alfaro "chose" to become a drug addict, it failed to consider what social or familial forces might impel a twelve-year-old girl, that is to say, a child legally and morally, to "choose" drug addiction.  Could such a choice, even if it were exercised as the court states, be a free and informed one?  Or was it the act of a child in response to a situation any human being might find intolerable.

421

39.  The court, in declaring that "it would not appear . . . that the (k) factor has any substantial weight in our case" (RT 4507), implied a chain of causality among the various petty crimes and moral infractions it cited, one thing leading inexorably to another, culminating, apparently, in the murder which brought Ms. Alfaro to stand before the bench.  But surely the court, arbitrarily and deliberately, picked up the chain in the middle, without a glance at the long train of horrors that preceded the ones it preferred.  The court did not venture far enough back in time in enumerating the various choices it supposed Ms. Alfaro to have made.  Had it done so, it might have said she chose to be born with an Intelligence Quotient no higher than 78, and conceivably much lower.  She must have chosen to be born into a family of modest, working class means, rather than one whose status and income may have helped in some measure to ameliorate other events.  She must have therefore chosen to be sired by a brutal and alcoholic father who beat her and her mother regularly and savagely.  At the age of nine, the court must have imagined, Rosie Alfaro chose to be raped by a family friend.  She also must have chosen, perforce, to never receive any moral instruction, apart from the purely negative and perverse lessons she derived from observation and personal, immediate and corporal experience.  All of these events -- the beatings, the drunkenness, the absenteeism, the moral vacuum -- must have been the product of free will on her part; in short, she was busily and of her own volition, building a crippled and twisted personality from the moment she was born until the moment she committed the crime under discussion.

40.  This view of her childhood was necessary for the court to logically and consistently hold to its view that human beings are the sum of the choices they make.  Otherwise, the court must allow the possibility that human beings are the sum of the choices they make plus something else, or allow that the choices they make might be influenced by past experiences beyond their control, e.g., in childhood, when all human beings are equally defenseless against viciousness, abandon, and want.

41.  Perhaps the court may have believed quite sincerely that a human being does not require moral instruction (which is usually inculcated in, rather than embraced by, the young), to lead an exemplary life.  In this belief the court would stand alone against the history of theology, philosophy, and law, which would hold that a spiritual discipline is necessary to distinguish good from evil, and to exercise the ability to embrace one and shun the other.  Ms. Alfaro's childhood was not only utterly devoid of positive moral instruction, the only illustrations of morality she was exposed to came from the beatings and abuse already described.  Those vivid and painful lessons were her sole experience of human interaction.

42.  The court chose to characterize Ms. Alfaro's childhood as disadvantaged.  This simple characterization falls far short, however, of describing Rosie Alfaro's childhood.  Her emotionally shattered and morally twisted childhood informed her later choices, just as any adult's choices are informed by their early circumstances.  She was, in fact, in a continuous state of extreme mental and emotional disturbance, and had been since childhood.

43.  And yet Rosie Alfaro is responsible.  Despite the influences of the horrors of her childhood, she found the moral strength to admit her responsibility, express remorse, and demand to be allowed to take public responsibility for her act and plead guilty.  This is a crucial point, and one that the court did its utmost to avoid.  She said she was responsible.  The court knew it, and colluded with her incompetent attorney to prevent her from telling the very people who would decide if she lived or died -- the jury.  The court then affirmed the death penalty, even knowing that she had long before demanded to take responsibility.  Not satisfied with that, it vilified her for her moral vacuity in not taking responsibility.  In so doing, the court prevented Ms. Alfaro from exercising the one choice demanded of her by her own conscience.

44.  The question is, if she was not incompetent, and could then and later apprehend the evil of her act, how impaired was Rosie Alfaro's ability to exercise the right use of will and resist the impulse to murder Autumn Wallace?  We say that

her life was such that her experiences, combined with a permanent state of severe emotional disturbance, crippled her will and her capacity to consciously reason out the consequences of her acts.  Her entire existence was a daily round of pain, sadness, anger, resentment, acute cravings and short-term efforts to satisfy them.  Each round of craving and satiation had its element of choice, to be sure, but just as surely each round eroded the ability to resist the next craving.  The will grew weaker, not stronger.  The intellect grew dimmer, and where there is not full consciousness there cannot be full reflection and full consent to the evil act.

45.  Human will is not limitless.  It is circumscribed by elements of life beyond our control and truncated by the realities of physical existence.  The great healer Paracelsus said, "How can a man do what he wants if he cannot so much as make a single hair white or black?"  Paracelsus, *Selected Writings* (c. 1951, The Princeton University Press), p. 206.

46.  Ms. Alfaro exercised her will, but within the severe and pitiless limits of a miserable life, which limits are recognized by law as mitigating factors, and the trial judge erred in dismissing them.

## C.    <u>CONCLUSION</u>

47.  In denying Ms. Alfaro's motion for modification of the death verdict, the trial court displayed a patent misunderstanding of the process of weighing the mitigating and aggravating factors described in Penal Code § 190.3.  Ms. Alfaro was entitled to have *all* these factors -- the lack of a felony record and past violent criminal activity, the effects of intoxication, her youth, her "disadvantaged" background, and her remorse -- actually weighed in mitigation, not dropped off the scale entirely.

48.  In each circumstance, the court entirely removed these factors from the balance.  For example, rather than considering the defendant's actual testimony that she was threatened by a third party, the court chose to ignore it, characterizing the substantial domination defense as a figment of someone's (that is, defense counsel's)

424

imagination.  The trial court explicitly doubted that there even *were* any mitigating factors.  This doubt manifested the fact that the court failed to give proper consideration to the undisputed mitigating circumstances that did exist, like Ms. Alfaro's lack of a felony record and her lack of a history of violent criminal activity.

49.  In an extraordinary application of individualism gone awry, the court weighs a childhood of rape, child abuse, drug addiction, homelessness, poverty, and prostitution not on the mitigating side of the scale, but as *aggravators* to cancel mitigation, because Rosie Alfaro "ought to be responsible for making these choices." The court relies on ideologically informed logic to blame the defendant for a disadvantaged youth.  Yet, the malformed logic that led the defendant to commit the act in question was the product of mitigating factors in her life that rendered it impossible for her to fully consent to the evil she did.  The phrase "abandoned and malignant heart" -- brandished by her own counsel -- cannot apply to such a person, who in any case suffered remorse and demanded to make amends, neither of which acts are the hallmarks of the abandoned and the maligned.

50.  Habeas relief is warranted.  The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

51.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together

425

1  with the additional constitutional errors outlined in the remainder of this petition.

2  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

3  sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

4  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

5  (9th Cir. 1978).

6                                          **XXXIII.**

7  **CLAIM 28:  THE DENIAL OF PETITIONER'S MOTION FOR NEW TRIAL**

8  **VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**

9        Petitioner's sentence of death was rendered in violation of her rights to a fair

10  trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

11  determination of guilt and penalty, to the effective assistance of counsel, to present

12  a defense, and to due process of law and equal protection as guaranteed by the Fifth,

13  Sixth, Eighth and Fourteenth Amendments to the United States Constitution because

14  the trial court failed to modify the sentence, knowing, as it did, compelling mitigating

15  evidence that was not brought before the jury.  As  a result, habeas relief is warranted.

16       1. Exhaustion of the claim:  This claim was fairly presented to the California

17  Supreme Court in the direct appeal.  It was presented as Claim 14 in Opening Brief.

18       2. AEDPA:  The California Supreme Court denied this claim.  *People v.*

19  *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

20  state court's denial of this claim is both "contrary to" and an "unreasonable

21  application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

22  must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

23  this claim was dependent on an antecedent unreasonable application of federal law,

24  this Court "must then resolve the claim without the deference that AEDPA otherwise

25  requires." *Panetti v. Quarterman*, 127 S. Ct. at 2858.

26       3. If Respondent disputes any of the facts alleged below, Petitioner requests

27  an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

28  has been afforded discovery and the disclosure of material evidence by the State,

the use of this court's subpoena power, and the opportunity to investigate fully,

counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the

allegations and facts set forth elsewhere in this petition, are hereby incorporated by

reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others

to be presented after full discovery, investigation, adequate funding, access to this

Court's subpoena power, and an evidentiary hearing.

A.    **INTRODUCTION**

6.  Penal Code § 1181(7) allows the trial court to reduce the punishment in lieu

of granting a new trial where the jury's finding of death is "contrary to evidence."

In Ms. Alfaro's case, partly because not all of the relevant mitigating evidence was

presented to the jury, the jury's finding that the aggravating factor outweighed all

of the mitigating factors was "contrary to evidence."  The trial court's denial

of Ms. Alfaro's motion for a new trial or reduction of penalty habeas relief is

warranted as by failing to follow the provisions of the California Penal Code, the trial

court created an unreliable and arbitrary imposition of the death penalty in violation

of Ms. Alfaro's due process rights.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *see*

*also Gregg v. Georgia*, 428 U.S. 153 (1976).

B.    **THE TRIAL COURT'S RULING**

7.  On July 14, 1992, immediately after stating its reasons for declining

to modify the jury's verdict of death pursuant to Penal Code § 190.4(e), the trial court

took up the defense motion for a new trial pursuant to Penal Code § 1181(7).  *See*

RT 4509-10.  The trial court began by acknowledging that it had the authority to

consider evidence that was not before the jury.  The court stated that while it is not

appropriate for a court to consider any evidence that was not before the jury in ruling

on a defendant's motion for modification of the verdict, it is appropriate for a court to

consider other evidence in ruling on a motion for new trial pursuant to Penal Code

427

1   § 1181(7).  *See* RT 4509-10.  The court said that in addition to the evidence that was
2   introduced at trial, it would consider the probation report and some of the attachments
3   to that report in ruling on Ms. Alfaro's motion for a new trial.  RT 4509.  But rather
4   than discuss the evidence included in the probation report that was not presented to
5   the jury, and explain why it did or did not change the court's analysis of the § 190.3
6   mitigating and aggravating factors, the court made the following statement:

> And there being nothing more to add to that, the court is going to deny
> the motion for new trial as to the guilt phase.  ¶ The court feels the
> evidence is overwhelming on the guilt phase and the court is going to
> deny the motion for a new trial for substantially the same reasons already
> indicated on the 190.3 motion.  I'll incorporate all of those reasons and
> I'll deny the motion for new trial under 1181 sub 6 or 7.  It purports no
> review evidence.  If the court did grant a motion for new trial, that
> evidence is not admissible.  So it wouldn't get us anywhere anyway.
> I think that's more appropriate for the court to consider in imposing
> sentence.  For those reasons, the court denies the motion for new trial.

13  RT 4510.

14      8.  From this ruling, it is apparent that the court misinterpreted the law.
15  Ms. Alfaro's remorse was among the evidence included in the probation report
16  and known to the court.  This evidence -- that Ms. Alfaro had wanted to accept full
17  responsibility for Autumn Wallace's murder and plead guilty unconditionally and had
18  been prevented from doing so by her attorney, who raised the SODDI defense over
19  her strenuous objection on the record -- was *admissible*.  Moreover, when a defendant
20  brings a motion under § 1181(7) in a death penalty case, she moves for both a new
21  guilt trial *and a new penalty trial.*  The trial court's comments indicate that it only
22  considered the evidence as it pertained to a motion for a new guilt trial, failing to
23  appreciate its duty to also analyze the evidence to determine whether a new penalty
24  trial was required.  The trial court's comment, "I think that's more appropriate for the
25  court to consider in imposing sentence," establishes that it gave no consideration
26  whatsoever to ordering a new penalty trial.

27      9.  Although the court does not describe it, there was significant *admissible*
28  mitigating evidence included in the probation report, including, but not limited to,

1  additional evidence of Ms. Alfaro's remorse, that had not been before the jury.  That

2  evidence included:

3          a.  The Probation Officer reported that subsequent to Ms. Alfaro's arrest,

4  "[n]umerous hypodermic injection sites were located on [her] hands, left arm, and

5  neck."  CT 1742.  This provided additional support for the mitigating factor set forth

6  in Penal Code § 190.3(h).

7          b.  Under the section entitled "Adjustment at the Orange County Jail,"

8  the probation officer reported that "[o]n May 23, 1992, the defendant was classified

9  for a housing change due to the need for 'acute mental health care.'  On May 30,

10  1992, an entry was placed in her 'jacket' indicating that she no longer needed mental

11  health care of that nature."  CT 1745-46.  This is the first time the record reflects the

12  trial court being informed that immediately before she waived her right to testify at

13  her second penalty trial, Ms. Alfaro was receiving "acute mental health care."  The

14  trial court was well aware that at the first penalty trial, during which Ms. Alfaro took

15  the stand and expressed her remorse, the jury had been unable to reach a unanimous

16  verdict, but that at the second penalty trial, where Ms. Alfaro had declined to testify,

17  the jury had recommended the death penalty.

18          c.  In addition to the remorse expressed on the video tape, and the

19  remorse represented by her attempt to plead guilty (a fact known to the judge but not

20  the jury), the probation officer presented the court with the following evidence

21  of Ms. Alfaro's remorse, in the form of a letter Ms. Alfaro had written to Linda

22  Wallace, which reads in part:

23          Mrs. Wallace I know sorry is not enough for what has happened sorry
           won't bring little Autumn back.  I am truely sorry and if I could turn
24          back time I would and I would of made it me instead of your innocent
           9 year old little girl.
25

26  CT 1747.

27          d.  If the court was under any misconceptions about Ms. Alfaro's prior

28  criminal record, the probation officer cleared them up, establishing that her prior

429

1  record consisted of nothing more than two arrests at age fourteen -- once for

2  possession of less than an ounce of marijuana and a hypodermic needle and syringe;

3  once for petty theft of three men's shirts from a Mervyn's Department Store -- and

4  once at age sixteen for possession of an open can of beer.  CT 1756-57.

5              e.  The probation officer reaffirmed Ms. Alfaro's mental disabilities,

6  reporting that "the defendant began experiencing difficulty in the school setting due

7  to limited intellectual capacity, and she ultimately dropped out of school . . ."

8  CT 1758.  This provided additional support for the mitigating factor set forth in Penal

9  Code § 190.3(h).

10             f.  In the probation officer's statement of circumstances in mitigation,

11  that professional included two that were wholly disregarded by the court:

12         It appears that the defendant may have been suffering from a physical
           condition, namely drug influence and/or addiction, *which may have*
13         *significantly reduced her culpability for the crime.*

14  CT 1761 (emphasis added).

15         It appears that the defendant voluntarily acknowledged wrongdoing
           shortly after her arrest.
16

17  *Id*.

18         10.  The trial judge did not indicate that it had considered other mitigating

19  evidence known to the court, but unknown to the jury in denying Ms. Alfaro's motion

20  for a new trial or reduction in the penalty.  In particular, the court did not state that it

21  had considered Ms. Alfaro's desire to plead guilty and not to implicate anyone else,

22  a desire that was thwarted by her attorney whose action was ratified by the court.

23  Nor did the court mention that Ms. Alfaro's desire to plead guilty was unconditional,

24  and thus, should have been admitted even under the District Attorney's analysis of the

25  law.  This highly relevant, admissible evidence of Ms. Alfaro's acceptance

26  of responsibility was wholly overlooked by the court, and renders the court's

27  comment, "If the court did grant a motion for new trial, that evidence is not

28  admissible," fundamentally wrong.

11. Nor does the court mention that after the first penalty jury hung, it was the court that forced Ms. Alfaro to endure a second penalty trial with an attorney that insisted on raising the defense that someone else was responsible for the crime, against his client's wishes yet again. It was the court, which would later describe the idea that someone else had been involved as "a figment of someone's imagination" (RT 4503-04) and that told Ms. Alfaro when she sought new counsel who would allow her to accept responsibility without attempting to pin the crime on anyone else:

> the chances are that -- first of all, if Mr. Monroe were taken off the case and another attorney put on the case, the other attorney is going to get Mr. Monroe's files. . . . Very well might reach the same conclusion that Mr. Monroe has reached. . . .
>
> And we'd be back in the same place again because generally, Rosie, anyone who views that videotape, okay, is, if they are going to defend you at all, they are going to have to shift the blame away from you to somebody else and to make it appear as though you are not the sole person involved in Autumn's death, you know.
>
> ***
>
> And it's just -- I mean, I can't conceive if we gave the case to ten different attorneys they wouldn't all reach that same opinion, they wouldn't all want to do the same thing. That's really the only avenue available to take part of the gravity of this crime off of your shoulders so that the jury will -- that and your age and background and your children. But I don't mean to say that's the only thing, but that's really a significant thing.
>
> Because when somebody listens to that videotape and looks at how Autumn died, if there is any way to get the blame away from you or have you share the blame with somebody else, they are going to do it.
>
> * * *
>
> See, that's the problem, Rosie. . . . Mr. Monroe, as your lawyer, or Mr. Jones or Mr. Smith, whoever the lawyer is, is going to look at your case, they are going to get familiar with the evidence and say oh, my god, we have to figure out some way to water down this responsibility that Rosie put on herself in the videotape.
>
> And pointing the finger or sharing the finger of blame or responsibility with another person is a very logical way to do it. . . . I personally think a lawyer, whether it's Mr. Monroe or Mr. Jones or Mr. Smith, would do it. They are going to say well, I respect your view, Rosie, but this doesn't really involve, you know, your fundamental rights as such. It doesn't really mean that I'm not effectively assisting you. I'm just assisting you in a way that you don't want it done. And it doesn't otherwise involve your fundamental rights or anything of that

431

1   nature.  And I think you'd be in the same boat whatever lawyer we gave

2   you.

3   RT 2142-47.  It was the court that after giving Ms. Alfaro this personal advice

4   held the fact that her attorney had adopted this strategy against her at her sentencing

5   hearing.  Addressing the mitigating factor set forth in Penal Code § 190.3(g),

6   "[w]hether or not defendant acted under extreme duress or under the substantial

7   domination of another person," it was the court that stated:

8          This is one the defense has honed in on in their argument
       to the jury.  *They honed it [sic] on it more in the argument than in the*
9      *evidence.  The evidence pointing to this phantom third person being*
       *there.*  It was argued to the jury.  The jury apparently didn't feel that
10     factor was there because that is a kind of a factor that if it was there it
       would appear to have some weight.

11

12         But I've gone over the evidence and I have listened to counsel's
       argument this morning.  It kind of reminded me of the argument he made
13     to the jury about the third party and how Miss Alfaro acted under the
       substantial domination of a third party.

14         And I recall watching the four hours of videotape where
       Mr. Giffin went over very carefully, many times, he gave Miss Alfaro
15     an opportunity, specifically afterwards, was anyone else involved in this
       offense?  Was anyone else in the house?  At the time the tape was
16     played?  I remember.  But he at least gave her the opportunity to come
       forward at that time at least four or five times.

17

18         I think it's for the reasons Mr. Giffin testified to when he was on
       the stand, that is, he himself when he conducted this interview and had
19     viewed the crime scene had a hard time believing that a young woman
       the age of Rosie Alfaro could in fact have done this crime by herself.  So
20     he gave her many, multiple opportunities at that time to come forward
       and indicate that someone else was involved in the offense.  Each inquiry
21     Mr. Giffin asked her on tape she replied in the negative.  No one else
       was involved in it.  No one else had anything to do with it.  *It's not until*
22     *after Miss Alfaro gets legal counsel that this idea of the third party, the*
       *phantom third party, pops up in the case.*

23         And I looked at the evidence real careful.  The defense even had
       an expert who came in and testified about some alleged footprints, things
24     of that nature.  *We adopt the argument of the defense, that is to say that*
       *Miss Alfaro stabbed Autumn Wallace several times, three or four or five*
25     *times, and then this other unknown person finished off the job stabbing*
       *young Autumn Wallace the other 47, 49 times, it's absolutely amazing*
26     *that Miss Alfaro left bloody footprints on the floor.  And this other*
       *person who obviously was there, according to their argument, after the*
27     *pool of blood is even larger than it would have been when Miss Alfaro*
       *left the room, somehow this person didn't leave a trace, not a single*
28     *trace of any footprint in the blood.*

A fingerprint was also found in the bathroom and it matched Miss Alfaro. *It's my belief that the jury rejected the defense's contention that a third person was present, did any of the stabbing in this case. I think the evidence is grossly insufficient to even raise that as a strong inference in the case, especially when you consider the numerous opportunities Mr. Giffin gave her on the videotape.*

It appears to this court -- and I have had an opportunity to go over the evidence, I took a lot of notes. My notes are, I don't know, probably four or five inches thick in the case. I reviewed them, I looked carefully at the defense expert testimony in the case, I looked at the prosecution's evidence in the case, and it would seem to me *it's a figment of someone's imagination to say that another third person was present* and that Miss Alfaro acted under the substantial domination of this unknown person.

For those reasons the court does not feel the circumstances described in subdivision (g) are present in the case.

RT 4501-04 (emphasis added).

12.  It was the court, that after depriving Ms. Alfaro of the concrete evidence of her remorse a guilty plea would have represented, failed to give this universally deemed mitigating circumstance any consideration whatsoever in sentencing her to death.

13.  Ms. Alfaro's acknowledgment of responsibility for the crime and her attempt to plead guilty, her genuine remorse, and the many other mitigating circumstances present in this case tipped the scales in favor of life.  But, though the probation report cited Ms. Alfaro's voluntary acknowledgment of wrongdoing as a mitigating circumstance in the case, and the trial court knew Ms. Alfaro's acceptance of responsibility to be genuine, the trial court failed to consider it in ruling on either Ms. Alfaro's motion for modification of the verdict pursuant to Penal Code § 190.4(e) or her motion for a new trial or reduction in penalty pursuant to Penal Code § 1181(7).  In so doing, the trial court abused its discretion.

433

## C.     THE COURT HAD A DUTY TO LOOK AT ANY EVIDENCE THAT RENDERED THE DEATH VERDICT INAPPROPRIATE

14.  Although a trial court may not rely on information outside the record in ruling on a § 190.4(e) motion, no such restriction bars the court from considering other evidence in ruling on a motion for a new trial or reduction in penalty pursuant to § 1181(7).  The statutory language of Penal Code § 1181(7) allows the court to grant a new trial or modify the verdict when the jury's finding of death is "contrary to . . . evidence" in general.  On the other hand, § 190.4(e) explicitly states that the court should assess whether the jury's finding is "contrary to law or the evidence *presented*."  This distinction between the two motions is further evidenced by the fact that in its other provisions § 1181 allows a defendant to apply for a new trial for reasons exclusive of the evidence presented at trial, such as for newly discovered evidence or for juror misconduct.  Pen. Code § 1181(8) and (3).[45]

15.  The trial court in Ms. Alfaro's case should have considered the mitigation factor recognized in the probation report, as well as her prior attempt to plead guilty, and any and all other mitigating evidence of which the court was aware in weighing the mitigating evidence for § 1181 purposes.  Consideration of a defendant's willingness to plead guilty as evidence in mitigation is appropriate since it reflects on a defendant's remorse and acceptance of responsibility.  The trial court's comment that even if it did grant a new trial, "that evidence is not admissible.  So it wouldn't get us anywhere anyway," was incorrect and evidences the utter unreliability of the analysis the court performed.

/ / /

/ / /

---

[45]  The fact that a § 1181(7) sentence modification application is deemed to automatically follow from a § 190.4(e) motion under the latter statute does not mean that all of the standards for modification and for a new trial are conflated.  If anything, it suggests the opposite, since it is unlikely that the Legislature would have created two different statutes providing the exact same post judgment remedies.

1    **D.    CONCLUSION**

2        16.  In light of all the powerful mitigating evidence known to the trial court,

3    some of which was not presented to the jury, the trial court abused its discretion

4    in denying Ms. Alfaro's motion for a new trial.  The court further erred in concluding

5    that there was no point in granting a new trial because the additional evidence would

6    be inadmissible therein.

7        17.  The foregoing violations of Ms. Alfaro's constitutional rights

8    constitute structural error and warrants the granting of this Petition without any

9    determination of whether the violations substantially affected or influenced the jury's

10   verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

11   doctrine applies to this claim, the foregoing constitutional violations so infected the

12   integrity of the proceedings that the error cannot be deemed harmless.  The foregoing

13   violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

14   Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

15   resulting in a miscarriage of justice.

16       18.  The constitutional violations set forth in this claim alone mandate relief

17   from the convictions and sentence.  However, even if these violations do not mandate

18   relief standing on their own, relief is required when this claim is considered together

19   with the additional constitutional errors outlined in the remainder of this Petition.

20   Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

21   sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

22   970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333

23   (9th Cir. 1978).

24   / / /

25   / / /

26

27

28

## XXXIV.

## CLAIM 29:  THE TRIAL COURT'S ERRONEOUS AND PREJUDICIAL DENIAL OF PETITIONER'S MOTIONS VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS

Petitioner's convictions and sentences were rendered in violation of her  rights to due process, a fair trial, the effective assistance of counsel, a sentence that is neither cruel nor unusual, and to a reliable, individualized, and non-arbitrary death-penalty determination, as a result of the trial court's erroneous and prejudicial denial of Petitioner's phase motions and erroneous and prejudicial granting of the State's motions, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits accompanying this petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

A.    **DEFENSE MOTIONS DENIED BY THE TRIAL COURT**

5.  The trial court erroneously and prejudicially denied Petitioner's motions, including, but not limited to the following:

1          a.  Petitioner's January 22, 1992 motion to continue the trial from

2     February 24 to April 20.  Attached to the motion was the declaration of defense

3     criminalist Marc Taylor who stated that further testing was required to clarify the

4     events that took place in the commission of the murder.  The testing required

5     involved the testing of blood droplets detected on various pieces of evidence.

6     Mr. Taylor believed that testing could take 6-8 weeks.  CT 333, 335.

7          b.  Petitioner's February 24, 1992 motion to continue the commencement

8     of trial.  In his attached declaration, defense criminalist Marc Taylor stated that

9     during his preliminary examination of the evidence, he found evidence of the possible

10    involvement of an additional individual in the murder -- a previously undetected

11    shoeprint in blood.  He also found a drop of blood on the toe of a pair of tennis shoes

12    seized from one of the other suspects.  CT 362-64.  The motion to continue was

13    denied.  CT 1215.

14         c.  Petitioner's April 17, 1992 motion to continue on grounds that

15    defense expert, Consuela Edwards, Ph.D., was not available.  Counsel advised court

16    of specific mitigating evidence which would be discussed by Dr. Edwards, including

17    Petitioner's rape at the age of 9, as well as findings of dependent personality disorder

18    and borderline intellectual functioning, based on IQ scores of 71-84.

19         d.  Petitioner's motion for access to forensic evidence.  CT 346.

20    The motion was denied with respect to item number 8, without prejudice to renew.

21    CT 346.

22         e.  Petitioner's motion to exclude photographs as prejudicial.  CT 349.

23         f.  Petitioner's February 26, 1992 motion to exclude her video taped

24    confession and all statements made to investigating officers.  CT 387, 2330.  In the

25    motion, Petitioner argues that toxiclogical reports prepared by Orange County

26    Sheriff's Department reflect that the drugs cocaine, benzoylecconine, and morphine

27    were detected in Petitioner's blood at the time she confessed and made statement

28    to law enforcement personnel.  Petitioner may have injected narcotics within an hour

437

prior to her arrest.  As such, Petitioner was under the influence of those drugs at time she was questioned.  On March 2, 1992, the trial court erroneously and prejudicially denied the motion, concluding that Petitioner knowingly and intelligently waived her *Miranda* rights and that her statements to law enforcement were voluntary.  CT 436; RT 302-307.

g.  Petitioner's motion for additional jury voir dire questions.  CT 397.

h.  Petitioner's motion for special jury instructions.  CT 405.

i.  Petitioner's motion to exclude the crime scene video and photographs of the crime scene.  CT 436.  Specifically, Petitioner objected to trial exhibits 6-16, 18, 19 and 26.  Exhibits 18 and 19 were withdrawn by the prosecution.  Petitioner's objections to Exhibits 14, 17 and 26 were sustained.  CT 436.  Certain portions of the crime scene video were ordered deleted.

j.  Petitioner's motion to ask follow-up questions of prospective jurors, including, but not limited to, Woodriff, Gorman, Goebel, Sanchez, Wiley, Saltz, Swanson, Lewis and Armstrong.  CT 230, 448.

k.  Petitioner's March 5, 1992 motion for additional peremptory challenges, argued on the basis that peremptories were used for prospective jurors who should have been excused for cause and on the basis that court did not allow additional voir dire questions as requested by Petitioner.  CT 459.

l.  Petitioner's motion to provide prospective jurors with defense counsel's questionnaire.  CT 156.

m.  Petitioner's April 7, 1992 request for a narrow instruction regarding a sentence of life without the possibility of parole.  CT 1136.

n.  Petitioner's motion requesting the trial court not to instruct the jurors regarding the governor's power to commute a sentence of life without the possibility of parole without mentioning the governor's power to commute a sentence of death as well.  CT 1136.

1    o.  Petitioner's March 9, 1992 objection to the use of a mannequin.  CT
2   468.

3    p.  Petitioner's March 19, 2992 motion to seal the courtroom during
4   testimony by Petitioner.  CT 489.

5    q.  Petitioner's motion for additional jury instructions.  CT 1179, 1423 .

6    r.  Petitioner's motion for change of venue or continuance based on
7   excessive publicity.  CT 1216, 1220.

8    s.  Petitioner's motion to quash a subpoena.  CT 1440.

9    t.  Petitioner's motion for *Hovey* or cluster voir dire.  CT 1440.

10    u.  Petitioner's challenge for cause as to prospective juror Pamela
11   Albanesi.  CT 1478.

12    v.  Petitioner's motion regarding a sentence of life without the possibility
13   of parole.  CT 1505.

14    w.  Petitioner's May 19, 1992 motion to exclude witnesses from the
15   courtroom.  CT 1528.

16    x.  Petitioner's motion to strike Dr. Katsuyama's testimony.  CT 1528.

17    y.  Petitioner's motion to exclude the media during Janell Laird's
18   testimony.  CT 1528.

19    z.  Petitioner's motion for a *Marsden* hearing.  CT 1195.

20    aa.  Petitioner's motion for additional expert fees for Norman Morein,
21   sentencing consultant.  CT 1496-98.

22    bb.  Petitioner's motion for additional expert funds for Consuelo
23   Edwards.  CT 1515.

24    cc.  Petitioner's motion for the address of Vicki Darr.  CT 1549.

25    dd.  Petitioner's motion for additional peremptories.

26  **B.    HABEAS RELIEF IS WARRANTED**

27    6.  The constitutional violations set forth in this claim alone mandate relief
28   from the convictions and sentence.  However, even if these violations do not mandate

439

relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this petition. Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and sentence. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

7. The foregoing violations of Ms. Alfaro's constitutional rights constitute structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht,* 507 U.S. at 638. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. These errors, both singularly and collectively, so infected the integrity of the proceedings that it cannot be deemed harmless and the State will be unable to meet its burden in showing this error harmless. In any event, the violation of Petitioner's rights in this regard had a substantial and injurious effect or influence on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally unfair and resulting in a miscarriage of justice. For the foregoing reasons, Petitioner respectfully requests that his petition be granted.

## XXXV.

## CLAIM 30:  THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS BY FAILING TO PROVIDE PETITIONER WITH THE NECESSARY ASSISTANCE OF COMPETENT AND INDEPENDENT EXPERTS

Petitioner's conviction and sentence of death were rendered in violation of her rights to due process, a fair trial, to present a defense, equal protection, a fair and impartial jury, to the effective assistance of counsel, and to a reliable, fair, non-

440

arbitrary, and non-capricious determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Petitioner was not provided with the necessary assistance of competent, independent experts at her trial, which not only prejudiced her defense, but also his attorneys' ability to develop and present her defense effectively at both phases of trial.

1. This claim is pending before the California Supreme Court.

2. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3. The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this court's subpoena power, and an evidentiary hearing.

5. Petitioner was not provided with the necessary assistance of competent, independent experts at her trial, which not only prejudiced her defense, but also his attorneys' ability to develop and present her defense effectively at both phases of trial. The United States Supreme Court has expressly addressed the issue of psychiatric assistance in *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), finding that when the State puts a defendant's mental health in issue, the federal constitution itself mandates that the defendant be afforded the right to a competent independent mental health expert.

6. If defense counsel had been given adequate access to expert assistance, he would have been able to present a formidable defense to the State's case against

441

1  Petitioner.  The trial court's denial of trial counsel's request for experts violated
2  Petitioner's constitutional rights.  In addition, the denial of timely assistance rendered
3  Petitioner's trial counsel utterly ineffective at Petitioner's trial.

4      7.  The constitutional violations set forth in this claim alone mandate relief
5  from the convictions and sentence.  However, even if these violations do not mandate
6  relief standing on their own, relief is required when this claim is considered together
7  with the additional constitutional errors outlined in the remainder of this petition.
8  Cumulatively, these errors mandate relief from Petitioner's convictions and sentence.
9  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*, 970 F.2d
10  614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978).

11      8.  The foregoing violations of Petitioner's constitutional rights constitute
12  structural error and warrants the granting of this petition without any determination
13  of whether the violations substantially affected or influenced the jury's verdict.
14  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error doctrine applies
15  to this claim, the foregoing constitutional violations so infected the integrity of the
16  proceedings that the error cannot be deemed harmless.  The foregoing violation
17  of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's
18  convictions and sentence, rendering them fundamentally unfair and resulting in a
19  miscarriage of justice.  These errors, both singularly and collectively, so infected the
20  integrity of the proceedings that it cannot be deemed harmless and the State will be
21  unable to meet its burden in showing this error harmless.  In any event, the violation
22  of Petitioner's rights in this regard had a substantial and injurious effect or influence
23  on the jury's penalty judgment, rendering Petitioner's death sentence fundamentally
24  unfair and resulting in a miscarriage of justice.  For the foregoing reasons, Petitioner
25  respectfully requests that his petition be granted.

26  / / /
27  / / /
28

442

1

**XXXVI.**

2

**CLAIM 31:  THE EXECUTION OF PETITIONER WOULD CONSTITUTE**

3

**CRUEL AND UNUSUAL PUNISHMENT AS PETITIONER IS**

4

**MENTALLY RETARDED**

5        The United States Supreme Court has concluded that the execution of mentally

6   retarded individuals is an excessive punishment and therefore violates the Eighth

7   Amendment's proscriptions against cruel and unusual punishment.  *Atkins v. Virginia*,

8   536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).  Petitioner's execution

9   would be cruel and unusual because she is mentally retarded.

10       1.  This claim is pending before the California Supreme Court.

11  **A.     INTRODUCTION**

12       2.  Writing for the majority in *Atkins*, Justice Stevens stated, "[t]he practice

13  [of executing mentally retarded individuals] . . . has become truly unusual, and it is

14  fair to say that a national consensus has developed against it."  536 U.S. at 316.

15  The actions of Congress, and of an increasing number of state legislatures in barring

16  execution of the mentally retarded, constitute an objective indicator of contemporary

17  values which demonstrates an expanding national opposition to the execution of the

18  mentally retarded.  In *Atkins*, the Supreme Court recognized that the death penalty is

19  cruel when imposed on those who are mentally retarded because, in light of their

20  impairments, "by definition they have diminished capacities to understand and

21  process information, to communicate, to abstract from mistakes and learn from

22  experience, to engage in logical reasoning, to control impulses, and to understand the

23  reactions of others."  536 U.S. at 318.  "[T]here is also abundant evidence that they

24  often act on impulse rather than pursuant to a premeditated plan, and that in group

25  settings, they are followers rather than leaders."  *Id*.

26  **B.     PETITIONER IS MENTALLY RETARDED**

27       3.  There is substantial evidence that Petitioner is mentally retarded.  In *Atkins*,

28  the Court noted the definition of mental retardation provided by The American

443

Association on Mental Retardation (hereinafter "AAMR") in *Mental Retardation: Definitions, Classification, and Systems of Supports* (hereinafter "*Mental Retardation*") (9th ed. 1992). *Id*. at 308, fn. 3. As provided therein, a diagnosis of mental retardation requires the following criteria:

> Mental retardation refers to substantial limitations in present functioning. It is characterized by: (1) Significantly subaverage intellectual functioning; existing concurrently with (2) Related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, work; (3) Mental retardation manifests before age 18.

Petitioner meets these criteria and is, therefore, retarded.

4. Five days before issuance of the *Atkins* decision, the AAMR released the tenth edition of its publication and revised its definition of mental retardation. The AAMR now defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." *Mental Retardation*, p. 8 (10th ed. 2002). The California statutory definition of mental retardation adopts the same criteria for a diagnosis, but is much more general.[46] The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") utilizes a definition that is very similar to the AAMR's 1992 definition.[47]

---

[46] "'Mentally retarded' means a condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." Ca. Penal Code § 1001.20(a).

[47] The DSM-IV-TR defines mental retardation as follows: The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev. 2000) ("DSM-IV-TR"), p. 41.)

5.  The AAMR's 1992 adaptive skills categories, as well as the AAMR's 2002 adaptive behavior definitions, will be utilized in the analysis of Petitioner's mental retardation.  Petitioner incorporates herein by reference Claim 1 above.  *Also see*, Exhibit 126 (Declaration of Gerardo Rangel) Exhibit 124 (Declaration of Dianne De La Mare); *see* Exhibits 93-121 (family history records).

**1.    Petitioner Has Well-documented Significant Limitations In intellectual Functioning**

6.  Petitioner has well-documented and long-standing mental deficiencies and significant limitations in intellectual functioning.  Intellectual functioning and "intelligence is not merely book learning, a narrow academic skill, or test-taking smarts.  Rather, it reflects a broader and deeper capacity for comprehending our surroundings - catching on, making sense of things, or figuring out what to do." *Mental Retardation*, page 40, (10th ed. 2002).  Petitioner suffered from learning disabilities and cognitive impairments throughout her childhood.  *See, e.g.*, Exhibit 7 (Declaration of Natasha Khazanov, Ph.D.) at ¶¶ 17-19.  Petitioner's specific developmental disabilities and borderline intellectual functioning are well-documented, as is her history of attentional disorder.  Exhibit 7 at ¶¶ 27, 133-138.  She tried to pay attention in school, but could not.  Exhibit 7 at ¶ 120.  She sometimes behaved as if she were "not there mentally."  Exhibit 8 (Declaration of Pablo Steward, M.D.) at ¶¶ 28, 31.  It was impossible for her to focus on anything for long periods of time.  *Id.*

7.  Petitioner could never keep up with the other kids and she was incapable of getting her life together.  Exhibit 8 at ¶ 31.  At the age of 10, she continued to have trouble reading, and could read neither street signs nor labels.  Exhibit 89 (Declaration of Tamara Benedict) at ¶¶ 2-3.  She could not remember the rules to simple card games.  *Id.* at ¶ 4.  Her son, Danny, "apparently suffers from impairments similar to those of his mother."  Exhibit 8 (Declaration of Pablo Stewart, M.D.) at ¶ 35.  He has significant learning difficulties and, like his mother, attends Special

445

1    Education classes, and may also have attentional deficits.  *Id*. at ¶¶ 35-36.  One of

2    Petitioner's brothers has Downs Syndrome.

3         8.  As discussed more fully below, Petitioner's intellectual functioning in an

4    academic setting has also been significantly substandard.  Petitioner simply was not

5    able to function in a school setting, eventually dropping out of school because of her

6    continual academic failures.  When she left school for the last time at the age of 14,

7    she had a mental age of 9.  Exhibit 10 (Declaration of Cynthia Asprodites, Ph.D.)

8    at ¶ 36.

9         9.  Petitioner has established concrete subaverage intellectual functioning that

10   falls within the mentally retarded range.  Her I.Q. score was somewhere in the mid-

11   70's.  In analyzing the actual number obtained from an I.Q. test, consideration must be

12   given to the standard deviation for error which is 3 to 5 points.  *Mental Retardation*,

13   p. 57 (10th ed. 2002).  Furthermore, there is no precise cut-off number in I.Q. scores

14   which delineates whether or not an individual is mentally retarded.  In fact, a

15   California Court of Appeals upheld a trial court finding that an individual with an I.Q.

16   ranging as high as 83 was mentally retarded.  *Money v. Krall*, 128 Cal. App. 3d 378,

17   180 Cal. Rptr. 376 (Cal. App. 5th Dist. 1982).  In that case, the Court found that:

18         Treating the I.Q. with some flexibility permits the inclusion in the
          Mental Retardation category of individuals with I.Q.s somewhat higher
19        than 70 who truly need special education or other programs . . .  The I.Q.
          level of 70 was chosen as the upper limit for Mental Retardation because
20        most people with I.Q.s below 70 are so limited in their adaptive
          functioning that they require special services and protection . . .  The
21        arbitrary I.Q. ceiling values are based on data indicating a positive
          association between intelligence (as measured by I.Q. score) and
22        adaptive behavior.  This association declines at the upper levels of Mild
          Retardation.  Some individuals with an I.Q. near but below 70 may not
23        have the impairment in adaptive behavior required for a diagnosis of
          Mental Retardation.

24

25   *Id*. at 400-401.  Thus, while low I.Q. standard scores alone are not sufficient for

26   a diagnosis of mental retardation, a higher I.Q. does not rule out the diagnosis either.

27   One's adaptive behavior in daily functioning must also be evaluated.

28

**2.      Petitioner Has Significant Limitations in Adaptive Behavior as Expressed in Conceptual, Social, and Practical Adaptive Skills**

10.   In order to apply the label of mental retardation to an individual, the second prong of the AAMR's definition must be met:  there must exist significant limitations in the individual's adaptive behavior.  Adaptive behavior is a "collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives." *Mental Retardation*, p. 41 (10th ed. 2002). Conceptual skills include communication, self-direction, and academic skills. Practical skills are independent living skills, including such things as self-care, home care, community use, and occupational skills or work.  Social skills are those skills that enable one to interact successfully with other individuals.

11.   Again and again, the mental health professionals who have interviewed, tested, and examined Petitioner have not only found her to be lacking in intellectual incapacity, but they have also found significant limitations in Petitioner's adaptability.

**a.      Conceptual Skills**

12.   Conceptual skills include:  communication, the comprehension and expression of information; self-direction, generally relating to skills related to making choices; and functional academics, focusing on cognitive abilities and skills related to learning at school that can be applied to everyday living.

**(i)      Functional Academics**

13.   Petitioner incorporates by reference Claim 1.I above.

14.   Petitioner suffered from learning disabilities and cognitive impairments throughout her childhood.  Exhibit 7 (Declaration of Natasha Khazanov, Ph.d.) at ¶¶ 17-19.  Her specific developmental disabilities and borderline intellectual functioning are well-documented, and she has a history of attentional disorder. *Id.* at ¶ 27.  Petitioner was referred for assessment for special education programs early in the second grade.  Exhibit 10 (Declaration of Cynthia Asprodites, Ph.d.) at ¶ 8-11.

447

1    Her academic performance remained significantly behind what was expected of her
2    and her progress in school was consistently extremely poor.  *Id.* at ¶¶ 9-11.  Her
3    grades in school were consistently poor and she was diagnosed with learning
4    disabilities in elementary school.  *See* Exhibit 82 (Petitioner's school records).  She
5    always had trouble at school and learned things more slowly than her sister, Silvia,
6    who was two years her junior.  Exhibit 3 (Declaration of Silvia Melenedez Alonso)
7    at ¶ 23.
8         15.  Special Education records reveal academic and emotional difficulties.
9    Exhibit 7 at ¶¶ 66-70.  She was still reading at the 5th grade level in 2001.  Exhibit 7
10   at ¶ 91.  Her "significant learning difficulties were consistently recognized" and they
11   "significantly impaired her ability to function not only academically, but emotionally,
12   socially and cognitively as well."  Exhibit 10 at ¶¶ 12-15, 19-22, 36.  She could not
13   understand homework assignments even though they were explained to her multiple
14   times.  Exhibit 90 (Declaration of Jeff Hasner) at ¶¶ 5-9.

15                        **(ii)    Communication**

16        16.  Petitioner has limitations in the area of communication.  She has always
17   had great difficulty in expressing herself and in comprehending information given
18   to her.  She has trouble paying attention and concentrating on tasks set before her.

19                        **(iii)    Self-direction**

20        17.  Self-direction is the ability to make choices and decisions based upon
21   those choices.  It includes being able to create and follow a schedule.  Self-direction
22   also means having the ability to initiate activities, complete tasks, resolve problems,
23   and possess appropriate assertiveness when necessary.  Petitioner struggled with all
24   these areas.  Her younger sister, Silvia, reports that, "[e]ven though Rosie was two
25   years older than me, I always had a better understanding of how to make my way in
26   the world than Rosie did.  Rosie did things that did not make sense.  She would put
27   herself in harm's way. . . .  It seemed like she just did not have any common sense."
28   Exhibit 88 (2008 Silvia Alfaro Declaration) at ¶ 2; and see ¶ 3 ("She just didn't think

448

right.").  At the age of 15, she fed her child curdled milk, and didn't know it.  *Id.* at

¶ 5.  She thought she could feed peanuts to her baby.  *Id.* at ¶ 6.

### b.    Practical Skills

18.  Practical skills are independent living skills, including the following categories:  self-care, which includes areas such as hygiene, grooming, and eating; home living, which includes such tasks as housekeeping, cooking, shopping, and finances; community use, which includes the ability to travel in a community and the use of public facilities; and work, including factors such as occupational skills, planning, and completion of tasks.

### (i)    Self-Care

19.  When she started using drugs, she stopped taking care of herself.  Exhibit 3 at ¶ 26.

### (ii)    Home Living

20.  Petitioner's mother reports that when Petitioner was nine, she developed a habit of cleaning the house excessively and constantly.  Exhibit 3 at ¶ 25.  She rearranged the furniture over and over again.  *Id.*

### (iii)    Community Use

21.  Community use includes the ability to navigate in a community, use public transportation, and follow the various laws and rules of society.  Petitioner's inadequate community use skills are evidenced by her inability to read street signs. Exhibit 89 (Benedict Dec.) at ¶ 2.

### (iv)    Occupational Skills/Work

22.  In terms of occupational skills, Petitioner's experience in the work force was limited.  Her only employment was at McDonald's for a short period of time.

### c.    Social Skills

23.  Social skills are those related to social exchanges with other individuals, including interpersonal interaction, responsibility, self esteem, gullibility, naivete,

ability to follow rules/obey laws, and the ability to avoid victimization. *Mental Retardation*, p. 42 (10th ed. 2002).

### (i)   Interpersonal Relationships And Responsibility

24.   Petitioner has definite limitations in the area of social skills.  As a child, she was teased and taunted at school by her peers.  Exhibit 3 at ¶ 24.  She was significantly less mature socially than even the younger children in her classroom. Exhibit 10 at ¶ 26.  As a teenager, she associated with dangerous men, apparently not understanding that she was placing herself in danger.  Exhibit 88 (2008 Silvia Alfaro Declaration) at ¶ 7.

### (ii)   Self-esteem, Gullibility, Naiveté, Capability to Obey Laws, and Avoidance of Victimization

25.   Petitioner was observed by both friends and mental health personnel as having low self-esteem and being depressed.  *See, e.g.*, Exhibit 9 (Silvia Alfaro Declaration) at ¶ 16.  She could be easily hurt and become despondent if she felt that she was being rejected by others.  She felt bad about her weight, but she couldn't stop eating.  Exhibit 3 at ¶ 22.  She cut her wrists (Exhibit 3, Silvia Melendez Alonso Declaration at ¶ 29) and at several points in her life was actively suicidal.  Exhibit 7 (Natasha Khazanov Declaration) at ¶ 30.  Her chronic drug use was, at least in part, a response to her unhappiness or perhaps clinical depression.  Exhibit 7 at ¶ 55-56. Petitioner was extremely vulnerable to suggestion and domination.  Exhibit 8 (Pablo Stewart, M.D. Declaration) at ¶¶ 72-75.  She was less mature than many young women of her age and lacked the insight, stability, confidence, judgment, and intellectual resources necessary to function as a healthy person.  Exhibit 10 at ¶ 38.

### 3.   Petitioner's Mental Retardation Manifested Before the Age of 18

26.   With respect to the third prong of the AAMR's definition of mental retardation, as demonstrated above, Petitioner's mental retardation clearly manifested before the age of 18.

1  **C. <u>CONCLUSION</u>**

2      27.  Petitioner meets all three of the categories necessary to make a diagnosis of

3  mental retardation.  Petitioner has established, concrete limited intellectual

4  functioning.  While I.Q. alone does not conclusively confirm a mental retardation

5  diagnosis, substantial evidence establishes that Petitioner clearly functions at a

6  mentally retarded range in her adaptive behavior.  Under the 1992 AAMR definition

7  of mental retardation, an individual must evidence limitations in at least two out of

8  the ten itemized adaptive skills areas (communication, self-care, home living, social,

9  community use, self-direction, heath and safety, functional academics, leisure, and

10  work).  *Mental Retardation*, p. 38 (9th ed. 1992).  As outlined above, Petitioner has

11  sufficiently evidenced these limitations in multiple categories.  Under the 2002

12  AAMR definition of mental retardation, an individual must demonstrate substandard

13  performance in at least one of three itemized types of adaptive behavior (conceptual,

14  practical, and social).  Petitioner has established substantial limitations in all three

15  categories.  Finally, Petitioner's mental retardation manifested itself before the age

16  of 18 years.

17      28.  The causal factors or etiology of mental retardation fall into the following

18  categories:  biomedical, social, behavioral, and educational.  *Mental Retardation*, p.

19  127 (10th ed. 2002).  The specific factors that contributed to Petitioner's mental

20  retardation are many and varied, including, but not limited to:  organic brain damage,

21  child abuse and neglect, family poverty, lack of early intervention/special education

22  services, and inadequate family support.

23      29.  In sum, an overwhelming amount of evidence establishes that Petitioner is

24  mentally retarded and her execution would constitute cruel and unusual punishment

25  under the Eighth Amendment.  As such, habeas relief is mandated.

26  / / /

27  / / /

28

**XXXVII.**

**CLAIM 32:  THE EIGHTH AMENDMENT PROHIBITS EXECUTION**

**OF PETITIONER DUE TO HER MENTAL DISABILITIES**

Petitioner's death sentence was rendered in violation of his rights to be free from the imposition of cruel and unusual punishment as Petitioner suffers from mental disabilities which profoundly impair his mental functioning, all in violation of Petitioner's federal constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.  This claim is pending before the California Supreme Court.

2.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3.  The declarations and other exhibits previously filed with this court and accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  On June 20, 2002, the United States Supreme Court issued its decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), which held that execution of mentally retarded individuals constitutes cruel and unusual punishment.  In reaching its conclusion that "death is not a suitable punishment for the mentally retarded criminal," the Supreme Court in *Atkins* concluded:

> We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or retributive purpose of the death penalty.  Construing and applying the Eighth Amendment in the light of

1  our 'evolving standards of decency,' we therefore conclude that such
2  punishment is excessive and that the Constitution 'places a substantive
   restriction on the State's power to take the life' of a mentally retarded
3  offender.

4  122 S. Ct. at 2252.

5      6.  In addition to mental retardation, Petitioner has significant organic brain

6  damage and other mental disabilities that profoundly affect her behavior and

7  functioning, particularly in conjunction with the signs and symptoms of mental illness

8  that were floridly present before and including the time of the offenses.  Petitioner

9  refers to and incorporates herein the allegations of Claims 1.I, 1.M and 3.  It is plain

10 that Petitioner has suffered from mental impairments that are at least as severe as

11 mental retardation during her development, surrounding the time of the offenses with

12 which she was charged, and thereafter.  Accordingly, her execution would not

13 "measurably advance the deterrent or retributive purpose of the death penalty."

14 *Atkins*, 122 S. Ct. at 2252.  For this reason, consistent with Eighth Amendment

15 principles, Petitioner cannot be executed.[48]

16                              **XXXVIII.**

17 **CLAIM 33:  CALIFORNIA'S DEATH PENALTY SENTENCING SCHEME**

18             **VIOLATES CONSTITUTIONAL GUARANTEES**

19     Petitioner's sentence of death was rendered in violation of her rights to a fair

20 trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious

21 determination of guilt and penalty, to the effective assistance of counsel, to present

22 a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and

23 Fourteenth Amendments to the United States Constitution because many features

24

25     [48]  Moreover, the execution of Petitioner, who has long suffered from mental
   impairments that are equivalent to mental retardation, at a time when the mentally
26 retarded are exempt from execution, would violate the Fourteenth Amendment's
   guarantees of equal protection of law and due process.  *See City of Cleburne v.*
27 *Cleburne Living Center*, 473 U.S. 432, 440-41, 105 S. Ct. 3249, 87 L. Ed. 2d 313
   (1985) (zoning decision against mentally retarded group home struck down because it
28 did not bear a rational relationship to legitimate state interests).

                              453

1    of California's capital sentencing scheme, alone and in combination with each other,

2    violate the federal Constitution.

3        1.  Exhaustion of the claim:  This claim was fairly presented to the California

4    Supreme Court in the direct appeal.  It was presented as Claim 11 in the Opening

5    Brief.

6        2.  AEDPA:  The California Supreme Court denied this claim.  *People v.*

7    *Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the

8    state court's denial of this claim is both "contrary to" and an "unreasonable

9    application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts

10   must resolve the claim *de novo*.  Moreover, because the state court's adjudication of

11   this claim was dependent on an antecedent unreasonable application of federal law,

12   this Court "must then resolve the claim without the deference that AEDPA otherwise

13   requires."  *Panetti*, 127 S. Ct. at 2858.

14       3.  If Respondent disputes any of the facts alleged below, Petitioner requests

15   an evidentiary hearing so that the factual disputes may be resolved.  After Petitioner

16   has been afforded discovery and the disclosure of material evidence by the State, the

17   use of this court's subpoena power, and the opportunity to investigate fully, counsel

18   requests an opportunity to supplement or amend this petition.

19       4.  The declarations and other exhibits filed with this petition, as well as the

20   allegations and facts set forth elsewhere in this petition, are hereby incorporated by

21   reference into this claim as though set forth in full.

22       5.  In support of this claim, Petitioner alleges the following facts, among others

23   to be presented after full discovery, investigation, adequate funding, access to this

24   Court's subpoena power, and an evidentiary hearing.

25   / / /

26   / / /

27

28

**A.    PENAL CODE § 190.2 FAILS TO ADEQUATELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY**

6. To pass constitutional muster, a capital sentencing scheme must "provide a 'meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not.'" *Furman v. Georgia*, 408 U.S. 238, 313, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (White, J., concurring); *accord Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980).) The Eighth and Fourteenth Amendments require that a state's death penalty statute "'genuinely narrow the class of persons eligible for the death penalty.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988) (*quoting Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)); *McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). Despite this constitutional mandate, California Penal Code § 190.2, which lists the "special circumstances" that distinguish capital from non-capital offenses, makes virtually every defendant found guilty of murder eligible for the death penalty. Because the "special circumstances" listed in § 190.2 do not perform the narrowing function required by *Furman,* they fail to pass constitutional muster.

7. The sweeping nature of Penal Code § 189, which both fixes the degree of murder and defines felony-murder, makes most murders first degree murders. Under § 190.2, those found guilty of first degree murder with at least one special circumstance are eligible for execution. Section 190.2 currently identifies twenty-nine special circumstances, embracing every type of first-degree murder that is likely to occur. The substantial overlap between the special circumstances listed in § 190.2 and the factors listed in § 189 makes almost all first degree murderers eligible to receive the death penalty. With respect to felony murders in particular, the list has been greatly expanded and court decisions have made virtually any first degree murder potentially death eligible, thereby abolishing all meaningful criteria for distinguishing the most serious from the less serious homicides.

455

8.  "[T]he risk of arbitrariness condemned in *Furman* is a function of the size of the class of convicted persons who are eligible for the death penalty."  *Walton v. Arizona*, 497 U.S. 639, 715, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Stevens, J, dissenting).  "When juries are presented with a broad class, composed of persons of many different levels of culpability, and are allowed to decide who among them deserves death, the possibility of aberrational decisions as to life or death is too great [to satisfy the Eighth Amendment]."  *United States v. Cheely*, 36 F.3d 1439, 1445 (9th Cir. 1994).  California's expansive death penalty statute violates the federal constitution by multiplying the "few" into the many.  Indeed, it appears that the proponents of the initiative which enacted § 190.2 had precisely this unconstitutional purpose in mind in drafting and advocating so expansive an array of special circumstances.  The proponents' argument in the Voter's Pamphlet assured voters that the statute would "apply to every murder." (*See* Cal. Votes Pamphlet, Gen. Elec. (Nov. 7, 1978) p. 34.

9.  The California statute does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not," (*Spaziano v. Florida*, 468 U.S. 447, 460, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984)), and it provides no "principled basis" to "enable the sentencer to distinguish those who deserve capital punishment from those who do not."  *Arave v. Creech*, 507 U.S. 463, 474, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993).  Because Ms. Alfaro was tried, convicted and sentenced under a statutory scheme that fails to meet these constitutional standards, habeas relief is warranted.  *Cheely*, 36 F.3d at 1444, fn.11.

**B.  PENAL CODE § 190.2 GIVES PROSECUTING AUTHORITIES UNGUIDED DISCRETION IN DECIDING WHETHER TO CHARGE STATUTORILY DEATH-ELIGIBLE DEFENDANTS WITH SPECIAL CIRCUMSTANCES AND TO SEEK THE DEATH PENALTY**

10.  Under the California death penalty law, the 58 county district attorneys are given total discretion in deciding whether to charge special circumstances for

456

"eligible" defendants and to seek the death penalty.  Because of the failure of Penal Code § 190.2 to constitutionally narrow the class of defendants who are "eligible" for the death penalty, this standardless discretion serves as the de facto narrowing procedure under the California death penalty scheme.  As a result, the death penalty is not applied on a uniform basis throughout the state, but instead is dependent upon standardless, arbitrary, uncontrolled and shifting views of individual elected officials.

11.  The unbounded and unguided nature of the statutory scheme is illustrated by Ms. Alfaro's case.  During the hearing on the district attorney's motion to exclude evidence that Ms. Alfaro's attorney had offered to have her plead guilty in exchange for a penalty of life without the possibility of parole, the district attorney explained that the Orange County district attorney's position was that if the Penal Code provided that a crime could be charged as a capital crime, it would be.  RT 185 (February 26, 1992 proceedings).  The district attorney admitted that there was no limitation on the prosecutor's discretion to seek the death penalty so long as the crime was included in the Penal Code.  *Id.* at 186.  He told the court, "I mean, if it were totally up to the district attorney, there is discretion there, but it's also mandated by the State that the district attorney proceed on cases that are in the Penal Code . . . .This case falls squarely within the death penalty statutes."  *Id*. at 185  Such unguided and unbounded discretion inevitably results in the kind of arbitrary imposition of the death penalty condemned by the United States Supreme Court in *Furman* and *Gregg v. Georgia*, 428 U.S. 153, 195, 198, 96 S. Ct 2909, 49 L. Ed. 2d 859 (1976).

12.  There can be no doubt that under this statutory scheme some offenders will be chosen as candidates for the death penalty by one prosecutor, while other offenders with similar qualifications in different counties will be spared by their prosecutors.  The only explanation for these differences will be found in the personal or political beliefs or office policies of one district attorney that cause a prosecutor to seek the death penalty against a defendant, while, for precisely the same reasons viewed differently by another prosecutor, an equally culpable offender will be spared.

457

1  Because there are no standards to guide the exercise of discretion, the prosecutor
2  will be able to rely on constitutionally irrelevant and impermissible considerations,
3  including race and economic status.  Where, as here, the defendant was Hispanic and
4  the victim was a white child whose mother worked for the Orange County Superior
5  Court, the risk of abuse of discretion was unacceptably high.

6         13.  The Eighth Amendment requires that the scheme by which a defendant is
7  made eligible for the death penalty ensure that "the death penalty is a proportionate
8  punishment and therefore not arbitrary or capricious in its imposition."  *Buchanan v.*
9  *Angelone*, 522 U.S. 269, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998).  Thus, as noted
10 above, a capital sentencing scheme must establish a meaningful basis for
11 distinguishing those cases in which it is imposed from those in which it is not.
12 *Lockett*, 438 U.S. at 600-01 (1978).  California's statutory scheme, as interpreted,
13 does not assure that like cases are treated alike and provides no mechanism to protect
14 against the arbitrary, capricious, or discriminatory winnowing of defendants
15 convicted of, or charged with, crimes punishable by death.  To be clear, Ms. Alfaro's
16 argument in the instant case is not limited to attacking unbridled prosecutorial
17 discretion, but rather is part of the broader claim, grounded in *Furman* and *Gregg*,
18 that neither the "eligibility" prong of California's death penalty statute (which
19 includes prosecutorial discretion), nor the "selection" prong of the statute, adequately
20 performs the "narrowing" function required by the United States Supreme Court in
21 *Furman* and *Gregg*.  *See also Zant v. Stephens*, 462 U.S. 862 (1983).  As a result,
22 California's present death penalty system, in allowing arbitrary and wanton
23 prosecutorial discretion, violates the Fifth and Fourteenth Amendment guarantees
24 to due process and a fair trial and the Eighth amendment protections against arbitrary,
25 inaccurate and irrational determination of death eligibility.

26 **C.     PENAL CODE § 190.3(A) as APPLIED IS UNCONSTITUTIONAL**

27         14.  Penal Code § 190.3 lists the various factors that the sentencer is to
28 consider, take into account and be guided by in deciding penalty.  The constitutional

errors resulting from the arbitrary manner in which defendants are deemed eligible or ineligible for the death penalty under § 190.2 are compounded by the ways in which California's death penalty "selection" criteria have been defined and applied by this Court.  *See Tuilaepa v. California*, 512 U.S. 967, 971, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994) ("Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decision-making process:  the eligibility decision and the selection decision.")

15.  Of the eleven different § 190.3 factors a jury is directed to consider when selecting the appropriate sentence for a capital defendant, factor (a) -- the sole aggravating factor relied upon by the prosecution in Ms. Alfaro's case -- is the most susceptible to arbitrary interpretation and application.  Section 190.3(a) directs the jury to consider the "circumstances of the crime" as a factor in aggravation.  This Court has consistently found that the broad term "circumstances of the crime" meets constitutional scrutiny and has never applied a limiting construction to this factor. Indeed, this Court has allowed extraordinary expansions of factor (a), approving reliance on the "circumstance of the crime" aggravating factor because a defendant had a "hatred of religion,"[49] or because three weeks after the crime the defendant sought to conceal evidence,[50] or threatened witnesses after his arrest,[51] or disposed of the victim's body in a manner that precluded its recovery.[52]  Although factor (a) has survived a facial Eighth Amendment challenge, (*see Tuilaepa v. California*, 512 U.S. 967 (1994)), when its actual application is scrutinized, it is clear that factor (a) has been used in ways so arbitrary and contradictory as to violate the guarantees

---

[49]  *People v. Nicolaus*, 54 Cal. 3d 551, 581-82, 817 P.2d 893, 286 Cal. Rptr. 628 (1991).

[50]  *People v. Walker*, 47 Cal. 3d 605, 640 fn.10, 765 P.2d 70, 253 Cal. Rptr. 863 (1988).

[51]  *People v. Hardy*, 2 Cal. 4th 86, 204, 825 P.2d 781 (1992).

[52]  *People v. Bittaker*, 48 Cal .3d 1046, 1110 fn.35, 774 P.2d 659, 258 Cal. Rptr. 630 (1989).

459

1    of due process of law.  Moreover, because § 190.3(a) fails to narrow the class

2    of death-eligible persons, it also renders the death selection criteria irremediably

3    vague, and "creates an unacceptable risk of randomness, the mark of the arbitrary and

4    capricious sentencing process prohibited by *Furman v. Georgia*, 408 U.S. 238

5    (1972)."  *Tuilaepa*, 512 U.S. at 974-75.

6        16.  Prosecutors throughout California have argued that the jury could weigh in

7    aggravation almost every conceivable circumstance of the crime, even those that,

8    from case to case, reflect starkly opposite circumstances.  Thus, prosecutors have

9    been permitted to argue that "circumstances of the crime" is an aggravating factor

10   supporting the death penalty (1) because the defendant struck many blows and

11   inflicted multiple wounds,[53] or because the defendant killed with a single execution-

12   style wound;[54] (2) because the defendant killed the victim for some purportedly

13   aggravating motive (money, revenge, witness-elimination, avoiding arrest, sexual

14   gratification)[55] or because the defendant killed the victim without any motive at all;[56]

15   (3) because the defendant killed the victim in cold blood[57] or because the defendant

16   / / /

17   / / /

18

19   ───────────

     [53]  *See, e.g., People v. Zapien*, No. S004762, RT 36-38; *People v. Lucas*, No.

20   S004788, RT 2997-98; *People v. Carrera*, No. S004569, RT 160-61.

21       [54]  *See, e.g., People v. Freeman*, No. S004787, RT 3674 (defendant killed with
     single wound); *People v. Frierson*, No. S004761, RT 3026-27 (same).

22       [55]  *See, e.g., People v. Howard*, No S004452, RT 6772 (money); *People v.

23   Allison*, No. S004649, RT 968-69 (same); *People v. Belmontes*, No. S004467, RT
     2466 (eliminate a witness); *People v. Coddington*, No. S008840, RT 6759-60 (sexual

24   gratification); *People v. Ghent*, No. S004309, RT 2553-55 (same); *People v. Brown*,
     No. S004451, RT 3543-44 (avoid arrest); *People v. McLain*, No. S004370, RT 31

25   (revenge).

26       [56]  *See, e.g., People v. Edwards*, No. S004755, RT 10, 544 (defendant killed for
     no reason); *People v. Osband*, No. S005233, RT 3650 (same); *People v. Hawkins*,

27   No. S014199, RT 6801 (same).

28       [57]  *See, e.g., People v. Visciotti*, No. S004597, RT 3296-97 (defendant killed in
     cold blood).

killed the victim during a savage frenzy;[58]  (4) because the defendant engaged in a cover-up to conceal his crime,[59] or because the defendant did not engage in a cover-up and so must have been proud of it;[60]  (5) because the defendant made the victim endure the terror of anticipating a violent death[61] or because the defendant killed instantly without any warning;[62]  (6)  because the victim had children,[63] or because the victim had not yet had a chance to have children;[64]  (7) because the victim struggled prior to death,[65] or because the victim did not struggle;[66]  (8) because the defendant

/ / /

/ / /

---

[58]  *See, e.g.*, *People v. Jennings*, No. S004754, RT 6755 (defendant killed victim in savage frenzy (trial court finding).)

[59]  *See, e.g.*, *People v. Stewart*, No. S020803, RT 1741-42 (defendant attempted to influence witnesses); *People v. Benson*, No. S004763, RT 1141 (defendant lied to police); *People v. Miranda*, No. S004464, RT 4192 (defendant did not seek aid for victim).

[60]  *See, e.g.*, *People v. Adcox*, No. S004558, RT 4607 (defendant freely informs others about crime); *People v. Williams*, No. S004365, RT 3030-31 (same); *People v. Morales*, No. S004552, RT 3093 (defendant failed to engage in a cover-up).

[61]  *See, e.g.*, *People v. Webb*, No. S006938, RT 5302, *People v. Davis*, No. S014636, RT 11, 125; *People v. Hamilton*, No. S004363, RT 4623.

[62]  *See, e.g.*, *People v. Freeman*, No. S004787, RT 3674 (defendant killed victim instantly); *People v. Livaditis*, No. S004767, RT 2959 (same).

[63]  *See, e.g.*, *People v. Zapien*, No. S004762, RT 37 (Jan. 23, 1987) (victim had children).

[64]  *See, e.g.*, *People v. Carpenter*, No. S004654, RT 16, 752 (victim had not yet had children).

[65]  *See, e.g.*, *People v. Dunkle*, No. S014200, RT 3812 (victim struggled); *People v. Webb*, No. S006938, RT 5302 (same); *People v. Lucas*, No. S004788, RT 2998 (same).

[66]  *See, e.g.*, *People v. Fauber*, No. S005868, RT 5546-47 (no evidence of a struggle); *People v. Carrera*, No. S004569, RT 160 (same).

461

1    had a prior relationship with the victim,[67] or because the victim was a complete

2    stranger to the defendant.[68]

3         17.  Further evidence of the contradictory applications of § 190.3(a) abounds:

4    Prosecutors have argued, and juries were free to find, that factor (a) was an

5    aggravating circumstance because the victim was a child, an adolescent, a young

6    adult, in the prime of life, or elderly; [69] because the victim was strangled, bludgeoned,

7    shot, stabbed or consumed by fire;[70] because the defendant killed for money, to

8    eliminate a witness, for sexual gratification, to avoid arrest, for revenge, of for no

9    motive at all;[71] because the victim was killed in the middle of the night, late at night,

10   ///

11   ///

12

13   _____

14   [67]  *See, e.g.*, *People v. Padilla*, No. S014496, RT 4604 (prior relationship);
     *People v. Waidla*, No. S020161, RT 3066-67 (same); *People v. Kaurish*, 52 Cal. 3d
     648, 717, 802 P.2d 278, 278 Cal. Rptr. 778 (1990), *cert. den.* 502 U.S. 837 (same).

15
16   [68]  *See, e.g.*, *People v. Anderson*, No. S004385, RT 3168-69 (no prior
     relationship); *People v. McPeters*, No. S004712, RT 4264 (same).

17   [69]  *See, e.g.*, *People v. Deere*, No. S004722, RT 155-56 (victims were young,
     ages 2 and 6); *People v. Bonin*, No. S004565, RT 10, 075 (victims were adolescents,
18   ages 14, 15 and 17); *People v. Kipp*, No. S009169, RT 5164 (victim was a young
     adult, age 18); *People v. Carpenter*, No. S004654, RT 16, 752 (victim was 20);
19   *People v. Phillips*, 41 Cal. 3d 29, 63, 711 P.2d 423 (1985) (26 year old victim was "in
     the prime of his life"); *People v. Samayoa*, No. S006284, RT 49 (victim was an adult
20   "in her prime"); *People v. Kimble*, No. S004364, RT 3345 (61 year old victim was
     "finally in a position to enjoy the fruits of his life's efforts"); *People v. Bean*, No.
21   S004387, RT 4715-16 (victim was "elderly").

22   [70]  *See, e.g.*, *People v. Clair*, No. S004789, RT 2474-75 (strangulation); *People
     v. Kipp*, No. S004784, RT 2246 (same); *People v. Fauber*, No. S005868, RT 5546
23   (use of an ax); *People v. Benson*, No. S004763, RT 1149 (use of a hammer]) *People
     v. Cain*, No. S006544, RT 6786-87 (use of a club); *People v. Jackson*, No. S010723,
24   RT 8075-76 (use of a gun); *People v. Reilly*, No. S004607, RT 14, 040 (stabbing);
     *People v. Scott*, No. S010334, RT 847 (fire).

25
26   [71]  *See, e.g.*, *People v. Howard*, No. S004452, RT 6772 (money); *People v.
     Allison*, No. S004649, RT 969-70 (same); *People v. Belmontes*, No. S004467,
27   RT 2466 (eliminate a witness); *People v. Coddington*, No. S008840, RT 6759-61
     (sexual gratification); *People v. Ghent*, No. S004309, RT 2553-55 (same); *People v.
28   Brown*, No. S004451, RT 3544 (avoid arrest); *People v. McLain*, No. S004370, RT 31
     (revenge); *People v. Edwards*, No. S004755, RT 10, 544 (no motive at all).

1   early in the morning or in the middle of the day;[72] or because the victim was killed in

2   her own home, in a public bar, in a city park or in a remote location.[73]

3       18.   The foregoing examples of the actual applications of factor (a) make clear

4   that factor (a) is being relied upon as an aggravating factor in every case, by every

5   prosecutor, without any limitations whatsoever.  As  a consequence, from case to

6   case, prosecutors have been permitted to turn entirely opposite facts -- or facts that

7   are inevitable variations of every homicide -- into aggravating factors which the jury

8   is urged to weigh on death's side of the scale.  In practice, § 190.3's broad

9   "circumstances of the crime" aggravating factor licenses indiscriminate imposition

10   of the death penalty upon no basis other than "that a particular set of facts

11   surrounding a murder . . . were enough in themselves, and without some narrowing

12   principles to apply to those facts, to warrant the imposition of the death penalty."

13   *Maynard v. Cartwright*, 486 U.S. 356, 363, 108 S. Ct. 1853, 100 L. Ed. 2d 372

14   (1988).  As  the United States Supreme Court has found, such insufficient narrowing

15   violates the constitution.  *Id*.

16   / / /

17   / / /

18

19

20

21

22

23

24   [72]  *See, e.g.*, *People v. Fauber*, No. S005868, RT 5777 (early morning); *People v. Bean*, No. S004387, RT 4715 (middle of the night); *People v. Avena*, No. S004422, RT 2603-04 (late at night); *People v. Lucero*, No. S012568, RT 4125-26 (middle of the day).

26   [73]  *See, e.g.*, *People v. Anderson*, No.  S004385, RT 3167-68 (victim's home); *People v. Cain*, No. S006544, RT 6787 (same); *People v. Freeman*, No. S004787, RT 3674, 3710-11 (public bar); *People v. Ashmus*, No. S004723, RT 7340-41 (city park); *People v. Carpenter*, No. S004654, RT 16, 749-50 (forested area); *People v. Comtois*, No. S017116, RT 2970 (remote, isolated location).

**D.** **THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON WHICH FACTORS SHOULD COULD BE CONSIDERED IN AGGRAVATION AND WHICH FACTORS COULD BE CONSIDERED IN MITIGATION**

19.  The above errors were further exacerbated because neither of the juries responsible for determining Ms. Alfaro's fate was ever instructed that the potential factors in aggravation were limited to those set forth in § 190.3 (a), (b), (c), and to a limited extent (i), and that factors 190.3 (d), (e), (f), (g), (h), (j), and (k) may only be given mitigating weight and may not be used in aggravation.  *See* RT 2042-2044; RT 4431-4434; *see also People v. Hardy,* 2 Cal. 4th 86, 207 (1992); *People v. Hamilton,* 48 Cal. 3d 1142, 1184, 774 P.2d 730 (1989); *People v. Davenport,* 41 Cal. 3d 247, 288-90, 710 P.2d 861 (1985) (plur. opn. of Reynoso, J.); *cf. People v. Osband,* 13 Cal. 4th 622, 708-709, 919 P.2d 640 (1996) (age of the defendant under factor (i) may be considered either in aggravation or mitigation[74]).  This error was compounded because in the instruction listing the sentencing factors (d), (e), (f), (g), (h), and (j) were each introduced by the phrase "[w]hether or not."  Thus, the jury could have concluded that the absence of these mitigating factors constituted aggravation.  *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988); *cf. Davenport,* 41 Cal. 3d at 289; *see also McCleskey v. Kemp, supra*, 481 U.S. at 313, fn. 37 ("It would be improper and often prejudicial to allow jurors to speculate as to aggravating circumstances wholly without support in the evidence."); *but see, People v. Marshall,* 50 Cal. 3d 907, 936-937, 790 P.2d 676, 269 Cal. Rptr. 269 (1990); *People v. McLain,* 46 Cal. 3d. 97, 118, 757 P.2d 569, 249 Cal. Rptr. 630 (1988).

20.  Without instructions as to which factors could be considered in aggravation and which could not, the jury was given inadequate, misleading, and erroneous guidance as to how it should evaluate the statutory factors essential to its

---

[74]  While age may be considered in mitigation or aggravation, youth is a mitigating factor.  *See Eddings v. Oklahoma,* 455 U.S. 104, 115-116 (1982).

464

penalty determination. *See, e.g.*, *Arave v. Creech,* 507 U.S. 463, 471 (1993) (aggravating circumstance must provide some guidance to the sentencer to meet constitutional requirements). The undefined, unitary list provided to the jury allowed the jurors to consider in aggravation factors such as Ms. Alfaro's youth, her mental or emotional disturbance, drug impairment, and positive background and character evidence, which may constitutionally only be considered in mitigation. *See Zant v. Stephens,* 462 U.S. at 885; *Penry v. Lynaugh*, 492 U.S. 302, 323-24, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (unconstitutional to not allow jury to give mitigating effect to evidence of mental retardation where jury may mistakenly consider it as aggravating evidence). The likelihood that the jury improperly gave aggravating weight to mitigating factors is illustrated by the fact that, in denying the motion to modify the sentence, the *judge* improperly gave aggravating weight to factor (i), the youth of the defendant, and to factor (k). *See* RT 4505-07. Similarly, the jury was allowed to and may have made the same mistake as did the trial in failing to consider Ms. Alfaro's lack of a felony record or history of criminal conduct involving violence as a mitigating circumstance.

21. This instructional error violated the federal constitution. When state law gives the jury a role in sentencing, the defendant has a liberty interest, protected under the due process clauses of the Fifth and Fourteenth Amendments, in having her sentence imposed by a jury accurately informed concerning the scope of their sentencing function. *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980); *see also McCoy v. Court of Appeals of Wisconsin, District 1*, 486 U.S. 429, 434, 108 S. Ct. 1895, 100 L. Ed. 2d 440 (1988) (state's enforcement of its criminal laws must comply with principles of equality and fair procedure embodied in Fourteenth Amendment); *see also Fetterly v. Paskett*, 997 F. 2d 1295, 1300-01 (9th Cir. 1993); *Fetterly v. Paskett*, 15 F.3d 1472, 1479-80 (9th Cir. 1994) (conc. opn. of Trott, J.).

1  **E.**     **THE JURY WAS PRECLUDED FROM GIVING ANY MITIGATING**
2           **EFFECT TO EVIDENCE OF MS. ALFARO'S MENTAL OR**
3           **EMOTIONAL DISTURBANCE THAT WAS DEEMED TO BE LESS**
4           **THAN "EXTREME"**

5       22.  The trial court's error in failing to instruct the jurors that factors (d)
6  through (h) and (j) through (k) may be given only mitigating weight was further
7  compounded by the implied prohibition in the jury instructions that jurors not give
8  any mitigating effect to evidence of Ms. Alfaro's mental or emotional disturbance that
9  was deemed to be less than "extreme."  *See* Pen. Code, § 190.3(d).  Section 190.3(d)
10 instructs a jury to consider "[w]hether or not the offense was committed while the
11 defendant was under the influence of *extreme* mental or emotional disturbance."  *Id.*
12 It appears to limit the effect a juror may give to mental or emotional problems
13 characterized as less than "extreme."  So drafted, it is clear that this jury instruction
14 would have prevented a reasonable juror from giving consideration to less-than-
15 extreme mental and emotional conditions.

16      23.  The Eighth Amendment requires that the jury, during a capital sentencing
17 hearing, be able "to consider and give effect to all relevant mitigating evidence
18 offered by [the defendant]."  *Boyde v. California,* 494 U.S. 370, 377-78, 110 S. Ct.
19 1190, 108 L. Ed. 2d 316 (1990); *see also Penry,* 492 U.S. at 319; *Lockett,* 438 U.S.
20 586; *Eddings,* 455 U.S. 104 (1982).  A defendant's mental and emotional problems
21 are undeniably relevant to a capital sentencing determination.  *See, e.g. Mills*,
22 486 U.S. at 376 (holding that mental infirmity, childhood therapy, and minimal brain
23 damage were among "factors which may call for a less severe penalty"); *Eddings*,
24 455 U.S. at 111, fn. 6 (holding that a defendant's "emotional state at the time of the
25 crime" is among "special facts about this defendant that mitigate against imposing
26 capital punishment;" the "mental and emotional development" of a youthful
27 defendant "must" be "duly considered in sentencing"); *see also, e.g.*, *Penry*, 492 U.S.
28 at 302 (noting that mental retardation, arrested emotional development, and mental

1    or emotional state must be considered by the jury); *California v. Brown*, 479 U.S.

2    538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (conc. opn. of O'Connor, J.).

3    Preventing a jury from considering less-than-extreme mental or emotional

4    disturbances of a defendant violates the Fifth, Eighth, and Fourteenth Amendments.)

5    *See, e.g. Smith v. McCormick*, 914 F. 2d 1153, 1165-66 (9th Cir. 1990) (Montana

6    sentencing scheme held unconstitutional because it permitted sentencer to reject

7    mitigating evidence falling below a certain weight); *Kenley v. Armontrout*, 937 F.2d

8    1298, 1309 (8th Cir. 1991) (defendant's mental health problems need not rise to the

9    level of insanity in Order to be considered mitigating evidence).

10    24.  The conclusion that § 190.3(d) precludes reasonable jurors from

11    considering less-than-extreme mental and emotional conditions is not avoided

12    by reference to the language of 190.3(k), the "catch-all" category.  Factor (k)

13    authorizes the jury to take into account "[a]ny other circumstance which extenuates

14    the gravity of the crime, even though it is not a legal excuse for the crime."  Factor (k)

15    is limited by its terms to any "other" circumstance.  Thus, factor (k) would not appear

16    to a reasonable juror to permit consideration of the kinds of mitigation evidence that

17    has been *explicitly limited* by the language of one of the other specifically enumerated

18    circumstances, such as factor (d)'s restriction to a showing that the defendant acted

19    under "extreme" mental or emotional disturbance.  In this context, factor (k)'s

20    reference to "other" circumstances could only mean to a reasonable juror a

21    "mitigating matter of a different kind from the mitigating circumstances already

22    listed."  In other words, factor (d), mental disturbance, and factor (k), the catch-all

23    category, are perceived as being mutually exclusive.  Hence, less-than-extreme

24    mental and emotional disturbances are dismissed under factor (d), but would not be

25    considered by jurors under factor (k).

26    25.  Defense counsel here compounded the flaw of the implied limitation

27    contained in factor (d) when he failed to provide the jury with any clarification.

28    Mr. Monroe never informed the jury that a less-than-severe mental or emotional

disturbance had any relevance whatsoever to the sentencing determination.[75]  In fact, Mr. Monroe's explication of factor (k) amounted to the statement that "you know about the (k) factor.  We alluded to that."  RT 4379.  This statement was followed by a brief description of Ms. Alfaro's troubled home life.  RT 4379-80.

26.  Such a profoundly inadequate discussion by Mr. Monroe did nothing to correct the error inherent in the plain language of factors (d) and (k).  Moreover, such an omission was inexcusable.  Evidence was adduced at both of Ms. Alfaro's trials that Ms. Alfaro suffered from mental and/or emotional probleMs.  Dr. Consuelo Edwards, psychiatrist and mental health expert witness, testified to Ms. Alfaro's traumatic childhood and multiple psychiatric disturbances, as corroborated by several experts, that unquestionably affected her at the time of the crime.  Ms. Alfaro had an abusive, alcoholic father (RT 1826, 4064-68), and had been raped as a child by one of her father's friends.  RT 1866-67.  She became involved with drugs at an early age (RT 4061), and by fourteen, had been abandoned by her father, was addicted to drugs, had dropped out of school, was pregnant with her first child, and was being prostituted by an older woman.  RT 4061-68, 1666-73.  That Ms. Alfaro had chronic, *ever-present* mental impairments was confirmed by Dr. Edwards testimony, including: borderline intellectual functioning with an IQ no higher than 78, and probably much lower; Attention Deficit Hyperactivity Disorder; low impulse control; possible organic brain damage on the right side of the brain; learning disabilities; Dependent Personality Disorder; and disorders associated with anxiety and depression.  RT 4068-97.

27.  In sum, the court's instructions and the argument by counsel lead unavoidably to the conclusion that a reasonable juror would have understood, contrary to the commands of the Fifth, Eighth and Fourteenth Amendments, that

---

[75]  Counsel's failure to argue about the relevance of factor (d) to the present case, or to make this critical point clear deprived Ms. Alfaro of the effective assistance of counsel due to her under the Sixth Amendment.

1    Ms. Alfaro's mental and emotional disturbances were not available as bases for

2    imposing a sentence less than death unless the disturbances were found to be

3    "extreme."

4    **F.    THE TRIAL COURT FAILED TO INSTRUCT ON BURDEN AND**

5    **STANDARDS OF PROOF AT CRUCIAL STEPS IN THE SENTENCING**

6    **DETERMINATION.**

7        28.  In California, before sentencing a person to death, the jury must be

8    persuaded that the factors in aggravation so substantially outweigh the factors in

9    mitigation that a verdict of death is appropriate. (CALJIC No. 8.88; *People v. Cudjo*,

10   6 Cal. 4th  585, 634, 863 P.2d 635 (1993).)  In failing to instruct the jury or otherwise

11   require (1) that all aggravating factors be proven beyond a reasonable doubt, (2) that

12   aggravation must outweigh mitigation beyond a reasonable doubt, and (3) that death

13   must be found to be the appropriate penalty beyond a reasonable doubt, the court

14   violated federal principles of due process,  (*see Santosky v. Kramer*, 455 U.S. 745,

15   754-755, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Winship,* 397 U.S. 358, 364,

16   90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)), equal protection, and the Eighth and

17   Fourteenth Amendments's requirements of heightened reliability in the death

18   determination.  *See Ford v. Wainwright*, 477 U.S. 399, 411, 414, 106 S. Ct. 2595,

19   91 L. Ed. 2d 335 (1986); *Beck v. Alabama*, 447 U.S. 625, 637, 100 S. Ct. 2382, 65 L.

20   Ed. 2d 392 (1980).

21       29.  Penalty phase evidence invariably raises disputed factual issues.  The trial

22   court's instructions commanded each juror to "determine what the facts are from

23   the evidence received during the entire trial unless you are instructed otherwise."

24   RT 2034; RT 4408.  Thus, it is clear not only that the existence of an aggravating

25   circumstance is a fact that is susceptible to proof under a reasonable doubt standard,

26   but that due process requires that such a circumstance be proven beyond a reasonable

27   doubt.  *See* 18 U.S.C. § 3593, subd. (c) ("The burden of establishing the existence

28

1  of any aggravating factor is on the government, and is not satisfied unless the
2  existence of such a factor is established beyond a reasonable doubt.").

3      30.  Further, to ensure the reliability of the jury's determination to sentence
4  a person to death, the prosecution must bear the burden of proof to some degree.
5  Because a capitally accused person stands to lose his or her life, a capital jury
6  should be instructed that they may impose a sentence of death only if they are
7  persuaded beyond a reasonable doubt as to each and every aggravating factor, that the
8  aggravating factors outweigh the mitigating factors, and that death is the appropriate
9  penalty.

10     31.  Finally, the failure to require that aggravation must outweigh mitigation
11  beyond a  reasonable doubt, and that death must be found to be the appropriate
12  penalty beyond a reasonable doubt, violates the Fifth, Eighth and Fourteenth
13  Amendments.  In cases where the jury finds the weight of the aggravating and
14  mitigating evidence to be close or equal, it is unacceptable under the Eighth and
15  Fourteenth Amendments that one person should live while another dies simply
16  because one jury assigns the burden of proof and persuasion to the State, while
17  another assigns it to the accused.

18  **G.    THE TRIAL COURT ERRED IN FAILING TO DELETE**
19  **        INAPPLICABLE FACTORS**

20     32.  Penal Code § 190.3 required the trial court to instruct the jury on factors
21  that were inapplicable to Ms. Alfaro's case.  The court's instructions as to these
22  inapplicable factors intolerably and unnecessarily risked juror confusion, and
23  capricious and unreliable decision making.  As  instructed, the jury was permitted
24  to aggravate Ms. Alfaro's sentence on the basis of factors that should have played
25  no role in the sentencing process, and interjected irrelevant and prejudicial
26  information into the jury's deliberations.  This danger was heightened because
27  the instructions did not explicitly designate which factors the jury should consider
28  as mitigating factors and which factors they should consider as aggravating.  When

1    combined with the court's failure to delete unsupported factors, jurors were left

2    to figure out, without direction or guidance, which factors were relevant and

3    applicable to Ms. Alfaro's case, creating the possibility that the jury rejected relevant

4    mitigating evidence because it thought that it was somehow inapplicable, as we know

5    the trial judge did.  *See* Claim 27.  Such a risk violated her rights under the Eighth

6    Amendment.  *Boyde*, 494 U.S. at 380 (instructions which create the reasonable

7    likelihood that the jury was prevented from giving mitigating effect to relevant

8    evidence violate the Eighth Amendment).

9         33.  Finally, the failure to delete inapplicable factors risked Ms. Alfaro's right

10   to an individualized sentencing determination based on permissible factors relating

11   to her and the crime.  This error, by potentially inflating the number of factors the jury

12   would consider as aggravation, violated the Fifth, Eighth and Fourteenth

13   Amendments' requirement of heightened reliability in the death determination.

14   *Ford v. Wainwright*, 477 U.S. 399, 411, 414 (1986); *Beck*, 447 U.S. at 637.

15   **H.      THE TRIAL COURT ERRED IN FAILING TO INFORM THE JURY**

16   **          THAT IT HAD THE DISCRETION TO DECLINE TO IMPOSE THE**

17   **          DEATH PENALTY AND RETURN A VERDICT OF LIFE WITHOUT**

18   **          PAROLE EVEN IF IT FOUND NO EVIDENCE IN MITIGATION**

19        34.  Under California law, the jury has the right to fix the penalty at life without

20   possibility of parole even in the absence of mitigating circumstances.  *See People v.*

21   *Duncan*, 53 Cal. 3d 955, 979, 810 P.2d 131, 281 Cal. Rptr. 273 (1991) (holding that

22   "[t]he jury may decide, even in the absence of mitigating evidence, that the

23   aggravating evidence is not comparatively substantial enough to warrant death").

24   The failure of the trial court to instruct the jurors that they could spare Ms. Alfaro's

25   life even in the absence of mitigating evidence violated Ms. Alfaro's right to a

26   reliable penalty determination guaranteed by the Eighth Amendment and her right to

27   equal protection of the laws guaranteed by the Fourteenth Amendment.  *See Hicks*,

28

1    447 U.S. at 346; *Hewitt v. Helms*, 459 U.S. 460, 469, 103 S. Ct. 864, 74 L. Ed. 2d 675
2    (1983).

3        35.  Mr. Monroe requested that the trial judge properly inform the jury of its
4    right to return a sentence less than death.  He asked the court to instruct that, "'the
5    jury must reject death . . .' if the jury finds that the ' . . . mitigating factors . . .'
6    outweigh the 'aggravating . . .' factors and the jury is 'free to do so even if the
7    aggravating factors . . .' outweigh 'mitigating factors.'"  CT 429.  The trial judge
8    refused Mr. Monroe's request, asserting that the proposed instruction was covered
9    by other instructions.  RT 1974 (defense counsel renewed his request for special jury
10   instructions during the second penalty phase and the judge refused them on the same
11   grounds).  The court erred in so ruling; no other instruction informed the jurors they
12   were free to impose a sentence of life in the absence of any mitigating evidence.
13   The court's error was particularly prejudicial in light of the district attorney's closing
14   arguments.  The prosecutor argued at both trials the apparent lack of mitigating
15   evidence (RT 1990-2006; RT 4341-66), even though this was factually incorrect
16   (*see* Penal Code §§ 190.3(b) and (c)), and further remarked that the amount
17   of mitigation required to overcome a sentence of death would need to "penetrate[ ]
18   . . . [a] block wall."  RT 4338.

19       36.  If a state law permits a jury to spare a defendant's life even if there is no
20   evidence in mitigation, the jury must be specifically so informed to avoid the Eighth
21   Amendment's prohibition of the "infliction of death under [a] legal system[ ] that
22   permit[s] this unique penalty to be so wantonly and so freakishly imposed."  *Furman*,
23   408 U.S. at 309-10.  The failure of the trial judge to instruct the jurors that they could
24   spare Ms. Alfaro's life, even in the absence of mitigating evidence, denied Ms. Alfaro
25   her rights to due process and a reliable penalty determination in violation of the Fifth,
26   Eighth and Fourteenth Amendments.
27   / / /
28   / / /

472

1   **I.     THE TRIAL COURT ERRED IN FAILING TO REQUIRE A WRITTEN**
2   **STATEMENT OF FINDINGS.**

3      37.  A sentencing jury in a capital case is faced with a complicated and
4   profound task.  A capital jury is expected to process an extensive body of evidence,
5   including the circumstances of the crime, the special circumstances, a defendant's
6   personal, criminal and family history, and a defendant's state of mind at the time the
7   crime was committed.  The jury must then determine, with no clear guidance, whether
8   such evidence should be treated as an aggravating or a mitigating factor and, finally,
9   must then determine the weight to be accorded to the evidence and the factors.
10  Despite the complicated nature of this process and the magnitude of the discretion
11  afforded to a capital sentencing jury, § 190.3 fails to require that the jury document,
12  in writing, its findings on the statutory aggravating and mitigating factors.  This
13  omission results in the complete abrogation of the defendant's right to meaningful
14  appellate review of the sentencing process in violation of the Fifth, Eighth and
15  Fourteenth Amendments.  *See Gregg*, 428 U.S. at 195, 198; *Proffitt v. Florida*,
16  428 U.S. 242, 250-51, 253, 259-60, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976).

17     38.  In a capital case, the sentencing process is highly subjective, (*see Turner v.*
18  *Murray*, 476 U.S. 28, 33-34, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986)), and the risk
19  that an errant procedure will result in the defendant's death is too great.  Because
20  a statement of findings and reasons would alleviate that risk, yet would pose only
21  a minimal burden on the State, due process also requires the sentencer to make such
22  a record.  *Cf. Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18
23  (1976).  The requirement of written findings not only fortifies the record for appellate
24  review, but also alerts the jury to the gravity of the task at hand by forcing
25  accountability regarding each factor considered in reaching the conclusion that death
26  is the appropriate penalty.  Requiring an explicit statement of the jury's findings
27  would provide greater certainty that the determination of death was predicated on a
28  rational ground and that any irrational decision to impose the death penalty will be

uncovered and corrected.  The guarantee of meaningful appellate review under the Fifth, Eighth and Fourteenth Amendments cannot be satisfied under California's death penalty statute as it currently stands.

**J.      CONCLUSION**

39.  The defects in California's capital sentencing scheme prejudiced Ms. Alfaro.  Both individually and cumulatively, the defects outlined above warrant habeas relief.

**XXXIX.**

**CLAIM 34:  PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED AS A RESULT OF THE DISCRIMINATORY MEANS OF SELECTING THE ORANGE COUNTY VENIRE**

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Petitioner was denied an impartial jury drawn from a "fair cross section" of the community.  Given that Ms. Alfaro is Hispanic, and the venire for her case was predominantly Caucasian, there is a serious question as to whether racial discrimination occurred in the selection process of the grand or petty jury.  As  a result, habeas relief is warranted.

1.  Exhaustion of the claim:  This claim was fairly presented as Claim 4 in the habeas petition filed in *Alfaro (Maria) on H. C.*, California Supreme Court case no. S099569.

2.  AEDPA:  The claim was rejected by an Order of the California Supreme Court dated November 18, 2007.  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent

474

unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858. The state court denied this claim without an opinion, and without affording Petitioner an evidentiary hearing, discovery, or any other means to further develop his claim. When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *see also Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). Here, the state court's denial was objectively unreasonable.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

6.  To establish a *prima facie* showing of a violation, a Petitioner must demonstrate that:  (1) the group alleged to have been excluded is a distinctive group in the community; (2) the representation of the group in venires from which juries are selected is not fair and reasonable in relation to their representation in the community; and (3) this underrepresentation is the result of a systematic exclusion of the group in the jury selection process.  An accused can show a systematic exclusion by demonstrating that the under-representation recurred over time and was inherent to

1  the particular jury selection process utilized.  Furthermore, while the accused must

2  show a "systematic exclusion," she need not prove intent.  The fair cross section

3  requirement forbids any substantial under-representation of minorities, regardless

4  of whether the State's motive is discriminatory.

5      7.  Petitioner in this case is part of a distinctive group in the community.  She is

6  Hispanic.  There is a substantial Hispanic population in Orange County, as evidenced

7  by the fact that the area of Anaheim where Ms. Alfaro went on the morning of June

8  15, 1990, is known as "Little Tijuana."  Census figures from 1990 indicate that

9  Orange County had a total population of 2,410,556, of which 564,828 were Hispanic.

10  Exhibit 86.

11      8.  From the surnames of the jurors, it appears that there were few, if any,

12  Hispanics in the venire.  CT 444-463, 1441-42, 1460-90, 1499-1508, 1517-20.

13  Because Ms. Alfaro is Hispanic and there were a minimal number of Hispanics in the

14  venire from which her juries were chosen, Petitioner alleges that the jury pool was

15  unrepresentative of the population in Orange County at the time of the trials and as a

16  result, Ms. Alfaro was denied a fair trial.

17      9.  The constitutional violations set forth in this claim alone mandate relief

18  from the convictions and sentence.  However, even if these violations do not mandate

19  relief standing on their own, relief is required when this claim is considered together

20  with the additional constitutional errors outlined in the remainder of this Petition.

21  Cumulatively, these errors mandate relief from Ms. Alfaro's convictions and

22  sentence.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001); *Mak v. Blodgett*,

23  970 F.2d 614, 620 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th

24  Cir. 1978).

25      10.  The foregoing violations of Ms. Alfaro's constitutional rights

26  constitute structural error and warrants the granting of this Petition without any

27  determination of whether the violations substantially affected or influenced the jury's

28  verdict.  *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

476

doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

## XL.

## CLAIM 35:  THE VIOLATIONS OF FEDERAL LAW ARTICULATED IN THIS PETITION ALSO CONSTITUTE VIOLATIONS OF INTERNATIONAL LAW

Petitioner's conviction and sentence of death were rendered in violation of her rights to a fair trial, a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the violations of federal law articulated in this petition constitute violations of international law. As  a result, habeas relief is warranted.

1. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim 12 in the Opening Brief.

2. AEDPA:  The California Supreme Court denied this claim. *People v. Alfaro*, 41 Cal. 4th 1277, 163 P.3d 118, 63 Cal. Rptr. 3d 433 (2007).  Because the state court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d), the federal courts must resolve the claim *de novo*.  Moreover, because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

3.  If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

4.  The declarations and other exhibits filed with this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

5.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

## A.    **INTRODUCTION**

6.  The procedures employed to convict and sentence Ms. Alfaro to death violated her right to a fair trial by an independent tribunal and her right to protection against the arbitrary deprivation of life and the discriminatory application of a state's criminal laws established by customary international law and the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights ("ICCPR"), and the American Declaration of the Rights and Duties of Man ("American Declaration").

## B.    **THE UNITED STATES, BY COMMITTING ITSELF TO VARIOUS MULTINATIONAL ORGANIZATIONS AND TREATIES, HAS COMMITTED ITSELF TO FOLLOWING INTERNATIONAL HUMAN RIGHTS LAW**

7.  The two principle sources of international human rights law are treaties and customary international law.  The United States Constitution accords treaties equal

478

rank with federal statutes.[76]  Customary international law is equated with federal common law.[77]  International law must be considered and administered in United States courts whenever questions of right depending on it are presented for determination.  *The Paquete Habana*, 175 U.S. 677, 700, 20 S. Ct. 290, 44 L. Ed. 320 (1900).  To the extent possible, courts must construe American law so as to avoid violating principles of international law.  *Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118, 2 Cranch 64, 2 L. Ed. 208 (1804).  When a court interprets a state or federal statute, the statute "ought never to be construed to violate the law of nations, if any possible construction remains . . . ."  *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S. Ct. 1510, 71 L. Ed. 2d 715 (1982) (quoting *Murray*, 6 U.S. at 118).  The United States Constitution also authorizes Congress to "define and punish . . . offenses against the law of nations," thus recognizing the existence and force of international law.  U.S. Const., art. I, § 8.  Courts within the United States have responded to this mandate by looking to international legal obligations, both customary international law and conventional treaties, in interpreting domestic law.  *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252, 104 S. Ct. 1776, 80 L. Ed. 2d 273 (1984).[78]

---

[76]  Article VI, § 1, clause 2 of the United States Constitution provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[77]  Restatement Third of the Foreign Relations Law of the United States , pp. 145, 1058 (1987).  *See also Eyde v. Robertson*, 112 U.S. 580, 5 S. Ct. 247, 28 L. Ed. 798 (1884).

[78]  *See also Oyama v. California*, 332 U.S. 633, 68 S. Ct. 269, 92 L. Ed. 249 (1948), which involved a  California Alien Land Law that prevented an alien ineligible for citizenship from obtaining land and created a presumption of intent to avoid escheat when such an alien pays for land and then transfers it to a U.S. citizen. The court held that the law violated the equal protection clause of the United States Constitution.  Justice Murphy, in a concurring opinion, noted, "Moreover, this nation has recently pledged itself, through the United Nations Charter, to promote respect for, and observance of, human rights and fundamental freedoms for all without

8.  It is an established principle of international law that a country, by committing a certain subject-matter to a treaty -- including the individual rights of its citizens -- has internationalized that subject-matter to such an extent that each country can no longer assert that the subject falls exclusively within domestic jurisdictions.[79] The United Nations Charter, a multinational treaty, also proclaims that member states of the United Nations are obligated to promote "respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language or religion."[80]

9.  In 1948, the UN drafted and adopted the Universal Declaration of Human Rights.[81]  The Universal Declaration is part of the International Bill of Human

---

distinction as to race, sex, language and religion.  [The Alien Land Law's] inconsistency with the Charter, which has been duly ratified and adopted by the United States, is but one more reason why the statute must be condemned." *Id*. at 673.  *See also, Namba v. McCourt*, 185 Or. 579, 204 P.2d 569 (1949), invalidating an Oregon Alien Land Law, in which the court stated:  "The American people have an increasing consciousness that, since we are a heterogeneous people, we must not discriminate against any one on account of his race, color or creed . . . .  When our nation signed the Charter of the United Nations we thereby became bound to the following principles (Article 55, subd. c, and *see* Article 56):  'Universal respect for, and observance of human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion.'  (59 Stat. 1031, 1046.)"  *Id.* at 604.

[79]  *Advisory Opinion on Nationality Decrees Issued in Tunis and Morocco* (1923) P.C.I.J., Ser. B, No. 4.

[80]  U.N. Charter, Jun. 26, 1945, art. 1(3), 59 Stat. 1031, T.S. 993 (eff. Oct. 24, 1945).

In his closing speech to the San Francisco United Nations conference, President Truman emphasized that:

"The Charter is dedicated to the achievement and observance of fundamental freedoMs.  Unless we can attain those objectives for all men and women everywhere --without regard to race, language or religion -- we cannot have permanent peace and security in the world."

Robertson, Human Rights in Europe (1985) p. 22, n. 22 (quoting President Truman).

[81]  Universal Declaration of Human Rights, Dec. 10, 1948, U.N. G.A. Res. 217A (III).  It is the first comprehensive human rights resolution to be proclaimed by a universal international organization (hereinafter Universal Declaration).

Rights,[82] which also includes the International Covenant on Civil and Political Rights (ICCPR),[83] the Optional Protocol to the ICCPR,[84] the International Covenant on Economic, Social and Cultural Rights,[85] and the human rights provisions of the UN Charter.  As  a member of the United Nations, the United States is bound by these instruments enumerating specific human rights and the duties of state parties, and that illustrate the multilateral commitment to enforcing human rights through international obligations.

10.  Equally pertinent are the human rights proclamations of the Organization of American States (OAS).  The OAS, established to promote and protect human rights, provides in its charter:  "The American States proclaim the fundamental rights of the individual without distinction as to race, nationality, creed or sex."[86]  In 1948, the Ninth International Conference of American States presented the American Declaration of the Rights and Duties of Man, a resolution adopted by the OAS members states.  The American Declaration is today the normative instrument that embodies the authoritative interpretation of the fundamental rights of individuals in this hemisphere.  The Inter-American Commission on Human Rights, an OAS charter organization charged with protecting human rights, reinforces the normative effect of the American Declaration.

---

[82] *See generally* Newman, *Introduction: The United States Bill of Rights, International Bill of Rights, and Other "Bills"* (1991) 40 Emory L.J. 731.

[83] International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 717, (eff. Mar. 23, 1976) (hereinafter ICCPR).

[84] Optional Protocol to the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 302 (eff. March 23, 1976).

[85] International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, 993 U.N.T.S. 3 (eff. Jan. 3, 1976).

[86] OAS Charter, 119 U.N.T.S. 3, Dec. 13, 1951, *amended* 721 U.N.T.S. 324 (eff. Feb. 27, 1970).

## C.   PETITIONER'S CONVICTION AND DEATH SENTENCE VIOLATE THE DUE PROCESS GUARANTEES OF INTERNATIONAL LAW

11.  The factual and legal issues presented in this brief demonstrate that Ms. Alfaro was denied her right to a fair and impartial trial in violation of customary international law and Articles 6 and 14 of the International Covenant on Civil and Political Rights ("ICCPR")[87] as well as Articles 1 and 26 of the American Declaration of the OAS.  Article 6 declares that  "[n]o one shall be arbitrarily deprived of his life . . . [The death] penalty can only be carried out pursuant to a final judgment rendered by a competent court."[88]  Article 14 of the ICCPR provides, "[a]ll persons shall be equal before the courts and tribunals.  In the determination of any criminal charge against him . . . everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law."  Likewise, these protections are found in the American Declaration: Article 1 protects the right to life, liberty and security of person; Article 2 guarantees equality before the law; and Article 26 protects the right of due process of law.[89]

### 1.   The Arbitrary Imposition Of the Death Penalty Against Petitioner Violates International Law

12.  California's death penalty scheme results in the arbitrary and capricious imposition of a death sentence.  For all of the reasons cited in this brief, imposing the death penalty in Ms. Alfaro's case would be arbitrary and capricious.  The death penalty verdict imposed against her represents the arbitrary deprivation of life in violation of Article VI, § 1 of the ICCPR.

---

[87]   The substantive provisions of the Universal Declaration have been incorporated into the ICCPR, so these are incorporated by reference in the discussion above.  Moreover, as was noted above, the Universal Declaration is accepted as customary international law.

[88]   International Covenant on Civil and Political Rights, *supra*.

[89]   American Declaration of the Rights and Duties of Man, *supra*.

13.  The United States Senate has not reserved or otherwise derogated the obligation to refrain from "arbitrary" deprivations.  Further, Article IV, § 2 of the ICCPR does not permit derogations from Article VI.  Because this treaty, of which the United States is a signatory, prohibits the arbitrary deprivation of life, Ms. Alfaro's sentence stands in violation of Article VI of the ICCPR.

**2.**     **The Capital Prosecution and Death Sentence Of Petitioner Violate International Law Prohibitions Against Discrimination on the Basis Of race and National or Social Origin**

14.  The capital prosecution and death sentence imposed against Ms. Alfaro violates the requirement of equal treatment without discrimination on the basis of race, color, sex, national or social origin, or other status in violation of Article XXVI of the ICCPR, Articles 1 and 2 of the American Declaration, and, as to race specifically, Articles V and VI of the International Convention on the Elimination of All Forms of Racial Discrimination (ICEAFRD).

15.  Because California's statutory scheme provides no limits on a prosecutor's discretion in deciding whether to seek the death penalty against a "qualified" defendant, no mechanism exists to protect against the prosecutor's discriminatory motives in selecting to pursue the death penalty.  Ms. Alfaro was Hispanic and the victim Caucasian.  Statistics show that, in the United States, the chances that discriminatory motives will infect juries' penalty decisions when the victim is Caucasian and the defendant a minority are intolerably high.

16.  Because racially discriminatory motives likely infected the decisions to prosecute Ms. Alfaro for a capital offense and to impose a sentence of death, her conviction and sentence violate Articles II and XXVI of the ICCPR, Articles 1 and 2 of the American Declaration, and Article V and VI of the ICEAFRD.

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3.**     **Together the Trial Court's Multiple Errors and California's Death Penalty Scheme Failed to Guarantee Petitioner Effective Protection Against Discrimination in Violation International Law**

17.  Many of trial court's multiple errors suggest discrimination against Ms. Alfaro because she is a young woman and a Hispanic.  These errors include the court's failure to inquire into the reasonableness of Ms. Alfaro's counsel withholding his consent to her guilty plea, the court's failure to conduct adequate voir dire on the question of jurors biases against a female Hispanic defendant when the victim was a nine-year-old Caucasian child, the court's refusal to close the trial for Ms. Alfaro's testimony, the court's refusal to replace Ms. Alfaro's counsel despite the clear breakdown in their relationship, the court's refusal to order a change of venue, and, in the most explicit example of discriminatory animus, the court' final opinion in its ruling on Ms. Alfaro's request for a modification of the verdict and new trial.

18.  Further, as discussed above, the inadequate protections afforded by California's capital statutory scheme against the arbitrary and capricious prosecution and imposition of a sentence of death for capital crimes allow discriminatory motives to infect the process.  As  a consequence, the state's failure to prohibit discrimination by law and to "guarantee to all persons equal and *effective* protection against discrimination" on the basis of race, sex, and national and social origin violates Article XXVI of the ICCPR, Articles 1 and 2 of the American Declaration, as to race specifically, Article 5(a) of the ICEAFRD.

19.  The United States Senate did not issue a reservation regarding these provisions as to State action.  In fact, in ratifying the ICEAFRD, the Senate indicated that its "understanding" was the Convention would be "implemented by the Federal Government to the extent that it exercise jurisdiction over the matters covered therein, and otherwise by the state and local governments" as to which the federal government would "take appropriate measure to insure the fulfillment of this Convention."

1

**D.     CONCLUSION**

2         20.  Ms. Alfaro's conviction and sentence stand in violation of international

3   law. In cases where the UN Human Rights Committee has found that a state party

4   violated Article 14 of the ICCPR, in that a defendant had been denied a fair trial,

5   the Committee has held that the imposition of the sentence of death also was

6   a violation of Article 6 of the ICCPR.[90]  Further, Article 4(2) of the ICCPR makes

7   clear that no derogation from Article 6's outright ban on the arbitrary deprivation

8   of life is allowed.[91]

9         21.  The due process violations that Ms. Alfaro suffered throughout her trial

10  and sentencing are prohibited by customary international law.  The United States

11  is bound by customary international law, as informed by such instruments as the

12  ICCPR and the American Declaration.  The purpose of these treaties is to bind

13  nations to an international commitment to further protections of human rights. The

14  United States must honor its role in the international community by recognizing the

15  human rights standards in our own country to which we hold other countries

16  accountable.

17        22.  The foregoing violations of Ms. Alfaro's constitutional rights

18  constitute structural error and warrants the granting of this Petition without any

19  determination of whether the violations substantially affected or influenced the jury's

20  verdict. *Brecht,* 507 U.S. at 638.  However, even assuming the harmless error

21  doctrine applies to this claim, the foregoing constitutional violations so infected the

22  integrity of the proceedings that the error cannot be deemed harmless. The foregoing

23  violation of Ms. Alfaro's rights had a substantial and injurious effect or influence on

24  Ms. Alfaro's convictions and sentence, rendering them fundamentally unfair and

25  resulting in a miscarriage of justice.

26  _____

27        [90]  U.N. GAOR, Supp. No. 40 at p. 72 (Report of the Human Rights
      Committee).

28        [91]  International Covenant on Civil and Political Rights, *supra*.

**XLI.**

**CLAIM 36: PETITIONER WAS DENIED HER CONSTITUTIONAL AND INTERNATIONAL LAW RIGHTS BECAUSE OF THE CUMULATIVE IMPACT OF ERRORS**

Petitioner's convictions and sentence of death were rendered in violation of his rights to due process, a fair trial, equal protection, trial by jury, confrontation and cross-examination, the effective assistance of counsel, a reliable and reviewable guilt determination, fairness in capital case sentencing and to be free from cruel and unusual punishments and to an individualized, non-arbitrary, reliable and reviewable penalty determination, as a result of multiple instances of manifest error in Petitioner's pre-trial and trial, all in violation of Petitioner's guaranteed constitutional rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and in violation of Petitioner's rights provided by international law and treaties to which the United States is a signatory.

1. This claim is pending before the California Supreme Court.

2. If Respondent disputes any of the facts alleged below, Petitioner requests an evidentiary hearing so that the factual disputes may be resolved. After Petitioner has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this petition.

3. The declarations and other exhibits previously filed with this court and accompanying this petition, as well as the allegations and facts set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

4. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

5.  Each of the numerous errors discussed in this petition had a substantially prejudicial effect, with each contributing an essential part to either the finding of guilt or the determination in favor of the death penalty or the affirmance of the conviction and sentence.  Had even a few of these errors not occurred, the outcome, in all probability, would have been a more favorable guilt, or at least, penalty verdict.  *See* Exhibit 91 (Declaration of Ralph Glass) at ¶ 4; Exhibit 122 (Declaration of Denise Coburn) at ¶4; Exhibit 125 (Declaration of Roger Ellison) at ¶¶ 2-3; Exhibit 123 (Declaration of Brent Conley) at ¶¶ 2-4; Exhibit 130 (Declaration of Lorelei Sontag, Ph.D.).

6.  While the State may urge that each of these errors, viewed individually, was harmless or not prejudicial, the cumulative effect of the multiplicity or errors cannot be ignored.  In order to meet the special need for reliability in any capital murder conviction, the cumulative effect of multiple individual errors must be reviewed.  *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988); *Mak v. Blodgett*, 970 F. 2d 614, 622; *Walker v. Engle*, 703 F. 2d 959 (6th Cir 1983).

7.  The totality of errors, by their number and importance, totally skewed the guilt and penalty determination so as to greatly increase the probability that the jury would return a guilty verdict, that it would recommend the imposition of the death penalty on the basis of improper considerations, and that the unsound conviction and sentence would be affirmed.  The result was a trial and appeal process that was so fundamentally unfair that the setting aside of the guilt and penalty phase verdicts is required.

8.  These violations of Petitioner's constitutional and international law rights warrant the granting of this petition without any determination of whether those violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 638 n.9.  Furthermore, the constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In any event, the violations

of Petitioner's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, and result in a miscarriage of justice.

## XLII.

## __PRAYER FOR RELIEF__

Wherefore, Petitioner Maria Del Rosio Alfaro respectfully requests that this Court:

1. Issue a Writ of Habeas Corpus to have Ms. Alfaro brought before this Court to the end that she might be discharged from her unconstitutional confinement and restraint and that she might be relieved of her unconstitutional sentence of death.

2. Continue the stay of Ms. Alfaro's execution, and any and all proceedings relating thereto, pending final disposition of this petition pursuant to 28 U.S.C. § 2251.

3. Permit Ms. Alfaro, who is indigent, to proceed without prepayment of costs and fees and grant her authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts alleged in this petition.

4. Grant Ms. Alfaro the right to conduct discovery, including the right to take depositions, request admissions, and propound interrogatories, as well as the means to preserve the testimony of witnesses.

5. Permit Ms. Alfaro a reasonable opportunity to supplement this petition to include claims which become known as a result of ongoing investigation and information which may hereafter become known to counsel.

6. Order and conduct an evidentiary hearing at which time proof may be offered concerning each of the allegations in the petition.

7. After full consideration of the issues raised in this petition, order that Ms. Alfaro be granted relief from her conviction and death sentence, and that she either be released from custody or retried by the Superior Court of the State of California within ninety (90) days after the issuance of the order.

1      8.  Grant Ms. Alfaro such further relief as is appropriate and just in the interests

2   of justice.

3                                          Respectfully submitted,

4                                          SEAN K. KENNEDY
                                           Federal Public Defender
5

6   Dated: March 2, 2009                   /s/ Craig A. Harbaugh
7                                          CRAIG A. HARBAUGH
                                           Deputy Federal Public Defender
8

9                                          /s/ Linda L. Griffis
10                                         LINDA L. GRIFFIS
                                           Deputy Federal Public Defender
11
                                           Attorneys for Petitioner
12                                         MARIA DEL ROSIO ALFARO

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION OF PETITION**

I, LINDA L. GRIFFIS, declare under penalty of perjury as follows:

1. I am an attorney admitted to the practice of law in the State of California, and admitted to the Bar of this Court. I am employed with the Office of the Federal Public Defender, which has been appointed to represent the Petitioner in this matter, Maria Del Rosio Alfaro.

2. I make this verification as someone acting on behalf of Ms. Alfaro pursuant to 28 U.S.C. § 2242.

3. I have read the foregoing petition and I am familiar with its contents. Some of the information contained in the petition is information that I know to be true and correct based on my personal knowledge. The remaining information in the petition is true and correct to the best of my knowledge, information, belief and understanding.

4. I am authorized to file this petition on Ms. Alfaro's behalf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of March 2009 at Los Angeles, California.


/s/Linda L. Griffis
Linda L. Griffis

490

**PROOF OF SERVICE**

I, the undersigned, declare that: I am employed in Los Angeles County, California; my business address is the Federal Public Defender's Office, 321 East Second Street, Los Angeles, California 90012-4202; I am over the age of eighteen years; I am not a party to the above-entitled action; I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served a copy of the attached PETITION FOR WRIT OF HABEAS CORPUS on the following individual(s), addressed as follows, by:

[ ] Placing same in a sealed envelope for collection and interoffice delivery:

[ x ]Placing same in an envelope for hand-delivery and personally served:

[ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office:

[ ] Faxing same via facsimile machine:

*Via Hand Delivery*
OFFICE OF DEATH PENALTY LAW CLERKS
U.S. Courthouse, 8th Floor
312 North Spring Street
Los Angeles, CA  90012

This proof of service is executed at Los Angeles, California, on March 2, 2009.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

//s//Patricia Jacobson
PATRICIA JACOBSON